UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

KELLY PRICE

Index No.: _____

PLAINTIFF

-against-

DETECTIVE LINDA SIMMONS Individually,
and as an employee of the New York City Police
Department, MARIA STROHBEHN and
KENYA WELLS Individually,
and as an employee of the New York County
District Attorney's Office, THE CITY OF NEW YORK,
Audrey Moore, Larry Newman, Laura Higgens
nee Richendorfer, Christina Maloney, Cyrus Vance Jr.,
Audrey Moore as employees of the New York County
District Attorney's Office, Inspector Obe of the New
York City Police Department, in her capacity as an
employee of the New York City Police Department,
Rose Pierre-Louis in her capacity as the Commissioner
of Domestic Violence of the City of New York,

DEFENDANTS,

-------------------------------------------------------------------x

**COMPLAINT**

RECEIVED
JUL 24 2015
PRO SE OFFICE

Kelly Price
Pro Se
534 w 187th st. apt #7
New York, NY 10033

1

Plaintiff Kelly Price, Pro Se, alleges for the following:

1.  Plaintiff Kelly Price "PRICE" is an individual and resident of New York, and resides at 534 w 187th st #7, New York, New York 646 676 1940: graciegracie212@gmail.com.

2.  **PRELIMINARY STATEMENT/Introduction:** Plaintiff Price has been unable to receive a satisfactory response to her previous demands that she be restored to the status she enjoyed before her false arrest, unlawful imprisonment and defaming by defendants and that training, policies and procedures be set in place to evaluate domestic violence and trafficking victims' complaints and veracity on a comprehensive level especially when the abuser is a confidential informant or complainent working with the NYPD or DA's office(s) on other, unrelated cases.  Currently there are special procedures in place in the NYPD Patrol Handbook for handling DV complaints allegedly committed by an uniformed or ununiformed NYPD member.  These special procedures are indicative that the NYPD recognizes that people with access to law enforcement channels hold great sway over investigations and victims.  Why isn't there a separate process denoted for those who work tacitly as informants or complainants on major cases who receive special handling from precincts?

3.  **McKinney's Executive Law; Article 23, Fair Treatment Standards for Crime Victims is explicit in its mandate of procedures that must be followed when a victim reports trafficking or certain felony assaults.  As Plaintiff will demonstrate, NOT ONE of these procedures were followed when Plaintiff turned to the NYPD and the MDAO for assistance (Exhibit # 45).  Further training and re-iteration of these laws needs to be**

implemented within the NYPD and MDAO as Plaintiff is not the only trafficking victim in NYC to have been refused to be recognized (Exhibit # 46 ) by the NYPD and Criminal Justice Authorities as a trafficking victim.  According to the NY Penal Law 135.35 the crime of "Labor Trafficking" is committed: "if a person compels or induces another person to engage in labor, or recruits, entices, harbors, or transports such other person by…Using force or engaging in any scheme, plan or pattern to compel or induce such person to engage in or continue to engage in labor activity by means of instilling a fear in such person…" the protections outlined (Exhibit #s 46 & 47) ) by the various statutes of McKinney's such as receiving emergency social and medical services, to be notified of the availability of crime victim compensation, support programs, prompt return of property held for evidentiary purposes, to be protected from intimidation, to have one's case reported by the MDAO to the Director of the Office of Victims' Services, the right to be pre-certified and/or certified as a victim of human trafficking, and finally confirmation as a victim of human trafficking (McKinney's Social Services Law (483-aa-483 cc) (Exhibit # 45).

4. Plaintiff also seeks POLICY CHANGE for the way that Domestic Violence and Trafficking Survivors are treated within the criminal justice system when they come forward for help in extracting themselves from life-threatening intimate partner situations. A methodology and better training needs to be implemented for identifying true victims that is not subject to the whimsy of one lone prosecutor's bias(es). When a victim is thought to be a 'fabricator' a review of his/her case needs to be examined by Domestic Violence advocates, therapists, social workers, and psychiatrists before they are denied restraining orders, protections, police services, social welfare services, a normal quality of life free from harm, and their ability to petition the government for a redress of grievances.

5. This Lawsuit seeks to hold the defendants, CITY OF NEW YORK et al, liable for, but is not limited to misconduct under the federal civil rights statute, 42 U.S.C. 1983. The unlawful actions of police and prosecutors documented in this lawsuit resulted from affirmative or de facto municipal policies, practices and customs to violate the constitutional rights of domestic violence survivors, suspects, and defendants, or from deliberate indifference by policymaking officials, acting on behalf of the City of New York, to such violations. As Plaintiff will demonstrate.

6. **STATEMENT OF FACTS** The basis for this lawsuit and State and Federal jurisdictions are violations of the USC § et. seq., & Title United States Code § ("The CIVIL RIGHTS Act") of Price's CONSTITUTIONAL RIGHTS and various State Law against malicious prosecution, This is a civil action, pursuant to 42 U.S.C 1983, and state law, seeking monetary damages for Plaintiff, Kelly Price, due to her wrongful arrest, malicious prosecution, and denial of police services caused by the pervasive misconduct of the Manhattan District Attorney's Office ["MDAO"] and the New York City Police Department and POLICY CHAGE for the way victims of Domestic Violence and Trafficking Victims are evaluated by the NYPD and MDAO when they approach the "authorities" in the darkest, most desperate days of their lives.

7. **LEGAL ARGUMENT** Defendant's would have the court believe that they followed all proper protocols and procedures when handling her complaints and that PLAINTIFF was not a victim but a FABRICATOR of her own injuries undeserving of services and justice. These base conclusions were drawn by inexperienced and biased members of the MDAO and NYPD whom had much at stake in the evaluation of Plaintiff's complaints of abuse and trafficking against her batterer as he, Raheem Andre Powell, was acting as a complaintant himself in an attempted murder case against a party unaffiliated with PLAINTIFF and also provided information and acted as a confidential informant for the NYPD and the MDAO who assisted in the arrests of countless alleged "gang" members operating in Harlem where

Plaintiff resided at the time of the infractions against her person and her rights.  PLAINTIFF addresses, and endeavors in the space available to correct, these mischaracterizations of law and fact below, and thereby to demonstrate that defendants' lack of training and willful disregard to Plaintiff's rights as a victim should be recognized by the court and that procedures and policies be mandated for the handling of intimate partner victims by the City of New York.

**NATURE OF ACTION:**

8.  Plaintiff Kelly Price brings forth the following causes of action and alleges the following: Beginning in 2010 and into early 2011, Plaintiff was in contact with various members of the Criminal Justice community including Manhattan Family Court Judge Sattler, who issued an order of protection in November of 2010 (Exhibit #25 ) against Plaintiff's abuser, Raheem Andre Powell, ADA Maria Strohbehn, ADA Kenya Wells, Deputy DA Audrey Moore (indirectly through Strohbehn), Detective Linda Simmons and other members of the 28th precinct, NYPD, for assistance in her attempts to extricate herself from her batterer, Raheem Andre Powell.  Powell had abused Plaintiff physically, mentally, and economically. Instead of investigating Plaintiff's claims and assisting her Plaintiff was arrested and charged with hundreds of counts of aggravated harassment towards her batterer and one count of contempt of court resulting in Plaintiff's false arrest, malicious prosecution, unlawful Imprisonment, and defamation. Various abuses of process and Injurious Falsehoods were levied against her in violation of her civil rights Constitutionally protected under the 1st, 4th, 5th, 6th, 8th, 14th, and 16th Amendments from unreasonable search and seizure et al and violations of procedural due process and the New York Constitution.

9.  This lawsuit seeks to hold the defendant CITY OF NEW YORK liable for the above and below stated misconduct under the federal civil rights statute, 42 U.S.C. § 1983, and Monell v. Dept. Of Social Services, 436 U.S. 658 (1978) and under state law. The unlawful actions

of police detectives and prosecutors documented in this lawsuit resulted from affirmative or de facto municipal policies, practices and customs to violate the constitutional rights of criminal suspects and defendants involved in making Domestic Violence complaints, or from deliberate indifference by policy-making officials, acting on behalf of the City of New York, to such violations. As Plaintiff will demonstrate, both the NYPD and the MDAO, as a matter of policy, instructed and coerced witnesses to give false or unreliable testimony through their misuse of their powers of arrest and interrogation, unlawfully concealed exculpatory or impeachment evidence known as "Brady" material, and lied to or misled courts, defense attorneys, and criminal defendants in order to cover up their unlawful behavior.

10. The principal individual defendant, acting pursuant to unlawful municipal policy, who caused Plaintiffs unconstitutional arrest, prosecution, inflicted intentional emotional distress and orchestrated the defaming and slander of plaintiff, is the very (ret.) NYPD detective formerly assigned to the 28th precinct, Linda Simmons, who was tasked to investigate Plaintiff's complaints of abuse against her batterer, Raheem Andre Powell. Simmons' illegal behavior in Plaintiff's case included the following:

   a.   Testifying under oath in Judge Sattler's Family Court Part that she had investigate Plaintiff's allegations of Domestic Violence perpetrated against her person and that she had found them "not credible" (EXHIBIT 13 # March 24th and Feb 1 Family court transcripts) when in fact NO INVESTIGATION HAD TRANSPIRED.

   b.   In violation of various criminal statutes, directing the preparation and filing, with the MDAO, the NYPD, of official records she knew were false alleging that Plaintiff had fabricated her injuries sustained at the hands of Mr. Powell, and that her "fabrications" were a threat to Mr. Powell (Exhibit #s 4 &5 )

c.   Repeatedly making willfully false representations of "fact" in such statements

under oath to create a "factual" basis to obtain court orders of protection on

behalf of Mr. Powell securing Plaintiff's constriction of willful and free

movement by the court, to gain illegal custody of plaintiff, and to coerce plaintiff.

(See Exhibit 26 #s Family court orders after March 24th giving Powell the more

restrictive 100 yard protection and eliminating it from Plaintiff's OP therefore

making it illegal for Plaintiff to happen to be in any space in her neighborhood

where Powell would enter after including bodegas, parks where bbqs were held,

dog runs, coffee shops, drugstores etc.  It felt to Plaintiff in fact that often when

she would be in a public place in her neighborhood that Powell would appear

shortly thereafter forcing her to leave and to call public attention to the situation,

causing her social injury and personal anguish, insult, shame and injury.  This

happened numerous times in the period of March 24, 2011 through July 24, 2012

when all charges were dismissed and sealed against Plaintiff making the

restraining order a nullity.)

d.   Lying to prosecutors in the MDAO who were investigating Plaintiffs allegations

of abuse, by flatly denying various allegations had ever taken place even though

she herself had never investigated to facts of the abuse.   Simmons never walked

the 175 yards from the precinct to Plaintiff's Brownstone to question neighbors

about abuse:  she never viewed or reviewed photographs of Plaintiff's injuries:

never asked Plaintiff to sign HPPA forms for her various emergency room

admissions for injuries sustained at the hands of Powell: never examined text

messages Plaintiff had received from Powell detailing physical and other threats

against her person, name and reputations her would unveil if she reported his

abuse against her:  never reviewed the various receipts Plaintiff had been given

by various window and door repairmen who had been called to her home

repeatedly to fix her front door and windows which had been broken as Powell

would try to gain illegal entry to Plaintiff's garden-level brownstone apartment

when he would fly into fits of rage etc.

11. Equally importantly, Plaintiff seeks additional recovery against New York City for the

actions of Assistant District Attorneys Maria Strohbehn, Audrey Moore and Kenya Wells

for initiating Plaintiff's malicious prosecution based upon allegations in Criminal Court

complaint they **knew** were neither true nor false as they had not investigated the facts of

Plaintiff's abuse they had no factual basis to believe their allegations to be true.

12. Additionally Plaintiff was placed on a "NO SERVICES LIST" which prohibited her from

attaining police services of any kind because of the actions of the MDAO against her 1st, 5th,

8th, and 14th Amendment entitlements to Equal Protection under the Law, to Redress the

Government for Greivances, Due Process and from Unusual Punishment.  Many other New

Yorkers have been placed on this list and DENIED police services:  Plaintiff seeks the court

to correct this practice by the MDAO and NYPD of denying the citizenry of Gotham the

ability to make police reports, to receive equal protection under the law, due process, and to

be protected from unusual punishment.  In a December, 2014 New York Times Magazine

interview DA Vance states:

"By May 2010, Parker and Vance had roughed out the structure of the so-called Crime

Strategies Unit (C.S.U.). They divided Manhattan's 22 police precincts into five areas and

assigned a senior assistant D.A. and an analyst to map the crime in each area. C.S.U. staff

members met with patrol officers, detectives and Police Department field intelligence

officers. They asked police commanders to submit a list of each precinct's 25 worst

offenders — so-called crime drivers, **whose "incapacitation by the criminal-justice system would have a positive impact on the community's safety**." Seeded with these initial cases, the C.S.U. built a searchable database that now includes more than 9,000 chronic offenders, virtually all of whom have criminal records. A large percentage are recidivists who have been repeatedly convicted of grand larceny, one of the top index crimes in Manhattan, but the list also includes active gang members, people whom the D.A. considers "uncooperative witnesses," and a fluctuating number of violent "priority targets," (Exhibit # 48).

13. How many "uncooperative witnesses" and crime victims have been unwittingly placed on this list and denied services?  Plaintiff seeks the court to explore this unconstitutional process vis a vis discovery regarding exactly how and why one is put on such a list and to question if at all this is even a legal practice employed by the MDAO and NYPD and to stave its practice and further implementation.

14. The MDAO refused to investigate Plaintiff's claims of abuse.  Plaintiff received a phone call from DA Strohbehn on February 2, 2011.   Strohbehn informed Plaintiff that she had "less than an hour" to get downtown to her office regardless of the difficulty in travelling that day as the city had been blanketed by a blizzard the previous evening. When Plaintiff arrived at her office she instructed her to wait in the Safe Horizon office for over two hours.  When she greeted Price she withdrew her right hand as Plaintiff outstretched hers to as is common in professional and official circumstances to do.  She  led Plaintiff  brusquely down the hall of the 2nd floor where she and Det. Simmons and another Dt from the 28th pct pepper Plaintiff with questions about how Price came to own a car, how Price earned a living, and accuse Price of answering her phone earlier in the day "with a fake accent.'  They proceeded to call Plaintiff a liar and refuse to look at any material that proved Price was telling the truth.

ADA Strohbehn informed Price she was declining to prosecute Raheem, and informed her that if I make another report against RAHEEM that she will 'lock Price up and throw away the key." She also informed the 28th precinct that she will personally handle all of Price's "police service needs" and if Price have "a bullet-hole in her head that they are to call the Das office first to clear police services offered first before responding to any call from Price." She informs Price that she has already assisted Raheem in drawing up a Family Court petition to attain a counter restraining order against me in order to press counter-claims of harassment against Price. She further instructs Price that even though she haven't been served that Price am to show up in family court the next morning to respond to Raheem's charges. She tells Plaintiff that she will be charged with contempt of court if Price does not show up "as she as an officer of the court (NOTE FAMILY COURT-NOT Criminal COURT where Stohbehn has jurisdiction) was ordering Price to appear even though there was no time to serve Price with a subpoena (sic)." She tells Price her only concern is that "an innocent black man has been sitting in jail for 24 hours…" Price asked to speak with her supervisor to show her proof and have neighbors interviewed etc. and Ms. Strohbehn informs Price that "she already checked with her supervisor (Audrey Moore) and that she has been given carte blanche to deal with me with finality." Price is instead thrown out of her office. Plaintiff's landlord and others try to speak with Ms. Strohbehn to introduce investigatory evidence and she rebuffs them (please see attached letters from landlord, Adam Gargani, My neighbors Marilyn Benetatos et al about Ms. Strohbehn's and ADA Kenya Wells' refusal to investigate. Exhibit #a 3, 17 and 30 respectively.

15. This lawsuit also seeks to hold the City of New York accountable for the actions of attorneys at the Manhattan District Attorney's Office, Susan Roque, Patricia Bailey and Christina Maloney, for their misconduct, in an administrative capacity as Freedom of Information Law ("FOIL") officers, in covering up and withholding documents and information formally and

continually requested by Plaintiff that directly hold baring to these proceedings. The unlawful denial of Plaintiff's FOIA requests by the SAME employee of the MDAO who REPRESENTED the individual DA defendants in a previous complaint filed incorrectly in NY State Supreme Court prevented Plaintiff's receiving of items in her File unlawfully and with intentional and willful fraud, unethically, maliciously, and against the requirements of McKinney's that crime victims be able to request and receive a copy of their crime victim report.

16. Plaintiff, Kelly Price, is an intelligent and able individual who had built a career in photojournalism and would have continued to earn a substantial salary as an editor, but for the defendants' misconduct in causing her wrongful prosecution, and imprisonment. She seeks $30 million in actual damages, and $10 million in punitive damages, for the egregious misconduct that deprived her of the joys of bearing the child she miscarried, of family life, of her journalism career, emotional pain and suffering, defamation and of living as a free person.

17. JURISDICTION, VENUE, and CONDITIONS PRECEDENT

This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

18. On or about October 22, 2013 Plaintiff served upon Defendant City of New York a timely notice of the present claims pursuant to New York General Municipal Law § 50-e.

19. This action has been commenced within three years of the accrual of Plaintiffs causes of action.

20. Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

THE PARTIES

21. Plaintiff, Kelly Plaintiff, is a citizen and resident of the State of New York and of the United States, and resides within the City of New York in the Southern District of New York.

22. Defendant, CITY OF NEW YORK, of which the County of New York is a subdivision, is a municipal corporation of the State of New York.

23. Defendant, Linda Simmons, "Simmons" at all relevant times, was a Detective in the 28th precinct which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her individual and her official capacities.

24. Defendant, Maria Strohbehn, "Strohbehn" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage Of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her official capacities.

25. Defendant, Audrey Moore, "Moore" at all relevant times, was an assistan district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage Of the State of New York and the City of

New York, and acted within the scope of her employment. She is sued in her official capacities.

26. Defendant, Kenya Wells, "Wells" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his official capacities.

27. The Manhattan District Attorney's Office "MDAO" is an agency of the CITY OF NEW YORK. The District Attorney, and assistant district attorneys employed by the D.A.'s Office are agents and employees of the City of New York, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

28. Similarly, the New York City Police Department "NYPD" is an agency of the CITY OF NEW YORK. Detectives and police officers employed by the NYPD are agents and employees of the City of New York, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

29. Defendant, Christina Maloney, "Maloney" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his official capacities.

30. Defendant, Cyrus Vance Jr.,, "Vance" at all relevant times, was the district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New

York, and acted within the scope of his employment. He is sued in his official capacities.

31. Defendant, Larry Newman, "Newman" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his official capacities.

32. Defendant, Laura Higgens, nee Richendorfer "Higgens" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her official capacities.

33. Defendant, Police Inspector Obe, Commanding Officer of the 28th Precinct, "Obe" at all relevant times, was an Inspector at the 28th precinct which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her official capacities.

34. Defendant, Detective Galan, "Galan" at all relevant times, was a Detective in the 20th precinct which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued his official capacities.

35. Defendant Rose Pierre-Louis, "Pierre-Louis" at all relevant times, was the Commissioner of Domestic Violence at the Mayor's Office for the Prevention of Domestic Violence, NYC which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her individual and her official capacities.

ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

36. Powell had abused Plaintiff physically, mentally, and economically. Instead of investigating

Plaintiff's claims, following the mandates for crime and trafficking victims as is

MANDATED by McKinney's  and assisting her Plaintiff was arrested and charged with

hundreds of counts of aggravated harassment towards her batterer BASED ON THE

ASSUMPTION THAT SHE WAS FABRICATING HER ABUSE IN AN ATTEMPT TO

HAVE POWELL ARRESTED FOR SAID ALLEGED FABRICATED ABUSE. Plaintiff

was also charged with one count of contempt of court resulting in Plaintiff's false arrest,

malicious prosecution, unlawful Imprisonment, and defamation. Various abuses of process

and Injurious Falsehoods were levied against her in violation of her civil rights

Constitutionally protected under the 1st, 4th 5TH, 6TH, 8TH,  16TH and 14th Amendments from

unreasonable search and seizure, and violations of procedural due process and the New York

Constitution.

37. Plaintiff's  batterer (Raheem Andre Powell) enjoyed a privileged status with the MDAO and

NYPD as a result of several incidents:  he had assisted in helping the police previously and

warned her that she would be unable to find sympathetic ears regarding his violence.  More

recently Powell had been a complainant in an attempted murder case wherein his marijuana

distribution hideout was robbed in December of 2010 by an armed member of a central-

Harlem gang.  During that robbery Powell was shot at by the perpetrator as he chased him

up nearby Frederick Douglas Boulevard in front of the 28th precinct.   That young

robber/shooter was key in unraveling knowledge about the "Goodfellas" and "137th st" gang

in Central Harlem which were 'brought to justice' under fanfare and several public press

conferences by the district attorney's office.   Powell also had knowledge of other gang-

related (Crips/Bloods) activities that involved the murder of his cousin, Andre, in broad

daylight on the corner of 115th and Lenox in the Fall of 2010 among other pieces of information he on passed to the police. As ADA Strohbehn at the time was a junior member of an anti-gang task force in Harlem (See Exhibit # 18 Strohbehn Linked in Resume) **Plaintiff has a very hard time understanding why Strohbehn was allowed to be the only ADA to evaluate the veracity of her complaints when it was known that Plaintiff's Batterer was an active participant in one of ADA Strohbehen's investigations and clearly she would need to defend his credibility to assist in her *case-building (*self-promoting career-building too.) Strohbehn after 'cleaning up' Harlem as a Junior member of the anti-gang squad has been PROMOTED to now be the SENIOR LEADER on a similar squad centered in MIDTOWN (see Exhibit #18 Strohbehn linked-in resume). This apparent conflict of interest that exists between a crime victim and a crime perpetrator who also just so happens to be an informant or complaintant acting in a support capacity for the NYPD or MDAO needs to be properly supervised and trained. The inherent conflict of interest and its existence still in the MDAO proves a lack of PROPER supervision and training exists within the NYPD and MDAO as to how to ferret out the good complaints from the bad, to initiate a full and fair investigation into allegations, and to ensure oversight of decisions that make or break a prosecutor's case.**

38. October 11, 2010:  Raheem Powell attacks Plaintiff in street and beats her in the face and neck with his cellphone at the intersection of 118th and St. Nicholas Ave (NW corner.)  He beats her with his fists and cellphone and Police are called.  Police encourage Plaintiff to make a combined report of stolen license plates, car, and Domestic Abuse all none.  Plaintiff is not given copy of report.   Police take extensive photos of face, back and torso with bruises all over.  Officers instruct parking garage to not allow Powell to take my car out of garage.  Raheem bribes parking lot owner and takes car even though Police helped me

remove one license plate and park suv in front of car.

39. On or About October 14, 2010 Plaintiff was not ready to initiate a prosecution against her

   batterer, Raheem Andre Powell, as he had threatened her with blackmail and reminded

   Plaintiff that he had Police connections and would 'ruin Plaintiff' if she reported his battery

   to the police (Exhibit 12 # text message threats from Powell to Plaintiff).  Upon arriving at

   the 28th Precinct on or about the morning of October 14th, 2010 and informing the DV

   officers McNair and Diaz that she was choosing to not initiate prosecution against Powell

   for beating Plaintiff on 10/11/2010 that had been discussed on or about the evening of

   10/13/10 Plaintiff asked the DV officers to tear up the 61 report. The previous evening she

   had been told by the police that they would allow Plaintiff time overnight to think about if

   she wanted to follow through with the filing of the complaint against Powell.  Plaintiff was

   reticent to go forward with her claim against Powell for several reasons including that

   Powell was blackmailing (Exhibit  12# Text Message transcripts of blackmail threats by

   Powell to Plaintiff) Plaintiff by telling Plaintiff that he would release intimately personal

   photos and information about Plaintiff's trafficking  as she was being coerced into

   prostitution by Powell to her family and colleagues if she ever went to the police about the

   battery he unhanded to Plaintiff  (please refer to Exhibit #12, cell phone transcripts of

   messages sent to Plaintiff from Powell proving the blackmail and trafficking).  The DV

   officers had already elevated the report even though they had promised not to and it had

   been assigned to Detective Simmons.  Simmons, according to McKinney's Social Services

   Law 483-cc which states that "As soon as practicable after a first encounter with a person

   who reasonably appears to a law enforcement agency or district attorney's office to be a

   human trafficking victim, that agency or office shall notify the office of temporary and

   disability assistance and the division of criminal justice services…" (Exhibit # 49).  Instead

   of treating Plaintiff as a trafficking and Domestic Violence Victim Detective Simmons

utilized a regularily issued process of evaluating her complaint and used her complaint to

coerce her batterer to reveal confidential information that was relevant and productive for

the NYPD and MDAO's joint anti-gang, anti-gun effort nicknamed "Operation Crew Cut"

of which ADA Strohbehn was a member of.

40. INSTEAD of following appropriate protocols and reporting and investigative procedures as

outlined in the NYPD Handbook for evaluating DV and Trafficking victims (Exhibit # 50)

Strohbehn and Simmons labled her as a "fabricator" and refused any investigation into her

complaints against the stipulations of McKinney's which require a MANDATORY

investigation into ALL COMPLAINTS OF TRAFFICKING.

41. INSTEAD of performing the regularily issued processes as Mandated by the NYPD

Patrolmen's Handbook for Domestic Violence victims (Exhibit #s 50) Simmons agreed to

tear up Plaintiff's report against Powell only if she wrote out a statement saying Plaintiff had

made a false report and inflicted injuries on herself and only if Plaintiff agreed to move out

of the neighborhood.  Simmons recommended this course of action as it was "the easiest

way to make the situation go away." Simmons stated that she needed overtime hours that

day and as it was nearing the end of her shift and by booking Plaintiff that day for filing a

false police report she would get overtime hours.  Simmons told Plaintiff that as she had

never been arrested that she would only receive a Desk Appearance Ticket and that no one

would go to jail.  She also warned Plaintiff to keep her head down and that she should move

out of the neighborhood because from this point on "you're on your own."

42. The report that Plaintiff had made was for injuries inflicted on Plaintiff  in public on the

corner of 118th St. and St.  Nicholas Avenue.  The events were witnessed by people known

to Plaintiff and she knew that if her story was ever followed up on that the facts would come

out so Plaintiff agreed to Simmons' plan.  Simmons informed Plaintiff that this was the only

way she would not arrest Powell based on her complaint filed without her permission by the

DV officers.   Detective Simmons coached Plaintiff on how to retract her statement: asking

Plaintiff to rewrite a synopsis of events several times Plaintiffs each time asking Plaintiff to

write the time at the top of the page much earlier than the last so that Detective Simmons

"could receive overtime Plaintiff by catching the case with enough time to start to work it"

on or about 10/14/2010.  A record of Simmons' overtime request and payment is on file for

this day.  Simmons helps Plaintiff write simple statement saying Plaintiff caused bruises to

her own face because  she was in a fight with Powell and was mad etc.  Plaintiff is arrested

and given a desk appearance ticket for falsifying a police report.  DA declines to prosecute

when Plaintiff make court appearance the following month.


43. Night of November 11/12 2010: Raheem breaks into Plaintiff's house and is waiting for her

when she comes home.  When Plaintiff entered her home Raheem attacked her, stole her

money and choked her until she passed out on her living room floor. When she regained

consciousness she tried to run for the door and screamed for help.  At that point Raheem

tried to detain her and she was thrown/pushed through a 30 gallon fish-tank.  When Raheem

realized what he did he panicked and stepped in the glass to pull Plaintiff out of tank as

Plaintiff was sitting in glass and foul water.  He stepped on glass in his flip-flops and needed

to be treated months later in December or early January at St. Luke's for an infection he

suffered from a shard of glass lodged in his foot from that evening that had become

infected.

44. Neighbors all called police and they were pounding on Plaintiff's door: there must have been

30 officers in her house that night.  After much arguing with police (Raheem had

disappeared out the back door and the Police from the 28th pct. did not want to accompany

Plaintiff to Metropolitan Hospital which was much further away than nearby St. Luke's
Roosevelt) Plaintiff was taken to Metropolitan Hospital and treated.  The FDNY ambulance
workers (Valentin was one of them) remember the incident and commented on how
strangely the police were acting.  The doctor who treated Plaintiff can also comment on this
(dr. Albert Della Fave—ER Resident.)  Dr Della Fave got in a shouting match with
detectives from the 28th squad as they would not leave Plaintiff alone while he was prepping
her for surgery.

45. MANY neighbors heard Plaintiff screaming for her life and called police that night.  survey
911 calls and Medical Professionals who Treated Plaintiff:  FDNY Valentin: see copy of
FDNY ambulance report (EXHIBIT # 2) Dr. Albert Della Fave: Metropolitan Hospital ER
Resident: 212 423 6262 to attain a copy of DELLA FAVES INTERNAL DISPOSITION
describing events with police and Plaintiff's treatment beyond the scope of what is in her
medical records. (see EXHIBIT # 2 Hospital emergency Report).  Plaintiff tries to make a
new report at precinct two days later when she was able to walk again and was told to come
back when the DV officers are around.   She returns the next day and is told again to come
back the next day.  No report was ever taken of incident by NYPD despite Plaintiff's efforts
to do so.

46. November 17, 2010:  Plaintiff is beaten by Nancy Powell, Raheem's mother when she goes
to her house for help.  Face completely covered in blood and deep scratches from her fake
nails digging into Plaintiff's flesh.  Plaintiff has permanent facial scarring as a result. (See
Exhibit # 1 Photo of deep scratches on Plaintiff's face dated 11/17/2010)  Nancy Powell was
given an ACD (2010NY092185) which she violated by being re-arrested for marijuana
possession six months later but the Das never prosecuted her.)

**47.** November 22, 2010:  Plaintiff approaches the 28th precinct five days after attack by Nancy

Gaines, mother of Raheem Powell.  Police, noting extensive damage to Plaintiff's face allow

Plaintiff to make report against Nancy Powell however they refuse to take a report for events

that transpired on the evening of November 11 2010 where Raheem threw Plaintiff through

a fish tank and instead the precinct instructs Plaintiff to go to family court to attain a

restraining order against him which she does (Exhibit # 26) **THIS FAMILY COURT**

**RESTRAINING ORDER IS DE FACTO EVIDENCE THAT THE CITY OF NEW**

**YORK HAD An OBLIGATION TO LOOK AFTER PLAINTIFF's INTERESTS and**

**that the NYPD and MDAO had a SPECIAL RELATIONSHIP TO PLAINTIFF ergo**

**there is no veracity to the assertion that these criminal justice agencies had leave to**

**NOT protect Plaintiff.  As a general rule, a municipality may not be held liable for**

**injuries resulting from a simple failure to provide police protection.  To overcome this**

**general rule, plaintiff would need to demonstrate a special relationship or duty**

**between her and the municiple agent (See McLean v City of New York, 12 N.Y.3d 194,**

**199 (2009.) The restraining order issued by Judge Sattler is evidence of a special**

**relationship between plaintiff and the municipal agent City of New York see Mclean v**

**City of New York, 12 N.Y. 3d 194, 199 (2009.). It proves that the City of New York**

**made promises to Plaintiff and took actions that created an affirmative duty to act to**

**protect plaintiff and that Plaintiff justifiably relied on this promise.  Plaintiff took the**

**restraining order to police to serve and they tell Plaintiff to come back.  Plaintiff**

**returned a few days later with Family Court restraining order and the precinct**

**ostensibly refuses to act on it:  each day she walks the 175 yards from her home to the**

**28th pct and each time she is told to come back the next day when officers will be**

**available for service.  Officers are never available for service.  Desk Sargeant Agron at**

**the 28th Pct. openly mocks Plaintiff to her face each time she enters precinct.  Plaintiff**

**makes IAB complaint against Desk Sargent Agron.**

48. December 22nd, 2010:  Plaintiff is beaten, robbed, dragged into street after Raheem breaks into Plaintiff's house and steals her money and phones.  Multiple witnesses call 911 for help.  Precinct desk sergeant Agron tells Plaintiff when she goes to make report that he will arrest Plaintiff  for trespassing if she doesn't leave the precinct.  Agron Refuses to act or to serve restraining order even though Plaintiff has an active restraining order against Raheem.  He refuses to look at it let alone serve it.  Plaintiff calls 911 from inside precinct to report his conduct and the operator tell Plaintiff they can't do anything to help Plaintiff.  FOIA request has been made to DANY, NYPD and the Dept. of Technology for all records of 911 calls.

49. January 27th 2011: fight with Raheem.  Another fight. Plaintiff goes to precinct to make police report of incident and sergeant Agron again tells Plaintiff that the only thing he can do for Plaintiff is to "move Plaintiff to Nevada"  (implying that Plaintiff is a some kind of filthy degenerate prostitute unworthy of the NYPD's assistance.) (See texts from Powell EXHIBIT #12).)

50. January 28th 2011: Plaintiff makes appeal to detective Simmons to help Plaintiff.  Simmons agrees to help initially and insists Plaintiff make reports about 12/20 and 1/27 incidents to DV officers when they are in the next day.   Simmons agrees to help Plaintiff if she tells her everything she knows about Raheem's drug-dealing and his connections etc.  Plaintiff ask about signing a complaint for injuries dating from 11/11/2011 and Simmons tells Plaintiff "it's too late that the precinct will look bad."

51. January 29th 2011: Interviewed by DTs about Raheem's drug sales enterprise.  They never

ask Plaintiff to show them pictures, ER reports etc.  Detectives tell Plaintiff the only way they will help keep Raheem away from Plaintiff and to get her car back from Raheem is if she presses charges against Raheem.

52. January 30th 2011: DV officer McNair takes report of 12/20 incident and encourages Plaintiff to make report about 1/27 incident.   Plaintiff is leery b/c no one saw him harm Plaintiff on 1/27 but people did see him harm Plaintiff on 12/20.  Precinct tells Plaintiff that Raheem has been making reports against Plaintiff and that if she doesn't make report about 1/27 incident "decisions may be made that are not in her favor."  Plaintiff asks again to make a report about incident on 11/10 and is told that; ' too much time has passed' by Domestic Violence officers McNair and Diaz at the 28th pct.

53. On or about February 2, 2011, shortly after Plaintiff had filed a complaint against Powell with the 28th Precinct the Plaintiff was contacted by ADA Strohbehn and asked to rush to the DA's office.  The city had been blanketed by a snow blizzard the evening before and as Plaintiff was on 125th st at the time she told Strohbehn it would be virtually impossible for her to make it to Centre st in less than an hour.  Regardless Strohbehn commanded Plaintiff to appear under verbal threat of arrest herself.  When Plaintiff appeared she was placed in the Safe Horizon Waiting room in the 2nd floor of the Das office at 100 Centre st where she continued to wait for over 2.5 hours.  When Strohbehn appeared she refused to shake Plaintiff's hand in the waiting room upon introduction, ferociously holding her hands behind her back when Plaintiff greeted her with her right hand out-stretched as it customary.

54. Plaintiff was commanded to a small interrogation room/office where she was told upon arrival by Strohbehn that Powell would not be charged, that Plaintiff was believed to be a "fabricator" and a liar, and was refused opportunities to provide evidence proving her story.  ADA Strohbehn informed Plaintiff that if Plaintiff makes another report against POWELL

that she Strohbehn will "lock [her] up and throw away the key." Strohbehn informs Plaintiff "the only reason I'm not arresting you right now is because I did not instruct you to bring counsel with you when I commanded you to appear at my office today." Strohbehn also informed Plaintiff that she had informed the 28th precinct that she will personally handle all of Plaintiff's "police service needs" and if Plaintiff has "a bullet-hole in her [sic] head that the NYPD is to call Strohbehn first before responding to any call from Plaintiff." Strohbehn informs Plaintiff that she has already assisted Powell in drawing up a Family Court petition to attain a counter restraining order against Plaintiff in order to press counter-claims of harassment. Strohbehn further instructs Plaintiff that even though she hasn't been served that she is to show up in family court the next morning to respond to Powell's charges. She tells Plaintiff that she will be charged with contempt of court if she does not show up in court: "as [Strohbehn] as an officer of the court am ordering you [Plaintiff] to appear even though there is not time to serve [Plaintiff with] a subpoena (sic)." Strohbehn tells Plaintiff her only concern is that "an innocent black man has been sitting in jail for 24 hours…" Plaintiff asks to speak with Strohbehn's supervisor to show her proof of the abuse and have her neighbors interviewed etc. and Ms. Strohbehn informs Plaintiff that "she already checked with her supervisor (Deputy DA Audrey Moore) and that she [Strohbehn] has been given [by Moore] carte blanche to deal with Plaintiff with finality." Plaintiff begged for someone to review the photographs (Exhibit #1), hospital emergency room reports (Exhibit #2 ), receipts for broken windows and kicked-down doors or to speak with her neighbors who had heard and seen the constant battery. Strohbehn informs Plaintiff that she will "have to show her proof to the judge."

55. Plaintiff's landlord and others try to speak with Ms. Strohbehn to introduce investigatory evidence and she rebuffs him and hangs up the phone on him before receiving contacts for other tenants in Plaintiff's building who had provided information to Landlord of Plaintiff's

abuse at the hands of Powell (please see Exhibit 3 # letter from Landlord). Strohbehn's

actions were in retaliation for Plaintiff's exercise of her rights to petition the Court for

grievances and violated Plaintiff's 1st amendment rights and privileges under the US

Constitution also under 42 USC 1983. These acts Strohbehn took to act as private attorney

for Plaintiff's batterer by ordering a petition to be filed in Family Court on his behalf, and

stripping Plaintiff of her right to police services are not functional prosecutorial actions and

exercising them denied Plaintiff's rights under the 1st 4th and 14th Amendments under 42

USC 1983.

56. February 3rd:  Powell tries to accost Plaintiff on way out of family court.  ADA Maria

Strohbehn refuses to help Plaintiff file report about Raheem's violation of restraining order/

conduct on way out of court building.  Plaintiff makes report with Det. Mortimer Plaintiff at

5th precinct as courthouse is in this jurisdiction.  Months later dt. Mortimer informs Plaintiff

that he was told to not pursue an investigation of her complaint.

57. Early February 2011:  Neighbors tell Plaintiff that nude photos of Plaintiff have been texted

around to all the neighborhood boys.  Plaintiff calls precinct and Strohbhen and no one will

take report.  She then calls Detective Mortimer and he tells Plaintiff he can't do

anything.  Lt. LArocca from the 28th pct. encourages Plaintiff to make a report to the court

and to the dept. of Investigations as he informs Plaintiff that ADA Strohbhen has instructed

the pct. to not take any reports from Plaintiff. (Need to get in CONTACT LT LAROCCA he

has retired and rumored to be living in Florida it is impossible to track down retired NYPD.)

58. February 2011 Plaintiff makes formal complaint to NYC Mayor's office for the Prevention

of Domestic Violence about the lack of investigation into her allegations and collusion

between her batterer and MDAO. Strohbehn is taken off the case and is replaced by ADA

Wells.

59. February 2011 Plaintiff contacts Deputy ADA of Special Victims and Domestic Violence,

Larry Newman.  Newman informs Plaintiff that she will not be arrested and that often

"Police and Das disagree on cases and not to worry." Newman invites Plaintiff to his office

to provide evidence that her story is true. Plaintiff informs Newman that she will arrange for

a meeting when her lawyer returns from vacation. Two weeks later when Greenberg returns

to town Plaintiff calls Newman to set up meeting and he never responds.

60. February of 2011 Plaintiff makes formal complaint to Mayor's office: Strohbehn is taken

off case.

61. February 23 (cq)2011: Plaintiff receives a call from officer Diaz at DV office of 28th

precinct asking Plaintiff to "come in to tell them how things are going." Officer McNair

admits to Plaintiff that Raheem made claims of harassment against Plaintiff. He's surprised

to find out that Raheem and Plaintiff had been discussing her pregnancy via telephone. Diaz

Plaintiff she will be arrested even though at time of conversation Plaintiff had no restraining

order against her and Powell had one prohibiting him from talking to her.

62. February 24, 2011: Plaintiff travels to 28th Precinct to discuss matter with Lt. LaRocca.

LaRocca rips up Powell's complaint against her in front of Plaintiff, informs Plaintiff that "a

war between upstairs (detective squad) and downstairs (patrol officers)is taking place in the

precinct" over her case. LaRocca again informs Plaintiff that the DAs office has instructed

precinct NOT to take any complaints filed by Plaintiff and that her only recourse is to

contact the Department of Investigations and to make a complaint.

63. March 11, 2011 Assistants from Plaintiff's Family Court Lawyer's office communicate with

28th Precinct seeking assistance in delivering restraining order issued by Judge Sattler on

November 22, 2010. Precinct acts strangely: inquires as to Plaintiff's whereabouts. (See

Exhibit 42 # detailed inventory of legal services provided from Atty Ed Greenberg)

64. March 16, 2010 Attorney Ed Greenberg faxes Dt. Flowers at 28th pct demanding an answer

to his question if he needs to surrender his client for any reason to the 28th pct. (Exhibit #13:

Statements on the court record ref his discussions of surrendering Plaintiff for arrest before

family court hearing  with detectives from 28th pct).  Later that afternoon via telephone

conversation Dt. Flowers inquires as to Plaintiff's whereabouts and denies any charges have

been filed/will be filed against her and assures Greenberg that he does not need to surrender

his client to the precinct. (See Exhibit #13 Greenberg statements on court record regarding

communiques to 28th precinct and Exhibit #42 Itemized communication between Greenberg

and Precinct noting conversation with Dt. Flowers.)


65. On or about late February or early March 2011 Plaintiff miscarried a child she was carrying

fathered by Powell.


66. On March 24, 2011 Plaintiff is arrested in front of Judge Sattler in Family Court as she tries

to have a restraining order extended against Powell by various detectives from the 28th

precinct inside the Family Courthouse and then handed over to Detective Flowers of the

28th precinct. Plaintiff is charged with hundreds of counts of aggravated harassment against

Powell (Exhibit #4).   THE STATUTE USED TO PROSECUTE PLAINTIFF IS FOUND

TO BE AN UNCONSTITUTIONAL LIMITATION OF 1ST AMENDMENT RIGHTS AND

IS STRUCK DOWN BY THE NY State Appelant Court (Exhibit #) Plaintiff's OP is

restricted and Powell's is given precedance barring Plaintiff from spacial proximity to

Powell but not vice-versa (Exhibit 25 & 26).  Technically every time Plaintiff entered her

home she was in violation of Powell's OP granted this day by Sattler as a direct result of

Detective Simmons' false testimony provided under oath as Powell lived next door

unofficially in a studio he illegally sublet and ran his drug-distribution from.


67. On March 24th, 2011 Detective Simmons PERJURED HERSELF IN COURT when she

was called in front of Judge Sattler in Family Court and asked if she had investigated

Plaintiff's claims of abuse and if they were credible. Simmons replied "no" (Exhibit #13 )

even though she had not questioned Plaintiff about her emergency room visits, reviewed

photos of injuries taken by her neighbors, or interviewed her building super, landlord or

neighbors about the ongoing abuse.

Judge Sattler:…Detectives investigated the stories?

Detective Simmons: Yes

Judge Sattler: And they don't find her story to be credible?

Detective Simmons: No.


68.  After Simmons answered that she did not believe Plaintiff's allegations even though she had

not investigated them whatsoever, Judge Sattler allowed four officers from the precinct to

cuff Plaintiff in the Family Court House on Lafayette St in her courtroom and transport

Plaintiff back to the 28th precinct for booking and further criminal processing..

DETECTIVE SIMMONS HAD NEVER INVESTIGATED PLAINTIFF'S

ALLEGATIONS OF ABUSE  & SHE PERJURED HERSELF IN OPEN COURT.

Detective Simmons NEVER followed the NYPD Handbook procedures for a DV

investigation and or McKinney's Laws for evaluating and protecting trafficking victims.

THESE STATEMENTS CAUSED INJURY TO PLAINTIFF NOT ONLY IN THE EYES

OF THE COURT BUT IN THE EYES OF THE DA AND THE NYPD.  In November of

2011 Plaintiff filed IAB complaint # 11-55009  against detective Simmons about her

perjuring herself under oath in front of Family Court Judge and failing to investigate

Plaintiff's abuse claims (see court transcript Exhibit #13).  This was logged by detective

Rogers on 11/29/2011.  It was marked unsubstantiated by Lt. Franqui.  No one called

Plaintiff or followed up with Plaintiff.  The Office of the NYPD Inspector General is now

investigating (Exhibit #40).

It is long-held that state agents, including Police Officers, receive immunity when testifying in court. Detective Simmons had not even asked Plaintiff to sign HPPA forms releasing her ER reports which according to the NYPD handbook is a crucial step of ANY domestic violence investigation. This and other affidavits prove detective Simmons willfully lied to the court with RECKLESS DISREGARD & DELIBERATE INDIFFERENCE for Plaintiff's rights and thus satisfies the standard applicable to violations of Plaintiff's Constitutional DUE PROCESS rights. What is at issue is can the city be held liable for the consequent wrongs unhanded to Plaintiff because of this lie. SCOTUS just refused to hear a case on this very issue citing: "police's obligation to disclose highly exculpatory evidence to the prosecutors...is widely recognized" upholding a 9th circuit ruling

"A jury determined the officers had demonstrated deliberate indifference or reckless disregard for Walker's rights or for the truth, and had withheld or concealed evidence that strongly indicated Walker's innocence, the 9th Circuit said..."A police officer's continuing obligation to disclose highly exculpatory evidence to the prosecutors to whom they report is widely recognized,"

69. Later that evening as Plaintiff is being arraigned the ADA standing in the court part, Ms. Zeinreich, eagerly tells Judge she is filing and expedited count sheet and requesting for a restraining order against Plaintiff and filing a family registry. These statements are made before any member of the Das office investigated any of Plaintiff's allegations. NO one asked Plaintiff to sign HPPA forms, to review photographs or for numbers of neighbors that could confirm her allegations.

70. Spring 2011:  Plaintiff miscarries her child.  It is a long, drawn-out miscarriage that is painful and protracted.

71. On or about May 8, 2011, Plaintiff is arrested again and taken to Rikers Island on the charge of Contempt of Court (Exhibit #5) by Detective Samuel Fontanez, shield #00311 of the 28th Detective Squad. Plaintiff overall served between eight to ten days incarcerated in the tombs

and on Rikers Island. While incarcerated Plaintiff was attacked by other inmates and had her belongings stolen by the guards. When Plaintiff was released on bail she had to travel home to Harlem via subway and bus barefoot as her shoes had been stolen by the guards at Rikers (Exhibit # 6). She also contracts a sinus infection that disables her hearing in her right ear for over six months. Her asthma and breathing disentegrate and Plaintiff is sent to infirmary for medical treatment and assessment of prescriptions for sinus/ear infection and pain.

72. May/June 2011:  Jumped by women's shelter dwellers at 233 W. 120th st. who do drugs with Raheem's cousins across the street three times.  Police called:  they refuse to help.

73. Have "Queen for a Day Meeting with Lawyer Kartagener and members of the Das office (Kenya Wells and Larry Newman.) See Exhibit # 11 Queen for a Day Debriefing agreement).  Price hands over cell phones that are NEVER returned despite promises that they will be at the commencement of current litigation against client.  Several of Plaintiff's attorney's reach out to MDAO requesting phones returned as is customary and all requests are denied.

74. June 2011:  St. Luke's & Roosevelt Hospital's Crime Victims' Center makes call to liasons @ Das office asking for review of case.  Agreements had been made between DV community and Prosecutors' offices for a procedure of review to take place when a defendant is identified by advocates to be a true victim not recognized by the court.  The calls for the review of case fall on deaf ears.  Calls were made to:Christine Quinn Yureni Sanchez, Constituent Liasion.

75. Detective Simmons, ADA Strohbehn, Deputy District Attorney Moore, and ADA Kenya Wells never investigated Plaintiff's claims of trafficking and abuse at the hands of Powell before charging her with hundreds of crimes against Powell against the tenents of

McKinney's and the NYPD Patrol Handbook. They failed to interview her landlord and

neighbors (and even lied about this); never looked at or compared photos of Plaintiff's

severe injuries to hospital emergency room reports; never requested that Plaintiff sign HPPA

forms releasing medical records, refused to collect/accept other evidence such as 911 calls,

receipts for repair work for broken windows or doors that had been kicked down that proves

that regular battery had taken place against Plaintiff by Powell. They accused Plaintiff of

fabrication without knowing or seeking to examine the facts and then initiated an elongated,

over-zealous, malicious and incorrectly charged case against her .

76. The criminal statute for Aggravated Harassment (ruled unconstitutional) requires counts to

be charged "per incident" which was not the done in this case. Instead, defendants

WILLFULLY AND WITH MALICE initiated a Criminal prosecution of Plaintiff which was

based on the manufactured, unfounded, and false belief that she was a fabricator and had

self-inflicted her injuries. No one bothered to interview the medical personnel who had

treated Plaintiff for her injuries regardless of the requirements of McKinney's and of the

NYPD Patrol Handbook.  Plaintiff's batterer was walking free: everyone in her community

was looking at her in strange ways and distancing themselves from her. Others openly

confronted her with violence in her neighborhood. She was assaulted by various people who

had known her batterer for decades who had heard swirling rumors fueled from the actions

of the 28th precinct. For two years the pallor of serious criminal charges hung over Plaintiff:

the threat of incarceration for potentially hundreds of years and the complete alteration of

the life she had built for herself hung in the balance. Plaintiff refused to take a plea that

admitted any sort of guilt for crimes of any kind against Powell. She was the one who had

gone to the police for help in the first place after suffering countless attacks on her person at

his hands. Powell's favorite method of abuse was to choke Plaintiff. He would watch her

suffer and struggle and panic as she fell into a stupor from lack of oxygen. Now Plaintiff

watched in court as Powell used the "Justice System" to literally choke the life out of everything Plaintiff had in the world.

77. Plaintiff to date despite repeated requests has not received her bail of $2000.00 back (Exhibit # 8).

78. When Plaintiff was subsequently assaulted by various parties associated or not with her ex-intimate partner in her neighborhood and attempted to file complaints to the NYPD she was informed that the Manhattan DAs office had instructed the precinct involved not to take her complaint or to not follow-through on any investigation of her allegations. This happened on numerous occasions notably: 7/6/3/2013, 5/17/13, 10/17/12, 07/27/12: (incident #2012-020-2969), 7/14/12, 4/17/12, 1/20/12, 12/1/11, 8/13/11, 8/4/11, 8/2/11. Refusing/failing to investigate are violations of Plaintiff's 14th amendment rights to equal protection under the law and 8th amendment rights to due process. Plaintiff has incident IDs, emergency room reports and ambulance records and eyewitness statements for most of these incidences.

79. 8/2/11:  Plaintiff is assaulted (punched in the face and chest when Plaintiff went outside of her Brownstone at 237 w 120th st to check her mailbox at the top of her brownstone steps) in front of her home by neighbors associated with the cousin of her ex intimate partner and batterer, Raheem Andre Powell.   Plaintiff called 911.  And p.o. Cooley shield # 14327 responded and told Plaintiff she was not allowed to receive police services, that the pct. had been informed by the DAs office that she  was 'crazy' and that even if he took an incident report  nothing would come of it.  Plaintiff called 911 around 1230 pm.  Cooley and his partner arrived at 1250 pm.  Plaintiff followed up the next day to get incident ID# and was ignored and never received a call back from a detective investigating the assault or from the clerk in the 28 pct. who assigns the ID #.  Eventually in 2012 Lt. LaRocca looked up the incident and provided and ID# to Plaintiff.

80. 8/11/11:  Told by associates of her intimate partner and batterer, Raheem Andre Powell, who

were exiting 239 w 120th next to her brownstone where Raheem operated his drug

distribution in apt #2 upstairs on the second floor in the back of the building (overlooking

her backyard and bedroom window) that 'YOU  would be taken care of' and that YOU

should fear for Your life.  Plaintiff immediately Called 911 to report death threats around

330pm.  P.O. Bonaparte (did not provide shield #) responded with partner around 400pm

and took incident report.  No one followed up with Plaintiff.  She followed up and received a

complaint number from lt. larocca who looked it up for Plaintiff;  complaint # 2011-28-

003732.  No one ever followed up with Plaintiff about these threats or arrested the

perps.  They continued to threaten and intimidate Plaintiff each time  Plaintiff encountered

them for the next two years saying; 'no one cares about you at the precinct;  no one gives a

shit if anything happens to you Kelly…'


81. 8/16/11:  Plaintiff is Assaulted by associate of RAP on her way home from store and

punched in the face.  After Plaintiff called 911 an ambulance arrived and treated Plaintiff,

police took report and told her that they were told not to extend Police services to Plaintiff.

No one  ever followed up.  See photos of busted face taken by FDNY ambulance workers

(Exhibit # 1 photos dated 8/16/11)


82. 8/31 9/1 2011:  Plaintiff is harassed by associates of RAP.  PO EBRIGHT PO RAMAN and

PO Ehlers respond and tell Plaintiff she  should move out of neighborhood, they harass

Plaintiff about associating with 'these people in this neighborhood' and refuse to take

complaint. PO Ebright tells Plaintiff he hopes he responds to one of her complaints one day

and 'finds Plaintiff lying on the sidewalk in front of her brownstone with a knife in her

back.'

83. 9/1/2011.  Plaintiff Filed complaint vs  Officers Bright, Ebright and Raman as well as

    Sergeant Agron  for incident on 8/31. IAB complaint # 11-39869 PO EBRIGHT PO

    RAMAN and PO Ehlers].  This complaint was marked by the 28 precinct as unsubstantiated

    by an officer on unknown rank named Lopez.  When they arrived on scene and Ebright said

    to Plaintiff;  "Miss Plaintiff I hope someday  I am called to your home and you are lying

    dead on the sidewalk with a knife in you…"

84. IAB Complaint # # 11-31923 was marked "unsubstantiated" by lt. Rentas and 11-43253 was

    closed by a 28 squad investigator and closed by lt. laburda:  678 1608.  No one ever

    contacted Plaintiff to interview Plaintiff regarding these complaints. (AN INVESTIGATION

    HAS NOW BEEN OPENED BY THE OIG NYPD SEE EXHIBIT # 40 ).

85. 9/24/11 In the wake of the ten-year anniversary of the tragedy of 9/11 the city erupted with

    violent clashes between Occupy Wall Street protestors and the NYPD. The whole of the city

    was on edge. Plaintiff had called police after being man-handled by an over-zealous man in

    a bar and been humiliated by the officers who arrived. After the officers refused to take

    report Plaintiff walked away and said "Ya'll should go fuck yourselves you don't help

    anyone." Plaintiff did not scream this at the top of her lungs: she said it as she turned to walk

    away with despair and tears rolling down her face and was apprehended forcefully from

    behind causing bruises to my entire body.(Exhibit # 10 Injuries sustained from Police

    beating Officer Winters of Midtown South)

86. Plaintiff's injuries were sustained as she was tackled from behind by the police that evening,

    hog-tied and dragged to a police cruiser (please refer to photographs provided in exhibit #1)

    and ambulance workers were called to the 14th precinct to examine Plaintiff. Plaintiff had

    called 911 and then ended up black and blue. Plaintiff's lawyer spent months trying to

subpoena all relevant video and audio material. When the tape finally appeared it had been

tampered with omitting the exchange outside the midtown bar where Plaintiff beseeched

officers to taker her 61 report and they summarily dismissed her. Eventually when the full

un-edited tapes arrived in court months later the officers all lied and said that Plaintiff had

screamed at the top of my lungs "Fuck you" even though the video does not show this nor

did the officers report this in their CCRB interviews or make any notation of it in their

logbooks(Exhibit#19 CCRB audiotapes and Exhibit # 20 officer logbooks).

87. On or about October, 2011, Price's cellular phone company, Metro PCS informs Price that

her phone line is being tracked by law enforcement in violation of her state and federal right

to privacy.

88. On October 25, 2011 Plaintiff attempted to file a DIR report with the 28th precinct about a

violation of a restraining order Powell had committed on 10/21/11 against an order of

protection issued by Judge Sattler (Docket #0–00763-11, File # 1685, order #2011-1195

issued on 9/29/11 expiring on 3/29/12.) Plaintiff was refused the opportunity to make a

report of the violation on the date of occurrence.  Plaintiff went back on subsequent days in

an attempt to file the report and Captain Williams, the CO of the 28th precinct, instructed his

DV officers to take the report.  The DV officer who took the report eventually (id # 939468)

ripped up the report and refused to process it (Exhibit # 14 copy of report ripped up by DV

officers).  When following up the next week on the status of the DIR Plaintiff was told it

was missing and that she was not invited back into the precinct to refile it.  Plaintiff was

accompanied on 12/01/11 by representatives from the St. Luke's Roosevelt Hospital Crime

Victims Center back to the precinct to refile a new DIR (Exhibit # 15.)  The DIR was

accepted by the SGT (id # 933944).   At that time Plaintiff received an apology from the

new DV SGT about the missing DIR and she  provided a copy of the missing DIR to the

SGT. The new DIR was assigned to Detective Ransom of the 28th squad who did not

follow-up on any investigation regarding the complaint.   In fact sgt Ransom engaged in a

game of telephone cat and mouse with Plaintiff and Powell was never arrested, investigated

or questioned about his offense against the court order.

89. October 2011 Plaintiff filed IAB complaint # 11-49386  against 28 pct. DV officers

Rosendary and Simmons WHO THREW AWAY her 61 when Plaintiff complained that

Powell was violating the terms of her  restraining order against him. (exhibits 14 & 15)

complaint c1-1-667494377.  This complaint was referred back to the precinct for

investigation by the manager of the officers, the SGT also marked the complaint as

UNSUBSTANTIATED.  The matter is currently under investigation by the OIG NYPD.

90. 1/20/12  Plaintiff is attacked by woman named INA  near Plaintiff's brownstone.  This

woman has known Plaintiff's batterer since he was a child, is a known street walker,

crack/cocaine addict and has had her youngest daughter, Sarde, removed from her by

children's services.  She encountered Plaintiff as she was walking to the store and began

yelling at Plaintiff about how she loved watching people attack and harass Plaintiff

whenever she left her home.  Plaintiff replied that she was a crack whore who couldn't even

take care of her own children, that often Plaintiff had to care for 'Dee-Dee" (short for Sarde)

often when she was too cracked out to help her own daughter with her home or when she fell

off her bike and needed bandaging and love.   Ina became enraged and smacked Plaintiff in

the face with a closed fist resulting in Plaintiff's front right tooth becoming dislodged and

landing on the sidewalk.  As blood spurted from Plaintiff's face and she searched the

sidewalk for her missing tooth Ina picked up a long wooden leg from an old table that still

had large protruding nails at the top of it where it had once been attached to the table

top.  She began to run at Plaintiff with this weapon and the only person on the sidewalk who

interfered was the neighborhood UPS guy, Danny, who jumped off his truck and tackled

INA so she would not club Plaintiff . Plaintiff then waved- down a passing NYPD cruiser. IT was a Manhattan north lt. and his assistant who took Plaintiff's details and said they would on pass her complaint to the 28 but that Plaintiff should also call 911 which Plaintiff did. The complaint was assigned to Dt. Fontanez who followed up once with Plaintiff asking who Plaintiff's assailant was. Plaintiff gave her first name and address to Fontanez and he mentioned he couldn't make an arrest based on that. Plaintiff called Fontanez multiple times reminding him that the statute of limitations on assault is two years and he told Plaintiff that he couldn't do anything because his hands were "tied."

91. 4/17/12 Plaintiff is attacked in front of home again. Police Called: inform plaintiff no services are available to her from NYPD.

92. 7/14/12, Plaintiff is attacked in front of 200 St. Nicholas Ave., around the corner from her home on way home from store. Hair grabbed and slammed over and over onto pavement by associates of RAP. Knee damaged bruises all over. Plaintiff called 911 around 200 am in the morning and P.O. Johns and partner responded, told Plaintiff they wouldn't do anything to help. PLAINTIFF insisted it is HER constitutional right to make a 61 report and that it is illegal for the police to refuse to take a report. They gave Plaintiff an incident slip marked 'harassment around 230 a.m. No one ever called or came by her brownstone to investigate or follow up. Plaintiff attempted to get an ID number for her complaint and DT Larocca located the complaint number.

93. On July 24, 2012, all charges (docket #s 20075-2011 and 20111-2011) are ordered dismissed and sealed by Judge Tandra Dawson in the I-DV Part of New York Supreme Court (Exhibit #7). Plaintiff was never given an explanation as to why or even permitted to stand in front of the judge and add something onto the record after being forced to stand at

the same table as those usually accused of beating their intimate partners in court. She was

pulled aside by one of Judge Dawson's clerks and told that the charges would be dismissed

and told to leave the courtroom.

94. 7/25-7/25 2012 (Late night/early morning on the 25th) Incident at Soldier McGee's Bar.  See

Exhibit # 1 photos dated on or about 7/28/12.  In this case the man who attacked Plaintiff

(incident #2012-020-2969), was let go by the 20th precinct and he continued to stalk, flash,

and trespass and terrorize other women in town. The same man who attacked Plaintiff on

7/28/12 went on to continue to terrorize women in NYC.)

| Case # | Defendant | Summons # | Appearance Date | Court | Judge | Part |
|---|---|---|---|---|---|---|
| 2013NY031505 | Baly, Rami | | 08/07/2013 | New York Criminal Court | | A |
| 2013NY049135 | Baly, Rami | | 08/07/2013 | New York Criminal Court | | A |
| 2013CN000347 | Baly, Rami H | | 08/02/2013 | New York Criminal Court | | |

95. Mr. Baly went on to assault, stalk, masturbate on, and trespass against several other women

in town after he was not punished for his acts against Plaintiff. Instead, Mr. Baly was set free

by the 20th pct.'s Detective Galan to purport other crimes on the public:  he was arrested in

November of 2012 for lewd acts on an Amtrak train, arrested in March of 2013 for

trespassing and stalking, again in May, again in June and again in July of 2013.  The system

itself aided and abetted Mr. Baly in his crime spree against other women in the City of New

York.  Mr. Wells needed to win against Plaintiff: a colleague of his sat on a case against a

man who should have been arrested and penalized for his behavior as well as under

psychiatric care.

96. Over a year later charges were subsequently brought against the man, Rami Baly, OVER A YEAR LATER AFTER HE HAD ATTACKED FIVE OTHER WOMEN IN NYC (New York Criminal Court case #s 2013NY031505, 2013NY049135, and 2013CN000347) the same man who attacked Plaintiff on 7/28/12. All other crimes Mr. Baly was charged with occurred after Baly attacked Plaintiff and was allowed to walk without arrest for his crimes against plaintiff when he was re-arrested in August of 2012 (case # 2012NY067321). Baly proceeded on a crime spree against women that ran from the fall of 2012 to the summer of 2013. On numerous occasions the detectives and the other ranking members (Lt. Carbone) of the 20th precinct informed and her advocates from Saint Luke's Roosevelt Hospital's Crime Victims Center that the reason that Mr. Baly had not been arrested was that he could not be located. Mr. Baly had paid with a credit card that evening at Soldier McGee's bar and the DAs office refused to request a subpoena from the court to attain his billing information so that he could be apprehended.

97. **When Mr. Baly returned to the bar on or about August 25ᵗʰ of 2012 approximately a month after assaulting Plaintiff staff members alerted the 20th precinct and he was apprehended.  When he was approached by officers in the bar he acted disorderly, allegedly fought with officers and resisted arrest.  He was arrested (case # 2012NY067321) and released and given "time-served" but not charged with the assault against Plaintiff on July 28, 2012. The detective assigned to the case, Galan, pretended Baly could not be located even though this was not the case.  He had been arrested already and not charged with the crime against me but was charged with acting disorderly and resisting arrest when NYPD approached him to question him.** Plaintiff pushed the case and her advocate, Kerri Toner, from the St. Luke's Roosevelt Crime Victims Center /Connect NYC inquired as to why no photo lineup had been done after the assault and nor any follow-up was made to trace Mr. Baly after he was let go as per

procedure outlined in the NYPD Patrol handbook (citation needed).

98. Ms. Toner was told that the case was being pursued and Baly could not be located and she made notes to this effect in her log (Amicus Brief to follow.) It was not until after Mr. Baly had committed other predatory crimes against other women that Baly was arrested for his assault against PLAINTIFF which was almost a year after his crime! Baly was arrested on 4/24/13 NINE MONTHS AFTER he assaulted Plaintiff when he appeared in criminal court to answer charges of criminal trespass (PL 140.01(a)), public lewdness PL 245.00), and public exposure of a person (PL 245.01). He had been arrested for these NEW CRIMES against ANOTHER WOMAN by the 1st Precinct's Officer Jessica Valle on 4/21/13 for crimes he committed against Kristyn Abbale (see Exhibit # 51). A prosecution of Baly for his crime against Plaintiff was initiated on paper, never investigated by Das office (See Exhibit # 41 Statement from Soldier McGee's Bartender stating he was NEVER contacted by ADA HIGGENS) but later dropped. The DAs office told the judge presiding over the case that they couldn't locate Plaintiff to testify and the case 30-30'd. The bartender who witnessed events the night of the attack and when the man returned to the bar weeks later was never interviewed by police. ADA Laura. Higgins who was assigned to prosecute the case informed Plaintiff that her allegations were too difficult to prove. Plaintiff has subsequently made a request to Judge McGrath to UNSEAL the case file so that ADA Higgens' lies on the court record can be revealed.

99. The detective assigned to the case, Galan, pretended Baly could not be located even though this was not the case and was a blatant lie and covered up for the fact that Detective Galan had not executed an investigation into Plaintiff's complaint of assault as per the mandates of the NYPD Police handbook. Plaintiff pushed the case and her advocates from the St. Luke's Roosevelt Crime Victims Center inquired as to why no photo lineup had been done after the

assault and no follow-up was made to trace Mr. Baly after he was let go.  The advocate was

told that the case was being pursued and Baly could not be located and she made notes to

this effect in her log. It was not until after Mr. Baly had committed other predatory crimes

against other women that  prosecution of Baly for his crimes  against Plaintiff was initiated

but later dropped.  The DAs office told the judge presiding over the case that they couldn't

locate PLAINTIFF to testify and the case 30-30'd.  The bartender who witnessed events the

night of the attack and when the man returned to the bar weeks later was never interviewed

by police.


100.    10/17/12: Plaintiff is Convicted of Disorderly conduct for actions on 9/24/11 when

Plaintiff called for Police assistance because she had been assaulted in a midtown bar. The

conviction revolved around ADA Wells' LIE about the tone of Plaintiff's voice.  He

coached the cops to say that Plaintiff screamed at the top of her lungs at a level TEN (being

the  loudest a human voice can possibly make according to Wells).  Never had the cops

made this statement before to any interviewer of the CCRB or in their log books (See

Exhibit #s 19 & 20 & 21 CCRB audio Interiews and logbooks).  The reason Mr. Wells had

to coach the cops to LIE is this is the only way he could win the case. This is why he didn't

want the video tapes introduced into evidence.  He did not want to have to suborn perjury

but was forced to do so to win the case and tried everything in his power to avoid this.

There simply is no other explanation for his reticence in presenting the tapes to court.


101.    Plaintiff was convicted of TWO counts of disorderly conduct as one was for allegedly

screaming and one was for making an obscene gesture but never in court did anyone

mention that she made an obscene gesture in their logs, in their CCRB interviews or at Trial.

Instead it was merely just bivouacked onto the other charge without any lip-service

whatsoever.

102.   Mr. Wells started his statements at trial by alleging to the judge that Plaintiff is a
"fabricator" and that she had hundreds of criminal charges of Domestic Violence filed
against her because of this false fact.  He was so hell-bent on making Plaintiff appear to be a
lying fabricator that he asked his colleague, ADA Bernard, to decline to prosecute another
man (Mr. Baly see above) who had hit Plaintiff outside of a bar on July 28, 2012 shortly
before Plaintiff's trial date for disorderly conduct on the evening of September 24, 2011 on
the night of the Occupy Wall Street Protests that threw the City into mahem.  That man,
Rami Baly went on to assault, stalk, masturbate on, and trespass against several other
women in town BECAUSE HE WAS not punished for his acts against Plaintiff.   **Mr.
Wells couldn't have Plaintiff appear as an innocent defendant in the same courthouse
at the same time he was trying to paint her as a crazy fabricator to win a disorderly
conduct conviction.  So Mr. Baly was set free instead to punch NYPD officers (he was
arrested a month later for assaulting an officer, arrested in November of 2012 for lewd
acts on an Amtrak train, arrested in March of 2013 for trespassing and stalking, again
in May, again in June and again in July of 2013.  Conveniently Mr. Wells aided and
abetted Mr. Baly in his crime spree against other women in the City of New York by
tricking his fellow colleague into declining to prosecute Mr. Baly so that he could paint
me as ugly as possible on a fresh courtroom canvas. (See Exhibit # 43 Letter to MDAO
Conviction Interity Unit and Letter to Chief of Staff, MDAO Jeffrey Schlanger Exhibit
# 43.)**

103.   10/18/12  While walking home from the subway during a nightly adjournment of trial for
Disorderly Conduct on 125th street and passing 200 St. Nicholas Ave Plaintiff was attacked
by a man named Willy who sells Heroin on the stoop of that building and is an associate of
RAP.  He jumped Plaintiff as she was passing his stoop and threw Plaintiff onto the ground
causing substantial damage to her right knee (see photos Exhibit #1 photos dated 10/17/12

). Plaintiff went to the emergency room and has reports and follow-ups from her orthopedic

surgeon stating that she needs knee surgery as a result of attack (Exhibit #23). P.O. Longo

responded (shield # 31565) and said they were instructed by desk sergeant not to take

Plaintiff's report.  Plaintiff insisted and they said they would turn in a notation to the desk

sergeant about the incident.  Plaintiff called the desk sergeant and complained  No one ever

called Plaintiff to follow up on this assault. complaint # 2012-28-005194.  The first police

who responded to my call said;  'aren't you the crazy one we are not supposed to take

reports from?"  P.O.sLongo and Walker eventually followed up after Plaintiff called 911 and

complained about the first officers on scene.  P.O. Walker sympathetically stated to Plaintiff

that the District Attorney's office had instructed the precinct not to respond to any of her

calls.  This was Witnessed by Plaintiff's neighbor, Elizabeth Walker, who is a graduate of

Harvard University, Colombia Law School and a PLAINTIFF MEMBER OF THE NEW

YORK BAR ASSOCIATION.  WALKER PRESSED WILLIAM'S AND LONGO TO

TAKE her COMPLAINT, reminded them that it is illegal to deny a person police

services.  Williams commented that the precinct had been instructed by the District

Attorney's office to not respond to any calls Plaintiff made AND THEY took Plaintiff's

information and told Plaintiff nothing would be done eventually.  (See Exhibit # 30 Letter

from Elizabeth Walker.)

104.    On the night of 6/2/2013-6/3/2013 while en route home from the Amsterdam Ale house

on 76th and Amsterdam where Plaintiff had dinner with a friend she instructed the cab

driver to follow a certain route and he refused.  She asked him to stop his cab so she could

get out and instead he locked the doors and sped up.  He carried on like this for a number of

blocks while Plaintiff screamed at him to stop the cab and let Plaintiff out.  Plaintiff called

911 from the back of the cab and when we stopped at a red light nearby police from the 28th

pct. were called over.  Officer Officer was one of these officers and he announced to his

partner that Plaintiff was not to be given police services or assisted in any way and that he

refused to take a report from Plaintiff.  Plaintiff called 911 and reported this

incident.  Surprise; it was never followed up on.

105.    6/2013; while in route to the subway past precinct from her home Detectives from the 28

squad opened their windows overlooking my path up St. Nicholas to the 125th St. subway

station and 'MOOed' at Plaintiff as if she were a cow.  Plaintiff called the precinct and

complained to the CO and his assistant immediately.


106.    July 2013; while walking her dog near home Plaintiff is given a jaywalking (Exhibit # 9

Jaywalking Summons) ticket on the corner of 120th and St. Nicholas (Plaintiff has

eyewitnesses that will testify that she did not jaywalk) even though she wasn't

jaywalking.  28th pct. cops were rude and condescending.  She fought the ticket in court and

won (docket # 2013SN053520).

107.    October 14, 2014: 28th Precinct blocks Plaintiff from commenting on 28th Pct. NYPD

public Twitter account effectively stripping her of her right to redress the government for

grievances and denying her her rights to free speech (See Exhibit # 44 311 Complaint Letter

forwarded to IAB detailing 28th PCT's blocking Plaintiff on Twitter for tweeting about the

poor Domestic Violence assistance rate within that precinct in opposition to the City of New

York's  formal Social Media Policy which only permits users to be blocked by public

officials if they are abusive (Exhibit # 47).

108.    In June of 2013 Plaintiff was en route to the train passing the 28th precinct and the

detectives yelled out her name from the second-story squad window and then proceeded to

MOO at her as if she were a Cow. Other times the cruisers pass Plaintiff on the street and

make sucking sounds at her (insinuating sexual acts with their crude verbosity

109.    The DAs office has continued their posture that Plaintiff is not worthy of police services

even after charges have been dismissed against her in violation of her Constitutional

Right(s) to Equal Protection under the law and Due Process. Plaintiff can provide incident

IDs that were never followed up on, hospital reports, proof that officers refused to even take a report, or Jaywalking tickets issued to Plaintiff (Exhibit #9) for the latter date when officers from the 28th pct. engaged in outright harassment of Plaintiff (Docket Number 2013SN053520 was dismissed on 8/27/2013). The police have been instructed not to assist Plaintiff or to prosecute those who do harm to her.

110.    Plaintiff provided phones with blackmail messages from Powell to the DAs office on June 24, 2011 during a "Queen for a Day" meeting. At the conclusion of Plaintiff's prosecution when the charges were dismissed and sealed Plaintiff made multiple requests for her property back and was refused by Wells. Plaintiff maintains that the DAs office has unlawfully held her property and demands the court to order its return to her as per the stipulations of the "Queen for the day" agreement between Larry Newman, Deputy of the Manhattan District Attorney Office's SVU unit and Plaintiff's criminal defense lawyer Stephen Kartagener. All of Plaintiff's attorneys including Kartagener, Benjamin Dell and Tajuana Johnson have demanded a return of the materials to Plaintiff as the case has concluded. Plaintiff made an inquiry to Wells' supervisor in the Trial Bureau, Minton Sabor, for the return of her property and was again refused. This is a violation to Ms. Plaintiff's right to privacy and from unlawful search and seizure. Sensitive, intimate, nude of Plaintiff that Powell texted to Plaintiff that he intended to blackmail her with are included among the media on the phones and the District Attorney's office has no right to keep these materials. McKinney's Laws specifically state that: "Law enforcement agencies and Das attorneys shall promptly return property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial..." (McKinney's 642-3 Criteria for Fair Treatment Standards.) (Exhibit #45)


111.    June 2014 ADA Maloney in DIRECT CONFLICT OF INTEREST WITH HER ETHICAL OBLIGATIONS AND VOWS takes on the role of acting as FOIL officer in

response to Plaintiff's FOIA request for all information in her MDAO files (Exhibits 44a-44d). As Maloney is the attorney representing individuals named in lawsuit how possibly could she fulfill her legal obligation to provide Plaintiff with materials she is legally and lawfully entitled to that would also implicate her colleagues in Plaintiff's lawsuit? Who allowed this mewling ingénue to take on the responsibility of being the same FOIL officer to respond to Plaintiff's request. It does not bode well that the MDAO blatantly ignores conflict of interests such as this and that anyone in the MDAO, especially Maloney's supervisors Patricia Bailey and Susan Roque would allow this misdeed and clear violation of ethics and legal standards to take place. Ms. Maloney is daughter of the very congresswoman who wrote the FOIA legislation prohibiting denials of requests based on "Pending Litigation" that is not criminal in nature (See Exhibit #s 44a- 44d FOIA request, denial, appeal and follow up.)

112.   March 2014, Plaintiff is denied entry into the Manhattan Family Justice Center by Hannah Pennington, the Director of the FJC. Pennington cites Plaintiff's lawsuit against the MDAO as reason for said denial of services as "several people named on Plaintiff's complaint work jointly in the MDAO and in the FJC." Plaintiff is denied psychiatric counselling, group therapy sessions with her contemporary DV survivors, access to wellness resources, access to Housing Relocation services, access to special case workers from the Human Rescources Administration who assist in benefit case management, access to a legal team to assist Plaintiff with her MANY legal needs to stave eviction and to assist in attaining Identification, bank accounts and small credit instruments offered to clients of the FJC (See Exhibit # 45 letter documenting denial of services/equal protection under the law from the Family Justice Center).

113.   On or about July 2, 2015 Plaintiff was assaulted in a restaurant within the confines of the Midtown North Precinct and was again denied the ability to make a complaint. She was instead taken to the Bellevue Psych ward in handcuffs for evaluation. As Plaintiff's mental

history record is familiar to Bellevue Hospital (Plaintiff is treated at Bellevue's James B.

Zadroga 9/11 Survivor's clinic on a regular basis) all of Plaintiff's psych files were reviewed

and after a ten minute conversation with the doctors at the ward Plaintiff was determined to

not be crazy and released from the Psych Ward.

114.  **FIRST CAUSE OF ACTION**
      **(Malicious Prosecution Under Federal Law; All Defendants)**

**Plaintiff repeats and realleges each and every allegation contained in ¶1 through**

**¶121 of this Complaint. By virtue of the foregoing, the Individual Defendants, acting**

**in concert with each other and with additional persons for whose acts they are**

**liable, initiated, continued, and/or caused the initiation or continuation of, criminal**

**proceedings against Plaintiff.**

**The criminal proceedings terminated in Plaintiffs favor. There was no probable**

**cause for the commencement or the continuation of the criminal proceedings. The**

**Defendants acted with actual malice. Defendant City of New York is liable under the**

**principle of** respondeat superior.

115.  **SECOND CAUSE OF ACTION**
      **(Intentional Infliction of Emotional Distress Under Federal Law; All Defendants)**

**Plaintiff repeats and realleges each and every allegation contained in contained in ¶1**

**through ¶121 of this Complaint. of this Complaint. Defendants engaged in a**

**continuous pattern of extreme and outrageous conduct directed at Plaintiff.**

**Defendants engaged in that pattern of conduct with an intention to cause, or in**

**reckless disregard of the substantial probability that it would cause, Plaintiff severe**

**emotional** distress.  Specifically, defendants, individually, in concert with, conspiring

with, and/or aiding and abetting one another and other persons for whose acts they are

47

liable, while acting in an investigative or administrative capacity, coerced witnesses into

making false statements to be used against Plaintiff, created false official records to be

used against Plaintiff, initiated or caused the initiation and continuation of false and

unfounded criminal charges against Plaintiff while lacking probable cause to do so,

abused judicial process in order to gain unlawful custody of and to coerce witnesses to

make false statements against Plaintiff and commit perjury, and repeatedly and

continually lied to and defrauded every court. Plaintiff suffered severe emotional distress

as a result of, and that was proximately caused by, the Defendants' aforementioned

actions.  By virtue of the foregoing, Plaintiff suffered the actual damages identified in

Defendant City of New York is liable under the principle of respondeat superior.


116.   **THIRD CAUSE OF ACTION**
       **(Abuse of Process Under Federal Law; Defendants: and City of New York)**

Plaintiff repeats and realleges each and every allegation contained in **contained in ¶1**

**through ¶121** of this Complaint. Defendants, individually, in concert with, conspiring

with, and/or aiding andabetting one another and other persons for whose acts they are

liable, employed regularly issued the Orders of Protection obtained by Mr. Powell in

Judge Sattler's Family Court Part were obtained through the use of false representations

of fact at the urging of the NYPD and the MDAO that set the criminal proceedings in

motion against Plaintiff.  Defendants used such process in a perverted manner to obtain a

collateral objective outside the legitimate ends of the process used, namely, to gain

unlawful, coercive custody of Plaintiff in order to intimidate her into dropping her

complaints against Mr. Powell and also to provoke Mr. Powell into giving false

statements  which the Defendants knew, believed, and intended would later be used in

court against Plaintiff at her criminal trial, and which were so used to continue the

criminal proceedings. Defendants did so with an intent to do harm to Plaintiff, with actual

malice, and

without excuse or justification.  By virtue of the foregoing, Plaintiff was caused the actual

and special damages identified  paragraphs 1-000 Defendant City of New York is liable

under the principle of respondeat superior.

117.   **FOURTH CAUSE OF ACTION**
       **(Actual and Constructive Fraud Under Federal Law; Defendants**
       **Simmons, and City of New York)**
       Plaintiff repeats and realleges each and every allegation contained in **¶1 through ¶121**

of this Complaint. Defendants made representations of material "fact" which were false,

and known to be false by Defendants, for the purpose of inducing other parties, including

Plaintiff, to rely upon such false representations, and the other parties did so rely, in

ignorance of the falsity of such representations, thereby causing Plaintiffs injuries alleged

in paragraphs 1-000. Specifically, Defendants made, caused to be made, acted in concert

or conspired to make, and/or aided or abetted one another to make, representations as to

material facts which were false, and known to be false by Defendants, to wit, the

representations by WELLS in his sworn Criminal Court complaint set forth in~ 00-00

supra, the false affirmations and affidavits of Wells submitted to the court, see paragraphs

00-00 above The aforementioned statements, made by the Defendants personally and/or

at their direction, were known by them to be false or misleading or were made with

deliberate indifference to their truth or falsity or to their misleading nature. The

statements were made by Defendants (or at their direction) for the purpose of inducing

other parties, including various courts, Defendants' supervisors, and/or Plaintiff, to rely

upon such false representations, and such parties rightfully did so rely, in ignorance of the

falsity of such representations, and to Plaintiffs detriment. The Defendants employed by

the MDAO had a fiduciary, confidential, and special relationship with and duty to

Plaintiff, arising out of their special status under the law as officers of the court, the

absolute deference and trust that courts give to their factual representations concerning

the possession or control by the MDAO of Brady material, their strict legal duty under the Constitution and the laws of the United States and the State of New York to fully and accurately disclose such material, and Plaintiffs entitlement to rely upon the accuracy and the completeness of such disclosures, to make accurate and complete disclosures so that Plaintiff would not be misled as to the existence or non-existence of such materials and whether to file legal actions for redress of violations of her constitutional rights. Plaintiff was entitled to rely, and foreseeably did rely, upon defendants to faithfully carry out their aforementioned duties and on defendants' factual representations. Defendants' aforementioned conduct caused or perpetuated the Plaintiffs injuries and damages as alleged in~ 00, supra, by knowingly, willfully, intentionally, recklessly, and/or negligently depriving her, or delaying her acquisition, of information to which she was legally entitled and by causing her to believe that such information did not or might not exist, and, as a result, by denying her unlawfully her rights to FOIA materials. Defendant City of New York is liable under the principle of respondent superior.

118.   **FIFTH CAUSE OF ACTION**

**(Negligent Misrepresentation Under Federal Law; Defendants , and City of New York)**
Plaintiff repeats and realleges each and every allegation contained in **contained in ¶1 through ¶121** of this Complaint. Defendants had a duty, as a result of their special relationship with Plaintiff, to give Plaintiff and others correct information. Defendants made false representations to the court and others that Defendants should have known were incorrect, including, but not limited to, the false representations that the Plaintiff's claims of abuse were not credible. Defendants' false representations were made for the purpose of inducing other parties, including Family Court and NY Supreme Court Judges, other prosecutors, and various State and Federal courts, to rely upon such false representations. Defendants knew that the information supplied in their representations was desired by Plaintiff, and others, for a serious purpose, specifically, to resolve the question of whether or

not Plaintiff had suffered abuse at the hands of Mr. Powell.  Plaintiff and others, including

other prosecutors, and various State and Federal courts, intended to rely and act upon

Defendants' representations, and did in fact reasonably rely on those representations, in

ignorance of the falsity of such representations. Defendants' aforementioned conduct caused

or perpetuated Plaintiffs injuries as alleged in paragraphs 1-000, supra, by causing the

wrongful continuation of her criminal trial. conviction, her imprisonment, and her related

damages, by causing her to incur substantial legal fees, by depriving her of the employment

income she would have been able to earn had she not been prosecuted and imprisoned, and by

depriving her, or delaying his acquisition, of information favorable to her defense to which

she was entitled under the Constitutions and the laws of the State of New York and of the

United States and which was necessary for her to successfully prove that she had been a

victim of domestic violence at the hands of Powell.


119.   **SIXTH CAUSE OF ACTION (42 U.S.C. §1983; Denial Of Due Process Under the**

**Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution and Deprivation of**

**Liberty Under the Fourth and Fourteenth Amendments; (Defendants: )** Plaintiff repeats

and realleges each and every allegation contained **contained in ¶1 through ¶121 of this**

**complaint** as if fully set forth herein. Defendants  Simmons knowingly and willfully

manufactured, or caused the manufacturing of, a false written statement, which they

prepared and improperly compelled or induced Plaintiff o sign under "oath," accusing

Plaintiff of fabricating her own injuries. They knew that the statement would, and caused the

statement to, be relied upon by the MDAO and the court as a basis to arrest Plaintiff, to

formally initiate her prosecution, to hold her for trial, and to compel Powell to submit

affidavits, and to give testimony consistent with her statement. Wells thereafter knowingly

swore to a false Criminal Court complaint initiating the criminal prosecution of Plaintiff, and

causing Plaintiff to be held in Rikers Island and in the tombs at 100 Centre Street. Malicious

Prosecution: Defendants filed hundreds of counts of aggravated harassment against Plaintiff against the allotments stipulated by the statute for aggravated harassment. Additionally, prior to trial, Simmons manufactured false "threat" evidence by filing a false police complaint alleging that Plaintiff was responsible for numerous threats against Raheem Powell: in fact Plaintiff's assertions that she would turn Powell into the NYPD for his physical attacks on her were themselves seen through some perverted law-enforcement spectrum as threats by Plaintiff to Powell by the NYPD and the MDAO: they were used in the actual false filing as such which caused injuries to Plaintiff, as set forth above. See~~ 000 and 000  By virtue of the foregoing, Simmons and Strohbehn and Wells, with actual malice, initiated and continued, or caused the initiation and continuation of, criminal proceedings against Plaintiff for which they knew, or should have known, there was no probable cause, and for which

In fact there was no probable cause, and thereby caused Plaintiff to be deprived of her liberty. Such proceedings ultimately were terminated in Plaintiffs favor. Additionally, Simmons and Strohbehn knew, but withheld from the MDAO, either permanently or for a substantial period of time, and therefore from the court and the defense, exculpatory or impeachment evidence that tended to negate Plaintiffs guilt and which they knew or should have known the law required them to timely disclose (such as Plaintiff's Batterers PREVIOUS FELONY CONVICTION FOR DOMESTIC VIOLENCE by the MDAO). This evidence included, but was not limited to, Hospital Emergency Room reports, statements from Plaintiff's neighbors and ER doctors; Photographs of Plaintiff's injuries incurred at the hands of Powell; the fact that Powell was a drug dealer who had acted in concert with the NYPD on more than one previous occasion; and their unreasonable failure to investigate the information provided to them by Plaintiff and Plaintiff's attorney and advocates from various Domestic violence advocacy groups. The aforesaid conduct, which Defendants committed in concert with and in aid of each other, and/or in concert