Exhibit #45



State
Constitutional and Statutory Victims' Rights
**New York**

NATIONAL CRIME VICTIM LAW INSTITUTE    310 SW 4th Ave., Suite 540, Portland, OR 97204

# NEW YORK VICTIMS' RIGHTS LAWS[1]

## Constitution

*New York does not have a victims' rights amendment to its constitution.*

**McKinney's Executive Law; Article 23, Fair Treatment Standards for Crime Victims**

### § 640 – Fair Treatment Standards for Crime Victims

1. The commissioner of the division of criminal justice services, in consultation with the director of the office of victim services and other appropriate officials, shall promulgate standards for the treatment of the innocent victims of crime by the agencies which comprise the criminal justice system of the state.

2. For the purposes of this article the term "criminal justice" shall include juvenile justice and the objectives and criteria set forth in sections six hundred forty-one and six hundred forty-two of this article shall apply to presentment agencies as defined in subdivision twelve of section 301.2 of the family court act.

### § 641 – Objectives of Fair Treatment Standards

The object of such fair treatment standards shall be to:

1. Ensure that crime victims routinely receive emergency social and medical services as soon as possible and are given information pursuant to section six hundred twenty-five-a of this chapter on the following:

    (a) availability of crime victim compensation;

    (b) availability of appropriate public or private programs that provide counseling, treatment or support for crime victims, including but not limited to the following: rape crisis centers, victim/witness assistance programs, elderly victim services, victim assistance hotlines and domestic violence shelters;

    (c) the role of the victims in the criminal justice process, including what they can expect from the system as well as what the system expects from them; and

    (d) stages in the criminal justice process of significance to a crime victim, and the manner in which information about such stages can be obtained.

---

[1] Not intended to be exhaustive.

2.  Ensure routine notification of a victim or witness as to steps that law enforcement officers or district attorneys can take to protect victims and witnesses from intimidation.

3.  Ensure notification of victims, witnesses, relatives of those victims and witnesses who are minors, and relatives of homicide victims, if such persons provide the appropriate official with a current address and telephone number, either by phone or by mail, if possible, of judicial proceedings relating to their case, including:

    (a) the arrest of an accused;

    (b) the initial appearance of an accused before a judicial officer;

    (c) the release of an accused pending judicial proceedings; and

    (d) proceedings in the prosecution of the accused including entry of a plea of guilty, trial, sentencing, but prior to sentencing specific information shall be provided regarding the right to seek restitution and reparation, and where a term of imprisonment is imposed, specific information shall be provided regarding maximum and minimum terms of such imprisonment.

## § 642 – Criteria for Fair Treatment Standards

Such fair treatment standards shall provide that:

1.  The victim of a violent felony offense, a felony involving physical injury to the victim, a felony involving property loss or damage in excess of two hundred fifty dollars, a felony involving attempted or threatened physical injury or property loss or damage in excess of two hundred fifty dollars or a felony involving larceny against the person shall, unless he or she refuses or is unable to cooperate or his or her whereabouts are unknown, be consulted by the district attorney in order to obtain the views of the victim regarding disposition of the criminal case by dismissal, plea of guilty or trial. In such a case in which the victim is a minor child, or in the case of a homicide, the district attorney shall, unless the family refuses or is unable to cooperate or his, her or their whereabouts are unknown, consult for such purpose with the family of the victim. In addition, the district attorney shall, unless he or she (or, in the case in which the victim is a minor child or a victim of homicide, his or her family) refuses or is unable to cooperate or his, her or their whereabouts are unknown, consult and obtain the views of the victim or family of the victim, as appropriate, concerning the release of the defendant in the victim's case pending judicial proceedings upon an indictment, and concerning the availability of sentencing alternatives such as community supervision and restitution from the defendant. The failure of the district attorney to so obtain the views of the victim or family of the victim shall not be cause for delaying the proceedings against the defendant nor shall it affect the validity of a conviction, judgment or order.

2.  The victims and other prosecution witnesses shall, where possible, be provided, when awaiting court appearances, a secure waiting area that is separate from all other witnesses.

2-a. (a) All police departments, as that term is defined in subdivision a of section eight

hundred thirty-seven-c of this chapter, district attorneys' offices and presentment agencies, as that term is defined in subdivision twelve of section 301.2 of the family court act, shall provide a private setting for interviewing victims of a crime defined in article one hundred thirty or section 255.25, 255.26, or 255.27 of the penal law. For purposes of this subdivision, "private setting" shall mean an enclosed room from which the occupants are not visible or otherwise identifiable, and whose conversations cannot be heard, from outside such room. Only (i) those persons directly and immediately related to the interviewing of a particular victim, (ii) the victim, (iii) a social worker, rape crisis counselor, psychologist or other professional providing emotional support to the victim, unless the victim objects to the presence of such person and requests the exclusion of such person from the interview, and (iv) where appropriate, the parent or parents of the victim, if requested by the victim, shall be present during the interview of the victim.

(b) All police departments, as that term is defined in subdivision a of section eight hundred thirty-seven-c of this chapter, shall provide victims of a crime defined in article one hundred thirty of the penal law with the name, address, and telephone of the nearest rape crisis center in writing.

3. Law enforcement agencies and district attorneys shall promptly return property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial.

4. The victim or witness who so requests shall be assisted by law enforcement agencies and district attorneys in informing employers that the need for victim and witness cooperation in the prosecution of the case may necessitate absence of that victim or witness from work. In addition, a victim or witness who, as a direct result of a crime or of cooperation with law enforcement agencies or the district attorney in the investigation or prosecution of a crime is unable to meet obligations to a creditor, creditors or others should be assisted by such agencies or the district attorney in providing to such creditor, creditors or others accurate information about the circumstances of the crime, including the nature of any loss or injury suffered by the victim, or about the victim's or witness' cooperation, where appropriate.

5. Victim assistance education and training, with special consideration to be given to victims of domestic violence, sex offense victims, elderly victims, child victims, and the families of homicide victims, shall be given to persons taking courses at state law enforcement training facilities and by district attorneys so that victims may be promptly, properly and completely assisted.

### § 642a – Fair Treatment of Child Victims as Witnesses

To the extent permitted by law, criminal justice agencies, crime victim-related agencies, social services agencies and the courts shall comply with the following guidelines in their treatment of child victims:

1. To minimize the number of times a child victim is called upon to recite the events of the case and to foster a feeling of trust and confidence in the child victim, whenever practicable and where one exists, a multi-disciplinary team as established pursuant to

subdivision six of section four hundred twenty-three of the social services law and/or a child advocacy center shall be used for the investigation and prosecution of child abuse cases involving abuse of a child, as described in paragraph (i), (ii) or (iii) of subdivision (e) of section one thousand twelve of the family court act, sexual abuse of a child or the death of a child.

2. Whenever practicable, the same prosecutor should handle all aspects of a case involving an alleged child victim.

3. To minimize the time during which a child victim must endure the stress of his involvement in the proceedings, the court should take appropriate action to ensure a speedy trial in all proceedings involving an alleged child victim. In ruling on any motion or request for a delay or continuance of a proceeding involving an alleged child victim, the court should consider and give weight to any potential adverse impact the delay or continuance may have on the well-being of the child.

4. The judge presiding should be sensitive to the psychological and emotional stress a child witness may undergo when testifying.

5. In accordance with the provisions of article sixty-five of the criminal procedure law, when appropriate, a child witness as defined in subdivision one of section 65.00 of such law should be permitted to testify via live, two-way closed-circuit television.

6. In accordance with the provisions of section 190.32 of the criminal procedure law, a person supportive of the "child witness" or "special witness" as defined in such section should be permitted to be present and accessible to a child witness at all times during his testimony, although the person supportive of the child witness should not be permitted to influence the child's testimony.

7. A child witness should be permitted in the discretion of the court to use anatomically correct dolls and drawings during his testimony.

## § 643 – Fair Treatment Standards for Crime Victims; Agencies Generally

1. As used in this section, "crime victim-related agency" means any agency of state government which provides services to or deals directly with crime victims, including (a) the office of children and family services, the office for the aging, the division of veterans affairs, and correctional alternatives the division of parole, office of victim services the department of motor vehicles, the office of vocational rehabilitation, the workers' compensation board, the department of health, the division of criminal justice services, the office of mental health, every transportation authority and the division of state police, and (b) any other agency so designated by the governor within ninety days of the effective date of this section.

2. Each crime victim-related agency shall review its practices, procedures, services, regulations and laws to determine the adequacy and appropriateness of its services with respect to crime victims, including victims with special needs, particularly the elderly, disabled or victims of child abuse, domestic violence or sex-related offenses. Such review

shall include reasonable opportunity for public comment and consultation with crime victims or their representatives, and may include public hearings.

3. After the review, and not later than one hundred eighty days after the effective date of this section, each crime victim-related agency shall submit a report to the governor and the legislature, setting forth the findings of the review including a description of the services provided by the agency and recommendations for changes in its practices, procedures, services, regulations and laws to improve its services to crime victims and to establish and implement fair treatment standards for crime victims.

4. Subject to the direction of the governor, and to the extent practicable, each crime victim-related agency shall expeditiously implement the recommendations of its report.

## § 644 – Implementation

The commissioner of the division of criminal justice services and the director of the office of victim services shall assist criminal justice agencies in implementing the guidelines promulgated by the commissioner.

## § 645 – Fair Treatment Standards for Crime Victims in the Courts

The chief administrator of the courts, in consultation with the commissioner of the division of criminal justice services, the director of the office of victim services and other appropriate officials, shall promulgate standards for the treatment of the innocent victims of crime by the unified court system. These standards shall conform to and be consistent with the regulations promulgated pursuant to section six hundred forty of this article.

## § 646 – Police Reports

1. A victim of crime shall be entitled, regardless of physical injury, without charge to a copy of a police report of the crime.

2. An individual whose identity was assumed or whose personal identifying information, as defined in section 190.77 of the penal law, was used in violation of section 190.78, 190.79 or 190.80 of the penal law, or any person who has suffered a financial loss as a direct result of the acts of a defendant in violation of section 190.78, 190.79, 190.80, 190.82 or 190.83 of the penal law, who has learned or reasonably suspects that his or her personal identifying information has been unlawfully used by another, may make a complaint to the local law enforcement agency of the county in which any part of the offense took place regardless of whether the defendant was actually present in such county, or in the county in which the person who suffered financial loss resided at the time of the commission of the offense, or in the county where the person whose personal identification information was used in the commission of the offense resided at the time of the commission of the offense as provided in paragraph (l) of subdivision four of section 20.40 of the criminal procedure law. Said local law enforcement agency shall take a police report of the matter and provide the complainant with a copy of such report free of charge.

## § 646 – Objectives

The object of these fair treatment standards shall be to:

1. Ensure that crime victims are given information on the following:

   (a) the role of the victims in the criminal justice process, including what they can expect from the system as well as what the system expects from them;

   (b) stages in the criminal justice process of significance to a crime victim, and the manner in which information about such stages can be obtained; and

   (c) how the court can address the needs of the victims at sentencing.

2. Ensure routine notification of a victim or witness as to steps that the court can take to protect victims and witnesses from intimidation, including the issuance of orders of protection and temporary orders of protection.

3. Ensure notification of victims, witnesses, relatives of those victims and witnesses who are minors, and relatives of homicide victims, if such persons provide the appropriate court official with a current address and telephone number, either by phone or by mail, if possible, of judicial proceedings relating to their case, including:

   (a) the initial appearance of an accused before a judicial officer;

   (b) the release of an accused pending judicial proceedings;

   (c) proceedings in the prosecution of the accused, including entry of a plea of guilty, trial, sentencing, and where a term of imprisonment is imposed, specific information shall be provided regarding maximum and minimum terms of such imprisonment; and

   (d) the reversal or modification of the judgment by an appellate court.

## § 646-a – Information Relative to the Fair Treatment Standards; Pamphlet

1. The district attorney shall provide the victim, at the earliest time possible, with an informational pamphlet detailing the rights of crime victims which shall be prepared by the division of criminal justice services in consultation with the director of the office of victim services and distributed to each district attorney's office.

2. The pamphlet shall summarize provisions of this article. It shall also include specific information with appropriate statutory references on the following:

   (a) the rights of crime victims to compensation and services;

   (b) the rights of crime victims to routine notification of judicial proceedings relating to their case as provided in section six hundred forty-one of this article, in section 330.20, and section 440.50 of the criminal procedure law and section one hundred forty-nine-a of the correction law;

(c) the rights of crime victims to be protected from intimidation and to have the court, where appropriate, issue protective orders as provided in sections 530.12 and 530.13 of the criminal procedure law and sections 215.15, 215.16 and 215.17 of the penal law;

(d) the rights of crime victims to submit, where appropriate, a victim impact statement for the pre-sentencing report and the parole hearing as provided in section 390.30 of the criminal procedure law and section two hundred fifty-nine-i of this chapter;

(e) the rights of crime victims, where a defendant is being sentenced for a felony, to request the right to make a statement at the time of sentencing as provided in section 380.50 of the criminal procedure law; and

(f) the rights of crime victims to request restitution and have the district attorney present such request to the court and assist the crime victim in the filing and collection of a restitution order in cooperation with the designated agency of the court as provided in section 420.10 of the criminal procedure law and section 60.27 of the penal law.

(g) the rights of crime victims to be aware of the defendant's incarceration status by providing the division of parole's contact information, including the division's toll-free telephone number, as provided for in subdivision two of section two hundred fifty-nine-i of this chapter. Such notice shall advise the crime victim to use the division's toll-free telephone number to update contact information.

3. This pamphlet shall provide space for the insertion of the following information:

(a) the address and phone number of the office of victim services;

(b) the address and phone numbers of local victim service programs, where appropriate;

(c) the name, phone number and office location of the person in the district attorney's office to whom inquiries concerning the victims case may be directed; and

(d) any other information the division deems appropriate.

4. (a) The commissioner of the division of criminal justice services in consultation with the director of the office of victim services shall develop and prepare a standardized form for the use of district attorney offices for the purpose of reporting compliance with this section. The form is to be distributed to each district attorney. Every district attorney's office in the state shall complete the reporting form annually and send it to the director of the office of victim services by the first day of January each year subsequent to the effective date of this subdivision.

(b) A copy of the report shall be retained by the district attorney and upon request, a victim of a crime or relative of a victim shall be entitled to receive from the district attorney a copy of their district attorney's annual report without charge. Any other person requesting a copy of the report shall pay a fee not to exceed the actual cost of reproduction.

## § 647 – Criteria

Fair treatment standards for crime victims in the courts shall provide that:

1. The court shall consider the views of the victim of a violent felony offense, a felony involving physical injury to the victim, a felony involving property loss or damage in excess of two hundred fifty dollars, a felony involving attempted or threatened physical injury or property loss or damage in excess of two hundred fifty dollars or a felony involving larceny against the person, or of the family of a homicide victim or minor child, regarding discretionary decisions relating to the criminal case, including, but not limited to, plea agreements and sentence. In addition, the court shall consider the views of the victim or family of the victim, as appropriate, concerning the release of the defendant in the victim's case pending judicial proceedings upon an indictment, and concerning the availability of sentencing alternatives such as community supervision and restitution from the defendant. The failure of the court to consider the views of the victim or family of the victim shall not be cause for delaying the proceedings against the defendant nor shall it affect the validity of a conviction, judgment or order.

2. The victims and other prosecution witnesses shall, where possible, be provided, when awaiting court appearances, a secure waiting area that is separate from all other witnesses.

3. The court shall assist in and expedite the return of property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial.

4. Victim assistance education shall be given to judicial and nonjudicial personnel of the unified court system so that victims may be promptly, properly and completely assisted.

## § 648 – Review; Report and Implementation

1. The chief administrator of the unified court system shall review court practices, procedures, services, regulations and laws to determine the adequacy and appropriateness of its services with respect to crime victims, including victims with special needs, particularly the elderly, disabled or victims of child abuse, domestic violence or sex-related offenses. Such review shall include reasonable opportunity for public comment and consultation with crime victims or their representatives, and may include public hearings.

2. After the review, and not later than two hundred seventy days after the effective date of this section, the chief administrator of the unified court system shall submit a report to the governor and the legislature, setting forth the findings of the review, including a description of the services provided by the components of the unified court system and recommendations for changes in its procedures, services, regulations and laws to improve its services to crime victims and to establish and implement fair treatment standards for crime victims.

3. Subject to the direction of the chief administrator, the components of the unified court system shall expeditiously implement the recommendations of its report.

## § 649 – Miscellaneous

Exhibit #48



**The New York Times Magazine** | http://nyti.ms/1CElg40

Magazine

# Cyrus Vance Jr.'s 'Moneyball' Approach to Crime

**By CHIP BROWN**   DEC. 3, 2014

A glance at New York City crime statistics might lead you to conclude that Cyrus Vance Jr., the district attorney of New York County, no longer works in what William Travers Jerome, who held the job more than a century ago, once called "the mouth of hell." Nowhere have declining crime trends been more striking than in Manhattan, where last year burglaries, shootings and murders were the lowest since the city began keeping formal records in the early 1960s; so far this year, statistically speaking, the epidemic of civility rages on. It's still a shock — where did Gotham go, the dangerous dark of nighttime Central Park, the East Village addicts brandishing box cutters, the cardsharps and sallow denizens of Times Square, which now seems overrun by Elmo impersonators and wide-eyed naïfs in fanny packs?

Vance is the fourth elected district attorney in 75 years to head what has been hailed as the model ministry of criminal justice since the arrival in 1935 of Thomas E. Dewey, who made a name for himself as the Gangbuster and established the office's tradition of nonpartisan professionalism. He was succeeded by Frank S. Hogan, Mr. Integrity, who served for 32 years and stepped aside in December 1973, just three months before his death. After a special election, Robert M. Morgenthau, a former federal prosecutor from the Southern District of New York, began his 35-year reign. At the time, Morgenthau recalled recently, crime was "endangering the economic and social viability of the city." He added dozens of detectives to the staff, boosted salaries and hired accountants to tackle white-collar crime. One of his major innovations was to "vertically integrate" prosecutions so that one assistant D.A.

Cyrus Vance Jr.'s 'Moneyball' Approach to Crime - The New York Times          Page 2 of 15

handled a case from arraignment to trial. There were 648 murders in Manhattan in the first year of Morgenthau's tenure; in 2009, when he retired, there were 59.

Campaigning on the themes of enhancing safety and fairness, and lifted by Morgenthau's endorsement, Vance won a three-way primary race for the D.A.'s office in 2009 and then carried the general election. In November 2013, he was re-elected with only token opposition. With violent crime at historic lows since its peak in the early 1990s, you might think being D.A. today is an afternoon nap compared with when Dewey was tilting at municipal corruption and trying gangsters like Lucky Luciano; or when Hogan was courting controversy with prosecutions of Lenny Bruce and antiwar demonstrators at Columbia University; or when Morgenthau was running the show with civil society hanging by a thread.

And to be sure, at the start of his second term in January, Vance was still intent on answering the questions he confronted when he first sought the job of overseeing 535 lawyers in the mouth of hell (which even with the recent renovations is still suffused with the purgatorial gloom of Manhattan's massive Criminal Courts Building, where most of the offices of the D.A. are housed and where a power failure caused by a hurricane can produce a Dickensian tableau of prosecutors handwriting charging documents by candlelight). In an era of low crime, what was the job of the D.A.? Who was to say the city couldn't be any safer, or what anti-crime ideas and utopian dreams were too far-fetched to pursue?

**In 2010,** at the start of his first term, Vance drew up a list of 20 things to do; four years later he had checked them all off, except for learning Spanish. He helped create a new court that offered alternatives to prison for mentally ill defendants whose crimes might have stemmed from treatable conditions. He set up a "conviction integrity program," which reviewed innocence claims in more than 160 cases and vacated four convictions. He pushed to raise the age of criminal responsibility to 18 — New York and North Carolina are the only states that treat 16-year-olds as adults. He lobbied for the New York's All Crimes DNA law, which doubled the kinds of crimes for which DNA evidence could be collected. He focused on crimes where the numbers in New York were going the wrong way: computer fraud, identity theft, abuse of the elderly and domestic violence. He reorganized office units and bureaus and shaved nine hours off the time between arrest and

arraignment, freeing up cops who used to have to wait so long to give statements that they would sometimes bring lawn chairs to the intake area in order to have a place to sit. Drunken-driving dismissals, according to the D.A.'s office, were down 81 percent; cases tossed because prosecutors violated speedy-trial rules were down 91 percent. Felony conviction rates, which were lower in Manhattan in 2009 than in the other four boroughs, now trailed only the conviction rate in Queens.

But Vance's most significant initiative, one that has been emulated in jurisdictions from Brooklyn to San Francisco, has been to transform, through the use of data, the way district attorneys fight crime. "The question I had when I came in was, Do we sit on our hands waiting for crime to tick up, or can we do something to drive crime lower?" Vance told me one afternoon in his eighth-floor office at the Criminal Courts Building in Lower Manhattan. "I wanted to develop what I call intelligence-driven prosecution."

Preparing to run in 2009, Vance studied "community-based prosecution" programs in Washington and consulted with experts in Milwaukee and San Francisco. The concept of expanding prosecution strategies to address neighborhood concerns emerged in the early 1990s as prosecutors and police departments grappled with an epidemic of violence, drug abuse and "quality of life" issues. Inspired by "broken windows" policing strategies advocated by William J. Bratton, who at the time was head of the city's transit cops and is now the New York City police commissioner, D.A.s began to prosecute offenses once considered small potatoes. The iconic example in New York was the campaign against the "squeegee men" cleaning car windshields when drivers were trapped in traffic.

The community focus was effective as far as it went, but there had been a revolution in the use of data over the last 20 years in areas as disparate as retailing, baseball and, in the prime example of the N.Y.P.D.'s CompStat program, policing; Vance thought prosecutors should get in on it. He sat down with a whiteboard, a cup of coffee and one of his first hires, an imaginative, dark-haired lawyer named Chauncey Parker, 54, who started his career under Morgenthau, spent a decade as a United States attorney and now, as Vance's executive assistant D.A. for crime-prevention strategies, had the job of dreaming up ideas, no matter how outlandish, that might reduce crime. It was glaringly evident to both men that assistant D.A.s

fielding the 105,000-plus cases a year in Manhattan seldom had enough information
to make nuanced decisions about bail, charges, pleas or sentences. They were
narrowly focused on the facts of cases in front of them, not on the people committing
the crimes. They couldn't quickly sort minor delinquents from irredeemably bad
apples. They didn't know what havoc defendants might be wreaking in other
boroughs.

By May 2010, Parker and Vance had roughed out the structure of the so-called
Crime Strategies Unit (C.S.U.). They divided Manhattan's 22 police precincts into
five areas and assigned a senior assistant D.A. and an analyst to map the crime in
each area. C.S.U. staff members met with patrol officers, detectives and Police
Department field intelligence officers. They asked police commanders to submit a
list of each precinct's 25 worst offenders — so-called crime drivers, whose
"incapacitation by the criminal-justice system would have a positive impact on the
community's safety." Seeded with these initial cases, the C.S.U. built a searchable
database that now includes more than 9,000 chronic offenders, virtually all of whom
have criminal records. A large percentage are recidivists who have been repeatedly
convicted of grand larceny, one of the top index crimes in Manhattan, but the list
also includes active gang members, people whom the D.A. considers "uncooperative
witnesses," and a fluctuating number of violent "priority targets," which currently
stands at 81.

But assembling data was meaningless without a timely way of distributing it. In-
house software programmers made key refinements to what is now considered the
nerve center of the office, the Arrest Alert System. When someone in the Arrest Alert
System is picked up, even on a minor charge or a parole violation, or is arrested in
another borough, any interested prosecutor is automatically pinged with a detailed
email. People outside the D.A.'s office like parole officers or police intelligence
officers are often notified, too. The database can be programmed to send arrest alerts
for a particular defendant, a particular gang, a particular neighborhood or housing
project, and can be sorted to highlight patterns of crime from bike theft to homicide.

"These are people we want to know about if they are arrested," says Kerry
Chicon, who started as the Crime Strategies Unit prosecutor in Area 3 and was
promoted to C.S.U. chief in January. "We are constantly adding, deleting, editing

and updating the intelligence in the Arrest Alert System. If someone gets out of a gang, or goes to prison for a long time, or moves out of the city or the state, or ages out of being a focus for us, or dies, we edit the system accordingly — we do that all the time."

Chicon, a 43-year-old mother of four, usually starts her morning reviewing the night's haul of 30 to 35 arrest alert emails as she drops her kids off at school. "C.S.U. prosecutors don't have to try cases — our job is to help assistant district attorneys understand whom they are prosecuting," she says. "Every morning, I talk to my five A.D.A.s, who are experts in their areas. We decide whom we should try to pull out for a debriefing. We don't debrief people arrested for felonies because we don't want to compromise a case. We pull people arrested on low-level misdemeanor charges, maybe two or three a week. We read them their Miranda rights. About 80 percent of them will talk. If you speak to a 16-year-old, they might tell you, 'This kid is running things, this kid is a hanger-on.' That's how we find out information like whether a gang has changed their name. We took down the Flow Boyz gang at the Robert F. Wagner housing project in 2012. But a lot of those gang members have aged out, and now there's a new group of 14- and 15-year-olds who want their own set name. Through debriefings, we learned they call themselves Only the Wagner."

The Arrest Alert System was the first of four programs created or tweaked by the C.S.U. using a combination of in-house technology and commercial software. The DANY (the District Attorney of New York) InPho program analyzes recorded inmate phone calls from Rikers Island. SCIM (the Surveillance Camera Interactive Map) shows the locations of and contact information for some 6,000 public and private surveillance cameras in Manhattan, making it possible for prosecutors to know whom to call at the 109th Street and Madison Avenue Dunkin' Donuts if they want to see what was recorded on the camera behind the cash register.

C.S.U. "violence timelines" reveal patterns around certain housing developments and neighborhoods, including shooting incidents that didn't generate a police report but that prosecutors were able to substantiate through debriefings or reports on social media. Probably the most comprehensive database is the Crime Prevention System, which targets violent crimes and gathers on one spreadsheet the sort of information that used to be scattered on legal pads or parked in some retired

detective's head — details about a defendant, including nicknames, which can be linked to additional information: friends, tattoos, telltale scars, Facebook entries, geo-coded street addresses, debriefing tips, excerpts from jailhouse phone calls.

"It's the 'Moneyball' approach to crime," Parker told me. "The tool is data; the benefit, public safety and justice — whom are we going to put in jail? If you have 10 guys dealing drugs, which one do you focus on? The assistant district attorneys know the rap sheets, they have the police statements like before, but now they know if you lift the left sleeve you'll find a gang tattoo and if you look you'll see a scar where the defendant was once shot in the ankle. Some of the defendants are often surprised we know so much about them."

In speeches praising intelligence-driven prosecution, Vance often cites the case of a 270-pound scam artist named Naim Jabbar, who for more than a decade made a living in the Times Square area bumping into pedestrians and then demanding money, saying they had broken his glasses. Convicted 19 times on the misdemeanor charge of "fraudulent accosting," Jabbar never served more than five months in jail until he was flagged by the C.S.U. His next arrest, in July 2010, triggered an alert. Instead of being offered a plea bargain, he was indicted and subsequently convicted on a felony robbery charge, and sentenced to three and a half to seven years in prison. With time served before his conviction, he was soon paroled and then arrested again, in July 2014, for another broken-eyeglasses incident and charged with robbery and grand larceny.

More broadly, working with the Police Department and following a plan based on information developed by the C.S.U., the Violent Criminal Enterprises Unit, which Vance created in his first term, began taking down the most violent of Manhattan's roughly 30 gangs; since 2011, 17 gangs have been dismantled, including three broken up last June at the Manhattanville and Grant housing projects, resulting in the largest number of gang indictments in a single operation. "There's a reason murders in Manhattan went from 70 in 2010 to 29 so far this year," Karen Friedman Agnifilo, former chief of the Trial Division, told me late last year. (In January, Vance promoted Friedman Agnifilo to the No. 2 job, chief assistant district attorney.) "We figured out who are the people driving crime in Manhattan, and for four years we focused on taking them out."

**One evening shortly** before Vance won his second term, I locked the only bicycle I haven't had stolen in New York to a No Parking sign in front of a restaurant in the East Village and lugged the front wheel inside, where Vance was nursing a club soda at the bar. "You're afraid of being robbed while having dinner with the district attorney?" he said. "That's an insult to me!"

Vance, now 60, is said to be funny in private, but as the white hat of moral order in Manhattan, he makes no apologies for his public persona, which is earnest, thoughtful, buttoned up and not unduly colorful. Not really colorful at all, in fact. He has a halting speaking style and the subdued manner of a man constrained by temperament, training and the peculiar fetters of his public duty.

"I would be more interesting to the newspapers if I showed up at crime scenes in a yellow coat barking orders into a two-way wrist watch," Vance told me. "But that's not me."

Vance was born in New York, the youngest of five siblings. His mother, Grace Sloane, who was called Gay, grew up dressing for black-tie dinners on the Philadelphia Main Line in the socially prominent family that founded the W. & J. Sloane furniture business. His father, Cyrus Roberts Vance, was born in West Virginia, where the idyll of his childhood ended at 5 when his father died of pneumonia. Vance's parents were both public-minded. His mother served as president of the New York Urban League. His father, after Yale, Yale Law School and a stint in the Navy, shuttled from a partnership at the prestigious law firm Simpson Thacher & Bartlett to various posts under three United States presidents and emerged as an icon of the Eastern establishment — a lawyer-counselor-diplomat who, after three years as secretary of state, resigned without fanfare in 1980 when President Jimmy Carter, against Vance's advice, authorized the ill-fated attempt to rescue the American hostages in Tehran.

Cy Vance Jr. grew up among the elite of Washington after the family moved to the capital from the Upper East Side in 1960. His father took him fishing at Camp David. He spent the night at the White House and met President Lyndon B. Johnson when he was 12. He followed his father to Yale, where he studied American history. Determined not to become a lawyer, he peddled oil-marketing services in West

Africa. He wasn't very good at it, and after five years he reconciled himself to his father's profession, enrolling at the Georgetown University Law Center. He graduated in 1982, shortly before his 28th birthday. Robert M. Morgenthau liked to say he had one rule — "never do a politician a favor"— but he hired his share of celebrity lawyers' sons, and Vance landed a coveted assistant D.A. position. He was assigned to Trial Bureau 80, where the halls were piled with cardboard boxes and the blue carpet underfoot was so memorably gross that Vance was given a framed swatch of it as a keepsake when it was finally replaced. "That time was the wild west," recalled Jeffrey Schlanger, Vance's chief of staff, who got to be friends with him when they worked together in the Rackets Bureau. "The crack epidemic was going. Arraignments had a feeling of controlled chaos. I remember one mentally ill defendant pulling feces out of his pants. Every day was a scramble. We were learning things they didn't teach in law school."

Trials were what appealed to Vance — the strategies, the characters, the drama of verdicts, the satisfaction of knowing his work mattered. He handled cases from murder to art theft to animal cruelty and made friends with people you don't normally see at Yale reunions. He loved getting up in the middle of the night to inspect crime scenes with detectives from the robbery squad. "We focused on pattern robberies," he recalled, "like the guys who specialized in shotgun stickups of Häagen-Dazs stores."

After six years, Vance was ready to get out from under the shadow of his father's fame. Against the advice of his dad, who said he was "waving the white flag" on his career, he found a job as an associate at Culp Dwyer Guterson & Grader in Seattle, where he moved with his wife, Peggy McDonnell, whom he'd married in 1984. He proved adept at white-collar criminal defense work, eventually made partner and then seven years later left to start his own firm. "He was *the* criminal lawyer in Seattle," recalled Robert Sulkin, a founding member of McNaul Ebel Nawrot Helgren & Vance. "When you got into trouble, you called Cy Vance."

Vance handled most of the firm's criminal work, taking cases that political opponents would later try to use against him, like his defense of Joseph Meling, an insurance salesman convicted of killing two people in an attempt to cover his tracks after trying to poison his wife with cyanide-laced Sudafed. Years at the defense table

underlined for Vance some of the prosecutor's powers. "The philosophy I have about law enforcement — enhancing public safety while enhancing fairness — didn't come from my father, and it didn't come from reading or professors in law school," Vance said. "It came from years of practical experience as a prosecutor and a defense attorney."

On trips back East, Vance would call on Morgenthau. In January 2002, his father died after a long decline. Two years later, with their children, Simon and Clare, on the brink of high school, and Vance's mother and his sister Amy debilitated by illness, Peggy thought it was time to come home. With the help of Morgenthau and Eliot Spitzer, then the New York State attorney general, whom Vance met in the Rackets Bureau, Vance landed a job in New York as a partner at a boutique white-collar firm, Morvillo Abramowitz. He had been back in the city a year or so when he confided to his wife that he was thinking of running for Manhattan district attorney if Morgenthau retired. His political résumé at the time consisted of passing out fliers for Lyndon Johnson and a couple of days of advance work for Gary Hart's unsuccessful presidential bid in 1984.

**So numerous were** the stumbles in Vance's first term that for a while it looked as if he might not have the luxury of a second. At one point the Data D.A. had a far more formidable reputation on the Facebook pages of East Harlem gangs than he did in the New York press. The New York Post labeled him, "Soft Cy," "Manhattan's hapless district attorney" who learned to fight crime in the "espresso bars of Seattle."

"Cy's first 18 months in office were so bruising that having no opposition for re-election was something I never expected even a year ago," says Linda Fairstein, a former Manhattan sex-crimes prosecutor and Vance adviser. The nadir of his rookie woes came in August 2011, when the sex-crimes prosecution of the French politician Dominique Strauss-Kahn collapsed. It's hard to imagine Vance will ever again find himself in a maelstrom like the drama of Strauss-Kahn and the Sofitel housekeeper Nafissatou Diallo: 19 New York Post cover stories; writhing news-media scrums outside the Criminal Courts Building; armchair prosecutors dissecting how the green D.A. and his mismanaged minions were in over their heads. Kenneth Thompson, who at the time was the attorney for Diallo and now is the district attorney in

Brooklyn, tore into Vance in front of TV cameras: "If the Manhattan district attorney, who is elected to protect our mothers, our daughters, our sisters, our wives and our loved ones, is not going to stand up for them when they're raped or sexually assaulted, who will?" (Many months later, when Thompson was preparing to run for public office himself, Vance says Thompson privately apologized. Thompson says that he did call to say he shouldn't have said Vance was afraid to try the case, but that that didn't constitute an apology.)

I asked Vance what he would do differently if he could replay those tumultuous weeks. "I probably would handle it exactly the same way," he said after a long pause.

Nothing different?

"I would like to have had the time the federal government has between arraignment and indictment. By law we have six days. Federal prosecutors have 30. That forced everybody to make rapid decisions. But I think at every stage we made the best decisions we could."

Even Vance's wife, Peggy, who had joined us for dinner, wondered if he wouldn't change his approach.

"I would probably move more slowly if I had to do it again," he conceded. "But what went right in DSK — although others might not see it this way — is that when we assessed the information we had that undermined the case, we didn't hide it. I look at the DSK case as a paragon, because we absolutely believed this poor woman should be believed over this powerful man, and when additional facts came out, we were willing to show them to the defense."

Vance critics have generally been focused on less sensational issues, questions of policy and priorities for which they find the D.A.'s leadership wanting. Did the Manhattan D.A., they ask, really need to set up a two-year study with the Vera Institute of Justice to realize the criminal-justice system was plagued by racial bias? And in light of its entrenched inequities, aren't databases and targeted intelligence-based prosecution especially problematic?

"When prosecutors begin to compile databases and start doing so-called 'smart prosecutions,' you have to ask who is getting in the databases, what are the criteria and where are the outside checks?" says Steven Zeidman, director of the criminal-defense clinic at the CUNY School of Law. "More than a thousand people are arrested in N.Y.C. each day, and the overwhelming and disproportionate number of them are people of color arrested for 'broken windows' type offenses like riding a bike on the sidewalk or jaywalking. I was in court with a kid arrested for jaywalking; the arresting officer was from the gang unit, and he stopped the kid because he was wearing a red shirt that, according to the police, happened to be a gang color. He wasn't in a gang, but he's probably now in a database."

Vance has also been criticized for shrinking from leadership on the issue of marijuana arrests in the city. In recent years, tens of thousands of New Yorkers — a vast majority of them blacks and Hispanics — have been arrested for small amounts of marijuana after being searched under the Police Department's now-scaled-back stop-and-frisk policy. Marijuana offenses were the top arrest category for the entire program in 2012, according to a study by the New York chapter of the American Civil Liberties Union. Vance has long supported reforming the penal code to treat small amounts of pot "in public view" as a violation resulting in a fine rather than a misdemeanor, which might lead to a jail sentence and a criminal record. But his office has declined to prosecute just under 7 percent of the 54,000 misdemeanor pot arrests in Manhattan since 2009, and it was Vance's old antagonist, the Brooklyn district attorney Kenneth Thompson, who declared his office would no longer prosecute such cases.

Vance's efforts to make prosecutors smarter — "to play offense instead of defense," as he has said — depend on what he calls "extreme collaboration" with the Police Department, cooperation that has increased notably since the arrival in January of William Bratton as police commissioner. Prosecutors say they now have access to precinct-level commanders they almost never had before. The complicated anti-gang cases mounted in Manhattan — like the one at the Manhattanville and Grant housing projects last June, which resulted in 103 arrests — were built by teams from the D.A.'s office working hand in glove with the investigators from the police and the city's Department of Correction. But critics argue that in doing so, prosecutors risk becoming extensions of the police force.

"Prosecutors are supposed to be the gatekeepers to the criminal-justice system," Zeidman told me. "They should maintain a healthy distance from the police so they can evaluate the constitutionality and appropriateness of what the police are doing. If they had been fulfilling that function all along, we might never have had scandals like the rampant Fourth Amendment violations uncovered in the federal stop-and-frisk litigation."

**It's hard to know** how much one person or policy can affect the crime rate, and consequently how much credit or blame should be assigned when things go well or don't. Evaluations of anti-crime measures often conflate cause and correlation. The sun comes up, the roosters preen. Raymond Kelly, the former New York City police commissioner, once said that taking credit for a decline in crime is like taking credit for an eclipse, but he, too, was quick to attribute auspicious trends to his department's strategies and tactics. The N.Y.P.D.'s seminal crime-mapping methodology CompStat surely made cops more effective and helped reduce crime, and yet crime began its epic decline in 1990, four years before CompStat was implemented. For years Kelly and former Mayor Michael Bloomberg insisted the city's stop-and-frisk program was the key — but then, as opponents asked, why did crime continue to go down even when stop-and-frisk was curtailed by public pressure in 2012?

Apart from effective police work, studies have attributed the decline in violent crime to a confounding hash of variables: demographic trends, fashions in drug abuse, a surge in public-housing programs, the proliferation of surveillance cameras, decreases in lead toxicity, increased incarceration rates (and paradoxically in recent years, increased prison discharge rates), even the availability of abortion. Morgenthau credits the pivotal role of the district attorney, noting Manhattan had 39 percent of the city's homicides when he took office and only 12 percent in the year before he finished — evidence to him of the difference a D.A. makes given that the city's boroughs all have the same police force. In his final report, he tartly observed that the 90 percent decline in murders in Manhattan during his tenure was "not due simply to the dawn of gentler times."

But of course gentler times were something to hope for and to cultivate if possible. Vance pressed the point to his staff: Their pole star wasn't convictions but

safety, a goal as readily attained by preventing crime as by prosecuting it. With asset-forfeiture money seized from drug dealers, Vance has opened 10 Manhattan gyms that would otherwise be closed on weekends and started sports programs for 11-to-18-year-olds called Saturday Night Lights. The community-affairs unit hired professional sports trainers to run drills and academic advocates to work as tutors and mentors and to keep track of how the players are faring in school. "We ask ourselves, Are we doing everything possible to reduce crime?" Chauncey Parker says. "If an overwhelming number of Rikers Island inmates don't have high-school diplomas, maybe we should be finding ways to help people stay in school and graduate. It seems obvious, but it's not until someone starts doing it."

Parker challenged C.S.U. prosecutors to come up with their equivalent of the Apollo moon project. Their answer was reforming public housing in the city, including the Polo Grounds, St. Nicholas and Wagner developments, and they are drawing up plans with the expectation that they can drive down crime.

A number of other cities and states are studying how the Manhattan D.A. has developed and deployed data. At a February 2013 conference in Miami, Kerry Chicon and David O'Keefe, then the C.S.U. chief, received numerous requests for meetings after their presentation on the Arrest Alert System. Philadelphia now has a rudimentary intelligence system modeled on Manhattan's C.S.U. So does the Delaware Department of Justice. "The Manhattan C.S.U. prosecutors spent a day with us, going over intelligence-driven models and how they analyzed cases," says Kathleen M. Jennings, the state prosecutor and head of the criminal division. "We developed an arrest-alert system that identified 50 high-risk offenders. In May we created our crime-strategies unit. Wilmington has one of the highest violent-crime rates in the country, but 1 to 2 percent of the people are doing 70 percent of the crimes. We've taken dozens of high-risk offenders off the street."

When he took office in 2011, District Attorney George Gascon of San Francisco was shocked by the paucity of data-informing prosecutions. "It wasn't even a bell that was being rung," says his chief of staff, Cristine Soto DeBerry. "We spent a day in Manhattan learning the ropes of how they used data, and Kerry Chicon came and spoke to our board of supervisors. It's very clear to our D.A. that we are overincarcerating, and we need to do something different. Jail is not an economically

sustainable model. We need to know for whom jail is appropriate and whom it isn't. That's where data becomes very useful."

In some ways it may be easier to be the district attorney of Manhattan in an era when New Yorkers aren't so inclined to do terrible things to one another. And yet the Manhattan D.A.'s office still handles more cases than the entire United States Department of Justice. Vance's predecessors didn't have to cope with the terabytes of digital evidence now central to many prosecutions, or with malign enterprises particular to our time, like cybercrime (200 to 300 complaints a month in Manhattan alone) and lone-wolf terrorism.

Vance was especially frustrated that his office had been unable to stem the upsurge in domestic violence. While the index felonies were going down, misdemeanor arrests in Manhattan were going up. And arrests for grand larceny, many of which involved iPads and iPhones, were running counter to the positive crime trends.

"I don't want to be known as the D.A. whose main mission was reducing property crime, but it is important we excel even in these kind of cases," Vance said. "The bar Bob Morgenthau set when he left was very high. It's my job to raise it."

It was almost midnight, and he was sitting in a pub in Chelsea reflecting on his first four years on the job. The supporters who helped him secure another term had gone home. "So," asked his wife, Peggy, "what three things have you learned about yourself?" Vance gazed at her evenly, well aware of the perils of domestic cross-examination. "You just have to be honest," she said.

"I'm thinking," he said, looking, for a moment, as if he would rather be coping with the recent outbreak of mold at their country house.

"Cyrus has always been a question to himself," Peggy said to me. "The things that should make him happy didn't make him happy. He's never had the ability to separate himself from his work."

Jimmy Zaccari, a detective on Vance's protection detail, was waiting outside in a black Suburban to drive the couple home. It was a quiet night, except for the cry of

far-off sirens. Changed as it might be, Manhattan was still the place where Jose Pimentel plotted to terrorize New Yorkers by detonating pipe bombs, and Corey Dunton stands accused of firing a gun at skaters in Bryant Park, and Cesar Lucas raped a woman on the West Side. It was still the place where, among thousands of nonviolent but still disgraceful affronts to the civility of city life, Dr. Lawrence Levitan stole insurance money from a hospital and Naim Jabbar wrung cash from people for eyeglasses they didn't break. It was still the place where even a Times Square Elmo impersonator had been jailed for harassment and extortion. Gentler times in Manhattan? Maybe someday — but not tonight. Sirens in the night meant cases in the morning.

### Correction: December 7, 2014

*An article on Page 22 this weekend about Cyrus Vance Jr., the district attorney of New York County, describes incompletely a shooting incident at the Bryant Park ice rink in November 2013 and misspells the given name of a man charged with shooting skaters. He is Corey Dunton, not Cory, and he has pleaded not guilty and is awaiting trial; it has not been established that he "fired a gun at skaters." In addition, the article misstates the length of time that Robert M. Morgenthau served as district attorney of New York County. It was 35 years, not 34.*

Chip Brown is a contributing writer for the magazine. His last article was on Peter Gelb, general manager of the Metropolitan Opera.

A version of this article appears in print on December 7, 2014, on page MM22 of the Sunday Magazine with the headline: The Data D.A.

© 2015 The New York Times Company

Exhibit #49



NATIONAL CRIME VICTIM LAW INSTITUTE    310 SW 4th Ave., Suite 540, Portland, OR 97204

State
Constitutional and Statutory Victims' Rights
New York

# NEW YORK VICTIMS' RIGHTS LAWS[1]

## Constitution

*New York does not have a victims' rights amendment to its constitution.*

**McKinney's Executive Law; Article 23, Fair Treatment Standards for Crime Victims**

### § 640 – Fair Treatment Standards for Crime Victims

1. The commissioner of the division of criminal justice services, in consultation with the director of the office of victim services and other appropriate officials, shall promulgate standards for the treatment of the innocent victims of crime by the agencies which comprise the criminal justice system of the state.

2. For the purposes of this article the term "criminal justice" shall include juvenile justice and the objectives and criteria set forth in sections six hundred forty-one and six hundred forty-two of this article shall apply to presentment agencies as defined in subdivision twelve of section 301.2 of the family court act.

### § 641 – Objectives of Fair Treatment Standards

The object of such fair treatment standards shall be to:

1. Ensure that crime victims routinely receive emergency social and medical services as soon as possible and are given information pursuant to section six hundred twenty-five-a of this chapter on the following:

    (a) availability of crime victim compensation;

    (b) availability of appropriate public or private programs that provide counseling, treatment or support for crime victims, including but not limited to the following: rape crisis centers, victim/witness assistance programs, elderly victim services, victim assistance hotlines and domestic violence shelters;

    (c) the role of the victims in the criminal justice process, including what they can expect from the system as well as what the system expects from them; and

    (d) stages in the criminal justice process of significance to a crime victim, and the manner in which information about such stages can be obtained.

---

[1] Not intended to be exhaustive.

2. Ensure routine notification of a victim or witness as to steps that law enforcement officers or district attorneys can take to protect victims and witnesses from intimidation.

3. Ensure notification of victims, witnesses, relatives of those victims and witnesses who are minors, and relatives of homicide victims, if such persons provide the appropriate official with a current address and telephone number, either by phone or by mail, if possible, of judicial proceedings relating to their case, including:

   (a) the arrest of an accused;

   (b) the initial appearance of an accused before a judicial officer;

   (c) the release of an accused pending judicial proceedings; and

   (d) proceedings in the prosecution of the accused including entry of a plea of guilty, trial, sentencing, but prior to sentencing specific information shall be provided regarding the right to seek restitution and reparation, and where a term of imprisonment is imposed, specific information shall be provided regarding maximum and minimum terms of such imprisonment.

## § 642 – Criteria for Fair Treatment Standards

Such fair treatment standards shall provide that:

1. The victim of a violent felony offense, a felony involving physical injury to the victim, a felony involving property loss or damage in excess of two hundred fifty dollars, a felony involving attempted or threatened physical injury or property loss or damage in excess of two hundred fifty dollars or a felony involving larceny against the person shall, unless he or she refuses or is unable to cooperate or his or her whereabouts are unknown, be consulted by the district attorney in order to obtain the views of the victim regarding disposition of the criminal case by dismissal, plea of guilty or trial. In such a case in which the victim is a minor child, or in the case of a homicide, the district attorney shall, unless the family refuses or is unable to cooperate or his, her or their whereabouts are unknown, consult for such purpose with the family of the victim. In addition, the district attorney shall, unless he or she (or, in the case in which the victim is a minor child or a victim of homicide, his or her family) refuses or is unable to cooperate or his, her or their whereabouts are unknown, consult and obtain the views of the victim or family of the victim, as appropriate, concerning the release of the defendant in the victim's case pending judicial proceedings upon an indictment, and concerning the availability of sentencing alternatives such as community supervision and restitution from the defendant. The failure of the district attorney to so obtain the views of the victim or family of the victim shall not be cause for delaying the proceedings against the defendant nor shall it affect the validity of a conviction, judgment or order.

2. The victims and other prosecution witnesses shall, where possible, be provided, when awaiting court appearances, a secure waiting area that is separate from all other witnesses.

2-a. (a) All police departments, as that term is defined in subdivision a of section eight

hundred thirty-seven-c of this chapter, district attorneys' offices and presentment agencies, as that term is defined in subdivision twelve of section 301.2 of the family court act, shall provide a private setting for interviewing victims of a crime defined in article one hundred thirty or section 255.25, 255.26, or 255.27 of the penal law. For purposes of this subdivision, "private setting" shall mean an enclosed room from which the occupants are not visible or otherwise identifiable, and whose conversations cannot be heard, from outside such room. Only (i) those persons directly and immediately related to the interviewing of a particular victim, (ii) the victim, (iii) a social worker, rape crisis counselor, psychologist or other professional providing emotional support to the victim, unless the victim objects to the presence of such person and requests the exclusion of such person from the interview, and (iv) where appropriate, the parent or parents of the victim, if requested by the victim, shall be present during the interview of the victim.

(b) All police departments, as that term is defined in subdivision a of section eight hundred thirty-seven-c of this chapter, shall provide victims of a crime defined in article one hundred thirty of the penal law with the name, address, and telephone of the nearest rape crisis center in writing.

3. Law enforcement agencies and district attorneys shall promptly return property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial.

4. The victim or witness who so requests shall be assisted by law enforcement agencies and district attorneys in informing employers that the need for victim and witness cooperation in the prosecution of the case may necessitate absence of that victim or witness from work. In addition, a victim or witness who, as a direct result of a crime or of cooperation with law enforcement agencies or the district attorney in the investigation or prosecution of a crime is unable to meet obligations to a creditor, creditors or others should be assisted by such agencies or the district attorney in providing to such creditor, creditors or others accurate information about the circumstances of the crime, including the nature of any loss or injury suffered by the victim, or about the victim's or witness' cooperation, where appropriate.

5. Victim assistance education and training, with special consideration to be given to victims of domestic violence, sex offense victims, elderly victims, child victims, and the families of homicide victims, shall be given to persons taking courses at state law enforcement training facilities and by district attorneys so that victims may be promptly, properly and completely assisted.

## § 642a – Fair Treatment of Child Victims as Witnesses

To the extent permitted by law, criminal justice agencies, crime victim-related agencies, social services agencies and the courts shall comply with the following guidelines in their treatment of child victims:

1. To minimize the number of times a child victim is called upon to recite the events of the case and to foster a feeling of trust and confidence in the child victim, whenever practicable and where one exists, a multi-disciplinary team as established pursuant to

subdivision six of section four hundred twenty-three of the social services law and/or a child advocacy center shall be used for the investigation and prosecution of child abuse cases involving abuse of a child, as described in paragraph (i), (ii) or (iii) of subdivision (e) of section one thousand twelve of the family court act, sexual abuse of a child or the death of a child.

2. Whenever practicable, the same prosecutor should handle all aspects of a case involving an alleged child victim.

3. To minimize the time during which a child victim must endure the stress of his involvement in the proceedings, the court should take appropriate action to ensure a speedy trial in all proceedings involving an alleged child victim. In ruling on any motion or request for a delay or continuance of a proceeding involving an alleged child victim, the court should consider and give weight to any potential adverse impact the delay or continuance may have on the well-being of the child.

4. The judge presiding should be sensitive to the psychological and emotional stress a child witness may undergo when testifying.

5. In accordance with the provisions of article sixty-five of the criminal procedure law, when appropriate, a child witness as defined in subdivision one of section 65.00 of such law should be permitted to testify via live, two-way closed-circuit television.

6. In accordance with the provisions of section 190.32 of the criminal procedure law, a person supportive of the "child witness" or "special witness" as defined in such section should be permitted to be present and accessible to a child witness at all times during his testimony, although the person supportive of the child witness should not be permitted to influence the child's testimony.

7. A child witness should be permitted in the discretion of the court to use anatomically correct dolls and drawings during his testimony.

## § 643 – Fair Treatment Standards for Crime Victims; Agencies Generally

1. As used in this section, "crime victim-related agency" means any agency of state government which provides services to or deals directly with crime victims, including (a) the office of children and family services, the office for the aging, the division of veterans affairs, and correctional alternatives the division of parole, office of victim services the department of motor vehicles, the office of vocational rehabilitation, the workers' compensation board, the department of health, the division of criminal justice services, the office of mental health, every transportation authority and the division of state police, and (b) any other agency so designated by the governor within ninety days of the effective date of this section.

2. Each crime victim-related agency shall review its practices, procedures, services, regulations and laws to determine the adequacy and appropriateness of its services with respect to crime victims, including victims with special needs, particularly the elderly, disabled or victims of child abuse, domestic violence or sex-related offenses. Such review

shall include reasonable opportunity for public comment and consultation with crime victims or their representatives, and may include public hearings.

3. After the review, and not later than one hundred eighty days after the effective date of this section, each crime victim-related agency shall submit a report to the governor and the legislature, setting forth the findings of the review including a description of the services provided by the agency and recommendations for changes in its practices, procedures, services, regulations and laws to improve its services to crime victims and to establish and implement fair treatment standards for crime victims.

4. Subject to the direction of the governor, and to the extent practicable, each crime victim-related agency shall expeditiously implement the recommendations of its report.

## § 644 – Implementation

The commissioner of the division of criminal justice services and the director of the office of victim services shall assist criminal justice agencies in implementing the guidelines promulgated by the commissioner.

## § 645 – Fair Treatment Standards for Crime Victims in the Courts

The chief administrator of the courts, in consultation with the commissioner of the division of criminal justice services, the director of the office of victim services and other appropriate officials, shall promulgate standards for the treatment of the innocent victims of crime by the unified court system. These standards shall conform to and be consistent with the regulations promulgated pursuant to section six hundred forty of this article.

## § 646 – Police Reports

1. A victim of crime shall be entitled, regardless of physical injury, without charge to a copy of a police report of the crime.

2. An individual whose identity was assumed or whose personal identifying information, as defined in section 190.77 of the penal law, was used in violation of section 190.78, 190.79 or 190.80 of the penal law, or any person who has suffered a financial loss as a direct result of the acts of a defendant in violation of section 190.78, 190.79, 190.80, 190.82 or 190.83 of the penal law, who has learned or reasonably suspects that his or her personal identifying information has been unlawfully used by another, may make a complaint to the local law enforcement agency of the county in which any part of the offense took place regardless of whether the defendant was actually present in such county, or in the county in which the person who suffered financial loss resided at the time of the commission of the offense, or in the county where the person whose personal identification information was used in the commission of the offense resided at the time of the commission of the offense as provided in paragraph (l) of subdivision four of section 20.40 of the criminal procedure law. Said local law enforcement agency shall take a police report of the matter and provide the complainant with a copy of such report free of charge.

## § 646 – Objectives

The object of these fair treatment standards shall be to:

1. Ensure that crime victims are given information on the following:

    (a) the role of the victims in the criminal justice process, including what they can expect from the system as well as what the system expects from them;

    (b) stages in the criminal justice process of significance to a crime victim, and the manner in which information about such stages can be obtained; and

    (c) how the court can address the needs of the victims at sentencing.

2. Ensure routine notification of a victim or witness as to steps that the court can take to protect victims and witnesses from intimidation, including the issuance of orders of protection and temporary orders of protection.

3. Ensure notification of victims, witnesses, relatives of those victims and witnesses who are minors, and relatives of homicide victims, if such persons provide the appropriate court official with a current address and telephone number, either by phone or by mail, if possible, of judicial proceedings relating to their case, including:

    (a) the initial appearance of an accused before a judicial officer;

    (b) the release of an accused pending judicial proceedings;

    (c) proceedings in the prosecution of the accused, including entry of a plea of guilty, trial, sentencing, and where a term of imprisonment is imposed, specific information shall be provided regarding maximum and minimum terms of such imprisonment; and

    (d) the reversal or modification of the judgment by an appellate court.

## § 646-a – Information Relative to the Fair Treatment Standards; Pamphlet

1. The district attorney shall provide the victim, at the earliest time possible, with an informational pamphlet detailing the rights of crime victims which shall be prepared by the division of criminal justice services in consultation with the director of the office of victim services and distributed to each district attorney's office.

2. The pamphlet shall summarize provisions of this article. It shall also include specific information with appropriate statutory references on the following:

    (a) the rights of crime victims to compensation and services;

    (b) the rights of crime victims to routine notification of judicial proceedings relating to their case as provided in section six hundred forty-one of this article, in section 330.20, and section 440.50 of the criminal procedure law and section one hundred forty-nine-a of the correction law;

(c) the rights of crime victims to be protected from intimidation and to have the court, where appropriate, issue protective orders as provided in sections 530.12 and 530.13 of the criminal procedure law and sections 215.15, 215.16 and 215.17 of the penal law;

(d) the rights of crime victims to submit, where appropriate, a victim impact statement for the pre-sentencing report and the parole hearing as provided in section 390.30 of the criminal procedure law and section two hundred fifty-nine-i of this chapter;

(e) the rights of crime victims, where a defendant is being sentenced for a felony, to request the right to make a statement at the time of sentencing as provided in section 380.50 of the criminal procedure law; and

(f) the rights of crime victims to request restitution and have the district attorney present such request to the court and assist the crime victim in the filing and collection of a restitution order in cooperation with the designated agency of the court as provided in section 420.10 of the criminal procedure law and section 60.27 of the penal law.

(g) the rights of crime victims to be aware of the defendant's incarceration status by providing the division of parole's contact information, including the division's toll-free telephone number, as provided for in subdivision two of section two hundred fifty-nine-i of this chapter. Such notice shall advise the crime victim to use the division's toll-free telephone number to update contact information.

3. This pamphlet shall provide space for the insertion of the following information:

(a) the address and phone number of the office of victim services;

(b) the address and phone numbers of local victim service programs, where appropriate;

(c) the name, phone number and office location of the person in the district attorney's office to whom inquiries concerning the victims case may be directed; and

(d) any other information the division deems appropriate.

4. (a) The commissioner of the division of criminal justice services in consultation with the director of the office of victim services shall develop and prepare a standardized form for the use of district attorney offices for the purpose of reporting compliance with this section. The form is to be distributed to each district attorney. Every district attorney's office in the state shall complete the reporting form annually and send it to the director of the office of victim services by the first day of January each year subsequent to the effective date of this subdivision.

(b) A copy of the report shall be retained by the district attorney and upon request, a victim of a crime or relative of a victim shall be entitled to receive from the district attorney a copy of their district attorney's annual report without charge. Any other person requesting a copy of the report shall pay a fee not to exceed the actual cost of reproduction.

## § 647 – Criteria

Fair treatment standards for crime victims in the courts shall provide that:

1. The court shall consider the views of the victim of a violent felony offense, a felony involving physical injury to the victim, a felony involving property loss or damage in excess of two hundred fifty dollars, a felony involving attempted or threatened physical injury or property loss or damage in excess of two hundred fifty dollars or a felony involving larceny against the person, or of the family of a homicide victim or minor child, regarding discretionary decisions relating to the criminal case, including, but not limited to, plea agreements and sentence. In addition, the court shall consider the views of the victim or family of the victim, as appropriate, concerning the release of the defendant in the victim's case pending judicial proceedings upon an indictment, and concerning the availability of sentencing alternatives such as community supervision and restitution from the defendant. The failure of the court to consider the views of the victim or family of the victim shall not be cause for delaying the proceedings against the defendant nor shall it affect the validity of a conviction, judgment or order.

2. The victims and other prosecution witnesses shall, where possible, be provided, when awaiting court appearances, a secure waiting area that is separate from all other witnesses.

3. The court shall assist in and expedite the return of property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial.

4. Victim assistance education shall be given to judicial and nonjudicial personnel of the unified court system so that victims may be promptly, properly and completely assisted.

## § 648 – Review; Report and Implementation

1. The chief administrator of the unified court system shall review court practices, procedures, services, regulations and laws to determine the adequacy and appropriateness of its services with respect to crime victims, including victims with special needs, particularly the elderly, disabled or victims of child abuse, domestic violence or sex-related offenses. Such review shall include reasonable opportunity for public comment and consultation with crime victims or their representatives, and may include public hearings.

2. After the review, and not later than two hundred seventy days after the effective date of this section, the chief administrator of the unified court system shall submit a report to the governor and the legislature, setting forth the findings of the review, including a description of the services provided by the components of the unified court system and recommendations for changes in its procedures, services, regulations and laws to improve its services to crime victims and to establish and implement fair treatment standards for crime victims.

3. Subject to the direction of the chief administrator, the components of the unified court system shall expeditiously implement the recommendations of its report.

## § 649 – Miscellaneous



Nothing in this article shall be construed as creating a cause of action for damages or injunctive relief against the state or any of its political subdivisions or officers or any agency thereof.



**McKinney's Social Services Law § 483-aa**

### § 483-aa. Definitions

The following definitions shall apply to this article:

(a) "Human trafficking victim" means a person who is a victim of sex trafficking as defined in section 230.34 of the penal law or a victim of labor trafficking as defined in section 135.35 of the penal law.

(b) "Pre-certified victim of human trafficking" is a person who has a pending application for federal certification as a victim of a severe form of trafficking in persons as defined in section 7105 of title 22 of the United States Code (Trafficking Victims Protection) but has not yet obtained such certification, or a person who has reported a crime to law enforcement and it reasonably appears to law enforcement that the person is such a victim.



### § 483-bb. Services for victims of human trafficking

(a) The office of temporary and disability assistance may coordinate with and assist law enforcement agencies and district attorney's offices to access appropriate services for human trafficking victims.

(b) In providing such assistance, the office of temporary and disability assistance may enter into contracts with non-government organizations for providing services to pre-certified victims of human trafficking as defined in subdivision (b) of section four hundred eighty-three-aa of this article, insofar as funds are available for that purpose. Such services may include, but are not limited to, case management, emergency temporary housing, health care, mental health counseling, drug addiction screening and treatment, language interpretation and translation services, English language instruction, job training and placement assistance, post-employment services for job retention, and services to assist the individual and any of his or her family members to establish a permanent residence in New York state or the United States. Nothing in this section shall preclude the office of temporary and disability assistance, or any local social services district, from providing human trafficking victims who are United States citizens or human trafficking victims who meet the criteria pursuant to section one hundred twenty-two of this chapter with any benefits or services for which they otherwise may be eligible.



### § 483-cc. Confirmation as a victim of human trafficking

(a) As soon as practicable after a first encounter with a person who reasonably appears to a law enforcement agency or a district attorney's office to be a human trafficking victim, that agency or office shall notify the office of temporary and disability assistance and

the division of criminal justice services that such person may be eligible for services under this article.

(b) Upon receipt of such a notification, the division of criminal justice services, in consultation with the office of temporary and disability assistance and the referring agency or office, shall make a preliminary assessment of whether such victim or possible victim appears to meet the criteria for certification as a victim of a severe form of trafficking in persons as defined in section 7105 of title 22 of the United States Code (Trafficking Victims Protection) or appears to be otherwise eligible for any federal, state or local benefits and services. If it is determined that the victim appears to meet such criteria, the office of temporary and disability assistance shall report the finding to the victim, and to the referring law enforcement agency or district attorney's office, and may assist that agency or office in having such victim receive services from a case management provider who may be under contract with the office of temporary and disability assistance, or from any other available source. If the victim or possible victim is under the age of eighteen, the office of temporary and disability assistance also shall notify the local department of social services in the county where the child was found.

## Statutes
**McKinney's Executive Law Ch. EIGHTEEN, Art. 23, Refs & Annos**

CROSS REFERENCES

Action against offender's estate; victim as creditor, see Civil Rights Law § 79-d.

Action by victim of criminal offense, time limits, see CPLR 213-b.

Compensation for crime victims, see Executive Law § 620 et seq.

Deaf victim, appointment of interpreter, see Judiciary Law § 390.

Dispositions of offenders, restitution and reparation, see Penal Law § 60.27.

Dispute resolution, notice and opportunity for victim to be heard prior to referral, see CPL 215.10; CPL 215.20.

Employer unlawfully penalizing victim witness, misdemeanor, see Penal Law § 215.14.

Forfeiture of proceeds of crime, see CPLR 1310 et seq.

Intimidation of victim, felony, see Penal Law § 215.15 et seq.

Judicial administration, chief administrator, see Judiciary Law § 212.

Mentally incapacitated defendant, notice to potential victim of release, see CPL 730.60.

Notice to crime victim of case disposition, see CPL 440.50.

Orders of protection for crime victims while action pending, see CPL 530.12; CPL 530.13.

Parole board, consideration of crime victim's statement, see Executive Law § 259-i.

Proceeds of crime, recovery by victim, see Executive Law § 632-a.

Released inmates; notification to victims and family members, see Correction Law § 149-a.

Restitution and reparation to crime victim, see Penal Law § 60.27.



Exhibit #50



## PATROL GUIDE

| Section: Arrests | Procedure No:   208-70 |
|---|---|

### PROCESSING OF NEW YORK STATE DOMESTIC INCIDENT REPORTS IN THE DOMESTIC VIOLENCE DATABASE

| DATE ISSUED:<br>08/01/13 | DATE EFFECTIVE:<br>08/01/13 | REVISION NUMBER: | PAGE:<br>1 of 4 |
|---|---|---|---|

**PURPOSE**  To improve the tracking, monitoring, and analysis of domestic violence cases.

**PROCEDURE**  Whenever entering information from a command's past/current **New York State Domestic Incident Report (DCJS-3221)** into the new Domestic Violence Database System:

**UNIFORMED MEMBER OF THE SERVICE**
1. Submit hard copy of **Domestic Incident Report** and any related paperwork [**COMPLAINT REPORT (PD313-152), AIDED REPORT WORKSHEET (PD304-152b), ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159)** etc.] to desk officer.

**NOTE**  *The current **New York State Domestic Incident Report (DCJS-3221)** does not have captions for certain pertinent information that is collected in the Domestic Violence Database System. Therefore, the following information is to be elicited from the person(s) involved and recorded in the NARRATIVE OF THE INCIDENT:*
   a. *Alcohol involved*
   b. *Narcotic involved*
   c. *Verbal dispute only*
   d. *Court and Docket number of Order of Protection*
   e. *Voucher number of photos (if taken)*
   f. *Social security number and alias of persons involved (record next to name if space allows, otherwise include name and information in narrative)*
   g. *Reporting officer's tax number in box titled "OFFICER I.D. NO."*

**DESK OFFICER**
2. Review hard copy of **Domestic Incident Report** and any related paperwork for accuracy and completeness and sign.
3. Direct command clerk to enter information from the **Domestic Incident Report** into the Domestic Violence Database System.

**COMMAND CLERK**
4. Enter information from the **Domestic Incident Report** into the Domestic Violence Database System and print out computer copy.

**NOTE**  *Members of the service entering Domestic Incident Reports into the Domestic Violence Database System should not attempt to translate victims' statements that are written in languages other than English, regardless of whether or not the member is proficient in the other language. However, members should indicate in the "Victims Statement of Allegations/Supporting Deposition" field that the statement is written in a language other than English (i.e., "Victim's statement is completed in apparent Spanish").*

5. Attach hard copy and computer copy and present them to the desk officer for review.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-70 | 08/01/13 | | 2 of 4 |

**NOTE**
*With the implementation of new, linked computer systems, the command clerk must enter all associated reports and obtain numbers from the other appropriate computer systems (OLCS, Aided, etc.) PRIOR TO entering the data into the Domestic Violence Database System. The command clerk will record all appropriate numbers on the hard copy of the **Domestic Incident Report**. It is imperative that these numbers are obtained prior to the entry of the **Domestic Incident Report** since these numbers link to the other systems and links information contained therein and CAN NOT be entered or retrieved later. In the event that a **Domestic Incident Report** is entered into the database without these numbers, it MUST BE VOIDED and re-entered with this information.*

*The command clerk will prepare a **Domestic Incident Report** for walk-in complainants reporting domestic incidents whenever the command's domestic violence officer is not available to do so.*

**DESK OFFICER**
6. Review computer copy and compare to the hard copy for accuracy and completeness.

7. Forward both copies to the command's domestic violence officer/designated reviewer.

**DOMESTIC VIOLENCE OFFICER/ DESIGNATED REVIEWER**
8. Obtain previously assigned victim and/or offender numbers or generate new numbers, as appropriate, from database.

9. Query the Domestic Violence Database System for the following offender information:
   a. Warrant history
   b. Investigation card status
   c. Gun license/permit status
   d. Criminal recidivist history
   e. Targeted narcotics violator status
   f. Domestic violence history

**NOTE**
*Results of the New York State Police Information Network (NYSPIN) inquiries concerning orders of protection, probation status and arrest history (Booking Arraignment Disposition System [BADS]), and complaint history (On Line Complaint System [OLCS]), will be entered onto the appropriate captions of the **Domestic Incident Report** review screen.*

10. Ensure that all computer inquiries regarding the offender are completed during the tour in which they are commenced.
    a. Attach printouts of all inquiries listed in step 9 to the **Domestic Incident Report**.

11. Forward both copies of the **Domestic Incident Report** back to the desk officer or domestic violence supervisor for endorsement

**DESK OFFICER/ DOMESTIC VIOLENCE SUPERVISOR**
12. Review the **Domestic Incident Report** computer summary screen.
    a. Ensure that all **Domestic Incident Reports** and the necessary offender queries are completed.

13. Utilize the supervisory sign off function to finalize each **Domestic Incident Report** thereby entering it into the Domestic Violence Database System.
    a. Print finalized copy of **Domestic Incident Report**.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-70 | 08/01/13 | | 3 of 4 |

| | | |
|---|---|---|
| **NOTE** | | *Any **Domestic Incident Report** prepared by a command other than <u>PRECINCT OF OCCURRENCE</u>, must be entered, reviewed and finalized by the <u>COMMAND OF REPORT</u>. The hard copy of the **Domestic Incident Report** will then be faxed to the precinct of occurrence. The original will be maintained in a file folder marked, "Out of Command DIRs". (This folder is not required if prepared by a PSA, and the incident occurs within the precincts that they cover).* |
| **DESK OFFICER/ DOMESTIC VIOLENCE SUPERVISOR** (continued) | 14. | Void any duplicate **Domestic Incident Reports** and those entered incorrectly or in error. |
| **DOMESTIC VIOLENCE PREVENTION OFFICER** | 15. | Prepare daily a Domestic Incident Index utilizing the computer's "Domestic Violence Query-Status Report" for all the **Domestic Incident Reports** entered the previous day. |
| | a. | Maintain a copy of the Index in the Domestic Violence office and at the desk. |
| | 16. | Utilize the computer's add/view "follow-up comments function" to enter new information (e.g. results of home visits, phone contacts, additional information, etc.) related to the **Domestic Incident Report**. |
| | 17. | Utilize the computer's "High Propensity Offender" function to add and remove offenders to the commands High Propensity List. |
| **PRECINCT DETECTIVE SQUAD MEMBER** | 18. | Enter case closing status of any resolved domestic violence case into the Domestic Violence Database System. |
| **ARREST PROCESSING OFFICER** | 19. | Complete a "Global Name Check" of the offender and victim in all domestic violence arrest cases. |
| | a. | Print out the result screen and the previously prepared **Domestic Incident Report(s)**. |
| | 20. | Forward the name check results and **Domestic Incident Report(s)** with the arrest package to the District Attorney's Office. |
| **COMMAND INTEGRITY CONTROL OFFICER** | 21. | Provide members of the service access to the Domestic Violence Database System utilizing the administrator options of the computer as appropriate. |
| | 22. | Maintain a list of authorized users assigned to the command. |
| | 23. | Print, review, and maintain on a monthly basis, a list of all voided **Domestic Incident Reports** entered into the Database. |
| | a. | Take corrective action where appropriate. |

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-70 | 08/01/13 | | 4 of 4 |

**ADDITIONAL DATA**

*Members of the service are reminded that the hard copy of the **DIR**, which should include a statement written in the complainant/victim's own handwriting, is the primary source for information regarding domestic incidents. The handwritten victim's statement is crucial to the District Attorney during the prosecution of a domestic violence case and can serve as the accusatory instrument, when necessary.  When a domestic violence officer, precinct detective squad member, or other interested member of the service is investigating a domestic incident and the Domestic Violence Database indicates that the victim's statement is written in a language other than English, he or she should refer to the hard copy of the DIR to obtain the victim's handwritten statement.  If the need for a translator arises, members of the service should comply with P.G. 212-90, "Guidelines for Interaction with Limited English Proficient (LEP) Persons".*

*__Domestic Incident Reports__ that are prepared by officers assigned to commands other than precinct of occurrence (i.e. Housing Bureau personnel, etc.) who have access to the Domestic Violence Database System, will be responsible for the data entry, review and finalization of the __Domestic Incident Report__.  The follow-up investigation will be the responsibility of the precinct of occurrence or housing PSA, as appropriate.*

*Due to the sensitive nature of the Database information, access is limited to authorized users and is controlled using CESN passwords.  The command's integrity control officer provides access to the system; however, revoked passwords must be re-activated by the integrity control officer assigned to the Management Information Systems Division.*

*Commands will access the Domestic Violence Database System from local area network (LAN) workstations that have Internet Explorer Browser installed. Once the system issues a sequential number and the __Domestic Incident Report__ is reviewed by the domestic violence officer, only a supervisor from the precinct of occurrence is permitted to make modifications. Additionally, once a desk officer/domestic violence supervisor has finalized a __Domestic Incident Report__ for entry into the Domestic Violence Database System, no modifications will be allowed.  (This does not include domestic violence officer notes or detective case closing).*

**RELATED PROCEDURES**

*Domestic Violence Prevention Officer (P.G. 202-29)*
*Family Offenses/Domestic Violence (P.G. 208-36)*
*Family Offenses and Domestic Violence Involving Uniformed or Civilian Members Of The Service (P.G 208-37)*
*Family Offense/Domestic Violence (Photographing Visible Injuries/Damaged Property) (P.G. 208-39)*

**FORMS AND REPORTS**

**AIDED REPORT WORKSHEET (PD304-152b)**
**COMPLAINT REPORT (PD313-152)**
**ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159)**
*New York State Domestic Incident Report (DCJS-3221)*

**NEW • YORK • CITY • POLICE • DEPARTMENT**



## PATROL GUIDE

| Section: Arrests | Procedure No:   208-39 |
|---|---|
| **FAMILY OFFENSES/DOMESTIC VIOLENCE (DIGITAL PHOTOGRAPHY OF VISIBLE INJURIES/DAMAGED PROPERTY)** | |

| DATE ISSUED: 08/01/13 | DATE EFFECTIVE: 08/01/13 | REVISION NUMBER: | PAGE: 1 of 5 |
|---|---|---|---|

**PURPOSE**   To capture, catalog, store and maintain digital photographic evidence of visible injuries and/or damaged property as a result of domestic violence.

**SCOPE**   All precinct and police service area commands citywide are now able to digitally capture domestic violence photos and transmit them as a permanent record into the Domestic Violence Digital Photo Database. These images may then be instantly viewed by prosecutors at each borough's District Attorney's Office and the New York Law Department (Corporation Counsel) who will have access to the Domestic Violence Digital Photo Database. Prosecutors may then present digital images of domestic violence to judges at the time of arraignment, thereby strengthening the District Attorney's case. In addition, uniformed members acting in investigatory and support roles (Detective Bureau personnel, domestic violence prevention officers, etc.) will be able to view these photos prior to making further contact with the victim and/or offender.

**PROCEDURE**   Upon responding to the scene of a reported domestic violence incident:

**UNIFORMED MEMBER OF THE SERVICE**
1. Comply with *P.G. 208-36, "Family Offenses/Domestic Violence."*
2. Determine if photographs must be taken.
3. Ascertain if the victim is willing to be photographed.
   a. Advise the victim that photographable evidence is crucial to future prosecutorial efforts and/or civil process such as divorce and child custody proceedings.
   b. If victim is not willing to be photographed, note refusal in **ACTIVITY LOG (PD112-145)**, and if possible, have victim sign entry.
4. Notify the patrol supervisor and request that the domestic violence digital camera be brought to location.

**NOTE**   *Only the domestic violence digital camera should be used to capture domestic violence evidence. No other cameras are compatible with the domestic violence capture station located in the area of the precinct desk. PERSONAL PHOTOGRAPHIC EQUIPMENT (CAMERAS, CELL PHONES, HANDHELD COMPUTERS, ETC.) SHOULD NEVER BE USED TO CAPTURE DOMESTIC VIOLENCE EVIDENCE. The Domestic Violence Digital Photo Database will be the sole repository for photographs of all domestic violence evidence.*

**PATROL SUPERVISOR**
5. Respond to requested location with domestic violence digital camera and direct photographs be taken of complainant/victim (if willing) and scene, if appropriate.

**NOTE**   *Domestic violence prevention officers are also equipped with a digital camera. When working in the field, domestic violence prevention officers should respond to the scene where a domestic violence digital camera has been requested.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-39 | 08/01/13 | | 2 of 5 |

**UNIFORMED**    6.    Take digital photographs as necessary, including but not limited to:
**MEMBER OF**             a.     Visible injuries
**THE SERVICE**

**NOTE**     *Injuries may not be initially prominent, therefore it is crucial for domestic violence prevention officers and investigators to take follow-up photographs for bruises that appear at a later time.  When a victim makes a complaint of substantial pain (Assault 3rd Degree), and there are no visible injuries, do not take photos.*

        b.     Damaged property
        c.     Weapons
        d.     Overall scene to illustrate items in disarray, indicating domestic violence or distress in home
        e.     Other types of evidence (i.e., pictures of caller-id box for aggravated harassment or flowers/notes for stalking, blood on the clothes/hands or ripped clothing of the victim/perpetrator, etc.)
        f.     Both pages (Data Sheet and Statement of Allegations written and signed by victim) of the completed **New York State Domestic Incident Report (DCJS 3221-6/05)**
        g.     Photo of the victim from the waist up, providing context for the series of photos.

**NOTE**     *The digital camera is to be set at the highest resolution setting to maximize the quality of the photo with minimal file size.  Each photo takes approximately one megabyte of data storage.  Therefore, memory cards containing 256 megabytes of memory will be able to hold approximately 256 photos; those with 512 megabytes will hold around 512 photos, etc.  The storage capacity of the camera enables members of the service to take as many photos as needed to depict any evidence and/or violence in the home.  There is no longer a limit to the number of photos or "sets" of photos that can be taken in domestic violence cases.  **Do not set the digital camera memory to "internal memory."  The camera must be set to capture photos on a memory card.  Photos saved on the internal memory mode cannot be uploaded into the Domestic Violence Digital Photo Database.***

        7.    Ensure that the phrase "DIGITAL PHOTOS" is documented on the "Evidence Collection" portion of the **COMPLAINT REPORT WORKSHEET (PD313-152A)** and the "Incident #" obtained from the first caption on the initial screen in the Domestic Violence Digital Photo Database is documented in "Invoice #" caption.
             a.     This "Incident #" is used by personnel at the District Attorney's Office to retrieve digital photos during pre-arraignment.

**NOTE**     *Polaroid film will no longer be used to capture domestic violence evidence.  Therefore, **PROPERTY CLERK INVOICES (PD521-141)** will no longer be used to voucher domestic violence digital photos.  Domestic violence digital photos will be uploaded into the Domestic Violence Digital Photo Database and NOT vouchered.  Members are reminded that the photographing of evidence does not substitute for the collection and invoicing of physical evidence (i.e., weapons, clothing, etc.).  Members will adhere to Patrol Guide 218-01, "Invoicing Property – General Procedure" when invoicing physical evidence.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-39 | 08/01/13 | | 3 of 5 |

| | | |
|---|---|---|
| **UNIFORMED MEMBER OF THE SERVICE (continued)** | 8. | Ensure that the "Photo Section" of the **New York State Domestic Incident Report** is completed after the victim completes the "Statement of Allegations/Supporting Deposition" section located on page two of the **Domestic Incident Report**. |
| **ARREST PROCESSING OFFICER/ ARRESTING OFFICER/ ASSIGNED OFFICER** | 9. | Upload all digital photos taken from the digital camera into the Domestic Violence Digital Photo Database by docking the camera and following the prompts from the system. |

*NOTE*      *Domestic violence digital photos must be uploaded into the Domestic Violence Digital Photo Database by the arresting/assigned officer at the earliest opportunity.  Digital photos are needed by the District Attorney's Office in arrest cases and by detective investigators on open cases.*

10. Adhere to the following in all cases:
   a. Ensure that the Domestic Violence Digital Photo Database is logged on as DVCAM.  No password is necessary.
   b. Place the camera on the docking station and press the space bar (camera can be on or off).
   c. Close the "Internal Memory" and "Picture Card" windows that appear.
   d. Click on the "Domestic Violence Camera" icon.
   e. If the pending box appears, close it and click on the "Capture" icon.
   f. Check off the appropriate relationship(s) to associate the specific domestic relationship.
   g. Answer all mandatory fields designated by an asterisk.
   h. Click on "add" to add photos.
   i. Click on photo thumbnails pertaining to the file, then click "OK" and await transfer of photos.
   j. Complete the captions located beneath the photos.
   k. Click on "Save" and the photos are now saved to the database.

*NOTE*      *Instructions for the use of the domestic violence digital camera and the uploading and hosting of domestic violence photos into the Domestic Violence Photo Database are maintained at the desk, the Command Reference Library, and are available on the Department Intranet site.*

| | | |
|---|---|---|
| **UNIFORMED MEMBER OF THE SERVICE** | 11. | Make an **ACTIVITY LOG** entry indicating date, time, number of digital photos taken, name and tax number of the officer taking the photos, name and tax number of officer uploading the images, and the name of the Assistant District Attorney confirming receipt if arrest is effected. |
| | 12. | Ensure the **COMPLAINT REPORT (PD313-152)** number is obtained and entered into the system as soon as practicable. |
| | 13. | Print one copy of the image(s) using the thumbnail feature and attach it to the **NYS Domestic Incident Report**. |

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-39 | 08/01/13 | | 4 of 5 |

**DOMESTIC VIOLENCE PREVENTION OFFICER**

14. Review all completed **NYS Domestic Incident Reports**, finalized **COMPLAINT REPORT** printouts, and the Domestic Violence Digital Photo Database daily to make certain that the digital photos for domestic violence were taken as necessary.

15. Perform follow-up with victims and take digital photos as necessary.

16. Host digital photos after the **COMPLAINT REPORT** has been finalized in the On Line Complaint System (OLCS).

*NOTE*

*Once hosted, information contained in the OLCS will automatically transfer to occupy captions in the Domestic Violence Digital Photo Database.*

*ADDITIONAL DATA*

*The uploading of domestic violence digital photos into the Domestic Violence Digital Photo Database does not require a unique password. The universal password "DVCAM" should be used to gain access to the system. Once uploaded, personnel at the District Attorney's Office can instantly view domestic violence digital photos. Therefore, arresting/assigned officers MUST upload any domestic violence photos from the camera into the database during arrest processing (arrest evidence) or prior to the end of their tour (non-arrest/investigatory evidence), whichever applies.*

*The domestic violence camera and capture station must be maintained in the vicinity of the command desk. Commanding officers will ensure that digital cameras are accessible at all times. Desk officers will allow access to uniformed members of the service to upload/host digital photos into the Domestic Violence Digital Photo Database. When not in use, domestic violence digital cameras must be left on the docking station to maintain a charge. The docking station also serves as a conduit to upload domestic violence photos.*

*The digital cameras assigned to the command are to be included in the commands computer self-inspection worksheet and inventory.*

<u>MAINTENANCE OF THE DOMESTIC VIOLENCE DIGITAL PHOTO CAMERA</u>

**DESK OFFICER**

17. At the beginning of each tour:
   a. Inspect all domestic violence digital cameras assigned to patrol.
   b. Ensure docking station, cables and memory cards (check inside cameras) are operational.
   c. Make a Command Log entry of results.

*NOTE*

*If during inspection, cameras/related equipment are found to be inoperable, the desk officer will immediately notify the Domestic Violence Unit. The Domestic Violence Unit is open Monday though Friday, between 0600 and 1800 hours. However, a message must be left during non-office hours. Domestic Violence Unit personnel will return the call as soon as possible. In the event that the computer where the digital camera capture station resides becomes disabled/inoperable, the desk officer will immediately call the MISD Help Desk and the Domestic Violence Unit. An entry of these notifications will be made in the Telephone Record.*

*If during inspection, the loss or theft of any domestic violence camera equipment is discovered, be guided by P. G. 219-20, "Loss or Theft of Department Property."*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-39 | 08/01/13 | | 5 of 5 |

| | | |
|---|---|---|
| **PATROL SUPERVISOR** | 18. | Make a Command Log entry when signing out or returning a domestic violence digital camera. |
| **DOMESTIC VIOLENCE PREVENTION OFFICER** | 19. | Inspect all domestic violence digital cameras each day to ensure operability and that all photos are uploaded into the Domestic Violence Digital Photo Database. |
| | | a.   If upon inspection, any domestic violence cameras/related equipment are missing, lost or inoperable, notify the desk officer. |
| **DOMESTIC VIOLENCE SERGEANT** | 20. | Ensure that digital photos are being taken with domestic violence digital cameras by first responding officers, as appropriate. |
| | 21. | Take corrective action when necessary. |
| **TRAINING SERGEANT** | 22. | Ensure that all uniformed members of the service assigned to the command are properly trained in the taking and uploading of domestic violence digital photos. |

| | |
|---|---|
| ***RELATED PROCEDURES*** | *Family Offenses/Domestic Violence (P.G. 208-36)* |
| | *Invoicing Property – General Procedure (P.G. 218-01)* |
| | *Family Offenses and Domestic Violence Involving Uniformed Members of the Service (P.G. 208-37)* |
| ***FORMS AND REPORTS*** | ***ACTIVITY LOG (PD112-145)*** |
| | ***COMPLAINT REPORT WORKSHEET (PD313-152A)*** |
| | ***COMPLAINT REPORT (PD313-152)*** |
| | ***PROPERTY CLERK INVOICE (PD521-141)*** |
| | ***New York State Domestic Incident Report (DCJS 3221-6/05)*** |

**NEW • YORK • CITY • POLICE • DEPARTMENT**



# PATROL GUIDE

| Section:  Arrests | | Procedure No:   208-70 |
|---|---|---|
| **PROCESSING OF NEW YORK STATE DOMESTIC INCIDENT REPORTS IN THE DOMESTIC VIOLENCE DATABASE** | | |
| DATE ISSUED:<br>08/01/13 | DATE EFFECTIVE:<br>08/01/13 | REVISION NUMBER: | PAGE:<br>1 of 4 |

**PURPOSE**    To improve the tracking, monitoring, and analysis of domestic violence cases.

**PROCEDURE**    Whenever entering information from a command's past/current **New York State Domestic Incident Report (DCJS-3221)** into the new Domestic Violence Database System:

**UNIFORMED MEMBER OF THE SERVICE**

1.   Submit hard copy of **Domestic Incident Report** and any related paperwork [**COMPLAINT REPORT (PD313-152), AIDED REPORT WORKSHEET (PD304-152b), ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159)** etc.] to desk officer.

**NOTE**    *The current **New York State Domestic Incident Report (DCJS-3221)** does not have captions for certain pertinent information that is collected in the Domestic Violence Database System. Therefore, the following information is to be elicited from the person(s) involved and recorded in the NARRATIVE OF THE INCIDENT:*

      *a.    Alcohol involved*
      *b.    Narcotic involved*
      *c.    Verbal dispute only*
      *d.    Court and Docket number of Order of Protection*
      *e.    Voucher number of photos (if taken)*
      *f.    Social security number and alias of persons involved (record next to name if space allows, otherwise include name and information in narrative)*
      *g.    Reporting officer's tax number in box titled "OFFICER I.D. NO."*

**DESK OFFICER**

2.   Review hard copy of **Domestic Incident Report** and any related paperwork for accuracy and completeness and sign.

3.   Direct command clerk to enter information from the **Domestic Incident Report** into the Domestic Violence Database System.

**COMMAND CLERK**

4.   Enter information from the **Domestic Incident Report** into the Domestic Violence Database System and print out computer copy.

**NOTE**    *Members of the service entering Domestic Incident Reports into the Domestic Violence Database System should not attempt to translate victims' statements that are written in languages other than English, regardless of whether or not the member is proficient in the other language. However, members should indicate in the "Victims Statement of Allegations/Supporting Deposition" field that the statement is written in a language other than English (i.e., "Victim's statement is completed in apparent Spanish").*

5.   Attach hard copy and computer copy and present them to the desk officer for review.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-70 | 08/01/13 | | 2 of 4 |

**NOTE**  *With the implementation of new, linked computer systems, the command clerk must enter all associated reports and obtain numbers from the other appropriate computer systems (OLCS, Aided, etc.) PRIOR TO entering the data into the Domestic Violence Database System.  The command clerk will record all appropriate numbers on the hard copy of the **Domestic Incident Report**.  It is imperative that these numbers are obtained prior to the entry of the **Domestic Incident Report** since these numbers link to the other systems and links information contained therein and CAN NOT be entered or retrieved later.  In the event that a **Domestic Incident Report** is entered into the database without these numbers, it MUST BE VOIDED and re-entered with this information.*

*The command clerk will prepare a **Domestic Incident Report** for walk-in complainants reporting domestic incidents whenever the command's domestic violence officer is not available to do so.*

**DESK OFFICER**
6. Review computer copy and compare to the hard copy for accuracy and completeness.
7. Forward both copies to the command's domestic violence officer/designated reviewer.

**DOMESTIC VIOLENCE OFFICER/ DESIGNATED REVIEWER**
8. Obtain previously assigned victim and/or offender numbers or generate new numbers, as appropriate, from database.
9. Query the Domestic Violence Database System for the following offender information:
   a. Warrant history
   b. Investigation card status
   c. Gun license/permit status
   d. Criminal recidivist history
   e. Targeted narcotics violator status
   f. Domestic violence history

**NOTE**  *Results of the New York State Police Information Network (NYSPIN) inquiries concerning orders of protection, probation status and arrest history (Booking Arraignment Disposition System [BADS]), and complaint history (On Line Complaint System [OLCS]), will be entered onto the appropriate captions of the **Domestic Incident Report** review screen.*

10. Ensure that all computer inquiries regarding the offender are completed during the tour in which they are commenced.
   a. Attach printouts of all inquiries listed in step 9 to the **Domestic Incident Report**.
11. Forward both copies of the **Domestic Incident Report** back to the desk officer or domestic violence supervisor for endorsement

**DESK OFFICER/ DOMESTIC VIOLENCE SUPERVISOR**
12. Review the **Domestic Incident Report** computer summary screen.
   a. Ensure that all **Domestic Incident Reports** and the necessary offender queries are completed.
13. Utilize the supervisory sign off function to finalize each **Domestic Incident Report** thereby entering it into the Domestic Violence Database System.
   a. Print finalized copy of **Domestic Incident Report**.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-70 | 08/01/13 | | 3 of 4 |

**NOTE**      *Any **Domestic Incident Report** prepared by a command other than <u>PRECINCT OF OCCURRENCE</u>, must be entered, reviewed and finalized by the <u>COMMAND OF REPORT</u>. The hard copy of the **Domestic Incident Report** will then be faxed to the precinct of occurrence. The original will be maintained in a file folder marked, "Out of Command DIRs". (This folder is not required if prepared by a PSA, and the incident occurs within the precincts that they cover).*

**DESK OFFICER/ DOMESTIC VIOLENCE SUPERVISOR (continued)**

14.  Void any duplicate **Domestic Incident Reports** and those entered incorrectly or in error.

**DOMESTIC VIOLENCE PREVENTION OFFICER**

15.  Prepare daily a Domestic Incident Index utilizing the computer's "Domestic Violence Query-Status Report" for all the **Domestic Incident Reports** entered the previous day.
   a.  Maintain a copy of the Index in the Domestic Violence office and at the desk.
16.  Utilize the computer's add/view "follow-up comments function" to enter new information (e.g. results of home visits, phone contacts, additional information, etc.) related to the **Domestic Incident Report**.
17.  Utilize the computer's "High Propensity Offender" function to add and remove offenders to the commands High Propensity List.

**PRECINCT DETECTIVE SQUAD MEMBER**

18.  Enter case closing status of any resolved domestic violence case into the Domestic Violence Database System.

**ARREST PROCESSING OFFICER**

19.  Complete a "Global Name Check" of the offender and victim in all domestic violence arrest cases.
   a.  Print out the result screen and the previously prepared **Domestic Incident Report(s)**.
20.  Forward the name check results and **Domestic Incident Report(s)** with the arrest package to the District Attorney's Office.

**COMMAND INTEGRITY CONTROL OFFICER**

21.  Provide members of the service access to the Domestic Violence Database System utilizing the administrator options of the computer as appropriate.
22.  Maintain a list of authorized users assigned to the command.
23.  Print, review, and maintain on a monthly basis, a list of all voided **Domestic Incident Reports** entered into the Database.
   a.  Take corrective action where appropriate.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-70 | 08/01/13 | | 4 of 4 |

**ADDITIONAL DATA**

Members of the service are reminded that the hard copy of the **DIR**, which should include a statement written in the complainant/victim's own handwriting, is the primary source for information regarding domestic incidents. The handwritten victim's statement is crucial to the District Attorney during the prosecution of a domestic violence case and can serve as the accusatory instrument, when necessary. When a domestic violence officer, precinct detective squad member, or other interested member of the service is investigating a domestic incident and the Domestic Violence Database indicates that the victim's statement is written in a language other than English, he or she should refer to the hard copy of the DIR to obtain the victim's handwritten statement. If the need for a translator arises, members of the service should comply with P.G. 212-90, "Guidelines for Interaction with Limited English Proficient (LEP) Persons".

**Domestic Incident Reports** that are prepared by officers assigned to commands other than precinct of occurrence (i.e. Housing Bureau personnel, etc.) who have access to the Domestic Violence Database System, will be responsible for the data entry, review and finalization of the **Domestic Incident Report**. The follow-up investigation will be the responsibility of the precinct of occurrence or housing PSA, as appropriate.

Due to the sensitive nature of the Database information, access is limited to authorized users and is controlled using CESN passwords. The command's integrity control officer provides access to the system; however, revoked passwords must be re-activated by the integrity control officer assigned to the Management Information Systems Division.

Commands will access the Domestic Violence Database System from local area network (LAN) workstations that have Internet Explorer Browser installed. Once the system issues a sequential number and the **Domestic Incident Report** is reviewed by the domestic violence officer, only a supervisor from the precinct of occurrence is permitted to make modifications. Additionally, once a desk officer/domestic violence supervisor has finalized a **Domestic Incident Report** for entry into the Domestic Violence Database System, no modifications will be allowed. (This does not include domestic violence officer notes or detective case closing).

**RELATED PROCEDURES**

Domestic Violence Prevention Officer (P.G. 202-29)
Family Offenses/Domestic Violence (P.G. 208-36)
Family Offenses and Domestic Violence Involving Uniformed or Civilian Members Of The Service (P.G 208-37)
Family Offense/Domestic Violence (Photographing Visible Injuries/Damaged Property) (P.G. 208-39)

**FORMS AND REPORTS**

**AIDED REPORT WORKSHEET (PD304-152b)**
**COMPLAINT REPORT (PD313-152)**
**ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159)**
**New York State Domestic Incident Report (DCJS-3221)**

# NEW • YORK • CITY • POLICE • DEPARTMENT



## PATROL GUIDE

| Section:  Duties and Responsibilities | Procedure No:   202-29 |
|---|---|

### DOMESTIC VIOLENCE PREVENTION OFFICER

| DATE ISSUED: 08/01/13 | DATE EFFECTIVE: 08/01/13 | REVISION NUMBER: | PAGE: 1 of 3 |
|---|---|---|---|

**DOMESTIC VIOLENCE PREVENTION OFFICER**

1. Perform duty in uniform, unless specifically authorized to do otherwise.
   a. Tours of duty will be set in accordance with command needs.
2. Review **New York State Domestic Incident Reports (DCJS-3221)** for accuracy and completeness.
   a. Indicate verification by completing the "Reviewed by" caption on the **Domestic Incident Report**.
   b. Forward copy of **Domestic Incident Report** to precinct's Domestic Violence Investigator.
3. Review each tour's SPRINT Resource Log and ensure that a **Domestic Incident Report** has been prepared for all assignments in which a 10-93F, 10-92F, or 10-90F radio code disposition was given.
4. Maintain a command Domestic Incident Report Log to record each **Domestic Incident Report**, captioned as follows:

| PRECINCT SERIAL NO. | SPRINT NO. | DATE OF REPORT | VICTIM'S NAME |
|---|---|---|---|

5. Maintain a **Domestic Incident Report** file comprised of all **Domestic Incident Reports** prepared within the command, or forwarded from other commands.

**NOTE**

*The original **Domestic Incident Report** (Domestic Violence Prevention Officer's copy) and the first copy (Domestic Violence Investigator's copy) will be filed in the command of occurrence.  If the command of occurrence is other than complainant/victim's resident precinct and a **Report** is prepared, a photocopy of that **Report** will be forwarded to the Domestic Violence Prevention Officer assigned to the complainant/ victim's resident precinct.*

6. Enter information obtained from all **Domestic Incident Reports** into the command's Domestic Incident Report database, updating existing files as new information concerning a particular complainant or household becomes available.
7. Identify and monitor those locations and victims (including all members of the household who may be at risk) requiring special attention by utilizing information obtained from all available sources.
   a. Enter all persons/families listed on the command High Propensity List (HPL) into the Domestic Incident Report (DIR) database utilizing the "Case Management" feature.
   b. Update the online HPL information during the first week of each month after conferring with the commanding officer.
8. Maintain contact with complainants, i.e., telephone calls, letters, home visits, or interviews at the command, depending on the complainant's needs and preferences.
   a. Use caution when attempting to contact victims so as not to alert the alleged offender of police intervention.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 202-29 | 08/01/13 | | 2 of 3 |

**NOTE**
*In an effort to avoid compromising ongoing investigations, the Domestic Violence Prevention Officer will confer with the precinct detective squad or Special Victims Squad investigator concerned, before contacting victims whose open complaints have been referred to either squad. Prior to conducting a family/home visit, notify Communications by utilizing radio code "10-75F" and give the address, and if applicable, the apartment number of the visit.*

**DOMESTIC VIOLENCE PREVENTION OFFICER (continued)**

9. Document any visits to domestic violence victim(s) and/or offender(s) where documented domestic violence has occurred as follows:

   a. If home visit was successful (i.e., contact was made with victim and/or offender), record the visit in Home Visit Log and complete **DOMESTIC VIOLENCE HOME VISIT CHECKLIST (PD313-148)**.

   b. If home visit was unsuccessful (i.e., contact was not made with victim and/or offender), record visit in Home Visit Log.

   c. Submit completed **DOMESTIC VIOLENCE HOME VISIT CHECKLIST** to desk officer or immediate supervisor for review and signature.

10. Maintain file of all completed **DOMESTIC VIOLENCE HOME VISIT CHECKLISTS** prepared within the command.

11. Effect summary arrests in adherence with *P.G. 208-36, "Family Offenses/Domestic Violence,"* if during the course of a home visit, interview, etc., a wanted offender is present.

    a. Ensure that a computer warrant check on individuals identified on the **Domestic Incident Report** has been completed prior to conducting a home visit, interview, etc., and that results have been entered on the **Domestic Incident Report**.

12. Relay information concerning victims or locations requiring special attention to other command personnel, including the Domestic Violence Investigator, community policing officers, youth officers, and sector officers.

13. Furnish complainants/victims with information concerning their rights, particularly the Right of Election, providing explanation if necessary.

    a. Advise complainants/victims of the availability of Orders of Protection.

14. Assist in the serving of Orders of Protection, when requested.

**NOTE**
*The above responsibility addresses all Orders of Protection served between Family/Household - Expanded Definition members, NOT the temporary Orders of Protection from Family Court as outlined in P.G. 212-57, "Service Of Orders Of Protection By Uniformed Members Of The Service."*

15. Advise complainants of the availability of counseling, assistance, and shelter.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 202-29 | 08/01/13 | | 3 of 3 |

**ADDITIONAL DATA**   *DOMESTIC VIOLENCE HOME VISIT CHECKLISTS, are potential Rosario material, and must be maintained at the precinct of occurrence.  If an arrest is effected, the arresting officer must ensure that the Assistant District Attorney is provided with a copy of the DOMESTIC VIOLENCE HOME VISIT CHECKLIST in regards to the incident. When requested, the domestic violence prevention officer will make the DOMESTIC VIOLENCE HOME VISIT CHECKLIST prepared regarding the incident available to an Assistant District Attorney.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**



## PATROL GUIDE

| Section: Arrests | Procedure No: 208-70 |
|---|---|
| **PROCESSING OF NEW YORK STATE DOMESTIC INCIDENT REPORTS IN THE DOMESTIC VIOLENCE DATABASE** | |

| DATE ISSUED:<br>08/01/13 | DATE EFFECTIVE:<br>08/01/13 | REVISION NUMBER: | PAGE:<br>1 of 4 |
|---|---|---|---|

**PURPOSE**   To improve the tracking, monitoring, and analysis of domestic violence cases.

**PROCEDURE**   Whenever entering information from a command's past/current **New York State Domestic Incident Report (DCJS-3221)** into the new Domestic Violence Database System:

**UNIFORMED MEMBER OF THE SERVICE**   1.   Submit hard copy of **Domestic Incident Report** and any related paperwork [**COMPLAINT REPORT (PD313-152), AIDED REPORT WORKSHEET (PD304-152b), ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159)** etc.] to desk officer.

**NOTE**   *The current **New York State Domestic Incident Report (DCJS-3221)** does not have captions for certain pertinent information that is collected in the Domestic Violence Database System. Therefore, the following information is to be elicited from the person(s) involved and recorded in the NARRATIVE OF THE INCIDENT:*

   *a.   Alcohol involved*
   *b.   Narcotic involved*
   *c.   Verbal dispute only*
   *d.   Court and Docket number of Order of Protection*
   *e.   Voucher number of photos (if taken)*
   *f.   Social security number and alias of persons involved (record next to name if space allows, otherwise include name and information in narrative)*
   *g.   Reporting officer's tax number in box titled "OFFICER I.D. NO."*

**DESK OFFICER**   2.   Review hard copy of **Domestic Incident Report** and any related paperwork for accuracy and completeness and sign.

   3.   Direct command clerk to enter information from the **Domestic Incident Report** into the Domestic Violence Database System.

**COMMAND CLERK**   4.   Enter information from the **Domestic Incident Report** into the Domestic Violence Database System and print out computer copy.

**NOTE**   *Members of the service entering Domestic Incident Reports into the Domestic Violence Database System should not attempt to translate victims' statements that are written in languages other than English, regardless of whether or not the member is proficient in the other language. However, members should indicate in the "Victims Statement of Allegations/Supporting Deposition" field that the statement is written in a language other than English (i.e., "Victim's statement is completed in apparent Spanish").*

   5.   Attach hard copy and computer copy and present them to the desk officer for review.

## NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-70 | 08/01/13 | | 2 of 4 |

**NOTE**    *With the implementation of new, linked computer systems, the command clerk must enter all associated reports and obtain numbers from the other appropriate computer systems (OLCS, Aided, etc.) PRIOR TO entering the data into the Domestic Violence Database System. The command clerk will record all appropriate numbers on the hard copy of the Domestic Incident Report. It is imperative that these numbers are obtained prior to the entry of the Domestic Incident Report since these numbers link to the other systems and links information contained therein and CAN NOT be entered or retrieved later. In the event that a Domestic Incident Report is entered into the database without these numbers, it MUST BE VOIDED and re-entered with this information.*

*The command clerk will prepare a Domestic Incident Report for walk-in complainants reporting domestic incidents whenever the command's domestic violence officer is not available to do so.*

**DESK OFFICER**    6.    Review computer copy and compare to the hard copy for accuracy and completeness.

7.    Forward both copies to the command's domestic violence officer/designated reviewer.

**DOMESTIC VIOLENCE OFFICER/ DESIGNATED REVIEWER**

8.    Obtain previously assigned victim and/or offender numbers or generate new numbers, as appropriate, from database.

9.    Query the Domestic Violence Database System for the following offender information:
   a.    Warrant history
   b.    Investigation card status
   c.    Gun license/permit status
   d.    Criminal recidivist history
   e.    Targeted narcotics violator status
   f.    Domestic violence history

**NOTE**    *Results of the New York State Police Information Network (NYSPIN) inquiries concerning orders of protection, probation status and arrest history (Booking Arraignment Disposition System [BADS]), and complaint history (On Line Complaint System [OLCS]), will be entered onto the appropriate captions of the Domestic Incident Report review screen.*

10.    Ensure that all computer inquiries regarding the offender are completed during the tour in which they are commenced.
   a.    Attach printouts of all inquiries listed in step 9 to the **Domestic Incident Report**.

11.    Forward both copies of the **Domestic Incident Report** back to the desk officer or domestic violence supervisor for endorsement

**DESK OFFICER/ DOMESTIC VIOLENCE SUPERVISOR**

12.    Review the **Domestic Incident Report** computer summary screen.
   a.    Ensure that all **Domestic Incident Reports** and the necessary offender queries are completed.

13.    Utilize the supervisory sign off function to finalize each **Domestic Incident Report** thereby entering it into the Domestic Violence Database System.
   a.    Print finalized copy of **Domestic Incident Report**.

**NEW • YORK • CITY • POLICE • DEPARTMENT**