2 County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and
3 usage of the State of New York and the City of New York, and acted within the scope of her
4 employment. She is sued in her individual and her official capacities.

ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

63. Powell had abused Plaintiff physically, mentally, and economically. Instead of investigating Plaintiff's claims, following the mandates for crime and trafficking victims as is MANDATED by McKinney's and assisting her Plaintiff was arrested and charged with hundreds of counts of aggravated harassment towards her batterer BASED ON THE ASSUMPTION THAT SHE WAS FABRICATING HER ABUSE IN AN ATTEMPT TO HAVE POWELL ARRESTED FOR SAID ALLEGED FABRICATED ABUSE even though no investigation into Price's allegations had transpired. Plaintiff was also charged with one count of contempt of court resulting in Plaintiff's false arrest, malicious prosecution, unlawful Imprisonment, and defamation. Various abuses of process and Injurious Falsehoods were levied against her in violation of her civil rights Constitutionally protected under the 1st, 4th 5TH, 6TH, 8TH, 16TH and 14th Amendments from unreasonable search and seizure, and violations of procedural due process and the New York Constitution.

64. Plaintiff's batterer (Raheem Andre Powell) enjoyed a privileged status with the MDAO and NYPD as a result of several incidents: he had assisted in helping the police previously and warned her that she would be unable to find sympathetic ears regarding his violence. More recently Powell had been a complainant in an attempted murder case wherein his marijuana distribution hideout was robbed in December of 2010 by an armed member of a central-Harlem gang. During that robbery the perpetrator shot at Powell as he chased him up nearby Frederick Douglas Boulevard in front of the 28th precinct. That young robber/shooter was key in unraveling knowledge about the "Goodfellas" and "137th st" gang in Central Harlem, which were 'brought to justice' under fanfare and several public press conferences by the district attorney's office. Powell also had knowledge of other gang-related (Crips/Bloods) activities that involved the murder of his cousin, Andre, in broad daylight on the corner of 115th and Lenox in the Fall of 2010 among other pieces of information he on passed to the police. As ADA Strohbehn at the time was a junior member of an anti-gang task force in Harlem (See Exhibit

| | | |
|---|---|---|
| 2 | | # 18 Strohbehn Linked in Resumes—two different versions!) Plaintiff has a very hard time |
| 3 | | understanding why Strohbehn was allowed to be the only ADA to evaluate the veracity of her |
| 4 | | complaints when it was known that Plaintiff's Batterer was an active participant in one of ADA |
| 5 | | Strohbehn's investigations and clearly she would need to defend his credibility to assist in her *case- |
| 6 | | building (*self-promoting career-building too.) Strohbehn after 'cleaning up' Harlem as a Junior |
| 7 | | member of the anti-gang squad has been PROMOTED to now be the SENIOR LEADER on a similar |
| 8 | | squad centered in MIDTOWN (see Exhibit #18 Strohbehn linked-in resume). This apparent conflict of |
| 9 | | interest that exists between a crime victim and a crime perpetrator who also just so happens to be an |
| 10 | | informant or complainant acting in a support capacity for the NYPD or MDAO needs to be properly |
| 11 | | supervised and trained. The inherent conflict of interest and its existence still in the MDAO proves a |
| 12 | | lack of PROPER supervision and training exists within the NYPD and MDAO as to how to ferret out |
| 13 | | the good complaints from the bad, to initiate a full and fair investigation into allegations, and to ensure |
| 14 | | oversight of decisions that make or break a prosecutor's case. |
| 15 | 65. | October 11, 2010: Raheem Powell attacks Plaintiff in street and beats her in the face and neck with his |
| 16 | | cell phone at the intersection of 118th and St. Nicholas Ave (NW corner.) He beats her with his fists |
| 17 | | and cell phone and Police are called. Police encourage Plaintiff to make a combined report of stolen |
| 18 | | license plates, car, and Domestic Abuse all none. Plaintiff is not given copy of report. Police take |
| 19 | | extensive photos of face, back and torso with bruises all over. Officers instruct parking garage to not |
| 20 | | allow Powell to take my car out of garage. Raheem bribes parking lot owner and takes car even |
| 21 | | though Police helped me remove one license plate and park suv in front of car. |
| 22 | 66. | On or About October 14, 2010 Plaintiff was not ready to initiate a prosecution against her batterer, |
| 23 | | Raheem Andre Powell, as he had threatened her with blackmail and reminded Plaintiff that he had |
| 24 | | Police connections and would 'ruin Plaintiff' if she reported his battery to the police (Exhibit 12 # text |
| 25 | | message threats from Powell to Plaintiff). Upon arriving at the 28th Precinct on or about the morning |
| 26 | | of October 14th, 2010 and informing the DV officers McNair and Diaz that she was choosing to not |
| 27 | | initiate prosecution against Powell for beating Plaintiff on 10/11/2010 that had been discussed on or |
| 28 | | about the evening of 10/13/10 Plaintiff asked the DV officers to tear up the 61 report. The previous |
| 29 | | evening she had been told by the police that they would allow Plaintiff time overnight to think about if |

she wanted to follow through with the filing of the complaint against Powell. Plaintiff was reticent to go forward with her claim against Powell for several reasons including that Powell was blackmailing (Exhibit 12# Text Message transcripts of blackmail threats by Powell to Plaintiff) Plaintiff by telling Plaintiff that he would release intimately personal photos and information about Plaintiff's trafficking as she was being coerced into prostitution by Powell to her family and colleagues if she ever went to the police about the battery he unhanded to Plaintiff (please refer to Exhibit #12, cell phone transcripts of messages sent to Plaintiff from Powell proving the blackmail and trafficking). The DV officers had already elevated the report even though they had promised not to and it had been assigned to Detective Simmons. Simmons, according to McKinney's Social Services Law 483-cc which states that "As soon as practicable after a first encounter with a person who reasonably appears to a law enforcement agency or district attorney's office to be a human trafficking victim, that agency or office shall notify the office of temporary and disability assistance and the division of criminal justice services…" (Exhibit # 49). Instead of treating Plaintiff as a trafficking and Domestic Violence Victim Detective Simmons utilized a regularly issued process of evaluating her complaint and used her complaint to coerce her batterer to reveal confidential information that was relevant and productive for the NYPD and MDAO's joint anti-gang, anti-gun effort nicknamed "Operation Crew Cut" of which ADA Strohbehn was a member of.

67. INSTEAD of following appropriate protocols and reporting and investigative procedures as outlined in the NYPD Handbook for evaluating DV and Trafficking victims (Exhibit # 50) Strohbehn and Simmons labeled her as a "fabricator" and refused any investigation into her complaints against the stipulations of McKinney's which require a MANDATORY investigation into ALL COMPLAINTS OF TRAFFICKING.

68. INSTEAD of performing the regularly issued processes as Mandated by the NYPD Patrolmen's Handbook for Domestic Violence victims (Exhibit #s 50) Simmons agreed to tear up Plaintiff's report against Powell only if she wrote out a statement saying Plaintiff had made a false report and inflicted injuries on herself and only if Plaintiff agreed to move out of the neighborhood. Simmons recommended this course of action as it was "the easiest way to make the situation go away." Simmons stated that she needed overtime hours that day and as it was nearing the end of her shift and by booking

19

Plaintiff that day for filing a false police report she would get overtime hours. Simmons told Plaintiff that as she had never been arrested that she would only receive a Desk Appearance Ticket and that no one would go to jail. She also warned Plaintiff to keep her head down and that she should move out of the neighborhood because from this point on "you're on your own."

69. The report that Plaintiff had made was for injuries inflicted on Plaintiff in public on the corner of 118th St. and St. Nicholas Avenue. People known to Plaintiff witnessed the events and she knew that if her story was ever followed up on that the facts would come out so Plaintiff agreed to Simmons' plan. Simmons informed Plaintiff that this was the only way she would not arrest Powell based on her complaint filed without her permission by the DV officers. Detective Simmons coached Plaintiff on how to retract her statement: asking Plaintiff to rewrite a synopsis of events several times Plaintiffs each time asking Plaintiff to write the time at the top of the page much earlier than the last so that Detective Simmons "could receive overtime Plaintiff by catching the case with enough time to start to work it" on or about 10/14/2010. A record of Simmons' overtime request and payment is on file for this day. Simmons helps Plaintiff write simple statement saying Plaintiff caused bruises to her own face because she was in a fight with Powell and was mad etc. Plaintiff is arrested and given a desk appearance ticket for falsifying a police report. DA declines to prosecute when Plaintiff make court appearance the following month.

70. Night of November 11/12 2010: Raheem breaks into Plaintiff's house and is waiting for her when she comes home. When Plaintiff entered her home Raheem attacked her, stole her money and choked her until she passed out on her living room floor. When she regained consciousness she tried to run for the door and screamed for help. At that point Raheem tried to detain her and she was thrown/pushed through a 30-gallon fish-tank. When Raheem realized what he did he panicked and stepped in the glass to pull Plaintiff out of tank as Plaintiff was sitting in glass and foul water. He stepped on glass in his flip-flops and needed to be treated months later in December or early January at St. Luke's for an infection he suffered from a shard of glass lodged in his foot from that evening that had become infected.

71. Neighbors all called police and they were pounding on Plaintiff's door: there must have been 30 officers in her house that night. After much arguing with police (Raheem had disappeared out the back

|  |  |  |
|---|---|---|
| 2 |  | door and the Police from the 28th pct. did not want to accompany Plaintiff to Metropolitan Hospital |
| 3 |  | which was much further away than nearby St. Luke's Roosevelt) Plaintiff was taken to Metropolitan |
| 4 |  | Hospital and treated. The FDNY ambulance workers (Valentin was one of them) remember the |
| 5 |  | incident and commented on how strangely the police were acting. The doctor who treated Plaintiff can |
| 6 |  | also comment on this (dr. Albert Della Fave—ER Resident.) Dr Della Fave got in a shouting match |
| 7 |  | with detectives from the 28th squad as they would not leave Plaintiff alone while he was prepping her |
| 8 |  | for surgery. |
| 9 | 72. | MANY neighbors heard Plaintiff screaming for her life and called police that night. survey 911 calls |
| 10 |  | and Medical Professionals who Treated Plaintiff: FDNY Valentin: see copy of FDNY ambulance |
| 11 |  | report (EXHIBIT # 2) Dr. Albert Della Fave: Metropolitan Hospital ER Resident: 212 423 6262 to |
| 12 |  | attain a copy of DELLA FAVES INTERNAL DISPOSITION describing events with police and |
| 13 |  | Plaintiff's treatment beyond the scope of what is in her medical records. (see EXHIBIT # 2 Hospital |
| 14 |  | emergency Report). Plaintiff tries to make a new report at precinct two days later when she was able |
| 15 |  | to walk again and was told to come back when the DV officers are around. She returns the next day |
| 16 |  | and is told again to come back the next day. No report was ever taken of incident by NYPD despite |
| 17 |  | Plaintiff's efforts to do so. |
| 18 | 73. | November 17, 2010: Plaintiff is beaten by Nancy Powell, Raheem's mother when she goes to her |
| 19 |  | house for help. Face completely covered in blood and deep scratches from her fake nails digging into |
| 20 |  | Plaintiff's flesh. Plaintiff has permanent facial scarring as a result. (See Exhibit # 1 Photo of deep |
| 21 |  | scratches on Plaintiff's face dated 11/17/2010) Nancy Powell was given an ACD (2010NY092185) |
| 22 |  | which she violated by being re-arrested for marijuana possession six months later but the Das never |
| 23 |  | prosecuted her.) |
| 24 | 74. | November 22, 2010: Plaintiff approaches the 28th precinct five days after attack by Nancy Gaines, |
| 25 |  | mother of Raheem Powell. Police, noting extensive damage to Plaintiff's face allow Plaintiff to make |
| 26 |  | report against Nancy Powell however they refuse to take a report for events that transpired on the |
| 27 |  | evening of November 11 2010 where Raheem threw Plaintiff through a fish tank and instead the |
| 28 |  | precinct instructs Plaintiff to go to family court to attain a restraining order against him which she does |
| 29 |  | (Exhibit # 26) THIS FAMILY COURT RESTRAINING ORDER IS DE FACTO EVIDENCE THAT |

2 THE CITY OF NEW YORK HAD An OBLIGATION TO LOOK AFTER Plaintiff's INTERESTS
3 and that the NYPD and MDAO had a SPECIAL RELATIONSHIP TO PLAINTIFF ergo there is no
4 veracity to the assertion that these criminal justice agencies had leave to NOT protect Plaintiff. As a
5 general rule, a municipality may not be held liable for injuries resulting from a simple failure to
6 provide police protection. To overcome this general rule, plaintiff would need to demonstrate a special
7 relationship or duty between her and the municipal agent (See McLean v City of New York, 12 N.Y.3d
8 194, 199 (2009.) The restraining order issued by Judge Sattler is evidence of a special relationship
9 between plaintiff and the municipal agent City of New York see Mclean v City of New York, 12 N.Y.
10 3d 194, 199 (2009.). It proves that the City of New York made promises to Plaintiff and took actions
11 that created an affirmative duty to act to protect plaintiff and that Plaintiff justifiably relied on this
12 promise. Plaintiff took the restraining order to police to serve and they tell Plaintiff to come back.
13 Plaintiff returned a few days later with Family Court restraining order and the precinct ostensibly
14 refuses to act on it: each day she walks the 175 yards from her home to the 28th pct and each time she
15 is told to come back the next day when officers will be available for service. Officers are never
16 available for service. Desk Sergeant Agron at the 28th Pct. openly mocks Plaintiff to her face each time
17 she enters precinct. Plaintiff makes IAB complaint against Desk Sergeant Agron.

18  75. December 22nd, 2010: Plaintiff is beaten, robbed, dragged into street after Raheem breaks into
19 Plaintiff's house and steals her money and phones. Multiple witnesses call 911 for help. Precinct desk
20 sergeant Agron tells Plaintiff when she goes to make report that he will arrest Plaintiff for trespassing
21 if she doesn't leave the precinct. Agron Refuses to act or to serve restraining order even though
22 Plaintiff has an active restraining order against Raheem. He refuses to look at it let alone serve it.
23 Plaintiff calls 911 from inside precinct to report his conduct and the operator tell Plaintiff they can't do
24 anything to help Plaintiff. FOIA request has been made to DANY, NYPD and the Dept. of Technology
25 for all records of 911 calls.

26  76. January 27th 2011: fight with Raheem. Another fight. Plaintiff goes to precinct to make police report
27 of incident and sergeant Agron again tells Plaintiff that the only thing he can do for Plaintiff is to
28 "move Plaintiff to Nevada" (implying that Plaintiff is a some kind of filthy degenerate prostitute
29 unworthy of the NYPD's assistance.) (See texts from Powell EXHIBIT #12).)

22

77. January 28th 2011: Plaintiff makes appeal to detective Simmons to help Plaintiff. Simmons agrees to help initially and insists Plaintiff make reports about 12/20 and 1/27 incidents to DV officers when they are in the next day. Simmons agrees to help Plaintiff if she tells her everything she knows about Raheem's drug-dealing and his connections etc. Plaintiff asks about signing a complaint for injuries dating from 11/11/2011 and Simmons tells Plaintiff "it's too late that the precinct will look bad."

78. January 29th 2011: Interviewed by DTs about Raheem's drug sales enterprise. They never ask Plaintiff to show them pictures, ER reports etc. Detectives tell Plaintiff the only way they will help keep Raheem away from Plaintiff and to get her car back from Raheem is if she presses charges against Raheem.

79. January 30th 2011: DV officer McNair takes report of 12/20 incident and encourages Plaintiff to make report about 1/27 incident. Plaintiff is leery b/c no one saw him harm Plaintiff on 1/27 but people did see him harm Plaintiff on 12/20. Precinct tells Plaintiff that Raheem has been making reports against Plaintiff and that if she doesn't make report about 1/27 incident "decisions may be made that are not in her favor." Plaintiff asks again to make a report about incident on 11/10 and is told that; ' too much time has passed' by Domestic Violence officers McNair and Diaz at the 28th pct.

80. On or about February 2, 2011, shortly after Plaintiff had filed a complaint against Powell with the 28th Precinct the Plaintiff was contacted by ADA Strohbehn and asked to rush to the DA's office. The city had been blanketed by a snow blizzard the evening before and as Plaintiff was on 125th st at the time she told Strohbehn it would be virtually impossible for her to make it to Centre st in less than an hour. Regardless Strohbehn commanded Plaintiff to appear under verbal threat of arrest herself. When Plaintiff appeared she was placed in the Safe Horizon Waiting room in the 2nd floor of the Das office at 100 Centre st where she continued to wait for over 2.5 hours. When Strohbehn appeared she refused to shake Plaintiff's hand in the waiting room upon introduction, ferociously holding her hands behind her back when Plaintiff greeted her with her right hand out-stretched as it customary.

81. Plaintiff was commanded to a small interrogation room/office where Strohbehn told her upon arrival that Powell would not be charged, that Plaintiff was believed to be a "fabricator" and a liar, and was refused opportunities to provide evidence proving her story. ADA Strohbehn informed Plaintiff that if Plaintiff makes another report against POWELL that she Strohbehn will "lock [her] up and throw away

23

2  the key." Strohbehn informs Plaintiff "the only reason I'm not arresting you right now is because I did

3  not instruct you to bring counsel with you when I commanded you to appear at my office today."

4  Strohbehn also informed Plaintiff that she had informed the 28th precinct that she will personally

5  handle all of Plaintiff's "police service needs" and if Plaintiff has "a bullet-hole in her [sic] head that

6  the NYPD is to call Strohbehn first before responding to any call from Plaintiff." Strohbehn informs

7  Plaintiff that she has already assisted Powell in drawing up a Family Court petition to attain a counter

8  restraining order against Plaintiff in order to press counter-claims of harassment. Strohbehn further

9  instructs Plaintiff that even though she hasn't been served that she is to show up in family court the

10  next morning to respond to Powell's charges. She tells Plaintiff that she will be charged with contempt

11  of court if she does not show up in court: "as [Strohbehn] as an officer of the court am ordering you

12  [Plaintiff] to appear even though there is not time to serve [Plaintiff with] a subpoena (sic)." Strohbehn

13  tells Plaintiff her only concern is that "an innocent black man has been sitting in jail for 24 hours…"

14  Plaintiff asks to speak with Strohbehn's supervisor to show her proof of the abuse and have her

15  neighbors interviewed etc. and Ms. Strohbehn informs Plaintiff that "she already checked with her

16  supervisor (Deputy DA Audrey Moore) and that she [Strohbehn] has been given [by Moore] carte

17  blanche to deal with Plaintiff with finality." Plaintiff begged for someone to review the photographs

18  (Exhibit #1), hospital emergency room reports (Exhibit #2 ), receipts for broken windows and kicked-

19  down doors or to speak with her neighbors who had heard and seen the constant battery. Strohbehn

20  informs Plaintiff that she will "have to show her proof to the judge."

21  82.  Plaintiff's landlord and others try to speak with Ms. Strohbehn to introduce investigatory evidence and

22  she rebuffs him and hangs up the phone on him before receiving contacts for other tenants in Plaintiff's

23  building who had provided information to Landlord of Plaintiff's abuse at the hands of Powell (please

24  see Exhibit 3 # letter from Landlord). Strohbehn's actions were in retaliation for Plaintiff's exercise of

25  her rights to petition the Court for grievances and violated Plaintiff's 1st amendment rights and

26  privileges under the US Constitution also under 42 USC 1983. These acts Strohbehn took to act as

27  private attorney for Plaintiff's batterer by ordering a petition to be filed in Family Court on his behalf,

28  and stripping Plaintiff of her right to police services are not functional prosecutorial actions and

29  exercising them denied Plaintiff's rights under the 1st 4th and 14th Amendments under 42 USC 1983.

83. February 3rd: Powell tries to accost Plaintiff on way out of family court. ADA Maria Strohbehn refuses to help Plaintiff file report about Raheem's violation of restraining order/ conduct on way out of court building. Plaintiff makes report with Det. Mortimer Plaintiff at 5th precinct as courthouse is in this jurisdiction. Months later dt. Mortimer informs Plaintiff that he was told to not pursue an investigation of her complaint.

84. Early February 2011: Neighbors tell Plaintiff that nude photos of Plaintiff have been texted around to all the neighborhood boys. Plaintiff calls precinct and Strohbhen and no one will take report. She then calls Detective Mortimer and he tells Plaintiff he can't do anything. Lt. LArocca from the 28th pct. encourages Plaintiff to make a report to the court and to the dept. of Investigations as he informs Plaintiff that ADA Strohbhen has instructed the pct. to not take any reports from Plaintiff. (LT LAROCCA has retired and living in Florida. Plaintiff Price has only FINALLY been able to track him down as of August 10, 2015 Please See Exhibit #60 request for affidavit from Lt. Larocca.) Larocca informed Plaintiff Price that each time she made a complaint of abuse, battery, assault, threats or was attacked by neighbors in Harlem associated or not with her batterer, Raheem Andre Powell, that the detectives in the 28 squad had to take the EXTRAORDINARY step of calling the MDAO and requesting PERMISSION to proceed with an investigation into her allegations for the period of time he remained under the employ of the 28th precinct. This treatment of her complaints as a victim of trafficking and abuse were outside of the the REGULARILY ISSUED PROSESS followed by the NYPD and the MDAO and proves that the MDAO took pains to unhand her unusual and excessive punishment for making allegations against their prized informant. Lt. Larocca has agreed tacitly to pen an affidavit describing these and other unusual steps the MDAO took to quelch Plaintiff Price's Due Process Rights and rights to equal protection under the law, right not to be unusually searched and seized, or to be excessively punished. Such an affidavit will be included in any response to a motion to dismiss that the City Law Department or other defendant attorneys should choose to bring to Plaintiff Price's complaint. *(See Exhibit #60 Letter to Lt. Larocca.)

85. February 2011 Plaintiff makes formal complaint to NYC Mayor's office for the Prevention of Domestic Violence about the lack of investigation into her allegations and collusion between her batterer and MDAO. Strohbehn is taken off the case and is replaced by ADA Wells.

25

| | | |
|---|---|---|
| 2 | 86. | February 2011 Plaintiff contacts Deputy ADA of Special Victims and Domestic Violence, Larry |
| 3 | | Newman. Newman informs Plaintiff that she will not be arrested and that often "Police and Das |
| 4 | | disagree on cases and not to worry." Newman invites Plaintiff to his office to provide evidence that |
| 5 | | her story is true. Plaintiff informs Newman that she will arrange for a meeting when her lawyer |
| 6 | | returns from vacation. Two weeks later when Greenberg returns to town Plaintiff calls Newman to set |
| 7 | | up meeting and he never responds. |
| 8 | 87. | February of 2011 Plaintiff makes formal complaint to Mayor's office: Strohbehn is taken off case. |
| 9 | 88. | February 23 (cq)2011: Plaintiff receives a call from officer Diaz at DV office of 28th precinct asking |
| 10 | | Plaintiff to "come in to tell them how things are going." Officer McNair admits to Plaintiff that |
| 11 | | Raheem made claims of harassment against Plaintiff. He's surprised to find out that Raheem and |
| 12 | | Plaintiff had been discussing her pregnancy via telephone. Diaz Plaintiff she will be arrested even |
| 13 | | though at time of conversation Plaintiff had no restraining order against her and Powell had one |
| 14 | | prohibiting him from talking to her. |
| 15 | 89. | February 24, 2011: Plaintiff travels to 28th Precinct to discuss matter with Lt. LaRocca. LaRocca rips |
| 16 | | up Powell's complaint against her in front of Plaintiff, informs Plaintiff that "a war between upstairs |
| 17 | | (detective squad) and downstairs (patrol officers)is taking place in the precinct" over her case. |
| 18 | | LaRocca again informs Plaintiff that the DAs office has instructed precinct NOT to take any |
| 19 | | complaints filed by Plaintiff and that her only recourse is to contact the Department of Investigations |
| 20 | | and to make a complaint. |
| 21 | 90. | March 11, 2011 Assistants from Plaintiff's Family Court Lawyer's office communicate with 28th |
| 22 | | Precinct seeking assistance in delivering restraining order issued by Judge Sattler on November 22, |
| 23 | | 2010. Precinct acts strangely: inquires as to Plaintiff's whereabouts. (See Exhibit 42 # detailed |
| 24 | | inventory of legal services provided from Atty Ed Greenberg) |
| 25 | 91. | March 16, 2010 Attorney Ed Greenberg faxes Dt. Flowers at 28th pct demanding an answer to his |
| 26 | | question if he needs to surrender his client for any reason to the 28th pct. (Exhibit #13: Statements on |
| 27 | | the court record ref his discussions of surrendering Plaintiff for arrest before family court hearing with |
| 28 | | detectives from 28th pct). Later that afternoon via telephone conversation Dt. Flowers inquires as to |
| 29 | | Plaintiff's whereabouts and denies any charges have been filed/will be filed against her and assures |

|   |   |   |
|---|---|---|
| 2 |  | Greenberg that he does not need to surrender his client to the precinct. (See Exhibit #13 Greenberg |
| 3 |  | statements on court record regarding communiqués to 28th precinct and Exhibit #42 Itemized |
| 4 |  | communication between Greenberg and Precinct noting conversation with Dt. Flowers.) |
| 5 | 92. | On or about late February or early March 2011 Plaintiff miscarried a child she was carrying fathered |
| 6 |  | by Powell. |
| 7 | 93. | On March 24, 2011 Plaintiff is arrested in front of Judge Sattler in Family Court as she tries to have a |
| 8 |  | restraining order extended against Powell by various detectives from the 28th precinct inside the Family |
| 9 |  | Courthouse and then handed over to Detective Flowers of the 28th precinct. Plaintiff is charged with |
| 10 |  | hundreds of counts of aggravated harassment against Powell (Exhibit #4).   THE STATUTE USED TO |
| 11 |  | PROSECUTE PLAINTIFF IS FOUND TO BE AN UNCONSTITUTIONAL LIMITATION OF 1ST |
| 12 |  | AMENDMENT RIGHTS AND IS STRUCK DOWN BY THE NY State Appellant Court (Exhibit |
| 13 |  | #61) Plaintiff's OP is restricted and Powell's is given precedence barring Plaintiff from special |
| 14 |  | proximity to Powell but not vice-versa (Exhibit 25 & 26). Technically every time Plaintiff entered her |
| 15 |  | home she was in violation of Powell's OP granted this day by Sattler as a direct result of Detective |
| 16 |  | Simmons' false testimony provided under oath as Powell lived next door unofficially in a studio he |
| 17 |  | illegally sublet and ran his drug-distribution from. |
| 18 | 94. | On March 24th, 2011 Detective Simmons PERJURED HERSELF IN COURT when she was called in |
| 19 |  | front of Judge Sattler in Family Court and asked if she had investigated Plaintiff's claims of abuse and |
| 20 |  | if they were credible. Simmons replied "no" (Exhibit #13 ) even though she had not questioned |
| 21 |  | Plaintiff about her emergency room visits, reviewed photos of injuries taken by her neighbors, or |
| 22 |  | interviewed her building super, landlord or neighbors about the ongoing abuse. |
| 23 |  |   |
| 24 |  | Judge Sattler:… Detectives investigated the stories? |
| 25 |  | Detective Simmons: Yes |
| 26 |  | Judge Sattler: And they don't find her story to be credible? |
| 27 |  | Detective Simmons: No. |
| 28 |  |   |
| 29 | 95. | After Simmons answered that she did not believe Plaintiff's allegations even though she had not |

27

investigated them whatsoever, Judge Sattler allowed four officers from the precinct to cuff Plaintiff in the Family Court House on Lafayette St in her courtroom and transport Plaintiff back to the 28th precinct for booking and further criminal processing on 324 counts of aggravated harassment.. DETECTIVE SIMMONS HAD NEVER INVESTIGATED PLAINTIFF'S ALLEGATIONS OF ABUSE & SHE PERJURED HERSELF IN OPEN COURT. Detective Simmons NEVER followed the NYPD Handbook procedures for a DV investigation and or McKinney's Laws for evaluating and protecting trafficking victims. THESE STATEMENTS CAUSED INJURY TO PLAINTIFF NOT ONLY IN THE EYES OF THE COURT BUT ALSO IN THE EYES OF THE DA AND THE NYPD. In November of 2011 Plaintiff filed IAB complaint # 11-55009 against detective Simmons about her perjuring herself under oath in front of Family Court Judge and failing to investigate Plaintiff's abuse claims (see court transcript Exhibit #13). Detective Rogers on 11/29/2011 logged this. It was marked unsubstantiated by Lt. Franqui. No one called Plaintiff or followed up with Plaintiff. The Office of the NYPD Inspector General is now investigating (Exhibit #40).

96. It is long-held that state agents, including Police Officers, receive immunity when testifying in court. Detective Simmons had not even asked Plaintiff to sign HPPA forms releasing her ER reports, which according to the NYPD handbook is a crucial step of ANY domestic violence investigation. This and other affidavits prove detective Simmons willfully lied to the court with RECKLESS DISREGARD & DELIBERATE INDIFFERENCE for Plaintiff's rights and thus satisfies the standard applicable to violations of Plaintiff's Constitutional DUE PROCESS rights. What is at issue is can the city be held liable for the consequent wrongs unhanded to Plaintiff because of this lie. SCOTUS just refused to hear a case on this very issue citing: "police's obligation to disclose highly exculpatory evidence to the prosecutors... is widely recognized" upholding a 9th circuit ruling:

"A jury determined the officers had demonstrated deliberate indifference or reckless disregard for Walker's rights or for the truth, and had withheld or concealed evidence that strongly indicated Walker's innocence, the 9th Circuit said... "A police officer's continuing obligation to disclose highly exculpatory evidence to the prosecutors to whom they report is widely recognized,"

97. Later that evening as Plaintiff is being arraigned the ADA standing in the court part, Ms. Zeinreich,

28

|   |   |   |
|---|---|---|
| 2 |  | eagerly tells Judge she is filing and expedited count sheet and requesting for a restraining order against |
| 3 |  | Plaintiff and filing a family registry. These statements are made before any member of the Das office |
| 4 |  | investigated any of Plaintiff's allegations. NO one asked Plaintiff to sign HPPA forms, to review |
| 5 |  | photographs or for numbers of neighbors that could confirm her allegations. |
| 6 | 98. | Spring 2011: Plaintiff miscarries her child. It is a long, drawn-out miscarriage that is painful and |
| 7 |  | protracted. |
| 8 | 99. | On or about May 8, 2011, Plaintiff is arrested again and taken to Rikers Island on the charge of |
| 9 |  | Contempt of Court (Exhibit #5) by Detective Samuel Fontanez, shield #00311 of the 28th Detective |
| 10 |  | Squad. Plaintiff overall served between eight to ten days incarcerated in the tombs and on Rikers |
| 11 |  | Island. While incarcerated Plaintiff was attacked by other inmates and had her belongings stolen by the |
| 12 |  | guards. When Plaintiff was released on bail she had to travel home to Harlem via subway and bus |
| 13 |  | barefoot as her shoes had been stolen by the guards at Rikers (Exhibit # 6). She also contracts a sinus |
| 14 |  | infection that disables her hearing in her right ear for over six months. Her asthma and breathing |
| 15 |  | disintegrate and Plaintiff is sent to infirmary for medical treatment and assessment of prescriptions for |
| 16 |  | sinus/ear infection and pain. |
| 17 | 100. | May/June 2011: Jumped by women's shelter dwellers at 233 W. 120th st. who do drugs with |
| 18 |  | Raheem's cousins across the street three times. Police called: they refuse to help. |
| 19 | 101. | Have "Queen for a Day Meeting with Lawyer Kartagener and members of the Das office (Kenya Wells |
| 20 |  | and Larry Newman.) See Exhibit # 11 Queen for a Day Debriefing agreement). Price hands over cell |
| 21 |  | phones that are NEVER returned despite promises that they will be at the commencement of current |
| 22 |  | litigation against client. Several of Plaintiff's attorney's reach out to MDAO requesting phones |
| 23 |  | returned as is customary and all requests are denied. |
| 24 | 102. | June 2011: St. Luke's & Roosevelt Hospital's Crime Victims' Center makes call to liasons @ Das |
| 25 |  | office asking for review of case. Agreements had been made between DV community and |
| 26 |  | Prosecutors' offices for a procedure of review to take place when a defendant is identified by |
| 27 |  | advocates to be a true victim not recognized by the court. The calls for the review of case fall on deaf |
| 28 |  | ears. Calls were made to: Christine Quinn Yureni Sanchez, Constituent Liasion. |
| 29 | 103. | Detective Simmons, ADA Strohbehn, Deputy District Attorney Moore, and ADA Kenya Wells never |

29

investigated Plaintiff's claims of trafficking and abuse at the hands of Powell before charging her with hundreds of crimes against Powell against the tenets of McKinney's and the NYPD Patrol Handbook. They failed to interview her landlord and neighbors (and even lied about this); never looked at or compared photos of Plaintiff's severe injuries to hospital emergency room reports; never requested that Plaintiff sign HPPA forms releasing medical records, refused to collect/accept other evidence such as 911 calls, receipts for repair work for broken windows or doors that had been kicked down that proves that regular battery had taken place against Plaintiff by Powell. They accused Plaintiff of fabrication without knowing or seeking to examine the facts and then initiated an elongated, over-zealous, malicious and incorrectly charged case against her.

104. The (unconstitutional) criminal statute for Aggravated Harassment (ruled unconstitutional) requires counts to be charged "per incident" which was not the done in this case.

105. Instead, defendants WILLFULLY AND WITH MALICE initiated a Criminal prosecution of Plaintiff which was based on the manufactured, unfounded, and false belief that she was a fabricator and had self-inflicted her injuries. No one bothered to interview the medical personnel who had treated Plaintiff for her injuries regardless of the requirements of McKinney's and of the NYPD Patrol Handbook. Plaintiff's batterer was walking free: everyone in her community was looking at her in strange ways and distancing himself or herself from her. Others openly confronted her with violence in her neighborhood. She was assaulted by various people who had known her batterer for decades who had heard swirling rumors fueled from the actions of the 28th precinct. For two years the pallor of serious criminal charges hung over Plaintiff: the threat of incarceration for potentially hundreds of years and the complete alteration of the life she had built for herself hung in the balance. Plaintiff refused to take a plea that admitted any sort of guilt for crimes of any kind against Powell. She was the one who had gone to the police for help in the first place after suffering countless attacks on her person at his hands. Powell's favorite method of abuse was to choke Plaintiff. He would watch her suffer and struggle and panic as she fell into a stupor from lack of oxygen. Now Plaintiff watched in court as Powell used the "Justice System" to literally choke the life out of everything Plaintiff had in the world.

106. Plaintiff to date despite repeated requests has not received her bail of $2000.00 back (Exhibit # 8).

107. When Plaintiff was subsequently assaulted by various parties associated or not with her ex-intimate

partner in her neighborhood and attempted to file complaints to the NYPD she was informed that the Manhattan DAs office had instructed the precinct involved not to take her complaint or to not follow-through on any investigation of her allegations. This happened on numerous occasions notably: 7/6/3/2013, 5/17/13, 10/17/12, 07/27/12: (incident #2012-020-2969), 7/14/12, 4/17/12, 1/20/12, 12/1/11, 8/13/11, 8/4/11, 8/2/11. Refusing/failing to investigate are violations of Plaintiff's 14th amendment rights to equal protection under the law and 8th amendment rights to due process. Plaintiff has incident IDs, emergency room reports and ambulance records and eyewitness statements for most of these incidences.

108. 8/2/11: Plaintiff is assaulted (punched in the face and chest when Plaintiff went outside of her Brownstone at 237 w 120th st to check her mailbox at the top of her brownstone steps) in front of her home by neighbors associated with the cousin of her ex intimate partner and batterer, Raheem Andre Powell. Plaintiff called 911. And p.o. Cooley shield # 14327 responded and told Plaintiff she was not allowed to receive police services, that the pct. had been informed by the DAs office that she was 'crazy' and that even if he took an incident report nothing would come of it. Plaintiff called 911 around 1230 pm. Cooley and his partner arrived at 1250 pm. Plaintiff followed up the next day to get incident ID# and was ignored and never received a call back from a detective investigating the assault or from the clerk in the 28 pct. who assigns the ID #. Eventually in 2012 Lt. LaRocca looked up the incident and provided and ID# to Plaintiff.

109. 8/11/11: Told by associates of her intimate partner and batterer, Raheem Andre Powell, who were exiting 239 w 120th next to her brownstone where Raheem operated his drug distribution in apt #2 upstairs on the second floor in the back of the building (overlooking her backyard and bedroom window) that 'YOU would be taken care of' and that YOU should fear for Your life. Plaintiff immediately Called 911 to report death threats around 330pm. P.O. Bonaparte (did not provide shield #) responded with partner around 400pm and took incident report. No one followed up with Plaintiff. She followed up and received a complaint number from lt. larocca who looked it up for Plaintiff, complaint # 2011-28-003732. No one ever followed up with Plaintiff about these threats or arrested the perps. They continued to threaten and intimidate Plaintiff each time Plaintiff encountered them for

31

|   |      |   |
|---|------|---|
| 2 |      | the next two years saying; 'no one cares about you at the precinct; no one gives a shit if anything |
| 3 |      | happens to you Kelly...' |
| 4 | 110. | 8/16/11: Plaintiff is Assaulted by associate of RAP on her way home from store and punched in the |
| 5 |      | face. After Plaintiff called 911 an ambulance arrived and treated Plaintiff, police took report and told |
| 6 |      | her that they were told not to extend Police services to Plaintiff. No one ever followed up. See photos |
| 7 |      | of busted face taken by FDNY ambulance workers (Exhibit # 1 photos dated 8/16/11) |
| 8 | 111. | 8/31 9/1 2011: Plaintiff is harassed by associates of RAP. PO EBRIGHT PO RAMAN and PO Ehlers |
| 9 |      | respond and tell Plaintiff she should move out of neighborhood, they harass Plaintiff about associating |
| 10 |     | with 'these people in this neighborhood' and refuse to take complaint. PO Ebright tells Plaintiff he |
| 11 |     | hopes he responds to one of her complaints one day and 'finds Plaintiff lying on the sidewalk in front |
| 12 |     | of her brownstone with a knife in her back.' |
| 13 | 112. | 9/1/2011. Plaintiff Filed complaint vs. Officers Bright, Ebright and Raman as well as Sergeant Agron |
| 14 |     | for incident on 8/31. IAB complaint # 11-39869 PO EBRIGHT PO RAMAN and PO Ehlers]. This |
| 15 |     | complaint was marked by the 28 precinct as unsubstantiated by an officer on unknown rank named |
| 16 |     | Lopez. When they arrived on scene and Ebright said to Plaintiff; "Miss Plaintiff I hope someday I am |
| 17 |     | called to your home and you are lying dead on the sidewalk with a knife in you..." |
| 18 | 113. | IAB Complaint # # 11-31923 was marked "unsubstantiated" by lt. Rentas and 11-43253 was closed by |
| 19 |     | a 28 squad investigator and closed by lt. laburda: 678 1608. No one ever contacted Plaintiff to |
| 20 |     | interview Plaintiff regarding these complaints. (AN INVESTIGATION HAS NOW BEEN OPENED |
| 21 |     | BY THE OIG NYPD SEE EXHIBIT # 40 ). |
| 22 | 114. | 9/24/11 In the wake of the ten-year anniversary of the tragedy of 9/11 the city erupted with violent |
| 23 |     | clashes between Occupy Wall Street protestors and the NYPD. The whole of the city was on edge. |
| 24 |     | Plaintiff had called police after being manhandled by an over-zealous man in a bar and been humiliated |
| 25 |     | by the officers who arrived. After the officers refused to take report Plaintiff walked away and said |
| 26 |     | "Ya'll should go fuck yourselves you don't help anyone." Plaintiff did not scream this at the top of her |
| 27 |     | lungs: she said it as she turned to walk away with despair and tears rolling down her face and was |
| 28 |     | apprehended forcefully from behind causing bruises to my entire body.(Exhibit # 10 Injuries sustained |
| 29 |     | from Police beating Officer Winters of Midtown South) |