2    115.  Plaintiff's injuries were sustained as she was tackled from behind by the police that evening, hog-tied

3          and dragged to a police cruiser (please refer to photographs provided in exhibit #1) and ambulance

4          workers were called to the 14th precinct to examine Plaintiff. Plaintiff had called 911 and then ended up

5          black and blue. Plaintiff's lawyer spent months trying to subpoena all relevant video and audio

6          material. When the tape finally appeared it had been tampered with omitting the exchange outside the

7          midtown bar where Plaintiff beseeched officers to taker her 61 report and they summarily dismissed

8          her. Eventually when the full un-edited tapes arrived in court months later the officers all lied and said

9          that Plaintiff had screamed at the top of my lungs "Fuck you" even though the video does not show

10         this nor did the officers report this in their CCRB interviews or make any notation of it in their

11         logbooks (Exhibit#19 CCRB audiotapes and Exhibit # 20 officer logbooks).

12   116.  On or about October, 2011, Price's cellular phone company, Metro PCS informs Price that her phone

13         line is being tracked by law enforcement in violation of her state and federal right to privacy.

14   117.  On October 25, 2011 Plaintiff attempted to file a DIR report with the 28th precinct about a violation of

15         a restraining order Powell had committed on 10/21/11 against an order of protection issued by Judge

16         Sattler (Docket #0–00763-11, File # 1685, order #2011-1195 issued on 9/29/11 expiring on 3/29/12.)

17         Plaintiff was refused the opportunity to make a report of the violation on the date of occurrence.

18         Plaintiff went back on subsequent days in an attempt to file the report and Captain Williams, the CO of

19         the 28th precinct, instructed his DV officers to take the report.  The DV officer who took the report

20         eventually (id # 939468) ripped up the report and refused to process it (Exhibit # 14 copy of report

21         ripped up by DV officers).  When following up the next week on the status of the DIR Plaintiff was

22         told it was missing and that she was not invited back into the precinct to refile it.  Plaintiff was

23         accompanied on 12/01/11 by representatives from the St. Luke's Roosevelt Hospital Crime Victims

24         Center back to the precinct to refile a new DIR (Exhibit # 15.)  The DIR was accepted by the SGT (id

25         # 933944).  At that time Plaintiff received an apology from the new DV SGT about the missing DIR

26         and she  provided a copy of the missing DIR to the SGT. The new DIR was assigned to Detective

27         Ransom of the 28th squad who did not follow-up on any investigation regarding the complaint.   In

28         fact sgt Ransom engaged in a game of telephone cat and mouse with Plaintiff and Powell was never

29         arrested, investigated or questioned about his offense against the court order.

33

2     118.    October 2011 Plaintiff filed IAB complaint # 11-49386  against 28 pct. DV officers Rosendary and

3            Simmons WHO THREW AWAY her 61 when Plaintiff complained that Powell was violating the

4            terms of her  restraining order against him. (exhibits 14 & 15) complaint c1-1-667494377.  This

5            complaint was referred back to the precinct for investigation by the manager of the officers, the SGT

6            also marked the complaint as UNSUBSTANTIATED.  The matter is currently under investigation by

7            the OIG NYPD.

8     119.    1/20/12  Plaintiff is attacked by woman named INA  near Plaintiff's brownstone.  This woman has

9            known Plaintiff's batterer since he was a child, is a known street walker, crack/cocaine addict and has

10           had her youngest daughter, Sarde, removed from her by children's services.  She encountered Plaintiff

11           as she was walking to the store and began yelling at Plaintiff about how she loved watching people

12           attack and harass Plaintiff whenever she left her home.  Plaintiff replied that she was a crack whore

13           who couldn't even take care of her own children, that often Plaintiff had to care for 'Dee-Dee" (short

14           for Sarde) often when she was too cracked out to help her own daughter with her home or when she

15           fell off her bike and needed bandaging and love.  Ina became enraged and smacked Plaintiff in the

16           face with a closed fist resulting in Plaintiff's front right tooth becoming dislodged and landing on the

17           sidewalk.  As blood spurted from Plaintiff's face and she searched the sidewalk for her missing tooth

18           Ina picked up a long wooden leg from an old table that still had large protruding nails at the top of it

19           where it had once been attached to the tabletop.  She began to run at Plaintiff with this weapon and the

20           only person on the sidewalk who interfered was the neighborhood UPS guy, Danny, who jumped off

21           his truck and tackled INA so she would not club Plaintiff .  Plaintiff then waved- down a passing

22           NYPD cruiser.  IT was a Manhattan north lt. and his assistant who took Plaintiff's details and said they

23           would on pass her complaint to the 28 but that Plaintiff should also call 911, which Plaintiff did.  The

24           complaint was assigned to Dt. Fontanez who followed up once with Plaintiff asking who Plaintiff's

25           assailant was.  Plaintiff gave her first name and address to Fontanez and he mentioned he couldn't

26           make an arrest based on that.  Plaintiff called Fontanez multiple times reminding him that the statute

27           of limitations on assault is two years and he told Plaintiff that he couldn't do anything because his

28           hands were "tied."

29     120.    4/17/12 Plaintiff is attacked in front of home again.  Police Called:  inform plaintiff no services are

2      available to her from NYPD.

3    121.    7/14/12, Plaintiff is attacked in front of 200 St. Nicholas Ave., around the corner from her home on

4      way home from store. Hair grabbed and slammed over and over onto pavement by associates of RAP.

5      Knee damaged bruises all over. Plaintiff called 911 around 200 am in the morning and P.O. Johns and

6      partner responded, told Plaintiff they wouldn't do anything to help.  PLAINTIFF insisted it is HER

7      constitutional right to make a 61 report and that it is illegal for the police to refuse to take a report.

8      They gave Plaintiff an incident slip marked 'harassment around 230 a.m.  No one ever called or came

9      by her brownstone to investigate or follow up.  Plaintiff attempted to get an ID number for her

10      complaint and DT Larocca located the complaint number.

11    122.    On July 24, 2012, all charges (docket #s 20075-2011 and 20111-2011) are ordered dismissed and

12      sealed by Judge Tandra Dawson in the I-DV Part of New York Supreme Court (Exhibit #7). Plaintiff

13      was never given an explanation as to why or even permitted to stand in front of the judge and add

14      something onto the record after being forced to stand at the same table as those usually accused of

15      beating their intimate partners in court. She was pulled aside by one of Judge Dawson's clerks and told

16      that the charges would be dismissed and told to leave the courtroom.

17    123.    7/25-7/25 2012 (Late night/early morning on the 25th) Incident at Soldier McGee's Bar.  See Exhibit #

18      1 photos dated on or about 7/28/12.  In this case the man who attacked Plaintiff (incident #2012-020-

19      2969), was let go by the 20th precinct and he continued to stalk, flash, and trespass and terrorize other

20      women in town. The same man who attacked Plaintiff on 7/28/12 went on to continue to terrorize

21      women in NYC.)

22

| Case # | Defendant | Summons # | Appearance Date | Court | Judge | Part |
|---|---|---|---|---|---|---|
| 2013NY031505 | Baly, Rami | | 08/07/2013 | New York Criminal Court | | A |

| 2013NY04913 5 | Baly , Ram i | 08/07/201 3 | New York Crimina l Court | A |
| 2013CN00034 7 | Baly, Rami H | 08/02/201 3 | Ne w Yor k Cri min al Cou rt | A |

124.    Mr. Baly went on to assault, stalk, masturbate on, and trespass against several other women in town after he was not punished for his acts against Plaintiff. Instead, Mr. Baly was set free by the 20th pct.'s Detective Galan to purport other crimes on the public:  he was arrested in November of 2012 for lewd acts on an Amtrak train, arrested in March of 2013 for trespassing and stalking, again in May, again in June and again in July of 2013.  The system itself aided and abetted Mr. Baly in his crime spree against other women in the City of New York.  Mr. Wells needed to win against Plaintiff: a colleague of his sat on a case against a man who should have been arrested and penalized for his behavior as well as under psychiatric care.

125.    Over a year later charges were subsequently brought against the man, Rami Baly, OVER A YEAR LATER AFTER HE HAD ATTACKED FIVE OTHER WOMEN IN NYC (New York Criminal Court case #s 2013NY031505, 2013NY049135, and 2013CN000347) the same man who attacked Plaintiff on 7/28/12. All other crimes  Mr. Baly was charged with occurred after Baly attacked Plaintiff and was allowed to walk without arrest for his crimes against plaintiff when he was re-arrested in August of 2012 (case # 2012NY067321). Baly proceeded on a crime spree against women that ran from the fall

2          of 2012 to the summer of 2013. On numerous occasions the detectives and the other ranking members

3          (Lt. Carbone) of the 20th precinct informed and her advocates from Saint Luke's Roosevelt Hospital's

4          Crime Victims Center that the reason that Mr. Baly had not been arrested was that he could not be

5          located. Mr. Baly had paid with a credit card that evening at Soldier McGee's bar and the DAs office

6          refused to request a subpoena from the court to attain his billing information so that he could be

7          apprehended.

8    126.   When Mr. Baly returned to the bar on or about August 25th of 2012 approximately a month after

9          assaulting Plaintiff staff members alerted the 20th precinct and he was apprehended.  When he was

10         approached by officers in the bar he acted disorderly, allegedly fought with officers and resisted arrest.

11         He was arrested (case # 2012NY067321) and released and given "time-served" but not charged with

12         the assault against Plaintiff on July 28, 2012. The detective assigned to the case, Galan, pretended Baly

13         could not be located even though this was not the case.  He had been arrested already and not charged

14         with the crime against me but was charged with acting disorderly and resisting arrest when NYPD

15         approached him to question him. Plaintiff pushed the case and her advocate, Kerri Toner, from the St.

16         Luke's Roosevelt Crime Victims Center /Connect NYC inquired as to why no photo lineup had been

17         done after the assault and nor any follow-up was made to trace Mr. Baly after he was let go as per

18         procedure outlined in the NYPD Patrol handbook (Exhibit #50).

19   127.   Ms. Toner was told that the case was being pursued and Baly could not be located and she made notes

20         to this effect in her log (Amicus Brief to follow.) It was not until after Mr. Baly had committed other

21         predatory crimes against other women that Baly was arrested for his assault against PLAINTIFF,

22         which was almost a year after his crime! Baly was arrested on 4/24/13 NINE MONTHS AFTER he

23         assaulted Plaintiff when he appeared in criminal court to answer charges of criminal trespass (PL

24         140.01(a)), public lewdness PL 245.00), and public exposure of a person (PL 245.01).  He had been

25         arrested for these NEW CRIMES against ANOTHER WOMAN by the 1st Precinct's Officer Jessica

26         Valle on 4/21/13 for crimes he committed against Kristyn Abbale (see Exhibit # 51).  A prosecution of

27         Baly for his crime against Plaintiff was initiated on paper, never investigated by Das office (See

28         Exhibit # 41 Statement from Soldier McGee's Bartender stating he was NEVER contacted by ADA

29         HIGGENS) but later dropped.  The DAs office told the judge presiding over the case that they couldn't

2    locate Plaintiff to testify and the case 30-30'd.  The bartender who witnessed events the night of the

3    attack and when the man returned to the bar weeks later was never interviewed by police.  ADA Laura.

4    Higgins who was assigned to prosecute the case informed Plaintiff that her allegations were too

5    difficult to prove.  Plaintiff has subsequently  made a request to Judge McGrath to UNSEAL the case

6    file so that ADA Higgens' lies on the court record can be revealed.

7    128.    The detective assigned to the case, Galan, pretended Baly could not be located even though this was

8    not the case and was a blatant lie and covered up for the fact that Detective Galan had not executed an

9    investigation into Plaintiff's complaint of assault as per the mandates of the NYPD Police handbook.

10    Plaintiff pushed the case and her advocates from the St. Luke's Roosevelt Crime  Victims Center

11    inquired as to why no photo lineup had been done after the assault and no follow-up was made to trace

12    Mr. Baly after he was let go.  The advocate was told that the case was being pursued and Baly could

13    not be located and she made notes to this effect in her log. It was not until after Mr. Baly had

14    committed other predatory crimes against other women that  prosecution of Baly for his crimes  against

15    Plaintiff was initiated but later dropped.  The DAs office told the judge presiding over the case that

16    they couldn't locate PLAINTIFF to testify and the case 30-30'd.  The bartender who witnessed events

17    the night of the attack and when the man returned to the bar weeks later was never interviewed by

18    police.

19    129.    10/17/12: Plaintiff is Convicted of Disorderly conduct for actions on 9/24/11 when Plaintiff called for

20    Police assistance because she had been assaulted in a midtown bar. The conviction revolved around

21    ADA Wells' LIE about the tone of Plaintiff's voice.  He coached the cops to say that Plaintiff

22    screamed at the top of her lungs at a level TEN (being the  loudest a human voice can possibly make

23    according to Wells).  Never had the cops made this statement before to any interviewer of the CCRB

24    or in their log books (See Exhibit #s 19 & 20 & 21 CCRB audio Interviews and logbooks).  The reason

25    Mr. Wells had to coach the cops to LIE is this is the only way he could win the case.  This is why he

26    didn't want the video tapes introduced into evidence.  He did not want to have to suborn perjury but

27    was forced to do so to win the case and tried everything in his power to avoid this.  There simply is no

28    other explanation for his reticence in presenting the tapes to court.

130.   Plaintiff was convicted of TWO counts of disorderly conduct as one was for allegedly screaming and one was for making an obscene gesture but never in court did anyone mention that she made an obscene gesture in their logs, in their CCRB interviews or at Trial.  Instead it was merely just bivouacked onto the other charge without any lip-service whatsoever.

131.   Mr. Wells started his statements at trial by alleging to the judge that Plaintiff is a "fabricator" and that she had hundreds of criminal charges of Domestic Violence filed against her because of this false fact. He was so hell-bent on making Plaintiff appear to be a lying fabricator that he asked his colleague, ADA Bernard, to decline to prosecute another man (Mr. Baly see above) who had hit Plaintiff outside of a bar on July 28, 2012 shortly before Plaintiff's trial date for disorderly conduct on the evening of September 24, 2011 on the night of the Occupy Wall Street Protests that threw the City into mayhem. That man, Rami Baly went on to assault, stalk, masturbate on, and trespass against several other women in town BECAUSE HE WAS not punished for his acts against Plaintiff.   Mr. Wells couldn't have Plaintiff appear as an innocent defendant in the same courthouse at the same time he was trying to paint her as a crazy fabricator to win a disorderly conduct conviction.  So Mr. Baly was set free instead to punch NYPD officers (he was arrested a month later for assaulting an officer, arrested in November of 2012 for lewd acts on an Amtrak train, arrested in March of 2013 for trespassing and stalking, again in May, again in June and again in July of 2013.  Conveniently Mr. Wells aided and abetted Mr. Baly in his crime spree against other women in the City of New York by tricking his fellow colleague into declining to prosecute Mr. Baly so that he could paint me as ugly as possible on a fresh courtroom canvas. (See Exhibit # 43 Letter to MDAO Conviction Integrity Unit and Letter to Chief of Staff, MDAO Jeffrey Schlanger Exhibit # 43.)

132.   10/18/12  While walking home from the subway during a nightly adjournment of trial for Disorderly Conduct on 125th street and passing 200 St. Nicholas Ave Plaintiff was attacked by a man named Willy who sells Heroin on the stoop of that building and is an associate of RAP.  He jumped Plaintiff as she was passing his stoop and threw Plaintiff onto the ground causing substantial damage to her right knee (see photos Exhibit #1 photos dated 10/17/12 ).  Plaintiff went to the emergency room and has reports and follow-ups from her orthopedic surgeon stating that she needs knee surgery as a result of attack (Exhibit #23). P.O. Longo responded (shield # 31565) and said they were instructed by desk

2    sergeant not to take Plaintiff's report. Plaintiff insisted and they said they would turn in a notation to

3    the desk sergeant about the incident. Plaintiff called the desk sergeant and complained No one ever

4    called Plaintiff to follow up on this assault. complaint # 2012-28-005194. The first police who

5    responded to my call said; 'aren't you the crazy one we are not supposed to take reports from?"

6    P.O.sLongo and Walker eventually followed up after Plaintiff called 911 and complained about the

7    first officers on scene. P.O. Walker sympathetically stated to Plaintiff that the District Attorney's

8    office had instructed the precinct not to respond to any of her calls. This was Witnessed by Plaintiff's

9    neighbor, Elizabeth Walker, who is a graduate of Harvard University, Colombia Law School and a

10    PLAINTIFF MEMBER OF THE NEW YORK BAR ASSOCIATION. WALKER PRESSED

11    WILLIAM'S AND LONGO TO TAKE her COMPLAINT, reminded them that it is illegal to deny a

12    person police services. Williams commented that the precinct had been instructed by the District

13    Attorney's office to not respond to any calls Plaintiff made AND THEY took Plaintiff's information

14    and told Plaintiff nothing would be done eventually. (See Exhibit # 30 Letter from Elizabeth Walker.)

15    133.   On the night of 6/2/2013-6/3/2013 while en route home from the Amsterdam Ale house on 76th and

16    Amsterdam where Plaintiff had dinner with a friend she instructed the cab driver to follow a certain

17    route and he refused. She asked him to stop his cab so she could get out and instead he locked the

18    doors and sped up. He carried on like this for a number of blocks while Plaintiff screamed at him to

19    stop the cab and let Plaintiff out. Plaintiff called 911 from the back of the cab and when we stopped at

20    a red light nearby police from the 28th pct. were called over. Officer Officer was one of these officers

21    and he announced to his partner that Plaintiff was not to be given police services or assisted in any way

22    and that he refused to take a report from Plaintiff. Plaintiff called 911 and reported this incident.

23    Surprise; it was never followed up on.

24    134.   6/2013; while in route to the subway past precinct from her home Detectives from the 28 squad opened

25    their windows overlooking my path up St. Nicholas to the 125th St. subway station and 'MOOed' at

26    Plaintiff as if she were a cow. Plaintiff called the precinct and complained to the CO and his assistant

27    immediately.

28    135.   July 2013; while walking her dog near home Plaintiff is given a jaywalking (Exhibit # 9 Jaywalking

29    Summons) ticket on the corner of 120th and St. Nicholas (Plaintiff has eyewitnesses that will testify

2        that she did not jaywalk) even though she wasn't jaywalking.  28th pct. cops were rude and

3        condescending.  She fought the ticket in court and won (docket # 2013SN053520).

4    136.    October 14, 2014:  28th Precinct blocks Plaintiff from commenting on 28th Pct. NYPD public Twitter

5        account effectively stripping her of her right to redress the government for grievances and denying her

6        her rights to free speech (See Exhibit # 44 311 Complaint Letter forwarded to IAB detailing 28th PCT's

7        blocking Plaintiff on Twitter for tweeting about the poor Domestic Violence assistance rate within that

8        precinct in opposition to the City of New York's  formal Social Media Policy which only permits users

9        to be blocked by public officials if they are abusive.

10   137.    In June of 2013 Plaintiff was en route to the train passing the 28th precinct and the detectives yelled

11        out her name from the second-story squad window and then proceeded to MOO at her as if she were a

12        Cow. Other times the cruisers pass Plaintiff on the street and make sucking sounds at her (insinuating

13        sexual acts with their crude verbosity

14   138.    The DAs office has continued their posture that Plaintiff is not worthy of police services even after

15        charges have been dismissed against her in violation of her Constitutional Right(s) to Equal Protection

16        under the law and Due Process. Plaintiff can provide incident IDs that were never followed up on,

17        hospital reports, proof that officers refused to even take a report, or Jaywalking tickets issued to

18        Plaintiff (Exhibit #9) for the latter date when officers from the 28th pct. engaged in outright

19        harassment of Plaintiff (Docket Number 2013SN053520 was dismissed on 8/27/2013). The police

20        have been instructed not to assist Plaintiff or to prosecute those who do harm to her.

21   139.    Plaintiff provided phones with blackmail messages from Powell to the DAs office on June 24, 2011

22        during a "Queen for a Day" meeting. At the conclusion of Plaintiff's prosecution when the charges

23        were dismissed and sealed Plaintiff made multiple requests for her property back and was refused by

24        Wells. Plaintiff maintains that the DAs office has unlawfully held her property and demands the court

25        to order its return to her as per the stipulations of the "Queen for the day" agreement between Larry

26        Newman, Deputy of the Manhattan District Attorney Office's SVU unit and Plaintiff's criminal

27        defense lawyer Stephen Kartagener. All of Plaintiff's attorneys including Kartagener, Benjamin Dell

28        and Tajuana Johnson have demanded a return of the materials to Plaintiff as the case has concluded.

29        Plaintiff made an inquiry to Wells' supervisor in the Trial Bureau, Minton Sabor, for the return of her

2     property and was again refused. This is a violation to Ms. Plaintiff's right to privacy and from unlawful

3     search and seizure. Sensitive, intimate, nude of Plaintiff that Powell texted to Plaintiff that he intended

4     to blackmail her with are included among the media on the phones and the District Attorney's office

5     has no right to keep these materials. McKinney's Laws specifically state that: "Law enforcement

6     agencies and Das attorneys shall promptly return property held for evidentiary purposes unless there is

7     a compelling reason for retaining it relating to proof at trial…" (McKinney's 642-3 Criteria for Fair

8     Treatment Standards.) (Exhibit #45)

9    140.   June 2014 ADA Maloney in DIRECT CONFLICT OF INTEREST WITH HER ETHICAL

10     OBLIGATIONS AND VOWS takes on the role of acting as FOIL officer in response to Plaintiff's

11     FOIA request for all information in her MDAO files (Exhibits 44a-44d). As Maloney is the attorney

12     representing individuals named in lawsuit how possibly could she fulfill her legal obligation to provide

13     Plaintiff with materials she is legally and lawfully entitled to that would also implicate her colleagues

14     in Plaintiff's lawsuit?  Who allowed this mewling ingénue to take on the responsibility of being the

15     same FOIL officer to respond to Plaintiff's request.  It does not bode well that the MDAO blatantly

16     ignores conflict of interests such as this and that anyone in the MDAO, especially Maloney's

17     supervisors Patricia Bailey and Susan Roque would allow this misdeed and clear violation of ethics

18     and legal standards to take place.  Ms. Maloney is daughter of the very congresswoman who wrote the

19     FOIA legislation prohibiting denials of requests based on "Pending Litigation" that is not criminal in

20     nature (See Exhibit #s 44a- 44d FOIA request, denial, appeal and follow up.)

21    141.   March 2014, Plaintiff is denied entry into the Manhattan Family Justice Center by Hannah Pennington,

22     the Director of the FJC. Pennington cites Plaintiff's lawsuit against the MDAO as reason for said

23     denial of services as "several people named on Plaintiff's complaint work jointly in the MDAO and in

24     the FJC." Plaintiff is denied psychiatric counseling, group therapy sessions with her contemporary DV

25     survivors, access to wellness resources, access to Housing Relocation services, access to special case

26     workers from the Human Resources Administration who assist in benefit case management, access to a

27     legal team to assist Plaintiff with her MANY legal needs to stave eviction and to assist in attaining

28     Identification, bank accounts and small credit instruments offered to clients of the FJC (See Exhibit #

29     45 letter documenting denial of services/equal protection under the law from the Family Justice

2        Center).

3   142.   On or about July 2, 2015 Plaintiff was assaulted in a restaurant within the confines of the Midtown

4        North Precinct and was again denied the ability to make a complaint.  She was instead taken to the

5        Bellevue Psych ward in handcuffs for evaluation.  As Plaintiff's mental history record is familiar to

6        Bellevue Hospital (Plaintiff is treated at Bellevue's James B. Zadroga 9/11 Survivor's clinic on a

7        regular basis) all of Plaintiff's psych files were reviewed and after a ten minute conversation with the

8        doctors at the ward Plaintiff was determined to not be crazy and released from the Psych Ward.

9   143.   FOIA ACTION

10

11  144.   ***The City Is Deliberately Indifferent to a class of CONFIDENTIAL INFORMANTS' AND MAJOR***
12        ***CASE COMPLAINTANTS'  Sexual AND Physical/Emotional/Economic Abuse of Women***
13        The City, which, through NYPD, and the various District Attorney's Offices including the MDAO, is
14        responsible for the evaluation, investigation, servicing, reporting, care, updating of as to case status,
15        and of intimate-partner assault crime victims and sexual slaves, and has, through its acts and
16        omissions, deliberately malicious or made in the face of several Hobsian, social, fantastical choices,
17        facilitated the trafficking, sexual slavery, sexual abuse, mental and physical and economic battery this
18        class of victims.
19
20        **CLASS ACTION ALLEGATIONS**
21  145.   Plaintiff Kelly Price brings this action on behalf of herself and, for certain claims,

22        as a class action under Rules 23(a), (b)(1) and b(2) of the Federal Rules of Civil Procedure on behalf of

23        a class consisting of all women who are victims of trafficking who turn to the authorities for help in

24        extracting themselves from sexual enslavement at the hands of a Confidential Informant or group of

25        Confidential Informants, or complainant in (a) major case/s pending in the criminal court system when

26        the victim approaches the NYPD or MDAO for help. Many victims, such as Plaintiff Price, for a

27        variety of unsavory, illegal, unconstitutional reasons, end up on RIKERS ISLAND on some sort of

28        cross-complaint to their claims of abuse, can't make bail, and find themselves further subjected to

29        abuse and sexual slavery at the hands of other prisoners and corrections officers.  Often their abuser

30        walks free: their use of the criminal justice system to further control and command the lives of the

31        abused solidified, endorsed, and tacitly approved by agencies of the criminal justice system: the

32        NYPD, the District Attorney's Offices, and the court system. The Women's Prison Association

33        estimates that 75% of women in Rikers' Rose M. Singer Center are Domestic Violence Survivors.

34        Based on a recent Department of Justice Survey statistics, at any given time, upwards of fifty women

2    at RMSC are experiencing or have recently experienced rape or other sexual abuse by staff, and many

3    more incidents likely go unreported (The U.S. Attorney's Office for the S.D.N.Y., CRIPA

4    Investigation of the New York Department of Correction Jails on Rikers Island (2014), available at

5    http://genius.com/Preet-bharara-rikers-report-i-chaos-at-rikers-annotated.  And U.S. Dep't of Justice,

6    Regulatory Impact Assessment for PREA Final Rule, at 17-18 (May 17, 2012), available at

7    http://www.ojp.usdoj.gov/programs/pdfs/prea_ria.pdf (concluding, based upon the DOJ Survey, that

8    between 69 percent and 82 percent of inmates who reported sexual abuse in response to the survey

9    stated that they had never reported an incident to corrections staff).

10    **Other Classes:  240.30, denied services, blocked on twitter,

12  146.  The class is sufficiently numerous, and the population of women potentially effected by this

13    secondary-abuse by the Criminal Justice System incarcerated on Rikers at the Rose M. Singer Center

14    or merely forsaken (willfully or mistakenly) by the NYPD and District Attorneys' offices continually

15    changes, rendering joinder of all members impracticable.  Additionally, as the only agencies aware of

16    this treatment, with access to statistics of how many women are falsely labeled "fabricators" or "Cross-

17    aggressors" physical or verbal are the agencies themselves accused of this misconduct.  Cyrus Vance

18    claims his office handles 5000 claims of Domestic Violence per year.  How many of these

19    complainants are labeled "fabricators" without proper due process or investigation? How many are

20    denied victim's protocols as defined by McKinney's? How many are denied services at the Family

21    Justice Centers?

22  147.  Recently the Commissioner of Domestic Violence, Rose Pierre-Louis reported at the "Not on MY

23    WATCH" International Interfaith anti-trafficking and anti-domestic violence Conference held at the

24    Salvation Army Headquarters in NYC on August 6, 2015 that in 2014 in New York City ~300,000

25    DIRs or complaints of Domestic Violence were filed with the NYPD (actual numbers: Manhattan:

26    40749, Bronx: 81870, Brooklyn: 87828, Queens: 56708, Staten Island: 15493.)  How many of these

27    complaints from women such as Plaintiff Price ended in the complainant's incarceration?  How many

28    of these women who bravely summoned the courage to try to break free of their chains of bondage and

29    made reports of abuse to the proper authorities found themselves forsaken and thwarted and still sit

30    suffering to this day at the Rose M. Singer Center at Rikers Island?  The only agencies with the keys to

2      unlocking this information are the very agencies with their hands on the slave-master's whip itself. If

3      the MDAO asserts its handles 5000 complaints of domestic violence a year, and the NYPD asserts it

4      receives TEN TIMES that number of complaints what is the vetting procedure/due process assigned to

5      the approximately 45,000 women in Manhattan who are denied to have their complaints investigated,

6      taken seriously and given proper victims' services? We know of at least one other case cited above in

7      Brooklyn in recent years (Citations above.) How many other victims suffer alone whose very chains

8      are bonded by the Police and District Attorney's in our great city?

9   148.   The questions of law and fact presented by Plaintiff Price common to all members of the class,

10      including, but not limited to, whether the City's policies, practices, acts and omissions cause women in

11      who come forward to report violent abuse and trafficking to be subject to a substantial pattern of

12      continued abuse and unreasonable further torture, psychological deprivation and punishment, risk and

13      experience of rape and other sexual abuse by other inmates, correctional facility staff at Rikers and

14      other city Jails. Questions of law and fact concerning these policies and practices include, but are not

15      limited to:

16
17      a.   Whether, despite knowledge that district attorneys and police officers routinely turn a blind eye to

18           their obligations under McKinney's Crime Victim's Statutes to report, investigate and serve the

19           abused women who turn to these officials and agencies at their darkest hour. The City has failed to

20           take action sufficient to protect the women/victims who come forward from recurrent and ongoing

21           acts of continued abuse and other abuse by Das, officers, court officers and corrections officers

22           including denial of services, verbal abuse, malicious prosecution, abuse of processes, and false

23           imprisonment leading in many circumstances to forced sexual intercourse, oral sexual acts, sexual

24           touching, public masturbation, and demeaning sexual comments while on Rikers and in other City

25           Jails and in going through often painful elongated court cases pending against them.

26      b.   Whether the City has failed to employ sufficient measures to reduce the risk of this secondary

27           victimization such as adequate oversight during the initial complainttant interview so that the

28           whimsy and biases of one loan young prosecutor is not a major factor in the outcome of the

29           narrative thrust of the case;

30      c.   Whether the City has failed to employ sufficient measures ensuring that complainants against

2           Confidential Informants and witnesses participating in major cases of primary importance to

3           district attorneys are treated to the same guarded process that those women and victims are who

4           bring complaints against Uniformed and Ununiformed Police Officers

5     d.  Whether the city has failed to employ oversight and heightened monitoring of the behavior of

6           district attorneys who attempt to further mute the voice of the true victim by denying them further

7           police services UNDER ANY CIRCUMSTANCE related or not to the initial complaint and by

8           denying them entrée to Family Justice Centers and other victims services offered to other souls

9           felled by abuse.

10    e.  Whether the City has failed to adequately set up a pathway from the Domestic Violence

11          community such as the Mt. Sinai, St. Luke's Roosevelt Crime Victims Center, Sanctuary for

12          Families et a who often care for those re-victimized to filter  communications regarding true

13          victims regarded as pariah, fabricators, or aggressors erroneously back to the district attorneys

14          who have made the wrong determination in the first place.  District attorneys emboldened by their

15          powers protected by absolute and qualified immunities often tip the scales using sometimes subtle

16          and sometimes overt tricks and acts to re-write the victims' narrative and cast them in a light

17          unfavorable to their ultimate protection and security for many reasons including but not limited to

18          when the accused is a Confidential Informant or complainant in a major case.

19    f.  Whether the City's current training practices on McKinney's Crime Victims' Statutes and its

20          mandates for how a complainant of trafficking and certain classes of Felony Assault must be

21          evaluated and taken seriously are in place and effectively internalized into the workflow of the

22          NYPD and District Attorney's offices.

23    g.  Whether the City's system for the reporting and investigation of secondary abuse, which relies

24          almost entirely on the NYPD and District Attorney's offices such as the MDAO to produce their

25          own numbers of women cast aside are adequate and comprehensive when there is NO

26          OVERSIGHT of these activities by the DOI is adequate.  When Plaintiff Price made various

27          complaints to the DOI they were referred BACK to the District Attorney's office for Internal

28          Investigation!

29    h.  Whether the City has failed to consistently and adequately investigate reports of the secondary

46

2    abuse of trafficking and/or domestic violence victims in a prompt or thorough manner;

3      i.   Whether the City has failed to appropriately discipline and terminate assistant district attorneys,

4           police officers and deputy district attorneys found to have subjected trafficking and/or domestic

5           violence complainants to secondary victimization by not undertaking proper investigative or

6           procedural mandates in place by the NY State legislator to protect victims and ensure their

7           protections;

8      j.   Whether the City's policy and practice has failed to protect those who report trafficking or

9           domestic violence other sexual, mental, or economic abuse by Confidential Informants and or

10          complainants on major cases from retaliation by police officers, detectives, precincts, and district

11          attorneys whose credibility and career often hinge on the record of their case judgement and

12          conviction rates.

13      k.   Whether the above-enumerated and other failings of City policy directly facilitated the continued

14          trafficking, domestic violence, emotional, physical economic and sexual abuse of women/victims

15          who come forward for assistance to the authorities during their darkest, most fragile hour.

16  149.  Plaintiff Kelly Price will fairly and adequately protect the interests of the class. Plaintiff Kelly Price's

17      interests are aligned with, and not antagonistic to, those of the other members of the class, and Plaintiff

18      has made, is making, and plans to request of the court Pro Bono permission from the court to attain in

19      her best efforts to retain counsel competent and experienced in civil rights and class action litigation.

20  150.  Prosecuting separate actions by individual class members would create a risk of (a) inconsistent or

21      varying adjudications with respect to individual class members that would establish incompatible

22      standards of conduct for the City, and/or (b) adjudications with respect to individual class members

23      that, as a practical matter, would be dispositive of the interests of the other members not parties to the

24      individual adjudications or would substantially impair or impede their ability to protect their individual

25      interests.

26  151.  The City has acted, and refused to act, on grounds that apply generally to the class, so that final

27      injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

28

29      CLAIM ON BEHALF OF THE PLAINTIFF CLASS

2          COUNT I

3          (CLASS DUE PROCESS CLAIM AGAINST THE CITY)

4    152.   Plaintiff Price  repeats and realleges each of the allegations contained in paragraphs 1 through 155 with

5          the same force and effect as if fully set forth herein.

6    153.   By its policies, practices, acts, and omissions, the City has caused the plaintiff class of trafficked and

7          battered women whose abusers are Confidential Informants and/or witnesses/complainants on major

8          cases to be subjected to further abuse by the criminal justice system when they come forward for help,

9          in violation of their due process rights under the Fourteenth Amendment to the United States

10         Constitution.

11   154.   COUNT TWO:  SECOND CAUSE OF ACTION

12         (Malicious Prosecution Under Federal Law; All Defendants)

13         Plaintiff repeats and realleges each and every allegation contained in ¶1 through ¶155 of this

14         Complaint. By virtue of the foregoing, the Individual Defendants, acting in concert with each other and

15         with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation

16         or continuation of, criminal proceedings against Plaintiff.

17         a.   The criminal proceedings terminated in Plaintiffs favor. There was no probable cause for the

18              commencement or the continuation of the criminal proceedings. The Defendants acted with actual

19              malice. Defendant City of New York is liable under the principle of respondent superior.

20   155.   COUNT THREE:  THIRD CAUSE OF ACTION

21         a.   (Intentional Infliction of Emotional Distress Under Federal Law; All Defendants)

22         b.   Plaintiff repeats and realleges each and every allegation contained in contained in ¶1 through ¶

23              155 of this Complaint.  of this Complaint. Defendants engaged in a continuous pattern of extreme

24              and outrageous conduct directed at Plaintiff. Defendants engaged in that pattern of conduct with

25              an intention to cause, or in reckless disregard of the substantial probability that it would cause,

26              Plaintiff severe emotional distress.  Specifically, defendants, individually, in concert with,

27              conspiring with, and/or aiding and abetting one another and other persons for whose acts they are

28              liable, while acting in an investigative or administrative capacity, coerced witnesses into making

29              false statements to be used against Plaintiff, created false official records to be used against