91. 8/31 9/1: harassed by associates of RAP. PO EBRIGHT PO RAMAN and PO Ehlers respond and tell me I should move out of neighborhood, they harass me about associating with 'these people in this neighborhood' and refuse to take my complaint. Ebright tells me he hopes he responds to one of my complaints one day and 'finds me lying on the sidewalk in front of my brownstone with a knife in my back.'

92. 9/24/11 In the wake of the ten-year anniversary of the tragedy of 9/11 the city erupted with violent clashes between Occupy Wall Street protesters and the NYPD. The whole of the city was on edge. I had called police after being man-handled by an over-zealous man in a bar and been humiliated by the officers who arrived. After the officers refused to take report I walked away and said "Ya'll should go fuck yourselves you don't help anyone." I did not scream this at the top of my lungs: I said it as I turned to walk away overwhelmed with despair and tears rolling down my face and was apprehended forcefully from behind causing bruises to my entire body.(Exhibit # 10 Injuries sustained from Police beating Officer Winters of Midtown South)

93. My injuries were sustained as I was tackled from behind by the police that evening, hog-tied and dragged to a police cruiser (please refer to photographs provided in exhibit #10) and ambulance workers were called to the 20th precinct to examine me. I had called 911 and then ended up black and blue. My lawyer spent months trying to subpoena all relevant video and audio material. When the tape finally appeared it had been tampered with omitting the exchange outside the midtown bar where I beseeched officers to taker my 61 report and they summarily dismissed me. Eventually when the full un-edited tapes arrived in court months the officers all lied and said that I had screamed at the top of my lungs "Fuck you" even though the video does not show this nor did the officers report this in their CCRB interviews or make any notation of it in their logbooks (Exhibit#19 CCRB audiotapes and Exhibit #20 officer logbooks). In fact when questioned directly about the actual words that came out of my mouth by the CCRB the officers actually can't remember what I said/when I said anything specifically.

94. On September 24, 2011 I was propositioned by a man at a bar and I rebuffed his advances. The gentleman as it turns out was the owner of the bar and was upset at the way I turned him down. He put his hands on me and I told him he had no right to touch me. The spat escalated and he had his bouncer grab me and throw me out of the bar injuring me as I was tossed through the door. My chest was sore and beginning to bruise and I know NO ONE is allowed to put their hands on me so I called the police to report the incident (see video inside bar).

95. When the police arrived the lead officers ignored me and marched into the bar to talk to their buddies (apparently the bar is only a block away from the 14th pct. and they frequent the place).

96. Without listening to my side of the story the officer in charge, Matthew Winters, told me "to keep it moving" that he wasn't doing anything to record the menacing, assault, and harassment I had just encountered. I told the officers they are not allowed to refuse to take my 61 report and that I would be making CCRB and IAB reports about their misconduct and callous regard for my safety. I was upset and I turned to walk away I was

20

crying and I said to the officers: "Ya'll don't help anyone ya'll should go fuck yourselves." (see video outside bar)

97. I proceeded two steps away from the group of four cops and from behind me and without warning Officer Winters tackled me to the ground by kneeing the back of my right knee and forcing me to collapse. He also grabbed my upper arms so hard literally each of his fingers made a bruise in my flesh. You can make out his handprints in the flesh of my upper arms (see attached photos and the bruise in the back of my right leg among others see exhibits # 10.)

98. I woke up hours later in a jail cell literally covered in bruises with officer Winters standing over me. He told me that I was arrested for disorderly conduct and that he had gone through my purse and found a few small dime bags of weed that I had as well as several condoms. He said that he was throwing the weed out as a favor to me and expected me "to do him a favor in return." He suggested that I don't report my injuries incurred during arrest and that "things would go in my favor." He also asked why I had so many condoms. I told him I was headed to a swinger's party that evening and he informed me he could have me also arrested on suspicion of prostitution and intent to distribute marijuana but that he was "being a nice guy." I listened to him with doubt and astonishment as I rubbed at my swollen wrists, hands and several dozen bruises all over my body. I was furious. Since when does a woman in NYC who calls the police for help B/C SHE has been harmed wind up incarcerated and beaten by the cops responding to her call for help?

99. ADA Kenya Wells caught the case. At that time another drawn-out case maliciously filed against me by Mr. Wells was pending over me. Mr. Wells kept insisting that I had made false reports to the police about my ex-boyfriend, Raheem Powell who had been beating me and subjecting me to economic, emotional, and physical abuse. I was charged after I went to the police for help to get him away from me because of my ex's relationship with the precinct as a confidential informant. He was a key witness in a murder, an attempted murder and several gang-related cases that were in-motion already so the police and Mr. Wells threw me to the wolves instead of assisting me at the darkest, bleakest, most helpless moment in my life. That case against me was eventually dropped after I stood in court for two years with the scars on my body burning under my dress as I repeatedly was called a fabricator in the I-DV court part. Mr. Wells had already made poorly-investigated conclusions about my other case (again similar scenario with him— no investigation just jumping to conclusions based on his own gut). Eventually that case was dismissed and sealed after I rejected every offer Mr. Wells through at me to try to cover up his errors. **Mr. Wells had a special vendetta against me because he was forced to drop the (329 incorrectly charged and malicious) charges he had filed. When it came time for trial for my disorderly conduct case Mr. Wells was prepared to do whatever it took to win: his reputation and his personal vendetta against me, a domestic violence survivor, a 911 survivor, and a 4th generation New Yorker was at stake.**

21

100.    **SETTING THE SCENE:** September 24, 2011 was an emotional time for me. It was shortly after the ten-year anniversary of the 911 attacks that I had survived by running for my life away from the towers and everything I had built for myself had subsequently unraveled around me because of the ineptitude and hubris of this young, untrained, sloppy District Attorney who had thrown me in Rikers island on Mothers' day after I miscarried my child and turned my life upside down. I had spent all weekend with a friend of mine, Lewyn Pogue, a member of SPECIAL FORCES NAVY SEAL TEAM 6, who was in town to swim in the "Little Red Light house Race" to raise money for the families of his friends who had died in an horrible attack on their helicopter in Afghanistan earlier that summer. It was the deadliest attack to date in that war and our emotions were high. I had been crying all day for the most part. I had nothing left inside of me. I wanted to sit down and have a drink quietly somewhere before moving on to a party that night. **Coincidentally the cops were twitchy. The entire city was on red-alert because the Occupy Wall Street marchers had violently clashed for the first time that morning with police and many members of the 14th pct. had been involved in crowd control. The cops were agitated and twitchy.** The bruises literally covering my body were a by-product of their sour mood. Lewyn can testify to the fact that I had nary a bruise on me when he left me half an hour before I strolled into the Stitch bar on W 37th st where I was assaulted. I had also had dinner at a place in Midtown I go to often and the bartender can also aver that I had nary a bruise on me while she served me my Cobb salad and coffee. I'm happy to provide you this information should you need it.

101.    **Mr. Wells didn't even investigate the case:** My Lawyer, Benjamin Dell from Legal Aide, spoke with Mr. Wells after the arrest and before my first court appearance. Mr. Wells didn't know that I had called 911. He said to my lawyer that in fact the incident had happened because the police had come upon me screaming and simply arrested me. When my lawyer, Benjamin Dell, suggested to Mr. Wells that there are 911 calls of my calmly requesting for police assistance Mr. Wells seemed panicked. He was also informed that there were video cameras all over the bar that would corroborate my story and it was suggested that he drop the case because the police had beaten me badly and I was a woman who had called them for help. Mr. Wells refused and scrambled to try to reconcile the way he wanted to paint the events of the evening to get a conviction. He knew he couldn't prove that a crowd had gathered or that I had blocked traffic on the sidewalk if the video was shown at trial. He then embarked on a campaign to keep the video tapes of the events from surfacing. Please pull the Part A transcripts for the case and pay careful attention to how many times Mr. Wells argues with the judges (on more than one occasion) about the lack of necessity of attaining the video tapes. In one instance the Judge in the court part remarked that she is surprised that Mr. Wells didn't already have the tapes in his possession and that he doesn't feel they are relevant! Isn't it the DAs DUTY to investigate? Isn't failing to do so an egregious error that allows for the breakdown of prosecutorial immunity? Is this not being taught to young ADAs in the Manhattan District Attorney's office? We (Mr. Dell and I) had asked Stitch bar for the tapes and they had refused. Instead we subpoenaed them from the CCRB as I had made a CCRB complaint as soon as I was released from jail. Graham Daw at the CCRB can attest to the fact that the bar sent over edited versions of the video tapes first that omitted all interaction I had with the police outside the bar. Why would the bar do this? Someone needs to ask the owners of Stitch bar if they were instructed by the police or by Mr. Wells to do so when they have to answer under sworn testimony. Eventually the correct tapes were sent to the CCRB and Graham Daw on passed them to the court. This caused MUCH consternation, huffing, puffing and pouting at each new court date when they didn't appear as Mr. Wells wanted to press on for trial. Surprise: the tapes were

mysteriously LOST in the courthouse for months after they arrived. Please note the court transcripts where My lawyer asks for a delay in trial until the tapes can be found by the Part A clerk and please note Mr. Wells insistence that the trial go forward without the tapes. The judges kept asking Mr. Wells why he had not pulled the tapes to begin with and Mr. Wells simply kept averting the questions. The plain truth is that he HAD to have already pulled the tapes and they did not corroborate the Police's version of the story that would allow him to take me to trial and justify his pursuit of the case against me so he tried to keep them out of our hands and the hands of the court. He stated MANY times on record that he had never seen the tapes.   I would be very interested if your conviction integrity officers can compare records of when he got a hold of the tapes at the DAs office and then compare that information with Mr. Wells' statements in court. He claims the first time he saw the video was in late Sept/early Oct of 2012. I sincerely doubt his honesty concerning his statements to this effect.  I would bet dollars to donuts that Wells had the video tapes in hand in late 2011 or early 2012.

102.   **In each of the three interviews the CCRB conducts with three of the four officers who responded to my 911 call there is a different story told than the manufactured, glossed, coached and clean version that Mr. Wells helped the officers recapitulate on the stand at trial.** Please listen to each of the interviews. Not one of the officers states that I raised my voice and screamed at a level 10 out of 10 being the loudest a human voice can possibly make during their CCRB interviews. In fact the officers don't even recall what I said as I walked away from them. But MAGIC! –when Mr. Wells called them to the stand they ALL say that I screamed "FUCK YOU" at the top of my lungs to the cops. How strange: magically over a year later all three cops' stories changed and were consistent!   There must be a magic memory pill in the water at the 1 Hogan Place witness lounge! A few weeks after the incident when the officers were questioned by CCRB inspectors there was not a narrative consensus about what I said or how I said it but  over a year later at trial all of a sudden each officer magically remembers that I screamed at the top of my lungs "fuck you?"  I find this incredulous. In addition to the lack of consensus about events stated in recorded CCRB interviews  in NONE of the officer's log books is any sort of notation that I screamed aloud or that even recounts what I said.  One would logically think that this information had it really occurred would have been recorded in the log books OR remembered in the CCRB interviews.

103.   The fourth Police officer, a young, Caucasian, female officer was never interviewed or called to testify.  We need to get her version of the story.  Her name was Officer _____.  She was Maladano's partner that evening and when I saw her in the pct the next afternoon as I was being led to a waiting van to be transported to the tombs for arraignment and booking she looked disgusted to see the amount of bruises all over my body caused by the brutal arrest by Officer Winters.  Her CCRB interview, logbooks and statements about the incident are SUSPICIALLY ABSENT FROM THE OFFICIAL RECORD.

104.   The video tapes show that a crowd NEVER gathered to witness "the spectacle I [sic] was making." Please review.  The cops all say different-sized clusters of people were standing just out of camera sight in their CCRB interviews in different places. NONE of their statements to the CCRB is consistent with what they claimed at trial. Please make note of time-stamps:  xyz on the video tape and abc on the ccrb interviews.

105. In November of 2011 My Legal Aide Attorney, Benjamin Wells, attempted to turn in a motion to the court asking the judge to dismiss the case against me as other cases had recently been dismissed of similar circumstances when constituents in NYC had said anything similar to "fuck yourselves" to NYPD. The ADA standing in the court part literally said: "Your honor I need you to know that Miss Price is considered a DANGEROUS person as she currently has over 300 counts of DOMESTiC VIOLENCE pending against her upstairs in Judge Dawson's I-DV court part." There was an audible gasp from the judge and gallery and the Judge dismissed Mr. Dell's motion based on this assertion. The ADA intentionally made it sound as if I had been abusing someone physically instead of the other way around. To what ends to these lies serve? How dare the District Attorney's office enter intentional falsehoods and misleading lies onto the court record. These liabolous statements caused me creat injury and when I get a hold of the transcript I will be adding this ADAs name to the list of persons guilty of crimes against me in a revised complaint to NY Supreme Court.

106. The conviction revolved around Mr. Wells' LIE about the tone of my voice. He coached the cops to say that I screamed at the top of my lungs at a level TEN (being the loudest a human voice can possibly make according to Wells). Never had the cops made this statement before to any interviewer of the CCRB or in their log books. The reason Mr. Wells had to coach the cops to LIE is this is the only way he could win the case. This is why he didn't want the video tapes introduced into evidence. He did not want to have to suborn perjury but was forced to do so to win the case and tried everything in his power to avoid this. There simply is no other explanation for his reticence in presenting the tapes to court.

107. I was convicted of TWO counts of disorderly conduct as one was for allegedly screaming and one was for making an obscene gesture but never in court did anyone mention that I made an obscene gesture in their logs, in their CCRB interviews or at Trial. This count should most certainly be dropped because it was never proven. Instead it was merely just bivouacked onto the other charge without any lip-service whatsoever.

108. Mr. Wells started his statements at trial by alleging to the judge that I am a "fabricator" and that I had hundreds of criminal charges filed against me because of this false fact. My lawyer objected stating that these cases were dismissed and sealed and Wells argued that he could bring up the cases because they supported his theory that I was a fabricator and that my credibility is allegedly weak. He was so hell-bent on making me appear to be a lying fabricator that he asked his colleague, ADA Bernard, to decline to prosecute another man who had hit me outside of a bar on July 28, 2012 shortly before my trial date. That man went on to assault, stalk, masturbate on, and trespass against several other women in town BECAUSE HE WAS not punished for his acts against me. Please look up this criminal: Rami Baly. ADA Richendorfer is FINALLY prosecuting him OVER a full year later for his crimes against me because I made complaints to the DOI, the IAB, the State Attorney General, Senator Gillabrand, Councilwoman Quinn, Councilwoman Dickenson, the Mayor's office, the Borough President, the Public Advocate, and the New York State Bar Association about how my right to equal protection under the law had been stripped from me. **Mr. Wells couldn't have me appear as an innocent defendant in the same courthouse at the same time**

he was trying to paint me as a crazy fabricator in front of the judge to win a disorderly conduct conviction. So Mr. Baly was set free instead to punch NYPD officers (he was arrested a month later for assaulting an officer, arrested in November of 2012 for lewd acts on an Amtrak train, arrested in March of 2013 for trespassing and stalking, again in May, again in June and again in July of 2013. Conveniently Mr. Wells aided and abetted Mr. Baly in his crime spree against other women in the City of New York by tricking his fellow colleague into declining to prosecute Mr. Baly so that he could paint me as ugly as possible on a fresh courtroom canvas. Look: this is anathema. Re-read the above paragraph. Mr. Wells wanted to win against me so badly that he had a colleague sit on a case against a man who clearly needed to be under psychiatric care and have his dopamine levels regulated and monitored all in the name of winning against me. Is this really a person you want in your office? This guy is the JAYSON BLAIR of the District Attorney's office and should be arrested himself for malicious prosecution, obstruction of justice, tampering with evidence and suborning perjury. Because of Wells' grudge against me many other women in town were armed by Baly. See below paragraphs detailing events that transpired on the evening of 7/27-/7/28 2012

109.    10/21/11: Raheem breeches restraining order in front of my home. A report is finally made on 12/1/11 for Raheem's breech of restraining order see description of my attempt to file a report for Raheem's breech of restraining order detailed above in the section outlining events that led to me filing and IAB complaint against the DV officers Rosendary and Simmons above in section II. (Exhibits # 14 & #15).

110.    1/20/12: Attacked by woman named INA who lived across the street in the white building Raheem's uncle and cousins dwelled in on 120th near my brownstone. This woman has known my batterer since he was a child, is a known street walker, crack/cocaine addict and has had her youngest daughter, Sarde, removed from her by children's services. She encountered me as I as walking to the store and began yelling at me abut how she loved watching people attack and harass me whenever I left my home. I replied that she was a crack whore who couldn't even take care of her own children, that often I had to care for 'Dee-Dee" (short for Sarde) often when she was too cracked out to help her own daughter with her homework or when she fell off her bike and needed bandaging and love. I had even taken her kid to Chucky Cheese with other neighborhood girls once when I surprised all the little girls on the block with an outing to the restaurant in September of 2010. Ina became enraged and smacked me in the face with a closed fist resulting in my front right tooth becoming dislodged and landing on the sidewalk. As blood spurted from my face and I searched the sidewalk for my missing tooth Ina picked up a long wooden leg from an old table that still had large protruding nails at the top of it where it had once been attached to the table top. She began to run at me with this weapon and the only person on the sidewalk who interfered was the neighborhood UPS guy, Danny, who jumped off his truck and tackled INA so she would not club me from behind with the weapon. At that moment a police cruiser passed by and I waved it down. IT was a Manhattan north lt. and his assistant who took my details and said they would on pass my complaint to the 28 but that I should also call 911 which I did. The complaint was assigned to Dt. Fontanez who followed up once with me asking who my assailant was. I gave her first name and address to Fontanez and he mentioned he couldn't make an arrest based on that. I deplored him to make an arrest and he drove me around one night when I saw her walking in the neighborhood but never followed up

again with me about locating this crazed attacker. I called Fontanez multiple times reminding him that the statute of limitations on assault is two years and he told me that he couldn't do anything because his hands were tied.

111. 4/17/12 attacked in front of home again.

112. 7/14/12, attacked in front of 200 St. Nicholas Ave., around the corner from my home on way home from store. Hair grabbed and slammed over and over onto pavement by associates of RAP. Knee damaged bruises all over. called 911 around 200 am in the morning and P.O. Johns and partner responded, told me they wouldn't do anything to help. I insisted it is my constitutional right to make a 61 report and that it is illegal for the police to refuse to take my report. They gave me an incident slip marked 'harassment' around 230 a.m. No one ever called or came by my brownstone to investigate or follow up. I attempted to get an ID number for my complaint and was rebuffed again by the mean mousy grey-haired lady who assigns these numbers in the 28th pct.

113. 7/25-7/25 2012 (Late night/early morning on the 25th) 7/27-7/28 2012 (Late night/early morning on the 28th) Incident at Soldier McGee's Bar. See Exhibit #1 photos dated 7/28/12 In this case the man who attacked me (incident #2012-020-2969), was let go by the 20th precinct and he continued to stalk, flash, and trespass and terrorize other women in town. The same man who attacked me on 7/28/12 went on to continue to terrorize women in NYC.)

| Case # | Defendant | Summons # | Appearance Date | Court | Judge | Part |
|---|---|---|---|---|---|---|
| 2013NY031505 | Baly, Rami | | 08/07/2013 | New York Criminal Court | | A |
| 2013NY049135 | Baly, Rami | | 08/07/2013 | New York Criminal Court | | A |
| 2013CN000347 | Baly, Rami H | | 08/02/2013 | New York Criminal Court | | A |

\'

139. Mr. Baly went on to assault, stalk, masturbate on, and trespass against several other women in town after he was not punished for his acts against me. Instead, Mr. Baly was set free by the 20th precinct's Detective Galan to purport other crimes on the public: he was arrested in November of 2012 for lewd acts on an Amtrak train, arrested in March of 2013 for trespassing and stalking, again in May, again in June and again in July of 2013. The system itself aided and abetted Mr. Baly in his crime spree against other women in the City of New York. Mr. Wells needed to win against me: a colleague of his sat on a case against a man who should have been arrested and penalized for his behavior as well

26

as under psychiatric care.

140. OVER A YEAR LATER charges were subsequently brought against the man, Rami Baly, (New York Criminal Court case #s 2013NY031505, 2013NY049135, and 2013CN000347) the same man who attacked me on 7/28/12. All other crimes Mr. Baly was charged with occurred after Baly attacked me and was allowed to walk free out the back door of the 20th precinct without arrest in August of 2012. Baly proceeded on a crime spree against women that ran from the fall of 2012 to the summer of 2013. On numerous occasions the detectives and the other ranking members of the 20th precinct (Lt. Carbone) informed Price and her advocate, Kerri Toner, from Saint Luke's Roosevelt Hospital's Crime Victims Center/Connect NYC that the reason that Mr. Baly had not been arrested was that he could not be located. Mr. Baly had paid with a credit card that evening at Soldier McGee's bar and the DAs office refused to request a subpoena from the court to attain his billing information so that he could be apprehended.

141. **When Mr. Baly returned to the bar on or about August 25th of 2012 approximately a month after assaulting me staff members alerted the 20th precinct and he was apprehended. When he was approached by officers in the bar he acted disorderly, allegedly fought with officers and resisted arrest. He was arrested (case # 2012NY067321) and released and given "time-served" but not charged with the assault against me. The detective assigned to the case, Galan, pretended Baly could not be located even though this was not the case. Galan had been told by the MDAO that they would NOT press charges against him and to NOT arrest him. He had been arrested already and not charged with the crime against me but was charged with acting disorderly and resisting arrest when NYPD approached him to question him!** I pushed the case and my advocate, Kerri Toner, from the St. Luke's Roosevelt Crime Victims Center /Connect NYC inquired as to why no photo lineup had been done after the assault and nor any follow-up was made to trace Mr. Baly after he was let go as per procedure outlined in the NYPD Patrol handbook (citation needed).

142. Ms. Toner was told that the case was being pursued and Baly could not be located and she made notes to this effect in her log (see Exhibit #40 ). It was not until after Mr. Baly had committed other predatory crimes against other women that Baly was arrested for his assault against me which was over a year after his crime! Baly was arrested on 4/24/13 NINE MONTHS AFTER he assaulted me when he appeared in criminal court to answer charges of criminal trespass (PL 140.01(a)), public lewdness PL 245.00), and public exposure of a person (PL 245.01). He had been arrested for these NEW CRIMES against ANOTHER WOMAN by the 1st Precinct's Officer Jessica Valle on 4/21/13 for crimes he committed against Kristyn Abbale. Following the arrest and the issuance of a desk appearance ticket to Baly for his crimes against me that had happened a year earlier neither I nor Ms. Toner from Connect NYC/Mt. Sinai & St. Luke's Roosevelt CVTC was not informed of his arrest. The first we ever heard of Mr. Baly was when I received a voice mail message from ADA Laura Higgins (nee Richendorfer) on June 23, 2013 informing me she was investigating the assault. A prosecution of Baly for his crime against me was initiated on paper, never investigated by Das office (See Exhibit # 41 Statement from Soldier McGee's Bartender stating he was NEVER contacted by ADA HIGGENS) but later dropped. The DAs office told the judge presiding over the case that

27

they couldn't locate ME to testify and the case 30-30'd. The bartender who witnessed events the night of the attack and when the man returned to the bar weeks later was never interviewed by police. Ms. Higgins informed me that my allegations were too difficult to prove. HOW WERE MY ALLEGATIONS SO DIFFICULT??

143. 10/17/12 While walking home from the subway on 125th street and passing 200 st. Nicholas Ave I was attacked by someone named Willy who sells Heroin on the stoop of that building and is an associate of RAP. He jumped me as I was passing his stoop and threw me onto the ground causing substantial damage to my right knee (see photos Exhibit #1 photos dated 10/17/12 ). I went to the emergency room and have reports and follow-ups from my orthopedic surgeon stating that I need knee surgery as a result of attack (Exhibit #23 ER Report and Orthopedic evaluation). P.O. Longo responded (shield # 31565) and said they were instructed by desk sergeant not to take my report. I insisted and they said they would turn in a notation to the desk sergeant about the incident. I called the desk sergeant and complained No one ever called me to follow up on this assault. complaint # 2012-28-005194. The first police who responded to my call said; 'aren't you the crazy one we are not supposed to take reports from?" P.O. Longo and Walker eventually followed up after I called 911 and complained about the first officers on scene. P.O. Walker sympathetically stated to me that the District Attorney's office had instructed the precinct not to respond to any of my calls. This was Witnessed by my neighbor, Elizabeth Walker, who is a graduate of Harvard University, Colombia Law School and a MEMBER OF THE NEW YORK BAR ASSOCIATION. WALKER PRESSED WILLIAM'S AND LONGO TO TAKE MY COMPLAINT, reminded them that it is illegal to deny a person police services. Williams commented that the precinct had been instructed by the District Attorney's office to not respond to any calls I made AND THEY took my information and told me nothing would be done eventually. (See Exhibit #30 Letter from Elizabeth Walker.)

144. On the night of 6/2/2013-6/3/2013 While en route home from the Amsterdam Ale house on 76th and Amsterdam where I had dinner with a friend of mine I instructed the cab driver to follow a certain route and he refused. I asked him to stop his cab so I could get out and instead he locked the doors and sped up. He carried on like this for a number of blocks while I screamed at him to stop the cab and let me out. I called 911 from the back of the cab and when we stopped at a red light nearby police from the 28th pct were called over. Officer Officer was one of these officers and he announced to his partner that I was not to be given police services or assisted in any way and that he refused to take a report from me. I called 911 and reported this incident. Surprise; it was never followed up on.

145. 6/2013; while in route to the subway past precinct from my home Detectives from the 28 squad opened their windows overlooking my path up St. Nicholas to the 125th st. subway station and 'MOO' at me as if I were a cow. I called the precinct and complained to the CO and his assistant immediately.

146. July 2013; while walking my dog near my home I'm given a jaywalking ticket on the

28

corner of 120th and St. Nicholas (I have eyewitnesses that will testify that I did not jaywalk) even though I wasn't jaywalking. 28th pct cops were rude and condescending. I fought the ticket in court and won (docket # 2013SN053520).

147. 2014: ADA Carolyn Maloney is assigned to represent three ADAs I named on my NY Supreme Court Lawsuit vs. City of NY. Maloney commits various acts of perjury within her own sworn court papers in an attempt to mislead the court.

148. June 2014 ADA Maloney in DIRECT CONFLICT OF INTEREST WITH HER ETHICAL OBLIGATIONS AND VOWS takes on the role of acting as FOIL officer in response to my FOIA request for all information in my MDAO files. As Maloney is the attorney representing individuals named in lawsuit how possibly could she fulfill her legal obligation to provide me with materials I am legally and lawfully entitled to that would implicate her colleagues in my lawsuit? Who allowed this mewling ingénue to take on the responsibility of being the same FOIL officer to respond to my request? I will on pass communications regarding this request separately. I'm still barking mad that anyone in the MDAO, especially her supervisors Patricia Bailey and Susan Roque would allow this misdeed and clear violation of ethics and legal standards to take place. I'm filing a Federal Lawsuit about this matter to be meted out in a court that does not care that she is the daughter of the very congresswoman who wrote the FOIA legislation her own child willfully spits in the face of.

149. The Manhattan District Attorney, Mr. Cyrus Vance, Jr., quoted Berger v S, 295 U.S. 78, 88 (1935) in his Recommendation for Dismissal of charges against DSK:

> "Along with the substantial power conferred upon prosecutors come unique responsibilities. Rather than serving only as a zealous advocate on behalf of a client, prosecutors have a broader set of obligations to the community, the victim, and the defendant: the [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is a complain as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that *guilt shall not escape or innocence suffer*." HOW MUCH LONGER MUST I SUFFER MR SCHLANGER?

# V. Moving FORWARD: THE MDAO, MISS PRICE, AND ADVOCACY FOR THE PROFESSION OF PHOTOJOURNALISM IN NYC.

139. I have some ideas about how the MDAO can rehabilitate its reputation and restore its good name in regard to the mess it has caused itself over my case. Many people in town know about my case, the abusive treatment the MDAO unhanded to me and the

29

egregious violations to my Constitutional Rights that took place in its attempt to cover-up its wrong-doing. It is in this office's best-interest to correct its own violations, to institutionalize proper training and to enforce diligent adherence standards of conduct, fairness, ethics and professional behavior for the people it has in its employ. I would like to start a dialogue with you about how exactly the MDAO can help restore me to the status I enjoyed before these malicious prosecutions, unlawful arrests and illegal actions against me.

140. As a public official Mr. Vance must recognize that his office must hold itself to the same high-standards of professional conduct that it insists from its constituents. How can this same office accuse various corporate entities of corporate wrongdoing, mishandling and various actionable breaches of professional standards when he does not hold his own employees accountable or attempt to make reparations for their misanthropy?

141. Before these egregious breaches of my Constitutional Rights I was well on my way to creating a governing body to give safe-harbor to professional photojournalists. I want to continue my work. I believe professional photographers are in danger now more than ever before and are under attack not only from Digital Media that practices that belittles and devalues their work but also from professional entities that seek to destabilize the industry for their own monetary gain. I would like to propose that the MDAO use some of the resources it has allocated to protect other industries in town (think Stub-hub and the office created to protect digital entertainment ticket sales) to oversee and protect the industry and business of photography/photojournalism. The creation of such an office would:

   a. Act as an assertion that the MDAO recognizes the integral work of photographers in building our society and in recording history.
   b. -Acknowledge that NYC is the place where the commerce of photojournalism takes place more so than any other city in the world.
   c. -Assert that there is sufficient need to establish protections and encouragements for professional photojournalists/photographers because of its SPECIAL JURISDICTIONAL PRESEDENCE/POSITIONING over the international industry that is anchored here in Manhattan.

142. The authority that such an office could exercise to its protectees around the globe by asserting its control here over factions or entities with business addresses in NYC whom operate oversees potentially could work in many ways.

143. The office would act as a body to advocate for basic professional working rights and wages and benefits for registered members. For instance it could begin to standardize fair day rate and space rate and danger pay agreements as well as regulations for royalty splits and copyright enforcements. Current business practices by Goliath Agencies such as Getty have endangered the business and asserted egregious working standards on photographers (i.e. a 70/30 royalty split in favor of the Agency that photographers HAVE to agree to or else not have their work distributed globally by the largest global player in the industry.)

144. It could also work to protect members from threats against their persons as a result of their journalistic endeavors. Meaning: if a registered member of the office worked say in a place like Pakistan and was undergoing harassment by authorities while doing his/her job a member of the office would visit the Pak Mission to the UN here in NY and have a chat with someone like Shalit Jalal, the Information Minister, with a formal complaint letter and a course of action plan outlined if actions weren't taken to exert checks and controls over such threats.

145. The office would work on specialized legislative projects such as advocating for 9/11 photographers. Many I know are currently outraged that nothing is being done to stop the illegal distribution of our photographic output by near-do-wells who have illegally collected them into memory books for sale by legions of street-vendors on the fringes of Ground Zero. What will happen when the transit hub is opened? Will the same flotilla of illegal memory-book hawkers flood the area below Calatrava's beloved firebird and continue their illegal commerce? Who is coordinating with the City Council to pass legislation prohibiting illegal sales on hallowed ground? Who is working with the NYPD to trace the publisher of such books and hold them accountable? Who is monitoring where the millions of dollars a month being made by such illegal practices is flowing to? When I last sat near the Millenium Hilton /Centry 21 department store where the lions share of the books are sold these days I counted over 25 book sales men all with armloads of books selling for 10.00 to 20.00 USD each (Exhibit #42 photos of Yemenis salesmen illegally selling 9/11 "memory" books by Ground Zero.) Just a quick estimate:

average of 100 books/day each @ 15.00 USD = 1000.00 USD EACH per day = 1500 USD/day

20 vendors x 1500 = $30,000.00/day

7 days per week = $210,000.00/week

52 weeks/year = $ 10,920,000.00/year in ILLEGAL 9/11 photo book sales at Ground Zero ALONE.

I have MANY other ideas and would like to begin a dialogue on how we can bring this very painful episode to a conclusion and work together to do some good. I very much look forward to hearing from you Mr. Schlanger. Please take my statements seriously. I'm happy to have this document notarized if you feel more comfortable knowing my statements are sworn.

Yours,

*Miss Kelly Price

*signed as per the 2000 Federal Digital Signature Act

31

VIA Hand Delivery AND
Electronic MAIL

July 9, 2014

Patricia Bailey
FOIA Appeals Officer
Manhattan District Attorney's Office
City of New York
One Hogan Place
New York, NY 10013

cc. ADA Christina Maloney, DA Cyrus Vance Jr.

**Ref: Appeal of FOIA Request Denial**

Dear Ms. Bailey

On June 26, 2014, I filed a Freedom of Information Act (FOIA) request with the MDAO, requesting all correspondence, memoranda, documents, reports, records, statements, audits, lists of names, applications, diskettes, letters, expense logs and receipts, calendar or diary logs, facsimile logs, telephone records, call sheets, tape/audio recordings, video/movie recordings, notes, examinations, database entries, opinions, folders, files, books, manuals, pamphlets, forms, drawings, charts, photographs, electronic mail, and other documents and things that refer of relate to myself, Kelly Price, DOB 11/27/70 ssn 521 55 0356, any and all criminal investigations, investigatory materials and surveillance logs as well as all audio and video materials in which my name, voice or image is seen, heard or invoked involving any other persons or entities within twenty (20) business days. In a response letter dated July 3, 2014, ADA Christina Maloney denied my request citing that:

"You have filed a lawsuit in New York State Supreme Court (Kelly Price v. the City of New York, et. Al. Index No. 101414/2013). Your request for documents regarding the underlying criminal cases is denied, as disclosure would interfere with the pending judicial proceeding. Public Officers Law § 87(2)(e)((I)."

This letter respectfully appeals the determination of Ms. Maloney. The information requested under FOIA must be disclosed because the "Judicial Proceeding" exemption of the FOIA does not apply as the underlying criminal case(s) has/have been dismissed and/or resolved. The FOIA exemption cited by Maloney [NY State Public Officers Law § 87(2)(e)((I)] provides protections for information complied for law enforcement purposes and stems from FOIA 5 U.S.C. §552 (b)(7). The intention behind this exemption is to allow agencies to withhold law

enforcement documents in order <u>*to prevent interference with the enforcement process.*</u> According to FOIA 5 U.S.C. §552 (b)(7):

<u>*Exemption 7 has six sub exemptions and Exemption 7A protects information because of a 'Judicial Proceeding' that could interfere with law enforcement proceedings, thus protecting ACTIVE investigations. This exemption is applicable only if an investigation is pending or planned and the release of the information will compromise the investigation.*</u>

      In the matter of Castle House Dev. Inc. v. The City of New York Justice Schlesinger states in regard to the NYPD's denial of petitioner's FOIA request by citing the *same* NY Public Officer Law [§ 87(2) (e) ((I)] that: "As far as what was known then and now, there was no continuing law enforcement proceeding extant and the only known Judicial Proceeding was the aforementioned tort action in King's County." Justice Schlesinger goes on to explain how a civil action is not the same as a criminal action in seeking to use its existence as a remedy against disclosing information sought on a FOIA request by labeling the civil action as a criminal one; "This exemption is not a viable one in circumstances such as this, a pending civil action." (Castle House Development Inc. v City of New York Police Dept. 2009 NY Slip OP 51553 (U) [24 MISC 3d 1222 (A)] Justice A Schlesinger 7/10/2009. SUPREME COURT NY COUNTY.

      In Maloney's Motion to Dismiss filed with NY Supreme Court on April 10, 2014 she states that "The facts below are gleaned from the records of the DA's Office and recitations made by plaintiff; however, much of the plaintiff's record is sealed…" Maloney herself admits in this statement that my record is sealed and thus NOT AN ACTIVE INVESTIGATION and thus not subject to the "Judicial Proceedings" exemption as she has wrongly and unlawfully asserted. Additionally in order to successfully assert the "Judicial Proceedings" exemption for a FOIA request that Agency or Actor asserting the denial must state how the release of the information will compromise said investigation. Maloney has made no attempt to show in what way granting my FOIA request would interfere with the civil tort action I have brought vs. individuals in the MDAO, the NYPD and the City of New York.

      Justice Schlesinger goes on to further review and discuss how Judge Kaye of the Appellant court made it clear in the opening lines of her unanimous Appellant court finding that in the case of M. Farbman & Sons v. New York City Health and Hospitals Corp et al., 62 NY2d 78 (1984): "Access to records of a government agency under the Freedom of Information Law…is not affected by the fact that there is pending a litigation between the person making the request and the agency." Schlesinger further cites this Court of Appeals decision that: "an agency's public records remain as available to its litigation adversary as to any other person…In the absence of indication from the Legislature, we refuse to read into FOIL the restriction that, once litigation commences, a party forfeits the rights available to all other members of the public."

Finally regarding the provisions of the FOIA statute and of particular note:

II. If any responsive record or portion thereof is claimed to be exempt from production under FOIA, sufficient identifying information (with respect to each allegedly exempt record or portion thereof) must be provided to allow the assessment of the propriety of the claimed exemption. *Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir 1973), *cert denied*, 415 U.S. 977 (1974). Additionally any reasonably segregable portion of a responsive record must be provided after redaction of any allegedly exempt material to me, as the law requires. 5 U.S.C. § 552(b).

II. Ms. Maloney has issued an adverse FOIA records determination in response to my request and as such she was required to (1) notify the requester of the right to appeal; (2) identify the appeals officer and the officer's contact information; and (3) state the date when the appeal letter must be received by the officer and; (4) address my request for all fees to be waived. As Maloney failed to satisfy the requirements of the first, third and fourth FOIA stipulations I have the right to initiate court action immediately. Please do respond to this FOIA APPEAL in a timely fashion (within twenty days of receipt of this letter.)

III. In order to help to determine my status for purposes of determining the applicability of any fees, you should know that I am willing to pay fees up to the amount of $250.00 USD which is a considerable hardship but an attainable one for me. If the fees will exceed this amount, please inform me before fees are incurred. I can be contacted via email or telephone if necessary to discuss any aspect of this request.

In conclusion: it pains me greatly as a fourth-generation daughter of the City of New York to witness the widespread malpractice and disregard for the letter of the laws of our country that I have been confronted with at every turn in my interactions with the MDAO since approaching them for assistance in extracting myself from a life-threatening intimate-partner situation. My family members have fought in wars, I myself have been on the frontlines of attacks on our nation, and have lost many friends and colleagues who have died in the name of these same laws that are disregarded, willfully misinterpreted and misappropriated to justify unlawful actions by the members of the MDAO. Please Ms. Bailey: let this epidemic that has swept the masses of young, mewling ingénues stocking the brigades of the MDAO stop with you.

Sincerely,

Kelly Price
534 w 187 st # 7
New York NY 10033
Signed as per the 2000 Electronic Signature Act




**DISTRICT ATTORNEY**
OF THE
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
New York, N.Y. 10013
(212) 335-9000

**CYRUS R. VANCE, JR.**
DISTRICT ATTORNEY

July 16, 2014

Kelly Price
534 W. 187th Street #7
New York, New York 10033

**VIA ELECTRONIC AND REGULAR MAIL**

Re: F.O.I.L. Appeal

Dear Ms. Price:

The New York County District Attorney's Office received your Freedom of Information Law (F.O.I.L.) appeal. As the F.O.I.L. Appeals Officer, I have reviewed our file and am prepared to rule on this matter.

You appeal the determination made by Assistant District Attorney Christina Maloney, the Records Access Officer assigned to your request. The substance of the argument in your appeal is that documents from the case files are not exempt under to F.O.I.L. because there is no pending judicial proceeding. Although ADA Maloney was correct in her assessment that you have a pending matter related to the requested cases, it is civil in nature and its disposition will have no effect on the closed criminal cases you request access to.

As such, I am remanding your original request back to ADA Maloney so that she may make a de novo determination. The case files will need to be ordered before she can make a determination on your request, so allow until August 16, 2014 for her determination or update.

In accordance with the above discussion, your appeal is dismissed at this time.

Sincerely,

Susan C. Roque
Assistant District Attorney
Special Litigation Bureau

cc: Committee on Open Government
Department of State
41 State Street
Albany, New York 12231