(c) the rights of crime victims to be protected from intimidation and to have the court, where appropriate, issue protective orders as provided in sections 530.12 and 530.13 of the criminal procedure law and sections 215.15, 215.16 and 215.17 of the penal law;

    (d) the rights of crime victims to submit, where appropriate, a victim impact statement for the pre-sentencing report and the parole hearing as provided in section 390.30 of the criminal procedure law and section two hundred fifty-nine-i of this chapter;

    (e) the rights of crime victims, where a defendant is being sentenced for a felony, to request the right to make a statement at the time of sentencing as provided in section 380.50 of the criminal procedure law; and

    (f) the rights of crime victims to request restitution and have the district attorney present such request to the court and assist the crime victim in the filing and collection of a restitution order in cooperation with the designated agency of the court as provided in section 420.10 of the criminal procedure law and section 60.27 of the penal law.

    (g) the rights of crime victims to be aware of the defendant's incarceration status by providing the division of parole's contact information, including the division's toll-free telephone number, as provided for in subdivision two of section two hundred fifty-nine-i of this chapter. Such notice shall advise the crime victim to use the division's toll-free telephone number to update contact information.

3. This pamphlet shall provide space for the insertion of the following information:

    (a) the address and phone number of the office of victim services;

    (b) the address and phone numbers of local victim service programs, where appropriate;

    (c) the name, phone number and office location of the person in the district attorney's office to whom inquiries concerning the victims case may be directed; and

    (d) any other information the division deems appropriate.

4. (a) The commissioner of the division of criminal justice services in consultation with the director of the office of victim services shall develop and prepare a standardized form for the use of district attorney offices for the purpose of reporting compliance with this section. The form is to be distributed to each district attorney. Every district attorney's office in the state shall complete the reporting form annually and send it to the director of the office of victim services by the first day of January each year subsequent to the effective date of this subdivision.

    (b) A copy of the report shall be retained by the district attorney and upon request, a victim of a crime or relative of a victim shall be entitled to receive from the district attorney a copy of their district attorney's annual report without charge. Any other person requesting a copy of the report shall pay a fee not to exceed the actual cost of reproduction.

### § 647 – Criteria

Fair treatment standards for crime victims in the courts shall provide that:

1. The court shall consider the views of the victim of a violent felony offense, a felony involving physical injury to the victim, a felony involving property loss or damage in excess of two hundred fifty dollars, a felony involving attempted or threatened physical injury or property loss or damage in excess of two hundred fifty dollars or a felony involving larceny against the person, or of the family of a homicide victim or minor child, regarding discretionary decisions relating to the criminal case, including, but not limited to, plea agreements and sentence. In addition, the court shall consider the views of the victim or family of the victim, as appropriate, concerning the release of the defendant in the victim's case pending judicial proceedings upon an indictment, and concerning the availability of sentencing alternatives such as community supervision and restitution from the defendant. The failure of the court to consider the views of the victim or family of the victim shall not be cause for delaying the proceedings against the defendant nor shall it affect the validity of a conviction, judgment or order.

2. The victims and other prosecution witnesses shall, where possible, be provided, when awaiting court appearances, a secure waiting area that is separate from all other witnesses.

3. The court shall assist in and expedite the return of property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial.

4. Victim assistance education shall be given to judicial and nonjudicial personnel of the unified court system so that victims may be promptly, properly and completely assisted.

### § 648 – Review; Report and Implementation

1. The chief administrator of the unified court system shall review court practices, procedures, services, regulations and laws to determine the adequacy and appropriateness of its services with respect to crime victims, including victims with special needs, particularly the elderly, disabled or victims of child abuse, domestic violence or sex-related offenses. Such review shall include reasonable opportunity for public comment and consultation with crime victims or their representatives, and may include public hearings.

2. After the review, and not later than two hundred seventy days after the effective date of this section, the chief administrator of the unified court system shall submit a report to the governor and the legislature, setting forth the findings of the review, including a description of the services provided by the components of the unified court system and recommendations for changes in its procedures, services, regulations and laws to improve its services to crime victims and to establish and implement fair treatment standards for crime victims.

3. Subject to the direction of the chief administrator, the components of the unified court system shall expeditiously implement the recommendations of its report.

### § 649 – Miscellaneous



Nothing in this article shall be construed as creating a cause of action for damages or injunctive relief against the state or any of its political subdivisions or officers or any agency thereof.



### McKinney's Social Services Law § 483-aa

**§ 483-aa. Definitions**

The following definitions shall apply to this article:

(a) "Human trafficking victim" means a person who is a victim of sex trafficking as defined in section 230.34 of the penal law or a victim of labor trafficking as defined in section 135.35 of the penal law.

(b) "Pre-certified victim of human trafficking" is a person who has a pending application for federal certification as a victim of a severe form of trafficking in persons as defined in section 7105 of title 22 of the United States Code (Trafficking Victims Protection) but has not yet obtained such certification, or a person who has reported a crime to law enforcement and it reasonably appears to law enforcement that the person is such a victim.



**§ 483-bb. Services for victims of human trafficking**

(a) The office of temporary and disability assistance may coordinate with and assist law enforcement agencies and district attorney's offices to access appropriate services for human trafficking victims.

(b) In providing such assistance, the office of temporary and disability assistance may enter into contracts with non-government organizations for providing services to pre-certified victims of human trafficking as defined in subdivision (b) of section four hundred eighty-three-aa of this article, insofar as funds are available for that purpose. Such services may include, but are not limited to, case management, emergency temporary housing, health care, mental health counseling, drug addiction screening and treatment, language interpretation and translation services, English language instruction, job training and placement assistance, post-employment services for job retention, and services to assist the individual and any of his or her family members to establish a permanent residence in New York state or the United States. Nothing in this section shall preclude the office of temporary and disability assistance, or any local social services district, from providing human trafficking victims who are United States citizens or human trafficking victims who meet the criteria pursuant to section one hundred twenty-two of this chapter with any benefits or services for which they otherwise may be eligible.



**§ 483-cc. Confirmation as a victim of human trafficking**

(a) As soon as practicable after a first encounter with a person who reasonably appears to a law enforcement agency or a district attorney's office to be a human trafficking victim, that agency or office shall notify the office of temporary and disability assistance and

the division of criminal justice services that such person may be eligible for services under this article.

(b) Upon receipt of such a notification, the division of criminal justice services, in consultation with the office of temporary and disability assistance and the referring agency or office, shall make a preliminary assessment of whether such victim or possible victim appears to meet the criteria for certification as a victim of a severe form of trafficking in persons as defined in section 7105 of title 22 of the United States Code (Trafficking Victims Protection) or appears to be otherwise eligible for any federal, state or local benefits and services. If it is determined that the victim appears to meet such criteria, the office of temporary and disability assistance shall report the finding to the victim, and to the referring law enforcement agency or district attorney's office, and may assist that agency or office in having such victim receive services from a case management provider who may be under contract with the office of temporary and disability assistance, or from any other available source. If the victim or possible victim is under the age of eighteen, the office of temporary and disability assistance also shall notify the local department of social services in the county where the child was found.

## Statutes
**McKinney's Executive Law Ch. EIGHTEEN, Art. 23, Refs & Annos**

CROSS REFERENCES

Action against offender's estate; victim as creditor, see Civil Rights Law § 79-d.

Action by victim of criminal offense, time limits, see CPLR 213-b.

Compensation for crime victims, see Executive Law § 620 et seq.

Deaf victim, appointment of interpreter, see Judiciary Law § 390.

Dispositions of offenders, restitution and reparation, see Penal Law § 60.27.

Dispute resolution, notice and opportunity for victim to be heard prior to referral, see CPL 215.10; CPL 215.20.

Employer unlawfully penalizing victim witness, misdemeanor, see Penal Law § 215.14.

Forfeiture of proceeds of crime, see CPLR 1310 et seq.

Intimidation of victim, felony, see Penal Law § 215.15 et seq.

Judicial administration, chief administrator, see Judiciary Law § 212.

Mentally incapacitated defendant, notice to potential victim of release, see CPL 730.60.

Notice to crime victim of case disposition, see CPL 440.50.

Orders of protection for crime victims while action pending, see CPL 530.12; CPL 530.13.

Parole board, consideration of crime victim's statement, see Executive Law § 259-i.

Proceeds of crime, recovery by victim, see Executive Law § 632-a.

Released inmates; notification to victims and family members, see Correction Law § 149-a.

Restitution and reparation to crime victim, see Penal Law § 60.27.

JULY 26, 2012

STATEMENT BY COALITION AGAINST TRAFFICKING IN WOMEN

**We are a coalition of advocates for victims of sex trafficking who feel compelled to speak in support of the complainant and her family in this case and to express our concern about the dismissal of charges against the defendants. In many respects, this case, in which a young girl from Crown Heights reported victimization by a group of older men, one of whom has been convicted of felony-level sex trafficking and another faces charges of murder in unrelated cases, is typical of sex trafficking.**

A victim of prior childhood sexual abuse, like an estimated 70 percent of prostituted girls and young women, the victim in this case reported that a group of adult men in her neighborhood sexually assaulted her and seasoned her into prostitution when she was in her early teens. Experts report that the average age of entry into prostitution is 13 years old and that prior sexual victimization renders many of these girls especially vulnerable to their exploiters' tactics of power and control. Traffickers are often trusted friends, family members, or neighbors.

**There is voluminous evidence corroborating this young woman's claim of sex trafficking and rape.** Police records and neighborhood witnesses support her and her family's account that they made complaints to the local police about her victimization by a group of neighborhood men during the early stages of her trafficking but the police did nothing to protect her. While police response to sex trafficking is changing under the leadership of Commissioner Kelly, it has been longstanding police practice, in New York City and throughout the country, to ignore the perpetrators and to blame and arrest the victims. The mental health issues faced by this victim, for which her family assisted her in obtaining in-patient treatment, are also typical. Most victims of prolonged sex trafficking suffer from acute post traumatic stress disorder, as this victim does.

**One of the most representative yet misunderstood features of this case is the victim's psychological bonds with her abusers.** Like most girls and young women under pimp control, she viewed her traffickers, variously, as tormentors, protectors, romantic partners, and surrogate father figures. Like most girls and young women under pimp control, and like many victims of domestic violence, a closely related form of gender abuse, the victim in this case expressed feelings of love for her tormentors, at times wished to protect them from punishment, blamed herself for her victimization, and repeatedly returned to them. This psychological condition,

sometimes called "Stockholm Syndrome" and designated "traumatic bonding" by mental health professionals, is widespread among victims of severe and prolonged sexual and physical violence. It is typically engendered by beatings, rape, captivity, and threats to the victim and the victim's family members, punctuated by expressions of caring and love. The young woman in this case reported precisely this kind of treatment at the hands of her traffickers.

**It is unfortunate that statements made by the victim that should be viewed as evidence of traumatic bonding have been wrongly interpreted by key legal players in this case as evidence of consent and have become the basis for the Brooklyn District Attorney's Office's decision to dismiss the charges against the defendants.** We regret that expert witness testimony was not employed by the Brooklyn District Attorney to educate the jury and the general public about the meaning and significance of these statements. We are concerned that the dismissal of these charges, coupled with silence about the role of traumatic bonding in this case and others, will have a chilling effect on other victims' willingness to report sex trafficking and may foster the erroneous view that women and girls' reports of sex trafficking are not to be trusted. We are outraged that some of the media coverage has denigrated the young woman in this case, who had the courage to come forward and report years of horrific abuse. We are deeply saddened that the victim and her family have been denied justice.

**This case has nothing to do with the victim's or her alleged perpetrators' race, religion, or ethnicity. Sex traffickers come from every racial, ethnic, and religious background, as do their victims.** In New York City, most sex trafficking victims are girls and young women from minority groups who grew up in conditions of poverty. Their poverty and minority status render them vulnerable and are exploited in the sexual stereotypes projected onto them by traffickers, who evoke them in marketing their victims to johns. This case is no different. One of ten children from a working-class family in a poor neighborhood, this victim's ethnicity and distinctive racial features were similarly exploited by the pimps who sold her and the johns who purchased her body.

One atypical factor in this case is this victim's strong family support. While her family members were unable to protect her from years of exploitation and abuse, they valiantly attempted to do so and today wholeheartedly stand behind their daughter and sister. Attached is a statement from the victim's father, who is determined to prevent other girls and young women from experiencing the suffering that his daughter has endured.

# Speakers at Press Conference

Kim Sykes, Director of Special Projects, Coalition Against Trafficking in Women

Taina Bien-Aime, J.D., former Executive Director, Equality Now, New York State Anti-Trafficking Coalition

Dr. B.J. Cling, Ph.D, J.D., Clinical and Forensic Psychologist

Danielle Latimer, LMSW, Commercial Sexual Exploitation Program Coordinator and Clinician, Mount Sinai School of Medicine

Norma Ramos, J.D., Executive Director, Coalition Against Trafficking in Women

Jane Manning, J.D., former prosecutor and Legislative Director, New York City NOW

Shana Frydman, MSW, Director of Clinical Programs, Metropolitan Council on Jewish Poverty

Kira Laffe, Outreach and Training Coordinator, New York City Alliance Against Sexual Assault

Press statement by the victim's father
July 26, 2012

June 28th of last year, the indictment of four individuals who had brutalized and prostituted my daughter since the age of 13 was announced with great fanfare by the Brooklyn District Attorney. For me, her father, her mother, and the other members of our family, this represented the end of a long nightmare. We had hoped that this case would shed light upon the legal and psychological issues that accompany this devastating crime. Today, the District Attorney has chosen to discontinue this legal battle. It is a decision that was made against our wishes and against our will.

We have maintained our silence at the request of the District Attorney, even as the defense in this case maintained a feverish battle in the court of public opinion. We were told repeatedly by the DA to maintain our silence, not to divulge facts that could be useful to the defense. We were told that our chance to reply would come in court. This is a promise that was not kept.

With our promise of silence now null and void, we now wish to set the record straight with facts that were omitted from press accounts of this case.

First, I became aware of the possibility of prosecution in my daughter's case in May of last year, almost six weeks before the indictments of Jamali and Jawara Brockett, Damien Crooks and Darrell Dula. During that time, my daughter courageously shared the details of her mental health history, as well as the extent of her "traumatic bonding" with her traffickers, in which

she felt fondness and affection that increased in direct proportion to the extent that she was brutalized. All of these facts she was eager to explain in a court of law. Repeatedly, she and I asked people in the DA's office if these facts-- facts which could easily be twisted and manipulated by defense attorneys- would stand in the way of their prosecuting the case. Repeatedly, we were assured that the case could go forward, that my daughter was no more to be blamed for returning to abuse than an abused wife or girl friend.

The press, hand fed a selective menu of leaks by the defense, presented my daughter in the most damaging light possible. Even when she attempted to learn self defense, a logical, therapeutic step for someone who had been gang raped at age 13, it was splashed in the headlines in a sensationalistic and negative way. What the press never focused on or even acknowledged was that every single piece of information they brought to light came from voluminous evidence turned over by my daughter. Presented in its context, and explained by experts in sex trafficking and domestic violence, the evidence should have been more than sufficient to convict my daughters' traffickers. It also would have enlightened the public on how to protect their children, as well as to expose how traffickers target their victims, "turn them out," put them on the street, and profit from their sale.

One of the most damning pieces of evidence cited against my daughter was a supposed recantation which she had signed. A copy of the so called recantation shows that it was defaced, and that the words "not true" were crossed out. [This needs a little more explanation.] What is not mentioned is that the signature

was extracted from my daughter when she was at a hospital, receiving medication intravenously. In this weakened state, she was told by the man who goes by the official title of detective that she could be arrested for prostitution if she did not recant. What is also not mentioned is that this individual, who was on duty wearing an NYPD badge, cursed at her as he left the room with her coerced recantation. Sadly enough, this incident was only one of many in which my daughter was rebuffed by police when she reached out to law enforcement authorities to obtain protection from the abuse to which she was being subjected.

Several of these attempts to obtain protection from the police came when she was well under age and therefore legally unable to consent to sex. Back when my daughter was only 14, at a meeting arranged by Crown Heights Shmira, my son and I met with Lieutenant Cantwell and other police officers at our local precinct and voiced our concerns that my daughter was being forced into sex by the Brockett brothers. Despite the our reports of serious criminal activity—the repeated rape of a minor-- there was absolutely no follow up by Lieutenant Cantwell or any of the other officers to the best of our knowledge. In nine years of dealing with the NYPD, I can truly say that a stolen car merits more attention than a stolen childhood in many parts of New York City. The attitude of the NYPD that we experienced towards under aged trafficking victims was one of sneering indifference, a response that served only to cover the backs of perpetrators who turn out and prostitute under aged girls.

As a result our government's failure to protect her, my daughter spent years in in-patient treatment. She now feels overwhelming sadness about the time she spent away from family, and about

the fact that a locked ward was the only place that she could be free of sexual enslavement.

It should be self evident that a young woman who has been subjected to years of physical and sexual abused would be in need of serious psychiatric intervention. Tragically, what the defense has shown, and what the District Attorney has affirmed, is that a "history of mental illness" is a scarlet letter that in all too many cases deprives its wearers of any legal recourse against those who victimize them. In addition, the "traumatic bonding" increasingly understood by the legal system, in cases of abused spouses is used against them as proof that they sought out, enjoyed, and deserved their victimization. One legal expert told me that understanding of sex trafficking is today where the understanding of spousal abuse was 30 years ago.

It saddens me and my family that we had to leave our beloved community, one in which people of different racial, ethnic, and religious groups lived side by side and learned to respect our differences and cherish our commonalities, especially our desire to nurture our children. We leave it with a deep sense of empathy for other families that have lost children to "the street life." Even today, in this hour of defeat, we remain committed more than ever to bringing about the day when law enforcement will treat forcing a child into prostitution with the same horror felt by the average citizen. I personally feel conscripted to fighting this tragic form of human suffering as a life's mission.

We had hoped that Brooklyn would be the place in which a stand would be made against sex trafficking. This was unfortunately not the case. Despite my daughter's total

cooperation, the Brooklyn District Attorney has surrendered against our will and without our consent. We have no doubt that a day will come when a victim of sex trafficking will fight and win in a battle in court and win. We have no doubt that precinct by precinct, city by city and state by state, police and the courts will reflect and act upon the natural indignation citizens feel about this heinous crime.

In 1857, the infamous Dred Scott decision affirmed the legality of slavery. In 1865, Juneteenth became a celebration of the freedom Dred Scott never lived to see. Despite today's surrender in Brooklyn, the fight against sex trafficking goes on. I am saddened as a father and as a human being that this decision to drop charges was made. As a Brooklynite, I am ashamed as well.

Women are half of the human race. When women are oppressed by gender violence and inequality, men are diminished as well. Until my dying day, the sex trafficking of women and girls, men and boys, in prison and in freedom [not sure what you mean by "men and boys, in prison and in freedom"] will remain my cause. The dignity given us by G-d is not ours to diminish or to deny others. This struggle will go on. I thank the many people who behind the scenes have assisted our family in coping with this crisis and who have helped my daughter reclaim her freedom and dignity. G-d bless you all and G-d save our country.

Exhibit #47



## *NEW YORK STATE ANTI-TRAFFICKING LAW*

New York State (NYS), especially New York City (NYC), is a destination for trafficked persons from all over the world who are forced into various labor sectors, such as restaurants, agriculture, domestic or sex work. To address this important concern, New York State enacted an anti-trafficking law that took effect on November 1, 2007.[1] This document highlights the key changes made to New York State laws.

## NEW YORK PENAL LAW

The law adds new sections to the Penal Law, creating the crimes of "Labor Trafficking" and "Sex Trafficking."

### "Labor Trafficking"

- A new N.Y. Penal Law §135.35 creates the crime of "Labor Trafficking." A person commits this crime when he or she compels or induces another person to engage in labor, or recruits, entices, harbors, or transports such other person by means of intentionally: (1) providing the victim with certain drugs; (2) requiring servicing of a debt that is caused by a course of conduct, with intent to defraud such person; (3) withholding or destroying government identification documents; (4) using force or engaging in any scheme, plan or pattern to compel or induce such person to engage in labor activity by making that person fearful of one of seven actions or consequences against him or her. (For the full text of this section, please see *Appendix A*.)

- N.Y. Penal Law §135.35 makes the crime of "Labor Trafficking" a class D felony, with a maximum sentence of 7 years imprisonment.[2] In addition, a court may order a defendant to pay a fine of $5,000 or double the defendant's gain from the commission of the crime.[3]

- A new N.Y. Penal Law §135.36 provides that a victim of "Labor Trafficking" is not an accomplice of the trafficker. (For the full text of this section, please see *Appendix A*.)

### "Sex Trafficking"

- A new N.Y. Penal Law Section §230.34 creates the crime of "Sex Trafficking." A person commits this crime when he or she intentionally advances or profits from prostitution by: (1) providing the victim with certain drugs;[4] (2) making material false statements;[5] (3) withholding or destroying government identification documents; (4) requiring repayment of a debt;[6] (5) using force or engaging in any scheme, plan or pattern to compel or induce such person to engage in prostitution by making that person fearful of one of eight actions or consequences against him or her. (For the full text of this section, please see *Appendix B*.)

---

[1] S.B. 5902, 228th Leg., Reg. Sess. (N.Y. 2007), chaptered on June 6, 2007.
[2] *See* N.Y. Penal Law §70.00(2)(d).
[3] *See* N.Y. Penal Law §80.00.
[4] N.Y. Penal Law §230.34(1), relating to drugs, is more detailed in the "Sex Trafficking" provision than in the "Labor Trafficking" provision at N.Y. Penal Law §135.35(1).
[5] N.Y. Penal Law §230.34(2), relating to the use of fraud, has no counterpart in the "Labor Trafficking" provision.
[6] N.Y. Penal Law §230.34(4), relating to repayment of a debt, does not require a "systematic ongoing course of conduct with intent to defraud such person" as required in the "Labor Trafficking" provision at N.Y. Penal Law §135.35(2).

- N.Y. Penal Law **§230.34** makes the crime of "Sex Trafficking" a Class B felony, with a maximum sentence of 25 years imprisonment.[7] In addition, a court may order a defendant to pay a fine of $5,000 or double the defendant's gain from the commission of the crime.[8]

- A new N.Y. Penal Law **§230.36** provides that a victim of "Sex Trafficking" is not an accomplice of the trafficker. (For the full text of this section, please see *Appendix B*.)

**Changes to the Penal Law Relating to Prostitution**

- N.Y. Penal Law **§230.25**, "Promoting Prostitution in the 3rd Degree," is amended to include the selling of traveled-related services, knowing that such services include or are intended to facilitate travel for the purpose of patronizing a prostitute.

- Repeals N.Y. Penal Law **§230.03**, "Patronizing a Prostitute in the 4th Degree," and amends **§230.04** to make the lowest level of "Patronizing a Prostitute" a Class A misdemeanor.

**NEW YORK SOCIAL SERVICES LAW**

The law adds a new Article 10-D to the Social Services Law, entitled "Services for Victims of Human Trafficking." New York State Office of Temporary and Disability Assistance (OTDA) and the Division of Criminal Justice Services (DCJS) are entrusted with ensuring that trafficked persons obtain necessary services. The process of determining eligibility for services is called "confirmation."[9]

- N.Y. Soc. Ser. Law **§483-bb(a)** authorizes OTDA to coordinate with and assist law enforcement agencies and district attorneys' offices to access appropriate services for trafficked persons.

- N.Y. Soc. Ser. Law **§483-bb(b)** states that OTDA may enter into contracts with non-governmental organizations for providing pre-certified victims of human trafficking services insofar as funds are available.

- N.Y. Soc. Ser. Law **§483-cc(a)** states that after the *first encounter* with a trafficked person, law enforcement or the district attorney's office shall notify OTDA and DCJS that this person may be eligible for services.

- N.Y. Soc. Ser. Law **§483-cc(b)** further states that upon receipt of notification, DCJS, in consultation with OTDA, shall make a preliminary assessment of whether such victim appears to meet criteria for certification as stated under federal law (section 7105 of title 22 of U.S. Code). If the victim meets the criteria, OTDA will inform the victim and the law enforcement agency or district attorney's office. OTDA may also assist in helping victim find services. If victim is under age of 18, then OTDA shall notify local department of social services in county where child found.

- N.Y. Soc. Ser. Law **§483-dd** states that the state or local law enforcement agency or district attorney's office must provide the victim with the Form I-914B for immigration purposes upon the request of the trafficking victim or victim's representative.

---

[7] *See* N.Y. Penal Law §70.00(2)(b).
[8] *See* N.Y. Penal Law §80.00.
[9] *See* N.Y. Soc. Ser. Law §483-cc.

2

## *GAPS IN THE LAW*

- Labor trafficking is not treated as serious a crime as sex trafficking. DCJS has recommended that some labor trafficking cases should be referred to federal law enforcement for prosecution, since those penalties are more substantial.
- The law does not include an independent private right of action.
- The law does not provide for restitution or forfeiture of traffickers' assets.
- There is no provision that allows for victims to vacate prior convictions for conduct involuntarily engaged in as a part of the trafficking scheme.
- There is no specific mechanism for service providers to make referrals to OTDA directly, meaning that a trafficked person must be involved with law enforcement in order to access services that are available through the confirmation process.

## *WHAT YOU SHOULD DO IF YOU BELIEVE SOMEONE IS TRAFFICKED*

- Immediately, reach out to social service providers and attorneys who are experts on trafficking. You can contact Safe Horizon, New York Association for New Americans, Sex Workers Project at the Urban Justice Center, City Bar Justice Center, Asian American Legal Defense and Education Fund, and The Door.
- If the trafficked person is in immediate physical danger, call your local law enforcement and emphasize that the person is trafficked.
- If the trafficked person is a minor who is not required to cooperate under the law, and does not want to cooperate, advocate to ensure his or her rights are not violated.
- Encourage your organization to receive training on the issue of trafficking in persons and on the new law.
- If you are with law enforcement or a district attorney's office, call OTDA and DCJS immediately. In addition, call a service provider who is experienced in working with trafficked persons to coordinate provision of essential health, housing, food and counseling resources.
- If you are OTDA or DCJS, after receiving a referral from law enforcement, confirm the person as trafficked and contact appropriate service providers.
- Law enforcement and/or the district attorneys' offices must complete an I-914B form immediately upon identifying a person as trafficked and forward it to either the trafficked person or his or her representative.