*NEW YORK STATE ANTI-TRAFFICKING LAW*

*APPENDIX A*

**New York Penal Law §135.35 – Labor Trafficking**
A person is guilty of labor trafficking if he or she compels or induces another to engage in labor or recruits, entices, harbors, or transports such other person by means of intentionally:
1. Unlawfully providing a controlled substance to such person with intent to impair said person's judgment;
2. Requiring that the labor be preformed to retire, repay, or service a real or purported debt that the actor has caused by a systematic ongoing course of conduct with intent to defraud such person;
3. Withholding, destroying, or confiscating any actual or purported passport, immigration document, or any actual or purported government identification document, of another person with the intent to impair said person's freedom of movement; provided, however, that this subdivision shall not apply to an attempt to correct a social security administration record or immigration agency record in accordance with any local, state, or federal agency requirement, where such attempt is not made for the purpose of any express or implied threat;
4. Using force or engaging in any scheme, plan or pattern to compel or induce such person to engage in or continue to engage in labor activity by means of instilling a fear in such person, that if the demand is not complied with, the actor or another will do one or more of the following:
    (a) cause physical injury, serious physical injury, or death to a person; or
    (b) cause damage to property, other than the property of the actor; or
    (c) engage in other conduct constituting a felony or unlawful imprisonment in the second degree in violation of section 135.05 of this chapter; or
    (d) accuse some person of a crime or cause criminal charges or deportation proceedings to be instituted against such person; provided, however, that is shall be an affirmative defense to this subdivision that the defendant reasonably believed the threatened charge to be true and that his or her sole purpose was to compel or induce the victim to take reasonable action to make good the wrong which was the subject of such threatened charge; or
    (e) expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or
    (f) testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or
    (g) use or abuse his or her position as a public servant by performing some act within or related to his or her official duties, or by failing or refusing to perform an official duty, in such manner as to affect some person adversely.

**New York Penal law §135.36 – Labor Trafficking Accomplice Liability**
In a prosecution for labor trafficking, a person who has been compelled or induced or recruited, enticed, harbored or transported to engage in labor shall not be deemed to be an accomplice.

*APPENDIX B*

**New York Penal Law §230.34 - Sex Trafficking**
A person is guilty of sex trafficking if he or she intentionally advances or profits from prostitution by:
1. Unlawfully providing to a person who is patronized, with intent to impair said person's judgment:
    (a) a narcotic drug or a narcotic preparation;
    (b) concentrated cannabis as defined in paragraph (a) of subdivision four of section thirty-three hundred two of the public health law;
    (c) methadone; or
    (d) gamma-hydroxybutyrate (GHB) or flunitrazepan, also known as Rohypnol;
2. Making material false statements, misstatements, or omissions to induce or maintain the person being patronized to engage in or continue to engage in prostitution activity;
3. Withholding, destroying, or confiscating any actual or purported passport, immigration document, or any other actual or purported government identification document of another person with intent to impair said person's freedom of movement; provided, however, that this subdivision shall not apply to an attempt to correct a social security administration record or immigration agency record in accordance with any local, state, or federal agency requirement, where such attempt is not made for the purpose of any express or implied threat;
4. Requiring that prostitution be performed to retire, repay, or service a real or purported debt;
5. Using force or engaging in any scheme, plan or pattern to compel or induce the person being patronized to engage in or continue to engage in prostitution activity by means of instilling a fear in the person being patronized that, if the demand is not complied with, the actor or another will do one or more of the following:
    (a) cause physical injury, serious physical injury, or death to a person; or
    (b) cause damage to property, other than property of the actor; or
    (c) engage in other conduct constituting a felony or unlawful imprisonment in the second degree in violation of section 135.05 of this chapter; or
    (d) accuse some person of a criminal charges or deportation proceedings to be instituted against some person; provided, however, that it shall be an affirmative defense to this subdivision that the defendant reasonably believed the threatened charge to be true and that his or her sole purpose was to compel or induce the victim to take reasonable action to make good the wrong which was the subject of such threatened charge; or
    (e) expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt, or ridicule; or
    (f) testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or
    (g) use or abuse his or her position as a public servant by performing some act within or related to his or her official duties, or by failing or refusing to perform an official duty, in such manner as to affect some person adversely; or
    (h) perform any other act which would not in itself materially benefit the actor but which is calculated to harm the person who is patronized materially with respect to his or her health, safety, or immigration status.

**New York Penal Law §230.36 – Sex Trafficking Accomplice Liability**
In a prosecution for sex trafficking, a person from whose prostitution activity another person is alleged to have advanced or attempted to advance or profited or attempted to profit shall not be deemed to be an accomplice.

5



# PATROL GUIDE

| Section: Arrests | Procedure No: 208-70 |
|---|---|
| **PROCESSING OF NEW YORK STATE DOMESTIC INCIDENT REPORTS IN THE DOMESTIC VIOLENCE DATABASE** ||
| DATE ISSUED: 08/01/13 | DATE EFFECTIVE: 08/01/13 | REVISION NUMBER: | PAGE: 1 of 4 |

**PURPOSE**    To improve the tracking, monitoring, and analysis of domestic violence cases.

**PROCEDURE**    Whenever entering information from a command's past/current **New York State Domestic Incident Report (DCJS-3221)** into the new Domestic Violence Database System:

**UNIFORMED MEMBER OF THE SERVICE**

1. Submit hard copy of **Domestic Incident Report** and any related paperwork [**COMPLAINT REPORT (PD313-152), AIDED REPORT WORKSHEET (PD304-152b), ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159)** etc.] to desk officer.

**NOTE**    *The current **New York State Domestic Incident Report (DCJS-3221)** does not have captions for certain pertinent information that is collected in the Domestic Violence Database System. Therefore, the following information is to be elicited from the person(s) involved and recorded in the NARRATIVE OF THE INCIDENT:*

    *a. Alcohol involved*
    *b. Narcotic involved*
    *c. Verbal dispute only*
    *d. Court and Docket number of Order of Protection*
    *e. Voucher number of photos (if taken)*
    *f. Social security number and alias of persons involved (record next to name if space allows, otherwise include name and information in narrative)*
    *g. Reporting officer's tax number in box titled "OFFICER I.D. NO."*

**DESK OFFICER**

2. Review hard copy of **Domestic Incident Report** and any related paperwork for accuracy and completeness and sign.
3. Direct command clerk to enter information from the **Domestic Incident Report** into the Domestic Violence Database System.

**COMMAND CLERK**

4. Enter information from the **Domestic Incident Report** into the Domestic Violence Database System and print out computer copy.

**NOTE**    *Members of the service entering Domestic Incident Reports into the Domestic Violence Database System should not attempt to translate victims' statements that are written in languages other than English, regardless of whether or not the member is proficient in the other language. However, members should indicate in the "Victims Statement of Allegations/Supporting Deposition" field that the statement is written in a language other than English (i.e., "Victim's statement is completed in apparent Spanish").*

5. Attach hard copy and computer copy and present them to the desk officer for review.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 208-70 | 08/01/13 | | 4 of 4 |

| | |
|---|---|
| **ADDITIONAL DATA** | Members of the service are reminded that the hard copy of the **DIR**, which should include a statement written in the complainant/victim's own handwriting, is the primary source for information regarding domestic incidents. The handwritten victim's statement is crucial to the District Attorney during the prosecution of a domestic violence case and can serve as the accusatory instrument, when necessary. When a domestic violence officer, precinct detective squad member, or other interested member of the service is investigating a domestic incident and the Domestic Violence Database indicates that the victim's statement is written in a language other than English, he or she should refer to the hard copy of the DIR to obtain the victim's handwritten statement. If the need for a translator arises, members of the service should comply with P.G. 212-90, "Guidelines for Interaction with Limited English Proficient (LEP) Persons". |
| | **Domestic Incident Reports** that are prepared by officers assigned to commands other than precinct of occurrence (i.e. Housing Bureau personnel, etc.) who have access to the Domestic Violence Database System, will be responsible for the data entry, review and finalization of the **Domestic Incident Report**. The follow-up investigation will be the responsibility of the precinct of occurrence or housing PSA, as appropriate. |
| | Due to the sensitive nature of the Database information, access is limited to authorized users and is controlled using CESN passwords. The command's integrity control officer provides access to the system; however, revoked passwords must be re-activated by the integrity control officer assigned to the Management Information Systems Division. |
| | Commands will access the Domestic Violence Database System from local area network (LAN) workstations that have Internet Explorer Browser installed. Once the system issues a sequential number and the **Domestic Incident Report** is reviewed by the domestic violence officer, only a supervisor from the precinct of occurrence is permitted to make modifications. Additionally, once a desk officer/domestic violence supervisor has finalized a **Domestic Incident Report** for entry into the Domestic Violence Database System, no modifications will be allowed.  (This does not include domestic violence officer notes or detective case closing). |
| **RELATED PROCEDURES** | Domestic Violence Prevention Officer (P.G. 202-29)<br>Family Offenses/Domestic Violence (P.G. 208-36)<br>Family Offenses and Domestic Violence Involving Uniformed or Civilian Members Of The Service (P.G 208-37)<br>Family Offense/Domestic Violence (Photographing Visible Injuries/Damaged Property) (P.G. 208-39) |
| **FORMS AND REPORTS** | **AIDED REPORT WORKSHEET (PD304-152b)**<br>**COMPLAINT REPORT (PD313-152)**<br>**ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159)**<br>New York State Domestic Incident Report (DCJS-3221) |

NEW • YORK • CITY • POLICE • DEPARTMENT

Like    Follow @NYDailyNews

NEW YORK   NEWS   POLITICS   SPORTS   ENTERTAINMENT   OPINION   LIVING   AUTOS

NYC CRIME   BRONX   BROOKLYN   QUEENS   UPTOWN   EDUCATION   WEATHER   OBITUARIES   NEW YORK PICS   DN PHOTOGRAPHERS

P.C. RICHARD & SON — HUGE SELECTION OF AIR CONDITIONERS — Available Now

# Dead Sea Scrolls case gets part of New York harassment law knocked off books as unconstitutional

Raphael Golb created phony email accounts to promote his theory about the ancient texts' origin and was convicted on 30 counts in 2010. The appeals court on Tuesday vacated his convictions of identity theft, criminal impersonation, aggravated harassment and unauthorized use of a computer.

BY SHAYNA JACOBS  /  NEW YORK DAILY NEWS  /  Wednesday, May 14, 2014, 9:35 AM    A A A

31    24                              SHARE THIS URL
                                      nydn.us/1mUQT1G

One Question Site Survey
IT TAKES ONLY SECONDS TO ANSWER BELOW

How likely are you to purchase a luxury vehicle in the next 6 months?
SELECT ONE ALWAYS
○ Definitely will
○ Probably will
○ May or may not
○ Probably will not
○ Definitely will not
[ VOTE TO SEE RESULTS ]
POWERED BY VIZU                    VIEW PRIVACY POLICY



LOUIS LANZANO/ASSOCIATED PRESS
Dead Sea enthusiast Raphael Golb (seen in 2010) had his felony convictions vacated on Tuesday in New York.

The state's top court ruled in a Dead Sea Scrolls case Tuesday — and struck down a law that's often used against stalkers and domestic abusers.

A significant portion of the second-degree aggravated harassment law, relating to phone calls, emails and other kinds of communication "in a manner likely to cause annoyance or alarm," is invalid under the New York State Court of Appeals ruling that stems from a case against Dead Sea Scrolls enthusiast Raphael Golb.

The judges said they "conclude that (the law) is unconstitutional under both the state and federal Constitutions, and we vacate defendants' convictions on these counts."

They sided with a case brought by Golb's attorney, Ron Kuby, saying: "We agree with defendant that this statute is constitutionally vague and over broad."

Golb's father, Norman Golb, is one of a small number of world experts on the ancient texts. Scholars in that group disagree on the origins of the Dead Sea Scrolls.

Prosecutors argued the son assumed the identities of a handful of academics and mocked them online in a campaign that began in 2008. One target of his alleged harassment was Lawrence Schiffman, formerly of NYU.

### EDITOR'S PICKS


**Queens man confesses to killing girlfriend: officials**
A 24-year-old Queens man was charged with murder in his girlfriend's...


**Minnesota teen stomps girlfriend's crying daughter to death**
A Minneapolis teen stomped his girlfriend's 2-year-old daughter to death...


**Baby dies while sitting in stroller at Queens park**
A newborn baby died Wednesday as she sat in a stroller in a Queens park...


**Man who fatally punched neighbor convicted of manslaughter**
A hot-headed Brooklyn homeowner was convicted for fatally assaulting his...


**Road rage suspect sobs in court for murder of Navy biker**
A shackled Darla Renee Jackson wore her hair in a braid and a jail-issued...

### PROMOTED STORIES


**Greatest Mugshots of Gucci Mane's Life**
(RantHollywood)


**Can You Believe These Items Are Dirtier Than Your Toilet?**
(ViewMixed)

Golb admitted he created email accounts Schiffman's and others' names but described the mass mailings he sent out as parody.

He was convicted on 30 counts in 2010, but the court tossed the felony charges against him.



**5 Simple Golf Swing Tweaks**
(Square to Square Method)

Never Leave Your Door Unlocked Again
(Alarm.com)

Recommended by



DAN BALILTY/ASSOCIATED PRESS

The origin of the Dead Sea Scrolls is a matter of scholarly debate — and apparently Raphael Golb was fanatical about protecting his father's theory.

The court vacated his conviction on identity theft, criminal impersonation, aggravated harassment and unauthorized use of a computer but upheld his guilt on criminal imprecation and forgery charges.

"I have made the world safe not just for Mr. Golb but all of the other people out there to annoy," said Kuby, a noted civil rights lawyer and colorful radio co-host, known for stirring up controversy.

"As somebody who frequently has been called annoying himself, I couldn't be prouder."

But Manhattan District Attorney Cyrus Vance Jr. said the court's decision on aggravated harassment was a blow to crime-fighters.

"The aggravated harassment statute is one of the most important tools we have to protect victims of, among other serious crimes, stalking and domestic violence," Vance said.

"Last year, there were approximately 1,000 people charged in Manhattan with this crime; many of these cases are pending. We will now work with advocates, our partners in law enforcement and state lawmakers to address the potential implications of this ruling," the D.A. added.

Golb was sentenced to six months in jail after his conviction but will be resentenced at a later date as a result of the ruling.

## EDITOR'S PICKS

**Queens teacher uses PACE method to help students' writing**
One Queens teacher is making an impact in the classrooms where she once...


**Alleged gun provider 'Chastity' revealed as pregnant**
She's taking a plus one to Rikers Island.


**NYC, lawyers to declassify Central Park Five case documents**
NYC, lawyers for the 'Central Park Five' are on verge of declassifying...


**Taxi allies seek to freeze bulk of apps like Uber's business**
A group of yellow cab backers suing the city for embracing apps like Uber...


**Bronx toddlers found wandering street alone: cops**
Hungry, dirty, barefoot and alone — a 2-year-old girl and her 3-year-old...


**Two men are mugged while visiting Central Park: cops**
The two men in Central Park were mugged in broad daylight, police said.


**Cops save 2 suicidal men on George Washington Bridge**
The officers found suicidal men from Connecticut and New Jersey on the...


**EXCLUSIVE: NYC left boy, 3, in care of violent pair: lawsuit**
Poseidon Quinones was found dead last Nov. 16 due to a brutal beating at...


**Missing Brooklyn girl, 17, found at friend's house**


### PROMOTED STORIES



**Meet the Most Exclusive Card in NYC**
Select at JustLuxe



**5 Amazing Estates That Are Just a Train Ride Away**
CT Tourism



**A popular new site reveals the truth about anyone's past. Simply enter name and state to see what**
Instant Checkmate


**This Is Why Australia Freaks Me Out...Yikes**
Viral Vinny


**Goldman Sachs Falls to Woo This Newly-Minted Millionaire**
CNN Money


**13 Stars Who Are Extremely Religious**
Suggest.com

Yojavi Ayarza was was found safe and sound at a friend's house Friday...
**Bicyclist impales neck on fence after Queens pothole crash**
A bicyclist was injured when he hit a pothole and crashed into a fence in...


Recommended by

### NEW YORK VIDEO

### MORE FROM NYDAILYNEWS

 **Long Island limousine wreck victim remembered at funeral**

 **Death of man who fell off car tied to drug deal: cops**

Recommended by

### SPONSOR CONTENT ON NYDAILYNEWS


#### 7 Habits of Highly Healthy Nurses
BY CHAMBERLAIN COLLEGE OF NURSING

Although there can be obstacles, the rewards for following a few healthy habits can pay off.

More videos:
  

### WE RECOMMEND

 **GPS Vehicle Tracking**

**Home Alarm Systems**

**New Sedan Cars**

 **Dental Plans for Seniors**

### COMMENTS (8)                              [ Discussion Guidelines ]

### MOST POPULAR

**MOST READ** | MOST SHARED

1. NY family adopts 4 daughters of friend who died of cancer
2. 'Feisty' alligator caught at Manhattan intersection: police
3. Estranged dad may fight for kids taken in by mom's friend
4. Flavor Flav vows bail for Brooklyn rapper Bobby Shmurda
5. Cops seen in video beating alleged pizza thief sidelined
6. Woman who jumped to death sent emotional email week before
7. Woman shot in feet as 2 men argue in East Village
8. SEE IT: Rats gone wild on New York City street
9. Rape victim, 82, won't go back to Brooklyn home: family
10. Suspect nabbed in shooting death of 20-year-old man in Bronx

POST A COMMENT
Write a comment

SORT

**JOHN BAILEY**                                                    2
432 days ago

Vance should certainly resign -- not because the statute criminalizing "annoying" speech was struck down, but because he had thousands of people prosecuted under it, knowing full well that it was unconstitutional. As for Golb's son, he had the courage to condemn the abusive tactics of a certain group of academics in a series of highly entertaining blogs, some of which can still be found online.

http://web.archive.org/web/20080430220843/www.nowpublic.com/culture/did-christian-agenda-lead-biased-dead-sea-scrolls-exhibit-san-diego

The "annoyance" he caused certainly did not deserve the persecution he endured for five years, replete with phony felony charges cooked up by Vance's assistants to try and force him to plead guilty. See the documentation of the trial and appeal at:

http://raphaelgolbtrial.wordpress.com/

and see the statement of Scott Greenfield, a former prosecutor: the abusive charges were a pretext for presenting "a tidal wave of evidence" against Golb, "wreaking prejudicial havoc and deflecting attention from the real issues raised by his conduct. Throw enough dreck against a wall and something is bound to stick. Only on appeal, when the odor of the trenches is filtered through the rarified appellate air, does the tactic of smearing a defendant no longer waft unpleasantly."

http://blog.simplejustice.us/2014/05/14/golb-decided-and-the-sockpuppet-dies/

Like | REPLY    SHARE

**JOHN BAILEY**
432 days ago

1

P.s. see also Jacob Sullum's excellent analysis:

http://reason.com/blog/2014/05/14/new-yorks-highest-court-upholds-the-righ

Like | REPLY    SHARE

**JOHN BAILEY**
431 days ago

1

P.p.s., as a disclaimer and to avoid confusion, I would also like to add that I am not John Bailey, the author; nor am I any other publicly known John Bailey; nor do I seek to harm any John Bailey with whom any reader might be acquainted in any manner whatsoever. I am simply an ordinary person who has been carefully following this case since it was first reported on in the Daily News five years ago.

Like | REPLY    SHARE

**DUCHAT**
434 days ago

1

This is a serious embarassment to the Manhattan DA's office to have the harassment law struck down because of his petty desire to punish a smart-ass, but bright son of a renowned scholar, who tweaked the noses of some of the City's establishment academics. I hope Vance loses his job over this one. He certainly should.

Like | REPLY    SHARE

SHOW MORE COMMENTS




AdChoices


DAILY NEWS PIX MANHATTAN

From 1939 Times Square to the Towers in the 90's, the Daily News has the legendary photos of NYC.

BUY A PRINT



Samsung 65" Class LED HDTV    LG 32" Class LED HDTV

Sharp 65" Class LED HDTV    Sony 48" Class LED 1080p HDTV with Built-in WiFi

Media Kit   Home Delivery   Newsletters   Businesses   Place an Ad   About our Ads   Contact Us   Careers   FAQ's   Feeds   Site Map

Use of this website signifies your agreement to the Terms of Service and Privacy Policy
© Copyright 2015 NYDailyNews.com. All rights reserved.

"When prosecutors begin to compile databases and start doing so-called 'smart prosecutions,' you have to ask who is getting in the databases, what are the criteria and where are the outside checks?" says Steven Zeidman, director of the criminal-defense clinic at the CUNY School of Law. "More than a thousand people are arrested in N.Y.C. each day, and the overwhelming and disproportionate number of them are people of color arrested for 'broken windows' type offenses like riding a bike on the sidewalk or jaywalking. I was in court with a kid arrested for jaywalking; the arresting officer was from the gang unit, and he stopped the kid because he was wearing a red shirt that, according to the police, happened to be a gang color. He wasn't in a gang, but he's probably now in a database."

Vance has also been criticized for shrinking from leadership on the issue of marijuana arrests in the city. In recent years, tens of thousands of New Yorkers — a vast majority of them blacks and Hispanics — have been arrested for small amounts of marijuana after being searched under the Police Department's now-scaled-back stop-and-frisk policy. Marijuana offenses were the top arrest category for the entire program in 2012, according to a study by the New York chapter of the American Civil Liberties Union. Vance has long supported reforming the penal code to treat small amounts of pot "in public view" as a violation resulting in a fine rather than a misdemeanor, which might lead to a jail sentence and a criminal record. But his office has declined to prosecute just under 7 percent of the 54,000 misdemeanor pot arrests in Manhattan since 2009, and it was Vance's old antagonist, the Brooklyn district attorney Kenneth Thompson, who declared his office would no longer prosecute such cases.

Vance's efforts to make prosecutors smarter — "to play offense instead of defense," as he has said — depend on what he calls "extreme collaboration" with the Police Department, cooperation that has increased notably since the arrival in January of William Bratton as police commissioner. Prosecutors say they now have access to precinct-level commanders they almost never had before. The complicated anti-gang cases mounted in Manhattan — like the one at the Manhattanville and Grant housing projects last June, which resulted in 103 arrests — were built by teams from the D.A.'s office working hand in glove with the investigators from the police and the city's Department of Correction. But critics argue that in doing so, prosecutors risk becoming extensions of the police force.

"Prosecutors are supposed to be the gatekeepers to the criminal-justice system," Zeidman told me. "They should maintain a healthy distance from the police so they can evaluate the constitutionality and appropriateness of what the police are doing. If they had been fulfilling that function all along, we might never have had scandals like the rampant Fourth Amendment violations uncovered in the federal stop-and-frisk litigation."

**It's hard to know** how much one person or policy can affect the crime rate, and consequently how much credit or blame should be assigned when things go well or don't. Evaluations of anti-crime measures often conflate cause and correlation. The sun comes up, the roosters preen. Raymond Kelly, the former New York City police commissioner, once said that taking credit for a decline in crime is like taking credit for an eclipse, but he, too, was quick to attribute auspicious trends to his department's strategies and tactics. The N.Y.P.D.'s seminal crime-mapping methodology CompStat surely made cops more effective and helped reduce crime, and yet crime began its epic decline in 1990, four years before CompStat was implemented. For years Kelly and former Mayor Michael Bloomberg insisted the city's stop-and-frisk program was the key — but then, as opponents asked, why did crime continue to go down even when stop-and-frisk was curtailed by public pressure in 2012?

Apart from effective police work, studies have attributed the decline in violent crime to a confounding hash of variables: demographic trends, fashions in drug abuse, a surge in public-housing programs, the proliferation of surveillance cameras, decreases in lead toxicity, increased incarceration rates (and paradoxically in recent years, increased prison discharge rates), even the availability of abortion. Morgenthau credits the pivotal role of the district attorney, noting Manhattan had 39 percent of the city's homicides when he took office and only 12 percent in the year before he finished — evidence to him of the difference a D.A. makes given that the city's boroughs all have the same police force. In his final report, he tartly observed that the 90 percent decline in murders in Manhattan during his tenure was "not due simply to the dawn of gentler times."

But of course gentler times were something to hope for and to cultivate if possible. Vance pressed the point to his staff: Their pole star wasn't convictions but

safety, a goal as readily attained by preventing crime as by prosecuting it. With asset-forfeiture money seized from drug dealers, Vance has opened 10 Manhattan gyms that would otherwise be closed on weekends and started sports programs for 11-to-18-year-olds called Saturday Night Lights. The community-affairs unit hired professional sports trainers to run drills and academic advocates to work as tutors and mentors and to keep track of how the players are faring in school. "We ask ourselves, Are we doing everything possible to reduce crime?" Chauncey Parker says. "If an overwhelming number of Rikers Island inmates don't have high-school diplomas, maybe we should be finding ways to help people stay in school and graduate. It seems obvious, but it's not until someone starts doing it."

Parker challenged C.S.U. prosecutors to come up with their equivalent of the Apollo moon project. Their answer was reforming public housing in the city, including the Polo Grounds, St. Nicholas and Wagner developments, and they are drawing up plans with the expectation that they can drive down crime.

A number of other cities and states are studying how the Manhattan D.A. has developed and deployed data. At a February 2013 conference in Miami, Kerry Chicon and David O'Keefe, then the C.S.U. chief, received numerous requests for meetings after their presentation on the Arrest Alert System. Philadelphia now has a rudimentary intelligence system modeled on Manhattan's C.S.U. So does the Delaware Department of Justice. "The Manhattan C.S.U. prosecutors spent a day with us, going over intelligence-driven models and how they analyzed cases," says Kathleen M. Jennings, the state prosecutor and head of the criminal division. "We developed an arrest-alert system that identified 50 high-risk offenders. In May we created our crime-strategies unit. Wilmington has one of the highest violent-crime rates in the country, but 1 to 2 percent of the people are doing 70 percent of the crimes. We've taken dozens of high-risk offenders off the street."

When he took office in 2011, District Attorney George Gascon of San Francisco was shocked by the paucity of data-informing prosecutions. "It wasn't even a bell that was being rung," says his chief of staff, Cristine Soto DeBerry. "We spent a day in Manhattan learning the ropes of how they used data, and Kerry Chicon came and spoke to our board of supervisors. It's very clear to our D.A. that we are overincarcerating, and we need to do something different. Jail is not an economically

July 30, 2015

Miss Kelly Grace Price
534 w 187th st #7
New York, NY 10033
Graciegracie212@gmail.com
646 676 1940

Lt. Larocca
c/o Lieutenant's Benevolent Association
Woolworth Building
233 Broadway
ste. 1801
New York, NY 10279
VIA FAX 212.964.4240

Dear Lt. LaRocca

I hope you remember me from 2011-2012 when you worked at the 28th pct. If you recall I came to the NYPD with complaints of violent physical, mental and economic abuse as well as complaints of being trafficked by my intimate partner at the time: Raheem Andre Powell.

As Mr. Powell was assisting the MDAO and their "Crew Cut" team in clearing out "gangs" from upper Manhattan my complaints were never investigated and I instead was falsely arrested on hundreds of counts of alleged harassment against Mr. Powell and thrown in Rikers Island where I miscarried my baby. After over two years I managed to out-maneuver the mewling ingénues at the MDAO and win a FULL DISMISSAL of all bogus charges against me. I am STILL however on a "DO NOT SERVE" list kept by the NYPD and the MDAO and am still being denied police assistance.

I have partnered with Sanctuary for Families, the largest advocacy group for DV and trafficking victims in the country and am bringing a Federal class-action lawsuit against the NYC, the NYPD, and the MDAO for blatantly denying me my due process rights, infringing my freedom of speech, denial of equal protection, abuse of process, malicious prosecution and for illegally seizing and searching me (my phone is STILL being monitored by the NYPD).

FIVE Other women in NYC have been subsequently raped, sexually assaulted, stalked and masturbated on by at least one man who assaulted me on 7/28/2012 because the NYPD and MDAO refused to investigate my complaint of assault against him because ADA Strohbehn placed me on a "do not serve" list and instructed the precinct to not help me. In fact, all other crimes this creep committed against other women of Gotham happened AFTER he was apprehended and released and told basically: "its your word against hers" by the 20th pct who arrested him on resisting arrest, disorderly conduct and felony assault of a police officer charges a month after his assault on me (the DA instructed him to be only charged on the DO offense and he was given a desk appearance ticket, NOT arrested for his assault against me a month prior, and released out the back door of the 20th pct). So this person, Rami Baly, went on to continue his crime spree against women because he had been given the green light to do so by the city because of their animus towards me. Maybe you can verify what I say is true by looking up SOME of his charges for crimes against other innocent women:

| Case # | Defendant | Summons # | Appearance Date | Court | Judge | Part |
|---|---|---|---|---|---|---|
| 2013NY031505 | Baly, Rami | | 08/07/2013 | New York Crimi | | A |

| | | | | |
|---|---|---|---|---|
| | | | nal Court | |
| 2013NY049135 | Baly, Rami | 08/07/2013 | New York Criminal Court | A |
| 2013CN000347 | Baly, Rami H | 08/02/2013 | New York Criminal Court | A |

I had attained a restraining order from the Family Court in Judge Lori Sattler's part as per your instructions in Oct/Nov of 2010 and thus the City of New York had a SPECIAL RELATIONSHIP with me and had promised me protections and police services. Lt. Larocca: if you had not instructed me to do this my case would be MUCH weaker right now because of precedents set in the cases of Riddick and MacLean that state that the NYPD does not HAVE to give assistance UNLESS there is a pre-existing promise to protect or special relationship between the victim and the city. I am ETERNALLY GRATEFUL TO YOU FOR THIS STEWARDSHIP AND ADVICE.

I need your assistance in proving that ADA Maria Strohbehn instructed you at the precinct to not investigate my claims of battery and trafficking and to not give me any assistance unless pre-approved by the MDAO. Please can you contact me to discuss this and other affidavits I need from you. I know what happened to me sat hard in your heart. I know you know the law, which mandates investigations and procedure to be followed when a complainant asserts certain types of crimes have been committed against them. Both McKinney's Crime Victim's Statutes and the NYPD handbook call for procedures and investigative mandates to be followed in situations such as I presented that were blatantly ignored.

I also know that the reason that my batterer was given special treatment and that I was thrown under the bus is that ADA Strohbehn and her "Crew Cut" team needed his assistance in making major cases against gangs in Harlem. My batterer was shot in front of the 28th precinct by an armed assailant who had been attempting to rob his weed spot on w 120th st. in December of 2010. That shooter turned out to be a young teen member of a mid-Harlem Gang centered around 137th st. He was apprehended and charged with attempted murder. Strohbehn and her team needed my batterer to cooperate with their investigation into his gang ties. Following, as I had been actively trying to make complaints against him for his violent abuse the only alternative Strohbehn had if she wanted to keep her case alive and turn the shooter into an informant by offering him a lower plea in

exchange for intel about his gang was to paint me as a fabricator in order to deny me police services and protections in order to protect my batterer and keep him cooperating.

This scheme is not only highly illegal but if left unchecked is a TEMPLATE for future prosecutors and police to utilize in similar situations. I know you don't wish for part of your legacy with the NYPD to be that of creating a cookie-cutter template for re-victimizing women already horribly victimized and abused. I know the person you are and all the things you did to try to help me and I need your help Lt. Larocca. Please reach out to me ASAP. I need someone from the precinct to aver that Strohbehn instructed the 28th precinct/NYPD not to respond to my complaints or take me seriously and to label me as "crazy" alternatively. This action was blatantly against my Constitutional Rights to equal protection under the law, not to be illegally searched and seized, not to be unusually punished, et al.

I know this much and so do you. My case is VERY strong but I need this piece from you Lt. Please reach out to discuss what you can do to help. I've come a VERY long way in rebuilding my life since I last saw you in late 2012/early 2013 (I HAVE TAKEN THE LSAT AND AM APPLYIN TO LAW SCHOOL THIS FALL SO I CAN SPEND MY LIFE HELPING OTHER VICTIMS WHOSE LIVES HAVE BEEN FELLED BY SECONDARY VICTIMIZATION) but my life is still very very different from the way it was before my batterer. I need you to help me bridge the gap between who I was and who I am now. Please Lt.; I'm begging you not to ignore me. Prosecutors should not be allowed to over-rule the judgment of experienced Police in the name of case-building (and career-building too!).

Lastly, remember please that I am a survivor of 9/11 and that I deserve to live a life in NYC free from continuous retribution from law enforcement and denial of services. I deserve to be protected and to feel safe here. I am a FOURTH GENERATION daughter of the city of New York and no little mewling ingénue imported for service by the MDAO from Maryland who has NOT a CLUE about the intricacies of city living and the special mysteries of Harlem has the right to take this away from me. Strohbehn already has taken everything from me: my reputation, my career, my unborn child, my sense of place and pride in the world, my friends and family. Please don't let her have the last word Lt. Larocca: pretty please I know you can help me.

Humbly,
Kelly

-------- Original Message --------
Subject: City of New York Auto Acknowledgment Correspondence # 1-1-1023188047
From: reply@customerservice.nyc.gov
To: GRACIEGRACIE212@GMAIL.COM
CC:

Dear KELLY GRACE PRICE:

Thank you for contacting the City of New York. Your message has been forwarded to the appropriate agency for review and handling.

For future reference, your service request number is 1-1-1023188047.

Sincerely,

The City of New York


This is an auto-generated system message. Please do not reply to this message. Messages received through this address are not processed.

Thank you.


The information you have provided is as follows:
Form: Customer Comment
Topic: Employee Complaint
Name:  KELLY GRACE PRICE
Street Address: 534 WEST 187 STREET
City, State Zip: NEW YORK, NY 10033
Country:
Email: GRACIEGRACIE212@GMAIL.COM
Company:
Work Phone: (646) 676-1940
Message:
Caller states that the Inspector of the 28th Precinct blocked her from the Twitter account. Caller has checked the policy on blocking someone, and they can only block a person if they were abusive. Caller tweeted to the inspector on how she would address and handle domestic abuse at the precincts. She also tried using a different name and was still blocked. She was not being abusive, or disreepectful. All she was requesting is information from the inspector. Her account is under(@gracieegorgeous) on Twitter.



**GRACE** <gorgeous212@gmail.com>                                                                12/31/14
to me

-------- Original Message --------
Subject: City of New York Auto Acknowledgment Correspondence # 1-1-1023188047
From: reply@customerservice.nyc.gov
To: GRACIEGRACIE212@GMAIL.COM
CC:

Dear KELLY GRACE PRICE:

Thank you for contacting the City of New York. Your message has been forwarded to the appropriate agency for review and handling.

For future reference, your service request number is 1-1-1023188047.

Sincerely,

The City of New York


This is an auto-generated system message. Please do not reply to this message. Messages received through this address are not processed.

Thank you.