The information you have provided is as follows:
Form: Customer Comment
Topic: Employee Complaint
Name:  KELLY GRACE PRICE
Street Address: 534 WEST 187 STREET
City, State Zip: NEW YORK, NY 10033
Country:
Email: GRACIEGRACIE212@GMAIL.COM
Company:
Work Phone: (646) 676-1940
Message:
Caller states that the Inspector of the 28th Precinct blocked her from the Twitter account. Caller has checked the policy on blocking someone, and they can only block a person if they were abusive. Caller tweeted to the inspector on how she would address and handle domestic abuse at the precincts. She also tried using a different name and was still blocked. She was not being abusive, or disreepectful. All she was requesting is information from the inspector. Her account is under(@gracieegorgeous) on Twitter.

"When prosecutors begin to compile databases and start doing so-called 'smart prosecutions,' you have to ask who is getting in the databases, what are the criteria and where are the outside checks?" says Steven Zeidman, director of the criminal-defense clinic at the CUNY School of Law. "More than a thousand people are arrested in N.Y.C. each day, and the overwhelming and disproportionate number of them are people of color arrested for 'broken windows' type offenses like riding a bike on the sidewalk or jaywalking. I was in court with a kid arrested for jaywalking; the arresting officer was from the gang unit, and he stopped the kid because he was wearing a red shirt that, according to the police, happened to be a gang color. He wasn't in a gang, but he's probably now in a database."

Vance has also been criticized for shrinking from leadership on the issue of marijuana arrests in the city. In recent years, tens of thousands of New Yorkers — a vast majority of them blacks and Hispanics — have been arrested for small amounts of marijuana after being searched under the Police Department's now-scaled-back stop-and-frisk policy. Marijuana offenses were the top arrest category for the entire program in 2012, according to a study by the New York chapter of the American Civil Liberties Union. Vance has long supported reforming the penal code to treat small amounts of pot "in public view" as a violation resulting in a fine rather than a misdemeanor, which might lead to a jail sentence and a criminal record. But his office has declined to prosecute just under 7 percent of the 54,000 misdemeanor pot arrests in Manhattan since 2009, and it was Vance's old antagonist, the Brooklyn district attorney Kenneth Thompson, who declared his office would no longer prosecute such cases.

Vance's efforts to make prosecutors smarter — "to play offense instead of defense," as he has said — depend on what he calls "extreme collaboration" with the Police Department, cooperation that has increased notably since the arrival in January of William Bratton as police commissioner. Prosecutors say they now have access to precinct-level commanders they almost never had before. The complicated anti-gang cases mounted in Manhattan — like the one at the Manhattanville and Grant housing projects last June, which resulted in 103 arrests — were built by teams from the D.A.'s office working hand in glove with the investigators from the police and the city's Department of Correction. But critics argue that in doing so, prosecutors risk becoming extensions of the police force.

"Prosecutors are supposed to be the gatekeepers to the criminal-justice system," Zeidman told me. "They should maintain a healthy distance from the police so they can evaluate the constitutionality and appropriateness of what the police are doing. If they had been fulfilling that function all along, we might never have had scandals like the rampant Fourth Amendment violations uncovered in the federal stop-and-frisk litigation."

**It's hard to know** how much one person or policy can affect the crime rate, and consequently how much credit or blame should be assigned when things go well or don't. Evaluations of anti-crime measures often conflate cause and correlation. The sun comes up, the roosters preen. Raymond Kelly, the former New York City police commissioner, once said that taking credit for a decline in crime is like taking credit for an eclipse, but he, too, was quick to attribute auspicious trends to his department's strategies and tactics. The N.Y.P.D.'s seminal crime-mapping methodology CompStat surely made cops more effective and helped reduce crime, and yet crime began its epic decline in 1990, four years before CompStat was implemented. For years Kelly and former Mayor Michael Bloomberg insisted the city's stop-and-frisk program was the key — but then, as opponents asked, why did crime continue to go down even when stop-and-frisk was curtailed by public pressure in 2012?

Apart from effective police work, studies have attributed the decline in violent crime to a confounding hash of variables: demographic trends, fashions in drug abuse, a surge in public-housing programs, the proliferation of surveillance cameras, decreases in lead toxicity, increased incarceration rates (and paradoxically in recent years, increased prison discharge rates), even the availability of abortion. Morgenthau credits the pivotal role of the district attorney, noting Manhattan had 39 percent of the city's homicides when he took office and only 12 percent in the year before he finished — evidence to him of the difference a D.A. makes given that the city's boroughs all have the same police force. In his final report, he tartly observed that the 90 percent decline in murders in Manhattan during his tenure was "not due simply to the dawn of gentler times."

But of course gentler times were something to hope for and to cultivate if possible. Vance pressed the point to his staff: Their pole star wasn't convictions but

safety, a goal as readily attained by preventing crime as by prosecuting it. With asset-forfeiture money seized from drug dealers, Vance has opened 10 Manhattan gyms that would otherwise be closed on weekends and started sports programs for 11-to-18-year-olds called Saturday Night Lights. The community-affairs unit hired professional sports trainers to run drills and academic advocates to work as tutors and mentors and to keep track of how the players are faring in school. "We ask ourselves, Are we doing everything possible to reduce crime?" Chauncey Parker says. "If an overwhelming number of Rikers Island inmates don't have high-school diplomas, maybe we should be finding ways to help people stay in school and graduate. It seems obvious, but it's not until someone starts doing it."

Parker challenged C.S.U. prosecutors to come up with their equivalent of the Apollo moon project. Their answer was reforming public housing in the city, including the Polo Grounds, St. Nicholas and Wagner developments, and they are drawing up plans with the expectation that they can drive down crime.

A number of other cities and states are studying how the Manhattan D.A. has developed and deployed data. At a February 2013 conference in Miami, Kerry Chicon and David O'Keefe, then the C.S.U. chief, received numerous requests for meetings after their presentation on the Arrest Alert System. Philadelphia now has a rudimentary intelligence system modeled on Manhattan's C.S.U. So does the Delaware Department of Justice. "The Manhattan C.S.U. prosecutors spent a day with us, going over intelligence-driven models and how they analyzed cases," says Kathleen M. Jennings, the state prosecutor and head of the criminal division. "We developed an arrest-alert system that identified 50 high-risk offenders. In May we created our crime-strategies unit. Wilmington has one of the highest violent-crime rates in the country, but 1 to 2 percent of the people are doing 70 percent of the crimes. We've taken dozens of high-risk offenders off the street."

When he took office in 2011, District Attorney George Gascon of San Francisco was shocked by the paucity of data-informing prosecutions. "It wasn't even a bell that was being rung," says his chief of staff, Cristine Soto DeBerry. "We spent a day in Manhattan learning the ropes of how they used data, and Kerry Chicon came and spoke to our board of supervisors. It's very clear to our D.A. that we are overincarcerating, and we need to do something different. Jail is not an economically

sustainable model. We need to know for whom jail is appropriate and whom it isn't. That's where data becomes very useful."

In some ways it may be easier to be the district attorney of Manhattan in an era when New Yorkers aren't so inclined to do terrible things to one another. And yet the Manhattan D.A.'s office still handles more cases than the entire United States Department of Justice. Vance's predecessors didn't have to cope with the terabytes of digital evidence now central to many prosecutions, or with malign enterprises particular to our time, like cybercrime (200 to 300 complaints a month in Manhattan alone) and lone-wolf terrorism.

Vance was especially frustrated that his office had been unable to stem the upsurge in domestic violence. While the index felonies were going down, misdemeanor arrests in Manhattan were going up. And arrests for grand larceny, many of which involved iPads and iPhones, were running counter to the positive crime trends.

"I don't want to be known as the D.A. whose main mission was reducing property crime, but it is important we excel even in these kind of cases," Vance said. "The bar Bob Morgenthau set when he left was very high. It's my job to raise it."

It was almost midnight, and he was sitting in a pub in Chelsea reflecting on his first four years on the job. The supporters who helped him secure another term had gone home. "So," asked his wife, Peggy, "what three things have you learned about yourself?" Vance gazed at her evenly, well aware of the perils of domestic cross-examination. "You just have to be honest," she said.

"I'm thinking," he said, looking, for a moment, as if he would rather be coping with the recent outbreak of mold at their country house.

"Cyrus has always been a question to himself," Peggy said to me. "The things that should make him happy didn't make him happy. He's never had the ability to separate himself from his work."

Jimmy Zaccari, a detective on Vance's protection detail, was waiting outside in a black Suburban to drive the couple home. It was a quiet night, except for the cry of

far-off sirens. Changed as it might be, Manhattan was still the place where Jose Pimentel plotted to terrorize New Yorkers by detonating pipe bombs, and Corey Dunton stands accused of firing a gun at skaters in Bryant Park, and Cesar Lucas raped a woman on the West Side. It was still the place where, among thousands of nonviolent but still disgraceful affronts to the civility of city life, Dr. Lawrence Levitan stole insurance money from a hospital and Naim Jabbar wrung cash from people for eyeglasses they didn't break. It was still the place where even a Times Square Elmo impersonator had been jailed for harassment and extortion. Gentler times in Manhattan? Maybe someday — but not tonight. Sirens in the night meant cases in the morning.

> **Correction: December 7, 2014**
> *An article on Page 22 this weekend about Cyrus Vance Jr., the district attorney of New York County, describes incompletely a shooting incident at the Bryant Park ice rink in November 2013 and misspells the given name of a man charged with shooting skaters. He is Corey Dunton, not Cory, and he has pleaded not guilty and is awaiting trial; it has not been established that he "fired a gun at skaters." In addition, the article misstates the length of time that Robert M. Morgenthau served as district attorney of New York County. It was 35 years, not 34.*

Chip Brown is a contributing writer for the magazine. His last article was on Peter Gelb, general manager of the Metropolitan Opera.

A version of this article appears in print on December 7, 2014, on page MM22 of the Sunday Magazine with the headline: The Data D.A.

© 2015 The New York Times Company