UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
KELLY PRICE

                          **PLAINTIFF**

      -against-

DETECTIVE LINDA SIMMONS Individually,
and as an employee of the New York City Police
Department, ADA MARIA STROHBEHN and
ADA KENYA WELLS Individually,
and as employees of the New York County
District Attorney's Office, THE CITY OF NEW YORK,
Deputy DA Audrey Moore, ADA Larry Newman, ADA
Laura Higgins nee Richendorfer, DA Cyrus Vance Jr.,
as employees of the New York County District
Attorney's Office, Inspector Obe of the New York City
Police Department, in her capacity as an employee
of the New York City Police Department,
Rose Pierre-Louis in her capacity as the Former
Commissioner of Domestic Violence of the
City of New York, PO Matthew Winters, individually
And in his capacity as an employee of the New York City
Police Department, Manhattan District Attorney's Employee

                       **DEFENDANTS,**

Index No.: _____
JURY TRIAL DEMANDED

15 cv 5871

**RECEIVED**

MAY 10 2016

LORETTA A. PRESKA
CHIEF U.S. DISTRICT JUDGE
S.D.N.Y.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5|9|16

---

### SECOND AMENDED COMPLAINT

#### as Ordered by Hon. Loretta A. Preska

---

Kelly Price

Pro Se

534 w 187th st. apt #7

New York, NY 10033

1. Plaintiff Kelly Price, Pro Se, alleges for the following:

2. Plaintiff Kelly Price "PRICE" is an individual and resident of New York, and resides at 534 w 187th st #7, New York, New York 646 676 1940: graciegracie212@gmail.com on behalf of herself ("Plaintiff"), based on personal knowledge and upon information and belief, allege as and for the Complaint as follows:

3. **STATUTE OF LIMITATIONS:** Plaintiff first filed her Federal complaint on July 24, 2015 exactly three years to the DAY from the date of dismissal of all charges against her: July 24, 2012. Plaintiff filed an AMENDED complaint twenty days following on August 13, 2015. According to the FREA tolling begins at the onset of original filing. Plaintiff has met the statute of limitations for all section 1983/Monell claims which is three years.

4. **PREVIOUS LITIGATION:** Plaintiff first filed a complaint as a domestic violence survivor in 2012 and not as a victim of trafficking as Plaintiff was nervous and ashamed about admitting statements into court documents assertions that she had been trafficked. NY state Executive and Social Service laws mandate certain protections for victims who come forward as survivors of trafficking that are not mandated for survivors of domestic violence. Additionally the section of the NY State Penal code that Plaintiff had been charged with (CPLR 240.30) was still on the books as a valid statute when Plaintiff filed her original state court complaint in 2012. It was stricken as unconstitutional only in June of 2014 (Exhibit A: Appellant finding People vs. Raphael Golb) a full two years after Plaintiff's original filing. Plaintiff did not know of said decision until June of 2015 when Dorchen Leidholdt told her about it after a panel discussion on trafficking held at the NYS Bar Association hosted by former Chief NY State Administrative Court Judge Jonathan Lippmann. Additionally the state case was heard under the late, great, Hon. Louis B. York of New York Supreme Court. Hon. York granted Plaintiff an RJI as the city had not responded to Plaintiff's complaint a full seven months after being served. This was the final decision he ever issued from the bench before going on vacation and falling ill leading him to languish for four months in a coma before perishing. Instead of filing a motion to request from the court a re-argument or taking an appeal the city law department filed a motion to dismiss which was accepted and validated by Hon. Kathryn Freed in March of 2015 without accepting Plaintiff's cross-motion and amended complaint even though she had accepted the city's motion to dismiss nine months late and after a final decision had been made by a previous judge who had since passed away. The two

cases are entirely different cases:  one being filed as a domestic violence survivor who was accused of a relevant and valid NY State Statute and the other as a survivor of trafficking who was charged with an unconstitutional statute of the NY State Penal Code.  Additionally, all of the relevant evidence that Plaintiff has been able to gather has come to light only in recent months such as Lt. Larocca's affidavit, ConnectNYC's case notes of their legal advocacy for Plaintiff that prove that Deputy DA Audrey Moore had knowledge of and failed to act to assist Plaintiff Price as a survivor of trafficking, the recent appeal of Plaintiff's disorderly conduct prosecution conviction which resulted in Plaintiff's favor  et al.

5.     **NATURE OF ACTION:**  Confidential informants and complainants on major cases exploit the authority of their position to exploit, abuse, traffic and torture the women in their reach.  This abuse is only possible because the City of New York has enabled a culture of complacency to perpetuate within the criminal justice system allowing the Police and District Attorneys to turn a blind eye towards the trafficking of, physical, mental, and economic abuses of women involved in intimate partner relationships with confidential informants or complainants on major cases.  These confidential informants and complainants are integral to Police and DA's successful prosecutions on other, unrelated, cases to the abuse because they allow Police and Prosecutors to maintain their quotas, conviction  rates, arrest-rates and to build their careers and move onto higher political office or higher-paid positions of employ.

6.     Plaintiff  Price was savagely trafficked, beaten and abused by Raheem Andre Powell, an informant and major-case complainant working for the NYPD and MDAO, who threatened to, and did, punish her if she resisted or reported his abuse. Now, Plaintiff  brings this civil rights action pursuant to 42 U.S.C. § 1983 against the City of New York (the "City") to obtain summary judgement, declaratory judgment, injunctive relief, and compensatory and punitive damages for deprivation of her constitutional rights. As Plaintiff Price will demonstrate, other women in NYC have been denied Police and DA protections because of the status their abusers have held as CIs, major case complaintents, and witnesses with the criminal justice system.

7.     Plaintiff Price was denied the ability to makereports against Powell for his abuse from 8/2009 through 1/ 2011 and continues to be denied the ability to file reports and services from the NYPD and MDAO.

8.     Plaintiff Price was denied intake and services at the Family Justice Center.

9.     Plaintiff Price was denied her First Amendment Rights to Free Speech similarly to others charged with the unconstitutional statute (NYS CPLR 240.30) that was stricken down as illegal, unlawful, unconstitutional and

misleadingly written in broad-strokes in May of 2014 in a decision written by the Hon. New York State Courts Chief Administrative Judge Jonathan Lippmann.

10. Plaintiff Price was Denied Police Services and put on a Blacklist and unlawfully denied her rights to due process, equal protection under the law et al.

11. The New York City Police Department and the City Itself by extension has recognized the coercive power that uniformed and ununiformed officers wield over complainants of Domestic Violence who come forward in an attempt to make complaints of violence against officers by meting-out separate procedures in the NYPD for the investigation of violence against ordinary citizens and of unformed and ununiformed Police Officers (Exhibit B NYPD Handbook). The City is aware that a significant risk of coercion of women who come forward to make complaints against officers exists but it nonetheless permits a culture of systemic trafficking and other abuse of women by Confidential Informants and complainants on major cases to exist in NYC.

12. The pervasive culture of trafficking, sexual slavery and abuse of women is common knowledge within and without the NYPD and various District Attorney's Offices. DAs and NYPD officers, brass and minions know not only that women are regularly abused by their Informants and complainants but also engage in a pattern of cover-up, victim-blaming, false-arrest, malicious prosecution, denial of rights, obfuscation and "GAS-Lighting" of victims in order to curry favor with their informants and to sink the true victim's credibility and esteem to the point of no return. This is especially egregious as the NYPD and District Attorney's offices are fully aware of the psychological repercussions and aftermath of abuse and are cognizant of how to play off of the mental disorders, depression, and physical frailties that domestic violence and traffic victims suffer during and after abuse (Citation Here.)

13. Supervisory officers and  managerial District Attorneys facilitate this abuse by allowing the normal mandates (legislated by the NYPD handbook and/or NY State Executive and Social Services Laws/Crime Victims' Laws) of investigations into allegations of trafficking and abuse to fall by the wayside and by turning the other cheek to the victims' ultimate secondary abuse by the criminal justice system when victims are charged and/or threatened  with fraudulently false counter-complaints in order to control them, shut them up, and appease their abusers.

14. The City facilitates this physical, economic and mental abuse and sexual slavery and other violations of rights by permitting supervisory officers and DAs to operate in the manner alleged herein, by failing to monitor

(through oversight or otherwise): failing to train ADAs and NYPD on the mandates of NYS Executive and Social Service Laws Crime Victims' Statutes: by failing to distribute literature or to post signs in its precincts, Family Justice Centers and Crime Victims Centers alerting victims of their rights as a crime victim: by failing to ensure that when a victim of DV and/or trafficking is denied services bc she/he is deemed a "fabricator" that proper DUE PROCESS is in place to ensure that the opinion of one prosecutor or officer is not heavily weighted by their motivation to bring-in convictions and make.

15.   The City fails to protect from retaliation women who make complaints against Confidential Informants or Complainants on major cases by placing them on "Do NOT SERVE" lists effectively barring them from receiving Police services and protections in the future giving other perpetrators and abusers, skilled at sousing-out and targeting weak and fragile victims in a depressed and helpless state an actual and perceived free hand to victimize these women. This retaliation in Plaintiff Price's case was well known in her neighborhood of Southwest Harlem and Plaintiff Price was often attacked by Powell's acquaintances, family members and other predators in the area BECAUSE THEY WERE AWARE OF PRICE'S STATUS AS A NAMED MEMBER OF THE "DO NOT SERVE LIST" THAT THE 28TH PRECINCT WOULD NOT ASSIST. The City's customs, policies, practices, acts, and omissions allowed Raheem Powell to abuse Plaintiff Price and for other women to be abused and allowed other predators, Powell, Powell's circle, the MDAO and the NYPD to retaliate against Plaintiff Price .

16.   The City remained indifferent to the widespread abuse and denial of protections and victims' services to Plaintiff Price. Rather than taking prompt steps to investigate and punish Powell, the City instead both continued to use Powell as an informant and complainant despite the credibility issues he had (his record already included a Domestic Violence Felony arrest and several drug-distribution related arrests). The City treated Price as an adversary, refusing all requests to accept and investigate her "61 reports" of his felony assaults and battery and refusing information about its investigation of her allegations, first on the ground that the investigation found no wrongdoing, and later on the mutually exclusive ground that the investigation that purportedly had "found" no wrongdoing was nevertheless still ongoing. The City has also withheld records of the abuse and blackmail and campaign of terror that Powell enacted against Price —text messages on Price's phone proving the battery, coercion trafficking and violence. The Manhattan District Attorney's Office has refused to return the personal property/phones to Plaintiff Price that she provided the City to assist its

5

purported investigation which have been refused to be returned to Plaintiff by the MDAO which is against NY State's Executive Laws that clearly state: "Law enforcement agencies and district attorneys shall promptly return property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial. **NY State Executive Law 23 § 642 (3) –Fair Treatment Standards** (Exhibit C.)

17. **JURISDICTION AND VENUE** This court has jurisdiction over action under 28 U.S.C. §§ 1331 and 1343.

18. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

*19.* **PRELIMINARY STATEMENT/Introduction**: Plaintiff  Price has been unable to receive a satisfactory response to her previous demands that she be restored to the status she enjoyed before her false arrest, unlawful imprisonment and defaming by defendants and that training, policies and procedures be set in place to evaluate domestic violence and trafficking victims' complaints and veracity on a comprehensive level especially when the abuser is a confidential informant or major case complainant working with the NYPD or DA's office(s) on other, unrelated cases.  Currently there are special procedures in place in the NYPD Patrol Handbook for handling DV complaints allegedly committed by an uniformed or ununiformed NYPD member.  These special procedures are indicative that the NYPD recognizes that people with access to law enforcement channels hold great sway over investigations and victims. *Why isn't there a separate process denoted for those who work tacitly as informants or complainants on major cases who receive special handling from precincts and district attorney's offices?  This complaint seeks to address this question and remedy this situation.*

20. **NYS Executive Law; Article 23, Fair Treatment Standards for Crime Victims** is explicit in its mandate of procedures that must be followed when a victim  reports trafficking or certain felony assaults.  As Plaintiff will demonstrate, NOT ONE of these procedures was followed when Plaintiff turned to the NYPD and the MDAO for assistance (Exhibit # C).  Further training and re-iteration of these laws needs to be implemented within the NYPD and District Attorney's offices such as the MDAO. Plaintiff is not the only trafficking victim in NYC to have been refused to be recognized (Exhibit HH) by the NYPD and Criminal Justice Authorities as a trafficking victim.  According to the NY Penal Law 135.35 the crime of "Labor Trafficking" is committed: "if a person compels or induces another person to engage in labor, or recruits, entices, harbors, or transports such other person by…Using force or engaging in any scheme, plan or pattern to compel or

induce such person to engage in or continue to engage in labor activity by means of instilling a fear in such person..." The protections outlined (Exhibit C) by the various statutes of NY State Executive Laws and Social Service Laws such as receiving emergency social and medical services, to be notified of the availability of crime victim compensation, support programs, prompt return of property held for evidentiary purposes, to be protected from intimidation, to have one's case reported by the MDAO to the Director of the Office of Victims' Services, the right to be pre-certified and/or certified as a victim of human trafficking, and finally confirmation as a victim of human trafficking (NY State Social Services Law (483-aa-483 cc) (Exhibit C) were not offered to Plaintiff Price against the mandates of these laws.

21.    Plaintiff also seeks POLICY CHANGE for the way that Domestic Violence and Trafficking Survivors are treated within the criminal justice system when they come forward for help in extracting themselves from life-threatening intimate partner situations. A methodology and better training needs to be implemented for identifying true victims that is not subject to the whimsy of one lone prosecutor's bias(es). When a victim is thought to be a 'fabricator' a review of his/her case needs to be examined by Trafficking and  Domestic Violence advocates, therapists, social workers, and psychiatrists before they are denied restraining orders, protections, police services, social welfare services, a normal quality of life free from harm, and their ability to petition the government for a redress of grievances.

22.    This Lawsuit seeks to hold the defendants, CITY OF NEW YORK et al, liable for, but is not limited to misconduct under the federal civil rights statute, 42 U.S.C. 1983. The unlawful actions of police and prosecutors documented in this lawsuit resulted from affirmative or de facto municipal policies, practices and customs to violate the constitutional rights of trafficking and domestic violence survivors, suspects, and defendants, or from deliberate indifference by policymaking officials, acting on behalf of the City of New York, to such violations. As Plaintiff will demonstrate.

23.    **STATEMENT OF FACTS** The basis for this lawsuit and State and Federal jurisdictions are violations of the USC §1983 et. seq., & Title United States Code § ("The CIVIL RIGHTS Act") of Price's CONSTITUTIONAL RIGHTS and various State Law against malicious prosecution, This is a civil action, pursuant to 42 U.S.C 1983, and state law, seeking monetary damages for Plaintiff, Kelly Price, due to her wrongful arrest, malicious prosecution, and denial of police services caused by the pervasive misconduct of the Manhattan District Attorney's Office ["MDAO"] and the New York City Police Department and POLICY

7

CHAGE for the way victims of Domestic Violence and Trafficking Victims are evaluated by the NYPD and MDAO when they approach the "authorities" in the darkest, most desperate days of their lives.

24.   **LEGAL ARGUMENT** Defendant's would have the court believe that they followed all proper protocols and procedures when handling Plaintiff Price's complaints and that PLAINTIFF was not a victim but a FABRICATOR of her own injuries undeserving of services and justice and the City Law Department Lawyers will laughably try to convince the court that the defendants are only guilty of "Negligent Investigation" of which there is no Federal or State proscription against.   These base conclusions were drawn by inexperienced and biased members of the MDAO and NYPD and recapitulated by members of the City Law Department whom had/have  much at stake in the evaluation of Plaintiff's complaints of abuse and trafficking against her batterer.   Raheem Andre Powell was acting as a complainant himself in an attempted murder case against a party unaffiliated with PLAINTIFF and also provided information and acted as a confidential informant for the NYPD and the MDAO's "Operation Crew Cut"  who assisted in the arrests of countless alleged "gang" members operating in Harlem where Plaintiff resided at the time of the infractions against her person and her rights (Exhibit D: news articles/Press releases about OPeration Crew Cut). PLAINTIFF addresses, and endeavors in the space available to correct, these mischaracterizations of law and fact below, and thereby to demonstrate that defendants' lack of training and willful disregard to Plaintiff's rights as a victim and survivor of trafficking should be recognized by the court and that procedures and policies be mandated for the handling of trafficking and  intimate partner victims by the City of New York and that Plaintiff Price should be restored to the status she enjoyed before her false arrest, malicious prosecution(s) and unlawful imprisonment.

The City Law Department would also have the court believe that the NYPD and MDAO held no responsibility to investigate or assist Plaintiff Price as a "SPECIAL RELATIONSHIP" must be pre-determined between a person or persons and the City in order for an expectation of police services to exist. This case law is solidly set in the pretenses established by the caselaw set-forth in Riddick [Riddick v City of New York 2004 NY Slip Op 51945(U) [21 Misc 3d 1138(A)] Decided on March 25, 2004]: "As a general rule, a municipality may not be held liable for injuries resulting from a failure to provide police protection (Cuffy v. City of New York, 69 NY2d 255 [1987]). A municipality's provision of police protection to its

citizenry has long been regarded as a resource-allocating function that is better left to the discretion of policy makers (id.). There is, however, a narrow exception to this general rule based upon a "special relationship" between the municipality and the claimant (id.). The elements of this "special relationship" are: an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; knowledge on the part of the municipality's agents that inaction could lead to harm; some form of direct contact between the municipality's agents and [*3]the injured party; and that party's justifiable reliance on the municipality's affirmative undertaking (id.). A duly issued order of protection constitutes an assumption of an affirmative duty of protection coupled with an awareness that inaction could lead to harm and thereby satisfies the first two elements of a special relationship (Mastroianni v. County of Suffolk, 91 NY2d 198 [1997])." Plaintiff Price had attained a order of Protection from the Hon. Judge Lori Sattler (Exhibit # E) and thus an existence of this "special relationship" was already established. The Federal regulation defers to state law when there is no federal law regarding a subject. This "Special Relationship" clause that mandates when a state must offer protections to its citizenry is one of these cases.

25.   Plaintiff Price has secured an affidavit (Exhibit # F ) from the retired NYPD Police Lieutenant, Mark C. Larocca, formerly in charge of managing the patrol men and women of the 28th precinct whom answered many of Plaintiff's 911 calls alleging abuse, battery and violence at the hands of Raheem Powell. Mr. LaRocca's affidavit describes a disturbing pattern of personal direction of Plaintiff's Police Services by the MDAO. In fact NOWHERE in the NYPD handbook or in NY State Executive and/or Social Service Laws/ Crime Victim Statutes is there instruction for a precinct, officer, and detective, LT, SGT Captain OR Inspector to solicit permission from the MDAO before taking complaints or following-up with investigations of complaints of abuse and/or trafficking. Yet, this is PRECISELY what Mr. LaRocca's affidavit indicates: the MDAO instructed the NYPD to act OUTSIDE of the regularly-issued process in regards to Plaintiff Price: to relinquish their role as investigator and unhand it wholesale to the MDAO. The residual effects of the up-ending of this traditional divider between the police and the district attorney's office are STILL stunting Plaintiff Price's attempts to receive police services and/or protections.

26.   Plaintiff Price brings forth the following causes of action and alleges the following: beginning in 2010 and into early 2011, Plaintiff was in contact with various members of the Criminal Justice community including

9

Manhattan Family Court Judge Sattler, who issued an order of protection in November of 2010 (Exhibit # E ) against Plaintiff's abuser, Raheem Andre Powell. Plaintiff Price was at various times in touch with Detective Linda Simmons and other members of the 28th precinct, NYPD, for assistance in her attempts to extricate herself from her batterer, Raheem Andre Powell. Powell had abused Plaintiff physically, mentally, and economically and engaged in a brutal campaign of trafficking and controlling her against her will. Instead of investigating Plaintiff's claims and assisting her Plaintiff was arrested and charged with hundreds of counts of the now-ruled unconstitutional CPLR 240.30 which was struck-down by Chief Judge Jonathan Lippmann and the NY State Appellant Panel (Exhibit #A ) aggravated harassment towards her batterer and one count of contempt of court resulting in Plaintiff's false arrest, malicious prosecution, unlawful Imprisonment, and defamation. Various abuses of process and Injurious Falsehoods were levied against her in violation of her civil rights constitutionally protected under the 1st, 4th, 5th, 6th, 8th, 14th, and 16th Amendments from unreasonable search and seizure et al and violations of procedural due process and the New York Constitution.

27.   This lawsuit seeks to hold the defendant CITY OF NEW YORK liable for the above and below stated misconduct under the federal civil rights statute, 42 U.S.C. § 1983, and Monell v. Dept. Of Social Services, 436 U.S. 658 (1978) and under state law. The unlawful actions of police detectives and prosecutors documented in this lawsuit resulted from affirmative or de facto municipal policies, practices and customs to violate the constitutional rights of survivors involved in making Domestic Violence and/or human trafficking complaints, or from deliberate indifference by policy-making officials, acting on behalf of the City of New York, to such violations. As Plaintiff will demonstrate, both the NYPD and the MDAO, as a matter of policy, instructed and coerced witnesses to give false or unreliable testimony through their misuse of their powers of arrest and interrogation, unlawfully concealed exculpatory or impeachment evidence known as "Brady" material, and lied to or misled courts, defense attorneys, and criminal defendants in order to cover up their unlawful behavior.   Further they retaliated by placing Plaintiff on a "DO NOT SERVE" list making it impossible for her to attain police services of protections in the wake of the MDAO and NYPD losing the protracted criminal proceedings against her.

28.   Plaintiff, Kelly Price, is an intelligent and able individual who had built a career in photojournalism and would have continued to earn a substantial salary as an editor, but for the defendants' misconduct in causing

10

her wrongful prosecution, and imprisonment. She seeks $30 million in actual damages, and $10 million in punitive damages, for the egregious misconduct that deprived her of the joys of bearing the child she miscarried, of family life, of her journalism career, emotional pain and suffering, defamation and of living as a free person.

**29.   JURISDICTION, VENUE, and CONDITIONS PRECEDENT**

    a.   This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

30.   On or about October 22, 2012 Plaintiff served upon Defendant City of New York a timely notice of the present claims pursuant to New York General Municipal Law § 50-e.

31.   This action has been commenced within three years of the accrual of Plaintiffs causes of action.

32.   Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

**33.   THE PARTIES**  Plaintiff, Kelly Price is a citizen and resident of the State of New York and of the United States, and resides within the City of New York in the Southern District of New York.

34.   Defendant, CITY OF NEW YORK, of which the County of New York is a subdivision, is a municipal corporation of the State of New York.

35.   Defendant, Linda Simmons, "Simmons" at all relevant times, was a Detective in the 28th precinct which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her individual and her official capacities.

36.   Defendant, Maria Strohbehn, "Strohbehn" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage Of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her official capacities.

37.   Defendant, Audrey Moore, "Moore" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage Of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her official capacities.

11

38.  Defendant, Kenya Wells, "Wells" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his official capacities.

39.  The Manhattan District Attorney's Office "MDAO" is an agency of the CITY OF NEW YORK. The District Attorney, and assistant district attorneys employed by the D.A.'s Office are agents and employees of the City of New York, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

40.  Similarly, the New York City Police Department "NYPD" is an agency of the CITY OF NEW YORK. Detectives and police officers employed by the NYPD are agents and employees of the City of New York, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

41.  Defendant, Cyrus Vance Jr.,, "Vance" at all relevant times, was the district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his official capacities.

42.  Defendant, Larry Newman, "Newman" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his official capacities.

43.  Defendant, Laura Higgens, nee Richendorfer "Higgins" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment.  She is sued in her official capacities.

44.  Defendant, Police Inspector Obe, Commanding Officer of the 28th Precinct, "Obe" at all relevant times, was an Inspector at the 28th precinct which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her official capacities.

45. Defendant Rose Pierre-Louis, "Pierre-Louis" at all relevant times, was the Commissioner of Domestic Violence at the Mayor's Office for the Prevention of Domestic Violence, NYC which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her individual and her official capacities.

46. Defendant, Matthew Winters, "Winters" at all relevant times, was a police officer in the 14t$^h$ precinct which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

47. **BACKGROUND** In this complaint, Plaintiff Kelly Price alleges that her ex-boyfriend Raheem Andre Powell was a drug dealer and informant for the police and the Manhattan District Attorney's office. Plaintiff Price alleges that in 2009, he began to physically abuse her, in 2010 he began to traffic and pimp her and she repeatedly called the police.

48. Powell had abused Plaintiff physically, mentally, and economically. Instead of investigating Plaintiff's claims, following the mandates for crime and trafficking victims as is MANDATED by NY State Executive and Social Service Laws and assisting her Plaintiff was arrested and charged with hundreds of counts of aggravated harassment towards her batterer BASED ON THE ASSUMPTION THAT SHE WAS FABRICATING HER ABUSE IN AN ATTEMPT TO HAVE POWELL ARRESTED FOR SAID ALLEGED FABRICATED ABUSE even though no investigation into Price's allegations had transpired. Plaintiff was also charged with one count of contempt of court resulting in Plaintiff's false arrest, malicious prosecution, unlawful Imprisonment, and defamation. Various abuses of process and Injurious Falsehoods were levied against her in violation of her civil rights Constitutionally protected under the 1st, 4th 5TH, 6TH, 8TH, 16TH and 14th Amendments from unreasonable search and seizure, and violations of procedural due process and the New York Constitution.

49. The principal individual defendant, acting pursuant to unlawful municipal policy, who caused Plaintiffs unconstitutional arrest, prosecution, inflicted intentional emotional distress and orchestrated the defaming and slander of plaintiff, is the very (ret.) NYPD detective formerly assigned to the 28th precinct, Linda Simmons,

who was tasked to investigate Plaintiff's complaints of abuse against her batterer, Raheem Andre Powell.

Simmons' illegal behavior in Plaintiff's case included the following:

a.    Testifying under oath by stating "YES" in Judge Sattler's Family Court Part in response to a question from the Hon. Judge Sattler claiming she had investigate Plaintiff's allegations of Domestic Violence perpetrated against her person and then exclaiming that she had found Plaintiff Price to be "not credible" (EXHIBIT # G March 24th and Feb 1 Family court transcripts) when in fact NO INVESTIGATION HAD TRANSPIRED. (Exhibit # B NYPD Handbook Procedures):

Judge Sattler: "You have investigated Plaintiff's allegations of abuse and found them to be not credible?

Det. Linda Simmons: "Yes."

b.    In violation of various criminal statutes, directing the preparation and filing, with the MDAO, the NYPD, of official records she knew were false alleging that Plaintiff had fabricated her injuries sustained at the hands of Mr. Powell, and that her "fabrications" were a threat to Mr. Powell (Exhibit # Q )

c.    Repeatedly making willfully false representations of "fact" in such statements under oath to create a "factual" basis to obtain court orders of protection on behalf of Mr. Powell securing Plaintiff's constriction of willful and free movement by the court, to gain illegal custody of plaintiff, and to coerce plaintiff. (See Exhibit E  Family court orders) after March 24th giving Powell the more restrictive 100-yard protection and eliminating it from Plaintiff's Order of Protection therefore making it illegal for Plaintiff to happen to be in any space in her neighborhood where Powell would enter after including bodegas, parks where bbqs were held, dog runs, coffee shops, drugstores etc. It felt to Plaintiff in fact that often when she would be in a public place in her neighborhood that Powell would appear shortly thereafter forcing her to leave and to call public attention to the situation, causing her social injury and personal anguish, insult, shame and injury.  This happened numerous times in the period of March 24, 2011 through July 24, 2012 when all charges were dismissed and sealed against Plaintiff making the restraining order a nullity.)

d.    Lying to prosecutors in the MDAO who were investigating Plaintiffs allegations of abuse, by flatly denying various allegations had ever taken place even though she herself had never investigated the facts of the abuse.   Simmons never walked the 175 yards from the precinct to Plaintiff's Brownstone to question neighbors about abuse: she never viewed or reviewed photographs of Plaintiff's injuries: never

asked Plaintiff to sign HPPA forms for her various emergency room admissions for injuries sustained at the hands of Powell: never examined text messages Plaintiff had received from Powell detailing physical and other threats against her person, name and reputations her would unveil if she reported his abuse against her:  never reviewed the various receipts Plaintiff had been given by various window and door repairmen who had been called to her home repeatedly to fix her front door and windows which had been broken as Powell would try to gain illegal entry to Plaintiff's garden-level brownstone apartment when he would fly into fits of rage etc.

50.    Equally importantly, Plaintiff seeks additional recovery against New York City for the actions of Assistant District Attorneys Maria Strohbehn, Audrey Moore and Kenya Wells for initiating Plaintiff's malicious prosecution based upon allegations in a Criminal Court complaint they knew were neither true nor false as they had not investigated the facts of Plaintiff's abuse they had no factual basis to believe their allegations to be true.

51.    Additionally Plaintiff was placed on a "NO SERVICES LIST" which prohibited her from attaining police services of any kind because of the actions of the MDAO against her 1st, 5th, 8th, and 14th Amendment entitlements to Equal Protection under the Law, to Redress the Government for Grievances, Due Process and from Unusual Punishment.  Many other New Yorkers have been placed on this list and DENIED police services:  Plaintiff seeks the court to correct this practice by the Police and Borough District Attorneys including the MDAO and NYPD of denying the citizenry of Gotham the ability to make police reports, to receive equal protection under the law, due process, and to be protected from unusual punishment.  In a December, 2014 New York Times Magazine interview DA Vance states:

"By May 2010, Parker and Vance had roughed out the structure of the so-called Crime Strategies Unit (C.S.U.). They divided Manhattan's 22 police precincts into five areas and assigned a senior assistant D.A. and an analyst to map the crime in each area. C.S.U. staff members met with patrol officers, detectives and Police Department field intelligence officers. They asked police commanders to submit a list of each precinct's 25 worst offenders — so-called crime drivers, whose "incapacitation by the criminal-justice system would have a positive impact on the community's safety." Seeded with these initial cases, the C.S.U. built a searchable database that now includes more than 9,000 chronic offenders, virtually all of whom have criminal records. A large percentage are recidivists who have been repeatedly

convicted of grand larceny, one of the top index crimes in Manhattan, but the list also includes active gang members, people whom the D.A. considers "uncooperative witnesses," and a fluctuating number of violent "priority targets," (Exhibit G).

52.    How many "uncooperative witnesses" and crime victims have been unwittingly placed on this list and denied services? Plaintiff beseaches the court to explore this unconstitutional process vis a vis discovery regarding exactly how and why one is put on such a list and to question if at all this is even a legal practice employed by the MDAO and NYPD and to stave its practice and further implementation.

53.    The MDAO refused to investigate Plaintiff's claims of abuse. Plaintiff received a phone call from DA Strohbehn on February 2, 2011.   Strohbehn informed Plaintiff that she had "less than an hour" to get downtown to her office regardless of the difficulty in travelling that day as the city had been blanketed by a blizzard the previous evening. When Plaintiff arrived at her office she instructed her to wait in the Safe Horizon office for over two hours. When she greeted Price she withdrew her right hand as Plaintiff outstretched hers to as is common in professional and official circumstances to do. She led Plaintiff brusquely down the hall of the 2nd floor where she and Det. Simmons and another Dt from the 28th pct pepper Plaintiff with questions about how Price came to own a car, how Price earned a living, and accuse Price of answering her phone earlier in the day "with a fake accent.' They proceeded to call Plaintiff a liar and refuse to look at any material that proved Price was telling the truth. ADA Strohbehn informed Price she was declining to prosecute Raheem, and informed her that if plaintiff makes another report against RAHEEM that she will 'lock Price up and throw away the key." She also informed the 28th precinct that she will personally handle all of Price's "police service needs" and if Price has "a bullet-hole in her head that they are to call the DAs office first to clear police services offered first before responding to any call from Price." She informs Price that she has already assisted Raheem in drawing up a Family Court petition to attain a counter restraining order against Plaintiff in order to press counter-claims of harassment against Price. She further instructs Price that even though she haven't been served that Price am to show up in family court the next morning to respond to Raheem's charges. She tells Plaintiff that she  will be charged with contempt of court if Price does not show up "as she as an officer of the court (NOTE FAMILY COURT-NOT Criminal COURT where Stohbehn has jurisdiction) was ordering Price to appear even though there was no time to serve Price with a subpoena (sic)." She tells Price her only concern is that "an innocent black man has been sitting in jail

16

for 24 hours..." Price asked to speak with her supervisor to show her proof and have neighbors interviewed etc. and Ms. Strohbehn informs Price that "she already checked with her supervisor (Audrey Moore) and that she has been given carte blanche to deal with me with finality." Price is instead thrown out of her office. Plaintiff's landlord and others try to speak with Ms. Strohbehn to introduce investigatory evidence and she rebuffs them (please see attached letters from landlord, Adam Gargani, My neighbors Marilyn Benetatos et al about Ms. Strohbehn's and ADA Kenya Wells' refusal to investigate (Exhibit #s H, I, and J respectively.)

54.   Plaintiff's batterer (Raheem Andre Powell) enjoyed a privileged status with the MDAO and NYPD as a result of several incidents: he had assisted in helping the police previously and warned her that she would be unable to find sympathetic ears regarding his violence. More recently Powell had been a complainant in an attempted murder case wherein his marijuana distribution hideout was robbed on or about December of 2010 by an armed member of a central-Harlem gang. During that robbery the perpetrator shot at Powell as he chased him up nearby Frederick Douglas Boulevard in front of the 28th precinct.    That young robber/shooter was key in unraveling knowledge about the "Goodfellas" and "137th st" gangs in Central Harlem, which were 'brought to justice' under fanfare and several public press conferences by the district attorney's office (Exhibit # K).  Powell also had knowledge of other gang-related (Crips/Bloods) activities that involved the murder of his cousin, Andre, in broad daylight on the corner of 115th and Lenox in the Fall of 2010 among other pieces of information he on passed to the police. As ADA Strohbehn at the time was a junior member of an anti-gang task force dubbed "Operation Crew Cut" in Harlem (See Exhibit # L and M Strohbehn Linked in Resumes—two different versions!) Plaintiff has a very hard time understanding why Strohbehn was allowed to be the only ADA to evaluate the veracity of her complaints when it was known that Plaintiff's Batterer was an active participant in one of ADA Strohbehn's investigations and clearly she would need to defend his credibility to assist in her *case-building (*self-promoting career-building too.) Strohbehn after 'cleaning up' Harlem as a Junior member of the anti-gang squad has been PROMOTED to now be the SENIOR LEADER on a similar squad centered in MIDTOWN (see Exhibit #L and N Strohbehn linked-in resumes). This apparent conflict of interest that exists between a crime victim and a crime perpetrator who also just so happens to be an informant or complainant acting in a support capacity for the NYPD or MDAO needs to be properly remedied. The inherent conflict of interest and its existence still in the MDAO proves a lack of PROPER supervision and training exists within the NYPD and MDAO as to how to ferret out the

good complaints from the bad, to initiate a full and fair investigation into allegations, and to ensure oversight of decisions that make or break a prosecutor's case.

55. October 11, 2010: Raheem Powell attacks Plaintiff in street and beats her in the face and neck with his cell phone at the intersection of 118th and St. Nicholas Ave (NW corner.) He beats her with his fists and cell phone and Police are called. Police encourage Plaintiff to make a combined report of stolen license plates, car, and Domestic Abuse all none. Plaintiff is not given copy of report. Police take extensive photos of face, back and torso with bruises all over. Officers instruct parking garage to not allow Powell to take my car out of garage. Raheem bribes parking lot owner and takes car even though Police helped me remove one license plate and park suv in front of car. 28th Precinct Loses this complaint filed by Plaintiff Price and it is never filed.

56. On or about November of 2010 Plaintiff seeks, and is awarded, a restraining order against Powell from the Manhattan Family Court as the 28th pct. refused to assist her by the Hon. Lori Sattler (Exhibit # E)

57. On or About October 14, 2010 Plaintiff receives blackmail text messages from her batterer (Exhibit N # text message threats from Powell to Plaintiff).

58. On or about the morning of October 14th, Plaintiff Price visits the 28th precinct and discusses her complaint, her abuse, and her status as a sex worker conscripted into slavery by Mr. Powell with Domestic Violence officers McNair and Diaz and Detective Linda Simmons. The DV officers had already elevated the report even though they had promised not to and it had been assigned to Detective Simmons. Simmons, according to NY Social Services Law 483 fails to carry-out the requirements of this law: "As soon as practicable after a first encounter with a person who reasonably appears to a law enforcement agency or district attorney's office to be a human trafficking victim, that agency or office shall notify the office of temporary and disability assistance and the division of criminal justice services..." (Exhibit # C). Instead of treating Plaintiff as a trafficking and Domestic Violence Victim Detective Simmons neglected to make any of the mandated reports regarding the status of Plaintiff Price as a trafficking victim.

59. On or about October 14th, 2010 Detective Simmons rejects the following appropriate protocols and reporting and investigative procedures as outlined in the NYPD Handbook for evaluating DV and Trafficking victims (Exhibit # B). Strohbehn and Simmons label Plaintiff Price her as a "fabricator" and refused any investigation into her complaints against the stipulations of McKinney's which require a MANDATORY investigation into

ALL COMPLAINTS OF TRAFFICKING.

60.   On or about 10/14/2010 instead of performing the regularly issued processes as Mandated by the NYPD Patrolmen's Handbook for Domestic Violence victims (Exhibit # B) Simmons tears-up Plaintiff's report against and instructs Plaintiff to move out of the neighborhood.  Simmons recommended this course of action as it was "the easiest way to make the situation go away." Simmons stated to Plaintiff Price that she needed overtime hours that day and as it was nearing the end of her shift by booking Plaintiff that day for filing a false police report she would get overtime hours.  Simmons told Plaintiff that as she had never been arrested that she would only receive a Desk Appearance Ticket and that no one would go to jail.  She also warned Plaintiff to keep her head down and that she should move out of the neighborhood because from this point on "you're {sic} on your own."  Detective Simmons coached Plaintiff on how to retract her statement: asking Plaintiff to rewrite a synopsis of events several times each time asking Plaintiff to write the time at the top of the page much earlier than the last so that Detective Simmons "could receive overtime by catching the case with enough time to start to work it." A record of Simmons' overtime request and payment is on file for this day.

61.   On or about the evening of November 11/12 2010:  Plaintiff is robbed and attacked by Raheem Powell.  Powell choked her until she passed out on her living room floor. When she regained consciousness she tried to run for the door and screamed for help.  At that point Raheem tried to detain her and she was thrown through a 30-gallon fish-tank.  Neighbors overheard the commotion and called police and Plaintiff's abuser runs out back door of brownstone.  Eventually after much argument from the members of the 28th precinct Plaintiff is taken to Metropolitan Hospital and treated.  The FDNY ambulance workers (Valentin was one of them) remember the incident and commented on how strangely the police were acting.  The doctor who treated Plaintiff was harassed and threatened by members of the 28th precinct as he tried to treat plaintiff Price on the emergency room table (Dr. Albert Della Fave—ER Resident 732.995.6868.) Dr Della Fave gets in a shouting match with detectives from the 28th squad as they would not leave Plaintiff alone while he was prepping her for surgery. Plaintiff tries to make a new report at precinct two days later when she was able to walk again and was told to come back when the DV officers are around.  She returns the next day and is told again to come back the next day. This continues for weeks.  No report was ever taken of incident by NYPD despite Plaintiff's efforts to do so.

62.   On or about November 17, 2010: Plaintiff is beaten by Nancy Powell, Raheem's mother when she goes to her house for help. Face completely covered in blood and deep scratches from her fake nails digging into Plaintiff's flesh. Plaintiff has permanent facial scarring as a result. (See Exhibit # O Photo of deep scratches on Plaintiff's face dated 11/17/2010). Nancy Powell was given an ACD (2010NY092185) which she violated by being re-arrested for marijuana possession six months later but the Das never prosecuted her.)

63.   On or about November 22, 2010: Plaintiff approaches the 28th precinct five days after attack by Nancy Gaines, mother of Raheem Powell. Police, noting extensive damage to Plaintiff's face allow Plaintiff to make report against Nancy Powell however they refuse to take a report for events that transpired on the evening of November 11 2010 where Raheem threw Plaintiff through a fish tank and instead the precinct instructs Plaintiff to go to family court to attain a restraining order against him which she does (Exhibit # E) THIS FAMILY COURT RESTRAINING ORDER IS DE FACTO EVIDENCE THAT THE CITY OF NEW YORK HAD An OBLIGATION TO LOOK AFTER Plaintiff's INTERESTS and that the NYPD and MDAO had a SPECIAL RELATIONSHIP TO PLAINTIFF ergo there is no veracity to the assertion that these criminal justice agencies had leave to NOT protect Plaintiff. As a general rule, a municipality may not be held liable for injuries resulting from a simple failure to provide police protection. To overcome this general rule, plaintiff would need to demonstrate a special relationship or duty between her and the municipal agent (See McLean v City of New York, 12 N.Y.3d 194, 199 (2009.) The restraining order issued by Judge Sattler is evidence of a special relationship between plaintiff and the municipal agent City of New York see Mclean v City of New York, 12 N.Y. 3d 194, 199 (2009.). It proves that the City of New York made promises to Plaintiff and took actions that created an affirmative duty to act to protect plaintiff and that Plaintiff justifiably relied on this promise. Plaintiff took the restraining order to police to serve and they tell Plaintiff to come back. Plaintiff returned a few days later with Family Court restraining order and the precinct ostensibly refuses to act on it: each day she walks the 175 yards from her home to the 28th pct. and each time she is told to come back the next day when officers will be available for service. Officers are never available for service. Desk Sergeant Agron at the 28th Pct. openly mocks Plaintiff to her face each time she enters precinct.

64.   On or about December 22nd, 2010: Plaintiff is beaten, robbed, dragged into street after Raheem breaks into Plaintiff's house and steals her money and phones. Multiple witnesses call 911 for help. Plaintiff Price attempts to report crimes to the 28th precinct where the on-duty desk sergeant, Agron, tells Plaintiff when she

goes to make report that he will arrest Plaintiff for trespassing if she doesn't leave the precinct.

65. On or about January 27th 2011: Plaintiff fights with Raheem. Plaintiff goes to precinct to make police report of incident and sergeant Agron again tells Plaintiff that the only thing he can do for Plaintiff is to "move Plaintiff to Nevada" (implying that Plaintiff is a some kind of filthy degenerate prostitute unworthy of the NYPD's assistance.) (See texts from Powell EXHIBIT # N).

66. On or about January 28th 2011: Plaintiff makes appeal to detective Simmons to help Plaintiff. Simmons agrees to help initially and insists Plaintiff make reports about 12/20 and 1/27 incidents to DV officers when they are in the next day.   Simmons agrees to help Plaintiff if she tells her everything she knows about Raheem's drug-dealing and his connections etc. Plaintiff asks about signing a complaint for injuries dating from 11/11/2011 and Simmons tells Plaintiff "it's too late that the precinct will look bad." Plaintiff Price again asks Dt. Simmons for help in extracting her from her sexual conscription/trafficking. Simmons gives Price lip-service but no reports are made/taken on her behalf.

67. On or about January 29th 2011:  Plaintiff Price is interviewed by several detectives from the 28th precinct about Raheem's drug sales enterprise. They never ask Plaintiff to show them pictures, ER reports etc. or produce witnesses that are able to aver the abuse Plaintiff suffered at the hands of Raheem Powell. Detectives tell Plaintiff the only way will they help keep Raheem away from Plaintiff and to get her car back from Raheem is if she presses charges against Raheem. Plaintiff Price attempts to make a police report but is told to come back the next day when the DV officers are on duty in the pct.

68. On or about January 30th 2011: DV officer McNair takes report of 12/20 incident and encourages Plaintiff to make report about 1/27 incident.   Plaintiff is leery. Precinct tells Plaintiff that Raheem has been making reports against Plaintiff and that if she doesn't make report about 1/27 incident "decisions may be made that are not in her favor." Plaintiff asks again to make a report about incident on 11/10 and is told that; 'too much time has passed' by Domestic Violence officers McNair and Diaz at the 28th pct.

69. On or about On or about February 2, 2011, shortly after Plaintiff had filed a complaint against Powell with the 28th Precinct the Plaintiff was contacted by ADA Strohbehn and asked to rush to the DA's office under verbal threat of arrest herself. Plaintiff was commanded to a small interrogation room/office where Strohbehn told her upon arrival that Powell would not be charged, that Plaintiff was believed to be a "fabricator" and a liar, and was refused opportunities to provide evidence proving her story. ADA Strohbehn informed Plaintiff

that if Plaintiff makes another report against POWELL that she Strohbehn will "lock [her] up and throw away the key." Strohbehn informs Plaintiff "the only reason I'm not arresting you right now is because I did not instruct you to bring counsel with you when I commanded you to appear at my office today." Strohbehn also informed Plaintiff that she had informed the 28th precinct that she will personally handle all of Plaintiff's "police service needs" and if Plaintiff has "a bullet-hole in her [sic] head that the NYPD is to call Strohbehn first before responding to any call from Plaintiff." Strohbehn informs Plaintiff that she has already assisted Powell in drawing up a Family Court petition to attain a counter restraining order against Plaintiff in order to press counter-claims of harassment. Strohbehn further instructs Plaintiff that even though she hasn't been served that she is to show up in family court the next morning to respond to Powell's charges. She tells Plaintiff that she will be charged with contempt of court if she does not show up in court: "as [Strohbehn] as an officer of the court am ordering you [Plaintiff] to appear even though there is not time to serve [Plaintiff with] a subpoena (sic)." Strohbehn tells Plaintiff her only concern is that "an innocent black man has been sitting in jail for 24 hours…" Plaintiff asks to speak with Strohbehn's supervisor to show her proof of the abuse and have her neighbors interviewed etc. and Ms. Strohbehn informs Plaintiff that "she already checked with her supervisor (Deputy DA Audrey Moore) and that she [Strohbehn] has been given [by Moore] carte blanche to deal with Plaintiff with finality." Plaintiff begged for someone to review the photographs (Exhibit #O), hospital emergency room reports (Exhibit #P ), receipts for broken windows and kicked-down doors or to speak with her neighbors who had heard and seen the constant battery. Strohbehn informs Plaintiff that she will "have to show her proof to the judge" and rebuffs all mandates for processing complaints made by trafficking and domestic violence victims that are set-forth in New York State's Executive and Social Service Laws.

70.   On or about February 2, 2011 Plaintiff's landlord and others try to speak with Ms. Strohbehn to introduce investigatory evidence and she rebuffs him and hangs up the phone on him before receiving contacts for other tenants in Plaintiff's building who had provided information to Landlord of Plaintiff's abuse at the hands of Powell (please see Exhibit # H letter from Landlord). Strohbehn's actions were in retaliation for Plaintiff's exercise of her rights to petition the Court for grievances and violated Plaintiff's 1st amendment rights and privileges under the US Constitution also under 42 USC 1983. These acts Strohbehn took to act as private attorney for Plaintiff's batterer by ordering a petition to be filed in Family Court on his behalf, and stripping

22

Plaintiff of her right to police services are not functional prosecutorial actions, are NOT covered by either absolute or qualified immunity, and exercising them denied Plaintiff's rights under the 1st 4th and 14th Amendments under 42 USC 1983.

71.   On or about February 3, 2011 Powell tries to accost Plaintiff on way out of family court. ADA Maria Strohbehn refuses to help Plaintiff file report about Raheem's violation of restraining order/ conduct on way out of court building. Plaintiff makes report with Det. Mortimer Plaintiff at 5th precinct as courthouse is in this jurisdiction. Months later dt. Mortimer informs Plaintiff that he was told to not pursue an investigation of her complaint by the DA's office.

72.   On or about early February 2011:  Neighbors tell Plaintiff that nude photos of Plaintiff have been texted around to all the neighborhood boys. Plaintiff calls precinct and Strohbehn and no one will take report. She then calls Detective Mortimer and he tells Plaintiff he can't do anything. Lt. Larocca from the 28th pct. encourages Plaintiff to make a report to the court and to the dept. of Investigations as he informs Plaintiff that ADA Strohbehn has instructed the pct. to not take any reports from Plaintiff. (LT LAROCCA has retired and living in Florida. Plaintiff Price has only FINALLY been able to track him down as of August 10, 2015 Please See Exhibit #F affidavit from Lt. Larocca). Larocca informed Plaintiff Price that each time she made a complaint of abuse, battery, assault, threats or was attacked by neighbors in Harlem associated or not with her batterer, Raheem Andre Powell, that the detectives in the 28 squad had to take the EXTRAORDINARY step of calling the MDAO and requesting PERMISSION to proceed with an investigation into her allegations for the remaining period of time he remained under the employ of the 28th precinct. This treatment of her complaints as a victim of trafficking and abuse were outside of the REGULARILY ISSUED PROSESS followed by the NYPD and the MDAO and proves that the MDAO took pains to unhand her unusual and excessive punishment for making allegations against their prized informant. Lt. Larocca has penned an affidavit describing these and other unusual steps the MDAO took to squelch Plaintiff Price's Due Process Rights and rights to equal protection under the law, right not to be unusually searched and seized, or to be excessively punished. *(See Exhibit # F Letter from Lt. Larocca.)

73.   On or about February 2011 Plaintiff makes formal complaint to NYC Mayor's office for the Prevention of Domestic Violence about the lack of investigation into her allegations and collusion between her batterer and MDAO. Strohbehn is taken off the case and is replaced by ADA Kenya Wells.

23

74.   On or about  February 2011 Plaintiff contacts Deputy ADA Larry Newman of Special Victims and Domestic Violence and tells him of her abuse and trafficking.  Newman  informs Plaintiff that she will not be arrested and that often "Police and DAs disagree on cases and not to worry."  Newman invites Plaintiff to his office to provide evidence that her story is true.  Plaintiff informs Newman that she will arrange for a meeting when her lawyer returns from vacation.  Two weeks later when Greenberg returns to town Plaintiff calls Newman to set up meeting and he never responds. Newman never reports Plaintiff Price's complaints of trafficking and/or domestic violence to the proper agencies as is required by NY State Executive and Social Service Laws.

75.   On or about  February 23rd, 2011:  Plaintiff receives a call from officer Diaz at DV office of 28th precinct asking Plaintiff to "come in to tell them how things are going."  Officer McNair admits to Plaintiff that Raheem made claims of harassment against Plaintiff.  He's surprised to find out that Raheem and Plaintiff had been discussing her pregnancy via telephone.  Diaz Plaintiff she will be arrested even though at time of conversation Plaintiff had no restraining order against her and Powell had one prohibiting him from talking to her.

76.   On or about February 24, 2011:  Plaintiff travels to 28th Precinct to discuss matter with Lt. LA Rocca.  LA Rocca rips up Powell's complaint against her in front of Plaintiff, informs Plaintiff that "a war between upstairs (detective squad) and downstairs (patrol officers)is taking place in the precinct" over her case. Larocca again informs Plaintiff that the DAs office has instructed precinct NOT to take any complaints filed by Plaintiff and that her only recourse is to contact the Department of Investigations and to make a complaint.

77.   On or about  March 11, 2011 Assistants from Plaintiff's Family Court Lawyer's office communicate with 28th Precinct seeking assistance in delivering restraining order issued by Judge Sattler on November 22, 2010. Precinct acts strangely:  inquires as to Plaintiff's whereabouts to her lawyer, Ed Greenberg)

78.   On or about  March 16, 2010 Attorney Ed Greenberg faxes Dt. Flowers at 28th pct. demanding an answer to his question if he needs to surrender his client for any reason to the 28th pct. (Exhibit # Q: Statements on the court record ref his discussions of surrendering Plaintiff for arrest before family court hearing  with detectives from 28th pct.).  Later that afternoon via telephone conversation Dt. Flowers inquires as to Plaintiff's whereabouts and denies any charges have been filed/will be filed against her and assures Greenberg that he does not need to surrender his client to the precinct. (See Exhibit # Q Greenberg statements on court record regarding communiqués to 28th precinct and and itemized communication between Greenberg and Precinct

24

noting conversation with Dt. Flowers.)

79.   On or about March 24, 2011, police detective Simmons testified before Judge Sattler in Family Court that she had investigated Plaintiff's allegations of abuse and had found them to be unfounded. At this time Plaintiff Price was arrested and charged with 324 counts of CPLR 240.30 (Exhibit 02) (now altered to remove language that the NY Appellant Court deemed unconstitutional see exhibit #A) Detective Simmons PERJURED HERSELF IN COURT when she was called in front of Judge Sattler and asked if she had investigated Plaintiff's claims of abuse and if they were credible. Simmons replied "no" (Exhibit # Q ) even though she had not questioned Plaintiff about her emergency room visits, reviewed photos of injuries taken by her neighbors, or interviewed her building super, landlord or neighbors about the ongoing abuse or followed any of the steps outlined in the NYPD Handbook for a Domestic Violence investigation (Exhibit # B)

> "Judge Sattler:…Detectives investigated the stories?
>
> Detective Simmons: Yes
>
> Judge Sattler: And they don't find her story to be credible?
>
> Detective Simmons: No." (Citation)

Plaintiff alleges that Simmons's testimony was false. After the court proceedings, four police detectives from the 28th precinct arrested Plaintiff inside the Family Courthouse on Lafayette Street. It is long-held that state agents, including Police Officers, receive immunity when testifying in court. Detective Simmons had not even asked Plaintiff to sign HPPA forms releasing her ER reports, which according to the NYPD handbook is a crucial step of ANY domestic violence investigation. This and other affidavits prove detective Simmons willfully lied to the court with RECKLESS DISREGARD & DELIBERATE INDIFFERENCE for Plaintiff's rights and thus satisfies the standard applicable to violations of Plaintiff's Constitutional DUE PROCESS rights. What is at issue is can the city be held liable for the consequent wrongs unhanded to Plaintiff because of this lie. SCOTUS just refused to hear a case on this very issue citing: "police's obligation to disclose highly exculpatory evidence to the prosecutors…is widely recognized" upholding a 9th circuit ruling that found police officers who presented perjuries testimony are NOT immune:

"A jury determined the officers had demonstrated deliberate indifference or reckless disregard for Walker's rights or for the truth, and had withheld or concealed evidence that strongly indicated Walker's innocence, the 9th Circuit said…"A police officer's continuing obligation to disclose highly exculpatory evidence…is widely recognized," 786 D 3D806 (9th Circuit 2014).

80. Under § 1983, "a [person is] responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. 167, 187 (1961), and Monel v Dep't of Soc. Srvs., 436 U.S. 658 (1978). Thus, a defendant is liable for "setting in motion a series of acts by others which the actor knows or reasonably should know would cause other to inflict the constitutional injury." Crowe v Cnty. of San Diego, 608 F. 3d 406, 430 (9th Cir. 2010.) Here, the "natural consequence" of Simmons' perjury was the hauling-off of Plaintiff to face charges of aggravated harassment, to be imprisoned, to have a restraining order imposed on her movement, and to suffer the threat of elongated incarceration as a result of her attempts to extract herself from a life-threatening intimate-partner and trafficking situation.

81. On or about May 8, 2011, Plaintiff is arrested again and taken to Rikers Island on the charge of Contempt of Court (Exhibit # R) by Detective Samuel Fontanez, shield #00311 of the 28th Detective Squad. Plaintiff overall served between eight to ten days incarcerated in the tombs and on Rikers Island. While incarcerated Plaintiff was attacked by other inmates and had her belongings stolen by the guards (Exhibit # S Property Receipt). When Plaintiff was released on bail she had to travel home to Harlem via subway and bus barefoot as her shoes had been stolen by the guards at Rikers (Exhibit # S). She also contracts a sinus infection that disables her hearing in her right ear for over six months. Her asthma and breathing disintegrate and Plaintiff is sent to infirmary for medical treatment and assessment of prescriptions for sinus/ear infection and pain.

82. During a proffer session (Exhibit #T Queen for a day agreement) On or about June 24, 2011, Plaintiff provided police with cell phones containing messages from Powell; the cell phones have not been returned to Plaintiff despite her repeated requests and despite the mandates of McKinney's Crime Victims Law: "Law enforcement agencies and district attorneys shall promptly return property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial." (McKinney's Executive Law; Article 23, Fair Treatment Standards for Crime Victims § 640.3 – Fair Treatment Standards for Crime Victims (Exhibit # C).

83.   On or about  May 11, 2011 Plaintiff was bailed out of Rikers island on 2500 USD bond by her friend, Mr. Ian Hague.   To date despite repeated requests has not received her bail of $2000.00 back (Exhibit # U).

84.   On or about May or June 2011, residents of a women's shelter on 120th Street in Manhattan allegedly assaulted Plaintiff, but police refused to help Plaintiff.

85.   On or about August 2, 2011,  and 16, 2011,  Plaintiff made police reports on regarding "death-threats, taunting & harassment by neighbors with allegiances to Raheem. No members of the NYPD or MDAO ever investigated or followed-up with Plaintiff. Plaintiff is told by officer Walker of the 28th precinct that she has been told not to process any report taken from Plaintiff Price as per the directions of the Manhattan District Attorney's Office.

86.   When Plaintiff was subsequently assaulted by various parties associated or not with her ex-intimate partner in her neighborhood and attempted to file complaints to the NYPD she was informed that the Manhattan DAs office had instructed the precinct involved not to take her complaint or to not follow-through on any investigation of her allegations. This happened on numerous occasions notably on or about: 7/6/3/2013, 5/17/13, 10/17/12, 07/27/12: (incident #2012-020-2969), 7/14/12, 4/17/12, 1/20/12, 12/1/11, 8/13/11, 8/4/11, 8/11/11 (complaint # 2011-28-003732.)  Refusing/failing to investigate are violations of Plaintiff's 14th amendment rights to equal protection under the law and 8th amendment rights to due process. Plaintiff has incident IDs, emergency room reports and ambulance records and eyewitness statements for most of these incidences.

87.   On or about June 24, 2011  Plaintiff provided phones with blackmail messages from Powell to the DAs office during a "Queen for a Day" meeting. At the conclusion of Plaintiff's prosecution when the charges were dismissed and sealed Plaintiff made multiple requests for her property back and was refused.  Plaintiff maintains that the DAs office has unlawfully held her property and demands the court to order its return to her as per the stipulations of the "Queen for the day" agreement between Larry Newman, Deputy of the Manhattan District Attorney Office's SVU unit and Plaintiff's criminal defense lawyer Stephen Kartagener. All of Plaintiff's attorneys including Kartagener, Benjamin Dell and Tajuana Johnson have demanded a return of the materials to Plaintiff as the case has concluded. Plaintiff made an inquiry to Wells' supervisor in the Trial Bureau, Minton Sabor, for the return of her property and was again refused. This is a violation to Ms. Plaintiff's right to privacy and from unlawful search and seizure. Sensitive, intimate, nude of Plaintiff that

Powell texted to Plaintiff that he intended to blackmail her with are included among the media on the phones and the District Attorney's office has no right to keep these materials. McKinney's Laws specifically state that: "Law enforcement agencies and Das attorneys shall promptly return property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial…" (NY State Executive Laws 642-3 Criteria for Fair Treatment Standards Exhibit # C).

88.   On or about 8/16/11 plaintiff is assaulted by a long-time associate of RAP on her way home and punched in the face. After Plaintiff called 911 an ambulance arrived and treated Plaintiff. Later the police took report and told her that they were told not to extend Police services to Plaintiff. No one ever followed up. See photos of busted face taken by FDNY ambulance workers (Exhibit # O photos dated 8/16/11)

89.   On or about October 25, 2011, Plaintiff attempted to file a report that Powell violated an order of protection but she was refused by Officers at the 28th Precinct who called her "crazy" and informed her that the MDAO had instructed them not to offer her Police Services of any kind.

90.   On or about  8/31/11 Plaintiff was harassed by associates of RAP. PO EBRIGHT PO RAMAN and PO Ehlers of the 28th precinct respond to plaintiff's 911 call and tell Plaintiff she should move out of neighborhood, they harass Plaintiff about associating with 'these people in this neighborhood' and refuse to take her complaint. PO Ebright tells Plaintiff he hopes he responds to one of her complaints one day and 'finds Plaintiff lying on the sidewalk in front of her brownstone with a knife in her back.' Plaintiff reported incident to the IAB (IAB Complaint # # 11-31923). Plaintiff's filing to the IAB was marked "unsubstantiated" by lt. Rentas and (IAB log #11-43253) and was closed by a 28 squad investigator and by Lt. Laburda. No one ever contacted Plaintiff to interview Plaintiff regarding these complaints.

91.   On or about September 24, 2011, Plaintiff was assaulted in a bar in the Midtown neighborhood of Manhattan. She called police and was arrested and charged with disorderly conduct based on false statements that she had screamed at officers (Exhibit # V Injuries sustained from Police beating Officer Winters of Midtown South) and held for over 72 hours in the Midtown South Precinct and the tombs under 100 Centre Street before being arraigned and released.

92.   On or about October, 2011, Price's cellular phone company, Metro PCS informs Price that her phone line is being tracked by law enforcement in violation of her state and federal right to privacy.

93.   On October 18, 2012, Plaintiff was convicted of disorderly conduct arising from 9/24/11 incident

94.  On or about February 26, 2016 the NY State Appellant Panel overturned this conviction and dismissed the accusatory instrument (Exhibit W Appeal from Conviction & Decision by Appellant Panel 1.26.2016.)

95.  On or about October 25, 2011 Plaintiff attempted to file a DIR report with the 28th precinct about a violation of a restraining order Powell had committed on 10/21/11 against an order of protection issued by Judge Sattler (Docket #0–00763-11, File # 1685, order #2011-1195 issued on 9/29/11 expiring on 3/29/12.) Plaintiff was refused the opportunity to make a report of the violation on the date of occurrence.

96.  On or about November 7, 2011 Plaintiff returned to the 28th precinct in an attempt to file the report and Captain Williams, the CO of the 28th precinct, instructed his DV officers to take the report. The DV officer who took the report eventually (id # 939468) ripped up the report and refused to process it (Exhibit # X copy of report ripped up by DV officers).

97.  On or about November 14, 2011 When following up the next week on the status of the DIR Plaintiff was told it was missing and that she was not invited back into the precinct to refile it.

98.  On or about 12/01/11 Plaintiff is accompanied by an advocate/ representatives from the St. Luke's Roosevelt Hospital Crime Victims Center back to the precinct to refile a new DIR (Exhibit # Y.) The DIR was accepted by the new DV SGT (id # 933944). At that time Plaintiff received an apology from the new DV. The new DIR was assigned to Detective Ransom of the 28th squad who did not follow-up on any investigation regarding the complaint.

99.  On or about October 2011 Plaintiff filed IAB complaint # 11-49386 against 28 pct. DV officers Rosendary and Simmons WHO THREW AWAY her 61 when Plaintiff complained that Powell was violating the terms of her restraining order against him. (exhibits Y & Z ) complaint c1-1-667494377. Complaint was referred back to the precinct for investigation by a SGT also marked the complaint as UNSUBSTANTIATED.

100.  On or about January 20, 2012, Plaintiff attempted to make a report that a woman named Ina attacked her, but Detective Fontanez of the 28th precinct never interviewed plaintiff about the assault nor did he perform any investigation elsewise into Plaintiff's complaint.

101.  On or about January 12, 2012 Plaintiff Price's legal Advocate from CONNECT NYC (http://www.connectnyc.org), Kerry Toner, met with Deputy ADA Audrey Moore to advocate for Plaintiff Price and to explain that Plaintiff Price was/is a survivor of abuse and trafficking. (Exhibit # Z pp #7): "KT s/w Audrey Moore, CHief of DV Bureau @ NYCo DA's office, to inquire about case and raise issues of

victim treated as perp. AM requested email with identifying email; I will follow up with her." This is the first documentation that Deputy Moore had knowledge of Plaintiff's true status as a victim. According to the mandates of NY State Executive and Social Service Laws (Exhibit # C). Ms. Moore at this point was mandated to follow investigative procedures and to report Plaintiff Price's claims of abuse and trafficking and to process her accordingly as a survivor and victim. No action was taken after this meeting, or ever, to undertake these required steps.

102.    On or about January 19, 2012, Kerry Toner, Plaintiff Price's legal advocate emailed Deputy DA Audrey Moore with the requested materials proving Plaintiff's assertions of abuse and trafficking at the hands of Raheem Powell. Moore never executed the mandates of the NYPD handbook, or of NY State Executive and Social Service Laws after receiving 'Proof" that Price was a true victim. "KT emailed Audrey Moore and Lisa Haileselassie re: case status and advocating for dismissal." (Exhibit # Z pp 7).

103.    On or about January 31, 2012 Plaintiff inquired as to whether a response had been offered by Audrey Moore: "SD informed CL that we gave her info and the info of the case to the SVB chief (Audrey Moore) in the DA's office a couple weeks ago and we're still waiting on the outcome of that." (Exhibit # Z pp 8.)

104.    On or about January 10, 2013 Plaintiff Price's advocates had still not received a response from Audrey Moore regarding any outcome of evidence introduced to the DA's office regarding evidence given to the special victims unit a full year earlier (Exhibit # Z pp 26.)

105.    On or about April 17, 2012, and July 14, 2012 Plaintiff was attacked , but police officers from the 28th precinct did not contact Plaintiff to investigate her complaints.

106.    On or about 7/14/12, Plaintiff is attacked in front of 200 St. Nicholas Ave., around the corner from her home and grabbed and slammed over and over onto pavement by associates of RAP. Plaintiff suffered Knee damage and bruises all over her body. Plaintiff called 911 around 200 am in the morning and P.O. Johns and partner responded, told Plaintiff they wouldn't do anything to help.

107.    On or about July 25, 2012 the state court dismissed the 324 aggravated harassment charges and one criminal contempt charged against Plaintiff (charges (docket #s NYS 20075-2011 and NYS20111-2011) ) (Exhibit # 12 & 13)'.

108.    On or about July 25, 2012, a man attacked  Plaintiff on the corner of Columbus Avenue and 83rd street in Manhattan at Soldier McGee's Bar. See Exhibit # AA photos dated on or about 7/28/12. In this case the

man who attacked Plaintiff (incident #2012-020-2969), was let go by the 20th precinct and he continued to stalk, flash, and trespass and terrorize other women in town. The same man who attacked Plaintiff on 7/28/12 went on to continue to terrorize women in NYC.) (Exhibits# BB Rami Bali Charge sheets, photos AA).

109.   Over a year later charges were subsequently brought against the man, Rami Baly, AFTER HE HAD ATTACKED FIVE OTHER WOMEN IN NYC (New York Criminal Court case #s 2013NY031505, 2013NY049135, and 2013CN000347 Exhibit # BB). All other crimes Mr. Baly was charged with occurred after Baly attacked Plaintiff and was allowed to walk without arrest for his crimes against plaintiff when he was re-arrested in August of 2012 (case # 2012NY067321). Baly proceeded on a crime spree against women that ran from the fall of 2012 to the summer of 2013. On numerous occasions the detectives and the other ranking members (Lt. Carbone) of the 20th precinct informed Plaintiff Price and her advocates from Saint Luke's Roosevelt Hospital's Crime Victims Center that the reason that Mr. Baly had not been arrested was that he could not be located. Mr. Baly had paid with a credit card that evening at Soldier McGee's bar and the DAs office refused to request a subpoena from the court to attain his billing information so that he could be apprehended. But this assertion that Mr. Baly could not be located was simply a lie.

110.   When Mr. Baly returned to the bar on or about August 25th of 2012 approximately a month after assaulting Plaintiff.  On that date staff members alerted the 20th precinct of his appearance again at Soldier McGee's bar and he was apprehended.  When he was approached by officers in the bar he acted disorderly, fought with officers and resisted arrest.  He was arrested (case # 2012NY067321) and released and given "time-served" but not charged with the assault against Plaintiff on July 28, 2012. The detective assigned to the case, Galan, pretended Baly could not be located even though this was not the case.  He had been arrested already and not charged with the crime against Plaintiff but was charged with acting disorderly and resisting arrest when NYPD approached him to question him. Plaintiff pushed the case and her advocate, Kerri Toner, from the St. Luke's Roosevelt Crime Victims Center /Connect NYC inquired as to why no photo lineup had been done after the assault and nor any follow-up was made to trace Mr. Baly after he was let go as per procedure outlined in the NYPD Patrol handbook (Exhibit Z).

111.   On or about  December of 2012 Ms. Toner was told that the case was being pursued and Baly could not be located and she made notes to this effect in her log (see attached Exhibit # Z pp 24.) Never did Detective Galan mention that Baly had already been arrested for several other crimes and that the NYPD not only knew

31

of his whereabouts but had arrested him three times for other crimes against other women in NYC and for resisting arrest and disorderly conduct! (Exhibit # BB). It was not until after Mr. Baly had committed other predatory crimes against other women that Baly was arrested for his assault against PLAINTIFF, which was almost a year after his crime. Baly was arrested on 4/24/13 NINE MONTHS AFTER he assaulted Plaintiff when he appeared in criminal court to answer charges of criminal trespass (PL 140.01(a)), public lewdness PL 245.00), and public exposure of a person (PL 245.01). He had been arrested for these NEW CRIMES against ANOTHER WOMAN by the 1st Precinct's Officer Jessica Valle on 4/21/13 for crimes he committed against Kristyn Abbale (see Exhibit # BB). A prosecution of Baly for his crime against Plaintiff was initiated on paper, never investigated by Das but later dropped. The DAs office told the judge presiding over the case that they couldn't locate Plaintiff to testify and the case 30-30'd. Plaintiff had emailed the ADA running the case, Laura Higgens nee Richendorfer asking about when to appear in court to testify multiple times and was summarily ignored. (See Exhibit # CC Email from PP to ADA Higgens).

112.   On or about August 2012 through March of 2013 The detective assigned to the case, Galan, pretended Baly could not be located even though this was not the case. Detective Galan had not executed an investigation into Plaintiff's complaint of assault as per the mandates of the NYPD Police handbook. Plaintiff pushed the case and her advocates from the St. Luke's Roosevelt Crime Victims Center inquired as to why no photo lineup had been done after the assault and no follow-up was made to trace Mr. Baly after he was let go (Exhibit # Z pp 23-24). The advocate was told that the case was being pursued, excuses where made that Plaintiff "was difficult" and this was preventing the case from moving forward EVEN THOUGH BALY HAD ALREADY BEEN ARRESTED THREE TIMES FOR OTHER CRIMES IN THE INTERIM THIS WAS NEVER MENTIONED TO KERRY TONER. Following, Ms. Toner made notes to this effect in her log (Exhibit Z # pp 23-24). It was not until after Mr. Baly had committed other predatory crimes against other women that prosecution of Baly for his crimes against Plaintiff was initiated but later dropped.

113.   On or about January 30, 2014 The DAs office told the judge presiding over the case that they couldn't locate PLAINTIFF to testify and the case 30-30'd. (See Exhibit # DD Letter to MDAO Conviction Integrity Unit and Letter to Chief of Staff, MDAO Jeffrey Schlanger Exhibit # EE.)

124.   On or about October 18, 2012, a heroin dealer named Willy assaulted Plaintiff as she walked past a stoop at 120th Street and St. Nicholas Avenue in the Harlem neighborhood of New York. He jumped

Plaintiff as she was passing his stoop and threw Plaintiff onto the ground causing substantial damage to her right knee. Plaintiff went to the emergency room and has reports and follow-ups from her orthopedic surgeon stating that she needs knee surgery as a result of attack.

125. On or about 10/18/12 P.O. Longo responded to Plaintiff's complaints of assault (shield # 31565) and said they were instructed by desk sergeant not to take Plaintiff's report. Plaintiff insisted and they said they would turn in a notation to the desk sergeant about the incident. Plaintiff called the desk sergeant and complained No one ever called Plaintiff to follow up on this assault (complaint # 2012-28-005194.) The first police who responded to said; 'aren't you the crazy one we are not supposed to take reports from?" P.O.s Longo and Walker eventually followed up after Plaintiff called 911 and complained about the first officers on scene. P.O. Walker sympathetically stated to Plaintiff that the District Attorney's office had instructed the precinct not to respond to any of her calls. This was Witnessed by Plaintiff's neighbor, Elizabeth Walker, who is a graduate of Harvard University, Colombia Law School and a MEMBER OF THE NEW YORK BAR ASSOCIATION. WALKER PRESSED WILLIAM'S AND LONGO TO TAKE Plaintiff's COMPLAINT, reminded them that it is illegal to deny a person police services. Williams commented that the precinct had been instructed by the District Attorney's office to not respond to any calls Plaintiff made AND THEY took Plaintiff's information and told Plaintiff nothing would be done eventually. (See Exhibit # I Letter from Elizabeth Walker.) Police officers allegedly told Plaintiff that they had been instructed not to take her reports.

114. On or about June 2, 20 13, a cab driver refused to let Plaintiff out of the cab and instead locked the doors and sped up. The cab stopped at a red light. Plaintiff called out to police officers, but one officer (His REAL name is Officer "Officer") told his partner that "Plaintiff was not to be given police services and they shooed her away." Plaintiff called 911, but no one followed up.

115. In July 201 3, unidentified police officers gave Plaintiff a jaywalking ticket even though she allegedly was not jaywalking. Plaintiff fought the ticket in court and won (docket # 2013SN053520) (Exhibit # FF Jaywalking Summons and appearance slip).

116. On or about 6/2013; while in route to the subway past precinct from her home Detectives from the 28 squad opened their windows overlooking my path up St. Nicholas to the 125th St. subway station and 'MOOed' at Plaintiff as if she were a cow. Plaintiff called the precinct and complained to the CO immediately.

117. On or about October 14, 2014: 28th Precinct blocks Plaintiff from commenting on 28th Pct. NYPD public Twitter account effectively stripping her of her right to redress the government for grievances and denying her rights to free speech (See Exhibit # 44 311 Complaint Letter forwarded to IAB detailing 28th PCT's blocking Plaintiff on Twitter for tweeting about the poor Domestic Violence assistance rate within that precinct in opposition to the City of New York's formal Social Media Policy which only permits users to be blocked by public officials if they are abusive. (Exhibit # 14).

118. On or about December 1, 2014:  the NY Mayor's Office to Combat Domestic Violence (@NYCagainstAbuse) blocks Plaintiff from commenting on that office's public Twitter account effectively stripping her of her right to redress the government for grievances and denying her rights to free speech (See Exhibit # 16 ) 311 Complaint Letter forwarded to IAB detailing 28th PCT's blocking Plaintiff on Twitter for tweeting about the poor Domestic Violence assistance rate within that precinct in opposition to the City of New York's formal Social Media Policy which only permits users to be blocked by public officials if they are abusive. (Exhibit # 14).

119. On or about  March 2014, Hannah  Pennington, Director of the Family Justice Center, A N Y C i t y A g e n c y  i n  n o  p a r t  p r i v a t e l y  o w n e d  o r  o p e r a t e d  (See  Exhibit  #GG)  denied  Plaintiff access  to  services  for domestic  violence  victims.  Pennington cites Plaintiff's lawsuit against the MDAO as reason for said denial of services as "several people named on Plaintiff's complaint work jointly in the MDAO and in the FJC."  Plaintiff is denied psychiatric counseling, group therapy sessions with her contemporary DV survivors, access to wellness resources, access to Housing Relocation services, access to special case workers from the Human Resources Administration who assist in benefit case management, access to a legal team to assist Plaintiff with her MANY legal needs to stave eviction and to assist in attaining Identification, bank accounts and small credit instruments offered to clients of the FJC (See Exhibit # CC letter documenting denial of services/equal protection under the law from the Family Justice Center).

120. On or about July 2, 2015, Plaintiff is again assaulted.  The New York Police Department's Midtown North police precinct rejected Plaintiff's attempt to file a complaint, and she was taken to the psychiatric ward of Bellevue Hospital in Manhattan for evaluation.  Plaintiff already had ongoing treatment with Bellevue 's 9/11 survivor's clinic, and she was released promptly from the ward.

121.    On or about 11/29/15 Plaintiff was assaulted in the hallway of her apartment building by a neighbor. When police they came, saw the bruises on plaintiff's arm, interviewed another neighbor who witnessed incident, were about to arrest the perpetrator until they looked up Plaintiff on their department-issued I-phones. Upon reviewing whatever information was stored in the NYPD database regarding Plaintiff they exclaimed to her: "Miss Price our database says that you are a fabricator and not to receive police services..."

122.    **ALLEGATIONS** *The City Is Deliberately Indifferent to a class of CONFIDENTIAL INFORMANTS' AND MAJOR CASE COMPLAINTANTS' Sexual AND Physical/Emotional/Economic Abuse of Women Plaintiff Price is part of this class and her treatment is de facto proof of the class' existence even though Plaintiff Price does not bring this action as a class at this time without representation.* The City, which, through NYPD, and the various District Attorney's Offices including the MDAO, is responsible for the evaluation, investigation, servicing, reporting, care, updating of as to case status, and of intimate-partner assault crime victims and sexual slaves, and has, through its acts and omissions, deliberately malicious or made in the face of several Hobbesian, social, fantastical choices, facilitated the trafficking, sexual slavery, sexual abuse, mental and physical and economic battery this class of victims. Other women have been trafficked by major case complainitants/informants who have been spurned by the NYPD and district attorney's offices (Exhibition # HH.)

123.    Plaintiff Kelly Price brings this action on behalf of herself under the Federal Rules of Civil Procedure as a woman who was a victim of trafficking who turned to the authorities for help in extracting herself from sexual enslavement at the hands of a Confidential or complainant in (a) major case/s pending in the criminal court system when Plaintiff approached the NYPD or MDAO for help. Plaintiff Price, for a variety of unsavory, illegal, unconstitutional reasons, ended up on RIKERS ISLAND and found herself subjected to abuse at the hands of other prisoners and corrections officers and other predators once released. In Plaintiff Price's case her abuser walked free: his use of the criminal justice system to further control and command the life of his victim was solidified, endorsed, and tacitly approved by agencies of the criminal justice system: the NYPD, the District Attorney's Offices, and the court system. The Women's Prison Association estimates that 75% of women in Rikers' Rose M. Singer Center are Domestic Violence Survivors and/or survivors of trafficking.

124.    Cyrus Vance claims his office handles 5000 complaints of Domestic Violence per year yet the Mayor's office

to combat Domestic Violence states that in Manhattan alone ~ 40,000 complaints of domestic violence are reported per year. How many of these complainants are labeled "fabricators" without proper due process or investigation? How many are denied victim's protocols as defined by NY State Executive and Social Service laws? How many are denied services at the Family Justice Centers?

125. Recently the Commissioner of Domestic Violence, Rose Pierre-Louis reported at the "Not on MY WATCH" International Interfaith anti-trafficking and anti-domestic violence Conference held at the Salvation Army Headquarters in NYC on August 6, 2015 that in 2014 in New York City ~300,000 DIRs or complaints of Domestic Violence were filed with the NYPD (actual numbers: Manhattan: 40749, Bronx: 81870, Brooklyn: 87828, Queens: 56708, Staten Island: 15493.) How many of these complaints from women such as Plaintiff Price ended in the complainant's incarceration? How many of these women who bravely summoned the courage to try to break free of their chains of bondage and made reports of abuse to the proper authorities found themselves forsaken and thwarted and still sit suffering to this day at the Rose M. Singer Center at Rikers Island? The only agencies with the keys to unlocking this information are the very agencies with their hands on the slave-master's whip itself. If the MDAO asserts its handles 5000 complaints of domestic violence a year, and the NYPD asserts it receives TEN TIMES that number of complaints what is the vetting procedure/due process assigned to the approximately 45,000 women in Manhattan who are denied to have their complaints investigated, taken seriously and given proper victims' services? We know of at least one other case cited above in Brooklyn in recent years (Citations above.) How many other victims suffer alone whose very chains are bonded by the Police and District Attorney's in our great city?

126. The questions of law and fact presented by Plaintiff Price include, but are not limited to: whether the City's policies, practices, acts and omissions cause women who come forward to report violent abuse and trafficking to be subject to a substantial pattern of continued abuse and unreasonable further torture, psychological deprivation and punishment, risk and experience of rape and other sexual abuse by other inmates, correctional facility staff at Rikers and other city Jails. Questions of law and fact concerning these policies and practices also include, but are not limited to:

a. Whether, despite knowledge that district attorneys and police officers routinely turn a blind eye to their obligations under NY's Crime Victim's Statutes in the Executive and Social Service laws to report, investigate and serve the abused women who turn to these officials and agencies at their darkest hour. The

City has failed to take action sufficient to protect Plaintiff Price the women/victims who come forward from recurrent and ongoing acts of continued abuse and other abuse by Das, officers, court officers and corrections officers including denial of services, verbal abuse, malicious prosecution, abuse of processes, and false imprisonment leading in many circumstances to forced sexual intercourse, oral sexual acts, sexual touching, public masturbation, and demeaning sexual comments while on Rikers and in other City Jails and in going through often painful elongated court cases pending against them.

b.   Whether the City has failed to employ sufficient measures to reduce the risk of this secondary victimization such as adequate oversight during the initial complainant interview so that the whimsy and biases of one loan young prosecutor is not a major factor in the outcome of the narrative thrust of the case;

c.   Whether the City has failed to employ sufficient measures ensuring that complainants against Confidential Informants and witnesses participating in major cases of primary importance to district attorneys are treated to the same guarded process that those women and victims are who bring complaints against Uniformed and Ununiformed Police Officers

d.   Whether the city has failed to employ oversight and heightened monitoring of the behavior of district attorneys who attempt to further mute the voice of the true victim by denying them further police services UNDER ANY CIRCUMSTANCE related or not to the initial complaint and by denying them entrée to Family Justice Centers and other victims services offered to other souls felled by abuse.

e.   Whether the City has failed to adequately set up a pathway from the Domestic Violence community such as the Mt. Sinai, St. Luke's Roosevelt (South) Hospital's Crime Victims Center, Sanctuary for Families et a who often care for and provide lifeline support and trauma counselling services to those re-victimized to filter communications regarding true victims regarded as pariah, fabricators, or aggressors erroneously back to the district attorneys who have made the wrong determination in the first place. District attorneys emboldened by their powers protected by absolute and qualified immunities often tip the scales using sometimes subtle and sometimes overt tricks and acts to re-write the victims' narrative and cast them in a light unfavorable to their ultimate protection and security for many reasons including but not limited to when the accused is a Confidential Informant or complainant in a major case.

f.   Whether the City's current training practices regarding NY Executive and Social Service Crime Victims'

Statutes and its mandates for how a complainant of trafficking and certain classes of Felony Assault must be evaluated and taken seriously are in place and effectively internalized into the workflow of the NYPD and District Attorney's offices.

g. Whether the City's system for the reporting and investigation of secondary abuse, which relies almost entirely on the NYPD and District Attorney's offices such as the MDAO to produce their own numbers of women cast aside are adequate and comprehensive when there is NO OVERSIGHT of these activities by the DOI is adequate. When Plaintiff Price made various complaints to the DOI they were referred BACK to the District Attorney's office for Internal Investigation!

h. Whether the City has failed to consistently and adequately investigate reports of the secondary abuse of trafficking and/or domestic violence victims in a prompt or thorough manner;

i. Whether the City has failed to appropriately discipline and terminate assistant district attorneys, police officers and deputy district attorneys found to have subjected trafficking and/or domestic violence complainants to secondary victimization by not undertaking proper investigative or procedural mandates in place by the NY State legislator to protect victims and ensure their protections;

j. Whether the City's policy and practice has failed to protect those who report trafficking or domestic violence other sexual, mental, or economic abuse by Confidential Informants and or complainants on major cases from retaliation by police officers, detectives, precincts, and district attorneys whose credibility and career often hinge on the record of their case judgement and conviction rates.

k. Whether the above-enumerated and other failings of City policy directly facilitated the continued trafficking, domestic violence, and emotional, physical economic and sexual abuse of women/victims who come forward for assistance to the authorities during their darkest, most fragile hour.

127.  **COUNT I: FIRST CAUSE OF ACTION DUE PROCESS CLAIM AGAINST THE CITY** Plaintiff Price repeats and realleges each of the allegations contained in paragraphs 1 through 124 with the same force and effect as if fully set forth herein. By its policies, practices, acts, and omissions, the City has caused the plaintiff whose abuser was a Confidential Informants and/or witness/complainant on major cases to be subjected to further abuse by the criminal justice system when she came forward for help, in violation of her due process rights under the Fourteenth Amendment to the United States Constitution.

128.  **COUNT TWO: SECOND CAUSE OF ACTION** (Malicious Prosecution Under Federal Law;)

Plaintiff repeats and realleges each and every allegation contained in ¶1 through ¶124 of this Complaint. By virtue of the foregoing, the Individual Defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

   a. The criminal proceedings terminated in Plaintiffs favor. There was no probable cause for the commencement or the continuation of the criminal proceedings. The Defendants acted with actual malice. Defendant City of New York is liable under the principle of respondent superior.

129. **COUNT THREE:  THIRD CAUSE OF ACTION** (Intentional Infliction of Emotional Distress Under Federal Law; All Defendants) Plaintiff repeats and realleges each and every allegation contained in contained in ¶1 through ¶ 124 of this Complaint. of this Complaint. Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at Plaintiff. Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause, Plaintiff severe emotional distress.  Specifically, defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, while acting in an investigative or administrative capacity, coerced witnesses into making false statements to be used against Plaintiff, created false official records to be used against Plaintiff, initiated or caused the initiation and continuation of false and unfounded criminal charges against Plaintiff while lacking probable cause to do so, abused judicial process in order to gain unlawful custody of and to coerce witnesses to make false statements against Plaintiff and commit perjury, and repeatedly and continually lied to and defrauded every court. Plaintiff suffered severe emotional distress as a result of, and that was proximately caused by, the Defendants' aforementioned actions. By virtue of the foregoing, Plaintiff suffered the actual damages identified in Defendant City of New York is liable under the principle of respondent superior.

130. **FOURTH CAUSE OF ACTION**

   a. (Actual and Constructive Fraud Under Federal Law; Defendants Simmons, and City of New York)

   b. Plaintiff repeats and re-alleges each and every allegation contained in ¶1 through ¶124  of this Complaint. Defendants made representations of material "fact" which were false, and known to be false by Defendants, for the purpose of inducing other parties, including Plaintiff, to rely upon such false representations, and the other parties did so rely, in ignorance of the falsity of such representations,

thereby causing Plaintiffs injuries alleged in paragraphs 1-000. Specifically, Defendants made, caused to be made, acted in concert or conspired to make, and/or aided or abetted one another to make, representations as to material facts which were false, and known to be false by Defendants, to wit, the representations by WELLS in his sworn Criminal Court complaint set forth in~ 00-00 supra, the false affirmations and affidavits of Wells submitted to the court, see paragraphs 00-00 above The aforementioned statements, made by the Defendants personally and/or at their direction, were known by them to be false or misleading or were made with deliberate indifference to their truth or falsity or to their misleading nature. The statements were made by Defendants (or at their direction) for the purpose of inducing other parties, including various courts, Defendants' supervisors, and/or Plaintiff, to rely upon such false representations, and such parties rightfully did so rely, in ignorance of the falsity of such representations, and to Plaintiffs detriment. The Defendants employed by the MDAO had a fiduciary, confidential, and special relationship with and duty to Plaintiff, arising out of their special status under the law as officers of the court, the absolute deference and trust that courts give to their factual representations concerning the possession or control by the MDAO of Brady material, their strict legal duty under the Constitution and the laws of the United States and the State of New York to fully and accurately disclose such material, and Plaintiffs entitlement to rely upon the accuracy and the completeness of such disclosures, to make accurate and complete disclosures so that Plaintiff would not be misled as to the existence or non-existence of such materials and whether to file legal actions for redress of violations of her constitutional rights. Plaintiff was entitled to rely, and foreseeably did rely, upon defendants to faithfully carry out their aforementioned duties and on defendants' factual representations. Defendants' aforementioned conduct caused or perpetuated the Plaintiffs injuries and damages as alleged in~ 00, supra, by knowingly, willfully, intentionally, recklessly, and/or negligently depriving her, or delaying her acquisition, of information to which she was legally entitled and by causing her to believe that such information did not or might not exist, and, as a result, by denying her unlawfully her rights to FOIA materials. Defendant City of New York is liable under the principle of respondent superior.

131. **FIFTH CAUSE OF ACTION:** Negligent Misrepresentation Under Federal Law; Defendants , and City of New York, Wells, Strogbehn, ) Plaintiff repeats and realleges each and every allegation contained in

contained in ¶1 through ¶124 of this Complaint. Defendants had a duty, as a result of their special relationship with Plaintiff, to give Plaintiff and others correct information. Defendants made false representations to the court and others that Defendants should have known were incorrect, including, but not limited to, the false representations that the Plaintiff's claims of abuse were not credible. Defendants' false representations were made for the purpose of inducing other parties, including Family Court and NY Supreme Court Judges, other prosecutors, and various State and Federal courts, to rely upon such false representations. Defendants knew that the information supplied in their representations was desired by Plaintiff, and others, for a serious purpose, specifically, to resolve the question of whether or not Plaintiff had suffered abuse at the hands of Mr. Powell. Plaintiff and others, including other prosecutors, and various State and Federal courts, intended to rely and act upon Defendants' representations, and did in fact reasonably rely on those representations, in ignorance of the falsity of such representations. Defendants' aforementioned conduct caused or perpetuated Plaintiffs injuries as alleged in paragraphs 1-000, supra, by causing the wrongful continuation of her criminal trial. conviction, her imprisonment, and her related damages, by causing her to incur substantial legal fees, by depriving her of the employment income she would have been able to earn had she not been prosecuted and imprisoned, and by depriving her, or delaying his acquisition, of information favorable to her defense to which she was entitled under the Constitutions and the laws of the State of New York and of the United States and which was necessary for her to successfully prove that she had been a victim of domestic violence at the hands of Powell.

132. **SIXTH CAUSE OF ACTION** (42 U.S.C. §1983; Denial Of Due Process Under the Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments; (Defendants: Simmons, Strohbehn, Vance, Wells,) Plaintiff repeats and realleges each and every allegation contained in ¶1 through ¶124 of this complaint as if fully set forth herein. Among other offenses, Defendants Simmons knowingly and willfully manufactured, or caused the manufacturing of, a false written statement, which they prepared and improperly compelled or induced Plaintiff o sign under "oath," accusing Plaintiff of fabricating her own injuries or they told her that her abuser would be arrested and he would tell everyone that she was working as a prostitute under duress. They knew that the statement would, and caused the statement to, be relied upon by the MDAO and the court as a basis to arrest Plaintiff, to formally initiate her prosecution, to hold her for trial, and to compel Powell to submit affidavits, and to give

testimony consistent with her statement. Wells thereafter knowingly swore to a false Criminal Court complaint initiating the criminal prosecution of Plaintiff, and causing Plaintiff to be held in Rikers Island and in the tombs at 100 Centre Street. Malicious Prosecution: Defendants filed hundreds of counts of aggravated harassment against Plaintiff against the allotments stipulated by the statute for aggravated harassment. Additionally, prior to trial, Simmons manufactured false "threat" evidence by filing a false police complaint alleging that Plaintiff was responsible for numerous threats against Raheem Powell: in fact Plaintiff's assertions that she would turn Powell into the NYPD for his physical attacks on her were themselves seen through some perverted law-enforcement spectrum as threats by Plaintiff to Powell by the NYPD and the MDAO: they were used in the actual false filing as such which caused injuries to Plaintiff, as set forth above. See~ 000 and 000  By virtue of the foregoing, Simmons and Strohbehn and Wells, with actual malice, initiated and continued, or caused the initiation and continuation of, criminal proceedings against Plaintiff for which they knew, or should have known, there was no probable cause, and for which

a.  In fact there was no probable cause, and thereby caused Plaintiff to be deprived of her liberty. Such proceedings ultimately were terminated in Plaintiffs favor. Additionally, Simmons and Strohbehn knew, but withheld from the MDAO, either permanently or for a substantial period of time, and therefore from the court and the defense, exculpatory or impeachment evidence that tended to negate Plaintiffs guilt and which they knew or should have known the law required them to timely disclose (such as Plaintiff's Batterers PREVIOUS FELONY CONVICTION FOR DOMESTIC VIOLENCE by the MDAO). This evidence included, but was not limited to, Hospital Emergency Room reports, statements from Plaintiff's neighbors and ER doctors; Photographs of Plaintiff's injuries incurred at the hands of Powell; the fact that Powell was a drug dealer who had acted in concert with the NYPD on more than one previous occasion; and their unreasonable failure to investigate the information provided to them by Plaintiff and Plaintiff's attorney and advocates from various Domestic violence advocacy groups. The aforesaid conduct, which Defendants committed in concert with and in aid of each other, and/or in concert or conspiracy with others named and unnamed, operated to deprive Plaintiff of her rights under the Constitution and the Laws of the United States:

i.  Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the

42

statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

1.  (b) Not to be deprived of her liberty absent probable cause to believe she has committed a crime, in violation of her rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

2.  (c) To timely disclosure of all material evidence favorable to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States,_ 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

133.  The foregoing violations of Plaintiffs federal constitutional rights by the Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiffs criminal prosecution, her loss of liberty and detention, her wrongful conviction for disorderly conduct, her subsequent imprisonment, her restriction of movement and freedoms as specified in the order of protection the court ordered against her in the name of her batterer, Raheem Powell, her to be placed on a NYPD 'no services' list and her other injuries and damages.  The foregoing violations of Plaintiffs rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Defendants' employment and authority. Defendants committed the foregoing violations of Plaintiffs rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiffs constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights. 413. By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

134.  **SEVENTH CAUSE OF ACTION (42 U.S.C. §1983; Denial Of Due Process Under the Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution, Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments;** Defendants: Moore, Wells, Strohbehn, Simmons, Vance:  Plaintiff repeats and realleges each and every allegation contained in contained in ¶1 through ¶154 of this complaint as if fully set forth herein Knowing that any colorable cause to continue the prosecution had evaporated, Wells, in the capacity of an investigator or "witness," acted in concert and conspired with

Strohbehn, Wells, Moore, and others, named and unnamed, to use any means, no matter how unlawful or coercive, to intimidate them into falsely accusing Plaintiff of the charged crimes. These illegal and unconstitutional means included, but were not limited to,

    i. Abusing judicial process by misusing the court's subpoena power to compel witnesses to appear at Court and the Das office;

    ii. Abusing judicial process by deceiving the court into issuing "orders of protection" restricting Plaintiff's liberties and freedom by: Personally attesting to "facts" which they knew were untrue in order to deceive the court into issue orders authorizing them to take custody of such plaintiff;

135. These lawless actions foreseeably caused the aforementioned witnesses to manufacture false evidence which Strohbehn and Simmons then used to continue Plaintiffs malicious prosecution, without probable cause, and for Wells to bring about her false conviction at trial. The foregoing violations of Plaintiffs federal constitutional rights by the Defendants, together with their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the continuation of Plaintiffs malicious prosecution without probable cause, her wrongful imprisonment, and her other injuries and damages. The foregoing violations of Plaintiffs rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Defendants' employment and authority. Defendants committed the foregoing violations of Plaintiffs rights knowingly, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Plaintiffs constitutional rights or to the effect of such misconduct upon Plaintiffs constitutional rights. By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

136. **EIGHTH CAUSE OF ACTION (Monell/42 U.S.C. § 1983: Claim Against Defendant City of New York For The Actions Of The NYPD)** Plaintiff repeats and re-alleges each and every allegation contained in contained in ¶1 through ¶124 as if fully set forth herein. The foregoing violations of Plaintiffs federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities. Prior to Plaintiffs arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and

44

convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

      i.   The use of excessive promises of rewards with witnesses, including drug dealers and and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

     ii.   The determination of probable cause to make an arrest; and

    iii.   The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information ("Brady material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under Brady.

137.   With respect to "a" and "c" in the preceding paragraph, prior to Plaintiffs arrest and the initiation of her prosecution the NYPD or the MDAO provided no training at all in regards to how a DV or trafficking complainant should be evaluated or the efficacy of their complaints as victims should they be suspected of fabricating their injuries. What further review other than the cursory nods by individuals who had not investigated the facts is needed to brandish such a title on a crime victim/complainant? What review exists to ensure an investigation is in fact undertaken? What checks and balances are in place to ensure innocent victims are not falsely branded "fabricators" enabling their abusers to use the criminal justice system against them to control their lives and alter the freedoms and liberties most citizens enjoy? To imprison them and cause them public shame, emotional distress, loss of income and loss of private and professional standing? The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

a.    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b.    that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c.    that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

d.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances: Plaintiff has obtained amicus briefs and affidavit testimony from present and former Domestic Violence advocacy groups, establishing, prior to and during the time period of Plaintiffs arrest and prosecution, the NYPD and MDAO provided no training concerning appropriate interrogation of Domestic Violence complainants suspected of being fabricators. formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions. Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters,

including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of Brady material. The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

138. During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public. The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiffs rights under the Constitution and laws of the United States. By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiffs constitutional rights and her constitutional injuries.

139. **NINTH CAUSE OF ACTION** (Monell/42 U.S.C. § 1983 Claim Against Defendants: Vance, Moore, City Of New York For Actions Of The MDAO) Plaintiff repeats and realleges each and every allegation contained in contained in ¶1 through ¶124 of this complaint as if fully set forth herein. At the time of Plaintiffs original prosecution, and continuing, District Attorney Cyrus Vance Jr, as the manager and chief administrator of the MDAO, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his employees of the constitutional rights of individuals who made complaints as victims of domestic violence whose batterers held information critical to other investigations and criminally prosecuted in New York County, including, but not limited to, abuse of process, manufacturing of false evidence and testimony through improper coercion of witnesses, Brady violations, reliance on false or misleading evidence and argument at trial ("the policy"), and covering up the same. The policy permits, encourages, or acquiesces in the commission of, constitutional violations of the rights of suspects and defendants by prosecutors, detective-

47

investigators, and NYPD detectives working with the D.A.'s Office, particularly in high profile or serious cases where arrest and conviction is most desired by the Office. The policy led directly to the violations of Plaintiffs constitutional rights, and the subsequent cover-up of police and prosecutors' wrongdoing, which greatly prolonged Plaintiffs wrongful imprisonment, seizure and other damages. Vance had no employee handbook, manual, or other document setting forth any process for evaluating "fabricators". Defendant CITY is liable for having substantially caused the foregoing violations of Plaintiffs constitutional rights and his resultant injuries.

140.   **TENTH CAUSE OF ACTION** (Negligent Hiring, Training and Supervision Under State Law; Defendant City of New York, Vance, Moore) Plaintiff repeats and realleges each and every allegation contained in ¶1 through ¶124 of this Complaint. By virtue of the foregoing, defendant City of New York is liable to plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the MDAO and or the NYPD with regard to their aforementioned duties.

141.   **Eleventh Cause of Action: 42 U.S.C. §1983; Denial Of Due Process Under the Fifth, Sixth and Fourteenth Amendments; Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments;** Defendants Obe, Pierre-Louis, Strohbehn, Vance, Wells, Winters: the NYPD and the MDAO, as a matter of policy, stripped Miss Plaintiff of her First Amendment Rights to petition the Government for redress of grievances:

142.   **12th Cause of Action: 42 U.S.C. §1983; Unreasonable Search & Seizure Under the Fouth Amendments; \*Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments\*;** Defendants: Simmons, Strohbeh, Wells, Winters and Vance knowingly kept Plaintiff Price under unreasonable seizure for an elongated period of time during her false arrest and drawn-out prosecution lasting approximately two years (during which the seizure continued) denying her of her Fourth Amendment right against unreasonable searches and seizures.

143.   **13th Cause of Action: 42 U.S.C. §1983; Excessive & Unusual Punishment Under the Eighth Amendment; \*Abuse of Process, and Deprivation of Liberty Under the First, Fourth, Fifth and sixteenth Amendments\*;** Defendants Simmons, Moore, Wells, Strohbehn, Vance: eschewed Plaintiff her Eighth Amendment rights by denying her police services asserting excessive and unusual punishment and

commencing court proceedings not once but twice against Plaintiff Price in order to achieve another goal:  to keep her batterer and abuser, Raheem Andre Powell cooperating with their operation "Crew Cut" investigation(s).  To succeed in an action for abuse of process, a litigant must establish that the defendant: (1) contemplated an ulterior motive in using the process, and (2) committed a willful act in the use of the process not proper in the regular conduct of the proceedings.In order to establish the wilful-act element of the abuse-of-process tort, "some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. In this case

1. **14th Cause of Action: 42 U.S.C. §1983; Right to a Speedy Trial  Under the XXX Amendment; *Abuse of Process, and Deprivation of Liberty Under the XXX and XX Amendments*;** Defendants: deprived Plaintiff her Sixth Amendment rights to enjoy the right to a speedy trial,

2. **15th Cause of Action: 42 U.S.C. §1983; Deprivations of life, liberty or property without due process of the law;  Under the 14th Amendment *Abuse of Process, and Deprivation of Liberty Under the XXX and XX Amendments*;** Defendants: Denied Plaintiff her Fourteenth Amendment rights to not be deprived of life, liberty or property without due process of the law:

3. **16th Cause of Action: 42 U.S.C. §1983; Right to Equal Protection Under the Law Under the 16th Amendment; *Abuse of Process, and Deprivation of Liberty Under the XXX and XX Amendments*;** Defendants:  as well as her Sixteenth Amendment right to equal protection under the law.

4. **17th Cause of Action: 42 U.S.C. §1983; Right to Not be Wrongfully Confined Under the XXth Amendment; *Abuse of Process, and Deprivation of Liberty Under the XXX and XX Amendments*;** Defendants: Wrongful Confinement: Plaintiff was held for between eight to ten days at Rikers Island and in the tombs at 100 Centre street.

5. **18th Cause of Action: Abuse of Process:** Defendants used the court system to further Plaintiff's misery in an attempt to force her to take a plea to cover-up their wrong-doing and to win a bogus conviction on a disorderly conduct charge brought falsely, ill-investigated, maliciously, and with intent to shield evidence from the court.

6. **19th Cause of Action. Defamation/Injurious Falsehood**: Defendants continued to make false statements about Plaintiff on the court record and off as well as concerning other court matters and when speaking with Domestic Violence advocates representing Plaintiff.

7. **TWENTIETH CAUSE OF ACTION (Abuse of Process Under Federal Law; Defendants: and City of New York)**

Plaintiff repeats and realleges each and every allegation contained in contained in ¶1 through ¶124 of this Complaint. Defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, employed regularly issued the Orders of Protection obtained by Mr. Powell in Judge Sattler's Family Court Part were obtained through the use of false representations of fact at the urging of the NYPD and the MDAO that set the criminal proceedings in motion against Plaintiff. Defendants used such process in a perverted manner to obtain a collateral objective outside the legitimate ends of the process used, namely, to gain unlawful, coercive custody of Plaintiff in order to intimidate her into dropping her complaints against Mr. Powell and also to provoke Mr. Powell into giving false statements which the Defendants knew, believed, and intended would later be used in court against Plaintiff at her criminal trial, and which were so used to continue the criminal proceedings. Defendants did so with an intent to do harm to Plaintiff, with actual malice, and without excuse or justification. By virtue of the foregoing, Plaintiff was caused the actual and special damages identified paragraphs 1-000 Defendant City of New York is liable under the principle of respondent superior.

8. **TWENTY-FIRST CAUSE OF ACTION (Negligent Hiring, Training and Supervision Under State AND FEDERAL Law;** Defendant MANHATTAN DISTRICT ATTORNEY CYRUS VANCE) Plaintiff repeats and realleges each and every allegation contained in ¶1 through ¶124 of this Complaint. By virtue of the foregoing, defendant City of New York is liable to plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the MDAO and or the NYPD with regard to their aforementioned duties.

9. **TWENTY SECOND CAUSE OF ACTION (Negligent Hiring, Training and Supervision Under State Law;** Defendant City of New York) Plaintiff repeats and realleges each and every allegation contained in ¶1

through ¶124 of this Complaint. By virtue of the foregoing, defendants SUSAN ROQUE AND PATRICIA BAILEY, SURPERVISORS OF ADA CHRISTINA MALONEY ARE liable to plaintiff because of THEIR intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the MDAO and or the NYPD with regard to their aforementioned duties.

10.  **TWENTY THIRD CAUSE OF ACTION (Negligent Hiring, Training and Supervision Under State Law;** Defendant City of New York) Plaintiff repeats and realleges each and every allegation contained in ¶1 through ¶124 of this Complaint. By virtue of the foregoing, AUDREY MOORE, SUPERVISORY DISTRCT ATTORNEY OF THE SPECIAL VICTIMS UNIT is liable to plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the MDAO and or the NYPD with regard to their aforementioned duties.

11.  **TWENTY FOURTH CAUSE OF ACTION (DENIAL OF FIRST AMENDMENT RIGHT TO REDRESS THE GOVERNMENT FOR GRIEVANCES)** Plaintiff repeats and realleges each and every allegation contained in ¶1 through ¶124 of this Complaint. By virtue of the foregoing, defendants POLICE INSPECTOR OBE AND COMMISSIONER OF DOMESTIC VIOLENCE ROSE PIERRE-LOUIS ARE liable to plaintiff because of THEIR intentional, deliberately indifferent, careless, reckless, and/or NEGLIGENT blocking of Plaintiff Kelly Price's twitter account, effectively blocking Plaintiff Price's ability to redress her government for grievances. Both twitter accounts (@NYCagainstViolence and @NYPD28PCT) are operated under the guise and moniker of public officials broadcasting knowledge and facts and accepting information praise, complaints and information from their constituents the people of the City of New York of which Plaintiff Price is a member.

12.  **TWENTY FIFTH CAUSE OF ACTION DENIAL OF DUE PROCESS, ABUSE OF PROCESS:** Plaintiff repeats and re-alleges each and every allegation contained in ¶1 through ¶124 of this Complaint. By virtue of the foregoing, defendants Commissioner Obe and Former Commissioner of Domestic Violence Rose Pierre Louis who are liable to plaintiff because of their intentional, deliberately indifferent, careless, reckless, and unconstitutional blocking of Plaintiff Price's twitter account ostensibly blocking her ability to redress her government for grievances. Both twitter accounts (@NYCagainstViolence and @NYPD28PCT) are

51

operated under the guise and moniker of public officials broadcasting knowledge and facts and accepting information praise, complaints and information from their constituents the people of the City of New York of which Plaintiff Price is a member.

13. **TWENTY FIFTH CAUSE OF ACTION (DENIAL OF FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS DENIAL OF FIFTH AMENTMENT RIGHT TO EQUAL PROTECTION UNDER THE LAW: DENIAL OF EIGHTH AMENDMENT RIGHT NOT TO BE ILLEGALLY AND UNLAWFULLY PUNISHED)** Plaintiff repeats and realleges each and every allegation contained in ¶1 through ¶124 of this Complaint. By virtue of the foregoing, COMMISSIONER OF DOMESTIC VIOLENCE ROSE PIERRE-LOUIS is liable to plaintiff because of her intentional, deliberately indifferent, careless, reckless, and/or NEGLIGENT denial of Plaintiff Kelly Price's intake and following servicing, care, and protections of the NYC Manhattan Family Justice Center despite repeated appeals, pleads and reminders that such actions are unconstitutional and unlawful. Recently the Commissioner has stated that the NYC Family Justice Centers in all five boroughs will be receiving the lion's share of the 73 Million USD that Mayor Bill de Blasio has earmarked for Mental Health Care and Services. Denial of such services to victims in this most needy class of victims who have been abused not only by their primary batterer but by the system they turn to for help is anathema at best, and a vision into a sort of Hobbesian future of New York City that Plaintiff Price begs the court to address.

14. **TWENTY-SIXTH CAUSE OF ACTION CLAIMS ON BEHALF OF NAMED PLAINTIFF (PLAINTIFF PRICE'S DUE PROCESS CLAIM AGAINST STROHBEHN )**

PLAINTIFF PRICE repeats and re-alleges each of the allegations contained in paragraphs 1 through 124 with the same force and effect as if fully set forth herein. At all relevant times, Strohbehn was acting in her capacity as an assistant district attorney employed by the City. At all relevant times, Strohbehn was acting under color of state law. Strohbehn denied Plaintiff Price her rights as a victim of trafficking and domestic violence as detailed herein (see Paragraphs #s x-x). As a result of the abuse, Plaintiff Price suffered severe physical harm and suffered and continues to suffer psychological and emotional distress. By virtue of her malicious and intentional denial of Price's rights to make crime complaints, to redress her government for grievances, and by falsely charging price with counts of and illegal and unconstitutional statute Strohbehn deprived Plaintiff Price of her due process rights under the Fourteenth Amendment to the United States Constitution.

15.     **TWENTY-SEVENTH CAUSE OF ACTION CLAIMS ON BEHALF OF NAMED PLAINTIFF**

        **(PLAINTIFF PRICE'S DUE PROCESS CLAIM AGAINST WELLS )**

        PLAINTIFF PRICE repeats and realleges each of the allegations contained in paragraphs 1 through 124 with
the same force and effect as if fully set forth herein. At all relevant times, WELLS was acting in HIS capacity as
an assistant district attorney employed by the City. At all relevant times, WELLS was acting under color of state
law. WELLS denied Plaintiff Price her rights as a victim of trafficking and domestic violence as detailed herein.
As a result of the abuse, Plaintiff Price suffered severe physical harm and suffered and continues to suffer
psychological and emotional distress. By virtue of his malicious and intentional denial of Price's rights to make
crime complaints, to redress her government for grievances, and by falsely charging price with counts of and
illegal and unconstitutional statute WELLS deprived Plaintiff Price of her due process rights under the Fourteenth
Amendment to the United States Constitution.


16.     **COUNT TWENTY-EIGHT (PLAINTIFF PRICE'S CLAIM AGAINST STROHBEHN FOR**

        **RETALIATION)**

        PLAINTIFF PRICE repeats and realleges each of the allegations contained in paragraphs 1 through 124 with the
same force and effect as if fully set forth herein. STOHBEHN retaliated against PLAINTIFF PRICE for reporting
her unjust and unconstitutional treatment to various authorities including but not limited to the NYC Mayor's
Office, the Department of Investigation, Senator Gillabrand, City Council Leader Christine Quinn, and Federal
Prosecutors in the SDNY. As a result of the retaliation, Plaintiff Price suffered severe physical, psychological, and
emotional distress, including PTSD. She continues to experience depression and anxiety, has difficulty sleeping,
and has had flashbacks of the imprisonment, battery, court battles and sexual abuse. By virtue of his retaliation
against Plaintiff Price for her reports of her unconstitutional and improper and illegal handling of Plaintiff Price's
Allegations of trafficking and Abuse, Strohbehn deprived her of her right to the freedom of speech in violation of
her rights under the First and Fourteenth Amendments to the United States Constitution.


17.     **COUNT TWENTY-NINE**

        (PLAINTIFF PRICE'S INDIVIDUAL DUE PROCESS CLAIM AGAINST THE CITY)

        PLAINTIFF PRICE repeats and realleges each of the allegations contained in paragraphs 1 through 124 with

the same force and effect as if fully set forth herein. By its policies, practices, acts, and omissions, the City has caused PLAINTIFF PRICE to be subjected to secondary victimization, continued abuse, continued trafficking and other sexual abuse, in violation of her due process rights under the Fourteenth Amendment to the United States Constitution.

18.   **Count THIRTY: FIRST AMENDMENT RETALIATION:** Plaintiff Price alleges that she was arrested by Officer Matthew Winters on September 24, 2011 in retaliation for her informing them that she was going to report them to the CCRB for refusing to take her complaint of assault perpetrated against her person. . A plaintiff asserting a First Amendment retaliation claim must show that "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. Cnty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). Redressing the government for grievances is clearly a First Amendment expression protected by that amendment. "'there is practically universal agreement that a major purpose of' the First Amendment 'was to protect the free discussion of governmental affairs.'" Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 131 S. Ct. 2806, 2828 (2011) (quoting Buckley v. Valeo, 424 U.S. 1, 14 (1976)). Relatedly, "the dissemination of information relating to alleged governmental misconduct . . . l[ies] at the core of the First Amendment." Gentile v. State Bar of Nev., 501 U.S. 1030, 1034–35 (1991). Plaintiff Price's assertion that she would report the reporting members of the NYPD's 14th Precinct, Officers Maladony, Winters Relf et al clearly falls under this 1st amendment protection.

19.   **COUNT THIRTY ONE: EXCESSIVE FORCE:** Plaintiff Price asserts that the police officers (specifically officers Winters and Relf) used excessive force in arresting her on September 24, 2011. A section 1983 excessive force claim arising in the context of an arrest is analyzed under Fourth Amendment principles. Graham v. Connor, 490 U.S. 386, 394 (1989). To prevail, the plaintiff must show that the defendants' use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. In this case, Plaintiff Price's excessive force claim is premised on the allegation that the defendants tackled her from behind without warning her to stop or that she was about to be arrested and knocked her legs out from under her as she strolling AWAY from the police and on the allegation that she was handcuffed too tightly, and beaten.

20. **Malicious Prosecution under Federal LAW** for actions arising on September 24, 2011by PO Matthew Winters formerly of the 14th precinct. Plaintiff Price asserts a claim for malicious prosecution. To prevails he "must show a violation of her rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." <u>Manganiello v. City of N.Y.</u>, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). In New York, the elements of malicious prosecution are the commencement of a criminal proceeding, its termination in favor of the accused, lack of probable cause, and actual malice. <u>Martinez v. City of Schenectady</u>, 97 N.Y.2d 78, 84 (2001). Under section 1983, the plaintiff must also show "that there was . . . a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." <u>Rohman v. N.Y.C. Transit Auth.</u>, 215 F.3d 208, 215 (2d Cir. 2000). Section 1983 requires a post-arraignment deprivation of liberty that is more than de minimis to prove Malicious Prosecution and being placed on a "DO NOT SERVE LIST" and being denied Police Services and Protections (ref: Paragraph #s XXXX & X) do show that Plaintiff Price has experienced post-arraignment deprivation of liberty substantially.

21. **False Arrest:** Plaintiff Price asserts that she was falsely arrested by police officers on the evening of September 24, 2011. "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." <u>Jenkins v. City of New York</u>, 478 F.3d 76, 84 (2d Cir. 2007). To establish such a claim, "a plaintiff must show that '(1) the defendant intended to confine him or her, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" <u>Holland v. City of Poughkeepsie</u>, 90 A.D.3d 841, 844 (2d Dep't 2011) (quoting <u>Lee v. City of New York</u>, 272 A.D.2d 586, 586 (2d Dep't 2000)). Plaintiff Price asserts that she has met the burden of all four prongs of this test ref Paragraphs XXXX and X as there was no probable cause for arrest or qualified immunity defense for the police officers.

**DAMAGES**

22. WHEREFORE, Plaintiff seeks compensatory damages in the amount of $30,000,000 (THIRTY MILLION USD) together with attorney fees and court costs for defamation, loss of work, emotional pain and suffering. Plaintiff also seeks POLICY CHANGE for the way that Domestic Violence Survivors are treated within the criminal justice system when they come forward for help in extracting themselves from life-threatening

intimate partner situations. A methodology and better training needs to be implemented for identifying true victims that is not subject to the whimsy of one lone prosecutor's bias(es). When a victim is thought to be a 'fabricator' a review of his/her case need to be examined by Domestic Violence advocates, therapists, social workers, and psychiatrists before they are denied protections, police services, social welfare services, a normal quality of life free from harm, and their ability to petition the government for redress of grievances. Recently, the Manhattan District Attorney Cyrus Vance has stated that his office reviews 5,000 case of Domestic Violence a year. How many of these cases are labeled 'fabrications' by prosecutors with other motives or who are too burdened by their case-loads and lack the acumen or incentive to make the right call? Plaintiff seeks transparency and public dialogue in order to ensure other victims don't slip through the cracks allowing their batterers to be emboldened to harm others and the victim to slip into emotional, psychological, social, physical and economic dire straits.

a. Plaintiff Price is a talented, ardent, skilled ambitious (Exhibit # 17 recent letter of recommendation from Dorchen Leidholdt, Director of Battered Womens' Services at Sanctuary for Families, NY) used to operate at very high-level as one of the most respected young photojournalism editors running war correspondents in and out of conflict zones (Exhibit # ). She is a graduate of Mount Holyoke College and attended the University of Colorado where she worked on her Master's degree: she won many academic awards and scholarships and endeavored to have a bright future ahead of her. Plaintiff ran the world's top photojournalists in and out of war zones and covered top stories on all fronts for over the past decade. (Exhibit # II list of some of Price's journalistic accomplishments.) She had achieved a high level of respect and admiration based on trust and love and solid, steady, cool-headed work. Now her life is literally in tatters. Credibility is key to the journalistic community and the pallor of criminality still follows her as a result of the malicious arrests and prosecutions. The emotional pain and suffering from these events has debilitating effects on Plaintiff who has literally lost everything she worked for: her personal identity, her career, her familial and social support networks, her unborn child, her apartment, her belongings, had her car repossessed, lost a pet because she did not have funds for vet bills, been ostracized from everything and everyone that meant anything to her. She was at one time trusted and loved until her world fell apart because of these prosecutions by the people she turned to for help at her darkest, most helpless hour. Plaintiff more than anything wants her name back and wishes to continue to

56

do the good work she was producing. She struggled to build a beautiful life for herself. Now she is trying to put the pieces of her life together but her troubles seem to compound as time slips by.

125.   Plaintiff has been diagnosed with Complex Post-Traumatic-Stress-Disorder by Psychiatrists and therapists at the St. Luke's Roosevelt Hospital's Crime Victims Center (Exhibit # JJ) where she has been in intensive Domestic Violence therapies and programs since 2011 and by the Psychiatric staff at Bellevue Hospital's 9/11 Survivors' Health Care Program. She suffers severe depression, bouts of racing thoughts, nausea, temperature swings, disassociation, mood-swings, sleeplessness, despair, weight fluctuations, digestive disorders and headaches.  She is currently in therapy at Sanctuary for Families, New York for the same disorders.

126.   DAMAGES DEMAND WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

   a.   For POLICY CHANGE for the way victims of trafficking and battery abused by Confidential Informants and/or witnesses/complainants on major cases are handled by the Police and District Attorneys when they come forward for help and to report the abuse.

   b.   For compensatory damages of not less than $30 million;

   c.   For punitive damages against the individual Defendants of $10 million;

   d.   For reasonable attorneys' fees, together with costs and disbursements,

   e.   pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

   f.   For pre-judgment interest as allowed by law; and For such other and further relief as   this Court may deem just and proper.

127.   The Manhattan District Attorney, Mr. Cyrus Vance, Jr., quoted Berger v S, 295 U.S. 78, 88 (1935) in his Recommendation for Dismissal of charges against DSK: "Along with the substantial power conferred upon prosecutors come unique responsibilities. Rather than serving only as a zealous advocate on behalf of a client, prosecutors have a broader set of obligations to the community, the victim, and the defendant: "The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is a complaint as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer."

128.   How much longer must Ms. Price suffer?

57

2

3          Kelly Price                          Sworn to me this 9th day of May, 2016

4

5      _____            _____

6      May 9, 2016

7

2

3    Kelly Price                              Sworn to me this 9th day of May, 2016

4

5

5    May 9, 2016

7

Jeffrey Richard Senter
Notary Public State of New York
No. 02SE6214827
Qualified In Queens County
Commission Expires 12/21/2017

58

