**Exhibit A**

1

1    COURT OF APPEALS

2    STATE OF NEW YORK

3    --------------------------------------

4    PEOPLE,
                    Respondent,

5
          -against-

6                                    No. 72

     RAPHAEL GOLB,

7
                    Appellant.

8    --------------------------------------

9
                                      20 Eagle Street

10                         Albany, New York 12207
                                    March 25, 2014

11   Before:

12                CHIEF JUDGE JONATHAN LIPPMAN
             ASSOCIATE JUDGE VICTORIA A. GRAFFEO

13           ASSOCIATE JUDGE SUSAN PHILLIPS READ
              ASSOCIATE JUDGE ROBERT S. SMITH

14       ASSOCIATE JUDGE EUGENE F. PIGOTT, JR.
              ASSOCIATE JUDGE JENNY RIVERA

15          ASSOCIATE JUDGE SHEILA ABDUS-SALAAM

16

     Appearances:

17
                      RONALD L. KUBY, ESQ.

18            LAW OFFICE OF RONALD L. KUBY
                   Attorney for Appellant

19            119 West 23rd Street, Suite 900
                      New York NY 10011

20
                    VINCENT RIVELLESE, ADA

21    NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
                   Attorney for Respondent

22                     Appeals Bureau
                 One Hogan Place, Room 854

23                    New York NY 10013

24
                                   Karen Schiffmiller

25                          Official Court Transcriber

```
 1              CHIEF JUDGE LIPPMAN:   72, People v. Golb.

 2              Counselor, do you want any rebuttal time?

 3              MR. KUBY:   I'll take three, if you would,

 4      Judge, okay?

 5              CHIEF JUDGE LIPPMAN:   Three minutes, you

 6      have it, go ahead.

 7              MR. KUBY:   Thank you so much.   May it

 8      please the court, my name if Ron Kuby.   And this case

 9      presents the question of whether communicating under

10      the name of another real person, an act of literary

11      impersonation becomes the crime of fraud simply

12      because the writer intends some benefit from his or

13      her writing or intends some harm, as a result of his

14      or her writing, regardless of whether that benefit -

15      - -

16              JUDGE SMITH:   Can - - - can this - - - are

17      you really saying that this legal for - - - for you

18      to take - - - to send e-mails in my name confessing

19      to the assassination of President Kennedy or

20      whatever.   You can do that?

21              MR. KUBY:   Great news, Judge, in your name,

22      no, because you're the government.   And the

23      government - - - I recognize you're a branch of the

24      government, but an important one, and the government

25      simulation of court process, official judicial
```

1          imprimatur is different.

2                    JUDGE SMITH:  Okay, well - - - so you're

3          saying - - - but - - - but when I'm not the

4          government next January, you can do it?

5                    MR. KUBY:  I wouldn't, but it would not be

6          criminal.  Would it be rude and boorish?  Yes.  Would

7          you have a remedy for this - - -

8                    JUDGE GRAFFEO:  Well, what if - - - what if

9          somebody loses their employment because their

10         employers think that they're engaged in some activity

11         that they're not doing, because they - - - they've

12         been represented on the Internet as taking certain

13         positions or engaging in certain activities that they

14         didn't authorize.

15                   MR. KUBY:  I understand that.  And - - -

16                   JUDGE GRAFFEO:  That's not - - - that's not

17         criminal?

18                   MR. KUBY:  Well - - -

19                   JUDGE GRAFFEO:  I mean, there can be some

20         serious financial and employment and personal

21         ramifications?

22                   MR. KUBY:  Well, yes, there could be, and -

23         - - and when you're talking about generalized

24         reputational damage, I lost my job for this discreet

25         sum of money because this person said these things

1    about me, there is a civil remedy.

2              CHIEF JUDGE LIPPMAN:  Where - - - where

3    does it cross over into criminal?  Where - - - where

4    would it be in this kind of situation that - - - that

5    you're dealing with?  What - - - what - - - what

6    would your client have done that would have made it

7    criminal - - -

8              MR. KUBY:  Oh, oh, oh.

9              CHIEF JUDGE LIPPMAN:   - - - as opposed to

10   what he did now?

11             MR. KUBY:  Easy.  He writes, takes the

12   Lawrence Schiffman e-mail.

13             CHIEF JUDGE LIPPMAN:  Right.

14             MR. KUBY:  Sends an e-mail to the - - - the

15   bursar at NYU saying, you know, because I stole

16   Norman Golb's theory and so much of my success is

17   dependent on Norman Golb, please deposit ten percent

18   of my salary into Norman Golb's checking account.

19             CHIEF JUDGE LIPPMAN:  So it's got to be a

20   direct economic benefit?  That's criminal.

21             MR. KUBY:  Well, if - - - if there is a

22   direct economic benefit, or economic harm, it is

23   criminal.

24             CHIEF JUDGE LIPPMAN:  What if - - -

25             JUDGE PIGOTT:  You're saying it's a

1      larceny.

2              MR. KUBY:  Right.  Or in this case, it

3      would be standard as - - - as you put it, Judge

4      Smith, good old fashioned fraud.

5              CHIEF JUDGE LIPPMAN:  Okay, that's one

6      criminal - - - that's one thing he could have done.

7      What else could he have done that's criminal?  We

8      have a whole bunch of charges here.  What else would

9      have been a criminal act in a context of what we're

10     dealing with here?

11             MR. KUBY:  He - - - for example, he wants

12     his father to show up at a particular lecture and

13     doesn't want Schiffman to be at a particular lecture,

14     so he takes his Lawrence Schiffman e-mail address,

15     sends the airlines a note, saying I'm canceling my

16     reservation.  You lose the value of the plane ticket.

17     Tot - - - clearly, exactly the type - - -

18             JUDGE RIVERA:  And if - - - and if someone

19     disinvites him because of the barrage of e-mails?

20             MR. KUBY:  I'm sorry?

21             JUDGE RIVERA:  Is that - - - if someone

22     disinvites the speaker, and they lose - - -

23             MR. KUBY:  Then that begins - - -

24             JUDGE RIVERA:  - - - the financial benefit

25     and the reputational benefit of the invitation.

1              MR. KUBY:  Well, how is that any different

2     from the type of public criticism that public folks

3     go through every single day?  There - - -

4              JUDGE SMITH:  Well, because you lie - - -

5     because there's a lie.  Because you're - - - you're

6     deceiving people into believing that this is Mr.

7     Schiffman and it's not.

8              MR. KUBY:  Well, that's right, Judge.  But

9     that - - - unfortunately, we're - - -

10            JUDGE SMITH:  Why - - - why - - - I mean,

11    does it make sense that you say it could be criminal

12    to cancel a guy's plane reservation - - -

13            MR. KUBY:  Right.

14            JUDGE SMITH:  - - - using his name, but it

15    - - - but it's not to destroy his reputation?

16            MR. KUBY:  Well, again, it depends how you

17    destroy somebody's reputation.  If you destroy

18    somebody's reputation by sending out this false

19    confession that is directly linked to the true

20    account of plagiarism, and people read that and say,

21    oh, my God, Lawrence Schiffman, in fact, is a

22    plagiarist, if you - - - if you tease them in by the

23    use of - - - of the Schiffman name, and then they

24    come to the conclusion that Schiffman has done these

25    terrible things, and he loses his job because he's a

```
1    plagiarist - - -
2              JUDGE RIVERA:  But what you're saying is
3    the person admits to the plagiarism?
4              MR. KUBY:  Pardon me?
5              JUDGE RIVERA:  You're saying through the e-
6    mail that he's admitting to the plagiarism - - -
7              MR. KUBY:  Well - - - well - - -
8              JUDGE RIVERA:  - - - which is different
9    from someone - - -
10              MR. KUBY:  Right.
11              JUDGE RIVERA:  - - - simply claiming the
12    person is a plagiarist.
13              MR. KUBY:  How is that any different from -
14    - - from Tucker Carlson sending out his e-mail under
15    the name Keith Olbermann, and sending out something
16    that actually sounds like Keith Olbermann, only a
17    little crazier than Keith actually is, and - - -
18              JUDGE RIVERA:  So - - - so - - -
19              MR. KUBY:  - - - and people say, wow, he's
20    really nuts.  And - - -
21              JUDGE RIVERA:  So apparently - - -
22    apparently to the research assistants they thought it
23    was the professor.
24              MR. KUBY:  Well, one - - - yeah, that's
25    right.  One student thought it was the professor and
```

1    came up to Professor Schiffman and in substance said,

2    don't worry, Professor Schiffman; your - - - your

3    history of plagiarism and your desire to conceal is

4    safe with me.  That's - - -

5         JUDGE SMITH:  But you're - - - you're - - -

6    is it - - - is it necessary to your argument that

7    Schiffman's in fact guilty of the - - - of the crime

8    that - - - that your - - - you know, your client had

9    him admit to or used his name to admit to?

10        MR. KUBY:  It - - - it is not, although

11   frankly, it's - - - it's helpful, but it's not

12   necessary.  Los Angeles Times - - -

13        JUDGE SMITH:  But it could be - - - it

14   could be - - - he - - - he - - - he could have done

15   the - - - he could have admitted that he's, you know,

16   that he's an assassin, that he's a thief.  And you -

17   - - are you saying that's because the statute doesn't

18   cover it, or because it's constitutionally protected?

19        MR. KUBY:  I'm saying that the statute

20   doesn't cover it on vagueness grounds.  The statute

21   doesn't cover it, because the statute has never been

22   read to cover that.  And as to whether you ultimately

23   could criminalize conduct that you have not yet

24   criminalized in the State of New York, I will go in

25   the same direction as the Skilling Court.  I'm not

1    going to start to define with precision when

2    intangible harm crosses the line into vagueness.  All

3    I will say is that - - - that as in Skilling, if - -

4    - if your definition of harm or benefit is anything,

5    psychic joy, savage pleasure in demolishing an

6    opponent in an Internet argument, that goes way too

7    far.  Now - - -

8                JUDGE SMITH:  What the stat - - - what the

9    statute says is the person is guilty of "criminal

10   impersonation when he impersonates another and

11   doesn't act in such assumed character with intent to

12   obtain a benefit or to injure or defraud another."

13               MR. KUBY:  That's right.

14               JUDGE SMITH:  It sounds - - - sounds like

15   it describes what your guy did.

16               MR. KUBY:  Well, it does.  As long as you

17   want to define benefit or harm to be anything.

18               JUDGE SMITH:  Well, I was actually defining

19   the word "injure".  I mean, isn't - - - I mean, isn't

20   - - - isn't injuring Schiffman exactly what your guy

21   was trying to do?

22               MR. KUBY:  Well, I would maintain that what

23   my guy was trying to do was expose Schiffman for the

24   mendacious plagiarist that he was.  Now - - -

25               JUDGE SMITH:  Okay.  Okay, okay - - -

1     MR. KUBY:  Now, obviously Schiffman sees it

2     differently.

3             JUDGE SMITH:  Okay, but the jury did not

4     seem to agree with you.

5             MR. KUBY:  Right.  Well, the jury wasn't

6     given the opportunity to consider that question - - -

7             JUDGE RIVERA:  And he did it by

8     impersonating him, as opposed to simply saying, he's

9     mendacious.

10            MR. KUBY:  That's right.

11            JUDGE RIVERA:  Right?

12            MR. KUBY:  That's right.  But how is this

13    any different from the impersonations that are done

14    of Cormac McCarthy to the Koch brothers, from Sarah

15    Palin to the mayor of Paris.

16            JUDGE SMITH:  No, no, but wait a minute.

17    No, but - - - I mean, if - - - because nobody - - -

18    because everybody knows that Tina Fey isn't Sarah

19    Palin.

20            MR. KUBY:  I'm not talking about that.  The

21    New York Times was fooled enough by a tweet from

22    Sarah Palin that they published it.  Governor Scott

23    Walker actually thought he was talking with David

24    Koch when the radio host impersonated him.

25            JUDGE SMITH:  But why - - - why - - - why

1       should - - - why should we assume that the people who

2       - - - who pulled those little capers are not

3       punishable?

4                   MR. KUBY:  Well, if you're going to assume

5       that, in fact, all of these people are publishable

6       (sic), including the Republican Party, which opened

7       up eighteen websites in the names of democratic

8       candidates who they wished to attack, you're

9       attracted - - - wow, it's Nancy Pelosi.  I'm a Nancy

10      Pelosi supporter.  I click on and I read all kinds of

11      things I didn't know about Nancy Pelosi.

12                  JUDGE SMITH:  Okay, but if - - - yeah - - -

13      well, wait - - -

14                  MR. KUBY:  If - - - if those prosecutions

15      are going to go forward, then Mr. Rivellese should do

16      them.

17                  JUDGE SMITH:  Wait a minute.  Wait a

18      minute.  They - - - yeah, those - - -

19                  MR. KUBY:  Do something useful.

20                  JUDGE SMITH:  Yeah, there might be a

21      problem there, but - - - but you don't go to that - -

22      - the Nancy Pelosi, then you don't see Nancy Pelosi

23      confessing all her sins on that website.

24                  MR. KUBY:  Oh, say - - - I actually didn't

25      click on.  Let's say you do.  Nancy Pelosi confesses,

1    yes, I'm destroying America through Obamacare.  Yes,

2    I have.  I have handed over the reigns of power to a

3    Kenyan-born Muslim - - -

4            JUDGE SMITH:  And - - - and - - - and - - -

5            MR. KUBY:  - - - who wants to destroy

6    America.  Then they get prosecuted?

7            JUDGE SMITH:  And you say that I - - - I,

8    the Republican Party, am entitled to do that?  That's

9    legal?

10           MR. KUBY:  I'm sorry, Judge?

11           JUDGE SMITH:  You say that the people who

12    put up a website like that are entitled to do it?

13           MR. KUBY:  Well, you know what?  Nobody,

14    nobody has prosecuted them yet, and I suspect that

15    it's not going to happen from this side of the table,

16    nor is Tucker Carlson going to get prosecuted.  The

17    person - - - as with all broad sincerest power, the

18    people who get prosecuted are not the people who have

19    power who can push back.  They're the nerds and the

20    dweebs.

21           JUDGE GRAFFEO:  So what - - - so what - - -

22    what are you asking us to define - - -

23           MR. KUBY:  The dissidents.

24           JUDGE GRAFFEO:  - - - as to when the line

25    is crossed between civil or criminal liability in

1      these cases?

2                    MR. KUBY:  Well - - -

3                    JUDGE GRAFFEO:  What are you - - - what are

4      you suggesting we say?

5                    MR. KUBY:  What I'm suggesting you say - -

6      -

7                    JUDGE GRAFFEO:  I presume you're not going

8      to - - - you don't expect us to say there's never any

9      criminal - - -

10                    MR. KUBY:  Nope.

11                    JUDGE GRAFFEO:  - - - liability.

12                    MR. KUBY:  Nope.  I'm suggesting that you

13     do exactly the same thing that the Skilling Court

14     said, which is, based - - - he essentially, based on

15     our case law, we have authorized the prosecutions for

16     property, pecuniary interests, and also defrauding

17     the government, obtaining government benefits.  So

18     even intangible benefits like liberty, but - - -

19                    CHIEF JUDGE LIPPMAN:  But does annoying

20     behavior, obnoxious behavior, never can cross over

21     the line into criminal behavior?

22                    MR. KUBY:  Well, obnoxious behavior, as

23     such, intent to annoy, intent to be obnoxious, that

24     in and of itself, cannot be criminalized - - -

25                    JUDGE SMITH:  You're now - - - you're now

1    on the harassment charge, I think.  The - - - the - -

2    - I think the Chief's - - - the Chief's question

3    really is - - -

4         MR. KUBY:  Yes, I think that's right.

5         JUDGE SMITH:  Yeah, spend a minute on - - -

6    spend a minute on the harassment charge.

7         MR. KUBY:  That's right.  And if we want to

8    - - - and I do want to go to that, because Judge

9    Berkman was extremely careful to make sure she

10   imposed a jail sentence for each and every conviction

11   to make sure that, even if I won ninety percent of

12   this case, this guy was still going to do some time

13   at Rikers Island.

14        So I do want to address that, and in

15   Dupont, Smith, Bethea, Dietze, they all say, okay,

16   you can convict somebody for alarming and annoying a

17   person as long as the way you anar - - - alarm and

18   annoy them is within one of the five areas that have

19   no First Amendment protection.  And - - - and what

20   the People have carved out here is they've said, this

21   is invasion of privacy in an essentially intolerable

22   way.  You have no privacy right to - - -

23        JUDGE SMITH:  But even - - - even if

24   they're right, isn't there a rather serious

25   overbreadth problem with the statute.

1              MR. KUBY:  Completely.  If it's interpreted

2       this way, which is why it is always been cabined by

3       every court to consider it.

4              JUDGE SMITH:  In the time you don't have

5       left, do the - - - do the computer fraud prosecution.

6              MR. KUBY:  Simply stated - - - I mean,

7       first and foremost, this is - - - this is Drew all

8       over again, except instead of a Terms of Service

9       Agreement, it's an agreement between NYU.

10              Not only would no one have a clue, that by

11       violating the computer policy, they're committing an

12       independent crime, the only subsection in - - - in

13       that policy itself that makes independent reference

14       to criminal liability is subsection C, I believe,

15       which has nothing to do with what Mr. Golb did.  It

16       has everything to do with giving other people who

17       aren't authorized to be at NYU access to the

18       computer.

19              In addition, the other question, which we

20       will not address right now, unless you want to ask me

21       some questions, is the very notion that somehow

22       acting in excess of authorization means acting

23       without authorization.  And so far, the consensus of

24       opinion around the country construing statutes very

25       much like this, is, no, we really don't want to go

1   there.

2           JUDGE SMITH:   That's - - - that's what

3   you're not going to say, right?

4           MR. KUBY:   That's what I didn't say, yeah,

5   thank you.

6           CHIEF JUDGE LIPPMAN:   But we'll ask you

7   more questions.

8           MR. KUBY:   Oh, good.

9           CHIEF JUDGE LIPPMAN:   Let's - - - let's get

10  to your adversary.

11          MR. RIVELLESE:   May it please the court,

12  I'm Vincent Rivellese for the Manhattan District

13  Attorney.

14          CHIEF JUDGE LIPPMAN:   Start with the

15  aggravated harassment.   What's that about?   Can you -

16  - -

17          MR. RIVELLESE:   Well, well - - -

18          CHIEF JUDGE LIPPMAN:   Is this aggravated

19  harassment or is this just annoying behavior?

20          MR. RIVELLESE:   Well, it's both, that's for

21  sure.   What's the - - -

22          CHIEF JUDGE LIPPMAN:   Well, but is it

23  technically a crime?   Can it be in this kind of - - -

24          MR. RIVELLESE:   Yes.

25          CHIEF JUDGE LIPPMAN:   Isn't that a little

1      bit overbroad?

2                  MR. RIVELLESE:  No.

3                  CHIEF JUDGE LIPPMAN:  No?  Go ahead.  Why

4      not?

5                  MR. RIVELLESE:  This - - - this is the

6      closest argument obviously in the case, but the

7      aggravated harassment involves an intent to harass,

8      annoy or alarm, and it's - - - it's got an intent

9      that's required.  It's also got the likelihood of

10     harassing or alarming the recipients or the victims.

11     It's also got - - -

12                 JUDGE SMITH:  If I - - - if I ask you a

13     question that I expect to be an annoying question,

14     and is likely to be an annoying question, am I

15     committing a misdemeanor by asking the question?

16                 MR. RIVELLESE:  No, because there's no

17     writing.  The aggravated harassment - - -

18                 JUDGE SMITH:  Oh, but - - - oh, but if I

19     submitted the question in writing, it would be a

20     misdemeanor?

21                 MR. RIVELLESE:  Well, if - - - if you

22     conveyed to somebody.  So if you e-mailed somebody or

23     you wrote a letter - - -

24                 JUDGE SMITH:  Really?  Really?

25                 MR. RIVELLESE:  That's the statute - - -

1           JUDGE SMITH:  If I e-mail someone an

2      annoying question, I get a year?

3           MR. RIVELLESE:  Well, it has to be likely

4      to annoy, harass, or alarm - - -

5           CHIEF JUDGE LIPPMAN:  So if Judge Smith put

6      what he's asking you now in writing, this is a crime?

7           MR. RIVELLESE:  I'm not annoyed.  I'm not

8      annoyed.  So I'm fine.

9           CHIEF JUDGE LIPPMAN:  Oh, okay, you're not

10     annoyed.  Okay.  It might have been mis - - -

11          JUDGE SMITH:  Give me - - - give me time.

12          MR. RIVELLESE:  The proper discussion - - -

13          JUDGE ABDUS-SALAAM:  Counsel, is it that

14     subjective that the person who receives the question

15     has to feel that it's annoying?

16          MR. RIVELLESE:  Well, no, it is - - - it's

17     reasonableness.

18          JUDGE ABDUS-SALAAM:  It has to have an

19     objective right.

20          MR. RIVELLESE:  It has to likely to harass

21     or alarm - - -

22          JUDGE PIGOTT:  I read this too to mean,

23     it's almost like there's a third-party one, that - -

24     - that if I write to you, and - - - and say something

25     that harasses or annoys Judge Smith, about Judge

1          Smith, that that's aggravated harassment, even though

2          I'm writing to you and he thinks it's annoying.

3                    MR. RIVELLESE:  Well, if I'm the governor

4          and I could fire him, that would - - - that could be

5          the case, but what's happening here is that he's

6          targeting the people that have control over his

7          victims - - -

8                    JUDGE PIGOTT:  But as a third - - - you're

9          saying there can be a third-party aggravated

10         harassment.

11                   MR. RIVELLESE:  Yes, if still - - - there's

12         still an intended victim.

13                   JUDGE PIGOTT:  So if - - - well, that's I -

14         - - you get - - - you get three college kids - - -

15         you get some college kid who write - - - who e-mails

16         the girlfriend of his roommate saying, you know, he

17         really is a useless person.  Is that aggravated

18         harassment with respect to the victim,

19         boyfriend/roommate?

20                   MR. RIVELLESE:  Yes, because it's got - - -

21                   JUDGE PIGOTT:  Really?

22                   MR. RIVELLESE:  It meets all the elements.

23         It does not require that the person that you send the

24         communication to is the same person that you intend

25         to harass, annoy and alarm.  It's - - -

1          JUDGE SMITH:  Wasn't - - - wasn't - - -

2     didn't the First Department hold this - - - or at

3     least say in Dupont, that this statute is

4     unconstitutional?

5          MR. RIVELLESE:  Well, the First

6     Department's decision in Dupont wasn't very clear,

7     because it says in the alternative a few different

8     things.  One thing it said was that the statute did -

9     - - wasn't even violated at all by the conduct.

10    Another thing it said was that it was

11    unconstitutional.

12         JUDGE SMITH:  So what's - - - what's

13    unclear about that?  It said two things in the

14    alternative.  It sounds clear to me.  And how - - -

15    how - - - my question is how can they then affirm a

16    conviction under the same statute, without even

17    citing Dupont?

18         MR. RIVELLESE:  Well, Dupont is - - - if

19    you read Dupont closely, it's rather hard to

20    understand because it says things in the alternative

21    that don't seem consistent with each other, by saying

22    it's not a violation of the statute, and at the same

23    the statute unconstitutionally violated the

24    defendant's rights.  It can't really be both at the

25    same time.  But in Dupont there was no - - -

1           JUDGE SMITH:  Isn't - - - isn't it a little

2    odd to in - - - if you said, whether oddly or wrongly

3    or not, if you said a statute is unconstitutional,

4    isn't it kind of funny to enforce it in the next case

5    without mentioning the precedent?

6           MR. RIVELLESE:  Well, well, in Dupont, it

7    was a little different, because in Dupont the

8    communication wasn't made from one person to another.

9    It was just a publication.  So - - - so the defendant

10   in Dupont just published his comments that - - -

11   granted they were about a particular person - - - but

12   he wasn't conveying his writing to a person, saying

13   here, I'm saying this about so-and-so, or giving it

14   to the person himself.  He was just publishing it.

15          JUDGE SMITH:  But why is - - - why is - - -

16   why is Dietze - - - what it is - - - forget about

17   Dupont - - - why doesn't Dietze knock out this

18   statute?  How does Dietze - - - how is the statute in

19   Dietze distinguishable from - - - from this one?

20          MR. RIVELLESE:  Could Your Honor remind me

21   - - - is that the speaking - - - calling the names

22   against the people?

23          JUDGE SMITH:  Well, that's the case, but

24   they - - -

25          MR. RIVELLESE:  Right.

1          JUDGE SMITH:  - - - but they - - - but I

2     think we - - - I thought - - - I thought we held that

3     statute unconstitutional, not just - - -

4          MR. RIVELLESE:  But that's - - - that's the

5     speaking of the bad words and calling names - - -

6          JUDGE SMITH:  Yes, yes.

7          MR. RIVELLESE:  - - - it's a different - -

8     - it's a different subdivision of the harassment.

9          JUDGE SMITH:  Yes, yes, but it seems to me

10    that that subdivision is narrower that this one.

11         MR. RIVELLESE:  Well - - -

12         JUDGE SMITH:  That one was overbroad.  How

13    can this one possibly survive?

14         MR. RIVELLESE:  Well, well, if - - - I

15    guess, if you're saying that it's possible that

16    somebody could violate the statue in a way that would

17    be unconstitutional, is different from saying it was

18    unconstitutional as applied to this defendant - - -

19         JUDGE SMITH:  No, this is - - - I mean,

20    isn't - - - when you're talking about a First

21    Amendment claim, and we are, right?  Isn't over - - -

22    isn't it - - -

23         MR. RIVELLESE:  On the - - - on the

24    aggravated harassment?

25         JUDGE SMITH:  Yes.  I mean, he's - - - he -

1        - - as I understand it, the claim your adversary

2        makes is that this statute infringes on protected

3        rights - - - rights protected by the First Amendment.

4                    MR. RIVELLESE:  Right - - - by being too

5        vague in this case.

6                    JUDGE SMITH:  Or too broad.

7                    MR. RIVELLESE:  Or overbroad.

8                    JUDGE SMITH:  And then isn't - - - isn't he

9        - - - even assuming that his conduct could be made

10       criminal, in a First Amendment situation, you're

11       entitled to do that, aren't you?  Saying the statute

12       is overbroad and therefore you can't enforce it, even

13       against the narrow category who might be - - - who it

14       might be legitimate to punish.

15                   MR. RIVELLESE:  Well, no, it should - - -

16       it has to be - - - he's not the one who can claim

17       that some other defendant could be violated here.

18       That would be the case where another defendant who's

19       closer to the line - - -

20                   JUDGE SMITH:  I'm - - - I'm not suggesting

21       to you that in the First Amendment area, that's not

22       the law, that the - - - that the guy who - - - that

23       the guy who is doing something punishable, can indeed

24       assert the rights of others.  Do you think - - - do

25       you think I'm wrong about that?

1              MR. RIVELLESE:  Well, I - - - I think

2       you're wrong that he can say that it's

3       unconstitutionally overbroad, when he has clearly

4       fallen within the statute.  He - - - because he has

5       clearly intended to harass, annoy or alarm.  He has

6       clearly sent hundreds of e-mails.  He has clearly

7       succeeded in harassing, annoying, and alarming.

8              JUDGE SMITH:  Okay, okay, but you don't

9       seem to be narrowing the statute that much.  I mean,

10      you - - - you - - - maybe I'm back where I started,

11      but you're really saying that any e-mail intended to

12      annoy somebody that succeeds is a misdemeanor.

13             MR. RIVELLESE:  Well, it has to be

14      reasonably likely.  The fact that it might succeed

15      could be unreasonable, depending on the - - -

16             JUDGE SMITH:  Okay, any - - - any - - -

17      yeah, suppose - - - I can - - - I - - - I'm pretty

18      good at annoying e-mails.  I could send out a lot of

19      e-mails that I guarantee you will be annoying.  You

20      say everyone of those is a misdemeanor.

21             MR. RIVELLESE:  Well, the legislature has

22      said so, and in this case, I would give it much more

23      - - -

24             JUDGE SMITH:  And you - - - you don't think

25      there's anything overbroad about that?

1     MR. RIVELLESE:  I think you could find a

2  case where it would be, I just don't think this is

3  that case.

4     JUDGE PIGOTT:  Going - - - going from there

5  to the - - - to the other charges, I was trying to

6  figure out where you draw this line of the People

7  versus somebody, as opposed to what is civil.

8     And if - - - if the victims here went into

9  their local police station and said, you're not going

10  to believe this, but this is what happened to me,

11  would they immediately pull out some forms and start

12  to - - - to put together some charges, or do they

13  say, go fi - - - well, go hire a lawyer.  You've got

14  - - - you know, you got libel; you got slander; go

15  sue.

16     MR. RIVELLESE:  Well, well, yeah, the

17  gravamen of these offenses here is that the defendant

18  intended to impersonate another person and to

19  convince people he was someone other than who he was,

20  and get reliance on that deception.  So that's the

21  thing that makes this different from any kind of a

22  civil libel case.

23     In a civil libel case, you - - - you can be

24  the person who's accusing someone else, and - - - and

25  you're being honest about who you are, but you can

1       still say something bad about the person, right?

2       Here, you have the defendant pretending to be someone

3       else, getting reliance on his deception.  That's the

4       thing that's different here than in a civil case.

5                   JUDGE SMITH:  I mean, you're talking about

6       the impersonation count?

7                   MR. RIVELLESE:  Well, all of the counts,

8       except the aggravated harassment at this point.  The

9       identity theft - - -

10                  JUDGE SMITH:  Well, and the - - - and the -

11      - - and the use of the computer.

12                  MR. RIVELLESE:  Right, right.  The

13      impersonation of the - - -

14                  CHIEF JUDGE LIPPMAN:  But most of these

15      situations are not - - - are not prosecuted.  What -

16      - -

17                  MR. RIVELLESE:  Well - - -

18                  CHIEF JUDGE LIPPMAN:  What is it exactly

19      that makes this different from all of the

20      circumstances your adversary mentioned that you read

21      about all the time?  Why aren't all those people

22      prosecuted?

23                  MR. RIVELLESE:  Well, those - - - those

24      people did not try to convince other people that they

25      were someone else.  So for example - - -

1              CHIEF JUDGE LIPPMAN:  Happens all the time.

2              JUDGE PIGOTT:  They do - - - they do it on

3       the radio.  That's what Mr. Kuby was pointing out,

4       where, you know, somebody's on the radio, and they

5       pretend to be somebody, and they're - - - you know,

6       they're - - - then all of a sudden it turns out not

7       to be true.  There were a couple in Florida that did

8       that, ended up - - - I do think they were prosecuted

9       - - -

10             MR. RIVELLESE:  Well - - -

11             JUDGE PIGOTT:   - - - but they ended up - -

12      -

13             MR. RIVELLESE:  Well, it would be

14      prosecutable if you're actually trying to convince

15      people you are someone else and get reliance on that.

16             CHIEF JUDGE LIPPMAN:  Could you do an

17      interview program, and you call in, and you pretend

18      to be someone else, do you get prosecuted?

19             MR. RIVELLESE:  Well, you have to meet all

20      of the elements of the crime.  You have to intend to

21      get people to rely on your deception, to believe that

22      you're the other person, and also intent to defraud.

23             JUDGE PIGOTT:  Well, what about the poor

24      Republican Party that Mr. Kuby just beat up?  I mean,

25      is that true what he said, that all of those websites

1      might be criminal?

2                    MR. RIVELLESE:  But - - - but they're not

3      trying to convince people that they are those other

4      politicians.  That's the whole point is that this is

5      - - - it's a spoof.  It's a parody; it's a mockery.

6                    JUDGE SMITH:  But - - - but if they - - -

7      but if they were, if people are actually deceived,

8      you say it's punishable.

9                    MR. RIVELLESE:  It would be against the

10     law.  The examples you gave before, if you pretend to

11     be a judge, or if you pretend to be a private

12     citizen.

13                   CHIEF JUDGE LIPPMAN:  So if you succeed,

14     it's punishable, but if you don't, you're okay.  If

15     you're so bad at it, that you don't succeed - - -

16                   MR. RIVELLESE:  Well, it's your intent.  If

17     you're intending to convince people you're someone

18     else, get them to rely on it - - - it's the elements

19     of the crime.  You intend to get - - -

20                   CHIEF JUDGE LIPPMAN:  But if you're - - -

21     if you're really bad at it, though, you're not going

22     to get prosecuted, right?

23                   MR. RIVELLESE:  If you intend, you will.

24                   CHIEF JUDGE LIPPMAN:  If you don't succeed

25     - - - if you intended, but they know who you are, so.

1          JUDGE ABDUS-SALAAM:  Well, what about the -

2    - -

3          MR. RIVELLESE:  Well, you might just have

4    an attempt, because you failed, but - - - but you've

5    attempted the crime if you intend to convince people

6    you're someone else, get them to rely on that, and

7    then get a benefit or a harm, those are the elements

8    of the crime.

9          JUDGE ABDUS-SALAAM:  Mr. Rivellese, what

10   about the use of the computer?  Apparently Mr. Golb

11   was an - - - is an NYU alum, and he, you know, paid

12   into the Bodner (sic) library or joined, you know, a

13   membership group that allowed him to use the

14   computer, so how is the use of the computer that

15   apparently was permitted, how did that become a

16   crime?

17         MR. RIVELLESE:  Well, the terms of use that

18   were found in his apartment said that he could not

19   commit crimes with the computers, and he also said

20   during his own testimony that he would assume that

21   you're not permitted to commit crimes on the

22   computers.  So assuming that the other counts stand,

23   he committed crimes with the computers, and that's

24   why in this - - -

25         JUDGE RIVERA:  But - - - but the question

1      is, not that's a crime.  He may assume that he

2      shouldn't do that, but he may not assume that it's

3      criminal to do that.  I think that's the distinction

4      he's drawing, if I'm understanding him correctly.

5                MR. RIVELLESE:  Well, then that goes to you

6      don't have to know that conduct's criminal, if you

7      know you're committing the conduct.  So - - -

8                JUDGE SMITH:  But is it - - - is it - - - I

9      mean, is it more generally - - - are you - - - is it

10     - - - is it a crime in New York anytime anyone

11     exceeds the te - - - the terms of use of his

12     computer?  So if my - - - if I work at a place that

13     doesn't let me go on Facebook, and I go on Facebook,

14     that's a crime?

15               MR. RIVELLESE:  I don't think that would be

16     a crime.  If - - -

17               JUDGE SMITH:  Why not?  I mean, it's a - -

18     - you're authorized to use this computer, but you're

19     not authorized to go on Facebook.

20               MR. RIVELLESE:  Well, I think that would be

21     a very difficult question, but I think that once - -

22     -

23               JUDGE SMITH:  That's why I asked it.

24               An annoying question.

25               CHIEF JUDGE LIPPMAN:  Annoying, annoying.

1          Very annoying question.  Go ahead.

2                    MR. RIVELLESE:  It's possible that would be

3          a crime.  It's just not what this case is about,

4          because this - - -

5                    CHIEF JUDGE LIPPMAN:  How could that be a

6          crime?  That you - - - that you - - - that you don't

7          follow the exact - - - half the people in this - - -

8          three-quarters of the people in this world work in

9          places where they have computers and they have

10         policies and what they can use it for and what they

11         can't.  And each time a person does that, it's a

12         crime?

13                   MR. RIVELLESE:  Well, according to the

14         statute, but - - -

15                   CHIEF JUDGE LIPPMAN:  If they ma - - - mean

16         to commit a crime?  But you're saying if it's - - -

17         if it's - - - if it differs from the terms of how

18         they're allowed to use it, it's a crime?

19                   MR. RIVELLESE:  Well, it's the same as if

20         somebody doesn't give you permission to use their car

21         in a certain way, and you use it a certain way - - -

22                   JUDGE SMITH:  Couldn't - - - can't - - -

23         can't the statute be read more narrowly?  A person's

24         "guilty of unauthorized use of a computer, when he or

25         she knowingly uses, caused to be used, or accesses a

1    computer without authorization".  In other words, if

2    you're allowed to be at the computer, it's okay, even

3    if you violate that terms of use.  What's wrong with

4    that?

5            MR. RIVELLESE:  Well, if - - - if you're

6    committing crimes with the computer, that should be

7    enough to - - -

8            JUDGE SMITH:  Well, you - - - well, you can

9    be prosecuted for the crimes you're committing, but

10   are you committing the crime of unauthorized use of a

11   computer, if, in fact, you are authorized to use the

12   computer?

13           MR. RIVELLESE:  Well, if - - - if you know

14   that you're not authorized to use the computer

15   because you're using the computer to commit conduct

16   that you're not supposed to be using on it - - -

17           JUDGE SMITH:  Like going on Facebook, for

18   example.

19           MR. RIVELLESE:  If you knew for a fact you

20   weren't supposed to use a computer to do it, and you

21   went and did it, you'd be violating that - - - that

22   term.

23           JUDGE SMITH:  I'll say a misdemeanor.

24           MR. RIVELLESE:  But - - - but - - -

25           CHIEF JUDGE LIPPMAN:  Counsel, but isn't

1    the fact that we're going through these - - - these

2    scenarios, doesn't it almost get to the point of

3    being a comedy and looking at what you're alleging

4    are crimes and when it is and when it isn't?  Doesn't

5    it get to the point where it's almost, you know,

6    ludicrous?  I mean, we're looking at this, and we're

7    here looking at criminal violations in the context of

8    the factual - - - the facts as we know it in this

9    case.

10           MR. RIVELLESE:  Well, you can - - -

11           CHIEF JUDGE LIPPMAN:  Almost ethereally

12    absurd, I guess, is what I'm saying.

13           MR. RIVELLESE:  What happened here is he

14    really got charged with everything that he could be

15    alleged to have done, whereas there was a very

16    central gravamen of crime, which was the

17    impersonating Schiffman, the stealing of Schiffman's

18    identity, and pretending to be - - -

19           CHIEF JUDGE LIPPMAN:  What's the crimes

20    that are most defensible to you, from your point of

21    view?  What's your strongest case against - - -

22           MR. RIVELLESE:  Schiffman.  Everything

23    against Schiffman, because he pretended to be him - -

24    -

25           CHIEF JUDGE LIPPMAN:  Everything that he

1    had to do with Schiffman, because he was using his

2    name?

3          MR. RIVELLESE:  Yes, he pretended to be

4    him.  He convinced people he was him.  He got

5    responses to his e-mails, believing that they were

6    responding to Schiffman, not just from the students,

7    but also from the Provost, informing defendant that

8    he was going to be referred to the proceedings to

9    determine whether he was a plagiarist.  So he got

10   responses indicating everyone thought he was

11   Schiffman.

12         He then continued to respond, for example,

13   to the students he - - - he responded back.  So he

14   was clearly orchestrating an identity theft, having

15   people believe he was Schiffman, in order to get

16   Schiffman, either fired, uninvited to the Jewish

17   Museum, otherwise damage his career, and help his own

18   father.  And that's - - - that's clearly every

19   element of the statute.

20         JUDGE GRAFFEO:  That you feel is the

21   strongest proof on a crime in this case?

22         MR. RIVELLESE:  Absolutely, and - - - and

23   those are the most solid and central, and then the

24   other ones are the ones that are tangential, and also

25         - - -

1          JUDGE SMITH:  And the ones - - -

2          JUDGE GRAFFEO:  And for those crimes that

3    you - - - the Schiffman crimes that you've just

4    mentioned, what is it that crosses the line then from

5    the civil to the criminal?  What makes it criminal

6    activity?  Just to focus in on those crimes.

7          MR. RIVELLESE:  The strongest thing is that

8    he's trying to convince other people that he is

9    someone other than who he is.  He's stealing the

10   identity of Schiffman, pretending to be him, and

11   getting them to rely on that, by saying - - -

12         CHIEF JUDGE LIPPMAN:  Counsel, what would

13   you advise someone who came to you?  Would you advise

14   them to go get themselves a lawyer to sue, or would

15   you advise them to go to the prosecutor?  In this

16   particular set of facts?

17         MR. RIVELLESE:  Well - - -

18         CHIEF JUDGE LIPPMAN:  Put - - - take off

19   your hat for a second, and - - -

20         MR. RIVELLESE:  Well, given what happened

21   to Schiffman, the prosecutor - - - that's clearly the

22   central and the most - - -

23         CHIEF JUDGE LIPPMAN:  You would clearly say

24   go to a prosecutor; it's a criminal offense.

25         MR. RIVELLESE:  Yes.

1              CHIEF JUDGE LIPPMAN:  These are criminal

2       offenses.

3              MR. RIVELLESE:  Yes.  And no, it's not an

4       A-I felony; it's not state prison, but it's

5       definitely wrong.  If you pretend to be someone else,

6       get people to believe you, and have them take actions

7       or expect them to take actions based on your

8       deception, not based on your personally saying what

9       you think, but pretending to be someone else,

10       confessing to something that they did or did not do,

11       because you can't pretend to be a criminal defendant

12       and confess to a crime either.

13              You have to be honest about who you are.

14       That's the real gravamen of the offense.  It's not

15       that he's alleging that someone's a plagiarist.  That

16       doesn't matter; he could be right about that.  But

17       he's saying that Schiffman is confessing to

18       plagiarism and pretending that he is Schiffman

19       confessing.  Judge Rivera mentioned that before, I

20       think.

21              If you're pretending to be someone and

22       confess to something that person did, that's the

23       dishonesty there.  It's not that the person may or

24       may not have done the thing, it's that they didn't

25       really confess to it; you did.

1        CHIEF JUDGE LIPPMAN:  Okay, thanks,

2   counsel.

3        MR. RIVELLESE:  Thank you.

4        CHIEF JUDGE LIPPMAN:  Counsel, rebuttal?

5        MR. KUBY:  Yes, thank you.  First of all,

6   it is state prison.  The - - - he's convicted of one

7   felony, the identity theft in the second degree.  The

8   prosecution asked for one and a third to four years.

9   Judge - - - Justice - - - former Justice Berkman, in

10  her infinite kindness, only gave him six months.  So

11  we are talking state prison here.

12       JUDGE SMITH:  Is - - - is six months so

13  very harsh for this - - - wasn't this a vicious thing

14  to do to try to ruin a man like this?

15       MR. KUBY:  If - - - if you start with the

16  assumption that this is a good man - - -

17       JUDGE SMITH:  Suppose - - - suppose a

18  mediocre man like everyone else, is it - - -

19       MR. KUBY:  Or - - - or - - - or maybe a bad

20  man, telling the truth about a bad man in a specific

21  way, is that a bad thing to do?  I don't know.  I'm

22  sort of okay with it.  You're not.  That's fine.

23  That's fine.  But we're talking about the use of the

24  criminal sanction - - -

25       JUDGE SMITH:  I mean, if - - - if - - -

1      yeah, I mean - - - I suppose, yeah.

2              MR. KUBY:   Yeah.

3              JUDGE SMITH:   You aren't really saying it's

4      okay to do it to bad people, and not good people, are

5      you?

6              MR. KUBY:   No, I - - - I - - - I'm saying

7      that - - - that if you sat here and - - - and you

8      believed that in fact, Schiffman was a rank

9      plagiarist and had ripped off the work of many other

10     scholars, it would have did - - - different

11     atmospherics and moreover, it never would have been

12     brought in the first place, because - - -

13             JUDGE PIGOTT:   Well, so, if you - - - if

14     you - - - if you say I'm A-Rod, and I admit that I

15     did drugs and I - - - you know, and I'm really sorry

16     about it, and I wish I could give the money back to

17     the Yankees, you don't see a problem with that?

18             MR. KUBY:   Well, I - - - I don't actually

19     see a criminal problem with that for the same reason

20     there's not a criminal problem here.   Exactly the

21     same situation.   Schiffman makes this confession.

22     What happens isn't the university fires Schiffman;

23     he's confessed to plagiarism.   The record reveals

24     they said to him, hey, this looks weird; is this you?

25     He says, no, it's not me.

1          JUDGE SMITH:  But suppose he's not going to

2     sue - - - he - - - he - - - he did do it, I guess, to

3     a tenured professor.  Suppose he - - - suppose he

4     gets mad at some poor adjunct who has to make a

5     living and does the same thing, shouldn't the adjunct

6     be protected by the criminal law?

7          MR. KUBY:  The - - - the adjunct is - - -

8     is protected by the way things actually work on

9     Planet Earth.  Nobody gets fired in - - - in the real

10    world based on a Gmail account, where they confess to

11    something that you haven't asked.

12          CHIEF JUDGE LIPPMAN:  But is it, counsel -

13    - -

14          JUDGE RIVERA:  But is that - - - is that

15    what had to happen, that he would have had to have

16    been fired that - - - you have to actually have that

17    as the result?

18          MR. KUBY:  No, no, you don't actually have

19    to have that, and - - - and even - - -

20          JUDGE RIVERA:  What if his reputation is

21    tarnished in the institution?  Nobody actually

22    believes him even if he - - -

23          MR. KUBY:  But if want to go - - -

24          JUDGE RIVERA:  - - - he's found not guilty.

25          MR. KUBY:  If we want to go back and

1    resurrect criminal libel in the Internet era, then we

2    can do that.  But - - - but at least, since 1965, the

3    law has been these types of reputational harms - - -

4              CHIEF JUDGE LIPPMAN:  Counsel - - -

5              MR. KUBY:  - - - are beyond the scope of

6    criminal law.

7              CHIEF JUDGE LIPPMAN:  Counsel, is your

8    basic argument that in the practical common-sense

9    world, these are not crimes in the year 2014?  And -

10   - - and if that is your argument, why is it that you

11   think that they've chosen to prosecute?  That they

12   chose to prosecute the defendant?

13             MR. KUBY:  Yes, it is my argument, Judge

14   Lippman.  And as we say in our brief, this type of

15   Internet impersonation, causing people to think it's

16   the real person, is absolutely ubiquitous in American

17   public life.

18             CHIEF JUDGE LIPPMAN:  But why - - - but why

19   did they choose to prosecute this?

20             MR. KUBY:  I can give you a dehors the

21   record answer.

22             CHIEF JUDGE LIPPMAN:  Go ahead.

23             MR. KUBY:  Because according, at least, to

24   Larry Schiffman when he gave an interview, what

25   happened was, he was upset about this, and - - - and

1      things weren't happening enough, so he contacted one

2      of his pals in the FBI, because he had done forensic

3      work for the FBI in the past.

4              The FBI hooked him up with the prosecutor,

5      and - - - and unfortunately, both Robert Morgenthau,

6      the former New York County District Attorney with his

7      long relationship to the Skirball Center, and

8      Lawrence Schiffman with his long relationship to the

9      Skirball Center, had a lot of sort of overlapping

10     types of relationships.

11             And the assumption was that this guy, who

12     really has no power, no authority, would just take

13     the plea that was offered, which is, hey, a single

14     misdemeanor and three years probation.

15             CHIEF JUDGE LIPPMAN:  Okay, counsel, thank

16     you both.

17             MR. KUBY:  All right.

18             CHIEF JUDGE LIPPMAN:  Appreciate it.

19             (Court is adjourned)

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4           I, Karen Schiffmiller, certify that the

5    foregoing transcript of proceedings in the Court of

6    Appeals of People v. Raphael Golb, No. 72, was

7    prepared using the required transcription equipment

8    and is a true and accurate record of the proceedings.

9

10

11

12   Signature: _____

13

14

15   Agency Name: eScribers

16

17   Address of Agency:   700 West 192nd Street

18                        Suite # 607

19                        New York, NY 10040

20

21   Date:   April 2, 2014

22

23

24

25

**Exhibit B**

Procedure No:   208-36                    Date Effective:   01-01-0

# FAMILY OFFENSES/DOMESTIC VIOLENCE

## PURPOSE
To process family offenses and other offenses that occur between family/household members as per the Family/Household - Expanded Definition.

## DEFINITIONS
COMPLAINANT/VICTIM - For purposes of this procedure ONLY, is limited to a person described in subdivisions "a" through "g" below:
FAMILY/HOUSEHOLD (AS DEFINED IN FAMILY COURT ACT) - includes persons who:

  a. Are legally married to one another.
  b. Were formerly legally married to one another.
  c. Are related by marriage (affinity).
  d. Are related by blood (consanguinity).
  e. Have a child in common regardless of whether such persons have been married or have lived together at any time.

[I.O. 17 s 09] *f. Are not related by consanguinity (blood) or affinity (marriage) and who are, or have been, in an intimate relationship regardless of whether such persons have lived together at any time.*

*NOTE   A common sense standard regarding the totality of the circumstances involving the relationship should be used to determine if an "intimate relationship" exists. Factors a member of the service may consider in determining whether a relationship is an "intimate relationship" include but are not limited to: the nature or type of relationship the relationship between the involved parties does not have to be sexual in nature to be considered "intimate"); the frequency of interaction between persons; and the duration of the relationship. Neither a casual acquaintance nor ordinary fraternization between two individuals solely in a business, educational, or social context shall be deemed to constitute an "intimate relationship." If unable to determine if the relationship in question is an "intimate relationship," the member of the service concerned will request the response of the patrol supervisor.*

*Additional factors that may assist in determining the intimacy of a relationship include, but are not limited to: amount of time spent together in either a work or leisure related capacity, shared expenses and/or finances, extent of interaction with family members, etc.*

*All members of the service are reminded that their primary responsibility is to ensure the immediate and future safety of all parties involved in domestic violence incidents."*

*FAMILY/HOUSEHOLD (NYPD EXPANDED DEFINITION) - includes subdivisions "a" through "f" above, AND persons who:*
  *g.  Are currently living together in a family-type relationship.*
  *h.  Formerly lived together in a family-type relationship.*
*A family/household thus includes: "common-law" marriages, same sex couples, registered NYC domestic partners, different generations of the same family.*

48

Section:   Arrests

**Procedure No: 208-36**

siblings and in-laws, persons involved in "intimate relationship", and persons who live or have lived together in a family-type relationship.

OFFENSE - Conduct for which a sentence to a term of imprisonment or to a fine is provided (felony, misdemeanor, or violation).

FAMILY OFFENSE - Any act which may constitute:
Harassment 1st or 2nd degree
Assault 2nd degree or Attempt
Disorderly Conduct (including acts amounting to Disorderly Conduct NOT committed in a public place)
Aggravated Harassment 2nd degree
Assault 3rd degree or Attempt
Reckless Endangerment
Menacing 2nd or 3rd degree - that is committed by one member of the same family/household, AS DEFINED IN THE FAMILY COURT ACT (subdivisions "a" through "e" above), against another.
[REV 01-01] Stalking (1st, 2nd, 3rd, and 4th degrees)

> NOTE  The law also adds the crimes of Stalking in the first through fourth degrees to the list of criminal convictions which will subject an offender to automatic suspension or revocation of a pistol license by the Criminal or Family Court.

ORDER OF PROTECTION - An order issued by the New York City Criminal Court, New York State Family Court, or the New York State Supreme Court, requiring compliance with specific conditions of behavior, hours of visitation and any other condition deemed appropriate by the court of issuance.
An Order of Protection may also be issued by the Supreme Court as part of a separation decree, divorce judgment, annulment, or as part of a court order in a pending separation, divorce, or annulment action.

PROBABLE CAUSE - A combination of facts, viewed through the eyes of a police officer, which would lead a person of reasonable caution to believe that an offense is being or has been committed.

The "probable cause" standard applied in family offense/domestic violence offenses IS NO DIFFERENT from the standard applied in other offenses and may be met by evidence other than the statement of the complainant/victim.

CONCURRENT JURISDICTION - Concurrent jurisdiction exists when different courts have jurisdiction over the same subject matter within the same territory. Both Criminal Court and Family Court have concurrent jurisdiction when:

   a. A family offense (as defined above) has been committed; AND

   [I.O. 17 s 09]  b. A family/household relationship as defined in the Family Court Act "a" through "f" above (and NOT including the NYPD expanded definition) exists between the offender and the victim; AND

   c. The offender is sixteen (16) years of age or older.

> NOTE  All three of the above elements must exist for both Family Court and Criminal Court to have jurisdiction at the same time. If either of the first two (2) elements are not met, the complainant MUST go to Criminal Court. If the first two (2) elements are met, but the offender is less than sixteen (16) years of age, the complainant must go to Family Court.

WHEN CONCURRENT JURISDICTION EXISTS:
Advise complainants/victim that:

490                                               © FPA July, 2009

a. There is concurrent jurisdiction with respect to family offenses in both Family Court and the Criminal Courts;

b. A Family Court proceeding is a civil proceeding and is for the purpose of attempting to stop the violence, end the family disruption and obtain protection. Referrals for counseling or counseling services are available through probation for this purpose;

c. A proceeding in the Criminal Courts is for the purpose of prosecution of the offender and can result in a criminal conviction of the offender;

d. A proceeding or action subject to the provisions of Family Court Act, Section 812, is initiated at the time of filing of an accusatory instrument or Family Court petition, not at the time of arrest, or request for arrest, if any;

e. An arrest may precede the commencement of a Family Court or a Criminal Court proceeding, but an arrest is not a requirement for commencing either proceeding; however, that the arrest of an alleged offender shall be made under the circumstances described in subdivision four (4) of Section 140.10 of the Criminal Procedure Law.

**PROCEDURE**

When members of the service respond to, or are notified of, any incident involving members of the same Family/Household (NYPD EXPANDED DEFINITION):

**UNIFORMED MEMBER OF THE SERVICE**

1. Obtain medical assistance if requested or the need is apparent.

2. Ascertain all facts.
   a. Interview persons involved SEPARATELY.
   b. Interview and take the names of any witnesses present at time of occurrence.
   c. Collect evidence and record statements of persons present (e.g., admission by offender during dispute).
   **[I.O. 17 s 08]** d. Take photographs using the domestic violence digital camera in all cases where a victim has visible injuries and/or damaged property as a result of domestic violence. Photographs will be uploaded into the Domestic Violence Digital Photo Database as per P.G. 208-39, "Family Offenses/Domestic Violence (Digital Photography of Visible Injuries/Damaged Property)." Other domestic violence evidence (i.e., weapons, clothing, etc.) must be vouchered in accordance with P.G. 218-01, "Invoicing Property - General Procedure".

3. Determine whether:
   a. Probable cause exists that any offense has been committed.
   b. An Order of Protection has been obtained by complainant/victim.
   c. The offense constitutes a FAMILY OFFENSE.
   d. There are children present in the home who may be victims of neglect, abuse, or maltreatment.
   (1) If a member REASONABLY SUSPECTS a child less than eighteen (18) is abused, neglected or maltreated and continued presence in the household presents an imminent risk to the child's physical or mental health, request the patrol supervisor to respond, prepare **REPORT OF SUSPECTED CHILD ABUSE OR MALTREATMENT (PD377-154)**, and notify the State Central Registry as outlined in *P.G. 215-03, "Emergency Removals Or Investigation And Reporting Of Abused, Neglected Or Maltreated Children."*

Procedure No: 208-36

**NOTE** *Willful failure to make such notification is a Class "A" Misde-meanor. Further, civil liability may result for the damages caused by such failure.*

(2) If probable cause exists that a crime has been committed against a child, the perpetrator will be arrested, and no DAT or stationhouse bail will be issued.

WHEN OFFENDER HAS DEPARTED SCENE PRIOR TO ARRIVAL OF POLICE:

4. Conduct search of immediate vicinity for offender when:
   a. Probable cause exists that a crime has been committed OR an Order of Protection has been violated, AND
   b. Officer has reason to believe that such search might yield positive results.

5. Advise complainant/victim to call police when offender returns, if search produces negative results and follow reporting procedures as set forth below.

WHEN COMPLAINANT/VICTIM INDICATES THAT AN ORDER OF PROTECTION HAS BEEN OBTAINED:

**[I.O. 38 s 03]** 6. Request complainant/victim to produce Order of Protection.
   a. If Order of Protection cannot be produced, use the Central Records Division inranet database application to do a search for all Orders of Protection issued by a New York City based court. If the computer system is down, or for Orders of Protection issued outside New York City, telephone Central Records Division, Identification Section at (646) 610-5195 to verify that an Order of Protection was issued, court of issuance, specific conduct prohibited and the expiration date.
   b. If the Identification Section reports that there are no Orders of Protection on file pertaining to the complainant/victim, telephone the precinct of occurrence and request a member of the service authorized to operate the FINEST System to conduct an Order of Protection database inquiry.
   c. In the event the precinct of occurrence is unable to conduct the inquiry, request the Communications dispatcher to conduct the inquiry.

IF OFFENDER IS PRESENT OR THE SEARCH FOR THE OFFENDER WAS SUCCESSFUL AND THERE IS PROBABLE CAUSE THAT ANY FELONY HAS BEEN COMMITTED OR AN ORDER OF PROTECTION HAS BEEN VIOLATED:

7. Arrest offender even if complainant/victim requests that offender not be arrested.
   a. When an Order of Protection is violated and the act that violates the order is an offense, offender must be charged with that offense in addition to the appropriate charge for the violation of the Order of Protection.
   b. In all cases, whether the Order of Protection was issued by Family Court, Supreme Court, or Criminal Court, and whether the violation of the Order of Protection also constitutes an offense or not (e.g., offender in proximity to complainant's residence or place of employment is not an offense in and of itself but does violate an Order of Protection), the violation of the Order of Protection shall be charged as the Penal Law crime of Criminal Contempt, or Aggravated Criminal Contempt, as appropriate, and the offender brought to Criminal Court.

**NOTE** *Under the federal 1994 Violence against Women Act, Orders of Protection issued by courts of other jurisdictions (other states, U.S. territories, tribal jurisdictions), in cases of domestic violence covered by this procedure, may be enforced in New York State. If the particular*

© FPA July, 2009

Procedure No: 208-36

out-of-state Order of Protection is available, and otherwise appears to be valid on its face (i.e., not expired, signed by a judge or justice of a court), and there is probable cause to believe that the Order of Protection has been violated, and that the offender had notice of the order and an opportunity to be heard, uniformed members of the service will arrest the offender and charge him or her with either Criminal Contempt in the second degree (Penal Law Section 215.50 (3), Criminal Contempt in the first degree (Penal Law section 215.51 (b), (c), or (d)), or Aggravated Criminal Contempt (Penal Law section 215.52), as appropriate.

In order to charge any of the criminal contempt charges above, for a violation of either an in-state or out-of-state Order of Protection, there must be a showing that the offender had "notice" of the issuance of the Order of Protection, either because he or she was present in court when the order was issued or because he or she was duly served with the order.

In order to establish probable cause that the offender had notice, uniformed members of the service should ask the offender if he or she knew of the order and if necessary ask the complainant/victim to verify that the offender had knowledge of the order. Additionally, if such is deemed necessary, uniformed members of the service may call the court that issued the order during normal business hours to seek further information.

In the case of out-of-state Orders of Protection, there is an additional requirement that the offender has had or will shortly have an opportunity to be heard. This essentially means that the offender was notified of a date to appear in the particular court in order to respond to the issuance of the order. In order to take enforcement action, probable cause as to any of the following must exist:

a. The offender appeared in court in response to issuance of the Order of Protection,

b. The offender was served with notice to appear, in response to the issuance of the Order of Protection and failed to appear, or

c. The offender was served with an Order of Protection with a notice to appear before the court within thirty (30) days of the issuance of the Order of Protection.

The inquiries set forth in the preceding paragraph may be used to establish the existence of this element of probable cause.

In cases in which the Order of Protection is not produced by the complainant/victim, in addition to the procedure set forth in step six (6), above, uniformed members of the service shall inquire whether a record of the order exists on the statewide registry of Orders of Protection or the protection order file maintained by the National Crime Information Center (NCIC). However, the presence of the order on any file shall not be required for enforcement of the order, provided that the uniformed member of the service has probable cause to believe that the order is in existence through credible information supplied by the complainant/victim or other reliable source.

**Section:**   **Arrests**

49.

Procedure No: 208-36

*When an offender is arrested for violating any Order of Protection, his or her arrest will, in ALL cases, be processed in New York City Criminal Court, regardless of the court that issued the order.  The offender will be charged with the appropriate criminal contempt charge. The offender will also be charged with any pertinent criminal offense for which probable cause exists.  When an arrest is made for violation of a Family Court Order of Protection, the complainant/victim will be advised that he or she has a right to proceed independently in Family Court by filing a petition.  However, uniformed members of the service are required to bring the offender before the local criminal court.*

WHEN THERE IS PROBABLE CAUSE THAT ANY MISDEMEANOR HAS BEEN COMMITTED, IN OR OUT OF THE OFFICER'S PRESENCE, OR A VIOLATION HAS BEEN COMMITTED IN THE OFFICER'S PRESENCE:

8. Arrest offender.

   a. Under the Criminal Procedure Law, a uniformed member of **the** service must arrest the offender, unless the victim specifically states, on his or her own initiative, that he or she does not want the offender arrested.  The officer **shall not** ask the victim if he or she wants to have the offender arrested.  The uniformed member of the service retains the discretion to make an arrest in a misdemeanor case, despite the victim's decision not to seek an arrest.

**NOTE**  *The primary considerations when the complainant/victim does not want an arrest are the prevention of further violence and the safety of ALL household members. Factors to be taken into consideration include, BUT ARE NOT LIMITED TO:*

   a. *The past history of the offender and victim (prior arrests, incidents, injuries sustained etc.). If possible, conduct an inquiry through the Precinct Domestic Incident Database.*

   b. *The officer's observations of the scene and victim.*

   c. *Statements of witnesses.*

   d. *Statements made by the offender (especially threats of suicide, homicide or other future violence).*

   e. *Threatened use of weapons, or the presence of or access to weapons by the offender.*

   f. *Mental and physical state of the offender (drug or alcohol intoxication, etc.).*

   g. *Presence of other household members who may be at risk, including the elderly.*

*If an officer has any doubts about the continued safety of any household member, AN ARREST SHOULD BE EFFECTED.*

9. Make an **ACTIVITY LOG (PD112-145)** entry if complainant/victim does not want an arrest for a misdemeanor or any violation committed in the officer's presence by family/household member.

   a. Request complainant/victim to sign log entry.

   b. Enter "Refused Signature" if complainant/victim will NOT sign entry.

IN CROSS COMPLAINT SITUATIONS, WHERE THERE IS PROBABLE CAUSE TO BELIEVE THAT MORE THAN ONE FAMILY OR HOUSEHOLD

© FPA July, 2009

494

Procedure No: 208-36

MEMBER HAS COMMITTED A *FAMILY OFFENSE* MISDEMEANOR, IN OR OUT OF THE OFFICER'S PRESENCE IN A SINGLE DOMESTIC INCIDENT:

10. Attempt to identify the primary physical aggressor after considering the following criteria:

   a. The comparative extent of any injuries inflicted by and between the parties,

   b. Whether any of the parties are threatening or have threatened future harm against another party, family, or household member,

   c. Whether any of the parties has a prior history of domestic violence that the uniformed member of the service can reasonably ascertain,

   d. Whether any such person acted defensively to protect himself or herself from injury.

> **NOTE** *Where one party has committed a family offense misdemeanor against a family/household member in response to or in retribution for a crime committed against him or her in the past, the responding police officers shall not determine who was the "Primary Physical Aggressor" and proceed as required by step eight (8), above.*

11. Confer with the patrol supervisor.

12. Arrest the offender identified as the primary physical aggressor.

   a. If complainant/victim requests that offender not be arrested, the officer may still effect the arrest.

> **NOTE** *Where there is reasonable cause to believe that both parties to a particular domestic violence dispute have committed family offense misdemeanors and the responding uniformed members of the service are unable to determine who, if anyone, was the primary physical aggressor, it would be lawful to arrest both parties. Further, even where the responding uniformed members of the service are able to determine who was the primary physical aggressor, both parties may, if appropriate, be arrested. The primary consideration when deciding whether to arrest other persons, in addition to the primary aggressor, is the prevention of further violence and the safety to ALL household members. Evaluate each complaint separately. Do not base a decision to arrest or not to arrest on the willingness of a person to testify or otherwise participate in a judicial proceeding. If a complainant/offender/victim requests that the offender not be arrested, the officer may still effect an arrest. The primary considerations when the complainant/offender/victim does not want an arrest to be made are the prevention of future violence and the safety of ALL household members. (See NOTE following step eight [8]).*

13. Make an ACTIVITY LOG entry of:

   a. Factors that resulted in determination or inability to determine that a particular offender was the primary physical aggressor.

   b. Fact that the complainant/victim does not want an arrest to be made.

     (1) Request complainant/victim to sign **LOG** entry.

     (2) Enter "Refused Signature" if complainant/victim will not sign entry.

WHEN THERE IS PROBABLE CAUSE THAT ANY VIOLATION HAS BEEN COMMITTED, NOT IN THE OFFICER'S PRESENCE.

14. Refer complainant/victim as follows:

**Section:**   **Arrests**

495

**Procedure No: 208-36**

a. Family/Household members, as defined in Family Court Act, AND family
offense violation, to:

  (1) Family Court

  (2) Summons Part - Criminal Court (if concurrent jurisdiction exists,
complainant may go to either court or both).

**[I.O. 17 s 09]** b. *Family/Household - Expanded Definition subdivisions "g"
and "h" above and/or non-family offense violations - to Summons Part -
Criminal Court*

> *NOTE An officer cannot effect an arrest for VIOLATIONS NOT
> COMMITTED IN HIS/HER PRESENCE, UNLESS such violation is
> specifically prohibited in a current Order of Protection issued to the
> complainant/victim. The proper charge is Criminal Contempt in the
> Second Degree, Penal Law Section 215.50(3), or Criminal Contempt in
> the First Degree, Penal Law Section 215.51(b [v]) or (c) (see para-
> graph 7(b), above).*

WHEN CONCURRENT JURISDICTION EXISTS:

15. Advise complainant/victim of the courts available to them and the purpose of
each court as outlined in the "Definitions - Concurrent Jurisdiction" section.

IN ALL CASES:

16. Advise complainant/victim of availability of shelter and other services by
providing 1-800-621-HOPE hotline number.

17. Prepare New York State Standardized Domestic Incident Report (DCJS 3221) in
ALL instances in which response to OR becoming apprised of an incident (e.g.,
altercation, disturbance, conflict, or dispute) involves members of the same
Family/Household-Expanded Definition, or is an allegation of child abuse.

  a. If prepared in response to a radio run include SPRINT job number on form.

  b. List in the "Narrative of the Incident" section all factors that resulted in
determination or inability to determine that a particular offender was the
primary physical aggressor and any property removed, (e.g. arrest evidence,
safekeeping, etc.)

  c. Ensure that the name and phone number of the precinct Domestic Violence
Prevention Officer is printed on the rear of the last copy of the N.Y.S.
Domestic Incident Report. Advise complainant/ victim to contact the
Domestic Violence Prevention Officer to obtain further information (e.g.
referrals, voucher number, etc.).

**[I.O. 7 s 04]** d. Insert 'Tax Number of reporting member of the service in
caption entitled "Officer I.D. No."

  e. Give New York State Standardized Domestic Incident Report (pink copy)
and Domestic Violence Notice (gold copy) to complainant/victim, if present.

  f. Inform all parties that they may be contacted by the Precinct Domestic
Violence Prevention Officer concerning this incident.

> **[I.O. 7 s 04]** *NOTE In cross complaint situations, a New York State
> Standardized Domestic Incident Report shall be prepared for each
> complainant/offender. Every attempt should be made to have the
> complainant complete the "Victims Statement of Allegations" caption,*

© PPA July, 2009

Procedure No:   208-36

*regardless of what language he/she speaks or writes.   DO NOT enter in "Victims Statement" caption "Refused" or "Same as above" if victim is unable to speak or write in English, unless the victim refuses.  Always allow the victim to write in his/her primary speaking language if unable to write in English.*

18. Use radio code dispositions to finalize assignment:

a. 10-90F(1) DIR Prepared/No Offense Alleged;
   Only to be used in those instances where the uniformed member of the service responded to a dispute which did not rise to the level of an offense; OR

b. 10-90F(2) DIR Prepared/Unfounded

c. 10-92F Arrest Effected/DIR Prepared

d. 10-93F COMPLAINT REPORT/DIR Prepared
   These dispositions MUST be used to finalize any incident involving a Family/Household-Expanded Definition.  Communications Section will NOT accept any other disposition code.  If the assignment was initially categorized as other than signal 10-52, notify Dispatcher and use above codes to finalize the assignment.

REPORTING PROCEDURE:

**MEMBER OF THE SERVICE**

19. Prepare COMPLAINT REPORT (PD313-152) for each complainant/ victim in addition to the N.Y.S. Domestic Incident Report when complainant/victim alleges an OFFENSE has been committed between members of the same Family/Household-Expanded Definition, including the violation of an Order of Protection. Include in the "Details":

a. Whether an Order of Protection is in effect.

b. Issuing court, and

c. If offender not present, the possible location(s) of offender.

d. In cross-complaint situations, where an attempt to determine which offender was the "primary physical aggressor" is required, include a statement that the offender was the "primary physical aggressor." The COMPLAINT REPORT pertaining to the offender determined not to be the "primary physical aggressor" shall be CLOSED to "Patrol" and the "Details" section shall include a statement that the offender was determined not to be the "primary physical aggressor."

> *NOTE   In cross-complaint situations requiring the preparation of two (2) or more COMPLAINT REPORTS and where the responding uniformed members of the service are unable to determine which offender was the primary physical aggressor, the factors that resulted in the inability to make that determination must be included in the "Details" section of each COMPLAINT REPORT.*

20. Enter in caption entitled "Unit Referred to":

a. Precinct Detective Squad - when COMPLAINT REPORT is prepared for:
   (1) Felony(s)
   (2) Violation(s) of an Order of Protection
   (3) Misdemeanor(s).

> *NOTE  The COMPLAINT REPORT MUST be classified as "open" in the above three circumstances, if an arrest is not made by patrol.*

Procedure No: 208-36

*However, in misdemeanor cases, close COMPLAINT REPORT only if complainant/victim does not want offender arrested and officer does not believe an arrest is warranted after considering criteria above.*

b. Court(s) victim was referred to in closed complaints.

21. When concurrent jurisdiction applies, make entry in **ACTIVITY LOG** indicating that complainant/victim was advised of:

a. Difference between proceedings in each court

b. Importance in selection of the appropriate court to process charge(s) and option to change from one court to the other, or proceed in both.

**DESK OFFICER**

22. DO NOT issue a **DESK APPEARANCE TICKET (PD260-121)** or stationhouse bail when any offense is committed and an arrest is affected involving members of the same Family/Household-Expanded Definition.

23. Verify accuracy and completeness of all required forms.

24. Have prisoner removed to borough Court Section facility to complete arrest process.

**DOMESTIC VIOLENCE PREVENTION OFFICER**

25. Perform duties and process all Domestic Incident Reports as per *P.G. 202-29, "Domestic Violence Prevention Officer."*

**ADDITIONAL DATA**

*A police officer will, when requested by a petitioner, assist in the service of an Order of Protection, summons, or petition. (Orders of Protection issued by the Family Court and delivered directly to the police will be served according to P.G. 212-57, "Service Of Family Court/Supreme Court Orders Of Protection By Uniformed Members Of The Service."*

*To avoid unnecessary court appearances by uniformed members of the service who are requested by a petitioner to serve a respondent with an Order of Protection, summons, or petition, uniformed members of the service will prepare STATEMENT OF PERSONAL SERVICE (PD260-152). The uniformed member concerned will sign the STATEMENT OF PERSONAL SERVICE after completing all captions on the form. It is no longer sworn to before a supervisory officer. The original copy (white) will be given to the petitioner and the duplicate copy (blue) will be filed in the precinct of service.*

*Domestic Incident Reports, are potential Rosario material, and must be maintained at the precinct of occurrence. If an arrest is effected, the arresting officer must ensure that the Assistant District Attorney is provided with a copy of the Domestic Incident Report prepared in regards to the incident. When requested, the Domestic Violence Prevention Officer will make all Domestic Incident Reports prepared regarding the person arrested available to a Assistant District Attorney.*

*In violation cases referred to the Criminal Court - Summons Part, the complainant/victim must have the offender's address available for service of the summons. Misdemeanor cases should NOT be referred to the Criminal Court - Summons Part. The preferred course of action is to advise the complainant/victim to contact the police on the next contact with the offender and request an arrest, presenting the Domestic Incident Report as proof of the previous complaint.*

© FPA July, 2009

498

**Procedure No:  208-36**

*Uniformed members of the service responding to a report of a domestic incident*
*question persons present about the existence of firearms in the household.  Seize*
*ANY firearms (including rifles and shotguns), and licenses/permits, if:*

> *(1) License holder is arrested, regardless of the charge; or*
> *(2) An Order of Protection exists against the licensee; or*
> *(3) When the incident involves physical force or the threat of physical force*

*When a police officer reasonably believes that the presence of firearms at a locat.*
*creates imminent risk of physical injury or serious physical injury, the following*
*actions should be taken to remove the weapon from the location:*

> *(1) Seize illegally possessed firearm(s) and make an arrest.*
> *(2) Seize legally possessed firearm(s) when such weapons create imminent*
>       *risk of physical injury or serious physical injury.*
> *(3) Voucher legally possessed firearms which are voluntarily surrendered*
>       *by participants in domestic incidents.*

*In all incidents involving pistol or permit holders, notify the License Division*
*Incident Section at (212) 374-5538, and comply with A.G. 321-07, "Incidents*
*Involving Holders of Pistol Licenses or Pre-Exemption License Permits."*
*License/permit holders must immediately notify the License Division, Incident*
*Section, of any police incident in which they are involved.*

## <u>RELATED PROCEDURES</u>

*Desk Appearance Ticket - General Procedure (P.G. 208-27)*
*Invoicing Property General Procedure (P.G. 218-01)*
*Unlawful Evictions (P.G. 214-12)*
*Family Offenses and Domestic Violence Involving Uniformed or Civilian Membe.*
*Of The Service (P.G. 208-37)*
*Emergency Removals Or Investigation And Reporting Of Abused, Neglected Or*
*Maltreated Children (P.G. 215-03)*
*Incidents Involving Holders Of Pistol Licenses Or Pre-Exemption License Permits (A.G. ?*
*07)*

## <u>FORMS AND REPORTS</u>

*ACTIVITY LOG (PD112-145)*
*COMPLAINT REPORT (PD313-152)*
*DESK APPEARANCE TICKET (PD260-121)*
*STATEMENT OF PERSONAL SERVICE (PD260-152)*
*New York State Standardized Domestic Incident Report (DCJS 3221)*

**Section:    Arrests**

Procedure No:   208-37                    Date Effective:   01-01-00

# FAMILY OFFENSES AND DOMESTIC VIOLENCE INVOLVING UNIFORMED OR CIVILIAN MEMBERS OF THE SERVICE

## PURPOSE

To process domestic incidents involving uniformed or civilian members of the service.

## PROCEDURE

When directed to respond on a radio run or assignment that is later deemed to be a family offense or domestic incident (as per the Department's expanded definition of Family/Household) involving uniformed or civilian members of the service:

*NOTE  Effective January 1, 1996, the Criminal Procedure Law mandates that an arrest be made when an officer establishes probable cause that any family offense misdemeanor has been committed, unless the victim, on his/her own volition, requests that an arrest not be made.  The law prohibits a uniformed member of the service from inquiring whether the victim seeks an arrest of such person.  In addition, uniformed members of the service are reminded that P.G. 208-36, "Family Offenses/Domestic Violence," sets out a mandatory arrest policy if a uniformed member of the service establishes probable cause that any felony has been committed or an order of protection has been violated.*

## RESPONDING MEMBER OF THE SERVICE

1. Obtain medical assistance if requested or the need is apparent.
2. Ascertain the facts.
3. Ensure that the patrol supervisor is responding.

*NOTE  Communications Section will automatically direct the patrol supervisor to respond to the scene of all family-related incidents involving members of the service.*

*A member of the service performing stationhouse duties who is apprised of a domestic incident involving a member of the service will notify the desk officer.  The desk officer will ensure that the procedures outlined in this order are followed.*

## PATROL SUPERVISOR

4. Comply with the provisions of P.G. 208-36, "Family Offenses/Domestic Violence."
   a. Direct the preparation of a New York State Domestic Incident Report (DCIS 3221) in all cases.
      (1) Give the last copy (pink) and the "Information to Victims of Domestic Violence" sheet (gold) to the complainant/victim.

© PPA July. 2003

500

Procedure No: 208-37

IN ALL CASES INCLUDING WHEN NO OFFENSE HAS BEEN ALLEGED:

**PATROL SUPERVISOR**

5. Comply with P.G. 208-36, "Family Offenses/ Domestic Violence."
6. Apprise the parties of the availability of counseling (See *Additional Data* Statement).

> **NOTE** *When there is doubt as to who is the offender and who is the victim, or if there is a cross-complaint situation, the commanding officer/duty captain will be notified and will determine the course of action.*

WHEN THE MEMBER OF THE SERVICE IS A VICTIM:

7. Notify precinct commanding officer/duty captain who will ensure that appropriate action is taken and apprise parties of the availability of counseling IF THE MEMBER OF THE SERVICE IS ALLEGED TO HAVE COMMITTED AN OFFENSE, IN ADDITION TO STEPS 5 AND 6, COMPLY WITH THE FOLLOWING STEPS:

8. Direct that a COMPLAINT REPORT WORKSHEET (PD313-152A) be prepared.

> **NOTE** *If a member of the service is arrested, comply with P.G. 206-11, "Member Of The Service Arrested - Uniformed Or Civilian."*

9. Notify desk officer, precinct of occurrence.

**DESK OFFICER**

10. Notify and confer with precinct commander/duty captain.
11. Notify Internal Affairs Bureau Command Center and obtain Log Number.

**[I.O. 27 s 03]** *a. Enter the IAB Log # in the "Details" section of the NYS Domestic Incident Report.*

b. Enter IAB Log # in the "Details" section of the COMPLAINT REPORT (IAB will determine the appropriate investigating command.)

c. Enter the words "IAB Log #" and the corresponding Log # in the precinct Domestic Incident Report Log under the caption Precinct Serial #." Also, have entered the corresponding SPRINT number in the caption "SPRINT NO." (For the purposes of this procedure, Transit Bureau personnel will use the "CAD. NO." in place of the "SPRINT NO." for assignments that originate through Transit Bureau communications).

**[I.O. 27 s 03]** *d. Direct that the NYS Domestic Incident Report be entered into the Domestic Violence Database (including the IAB Log#).*

**[I.O. 27 s 03]** *12. Prepare report on Typed Letterhead in all cases even if offender was not present. Provide details of incident and include domestic violence referrals/counseling offered to the victim. Forward with copy of COMPLAINT REPORT and NYS Domestic Incident Report in a sealed envelope, as follows:*

*a. Chief of Internal Affairs (original and canary copy of DIR).*

b. Commanding officer, member of the service involved. (If more than one (1 member of the service is involved, send a copy of report to commanding officer of each.)

c. Commanding officer, precinct of occurrence.
   (1) Maintain in confidential file.

d. Commanding officer, borough investigations unit concerned.

e. Commanding officer, borough investigations unit covering member's command, if different from "d."

**Section:   Arrests**

Procedure No: 208-37

f. Commanding officers of:
   (1) Medical Division
   (2) Employee Management Division (immediately, by fax at (212) 374-2768)
   (3) Personnel Orders Section, if firearms are removed.

---

**[I.O. 27 s 03] NOTE** *In situations where the complainant/victim is present at the stationhouse, the desk officer will ensure that only persons who are investigating the incident have access to the complainant/victim. No other copies or files relating to the investigation will be maintained in the precinct of occurrence other than in the commanding officer's confidential file.*

*Victims of domestic violence may be referred to the following in an effort to provide appropriate victim services:*

*NYC Victims Services*      (800) 621-HOPE (4673)
*NYS Coalition Against Domestic Violence*     (800) 942-6906

---

**COMMANDING OFFICER/DUTY CAPTAIN**

13. Commence an immediate investigation and take appropriate action as indicated by P.G. 208-36, "Family Offenses/Domestic Violence."

  a. Make a background inquiry through the Internal Affairs Bureau Command Center during the initial stages of an official investigation involving a member of the service and PRIOR to suspending, modifying or placing the member concerned on restricted duty pending evaluation of duty status. This conferral is to obtain background information that may assist in the investigation. All decisions regarding the investigation, as well as any resulting determination regarding the member's duty status, remain the responsibility of the commanding officer/duty captain concerned.

  b. If the offender is not present and further investigation is required, confer with the Internal Affairs Bureau and request assistance if needed.

---

**NOTE** *Whenever notification of an incident involving a member of the service (uniformed or civilian) residing outside the City of New York is received, the appropriate duty captain will be responsible for conducting an investigation. All decisions concerning the initial investigation of the allegation remain the responsibility of the duty captain. Follow-up notifications concerning actions taken or anticipated will be made to update the Internal Affairs Bureau Command Center.*

---

**COMMANDING OFFICER/M.O.S. INVOLVED**

14. Review and maintain a confidential file of all reports regarding members of the service involved in domestic incidents.

  a. Confer with Internal Affairs Bureau or investigations unit concerned, regarding status of ongoing investigations.

**I.A.B. MEMBER CONCERNED**

15. Determine immediately, if circumstances necessitate an investigation be conducted by Internal Affairs Bureau.

  a. In all other cases, refer the investigation to the investigations unit covering the borough of occurrence.

562

Procedure No:    208-37

## INVESTIGATIONS UNIT, COMMANDING OFFICER

16. Designate a supervisory member of the unit to be a "Domestic Violence Investigator."

17. Ensure that the investigations unit is equipped with a Domestic Incident Repo database.

**[I.O. 27 s 03]** 18. Ensure that the NYS Domestic Incident Report has been entered into the Domestic Violence Database System.  Conduct the Domestic Violenc Database System Review process and finalize the DIR in the database.

19. Check the database for a record of prior domestic incidents.

> **NOTE**  *In addition, confer with the integrity control officer of the subject's and victim's resident precincts to ascertain if other NYS Domestic Incident Reports have been prepared, (e.g., no allegation was alleged, etc.).  Also, check with the investigations unit covering th command of the subject member of the service.*

20. Confer with Internal Affairs Bureau to ascertain whether there exists any reco of prior domestic violence incidents involving the subject member of the serv

**[I.O. 27 s 03]** 21. Confer with the Domestic Violence Officer of the victims reside precinct/local police agency to ascertain if there are domestic violence service available and make appropriate referrals to the victim.  Document referrals m in case folder.

## ADDITIONAL DATA

*An off-duty uniformed member of the service present at an unusual police occurrence (including family disputes and other incidents of domestic violence) i which the officer is either a participant or a witness is required to remain at the scene when feasible and consistent with personal safety and request the response the patrol supervisor.  In situations where remaining at the scene is not feasible, uniformed members are to notify the desk officer, precinct of occurrence.  When incident occurs outside the City of New York, the uniformed member of the servic to notify the Operations Unit.*

*In all circumstances, no matter where issued, when a member of the service (uniformed or civilian) becomes aware that he or she is the respondent/defendan an Order of Protection, the member concerned MUST IMMEDIATELY notify his commanding officer/supervisory head.  The commanding officer/supervisory hea will interview the member concerned and conduct an investigation to determine whether the member of the service is fit for duty.  The commanding officer/supervisory head must then notify the Internal Affairs Bureau Command Center at (212) 741-8401 and obtain an Internal Affairs Bureau log number.  If t member's command is not open when such situation occurs, the member concern will immediately notify the Internal Affairs Bureau Command Center at (212) 74. 8401 and obtain an Internal Affairs Bureau log number.  The member will subsequently notify his/her commanding officer/supervisory head (providing the Internal Affairs Bureau log number obtained) at the first available opportunity. After obtaining the log number the commanding officer/supervisory head will prepare a report to the Chief of Internal Affairs, containing a decision as to duty status.  Additional copies of the report will be forwarded to the commanding offic of the member's resident precinct, the Director of the Employee Management Division and the Investigation Unit concerned.  Any decision regarding a uniform*

**Section:  Arrests**

PROCEDURE NO: 208-37

member of the service's duty status should be made on a case by case basis. The Order of Protection should only be one factor considered in this determination. In cases where the member of the service is a petitioner or complainant on an Order of Protection, the member may choose to notify their commanding officer for safety reasons. If necessary, those affected should comply with the provisions of P.G. 212-31, "Threats To Members Of The Service."

Counseling and other services are available for both members of the service and their families. Uniformed and civilian members or their families may contact any of the units listed below to obtain necessary services and referrals for counseling, shelter and other assistance:

| | |
|---|---|
| Family Counseling Unit | (718) 760-7665 |
| Employee Relations Section | (212) 374-5434 |
| Early Intervention Unit | (212) 374-6730 |
| Counseling Service Unit | (212) 489-0586 |
| Chaplains Unit | (212) 374-6472 |
| Psychological Services Section | (718) 760-7665 |
| Sick Desk | (718) 760-7600 |
| Sick Desk Supervisor | (718) 760-7606 |
| NYPD HELPLINE | (718) 271-7777 |
| Operations Unit | (212) 374-5580 |

After hours, or in an emergency, contact the HELPLINE, Sick Desk or Operations Unit.

In addition, the following non-Departmental programs and Domestic Violence Prevention Hotlines can provide referrals:

| | |
|---|---|
| New York City (Victims Services) | 800-621-HOPE |
| NYS Coalition Against Domestic Violence | 800-942-6906 |
| National Coalition Against Domestic Violence | 202-638-6388 |
| PBA Membership Assistance Program | 888-267-7267 |
| Police Self Support Group | (718) 745-3345 |

## RELATED PROCEDURES

Family Offenses/Domestic Violence (P.G. 208-36)
Threats To Members Of The Service (P.G. 212-31)
Member Of The Service Arrested -Uniformed Or Civilian (P.G. 206-11)
[REV 06-03] Employment Discrimination (P.G. 205-36)

## FORMS AND REPORTS

COMPLAINT REPORT WORKSHEET (PD313-152A)
New York State Domestic Incident Report (DCJS 3221)

Procedure No:   208-38                    Date Effective:   01-01-

# NEW YORK STATE ORDER OF PROTECTION
# REGISTRY

## PURPOSE

To establish guidelines to be followed whenever a complainant claims to be the petitioner (possessor) of an active order of protection but is either unable to prod. a copy of the order or produces one that is illegible, for the responding officer's review.

## PROCEDURE

When a member of the service is informed by a complainant that he/she possesse: active order of protection, which has been violated, but is unable to produce a cop of that order.

## UNIFORMED MEMBER OF THE SERVICE

1. Ascertain from the complainant all available information concerning the order (e.g., court of issuance, date of issuance, the names, addresses and dates of bir of all parties concerned, etc.).

*NOTE  The above list of information to be obtained, if possible, from the complainant serves to aid the member accessing the system in verifying that the correct order has been located.  Failure to obtain certain information from this list will not prevent the locating of a database file; an order can be located merely by entering the petitioner's (complainant's) name and date of birth.  However, every attempt should be made to ascertain as much information as possible concerning the order and the parties to whom it pertains.*

**[I.O. 38 s 03]** *2. Telephone Central Records Division, Identification Section a (646) 610-5195 to verify that an Order of Protection was issued, court of issuance, specific conduct prohibited and the expiration date.*

3. If the Identification Section reports that there are no Orders of Protection on fi pertaining to the complainant/victim, telephone the precinct of occurrence and request a member of the service authorized to operate the FINEST System to conduct an Order of Protection database inquiry.

a. In the event the precinct of occurrence is unable to conduct the inquiry, request the Communications Division dispatcher to conduct the inquiry.

*[I.O. 38 s 03] NOTE  The following information is obtainable through the database:*
*a. Data relating to the person requesting the order of protection (name, address, date of birth, etc.).*
*b. Data relating to the person against whom the order runs (nam address, date of birth, etc.).*
*c. The terms and conditions of the order.*
*d. Date and court of issuance, and date of expiration.*
*e. Whether the respondent has been served with a copy of the order.*
*f. Additional comments regarding the parties involved and unique terms of the order.*

Section:    Arrests

> *It should be noted that the state database will not contain orders*
> *of protection that have been issued prior to October 1, 1995.*
>
> *The Central Records Division Intranet database application will be*
> *utilized to access information for all Orders of Protection issued*
> *by New York City based courts, as outlined in Patrol Guide*
> *procedure 208-36, "Family Offenses/Domestic Violence."*

WHEN THE COMPLAINANT INDICATES THAT THE ORDER WAS ISSUED
PRIOR TO OCTOBER 1, 1995, OR A STATE DATABASE INQUIRY REVEALS
THAT THERE IS NO ORDER ON FILE RELATING TO THE PARTIES
CONCERNED

**UNIFORMED MEMBER OF THE SERVICE**

4. Telephone Central Records Division, Identification Section, at (212) 374-5195 to
verify the existence of the order.

WHEN A STATE DATABASE INQUIRY REVEALS THAT THERE IS AN
ACTIVE ORDER OF PROTECTION IN EFFECT

5. Verify that the order relates to the parties involved, naming the complainant as
petitioner and the offender as the respondent.

6. Verify that the respondent has been previously served with a copy of the order.

> *NOTE  In order to effect an arrest for violation of an order of protection,*
> *the member must have probable cause to believe the order was*
> *effectively served upon the respondent PRIOR to its violation. While a*
> *notation in the database file will provide the member with sufficient*
> *probable cause to believe the order was effectively served, the*
> *absence of such information in the database file will not automatically*
> *prevent the member from making the arrest. If the member, through*
> *alternative means, can verify that the order was properly served (e.g.,*
> *an affidavit of service, an admission by the respondent that he/she was*
> *properly served, etc) then the arrest can be effected.*

7. Determine whether there exists probable cause to believe that the terms of the
order have been violated by the respondent. If probable cause does exist, comply
with the applicable provisions of P.G. 208-36, "Family Offenses/Domestic
Violence."

**ADDITIONAL DATA**

*The fact that the order has not been properly served or that the specific terms of the*
*order have not been violated will not prevent the member from effecting an arrest if*
*the underlying conduct constitutes a crime.*

**RELATED PROCEDURE**

*Family Offenses/Domestic Violence (P.G. 208-36)*

© FPA January, 2004

INTERIM ORDER 17 ISSUED 05-20-08 SUSPENDS/REPLACES PATROL GUIDE 208-39

# FAMILY OFFENSES/DOMESTIC VIOLENCE (DIGITAL PHOTOGRAPHY OF VISIBLE INJURIES/DAMAGED PROPERTY)

## PURPOSE

To capture, catalog, store and maintain digital photographic evidence of visible injuries and/or damaged property as a result of domestic violence.

## SCOPE

All precinct and police service area commands citywide are now able to digitally capture domestic violence photos and transmit them as a permanent record into the Domestic Violence Digital Photo Database. These images may then be instantly viewed by prosecutors at each borough's District Attorney's Office and the New York City Law Department (Corporation Counsel) who will have access to the Domestic Violence Digital Photo Database. Prosecutors may then present digital images of domestic violence to judges at the time of arraignment, thereby strengthening the District Attorney's case. In addition, uniformed members acting in investigatory and support roles (Detective Bureau personnel, domestic violence prevention officers, etc.) will be able to view these photos prior to making further contact with the victim and/or offender.

## PROCEDURE

Upon responding to the scene of a reported domestic violence incident:

## UNIFORMED MEMBER OF THE SERVICE

1. Comply with P.G. 208-36, "Family Offenses/Domestic Violence."
2. Determine if photographs must be taken.
3. Ascertain if the victim is willing to be photographed.
   a. Advise the victim that photographable evidence is crucial to future prosecutorial efforts and/or civil process such as divorce and child custody proceedings.
   b. If victim is not willing to be photographed, note refusal in ACTIVITY LOG (PD112-145), and if possible, have victim sign entry.
4. Notify the patrol supervisor and request that the domestic violence digital camera be brought to location.

> **NOTE** Only the domestic violence digital camera should be used to capture domestic violence evidence. No other cameras are compatible with the domestic violence capture station located in the area of the precinct desk. **PERSONAL PHOTOGRAPHIC EQUIPMENT (CAMERAS, CELL PHONES, HANDHELD COMPUTERS, ETC.) SHOULD NEVER BE USED TO CAPTURE DOMESTIC VIOLENCE EVIDENCE.** The Domestic Violence Digital Photo Database will be the sole repository for photographs of all domestic violence evidence.

## PATROL SUPERVISOR

5. Respond to requested location with domestic violence digital camera and direct photographs be taken of complainant/victim (if willing) and scene, if appropriate.

**Section:  Arrests**

5(

*NOTE Domestic violence prevention officers are also equipped with a digital camera. When working in the field, domestic violence prevention officers should respond to the scene where a domestic violence digital camera has been requested.*

## UNIFORMED MEMBER OF THE SERVICE

6. Take digital photographs as necessary, including but not limited to:
   a. Visible injuries

      *NOTE Injuries may not be initially prominent, therefore it is crucial for domestic violence prevention officers and investigators to take follow-up photographs for bruises that appear at a later time. When a victim makes a complaint of substantial pain (Assault 3rd Degree), and there are no visible injuries, do not take photos.*

   b. Damaged property
   c. Weapons
   d. Overall scene to illustrate items in disarray, indicating domestic violence or distress in home
   e. Other types of evidence (i.e., pictures of caller-id box for aggravated harassment or flowers/notes for stalking, blood on the clothes/hands or ripped clothing of the victim/perpetrator, etc.)
   f. Both pages (Data Sheet and Statement of Allegations written and signed by victim) of the completed **New York State Domestic Incident Report (DCJS 3221-6/05)**
   g. Photo of the victim from the waist up, providing context for the series of photos.

   *NOTE The digital camera is to be set at the highest resolution setting to maximize the quality of the photo with minimal file size. Each photo takes approximately one megabyte of data storage. Therefore, memory cards containing 256 megabytes of memory will be able to hold approximately 256 photos; those with 512 megabytes will hold around 512 photos, etc. The storage capacity of the camera enables members of the service to take as many photos as needed to depict any evidence and/or violence in the home. There is no longer a limit to the number of photos or "sets" of photos that can be taken in domestic violence cases. **Do not set the digital camera memory to "internal memory." The camera must be set to capture photos on a memory card. Photos saved on the internal memory mode cannot be uploaded into the Domestic Violence Digital Photo Database.***

7. Ensure that the phrase "DIGITAL PHOTOS" is documented on the "Evidence Collection" portion of the **COMPLAINT REPORT WORKSHEET (PD313-152A)** and the "Incident #" obtained from the first caption on the initial screen in the Domestic Violence Digital Photo Database is documented in "Invoice #" caption.

   a. This "Incident #" is used by personnel at the District Attorney's Office to retrieve digital photos during pre-arraignment.

© FPA July, 2008

**NOTE** *Polaroid film will no longer be used to capture domestic violen evidence. Therefore, PROPERTY CLERK'S INVOICES (PD521-14 will no longer be used to voucher domestic violence digital phot Domestic violence digital photos will be uploaded into the Domes Violence Digital Photo Database and NOT vouchered. Members a reminded that the photographing of evidence does not substitute the collection and invoicing of physical evidence (i.e., weapor clothing, etc.). Members will adhere to Patrol Guide 218-01, "Invoici Property – General Procedure" when invoicing physical evidence.*

8. Ensure that the "Photo Section" of the New York State Domestic Incident Report is completed after the victim completes the "Statement of Allegations/Supporting Deposition" section located on page two (2) of the **Domestic Incident Report.**

**ARREST PROCESSING OFFICER/ ARRESTING OFFICER/ ASSIGNED OFFICER**

9. Upload all digital photos taken from the digital camera into the Domestic Violence Digital Photo Database by docking the camera and following the prompts from the system.

**NOTE** *Domestic violence digital photos must be uploaded into t Domestic Violence Digital Photo Database by the arresting/assign officer at the earliest opportunity. Digital photos are needed by t District Attorney's Office in arrest cases and by detective investigato on open cases.*

10. Adhere to the following in all cases:
   a. Ensure that the Domestic Violence Digital Photo Database is logged on as DVCAM. No password is necessary.
   b. Place the camera on the docking station and press the space bar (camera can be on or off).
   c. Close the "Internal Memory" and "Picture Card" windows that appear.
   d. Click on the "Domestic Violence Camera" icon.
   e. If the pending box appears, close it and click on the "Capture" icon.
   f. Check off the appropriate relationship(s) to associate the specific domestic relationship.
   g. Answer all mandatory fields designated by an asterisk.
   h. Click on "add" to add photos.
   i. Click on photo thumbnails pertaining to the file, then click "OK" and await transfer of photos.
   j. Complete the captions located beneath the photos.
   k. Click on "Save" and the photos are now saved to the database.

**NOTE** *Instructions for the use of the domestic violence digital came and the uploading and hosting of domestic violence photos into t Domestic Violence Photo Database are maintained at the desk, t Command Reference Library, and are available on the Departme Intranet Site.*

**Section: Arrests**

508

INTERIM ORDER 17 ISSUED 05-20-08 SUSPENDS/REPLACES PATROL GUIDE 208-39

## UNIFORMED MEMBER OF THE SERVICE

11. Make an **ACTIVITY LOG** entry indicating date, time, number of digital photos taken, name and tax number of the officer taking the photos, name and tax number of officer uploading the images, and the name of the Assistant District Attorney confirming receipt if arrest is effected.
12. Ensure the **COMPLAINT REPORT (PD313-152)** number is obtained and entered into the system as soon as practicable.
13. Print one (1) copy of the image(s) using the thumbnail feature and attach it to the **NYS Domestic Incident Report.**

## DOMESTIC VIOLENCE PREVENTION OFFICER

14. Review all completed **NYS Domestic Incident Reports**, finalized **COMPLAINT REPORT** printouts, and the Domestic Violence Digital Photo Database daily to make certain that the digital photos for domestic violence were taken as necessary.
15. Perform follow-up with victims and take digital photos as necessary.
16. Host digital photos after the **COMPLAINT REPORT** has been finalized in the On Line Complaint System (OLCS).

> **NOTE** Once hosted, information contained in the OLCS will automatically transfer to occupy captions in the Domestic Violence Digital Photo Database.

## ADDITIONAL DATA

*The uploading of domestic violence digital photos into the Domestic Violence Digital Photo Database does not require a unique password. The universal password "DVCAM" should be used to gain access to the system. Once uploaded, personnel at the District Attorney's Office can instantly view domestic violence digital photos. Therefore, arresting/assigned officers MUST upload any domestic violence photos from the camera into the database during arrest processing (arrest evidence) or prior to the end of their tour (non-arrest/investigatory evidence), whichever applies.*

*The domestic violence camera and capture station must be maintained in the vicinity of the command desk. Commanding officers will ensure that digital cameras are accessible at all times. Desk officers will allow access to uniformed members of the service to upload/host digital photos into the Domestic Violence Digital Photo Database. When not in use, domestic violence digital cameras must be left on the docking station to maintain a charge. The docking station also serves as a conduit to upload domestic violence photos. The digital cameras assigned to the command are to be included in the commands computer self-inspection worksheet and inventory.*

## MAINTENANCE OF THE DOMESTIC VIOLENCE DIGITAL PHOTO CAMERA

### DESK OFFICER

17. At the beginning of each tour:
   a. Inspect all domestic violence digital cameras assigned to patrol.
   b. Ensure docking station, cables and memory cards (check inside cameras) are operational.
   c. Make a Command Log entry of results.

508-B                                                                 © FPA July, 2008

INTERIM ORDER 17 ISSUED 05-20-08 SUSPENDS/REPLACES PATROL GUIDE 208-39

> **NOTE** *If during inspection, cameras/related equipment are found to inoperable, the desk officer will immediately notify the Domes Violence Unit at 646-610-5970. The Domestic Violence Unit is op Monday though Friday, between 0600 and 1800 hours. However, message must be left during non-office hours. Domestic Violence U personnel will return the call as soon as possible. In the event that t computer where the digital camera capture station resides becom disabled/inoperable, the desk officer will immediately call the MIS Help Desk at (646)-610-6473 and the Domestic Violence Unit. entry of these notifications will be made in the Telephone Record.*
>
> *If during inspection, the loss or theft of any domestic violence came equipment is discovered, be guided by P. G. 219-20, "Loss or Theft Department Property."*

## PATROL SUPERVISOR

18. Make a Command Log entry when signing out or returning a domestic violence digital camera.

## DOMESTIC VIOLENCE PREVENTION OFFICER

19. Inspect all domestic violence digital cameras each day to ensure operability and that all photos are uploaded into the Domestic Violence Digital Photo Database.

a. If upon inspection, any domestic violence cameras/related equipment are missing, lost or inoperable, notify the desk officer.

## DOMESTIC VIOLENCE SERGEANT

20. Ensure that digital photos are being taken with domestic violence digital cameras by first responding officers, as appropriate.

21. Take corrective action when necessary.

## TRAINING SERGEANT

22. Ensure that all uniformed members of the service assigned to the command are properly trained in the taking and uploading of domestic violence digital photos.

## *RELATED PROCEDURES*

*Family Offenses/Domestic Violence (P.G. 208-36)*
*Invoicing Property – General Procedure (P.G. 218-01)*
*Family Offenses and Domestic Violence Involving Uniformed Members of the Service (P.G. 208-37)*

## *FORMS AND REPORTS*

*ACTIVITY LOG (PD112-145)*
*COMPLAINT REPORT WORKSHEET (PD313-152A)*
*COMPLAINT REPORT (PD313-152)*
*PROPERTY CLERK'S INVOICE (PD521-141)*
*New York State Domestic Incident Report (DCJS 3221-6/05)*

**Section:** Arrests

50(

INTERIM ORDER 7 ISSUED 05-20-08 SUSPENDS/REPLACES PATROL GUIDE 208-39

**This Page Intentionally Left Blank**

© FPA July, 2008

Procedure No: 208-70      Date Effective: 03-26-

# PROCESSING OF NEW YORK STATE DOMESTIC INCIDENT REPORTS IN THE DOMESTIC VIOLENCE DATABASE

## PURPOSE

To improve the tracking, monitoring, and analysis of domestic violence cases.

## PROCEDURE

Whenever entering information from a command's past/current **New York State Domestic Incident Report (DCJS-3221)** into the new Domestic Violence Database System:

## UNIFORMED MEMBER OF THE SERVICE

1. Submit hard copy of **Domestic Incident Report** and any related paperwork [COMPLAINT REPORT (PD313-152), AIDED REPORT WORKSHEET (PD304-152b), ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159) etc,] to desk officer.

> **NOTE** *The current New York State Domestic Incident Report (DCJS-3221) does not have captions for certain pertinent information that is collected in the Domestic Violence Database System. Therefore, the following information is to be elicited from the person(s, involved and recorded in the NARRATIVE OF THE INCIDENT:*
>     *a. Alcohol involved*
>     *b. Narcotic involved*
>     *c. Verbal dispute only*
>     *d. Court and Docket number of Order of Protection*
>     *e. Voucher number of photos (if taken)*
>     *f. Social security number and alias of persons involved (record*
>     *next to name if space allows, otherwise include name and*
>     *information in narrative)*
>     *g. Reporting officer's tax number in box titled "OFFICER I.D. NO.*

## DESK OFFICER

2. Review hard copy of **Domestic Incident Report** and any related paperwork fo accuracy and completeness and sign.
3. Direct command clerk to enter information from the **Domestic Incident Repo** into the Domestic Violence Database System.

## COMMAND CLERK

4. Enter information from the **Domestic Incident Report** into the Domestic Violence Database System and print out computer copy.
5. Attach hard copy and computer copy and present them to the desk officer for review.

Procedure No:   208-70

*NOTE  With the implementation of new, linked computer systems, the command clerk must enter all associated reports and obtain numbers from the other appropriate computer systems (OLCS, Aided, etc.) PRIOR TO entering the data into the Domestic Violence Database System. The command clerk will record all appropriate numbers on the hard copy of the Domestic Incident Report. It is imperative that these numbers are obtained prior to the entry of the Domestic Incident report since these numbers link to the other systems and links information contained therein and CAN NOT be entered or retrieved later. In the event that a Domestic Incident Report is entered into the database without these numbers, it MUST BE VOIDED and re-entered with this information.*

*The command clerk will prepare a Domestic Incident Report for walk-in complainants reporting domestic incidents whenever the command's domestic violence officer is not available to do so.*

## DESK OFFICER

6. Review computer copy and compare to the hard copy for accuracy and completeness.

7. Forward both copies to the command's domestic violence officer/designated reviewer.

## DOMESTIC VIOLENCE OFFICER/ DESIGNATED REVIEWER

8. Obtain previously assigned victim and/or offender numbers or generate new numbers, as appropriate, from database.

9. Query the Domestic Violence Database System for the following offender information:
   a.   Warrant history
   b.   Investigation card status
   c.   Gun license/permit status
   d.   Criminal recidivist history
   e.   Targeted narcotics violator status
   f.   Domestic violence history

*NOTE  Results of the New York State Police Information Network (NYSPIN) inquiries concerning orders of protection, probation status and arrest history (Booking Arraignment Disposition System [BADS]), and complaint history (On Line Complaint System [OLCS]), will be entered onto the appropriate captions of the Domestic Incident Report review screen.*

10. Ensure that all computer inquiries regarding the offender are completed during the tour in which they are commenced.
    a. Attach printouts of all inquiries listed in step 9 to the Domestic Incident Report.

11. Forward both copies of the Domestic Incident Report back to the desk officer or domestic violence supervisor for endorsement.

## DESK OFFICER/DOMESTIC VIOLENCE SUPERVISOR

12. Review the **Domestic Incident Report** computer summary screen. Ensure that all **Domestic Incident Reports** and the necessary offender queries are completed.

13. Utilize the supervisory sign off function to finalize each **Domestic Incident Report** thereby entering it into the Domestic Violence Database System.

   a. Print finalized copy of **Domestic Incident Report**.

> **NOTE** *Any Domestic Incident Report prepared by a command other than PRECINCT OF OCCURRENCE must be entered, reviewed and finalized by the COMMAND OF REPORT. The hard copy of the Domestic Incident Report will then be faxed to the precinct of occurrence. The original will be maintained in a file folder marked, "Out of Command DIRs." (This folder is not required if prepared by a PSA, and the incident occurs within the precincts that they cover).*

14. Void any duplicate **Domestic Incident Reports** and those entered incorrectly or in error.

## DOMESTIC VIOLENCE PREVENTION OFFICER

15. Prepare daily a Domestic Incident Index utilizing the computer's "Domestic Violence Query-Status Report" for all the **Domestic Incident Reports** entered the previous day.

   a. Maintain a copy of the Index in the Domestic Violence office and at the desk.

16. Utilize the computer's add/view "follow-up comments function'" to enter new information (e.g. results of home visits, phone contacts, additional information, etc.) related to the **Domestic Incident Report**.

17. Utilize the computer's "High Propensity Offender" function to add and remove offenders to the commands High Propensity List.

## PRECINCT DETECTIVE SQUAD MEMBER

18. Enter case closing status of any resolved domestic violence case into the Domestic Violence Database System.

## ARREST PROCESSING OFFICER

19. Complete a "Global Name Check" of the offender and victim in all domestic violence arrest cases.

   a. Print out the result screen and the previously prepared **Domestic Incident Report(s)**.

20. Forward the name check results and **Domestic Incident Report(s)** with the arrest package to the District Attorney's Office.

Procedure No:   208-70

COMMAND INTEGRITY CONTROL OFFICER

21.   Provide members of the service access to the Domestic Violence
       Database System utilizing the administrator options of the computer as
       appropriate.

22.   Maintain a list of authorized users assigned to the command.

23.   Print, review, and maintain on a monthly basis, a list of all voided
       **Domestic Incident Reports** entered into the Database.

       a.   Take corrective action where appropriate.

## ADDITIONAL DATA

*Domestic Incident Reports that are prepared by officers assigned to commands
other than precinct of occurrence (i.e. Housing Bureau personnel, etc.) who have
access to the Domestic Violence Database System, will be responsible for the data
entry, review and finalization of the **Domestic Incident Report**. The follow-up
investigation will be the responsibility of the precinct of occurrence or housing
PSA, as appropriate.*

*Due to the sensitive nature of the Database information, access is limited to
authorized users and is controlled using CESN passwords. The command's
integrity control officer provides access to the system; however, revoked
passwords must be re-activated by the integrity control officer assigned to the
Management Information Systems Division.*

*Commands will access the Domestic Violence Database System from local
area network (LAN) workstations that have Internet Explorer Browser installed.
Once the system issues a sequential number and the **Domestic Incident Report** is
reviewed by the domestic violence officer, only a supervisor from the precinct of
occurrence is permitted to make modifications.*

*Additionally, once a desk officer/domestic violence supervisor has finalized a
**Domestic Incident Report** for entry into the Domestic Violence Database System, no
modifications will be allowed.  (This does not include domestic violence officer notes
or detective case closing).*

## RELATED PROCEDURES

*Domestic Violence Prevention Officer (P.G. 202-29)*
*Family Offenses/Domestic Violence (P.G. 208-36)*
*Family Offenses and Domestic Violence Involving Uniformed or Civilian Members
Of The Service (P.G 208-37)*
*Family Offense/Domestic Violence (Photographing Visible Injuries/Damaged
Property) (P.G. 208-39)*

## FORMS AND REPORTS

*AIDED REPORT WORKSHEET (PD304-152b)*
*COMPLAINT REPORT (PD313-152)*
*ONLINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159)*
*New York State Domestic Incident Report (DCJS-3221)*

**Procedure No:  212-56**

**INTELLIGENCE DIVISION MEMBER**

12. Transmit details of incident to:
   a. United States Mission to United Nations
   b. New York City Commission for the United Nations and Consular Corps
   c. United States Department of State
   d. Federal Bureau of Investigation.

**PATROL SUPERVISOR**

13. Investigate incident and interview witnesses.
14. Determine if incident is of a serious or non-serious nature.
15. Take <u>immediate</u> action as required by circumstances of incident.
16. Report actions taken to precinct desk officer.

> *NOTE  The desk officer will notify the precinct commander/duty capta-*
> *who will perform the duties of the patrol supervisor if the incident is of*
> *serious nature.  Incidents of a non-serious nature will be investigated*
> *by the patrol supervisor.*

17. Review actions already taken, conduct additional investigation as necessary.
18. Telephone results of preliminary investigation to:
   a. Operations Unit
   b. Patrol borough office concerned
   c. Intelligence Division - indicate whether incident serious or non-serious.
19. Prepare four (4) copies of report concerning results of investigation on
   Typed Letterhead, when incident is of a serious nature, and forward to:
   a.     Chief of Patrol - one (1) copy <u>DIRECT</u>
   b.     Intelligence Division - two (2) copies <u>DIRECT</u>
   c.     File last copy in precinct desk binder.
20. Notify precinct commander/duty captain of actions taken, when incident is
   of a non-serious nature.

**PRECINCT COMMANDER/DUTY CAPTAIN**

21. Review actions taken by the patrol supervisor in non-serious incidents.

**INTELLIGENCE DIVISION MEMBER**

22. Forward one (1) copy of report, if appropriate, to:
   a. United States Mission to the United Nations
   b. New York City Commission for the United Nations and Consular Corps
   c. United States Department of State
   d. Federal Bureau of Investigation.

**DESK OFFICER**

23. Review and process required reports/forms.

**ADDITIONAL DATA**

   *Subsequent reports including final dispositions will be prepared and forwarded
   in the same manner as initial reports.*

   *A parking summons placed upon a vehicle bearing "Diplomat" and "Consul"
   license plates for a safety hazard violation is NOT considered a diplomatic
   incident.*

**RELATED PROCEDURES**

   *Parking Summons - General Procedure (P.G. 209-07)*
   *Unusual Occurrence Reports (P.G. 212-09)*

**FORMS AND REPORTS**

   *ACTIVITY LOG (PD112-145)*
   *TYPED LETTERHEAD*

**Section:    Command Operations**

Procedure No:   212-57                           Date Effective:   01-01-00

# SERVICE OF FAMILY COURT/SUPREME COURT ORDERS OF PROTECTION BY UNIFORMED MEMBERS OF THE SERVICE

## PURPOSE

To effect the service of all orders of protection, and any associated papers, issued by Family Court or Supreme Court to the respondent, and to ensure proper entry of police service into the order of protection database.

## PROCEDURE

When an order of protection issued by a Family Court or Supreme Court is to be served:

## UNIFORMED MEMBER OF THE SERVICE ASSIGNED TO FAMILY/SUPREME COURT

1. Obtain, on a daily basis, all orders of protection and any related papers from the Family Court or Supreme Court clerk.
2. Review order of protection and associated papers to ensure that respondent's address is provided, or petitioner's address if order is to be served at petitioner's residence.
   a. Any set of papers lacking an address will be returned to the Family Court or Supreme Court clerk.
3. Separate orders of protection by patrol borough based on the respondent's address.
4. Prepare two (2) copies of a letter of transmittal  on Typed Letterhead for each patrol borough, as necessary, including:
   a. Respondent's name
   b. Docket number
   c. Caption for final disposition.

> **NOTE** *In addition to orders obtained from Family Court, members of the service assigned to Family Court will also be delivered orders from Supreme Court. These Supreme Court orders will be processed in the same manner as those from the Family Court.  Orders from both Family Court and Supreme Court may be listed on the same letter of transmittal but should be separated by a single blank line.  No more than ten (10) orders of protection will be listed on each letter of transmittal.*

5. Attach letter of transmittal to orders of protection, that have been separated by patrol borough, to be picked up by local patrol borough personnel.
   a. File photocopy of letter of transmittal.

## PATROL BOROUGH COORDINATOR WHEREIN FAMILY COURT LOCATED

6. Obtain all orders of protection and accompanying letters of transmittal on a daily basis.

> **NOTE** *Messengers from Patrol Boroughs Manhattan North and Brooklyn South will pick up their borough's orders of protection from the uniformed member of the service assigned to the local Family Court.*

870

© FPA July, 2003

**Procedure No:   212-57**

7. Forward via Department mail orders of protection to be served in other patrol boroughs.
8. Verify all orders of protection listed on letter of transmittal have been received.
9. Number each order of protection received by precinct and serial number beginning with the number one (1) at the start of each year.  (Example, the first order of protection in the 60th Precinct would be listed as 60-1).
10. Prepare two (2) copies of a letter of transmittal on Typed Letterhead captioned as in step 4 for each precinct where an order of protection is to be served.
11. Attach **STATEMENT OF PERSONAL SERVICE (PD260-152)** and **WARRANT OFFICER'S REPORT OF INVESTIGATION (PD374-1510)** to each order of protection.
12. Forward letter of transmittal and orders of protection to appropriate precinct(s).
   a. File photocopy of letter(s) of transmittal.

---

*NOTE   A separate file of letters of transmittal will be maintained for each precinct within the patrol borough.*

---

**DESK OFFICER**
13. Verify all orders of protection listed on letter of transmittal have been received.
14. Make an entry in a log maintained at the desk and captioned across a double page as follows:

*LEFT PAGE*

| Pct. Serial # | Petitioner's Name | Respondent's Name | Docket # | 1st Tour UMOS Assigned/Desk Officer | Date & Tim of Attempt( |
|---|---|---|---|---|---|

*RIGHT PAGE*

| 2nd Tour UMOS Assigned/ Desk Officer | Date & Time of Attempt(s) | (Through) | 6th Tour UMOS Assigned/ Desk Officer | Date & Time of Attempt(s) | Final Disposition | Time/Date Entered In Database |
|---|---|---|---|---|---|---|

15. Assign a uniformed member of the service to serve the order of protection.
   a. Indicate name under caption "1st TOUR UMOS."

**UNIFORMED MEMBER OF THE SERIVCE**
16. Attempt to serve the order of protection.

---

*NOTE   The order of protection may be served at any time seven (7) days a week, twenty-four (24) hours a day.*

---

**Section:    Command Operations**

**Procedure No:   212-57**

IF ORDER OF PROTECTION IS SERVED

**UNIFORMED MEMBER OF THE SERVICE**
17. Prepare **STATEMENT OF PERSONAL SERVICE** and then photocopy.
   a. Examine and account for all documents served by insuring that appropriate box is checked.
18. Deliver form to desk officer
   a. Forward photocopy to domestic violence prevention officer.

> *NOTE  When preparing STATEMENT OF PERSONAL SERVICE forms for orders issued by Supreme Court, strike out the heading reading "Family Court" and write in "Supreme Court".*

IF UNABLE TO SERVE ORDER OF PROTECTION

**UNIFORMED MEMBER OF THE SERVICE**
19. Document each attempt on **WARRANT OFFICER'S REPORT OF INVESTIGATION.**
20. Make an **ACTIVITY LOG (PD112-145)** entry of each attempt to serve the order of protection.
21. Return the order of protection and related forms at end of tour to the desk officer.

**DESK OFFICER**
22. Repeat step 15.
   a. Indicate name under caption "2nd TOUR UMOS," etc.

> *NOTE  Service of the order of protection must be attempted at least once on each tour for six (6) consecutive tours.  After the sixth tour the order of protection will be considered to be "Undeliverable." Service of the order of protection will be initiated on the same tour that the order is received.*

**DESK OFFICER**
23. Enter into the log one (1) of four (4) final dispositions:
   a. Order of protection served.
   b. Undeliverable-respondent not known at address.
   c. Undeliverable-respondent's new address located outside of command.
   d. Undeliverable-attempts completed on six (6) consecutive tours.
      (1) Ensure that dates and times of attempted service are indicated in the log.
24. Prepare **STATEMENT OF PERSONAL SERVICE** and write "NOT SERVED" on the top right hand corner of the form, if the order of protection was not served.
   a. Strike out the heading "Family Court" and write in "Supreme Court", if the order was issued by a Supreme Court.
25. Place "Undeliverable" orders of protection in log for precinct domestic violence prevention officer to forward.

© FPA July, 2003

Procedure No: 212-57

## DOMESTIC VIOLENCE PREVENTION OFFICER

26. Coordinate all tasks relating to the service and recording of orders of protection including filing, forwarding, etc.
27. Enter applicable information into the State Order of Protection Registry, via the FINEST system, upon receipt of each photocopy of a **STATEMENT OF PERSONAL SERVICE**.
28. Enter the date and time entry into the registry was made under the appropriate caption in log.
    a. Place initials inside same caption.

> **NOTE** *The Domestic Violence Unit will be responsible for ensuring that all Domestic Violence Prevention Officers are trained in the use o the NYSPIN/FINEST system in regard to the entry of service information.*

29. Check log containing orders of protection on a daily basis.
    a. Ensure that for every disposition indicating service was made a corresponding entry was made into the order of protection registry.
30. Forward to the patrol borough coordinator any orders of protection and related forms, if investigation reveals that respondent resides outside of precinct.
31. Maintain a file of letters of transmittal.
32. Enter a final disposition on letters of transmittal as indicated in step 23.

> **NOTE** *Every order of protection received must be assigned one (1) o the four (4) final dispositions.*

33. Forward to the patrol borough coordinator:
    a. Original (white copy) of the completed **STATEMENT OF PERSONAL SERVICE** for all orders of protection.
    b. Original of completed **WARRANT OFFICER'S REPORT OF INVESTIGATION** for orders of protection that are "Undeliverable."
34. Attach to file copy of appropriate letter of transmittal:
    a. Second (blue copy) of **STATEMENT OF PERSONAL SERVICE** and
    b. Photocopy of **WARRANT OFFICER'S REPORT OF INVESTIGATION**, if applicable.

## PATROL BOROUGH COORDINATOR

35. Attach to the file copy of appropriate letter of transmittal, a photocopy of the **STATEMENT OF PERSONAL SERVICE** and the **WARRANT OFFICER'S REPORT OF INVESTIGATION**, if applicable.
    a. Ensure that a final disposition is indicated on letter of transmittal.
36. Forward original (white copy) of **STATEMENT OF PERSONAL SERVICE** and/or **WARRANT OFFICER'S REPORT OF INVESTIGATION** to the uniformed member of the service assigned at the Family Court that issued the order of protection.

> **NOTE** *If the originating Family Court is located outside the patrol borough, the STATEMENT OF PERSONAL SERVICE and/or WARRANT OFFICER'S REPORT OF INVESTIGATION will be returned via the patrol borough coordinator in which the Family Court i located.*

**Section:** Command Operations

Procedure No:   212-57

## UNIFORMED MEMBER OF THE SERVICE ASSIGNED FAMILY COURT

37. Indicate on original letter of transmittal a final disposition:

   a. Order of protection served

   b. Undeliverable-respondent not known at address

   c. Undeliverable-attempts completed on six (6) consecutive tours.

38. Forward **STATEMENT OF PERSONAL SERVICE** to Family Court or Supreme Court clerk.

39. File **WARRANT OFFICER'S REPORT OF INVESTIGATION**.

### ADDITIONAL DATA

*Each attempt made to serve the order of protection shall be documented on a* ***WARRANT OFFICER'S REPORT OF INVESTIGATION*** *and an* ***ACTIVITY LOG*** *entry shall be made. The respondent's name shall be entered under the caption "Defendant Surname" and the docket number shall be entered under the caption "Docket/Indict #." Service must be attempted at least once each tour for six (6) consecutive tours, after which the order of protection may be considered undeliverable.*

*The assigned uniformed member of the service will inquire of neighbors, superintendent, etc., as to respondent's whereabouts. If respondent has moved, attempt to obtain the new address. If the new address is within the precinct, service of the order of protection will be attempted at the new location for an additional six (6) consecutive tours. A new log entry will be required.*

*If the new address is outside the precinct concerned, indicate this on the* ***WARRANT OFFICER'S REPORT OF INVESTIGATION****. The order of protection will be returned to the patrol borough coordinator for forwarding to the proper patrol borough. Although most of the Family Court or Supreme Court orders of protection will be delivered through the patrol borough coordinator, the petitioner may elect to personally seek police assistance in serving the order of protection. In that instance, the desk officer will inspect the "Order of Protection" log to determine if the order of protection has already been served. If it has not been served, a uniformed member of the service will provide assistance in serving the order and give the original (white copy) of the completed* ***STATEMENT OF PERSONAL SERVICE*** *to the petitioner. The petitioner will be instructed to deliver the form to the Family Court or Supreme Court clerk that issued the order of protection. The blue copy of the* ***STATEMENT OF PERSONAL SERVICE*** *will be delivered to the desk officer who will indicate in the log that the order of protection was served, and then forward the copy to the domestic violence prevention officer who will process it in accordance with the foregoing procedure.*

© FPA July, 2003

874

Procedure No:   212-57

*When an exclusionary Order of Protection has been served, uniformed members of the service may not assist respondents who wish to remove clothing/property (commonly known as "clothes jobs"), where an exclusionary Order of Protection exists which prohibits contact between the petitioner and respondent and/or excludes the respondent from being present at said location. Instead, the respondent should be advised to return to court to have the Order of Protection amended, so that he/she may remove clothing/personal property from the location, or, so that the items may be delivered to the respondent or a third party.*

## RELATED PROCEDURES

*Arrests - Removal To Department Facility For Processing (P.G. 208-02)*
*Family Offenses/Domestic Violence (P.G. 208-36)*
*Arrests – Removal To Department Facility For Processing (P.G. 208-02)*
*Family Offenses/Domestic Violence (P.G. 208-36)*

## FORMS AND REPORTS

*ACTIVITY LOG (PD112-1450)*
*STATEMENT OF PERSONAL SERVICE (PD260-152)*
*WARRANT OFFICER'S REPORT OF INVESTIGATION (PD374-1510)*

**Section:**   **Command Operations**

Procedure No: 212-58                                    Date Effective:  01-01-00

# FIRE

## PURPOSE
To protect life and property and assist the Fire Department.

## PROCEDURE
Upon arriving at the scene of a fire:

## UNIFORMED MEMBER OF THE SERVICE
1. Send an alarm or make sure one has been sent.
2. Park RMP car to prevent interference with fire fighting operation.
3. Direct responsible person to remain in front of location to direct fire apparatus if fire is not in view.
4. Warn and assist occupants in evacuation of building.
5. Take other action required by situation.

UPON ARRIVAL OF FIRE APPARATUS:

## UNIFORMED MEMBER OF THE SERVICE
6. Establish police lines beyond the fire apparatus and hydrants in use.
   a. Establish police lines behind the building beyond fire operations, if necessary.

## PATROL SUPERVISOR
7. Supervise members of the service.
   a. Notify desk officer if fire is suspicious and request detectives concerned.
8. Immediately assign uniformed members of the service to direct and control responding emergency vehicles to allow free access to affected area.
   a. Ensure that fire hydrants remain accessible for use.

## UNIFORMED MEMBER OF THE SERVICE
9. Permit only the following persons or vehicles to enter fire lines:
   a. The Mayor
   b. Members of governmental agencies in performance of duty
   c. Employees of public service corporations in the performance of emergency duties
   d. Persons holding unexpired:
      (1) Working Press cards
      (2) Fire Line cards signed by the Fire Commissioner
   e. The Mayor's car
   f. Police and Fire Department vehicles
   g. Ambulances
   h. Public service corporation vehicles for duty in connection with the fire
   i. City agency vehicles for duty in connection with the fire
   j. U.S. Mail vehicles
   k. Prison vans transporting prisoners.

© FFA July, 2003

876

Procedure No:   214-21          Date Effective:  09-22-00

# PROJECT SAFE – ESCORTS FOR SAFE HORIZON CLIENTS AND LOCKSMITHS

**PURPOSE**

To prevent assaults and other criminal acts against Safe Horizon clients and authorized locksmiths (Project SAFE).

**SCOPE**

PROJECT SAFE is a program administered by Safe Horizon that provides lock replacements and counseling to victims of domestic violence and other crimes.  This Department will assist in this endeavor by providing a police escort.

**PROCEDURE**

When a request is received from Safe Horizon to escort a client and authorized locksmith:

**DESK OFFICER**

1. Record notification from Safe Horizon in Telephone Record.

> *NOTE Safe Horizon will telephone in advance to notify desk officer of the pending arrival of the locksmith and client.*

2. Identify the client and locksmith, when they arrive at the precinct.

> *NOTE Safe Horizon policy is to ensure that domestic violence victims still cohabiting with the batterer must have an exclusionary Order of Protection in order to have their locks changed.  Desk officers will ensure that this policy is enforced.*

3. Assign the precinct crime prevention officer or the precinct domestic violence officer to escort the client and locksmith, if time permits.

4. Assign a uniformed member of the service to provide the escort, if the crime prevention officer or the domestic violence officer is not available.

**UNIFORMED MEMBER OF THE SERVICE**

5. Escort identified client and locksmith to location and notify radio dispatcher.
6. Have client ride in Department vehicle to the location, if necessary.
7. Remain at location until locksmith has completed the work.
8. Escort locksmith from premises.
9. Notify radio dispatcher that escort is completed.
10. Report completion of assignment to desk officer.