Notwithstanding her story that she had sought police intervention earlier that day, I insisted that she call 911 again and report the chain of events. She complied.

Eventually another patrol car arrived in front of our building. Two police officers, whom Kelly has since reminded me were named P.O. Longo (shield # 31565) and P.O. Walker, related to us that they were instructed by the station's desk sergeant not to take Kelly's reports. P.O. Walker stated that the District Attorney's office had instructed the precinct not to respond to any of Kelly's calls. I recall being genuinely shocked and outraged to hear this instruction, and further surprised that a young woman, like P.O. Walker, would be tasked by her superiors with being complicit in a practices that left a domestic violence victim without recourse for protection. At this juncture, I introduced myself as an officer of the court and member of the NY State Bar, and reminded the officers of their legal and ethical responsibilities to provide complainants with police services. I recall that the officers responded more favorably to me than they did to Kelly, but I could not discern whether this was the case because I notified them that I am an attorney, or because I'm just someone other than Kelly Price. P.O. Walker stated that she would take basic information about the incident, but she believed that once the precinct began to process the event, it most likely would be "circular-filed" in the trash bin. P.O. Longo gave Kelly an incident ID slip and told her to follow up with the precinct in a few days, then both officers left. I was then, and remain, dumbfounded by what I witnessed transpire that evening.

As a single young woman living and working in NYC, it unsettled me that the police could be so cavalier about Kelly Price's safety. Kelly has since told me that the complaint number she was given months later when she inquired as to why no one had ever followed up with her about the incident was 2012-28-005194. Kelly also informs me that the detective squad at the 28th Precinct closed her incident report without contacting her either to identify the perpetrator of the attack or review the emergency room reports or follow-on orthopedic assessments describing Price's injuries resulting from the attack.

Please feel free to contact me concerning these events.

Sincerely,

Elizabeth Walker

**Exhibit J**

Marilyn Benetatos
231 West 120th Street
N.Y. N.Y. 10027
(212) 663-5372 (home)
(347) 203-2623 (cell)

To whom it may concern:

I was a neighbor of Kelly Price when she lived at 237 West 120th Street.  I am a manager in Con Edison where I have worked for over 26 years.  I have approximately 70 employees in my chain of command.  I lived on the street for over 12 years, walk my dog every day and know and get along with my neighbors.

In the spring and summer of 2011 and later in 2012, there were some problems on the street related to young teenagers from other blocks hanging out on 120th street vandalizing cars, the school yard, fighting in the streets and being somewhat threatening to others.  As a result, a group of us from the block attended monthly meetings at the police station to make our issues known there and to get further on-going support from the police and the community officer.  The police were very helpful, offered a lot of support and worked with us and the principal at the local school and facilitated the problem going away.

After the formal meeting, the head of the station, Captain Rodney Harrison, invited attendees to speak with him personally about issues of concern.  I went up to him after one of these meetings and asked him why more was not being done to help Kelly Price, who everyone knew was being battered.  I was concerned because the young teenagers seemed to be learning the wrong thing from the situation.  At that time, Captain Harrison told me that he had never seen anything like it, but he/the police were told to not respond to Kelly Price without the direct instruction of the District Attorney's office.  He said it was strange but indicated that, to some extent, his hands were tied.

I found his response really surprising, so it stood out in my mind.  I don't remember when or in what circumstances I came to be telling Kelly Price the

details of my interaction with Captain Harrison.

Please feel free to contact me, should I be able to assist you further.

Sincerely,

**Exhibit K**

Case 1:15-cv-05871-KPF   Document 16-3   Filed 05/09/16   Page 6 of 71

**The New York Times**

N.Y. / REGION

# In Conspiracy Trial, a Query: What, Exactly, Is a Gang?

By JOHN ELIGON    OCT. 11, 2011

From a telephone on Rikers Island, an inmate barked out his orders to a man in Harlem, prefacing them with an explanation.

"Yo, there's money out there right now," the inmate, Jaquan Layne, said. "Go outside."

The man on the other end of the line, Jeffrey Brown, turned to the others inside the Harlem apartment and echoed Mr. Layne's orders: "He said there's money out there right now. Go to the block."

There were other directives: Mr. Brown should collect some money from a woman named Gloria, and if she asked any questions, she should be told that Mr. Brown was "taking care of this now" because Mr. Layne was locked up. Another man in the apartment, Habiyb Mohammed, was asked to monitor the others because they were "new at what they're doing right now, so, like, keep them on point."

This recorded phone call and dozens of others between Mr. Layne and his friends form the central issue in a trial in Manhattan that might at first seem simple: What is a gang?

To Manhattan prosecutors, a gang is a structured criminal organization, and Mr. Layne's worked together as a drug-selling enterprise that defended its turf, a block of 137th Street, with violence.

Case 1:15-cv-05871-KPF   Document 16-3   Filed 05/09/16   Page 7 of 71

But to the lawyers for Mr. Layne and four co-defendants, the group, while perhaps selling drugs, was anything but a structured trafficking enterprise.

The trial began three weeks ago and is expected to go to the jury on Wednesday.

The defendants, portrayed by prosecutors as gang leaders, are Mr. Layne, 21; his brother Jahlyl, 18; Mr. Brown, 20, who is a cousin; Mr. Mohammed, 31; and Jonathan Hernandez, 19. Jahlyl Layne is charged with second-degree conspiracy. The other four are charged with first-degree conspiracy, which carries a maximum sentence of life in prison.

The prosecutors, who must prove that the defendants agreed to commit a crime and took steps to do so, are using the recorded telephone conversations to illustrate what they say is the behind-the-scenes planning and structuring of a drug organization.

Conspiracy charges are generally difficult to prove, legal experts said, but they offer prosecutors a great reward: they can bring down multiple defendants at once and wipe out entire pockets of crime.

Karen Friedman Agnifilo, chief of the trial division in the Manhattan district attorney's office, speaking generally about gangs and not about the case currently on trial, said, "They might not be as structured or organized, but they're not less violent." She added, "We're focusing on violence."

She said Cyrus R. Vance Jr., the Manhattan district attorney, emphasized a holistic approach in which the office not only prosecuted violent groups, but also promoted community-building activities to help keep young people away from crime.

Law enforcement authorities said that modern-day gangs in New York City shared several characteristics: members tend to be young, under 20; they are territorial, attaching themselves to a specific block or housing project; they are well armed and instantly violent. Some gangs simply exist to fight other gangs, while others are centered on crimes like gun trafficking.

Case 1:15-cv-05871-KPF   Document 16-3   Filed 05/09/16   Page 8 of 71

In the 137th Street case, prosecutors said, Jaquan Layne was the ringleader of a gang tied together by a drug operation. But where prosecutors hear strategy and planning in telephone conversations, Mr. Layne's lawyer, Franklin Rothman, hears a young man who likes to boast.

"They have nothing on Jaquan Layne other than his big, stupid mouth that got him in trouble," Mr. Rothman said in his opening statement. "He's not part of a conspiracy. He's not part of this gang. He's a guy from the block."

In one call, Jahlyl Layne seemed intent on collecting on a debt, even though he was in jail.

"You know them fiends still owe me that money, too," he told the man on the other end of the phone. "Go get that money, B."

"I'm gonna go knock on that door for you," the man responded. "I got you."

Prosecutors said some of the calls also described the group's violence and the passing of weapons. Pierce Gross, who is not on trial but was one of the people charged with the 137th Street group, told someone in a recorded call that "Jon snapped," meaning he had fired a gun.

Mr. Gross was speaking of an episode, prosecutors said, in which Mr. Hernandez fired several shots at someone, leading to an attempted-murder charge being prosecuted in the trial.

Some of the phone calls displayed internal strife, prosecutors said. In one call, Jahlyl Layne told Louis Williams, who prosecutors said was in the gang, that someone was "gonna kill" him and others in the group who were still on the streets because, he said, using a term for money, they "ain't setting no chicken out" to those who were in jail. They were "due a spanking," Mr. Layne said.

Mr. Williams called Mr. Layne's bluff, saying they were not "gonna kill nobody."

In another call, Jaquan Layne appeared to complain that Mr. Brown and another man were still selling drugs but not putting any of the money in his commissary account at Rikers. They "ain't sending me no paper," Mr. Layne told

Case 1:15-cv-05871-KPF   Document 16-3   Filed 05/09/16   Page 9 of 71

Afrika Owes, a former private-school student who was also charged in the case but pleaded guilty to lesser charges.

"Who they selling it for?" Ms. Owes asked.

"They self," Mr. Layne responded.

Mr. Rothman, his lawyer, has said that that answer indicated an every-man-for-himself attitude, rather than some structured drug organization with people working together.

Yet in another call, Mr. Layne appeared to be instructing Ms. Owes on how to take care of herself. After she explained that she was carrying guns, Mr. Layne told her that if things got crazy, she should use them — "let it go, let it go."

"I got you," Ms. Owes responded.

"Make sure," Mr. Layne said, "head shots only."

A version of this article appears in print on October 12, 2011, on page A21 of the New York edition with the headline: In Conspiracy Trial, a Query: What, Exactly, Is a Gang?.

© 2016 The New York Times Company

**Exhibit L**



# Maria Strohbehn

Assistant District Attorney, Manhattan District Attorney's Office

New York, New York | Law Practice

| | |
|---|---|
| Current | Manhattan District Attorney's Office |
| Previous | U.S. Department of Justice, U.S. Attorney's Office, District of Maryland, State Attorney's Office, Anne Arundel County, National District Attorney's Association/ American Prosecutor's Research Institute |
| Education | The George Washington University Law School |

**Send Maria InMail** ▸

**119**
connections

in www.linkedin.com/pub/maria-strohbehn/54/1b9/294

**Background**

##  Summary

As a member of the Trial Division, I am responsible for investigating, indicting, and trying felonies. In Manhattan, we vertically prosecute: I take on cases from arrest and handle them through collateral appeal. As lead prosecutor, I have tried nine cases before juries in New York County and conducted dozens of hearings. I have presented at least fifty cases before the grand jury, including cold-hit DNA cases.

Currently, I am supervising two junior attorneys in a project targeted to reduce crime in Mid-town Manhattan. In the past, I served as a junior member of a project targeting a specific gang responsible for violence in Harlem. These projects highlight the investigative skills necessary for a big-city prosecutor.

---

Ads You May Be Interested In

 **Corporate Headshots**
$25.00 off to LinkedIn Members! Over 240 Recommendations on LinkedIn!

**Find Your Dream Job Fast**
Get free tips on how to find your travel, tourism & hospitality dream job.

 **Jump Start Q2 Sales**
Support your hybrid entrepreneurs, overcome the 3 Fatal Flaws in Selling

## People Also Viewed

**Amy Cohen**
Assistant District Attorney

**Daniel Boylan**
Assistant District Attorney, Crime Strategies Unit at New York County District Attorney's Office

**David R. Smith**
Trial Attorney at Adam Leitman Bailey, P.C.

**palmira garcia**

**Erin Tierney**
Assistant District Attorney at New York

**Exhibit M**

Maria Strohbehn

Assistant District Attorney, Manhattan District Attorney's Office

Location

New York, New York (Greater New York City Area)

Industry

Law Practice

Maria Strohbehn's Overview

Current

- Assistant District Attorney at Manhattan District Attorney's Office

Past

- Law Clerk at U.S. Department of Justice, U.S. Attorney's Office, District of Maryland
- Intern at State Attorney's Office, Anne Arundel County
- Law Clerk at National District Attorney's Association/ American Prosecutor's Research Institute

see all...

Education

- The George Washington University Law School
- University of Maryland Baltimore County

Connections

77 connections

Maria Strohbehn's Experience

Assistant District Attorney

**Manhattan District Attorney's Office**

Law Practice industry

September 2008 – Present (2 years 11 months)

· Research and write various pre-trial and post-conviction motions, including motions in opposition of dismissal, motions in opposition of vacating judgment, and motions for protective order

· Write search warrants including residences, computers, cellular telephones, and other mobile technology

· Present cases to the grand jury in Manhattan, from complex identity theft cases to domestic violence assaults

· Investigate and prosecute long-term employee fraud

· Serve as First Chair on bench and jury trials

· Organize trial strategies by reviewing evidence and developing themes

· Collaborate with family lawyers in domestic violence-related custody and divorce issues in the Integrated Domestic Violence Part of the New York County Supreme Court

· Volunteer, such as a presentation to adolescents in upper-Manhattan on various aspects of the criminal law and law enforcement issues in New York, including dating violence

· Attend continuing legal education seminars including a lecture on various forms of financial evidence, and its collection

· Write complaints to commence prosecution on the basis of a thorough review of evidence in shifts, including shifts into the early morning

· Balance a caseload of about three-hundred active cases with an aggressive court schedule· **Chosen to begin working on a bureau based project targeting gang-related violent crime in the 28th precinct in 2011**

**Exhibit N**

12/20/10

9:32 PM
1/2  Chalupa u fucking with this dude: but you on my back about girls.  trying to get me
locked up for no reason. When I  get locked up I'm showing and telling
2/2 everything.  And calling warren once I get locked up.

9:46 PM:  I will turn your life upside down one I'm in Jail.

10:02 pm:  Yea if you say so Hoe:  Everybody is going to know

10:25 pm:  so they will love all the great things I got to show them

10:31 pm:  its your word against mine let's play I got pi and everything else.  Daddy and
mommy and big bro will love my info.  And I saw your speed dial u got two guys on
speed dial ur sad broke and a hoe.  ur a loser

10:33 pm:  warren rob warren rob warren rob they going to love me

12/21/10

6:37 am:  lets have make up sex my dick is rock hard

(12/21 time unidentified sometime between 6:37 and 10:17 am)
[TEXT BENEATH NAKED PHOTO OF ME]
U see that window that's your house.  Just leave me alone please I don't want to be with
someone that wants to get me locked up.  Plus Hoeing

(12/21 time unidentified sometime between 6:37 and 10:17 am)
[TEXT BENEATH NAKED PHOTOs OF ME]
Two taps I can see every word even your number and I got more.  Just leave me alone
and stop lying to the cops.  I'm not going to fuck you intill I get lock up for no reason

10:17 am
I have Keys

10:19 am:  U think I'm playing.  Play with the cops and u will never hoe or work again

10:21 a.m:  Your is too

10:25 a.m. thanks more for the cops when you get me locked up

10:28 Not when they see what I got and the people who will come downtown to help me

10:32 that paper will

12/22:

9:02 a.m.:  Did you pay my car note

9:20 am: I was making a lot of money when I had my car.  How u think I saved your ass so many times.  When u had no money.  I would love it if u can pay my car note like you said u would but if not we can go 310 310 = 620 or I can pay it by myself just the the info.  please I need that car on the streets.  I don't have to get nj plate it koool.  I will wait intill the weeks are up. ate the gym I'm taking a cab to my lot and going to the dmv to take back my plates

*RESPONSE 9:30 am: You ignore every holiday you spend hem with someone else including my birthday I can't wait till your car is gone*

9:28 am: when they take my car I'm telling every thing that on niya

9:30 am: once that go u know what's going to happen

*9:30 am RESPONSE: I am not talking to you until I get my phones and i'm warning you stay away from the DMV u have no right to conduct my business*

10:07 am: So get my car took of u want.  Just know what's happens after.  no order can stop me from talking.

*RESPONSE: 10:10 am I hate you for ruining me but I will survive you been doing me filthy for too long*

10:16 am:  Hell no tell me how?  other way around.  Ruining you how?  Ur selfish an i u fuck me with the cops or my car u will not survive because I'm going to really ruining u like u keep trying to do to me.  But I'm going to OVER DOSE ON YOU.  So  give me the info or let's go half or pay the note.  but that car is not going no where.

10:22 am: I will never fuck you.  But u fuck me so many times.  So I'm not letting u get away no more.  You know right from wrong so u fuck me I'm going hard.  Please I love you so don't make me do this

**Exhibit O**



**Exhibit P**

Exhibit 2
Page 1

**SKIN**
__ intact
__ warm, dry

| | __ see diagram |
| __ ecchymosis / laceration |
| __ crepitus / diaphoresis |
| __ decubitus |

**BACK**
__ no CVA
__ tenderness
__ no vertebral
__ tenderness

| __ see diagram |
| __ vertebral point-tenderness |
| __ CVA tenderness |
| __ muscle spasm / limited ROM |

**EXTREMITIES**
__ atraumatic
__ pelvis stable
__ hips non-tender
__ no pedal edema
__ nml ROM
__ nml color / temp

| __ see diagram |
| __ bony point-tenderness |
| __ painful / unable to bear weight |
| __ pulse deficit |

__ *Joint Exam:*
__ limited ROM / ligaments laxity
__ joint effusion

T=Tenderness  PT=Point Tenderness  S=Swelling  E=Ecchymosis  B=Burn
C=Contusion  L=Laceration  A=Abrasion  M=Muscle spasm  FW=Fracture Wound
(O° = without normal)  med=moderate etc  err=around

## PROCEDURES

Wound Description / Repair:                    Time:_____
length 1.5 x 3 cm  location Outer thr
linear  stellate (irregular) (flap)  inciso: subcut / muscle
(clean)  contaminated moderately / heavily
distal NVT: (neurovasc intact)  (no tendon injury)
anesthesia: (local) topical __ /__  (lidocaine) / bupivacaine  epi / bicarb
    digital block
prep:  Shur-Clens  Eterna H/C
irrigated with saline         (debrided mod. / extensive)
wound explored              (wound margins revised)
    to bone / in bloodless field    multiple flaps aligned
(no foreign body identified)
    foreign material removed
repair:  Wound closed with:  wound adhesive / Dermabond / steri-strips
    SKIN-   #  17      5 .0 (nylon) / prolene / staples /
                          silk / vicryl
    SUBCUT- #            -0  vicryl / chromic
    OTHER-  #            -0

## LABS

| CBC | Chemistries | UA | ETOH |
|-----|-------------|-----|------|
| normal except | normal except | normal except | TOX____ |
| WBC____ | Na____ | | |
| Hgb____ | K____ | HCG____ | PT/PTT____ |
| Hct____ | CO2____ | serum / urine | INR____ |
| Platelets____ | Glue____ | POS  NEG | |
| | BUN____ | | |
| | Creat____ | | |

Multiple Trauma - 18

---

First Name  Cathleen        Last Name  Alis
MRN  167 9107                White

## EKG & XRAYS

EKG __ NML  __ Interp. by me  __ Reviewed by me  Rate____
__ NSR  __ nml intervals  __ nml axis  __ nml QRS  __ nml ST/T

XRAYS __ Interp. by me  __ Reviewed by me  __ Disc'd w/ radiologist
C-spine __ T-spine __ LS-spine __ pelvis
__ nml / NAD  __ no fracture  __ nml alignment  __ soft tissues nml

CXR
__ nml / NAD  __ no pneumothorax  __ nml heart size  __ nml mediastinum

CT Scan                            __ Disc'd w/ radiologist
    head  C-spine  chest  abdomen / pelvis
__ nml / NAD____

Ultrasound / FAST Exam
__ nml / NAD____

Other____

## PROGRESS

Time____    unchanged    improved    re-examined

__ Referred / Discussed with PCP Dr.____              Time____
__ will see patient in  office / ED / hospital
__ pt. interviewed / examined by ED attending
__ pt. discussed with ED attending  P McGreevy

__ Counseled patient / family regarding:  Additional history from:
   lab / rad results  diagnosis  need for follow-up  family  caretaker  paramedics
   Rx given.
CRIT CARE TIME  (excluding separately billable procedures)____ min

## CLINICAL IMPRESSION

Abrasion
Concussion  with LOC  w/o LOC
Contusion
(Laceration)
Fracture
Sprain / Strain  cervical  thoracic  lumbosacral

DISPOSITION-  ☑ home  ☐ transferred
Time____     ☐ admitted  POA decubitus / UTI (foley)____
CONDITION-   ☐ unchanged  ☐ improved  ☐ stable____

_____  MD/DO/PA
_____  MD/DO  8/11/10
                       Attending
☐ Template Complete  ☐ See Addendum (Dictated / Template #____)

Page 2 of 2.

Exhibit 2
Page 1

**SKIN**
__ intact
__ warm, dry

_see diagram_
__ ecchymosis / laceration
__ crepitus / diaphoresis
__ decubitus

**BACK**
✓ no CVA
__ tenderness
✓ no vertebral
tenderness

_see diagram_
__ vertebral point-tenderness
__ CVA tenderness
__ muscle spasm / limited ROM

**EXTREMITIES**
__ atraumatic
__ pelvis stable
✓ hips non-tender
✓ no pedal edema
✓ nml ROM
✓ nml color / temp

_see diagram_
__ bony point-tenderness
__ painful / unable to bear weight
__ pulse deficit

_Joint Exam_
__ limited ROM / ligaments laxity
__ joint effusion

T=Tenderness  PnT=Point Tenderness  S=Swelling  E=Ecchymosis  B=Burn
C=Contusion  L=Laceration  A=Abrasion  M=Muscle spasm  PW=Puncture Wound
(0 = without  m=mild  mo=moderate  sv=severe)

## PROCEDURES

**Wound Description / Repair:**   Time_____
length 1.5 × 3 cm   location _Lower lip_
linear   stellate   (irregular) (flap)   into: subcut / muscle
(clean)   contaminated moderately / heavily   (no tendon injury)
distal NVT: (neurovasc intact)
anesthesia: (local) topical _1%_   (lidocaine) / bupivacaine  epi / bicarb
digital block
prep: Shur-Clens _Betadine 4%_
irrigated with saline   (debrided) mod. / extensive
wound explored   (wound margins revised)
to base / in bloodless field   multiple flaps aligned
(no foreign body identified)
foreign material removed
**repair:**   Wound closed with: wound adhesive / Dermabond / steri-strips
SKIN-   # _17_   _5_.0 (nylon) / prolene / staples /
silk / ethilon
SUBCUT-   #_____   _0 vicryl / chromic
OTHER-   #_____   _0_____

## LABS

| CBC | Chemistries | UA | ETOH |
|---|---|---|---|
| normal except | normal except | normal except | TOX |
| WBC____ | Na____ | | |
| Hgb____ | K____ | | |
| Hct____ | CO2____ | HCG____ | PT/PTT____ |
| Platelets____ | Gluc____ | serum / urine | INR____ |
| | BUN____ | POS  NEG | |
| | Creat____ | | |

Multiple Trauma - 18

---

_Carolees_ _____   _Aug_ _____
First Name        Last Name

_1674407_
MRN                _White_

## EKG & XRAYS

**EKG**   __ NML   □ Interp. by me   □ Reviewed by me   Rate____
__ NSA   __ nml intervals   __ nml axis   __ nml QRS   __ nml ST/T

**XRAYS**   □ Interp. by me   □ Reviewed by me   □ Discsd w/ radiologist
**C-spine   T-spine   LS-spine   pelvis**
__ nml / NAD   __ no fracture   __ nml alignment   __ soft tissues nml

**CXR**
__ nml / NAD   __ no pneumothorax   __ nml heart size   __ nml mediastinum

**CT Scan**   □ Discsd w/ radiologist
**head   C-spine   chest   abdomen / pelvis**
__ nml / NAD_____

**Ultrasound / FAST Exam**
__ nml / NAD_____

**Other**_____

## PROGRESS
Time_____   unchanged   improved   re-examined
_____
_____
_____
_____
_____

__ Referred / Discussed with PCP Dr._____   Time_____
will see patient in: office / ED / hospital
__ pt interviewed / examined by ED attending
✓ pt discussed with ED attending _____

□ Counseled patient / family regarding   Additional history from:
lab / rad results  diagnosis  need for follow-up   family caretaker paramedics
Rx given_____
CRIT CARE TIME _(excluding separately billable procedures)_____ min

## CLINICAL IMPRESSION

Abrasion_____
Concussion  with LOC   w/o LOC_____
Contusion_____
(Laceration)_____
Fracture_____
Sprain / Strain  cervical  thoracic  lumbosacral___

DISPOSITION-   ✓ home   □ transferred
Time_____   □ admitted   PDA  decubitus / UTI (foley)___
CONDITION-   □ unchanged   □ improved   □ stable___

_____ MD/DO/PA
_Intern/Resident/PA_
_____ MD/DO 5/11/10
_Attending_

□ Template Complete   □ See Addendum (Dictated / Template #_____ )

Page 2 of 2

*Exhibit 2 page 2*

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|----------|--------------|----------------|--------------|-----|-----|
| DIS-Hd6 | Price,Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche,Carlos M, MD

--------------------------------------------------------------------------

ED Adult RN Initial Note -- cont'd
Braden Scale : Score: 22 Scale: no risk Sensory Perception: responds to
               verbal commands,has no sensory deficits Moisture: skin
               is usually dry Activity: walks frequently during
               waking hours Mobility: makes position changes without
               assistance Nutrition: eats over half most meals or on
               tube feeding or TPN regimen which probably meets most
               of nutritional needs Friction/Shear: moves in bed and
               in chair independently.
Skin Lesions?: yes
Lesion Detail: Lesions: laceration, hematoma Location: right posterior
               thigh, facial
               Lesions: laceration Location: right thigh, left buttocks,
               face
Photo        : not applicable
--------------------------------------------------------------------------

  Problem List:
  Diagnosis   :
  Working Diag:

  Resulted by        : Lopez,Michelle, RN   (ESOF)
  Ordering MD        :   (ESOF)

Exhibit 2
Page 8

74776827

## Narrative History: Key words - (Onset, Provokes, Quality, Radiates, Severity, Position, Chronus En Route, Medications)

**PMH:** ☐ Asthma ☐ Chronic Renal Failure ☐ Cardiac ☐ Diabetes ☐ Frail / Debilitated ☐ Hypertension ☐ IV Drug Use ☐ Seizure Disorder ☐ Tracheostomy
☐ Angina ☐ Cancer ☐ COPD ☐ CVA / Stroke ☐ Dialysis ☐ HIV / AIDS ☐ Incontinent ☐ Psychiatric Hx ☐ Substance Abuse ☐ Tuberculosis

**Special Conditions:** ☐ Bed Confined ☐ Non-Ambulatory ☐ Required Stretcher ☐ Valid DNR

**Allergies:** ☑ No known allergies

**Medications:** ☐ Unknown   Denied

Pt Ambulatory, Alert, Appears to have small abrasions on
her face
PERL OLOC some Abrasions to her face, SOB
Neck, OH ABD, X deals SNWD, side of upper leg R
Proximal to buttocks on lateral side lacerations
(small multiple) PMS X 4 Ext. Pt was assaulted earlier by
unknown person She was choked and wrestled & this person &
crashed into a _____ Pt _____ Page ___ 167 46 07
5151876075 5
PRICE CATHLEEN
F 11/11/10 - 11/11/10
232 WEST 10UTH STR
NEW YORK, NY 10021

**Chief Complaint:** _____
**Presumptive Diagnosis:** _____ Assault

**SH9001 (2 of 2), Rev 3G, 0510**   © 2010 Sansio   (Page 2)

Exhibit 2 page 3

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|---|---|---|---|---|---|
| DIS-Hd6 | Price,Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche,Carlos M, MD

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MDInitNote DellaFavaA
Event Time: Thu, 11 Nov 10   0336                    Status: complete

Thu, 11 Nov 10   0606    Documented by Carlos M Meletiche, MD

| | |
|---|---|
| T | : 97.9 F (36.6 C) |
| P | : 84 bpm |
| BP | : 127/77 |
| R | : 18 |
| Pain | : yes |
| Pt Walked Out? | : no |
| Time Pt Seen | : 11Nov2010 0326 |
| Visit Provider | : Albert David Della Fava, MD |
| Attending | : Carlos M Meletiche, MD |
| Communication | : Direct Communication in Patients's Primary Requested Language |
| Chief Complaints | : Assault Sustain 3 laceration to Rt posterolat thigh and facial hematoma |
| TB/Pneumonia | : Fever: no Cough: no Night Sweats: no Weight Loss: no Shortness of Breath: no |
| Assessment | : vs wnl, mild distress however patient calmed during exam, no respiratory distress or SOB, abrasion/bruise to right infraorbit, no orbital tenderness EOMI, erythema to lateral neck and throat, 5 cm laceration to left buttock, 3 1.5 cm lacerations to right hip, no boney deformates or joint complaints |
| Plan | : clinical work up as ordered |
| Diagnosis | : Assault by other specified means |
| E&M Level | : non critical visit |
| Non-Critical Vst | : 99283 expanded problem focused hx, exam and mod complex MDM |
| Attend'g Addendum: | Gen Supv |
| DAWN? | : no |
| Comment | : See paper chart |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Diagnosis       : E968.8    Assault by other specified means
Principal Pr: E968.8    Assault by other specified means

Exhibit 2 page 4

Fri, 22 Apr 11  1450                                    Page  5 of 8

Chart Review Print

Metropolitan Hospital Center

Location        Patient Name              Patient Number    Visit Number    Age    Sex
DIS-Hd6         Price,Cathleen            1674607           1674607-4        40Y    F

                                          Attending Physician
                                          Meletiche,Carlos M, MD

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PHM/PSHx/Fam:
Diagnosis    :
Working Diag:

Resulted by       : Meletiche,Carlos M, MD (ESOF)
Ordering MD       : (ESOF)


ED RN Disposition Assessment
Event Time: Thu, 11 Nov 10  0554                    Status: complete

Thu, 11 Nov 10  0558   Documented by Nakita Mccoy, RN

Discharge Disposition: treated & released
Home Care Discharge  : no
Diagnosis            : Assault by other specified means
Vital Signs          : SBP:: 121  mmHg DBP:: 64  mmHg P: 76  bpm R: 17 T:
                       97.8 F (36.6 C) Temp Route: oral O2
                       Saturation: 99  % Comments: ROOM AIR
Barriers to Learning : none
DC Plan              : MEDICATION AS PRESCRIBED. FOLLOW UP IN CLINIC AS
                       DIRECTED. RETURN TO ER FOR ANY NEW OR WORSENING
                       CONCERNS. NAD NOTED.
Valuables/Clothing   : patient kept at own risk
Comment              : PT OUT WITH STEADY GAIT. RESP EVEN/UNLABORED. NO
                       DISTRESS NOTED. PT VERBALIZED UNDERSTANDING OF INSTR
                       PROVIDED BY DELLFAVA, MD
Medication Order(s)  : Adacel (Tdap 11-64y)(Tetanus Toxoid, Reduced
                       Diphtheria Toxoid & Acellular Pertussis Vaccine
                       Adsorbed)
Medication Effect(s) : no adverse effects for all new medications
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Diagnosis    :
Working Diag: E968.8    Assault by other specified means

Case 1:15-cv-05871-KPF   Document 16-3   Filed 05/09/16   Page 26 of 71

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|---|---|---|---|---|---|
| DIS-Hd6 | Price,Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche,Carlos M, MD

----------------------------------------------------------------

ED Chest Pai:
Diagnosis   :

Resulted by     : Mccoy,Nakita, RN   (ESOF)
Ordering MD     :   (ESOF)

Exhibit 2 page 7

Metropolitan Hospital Center
Department of Emergency Medicine
1901 First Avenue
New York, NY 10029
212-423-6466

_____ STR CARMEN PRICE
Patient Name

Carrington plate

Discharge Instructions for: _Assault_____
(condition)

The emergency examination and treatment you received today is not intended to provide you with a complete medical workup. You should follow-up with a physician for further evaluation and treatment. If you have any questions or concerns regarding your emergency department treatment, please return to the Emergency Department. Notify your own physician for any new or remaining problems. If you are concerned about those problems, please return to this or any other Emergency Department. Otherwise, follow these instructions below.

The results of x-rays, ultrasounds, blood tests and EKGs are preliminary at this time. They will be reviewed by a specialist, usually within 24 hours. Should it be necessary, you will be contacted. Notify your primary care physician if you had such tests done during your emergency visit.

Please make sure that you have notified the physicians and nurses of all of your past medical and surgical history as well as any medications (including over-the-counter and herbal preparations) that you are currently taking.

Return to the Emergency Department, or any other emergency department, for any current or new problem that you think may be a serious threat to your health. These problems vary depending on your underlying condition, but include such problems as high fever, severe pain, shortness of breath, persistent vomiting, excessive diarrhea, heavy bleeding, black stools, seizure/convulsion or change in behavior. Ask your nurse or doctor to inform you of any problems that may be more specific to your visit today.

Continue taking any previously prescribed medications, in addition to any new ones from today, unless otherwise informed. Please make sure that you have informed us today of all of your medications and allergies to medications/ foods, including any recently changed by any other doctor.

Medications: _Tylenol #3  2 tabs by mouth every 4 hours with pain_
_Keflex 500mg by mouth every 6 hours for 7 days_

Please pick up or ask for any printed educational materials that we may have specific to your probable condition.

Make an appointment to:
☐ follow up with your primary care provider within ____ days. If you don't have a primary care provider, you can call our clinic appointment center at 212-423-7000 for an appointment to the _____ clinic. Inform them that you need to be seen within this number of days.
☐ follow up in _Surgery_ clinic within _10_ days at 212-423-7000.
☐ follow up in _ER_ clinic within _10_ days at 212-423-7000.

Additional Instructions: _Please return to ER for fever, chills, wound discharge or_
_pain._

_Please be seen here or by surgery in 10 days for suture removal_

These instructions have been explained to me and I fully understand. I also certify that my address and or phone number / emergency contact information provided is accurate.

_____    _____    _____    _____    _4/4/10_    _5:31 AM_
Patient Signature         Phone #       PA / MD Signature    RN/RT Signature    Date        Time

White copy: Chart          Yellow copy: Patient                                          MHC;052-5/06

**Exhibit Q**

1

```
 1    FAMILY COURT OF THE STATE OF NEW YORK
      CITY OF NEW YORK:   COUNTY OF NEW YORK
 2    ------------------------------------x
      In the Matter of a Family Offense
 3    Proceeding                          :

 4    KELLY CATHLEEN PRICE,               :

 5                      Petitioner,       :     DOCKET NO.
                                                O-10874/10
 6              -against-                 :

 7    RAHEEM POWELL,                      :

 8                      Respondent.       :
      ------------------------------------x
 9    Held:           60 Lafayette Street
                      New York, N.Y. 10013
10                    March 24, 2011 - Part 5

11
      Before:         HONORABLE LORI S. SATTLER, JUDGE
12

13    Appearances:
                      EDWARD GREENBERG , ESQ.
14                    Attorney for the Petitioner

15
                      WILLIAM O'HEARN, ESQ.
16                    Attorney for the Respondent

17

18
      Also Present:
19
                      Kelly Price
20                    Raheem Powell

21

22
                                Kitty S. Irizarry
23                              Official Court Reporter

24

25
```

1

Proceedings

1                    COURT OFFICER:  Six and fourteen in the matte:
2        Price and Powell.
3                    Counsel, your appearance.
4                    MR. GREENBERG:  For the petitioner, Your Honoi
5        Edward C. Greenberg, 570 Lexington Avenue, New York, New
6        York.
7                    Good morning.
8                    COURT OFFICER:  Raise your right hand.
9                    (Whereupon, the following parties were sworn i
10       by the court officer.)
11                   MS. PRICE:  Kelly Catherine Price.
12                   MR. POWELL:  Raheem Powell.
13                   THE COURT:  Good morning, Your Honor.
14                   You are entitled to have an attorney in this
15       proceeding.  If you don't have an attorney, I can assign c
16       to represent you.  You can also decide you would like to ç
17       forward on our own without an attorney, or if you would
18       like, you can hire or consult with an attorney that you
19       would pick.
20                   Do you want an attorney in this proceeding?
21                   MR. POWELL:  Yes.
22                   THE COURT:  What's your source of income at the
23       present time?  Are you working?
24                   MR. POWELL:  Yes.
25                   THE COURT:  How much are you earning?

Proceedings

1       MR. POWELL:  Like $250 a week.

2       THE COURT:  Are you a member of a union?

3       MR. POWELL:  (No response)

4       (Whereupon, the following party was sworn in b

5   the court officer.)

6       DETECTIVE SIMMONS:  Detective Linda Simmons,

7   shield number 2653 of the 28 Detective Squad.

8       THE COURT:  Sorry to drag you in, Detective

9   Simmons, but I have a couple of questions, since I was

10  informed that you are here to arrest the petitioner.

11      DETECTIVE SIMMONS:  We are here to pick her up

12  for another detective that will be arresting her.

13      THE COURT:  Anything related to my case here?

14      DETECTIVE SIMMONS:  It's between the two of th

15  It's between the two of them and how she calls him and

16  threatens to have him arrested if he doesn't come see her.

17      (Whereupon, Mr. O'Hearn entered the courtroom.

18      THE COURT:  Mr. O'Hearn is going to be

19  representing the respondent.

20      Do you want to note your appearance.

21      MR. O'HEARN:  William O'Hearn, 225 Broadway,

22  appearing for the respondent.

23      THE COURT:  Okay.  So he had a family offense

24  case at some point in time, but your Order of Protection w

25  vacated when you didn't show up on March 9th.

3
3

Proceedings

| | |
|---|---|
| 1 | MR. POWELL:  I was on the wrong floor. |
| 2 | THE COURT:  Did you file again? |
| 3 | MR. POWELL:  No. |
| 4 | THE COURT:  So are you picking her up for |
| 5 | violating the order? |
| 6 | DETECTIVE SIMMONS:  She is going to be arreste |
| 7 | for aggravated harassment. |
| 8 | THE COURT:  Okay, got you. |
| 9 | MR. GREENBERG:  Your Honor, with respect to |
| 10 | Mr. Powell's claim that he was in the wrong room, I know |
| 11 | Your Honor is very busy and doesn't remember this case, bu |
| 12 | this case -- |
| 13 | THE COURT:  No.  I actually remember it. |
| 14 | MR. GREENBERG:  Good.  Then Your Honor will |
| 15 | remember that we delayed to call this case for quite some |
| 16 | time because Mr. Powell was not here, and Your Honor calle |
| 17 | the case at 11:02. |
| 18 | THE COURT:  Your client wasn't here either on |
| 19 | that date, as I recall. |
| 20 | MR. GREENBERG:  That's correct, and I expresse |
| 21 | concern about the safety of my client.  So while the court |
| 22 | officer called the case at about 9:32, Your Honor didn't |
| 23 | hear it until about 11:00.  This was a 9:30 case, so I don |
| 24 | know how Mr. Powell couldn't have found his case within an |
| 25 | hour and a half. |

Proceedings

1            THE COURT:  His case was dismissed.  He paid

2       consequence of not being here.

3                 I think the bigger issue is your client is ab

4       to get arrested.  And I am hearing that right now, and

5       perhaps that makes me concerned about whether I actually

6       need to continue an Order of Protection in this case,

7       because he is not getting arrested, she is getting arrest

8                 Detectives investigated the stories?

9            DETECTIVE SIMMONS:  Yes.

10                THE COURT:  And don't find her story to be

11      credible?

12                DETECTIVE SIMMONS:  No.

13           MR. GREENBERG:  We have a couple of competing

14      issues.  Issue number one, and perhaps not the most

15      important, but I think it should be before Your Honor befc

16      the case is discussed before you, no request was made of n

17      office to surrender Ms. Price, notwithstanding the fact th

18      I had lengthy conversations with detectives at the 28

19      Precinct, including Detective Flowers, who is, presumably,

20      going to be the detective arresting Ms. Price today.

21                I had a conversation with Mr. Flowers for over

22      five minutes, and at no time did he ask me to bring

23      Ms. Price in, nor had any request been made to me or to

24      Ms. Price' other attorney to bring her in.  She would have

25      been brought in and this exercise, perhaps, would have bee

Proceedings

```
 1    avoided or at least postponed.  That's issue one, Your
 2    Honor.
 3              Number two, there was an Order of Protection
 4    sought against Mr. Powell, whose acts of violence against
 5    Ms. Price are well documented by hospital reports and so
 6    forth.  The detectives have come in here, and I understand
 7    their responsibilities, as they see them, but they come in
 8    here without any adjudication at all based on, solely, the
 9    word of Mr. Powell, whom Your Honor has already awarded
10    Orders of Protection against, presumably, because Your Honor
11    was satisfied.
12              THE COURT:  Excuse me.
13              An ex-parte Order of Protection -- Everyone co:
14    in here and does an ex-parte the first time, and I -- This
15    is the first time I have the parties in front of me.
16              MR. GREENBERG:  That's true.
17              Not all ex-partes.  Ms. Price had been here
18    before.
19              MR. O'HEARN:  The most recent one was ex-parte
20    because he didn't show up, but that's not the initial one.
21    There was evidence that satisfied Your Honor to issue an
22    Order of Protection, apparently, where Mr. Powell was here
23    on prior occasions.
24              MR. GREENBERG:  My recollection, Your Honor, i
25    when I was here three or four weeks ago, Your Honor stated
```

Proceedings

```
 1        blackmail from the text messages from Mr. Powell to mysel
 2        letting me know exactly what would happen to me if I ever
 3        did such things like leave him, report the physical ongoi
 4        physical abuse.
 5                    THE COURT:  Were the nude photos you are alleg
 6        on there?
 7                    MS. PRICE:  No.  He never sent them to me.
 8                    THE COURT:  How, again, did you know there wer
 9        photos of you?
10                    MS. PRICE:  People in my neighborhood and
11        children in my neighborhood taunt me and taunt me with the
12        phones when I walk by.
13                    THE COURT:  Did you see what was on the
14        children's phones?
15                    MS. PRICE:  No, I did not.
16                    I am happy to present respectable adults in my
17        neighborhood, especially the owners of the livery cabs
18        around the corner from me, who showed them to me and said
19        cannot believe this is happening to you and are willing to
20        testify.
21                    THE COURT:  I am going to let them do whatever
22        they have to do, arrest your client.
23                    I will give you another date to come back.
24                    I will put in a usual terms Order of Protectior
25        and refrain from communication.  If he is going to renew h
```

7
7

Proceedings

1   request, Mr. O'Hearn, he needs to do that.  This is agains

2   him.

3           She actually, quite frankly, based on the

4   allegations, I am willing to bet that the Criminal Court

5   will also put in an Order of Protection in place.  But you

6   client can decide if he wants to file here, and I will giv

7   you a date to come back to court.

8           MR. GREENBERG:  May I make a request with resp

9   to a return date, if it suits the Court?

10          THE COURT:  Sure.

11          MR. GREENBERG:  I can have any date in the las

12  two weeks of April, but the first two weeks I can't and I

13  can't in May.  So any date anytime that the Court wants f

14  April 18th to the end of the month is fine with me.

15          MR. O'HEARN:  I am out the last week of April.

16          THE COURT:  I am not here on the 18th or the

17  19th.

18          MR. GREENBERG:  Any date that week.

19          THE COURT:  How about the 21st?

20          MR. O'HEARN:  I am out that weekend.

21          THE COURT:  You are out the 18th.

22          How about May 2nd?  That certainly will give t

23  Criminal Court matter time for us to know what's going on

24  there.

25          I could bring you in earlier.  I could bring y

8

Proceedings

1        in on April 13th or 14th, but, otherwise, we are going to

2        May 2.

3                    MR. O'HEARN:  I can appear on May 2nd.

4                    MR. GREENBERG:   I will do May 2nd if I have to

5        At what time, Your Honor?

6                    THE COURT:  Let me pick an available time.

7                    11:00 a.m.

8                    MR. GREENBERG:  That's fine.  All right.

9                    THE COURT:  I will see you all then.

10                   Thank you.

11       *************************************************************

12                   Court Reporter's Certification

13            I hereby certify that the foregoing transcript is a true

14       and accurate record of the stenographic proceedings in the abo

15       matter.

16                              _____

17                              Kitty S. Irizarry
                                Official Court Reporter

18

19

20

21

22

23

24

25

**Exhibit R**

Exhibit 5 Page 1

## CRIMINAL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK

Page 1 of 1

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK <br> -against- <br><br> 1. Kelly Price (F 40)      ECAB # <br>                  1222673 <br><br>                Defendant. | FAMILY OFFENSE <br> DEFENDANT/VICTIM <br> RELATIONSHIP: <br> INTIMATE/ACCESS <br><br> MISDEMEANOR <br> ADA MARQUEZ <br> 212-335-9522 |

Detective Samuel Fontanez, shield 00311 of the 028 Detective Squad, states as follows:

On April 30, 2011, at about 00:01 hours inside of 315 West 116th Street in the County and State of New York, the Defendant committed the offenses of:

1.    PL215.50(3)     Criminal Contempt in the Second Degree
                         (1 count)

the defendant engaged in intentional disobedience to the lawful mandate of a court in other than a labor dispute.

The offenses were committed under the following circumstances:

Deponent states that deponent is informed by Raheem Powell, of an address known to the District Attorney's Office, that defendant called informant on the telephone and stated in substance: ARE YOU RECORDING ME? I WANT TO TALK TO YOU SO WE CAN WORK THINGS OUT. Deponent is further informed that informant has known defendant for more than two years and informant recognized defendant's voice.

Deponent states (i) that the above actions by defendant are in violation of an order of protection issued on March 24, 2011 by Judge Amaker, docket number 2011NY021627, and which remains in effect until May 10, 2011, (ii) that the order of protection directs the defendant to refrain from communication or any other contact by mail, telephone, e-mail, voicemail or other electronic means with Raheem Powell, and (iii) that defendant is aware of the order of protection in that defendant was present in court when the court order was issued and the order of protection is signed by the defendant.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

| | |
|---|---|
| _____Det ___ #311___ <br> Deponent | ___5/6/11___ <br> Date and Time |

ACT 5 Version 4.3.5 Created on 05/06/11 5:10 PM

Exhibit 5 page 2

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: PART D

THE PEOPLE OF THE STATE OF NEW YORK

-against-

KELLY PRICE,

Defendant.

SUPPORTING DEPOSITION
C.P.L. § 100.20

Docket No. 2011NY032918

I, Raheem Powell, of an address known to the District Attorney's Office, County of New York County, State of New York, being duly sworn, depose and say:

that I have read the Accusatory Instrument filed in the above-entitled action and attached hereto and that the facts therein stated to be on information furnished by me are true upon my personal knowledge.

*False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.*

_____  _____
Signature (Deponent)                Date

She called me around 11:45 pm
and she said lets meet up

**Exhibit S**

**Property Receipt**

Inmate _Price Kelly_
Last        First

**A** N⁰ _768932_   _2011_ year

Institution _RMSC_

Date _05/07/11_

Exhibit 6 pg-1

☐ NYSID # _0790619M_
☐ Book and Case # _3171100788_
☐ Sentence # _____

CONTROL/CUFFLOCK# _____

| WHERE WAS PROPERTY TAKEN: |
|---|
| ☐ Admission    ☐ Housing Area - Specify: _____    ☐ Other - Specify: _____ |
| Was this property taken on a search: ☐ Yes / ☐ No |

| I. Personal Items | | II. Clothing | | | III. Jewelry | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No. | Articles | No. | Articles | Color | No. | Article | Descriptiou | | |
| | | | | | | | Y | W | CS |
| | Radio | | Coat/Jacket | | | | | | |
| | Personal papers | | Pants | | | Tooth Cap | | | |
| | Pocketbook | | Belts | | | Neck Chain | | | |
| | Gloves | | Shoes/Sneaker | | | Earring | | | |
| | Glasses | | Shirt/Blouse | | | Charm | | | |
| | Wig | | Skirt | | | Bracelet | | | |
| | Wallet | 2 | Boots | Black | | Watch | | | |
| | Keys | | Hat | | | Ring | | | |

| Identification: ☐ Yes  ☐ No | | On Person | Same Name? | | IV. Miscellaueous | |
|---|---|---|---|---|---|---|
| | | | Y | N | No. | Article |
| U.S. Passport | | | | | | |
| Green Card | | | | | | |
| Driver's License | | | | | | |
| Other Government-issued photo ID | | | | | | |
| Birth Certificate | | | | | | |
| Social Security Card | | | | | | |
| Other: | | | | | | |

**Please Note:**
Description Color:
Y-Yellow Metal
W-White Metal
CS-Color of Stone

**INSTRUCTIONS**
1. If you receive more than one (1) item on a line, (e.g., coat/jacket) circle appropriate item, then enter the number.

☐ NO PROPERTY

**The above item(s) has been received from you because:**
☐ It is not on the list of items which are permitted in this facility
☐ The quantity is in excess of that allowed in this facility.
☐ It may create a health, safety or security hazard, and therefore, you are not permitted to have it in your possession.
☐ You have submitted the item to us voluntarily for safekeeping.
☐ Other _____

_Inmate did not Receives BOOTS, CD √ mcl 14330_

_Redelto_
Signature of person taking property

_14344_
Shield ID #

_Robelto_
Print Name

_Kelson_
Signature of Inmate

_05/07/11_
Date

_0349_
Time

**SEE APPEAL AND DISPOSAL PROVISIONS ON OTHER SIDE.**

Distribution:
White - Inmate Copy    Yellow - Duplicate (TO BE SECURED WITH PROPERTY)
Green - Inmate Legal Folder    Blue - Discharge Planning Cent    (ON CITY SENTENCING)

**Exhibit T**

Exhibit 11 Page #1

# DEBRIEFING AGREEMENT

With respect to the meeting of Kenya Wells, an Assistant District Attorney in the Office of the District Attorney for New York County ("Office") with Kelly Price ("Client") to be held on the date of this memorandum, the following understandings exist:

(1) Should any prosecutions be brought against Client by this Office, this Office will not offer as evidence in its case-in-chief any statement made by Client at the meeting, except in a prosecution for false statements or perjury.

(2) Notwithstanding paragraph one, (a) this Office may use information derived directly or indirectly from Client's statements at the meeting for the purpose of obtaining leads to other evidence, and if any such evidence is developed, it may be used in any prosecution of Client; and (b) should any prosecution of Client be undertaken, this Office may use statements made by Client at the meeting and all evidence obtained directly or indirectly therefrom for the purpose of cross-examination should Client testify, or to rebut any evidence offered by or on behalf of Client in connection with the prosecution.

(3) This agreement is limited to the statements made by Client at the meeting held on this date, and does not apply to any oral, written or recorded statements made by Client at any other time. No understandings, promises, agreements, or conditions have been entered into with respect to the meeting other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties.

DATED:   New York, New York
         June 21, 2011

                                        CYRUS R. VANCE, JR.
                                        District Attorney
                                        New York County

                                        By: _____
                                        Kenya Wells
                                        Assistant District Attorney

_____
Client

_____
Attorney for Client

**Exhibit U**

BAIL RECEIPT & NOTICE TO PERSON POSTING BAIL

1002643

Exhibit #8 page1

| Date Bail $ Received (Today's Date) | Time Bail $ Received |
|---|---|
| 05. 08. 10 | 21:35 |

| Indictment # | Docket # | 2110 3 2 9 1 8 | Defendant's Name (Last, First and M.I.) |
|---|---|---|---|
| | People v. | | PRICE, KELLY |

| NYSID # | 796 18 9 M 34 | Book & Case # | 7 1 00 7 88 | Offense(s) | 215.50 (3) |
|---|---|---|---|---|---|

| Name of Judge/Justice Who Set Bail | County | Court | Part |
|---|---|---|---|
| LBBOUITS | NEW YORK | CRIMINAL | AR3A |

| Last Court Date Bail Was Set | Bail Amount (Numerical) | Bail Amount (Written) | |
|---|---|---|---|
| 05.06.11 | $ 2000.00 | Two Thousand | DOLLAR(S) |

Check One:  Cash ✓  (if check(s) or money order(s), enter number(s) and name(s) of issuing organization(s))

Check or Money Order

Describe any outstanding warrants or detainers, including surety examination, prohibiting defendant's immediate discharge. If none, write "NONE".

NONE

Having posted the bail amount listed above, and having read the information on the back of Copy 1 concerning bail refunds, and having been notified of any outstanding warrants or detainers prohibiting the immediate discharge of the defendant, I undertake that the defendant will appear in this action whenever required & will at all times render himself/herself amenable to the orders and processes of the court, and I acknowledge that the bail will be forfeited if the defendant does not comply with any requirement or order of process to appear in this action, and that his/her next scheduled court appearance is at 9:30 A.M. on the date and place written below:

| Date of Next Court Appearance | County | Court | Part |
|---|---|---|---|
| 05. 11 .11 | NEW YORK | CRIMINAL | D. |

OBTAIN SIGNATURE OF PERSON POSTING BAIL ON COPIES 2, 3, 4, & 5

| Name of Person Posting Bail (Printed) | Occupation of Person Posting Bail |
|---|---|
| HAGUE, DAN | FUND MANAGER |

Residential Address of Person Posting Bail (including ZIP Code)

60, BROADWAY, PH1A, BROOKLYN, NY 11211

| Signature of Employee Receiving Bail $ | Title | Shield or ID # | Facility Recv'g Bail $ | Facility Housing Inmate |
|---|---|---|---|---|
| M Whye | C.O. | 38181 | RICC | RMSC, |

## Distribution & Routing Instructions

No.1 Give to person posting bail. Bail funds are deposited not later than the next business day after their receipt. Checks for refund of bail, minus the Department of Finance three percent 3% fee will be mailed according to the notice on the back of this form from the DIRECTOR OF FINANCE OF THE CITY OF NEW YORK, Room 2200, Municipal Building, 1 Centre Street, New York, NY 10007. The three percent 3% fee will not be subtracted if the case is terminated at the trial level with a dismissal or acquittal.

**Exhibit V**

left outer hand.jpg


POLICE INJURIES.pdf


left outer wrist an...


-right outer wrist.jpg


rear right leg.jpg


front of legs.jpg


ter wrist an...

outer wrist.jpg

rear right leg.jpg

front of legs.jpg

right back hand.jpg

inner left upper ar...

rightblacke



inner right





right back hand.jpg



inner left upper ar...



rightblackeyera.jpg



inner right upper ...



left inner lower ar...

**Exhibit W**

| People v Price (Kelly) |
|---|
| 2016 NY Slip Op 50231(U) |
| Decided on February 25, 2016 |
| Appellate Term, First Department |
| Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. |
| This opinion is uncorrected and will not be published in the printed Official Reports. |

Decided on February 25, 2016
SUPREME COURT, APPELLATE TERM, FIRST DEPARTMENT
PRESENT: Schoenfeld, J.P., Shulman, Hunter, Jr., JJ.
571134/12

The People of the State of New York, Respondent, -

against

Kelly Price, Defendant-Appellant.

Defendant appeals from a judgment of the Criminal Court of the City of New York, New York County (Robert M. Mandelbaum, J.), rendered October 18, 2012, convicting him, after a nonjury trial, of two counts of disorderly conduct, and imposing sentence.

Per Curiam.

Judgment of conviction (Robert M. Mandelbaum, J.), rendered October 18, 2012, reversed, on the law and the facts, and the accusatory instrument is dismissed.

The verdict convicting defendant of two counts of disorderly conduct (see Penal Law §§ 240.20[2], [3]), was not based on legally sufficient evidence and was, in any event, against the weight of the evidence. The trial evidence showed that defendant called police after she was asked to leave a midtown Manhattan bar on a Saturday evening; the responding officers observed defendant to be visibly upset and they tried to calm her down; upon interviewing people inside the bar, the officers informed defendant that there was no action that they could take on her behalf; defendant was angry, but walked away from the scene; and that as defendant was approximately 20 feet away from the officers, she turned her head and shouted an epithet at them. On these facts, defendant's intent to cause public inconvenience, annoyance, or alarm, or recklessness in creating such a risk, was not established beyond a reasonable doubt (see Penal Law § 240.20 People v Baker, 20 NY3d 354 [2013]). Defendant's conduct did not indicate an intent to breach the peace, or even constitute an act from which a breach of the peace was likely to occur (see People v Johnson, 22 NY3d 1162 [2014]; People v Baker, supra; People v Pritchard, 27 NY2d 246 [1970]; People v Smith, 19 NY2d 212 [1967]).

THIS CONSTITUTES THE DECISION AND ORDER OF THE COURT.

I concur I concur I concur

Decision Date: February 25, 2016

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE TERM: FIRST DEPARTMENT
-------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,                    :

                      Respondent,                    :

            -against-                    :

KELLY PRICE,                                            :

                Defendant-Appellant.              :

-------------------------------------------------------------------------x

## STATEMENT PURSUANT TO RULE 5531

1.    The docket number in the court below was 2011NY016509.

2.    The full names of the original parties were People of the State of New York against Kelly Price. There has been no change of parties on appeal.

3.    This action was commenced in Criminal Court, New York County.

4.    This action was commenced by the filing of an accusatory instrument.

5.    This appeal is from a judgment convicting appellant, after a bench trial, of two counts of disorderly conduct (P.L. §240.20(2); P.L. §240.20(3)).

6.    This is an appeal from a judgment of conviction rendered October 18, 2012 (Mandelbaum, J., at trial and sentencing).

7.    Appellant has been granted permission to appeal as a poor person on the original record. The appendix method is not being used.

## PRELIMINARY STATEMENT

This is an appeal from a judgment of the Criminal Court, New York County, dated October 18, 2012, convicting appellant, after a bench trial, of two counts of disorderly conduct (P.L. §240.20(2); P.L. §240.20(3)), and sentencing her to a conditional discharge and three days community service (Mandelbaum, J., at trial and sentencing).[1]

Timely notice of appeal was filed and, on January 7, 2013, this Court granted appellant leave to appeal as a poor person on the original record and typewritten briefs, and assigned Seymour James, Jr., successor to Steven Banks, as appellate counsel.

Appellant did not have any codefendants below. She is not incarcerated pursuant to the judgment above.

## QUESTION PRESENTED

> Whether the convictions should be reversed and the accusatory instrument dismissed where the evidence was insufficient to establish that appellant had the requisite *mens rea* to commit disorderly conduct. U.S. Const., Amend. XIV; N.Y. Const. art. I, §6; P.L. §240.20.

---

[1] References are to the trial transcript (Part 1), dated October 17, 2012; Those preceded by "T" are to the combined trial minutes (Part 2) and sentencing minutes, dated October 18, 2012.

The original complaint, which charged appellant with one count of disorderly conduct P.L. §240.20(3)), was replaced by a Prosecutor's Information charging her with both P.L. §240.20(2) and P.L. §240.20(3) (2-3).

## STATEMENT OF FACTS

*Trial*

On September 24, 2011, at about 10 p.m., Police Officer *Matthew Winters*, a seven-year veteran of NYPD assigned to Midtown South, and his partner, Police Officer Michael Relf, responded to a radio run of an assault in progress at Stitch Bar, 247 W. 37th St., New York County (27-30, 61, 64). [2] There, Winters was approached by appellant, who had called to report the assault and was standing in front of the bar waiting for the police to arrive. Winters recalled that appellant was upset and had "visible bruises" on her arms (30, 62-64). [3]

After briefly speaking to appellant, Winters went inside the bar to hear "the other side of the story" while appellant remained outside (30, 63-64). When Winters returned a few minutes later, he told appellant that the police would not be charging anyone and refused to take her complaint (30-31, 51-54, 64).

While Winters was conversing with appellant, he was standing by the curb next to several other officers, and leaning on a phone booth with his back to the street. Appellant, who appeared visibly exhausted, stood directly in front of Winters (31-34). After Winters told appellant that the police would not assist her, appellant became more upset. The tone of her voice became higher and her hand gesturing movements became more animated (33). Winters testified that he tried to calm appellant down -- he told her to "calm down"

---

[2] September 24, 2011 was a Saturday.

[3] Counsel told the court that, at the time of trial, CCRB was investigating the police response to appellant's 911 complaint and the circumstances of her arrest in the instant case (12-14).

and "speak lower." Appellant lowered her voice but, as she grew more excited, the tone of her voice became elevated (33-34, 54-55).

Appellant communicated to Winters, who spoke to appellant for about five minutes, that she was upset about the way the police were handling her complaint. In response, Winters told her to contact the Better Business Bureau if "she had a problem with the establishment" (34-35, 65-67, 70-71). After Winters made the remark, appellant started walking away from the bar towards Eighth Avenue. When she had walked about 20-25 feet, appellant glanced over her shoulder and yelled to Winters, "go f--- yourself" in a tone that Winters ranked as 9 on a 1-10 scale with 10 being the highest. Because appellant's remark was "loud enough for others to hear," Winters immediately grabbed appellant and placed her under arrest (34-35, 55-58, 65-68, 70-71). Winters did not recall appellant making any other derogatory statements prior to her arrest (36-37).[4]

Throughout the course of their conversation, Winters recalled, appellant's tone "fluctuated up and down" with her emotions. After he told her that police would not be charging anyone, appellant became more upset and her tone became higher (66-69).

From the time Winters first responded to the time of appellant's arrest, Winters estimated that there were about twenty people in the area. "There were a few [people] in front of the bar, a few to my left, a few to my right, and a few across the street" (35). He

---

[4] The People introduced a videotape showing the police responding to the scene, and Winters speaking to appellant, entering the bar, exiting the bar, and again speaking to appellant, who could be seen waving her arms (51-54, 65; People's exhibit number 2).

testified that "[p]eople were walking through us as we were speaking with the defendant" and that some people stopped on the sidewalk (37).[5]

When Police Officer *Michael Relf*, Winters' partner, first observed appellant, she was animated and "on the verge of crying" (T. 16-19, 26-27). As appellant described the incident, Relf recalled, the tone of appellant's voice fluctuated considerably – she spoke calmly one minute, and was yelling the next (T. 16-19, 26-27). After Relf and his partner spoke to the bar manager and two patrons, they decided not to arrest anyone for assault (T. 20-21, 28).

Although appellant was initially calm when Winters told her that the police would not be making an arrest, she became upset after Winters refused to take her statement. Appellant, who felt as if she had been wronged, Relf testified, then purportedly became "animated and aggressive" and she told Winters that NYPD was "worthless" and "she is the victim" (T. 20, 28-30).[6] After appellant yelled "go f--- yourself" as she was walking away from the scene in a tone Relf described as a 9,[7] Winters arrested appellant for using "obscene language easily within hearing of the general public" (T. 22-25, 30-31).

Relf described the area as mostly commercial. Although there were about ten people in the general area and appellant's comments caused some pedestrians to glance

---

[5] The court stated that it would only consider the "go f--- yourself" statement because the other statements contained in the complaint were apparently made after appellant was arrested and would be precluded (38).

[6] When asked to describe the tone of appellant's voice at the time she made the comments, Relf testified her tone was a 7 or 8 on a scale of 1 to 10 with 10 being the highest (T. 28).

[7] On a scale of 1 to 10 with 10 being the highest tone (T. 30-31).

over, appellant did not try to engage any of them and none of them got involved (T. 20-21, 24-31).

When Midtown South Police Officer *Dianne Melidones* responded to Stitch Bar, Winters was on the sidewalk in front of the bar talking to appellant, who appeared "agitated" and was waving her hands around, and Melidones remained with appellant when Winters went inside the bar (72-75; T. 3-5). When Winters returned and informed appellant that the police would not help her, appellant's tone became elevated. After Winters told appellant to contact the Better Business Bureau about her complaint, appellant started walking away from the scene. As she was walking away, appellant was purportedly "screaming and carrying on" and, after she told the police "go f--- yourself," Winters proceeded to arrest her (77-79; T. 2, 9-12).

During the encounter, Melidones testified, a few pedestrians glanced over as they passed by but continued walking and did not have any audible reaction, and a "crowd of five people gathered across the street" (75-79; T. 9, 13-15). Appellant made no attempt to engage any of the bystanders or pedestrians (T. 9-11).


*The Defense Motion to Dismiss*

After the People rested, counsel moved for a trial order of dismissal. The defense maintained that the People failed to make out a *prima facie* case since the evidence was insufficient to support the inference that appellant acted intentionally or recklessly to create a public safety risk. Citing, *inter alia, People v. Munafo*, 50 N.Y.2d 326 (1980), counsel noted that the dispute was a private matter solely between appellant and the

6

police -- specifically officer Winters -- regarding her assault complaint. Although a few pedestrians glanced in appellant's direction as they walked by, they did not get involved and there was no indication that appellant sought to incite or involve the public or that the public was inconvenienced, annoyed, or alarmed. Thus, counsel continued, the circumstances did not support the inference that appellant intentionally or recklessly created a risk that the private dispute between her and the police would extend its boundaries and become a public issue (T. 33-37, 40-48).

In response, the prosecutor contended that yelling "go f--- yourself" in a loud tone -- even just once – is sufficient to establish "unreasonable noise" under subsection (2) of P.L. §240.20 (T. 49-50). Citing *People v. Weaver*, 16 N.Y.3d 123 (2011), the prosecutor further argued that appellant's use of "profanities one time" was sufficient to satisfy P.L. §240.20(3), and that the noise and obscene language recklessly "created a risk to the public" (T. 49-53).

The court denied the defense motion (T. 57).

*The Closing Arguments*

Counsel maintained that the People failed to prove beyond a reasonable doubt that appellant had the requisite *mens rea* or *actus rea* to commit disorderly conduct. Appellant sought out the police after she was assaulted and when they refused to take her complaint, she became justifiably upset with Winters. At no point, however, did appellant attempt to involve or incite others and, although a few curious pedestrians turned to look, they

7

continued walking, and there was no evidence it caused them to become inconvenienced, annoyed, or alarmed or created a risk to public safety (T. 58-61, 66-68).

Counsel further noted that appellant made the derogatory remark to Winters because she was nervous and upset with Winters, and not to intentionally incite others and, moreover, the disorderly conduct statute was not intended to criminalize the conduct here – a single derogatory remark made during a private dispute with a police officer. Counsel also pointed out that the encounter occurred in midtown Manhattan, where the public is constantly barraged with sirens and other loud noises, which is relevant in assessing whether the noise was "unreasonable" (T. 59-68).

In response, the People contended that appellant intended to cause public inconvenience, annoyance, or alarm because she was "already agitated and worked up and then became even more agitated when they told her they would not arrest the person but when they told her she should go to the Better Business Bureau she got even more upset because she wasn't having her own way and she continued yelling and cursing and then walked away from the place. At the moment she said 'go f--- yourself' [in a loud tone] we know that her intention was to cause public inconvenience, annoyance, or alarm [because] she did not state to the police officers 'go fuck yourself' when she was standing right in front of them within 2 to 3 feet" (T. 71-75). According to the prosecutor, because appellant was aware that members of the public were in the area, by making unreasonable noise and yelling obscenities and gesturing, she recklessly created a risk to others (T. 77-82).

8

*Sentencing*

Appellant was convicted of both P.L. §240.20(2) and P.L. §240.20(3) (T. 82). Before sentencing, appellant apologized for her actions and explained to the court that she was a victim of domestic violence and suffered from post dramatic stress syndrome, and that the guilty verdict was punishment enough (T. 83-85). The court sentenced appellant to a conditional discharge and three days community service, and imposed a $120 mandatory surcharge (T. 85-86).

## ARGUMENT

### POINT

THE CONVICTIONS SHOULD BE REVERSED AND ACCUSATORY INSTRUMENT DISMISSED WHERE THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT APPELLANT HAD THE REQUISITE *MENS REA* TO COMMIT DISORDERLY CONDUCT. U.S. CONST., AMEND. XIV; N.Y. CONST. ART. I, §6; P.L. §240.20.

Shortly before 10:00 p.m. on the Saturday night in question, appellant called 911 to report that she was being assaulted in Stitch Bar in midtown Manhattan. When officer Winters and his partner responded to the scene, they were approached by appellant, who was standing in front of the bar waiting for the police to arrive. Appellant, Winters recalled, was distraught and had visible bruising on her arms. As appellant described the incident to Winters, the tone of appellant's voice fluctuated with her emotional state; When she was calm, appellant spoke in a low tone and when she was agitated or upset, appellant's tone became elevated. After briefly speaking to a couple of people about the

9

allegations outside of appellant's presence, Winters informed appellant that the police would not take any further action and refused to take her assault complaint. When Winters suggested that appellant contact the Better Business Bureau about her complaint, appellant became upset and started to walk away. After she had walked about 25 feet, appellant glanced over her shoulder and, as she continued walking, yelled to Winters, "go f--- yourself." Winters immediately arrested appellant for disorderly conduct. As discussed below, because evidence that appellant had the requisite *mens rea* to commit disorderly conduct was lacking, the convictions must be reversed and the accusatory instrument dismissed.

It is a fundamental principle that a criminal conviction cannot stand absent sufficient proof beyond a reasonable doubt on every element of the offense. *See Jackson v. Virgina*, 443 U.S. 307, 316 (1979). A conviction is legally insufficient where, viewing the record in the light most favorable to the prosecution, there is no "valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt." *People v. Maldonado*, 24 N.Y.3d 48 (2014)(quoting *People v. Danielson*, 9 N.Y.3d 342, 349 (2007)); *see People v. Khan*, 18 N.Y.3d 535, 541 (2012); *People v. Williams*, 84 N.Y.2d 925, 926 (1994); *People v. Contes*, 60 N.Y.2d 620, 621 (1983). [8]

---

[8] Counsel preserved the legal insufficiency argument by moving for a trial order of dismissal based on the lack of evidence of "public harm," a requisite element of P.L. §240.20. *See People v. Hawkins*, 11 N.Y.3d 484 (2008); *People v. Gray*, 86 N.Y.2d 10 (1995).

Moreover, even if all the elements are supported by some credible evidence, the Court still must examine the evidence further and "determine whether an acquittal would not have been unreasonable." *People v. Bailey*, 94 A.D.3d 904, 905 (2d Dept. 2012). If, based on the credible evidence, a different finding would not have been unreasonable, then the appellate court must "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony." *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987)(citation omitted); *see People v. Danielson*, 9 N.Y.3d 342; *People v. McFadden*, 106 A.D.3d 1020 (2d Dept. 2013)(noting there is no preservation requirement for appellate weight-of-the-evidence review).

In reviewing a weight of the evidence claim, an appellate court exercises its power to "affirmatively review the record; independently assess all of the proof; substitute its own credibility determinations for those made by the jury[,] determine whether the verdict was factually correct; and acquit a defendant if the court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt." *People v. Delamota*, 18 N.Y.3d 107, 117 (2011); *see Danielson*, 9 N.Y.3d at 348; *Bleakley*, 60 N.Y.2d 490.


*Appellant lacked the mens rea to commit disorderly conduct*

Appellant was convicted of two counts of disorderly conduct, P.L. §240.20(2) and P.L. §240.20(3). Under Penal Law §240.20(2), "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e makes unreasonable noise." Under Penal Law §240.20(3),

"[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [i]n a public place, he uses abusive or obscene language, or makes an obscene gesture."[9]

That the "defendant's disruptive statements and behavior [are] of a public rather than an individual dimension . . . stems from the *mens rea* component, which requires proof of an intent to threaten public safety, peace or order (or the reckless creation of such a risk)." *People v. Baker*, 20 N.Y.3d 354, 360 (2013). The Court of Appeals in *People v. Baker* noted that, because of its "important narrowing function," without which the disorderly conduct statute would be vulnerable to constitutional attack, the "public harm" element "cannot be overstated." *People v. Baker*, 20 N.Y.3d 354, 360. Thus, "a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem" *Id.* at 359-360; *see People v. Bakolas*, 59 N.Y.2d 51, 54 (1983)(public harm element vital to the constitutionality of P.L. §240.20 because it "narrows the definition [of prohibited conduct], so that no inadvertent . . . act may be punished").

---

[9] "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct." P.L. §15.05(1).

"A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto." P.L. §15.05(3).

To determine whether the record supports an inference that the defendant had the requisite *mens rea*, courts conduct "a contextual analysis that turns on consideration of many factors, including 'the time and place of the episode under scrutiny; the nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances." *Baker*, at 360 (quoting *People v. Weaver*, 16 N.Y.3d 123, 128 (2011)). Although the risk of public disorder does not have to be realized, "the circumstances must be such that defendant's intent to create such a threat (or reckless disregard thereof) can be readily inferred." *People v. Baker, supra* (citing *People v Todaro*, 26 N.Y.2d 325, 329 (1970)).

In *Baker*, the Court of Appeals revisited several of its seminal decisions analyzing the "public harm" element of the disorderly conduct statute, and the decision provides a helpful contextual framework for assessing whether a particular situation "extend[s] beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem." *People v. Baker*, 20 N.Y.3d at 359-360 (citing *People v Weaver*, 16 N.Y.3d at 128 (internal quotation marks and citation omitted)).

The defendant in *Baker* approached a police car that was parked on a residential block in Rochester and asked the officer inside why he had checked the license plate of a car that was parked in his girlfriend's driveway across the street. The officer replied that "he could run a plate if he wanted to," and the defendant, who started backing away from the officer towards the middle of the street, swore at the officer in a loud tone. When the officer asked "what did you say," the defendant repeated the profanity and accused the

13

officer of harassing him. The officer then arrested the defendant for disorderly conduct. *Baker*, at 357.

Although the defendant swore at the officer in a loud tone and his conduct attracted the attention of about ten bystanders, who had gathered on the sidewalk to watch the interaction, the Court, reversing the defendant's plea conviction, held there was "no record basis for the finding of probable cause" to arrest the defendant for P.L. §240.20(3) because the proof was "insufficient to support the public harm element." *Id.* at 362-363.

Conducting a multi-factored contextual analysis, the *Baker* Court noted that the defendant's "public outburst" -- which consisted of making two loud derogatory statements claiming harassment -- was "extremely brief." *Id.* And, because the incident "occurred around dinner time on a heavily-populated city street bustling with car traffic and pedestrian activity," the Court observed, "there was no significant likelihood that defendant's brief statements loud [as] they were would disrupt peace and order in the vicinity." *People v. Baker,* at 363.

The Court further noted that, although a group of bystanders had gathered around the defendant and his girlfriend, there was "no evidence that the bystanders expressed any inclination, verbally or otherwise, to involve themselves in the dispute between defendant and [the officer]" and "no basis to infer that these spectators were motivated by anything other than curiosity." *Baker,* at 363. In addition, the Court pointed out that the derogatory statements were "not accompanied by menacing conduct" and, in fact, the "defendant was stepping away from the vehicle when he made them." Nor was there any basis to infer

14

that the officer felt threatened by the statements, and the presence of another officer at the scene who was "fully able to provide assistance diluted the risk that others in the vicinity would join forces with [the] defendant and gang up on [the officer]." *Id.*

"Another factor worthy of consideration," the *Baker* Court continued, was that the abusive statements were directed at a police officer.

> [B]oth at its inception and conclusion, the verbal exchange was between a single civilian and a police officer. The fact that defendant's abusive statements were directed exclusively at a police officer a party trained to diffuse situations involving angry or emotionally distraught persons further undermines any inference that there was a threat of public harm, particularly since the police officer was in a position of safety and could have closed his windows and ignored defendant. . . . [I]solated statements using coarse language to criticize the actions of a police officer, unaccompanied by provocative acts or other aggravating circumstances, will rarely afford a sufficient basis to infer the presence of the "public harm" *mens rea* necessary to support a disorderly conduct charge.

*People v. Baker*, 20 N.Y.3d at 363 (emphasis added).

As discussed below, the underlying facts in the instant case are strikingly similar to those in *Baker*. While in *Baker*, the facts did not provide a record basis to support a finding of probable cause, in the instant case there was an insufficient factual basis to support the conviction. The encounter here was merely a "purely personal clash" and "momentary . . . flare-up [and did not] attain the degree of gravity warranting criminal prosecution under the statute." *Baker*, at 361 (citing *People v. Pritchard*, 27 N.Y.2d 246, 249 (1970)).

15

*Nature and character of the conduct*

As in *Baker*, appellant's outburst was extremely brief. Dissatisfied with the way officer Winters responded to her complaint, appellant expressed her dissatisfaction by making a loud derogatory remark to officer Winters as she was walking away from the scene. Winters reacted by immediately arresting appellant for disorderly conduct.

The disorderly conduct statute was not intended to proscribe each and every minor annoyance. Again, the scope of the statute "is limited to that type of conduct which involves a genuine intent or tendency to provoke a breach of the peace." *People v. Pritchard*, 27 N.Y.2d at 248 (quotations omitted). Thus, standing alone, appellant's statement was insufficient to satisfy the "public harm" element of P.L. §240.20. *See People v. Baker*, *supra*, at 362-363; *People v. Pritchard*, *supra*, at 249 (reversing disorderly conduct conviction based on defendant's fight in dance club, which resulted in crowd gathering); *People v. Perry*, 265 N.Y. 362, 365 (1934)(notwithstanding the fight occurred in public venue and a crowd had gathered to watch, evidence legally insufficient to establish disorderly conduct); *see also People v. Carter*, 13 A.D.2d 652 (1st Dept. 1961)(defendant may not be convicted of disorderly conduct where there is a reasonable doubt whether the conduct was intentional or whether it resulted from a momentary and unanticipated lack of physical control).

*Time and Place*

As in *Baker*, the incident here occurred "on a heavily-populated city street bustling with car traffic and pedestrian activity." Specifically, the encounter occurred shortly

16

before 10:00 p.m. on a Saturday night in noisy midtown Manhattan, a few blocks from Madison Square Garden, where sport fans regularly congregate outside and yell and curse and complain about their team's latest loss. Thus, as in *Baker*, given the makeup of the area, "there was no significant likelihood that defendant's brief statements loud [as] they were would disrupt peace and order in the vicinity." *Baker*, 20 N.Y.3d at 363.

*Private exchange*

The *Baker* Court reiterated that "isolated statements using coarse language to criticize the actions of a police officer, unaccompanied by provocative acts or other aggravating circumstances, will rarely afford a sufficient basis to infer the presence of the 'public harm' *mens rea* necessary to support a disorderly conduct charge." *Id.* [10]

As in *Baker*, appellant's remark was directed exclusively at a police officer, "a party trained to diffuse situations involving angry or emotionally distraught persons." *Baker*, 20 N.Y.3d at 363. [11]

---

[10] *See also People v. Fassinger*, 42 Misc. 3d 407 (Crim. Ct. N.Y. Co. 2013)(dismissing accusatory instrument charging P.L. §240.20(2) and P.L. §240.20(3) based on defendant, who was walking in middle of street, yelling to officer, including saying "arrest me," and making several obscene gestures including giving two middle fingers and grabbing her crotch in that the conduct "create[d] the risk for public alarm as cars were stopped behind patrol in view of the defendant's behavior." Court noted that officer "could have just as easily ignored Defendant's crude gestures" and "isolated statements using course language to criticize the actions of a police officer, unaccompanied by provocative acts or other aggravating circumstances, will rarely afford a sufficient basis to infer the presence of the public harm *mens rea* necessary to support a disorderly conduct charge.").

[11] In *City of Houston v. Hill*, 482 U.S. 451 (1987), the defendant was arrested after "shout[ing] abuses," which violated a city ordinance that prohibited "intentionally interrupt[ing] a city policeman . . . by verbal challenge during an investigation," and accosting police officers who were in the process of issuing a ticket to his friend. *Id.* at 454 & n.2. The law had been interpreted as encompassing those who "verbal[y] abuse" and "curs[e]" at a police officer while in the line of duty. *Id.* at 457.

17

*Absence of other aggravating circumstances*

Nor do the other circumstances of the encounter support the inference that appellant intentionally or recklessly caused public harm or created the risk thereof. As in *Baker*, appellant uttered the statement as she was walking away from the scene, from a distance of 25 feet. The fact that appellant had started to physically distance herself from the encounter is inconsistent with the finding that she possessed the requisite *mens rea* or that her statement created a public safety risk or was otherwise threatening to the police.[12]

---

Vacating Hill's conviction, the Supreme Court found that the ordinance was unconstitutionally overbroad because "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Hill*, 482 U.S. at 461. Even speech that is "provocative and challenging" is "protected against censorship or punishment," the Court explained, "unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* at 461. Unless a defendant's verbal challenge to law enforcement officers rises to the level of "fighting words that 'by their very utterance inflict injury or tend to incite an immediate breach of the peace,'" his activity is constitutionally protected. *Hill*, 482 U.S. at 461-462 (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 133 (1974)(invalidating ordinance that made it a crime "for any person wantonly to curse or revile or to use obscene or opprobrious language toward . . . police"). As the *Hill* Court noted, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462-463.

Similarly, in *Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir. 2001), the Court sustained the jury finding that police lacked probable cause to arrest Provost under P.L. §240.20(3)(using abusive or obscene language in a public place), despite evidence that Provost, who became angry after a lengthy wait at a police station, repeatedly "scream[ed], sw[ore], [and] holler[ed]" at officers in the presence of others. *Id.* at 151-152. The Court ruled that Provost's "language could not be the basis for a valid arrest because . . . it was constitutionally protected," 262 F.3d at 159, and "[o]nly fighting words directed at police officers can be criminalized" because "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen." *Id.* at 159-160 (quotations and citations omitted).

[12] The prosecutor's argument on summation that appellant's intent to create a public disturbance could be inferred from the fact that she made the statement to the police from afar instead of face-to-face is ridiculous and should be rejected. There were four officers at the scene, none of whom seemed the least bit sensitive to appellant's complaint, and appellant, who was evidently

Nor was there any evidence that Winters felt threatened by appellant at an earlier point, before she started to walk away. During Winters five-minute conversation with appellant, the officer was leaning against a phone booth in a relaxed pose and three fellow officers were within arm's reach. [13]

Regardless of whether the remark was directed at Winters specifically or all four officers, here, as in *Baker* and as in *People v. Munafo*, 50 N.Y.2d 326 (1980), [14] which also involved a private dispute between the defendant and police, there was no indication that appellant sought to expand the boundaries of the encounter by inciting or involving

---

alone, had reason to question their professionalism and judgment. That appellant uttered the statement from a distance supports the inference that, although she wanted to voice her dissatisfaction with how Winters handled her complaint, she felt less vulnerable expressing herself from afar.

[13] Although appellant had earlier used animated hand gestures while communicating to officer Winters, there is no evidence that the gestures were intended to be menacing or threatening. Studies of gesture at the University of Chicago concluded that speech and gesture are two aspects of a single linguistic system and the evidence suggests that the greater the cognitive effort required for speech, the more we gesture. Essentially, hand-waving, some of which is reflexive, seems to decrease our "cognitive load" or the amount of mental effort needed to retrieve information. http://online.wsj.com/news/articles/SB10686987621722900. Although Relf claimed that appellant was acting "aggressively," Relf was apparently referring to appellant's hand gesturing and there is no evidence to suggest that Relf (or any of the other officers) actually felt threatened. In any event, regardless of how the police perceived the earlier hand gesturing, at the time of appellant's arrest, she was walking away from the scene and clearly posed no threat.

[14] Defense counsel relied on *Munafo* in support of the defense motion to dismiss based on insufficient evidence of public harm. In *Munafo*, the defendant fired a shot in the air at a State Power Authority construction crew that was attempting to erect a transmission line on a right-of-way that went through his farm. About ten people witnessed the incident but they had not been drawn there by defendant's conduct and did not get involved. The evidence in *Munafo* did not support the disorderly conduct conviction not only because the incident occurred on the defendant's private property in a remote area, but also because there was no indication that the defendant sought to incite or involve the witnesses, who were already in the area, and the "only fair inference was that the differences between the authority and the defendant were confined to these two disputants rather than spread to the public." *People v. Munafo*, 50 N.Y.2d at 332.