egregious violations to my Constitutional Rights that took place in its attempt to cover-up its wrong-doing. It is in this office's best-interest to correct its own violations, to institutionalize proper training and to enforce diligent adherence standards of conduct, fairness, ethics and professional behavior for the people it has in its employ. I would like to start a dialogue with you about how exactly the MDAO can help restore me to the status I enjoyed before these malicious prosecutions, unlawful arrests and illegal actions against me.

140. As a public official Mr. Vance must recognize that his office must hold itself to the same high-standards of professional conduct that it insists from its constituents. How can this same office accuse various corporate entities of corporate wrongdoing, mishandling and various actionable breaches of professional standards when he does not hold his own employees accountable or attempt to make reparations for their misanthropy?

141. Before these egregious breaches of my Constitutional Rights I was well on my way to creating a governing body to give safe-harbor to professional photojournalists. I want to continue my work. I believe professional photographers are in danger now more than ever before and are under attack not only from Digital Media that practices that belittles and devalues their work but also from professional entities that seek to destabilize the industry for their own monetary gain. I would like to propose that the MDAO use some of the resources it has allocated to protect other industries in town (think Stub-hub and the office created to protect digital entertainment ticket sales) to oversee and protect the industry and business of photography/photojournalism. The creation of such an office would:

    a. Act as an assertion that the MDAO recognizes the integral work of photographers in building our society and in recording history.
    b. -Acknowledge that NYC is the place where the commerce of photojournalism takes place more so than any other city in the world.
    c. -Assert that there is sufficient need to establish protections and encouragements for professional photojournalists/photographers because of its SPECIAL JURISDICTIONAL PRESEDENCE/POSITIONING over the international industry that is anchored here in Manhattan

142. The authority that such an office could exercise to its protectees around the globe by asserting its control here over factions or entities with business addresses in NYC whom operate oversees potentially could work in many ways.

143. The office would act as a body to advocate for basic professional working rights and wages and benefits for registered members. For instance it could begin to standardize fair day rate and space rate and danger pay agreements as well as regulations for royalty splits and copyright enforcements. Current business practices by Goliath Agencies such as Getty have endangered the business and asserted egregious working standards on photographers (i.e. a 70/30 royalty split in favor of the Agency that photographers HAVE to agree to or else not have their work distributed globally by the largest global player in the industry.)

30

144. It could also work to protect members from threats against their persons as a result of their journalistic endeavors. Meaning: if a registered member of the office worked say in a place like Pakistan and was undergoing harassment by authorities while doing his/her job a member of the office would visit the Pak Mission to the UN here in NY and have a chat with someone like Shalit Jalal, the Information Minister, with a formal complaint letter and a course of action plan outlined if actions weren't taken to exert checks and controls over such threats.

145. The office would work on specialized legislative projects such as advocating for 9/11 photographers. Many I know are currently outraged that nothing is being done to stop the illegal distribution of our photographic output by near-do-wells who have illegally collected them into memory books for sale by legions of street-vendors on the fringes of Ground Zero. What will happen when the transit hub is opened? Will the same flotilla of illegal memory-book hawkers flood the area below Calatrava's beloved firebird and continue their illegal commerce? Who is coordinating with the City Council to pass legislation prohibiting illegal sales on hallowed ground? Who is working with the NYPD to trace the publisher of such books and hold them accountable? Who is monitoring where the millions of dollars a month being made by such illegal practices is flowing to? When I last sat near the Millenium Hilton /Centry 21 department store where the lions share of the books are sold these days I counted over 25 book sales men all with armloads of books selling for 10.00 to 20.00 USD each (Exhibit #42 photos of Yemenis salesmen illegally selling 9/11 "memory" books by Ground Zero.) Just a quick estimate:

average of 100 books/day each @ 15.00 USD = 1000.00 USD EACH per day = 1500 USD/day

20 vendors x 1500 = $30,000.00/day

7 days per week = $210,000.00/week

52 weeks/year = $ 10,920,000.00/year in ILLEGAL 9/11 photo book sales at Ground Zero ALONE.

I have MANY other ideas and would like to begin a dialogue on how we can bring this very painful episode to a conclusion and work together to do some good. I very much look forward to hearing from you Mr. Schlanger. Please take my statements seriously. I'm happy to have this document notarized if you feel more comfortable knowing my statements are sworn.

Yours,

*Miss Kelly Price

*signed as per the 2000 Federal Digital Signature Act

31

**Exhibit FF**

*Exhibit # 9 Pg 1*

# CRIMINAL COURT OF THE CITY OF NEW YORK

## COUNTY OF  NEW YORK

## ADJOURNMENT SLIP

DEFENDANT NAME:  PRICE, KELLY C.

DOCKET NUMBER:  2013SN053520

YOU ARE TO APPEAR IN COURT ON ___08/27/2013___ , IN PART

___SAP___ , ___346 BROADWAY___ ___09:00___ A.M./P.M.

IF YOU FAIL TO APPEAR, A WARRANT MAY BE ISSUED FOR YOUR ARREST.

BRING THIS NOTICE WITH YOU.

---

## TRIBUNAL CRIMNAL DE LA CIUDAD DE NEW YORK

## CONDADO DE  NEW YORK

## A VISO DE APLAZAMIENTO

NOBRE DE EL ACUSADO: PRICE, KELLY C.

NUMERO DE INSCRIPCION: 2013SN053520

USTED DEBE COMPARECER AL TRIBUNAL EL ___08/27/2013___ , EN LA

SALA ___SAP___ , EN ___346 BROADWAY___ ,

A LA(S) ___09:00___ A.M./P.M.

SI USTED NO COMPARECE, UNA ORDEN DE DETENCION PODRIA SER
EMITIDO PARA USTED.

TRAIGA ESTA NOTIFICION CUANDO VENGA AL TRIBUNAL.

**Exhibit GG**

Case 1:15-cv-05871-KPF  Document 16-6  Filed 05/09/16  Page 6 of 49



NYC Resources | 311 | Office of the Mayor

## NYC Mayor's Office to Combat Domestic Violence

Printer Friendly    Email a Friend    Translate This Page    Text Size: A A A

**SEARCH** GO

**Call 311 for the DV Hotline**
**Call 911 in emergencies**

Home

About OCDV

Get Help
- Domestic Violence Hotline
- NYC Family Justice Centers
- Domestic Violence Response Team (DVRT)
- NYC Services Snapshot
- A.V.O.N. Mentoring Program
- Resource Directory
- Staying Safe

Prevention + Education

Statistics

Newsroom

Donate/Volunteer

Frequently Asked Questions

Contact OCDV

**Available Languages**

| Español | Français |
| 繁體中文 | 한국어 |
| Русский | 한국어 |
| اردو | বাংলা |
| বাংলা | 日本人 |
| Polski | Shqip |
| Kreyòl Ayisyen | English |

**Resource Directory →**



# NYC Family Justice Centers

The New York City Family Justice Centers are a program of the Mayor's Office to Combat Domestic Violence.

## Services Provided
The New York City Family Justice Centers provide criminal justice, civil legal, and social services all in one location for victims of domestic violence, elder abuse, and sex trafficking.

Victims can meet with a prosecutor, speak with a trained counselor, and apply for housing and financial assistance in just one place. Children age 3 and up can play in a children's room while their parents receive services.

Services are free and available to all victims. Victims can get help at the Centers no matter what their immigration status or the language they speak. Staff can speak more than 30 languages and interpretation services are also available in many more languages.

## Locations
Each Center is open Monday through Friday, from 9am- 5pm. Clients may walk-in during these hours – *you do not need to make an appointment.*

**NYC Family Justice Center Bronx**
**Address:**
198 East 161st Street, Bronx
**Phone:**
(718) 508-1222

**Subway:** Take the ④ or ⑮⑯ to 161st Street Yankee Stadium station. Exit near the intersection of E. 161st Street and River Avenue. Walk east on 161st Street towards the Grand Concourse. The Center is located at the corner of E. 161st Street and Sheridan Avenue.

**Bus:** The BX1, BX2, BX6, and BX13 all stop near the Center.

**NYC Family Justice Center Brooklyn**
**Address:**
350 Jay Street, downtown Brooklyn
**Phone:**
(718) 250-5111 and select 6

**Subway:** Take the ④⑥, ⑮ or ℝ train to Jay Street or the ②⑤ or ④ or ⑤ train to Borough Hall.

**Bus:** The B25, B26, B38, B51, B54, B57, B61, B65, B67, and B75 buses all stop near the Center.

**NYC Family Justice Center Manhattan**
**Address:**
80 Centre St.
**Phone:**
(212) 602-2800

**Subway:** Take the ④⑤⑥ to Brooklyn Bridge-City Hall, the ④⑥ to Chambers Street, the Ⓝ Ⓡ ⓠ to Canal Street, the ①②③ to Chambers Street or the ④⑥ to Chambers Street.

**Bus:** The M5, M9, M22 and M103 buses all stop near the Center.

**NYC Family Justice Center Queens**

Case 1:15-cv-05871-KPF   Document 16-6   Filed 05/09/16   Page 7 of 49

**Address:**
126-02 82nd Avenue, Kew Gardens
**Phone:**
(718) 575-4500

**Subway:** Take the ⊕ or Ⓔ train to Kew Gardens/Union Turnpike. Use the "Court House/North Side" exit and walk east on Queens Boulevard past Queens Borough Hall. Turn left on 82nd Avenue.

**Bus:** The Q10, Q37, Q46, and Q60 all stop near the Center.

## Learn More
View our video about the New York City Family Justice Center, Brooklyn: 56k; 300k

Download one-page flyers about the New York City Family Justice Centers in these languages.
Albanian, Arabic, Bengali, Chinese (traditional), English, French, Haitian Creole, Hindi, Korean, Japanese, Polish, Russian, Spanish, Urdu (in PDF)
Download the New York City Family Justice Center Initiative Brochure (in PDF)
Visit our Frequently Asked Questions

## Partners
Get information about the on-site community organizations and government partners.

The New York City Family Justice Center Initiative is a private/public partnership of the Mayor's Fund to Advance New York City, a 501(c)(3) not-for-profit organization established to promote partnerships between the City and the private sector.

Copyright 2015 The City of New York

Contact Us  |  Privacy Policy  |  Terms of Use

**Exhibit HH**

JULY 26, 2012

## STATEMENT BY COALITION AGAINST TRAFFICKING IN WOMEN

**We are a coalition of advocates for victims of sex trafficking who feel compelled to speak in support of the complainant and her family in this case and to express our concern about the dismissal of charges against the defendants. In many respects, this case, in which a young girl from Crown Heights reported victimization by a group of older men, one of whom has been convicted of felony-level sex trafficking and another faces charges of murder in unrelated cases, is typical of sex trafficking.**

A victim of prior childhood sexual abuse, like an estimated 70 percent of prostituted girls and young women, the victim in this case reported that a group of adult men in her neighborhood sexually assaulted her and seasoned her into prostitution when she was in her early teens. Experts report that the average age of entry into prostitution is 13 years old and that prior sexual victimization renders many of these girls especially vulnerable to their exploiters' tactics of power and control.  Traffickers are often trusted friends, family members, or neighbors.

**There is voluminous evidence corroborating this young woman's claim of sex trafficking and rape.** Police records and neighborhood witnesses support her and her family's account that they made complaints to the local police about her victimization by a group of neighborhood men during the early stages of her trafficking but the police did nothing to protect her. While police response to sex trafficking is changing under the leadership of Commissioner Kelly, it has been longstanding police practice, in New York City and throughout the country, to ignore the perpetrators and to blame and arrest the victims. The mental health issues faced by this victim, for which her family assisted her in obtaining in-patient treatment, are also typical.  Most victims of prolonged sex trafficking suffer from acute post traumatic stress disorder, as this victim does.

**One of the most representative yet misunderstood features of this case is the victim's psychological bonds with her abusers.** Like most girls and young women under pimp control, she viewed her traffickers, variously, as tormentors, protectors, romantic partners, and surrogate father figures. Like most girls and young women under pimp control, and like many victims of domestic violence, a closely related form of gender abuse, the victim in this case expressed feelings of love for her tormentors, at times wished to protect them from punishment, blamed herself for her victimization,  and repeatedly returned to them. This psychological condition,

sometimes called "Stockholm Syndrome" and designated "traumatic bonding" by mental health professionals, is widespread among victims of severe and prolonged sexual and physical violence. It is typically engendered by beatings, rape, captivity, and threats to the victim and the victim's family members, punctuated by expressions of caring and love. The young woman in this case reported precisely this kind of treatment at the hands of her traffickers.

**It is unfortunate that statements made by the victim that should be viewed as evidence of traumatic bonding have been wrongly interpreted by key legal players in this case as evidence of consent and have become the basis for the Brooklyn District Attorney's Office's decision to dismiss the charges against the defendants.** We regret that expert witness testimony was not employed by the Brooklyn District Attorney to educate the jury and the general public about the meaning and significance of these statements. We are concerned that the dismissal of these charges, coupled with silence about the role of traumatic bonding in this case and others, will have a chilling effect on other victims' willingness to report sex trafficking and may foster the erroneous view that women and girls' reports of sex trafficking are not to be trusted. We are outraged that some of the media coverage has denigrated the young woman in this case, who had the courage to come forward and report years of horrific abuse. We are deeply saddened that the victim and her family have been denied justice.

**This case has nothing to do with the victim's or her alleged perpetrators' race, religion, or ethnicity. Sex traffickers come from every racial, ethnic, and religious background, as do their victims.** In New York City, most sex trafficking victims are girls and young women from minority groups who grew up in conditions of poverty. Their poverty and minority status render them vulnerable and are exploited in the sexual stereotypes projected onto them by traffickers, who evoke them in marketing their victims to johns. This case is no different. One of ten children from a working-class family in a poor neighborhood, this victim's ethnicity and distinctive racial features were similarly exploited by the pimps who sold her and the johns who purchased her body.

One atypical factor in this case is this victim's strong family support. While her family members were unable to protect her from years of exploitation and abuse, they valiantly attempted to do so and today wholeheartedly stand behind their daughter and sister. Attached is a statement from the victim's father, who is determined to prevent other girls and young women from experiencing the suffering that his daughter has endured.

Press statement by the victim's father
July 26, 2012

June 28th of last year, the indictment of four individuals who had brutalized and prostituted my daughter since the age of 13 was announced with great fanfare by the Brooklyn District Attorney. For me, her father, her mother, and the other members of our family, this represented the end of a long nightmare. We had hoped that this case would shed light upon the legal and psychological issues that accompany this devastating crime. Today, the District Attorney has chosen to discontinue this legal battle. It is a decision that was made against our wishes and against our will.

We have maintained our silence at the request of the District Attorney, even as the defense in this case maintained a feverish battle in the court of public opinion. We were told repeatedly by the DA to maintain our silence, not to divulge facts that could be useful to the defense. We were told that our chance to reply would come in court. This is a promise that was not kept.

With our promise of silence now null and void, we now wish to set the record straight with facts that were omitted from press accounts of this case.

First, I became aware of the possibility of prosecution in my daughter's case in May of last year, almost six weeks before the indictments of Jamali and Jawara Brockett, Damien Crooks and Darrell Dula. During that time, my daughter courageously shared the details of her mental health history, as well as the extent of her "traumatic bonding"with her traffickers, in which

she felt fondness and affection that increased in direct
proportion to the extent that she was brutalized. All of these
facts she was eager to explain in a court of law. Repeatedly, she
and I asked people in the DA's office if these facts-- facts which
could easily be twisted and manipulated by defense attorneys-
would stand in the way of their prosecuting the case.
Repeatedly, we were assured that the case could go forward, that
my daughter was no more to be blamed for returning to abuse
than an abused wife or girl friend.

The press, hand fed a selective menu of leaks by the defense,
presented my daughter in the most damaging light possible.
Even when she attempted to learn self defense, a logical,
therapeutic step for someone who had been gang raped at age
13, it was splashed in the headlines in a sensationalistic and
negative way. What the press never focused on or even
acknowledged was that every single piece of information they
brought to light came from voluminous evidence turned over by
my daughter. Presented in its context, and explained by experts
in sex trafficking and domestic violence, the evidence should
have been more than sufficient to convict my daughters'
traffickers. It also would have enlightened the public on how to
protect their children, as well as to expose how traffickers target
their victims, "turn them out," put them on the street, and profit
from their sale.

One of the most damning pieces of evidence cited against my
daughter was a supposed recantation which she had signed. A
copy of the so called recantation shows that it was defaced, and
that the words "not true" were crossed out. [This needs a little
more explanation.]What is not mentioned is that the signature

was extracted from my daughter when she was at a hospital, receiving medication intravenously. In this weakened state, she was told by the man who goes by the official title of detective that she could be arrested for prostitution if she did not recant. What is also not mentioned is that this individual, who was on duty wearing an NYPD badge, cursed at her as he left the room with her coerced recantation. Sadly enough, this incident was only one of many in which my daughter was rebuffed by police when she reached out to law enforcement authorities to obtain protection from the abuse to which she was being subjected.

Several of these attempts to obtain protection from the police came when she was well under age and therefore legally unable to consent to sex. Back when my daughter was only 14, at a meeting arranged by Crown Heights Shmira, my son and I met with Lieutenant Cantwell and other police officers at our local precinct and voiced our concerns that my daughter was being forced into sex by the Brockett brothers. Despite the our reports of serious criminal activity—the repeated rape of a minor-- there was absolutely no follow up by Lieutenant Cantwell or any of the other officers to the best of our knowledge. In nine years of dealing with the NYPD, I can truly say that a stolen car merits more attention than a stolen childhood in many parts of New York City. The attitude of the NYPD that we experienced towards under aged trafficking victims was one of sneering indifference, a response that served only to cover the backs of perpetrators who turn out and prostitute under aged girls.

As a result our government's failure to protect her, my daughter spent years in in-patient treatment. She now feels overwhelming sadness about the time she spent away from family, and about

the fact that a locked ward was the only place that she could be free of sexual enslavement.

It should be self evident that a young woman who has been subjected to years of physical and sexual abused would be in need of serious psychiatric intervention. Tragically, what the defense has shown, and what the District Attorney has affirmed, is that a "history of mental illness" is a scarlet letter that in all too many cases deprives its wearers of any legal recourse against those who victimize them. In addition, the "traumatic bonding" increasingly understood by the legal system, in cases of abused spouses is used against them as proof that they sought out, enjoyed, and deserved their victimization. One legal expert told me that understanding of sex trafficking is today where the understanding of spousal abuse was 30 years ago.

It saddens me and my family that we had to leave our beloved community, one in which people of different racial, ethnic, and religious groups lived side by side and learned to respect our differences and cherish our commonalities, especially our desire to nurture our children. We leave it with a deep sense of empathy for other families that have lost children to "the street life." Even today, in this hour of defeat, we remain committed more than ever to bringing about the day when law enforcement will treat forcing a child into prostitution with the same horror felt by the average citizen. I personally feel conscripted to fighting this tragic form of human suffering as a life's mission.

We had hoped that Brooklyn would be the place in which a stand would be made against sex trafficking. This was unfortunately not the case. Despite my daughter's total

cooperation, the Brooklyn District Attorney has surrendered against our will and without our consent. We have no doubt that a day will come when a victim of sex trafficking will fight and win in a battle in court and win. We have no doubt that precinct by precinct, city by city and state by state, police and the courts will reflect and act upon the natural indignation citizens feel about this heinous crime.

In 1857, the infamous Dred Scott decision affirmed the legality of slavery. In 1865, Juneteenth became a celebration of the freedom Dred Scott never lived to see. Despite today's surrender in Brooklyn, the fight against sex trafficking goes on. I am saddened as a father and as a human being that this decision to drop charges was made. As a Brooklynite, I am ashamed as well.

Women are half of the human race. When women are oppressed by gender violence and inequality, men are diminished as well. Until my dying day, the sex trafficking of women and girls, men and boys, in prison and in freedom [not sure what you mean by "men and boys, in prison and in freedom"] will remain my cause. The dignity given us by G-d is not ours to diminish or to deny others. This struggle will go on. I thank the many people who behind the scenes have assisted our family in coping with this crisis and who have helped my daughter reclaim her freedom and dignity. G-d bless you all and G-d save our country.

# Speakers at Press Conference

Kim Sykes, Director of Special Projects, Coalition Against
Trafficking in Women

Taina Bien-Aime, J.D., former Executive Director, Equality Now,
New York State Anti-Trafficking
Coalition

Dr. B.J. Cling, Ph.D, J.D., Clinical and Forensic Psychologist

Danielle Latimer, LMSW, Commercial Sexual Exploitation Program
Coordinator and Clinician, Mount Sinai School of Medicine

Norma Ramos, J.D., Executive Director, Coalition Against
Trafficking in Women

Jane Manning, J.D., former prosecutor and Legislative Director,
New York City NOW

Shana Frydman, MSW, Director of Clinical Programs, Metropolitan
Council on Jewish Poverty

Kira Laffe, Outreach and Training Coordinator, New York City
Alliance Against Sexual Assault

**Exhibit II**

Price began the careers of many journalists such as David Rochkind: his work on the drug wars in South America spans a decade of reportage produced together. The Guardian just did a review of his book co-produced with the Pulitzer Center: http://www.guardian.co.uk/artanddesign/photography-blog/2013/jan/25/mexico-drug-war-photographer-david-rochkind?intcmp=ILCMUSTXT9384

 Scout Tufankjian was asked to be one of President Obama's Photographers after her comprehensive coverage of his 2008 campaign. Price was Scout's editor who stewarded her work with the campaign: Scout even mentions Price as the reason for her success when interviewed on the Charlie Rose show: http://www.charlierose.com/view/interview/10026 and thanks her in the forward and back cover of her best-selling book "Yes we Can":  http://www.scouttufankjian.com/#/yes-we-can---the-book.

Kate Brooks was one of the many photographers Price worked with and wrangled into difficult areas of the world to cover wars throughout the Mideast as well as children's' and women's' issues http://lightbox.time.com/2011/09/19/in-the-light-of-darkness-a-photographers-journey-after- 911/#12

Photographers such as Max Becherer, Christoph Bangert, Johan Spanner and Mitchell Prothero needed help getting into Iraq to work. Price not only got them safely in and out of the country dozens of times but initiated them on how to operate while there and subsequently most became full-time staffers at the NYT House in Baghdad: http://maxbecherer.com/#/the-dark-days-iraq/01182013_Becherer_IraqDark001

Price helped to position exclusive access inside the home of Benizir Bhutto in Pakistan while she was placed under house arrest by the Pakistani government upon her return after years in exile a week before her assignation:  http://www.time.com/time/photogallery/0,29307,1683694_1485358,00.html

Price worked with Stephanie Sinclair on several stories including a never-before-seen intimate portrayal of the family of polygamist Warren Jeffs for the NYT Magazine (Winner of National Magazine Award for Best Cover Story, 2009) http://www.childbrides.org/raid_NYTimes_children_of_God.html

Price is a 9/11 survivor whose work was published around the world:  now that she has

lost credibility she has difficulty distributing her photos taken on 9/11 for which

she made yearly income:

http://digitaljournalist.org/issue0609/watching-the-world-change.html

http://www.amazon.co.uk/102-Minuten-erz%C3%A4hlte-Geschichte-%C3%9Cberleben/

dp3492250521ref=sr_1_11s=books&ie=UTF8&qid=1363704757&sr=1-11

http://www.nytimes.com/2001/09/23/arts/the-aftermath-peering-into-the-abyss-of-the-

future.html

http://www.time.com/time/magazine/article/0,9171,1053663,00.html

http://www.thetimes.co.uk/tto/news/uk/jubilee/article3353131.ece


Price positioned photojournalist Robert Stolarik in NOLA days before hurricane Katrina

and more than supported his efforts to document the events during and after the storm:

Stolarik won many awards that year and Robert's coverage secured him a staff position

at the NYT: http://www.nypress.org/KATRINA/index.html



**CCM** COMMUNITY
COUNSELING
& MEDIATION

115 West 31st Street . 5th Floor . New York, NY 10001
PH 212 564 6006 . FAX 212 564 3440 . WWW.CCMNYC.ORG

January 25, 2016

To Whom It May Concern,

Ms. Kelly Price is a client here at the Manhattan clinic of Community Counseling and Mediation. She is seen for weekly psychotherapy and has been diagnosed with: F43.10 Posttraumatic Stress Disorder. She began treatment on December 29, 2015 and her most recent appointment was Friday, January 15th.

Please inform if there is any additional information you may need.



Sincerely,

Alyssa Rodriguez, MHC Intern

Lauren L. Rigney, MS, LMHC, NCC
Clinic Director

BOARD OF DIRECTORS

LaWanda A. Jackson, Esq.
Chairperson

Russel Shuler
Treasurer

Jean Goossen
Secretary

Cassandra Underdue

Joyce Tyson
Past Chairperson

ADVISORY BOARD

Margaret Crawford

Jenny Morgenthau

Emory X. Brooks
President and CEO

THERAPEUTIC SERVICES FOR CHILDREN AND THEIR FAMILIES

**EXHIBIT  20**

Exhibit 4 Page 1

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

Page 1 of 4

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br>-against-<br><br>1. Kelly Price (F 40)    ECAB #<br>1208401<br><br>Defendant. | FAMILY OFFENSE<br>DEFENDANT/VICTIM<br>RELATIONSHIP:<br>INTIMATE/ACCESS<br><br>MISDEMEANOR<br>ADA WELLS<br>212-335-4032 |

Raheem Powell, of an address known to the District Attorney's Office, states as follows:

At the times and places described below in the County and State of New York, the defendant committed the offenses of:

| | | |
|---|---|---|
| 1. | PL240.30(2) | Aggravated Harassment in the Second Degree<br>(109 counts) |
| 2. | PL240.30(1)(a) | Aggravated Harassment in the Second Degree<br>(109 counts) |
| 3. | PL240.30(1)(b) | Aggravated Harassment in the Second Degree<br>(109 counts) |
| 4. | PL240.26(3) | Harassment in the Second Degree<br>(1 count) |

the defendant, with intent to harass, annoy, threaten and alarm another person, made a telephone call with no purpose of legitimate communication; the defendant, with intent to harass, annoy, threaten and alarm another person, communicated with a person, anonymously and otherwise, by telephone, by telegraph, and by mail, and by transmitting and delivering any other form of written communication, in a manner likely to cause annoyance and alarm; the defendant, with intent to harass, annoy, threaten and alarm another person, caused a communication to be initiated by mechanical and electronic means and otherwise with a person, anonymously and otherwise, by telephone, by telegraph, and by mail, and by transmitting and delivering any other form of written communication, in a manner likely to cause annoyance and alarm; and the defendant, with intent to harass, annoy and alarm another, engaged in a course of conduct which alarmed and seriously annoyed another person and which served no legitimate purpose.

The offenses were committed under the following circumstances:

*Exhibit 4 pg 2*

## CRIMINAL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK

Page 2 of 4

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br>-against-<br><br>1. Kelly Price (F 40)          ECAB #<br>                                   1208401<br><br>                                   Defendant. | FAMILY OFFENSE<br>DEFENDANT/VICTIM<br>RELATIONSHIP:<br>INTIMATE/ACCESS<br><br>MISDEMEANOR<br>ADA WELLS<br>212-335-4032 |

Deponent states that on January 27, 2011, from about 23:36 hours until about 23:54 hours, at 315 West 116 Street, deponent received three (3) text messages from defendant, and deponent recognized the phone number of said text messages to be the defendant's phone number.

Deponent further states that on January 28, 2011, at about 00:49 hours, at 315 West 116 Street, deponent received a text message from defendant which stated in substance: I JUST TOOK ALL THE VICADIN AND IBUPROFIN PILLS WANDA GAVE ME AT ONCE. I HOPE I NEVER WAKE UP FROM THIS NIGHTMARE, and deponent recognized the phone number which the text message came from to be the defendant's phone number.

Deponent further states that on January 28, 2011, at about 2:39 hours, at 315 West 116 Street, deponent received a text message from defendant which stated in substance: I AM GOING TO ENACT A REVENGE ON YOU LIKE HELL HAS YET TO EVER SEE. YOU WILL TREMBLE AT MY FURY YOU WORTHLESS MAN-CUNT, and deponent recognized the phone number which the text message came from to be the defendant's phone number.

Deponent further states that on January 28, 2011 at about 10:44, at 315 West 116 Street, deponent received a text message from defendant which stated in substance: SADIE JUST SEALED YOUR FATE. WHAT YOU DONT KNOW IS MY NEW MAN IS VERY POWERFUL RAHEEM. GOT COPS ON A STRING. YOU WILL BE VERY SORRY FOR THIS, and deponent recognized the phone number which the text message came from to be the defendant's phone number.

Exhibit 4 page 3

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

Page 3 of 4

THE PEOPLE OF THE STATE OF NEW YORK

-against-

1. Kelly Price (F 40)

ECAB #
1208401

Defendant.

FAMILY OFFENSE
DEFENDANT/VICTIM
RELATIONSHIP:
INTIMATE/ACCESS

MISDEMEANOR
ADA WELLS
212-335-4032

Deponent further states that on January 28, 2011, from about 00:14 hours until about 11:55 hours, at 315 West 116 Street, deponent received five (5) additional text messages from defendant, and deponent recognized the phone number of said text messages to be the defendant's phone number.

Deponent states that on February 20, 2011, from about 8:57 hours until about 16:05 hours, at 315 West 116 Street, deponent received twenty-two (22) phone calls from the defendant, and some of said calls were within one minute apart from one another, and deponent answered some of said phone calls and deponent heard and recognized defendant's voice, and when deponent answered said phone calls deponent stated in substance to defendant, STOP CALLING MY PHONE and one of the times when deponent answered the phone deponent heard defendant state in substance: I HAVE YOUR LIFE IN MY HANDS AND I WILL GET YOU ARRESTED.

Deponent further states that on February 20, 2011, from about 17:22 hours until about 17:44 hours, at 2271 Frederick Douglas Boulevard, deponent received seven (7) phone calls from the defendant, and all of said phone calls were made within the time span of twenty-two (22) minutes.

Deponent further states that on February 20, 2011, from about 19:10 hours until about 21:56 hours, at 315 West 116 Street, deponent received seven (7) phone calls from the defendant, and some of said calls were within one minute apart from one another, and deponent answered some of said phone calls and deponent heard and recognized defendant's voice when deponent answered said phone calls, and when deponent answered said phone calls deponent stated in substance to defendant, STOP CALLING MY PHONE.

*Exhibit 4 Page 4*

## CRIMINAL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK

Page 4 of 4

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br>-against-<br><br>1. Kelly Price (F 40)        ECAB #<br>                                        1208401<br><br>                                        Defendant. | FAMILY OFFENSE<br>DEFENDANT/VICTIM<br>RELATIONSHIP:<br>INTIMATE/ACCESS<br><br>MISDEMEANOR<br>ADA WELLS<br>212-335-4032 |

Deponent further states that on from about 7:30 hours until about 21:30 hours on February 21, 2011, at 315 West 116 Street, deponent received forty-one (41) phone calls from the defendant, and some of said calls were within one minute apart from one another, and deponent answered some of said phone calls and deponent heard and recognized defendant's voice when deponent answered said phone calls, and when deponent answered said phone calls deponent stated in substance to defendant, STOP CALLING MY PHONE.

Deponent further states that on from about 8:32 hours until about 15:02 hours on February 22, 2011, at 315 West 116 Street, deponent received twenty-one (21) phone calls from the defendant, and some of said calls were within one minute apart from one another, and deponent answered some of said phone calls and deponent heard and recognized defendant's voice when deponent answered said phone calls, and when deponent answered said phone calls deponent stated in substance to defendant, STOP CALLING MY PHONE.

Deponent is further states that defendant's above-described actions caused informant to become alarmed and annoyed and feel harassed and afraid for deponent's well-being.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

_____          3/25/11   5:21 PM
Deponent                                      Date and Time

ACT 5 Version 4.3.5 Created on 03/25/11 5:18 PM

**EXHIBIT 12**

Exhibit 7 Page 1

SUPREME COURT OF THE STATE OF NEW YORK        NO FEE
NEW YORK COUNTY
100 CENTRE STREET
NEW YORK, NY 10013


CERTIFICATE OF DISPOSITION DISMISSAL

DATE: 08/08/2012                    CERTIFICATE OF DISPOSITION NUMBER: 29363

PEOPLE OF THE STATE OF NEW YORK      CASE NUMBER:             20075-2011
              VS.                    LOWER COURT NUMBER(S):   2011NY021627
                                     DATE OF ARREST:          03/24/2011
                                     ARREST #:                M11625738
                                     DATE OF BIRTH:           11/27/1970
PRICE,KELLY

              DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 07/24/2012 THE ABOVE ACTION WAS
DISMISSED AND ALL PENDING CRIMINAL CHARGES RELATED TO
THIS ACTION WERE ALSO DISMISSED BY THE HONORABLE DAWSON,T    THEN
A JUDGE OF THIS COURT.

THE DEFENDANT WAS DISCHARGED FROM THE JURISDICTION OF THE COURT.

THE ABOVE MENTIONED DISMISSAL IS A TERMINATION OF THE CRIMINAL
ACTION IN FAVOR OF THE ACCUSED AND PURSUANT TO SECTION 160.60 OF
THE CRIMINAL PROCEDURE LAW "THE ARREST AND PROSECUTION SHALL BE
DEEMED A NULLITY AND THE ACCUSED SHALL BE RESTORED, IN
CONTEMPLATION OF LAW, TO THE STATUS OCCUPIED BEFORE THE ARREST
AND PROSECUTION".

PURSUANT TO SECTION 160.50(1C) OF THE CRIMINAL PROCEDURE LAW, ALL
OFFICIAL RECORDS AND PAPERS RELATING TO THIS CASE ARE SEALED.


IN WITNESS WHEREOF,I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 08/08/2012.

                                    COURT CLERK

**EXHIBIT 13**

Exhibit 7 page 2

SUPREME COURT OF THE STATE OF NEW YORK     NO FEE
NEW YORK COUNTY
100 CENTRE STREET
NEW YORK, NY 10013

CERTIFICATE OF DISPOSITION DISMISSAL

DATE: 08/08/2012                    CERTIFICATE OF DISPOSITION NUMBER: 29364

PEOPLE OF THE STATE OF NEW YORK          CASE NUMBER:              20111-2011
             VS.                         LOWER COURT NUMBER(S):   2011NY032918
                                         DATE OF ARREST:          05/06/2011
                                         ARREST #:                M11639652
PRICE,KELLY C                            DATE OF BIRTH:           11/27/1970
_____
             DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 07/24/2012 THE ABOVE ACTION WAS
DISMISSED AND ALL PENDING CRIMINAL CHARGES RELATED TO
THIS ACTION WERE ALSO DISMISSED BY THE HONORABLE  DAWSON,T    THEN
A JUDGE OF THIS COURT.

THE DEFENDANT WAS DISCHARGED FROM THE JURISDICTION OF THE COURT.

THE ABOVE MENTIONED DISMISSAL IS A TERMINATION OF THE CRIMINAL
ACTION IN FAVOR OF THE ACCUSED AND PURSUANT TO SECTION 160.60 OF
THE CRIMINAL PROCEDURE LAW "THE ARREST AND PROSECUTION SHALL BE
DEEMED A NULLITY AND THE ACCUSED SHALL BE RESTORED, IN
CONTEMPLATION OF LAW, TO THE STATUS OCCUPIED BEFORE THE ARREST
AND PROSECUTION".

PURSUANT TO SECTION 160.50(1C) OF THE CRIMINAL PROCEDURE LAW, ALL
OFFICIAL RECORDS AND PAPERS RELATING TO THIS CASE ARE SEALED.

IN WITNESS WHEREOF,I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 08/08/2012.

_____
             COURT CLERK

**EXHIBIT 14**



**NYPD 28th Precinct**
@NYPD28Pct

You are blocked from following @NYPD28Pct and viewing @NYPD28Pct's Tweets. Learn more

Who to follow ·


Erik Jens
Followed

Michael B
Foll

Peter Chi

EXHIBIT 15



r's Office to
at Domestic
ce

to Combat DV

You are blocked from following @NYCagainstabuse and viewing @NYCagainstabuse's
Tweets. Learn more

Who to fol



Ale

Mic

Ma

**EXHIBIT  16**

---------- Forwarded message ----------
From: **RODRIGUEZ, BRAULIO** <BRAULIO.RODRIGUEZ@nypd.org>
Date: Fri, Apr 11, 2014 at 5:35 PM
Subject: RE: Follow up phone Call has gone very SOUTH lieutenant
To: Gracie2 <graciegracie212@gmail.com>


Hi Ms. Price,
I apologize for the phone call drop and I'm sorry if you feel I did anything intentional. I thought you had a bad connection and I waited for a call back from you. I've been in/out of the office, if you call and I'm not available, you may leave a message in the answer machine.

Ms. Price,
I would like to apologize for the negative experience you have been encountering with the 28 Pct. Although you may feel that the 28 Pct does not assist you with your complaints, I want to assure you that the Police Department takes all citizens' complaints serious. We vigorously strive for a better and more comfortable place for the members of the community to live in, and that includes handling every complaint seriously. As I explained earlier during our phone conversation, all of the cases/complaints you mentioned have been closed and investigated by the Detective Squad. Regarding your complaints about the District Attorney's Office refusing to offer you any help, you need to contact their office and file a complaint with the Department Disciplinary Committee (212)401-0800 or log on manhattanda.org. Unfortunately, the Police Department does not handle complaints against the D.A's Office. I hope this may have clarified any questions or doubts you had. If you have any emergencies please dial 911 and for non-emergencies dial 311 or call your local Precinct.


Lieutenant Braulio Rodriguez
NYPD - 28th Precinct
Integrity Control Officer
(212)678-1601
2271-89 8th Avenue
New York , N.Y. 10027




From: **Grace P.** <graciegracie212@gmail.com>
Date: Thu, Apr 3, 2014 at 6:02 PM
Subject: ref; mistreatment of K. Price as a domestic violence survivor by members of the 28th Precinct, Un-investigated IAB complaints and refusal of Police Services
To: braulio.rodriguez@nypd.org

March 20th, 2014

Kelly Price
New York,  NY
via email

Lt. Rodrigues
⅝ 28th Precinct
8th Avenue
New York, NY 10027
via email; braulio.rodriguez@nypd.org


Dear Lt Rodriguez:


I'm writing to provide further information to assist you in your investigations of my complaints  made to the IAB

regarding the handling of me as a victim of domestic violence and the hell your precinct put me through as I tried to liberate myself from my batterer. I came to the precinct in 2010 about my situation as I was suffering severe physical, mental, and economic abuse and instead of assisting me your pct chose to throw me to the wolves and put me in Riker's Island for alleged crimes of harassment against my batterer. How is a woman to defend herself if she is silenced by the police?? When I went to the NYPD for help in freeing myself from my batterer not one person in the precinct took the time to meet with me and review the many pieces of evidence that I had proving that I had not fabricated my own injuries; the stance the detectives in the 28 squad and the Manhattan District Attorney's office took in order to protect my batterer who was involved in several prosecutions they had already set in-motion against other parties not associated with me.

My batterer (Raheem Andre Powell) enjoyed a privileged status with the NYPD as a result of several incidents: he had assisted in helping the police previously and warned me that I would be unable to find sympathetic ears regarding his violence. More recently Powell had been a complainant in an attempted murder case wherein his drug-distribution hideout was robbed in December of 2010 by an armed member of a central-Harlem gang. During that robbery Powell was shot at by the perpetrator as he chased him up nearby Frederick Douglas Boulevard in front of the 28th precinct. That young robber/shooter was key in unravelling knowledge about the "Goodfellas" and "137th st" gang in Central Harlem which were 'brought to justice' under fanfare and several public press conferences by the district attorney's office. Powell also had knowledge of other gang-related (Crips/Bloods) activities that involved the murder of his cousin, Andre, in broad daylight on the corner of 115th and Lenox in the Fall of 2010 among other pieces of information he on passed to the police.

For these reasons my complaints as a battered intimate-partner against Powell fell on deaf ears at the 28th precinct nearby to my home on w. 120th st in Manhattan. I was caught up in a miasma of legal posturing and wrangling as the DAs office made a case against me for hundreds of counts of alleged aggravate harassment I supposedly committed against Powell. Without examining one hospital emergency room record, speaking to one neighbor, examining the receipts I had for various broken windows, kicked-down doors, or examining the photos of my injuries I was labeled a fabricator and liar. Branded a pariah I was thrown into jail, miscarried the child fathered by Powell I was carrying, and began suffering serious symptoms of Complex Post Traumatic Distress Disorder. Everything I had worked for in my life burned around me as my credibility was lost. My friends and neighbors looked at me with disdain and disbelief as swirling rumors fueled by the actions of the police and DAs office gave people incredulous pause whenever they confronted me. On many occasions I was physically attacked in the neighborhood by people I knew loosely in the street.

**The following information is broken down into three categories;**

**I. Rough timeline of events involving violence against me by Powell**

**II. Events that led to the filing of IAB complaints and details of those incidences.**

**III. Details of attacks on my person that the 28th precinct refused to follow up on.**

**I. Rough timeline of events involving violence against me by Powell**
**August 2009**—First Beating I suffered at the hands of Powell
People I told about first incident and/or who saw bruises/marks on me after incident (I went to a party that night with friends and was in shock still as the beating had taken place in the early morning):
Friends who attended Party:
James Price-Newsweek Magazine: 718. 872.8544 or office: 212 445 4628
Paul Moakley (party thrower): Deputy Director of Photography, Time Magazine: 646 379 0806
Brona Hatchette: Women's Health Magazine: 646 667 7609

**Fall 2009:**
I receive a visit from best college friend from Mount Holyoke, Amy Carter, from Seattle while she is in town on

Business.
She comments on how I live in fear of my boyfriend: she is upset that even though she is taking me out to dinner I still have to prepare meal for Raheem and that he calls me several times throughout dinner to check up on me and question me jealously about my whereabouts.
After her visit she sends me a letter fearful of my circumstances, begging me to take a hard look at why I am in relationship and encouraging me to leave Raheem.
Amy Carter
The Bill & Melinda Gates Foundation
Senior Program Official, Private Gifts
Seattle, WA
206 709 3282
206 612 6496
206 691 1655


**Beatings Continue through fall of 2009 and winter of 09/2010.**
People who heard domestic disputes:

Tammy Grinder upstairs neighbor (646 228 1469)
Jared Love (upstairs neighbor in #3—Landlord Adam Gargani has his contacts 347 237 0100)

People who called the Police when they feared for me b/c of Raheem:
Levertt (neighbor) NYC Public School Teacher.   646 320 6145
Tammy Grinder (definitely called police on night of 11/12—646 228 1469)

People who saw bruises/marks on me:
Neighborhood drivers from Harlem Transport—cab base around the corner:
Kalu 646 721 8592
Modou 347 751 4211
Dee and Marilyn; 347 203 2623

Neighbors:
Brianne: ask landlord for number ex-girlfriend of Jared Love (Adam Gargani is landlord: 347 237 0100)
Tony: Photographer who lives at 231 w 120th apt #3:  he took pictures when Raheem would beat me:   (212 729 7434)
Faisal: ask landlord for number—he and his wife have moved but they witnessed Raheem punching me and preventing me from entering my home (Adam Gargani is landlord: 347 237 0100)
Feliciano  My building super;  witnesses Raheem push me and hit me in front of my home in the spring of 2010: (646 201 1096)
Marcel:  the son of Maria Robinson.  Lives at 232 w 120th #1 (cq)
Dee &  Marilyn: Owners and
 Residents of 231 w 120th st:  witnesses bruises on me on numerous occasions. 347 203 2623
Maria Robinson:  Lives across street:  witnesses Raheem Beating me on 12/20/2010 in front of my home.  Her son, Marcel, also saw bruises on me on numerous occasions Maria died of Cancer in 2012)

Todd  Stevens:  212 350 8507  (my real estate broker—encountered me covered with bruises in sept of 2010 @ 28th precinct as I tried to make a police report about beating.)


**February 2010:**  suffer massive beatings:  sent to Emergency rooms twice back to back @ St. Luke's and Metropolitan to treat ripped cornea/black eyes Have Emergency Reports

**March 2010;**  suffer fabric burns all over upper body from Raheem ripping my clothes off as I tried to flee and dislocated shoulder.  Photos of injuries

**April 2010:** huge fight over easter week.  bruised badly-entire back and arms covered in bruises: swollen jaw. sprained ankle.

Beatings continue whenever we fight throughout Spring of 2010

**May/June 2010:**  call and visit 28th precinct multiple times to discuss how to get help.  Speak with young officer at desk:  Officer Williams. (pretty, petite, Afro-American) she witnesses bruises all over me
and encourages me to make report.  She warns me that he will be locked up if I sign report.  I beg her if there is a way to just give him a warning or to help me just extricate myself from relationship.
She says the only way Police can help is if he is arrested.  I leave station house without signing report.

**June 2010;** Raheem attacks me with belt that is covered in metal bottle-caps.  leaves permanent bruises on me.  Several people exclaim that my body looks as if it had been run over by a truck.  Dirk Caldwell VP of Sales at Black Enterprise witnessed belt marks; 347.865.5892

**June 2010**
kidnapped a raped at gunpoint by guy on long island named Ricky.  I have address and phone number still.  Raheem indifferent—beats me up and blames me.
i call svu and discuss attack with female officer who tells me that i cannot make an anonymous report to police.  Raheem encourages me not to make report and he gets in shouting match on phone with kidnapper.  ricky; 347 863 8171

**July 3 2010:**  Raheem attacks me as I leave my house to see friend.  He chokes me through my front gate and rips off my necklace and prohibits me from leaving aedicule outside my front door.  I have to call Police to get him to leave and permit me to leave my home.  Officers respond to 911 call.  They encourage me to make report—I decline as they say he will be arrested.  officers Loor and Chan respond.

**July-September 2010;**  multiple blow-ups:  police called to home on many occasions in response to my calls and other complaints by neighbors.

**July-September 2010:**  multiple trips to station house to discuss situation with Domestic Violence officers McNair and Diaz.  I fill out several reports and don't sign.  Many photos taken at precinct of my injuries.

**September 2010:** multiple calls to Police.  Front Windows smashed and replaced several times.  Door kicked in, locks broken, locksmiths called.  Locksmiths and glass companies have records of damages and repairs.

**October 11, 2010:**  Raheem tackles me and beats me in street at intersection of 118th and st. Nicholas Ave (NW corner.)  He beats me with his fists and cellphone and Police are called.  Police encourage me to make a combined report of stolen license plates, car, and Domestic Abuse all n one.  I'm not given copy of report.  Police take extensive photos of face, back and torso with bruises all over.  Officers instruct parking garage to not allow Raheem to take my car out of garage.  Raheem bribes parking lot owner and takes car even though Police helped me remove one license plate and park suv in front of car.
Witnesses:  Levertt (number above) and a girl named Jenn I know from the Dog Park (can get her number)

**October 14, 2010:**  Blackmailed and life threatened:  dogs' lives threatened by Raheem.  Says he will "ruin" me by telling ex colleagues and family private info about me if he gets arrested for Domestic violence, if I leave him, or if I fail to pay his bills.  Forced to go to precinct and ask for help.  I explain to officer McNair and Detective Simmons that I'm being blackmailed and Raheem is blackmailing me and if he gets arrested everyone will know etc.  Detective Simmons states the only way to dismiss complaint filed without my permission is that she needs overtime that week and by arresting me for making a false statement she will receive it.  She says since i've never been arrested that this will not be an issue and I won't go to jail.  She helps me write simple statement saying I caused bruises to my face bc we were in a fight and I was mad etc.  I'm arrested and given a desk appearance ticket for falsifying a police report.  DA declines to prosecute when I make court appearance.

**Night of November 11/12 2010:** Raheem breaks into my house and is waiting for me when I come home.  I had been at Amsterdam Ale House for dinner.  Police saw me (officer Loor) come home as they beeped at my taxi to move aside when I was paying fare and waved at them when I disembarked.  When I entered my home Raheem attacked me, stole my money and choked me until I passed out on my living room floor.  When I regained consciousness I tried to run for door and screamed for help.  At that point Raheem tried to detain me and I was

thrown/pushed through a 30 gallon fish-tank.  When Raheem realized what he did he panicked and stepped in the glass to pull me out of tank as I was sitting in glass and foul water.  He stepped on glass in his flip-flops and needed to be treated months later in december or early January at st. Luke's for an infection he suffered from a shard of glass lodged in his foot from that evening.  Neighbors all called police and they were pounding on my door: there must have been 30 officers in my house that night.  After much arguing with police (Raheem had disappeared out the back door) I was taken to Metropolitan Hospital and treated.  The FDNY ambulance workers (Valentin was one of them) remember the incident and how strange the police were acting.  The doctor who treated me can also comment on this (dr. Albert Della Fave—ER Resident.)

MANY neighbors heard me screaming for my life and called police that night.  survey 911 calls

Medical Professionals who Treated me:
FDNY Valentin: see copy of FDNY ambulance report (EXHIBIT  #)
Dr. Albert Della Fave: Metropolitan Hospital ER Resident: 212 423 6262 to attain a copy of DELLA FAVES INTERNAL DISPOSITION describing events with police and my treatment beyond the scope of what is in my medical records. (see EXHIBIT # Hospital emergency Report)

**November 17, 2010:**  Beaten by Nancy Powell, Raheem's mother when I go to her house for help.  Face completely covered in blood and deep scratches from her fake nails digging into my flesh.  I have permanent facial scarring as a result. (Exhibit #)

**November 22, 2010:**  after lying in bed frightened and starving for five days while my house is trashed I go to the police in fear of my life.  Police see the damage on my face still five days later and allow me to make report against Nancy Powell however they refuse to allow me to make a report about the November 11/12 incident  where Raheem through me through fish tank and instead instruct me to go to family court to attain a restraining order against him which i do.  I take it to police to serve and they tell me to come back.  I return a few days later with Family Court restraining order and the precinct refuses to act on it.

**December 22nd, 2010:**  beaten, robbed, dragged into street after Raheem breaks into my house and steals my money and phones.  Multiple witnesses call 911 for help.  Precinct desk sergeant Agron tells me when I go to make report that he will arrest me for trespassing if I don't leave the precinct.  Refuses to act even though i have an active restraining order against Raheem.  He refuses to look at it let alone serve it.  I call 911 from inside precinct to report his conduct and the operator tells me they can't do anything to help me.

**More fights through December 2010 and January 2011.**  ***I attempt to lock Raheem out over Christmas and Raheem incessantly pounds on door and  windows calling me all night for two days when i wouldn't let him in*********I had a friend staying with me, Dirk Caldwell from Black Enterprise.  He witnessed this barrage of harassment and vowed to only return to my house 'with a gun to protect himself.' Dirk Caldwell VP of Sales at Black Enterprise witnessed Raheem trying to break down my door and his incessant pounding on my windows 347.865.5892

**January 27th 2011:** fight with Raheem.  I refuse to have sex with him and tell him to leave after we agree to try to reunite.  He attempts to beat me again and I start screaming for help. in his haste to leave he leaves phone in my apartment.  I go to precinct to make police report of incident and sergeant Agron again tells me that the only thing he can do for me is to "move me to Nevada" (implying that I am a some kind of filthy degenerate prostitute unworthy of the NYPD's assistance.) (See texts from Powell EXHIBIT #)

**January 28th 2011:** I make appeal to detective Simmons to help me.  She is disgusted at Agron for his treatment of me and insists I make reports about 12/20 and 1/27 incidents to DV officers when they are in the next day.  Simmons agrees to help me if I tell her everything I know about Raheem's drug-dealing and his connections etc.  I ask about signing a complaint for injuries dating from 11/11/2010 and Simmons tells me its too late that the precinct will look bad.

**January 29th 2011:** Interviewed by DTs about Raheem's drug sales enterprise. They never ask me to show them pictures, ER reports etc. Detectives tell me the only way they will help keep Raheem away from me and to get my car back from Raheem is if I press charges against Raheem.

**January 30th 2011:** DV officer McNair takes report of 12/20 incident and encourage me to make report about 1/27 incident. I am leery b/c no one saw him harm me on 1/27 but people did see me harmed on 12/20. Precinct tells me that Raheem has been making reports against me and that if I don't make report about 1/27 incident "decisions may be made that are not in my favor." I ask again to make a report about incident on 11/10 and am told that; ' too much time has passed' by officer McNair.

**January 31st 2011:** file report regarding 1/27 incident.

**February 1st, 2011** receive call from officer McNair telling me Raheem has been arrested and served with restraining order. he then asks me where I am and presses me. I refuse to tell him.

**February 2nd 2011:** receive call from DA Strobhen: she tells me I have "less than an hour" to get downtown to her office. When I arrive she and det. simmmons and another dt from the 28 (George?) pepper me with questions, call me a liar, informs me she is declining to prosecute Raheem, refuses to look at any evidence I have that supports that i have not been making-up abuse, accuses me of running a dominatrix dungeon out of my brownstone apt, informs me that if I make another report against RAHEEM that she will 'lock me up and throw away the key". She also informs precinct that she will personally handle all of my inquiries and if I have "a bullet-hole in my head that they are to call her first before responding to any call from me." She also encourages Raheem to press counter-claims of harassment against me and instructs me that even though I haven't been served that I am to show up in family court the next morning to respond to Raheem's charges. She tells me I will be charged with contempt of court if I do not show up. She tells me her only concern is that "an innocent black man has been sitting in jail for 24 hours…"

**February 3rd:** Powell tries to accost me on way out of family court. Judge denies his petition for a reciprocal restraining-order
Slobhen refuses to help me file report about Raheem's conduct on way out of court building. I make report with Det. Mortimer at 5th precinct.

**February 2011:** I discover I am pregnant

**Early February 2011:** Neighbors tell me that nude photos of me have been texted around to all the neighborhood boys. I call precinct and slobhan and no one will take report. I call Mortimer and he tells me he can't do anything. Lt. LArocca encourages me to make a report to the court and to the Department of Investigations as he informs me that ADA Strohbhen has instructed the pct. to not take any reports from me.

**February/March 2011:** I miscarry my child. Numerous calls from Raheem from Pay phones remember many and can pinpoint March 16th 10:30am repeated calls from him. please check my phone records 212 470 5624 was my number then.)

**February 20th 2011:** I call Raheem to tell him about pregnancy. I was extremely uncomfortable and in pain. We speak for hours/days on end about situation. Raheem enraged that I will not return to him and that i am considering terminating my pregnancy. He's also enraged that I beg him to seek counseling for his abuse and battery.

**February 23 (cq)2011:** receive call from officer Diaz at DV office of 28th precinct asking me to "come in to tell them how things are going." I smell something fishy and bug out. Officer McNair admits to me that Raheem made claims of harassment against me. He's surprised to find out that Raheem and I had been discussing my pregnancy. Tells me I will be arrested.

**March 24th 2011:** arrested in Manhattan family court by FOUR NYPD DETECTIVES from the 28…Det. Simmons responds to a question I ask her (after she calls me a liar and accuses me of making up abuse) by saying: "Kelly: I don't tell you how to lay {sic} flat on your back and spread your legs when you do your job and I certainly don't expect you to tell me how to do mine…" while I am in the holding cell at the 28 DT squad

**May 2011:** arrested by det fontanez for contempt of court. Not given time to make bail  taken straight to Rikers island where I am beaten. Raheem's cousin works on Rikers island so I was treated with special disdain. He promises if I come with him quietly that he will investigate my claims that Raheem beat me. Contract sinus infection

that causes hearing loss on Rikers.  Rikers staff loses my belongings and refuses to give me house keys when I am discharged.  Corrections officers Montague and others I made note of.  They can vouch to the abuse I suffered while in custody of the NYCD.

**May/June 2011:**  Jumped by women's shelter dwellers  at 233 W. 120th st. who do drugs with Raheem's cousins across the street three times.  Police called:  they refuse to help.

**May/June/July 2011:**  constantly taunted by neighbors about beatings and called a whore.  TOld my life is in danger by Raheem's drug-pusher TY who still slings Raheem's drugs out of 239 w 120th st. #2.

**AUGUST 2011:**  multiple attacks and constant taunting &  harassment by neighbors with allegiances to Raheem. Police take reports.


**II. Events that led to the filing of IAB complaints and details of those incidences.**

**Complained  July 15th, 2011 complaint # 11-31923**  and #11-43253 that Dt. Simmons failed to investigate my allegations of abuse at the hands of Powell, and that the 28th precinct  no action was ever taken nor any report provided back to Manhattan North liaison (as per officer Van Vorren and SGT Purcel)

Detective Simmons claims to have investigated my assertions that I had been abused by Powell but she never inquired about the abuse and checked with my neighbors interviewed,  reviewed
the photographs (Exhibit #) , hospital emergency room reports (Exhibit #2),
receipts for broken windows and kicked-down doors or to spoke with my
neighbors who had heard and seen the constant battery.
Detective Simmons never
investigated my  claims of abuse at the hands of Powell before charging me
with hundreds of crimes against Powell.  She failed to interview my landlord (Exhibit #3)
and neighbors (and even lied about this); never looked at or compared photos of
my severe injuries to hospital emergency room reports; never requested
that my sign HPPA forms releasing medical records,  and refused to collect/
accept other evidence such as 911 calls, receipts for repair work for broken
windows or doors that had been kicked down that proves that regular battery had
taken place against my by Powell. They accused me of fabrication without
knowing or seeking to examine the facts and then initiated an elongated, over-
zealous, and incorrectly charged case against me.
Detective Simmons never investigated the facts of my abuse
despite the fact that on the night of November 10-11th, 2010 over thirty
members of the 28th precinct converged on her home. The police accompanied her
ambulance to a hospital after Ms. my had been choked until passing out and
thrown through a fish tank by Powell(see Exhibit #2 hospital records and
Exhibit #1 photographs of permanent scarring from being thrown through fish
tank).  Simmons never asked me to sign a HPPA form or for permission to
speak to various doctors that had treated  me for the many emergency room
visits she made in 2010.  Detective Simmons never interviewed neighbors who
heard constant battery and called the police beseeching them to help me.

Simmons and I had had a previous encounter on October 14, 2010 when
I begged the 28th precinct not to file a report they had told me that I  could
have a night to sleep on before initiating action on.  I was not ready at
that time to initiate a prosecution against my batterer, Raheem Andre Powell,
as he had threatened my with blackmail and reminded me that he had Police
connections and would 'ruin me' if I reported his battery to the police. Upon
arriving at the 28th Precinct on the morning of October 14th, 2010 and telling
the DV officers McNair and Diaz that I was choosing to not initiate
prosecution against Powell for beating me on 10/11/2010 I asked them to tear
up the 61 report. The previous evening I had been told by the police that
they would allow me time to think about if I wanted to follow through with
the filing of the complaint against Powell.  I was reticent to go forward

with my claim against Powell  for several reasons including that Powell was
blackmailing (Exhibit #12) me by telling me that he would release intimately
personal photos and information about me to my family and colleagues if I
ever went to the police about the battery he unhanded on me.  (please refer to
exhibit #, cell phone transcripts of messages sent to me from Powell
proving the blackmail).  The DV officers had already elevated the report even
though they had promised not to and it had been assigned to Detective Simmons.

Simmons agreed to tear up my report against Powell only if I wrote out
a statement saying I had made a false report and inflicted injuries on
myself.  Simmons recommended this course of action as it was the easiest way
to make the situation go away. Simmons stated that she needed overtime hours
that day and as it was nearing the end of her shift and by booking me that day
for filing a false police report she would get some overtime hours.  Simmons
told me that as I had never been arrested that I would only receive a
Desk Appearance Ticket and that no one would go to jail.  She also warned me
to keep my head down and that I should move out of the neighborhood because
from this point on "you're on your own."  The report that I had made was
for injuries inflicted on me in public on the corner of 118th st. and St.
Nicholas Avenue.  The events were witnessed by people known to me and I
knew that if my story was ever followed up on that the facts would come out so
I agreed to Simmons' plan.  Simmons informed me that this was the only way
she would not arrest Powell based on my complaint filed without my
permission by the DV officers.   Detective Simmons coached me on how to
retract my statements: asking me to rewrite a synopsis of events several
times each time asking me to write the time at the top of the page much
earlier than the last so that Detective Simmons "could receive overtime by
catching the case with enough time to start to work it" on 10/14/2010.  A
record of Simmons' overtime request and payment is on file for this day.


 On March 24th, 2011 Detective Simmons was called in front of Judge Sattler in Family Court and asked if she had
investigated my claims of abuse and if they were credible. Simmons replied "no" (Exhibit # ) even though she had not
questioned me about my emergency room visits, reviewed photos of injuries taken by my neighbors, or interviewed
my building super, landlord or neighbors about the ongoing abuse. After Simmons answered that she did not believe
my's allegations Judge Sattler allowed four officers from the precinct to cuff me in the Family Court House on
Lafayette St in her courtroom and transport me back to the 28th precinct for booking and further processing and
arraignment. DETECTIVE SIMMONS HAD NEVER INVESTIGATED MY ALLEGATIONS OF ABUSE  & SHE
PERJURED HERSELF IN OPEN COURT.

When I was in the cell in the squad room AFTER being arrested in Sattler's court  inquired as to why Simmons hadn't
investigated my claims. My home was 1.5 blocks from the Precinct on 122nd but no one in my brownstone was
interviewed about the constant abuse. Detective Simmons replied to my query: "Miss Price, when you lay on your
back and spread your legs while doing your job I'm not standing over you telling you what to do and I sure as hell
don't expect you to tell me how to do mine..."

Complaint # # 11-31923 was marked "unsubstantiated" by lt. Rentas and 11-43253 was closed by a 28 squad
investigator and closed by lt. laburda:  678 1608.  No one ever contacted me to interview me regarding these
complaints.


9/1/2011 Filed complaint vs  Officers Bright, Ebright and Raman as well as Sergeant Agron  for incident on
8/31. IAB complaint # 11-39869 PO EBRIGHT PO RAMAN and PO Ehlers].  This complaint was marked by the  28
precinct as unsubstantiated by someone named Lopez. Basically these cops instead of taking my report of death
threats by Raheem's friends outside my home chided me, harassed me, and laughed in my face. When they arrived
on scene and Ebright said to me;  "Miss Price I hope someday I am called to your home and you are lying dead on
the sidewalk with a knife in you.. "


October 2011;  filed IAB complaint # 11-49386  against 28 pct DV officers Rosendary and Simmons

complaint c1-1-667494377.  This complaint was referred back to the precinct for investigation by the manager of the officers, the SGT also marked my complaint as UNSUBSTANTIATED.

On October 25, 2011 I attempted to file a DIR report with the 28th
precinct about a violation of a restraining order Powell had committed on
10/21/11 against an order of protection issued by Judge Sattler (Docket #0–
00763-11, File # 1685, order #2011-1195 issued on 9/29/11 expiring on 3/29/12.)
I was refused the opportunity to make a report of the violation on the date
of occurrence.  I went back on subsequent days in an attempt to file the
report and Captain Williams, the CO of the 28th precinct, instructed his DV
officers to take the report.  The DV officer who took the report eventually (id
# 939468) ripped up the report and refused to process it (Exhibit # copy of
report ripped up by DV officers).  When following up the next week on the
status of the DIR I was told it was missing and that I was not invited
back into the precinct to refile it.  I was accompanied on 12/01/11 by
representatives from the St. Luke's Roosevelt Hospital Crime Victims Center
back to the precinct to refile a new DIR (Exhibit #.)  The DIR was accepted
by the SGT (id # 933944).  I at that time received an apology from the SGT about the missing DIR and I provided a
copy of the missing DIR to the SGT.  The new
DIR was assigned to Detective Ransom of the 28th squad who did not follow-up
on any investigation regarding the complaint.   In fact sgt Ransom engaged in a game of telephone cat and mouse
with me and Powell was never arrested,
investigated or questioned about his offense against the court order.  A DIR was lost about a violation of a restraining
order and the superior marks the complaint about the loss and inaction to protect my safety 'unsubstantiated?"


**In November of 2011 I filed complaint # 11-55009 against detective Simmons about her perjuring herself
under oath in front of Family Court Judge and failing to investigate my abuse claims (see court transcript
Exhibit #). This was logged by detective rogers on 11/29/2011. It was marked unsubstantiated by Lt. Franqui. No
one called me or followed up with me.**


**III. Details of attacks on my person that the 28th precinct refused to follow up on.**

I was informed multiple times after being assaulted or threatened that the Manhattan DAs office had instructed the
precinct involved not to take my complaint or to not follow-
through on any investigation of my allegations. This happened on numerous
occasions notably: 6/3/2013, 5/17/13, 10/17/12, 07/27/12: (incident
#2012-020-2969), 7/14/12, 4/17/12, 1/20/12, 12/1/11, 8/13/11, 8/4/11, 8/2/11. Attacks on my person and death threats/
harassment continued  through 2013 when I moved out of the 28th precinct's domain.  Please refer to incident report
slips, jaywalking tickets,  hospital records etc.


8/2/11  When assaulted (punched in the face and chest when I went outside to check my mailbox) in front of my
home by neighbors associated with the cousin of my ex intimate partner and batterer, Raheem Andre Powell. I
called 911.  p.o. Cooley shield # 14327 responded and told me I was not allowed to receive police services, that the
pct. had been informed by the DAs office that I was 'crazy' and that even if he took an incident report  nothing would
come of it  I called 911 around 1230 pm.  Cooley and his partner arrived at 1250 pm.  I followed up the next day to
get incident ID# and was ignored and never received a call back from a detective investigating the assault or from the
mousy grey-haired mean-spirited clerk in the 29 pct who assigns the ID #.  Eventually in 2012 Lt. LaRocca looked up
the incident and provided and ID# to me.


8/11/11  Told by associates of of my ex intimate partner and batterer, Raheem Andre Powell, who were exiting 239 w
120th next to my brownstone where Raheem operated his drug distribution in apt #2 upstairs on the second floor in
the back of the building (overlooking my backyard and bedroom window) that 'I would be taken care of' and that I
should fear for my life.  Called 911 to report death threats around 330pm.  P.O. Bonaparte (did not provide shield #)

responded with partner around 400pm and took incident report.  No one followed up with me.  I followed up and received a complaint number from lt. Iarocca who looked it up for me;  complaint # 2011-28-003732.  No one ever followed up with me about these threats or arrested the perps.  They continued to threaten and intimidate me each time I left my home and encountered them for the next two years saying; 'no one cares about you at the precinct;  no one gives a shit if anything happens to you kelly…'

8/16/11;  Assaulted by associate of RAP on my way home from store.  Punched in the face.  called 911.  Ambulance arrived and treated me, police took report and never followed up.  See photos of busted face taken by FDNY ambulance workers (Exhibit #)

8/31 9/1;  harassed by associates of RAP.  PO EBRIGHT PO RAMAN and PO Ehlers respond and tell me I should move out of neighborhood, they harass me about associating with 'these people in this neighborhood' and refuse to take my complaint.  **Ebright tells me he hopes he responds to one of my complaints one day and 'finds me lying on the sidewalk in front of my brownstone with a knife in my back.'**

10/25/11;  report finally made on 12/1/11;  see description of my attempt to file a report for Raheem's breech of restraining order detailed above in the section outlining events that led to me filing and IAB complaint against the DV officers Rosendary and Simmons above in section II.

1/20/12  Attacked by woman named INA who lived across the street in the  white building Raheem's uncle and cousins dwelled in on 120th near my brownstone. This woman has known my batterer since he was a child, is a known street walker, crack/cocaine addict and has had her youngest daughter, Sarde, removed from her by children's services.  She encountered me as I as walking to the store and began yelling at me abut how she loved watching people attack and harass me whenever I left my home.  I replied that she was a crack whore who couldn't even take care of her own children, that often I had to care for 'Dee-Dee' (short for Sarde) often when she was too cracked out to help her own daughter with her homework or when she fell off her bike and needed bandaging and love.  I had even taken her kid to Chucky Cheese with other neighborhood girls once when I surprised all the little girls on the block with an outing to the restaurant in september of 2010.  Ina became enraged and smacked me in the face with a closed fist resulting in my front right tooth becoming dislodged and landing on the sidewalk. As blood spurted from my face and I searched the sidewalk for my missing tooth Ina picked up a long wooden leg from an old table that still had large protruding nails at the top of it where it had once been attached to the table top.  She began to run at me with this weapon and the only person on the sidewalk who interfered was the neighborhood UPS guy, Danny, who jumped off his truck and tackled INA so she would not club me from behind with the weapon.   At that moment a police cruiser passed by and I waved it down.  IT was a manhattan north lt. and his assistant who took my details and said they would on pass my complaint to the 28 but that I should also call 911 which I did.  The complaint was assigned to Dt. Fontanez who followed up once with me asking who my assailant was.  I gave her first name and address to Fontanez and he couldn't make an arrest based on that.  I deplored him to make an arrest and he drove me around one night when I saw him walking in the neighborhood but never followed up again with me about locating this crazed attacker.  I called Fontanez multiple times reminding him that the statute of limitations on assault is two years and he told me that he couldn't do anything because his hands were tied.

4/17/12  attacked in front of home again.

7/14/12, attacked in front of 200 St. Nicholas Ave., around the corner from my home on way home from store.  Hair grabbed and slammed over and over onto pavement by associates of RAP.  Knee damaged bruises all over.  called 911 around 200 am in the morning and P.O. Johns and partner responded, told me they wouldn't do anything to help.  I insisted it is my constitutional right to make a  61 report and that it is illegal for the police to refuse to take my report.  They gave me an incident slip marked 'harassment' around 230 a.m.  No one ever called or came by my brownstone to investigate or follow up.  I attempted to get an ID number for my complaint and was rebuffed again by the mean mousy grey-haired lady who assigns these numbers in the 28th pct.

10/17/12  While walking home from the subway on 125th street and passing 200 st. Nicholas Ave I was attacked by someone named Willy who sells Heroin on the stoop of that building and is an associate of RAP.  He jumped me as I was passing his stoop and threw me onto the ground causing substantial damage to my right knee (see photos Exhibit #).  I went to the emergency room and have reports and follow-ups from my orthopedic surgeon stating that I need knee surgery as a result of attack (Exhibit #s , and and). P.O. Longo responded (shield # 31565) and said they were instructed by desk sergeant not to take my report.  I insisted and they said they would turn in a notation to the desk sergeant about the incident.  I called the desk sergeant and complained  No one ever called me to follow up on

this assault. complaint # 2012-28-005194.  The first police who responded to my call said; 'aren't you the crazy one we are not supposed to take reports from?"  P.O. Longo and Williams eventually followed up after I called 911 and complained about the first officers on scene.  P.O. Williams sympathetically stated to me that the District Attorney's office had instructed the precinct not to respond to any of my calls.  This was Witnessed by my neighbor, Elizabeth Walker, who is a graduate of Harvard University, Colombia Law School and a MEMBER OF THE NEW YORK BAR ASSOCIATION.  WALKER PRESSED WILLIAM'S AND LONGO TO TAKE MY COMPLAINT, reminded them that it is illegal to deny a person police services.  Williams commented that the precinct had been instructed by the District Attorney's office to not respond to any calls I made AND THEY took my information and told me nothing would be done eventually.


On the night of 6/2/2013-6/3/2013  While en route home from the Amsterdam Ale house on 76th and Amsterdam where I had dinner with a friend of mine I instructed the cab driver to follow a certain route and he refused.  I asked him to stop his cab so I could get out and instead he locked the doors and sped up.  He carried on like this for  a number of blocks while I screamed at him to stop the cab and let me out.  I called 911 from the back of the cab and when we stopped at a red light nearby police from the 28th pct were called over.  Officer Officer was one of these officers and he announced to his partner that I was not to be given police services or assisted in any way and that he refused to take a report from me.  I called 911 and reported this incident.  Surprise; it was never followed up on.

6/2013;  while in route to the subway past precinct from my home Detectives from the 28 squad opened their windows overlooking my path up St. Nicholas to the 125th st. subway station and 'MOO' at me as if I were a cow.  I called the precinct and complained to the CO and his assistant immediately.

July 2013;  while walking my dog near my home i'm given a jaywalking ticket on the corner of 120th and St. Nicholas (I have eyewitnesses that will testify that I did not jaywalk) even though I wasn't jaywalking.  28th pct cops were rude and condescending.  I fought the ticket in court and won (docket # 2013SN053520).

**EXHIBIT 17**



Sanctuary for Families

Center for Battered Women's Legal Services
30 Wall Street, 8th floor
New York, NY 10005
Tel. 212.349.6009  Fax 212.566.0344
www.sanctuaryforfamilies.org

Judy Harris Kluger
EXECUTIVE DIRECTOR

BOARD OF DIRECTORS
William F. Gorin
PRESIDENT

Melissa Berger
Jeanne M. Luboja
Gregory P. Pressman
VICE PRESIDENTS

Jill Markowitz
SECRETARY

Mary Cannon
TREASURER

Erin M. Correale
Cathy A. Cramer
Blair A. England
Christopher J. Eykyn
George M. Lazarus
Holly Lipton
Janice Mac Avoy
Randy M. Mastro
Jenifer Wells Megalli
Heather Kennedy Miner
Petal Modeste
Courtney Wilson Monahan
Christopher Nordquist
Barry R. Ostrager
Pearl S. Pell
Alice Peterson
Sarah Pfuhl
Cynthia B. Rubin
Anita M. Sands
Michael J. Sharp
Pamela Shifman
Kathrine Stein
Christopher K. Tahbaz
Grace Wang
Lisa M. Wolman

PRESIDENT'S COUNCIL
Stephanie Ferdman*
CHAIR

Lynn F. Beller
Gilman S. Burke
Nina Kressner Cobb
Sarah Goldhill
Karenna Gore
Theresa Ann Havell*
Rita A. Hernandez
Carole S. Hochman
Dane E. Holmes
John R. Horan*
Anita Kawatra
Toby Koren
Mary Ann Mailman*
Lauren Manning
Loretta McCarthy*
Leslie Perkins
Donna Bonem Rich
Susan Sokol
Barbara Stimmel
Diana L. Taylor
David T. Washburn
Judy Weill
Catherine L. Woodman*
Audrey Y. Zucker

* PAST BOARD PRESIDENT

May 3, 2016

Public Allies
50 Broadway, Suite 2400
New York, New York 10004

Dear Public Allies:

I am the Director of Sanctuary for Families Center for Battered Women's Legal Services ("Sanctuary's Legal Center"). With 45 attorneys and more than 500 pro bono attorney partners, Sanctuary's Legal Center is the largest legal services program dedicated to the needs of survivors of gender violence in the country. I write in enthusiastic support of Kelly Grace Price's application to become a Public Ally. A survivor of both domestic violence and sex trafficking, and of our justice system's failure to protect survivors of these abuses, Kelly Grace Price, whom I know as Grace, has transcended unspeakable violence to become a fiercely powerful and highly effective advocate for some of the most marginalized and vulnerable women and girls in our city.

I first met Grace after a New York City Bar Association panel in the summer of 2015 addressing sex trafficking in New York City. After the discussion, which featured the Manhattan District Attorney, Cyrus Vance Jr., the Chief of Counter-terrorism for the New York City Police Department, John Miller, and former Chief Judge for the New York State Courts, the Honorable Jonathan Lippmann, Grace hovered outside the auditorium as the attendees, mostly professionals who work in trauma, trafficking, sexual assault and battered women's services, filed down the stairs. Clad in black and sad-eyed, Grace politely posed a provocative but accurate question to us, "How come all three speakers were Pale Males?" She offered politely to our group with sad eyes. Who are you?" I asked out her, as her comment reflected my own thoughts. "I'm Grace," she replied, "And I don't think Cy Vance would know a trafficking survivor if he ran one over with his police escort." Thus began my interaction with one of the most gifted and committed activists with whom I have had the privilege of assisting and collaborating.

As mentioned above, Grace has been subjected to domestic violence and trafficking in a pattern that we encounter frequently among clients at Sanctuary's Legal Center: an abusive predatory boyfriend becomes a trafficker. When Grace was finally able to seek protection from the justice system, however, rather than obtaining the protection she desperately needed she was revictimized by the very system that was supposed to protect her. Not only was she arrested and prosecuted under a section of the penal code that was subsequently struck down as unconstitutional, she was jailed for more than fifteen days on Rikers Island—a searing experience that exponentially increased her trauma. I have seen many cases over the years in which survivors have been revictimized by the criminal justice system but few have been as severe as Grace's.

Since that time Grace has drawn on reserves of strength and resilience to patiently and meticulously rebuild her life, preserving to ensure that what happened to her does not happen to others when they turn to the authorities for help in their darkest, most desperate moments. Since that time she has dedicated her life to the voiceless and the hopeless who like her have been refused recognition as victims and survivors of trauma/abuse. After spending weeks awaiting bail at Rikers and seeing the reality of who is confined there and how they are treated she has dedicated every waking moment to addressing the inhumane conditions on that island jail complex. It was apparent to Grace that over 75 percent of the women in the Rose M. Singer Center were survivors of either domestic violence amd/or trafficking and that the crimes they were accused of often arose out of these horrific circumstances. Instead of moving on with her life, she chose to try to do something about them.

Back in 2012 Grace began a campaign to remove all women off of Rikers, long before this topic was a headline in our newspapers. She has become a stalwart member of the NYC Jails Action Coalition, where she has steadily worked towards her goal, organized, built relationships with religious leaders, social justice leaders, and local, state and federal politicians. Indeed she has established herself as a driving force behind criminal justice reform in the areas of prosecutorial immunity, survivors' rights and secondary victimization, all while recovering and living on public assistance in a tiny SRO studio apartment in Washington Heights.

Grace's work to end the crisis of rape and sexual assault in our City jails has picked up momentum in recent months. The NYC Board of Correction has finally agreed to begin implementing rules to address the Federal Prison Rape Elimination Act this spring after almost a full year of forceful advocacy from Grace and her organization. From our past experience we know that the draft of a rule change to the minimum standards that comprise the Department of Correction's charter takes many months to revise, more to affirm positively with a vote, and even more to implement. Grace's work dedicated to reducing harm in our City jails and to giving victims like her, who were written-off as mentally ill, derelict, fabricators, is a profound reflection of who she is: without having regained her full rights and without having been restored to the status she enjoyed before her life was turned upside down, she fights for others who are more helpless and more desperate. What a testament this is to her strength of character!

Please help Grace to continue her work: in assisting her to restore the voices of the voiceless victims and survivors on Rikers, she has found her own again, and what a powerful and eloquent voice it is. By enabling Grace to continue and intensify her forceful and urgently needed advocacy for the most marginalized and vulnerable victims of gender violence, those who have been revictimized by our justice system, you will be empowering one of New York City's most formidable and dedicated public allies.

Sincerely yours,

Dorchen A. Leidholdt, Esq.
Director
Center for Battered Women's Legal Services
Sanctuary for Families