UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

KELLY PRICE

                PLAINTIFF

    -against-

DETECTIVE LINDA SIMMONS Individually,
and as an employee of the New York City Police
Department, ADA MARIA STROHBEHN and
ADA KENYA WELLS Individually,
and as employees of the New York County
District Attorney's Office, THE CITY OF NEW YORK,
Deputy DA Audrey Moore, ADA Larry Newman, ADA
Laura Higgins nee Richendorfer, DA Cyrus Vance Jr.,
as employees of the New York County District
Attorney's Office, Inspector Obe of the New York City
Police Department, in her capacity as an employee
of the New York City Police Department,
Rose Pierre-Louis in her capacity as the Former
Commissioner of Domestic Violence of the
City of New York, PO Matthew Winters, individually
And in his capacity as an employee of the New York City
Police Department, PO Relf, individually
And in his capacity as an employee of the New York City
Police Department, PO Maladano, individually
And in her capacity as an employee of the New York City
Police Department, PO Jane Doe, individually
And in her capacity as an employee of the New York City
Police Department, Jane Doe and/or John Doe Operator
of @NYPD28PCT Twitter Account, John Doe Operator
of @NYCagainstAbuse Twitter Account, John Doe Operator
of @RPLNYC Twitter Account, Jane Doe Assistant
District Attorney, John Doe Assistant District Attorney

Index No.: 15-CV-05871
JURY TRIAL DEMANDED

                DEFENDANTS,

-------------------------------------------------------

## THIRD AMENDED COMPLAINT

### as Ordered by Hon. Loretta A. Preska

-------------------------------------------------------

Kelly Price

RECEIVED
SDNY PRO SE OFFICE
2016 SEP -6 AM 9: 22

RECEIVED
2016 SEP -2 P 11: 58
U S DISTRICT COURT SDNY

Pro Se
534 w 187th st. apt #7
New York, NY 10033

1.    Plaintiff Kelly Price, Pro Se, alleges for the following:

2.    Plaintiff Kelly Price "PRICE" is an individual and resident of New York, and resides at 534 w 187th st #7,

New York, New York 646 676 1940: graciegracie212@gmail.com on behalf of herself ("Plaintiff"), based

on personal knowledge and upon information and belief, allege as and for the Complaint as follows:

3.    **STATUTE OF LIMITATIONS:** Plaintiff first filed her Federal complaint on July 24, 2015 exactly three

years to the DAY from the date of dismissal of felony and misdemeanor charges against her: July 24, 2012.

Plaintiff filed an AMENDED complaint twenty days following on August 13, 2015. According to the FREA

tolling begins at the onset of original filing. Plaintiff has met the three-year statute of limitations for all

section 1983/Monell claims. In February of 2016 charges of disorderly conduct were vacated by the NY

State Appellate Panel and Price Amended her complaint and filed her amended second complaint on May 8,

2016 well within the three-year statute of limitations. Further, Plaintiff has discovered (as of September, 30,

2016) that her arrest and confinement for allegedly falsifying a police report on October, 13, 2010 that

plaintiff had believed was dismissed on July 24, 2012 is still pending as this third amended complaint is

filed. Plaintiff's seizure in violation of her 4th Amendment right not to suffer unlawful search and seizure

under this arrest has continued un-adjudicated for almost six years to date. Plaintiff has made a request

with the Manhattan District Attorney's Office ("MDAO") for a speedy dismissal of these proceedings and

has been informed that the process will take at least one week. Plaintiff has made a request for the court to

allow the filing of this re-write to temporarily accommodate this dismissal so that proper actions may be

brought as a mandate of all section 1983 claims is that proceedings were dismissed in favor of the accused.

Plaintiff Price finds it incredulous that this still-pending charge has gone undetected under the circumstances

of various FOIA and investigatory inquests into her files have been made.

4.    **PREVIOUS LITIGATION:** Plaintiff first filed a complaint as a domestic violence survivor in 2012 and

not as a victim of trafficking as Plaintiff was nervous and ashamed about admitting statements into court

2

documents assertions that she had been trafficked.  NY state Executive and Social Service laws mandate certain protections for victims who come forward as survivors of trafficking that are not mandated for survivors of domestic violence.  Additionally the section of the NY State Penal code that Plaintiff had been charged with (CPLR 240.30) was still on the books as a valid statute when Plaintiff filed her original state court complaint in 2012.  It was stricken as unconstitutional only in June of 2014 (Exhibit A: Appellant finding People vs. Raphael Golb) a full two years after Plaintiff's original filing.  Plaintiff did not know of said decision until June of 2015 when Dorchen Leidholdt told her about it after a panel discussion on trafficking held at the NYS Bar Association hosted by former Chief NY State Administrative Court Judge Jonathan Lippmann.  Additionally the state case was heard under the late, great, Hon. Louis B. York of New York Supreme Court.  Hon. York granted Plaintiff an RJI as the city had not responded to Plaintiff's complaint a full seven months after being served.  This was the final decision he ever issued from the bench before going on vacation and falling ill leading him to languish for four months in a coma before perishing. Instead of filing a motion to request from the court a re-argument or taking an appeal the city law department filed a motion to dismiss which was accepted and validated by Hon. Kathryn Freed in March of 2015 without accepting Plaintiff's cross-motion and amended complaint even though she had accepted the city's motion to dismiss nine months late and after a final decision had been made by a previous judge who had since passed away. The two cases are entirely different cases: one being filed as a domestic violence survivor who was accused of a relevant and valid NY State Statute and the other as a survivor of trafficking who was charged with an unconstitutional statute of the NY State Penal Code.  Additionally, all of the relevant evidence that Plaintiff has been able to gather has come to light only in recent months such as Lt. Larocca's affidavit, ConnectNYC's case notes of their legal advocacy for Plaintiff that prove that Deputy DA Audrey Moore had knowledge of and failed to act to assist Plaintiff Price as a survivor of trafficking, the recent appeal of Plaintiff's disorderly conduct prosecution conviction which resulted in Plaintiff's favor et al.

5.    **NATURE OF ACTION:** Confidential informants and complainants on major cases exploit the authority of their position to exploit, abuse, traffic and torture the women in their reach.  This abuse is only possible because the City of New York has enabled a culture of complacency to perpetuate within the criminal justice system allowing the Police and District Attorneys to turn a blind eye towards the trafficking of, physical, mental, and economic abuses of women involved in intimate partner relationships with confidential informants or complainants on major cases.  These confidential informants and complainants are integral to Police and DA's successful prosecutions on other, unrelated, cases to the abuse because they allow Police and Prosecutors to maintain their quotas, conviction  rates, arrest-rates and to build their careers and move onto higher political office or higher-paid positions of employ.

6.    Plaintiff  Price was savagely trafficked, beaten and abused by Raheem Andre Powell, an informant and major-case complainant working for the NYPD and MDAO, who threatened to, and did, punish her if she resisted or reported his abuse. Now, Plaintiff  brings this civil rights action pursuant to 42 U.S.C. § 1983 against the City of New York (the "City") to obtain summary judgement, declaratory judgment, injunctive relief, and compensatory and punitive damages for deprivation of  her constitutional rights. As Plaintiff Price will demonstrate, other women in NYC have been denied Police and DA protections because of the status their abusers have held as CIs, major case complainants, and witnesses with the criminal justice system.

7.    Plaintiff Price was denied the ability to make reports against Powell for his abuse from 8/2009 through 1/2011 and continues to be denied the ability to file reports and services from the NYPD and MDAO.

8.    Plaintiff Price was denied intake and services at the Family Justice Center.

9.    Plaintiff Price was denied her First Amendment Rights to Free Speech similarly to others charged with the unconstitutional statute (NYCPLR 240.30) that was stricken down as illegal, unlawful, unconstitutional and misleadingly written in broad-strokes in May of 2014 in a decision written by the Hon. New York State Courts Chief Administrative Judge Jonathan Lippmann.

10.    Plaintiff Price was denied police services and put on a Blacklist and unlawfully denied her rights to due process, equal protection under the law et al.

11.   The New York City Police Department and the City Itself by extension has recognized the coercive power that uniformed and uniformed officers wield over complainants of Domestic Violence who come forward in an attempt to make complaints of violence against officers by meting-out separate procedures in the NYPD for the investigation of violence against ordinary citizens and of unformed and ununiformed Police Officers (Exhibit B NYPD Handbook).  The City is aware that a significant risk of coercion of women who come forward to make complaints against officers exists but it nonetheless permits a culture of systemic trafficking and other abuse of women by Confidential Informants and complainants on major cases to exist in NYC.

12.   The pervasive culture of trafficking, sexual slavery and abuse of women is common knowledge within and without the NYPD and various District Attorney's Offices.  DAs and NYPD officers, brass and minions know not only that women are regularly abused by their Informants and complainants but also engage in a pattern of cover-up, victim-blaming, false-arrest, malicious prosecution, denial of rights, obfuscation and "GAS-Lighting" of victims in order to curry favor with their informants and to sink the true victim's credibility and esteem to the point of no return.  This is especially egregious as the NYPD and District Attorney's offices are fully aware of the psychological repercussions and aftermath of abuse and are cognizant of how to play off of the mental disorders, depression, and physical frailties that domestic violence and traffic victims suffer during and after abuse (Citation Here.)

13.   Supervisory officers and  managerial District Attorneys facilitate this abuse by allowing the normal mandates (legislated by the NYPD handbook and/or NY State Executive and Social Services Laws/Crime Victims' Laws) of investigations into allegations of trafficking and abuse to fall by the wayside and by turning the other cheek to the victims' ultimate secondary abuse by the criminal justice system when victims are charged and/or threatened  with fraudulently false counter-complaints in order to control them, shut them up, and appease their abusers.

14.   The City facilitates this physical, economic and mental abuse and sexual slavery and other violations of rights by permitting supervisory officers and DAs to operate in the manner alleged herein, by failing to

monitor (through oversight or otherwise): failing to train ADAs and NYPD on the mandates of NYS

Executive and Social Service Laws Crime Victims' Statutes: by failing to distribute literature or to post

signs in its precincts, Family Justice Centers and Crime Victims Centers alerting victims of their rights as a

crime victim: by failing to ensure that when a victim of DV and/or trafficking is denied services bc she/he

is deemed a "fabricator" that proper DUE PROCESS is in place to ensure that the opinion of one prosecutor

or officer is not heavily weighted by their motivation to bring-in convictions and make.

15.    The City fails to protect from retaliation women who make complaints against Confidential Informants or

Complainants on major cases by placing them on "Do NOT SERVE" lists effectively barring them from

receiving Police services and protections in the future giving other perpetrators and abusers, skilled at

sousing-out and targeting weak and fragile victims in a depressed and helpless state an actual and perceived

free hand to victimize these women.  This retaliation in Plaintiff Price's case was well known in her

neighborhood of Southwest Harlem and Plaintiff Price was often attacked by Powell's acquaintances, family

members and other predators in the area BECAUSE THEY WERE AWARE OF PRICE'S STATUS AS A

NAMED MEMBER OF THE "DO NOT SERVE LIST" THAT THE 28TH PRECINCT WOULD NOT

ASSIST. The City's customs, policies, practices, acts, and omissions allowed Raheem Powell to abuse

Plaintiff Price and for other women to be abused and allowed other predators, Powell, Powell's circle, the

MDAO and the NYPD to retaliate against Plaintiff Price .

16.    The City remained indifferent to the widespread abuse and denial of protections and victims' services to

Plaintiff Price. Rather than taking prompt steps to investigate and punish Powell, the City instead both

continued to use Powell as an informant and complainant despite the credibility issues he had (his record

already included a Domestic Violence Felony arrest and several drug-distribution related arrests).  The City

treated Price as an adversary, refusing all requests to accept and investigate her "61 reports" of his felony

assaults and battery and refusing information about its investigation of her allegations, first on the ground that

the investigation found no wrongdoing, and later on the mutually exclusive ground that the investigation that

purportedly had "found" no wrongdoing was nevertheless still ongoing. The City has also withheld records of

the abuse and blackmail and campaign of terror that Powell enacted against Price —text messages on

Price's phone proving the battery, coercion trafficking and violence.  The Manhattan District Attorney's

Office has refused to return the personal property/phones to Plaintiff Price that she provided the City to

assist its purported investigation which have been refused to be returned to Plaintiff by the MDAO which is

against NY State's Executive Laws that clearly state: "Law enforcement agencies and district attorneys

shall promptly return property held for evidentiary purposes unless there is a compelling reason for retaining

it relating to proof at trial.  **NY State Executive Law 23 § 642 (3) –Fair Treatment Standards** (Exhibit C.)

17.     **JURISDICTION AND VENUE** This court has jurisdiction over action under 28 U.S.C. §§ 1331 and 1343.

18.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28

U.S.C. § 1391(b).

19.     **PRELIMINARY STATEMENT/Introduction**: Plaintiff  Price has been unable to receive a satisfactory

response to her previous demands that she be restored to the status she enjoyed before her false arrest,

unlawful imprisonment and defaming by defendants and that training, policies and procedures be set in place

to evaluate domestic violence and trafficking victims' complaints and veracity on a comprehensive level

especially when the abuser is a confidential informant or major case complainant working with the NYPD or

DA's office(s) on other, unrelated cases.  Plaintiff thinks it is absurd that the same ADA, Maria Strohbehn

who was using Plaintiff's abuser's proffer to her best advantage in a gang-destruction unit was also the one

to  be given the responsibility to evaluate Plaintiff's claims of abuse at the hands of her own

informant/major-case complainant? Currently there are special procedures in place in the NYPD Patrol

Handbook for handling DV complaints allegedly committed by an uniformed or non uniformed NYPD

member.  These special procedures are indicative that the NYPD recognizes that people with access to law

enforcement channels hold great sway over investigations and victims.  *Why isn't there a separate process

denoted for those who work tacitly as informants or complainants on major cases who receive special

handling from precincts and district attorney's offices?  This complaint seeks to address this question and

remedy this situation.*

20.     **NYS Executive Law; Article 23, Fair Treatment Standards for Crime Victims** is explicit in its mandate of procedures that must be followed when a victim reports trafficking or certain felony assaults. As Plaintiff will demonstrate, NOT ONE of these procedures was followed when Plaintiff turned to the NYPD and the MDAO for assistance (Exhibit # C). Further training and re-iteration of these laws needs to be implemented within the NYPD and District Attorney's offices such as the MDAO. Plaintiff is not the only trafficking victim in NYC to have been refused to be recognized (Exhibit HH) by the NYPD and Criminal Justice Authorities as a trafficking victim. According to the NY Penal Law 135.35 the crime of "Labor Trafficking" is committed: "if a person compels or induces another person to engage in labor, or recruits, entices, harbors, or transports such other person by…Using force or engaging in any scheme, plan or pattern to compel or induce such person to engage in or continue to engage in labor activity by means of instilling a fear in such person…" The protections outlined (Exhibit C) by the various statutes of NY State Executive Laws and Social Service Laws such as receiving emergency social and medical services, to be notified of the availability of crime victim compensation, support programs, prompt return of property held for evidentiary purposes, to be protected from intimidation, to have one's case reported by the MDAO to the Director of the Office of Victims' Services, the right to be pre-certified and/or certified as a victim of human trafficking, and finally confirmation as a victim of human trafficking (NY State Social Services Law (483-aa-483 cc) (Exhibit C) were not offered to Plaintiff Price against the mandates of these laws.

21.     Plaintiff also seeks POLICY CHANGE for the way that Domestic Violence and Trafficking Survivors are treated within the criminal justice system when they come forward for help in extracting themselves from life-threatening intimate partner situations. A methodology and better training needs to be implemented for identifying true victims that is not subject to the whimsy of one lone prosecutor's bias(es). When a victim is thought to be a 'fabricator' a review of his/her case needs to be examined by Trafficking and Domestic Violence advocates, therapists, social workers, and psychiatrists before they are denied restraining orders, protections, police services, social welfare services, a normal quality of life free from harm, and their ability to petition the government for a redress of grievances.

22.  This Lawsuit seeks to hold the defendants, CITY OF NEW YORK et al, liable for, but is not limited to misconduct under the federal civil rights statute, 42 U.S.C. 1983. The unlawful actions of police and prosecutors documented in this lawsuit resulted from affirmative or de facto municipal policies, practices and customs to violate the constitutional rights of trafficking and domestic violence survivors, suspects, and defendants, or from deliberate indifference by policymaking officials, acting on behalf of the City of New York, to such violations. As Plaintiff will demonstrate.

23.  **STATEMENT OF FACTS**  The basis for this lawsuit and State and Federal jurisdictions are violations of the USC §1983 et. seq., & Title United States Code § ("The CIVIL RIGHTS Act") of Price's CONSTITUTIONAL RIGHTS and various State Law against malicious prosecution, This is a civil action, pursuant to 42 U.S.C 1983, and state law, seeking monetary damages for Plaintiff, Kelly Price, due to her wrongful arrest, malicious prosecution, and denial of police services caused by the pervasive misconduct of the Manhattan District Attorney's Office ["MDAO"] and the New York City Police Department and POLICY CHANGE for the way victims of Domestic Violence and Trafficking Victims are evaluated by the NYPD and MDAO when they approach the "authorities" in the darkest, most desperate days of their lives.

24.  **LEGAL ARGUMENT** Defendants would have the court believe that they followed all proper protocols and procedures when handling Plaintiff Price's complaints and that PLAINTIFF was not a victim but a FABRICATOR of her own injuries undeserving of services and justice and the City Law Department Lawyers will laughably try to convince the court that the defendants are only guilty of "Negligent Investigation" of which there is no Federal or State proscription against.   These base conclusions were drawn by inexperienced and biased members of the MDAO and NYPD and recapitulated by members of the City Law Department whom had/have  much at stake in the evaluation of Plaintiff's complaints of abuse and trafficking against her batterer.   Raheem Andre Powell was acting as a complainant himself in an attempted murder case against a party unaffiliated with PLAINTIFF and also provided information and acted as a confidential informant for the NYPD and the MDAO's "Operation Crew Cut"  who assisted in the arrests of countless alleged "gang" members operating in Harlem where Plaintiff resided at the time of the infractions

9

against her person and her rights (Exhibit D: news articles/Press releases about OPeration Crew Cut). PLAINTIFF addresses, and endeavors in the space available to correct, these mischaracterizations of law and fact below, and thereby to demonstrate that defendants' lack of training and willful disregard to Plaintiff's rights as a victim and survivor of trafficking should be recognized by the court and that procedures and policies be mandated for the handling of trafficking and intimate partner victims by the City of New York and that Plaintiff Price should be restored to the status she enjoyed before her false arrest, malicious prosecution(s) and unlawful imprisonment.

25. Plaintiff Price has secured an affidavit (Exhibit # F ) from the retired NYPD Police Lieutenant, Mark C. Larocca, formerly in charge of managing the patrol men and women of the 28th precinct whom answered many of Plaintiff's 911 calls alleging abuse, battery and violence at the hands of Raheem Powell.  Mr. LaRocca's affidavit describes a disturbing pattern of personal direction of Plaintiff's Police Services by the MDAO.  In fact NOWHERE in the NYPD handbook or in NY State Executive and/or Social Service Laws/ Crime Victim Statutes is there instruction for a precinct, officer, and detective, LT, SGT Captain OR Inspector to solicit permission from the MDAO before taking complaints or following-up with investigations of complaints of abuse and/or trafficking.  Yet, this is PRECISELY what Mr. LaRocca's affidavit indicates: the MDAO instructed the NYPD to act OUTSIDE of the regularly-issued process in regards to Plaintiff Price:  to relinquish their role as investigator and unhand it wholesale to the MDAO. The residual effects of the up-ending of this traditional divider between the police and the district attorney's office are STILL stunting Plaintiff Price's attempts to receive police services and/or protections.

26. Plaintiff Price brings forth the following causes of action and alleges the following:  beginning in 2010 and into early 2011, Plaintiff was in contact with various members of the Criminal Justice community including Manhattan Family Court Judge Sattler, who issued an order of protection in November of 2010 (Exhibit # E ) against Plaintiff's abuser, Raheem Andre Powell.  Plaintiff Price was at various times in touch with Detective Linda Simmons and other members of the 28th precinct, NYPD, for assistance in her attempts to extricate herself from her batterer, Raheem Andre Powell.  Powell had abused Plaintiff physically, mentally,

and economically and engaged in a brutal campaign of trafficking and controlling her against her will.
Instead of investigating Plaintiff's claims and assisting her Plaintiff was arrested and charged with hundreds
of counts of the now-ruled unconstitutional CPLR 240.30 which was struck-down by Chief Judge Jonathan
Lippmann and the NY State Appellate Panel (Exhibit #A ) aggravated harassment towards her batterer and
one count of contempt of court resulting in Plaintiff's false arrest, malicious prosecution, unlawful
Imprisonment, and defamation. Various abuses of process and Injurious Falsehoods were levied against her
in violation of her civil rights constitutionally protected under the 1st, 4th, 5th, 6th, 8th, 14th, and 16th
Amendments from unreasonable search and seizure et al and violations of procedural due process and the
New York Constitution.

27.   This lawsuit seeks to hold the defendant CITY OF NEW YORK liable for the above and below stated
misconduct under the federal civil rights statute, 42 U.S.C. § 1983, and Monell v. Dept. Of Social Services,
436 U.S. 658 (1978) and under state law. The unlawful actions of police detectives and prosecutors
documented in this lawsuit resulted from affirmative or de facto municipal policies, practices and customs to
violate the constitutional rights of survivors involved in making Domestic Violence and/or human trafficking
complaints, or from deliberate indifference by policy-making officials, acting on behalf of the City of New
York, to such violations. As Plaintiff will demonstrate, both the NYPD and the MDAO, as a matter of
policy, instructed and coerced witnesses to give false or unreliable testimony through their misuse of their
powers of arrest and interrogation, unlawfully concealed exculpatory or impeachment evidence known as
"Brady" material, and lied to or misled courts, defense attorneys, and criminal defendants in order to cover
up their unlawful behavior.   Further they retaliated by placing Plaintiff on a "DO NOT SERVE" list making
it impossible for her to attain police services of protections in the wake of the MDAO and NYPD losing the
protracted criminal proceedings against her.

28.   Plaintiff, Kelly Price, is an intelligent and able individual who had built a career in photojournalism and
would have continued to earn a substantial salary as an editor, but for the defendants' misconduct in causing
her wrongful prosecution, and imprisonment. She seeks $30 million in actual damages, and $10 million in

punitive damages, for the egregious misconduct that deprived her of the joys of bearing the child she miscarried, of family life, of her journalism career, emotional pain and suffering, defamation and of living as a free person and to be blacklisted by the NYPD in a city where Plaintiff is a fourth-generation member of her family to live.

29.   **JURISDICTION, VENUE, and CONDITIONS PRECEDENT**

    a.   This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

30.   On or about October 22, 2012 Plaintiff served upon Defendant City of New York a timely notice of the present claims pursuant to New York General Municipal Law § 50-e.

31.   This action has been commenced within three years of the accrual of Plaintiffs causes of action.

32.   Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

33.   **THE PARTIES**  Plaintiff, Kelly Price is a citizen and resident of the State of New York and of the United States, and resides within the City of New York in the Southern District of New York.

34.   Defendant, CITY OF NEW YORK, of which the County of New York is a subdivision, is a municipal corporation of the State of New York.

35.   Defendant, Linda Simmons, "Simmons" at all relevant times, was a Detective in the 28th precinct which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her individual and her official capacities.

36.   Defendant, Maria Strohbehn, "Strohbehn" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage Of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her official capacities.

37.   Defendant, Audrey Moore, "Moore" at all relevant times, was an assistant district attorney in New York

County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage Of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her official capacities.

38.     Defendant, Kenya Wells, "Wells" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his official capacities.

39.     The Manhattan District Attorney's Office "MDAO" is an agency of the CITY OF NEW YORK. The District Attorney, and assistant district attorneys employed by the D.A.'s Office are agents and employees of the City of New York, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

40.     Similarly, the New York City Police Department "NYPD" is an agency of the CITY OF NEW YORK. Detectives and police officers employed by the NYPD are agents and employees of the City of New York, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

41.     Defendant, Cyrus Vance Jr.,, "Vance" at all relevant times, was the district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his official capacities.

42.     Defendant, Larry Newman, "Newman" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his official capacities.

43.     Defendant, Laura Higgens, nee Richendorfer "Higgins" at all relevant times, was an assistant district attorney in New York County, was employed by the City of New York, acted toward Plaintiff under color of

statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment.  She is sued in her official capacities.

44. Defendant, Police Inspector Obe, Commanding Officer of the 28th Precinct, "Obe" at all relevant times, was an Inspector at the 28th precinct which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her official capacities.

45. Defendant Rose Pierre-Louis, "Pierre-Louis" at all relevant times, was the Commissioner of Domestic Violence at the Mayor's Office for the Prevention of Domestic Violence, NYC which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her individual and her official capacities.

46. Defendant, Matthew Winters, "Winters" at all relevant times, was a police officer in the 14th precinct which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

47. Defendant, John Doe or Jane Doe Operator of @NYPD28pct Twitter Account  at all relevant times, was a police officer in the 14th precinct which is in New York County, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He or she is sued in his individual and his official capacities.

48. Defendant, John Doe or Jane Doe Operator of @NYCagainstAbuse Twitter Account  at all relevant times, was an employee of the Mayor's Office to Combat Domestic Violence, the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He or she is sued in his individual and his official capacities.

49. Defendant, John Doe or Jane Doe Operator of @RPLNYC Twitter Account  at all relevant times, was an

employee of the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He or she is sued in his individual and his or her official capacities.

**EXTENDED BACKGROUND:**

50.    October 11, 2010:  Raheem Powell attacks Plaintiff in street and beats her in the face and neck with his cell phone at the intersection of 118th and St. Nicholas Ave (NW corner.)  He beats her with his fists and cell phone and Police are called.  Police encourage Plaintiff to make a combined report of stolen license plates, car, and Domestic Abuse all none.  Plaintiff is not given copy of report.  Police take extensive photos of face, back and torso with bruises all over.  Officers instruct parking garage to not allow Powell to take my car out of garage.  Raheem bribes parking lot owner and takes car even though Police helped me remove one license plate and park suv in front of car.  28th Precinct Loses this complaint filed by Plaintiff Price and it is never filed.

51.    On or about November of 2010 Plaintiff seeks, and is awarded, a restraining order against Powell from the Manhattan Family Court as the 28th pct. refused to assist her by the Hon. Lori Sattler (Exhibit # E)

52.    On or About October 14, 2010  Plaintiff receives blackmail text messages from her batterer (Exhibit N # text message threats from Powell to Plaintiff).

53.    On or about the morning of October 14th,  Plaintiff Price visits the 28th precinct and discusses her complaint, her abuse, and her status as a sex worker conscripted into slavery by Mr. Powell with Domestic Violence officers McNair and Diaz and Detective Linda Simmons. The DV officers had already elevated the report even though they had promised not to and it had been assigned to Detective Simmons.  Simmons, according to NY Social Services Law 483 fails to carry-out the requirements of this law: "As soon as practicable after a first encounter with a person who reasonably appears to a law enforcement agency or district attorney's office to be a human

trafficking victim, that agency or office shall notify the office of temporary and disability assistance and the division of criminal justice services…" (Exhibit # C).  Instead of treating Plaintiff as a trafficking and Domestic Violence Victim Detective Simmons neglected to make any of the mandated reports regarding the status of Plaintiff Price as a trafficking victim.

54.   On or about October 14th, 2010  Detective Simmons rejects the following appropriate protocols and reporting and investigative procedures as outlined in the NYPD Handbook for evaluating DV and Trafficking victims (Exhibit # B). Strohbehn and Simmons label Plaintiff Price her as a "fabricator" and refused any investigation into her complaints against the stipulations of McKinney's which require a MANDATORY investigation into ALL COMPLAINTS OF TRAFFICKING.

55.   On or about 10/14/2010 instead of performing the regularly issued processes as Mandated by the NYPD Patrolmen's Handbook for Domestic Violence victims (Exhibit # B) Simmons tears-up Plaintiff's report against and instructs Plaintiff to move out of the neighborhood.  Simmons recommended this course of action as it was "the easiest way to make the situation go away." Simmons stated to Plaintiff Price that she needed overtime hours that day and as it was nearing the end of her shift by booking Plaintiff that day for filing a false police report she would get overtime hours.  Simmons told Plaintiff that as she had never been arrested that she would only receive a Desk Appearance Ticket and that no one would go to jail.  She also warned Plaintiff to keep her head down and that she should move out of the neighborhood because from this point on "you're {sic} on your own."  Detective Simmons coached Plaintiff on how to retract her statement: asking Plaintiff to rewrite a synopsis of events several times each time asking Plaintiff to write the time at the top of the page much earlier than the last so that Detective Simmons "could receive overtime by catching the case with enough time to start to work it." A record of Simmons' overtime request and payment is on file for this day.

56.   On or about the evening of November 11/12 2010:  Plaintiff is robbed and attacked by Raheem

Powell.  Powell choked her until she passed out on her living room floor.  When she regained

consciousness she tried to run for the door and screamed for help.  At that point Raheem tried to

detain her and she was thrown through a 30-gallon fish-tank.  Neighbors overheard the commotion

and called police and Plaintiff's abuser runs out back door of brownstone.  Eventually after much

argument from the members of the 28th precinct Plaintiff is taken to Metropolitan Hospital and

treated.  The FDNY ambulance workers (Valentin was one of them) remember the incident and

commented on how strangely the police were acting.  The doctor who treated Plaintiff was harassed

and threatened by members of the 28th precinct  as he tried to treat plaintiff  Price on the emergency

room table (Dr. Albert Della Fave—ER Resident 732.995.6868.)  Dr Della Fave gets in a shouting

match with detectives from the 28th squad as they would not leave Plaintiff alone while he was

prepping her for surgery. Plaintiff tries to make a new report at precinct two days later when she was

able to walk again and was told to come back when the DV officers are around.   She returns the

next day and is told again to come back the next day.  This continues for weeks.  No report was ever

taken of incident by NYPD despite Plaintiff's efforts to do so.

57.   On or about  November 17, 2010:  Plaintiff is beaten by Nancy Powell, Raheem's mother when she

goes to her house for help.  Face completely covered in blood and deep scratches from her fake nails

digging into Plaintiff's flesh.  Plaintiff has permanent facial scarring as a result. (See Exhibit # O

Photo of deep scratches on Plaintiff's face dated 11/17/2010).  Nancy Powell was given an ACD

(2010NY092185) which she violated by being re-arrested for marijuana possession six months later

but the Das never prosecuted her.)

58.   On or about  November 22, 2010:  Plaintiff approaches the 28th precinct five days after attack by

Nancy Gaines, mother of Raheem Powell.  Police, noting extensive damage to Plaintiff's face allow

17

Plaintiff to make report against Nancy Powell however they refuse to take a report for events that transpired on the evening of November 11 2010 where Raheem threw Plaintiff through a fish tank and instead the precinct instructs Plaintiff to go to family court to attain a restraining order against him which she does (Exhibit # E)  THIS FAMILY COURT RESTRAINING ORDER IS DE FACTO EVIDENCE THAT THE CITY OF NEW YORK HAD An OBLIGATION TO LOOK AFTER Plaintiff's INTERESTS and that the NYPD and MDAO had a SPECIAL RELATIONSHIP TO PLAINTIFF ergo there is no veracity to the assertion that these criminal justice agencies had leave to NOT protect Plaintiff.  As a general rule, a municipality may not be held liable for injuries resulting from a simple failure to provide police protection.  To overcome this general rule, plaintiff would need to demonstrate a special relationship or duty between her and the municipal agent (See McLean v City of New York, 12 N.Y.3d 194, 199 (2009.) The restraining order issued by Judge Sattler is evidence of a special relationship between plaintiff and the municipal agent City of New York see Mclean v City of New York, 12 N.Y. 3d 194, 199 (2009.).  It proves that the City of New York made promises to Plaintiff and took actions that created an affirmative duty to act to protect plaintiff and that Plaintiff justifiably relied on this promise.  Plaintiff took the restraining order to police to serve and they tell Plaintiff to come back.  Plaintiff returned a few days later with Family Court restraining order and the precinct ostensibly refuses to act on it:  each day she walks the 175 yards from her home to the 28th pct. and each time she is told to come back the next day when officers will be available for service.  Officers are never available for service.  Desk Sergeant Agron at the 28th Pct. openly mocks Plaintiff to her face each time she enters precinct.

59.   On or about December 22nd, 2010:  Plaintiff is beaten, robbed, dragged into street after Raheem breaks into Plaintiff's house and steals her money and phones.  Multiple witnesses call 911 for help. Plaintiff Price attempts to report crimes to the 28th precinct  where the on-duty desk sergeant, Agron,

tells Plaintiff when she goes to make report that he will arrest Plaintiff for trespassing if she doesn't leave the precinct.

60.    On or about  January 27th 2011: Plaintiff fights with Raheem.  Plaintiff goes to precinct to make police report of incident and sergeant Agron again tells Plaintiff that the only thing he can do for Plaintiff is to "move Plaintiff to Nevada"  (implying that Plaintiff is a some kind of filthy degenerate prostitute unworthy of the NYPD's assistance.) (See texts from Powell EXHIBIT # N).

61.    On or about  January 28th 2011: Plaintiff makes appeal to detective Simmons to help Plaintiff. Simmons agrees to help initially and insists Plaintiff make reports about 12/20 and 1/27 incidents to DV officers when they are in the next day.   Simmons agrees to help Plaintiff if she tells her everything she knows about Raheem's drug-dealing and his connections etc.  Plaintiff asks about signing a complaint for injuries dating from 11/11/2011 and Simmons tells Plaintiff "it's too late that the precinct will look bad." Plaintiff Price again asks Dt. Simmons for help in extracting her from her sexual conscription/trafficking.  Simmons gives Price lip-service but no reports are made/taken on her behalf.

62.    On or about  January 29th 2011:  Plaintiff Price is interviewed by several detectives from the 28th precinct about Raheem's drug sales enterprise.  They never ask Plaintiff to show them pictures, ER reports etc. or produce witnesses that are able to aver the abuse Plaintiff suffered at the hands of Raheem Powell. Detectives tell Plaintiff the only way they will help keep Raheem away from Plaintiff and to get her car back from Raheem is if she presses charges against Raheem. Plaintiff Price attempts to make a police report but is told to come back the next day when the DV officers are on duty in the pct.

63.    On or about  January 30th 2011: DV officer McNair takes report of 12/20 incident and encourages Plaintiff to make report about 1/27 incident.   Plaintiff is leery.  Precinct tells Plaintiff that Raheem

has been making reports against Plaintiff and that if she doesn't make report about 1/27 incident

"decisions may be made that are not in her favor."  Plaintiff asks again to make a report about

incident on 11/10 and is told that; 'too much time has passed' by Domestic Violence officers McNair

and Diaz at the 28th pct.

64.   On or about  On or about February 2, 2011, shortly after Plaintiff had filed a complaint against

Powell with the 28th Precinct the Plaintiff was contacted by ADA Strohbehn and asked to rush to the

DA's office  under verbal threat of arrest herself.  Plaintiff was commanded to a small interrogation

room/office where Strohbehn told her upon arrival that Powell would not be charged, that Plaintiff

was believed to be a "fabricator" and a liar, and was refused opportunities to provide evidence

proving her story. ADA Strohbehn informed Plaintiff that if Plaintiff makes another report against

POWELL that she Strohbehn will "lock [her] up and throw away the key." Strohbehn informs

Plaintiff "the only reason I'm not arresting you right now is because I did not instruct you to bring

counsel with you when I commanded you to appear at my office today." Strohbehn also informed

Plaintiff that she had informed the 28th precinct that she will personally handle all of Plaintiff's

"police service needs" and if Plaintiff has "a bullet-hole in her [sic] head that the NYPD is to call

Strohbehn first before responding to any call from Plaintiff." Strohbehn informs Plaintiff that she has

already assisted Powell in drawing up a Family Court petition to attain a counter restraining order

against Plaintiff in order to press counter-claims of harassment. Strohbehn further instructs Plaintiff

that even though she hasn't been served that she is to show up in family court the next morning to

respond to Powell's charges. She tells Plaintiff that she will be charged with contempt of court if she

does not show up in court: "as [Strohbehn] as an officer of the court am ordering you [Plaintiff] to

appear even though there is not time to serve [Plaintiff with] a subpoena (sic)." Strohbehn tells

Plaintiff her only concern is that "an innocent black man has been sitting in jail for 24 hours…"

Plaintiff asks to speak with Strohbehn's supervisor to show her proof of the abuse and have her neighbors interviewed etc. and Ms. Strohbehn informs Plaintiff that "she already checked with her supervisor (Deputy DA Audrey Moore) and that she [Strohbehn] has been given [by Moore] carte blanche to deal with Plaintiff with finality." Plaintiff begged for someone to review the photographs (Exhibit #O), hospital emergency room reports (Exhibit #P ), receipts for broken windows and kicked-down doors or to speak with her neighbors who had heard and seen the constant battery. Strohbehn informs Plaintiff that she will "have to show her proof to the judge" and rebuffs all mandates for processing complaints made by trafficking and domestic violence victims that are set-forth in New York State's Executive and Social Service Laws.

65.   On or about February 2, 2011 Plaintiff's landlord and others try to speak with Ms. Strohbehn to introduce investigatory evidence and she rebuffs him and hangs up the phone on him before receiving contacts for other tenants in Plaintiff's building who had provided information to Landlord of Plaintiff's abuse at the hands of Powell (please see Exhibit # H letter from Landlord). Strohbehn's actions were in retaliation for Plaintiff's exercise of her rights to petition the Court for grievances and violated Plaintiff's 1st amendment rights and privileges under the US Constitution also under 42 USC 1983. These acts Strohbehn took to act as private attorney for Plaintiff's batterer by ordering a petition to be filed in Family Court on his behalf, and stripping Plaintiff of her right to police services are not functional prosecutorial actions, are NOT covered by either absolute or qualified immunity, and exercising them denied Plaintiff's rights under the 1st 4th and 14th Amendments under 42 USC 1983.

66.   On or about February 3, 2011  Powell tries to accost Plaintiff on way out of family court.  ADA Maria Strohbehn refuses to help Plaintiff file report about Raheem's violation of restraining order/ conduct on way out of court building.  Plaintiff makes report with Det. Mortimer Plaintiff at 5th

precinct as courthouse is in this jurisdiction. Months later dt. Mortimer informs Plaintiff that he was told to not pursue an investigation of her complaint by the DA's office.

67.     On or about early February 2011: Neighbors tell Plaintiff that nude photos of Plaintiff have been texted around to all the neighborhood boys. Plaintiff calls precinct and Strohbehn and no one will take report. She then calls Detective Mortimer and he tells Plaintiff he can't do anything. Lt. Larocca from the 28th pct. encourages Plaintiff to make a report to the court and to the dept. of Investigations as he informs Plaintiff that ADA Strohbehn has instructed the pct. to not take any reports from Plaintiff. (LT LAROCCA has retired and living in Florida. Plaintiff Price has only FINALLY been able to track him down as of August 10, 2015 Please See Exhibit #F affidavit from Lt. Larocca.). Larocca informed Plaintiff Price that each time she made a complaint of abuse, battery, assault, threats or was attacked by neighbors in Harlem associated or not with her batterer, Raheem Andre Powell, that the detectives in the 28 squad had to take the EXTRAORDINARY step of calling the MDAO and requesting PERMISSION to proceed with an investigation into her allegations for the remaining period of time he remained under the employ of the 28th precinct. This treatment of her complaints as a victim of trafficking and abuse were outside of the REGULARLY ISSUED PROCESS followed by the NYPD and the MDAO and proves that the MDAO took pains to unhand her unusual and excessive punishment for making allegations against their prized informant. Lt. Larocca has penned an affidavit describing these and other unusual steps the MDAO took to squelch Plaintiff Price's Due Process Rights and rights to equal protection under the law, right not to be unusually searched and seized, or to be excessively punished. *(See Exhibit # F Letter from Lt. Larocca.)

68.     On or about February 2011 Plaintiff contacts Deputy ADA Larry Newman of Special Victims and Domestic Violence and tells him of her abuse and trafficking. Newman informs Plaintiff that she

will not be arrested and that often "Police and DAs disagree on cases and not to worry **she will be**

**protected."** Newman invites Plaintiff to his office to provide evidence that her story is true.

Plaintiff informs Newman that she will arrange for a meeting when her lawyer returns from vacation.

Two weeks later when Greenberg returns to town Plaintiff calls Newman to set up meeting and he

never responds. Newman never reports Plaintiff Price's complaints of trafficking and/or domestic

violence to the proper agencies as is required by NY State Executive and Social Service Laws.

69.     On or about  February 23rd, 2011:  Plaintiff receives a call from officer Diaz at DV office of 28th

precinct asking Plaintiff to "come in to tell them how things are going."  Officer McNair admits to

Plaintiff that Raheem made claims of harassment against Plaintiff.  He's surprised to find out that

Raheem and Plaintiff had been discussing her pregnancy via telephone.  Diaz Plaintiff she will be

arrested even though at time of conversation Plaintiff had no restraining order against her and Powell

had one prohibiting him from talking to her.

70.     On or about February 24, 2011:  Plaintiff travels to 28th Precinct to discuss matter with Lt. LA

Rocca.  LA Rocca rips up Powell's complaint against her in front of Plaintiff, informs Plaintiff that

"a war between upstairs (detective squad) and downstairs (patrol officers)is taking place in the

precinct" over her case.  Larocca again informs Plaintiff that the DAs office has instructed precinct

NOT to take any complaints filed by Plaintiff and that her only recourse is to contact the Department

of Investigations and to make a complaint.

71.     On or about  March 11, 2011 Assistants from Plaintiff's Family Court Lawyer's office communicate

with 28th Precinct seeking assistance in delivering restraining order issued by Judge Sattler on

November 22, 2010.  Precinct acts strangely:  inquires as to Plaintiff's whereabouts to her lawyer, Ed

Greenberg.

72.   On or about  March 16, 2010 Attorney Ed Greenberg faxes Dt. Flowers at 28th pct. demanding an

answer to his question if he needs to surrender his client for any reason to the 28th pct.  (Exhibit # Q:

Statements on the court record ref his discussions of surrendering Plaintiff for arrest before family

court hearing  with detectives from 28th pct.).  Later that afternoon via telephone conversation Dt.

Flowers inquires as to Plaintiff's whereabouts and denies any charges have been filed/will be filed

against her and assures Greenberg that he does not need to surrender his client to the precinct. (See

Exhibit # Q Greenberg statements on court record regarding communiqués to 28th precinct and an

itemized communication between Greenberg and Precinct noting conversation with Dt. Flowers.)

73.   On or about  March 24, 2011, police detective Simmons testified before Judge Sattler in Family

Court that she had investigated Plaintiff's allegations of abuse and had found them to be unfounded.

At this time Plaintiff Price was arrested and charged with 324 counts of CPLR 240.30  (Exhibit  02)

(now altered to remove language that the NY Appellate Court deemed unconstitutional see exhibit

#A) Detective Simmons PERJURED HERSELF IN COURT when she was called in front of Judge

Sattler and asked if she had investigated Plaintiff's claims of abuse and if they were credible.

Simmons replied "no" (Exhibit # Q ) even though she had not questioned Plaintiff about her

emergency room visits, reviewed photos of injuries taken by her neighbors, or interviewed her

building super, landlord or neighbors about the ongoing abuse or followed any of the steps outlined

in the NYPD Handbook for a Domestic Violence investigation (Exhibit # B)

> "Judge Sattler:…Detectives investigated the stories?
>
> Detective Simmons: Yes
>
> Judge Sattler: And they don't find her story to be credible?
>
> Detective Simmons: No."

Plaintiff alleges that Simmons's testimony was false. After the court proceedings, four police detectives from the 28th precinct arrested Plaintiff inside the Family Courthouse on Lafayette Street. It is long-held that state agents, including Police Officers, receive immunity when testifying in court. Detective Simmons had not even asked Plaintiff to sign HPPA forms releasing her ER reports, which according to the NYPD handbook is a crucial step of ANY domestic violence investigation. This and other affidavits prove detective Simmons willfully lied to the court with RECKLESS DISREGARD & DELIBERATE INDIFFERENCE for Plaintiff's rights and thus satisfies the standard applicable to violations of Plaintiff's Constitutional DUE PROCESS rights. What is at issue is can the city be held liable for the consequent wrongs unhanded to Plaintiff because of this lie. SCOTUS just refused to hear a case on this very issue citing: "police's obligation to disclose highly exculpatory evidence to the prosecutors...is widely recognized" upholding a 9th circuit ruling that found police officers who presented perjured testimony are NOT immune:

"A jury determined the officers had demonstrated deliberate indifference or reckless disregard for Walker's rights or for the truth, and had withheld or concealed evidence that strongly indicated Walker's innocence, the 9th Circuit said..."A police officer's continuing obligation to disclose highly exculpatory evidence...is widely recognized," 786 D 3D806 (9th Circuit 2014).

74. Under § 1983, "a [person is] responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. 167, 187 (1961), and Monell v Dep't of Soc. Srvs., 436 U.S. 658 (1978). Thus, a defendant is liable for "setting in motion a series of acts by others which the actor knows or reasonably should know would cause other to inflict the constitutional injury." Crowe v Cnty. of San Diego, 608 F. 3d 406, 430 (9th Cir. 2010.) Here, the "natural consequence" of Simmons' perjury was the hauling-off of Plaintiff to face charges of aggravated harassment, to be imprisoned, to have a restraining order imposed on her movement, and to suffer the threat of elongated incarceration as a

result of her attempts to extract herself from a life-threatening intimate-partner and trafficking situation.

75.    On or about May 8, 2011, Plaintiff is arrested again and taken to Rikers Island on the charge of Contempt of Court (Exhibit # R) by Detective Samuel Fontanez, shield #00311 of the 28th Detective Squad. Plaintiff overall served between eight to ten days incarcerated in the tombs and on Rikers Island. While incarcerated Plaintiff was attacked by other inmates and had her belongings stolen by the guards (Exhibit # S Property Receipt). When Plaintiff was released on bail she had to travel home to Harlem via subway and bus barefoot as her shoes had been stolen by the guards at Rikers (Exhibit # S).  She also contracts a sinus infection that disables her hearing in her right ear for over six months.  Her asthma and breathing disintegrate and Plaintiff is sent to infirmary for medical treatment and assessment of prescriptions for sinus/ear infection and pain.

76.    During a proffer session (Exhibit #T Queen for a day agreement) On or about  June 24, 2011, Plaintiff provided police with cell phones containing messages from Powell; the cell phones have not been returned to Plaintiff despite her repeated requests and despite the mandates of McKinney's Crime Victims Law: "Law enforcement agencies and district attorneys shall promptly return property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial."  (McKinney's Executive Law; Article 23, Fair Treatment Standards for Crime Victims § 640.3 – Fair Treatment Standards for Crime Victims (Exhibit # C).

77.    On or about  May 11, 2011 Plaintiff was bailed out of Rikers island on 2500 USD bond by her friend, Mr. Ian Hague.   To date despite repeated requests has not received her bail of $2000.00 back (Exhibit # U).

78.    On or about May or June 2011, residents of a women's shelter on 120th Street in Manhattan allegedly assaulted Plaintiff, but police refused to help Plaintiff.

79. On or about August 2, 2011, and 16, 2011, Plaintiff made police reports on regarding "death-threats, taunting and harassment by neighbors with allegiances to Raheem. No members of the NYPD or MDAO ever investigated or followed-up with Plaintiff. Plaintiff is told by officer Walker of the 28th precinct that she has been told not to process any report taken from Plaintiff Price as per the directions of the Manhattan District Attorney's Office.

80. When Plaintiff was subsequently assaulted by various parties associated or not with her ex-intimate partner in her neighborhood and attempted to file complaints to the NYPD she was informed that the Manhattan DAs office had instructed the precinct involved not to take her complaint or to not follow-through on any investigation of her allegations. This happened on numerous occasions notably on or about: 7/6/3/2013, 5/17/13, 10/17/12, 07/27/12: (incident #2012-020-2969), 7/14/12, 4/17/12, 1/20/12, 12/1/11, 8/13/11, 8/4/11, 8/11/11 (complaint # 2011-28-003732.)  Refusing/failing to investigate are violations of Plaintiff's 14th amendment rights to equal protection under the law and 8th amendment rights to due process. Plaintiff has incident IDs, emergency room reports and ambulance records and eyewitness statements for most of these incidences.

81. On or about June 24, 2011  Plaintiff provided phones with blackmail messages from Powell to the DAs office during a "Queen for a Day" meeting. At the conclusion of Plaintiff's prosecution when the charges were dismissed and sealed Plaintiff made multiple requests for her property back and was refused.  Plaintiff maintains that the DAs office has unlawfully held her property and demands the court to order its return to her as per the stipulations of the "Queen for the day" agreement between Larry Newman, Deputy of the Manhattan District Attorney Office's SVU unit and Plaintiff's criminal defense lawyer Stephen Kartagener. All of Plaintiff's attorneys including Kartagener, Benjamin Dell and Tajuana Johnson have demanded a return of the materials to Plaintiff as the case has concluded. Plaintiff made an inquiry to Wells' supervisor in the Trial Bureau, Minton

Sabor, for the return of her property and was again refused. This is a violation to Ms. Plaintiff's right to privacy and from unlawful search and seizure. Sensitive, intimate, nude of Plaintiff that Powell texted to Plaintiff that he intended to blackmail her with are included among the media on the phones and the District Attorney's office has no right to keep these materials. McKinney's Laws specifically state that: "Law enforcement agencies and Das attorneys shall promptly return property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial..." (NY State Executive Laws 642-3 Criteria for Fair Treatment Standards Exhibit # C).

82. On or about 8/16/11 plaintiff is assaulted by a long-time associate of RAP on her way home and punched in the face. After Plaintiff called 911 an ambulance arrived and treated Plaintiff. Later the police took report and told her that they were told not to extend Police services to Plaintiff. No one ever followed up. See photos of busted face taken by FDNY ambulance workers (Exhibit # O photos dated 8/16/11)

83. On or about October 25, 2011, Plaintiff attempted to file a report that Powell violated an order of protection but she was refused by Officers at the 28th Precinct who called her "crazy" and informed her that the MDAO had instructed them not to offer her Police Services of any kind.

84. On or about 8/31/11 Plaintiff was harassed by associates of RAP. PO EBRIGHT PO RAMAN and PO Ehlers of the 28th precinct respond to plaintiff's 911 call and tell Plaintiff she should move out of neighborhood, they harass Plaintiff about associating with 'these people in this neighborhood' and refuse to take her complaint. PO Ebright tells Plaintiff he hopes he responds to one of her complaints one day and 'finds Plaintiff lying on the sidewalk in front of her brownstone with a knife in her back.' Plaintiff reported incident to the IAB (IAB Complaint # # 11-31923). Plaintiff's filing to the IAB was marked "unsubstantiated" by lt. Rentas and (IAB log #11-43253) and was closed by a 28

squad investigator and  by Lt. Laburda.  No one ever contacted Plaintiff to interview Plaintiff regarding these complaints.

85.    On or about September 24, 2011, Plaintiff was assaulted in a bar in the Midtown neighborhood of Manhattan. She called police and was arrested and charged with disorderly conduct based on false statements that she had screamed at officers (Exhibit # V Injuries sustained from Police beating Officer Winters of Midtown South) and held for over 72 hours in the Midtown South Precinct and the tombs under 100 Centre Street before being arraigned and released.

86.    On or about October, 2011, Price's cellular phone company, Metro PCS informs Price that her phone line is being tracked by law enforcement in violation of her state and federal right to privacy.

87.     On October 18, 2012, Plaintiff was convicted of disorderly conduct arising from 9/24/11 incident

88.    On or about February 26, 2016 the NY State Appellate Panel overturned this conviction and dismissed the accusatory instrument (Exhibit W Appeal from Conviction & Decision by Appellant Panel 1.26.2016.)

89.    On or about October 25, 2011 Plaintiff attempted to file a DIR report with the 28th precinct about a violation of a restraining order Powell had committed on 10/21/11 against an order of protection issued by Judge Sattler (Docket #0–00763-11, File # 1685, order #2011-1195 issued on 9/29/11 expiring on 3/29/12.) Plaintiff was refused the opportunity to make a report of the violation on the date of occurrence.

90.    On or about November 7, 2011 Plaintiff returned to the 28th precinct in an attempt to file the report and Captain Williams, the CO of the 28th precinct, instructed his DV officers to take the report.  The DV officer who took the report eventually (id # 939468) ripped up the report and refused to process it (Exhibit # X copy of report ripped up by DV officers).

91. On or about November 14, 2011  When following up the next week on the status of the DIR Plaintiff was told it was missing and that she was not invited back into the precinct to refile it.

92. On or about 12/01/11 Plaintiff is accompanied by an advocate/ representatives from the St. Luke's Roosevelt Hospital Crime Victims Center back to the precinct to refile a new DIR (Exhibit # Y.)  The DIR was accepted by the new DV SGT (id # 933944).   At that time Plaintiff received an apology from the new DV. The new DIR was assigned to Detective Ransom of the 28th squad who did not follow-up on any investigation regarding the complaint.

93. On or about October 2011 Plaintiff filed IAB complaint # 11-49386 against 28 pct. DV officers Rosendary and Simmons WHO THREW AWAY her 61 when Plaintiff complained that Powell was violating the terms of her restraining order against him. (exhibits Y & Z ) complaint c1-1-667494377.  Complaint was referred back to the precinct for investigation by a SGT also marked the complaint as UNSUBSTANTIATED.

94. On or about January 20, 2012, Plaintiff attempted to make a report that a woman named Ina attacked her, but Detective Fontanez of the 28th precinct never interviewed plaintiff about the assault nor did he perform any investigation elsewise into Plaintiff's complaint.

95. On or about January 12, 2012 Plaintiff Price's legal Advocate from CONNECT NYC (http://www.connectnyc.org), Kerry Toner, met with Deputy ADA Audrey Moore to advocate for Plaintiff Price and to explain that Plaintiff Price was/is a survivor of abuse and trafficking. (Exhibit # Z pp #7): "KT s/w Audrey Moore, CHief of DV Bureau @ NYCo DA's office, to inquire about case and raise issues of victim treated as perp. AM requested email with identifying email; I will follow up with her." This is the first documentation that Deputy Moore had knowledge of Plaintiff's true status as a victim.  According to the mandates of NY State Executive and Social Service Laws (Exhibit # C). Ms. Moore at this point was mandated to follow investigative procedures and to report

Plaintiff Price's claims of abuse and trafficking and to process her accordingly as a survivor and victim. No action was taken after this meeting, or ever, to undertake these required steps.

96. On or about January 19, 2012, Kerry Toner, Plaintiff Price's legal advocate emailed Deputy DA Audrey Moore with the requested materials proving Plaintiff's assertions of abuse and trafficking at the hands of Raheem Powell. Moore never executed the mandates of the NYPD handbook, or of NY State Executive and Social Service Laws after receiving 'Proof' that Price was a true victim. "KT emailed Audrey Moore and Lisa Haileselassie re: case status and advocating for dismissal." (Exhibit # Z pp 7).

97. On or about January 31, 2012 Plaintiff inquired as to whether a response had been offered by Audrey Moore: "SD informed CL that we gave her info and the info of the case to the SVB chief (Audrey Moore) in the DA's office a couple weeks ago and we're still waiting on the outcome of that." (Exhibit # Z pp 8.)

98. On or about January 10, 2013 Plaintiff Price's advocates had still not received a response from Audrey Moore regarding any outcome of evidence introduced to the DA's office regarding evidence given to the special victims unit a full year earlier (Exhibit # Z pp 26.)

99. On or about April 17, 2012, and July 14, 2012 Plaintiff was attacked , but police officers from the 28th precinct did not contact Plaintiff to investigate her complaints.

100. On or about 7/14/12, Plaintiff is attacked in front of 200 St. Nicholas Ave., around the corner from her home and grabbed and slammed over and over onto pavement by associates of RAP. Plaintiff suffered Knee damage and bruises all over her body. Plaintiff called 911 around 200 am in the morning and P.O. Johns and partner responded, told Plaintiff they wouldn't do anything to help.

101.    On or about July 25, 2012  the state court dismissed the 324 aggravated harassment charges and one criminal contempt charged against Plaintiff (charges (docket #s NYS 20075-2011 and NYS20111-2011) ) (Exhibit # 12 & 13)'.

102.    On or about July 25, 2012, a man attacked  Plaintiff on the corner of Columbus Avenue and 83rd street in Manhattan  at Soldier McGee's Bar.  See Exhibit # AA photos dated on or about 7/28/12.  In this case the man who attacked Plaintiff (incident #2012-020-2969), was let go by the 20th precinct and he continued to stalk, flash, and trespass and terrorize other women in town. The same man who attacked Plaintiff on 7/28/12 went on to continue to terrorize women in NYC.) (Exhibits# BB Rami Bali Charge sheets, photos AA).

103.    Over a year later charges were subsequently brought against the man, Rami Baly, AFTER HE HAD ATTACKED FIVE OTHER WOMEN IN NYC (New York Criminal Court case #s 2013NY031505, 2013NY049135, and 2013CN000347 Exhibit # BB). All other crimes  Mr. Baly was charged with occurred after Baly attacked Plaintiff and was allowed to walk without arrest for his crimes against plaintiff when he was re-arrested in August of 2012 (case # 2012NY067321). Baly proceeded on a crime spree against women that ran from the fall of 2012 to the summer of 2013. On numerous occasions the detectives and the other ranking members (Lt. Carbone) of the 20th precinct informed Plaintiff Price and her advocates from Saint Luke's Roosevelt Hospital's Crime Victims Center that the reason that Mr. Baly had not been arrested was that he could not be located. Mr. Baly had paid with a credit card that evening at Soldier McGee's bar and the DAs office refused to request a subpoena from the court to attain his billing information so that he could be apprehended. But this assertion that Mr. Baly could not be located was simply a lie.

104.    When Mr. Baly returned to the bar on or about August  25th of 2012 approximately a month after assaulting Plaintiff. On that date staff members alerted the 20th precinct of his appearance again at

Soldier McGee's bar and he was apprehended.  When he was approached by officers in the bar he acted disorderly, fought with officers and resisted arrest.  He was arrested (case # 2012NY067321) and released and given "time-served" but not charged with the assault against Plaintiff on July 28, 2012. The detective assigned to the case, Galan, pretended Baly could not be located even though this was not the case.  He had been arrested already and not charged with the crime against Plaintiff but was charged with acting disorderly and resisting arrest when NYPD approached him to question him. Plaintiff pushed the case and her advocate, Kerri Toner, from the St. Luke's Roosevelt Crime Victims Center /Connect NYC inquired as to why no photo lineup had been done after the assault and nor any follow-up was made to trace Mr. Baly after he was let go as per procedure outlined in the NYPD Patrol handbook (Exhibit Z).

105.   On or about  December of 2012 Ms. Toner was told that the case was being pursued and Baly could not be located and she made notes to this effect in her log (see attached Exhibit # Z pp 24.) Never did Detective Galan mention that Baly had already been arrested for several other crimes and that the NYPD not only knew of his whereabouts but had arrested him three times for other crimes against other women in NYC and for resisting arrest and disorderly conduct! (Exhibit # BB).  It was not until after Mr. Baly had committed other predatory crimes against other women that Baly was arrested for his assault against PLAINTIFF, which was almost a year after his crime.  Baly was arrested on 4/24/13 NINE MONTHS AFTER he assaulted Plaintiff when he appeared in criminal court to answer charges of criminal trespass (PL 140.01(a)), public lewdness PL 245.00), and public exposure of a person (PL 245.01).  He had been arrested for these NEW CRIMES against ANOTHER WOMAN by the 1st Precinct's Officer Jessica Valle on 4/21/13 for crimes he committed against Kristyn Abbale (see Exhibit # BB).  A prosecution of Baly for his crime against Plaintiff was initiated on paper, never investigated by Das but later dropped.  The DAs office told the judge

presiding over the case that they couldn't locate Plaintiff to testify and the case 30-30'd. Plaintiff

had emailed the ADA running the case, Laura Higgens nee Richendorfer asking about when to

appear in court to testify multiple times and was summarily ignored. (See Exhibit # CC Email from

PP to ADA Higgens).

106.    On or about August 2012 through March of 2013 The detective assigned to the case, Galan,

pretended Baly could not be located even though this was not the case. Detective Galan had not

executed an investigation into Plaintiff's complaint of assault as per the mandates of the NYPD

Police handbook. Plaintiff pushed the case and her advocates from the St. Luke's Roosevelt Crime

Victims Center inquired as to why no photo lineup had been done after the assault and no follow-up

was made to trace Mr. Baly after he was let go (Exhibit # Z pp 23-24). The advocate was told that

the case was being pursued, excuses were made that Plaintiff "was difficult" and this was preventing

the case from moving forward EVEN THOUGH BALY HAD ALREADY BEEN ARRESTED

THREE TIMES FOR OTHER CRIMES IN THE INTERIM THIS WAS NEVER MENTIONED TO

KERRY TONER. Following, Ms. Toner made notes to this effect in her log (Exhibit Z # pp 23-24).

It was not until after Mr. Baly had committed other predatory crimes against other women that

prosecution of Baly for his crimes against Plaintiff was initiated but later dropped.

107.    On or about January 30, 2014 The DAs office told the judge presiding over the case that they

couldn't locate PLAINTIFF to testify and the case 30-30'd. (See Exhibit # DD Letter to MDAO

Conviction Integrity Unit and Letter to Chief of Staff, MDAO Jeffrey Schlanger Exhibit # EE.)

124.    On or about October 18, 2012, a heroin dealer named Willy assaulted Plaintiff as she walked past

a stoop at 120th Street and St. Nicholas Avenue in the Harlem neighborhood of New York. He

jumped Plaintiff as she was passing his stoop and threw Plaintiff onto the ground causing substantial

damage to her right knee.  Plaintiff went to the emergency room and has reports and follow-ups from her orthopedic surgeon stating that she needs knee surgery as a result of attack.

125.   On or about 10/18/12 P.O. Longo responded to Plaintiff's complaints of assault (shield # 31565) and said they were instructed by desk sergeant not to take Plaintiff's report.  Plaintiff  insisted and they said they would turn in a notation to the desk sergeant about the incident.  Plaintiff called the desk sergeant and complained  No one ever called Plaintiff to follow up on this assault  (complaint # 2012-28-005194.)  The first police who responded to said;  'aren't you the crazy one we are not supposed to take reports from?"  P.O.s Longo and Walker eventually followed up after Plaintiff called 911 and complained about the first officers on scene.  P.O. Walker sympathetically stated to Plaintiff that the District Attorney's office had instructed the precinct not to respond to any of her calls.  This was Witnessed by Plaintiff's neighbor, Elizabeth Walker, who is a graduate of Harvard University, Columbia Law School and a MEMBER OF THE NEW YORK BAR ASSOCIATION.  ~~WALKER PRESSED WILLIAM'S AND LONGO TO TAKE~~  Plaintiff's COMPLAINT, reminded them that it is illegal to deny a person police services.  Williams commented that the precinct had been instructed by the District Attorney's office to not respond to any calls Plaintiff made AND THEY took Plaintiff's information and told Plaintiff nothing would be done eventually.  (See Exhibit # I Letter from Elizabeth Walker.)  Police officers allegedly told Plaintiff that they had been instructed not to take her reports.

108.   On or about June 2, 20 13, a cab driver refused to let Plaintiff out of the cab and instead locked the doors and sped up.  The cab stopped at a red light.  Plaintiff called out to police officers, but one officer (His REAL name is Officer "Officer") told his partner that "Plaintiff was not to be given police services and they shooed her away."  Plaintiff called 911, but no one followed up.

109.   In July 201 3, unidentified police officers gave Plaintiff a jaywalking ticket even though she allegedly was not jaywalking. Plaintiff fought the ticket in court and won (docket # 2013SN053520) (Exhibit # FF Jaywalking Summons and appearance slip).

110.   On or about 6/2013; while in route to the subway past precinct from her home Detectives from the 28 squad opened their windows overlooking my path up St. Nicholas to the 125th St. subway station and 'MOOed' at Plaintiff as if she were a cow. Plaintiff called the precinct and complained to the CO immediately.

111.   On or about October 14, 2014: 28th Precinct blocks Plaintiff from commenting on 28th Pct. NYPD public Twitter account effectively stripping her of her right to redress the government for grievances and denying her rights to free speech (See Exhibit # 44 311 Complaint Letter forwarded to IAB detailing 28th PCT's blocking Plaintiff on Twitter for tweeting about the poor Domestic Violence assistance rate within that precinct in opposition to the City of New York's formal Social Media Policy which only permits users to be blocked by public officials if they are abusive. (Exhibit # 14).

112.   On or about December 1, 2014: the NY Mayor's Office to Combat Domestic Violence (@NYCagainstAbuse) blocks Plaintiff from commenting on that office's public Twitter account effectively stripping her of her right to redress the government for grievances and denying her rights to free speech (See Exhibit # 16 ) 311 Complaint Letter forwarded to IAB detailing 28th PCT's blocking Plaintiff on Twitter for tweeting about the poor Domestic Violence assistance rate within that precinct in opposition to the City of New York's formal Social Media Policy which only permits users to be blocked by public officials if they are abusive. (Exhibit # 14).

113.   On or about March 2014, Hannah Pennington, Director of the Family Justice Center, A NY City Agency in no part privately owned or operated (See Exhibit #GG) denied Plaintiff access to services for domestic violence victims. Pennington cites Plaintiff's lawsuit against the MDAO as

reason for said denial of services as "several people named on Plaintiff's complaint work jointly in the MDAO and in the FJC." Plaintiff is denied psychiatric counseling, group therapy sessions with her contemporary DV survivors, access to wellness resources, access to Housing Relocation services, access to special case workers from the Human Resources Administration who assist in benefit case management, access to a legal team to assist Plaintiff with her MANY legal needs to stave eviction and to assist in attaining Identification, bank accounts and small credit instruments offered to clients of the FJC (See Exhibit # CC letter documenting denial of services/equal protection under the law from the Family Justice Center).

114.   On or about July 2, 2015, Plaintiff is again assaulted.   The New York Police Department's Midtown North police precinct rejected Plaintiff's attempt to file a complaint, and she was taken to the psychiatric ward of Bellevue Hospital in Manhattan for evaluation.  Plaintiff already had ongoing treatment with Bellevue 's 9/1 I survivor's clinic, and she was released promptly from the ward.

115.   On or about 11/ 29/15 Plaintiff was assaulted in the hallway of her apartment building by a neighbor.  When police they came, saw the bruises on plaintiff's arm, interviewed another neighbor who witnessed incident, were about to arrest the perpetrator until they looked up Plaintiff on their department-issued I-phones.  Upon reviewing whatever information was stored in the NYPD database regarding Plaintiff they exclaimed to her:  "Miss Price our database says that you are a fabricator and not to receive police services..."

**PRINCIPAL PLAYERS IN THE CONSPIRACY:**

116.   The principal individual defendant, acting pursuant to unlawful municipal policy, who caused Plaintiffs unconstitutional arrest, prosecution, inflicted intentional emotional distress and orchestrated the defamation and slander of plaintiff, is the very (ret.) NYPD detective formerly assigned to the 28th precinct, Linda Simmons, who was tasked to investigate Plaintiff's complaints of abuse against her batterer, Raheem Andre Powell. Simmons' illegal behavior in Plaintiff's case included the following:

a.  Testifying under oath by stating "YES" in Judge Sattler's Family Court Part in response to a question from the Hon. Judge Sattler claiming she had investigate Plaintiff's allegations of Domestic Violence perpetrated against her person and then exclaiming that she had found Plaintiff Price to be "not credible" (EXHIBIT # G March 24th and Feb 1 Family court transcripts) when in fact NO INVESTIGATION HAD TRANSPIRED. (Exhibit # B NYPD Handbook Procedures):

Judge Sattler: "You have investigated Plaintiff's allegations of abuse and found them to be not credible?

Det. Linda Simmons: "Yes."

b.  In violation of various criminal statutes, directing the preparation and filing, with the MDAO, the NYPD, of official records she knew were false alleging that Plaintiff had fabricated her injuries sustained at the hands of Mr. Powell, and that her "fabrications" were a threat to Mr. Powell (Exhibit # Q )

c.  Repeatedly making willfully false representations of "fact" in such statements under oath to create a "factual" basis to obtain court orders of protection on behalf of Mr. Powell securing Plaintiff's constriction of willful and free movement by the court, to gain illegal custody of plaintiff, and to coerce plaintiff. (See Exhibit E  Family court orders) after March 24th giving Powell the more restrictive 100-yard protection and eliminating it from Plaintiff's Order of Protection therefore making it illegal for Plaintiff to happen to be in any space in her neighborhood where Powell would enter after including bodegas, parks where bbqs were held, dog runs, coffee shops, drugstores etc. It felt to Plaintiff in fact that often when she would be in a public place in her neighborhood that Powell would appear shortly thereafter forcing her to leave and to call public attention to the situation, causing her social injury and personal anguish, insult, shame and injury. This happened numerous times in the period of March 24, 2011 through July 24, 2012 when all charges were dismissed and sealed against Plaintiff making the restraining order a nullity.)

d.  Lying to prosecutors in the MDAO who were investigating Plaintiff's allegations of abuse, by flatly denying various allegations had ever taken place even though she herself had never investigated the facts

of the abuse.   Simmons never walked the 175 yards from the precinct to Plaintiff's Brownstone to question neighbors about abuse: she never viewed or reviewed photographs of Plaintiff's injuries: never asked Plaintiff to sign HPPA forms for her various emergency room admissions for injuries sustained at the hands of Powell: never examined text messages Plaintiff had received from Powell detailing physical and other threats against her person, name and reputations her would unveil if she reported his abuse against her: never reviewed the various receipts Plaintiff had been given by various window and door repairmen who had been called to her home repeatedly to fix her front door and windows which had been broken as Powell would try to gain illegal entry to Plaintiff's garden-level brownstone apartment when he would fly into fits of rage etc.

117.   Equally importantly, Plaintiff seeks additional recovery against New York City for the actions of Assistant District Attorneys Maria Strohbehn, Audrey Moore and Kenya Wells for initiating Plaintiff's malicious prosecution based upon allegations in a Criminal Court complaint they knew were neither true nor false as they had not investigated the facts of Plaintiff's abuse they had no factual basis to believe their allegations to be true.

118.   Additionally Plaintiff was placed on a "NO SERVICES LIST" which prohibited her from attaining police services of any kind because of the actions of the MDAO against her 1st, 5th, 8th, and 14th Amendment entitlements to Equal Protection under the Law, to Redress the Government for Grievances, Due Process and from Unusual Punishment.  Many other New Yorkers have been placed on this list and DENIED police services:  Plaintiff seeks the court to correct this practice by the Police and Borough District Attorneys including the MDAO and NYPD of denying the citizenry of Gotham the ability to make police reports, to receive equal protection under the law, due process, and to be protected from unusual punishment.  In a December, 2014 New York Times Magazine interview DA Vance states:

"By May 2010, Parker and Vance had roughed out the structure of the so-called Crime Strategies Unit (C.S.U.). They divided Manhattan's 22 police precincts into five areas and assigned a senior assistant D.A. and an analyst to map the crime in each area. C.S.U. staff members met with patrol officers,

detectives and Police Department field intelligence officers. They asked police commanders to submit a list of each precinct's 25 worst offenders — so-called crime drivers, whose "incapacitation by the criminal-justice system would have a positive impact on the community's safety." Seeded with these initial cases, the C.S.U. built a searchable database that now includes more than 9,000 chronic offenders, virtually all of whom have criminal records. A large percentage are recidivists who have been repeatedly convicted of grand larceny, one of the top index crimes in Manhattan, but the list also includes active gang members, people whom the D.A. considers "uncooperative witnesses," and a fluctuating number of violent "priority targets," (Exhibit G).

119. **Secondary Principal Player in the Conspiracy: Maria Strohbehn: The MDAO** refused to investigate Plaintiff's claims of abuse.  Plaintiff received a phone call from DA Strohbehn on February 2, 2011. Strohbehn informed Plaintiff that she had "less than an hour" to get downtown to her office regardless of the difficulty in travelling that day as the city had been blanketed by a blizzard the previous evening. When Plaintiff arrived at her office she instructed her to wait in the Safe Horizon office for over two hours.  When she greeted Price she withdrew her right hand as Plaintiff outstretched hers to as is common in professional and official circumstances to do.  She  led Plaintiff  brusquely down the hall of the 2nd floor where she and Det. Simmons and another Dt from the 28th pct pepper Plaintiff with questions about how Price came to own a car, how Price earned a living, and accuse Price of answering her phone earlier in the day "with a fake accent.'  They proceeded to call Plaintiff a liar and refuse to look at any material that proved Price was telling the truth.  ADA Strohbehn informed Price she was declining to prosecute Raheem, and informed her that if plaintiff makes another report against RAHEEM that she will 'lock Price up and throw away the key." She also informed the 28th precinct that she will personally handle all of Price's "police service needs" and if Price has "a bullet-hole in her head that they are to call the DAs office first to clear police services offered first before responding to any call from Price."  She informs Price that she has already assisted Raheem in drawing up a Family Court petition to attain a counter restraining order against Plaintiff in order to press counter-claims of harassment against Price.  She further instructs Price that even though she haven't

been served that Price am to show up in family court the next morning to respond to Raheem's charges.  She

tells Plaintiff that she  will be charged with contempt of court if Price does not show up "as she as an officer

of the court (NOTE FAMILY COURT-NOT Criminal COURT where Stohbehn has jurisdiction) was

ordering Price to appear even though there was no time to serve Price with a subpoena (sic)."  She tells

Price her only concern is that "an innocent black man has been sitting in jail for 24 hours…" Price asked to

speak with her supervisor to show her  proof and have neighbors interviewed etc. and Ms. Strohbehn informs

Price that "she already checked with her supervisor (Audrey Moore) and that she has been given carte

blanche to deal with me with finality." Price is  instead thrown out of her office.  Plaintiff's landlord and

others try to speak with Ms. Strohbehn to introduce investigatory evidence and she rebuffs them (please see

attached letters from landlord, Adam Gargani, My neighbors Marilyn Benetatos et al about Ms. Strohbehn's

and ADA Kenya Wells' refusal to investigate (Exhibit #s H, I, and J respectively.)

120.    Plaintiff's  batterer (Raheem Andre Powell) enjoyed a privileged status with the MDAO and NYPD as a

result of several incidents:  he had assisted in helping the police previously and warned her that she would be

unable to find sympathetic ears regarding his violence.  More recently Powell had been a complainant in an

attempted murder case wherein his marijuana distribution hideout was robbed on or about December of 2010

by an armed member of a central-Harlem gang.  During that robbery the perpetrator shot at Powell as he

chased him up nearby Frederick Douglas Boulevard in front of the 28th precinct.    That young

robber/shooter was key in unraveling knowledge about the "Goodfellas" and "137th st" gangs in Central

Harlem, which were 'brought to justice' under fanfare and several public press conferences by the district

attorney's office (Exhibit # K).    Powell also had knowledge of other gang-related (Crips/Bloods) activities

that involved the murder of his cousin, Andre, in broad daylight on the corner of 115th and Lenox in the Fall

of 2010 among other pieces of information he on passed to the police.  As ADA Strohbehn at the time was a

junior member of an anti-gang task force dubbed "Operation Crew Cut" in Harlem (See Exhibit # L and M

Strohbehn Linkedin Resumes—two different versions!) Plaintiff has a very hard time understanding why

Strohbehn was allowed to be the only ADA to evaluate the veracity of her complaints when it was known

that Plaintiff's Batterer was an active participant in one of ADA Strohbehn's investigations and clearly she would need to defend his credibility to assist in her *case-building (*self-promoting career-building too.) Strohbehn after 'cleaning up' Harlem as a Junior member of the anti-gang squad has been PROMOTED to now be the SENIOR LEADER on a similar squad centered in MIDTOWN (see Exhibit #L and N Strohbehn linkedin resumes). This apparent conflict of interest that exists between a crime victim and a crime perpetrator who also just so happens to be an informant or complainant acting in a support capacity for the NYPD or MDAO needs to be properly remedied. The inherent conflict of interest and its existence still in the MDAO proves a lack of PROPER supervision and training exists within the NYPD and MDAO as to how to ferret out the good complaints from the bad, to initiate a full and fair investigation into allegations, and to ensure oversight of decisions that make or break a prosecutor's case.

121.    How many "uncooperative witnesses" and crime victims have been unwittingly placed on this list and denied services? Plaintiff beseeches the court to explore this unconstitutional process vis a vis discovery regarding exactly how and why one is put on such a list and to question if at all this is even a legal practice employed by the MDAO and NYPD and to stave its practice and further implementation.

122.    **ALLEGATIONS** *The City Is Deliberately Indifferent to a class of CONFIDENTIAL INFORMANTS' AND MAJOR CASE COMPLAINTANTS' Sexual AND Physical/Emotional/Economic Abuse of Women Plaintiff Price is part of this class and her treatment is de facto proof of the class' existence even though Plaintiff Price does not bring this action as a class at this time without representation.* The City, which, through NYPD, and the various District Attorney's Offices including the MDAO, is responsible for the evaluation, investigation, servicing, reporting, care, updating of as to case status, and of intimate-partner assault crime victims and sexual slaves, and has, through its acts and omissions, deliberately malicious or made in the face of several Hobbesian, social, fantastical choices, facilitated the trafficking, sexual slavery, sexual abuse, mental and physical and economic battery this class of victims. Other women have been

trafficked by major case complainants/informants who have been spurned by the NYPD and district attorney's offices (Exhibition # HH.)

123.   Plaintiff Kelly Price brings this action on behalf of herself under the Federal Rules of Civil Procedure as a woman who was a victim of trafficking who turned to the authorities for help in extracting herself from sexual enslavement at the hands of a Confidential or complainant in (a) major case/s pending in the criminal court system when Plaintiff approached the NYPD or MDAO for help.  Plaintiff Price, for a variety of unsavory, illegal, unconstitutional reasons, ended up on RIKERS ISLAND and found herself subjected to abuse at the hands of other prisoners and corrections officers and other predators once released.  In Plaintiff Price's case her abuser walked free: his use of the criminal justice system to further control and command the life of his victim was solidified, endorsed, and tacitly approved by agencies of the criminal justice system: the NYPD, the District Attorney's Offices, and the court system. The Women's Prison Association estimates that 75% of women in Rikers' Rose M. Singer Center are Domestic Violence Survivors and/or survivors of trafficking.

124.   Cyrus Vance claims his office handles 5000 complaints of Domestic Violence per year yet the Mayor's office to combat Domestic Violence states that in Manhattan alone ~ 40,000 complaints of domestic violence are reported per year.  How many of these complainants are labeled "fabricators" without proper due process or investigation?  How many are denied victim's protocols as defined by NY State Executive and Social Service laws?  How many are denied services at the Family Justice Centers?

125.   Recently the Commissioner of Domestic Violence, Rose Pierre-Louis reported at the "Not on MY WATCH" International Interfaith anti-trafficking and anti-domestic violence Conference held at the Salvation Army Headquarters in NYC on August 6, 2015 that in 2014 in New York City ~300,000 DIRs or complaints of Domestic Violence were filed with the NYPD (actual numbers: Manhattan: 40749, Bronx: 81870, Brooklyn: 87828, Queens: 56708, Staten Island: 15493.)  How many of these complaints from women such as Plaintiff Price ended in the complainant's incarceration?  How many of these women who bravely summoned the courage to try to break free of their chains of bondage and made reports of abuse to the proper authorities

found themselves forsaken and thwarted and still sit suffering to this day at the Rose M. Singer Center at

Rikers Island?  The only agencies with the keys to unlocking this information are the very agencies with

their hands on the slave-master's whip itself.  If the MDAO asserts its handles 5000 complaints of domestic

violence a year, and the NYPD asserts it receives TEN TIMES that number of complaints what is the

vetting procedure/due process assigned to the approximately 45,000 women in Manhattan who are denied to

have their complaints investigated, taken seriously and given proper victims' services?  We know of at least

one other case cited above in Brooklyn in recent years (Citations above.)  How many other victims suffer

alone whose very chains are bonded by the Police and District Attorney's in our great city?

a.  The questions of law and fact presented by Plaintiff Price include, but are not limited to: whether the

City's policies, practices, acts and omissions cause women who come forward to report violent abuse

and trafficking to be subject to a substantial pattern of continued abuse and unreasonable further torture,

psychological deprivation and punishment, risk and experience of rape and other sexual abuse by other

inmates, correctional facility staff at Rikers and other city Jails. Questions of law and fact concerning

these policies and practices also include, but are not limited to: Whether, despite knowledge that district

attorneys and police officers routinely turn a blind eye to their obligations under NY's Crime Victim's

Statutes in the Executive and Social Service laws to report, investigate and serve the abused women who

turn to these officials and agencies at their darkest hour. The City has failed to take action sufficient to

protect Plaintiff Price the women/victims who come forward from recurrent and ongoing acts of

continued abuse and other abuse by Das, officers, court officers and corrections officers including denial

of services, verbal abuse, malicious prosecution, abuse of processes, and false imprisonment leading in

many circumstances to forced sexual intercourse, oral sexual acts, sexual touching, public masturbation,

and demeaning sexual comments while on Rikers and in other City Jails and in going through often

painful elongated court cases pending against them.

b.  Whether the City has failed to employ sufficient measures to reduce the risk of this secondary

victimization such as adequate oversight during the initial complainant interview so that the whimsy and

biases of one loan young prosecutor is not a major factor in the outcome of the narrative thrust of the case;

c.   Whether the City has failed to employ sufficient measures ensuring that complainants against Confidential Informants and witnesses participating in major cases of primary importance to district attorneys are treated to the same guarded process that those women and victims are who bring complaints against Uniformed and Ununiformed Police Officers

d.   Whether the city has failed to employ oversight and heightened monitoring of the behavior of district attorneys who attempt to further mute the voice of the true victim by denying them further police services UNDER ANY CIRCUMSTANCE related or not to the initial complaint and by denying them entrée to Family Justice Centers and other victims services offered to other souls felled by abuse.

e.   Whether the City has failed to adequately set up a pathway from the Domestic Violence community such as the Mt. Sinai, St. Luke's Roosevelt (South) Hospital's Crime Victims Center, Sanctuary for Families et a who often care for and provide lifeline support and trauma counselling services to those re-victimized to filter communications regarding true victims regarded as pariah, fabricators, or aggressors erroneously back to the district attorneys who have made the wrong determination in the first place.  District attorneys emboldened by their powers protected by absolute and qualified immunities often tip the scales using sometimes subtle and sometimes overt tricks and acts to re-write the victim's' narrative and cast them in a light unfavorable to their ultimate protection and security for many reasons including but not limited to when the accused is a Confidential Informant or complainant in a major case.

f.   Whether the City's current training practices regarding NY Executive and Social Service Crime Victims' Statutes and its mandates for how a complainant of trafficking and certain classes of Felony Assault must be evaluated and taken seriously are in place and effectively internalized into the workflow of the NYPD and District Attorney's offices.

g.   Whether the City's system for the reporting and investigation of secondary abuse, which relies almost entirely on the NYPD and District Attorney's offices such as the MDAO to produce their own numbers

of women cast aside are adequate and comprehensive when there is NO OVERSIGHT of these activities by the DOI is adequate.  When Plaintiff Price made various complaints to the DOI they were referred BACK to the District Attorney's office for Internal Investigation!

h.  Whether the City has failed to consistently and adequately investigate reports of the secondary abuse of trafficking and/or domestic violence victims in a prompt and thorough manner;

i.  Whether the City has failed to appropriately discipline and terminate assistant district attorneys, police officers and deputy district attorneys found to have subjected trafficking and/or domestic violence complainants to secondary victimization by not undertaking proper investigative or procedural mandates in place by the NY State legislator to protect victims and ensure their protections;

j.  Whether the City's policy and practice has failed to protect those who report trafficking or domestic violence other sexual, mental, or economic abuse by Confidential Informants and or complainants on major cases from retaliation by police officers, detectives, precincts, and district attorneys whose credibility and career often hinge on the record of their case judgement and conviction rates.

k.  Whether the above-enumerated and other failings of City policy directly facilitated the continued trafficking, domestic violence, and emotional, physical economic and sexual abuse of women/victims who come forward for assistance to the authorities during their darkest, most fragile hour.

Actions to clarify:  each time I was arrested, each time charges were filed, each time I stood in court and accusations were levied against me, every appearance, Supervisor instruction:  vance created Crew Cut Model (city NYT moneyball article) and thus knew roles between police investigators and advocate assistant district attorney would be mitigated etc.  also state created danger:  they knew by ceasing to offer me police services that others would take that opportunity to attack me, also Raheem, also Vance and Malicious Prosecution,  Strohbehn in advocate and investigator role—responsibility of making inherently impossible decisions between cases would be encountered…Inadequate supervision and training, etc.

**ACTIONS:**

126.  **Count #1: Jane and/or John Doe Operator of Twitter Account "@NYPD28PCT"– Action under Color of State Law: Section 1983 – Deprivation of Plaintiff's First Amendment Federal Right to petition the Government for Redress of Grievances under Section 1983**

Plaintiff Priss repeats and realleges each of the allegations contained in the above paragraphs with the same force and effect as if fully set forth herein.   At all relevant times **Jane and/or John Doe Operator of Twitter Account "@NYPD28PCT"** acted under color of state law as an employee of the NYPD under  NYPD Inspector Obe of the 28th Precinct and acted as such. Under the color of state law, **Jane and/or John Doe Operator of Twitter Account "@NYPD28PCT"** deprived Plaintiff Price of a federal **Deprivation of First Amendment Federal Right to petition the Government for Redress of Grievances**.  Jane and/or John Doe Operator of Twitter Account "@NYPD28PCT"  which unlawfully blocked Plaintiff's Twitter handle "@GracieeGorgeous" without cause to as the City of New York's Government Guidelines for Official operating Social Media Accounts mandates that only abusive users can be blocked by Government officials.  This unlawful blocking deprived Plaintiff of a federal First Amendment Right to petition the Government for Grievances.  Plaintiff Price's tweets were far from abusive and do not violate any NYC media policy (Exhibit # Tweets to "@NYPD28PCT" and EXHIBIT # NYC Social Media Policy).

127. **Count #2 NYPD Police Inspector Obe  acting under the Color of State Law as Supervisory Official NYPD Inspector Obe of the 28th Precinct:  Section 1983 –Liability in Connection with the Actions of Another –Supervisory Officials Section 1983 –**
Plaintiff Price repeats and realleges each of the allegations contained in the above paragraphs with the same force and effect as if fully set forth herein.   At all relevant times  Supervisory Official NYPD Inspector Obe of the 28th Precinct acted under color of state law as a Supervisory Official of the Government in her capacity as NYPD Inspector Obe of the 28th Precinct.  Plaintiff Price contends that NYPD Police Inspector OBE's ("Obe's") subordinate, Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct" violated Plaintiff Price's federal rights, and that Obe should be liable for Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct"'s conduct. If you

47

find that  Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct"violated Plaintiff

Price's federal rights, then you must consider whether Obe caused Jane Doe and/or John Doe

Operator of Twitter account "@NYPD28pct"'s conduct. Obe is not liable for such a violation simply

because Obe is Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct"'s supervisor.

To show that Obe caused Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct"'s

conduct, Plaintiff Price must show one  of three things: First: Obe directed Jane Doe and/or John

Doe Operator of Twitter account "@NYPD28pct" to take the action in question; Second: Obe had

actual knowledge of Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct"'s

violation of Plaintiff's rights and Obe acquiesced in that violation; or Third: Obe, with deliberate

indifference to the consequences, established and maintained a policy, practice or custom which

directly caused the violation. As I mentioned, the first way for Plaintiff to show that Obe is liable for

Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct"'s conduct is to show that

Obe directed Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct" to engage in

the conduct. Plaintiff need not show that Obe directly, with her own hands, deprived Plaintiff of her

rights. The law recognizes that a supervisor can act through others, setting in motion a series of acts

by subordinates that the supervisor knows, or reasonably should know, would cause the subordinates

to violate the plaintiff's rights. Thus, Plaintiff can show that Obe caused the conduct if Plaintiff

shows that Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct"violated

Plaintiff's rights  at Obe's direction. Alternatively, the second way for Plaintiff to show that Obe is

liable for Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct"conduct is to show

that Obe had actual knowledge of Jane Doe and/or John Doe Operator of Twitter account

"@NYPD28pct"'s violation of Plaintiff's rights and that Obe acquiesced in that violation. To

"acquiesce" in a violation means to give assent to the violation. Acquiescence does not require a

statement of assent, out loud: acquiescence can occur through silent acceptance. If you find that Obe

had authority over Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct"and that

Obe actually knew that Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct" was

2 violating Plaintiff's rights but failed to stop Jane Doe and/or John Doe Operator of Twitter account

"@NYPD28pct" from doing so, you may infer that  Obe acquiesced in Jane Doe and/or John Doe

Operator of Twitter account "@NYPD28pct" conduct. Finally, the third way for Plaintiff Price to

show that Obe is liable for Jane Doe and/or John Doe Operator of Twitter account "@NYPD28pct"'s

conduct is to show that Obe  with deliberate indifference to the consequences, established  and

maintained a policy, practice or custom which directly caused the conduct. Plaintiff alleges that Obe

should have followed the existing Social Media Policy of the City of New York (EXHIBIT #) that

only allows for government officials of the City of New York to block constituents on Twitter if their

tweets rise to an abusive level.  Attached as Exhibit # are the tweets the Plaintiff Price mentions

"@NYPD28PCT"'s twitter handle. Plaintiff contends supervisor should have adopted or followed

the policy and not blocked Plaintiff Price from redressing the government for grievances as Plaintiff

Price's tweets cannot be construed to be abusive at any level. To prove that Obe is liable for Jane

Doe and/or John Doe Operator of Twitter account "@NYPD28pct"'s conduct based on Obe's failure

to follow that policy, Plaintiff must prove all of the following four things by a preponderance of the

evidence: First: the Social Media Policy of the City of New York that is an existing custom and

practice outlined by the City of New York,  Jane Doe and/or John Doe Operator of Twitter account

"@NYPD28pct"'s failure to follow that policy created an unreasonable risk of violating Plaintiff's

First Amendment right to redress the government for grievences. Second: Obe was aware that this

unreasonable risk existed. Third: Obe was deliberately indifferent to that risk. Fourth Jane Doe

and/or John Doe Operator of Twitter account "@NYPD28pct"'s blocking of Plaintiff Price's Twitter

account "@GracieeGorgeous" from interacting with the "@NYPD28pct"'s Twitter account resulted

from Obe 's failure to adopt New York City's social media policy which prohibits the blocking of

constituents unless abusive conduct is pervasive.

128.   **Count #3: Jane Doe and/or John Doe Operator of Twitter Account Acting Under Color of State Law in his/her official capacity as an employee of the 28th Precinct, a division of the New York City Department which is an Agency of the City of New York, "@NYCagainstAbuse": Section 1983 – Deprivation of First Amendment Federal Right to petition the Government for Redress of Grievances**
Plaintiff Price repeats and realleges each of the allegations contained in the above paragraphs with

the same force and effect as if fully set forth herein.   At all relevant times  John Doe Operator of

Twitter Account "@NYCagainstAbuse" acted under color of state law. Jane and/or John Doe

Operator of Twitter Account "@NYCagainstAbuse" deprived Plaintiff Price of her federal First

Amendment Right to petition the Government for Grievances.  Plaintiff Price's tweets were far from

abusive and do not violate any NYC media policy (Exhibit # NYC Social Media Policy).

129.   ~~Count #4 Section 1983 –Liability in Connection with the Actions of Another –Supervisory~~
**Official Former NYC Commissioner of Domestic Violence, Rose Pierre-Louis acting under the Color of State Law as Former Commissioner of an official Agency of NYC, the Office for the Prevention of Domestic Violence:  Deprivation of First Amendment Right to Redress the Government for Grievances:**
Plaintiff Priss repeats and realleges each of the allegations contained in the above paragraphs with

the same force and effect as if fully set forth herein.   At all relevant times  Supervisory Official

Former NYC Commissioner of Domestic Violence, Rose Pierre-Louis acted under color of state law.

Supervisory Official Former NYC Commissioner of Domestic Violence, Rose Pierre-Louis deprived

Plaintiff Price of her federal First Amendment Right to petition the Government for Grievances.

Plaintiff Price contends that Former NYC Commissioner of Domestic Violence, which owns and

operates a Twitter account that disseminates and reports information from the NYC Office to

Combat Domestic Violence, Former Commissioner of  Domestic Violence Prevention, Rose

Pierre-Louis ("RPL") subordinate, Jane Doe and/or John Doe Operator of Twitter account

"@NYCagainstAbuse" violated Plaintiff Price's federal rights, and that RPL should be liable for

Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse"'s conduct. If you find

that Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse" violated Plaintiff

Price's federal rights, then you must consider whether RPL caused Jane Doe and/or John Doe

Operator of Twitter account "@NYCagainstAbuse"'s conduct. RPL is not liable for such a violation

simply because RPL is Jane Doe and/or John Doe Operator of Twitter account

"@NYCagainstAbuse"'s supervisor. To show that RPL caused Jane Doe and/or John Doe Operator

of Twitter account "@NYCagainstAbuse"'s conduct, Plaintiff Price must show one  of three things:

First: RPL directed Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse" to

take the action in question; Second: RPL had actual knowledge of Jane Doe and/or John Doe  as

Operator of  the Twitter account "@NYCagainstAbuse"'s violation of Plaintiff's rights and RPL

acquiesced in that violation; or Third: RPL with deliberate indifference to the consequences,

established and maintained a policy, practice or custom which directly caused the violation. As I

mentioned, the first way for Plaintiff to show that RPL is liable for Jane Doe and/or John Doe

Operator of Twitter account "@NYCagainstAbuse"'s conduct is to show that RPL directed Jane Doe

and/or John Doe Operator of Twitter account "@NYCagainstAbuse" to engage in the conduct.

Plaintiff need not show that RPL directly, with her own hands, deprived Plaintiff of her rights. The

law recognizes that a supervisor can act through others, setting in motion a series of acts by

subordinates that the supervisor knows, or reasonably should know, would cause the subordinates to

violate the plaintiff's rights. Thus, Plaintiff can show that RPL caused the conduct if Plaintiff shows

that Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse"  violated

Plaintiff's rights  at RPL's direction. Alternatively, the second way for Plaintiff to show that RPL is

liable for Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse"'s conduct is

to show that RPL had actual knowledge of Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse"'s violation of Plaintiff's rights and that RPL acquiesced in that violation. To "acquiesce" in a violation means to give assent to the violation. Acquiescence does not require a statement of assent, out loud: acquiescence can occur through silent acceptance. If you find that RPL had authority over Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse" and that RPL actually knew that Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse"was 2 violating Plaintiff's rights but failed to stop Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse"from doing so, you may infer that RPL acquiesced in Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse"'s conduct. Finally, the third way for Plaintiff Price to show that RPL is liable for Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse"'s conduct is to show that RPL with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the conduct. Plaintiff alleges that RPL should have followed the existing Social Media Policy of the City of New York (EXHIBIT #) that only allows for government officials of the City of New York to block constituents on Twitter if their tweets rise to an abusive level. Attached as Exhibit # are the tweets the Plaintiff Price mentions "@NYCagainstAbuse"'s twitter handle. Plaintiff contends supervisor should have adopted or followed the policy and not blocked Plaintiff Price from redressing the government for grievances as Plaintiff Price's tweets cannot be construed to be abusive at any level. To prove that RPL is liable for Jane Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse"'s conduct based on RPL's failure to follow policy, Plaintiff must prove all of the following four things by a preponderance of the evidence: First: the Social Media Policy of the City of New York that is an existing custom and practice outlined by the City of New York,  Jane Doe and/or John Doe Operator of Twitter account

"@NYCagainstAbuse"'s failure to follow that policy created an unreasonable risk of violating

Plaintiff's First Amendment right to redress the government for grievances. Second: RPL was aware

that this unreasonable risk existed. Third: RPL was deliberately indifferent to that risk. Fourth Jane

Doe and/or John Doe Operator of Twitter account "@NYCagainstAbuse"'s blocking of Plaintiff

Price's Twitter account "@GracieeGorgeous" from interacting with the "@NYCagainstAbuse"'s

Twitter account resulted from RPL 's failure to adopt New York City's social media policy which

prohibits the blocking of constituents unless abusive conduct is pervasive.

130. **Count #5: Jane Doe and/or John Doe Operator of Twitter Account "@RPLNYC" Under Color of State Law in his/her official capacity as an employee of Former Commissioner of Domestic Violence or in her own capacity as Former Commissioner of the Office to Prevent Domestic Violence, a division of the New York City Department which is an Agency of the City of New York: Section 1983 – Deprivation of First Amendment Federal Right to petition the Government for Redress of Grievances**
Jane and/or John Doe Operator of Twitter Account "@RPLNYC", which at the time RPL was acting

Commissioner of the Office to Prevent Domestic Violence, used the Twitter account "@RPLNYC"

to disseminate official information and at the time she was acting commissioner stated that RPL was

the Commissioner of that office identifying the account as an official NYC account and

disseminating official NYC news and information to constituents. Jane Doe and/or John Doe

Operator of Twitter Account "@RPLNYC" acted under color of state law. Jane and/or John Doe

Operator of Twitter Account "@RPLNYC" deprived her of a federal First Amendment Right to

petition the Government for Grievances.  Plaintiff Price's tweets were far from abusive and do not

violate any NYC media policy (Exhibit # NYC Social Media Policy).

131. **Count #6: Section 1983 –Liability in Connection with the Actions of Another –Supervisory Official Former NYC Commissioner of Domestic Violence, Rose Pierre-Louis Under Color of State Law in his/her official capacity as an employee as Former Commissioner of the NYC Office to Combat Domestic Violence, a division of New York City Government which is an Agency of the City of New York,  Deprivation of First Amendment Right to Redress the Government for Grievances:**

Plaintiff Price repeats and realleges each of the allegations contained in the above paragraphs with the same force and effect as if fully set forth herein.   At all relevant times **Former NYC Commissioner of Domestic Violence, Rose Pierre-Louis** acted under color of state law. **Former NYC Commissioner of Domestic Violence, Rose Pierre-Louis** deprived Plaintiff Price of her federal First Amendment Right to petition the Government for Grievances.  Plaintiff Price's tweets were far from abusive and do not violate any NYC media policy (Exhibit # NYC Social Media Policy).  Plaintiff Price contends that Former NYC Commissioner of Domestic Violence, who owns and operates a Twitter account that disseminates and reports information from a former NYC Commissioner for the Office to Combat Domestic Violence, Former Commissioner of  Domestic Violence Prevention, Rose Pierre-Louis ("RPL")  herself or a subordinate, Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC" violated Plaintiff Price's federal rights, and that RPL should be liable for Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC"'s conduct.

If you find that Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC" violated Plaintiff Price's federal rights, then you must consider whether RPL caused Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC"'s conduct. RPL is not liable for such a violation simply because RPL is Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC"'s supervisor. To show that RPL caused Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC"'s conduct, Plaintiff Price must show one  of three things: First: RPL directed Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC" to take the action in question; Second: RPL had actual knowledge of Jane Doe and/or John Doe  as Operator of  the Twitter account "@RPLNYC"'s violation of Plaintiff's rights and RPL acquiesced in that violation; or Third: RPL with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the violation. As I mentioned, the first way for Plaintiff to

show that RPL is liable for Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC"'s conduct is to show that RPL directed Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC" to engage in the conduct. Plaintiff need not show that RPL directly, with her own hands, deprived Plaintiff of her rights. The law recognizes that a supervisor can act through others, setting in motion a series of acts by subordinates that the supervisor knows, or reasonably should know, would cause the subordinates to violate the plaintiff's rights. Thus, Plaintiff can show that RPL caused the conduct if Plaintiff shows that Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC" violated Plaintiff's rights  at RPL's direction. Alternatively, the second way for Plaintiff to show that RPL is liable for Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC"'s conduct is to show that RPL had actual knowledge of Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC"'s violation of Plaintiff's rights and that RPL acquiesced in that violation. To "acquiesce" in a violation means to give assent to the violation. Acquiescence does not require a statement of assent, out loud: acquiescence can occur through silent acceptance. If you find that RPL had authority over Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC" and that RPL actually knew that Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC"  was violating Plaintiff's rights but failed to stop Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC" from doing so, you may infer that RPL acquiesced in Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC"'s conduct. Finally, the third way for Plaintiff Price to show that RPL is liable for Jane Doe and/or John Doe Operator of Twitter account "@RPLNYC"'s  conduct is to show that RPL with deliberate indifference to the consequences, established  and maintained a policy, practice or custom which directly caused the conduct. Plaintiff alleges that RPL should have followed the existing Social Media Policy of the City of New York (EXHIBIT #) that only allows for government officials of the City of New York to

55

block constituents on Twitter if their tweets rise to an abusive level.  Attached as Exhibit # are the

tweets the Plaintiff Price mentions "@RPLNYC"'s twitter handle. Plaintiff contends supervisor

should have adopted or followed the policy and not blocked Plaintiff Price from redressing the

government for grievances as Plaintiff Price's tweets cannot be construed to be abusive at any level.

To prove that RPL is liable for Jane Doe and/or John Doe Operator of Twitter account

"@RPLNYC"'s conduct based on RPL's failure to follow that policy, Plaintiff must prove all of the

following four things by a preponderance of the evidence: First: the Social Media Policy of the City

of New York that is an existing custom and practice outlined by the City of New York,  Jane Doe

and/or John Doe Operator of Twitter account "@RPLNYC"'s failure to follow that policy created an

unreasonable risk of violating Plaintiff's First Amendment right to redress the government for

grievances. Second: RPL was aware that this unreasonable risk existed. Third: RPL was deliberately

indifferent to that risk. Fourth Jane Doe and/or John Doe Operator of Twitter account

"@RPLNYC"'s blocking of Plaintiff Price's Twitter account "@GracieeGorgeous" from interacting

with the "@RPLNYC"'s Twitter account resulted from RPL 's failure to adopt New York City's

social media policy which prohibits the blocking of constituents unless abusive conduct is pervasive

EVEN on social media accounts that purport to be private ones.  Former Commissioner Obe gained

notoriety, followers and public attention from naming herself as a Commissioner of a NYC office or

agency on "@RPLNYC" and also posted information intended for public consumption to her

constituents and therefore may not assert the account was purely of a personal nature.

132.   **Count # 7 Section 1983 – Unreasonable Search and Seizure under the 4th Amendment –
       Conduct Not Covered by Absolute Immunity: ADA Maria Strohbehn Under Color of State
       Law in her official capacity as an employee of the Manhattan District Attorney's Office a
       division of an official Agency of the City of New York,  or in her own capacity:**
       Plaintiff Price repeats and realleges each of the allegations contained in the above paragraphs

with the same force and effect as if fully set forth herein.   At all relevant times ADA Maria Strohbehn

"Strohbehn" acted under color of state law. **Strohbehn** deprived Plaintiff Price of her federal rights to due process and to not be placed under unreasonable search and seizure by maliciously ordering her arrest, ordering the Police not to give her any services or to receive complaints from Plaintiff Price or to investigate Plaintiff's complaints. The defendant in this case is a Prosecutor in her role as Assistant District Attorney for the New York City Police Department.  Prosecutors are USUALLY entitled to absolute immunity for all conduct reasonably-related to their functions as advocates of the court they swear a vow to. Thus, you can hold ADA Maria Strohbehn liable for violations of Plaintiff Price's 4th Amendment Rights based upon Strohbehn's actions in informing the 28th Precinct that and the entire NYPD that they were to "Stand Down" and not to provide services to Plaintiff Price.  Evidence concerning those actions was admitted in the form of an Affidavit from Lieutenant Mark C. Larocca. This evidence can be considered by you as evidence that ADA Maria Strohbehn INTER-TWINED her protected role of court advocate with a non-protected role of acting as Police Investigator when she ordered the NYPD to not perform this function and assumed it for herself and for her office in regard to Plaintiff Price.  However, Plaintiff Price also alleges that Strohbehn's conduct has placed her on a "Do Not Serve" list that to this day has prohibited Plaintiff Price from enjoying normal protections from the NYPD as she has been designated as a "fabricator" in NYPD databases and thus Plaintiff Price's Seizure continues to the present day and is NOT covered by the tenants of immunity.  Absolute immunity does not apply to such conduct and advocate conduct has been specified to only include certain acts.  ADA (Maria Strohbehn) also orchestrated a family court hearing, ordered police to attend and to testify falsely against me etc all non-advocate functions that mitigate all her advocate functions.  In Doe v. Phillips, 81 F.3d 1204 (2d Cir. 1996) it was ruled that any immune prosecutorial function INTERTWINED with a non-advocate function is NOT absolutely immune. The affidavit Plaintiff has from Lt. Larocca stating that the Manhattan District Attorney's Office had ordered the NYPD to not take or investigate Plaintiff's

complaints, coupled with Strohbehn's OWN STATEMENT TO PLAINTIFF PRICE INFORMING HER

THAT SHE WAS DOING SO effectively asserted the MDAO not into its traditional protected advocate

role but instead into the NYPD's investigative role regarding Plaintiff.  These actions mitigate that entire

office's immunity for ALL of its actions including the unlawful, alarming and incredulous acts that

Strohbehn undertook to impugn Plaintiff's credibility. In Doe, a state prosecutor, Gerald D'Amelia filed

felony charges against a mother for  allegedly molesting her 14-year old son. Id. at 1206. After

beginning to doubt the boy's  accusations, the prosecutor agreed to dismiss the charges. But only on one

condition. Doe, a  Roman Catholic, was required to swear on the Bible that the son's accusations were

false. Id. at  1207 ("D'Amelia testified that he told counsel that [unless Doe swore on the Bible] criminal

charges would not be dismissed against he [ ].") The panel held that even though accepting and demand

a plea bargain is an advocative  function, Taylor v. Kavanagh, 640 F.2d 450 (2d Cir. 1981), the

prosecutor was not absolutely  immune since he lacked authority to demand that Doe swear on the Bible.

Because he lacked  authority to demand this "intertwined conduct," D'Amelia was not absolutely

immune from suit.  Id. at 1211. ("D'Amelia's conduct was not protected by absolute immunity because

his demand that  Doe swear to her innocence on a bible in church was manifestly beyond his authority.")

The DAs office's practice of inserting itself into the investigative role by marking thousands of New

Yorkers on the CompStat list and in need of "incapacitation by the Criminal Justice System" (Vance's

words) may also be open to immunity challenges for the same reason. Thus if you find that Strohbehn

engaged in such conduct, you should consider it in determining Strohbehn's liability to Plaintiff Price.

133.    **Count #8: District Attorney Cyrus Vance:  Section 1983 Violations under the 4th Amendment's Due Process Clause–Liability in Connection with the Actions of Another –Supervisory Official District Attorney Cyrus Vance Under Color of State Law in his official capacity as an employee of the Manhattan District Attorney's Office a division of an official Agency of the City of New York,  or in his own capacity:**
            Plaintiff Price repeats and realleges each of the allegations contained in the above paragraphs

with the same force and effect as if fully set forth herein.   At all relevant times DA Cyrus Vance Jr.,

"Vance" acted under color of state law. Plaintiff Price contends that DA Vance's subordinate, ADA

Maria Strohbehn violated Plaintiff Price's federal rights, and that DA Vance should be liable for ADA

Maria Strohbehn's conduct. If you find that Strohbehn violated Plaintiff Price's federal rights, then you

must consider whether DA Vance caused Strohbehn's conduct. Vance is not liable for such a violation

simply because Vance is Strohbehn's supervisor. Vance caused Strohbehn's conduct, Plaintiff Price must

show at least one of three things: First: Vance directed Strohbehn to take the action in question; Second:

Vance had actual knowledge of Strohbehn violation of Plaintiff Price's rights and Vance acquiesced in

that violation; or Third: Vance, with deliberate indifference to the consequences, established and

maintained a policy, practice or custom which directly caused the violation. Vance directed Strohbehn to

engage in the conduct by creating the Operation "Crew Cut" squads who "collaborate" with city-wide

precincts on an intimate level: co-mingling their advocate court functions with investigatory ones of the

Police. Plaintiff Price does not need not show that Vance directly, with his own hands, deprived

Plaintiff of her rights. The law recognizes that a supervisor can act through others, setting in motion a

series of acts by subordinates that the supervisor knows, or reasonably should know, would cause the

subordinates to violate the plaintiff's rights. In this case Plaintiff has shown that Vance designed the

Crew Cut Squads (ref: NYT Magazine "Moneyball article attached as an Exhibit # where Vance

describes in his own words how he created these collaborative units).   Thus Plaintiff can show that

Vance caused the conduct  as Plaintiff shows that Strohbehn violated Plaintiff Price's rights  at Vance's

direction.

134.    Alternatively, a second way  that Vance is liable for Strohbehn's conduct as Vance  had actual

knowledge of Strohbehn's violation of Plaintiff Price's rights and that Vance acquiesced in that

violation. To "acquiesce" in a violation means to give assent to the violation. Acquiescence does not

require a statement of  assent, out loud: acquiescence can occur through silent acceptance. As

Plaintiff has shown in her pleadings she and her agents from Senator Gillabrand's office, from former Speaker of the NYC Council Christine Quinn's office, from Connect NYC, from the Mt. Sinai/St. Luke's Roosevelt Hospital Crime Victims Treatment Center, from the Director of the Battered Women's Legal Center at Sanctuary for Families, Dorchen Leightholt, and several personal acquaintances of Vance all approached him and his Chief Officers such as his Chief Legal Counsel, Mr. Rosenberg and Jeffrey Schlanger (ref: former MDAO chief of staff Jeffrey Schlanger who Plaintiff Price had lengthy exchanges with before he quit in 2015 ahead of a scandal regarding his own alleged sexual assault of a young intern of that office. Certainly at some point Vance was made aware of Strohbehn's actions to place Plaintiff Price on a "Do Not Serve" list and he acquiesced to it for the purpose of increasing the efficacy of his gang-busting initiative, making headline news, increasing his political profile and reigning in gangs and guns in Harlem/Manhattan: one of the keystone goals of his administration.   If you find that Vance had authority over Strohbehn and that Vance actually knew that Strohbehn was violating Plaintiff Price's rights but failed to stop Strohbehn from doing so, you may infer that Vance acquiesced in Strohbehn's conduct. Plaintiff Price has contacted Vance personally at public events, sent letters to his Chief of Staff, General Counsel, and Chief of Special Litigations as well as blog publically to him and tweet to him asking him to correct the constitutional harms his office continues to unhand to her to no avail. Certainly in the past six years dozens of communications from and about Plaintiff Price complaining about Strohbehn's non-advocate behavior have been shared with him but at no point has he ceased to acquiesce to it.

135.   Finally, Vance is liable for Strohbehn's conduct as Vance with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the conduct. Plaintiff alleges that Vance should have adopted a practice of and or followed the existing

policy of installing oversight mechanisms in his Crew Cut Squads so that the members of these

squads were not forced to intertwine her Advocative ADA function in Operation Crew Cut with her

refusal to take Plaintiff's complaints. Absolute immunity is denied when a prosecutor has linked or

intertwined his or her authorized discretion to an unauthorized demand. Doe v. Phillips, 81 F.3d 1204

(2d Cir. 1996). It's certainly questionable whether this ADA Strohbeh's refusal to accept Plaintiff's

complaints of battery and trafficking against the Crew Cut informant falls within the scope of

"advocative" conduct, or whether she was intertwining her investigative function in Operation Crew

Cut with her refusal to take Plaintiff's complaints. It is certainly arguable to assume that because the

MDAO had inserted itself into the investigative role by ordering the police to STAND DOWN and

not take complaints or carry out investigations regarding my complaints that they have mitigated all

usual absolute immunity defenses normally available to them. Creating Crew Cut squads that work

hand-in-hand with police creates new questions about the roles that Vance intended his employees to

assert themselves over. Certainly Lt. Larocca, a ~20 year veteran of the New York City Police

Department disagreed with this assertion of District Attorney's into the Police Investigative role.

Vance should never have created roles for his ADAs at the Precinct level all but asking them to

effectively forsake their own immunity protections. Vance should have foreseen that his ADAs on

Crew Cut squads would encounter confidential informants and or major case complaintants who

committed crimes against other parties and that those other parties complaints would be mitigated by

the Crew Cut squad member's desire to make Hobbesian choices between protecting the rights of

individual crime victims OR bringing in major-case convictions. Vance is liable for Strohbehn's

conduct based on Vance's failure to adopt that practice and/or follow a policy that would protect the

interests of all involved by not allowing individual Crew Cut Squad members to be the nexus of all

decision-making involving one of their CI's and those who attempt to make complaints against those

C.I's for constitutional harms they have suffered.

136.    Plaintiff has proved all of the following four things by a preponderance of the evidence as stated in

the same full-force as the above paragraphs in this complaint: First: The existing custom and

practice without oversight of a Crew Cut's decision making process when evaluating complaints

brought against their Confidential Informants and/or Major Case Complaintants. Vance further is

responsible for a failure to follow the traditional policy of investigating Domestic Violence

Complaints as outlined by the NYPD handbook when its office inserted itself into the Police's

investigatory role thus creating an unreasonable risk of destroying crime victim survivor's interests

of living safe and happy lives free from harm when their attempt to seek justice for crimes against

their persons get second-fiddle to the City's interests in of reigning in and destroying gangs. Second:

Vance was aware that this unreasonable risk existed as he was informed at many points along the

way of Plaintiff's situation. Third: Vance was and still is deliberately indifferent to that risk.   Fourth:

~~Strohbehn's constitutional harms against Plaintiff Price  resulted from Vance's failure to adopt an~~

oversight supervisory practice within the Crew Cut Squads to fairly determine the facts of crime

victim's assertions free from bias or prejudice from young, inexperienced prosecutors eager to make

large gang busts and climb the career-ladder.

137.    **Actions # 9, 10, & 11: Claims Against Defendant ADA Kenya Wells: Section 1983 – Malicious
Prosecution under Federal Law in Violation of  the 4th Amendment Under Color of State Law
in his official capacity as an employee of the Manhattan District Attorney's Office a division of
an official Agency of the City of New York,  or in his own capacity:**
       Plaintiff repeats and realleges each and every allegation contained in the above paragraphs of this

complaint.  ADA Kenya Wells ("Wells") engaged in a pattern of conduct that violated Plaintiff Price's

Fourth Amendment rights by  initiating the prosecution of Plaintiff Price for aggravated harassment

(CPL 240.30 (1), Felony contempt of court, and misdemeanor disorderly conduct.  ADA Wells  initiated

the criminal proceedings against Plaintiff Price. Wells lacked probable cause to initiate the proceedings.

All three criminal proceeding ended in Plaintiff Price's favor. Wells acted maliciously or for a purpose other than bringing Plaintiff Price to justice. As a consequence of the proceeding, Plaintiff Price suffered a significant deprivation of liberty. In this case, the first, third and fifth of these issues are not in dispute as plead in the above paragraphs. As to the second element of Plaintiff Price's malicious prosecution claims against Wells, Plaintiff Price must lacked probable cause to initiate the proceedings for Aggravated Harassment as has also been often pled in Plaintiff's complaint in that her claims of battery, abuse, pimping, trafficking and conscription into sexual slavery were blatantly ignored by ADA Wells: in fact her assertions were NEVER investigated. All facts and circumstances were available to Wells (discussing Gallo v. City of Philadelphia, 161 F.3d 217 (3d Cir. 1998), and DiBella v. Borough of Beachwood, 407 F.3d 599 (3d Cir. 2005) ). Defendant Well's initiation of the proceeding without investigating Plaintiff Price's side of the story are not in disputed. Wells knew of Price's innocence and with deliberate indifference proceeded with his criminal prosecutions. Even IF Plaintiff Price was ~~indicted by a grand jury (which is clearly the case) as all Felony prosecutions must be Grand-Juried~~ before arraignment (See Exhibit: MDAO Criminal Proceeding Flowchart). All Grand jury records have been denied to Plaintiff Price. The important 2013 Morse v Fusto case that established material omissions of fact during Grand Jury presentations by prosecutors are not covered by absolute immunity is active in my circumstances establishes that Well's Grand Jury presentation, if consistent in material omissions with the rest of his presentations at court, was rife with material omissions and following NOT COVERED BY THE NORMAL DEFENCES AVAILABLE TO WELLS BECAUSE OMISSIONS OF MATERIAL FACT DURING GRAND JURY PRESENTATIONS ARE NOT COVERED BY ABSOLUTE IMMUNITY as established in the Morse V Fusto case.

138.    Plaintiff Price had at least one GJ presentation/indictment if not two. Plaintiff Price endeavors to move to a discovery stage in these proceedings when a court order will unseal the tainted grand jury

proceedings against Plaintiff Price.   Plaintiff Price suspects during the Grand Jury presentations

Wells said nary a word about the hospital surgeries Price  needed after her abuser choked her until

she passed and threw her through a fishtank backwards mutilating her posterior and genitalia.

139.   Plaintiff Price proves preponderance of the evidence that and Grand Jury indictment(s) was/were

obtained by fraud, perjury or other corruption as the MDAO outright denied evidence to be

introduced into her case file proving her innocence.  In her pleadings Plaintiff Price  points to many

occasions where members of the MDAO hung up the phone on her landlord, refused to accept HPPA

forms so they could examine her emergency room records, and underwent dispatching a pattern of

collusion conspiracy to deny and evidence supporting her claims of abuse into her case file

ultimately with the goal of thwarting her status as a victim and survivor at all costs.   As to the fourth

element of the malicious prosecution claim, Plaintiff Price has plead sufficiently in the above

paragraphs in this complaint that  prove that in  initiating the proceedings,Wells acted out of spite,

and that Wells did not  himself  believe that the proceedings was proper, or that Wells initiated the

proceeding for a purpose unrelated to bringing Plaintiff Price to justice. Plaintiff has plead ampley

that Wells like his other colleagues in the MDAO had motivation rooted in the unrelated purpose of

gathering proffer from Plaintiff Price's abuser/batterer/trafficker/pimp to aid in the prosecution of

other major cases important to Operation Crew Cut.

140.   **Count #12: District Attorney Cyrus Vance:  Section 1983 Violations under the 4th
Amendment's Due Process Clause–Liability in Connection with the Actions of Another
–Supervisory Official District Attorney Cyrus Vance Under Color of State Law in his official
capacity as an employee of the Manhattan District Attorney's Office a division of an official
Agency of the City of New York, and/or in his own capacity:**
        Plaintiff Price repeats and realleges each of the allegations contained in the above paragraphs

with the same force and effect as if fully set forth herein.   At all relevant times DA Cyrus Vance Jr.,

"Vance" acted under color of state law. Plaintiff Price contends that DA Vance's subordinate, ADA

Kenya Wells violated Plaintiff Price's federal rights, and that DA Vance should be liable for ADA Kenya

Well's conduct. If you find that Wells violated Plaintiff Price's federal rights, then you must consider

whether DA Vance caused Well's conduct. Vance is not liable for such a violation simply because Vance

is Wells's supervisor. Vance caused Wells' conduct, Plaintiff Price must show at least one of three

things: First: Vance directed Wells to take the action in question; Second: Vance had actual knowledge

of Wells' violation of Plaintiff Price's rights and Vance acquiesced in that violation; or Third: Vance,

with deliberate indifference to the consequences, established and maintained a policy, practice or

custom which directly caused the violation. Vance directed Wells to engage in the conduct by creating

the Operation "Crew Cut" squads who "collaborate" with city-wide precincts on an intimate level:

co-mingling their advocate court functions with investigatory ones of the Police.  Plaintiff Price does not

need not show that Vance directly, with his own hands, deprived Plaintiff of her rights. The law

recognizes that a supervisor can act through others, setting in motion a series of acts by subordinates that

the supervisor knows, or reasonably should know, would cause the subordinates to violate the plaintiff's

rights. In this case Plaintiff has shown that Vance designed the Crew Cut Squads (ref: NYT Magazine

"Moneyball article attached as an Exhibit # where Vance describes in his own words how he created

these collaborative units).   Thus Plaintiff can show that  Vance caused the conduct as Plaintiff shows

that Strohbehn violated Plaintiff Price's rights  at Vance's direction.

141.    **Count #13: Defendant ADA Maria Strohbehn: Section 1983 Violations for State-created
        Danger under the Due Process Clause of the Fourteenth Amendment:  Under Color of State
        Law in her official capacity as an employee of the Manhattan District Attorney's Office a
        division of an official Agency of the City of New York,  or in her own capacity:**
        Plaintiff Price repeats and realleges each and every allegation contained in the above paragraphs.

claims that she was injured and continues to be injured as a result of being placed on the NYPD "Do not

Serve" Compstat List. Under the Due Process Clause of the Fourteenth Amendment, state officials may

not deprive an individual of life, liberty, or property without due process of law. The Due Process Clause

generally does not require the state and its officials to protect individuals from harms caused by persons