subdivision six of section four hundred twenty-three of the social services law and/or a child advocacy center shall be used for the investigation and prosecution of child abuse cases involving abuse of a child, as described in paragraph (i), (ii) or (iii) of subdivision (e) of section one thousand twelve of the family court act, sexual abuse of a child or the death of a child.

2. Whenever practicable, the same prosecutor should handle all aspects of a case involving an alleged child victim.

3. To minimize the time during which a child victim must endure the stress of his involvement in the proceedings, the court should take appropriate action to ensure a speedy trial in all proceedings involving an alleged child victim. In ruling on any motion or request for a delay or continuance of a proceeding involving an alleged child victim, the court should consider and give weight to any potential adverse impact the delay or continuance may have on the well-being of the child.

4. The judge presiding should be sensitive to the psychological and emotional stress a child witness may undergo when testifying.

5. In accordance with the provisions of article sixty-five of the criminal procedure law, when appropriate, a child witness as defined in subdivision one of section 65.00 of such law should be permitted to testify via live, two-way closed-circuit television.

6. In accordance with the provisions of section 190.32 of the criminal procedure law, a person supportive of the "child witness" or "special witness" as defined in such section should be permitted to be present and accessible to a child witness at all times during his testimony, although the person supportive of the child witness should not be permitted to influence the child's testimony.

7. A child witness should be permitted in the discretion of the court to use anatomically correct dolls and drawings during his testimony.

## § 643 – Fair Treatment Standards for Crime Victims; Agencies Generally

1. As used in this section, "crime victim-related agency" means any agency of state government which provides services to or deals directly with crime victims, including (a) the office of children and family services, the office for the aging, the division of veterans affairs, and correctional alternatives the division of parole, office of victim services the department of motor vehicles, the office of vocational rehabilitation, the workers' compensation board, the department of health, the division of criminal justice services, the office of mental health, every transportation authority and the division of state police, and (b) any other agency so designated by the governor within ninety days of the effective date of this section.

2. Each crime victim-related agency shall review its practices, procedures, services, regulations and laws to determine the adequacy and appropriateness of its services with respect to crime victims, including victims with special needs, particularly the elderly, disabled or victims of child abuse, domestic violence or sex-related offenses. Such review

shall include reasonable opportunity for public comment and consultation with crime victims or their representatives, and may include public hearings.

3. After the review, and not later than one hundred eighty days after the effective date of this section, each crime victim-related agency shall submit a report to the governor and the legislature, setting forth the findings of the review including a description of the services provided by the agency and recommendations for changes in its practices, procedures, services, regulations and laws to improve its services to crime victims and to establish and implement fair treatment standards for crime victims.

4. Subject to the direction of the governor, and to the extent practicable, each crime victim-related agency shall expeditiously implement the recommendations of its report.

## § 644 – Implementation

The commissioner of the division of criminal justice services and the director of the office of victim services shall assist criminal justice agencies in implementing the guidelines promulgated by the commissioner.

## § 645 – Fair Treatment Standards for Crime Victims in the Courts

The chief administrator of the courts, in consultation with the commissioner of the division of criminal justice services, the director of the office of victim services and other appropriate officials, shall promulgate standards for the treatment of the innocent victims of crime by the unified court system. These standards shall conform to and be consistent with the regulations promulgated pursuant to section six hundred forty of this article.

## § 646 – Police Reports

1. A victim of crime shall be entitled, regardless of physical injury, without charge to a copy of a police report of the crime.

2. An individual whose identity was assumed or whose personal identifying information, as defined in section 190.77 of the penal law, was used in violation of section 190.78, 190.79 or 190.80 of the penal law, or any person who has suffered a financial loss as a direct result of the acts of a defendant in violation of section 190.78, 190.79, 190.80, 190.82 or 190.83 of the penal law, who has learned or reasonably suspects that his or her personal identifying information has been unlawfully used by another, may make a complaint to the local law enforcement agency of the county in which any part of the offense took place regardless of whether the defendant was actually present in such county, or in the county in which the person who suffered financial loss resided at the time of the commission of the offense, or in the county where the person whose personal identification information was used in the commission of the offense resided at the time of the commission of the offense as provided in paragraph (l) of subdivision four of section 20.40 of the criminal procedure law. Said local law enforcement agency shall take a police report of the matter and provide the complainant with a copy of such report free of charge.

## § 646 – Objectives

The object of these fair treatment standards shall be to:

1. Ensure that crime victims are given information on the following:

   (a) the role of the victims in the criminal justice process, including what they can expect from the system as well as what the system expects from them;

   (b) stages in the criminal justice process of significance to a crime victim, and the manner in which information about such stages can be obtained; and

   (c) how the court can address the needs of the victims at sentencing.

2. Ensure routine notification of a victim or witness as to steps that the court can take to protect victims and witnesses from intimidation, including the issuance of orders of protection and temporary orders of protection.

3. Ensure notification of victims, witnesses, relatives of those victims and witnesses who are minors, and relatives of homicide victims, if such persons provide the appropriate court official with a current address and telephone number, either by phone or by mail, if possible, of judicial proceedings relating to their case, including:

   (a) the initial appearance of an accused before a judicial officer;

   (b) the release of an accused pending judicial proceedings;

   (c) proceedings in the prosecution of the accused, including entry of a plea of guilty, trial, sentencing, and where a term of imprisonment is imposed, specific information shall be provided regarding maximum and minimum terms of such imprisonment; and

   (d) the reversal or modification of the judgment by an appellate court.

## § 646-a – Information Relative to the Fair Treatment Standards; Pamphlet

1. The district attorney shall provide the victim, at the earliest time possible, with an informational pamphlet detailing the rights of crime victims which shall be prepared by the division of criminal justice services in consultation with the director of the office of victim services and distributed to each district attorney's office.

2. The pamphlet shall summarize provisions of this article. It shall also include specific information with appropriate statutory references on the following:

   (a) the rights of crime victims to compensation and services;

   (b) the rights of crime victims to routine notification of judicial proceedings relating to their case as provided in section six hundred forty-one of this article, in section 330.20, and section 440.50 of the criminal procedure law and section one hundred forty-nine-a of the correction law;

(c) the rights of crime victims to be protected from intimidation and to have the court, where appropriate, issue protective orders as provided in sections 530.12 and 530.13 of the criminal procedure law and sections 215.15, 215.16 and 215.17 of the penal law;

(d) the rights of crime victims to submit, where appropriate, a victim impact statement for the pre-sentencing report and the parole hearing as provided in section 390.30 of the criminal procedure law and section two hundred fifty-nine-i of this chapter;

(e) the rights of crime victims, where a defendant is being sentenced for a felony, to request the right to make a statement at the time of sentencing as provided in section 380.50 of the criminal procedure law; and

(f) the rights of crime victims to request restitution and have the district attorney present such request to the court and assist the crime victim in the filing and collection of a restitution order in cooperation with the designated agency of the court as provided in section 420.10 of the criminal procedure law and section 60.27 of the penal law.

(g) the rights of crime victims to be aware of the defendant's incarceration status by providing the division of parole's contact information, including the division's toll-free telephone number, as provided for in subdivision two of section two hundred fifty-nine-i of this chapter. Such notice shall advise the crime victim to use the division's toll-free telephone number to update contact information.

3. This pamphlet shall provide space for the insertion of the following information:

(a) the address and phone number of the office of victim services;

(b) the address and phone numbers of local victim service programs, where appropriate;

(c) the name, phone number and office location of the person in the district attorney's office to whom inquiries concerning the victims case may be directed; and

(d) any other information the division deems appropriate.

4. (a) The commissioner of the division of criminal justice services in consultation with the director of the office of victim services shall develop and prepare a standardized form for the use of district attorney offices for the purpose of reporting compliance with this section. The form is to be distributed to each district attorney. Every district attorney's office in the state shall complete the reporting form annually and send it to the director of the office of victim services by the first day of January each year subsequent to the effective date of this subdivision.

(b) A copy of the report shall be retained by the district attorney and upon request, a victim of a crime or relative of a victim shall be entitled to receive from the district attorney a copy of their district attorney's annual report without charge. Any other person requesting a copy of the report shall pay a fee not to exceed the actual cost of reproduction.

## § 647 – Criteria

Fair treatment standards for crime victims in the courts shall provide that:

1. The court shall consider the views of the victim of a violent felony offense, a felony involving physical injury to the victim, a felony involving property loss or damage in excess of two hundred fifty dollars, a felony involving attempted or threatened physical injury or property loss or damage in excess of two hundred fifty dollars or a felony involving larceny against the person, or of the family of a homicide victim or minor child, regarding discretionary decisions relating to the criminal case, including, but not limited to, plea agreements and sentence. In addition, the court shall consider the views of the victim or family of the victim, as appropriate, concerning the release of the defendant in the victim's case pending judicial proceedings upon an indictment, and concerning the availability of sentencing alternatives such as community supervision and restitution from the defendant. The failure of the court to consider the views of the victim or family of the victim shall not be cause for delaying the proceedings against the defendant nor shall it affect the validity of a conviction, judgment or order.

2. The victims and other prosecution witnesses shall, where possible, be provided, when awaiting court appearances, a secure waiting area that is separate from all other witnesses.

3. The court shall assist in and expedite the return of property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial.

4. Victim assistance education shall be given to judicial and nonjudicial personnel of the unified court system so that victims may be promptly, properly and completely assisted.

## § 648 – Review; Report and Implementation

1. The chief administrator of the unified court system shall review court practices, procedures, services, regulations and laws to determine the adequacy and appropriateness of its services with respect to crime victims, including victims with special needs, particularly the elderly, disabled or victims of child abuse, domestic violence or sex-related offenses. Such review shall include reasonable opportunity for public comment and consultation with crime victims or their representatives, and may include public hearings.

2. After the review, and not later than two hundred seventy days after the effective date of this section, the chief administrator of the unified court system shall submit a report to the governor and the legislature, setting forth the findings of the review, including a description of the services provided by the components of the unified court system and recommendations for changes in its procedures, services, regulations and laws to improve its services to crime victims and to establish and implement fair treatment standards for crime victims.

3. Subject to the direction of the chief administrator, the components of the unified court system shall expeditiously implement the recommendations of its report.

## § 649 – Miscellaneous

Nothing in this article shall be construed as creating a cause of action for damages or injunctive relief against the state or any of its political subdivisions or officers or any agency thereof.

 **McKinney's Social Services Law § 483-aa**

### § 483-aa. Definitions

The following definitions shall apply to this article:



(a) "Human trafficking victim" means a person who is a victim of sex trafficking as defined in section 230.34 of the penal law or a victim of labor trafficking as defined in section 135.35 of the penal law.

(b) "Pre-certified victim of human trafficking" is a person who has a pending application for federal certification as a victim of a severe form of trafficking in persons as defined in section 7105 of title 22 of the United States Code (Trafficking Victims Protection) but has not yet obtained such certification, or a person who has reported a crime to law enforcement and it reasonably appears to law enforcement that the person is such a victim.

### § 483-bb. Services for victims of human trafficking



(a) The office of temporary and disability assistance may coordinate with and assist law enforcement agencies and district attorney's offices to access appropriate services for human trafficking victims.

(b) In providing such assistance, the office of temporary and disability assistance may enter into contracts with non-government organizations for providing services to pre-certified victims of human trafficking as defined in subdivision (b) of section four hundred eighty-three-aa of this article, insofar as funds are available for that purpose. Such services may include, but are not limited to, case management, emergency temporary housing, health care, mental health counseling, drug addiction screening and treatment, language interpretation and translation services, English language instruction, job training and placement assistance, post-employment services for job retention, and services to assist the individual and any of his or her family members to establish a permanent residence in New York state or the United States. Nothing in this section shall preclude the office of temporary and disability assistance, or any local social services district, from providing human trafficking victims who are United States citizens or human trafficking victims who meet the criteria pursuant to section one hundred twenty-two of this chapter with any benefits or services for which they otherwise may be eligible.

### § 483-cc. Confirmation as a victim of human trafficking



(a) As soon as practicable after a first encounter with a person who reasonably appears to a law enforcement agency or a district attorney's office to be a human trafficking victim, that agency or office shall notify the office of temporary and disability assistance and

the division of criminal justice services that such person may be eligible for services under this article.

(b) Upon receipt of such a notification, the division of criminal justice services, in consultation with the office of temporary and disability assistance and the referring agency or office, shall make a preliminary assessment of whether such victim or possible victim appears to meet the criteria for certification as a victim of a severe form of trafficking in persons as defined in section 7105 of title 22 of the United States Code (Trafficking Victims Protection) or appears to be otherwise eligible for any federal, state or local benefits and services. If it is determined that the victim appears to meet such criteria, the office of temporary and disability assistance shall report the finding to the victim, and to the referring law enforcement agency or district attorney's office, and may assist that agency or office in having such victim receive services from a case management provider who may be under contract with the office of temporary and disability assistance, or from any other available source. If the victim or possible victim is under the age of eighteen, the office of temporary and disability assistance also shall notify the local department of social services in the county where the child was found.

## Statutes
**McKinney's Executive Law Ch. EIGHTEEN, Art. 23, Refs & Annos**

CROSS REFERENCES

Action against offender's estate; victim as creditor, see Civil Rights Law § 79-d.

Action by victim of criminal offense, time limits, see CPLR 213-b.

Compensation for crime victims, see Executive Law § 620 et seq.

Deaf victim, appointment of interpreter, see Judiciary Law § 390.

Dispositions of offenders, restitution and reparation, see Penal Law § 60.27.

Dispute resolution, notice and opportunity for victim to be heard prior to referral, see CPL 215.10; CPL 215.20.

Employer unlawfully penalizing victim witness, misdemeanor, see Penal Law § 215.14.

Forfeiture of proceeds of crime, see CPLR 1310 et seq.

Intimidation of victim, felony, see Penal Law § 215.15 et seq.

Judicial administration, chief administrator, see Judiciary Law § 212.

Mentally incapacitated defendant, notice to potential victim of release, see CPL 730.60.

Notice to crime victim of case disposition, see CPL 440.50.

Orders of protection for crime victims while action pending, see CPL 530.12; CPL 530.13.

Parole board, consideration of crime victim's statement, see Executive Law § 259-i.

Proceeds of crime, recovery by victim, see Executive Law § 632-a.

Released inmates; notification to victims and family members, see Correction Law § 149-a.

Restitution and reparation to crime victim, see Penal Law § 60.27.

**Exhibit D**

OPERATION CREW CUT RESULTS

**This page is located on the NYC.gov Web site at**
http://www.nyc.gov/html/nypd/html/pr/pr_2013_11_25_operation_crew_cuts_homicide_among_youth_in_half.shtml

FOR IMMEDIATE RELEASE
Monday, November 25, 2013

**HOMICIDES AMONG VICTIMS AGE 13 TO 21 HAVE DECLINED 50% CITYWIDE**

*NYPD Credits Reduction to Operation Crew Cut; 21% Decrease In Homicides and Shootings Overall*

*Strategic Enforcement Team in Brownsville, Brooklyn Identifies 20 Subjects Being Indicted Today*

Police Commissioner Raymond W. Kelly announced Monday that one year after the implementation of the NYPD's "Operation Crew Cut," crime statistics show that homicides among young people ages 13 to 21 – those who are most at risk of retaliatory street violence such as that which Operation Crew Cut is designed to suppress – have fallen 50.6%, from 87 to 43 through November 24. Commissioner Kelly was joined at One Police Plaza by Chief of Department Philip Banks III, Chief of Patrol James P. Hall; Assistant Chief Gerald Nelson, the commander of Patrol Borough Brooklyn North; Deputy Inspector Joseph Gulotta, the commanding officer of the 73rd Precinct in Brownsville; Lance Ogiste, Counsel to the Kings County District Attorney; and Chief of the Kings County District Attorney Gangs Bureau, Edward J. Carroll.

"Strategic enforcement and proactive policing combined with strong prosecutorial partnerships, including attention to the new battleground of social media, have resulted in lives being saved in New York City, mostly young minority men." Police Commissioner Raymond W. Kelly said. "Additionally, shootings and homicides citywide, regardless of victim age, are down 21% on top of 2012's record lows."

Commissioner Kelly said that since the establishment of Operation Crew Cut last October, police and prosecutors have conducted 25 investigations throughout the five boroughs resulting in more than 400 crew members indicted for crimes including murder, robberies, assault, and weapons possession. Twenty subjects responsible for violence in Brownsville's 73rd Precinct have been identified in indictments being unsealed in Brooklyn today. The charges include the August 2012 shooting homicide of a 14-year-old "ATC - Addicted to Cash" crew member, Ronald Wallace.

In 2011, about one-third of shootings in New York City were committed by young people motivated by geographic turf or other street crew rivalry. In response, the Department increased the number of detectives in its Gang Division and shifted investigative attention to loosely organized crews, as well as partnered NYPD attorneys with Gang Division investigators and their counterparts in the five District Attorneys' offices. A Juvenile Justice Division was established within the Community Affairs Bureau and its members have, along with helping to enhance investigations with insight gleaned from open-source social media, held 'youth summits' to educate parents and guardians, school personnel and other adults on signs of crew involvement or violent criminal behavior, and ways to mitigate that.

At the precinct level, Strategic Enforcement Teams (SETs) were developed and deployed to perform proactive, anti-crime patrol and in cases of established rivalries, to identify and apprehend perpetrators and prevent further escalation between groups. Members of the NYPD's Transit and Housing Bureaus were trained and dedicated to work closely with investigators on cases. A disproportionate number of shootings occur in public housing --- approximately one in five or 20% of violent crimes citywide, with only 5% of New York City residents living in public housing.

Year to date, the Department also has recovered 2,657 guns, including from young men originally stopped for infractions such as turnstile jumping . Five guns were recovered from the subjects identified in Monday's case, including a loaded 22-caliber revolver from a 14-year-old female crew member carrying it in her pocketbook this August.

### # # #

VIDEO: «Commissioner Kelly Announces Operation Crew Cut, Oct. 2012»



FOR YOUR CONSIDERATION
BROOKLYN
FIND SCREENINGS

# The New York Times

N.Y. / REGION

# A New Crackdown Yields 14 Indictments Against a Youthful Harlem Gang

**By JOHN ELIGON**   FEB. 16, 2011

All but one of the reputed gang members were born in the 1990s. The lone female among them was a student at Deerfield Academy, an elite Massachusetts prep school.

They were said to have hired young girls to carry their guns because the girls were less likely to be stopped and frisked by the police. And some of them allegedly continued to run their Central Harlem drug operation from behind bars, referring to their product with terms like "chicken" when they spoke to their associates over the phone.

That was how prosecutors on Wednesday described a gang called the 137th Street Crew, which they said ran a cocaine ring and used guns to protect their turf from rival gangs.

Manhattan prosecutors won indictments of 14 people they identified as members of the gang. Five of them were charged with first-degree conspiracy, which carries a maximum sentence of life in prison.

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 12 of 50

14 Reputed Cocaine Sellers on a Harlem Block Indicted - The New York Times   Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 17 of 61   Page 2 of 3

Other charges included attempted assault and weapons possession. And prosecutors accused one of the alleged gang members, Jonathan Hernandez, of attempted murder involving a shooting last July.

The arrests were the first major roundup in an ambitious effort by Cyrus R. Vance Jr., the Manhattan district attorney, to try to take down, over the course of the next year, roughly 20 gangs that his office has identified.

Mr. Vance said that his office, working with the Police Department, had used new analytic tools that have allowed prosecutors to better identify gangs and connect different criminal acts to particular gangs.

"This is a measured, proactive, step-by-step approach to taking on violent hot spots throughout Manhattan," Mr. Vance said.

All but two of the defendants are in custody, and they were arraigned on Wednesday in State Supreme Court in Manhattan. Mr. Vance appeared before the judge for several of the arraignments, a rare step for a prosecutor with many assistant district attorneys.

The court entered not guilty pleas on the defendants' behalf.

This gang fits what prosecutors have called the new face of gangs in the city: young people, many still in their teens, organized by blocks, well armed and willing to protect their territory.

The 137th Street Crew operated "in the center of a cultural zone of Harlem," Mr. Vance said. Their turf was 137th Street between Adam Clayton Powell Jr. Boulevard and Lenox Avenue, the same block that the Abyssinian Baptist Church, Mother A.M.E. Zion Church and the Harlem Children's Zone Promise Academy are on.

Jaquan Layne, who prosecutors said was one of the leaders of the operation, continued to coordinate drug activity after he was jailed on Rikers Island in a different case.

"Just sit in front of the stoop in the morning," Mr. Layne, 20, told a co-defendant, according to an excerpt of their recorded telephone conversation cited in

14 Reputed Cocaine Sellers on a Harlem Block Indicted - The New York Times                    Page 3 of 3

the indictment. "You catch all the morning flow, 'cause they'll all come see you, boom, boom, boom, 'cause that's the morning."

### Correction: February 23, 2011

An article on Thursday about indictments of reputed gang members in Harlem misstated the name of a church that is on the block where the gang allegedly operated. It is Mother A.M.E. Zion Church, not Mother A.M.E. Zion Baptist Church.

A version of this article appears in print on February 17, 2011, on page A29 of the New York edition with the headline: A New Crackdown Yields 14 Indictments Against a Youthful Harlem Gang.

© 2015 The New York Times Company

Case 1:15-cv-05871-KPF    Document 21-3    Filed 09/02/16    Page 14 of 50
Case 1:15-cv-05871-LAP    Document 16-2    Filed 05/09/16    Page 19 of 61
How the NYPD is using social media to put Harlem teens behind bars | The Verge          Page 1 of 17



# How the NYPD is using social media to put Harlem teens behind bars

*The untold story of Jelani Henry, who says Facebook likes landed him in Rikers*

By Ben Popper on December 10, 2014 01:15 pm

**The Henry brothers**, Asheem and Jelani, were born exactly one year apart to the day, in the warm Junes of 1991 and '92. "I always felt there was something special about that," says their mother Alethia. "A little bit of magic." The two grew up together in their mother's small apartment on the corner of 129th Street and Malcolm X Boulevard in New York's Harlem neighborhood.

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 15 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 20 of 61
How the NYPD is using social media to put Harlem teens behind bars | The Verge          Page 2 of 17

As young children, the brothers were good friends with kids from all over. But as they matured into adolescent young men, a set of once-invisible rivalries began to surface. The True Money Gang from the Johnson Houses was at war with the Air It Out crew from the Taft Houses. Crews from Grant and Manhattanville projects exchanged gunfire in the streets. As he grew up, Jelani looked forward to leaving the neighborhood for school, "So I didn't have to look behind my back every two seconds to see if someone about to bash me in the head," he says.

When Asheem was 13 and Jelani was 12, the Henry boys began running with a crew based on 129th Street between Fifth Avenue and Lenox. The Goodfellas was a clique that offered the boys camaraderie, cache, and protection from other crews. "If you in another crew's area, without your boys, those niggas will jump you," explains Asheem.

## THE MOUNTAINS OF DIGITAL MEDIA POSTED ONLINE ARE A TANGLED WEB OF CONNECTIONS

In November of 2011, the crew life caught up with them. Asheem was arrested on conspiracy charges as part of gang raid that targeted the Goodfellas. Five months later, Jelani was arrested and charged with a double attempted murder charge following a shooting in the neighborhood. Social media evidence was at the center of the older brother's case, and the the family says online activity figured into the arrest of the younger brother as well.

The story of the Henry brothers highlights a new reality for teenagers growing up at the intersection of social media, street gangs, and mounting law enforcement surveillance. For those coming of age in gang-saturated areas, the mountains of digital media posted online are a tangled web of connections that can be used to lock up violent perpetrators—but can also ensnare the innocent along with them.



**Alethia Henry raised** her boys as a single mother, maintaining a steady job as a case manager for an organization supporting people with developmental disabilities. She made sure her two sons had a good education and wore the latest clothes. Her home was a welcoming place, and Asheem and Jelani's friends would gather at the Henry house to play video games and get a full meal. "My mom, she always opened the door to other kids," says Asheem. "She kind of made our place a safe space to hang."

As kids, the brothers felt comfortable walking the streets of their neighborhood—Asheem played pick-up basketball games at courts all around Harlem. But as the brothers turned 12 and 13, they became increasingly aware of a violent map of territories and rivalries. Jelani says that sometimes he was afraid to go to the grocery store. Certain friends the boys had known for years suddenly became enemies because of where they were from.

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 17 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 22 of 61   Page 4 of 17
How the NYPD is using social media to put Harlem teens behind bars | The Verge

# THE BROTHERS BECAME INCREASINGLY AWARE OF A VIOLENT MAP OF TERRITORIES AND RIVALRIES

New York City's murder rate has been falling for two decades, recently hitting lows not seen since the 1960s. But that trend isn't true in Harlem, where gun violence began climbing during the boys' teenage years. At the heart of this violence was a back and forth cycle of vengeance between youth crews that exploded in number during the Henry boys teenage years.

Harlem, like many poor urban areas, had experienced its shares of notorious gangs like the Bloods and Crips. But the crews that the Henry boys grew up with were mostly small and local in nature, with no connection to a larger, national organization. Like an increasing number of such groups across the country, these crews consisted of a loose group of a dozen or so teens from the neighborhood. Sometimes they controlled nothing more than a single corner. "You could live on the east side of a project, and have problems with them dudes on the west side, one block away," says Asheem.

"You roll up to a spot with your boys, you wanna feel safe, you wanna impress the girls," he explains. Goodfellas was never meant to be a criminal organization — more of a neighborhood clique. But over time, the crew found itself in violent rivalries with other crews in the area. "The first time someone robbed me for my jacket, I let it happen," Asheem says. "The second time, I fought back and got my ass whooped. The third time, I got a weapon to defend myself."

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 18 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 23 of 61
How the NYPD is using social media to put Harlem teens behind bars | The Verge                    Page 5 of 17



**Source:** Harlem Community Justice Center
(http://www.courtinnovation.org/sites/default/files/documents/Juvenile_Gangs_Needs_Assessment.pdf)

More so than his younger brother, Asheem fell deeply into the
Goodfellas crew and its conflicts. Jelani, meanwhile, managed to stay
removed from these local struggles. As a young teen, he began
attending Leake & Watts, a special needs school based in Yonkers,
outside the city. But as Asheem's younger brother, Jelani remained a
background member of the crew by default.

"I knew them all my life, and we always had each other's back.
Somebody mess with you, they mess with all, that was my perspective.
Just friends hanging out, chasing after girls," says Jelani. "I didn't think

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 19 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 24 of 61
How the NYPD is using social media to put Harlem teens behind bars | The Verge          Page 6 of 17

**THE VERGE**

of it as a gang. I thought of it as family." He was aware of the violence that the crew was involved in, but says he never participated, save a few scuffles in the street. For the most part, Jelani says, "what they was doing, I wasn't doing."



*The Goodfellas. Jelani can be seen at top right*

**Like many teens,** the Henry boys were avid users of social media, posting content about themselves and their crew. They appeared in Goodfellas rap videos on YouTube, and had accounts on MySpace and Facebook where they appeared in Goodfellas jackets or in images tagged with "Goodfellas" and "GF." It was clear to both of them that the reputation they projected online was not just fun, but as critical to their safety as not walking alone at night.

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 20 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 25 of 61
How the NYPD is using social media to put Harlem teens behind bars | The Verge          Page 7 of 17

**THE VERGE**

"The streets be watching, you know that saying?" says Asheem, echoing the words of Jeff Lane, an assistant professor at Rutgers University in the School of Communication and Information who came to know the Henry boys well. Lane spent several years living in Harlem, working on violence prevention and writing about street life. Even good kids who prefer to spend time with family and in the classroom often find it necessary to act "hard," says Lane. In tough neighborhoods, displays of violence and bravado are not a choice, but a survival tactic. "Teenagers these days need to worry not just about how they act in real life, but also how they are perceived on the digital street."

For those not deeply involved in crews but who, like Jelani, were connected by family and proximity, the same kind of scrutiny applied. "People are looking to see how you respond," Jelani explains. There might be a fistfight, for example, and a video would be posted online to Facebook or YouTube. "If you don't 'like' that post," he says, "people are gonna ask you why."

**As crime in** New York City has fallen, law enforcement has focused on the pockets of violence that remain. Over the last five years, the New York City police department and Manhattan prosecutors office have ramped up their efforts to understand, oversee, and infiltrate the digital lives of teenagers from crime-prone neighborhoods like Harlem. They track the activity of kids through services like Twitter, Facebook, YouTube, and Instagram, going so far as to create fake accounts and spark online friendships to sidestep privacy settings. A recent indictment discusses activity of crew members as young as 10, and arrested several 15-year-olds following a four and half year investigation.

"We are coming to find you and monitor every step you take," Joanne Jaffe, the department's Housing Bureau chief, told *The New York Times* in 2013. "And we are going to learn about every bad friend you have."

*A music video by The Goodfellas*

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 21 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 26 of 61
How the NYPD is using social media to put Harlem teens behind bars | The Verge          Page 8 of 17

**THE VERGE**

In Harlem, the social media busts emerged around 2011 with a crack down on a gang of 14 crew members. Asheem's case followed shortly thereafter, with 19 defendants. In April of 2013, another Harlem raid took down 63 crew members. Many of these operations have been organized under the rubric of Operation Crew Cut, a police strategy combining a focus on crews and social media in an effort to curb gun violence.

The most recent Crew Cut raid took place this past June, just after dawn. Helicopters circled low over the Grant and Manhattanville housing projects in West Harlem. Hundreds of officers swarmed into the buildings as members of the press, tipped off beforehand, watched from the wings. In all, 103 defendants, many between the ages of 15 and 20, were indicted. (The word "Facebook" appears more than three hundred times in these indictments.) It was the largest gang raid in the history of New York City, part of an escalating pattern of mass arrests that used social media evidence and conspiracy statutes to arrest larger and larger numbers of defendants.

The district attorney leading the case accused rival crews who lived in the housing projects of two homicides and 19 non-lethal shootings, pointing to a wealth of evidence gathered from reviews of over 1 million social media pages where feuds played out. "IM GOOD BRO THEY SHOT ND MISS WE SHOOT TO KILL" read one Facebook message. "NOW IMAA REALII KILL SOMEONE" read another.

## "THE MIX OF SOCIAL MEDIA AND CONSPIRACY STATUTES CREATES A DRAGNET THAT CAN BRING ALMOST ANYBODY IN"

Though the New York City Police has declined to comment for this piece, in the past the department has touted Operation Crew Cut as a success. "Strategic enforcement and proactive policing combined with strong prosecutorial partnerships, including attention to the new battleground of social media, have resulted in lives being saved in New York City, mostly young minority men," former police commissioner Raymond Kelly said in a 2013 press release. The NYPD says statistics

Case 1:15-cv-05871-KPF  Document 21-3  Filed 09/02/16  Page 22 of 50
Case 1:15-cv-05871-LAP  Document 16-2  Filed 05/09/16  Page 27 of 61
How the NYPD is using social media to put Harlem teens behind bars | The Verge   Page 9 of 17

**THE VERGE** show that during the first year of Operation Crew Cut, homicides among young people ages 13 to 21 fell 50.6 percent in the areas targeted by the operation.

But critics say that while violence may have fallen, the number of arrests during each raid has not. "The mix of social media and conspiracy statutes creates a dragnet that can bring almost anybody in," says Andrew Laufer, a New York City attorney who has worked on numerous cases involving teenagers wrongly arrested by police. "It's a complete violation of the Fourth Amendment and the worst kind of big brother law enforcement." To build the case for the Harlem raid, police had begun social media surveillance of children well before they had built up a serious criminal record.

Affiliation with a crew, even a tangential one, can be a deciding factor in getting locked up. "I find it disturbing and scary," says Christian Bolden, a professor of criminology at Loyola University. "In many states, if police see you together with someone three times — and this can be in real life or in a picture they find online — that is enough to prove conspiracy. That puts the onus on young people to be smart and careful about who they are with and what they post. And if we know one thing about teenagers, it's that they are rabidly social and often quite reckless." It was this exact mix of neighborhood affiliations and social media that entangled the fates of the Henry brothers.

In 2008, **Asheem** was arrested for weapons possession. He had never fired the gun in question—the indictment showed that it didn't even work—but he admits to obtaining the weapon illegally. When I visited him at Elmira Correctional Facility, a maximum security facility four hours northwest of New York City where he was serving his sentence, he wore a dark green prison uniform and clean white sneakers. His hair was still in the stylish waves he was known for in Harlem. "I was running around with a gun because—not because I was a gangbanger," he says. "You get caught out your neighborhood, you get jumped."

How the NYPD is using social media to put Harlem teens behind bars | The Verge          Page 10 of 17

# THE VERGE "YOU NEED TO COME HOME," HIS MOTHER TOLD HIM. "THE POLICE ARE LOOKING FOR YOU."

Asheem pleaded guilty to the charge and got five years probation. Determined to fly straight, he kept a clean record after that, graduating high school and heading off to college at William Paterson University in New Jersey. As a freshman, Asheem had finally put some distance between himself and his troubled neighborhood. But in the week of his first midterm exams, his mother called him. "You need to come home," she told him. "The police are looking for you."

The 129th street indictment was one of the earliest in a string of cases that the Manhattan DA has brought against 16 crews in the last four years. These operations have leveraged the potent combination of social media evidence and conspiracy statutes. Asheem was charged with conspiracy in the third degree. The evidence was the gun charge to which he had already pled guilty, and photos, which he says dated back to the time when he was 14 and 15, showing him and other boys under the banner of Goodfellas.

*The Goodfellas. Jelani can be seen top right*

One image showed Asheem and friends at an older girl's Sweet Sixteen party — their arms draped over one another's shoulders. Alethia says the picture was used as evidence to show participation in a criminal conspiracy. His mother had been at the party as a chaperone. "I didn't see gangsters," she says, "I just saw some kids."

But even though these photos were posted online when Asheem was still a minor, they were fair game for the prosecutor when bringing charges against him as an adult. Along with his previous confession to the gun charge, it was enough to prove he belonged to a violent crew. "So I asked them, 'Yo, is that no form of double jeopardy?' And they said, 'No, because you pled guilty to the weapon, it opens up [the conspiracy charge],'" recalls Asheem. "And because you got pictures

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 24 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 29 of 61
How the NYPD is using social media to put Harlem teens behind bars | The Verge                Page 11 of 17

with these other guys, they're saying you guys all knew what was going on.

**THE VERGE**

## "I DIDN'T SEE GANGSTERS," HIS MOTHER SAYS. "I JUST SAW SOME KIDS."

"We were just young dumb kids running around, and we just happened to run under the one name," he tells me. "There wasn't no hierarchy, there wasn't order." But the nature of some conspiracy statutes, especially when defendants are identified as gang members, doesn't require that teens be aware of a specific plan or crime in order to be found guilty.

According to Chris Lawson, a prosecutor in San Diego, three ingredients must be present to bring a conspiracy charge against gang members in his state: knowledge of a gang's criminality, active participation in the gang, and intent to further the gang's overall goals. Prosecutors can glean evidence for all of this off social media. "If you go out and represent yourself as a members of the Crip killers, and if shortly after you make threats online, a Crip is killed—even though we don't know who pulled the trigger—we can hold you legally responsible for conspiracy to commit those murders."

Alethia says that in Asheem's case, the judge told him he was looking at a possible sentence of 15 to 30 years. It was a frightening length of time that convinced Asheem to take a plea deal that could range from 16 months to 4 years instead. While he was incarcerated, the police matched his DNA to another gun recovered near the scene of a gang altercation. Though this gun was operable and loaded, it had not been used in a murder or violent conflict. But Asheem, knowing his record would look bad before a judge, decided to take another plea, adding six more years onto his current sentence. He is now scheduled for release in 2017.

*Photo taken by local event company at a Sweet Sixteen party. Asheem is farthest left*

Case 1:15-cv-05871-KPF    Document 21-3    Filed 09/02/16    Page 25 of 50
Case 1:15-cv-05871-LAP    Document 16-2    Filed 05/09/16    Page 30 of 61
Page 12 of 17

How the NYPD is using social media to put Harlem teens behind bars | The Verge

**THE VERGE**

Had it not been for the social media evidence, it's likely Asheem would not have been pulled into the conspiracy indictment. California has introduced a new law that would allow teenagers to wipe clean their online presence when they turn 18, erasing youthful indiscretions. And in Europe, major governments have forced Google to remove links that users feel keep them unfairly associated with their past. But for now, in most US states, social media creates a time capsule that can come back to haunt you. Asheem was a minor during the period when the pictures were taken. But when the conspiracy indictment came down, he was old enough to be charged as an adult.

## IN MOST US STATES, SOCIAL MEDIA CREATES A TIME CAPSULE THAT CAN COME BACK TO HAUNT YOU

Individuals who work closely with at-risk youth in Harlem and strive to keep them out of the prison system admit that the surveillance of social media and operations like Crew Cut are a necessary response to gun violence among youth. "Nobody wants to see 14- and 15-year-old kids getting locked up," says Chris Watler, Project Director at the Harlem Community Justice Center. "But if a kid is picking up a gun, or shooting other kids, we need to stop them from doing that. If you have a kids posing online with a gun, what is the obligation of law enforcement? There is a legitimate public safety concern."

To his family and friends, Asheem's case is tragic. They saw a a high school graduate and aspiring college freshman, a young man who had pled guilty to his crime and then tried to leave that life behind. But belonging to the Goodfellas was also a crime—and Asheem was admittedly guilty of it. He would become among the earliest of more than 300 crew members who have been convicted over the past four years by the Manhattan DA on conspiracy charges.

But what happened next came as a shock: the police came for Jelani as well.

*A line up of suspects in Jelani's case. Jelani is at bottom right.*

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 26 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 31 of 61
How the NYPD is using social media to put Harlem teens behind bars | The Verge                    Page 13 of 17

**THE VERGE**

**Five months after** Asheem's indictment, in April of 2012, the police arrested him at his girlfriend's home in the Bronx. At first he thought it was for something minor: he had jumped a subway turnstile earlier that year and failed to show up in court for his summons. But he quickly learned that he was under arrest for two counts of attempted murder and other charges.

A few weeks prior, a girl had been spit on by members of a local Harlem crew. The next day, someone shot the spitter and his friend in retaliation. The gunfire broke out in front of Kings Deli on 129th Street and Frederick Douglass Boulevard, two blocks west of the Henry household. Jelani, the police said, matched an eyewitness description of an individual fleeing the scene: a tall, light-skinned black male.

In the interrogation room, two detectives grilled Jelani about Goodfellas gang rivalries in the area. "All my friends are in jail," he told them. "I don't hang out with nobody."

## "ALL MY FRIENDS ARE IN JAIL," JELANI TOLD THE POLICE. "I DON'T HANG OUT WITH NOBODY."

Jelani had never been convicted of a crime, but at the arraignment, the District Attorney's office described him as a known member of a violent gang. As evidence, Jelani and Alethia say, she pointed to posts about Goodfellas that he had "liked" on Facebook. The judge denied Jelani bail, instead sending him to Rikers Island, one of the nation's most notorious jails. The district attorney offered him 20 years if he pled guilty, but Jelani refused. He was certain that a trial would prove his innocence. Days went by, then weeks, months, a year. The trial never came.

During the time he was imprisoned, the DA refused to share almost all the evidence with Jelani or his lawyer. He had no access to the testimony or physical evidence against him and therefore no way to argue that his indictment and detention should be overturned. What little his lawyer did know showed the case to be a shaky one. Two men

How the NYPD is using social media to put Harlem teens behind bars | The Verge

**THE VERGE**

were seen running from the scene of the shooting. One eyewitness said the dark-skinned man held the gun. Another said it was the light-skinned man. An eye witness picked Jelani out of a lineup, but another failed to do so.

"Because of them pictures, the DA said I was affiliated, that I know what's going on in the hood," Jelani remembers. On Facebook, Jelani had appeared in pictures with the crewmembers, and he had liked images linked to Goodfellas on Facebook. Again and again, Jelani says, the district attorney pressed him to take a plea bargain, pointing to the evidence on social media. But he refused. "Those are people I would call my friends, but what they was doing, I wasn't doing. To her, I'm part of them. I'm a monster."

# IN A BIT OF KAFKA-ESQUE ARITHMETIC, 19 MONTHS BECAME 83 DAYS

Every so often Henry would be shuttled to the courthouse in Manhattan, and every time, the district attorney delayed the start of the trial. In New York, a defendant is entitled to a trial, and a felony suspect is supposed to be freed on bail after six months without one.

But the district attorney convinced a judge that most of the time Jelani spent in jail shouldn't count towards that release. She argued that days spent gathering more evidence, delays in testimony by a police officer who was on vacation, or instances where she was unprepared to make her case did not figure into the six-month period. The judge agreed. In a bit of Kafka-esque arithmetic, 19 months became 83 days. Instead of finishing trade school, Jelani celebrated his 20th and 21st birthdays in a cell.

Because of the serious charges and the assertion that the crime was gang-related, Jelani was kept in the George R. Vierno Center, among the most violent housing facilities at Rikers Island. There he was forced into close proximity with inmates from rival areas of Harlem, leading to several fights. The violence changed him. "My experience on Rikers

How the NYPD is using social media to put Harlem teens behind bars | The Verge                   Page 15 of 17

**THE VERGE**

Island, that's when I had to show, like not just be myself," he says. "I act like a beast."

Jelani fought with other inmates and was was punished with solitary confinement. "I did nine months straight in the box," he remembers. That meant 23 hours a day in a 6 x 8 foot cinder block room, his meals pushed through a slot in the door. "For a while, I kind of lost my mind in there."

Henry said he struggled at times to avoid taking the guilty plea. "I'm like, God's not listening to my prayers." Thinking of his brother's plea helped him to stay strong. "I knew sooner or later, [God's] gonna be like, aight, you suffered enough."

Meanwhile, the district attorney kept dragging her feet. "She definitely thought we would crack if she kept him up in Rikers long enough," says Alethia. But Jelani and his mother refused to cut a deal. "They took one of my boys, but you can't have them both," she says.

Alethia finally convinced her lawyer to file a speedy trial motion and in November of 2013 Jelani was given bail. Four months later, with no move by the DA to proceed, his case was finally dismissed, almost two years to the day it began. The DA has refused to share the document that outlines the reason for dismissing Jelani's case with him or his lawyer. To date, there has been no explanation and no apology for Jelani's detention.

## "THEY TOOK ONE OF MY BOYS, BUT YOU CAN'T HAVE THEM BOTH."

**After leaving Rikers,** Henry moved in with his grandmother in West Harlem. He has tried to steer clear of old neighborhood conflicts. "My head is all over the place these days," he says, walking along Harlem River Drive.

Gone is the skinny kid who appears in Goodfellas group photos on MySpace. He is a young man now, with a mustache goatee and a layer of muscle he put on in prison. "I want to be a DJ, a bartender, maybe

How the NYPD is using social media to put Harlem teens behind bars | The Verge    Page 16 of 17

**THE VERGE**

write a book. I just feel like I'm making up for the lost time, and there is n... ...t I could do." He hopes to return to school, this time for a degree in automotive repair.

As for social media, and socializing in general, he says he mostly avoids it. "I prefer to just be in the house, not do nothing, be bored out my mind, instead of being outside and being a part of something, which I'm not really." He is hypervigilant about what he posts and what pictures he appears in, but says he doesn't think the big takedowns of crews have changed the behavior of the average Harlem teenager. "People post things just to get likes to be popular," he says.

Because Jelani's case was dismissed, the Manhattan District Attorney legally cannot discuss it in any way. But the office stands by the work it has done on social media and the cases it prosecuted based on Operation Crew Cut raids.

"When we first start, a crew might have hundreds of people in it. We then start to narrow, and we focus, like a laser, the worst of the worst," says Chief Assistant District Attorney Karen Friedman Agnifilo. "We are very careful to make sure that we have evidence that we can prove at trial, that these weren't just kids who like to hang out with the gang [but] members who are really a part of the violence."

Jelani's case wasn't caught up in one of the big conspiracy indictments — his was one ripple farther out from those takedowns. While she wouldn't discuss Jelani directly, Agnifilo spoke in broad terms about the risk-and-reward dynamic of this new style of policing. "With big gang raids, there is collateral damage that spills over and affects the families," she says. "The criminal justice system is not the answer. This is a social and economic issue. But when there is violence, we are prosecutors, and there are only so many options."

Unfortunately, Henry's troubles from the arrest aren't over. He is now facing assault charges stemming from a fight in prison. "He was innocent when he went in there, and now he might come out with a charge for defending himself," says Alethia. His family plans to sue the

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 30 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 35 of 61
How the NYPD is using social media to put Harlem teens behind bars | The Verge        Page 17 of 17

**THE VERGE**

city over his arrest and to have the charges stemming from his time in
Rikers dropped.

Alethia is committed to getting his story out there because she believes
the policies of police and prosecutors have to change. "Jelani was
brought in over nothing. Because he was Asheem's brother. Because
he was friends with people from the hood on Facebook." Well before
the arrest of either boy, she had gone to the local police, begging them
to intervene in the deadly neighborhood conflicts. "We asked for help,
and we got an indictment instead," she says sitting in her kitchen, tears
wetting her eyes. "People don't understand why it's so dangerous to
put yourself out there on social media. You know what my son is guilty
of? Being born on 129th Street."

*Photography by Bryan Derballa*

*Map by Ryan Mark and Josh Laincz*

*Additional reporting by Chaim Gartenberg*

**Exhibit E**

GF2 8/2002

**FAMILY COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| In the Matter of a **Family Offense** Proceeding | File #:   132891 |
| | Docket #:   O-10874-10 |

**Kelly Cathleen Price,**

Petitioner,                    **SUMMONS**

- against -

**Raheem Powell,**

Respondent.

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK:

To:   Raheem Powell
315 West 116th Street #3B
New York, NY 10026

A petition under Article 8 of the Family Court Act having been filed with this Court, and annexed hereto

YOU ARE HEREBY SUMMONED to appear before this court on

| | |
|---|---|
| **Date/Time:** | January 24, 2011 at 9:15 AM |
| **Purpose:** | Return of Process |
| **Part:** | 5 |
| **Floor/Room:** | Floor 8 South/Room PT 5 |
| **Presiding:** | Hon. Lori S. Sattler |
| **Location:** | 60 Lafayette Street |
| | New York, NY 10013 |

to answer the petition and to be dealt with in accordance with the Family Court Act.

**On your failure to appear as herein directed, a warrant may be issued for your arrest.**

*Evelyn Hasanoeddin*

**Dated:** November 22, 2010                    Evelyn Hasanoeddin, Clerk of Court

**NOTICE:** Family Court §154(c) provides that petitions brought pursuant to Article 4, 5, 6, 8 and 10 of the Family Court Act, in which an order of protection is sought or in which a violation of an order of protection is alleged, may be served outside the State of New York upon a Respondent who is not a resident or domiciliary of the State of New York. If no other grounds for obtaining personal jurisdiction over the Respondent exist aside from the application of this provision, the exercise of personal jurisdiction over the respondent is limited to the issue of the request for, or alleged violation of, the order of protection. Where the Respondent has been served with this summons and petition does not appear, the Family Court may proceed to a hearing with respect to issuance or enforcement of the order of protection.

F.C.A.§§ 812, 818, 821                                                    8-2 09/2009

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of a Family Offense Proceeding         **File #:**      132891
                                                     **Docket #:**  O-10874-10
**Kelly Cathleen Price,**

                              Petitioner,                **FAMILY OFFENSE**
      - against -                                           **PETITION**

**Raheem Powell,**

                              Respondent.

TO THE FAMILY COURT:

The undersigned Petitioner respectfully states that:

I, Kelly Cathleen Price reside at[1] 237 West 120th Street #1, New York, NY 10027.

The Respondent, Raheem Powell resides at 315 West 116th Street #3B, New York, NY 10026.

The Respondent and I are related in the following way: I had a intimate relationship (former dating) with the Respondent.

The Respondent committed the following family offenses against me and/or my children which constitute attempted assault, assault in the second or third degree, aggravated harassment in the second degree, harassment in the first or second degree, disorderly conduct, menacing in the second or third degree, reckless endangerment, and criminal mischief.

The most recent incident was on November 11, 2010 at home of the Petitioner: **Petitioner states that the Respondent choked her until she passed out and pushed her through a fish tank (causing severe cuts and blood loss). Petitioner states that she has to go to the hospital for stitches in her rear due to the above incident. Petitioner states she was and beaten by the Respondent's mother on 11/17/2010 (she was arrested 11/22/10). Petitioner states that the Respondent has made death threats against her and his family has caused her bodily harm.**

I have not filed a criminal court complaint concerning these incidents, but Petitioner states that she has filed numerous complaints against the Respondent.

I have no minor children and there are no other minor children living in my home.

The Respondent owns or has access to guns as follows: **Petitioner states that the Respondent owns and/or has access to guns and knives.**

[1] If your health or safety or that of your child or children would be put at risk by disclosure of your address or other identifying information, you may apply to the Court for an address confidentiality order by submitting General



Page: 2 of 2
Docket No: O-10874-10
8-2

The Respondent has the following criminal convictions: **Petitioner states that the Respondent has been arrested in the past for selling narcotics.**

I have not made any previous application to any court or judge for the relief requested in this petition.

WHEREFORE, Petitioner respectfully requests this Court to:

- adjudge the Respondent to have committed the family offenses alleged;
- enter an order of protection, specifying conditions of behavior to be observed by the Respondent in accordance with Section 842 of the Family Court Act:
  - **Petitioner is requesting an Order of Protection to keep the Respondent away from her, her home, her pets, and to stop the Respondent from harming, harassing, menacing, calling, any 3rd party and electronic contact, and threatening the Petitioner in any way;**
- order such other and further relief as the Court deems just and proper.

**Dated:** November 22, 2010

**Kelly Cathleen Price, Petitioner**

VERIFICATION

STATE OF NEW YORK)
                            ;ss:
COUNTY OF NEW YORK)

Kelly Cathleen Price being duly sworn, says that he/she is the Petitioner in the above-named proceeding and that the foregoing petition is true to his/her own knowledge, except as to matters stated to be alleged on information and belief and as to those matters he/she believes them to be true.

**Kelly Cathleen Price, Petitioner**

Sworn to before me on
November 22, 2010

**Chief Clerk or Designee
Notary Public**

**Exhibit F**

DECEMBER 18, 2015

My name is Mark Christopher LaRocca. Lieutenant in the New York City Police Department. I worked as a assigned to the 028 Precinct in Manhattan. Circa 2010 and 2011, I had several conversations with Ms. Kelly Price in which she claimed to be a crime victim, specifically a victim of domestic violence.

During my interviews of Ms. Price, I found her allegations of abuse, to be credible and with merit. I felt there was sufficient evidence to prepare Complaint Reports to document these allegations which would then be further investigated by the Precinct Domestic Violence Officer and/or the Precinct Detective Squad.

After speaking with the Detectives regarding Ms. Price's allegations, I was informed that prior to a report being further investigated, a phone call to someone in the Manhattan District Attorney's Office who was familiar with Ms. Price's history of reporting crimes needed to be consulted.

Ms. Price informed me that she felt this hindered her ability to receive fair treatment regarding the investigation of her complaints. I informed her that as a victim, she should speak with the supervisor of the person at the Manhattan District Attorney's Office handling her complaint if she felt her complaints were being stonewalled and not acted upon in a fair manner.

MARK C. LAROCCA

Mark C. LaRocca

July 30, 2015

Miss Kelly Grace Price
534 w 187th st #7
New York, NY 10033
Graciegracie212@gmail.com
646 676 1940

Lt. Larocca
c/o Lieutenant's Benevolent Association
Woolworth Building
233 Broadway
ste. 1801
New York, NY 10279
VIA FAX 212.964.4240

Dear Lt. LaRocca

I hope you remember me from 2011-2012 when you worked at the 28th pct. If you recall I came to
the NYPD with complaints of violent physical, mental and economic abuse as well as complaints of
being trafficked by my intimate partner at the time: Raheem Andre Powell.

As Mr. Powell was assisting the MDAO and their "Crew Cut" team in clearing out "gangs" from upper
Manhattan my complaints were never investigated and I instead was falsely arrested on hundreds of
counts of alleged harassment against Mr. Powell and thrown in Rikers Island where I miscarried my
baby. After over two years I managed to out-maneuver the mewling ingénues at the MDAO and win a
FULL DISMISSAL of all bogus charges against me. I am STILL however on a "DO NOT SERVE" list kept
by the NYPD and the MDAO and am still being denied police assistance.

I have partnered with Sanctuary for Families, the largest advocacy group for DV and trafficking
victims in the country and am bringing a Federal class-action lawsuit against the NYC, the NYPD, and
the MDAO for blatantly denying me my due process rights, infringing my freedom of speech, denial of
equal process, abuse of process, malicious prosecution and for illegally seizing and searching me
(my phone is STILL being monitored by the NYPD).

FIVE Other women in NYC have been subsequently raped, sexually assaulted, stalked and
masturbated on by at least one man who assaulted me on 7/28/2012 because the NYPD and MDAO
refused to investigate my complaint of assault against him because ADA Strohbehn placed me on a
"do not serve" list and instructed the precinct to not help me. In fact, all other crimes this creep
committed against other women of Gotham happened AFTER he was apprehended and released and
told basically: "its your word against hers" by the 20th pct who arrested him on resisting arrest,
disorderly conduct and felony assault of a police officer charges a month after his assault on me (the
DA instructed him to be only charged on the DO offense and he was given a desk appearance ticket,
NOT arrested for his assault against me a month prior, and released out the back door of the 20th pct).
So this person, Rami Baly, went on to continue his crime spree against women because he had been
given the green light to do so by the city because of their animus towards me. Maybe you can verify
what I say is true by looking up SOME of his charges for crimes against other innocent women:

| Case # | Defenda nt | Sum mons # | Appe aranc e Date | Court | Ju dg e | Pa rt |
|---|---|---|---|---|---|---|
| 2013NY03 1505 | Baly, Rami | | 08/07 /2013 | New York Criminal Court | | A |

| 2013N Y0491 35 | Bal y, Ra mi | 08/07 /2013 | New York Criminal Court | A |
| 2013C N0003 47 | Baly, Rami H | 08/02 /2013 | New York Criminal Court | |

I had attained a restraining order from the Family Court in Judge Lori Sattler's part as per your instructions in Oct/Nov of 2010 and thus the City of New York had a SPECIAL RELATIONSHIP with me and had promised me protections and police services. Lt. Larocca: if you had not instructed me to do this my case would be MUCH weaker right now because of precedents set in the cases of Riddick and MacLean that state that the NYPD does not HAVE to give assistance UNLESS there is a pre-existing promise to protect or special relationship between the victim and the city. I am ETERNALLY GRATEFUL TO YOU FOR THIS STEWARDSHIP AND ADVICE.

I need your assistance in proving that ADA Maria Strohbehn instructed you at the precinct to not investigate my claims of battery and trafficking and to not give me any assistance unless pre-approved by the MDAO. Please can you contact me to discuss this and other affidavits I need from you. I know what happened to me sat hard in your heart. I know you know the law, which mandates investigations and procedure to be followed when a complainant asserts certain types of crimes have been committed against them. Both McKinney's Crime Victim's Statutes and the NYPD handbook call for procedures and investigative mandates to be followed in situations such as I presented that were blatantly ignored.

I also know that the reason that my batterer was given special treatment and that I was thrown under the bus is that ADA Strohbehn and her "Crew Cut" team needed his assistance in making major cases against gangs in Harlem. My batterer was shot in front of the 28th precinct by an armed assailant who had been attempting to rob his weed spot on w 120th st. in December of 2010. That shooter turned out to be a young teen member of a mid-Harlem Gang centered around 137th st. He was apprehended and charged with attempted murder. Strohbehn and her team needed my batterer to cooperate with their investigation into his gang ties. Following, as I had been actively trying to make complaints against him for his violent abuse the only alternative Strohbehn had if she wanted to keep her case alive and turn the shooter into an informant by offering him a lower plea in exchange for intel about his gang was to paint me as a fabricator in order to deny me police services and protections in order to protect my batterer and keep him cooperating.

This scheme is not only highly illegal but if left unchecked is a TEMPLATE for future prosecutors and police to utilize in similar situations. I know you don't wish for part of your legacy with the NYPD to be that of creating a cookie-cutter template for re-victimizing women already horribly victimized and abused. I know the person you are and all the things you did to try to help me and I need your help Lt. Larocca. Please reach out to me ASAP. I need someone from the precinct to aver that Strohbehn instructed the 28th precinct/NYPD not to respond to my complaints or take me seriously and to label me as "crazy" alternatively. This action was blatantly against my Constitutional Rights to equal protection under the law, not to be illegally searched and seized, not to be unusually punished, et al.

I know this much and so do you. My case is VERY strong but I need this piece from you Lt. Please reach out to discuss what you can do to help. I've come a VERY long way in rebuilding my life since I last saw you in late 2012/early 2013 (I HAVE TAKEN THE LSAT AND AM APPLYIN TO LAW SCHOOL THIS FALL SO I CAN SPEND MY LIFE HELPING OTHER VICTIMS WHOSE LIVES HAVE BEEN FELLED

BY SECONDARY VICTIMIZATION) but my life is still very very different from the way it was before my batterer. I need you to help me bridge the gap between who I was and who I am now. Please Lt.; I'm begging you not to ignore me. Prosecutors should not be allowed to over-rule the judgment of experienced Police in the name of case-building (and career-building too!).

Lastly, remember please that I am a survivor of 9/11 and that I deserve to live a life in NYC free from continuous retribution from law enforcement and denial of services. I deserve to be protected and to feel safe here. I am a FOURTH GENERATION daughter of the city of New York and no little mewling ingénue imported for service by the MDAO from Maryland who has NOT a CLUE about the intricacies of city living and the special mysteries of Harlem has the right to take this away from me. Strohbehn already has taken everything from me: my reputation, my career, my unborn child, my sense of place and pride in the world, my friends and family. Please don't let her have the last word Lt. Larocca: pretty please I know you can help me.

Humbly,
Kelly

**Exhibit G**

http://www.nytimes.com/2014/12/07/magazine/cyrus-vance-jrs-moneyball-approach-to-crime.html?_r=0

**Magazine**

# Cyrus Vance Jr.'s 'Moneyball' Approach to Crime

By CHIP BROWNDEC. 3, 2014

Photo



Cyrus Vance Jr. Credit Lee Friedlander for The New York Times

Advertisement

Advertisement

Continue reading the main story

Continue reading the main story Share This Page
- Email
- Share
- Tweet
- Pin
- Save
- more

Continue reading the main story

A glance at New York City crime statistics might lead you to conclude that Cyrus Vance Jr., the district attorney of New York County, no longer works in what William Travers Jerome, who held the job more than a century ago, once called "the mouth of hell." Nowhere have declining crime trends been more striking than in Manhattan, where last year burglaries, shootings and murders were the lowest since the city began keeping formal records in the early 1960s; so far this year, statistically speaking, the epidemic of civility rages on. It's still a shock — where did Gotham go, the dangerous dark of nighttime Central Park, the East Village addicts brandishing box cutters, the cardsharps and sallow denizens of Times Square, which now seems overrun by Elmo impersonators and wide-eyed naïfs in fanny packs?

## Stories from Our Advertisers

- 
- 
- 
- 

Continue reading the main story

## Related Coverage

- 



### New York Initiative to Help Other Cities Clear Rape-Kit BacklogsNOV. 12, 2014

- 



### Cyrus R. Vance Jr. Found Own Way to Manhattan District Attorney's OfficeDEC. 27, 2009

- 



# Vance Is Winner in Primary Vote to Replace MorgenthauSEPT. 15, 2009

Vance is the fourth elected district attorney in 75 years to head what has been hailed as the model ministry of criminal justice since the arrival in 1935 of Thomas E. Dewey, who made a name for himself as the Gangbuster and established the office's tradition of nonpartisan professionalism. He was succeeded by Frank S. Hogan, Mr. Integrity, who served for 32 years and stepped aside in December 1973, just three months before his death. After a special election, Robert M. Morgenthau, a former federal prosecutor from the Southern District of New York, began his 35-year reign. At the time, Morgenthau recalled recently, crime was "endangering the economic and civic viability of the city." He added dozens of detectives to the staff, boosted salaries and hired accountants to tackle white-collar crime. One of his major innovations was to "vertically integrate" prosecutions so that one assistant D.A. handled a case from arraignment to trial. There were 648 murders in Manhattan in the first year of Morgenthau's tenure; in 2009, when he retired, there were 59.

## Continue reading the main story

'The question I had when I came in was, Do we sit on our hands waiting for crime to tick up, or can we do something to drive crime lower?'

Campaigning on the themes of enhancing safety and fairness, and lifted by Morgenthau's endorsement, Vance won a three-way primary race for the D.A.'s office in 2009 and then carried the general election. In November 2013, he was re-elected with only token opposition. With violent crime at historic lows since its peak in the early 1990s, you might think being D.A. today is an afternoon nap compared with when Dewey was tilting at municipal corruption and trying gangsters like Lucky Luciano; or when Hogan was courting controversy with prosecutions of Lenny Bruce and antiwar demonstrators at Columbia University; or when Morgenthau was running the show with civil society hanging by a thread.

And to be sure, at the start of his second term in January, Vance was still intent on answering the questions he confronted when he first sought the job of overseeing 535 lawyers in the mouth of hell (which even with the recent renovations is still suffused with the purgatorial gloom of Manhattan's massive Criminal Courts Building, where most of the offices of the D.A. are housed and where a power failure caused by a hurricane can produce a Dickensian tableau of prosecutors handwriting charging documents by candlelight). In an era of low crime, what was the job of the D.A.? Who was to say the city couldn't be any safer, or what anti-crime ideas and utopian dreams were too far-fetched to pursue?

Advertisement

## Continue reading the main story

In 2010, at the start of his first term, Vance drew up a list of 20 things to do; four years later he had checked them all off, except for learning Spanish. He helped create a new court that offered alternatives to prison for mentally ill defendants whose crimes might have stemmed from treatable conditions. He set up a "conviction integrity program," which reviewed innocence claims in more than 160 cases and vacated four convictions. He pushed to raise the age of criminal responsibility to 18 — New York and North Carolina are the only states that treat 16-year-olds as adults. He lobbied for the New York's All Crimes DNA law, which doubled the kinds of crimes for which DNA evidence could be collected. He focused on crimes where the numbers in New York were going the wrong way: computer fraud, identity theft, abuse of the elderly and domestic violence. He reorganized office units and bureaus and shaved nine hours off the time between arrest and arraignment, freeing up cops who used to have to wait so long to give statements that they would sometimes bring lawn chairs to the intake area in order to have a place to sit. Drunken-driving dismissals, according to the D.A.'s office, were down 81 percent; cases tossed because prosecutors violated speedy-trial rules were down 91 percent. Felony conviction rates, which were lower in Manhattan in 2009 than in the other four boroughs, now trailed only the conviction rate in Queens.

But Vance's most significant initiative, one that has been emulated in jurisdictions from Brooklyn to San Francisco, has been to transform, through the use of data, the way district attorneys fight crime. "The question I had when I came in was, Do we sit on our hands waiting for crime to tick up, or can we do something to drive crime lower?" Vance told me one afternoon in his eighth-floor office at the Criminal Courts Building in Lower Manhattan. "I wanted to develop what I call intelligence-driven prosecution."

Preparing to run in 2009, Vance studied "community-based prosecution" programs in Washington and consulted with experts in Milwaukee and San Francisco. The concept of expanding prosecution strategies to address neighborhood concerns emerged in the early 1990s as prosecutors and police departments grappled with an epidemic of violence, drug abuse and "quality of life" issues. Inspired by "broken windows" policing strategies advocated by William J. Bratton, who at the time was head of the city's transit cops and is now the New York City police commissioner, D.A.s began to prosecute offenses once considered small potatoes. The iconic example in New York was the campaign against the "squeegee men" cleaning car windshields when drivers were trapped in traffic.

The community focus was effective as far as it went, but there had been a revolution in the use of data over the last 20 years in areas as disparate as retailing, baseball and, in the prime example of the N.Y.P.D.'s CompStat program, policing; Vance thought prosecutors should get in on it. He sat down with a whiteboard, a cup of coffee and one of his first hires, an imaginative, dark-haired lawyer named Chauncey Parker, 54, who started his career under Morgenthau, spent a decade as a United States attorney and now, as Vance's executive assistant D.A. for crime-prevention strategies, had the job of dreaming up ideas, no matter how outlandish, that might reduce crime. It was glaringly evident to both men that assistant D.A.s fielding the 105,000-plus cases a year in Manhattan seldom had enough information to make nuanced decisions about bail, charges, pleas or sentences. They were narrowly focused on the facts of cases in front of them, not on the people committing the crimes. They couldn't quickly sort minor delinquents from irredeemably bad apples. They didn't know what havoc defendants might be wreaking in other boroughs.

Advertisement

## Continue reading the main story

By May 2010, Parker and Vance had roughed out the structure of the so-called Crime Strategies Unit (C.S.U.). They divided Manhattan's 22 police precincts into five areas and assigned a senior assistant D.A. and an analyst to map the crime in each area. C.S.U. staff members met with patrol officers, detectives and Police Department field intelligence officers. They asked police commanders to submit a list of each precinct's 25 worst offenders — so-called crime drivers, whose "incapacitation by the criminal-justice system would have a positive impact on the community's safety." Seeded with these initial cases, the C.S.U. built a searchable database that now includes more than 9,000 chronic offenders, virtually all of whom have criminal records. A large percentage are recidivists who have been repeatedly convicted of grand larceny, one of the top index crimes in Manhattan, but the list also includes active gang members, people whom the D.A. considers "uncooperative witnesses," and a fluctuating number of violent "priority targets," which currently stands at 81.

But assembling data was meaningless without a timely need of distributing it. In-house software programmers made key refinements to what is now considered the nerve center of the office, the Arrest Alert System. When someone in the Arrest Alert System is picked up, even on a minor charge or a parole violation, or is arrested in another borough, any interested prosecutor is automatically pinged with a detailed email. People outside the D.A.'s office like parole officers or police intelligence officers are often notified, too. The database can be programmed to send arrest alerts for a particular defendant, a particular gang, a particular neighborhood or housing project, and can be sorted to highlight patterns of crime from bike theft to homicide.

"These are people we want to know about if they are arrested," says Kerry Chicon, who started as the Crime Strategies Unit prosecutor in Area 3 and was promoted to C.S.U. chief in January. "We are constantly adding, deleting, editing and updating the intelligence in the Arrest Alert System. If someone gets out of a gang, or goes to prison for a long time, or moves out of the city or the state, or ages out of being a focus for us, or dies, we edit the system accordingly — we do that all the time."

Chicon, a 43-year-old mother of four, usually starts her morning reviewing the night's haul of 30 to 35 arrest alert emails as she drops her kids off at school. "C.S.U. prosecutors don't have to try cases — our job is to help assistant district attorneys understand whom they are prosecuting," she says. "Every morning, I talk to my five Area A.D.A.s, who are experts in their areas. We decide whom we should try to pull out for a debriefing. We don't debrief people arrested for felonies because we don't want to compromise a case. We pull people arrested on low-level misdemeanor charges, maybe two or three a week. We read them their Miranda rights. About 80 percent of them will talk. If you speak to a 16-year-old, they might tell you, 'This kid is running things, this kid is a hanger-on.' That's how we find out information like whether a gang has changed their name. We took down the Flow Boyz gang at the Robert F. Wagner housing project in 2012. But a lot of those gang members have aged out, and now there's a new group of 14- and 15-year-olds who want their own set name. Through debriefings, we learned they call themselves Only the Wagner."

Advertisement

Continue reading the main story

The Arrest Alert System was the first of four programs created or tweaked by the C.S.U. using a combination of in-house technology and commercial software. The DANY (the District Attorney of New York) InPho program analyzes recorded inmate phone calls from Rikers Island. SCIM (the Surveillance Camera Interactive Map) shows the locations of and contact information for some 6,000 public and private surveillance cameras in Manhattan, making it possible for prosecutors to know whom to call at the 109th Street and Madison Avenue Dunkin' Donuts if they want to see what was recorded on the camera behind the cash register.

C.S.U. "violence timelines" reveal patterns around certain housing developments and neighborhoods, including shooting incidents that didn't generate a police report but that prosecutors were able to substantiate through debriefings or reports on social media. Probably the most comprehensive database is the Crime Prevention System, which targets violent crimes and gathers on one spreadsheet the sort of information that used to be scattered on legal pads or parked in some retired detective's head — details about a defendant, including nicknames, which can be linked to additional information: friends, tattoos, telltale scars, Facebook entries, geo-coded street addresses, debriefing tips, excerpts from jailhouse phone calls.

Photo



Cyrus Vance Jr. (a future Manhattan district attorney) and Sr. (a future secretary of state). Credit Photograph from the Vance Family

"It's the 'Moneyball' approach to crime," Parker told me. "The tool is data; the benefit, public safety and justice — whom are we going to put in jail? If you have 10 guys dealing drugs, which one do you focus on? The assistant district attorneys know the rap sheets, they have the police statements like before, but now they know if you lift the left sleeve you'll find a gang tattoo and if you look you'll see a scar where the defendant was once shot in the ankle. Some of the defendants are often surprised we know so much about them."

In speeches praising intelligence-driven prosecution, Vance often cites the case of a 270-pound scam artist named Naim Jabbar, who for more than a decade made a living in the Times Square area bumping into pedestrians and then demanding money, saying they had broken his glasses. Convicted 19 times on the misdemeanor charge of "fraudulent accosting," Jabbar never served more than five months in jail until he was flagged by the C.S.U. His next arrest, in July 2010, triggered an alert. Instead of being offered a plea bargain, he was indicted and subsequently convicted on a felony robbery charge, and sentenced to three and a half to seven years in prison. With time served before his conviction, he was soon paroled and then arrested again, in July 2014, for another broken-eyeglasses incident and charged with robbery and grand larceny.

More broadly, working with the Police Department and following a plan based on information developed by the C.S.U., the Violent Criminal Enterprises Unit, which Vance created in his first term, began taking down the most violent of Manhattan's roughly 30 gangs; since 2011, 17 gangs have been dismantled, including three broken up last June at the Manhattanville and Grant housing projects, resulting in the largest number of gang indictments in a single operation. "There's a reason murders in Manhattan went from 70 in 2010 to 29 so far this year," Karen Friedman Agnifilo, former chief of the Trial Division, told me late last year. (In January, Vance promoted Friedman Agnifilo to the No. 2 job, chief assistant district attorney.) "We figured out who are the people driving crime in Manhattan, and for four years we focused on taking them out."

Advertisement

### Continue reading the main story

**One evening shortly** before Vance won his second term, I locked the only bicycle I haven't had stolen in New York to a No Parking sign in front of a restaurant in the East Village and lugged the front wheel inside, where Vance was nursing a club soda at the bar. "You're afraid of being robbed while having dinner with the district attorney?" he said. "That's an insult to me!"

Vance, now 60, is said to be funny in private, but as the white hat of moral order in Manhattan, he makes no apologies for his public persona, which is earnest, thoughtful, buttoned up and not unduly colorful. Not really colorful at all, in fact. He has a halting speaking style and the subdued manner of a man constrained by temperament, training and the peculiar fetters of his public duty.

"I would be more interesting to the newspapers if I showed up at crime scenes in a yellow coat barking orders into a two-way wrist watch," Vance told me. "But that's not me."

Vance was born in New York, the youngest of five siblings. His mother, Grace Sloane, who was called Gay, grew up dressing for black-tie dinners on the Philadelphia Main Line in the socially prominent family that founded the W. & J. Sloane furniture business. His father, Cyrus Roberts Vance, was born in West Virginia, where the idyll of his childhood ended at 5 when his father died of pneumonia. Vance's parents were both public-minded. His mother served as president of the New York Urban League. His father, after Yale, Yale Law School and a stint in the Navy, shuttled from a partnership at the prestigious law firm Simpson Thacher & Bartlett to various posts under three United States presidents and emerged as an icon of the Eastern establishment — a lawyer-counselor-diplomat who, after three years as secretary of state, resigned without fanfare in 1980 when President Jimmy Carter, against Vance's advice, authorized the ill-fated attempt to rescue the American hostages in Tehran.

Cy Vance Jr. grew up among the elite of Washington after the family moved to the capital from the Upper East Side in 1960. His father took him fishing at Camp David. He spent the night at the White House and met President Lyndon B. Johnson when he was 12. He followed his father to Yale, where he studied American history. Determined not to become a lawyer, he peddled oil-marketing services in West Africa. He wasn't very good at it, and after five years he reconciled himself to his father's profession, enrolling at the Georgetown University Law Center. He graduated in 1982, shortly before his 28th birthday. Robert M. Morgenthau liked to say he had one rule — "never do a politician a favor"— but he hired his share of celebrity lawyers' sons, and Vance landed a coveted assistant D.A. position. He was assigned to Trial Bureau 80, where the halls were piled with cardboard boxes and the blue carpet underfoot was so memorably gross that Vance was given a framed swatch of it as a keepsake when it was finally replaced. "That time was the wild west," recalled Jeffrey Schlanger, Vance's chief of staff, who got to be friends with him when they worked together in the Rackets Bureau. "The crack epidemic was going. Arraignments had a feeling of controlled chaos. I remember one mentally ill defendant pulling feces out of his pants. Every day was a scramble. We were learning things they didn't teach in law school."

Advertisement

### Continue reading the main story

Trials were what appealed to Vance —- the strategies, the characters, the drama of verdicts, the satisfaction of knowing his work mattered. He handled cases from murder to art theft to animal cruelty and made friends with people you don't normally see at Yale reunions. He loved getting up in the middle of the night to inspect crime scenes with detectives from the robbery squad. "We focused on pattern robberies," he recalled, "like the guys who specialized in shotgun stickups of Häagen-Dazs stores."

After six years, Vance was ready to get out from under the shadow of his father's fame. Against the advice of his dad, who said he was "waving the white flag" on his career, he found a job as an associate at Culp Dwyer Guterson & Grader in Seattle, where he moved with his wife, Peggy McDonnell, whom he'd

married in 1984. He proved adept at white-collar criminal defense work, eventually made partner and then seven years later left to start his own firm. "He was *the* criminal lawyer in Seattle," recalled Robert Sulkin, a founding member of McNaul Ebel Nawrot Helgren & Vance. "When you got into trouble, you called Cy Vance."

Vance handled most of the firm's criminal work, taking cases that political opponents would later try to use against him, like his defense of Joseph Meling, an insurance salesman convicted of killing two people in an attempt to cover his tracks after trying to poison his wife with cyanide-laced Sudafed. Years at the defense table underlined for Vance some of the prosecutor's powers. "The philosophy I have about law enforcement — enhancing public safety while enhancing fairness — didn't come from my father, and it didn't come from reading or professors in law school," Vance said. "It came from years of practical experience as a prosecutor and a defense attorney."

On trips back East, Vance would call on Morgenthau. In January 2002, his father died after a long decline. Two years later, with their children, Simon and Clare, on the brink of high school, and Vance's mother and his sister Amy debilitated by illness, Peggy thought it was time to come home. With the help of Morgenthau and Eliot Spitzer, then the New York State attorney general, whom Vance met in the Rackets Bureau, Vance landed a job in New York as a partner at a boutique white-collar firm, Morvillo Abramowitz. He had been back in the city a year or so when he confided to his wife that he was thinking of running for Manhattan district attorney if Morgenthau retired. His political résumé at the time consisted of passing out fliers for Lyndon Johnson and a couple of days of advance work for Gary Hart's unsuccessful presidential bid in 1984.

## Continue reading the main story

'We figured out who are the people driving crime in Manhattan, and for four years we focused on taking them out.'

**So numerous were** the stumbles in Vance's first term that for a while it looked as if he might not have the luxury of a second. At one point the Data D.A. had a far more formidable reputation on the Facebook pages of East Harlem gangs than he did in the New York press. The New York Post labeled him, "Soft Cy," "Manhattan's hapless district attorney" who learned to fight crime in the "espresso bars of Seattle."
Advertisement

## Continue reading the main story

"Cy's first 18 months in office were so bruising that having no opposition for re-election was something I never expected even a year ago," says Linda Fairstein, a former Manhattan sex-crimes prosecutor and Vance adviser. The nadir of his rookie woes came in August 2011, when the sex-crimes prosecution of the French politician Dominique Strauss-Kahn collapsed. It's hard to imagine Vance will ever again find himself in a maelstrom like the drama of Strauss-Kahn and the Sofitel housekeeper Nafissatou Diallo: 19 New York Post cover stories; writhing news-media scrums outside the Criminal Courts Building; armchair prosecutors dissecting how the green D.A. and his mismanaged minions were in over their heads. Kenneth Thompson, who at the time was the attorney for Diallo and now is the district attorney in Brooklyn, tore into Vance in front of TV cameras: "If the Manhattan district attorney, who is elected to protect our mothers, our daughters, our sisters, our wives and our loved ones, is not going to stand up for them when they're raped or sexually assaulted, who will?" (Many months later, when Thompson was preparing to run for public office himself, Vance says Thompson privately apologized. Thompson says that he did call to say he shouldn't have said Vance was afraid to try the case, but that that didn't constitute an apology.)

I asked Vance what he would do differently if he could replay those tumultuous weeks. "I probably would handle it exactly the same way," he said after a long pause.

Nothing different?

"I would like to have had the time the federal government has between arraignment and indictment. By law we have six days. Federal prosecutors have 30. That forced everybody to make rapid decisions. But I think at every stage we made the best decisions we could."

Even Vance's wife, Peggy, who had joined us for dinner, wondered if he wouldn't change his approach.

"I would probably move more slowly if I had to do it again," he conceded. "But what went right in DSK — although others might not see it this way — is that when we assessed the information we had that undermined the case, we didn't hide it. I look at the DSK case as a paragon, because we absolutely believed this poor woman should be believed over this powerful man, and when additional facts came out, we were willing to show them to the defense."

Vance critics have generally been focused on less sensational issues, questions of policy and priorities for which they find the D.A.'s leadership wanting. Did the Manhattan D.A., they ask, really need to set up a two-year study with the Vera Institute of Justice to realize the criminal-justice system was plagued by racial bias? And in light of its entrenched inequities, aren't databases and targeted intelligence-based prosecution especially problematic?

Continue reading the main story

# Recent Comments

## psqm

December 6, 2014

kudos cy vance. it's not the change in the economic make up of manhattan that has brought crime down, the rich don't move into rough...

## EMJ

December 6, 2014

the only reason Vance's office had to indict DSK in six days was that it would not consent to release him on bail (which happened later). ...

## EuroAm

December 5, 2014

Perfection: An admirable yet unobtainable goal...

- See All Comments

"When prosecutors begin to compile databases and start doing so-called 'smart prosecutions,' you have to ask who is getting in the databases, what are the criteria and where are the outside checks?" says Steven Zeidman, director of the criminal-defense clinic at the CUNY School of Law. "More than a thousand people are arrested in N.Y.C. each day, and the overwhelming and disproportionate number of them are people of color arrested for 'broken windows' type offenses like riding a bike on the sidewalk or jaywalking. I was in court with a kid arrested for jaywalking; the arresting officer was from the gang unit, and he stopped the kid because he was wearing a red shirt that, according to the police, happened to be a gang color. He wasn't in a gang, but he's probably now in a database."

Advertisement

Continue reading the main story

Vance has also been criticized for shrinking from leadership on the issue of marijuana arrests in the city. In recent years, tens of thousands of New Yorkers — a vast majority of them blacks and Hispanics — have been arrested for small amounts of marijuana after being searched under the Police Department's now-scaled-back stop-and-frisk policy. Marijuana offenses were the top arrest category for the entire program in 2012, according to a study by the New York chapter of the American Civil Liberties Union. Vance has long supported reforming the penal code to treat small amounts of pot "in public view" as a violation resulting in a fine rather than a misdemeanor, which might lead to a jail sentence and a criminal record. But his office has declined to prosecute just under 7 percent of the 54,000 misdemeanor pot arrests in Manhattan since 2009, and it was Vance's old antagonist, the Brooklyn district attorney Kenneth Thompson, who declared his office would no longer prosecute such cases.

Vance's efforts to make prosecutors smarter — "to play offense instead of defense," as he has said — depend on what he calls "extreme collaboration" with the Police Department, cooperation that has increased notably since the arrival in January of William Bratton as police commissioner. Prosecutors say they now have access to precinct-level commanders they almost never had before. The complicated anti-gang cases mounted in Manhattan — like the one at the Manhattanville and Grant housing projects last June, which resulted in 103 arrests — were built by teams from the D.A.'s office working hand in glove with the investigators from the police and the city's Department of Correction. But critics argue that in doing so, prosecutors risk becoming extensions of the police force.

"Prosecutors are supposed to be the gatekeepers of the criminal-justice system," Zeidman told me. "They should maintain a healthy distance from the police so they can evaluate the constitutionality and appropriateness of what the police are doing. If they had been fulfilling that function all along, we might

never have had scandals like the rampant Fourth Amendment violations uncovered in the federal stop-and-frisk litigation."

## Continue reading the main story

'When prosecutors begin to compile databases and start doing so-called "smart prosecutions," you have to ask who is getting in the databases, what are the criteria and where are the outside checks?'

**It's hard to know** how much one person or policy can affect the crime rate, and consequently how much credit or blame should be assigned when things go well or don't. Evaluations of anti-crime measures often conflate cause and correlation. The sun comes up, the roosters preen. Raymond Kelly, the former New York City police commissioner, once said that taking credit for a decline in crime is like taking credit for an eclipse, but he, too, was quick to attribute auspicious trends to his department's strategies and tactics. The N.Y.P.D.'s seminal crime-mapping methodology CompStat surely made cops more effective and helped reduce crime, and yet crime began its epic decline in 1990, four years before CompStat was implemented. For years Kelly and former Mayor Michael Bloomberg insisted the city's stop-and-frisk program was the key — but then, as opponents asked, why did crime continue to go down even when stop-and-frisk was curtailed by public pressure in 2012?

Advertisement

## Continue reading the main story

Apart from effective police work, studies have attributed the decline in violent crime to a confounding hash of variables: demographic trends, fashions in drug abuse, a surge in public-housing programs, the proliferation of surveillance cameras, decreases in lead toxicity, increased incarceration rates (and paradoxically in recent years, increased prison discharge rates), even the availability of abortion. Morgenthau credits the pivotal role of the district attorney, noting Manhattan had 39 percent of the city's homicides when he took office and only 12 percent in the year before he finished — evidence to him of the difference a D.A. makes given that the city's boroughs all have the same police force. In his final report, he tartly observed that the 90 percent decline in murders in Manhattan during his tenure was "not due simply to the dawn of gentler times."

But of course gentler times were something to hope for and to cultivate if possible. Vance pressed the point to his staff: Their pole star wasn't convictions but safety, a goal as readily attained by preventing crime as by prosecuting it. With asset-forfeiture money seized from drug dealers, Vance has opened 10 Manhattan gyms that would otherwise be closed on weekends and started sports programs for 11-to-18-year-olds called Saturday Night Lights. The community-affairs unit hired professional sports trainers to run drills and academic advocates to work as tutors and mentors and to keep track of how the players are faring in school. "We ask ourselves, Are we doing everything possible to reduce crime?" Chauncey Parker says. "If an overwhelming number of Rikers Island inmates don't have high-school diplomas, maybe we should be finding ways to help people stay in school and graduate. It seems obvious, but it's not until someone starts doing it."

Parker challenged C.S.U. prosecutors to come up with their equivalent of the Apollo moon project. Their answer was reforming public housing in the city, including the Polo Grounds, St. Nicholas and Wagner developments, and they are drawing up plans with the expectation that they can drive down crime.

A number of other cities and states are studying how the Manhattan D.A. has developed and deployed data. At a February 2013 conference in Miami, Kerry Chicon and David O'Keefe, then the C.S.U. chief, received numerous requests for meetings after their presentation on the Arrest Alert System. Philadelphia now has a rudimentary intelligence system modeled on Manhattan's C.S.U. So does the Delaware Department of Justice. "The Manhattan C.S.U. prosecutors spent a day with us, going over intelligence-driven models and how they analyzed cases," says Kathleen M. Jennings, the state prosecutor and head of the criminal division. "We developed an arrest-alert system that identified 50 high-risk offenders. In May we created our crime-strategies unit. Wilmington has one of the highest violent-crime rates in the country, but 1 to 2 percent of the people are doing 70 percent of the crimes. We've taken dozens of high-risk offenders off the street."

Advertisement

## Continue reading the main story

Advertisement

## Continue reading the main story

When he took office in 2011, District Attorney George Gascon of San Francisco was shocked by the paucity of data-informing prosecutions. "It wasn't even a bell that was being rung," says his chief of staff,