Cristine Soto DeBerry. "We spent a day in Manhattan learning the ropes of how they used data, and Kerry Chicon came and spoke to our board of supervisors. It's very clear to our D.A. that we are overincarcerating, and we need to do something different. Jail is not an economically sustainable model. We need to know for whom jail is appropriate and whom it isn't. That's where data becomes very useful."

In some ways it may be easier to be the district attorney of Manhattan in an era when New Yorkers aren't so inclined to do terrible things to one another. And yet the Manhattan D.A.'s office still handles more cases than the entire United States Department of Justice. Vance's predecessors didn't have to cope with the terabytes of digital evidence now central to many prosecutions, or with malign enterprises particular to our time, like cybercrime (200 to 300 complaints a month in Manhattan alone) and lone-wolf terrorism.

Vance was especially frustrated that his office had been unable to stem the upsurge in domestic violence. While the index felonies were going down, misdemeanor arrests in Manhattan were going up. And arrests for grand larceny, many of which involved iPads and iPhones, were running counter to the positive crime trends.

"I don't want to be known as the D.A. whose main mission was reducing property crime, but it is important we excel even in these kind of cases," Vance said. "The bar Bob Morgenthau set when he left was very high. It's my job to raise it."

It was almost midnight, and he was sitting in a pub in Chelsea reflecting on his first four years on the job. The supporters who helped him secure another term had gone home. "So," asked his wife, Peggy, "what three things have you learned about yourself?" Vance gazed at her evenly, well aware of the perils of domestic cross-examination. "You just have to be honest," she said.

"I'm thinking," he said, looking, for a moment, as if he would rather be coping with the recent outbreak of mold at their country house.

"Cyrus has always been a question to himself," Peggy said to me. "The things that should make him happy didn't make him happy. He's never had the ability to separate himself from his work."

Jimmy Zaccari, a detective on Vance's protection detail, was waiting outside in a black Suburban to drive the couple home. It was a quiet night, except for the cry of far-off sirens. Changed as it might be, Manhattan was still the place where Jose Pimentel plotted to terrorize New Yorkers by detonating pipe bombs, and Corey Dunton stands accused of firing a gun at skaters in Bryant Park, and Cesar Lucas raped a woman on the West Side. It was still the place where, among thousands of nonviolent but still disgraceful affronts to the civility of city life, Dr. Lawrence Levitan stole insurance money from a hospital and Naim Jabbar wrung cash from people for eyeglasses they didn't break. It was still the place where even a Times Square Elmo impersonator had been jailed for harassment and extortion. Gentler times in Manhattan? Maybe someday — but not tonight. Sirens in the night meant cases in the morning.

**Correction: December 7, 2014**

An article on Page 22 this weekend about Cyrus Vance Jr., the district attorney of New York County, describes incompletely a shooting incident at the Bryant Park ice rink in November 2013 and misspells the given name of a man charged with shooting skaters. He is Corey Dunton, not Cory, and he has pleaded not guilty and is awaiting trial; it has not been established that he "fired a gun at skaters." In addition, the article misstates the length of time that Robert M. Morgenthau served as district attorney of New York County. It was 35 years, not 34.

**Exhibit H**

Adam Gargani

To Whom It May Concern:

This reviews a phone conversation I had with the New York City's District Attorney's Office.

On February 2 of 2011 I received a voicemail message from Maria Strohbhen stating she was from the District Attorney's Office and was calling as part of a matter she was handling with one of my tenants, and requested a return call, which I did.

The matter involved Kelly Price who was my tenant at that time at 237 West 120th Street, #1 New York, NY 10027 from July of 2007 to August of 2013.

Miss Strohbhen had several questions to ask me concerning events that had taken place at the building.  Specifically these involved incidents where the police had been called and other events that involved altercations between Ms. Price and a man.

Miss Strohbhen asked me about my knowledge of these events.  In both the structure of the questions and the inflection with which these were asked, it was apparent that the purpose was to question whether these events happened, and as it was directly communicated, to question whether Ms. Price had been telling the truth, which she posed was not the case.

I informed Miss Strohbhen that I was aware of issues taking place by reports from my other tenants as well as conversations with Ms. Price.  I told Miss Strohbhen that although I did not have any direct knowledge of what took place since I did not live at the building, and was not present when they occurred, I also had no reason to question the veracity of either the reports from my other tenants or Ms. Price.

I would characterize the reaction of Miss Strohbhen to my responses as frustrated or annoyed.

She indicated that she was dealing with Ms. Price and was looking to assemble information that refuted claims that Ms. Price had made.  She suggested that Ms. Price had been making false statements.  I told Miss Strohbhen that I although I

could not comment on any specific event on the basis of other than what I had been told, that in my dealings with Ms. Price as a tenant in general I had no reason to presume that her claims, or the reports of my other tenants, were less than the truth.

The names of other tenants or neighbors were not requested

Miss Strohbhen gave me the impression she was less than satisfied with the outcome of her call and ended it abruptly

Sincerely,

Adam Gargani
Landlord and Owner of 237 West 120th Street, NY NY 10027

EVergreen 9- Corporation
267 Carleton Avenue
Suite 202
Central Islip. NY 11722

347 237 0100

8 October 2013

**Exhibit I**

Elizabeth Walker
235 West 120th Street Apt 2
New York, NY 10027
(917) 575-9600

April 22, 2014

To Whom It May Concern:

I was one of Kelly Price's neighbors when she lived at 237 West 120th Street. I have lived at 235 West 120th Street for five years. I am an attorney and have been a member of the New York State Bar for over seven years.

During the course of our relationship as neighbors and eventually as friends, Kelly shared with me the trouble she had obtaining police assistance from members of the 28th Precinct on multiple occasions when she had been attacked by people in our neighborhood, including her ex intimate partner, Raheem Powell. I did not witness the events or attacks Kelly described to me, but throughout 2011 and 2012 she would cry and talk to me whenever she was assaulted. Kelly believed the women who assaulted her were associated with either her ex, his alleged drug dealing associates or his childhood cronies. Kelly was particularly dismayed that the police refused to take her reports, follow up on assaults against her person, or regard her as a member of society needing protection in general. She told me that officers in the precinct told her that the district attorney's office had instructed them not to assist her. Candidly, I did not entirely believe that the police would refuse Kelly, and I suspected that she was omitting some dispositive reason why the police were reluctant to intervene on her behalf against her various alleged attackers.

On the evening of October 18, 2012, Kelly called me crying and asking for my help. I observed her distraught and injured after she said she had been assaulted in broad daylight on the corner of our block, at 120th Street and St. Nicholas Avenue, at approximately 5:30 p.m. while she was en route to her home from the 125th Street subway. I observed that she was disheveled, her stockings were torn and her knees and hands were bruised and bloodied. Kelly was nearly hysterical, and I had to calm her down and give her medical assistance. Kelly related that a purported heroin dealer named Willy who was known to many residents in the neighborhood (he purportedly operated his business from a visible stoop on Saint Nicholas Avenue) had "jumped" her and hit her in the face, spit at her and pushed her onto the sidewalk, all the while screaming insults at her. I do not recall what Kelly said she said to him before or after the attack, but I do recall that she said she did not provoke him or retaliate against him physically. I took pictures of Kelly and her wounds, and encouraged her to call 911 for assistance in reporting the crime. Kelly stated that she already had called the 28th Precinct and that a patrol car had been sent to the scene of the assault. Kelly said that when the officers arrived they refused to take her report and called her crazy. Kelly also stated that she had then walked to the precinct, three blocks away, for help and had been rebuffed by the desk sergeant, who Kelly said ridiculed and mocked her.

Page 2 of 2

Notwithstanding her story that she had sought police intervention earlier that day, I insisted that she call 911 again and report the chain of events. She complied.

Eventually another patrol car arrived in front of our building. Two police officers, whom Kelly has since reminded me were named P.O. Longo (shield # 31565) and P.O. Walker, related to us that they were instructed by the station's desk sergeant not to take Kelly's reports. P.O. Walker stated that the District Attorney's office had instructed the precinct not to respond to any of Kelly's calls. I recall being genuinely shocked and outraged to hear this instruction, and further surprised that a young woman, like P.O. Walker, would be tasked by her superiors with being complicit in a practices that left a domestic violence victim without recourse for protection. At this juncture, I introduced myself as an officer of the court and member of the NY State Bar, and reminded the officers of their legal and ethical responsibilities to provide complainants with police services. I recall that the officers responded more favorably to me than they did to Kelly, but I could not discern whether this was the case because I notified them that I am an attorney, or because I'm just someone other than Kelly Price. P.O. Walker stated that she would take basic information about the incident, but she believed that once the precinct began to process the event, it most likely would be "circular-filed" in the trash bin. P.O. Longo gave Kelly an incident ID slip and told her to follow up with the precinct in a few days, then both officers left. I was then, and remain, dumbfounded by what I witnessed transpire that evening.

As a single young woman living and working in NYC, it unsettled me that the police could be so cavalier about Kelly Price's safety. Kelly has since told me that the complaint number she was given months later when she inquired as to why no one had ever followed up with her about the incident was 2012-28-005194. Kelly also informs me that the detective squad at the 28th Precinct closed her incident report without contacting her either to identify the perpetrator of the attack or review the emergency room reports or follow-on orthopedic assessments describing Price's injuries resulting from the attack.

Please feel free to contact me concerning these events.

Sincerely,

Elizabeth Walker

**Exhibit J**

Marilyn Benetatos
231 West 120th Street
N.Y. N.Y. 10027
(212) 663-5372 (home)
(347) 203-2623 (cell)

To whom it may concern:

I was a neighbor of Kelly Price when she lived at 237 West 120th Street.  I am
a manager in Con Edison where I have worked for over 26 years.  I have
approximately 70 employees in my chain of command.  I lived on the street
for over 12 years, walk my dog every day and know and get along with my
neighbors.

In the spring and summer of 2011 and later in 2012, there were some
problems on the street related to young teenagers from other blocks hanging
out on 120th street vandalizing cars, the school yard, fighting in the streets
and being somewhat threatening to others.  As a result, a group of us from the
block attended monthly meetings at the police station to make our issues
known there and to get further on-going support from the police and the
community officer.  The police were very helpful, offered a lot of support and
worked with us and the principal at the local school and facilitated the
problem going away.

After the formal meeting, the head of the station, Captain Rodney Harrison,
invited attendees to speak with him personally about issues of concern.  I
went up to him after one of these meetings and asked him why more was not
being done to help Kelly Price, who everyone knew was being battered.  I
was concerned because the young teenagers seemed to be learning the wrong
thing from the situation.  At that time, Captain Harrison told me that he had
never seen anything like it, but he/the police were told to not respond to Kelly
Price without the direct instruction of the District Attorney's office.  He said
it was strange but indicated that, to some extent, his hands were tied.

I found his response really surprising, so it stood out in my mind.  I don't
remember when or in what circumstances I came to be telling Kelly Price the

details of my interaction with Captain Harrison.

Please feel free to contact me, should I be able to assist you further.

Sincerely,

**Exhibit K**

# The New York Times

N.Y. / REGION

# In Conspiracy Trial, a Query: What, Exactly, Is a Gang?

By JOHN ELIGON    OCT. 11, 2011

From a telephone on Rikers Island, an inmate barked out his orders to a man in Harlem, prefacing them with an explanation.

"Yo, there's money out there right now," the inmate, Jaquan Layne, said. "Go outside."

The man on the other end of the line, Jeffrey Brown, turned to the others inside the Harlem apartment and echoed Mr. Layne's orders: "He said there's money out there right now. Go to the block."

There were other directives: Mr. Brown should collect some money from a woman named Gloria, and if she asked any questions, she should be told that Mr. Brown was "taking care of this now" because Mr. Layne was locked up. Another man in the apartment, Habiyb Mohammed, was asked to monitor the others because they were "new at what they're doing right now, so, like, keep them on point."

This recorded phone call and dozens of others between Mr. Layne and his friends form the central issue in a trial in Manhattan that might at first seem simple: What is a gang?

To Manhattan prosecutors, a gang is a structured criminal organization, and Mr. Layne's worked together as a drug-selling enterprise that defended its turf, a block of 137th Street, with violence.

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 13 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 7 of 71
Harlem Drug Conspiracy Case Is Heading to Jury - The New York Times                    Page 2 of 4

But to the lawyers for Mr. Layne and four co-defendants, the group, while perhaps selling drugs, was anything but a structured trafficking enterprise.

The trial began three weeks ago and is expected to go to the jury on Wednesday.

The defendants, portrayed by prosecutors as gang leaders, are Mr. Layne, 21; his brother Jahlyl, 18; Mr. Brown, 20, who is a cousin; Mr. Mohammed, 31; and Jonathan Hernandez, 19. Jahlyl Layne is charged with second-degree conspiracy. The other four are charged with first-degree conspiracy, which carries a maximum sentence of life in prison.

The prosecutors, who must prove that the defendants agreed to commit a crime and took steps to do so, are using the recorded telephone conversations to illustrate what they say is the behind-the-scenes planning and structuring of a drug organization.

Conspiracy charges are generally difficult to prove, legal experts said, but they offer prosecutors a great reward: they can bring down multiple defendants at once and wipe out entire pockets of crime.

Karen Friedman Agnifilo, chief of the trial division in the Manhattan district attorney's office, speaking generally about gangs and not about the case currently on trial, said, "They might not be as structured or organized, but they're not less violent." She added, "We're focusing on violence."

She said Cyrus R. Vance Jr., the Manhattan district attorney, emphasized a holistic approach in which the office not only prosecuted violent groups, but also promoted community-building activities to help keep young people away from crime.

Law enforcement authorities said that modern-day gangs in New York City shared several characteristics: members tend to be young, under 20; they are territorial, attaching themselves to a specific block or housing project; they are well armed and instantly violent. Some gangs simply exist to fight other gangs, while others are centered on crimes like gun trafficking.

In the 137th Street case, prosecutors said, Jaquan Layne was the ringleader of a gang tied together by a drug operation. But where prosecutors hear strategy and planning in telephone conversations, Mr. Layne's lawyer, Franklin Rothman, hears a young man who likes to boast.

"They have nothing on Jaquan Layne other than his big, stupid mouth that got him in trouble," Mr. Rothman said in his opening statement. "He's not part of a conspiracy. He's not part of this gang. He's a guy from the block."

In one call, Jahlyl Layne seemed intent on collecting on a debt, even though he was in jail.

"You know them fiends still owe me that money, too," he told the man on the other end of the phone. "Go get that money, B."

"I'm gonna go knock on that door for you," the man responded. "I got you."

Prosecutors said some of the calls also described the group's violence and the passing of weapons. Pierce Gross, who is not on trial but was one of the people charged with the 137th Street group, told someone in a recorded call that "Jon snapped," meaning he had fired a gun.

Mr. Gross was speaking of an episode, prosecutors said, in which Mr. Hernandez fired several shots at someone, leading to an attempted-murder charge being prosecuted in the trial.

Some of the phone calls displayed internal strife, prosecutors said. In one call, Jahlyl Layne told Louis Williams, who prosecutors said was in the gang, that someone was "gonna kill" him and others in the group who were still on the streets because, he said, using a term for money, they "ain't setting no chicken out" to those who were in jail. They were "due a spanking," Mr. Layne said.

Mr. Williams called Mr. Layne's bluff, saying they were not "gonna kill nobody."

In another call, Jaquan Layne appeared to complain that Mr. Brown and another man were still selling drugs but not putting any of the money in his commissary account at Rikers. They "ain't sending me no paper," Mr. Layne told

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 15 of 66
Harlem Drug Conspiracy Case Is Heading to Jury - The New York Times   Page 9 of 71   Page 4 of 4
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16

Afrika Owes, a former private-school student who was also charged in the case but pleaded guilty to lesser charges.

"Who they selling it for?" Ms. Owes asked.

"They self," Mr. Layne responded.

Mr. Rothman, his lawyer, has said that that answer indicated an every-man-for-himself attitude, rather than some structured drug organization with people working together.

Yet in another call, Mr. Layne appeared to be instructing Ms. Owes on how to take care of herself. After she explained that she was carrying guns, Mr. Layne told her that if things got crazy, she should use them — "let it go, let it go."

"I got you," Ms. Owes responded.

"Make sure," Mr. Layne said, "head shots only."

A version of this article appears in print on October 12, 2011, on page A21 of the New York edition with the headline: In Conspiracy Trial, a Query: What, Exactly, Is a Gang?.

© 2016 The New York Times Company

**Exhibit L**

Ads You may be interested in


**Corporate Headshots**
$25.00 off to LinkedIn Members! Over 240 Recommendations on LinkedIn!


**Find Your Dream Job Fast**
Get free tips on how to find your travel, tourism & hospitality dream job.


**Jump Start Q2 Sales**
Support your hybrid entrepreneurs, overcome the 3 Fatal Flaws in Selling

**People Also Viewed**

**Amy Cohen**
Assistant District Attorney

**Daniel Boylan**
Assistant District Attorney, Crime Strategies Unit at New York County District Attorney's Office

**David R. Smith**
Trial Attorney at Adam Leitman Bailey, P.C.

**palmira garcia**

**Erin Tierney**
Assistant District Attorney at New York



# Maria Strohbehn
Assistant District Attorney, Manhattan District Attorney's Office

New York, New York | Law Practice

| | |
|---|---|
| Current | Manhattan District Attorney's Office |
| Previous | U.S. Department of Justice, U.S. Attorney's Office, District of Maryland, State Attorneys Office, Anne Arundel County, National District Attorneys Association/American Prosecutor's Research Institute |
| Education | The George Washington University Law School |

**Send Maria InMail** ▶

**119**
connections

in www.linkedin.com/pub/maria-strohbehn/54/1b9/264

**Background**

## Summary

As a member of the Trial Division, I am responsible for investigating, indicting, and trying felonies. In Manhattan, we vertically prosecute: I take on cases from arrest and handle them through collateral appeal. As lead prosecutor, I have tried nine cases before juries in New York County and conducted dozens of hearings. I have presented at least fifty cases before the grand jury, including cold-hit DNA cases.

Currently, I am supervising two junior attorneys in a project targeted to reduce crime in Mid-town Manhattan. In the past, I served as a junior member of a project targeting a specific gang responsible for violence in Harlem. These projects highlight the investigative skills necessary for a big-city prosecutor.

**Exhibit M**

Maria Strohbehn

Assistant District Attorney, Manhattan District Attorney's Office

Location

New York, New York (Greater New York City Area)

Industry

Law Practice

Maria Strohbehn's Overview

Current

• Assistant District Attorney at Manhattan District Attorney's Office

Past

• Law Clerk at U.S. Department of Justice, U.S. Attorney's Office, District of Maryland

• Intern at State Attorney's Office, Anne Arundel County

• Law Clerk at National District Attorney's Association/ American Prosecutor's Research Institute

see all...

Education

• The George Washington University Law School

• University of Maryland Baltimore County

Connections

**77 connections**

Maria Strohbehn's Experience

Assistant District Attorney

**Manhattan District Attorney's Office**

Law Practice industry

September 2008 – Present (2 years 11 months)

· Research and write various pre-trial and post-conviction motions, including motions in opposition of dismissal, motions in opposition of vacating judgment, and motions for protective order

· Write search warrants including residences, computers, cellular telephones, and other mobile technology

· Present cases to the grand jury in Manhattan, from complex identity theft cases to domestic violence assaults

· Investigate and prosecute long-term employee fraud

· Serve as First Chair on bench and jury trials

· Organize trial strategies by reviewing evidence and developing themes

· Collaborate with family lawyers in domestic violence-related custody and divorce issues in the Integrated Domestic Violence Part of the New York County Supreme Court

· Volunteer, such as a presentation to adolescents in upper-Manhattan on various aspects of the criminal law and law enforcement issues in New York, including dating violence

· Attend continuing legal education seminars including a lecture on various forms of financial evidence, and its collection

· Write complaints to commence prosecution on the basis of a thorough review of evidence in shifts, including shifts into the early morning

· Balance a caseload of about three-hundred active cases with an aggressive court schedule· **Chosen to begin working on a bureau based project targeting gang-related violent crime in the 28th precinct in 2011**

**Exhibit N**

12/20/10

9:32 PM
1/2  Chalupa u fucking with this dude: but you on my back about girls.  trying to get me
locked up for no reason. When I  get locked up I'm showing and telling
2/2 everything.  And calling warren once I get locked up.

9:46 PM: I will turn your life upside down one I'm in Jail.

10:02 pm: Yea if you say so Hoe:  Everybody is going to know

10:25 pm: so they will love all the great things I got to show them

10:31 pm: its your word against mine let's play I got pi and everything else.  Daddy and
mommy and big bro will love my info.  And I saw your speed dial u got two guys on
speed dial ur sad broke and a hoe.  ur a loser

10:33 pm:  warren rob warren rob warren rob they going to love me

12/21/10

6:37 am: lets have make up sex my dick is rock hard

(12/21 time unidentified sometime between 6:37 and 10:17 am)
[TEXT BENEATH NAKED PHOTO OF ME]
U see that window that's your house.  Just leave me alone please I don't want to be with
someone that wants to get me locked up.  Plus Hoeing

(12/21 time unidentified sometime between 6:37 and 10:17 am)
[TEXT BENEATH NAKED PHOTOs OF ME]
Two taps I can see every word even your number and I got more.  Just leave me alone
and stop lying to the cops.  I'm not going to fuck you intill I get lock up for no reason

10:17 am
I have Keys

10:19 am: U think I'm playing.  Play with the cops and u will never hoe or work again

10:21 a.m: Your is too

10:25 a.m. thanks more for the cops when you get me locked up

10:28 Not when they see what I got and the people who will come downtown to help me

10:32 that paper will

12/22:

9:02 a.m.:  Did you pay my car note

9:20 am: I was making a lot of money when I had my car.  How u think I saved your ass so many times.  When u had no money.  I would love it if u can pay my car note like you said u would but if not we can go 310 310 = 620 or I can pay it by myself just the the info. please I need that car on the streets.  I don't have to get nj plate it koool.  I will wait intill the weeks are up. ate the gym I'm taking a cab to my lot and going to the dmv to take back my plates

*RESPONSE 9:30 am: You ignore every holiday you spend hem with someone else including my birthday I can't wait till your car is gone*

9:28 am: when they take my car I'm telling every thing that on niya

9:30 am: once that go u know what's going to happen

*9:30 am RESPONSE: I am not talking to you until I get my phones and i'm warning you stay away from the DMV u have no right to conduct my business*

10:07 am: So get my car took of u want.  Just know what's happens after.  no order can stop me from talking.

*RESPONSE: 10:10 am I hate you for ruining me but I will survive you been doing me filthy for too long*

10:16 am:  Hell no tell me how?  other way around.  Ruining you how?  Ur selfish an i u fuck me with the cops or my car u will not survive because I'm going to really ruining u like u keep trying to do to me.  But I'm going to OVER DOSE ON YOU.  So  give me the info or let's go half or pay the note.  but that car is not going no where.

10:22 am: I will never fuck you.  But u fuck me so many times.  So I'm not letting u get away no more.  You know right from wrong so u fuck me I'm going hard.  Please I love you so don't make me do this

**Exhibit O**












**Exhibit P**

Exhibit 2
page 1

**SKIN**
__ Intact
__ warm, dry

[ see diagram ]
__ ecchymosis / laceration
__ crepitus / diaphoresis
__ decubitus

**BACK**
__ no CVA
__ tenderness
__ no vertebral
__ tenderness

[ see diagram ]
__ vertebral point-tenderness
__ CVA tenderness
__ muscle spasm / limited ROM

**EXTREMITIES**
__ atraumatic
__ pelvis stable
__ hips non-tender
__ no pedal edema
__ full ROM
__ nml color / temp

[ see diagram ]
__ bony point-tenderness ...
__ painful / unable to bear weight
__ pulse deficit

**Joint Exam**
__ limited ROM / ligaments laxity
__ joint effusion

Graces        Aus
First Name      Last Name

167 Y107
MRN             Witte

**EKG & XRAYS**
EKG   NML   ☐ Interp. by me   ☐ Reviewed by me   Rate____
__ NSR   __ nml intervals   __ nml axis   __ nml QRS   __ nml ST/T

XRAYS ☐ Interp. by me   ☐ Reviewed by me   ☐ Discssd w/ radiologist
C-spine   T-spine   LS-spine   pelvis
__ nml / NAD   __ no fracture   __ nml alignment   __ soft tissues nml

CXR
__ nml / NAD   __ no pneumothorax   __ nml heart size   __ nml mediastinum

CT Scan                                    ☐ Discssd w/ radiologist
head   C-spine   chest   abdomen / pelvis
nml / NAD __

Ultrasound / FAST Exam
__ nml / NAD.

Other

**PROGRESS**
Time____   unchanged   improved   re-examined
_____
_____
_____
_____
_____

__ Referred / Discussed with PCP Dr.____   Time.____
   will see patient in:   office / ED / hospital
__ pt interviewed / examined by ED attending
__ pt discussed with ED attending                McGovern

__ Counseled patient / family regarding:   Additional history from:
lab / rad results   diagnosis   need for follow-up   family caretaker paramedics
incr given                                                 ____
CRIT CARE TIME (excluding separately billable procedures)____ min

**PROCEDURES**
Wound Description / Repair:   Time:____
length 1.5 x 5 cm   location Cover thr
linear   stellate   irregular   flap   lacer: subcut / muscle
clean   contaminated moderately / heavily
distal NVI:   neurovasc intact   no tendon injury
anesthesia: local topical   1% lidocaine / bupivacaine spl / block
   digital block
prep: Shur-Clens   Bld + H2O 1/2
wound explored                    debrided mod. / extensive
to base / in bloodless field     wound margins revised
no foreign body identified       multiple flaps aligned
foreign material removed
repair:   Wound closed with:   wound adhesive / dermabond / steri-strips
SKIN- #  17        0 nylon / prolene / staples /
                      silk / ethilon
SUBCUT- #          0 vicryl / chromic
OTHER- #           0

**LABS**

| CBC | Chemistries | UA | ETOH |
|-----|-------------|-----|------|
| normal except | normal except | normal except | TOX____ |
| WBC____ | Na____ | | |
| Hgb____ | K____ | | |
| Hct____ | CO2____ | HCG | PT/PTT____ |
| Platelets____ | Gluc____ | serum / urine | INR____ |
| | BUN____ | POS   NEG | |
| | Creat____ | | |

Multiple Trauma - 18

**CLINICAL IMPRESSION**
Abrasion
Concussion with LOC   w/o LOC
Contusion
Laceration
Fracture
Sprain / Strain   cervical   thoracic   lumbosacral

DISPOSITION-   ☑ home   ☐ transferred____
Time____   ☐ admitted   POA   deadline / UTI (filer)____
CONDITION-   ☐ unchanged   ☐ improved   ☐ stable____

MD/DO/PA

MD/DO 6/11/10
Attending
☐ Template Complete   ☐ See Addendum (Dictated / Template #____)

Page 2 of 2

Exhibit 2
page 1

**SKIN**
___ intact
___ warm, dry
___ see diagram
___ ecchymosis / laceration
___ crepitus / capno rash
___ decubitus
**BACK**
___ no CVA tenderness
___ see diagram
___ vertebral point-tenderness
___ no vertebral tenderness
___ CVA tenderness
___ muscle spasm / limited ROM
**EXTREMITIES**
___ atraumatic
___ see diagram
___ pelvis stable
___ bony point-tenderness
___ hips non-tender
___ painful / unable to bear weight
___ no pedal edema
___ pulse deficit
___ full ROM
**Joint Exam:**
___ distal color / temp
___ limited ROM / ligaments laxity
___ joint effusion



T=Tenderness  PT=Point Tenderness  S=Swelling  E=Ecchymosis  B=Burn
C=Crepitus  L=Laceration  A=Abrasion  M=Muscle spasm  PW=Puncture Wound
(FF=edema  present  and  moderate  amount)

**EKG & XRAYS**

EKG ___ NML  ☐ Interp. by me  ☐ Reviewed by me   Rate ___
___ NSR ___ nml intervals ___ nml axis ___ nml QRS ___ nml ST/T

XRAYS ☐ Interp. by me  ☐ Reviewed by me  ☐ Cleared w/ radiologist
C-spine  T-spine  LS-spine  pelvis
___ nml / NAD ___ no fracture ___ nml alignment ___ soft tissues nml

CXR
___ nml / NAD ___ no pneumothorax ___ nml heart size ___ nml mediastinum

CT Scan                                          ☐ Cleared w/ radiologist.
head    C-spine    chest    abdomen / pelvis
___ nml / NAD ___

**Ultrasound / FAST Exam**
___ nml / NAD ___

**Other**

**PROGRESS**
Time ___          unchanged          improved          re-examined

**PROCEDURES**
**Wound Description / Repair:**      Time ___
length  1.5 x 3  cm   location  lower  lip
  linear    stellate   irregular   flap   into:  subcut / muscle
  clean    contaminated  moderately / heavily
  distal NVI:  neurovasc intact   no tendon injury
  anesthesia:  local  topical  1%  lidocaine / bupivacaine  epi / bicarb
          digital block
  prep:  Shur-Clens  ___
  irrigated with saline             debrided mod. / extensive
  wound explored                    wound margins revised
      to base / in bloodless field      multiple flaps aligned
  no foreign body identified.
  foreign material removed
  repair:   Wound closed with:  wound adhesive / Dermabond / steri-strips
      SKIN:   # _17_  3-0 nylon / prolene / staples /
                              silk / ethilon
      SUBCUT-  # ___      0 vicryl / chromic
      OTHER-    # ___      0 ___

**LABS**

| CBC | Chemistries | UA | ETOH |
|---|---|---|---|
| normal except | normal except | normal except | TOX |
| WBC | Na | | |
| Hgb | K | | |
| Hct | CO2 | HCG | PT/PTT |
| Platelets | Gluc | serum / urine | INR |
| | BUN | POS  NEG | |
| | Creat | | |

Multiple Trauma - 10

___ Referred / Discussed with PCP Dr. ___        Time ___
  will see patient in   office / ED / hospital
  pt. interviewed / examined by ED attending  ___
☐ discussed with ED attending ___

☐ Counseled patient / family regarding ___    Additional history from:
  lab / rad results  diagnosis  need for follow-up   family / caretaker  paramedics
  ___ Rx given
  CRIT CARE TIME  (excluding separately billable procedures) ___ min

**CLINICAL IMPRESSION**
  Abrasion ___
  Concussion with LOC   w/o LOC ___
  Contusion ___
  Laceration ___
  Fracture ___
  Sprain / Strain  cervical  thoracic  lumbosacral ___

DISPOSITION-   ☑ home  ☐ transferred ___
Time ___         ☐ admitted    POA decub/os / UTI / decub ___
CONDITION-     ☐ unchanged ☑ improved ☐ stable ___

☐ Template Complete   ☐ See Addendum (Dictated / Template # ___ )

Page 2 of 2

*Exhibit 2 page 2*

Fri, 22 Apr 11   1450                                      Page   3 of 8

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|----------|--------------|----------------|--------------|-----|-----|
| DIS-Hd6 | Price,Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche,Carlos M, MD

---

ED Adult RN Initial Note -- cont'd
Braden Scale : Score: 22 Scale: <u>no risk</u> Sensory Perception: responds to
          verbal commands,has no sensory deficits Moisture: skin
          is usually dry Activity: walks frequently during
          waking hours Mobility: makes position changes without
          assistance Nutrition: <u>eats over half most meals or on</u>
          <u>tube feeding or TPN regimen which probably meets most</u>
          <u>of nutritional needs</u> Friction/Shear: moves in bed and
          in chair independently.
Skin Lesions?: yes
Lesion Detail: Lesions: laceration, hematoma Location: right posterior
          thigh, facial
          Lesions: laceration Location: right thigh, left buttocks,
          face
Photo        : not applicable

---

   Problem List:
   Diagnosis    :
   Working Diag:

   Resulted by        : Lopez,Michelle, RN   (ESOF)
   Ordering MD        : (ESOF)

Exhibit 2
Page 8

CAD #                                    74776827

**Narrative History:** Key words: (Onset, Provokes, Quality, Radiates, Severity, Passion, Chronic En Route, Medications)

PMH: ☐ Asthma  ☐ Chronic Renal Failure  ☐ Cardiac  ☐ Diabetes  ☐ Frail / Debilitated  ☐ Hypertension  ☐ IV Drug Use  ☐ Seizure Disorder  ☐ Tracheostomy
☐ Amputee  ☐ Cancer  ☐ COPD  ☐ CVA / Stroke  ☐ Dialysis  ☐ HIV / AIDS  ☐ Incontinent  ☐ Psychotic Int.  ☐ Substance Abuse  ☐ Tuberculosis

**Special Conditions:** ☐ Bed Confined  ☐ Non Ambulatory  ☐ Required Stretcher  ☐ Valid DNR

**Allergies:** ☒ No known allergies

**Medications:** ☐ Unknown   Denied

Pt Amulatory Alert Appears to have small abrasions on
her face
PER LOC some abrasions to her face 3cm
also 3 x ABD Wds SW IND, side of upper leg ℞
Proximal in buttocks on lateral side laceration
(small multiple) PMS x 4 Tx. pt was assaulted earlier by
unknown person She was choked and wrestled ℅ this person &
crashed into a Car Lock P Drs

3151066060/3 S
PRICE, CATHLEEN
F 778-66/10   11/11/10
239 WEST 164th STR
NEW YORK 10027

107 46 07

**Chief Complaint:**  ? cut inj her ?

**Presumptive Diagnosis:**  laceration in inj ? Assault

Have the patient's symptoms appeared ☐ Yes or gotten worse in the last 72 hours? ☐ No

---

**OLMC:**
Time of Contact | OLMC Physician | Reason Fm Contact | OLMC Template Time | ED Chart Number
☐ RMA  ☐ Consult  ☐ Orders
☐ Transport Decision  ☐ Obscene Triage

Crime # | C.S. Administered By - Signature | Witness Signature / Title | Amount Wasted | # Vials Used OLMC Physician | URN

---

**PAYER INFO:**
Insurance Company Name

Policy Number | Group Number

Insurance Related Information | Medicare # | Medicaid # | Work related? ☐
☐ Auto Insurance  ☒ Self Pay
☐ Private Insurance

**(1) PATIENT INFORMATION DISCLOSURE AND ASSIGNMENT OF CLAIM:** I acknowledge that I have been given the Notice of Privacy Practices and Patient Information Release/Assignment of Claim, set forth on the Patient Copy of this Prehospital Care Report and have read or have informed of their contents, including the purposes for which my protected health care information will be shared, and my responsibility for any charges for services not covered by any insurance or found to be medically unnecessary. I hereby authorize, for myself or my dependent(s), this release of medical and other information for the purposes specified, including treatment and billing. I further authorize and assign payment of Medicare and any other authorized benefits to the NYC EMS Department.
☐ Patient Unable to Sign
☐ (Reason Documented)  ☐ Patient Refused to Sign   Information Release Patient / Auth. Rep. Signature (1)

**(3) OUT OF AREA TRANSPORT / DIVERSION:** I request to be transported to a hospital that is more than 10 minutes from the closest appropriate hospital, or that is on diversion status. I have been advised and I understand that I may experience delays in my care that may impair my health or result in death.
☐ Patient Unable to Sign  ☐ Patient Refused to Sign   Hospital Requested   Out of Area Transport Patient Signature (2)

**(5) RELEASE/REFUSAL OF MEDICAL ASSISTANCE (RMA):** I have been advised and I understand that I require medical assistance, and will be transported to a hospital of my choice, and that my refusal to accept such medical assistance may imperil my health or result in death, but I nonetheless refuse to accept the medical assistance. I agree to assume all risks, consequences and costs of my decision not to accept such care, and I release the provider of ambulance service, and its employees, agents and independent contractors, from any liability arising from my decision.
☐ Pre-hospital care refused  ☐ Transportation to hospital refused  ☐ Patient Unable to Sign  ☐ Patient Refused to Sign
List care refused:                                           RMA Patient Signature   RMA Witness Name / Signature (3)

---

**SAFETY:**
Lights / Siren | Conditions Causing Delay | Seat Belt Use | Airbags Deployed | Patient Safety Equip.
☐ To Scene (53)  ☐ To Destination (82) | To Scene / To Patient / To Hospital | ☐ Lap Belt  ☐ Shoulder Belt  Car Seat: ☐ Front Facing ☐ Side Facing ☐ Rear Facing | ☐ Steering Wheel ☐ Passenger Wheel ☐ Driver Door ☐ Passenger Door ☐ Other | ☐ Eye Protection ☐ Helmet ☐ Personal Flotation ☐ Protective Clothing ☐ Protective Gear

Removed to Vehicle By: | Transport From | Transport Position | Pt Transported in Vehicle | Hospital Selection | Pt Not Transported In This Vehicle
☐ Chair ☐ Walked ☐ Carried ☐ Scoop Stretcher ☐ Flat ☐ Stretcher ☒ Met at Ambulance | ☒ Residence (Home) ☐ Scene of Accident or Acute Event ☐ Residential, Custodial Facility ☐ Skilled Nursing Facility (SNF) ☐ Inter-facility  Transport From Code: | ☐ Supine ☒ Sitting ☐ Block ☐ Semi / Full Fowlers ☐ Left Lateral Recumbent ☐ Restrained | # of Patients Transported: | Transport Miles: 2 | ☒ Nearest Facility ☒ Patient / Family Choice ☐ Specialty Referral ☐ Hospital Diversion  Diverted From Code: | ☐ Assisted in Transport ☐ RMA  With Unit # ☐ Pronounced, Not Transported ☐ Obscene Triage ☐ Transferred Care  To Unit # ☐ Other

Hospital Receiving Agent Signature | FDNY Code | Qty | Supply Code | Qty | Supply Code | Technician Signature

SH9001 (2 of 2), Rev 3G, 0510          © 2010 Sansio          (Page 2)

Exhibit 2 page 3

Fri, 22 Apr 11  1450                                        Page  4 of 8

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|---|---|---|---|---|---|
| DIS-Hd6 | Price, Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche, Carlos M, MD

--------------------------------------------------------------------------

MDInitNote DellaFavaA
Event Time: Thu, 11 Nov 10  0336                      Status: complete

Thu, 11 Nov 10  0606   Documented by Carlos M Meletiche, MD

```
T                : 97.9 F (36.6 C)
P                : 84 bpm
BP               : 127/77
R                : 18
Pain             : yes
Pt Walked Out?   : no
Time Pt Seen     : 11Nov2010 0326
Visit Provider   : Albert David Della Fava, MD
Attending        : Carlos M Meletiche, MD
Communication    : Direct Communication in Patients's Primary Requested
                   Language
Chief Complaints : Assault Sustain 3 laceration to Rt posterolat thigh and
                   facial hematoma
TB/Pneumonia     : Fever: no Cough: no Night Sweats: no Weight Loss: no
                   Shortness of Breath: no
Assessment       : vs wnl, mild distress however patient calmed during exam,
                   no respiratory distress or SOB, abrasion/bruise to right
                   infraorbit, no orbital tenderness EOMI, erythema to
                   lateral neck and throat, 5 cm laceration to left buttock,
                   3 1.5 cm lacerations to right hip, no boney deformates or
                   joint complaints
Plan             : clinical work up as ordered
Diagnosis        : Assault by other specified means
E&M Level        : non critical visit
Non-Critical Vst : 99283 expanded problem focused hx, exam and mod complex MDM
Attend'g Addendum: Gen Supv
DAWN?            : no
Comment          : See paper chart
```
--------------------------------------------------------------------------

Diagnosis     : E968.8    Assault by other specified means
Principal Pr: E968.8    Assault by other specified means

Exhibit 2 page 4

Fri, 22 Apr 11   1450                                    Page  5 of 8

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|---|---|---|---|---|---|
| DIS-Hd6 | Price,Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche,Carlos M, MD

PHM/PSHx/Fam:
Diagnosis   :
Working Diag:

Resulted by    : Meletiche,Carlos M, MD (ESOF)
Ordering MD    : (ESOF)

ED RN Disposition Assessment
Event Time: Thu, 11 Nov 10   0554                 Status: complete

Thu, 11 Nov 10   0558   Documented by Nakita Mccoy, RN

Discharge Disposition: treated & released
Home Care Discharge  : no
Diagnosis            : Assault by other specified means
Vital Signs          : SBP:: 121  mmHg DBP:: 64  mmHg P: 76  bpm R: 17 T:
                         97.8 F (36.6 C) Temp Route: oral O2
                         Saturation: 99  % Comments: ROOM AIR
Barriers to Learning : none
DC Plan              : MEDICATION AS PRESCRIBED. FOLLOW UP IN CLINIC AS
                       DIRECTED. RETURN TO ER FOR ANY NEW OR WORSENING
                       CONCERNS. NAD NOTED.
Valuables/Clothing   : patient kept at own risk
Comment              : PT OUT WITH STEADY GAIT. RESP EVEN/UNLABORED. NO
                       DISTRESS NOTED. PT VERBALIZED UNDERSTANDING OF INSTR
                       PROVIDED BY DELLFAVA, MD
Medication Order(s)  : Adacel (Tdap 11-64y)(Tetanus Toxoid, Reduced
                       Diphtheria Toxoid & Acellular Pertussis Vaccine
                       Adsorbed)
Medication Effect(s) : no adverse effects for all new medications

Diagnosis   :
Working Diag: E968.8   Assault by other specified means

Fri, 22 Apr 11  1450                                    Page  6 of 8

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|----------|--------------|----------------|--------------|-----|-----|
| DIS-Hd6 | Price,Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche,Carlos M, MD

----------------------------------------------------------------------------

ED Chest Pai:
Diagnosis   :

Resulted by      : Mccoy,Nakita, RN  (ESOF)
Ordering MD      :  (ESOF)

Metropolitan Hospital Center
Department of Emergency Medicine
1901 First Avenue
New York, NY  10029
212-423-6466

*Exhibit 2 page 7*

_____ STR _Camden Price_
Patient Name

Burlington plate

Discharge Instructions for: _Abscess_
(condition)

The emergency examination and treatment you received today is not intended to provide you with a complete medical workup.  You should follow-up with a physician for further evaluation and treatment.  If you have any questions or concerns regarding your emergency department treatment, please return to the Emergency Department.  Notify your own physician for any new or remaining problems.  If you are concerned about those problems, please return to this or any other Emergency Department.  Otherwise, follow these instructions below.

The results of x-rays, ultrasounds, blood tests and EKGs are preliminary at this time.  They will be reviewed by a specialist, usually within 24 hours.  Should it be necessary, you will be contacted.  Notify your primary care physician if you had such tests done during your emergency visit.

Please make sure that you have notified the physicians and nurses of all of your past medical and surgical history as well as any medications (including over-the-counter and herbal preparations) that you are currently taking.

Return to the Emergency Department, or any other emergency Department, for any current or new problem that you think may be a serious threat to your health.  These problems vary depending on your underlying condition, but include such problems as high fever, severe pain, shortness of breath, persistent vomiting, excessive diarrhea, heavy bleeding, black stools, seizure/convulsion or change in behavior.  Ask your nurse or doctor to inform you of any problems that may be more specific to your visit today.

Continue taking any previously prescribed medications, in addition to any new ones from today, unless otherwise indicated.  Please make sure that you have informed us today of all of your medications and allergies to medications/ foods, including any recently changed by any other doctor.

Medications: _Tylenol #3  2 tabs  by mouth every  4 hours with pain_
_Keflex  500mg  by mouth every  6 hours for 7 days_

Please pick up or ask for any printed educational materials that we may have specific to your probable condition.

Make an appointment to:
☐ follow up with your primary care provider within ____ days.  If you don't have a primary care provider, you can call our clinic appointment center at 212-423-7000 for an appointment to the _____ clinic.  Inform them that you need to be seen within this number of days.
☑ follow up in _Surgery_ clinic within _10_ days @ 212-423-7000.
☑ follow up in _ER_ clinic within _10_ days at 212-423-7000.

Additional Instructions: _Please return to ER for redness, fever, wound breakage or pus._

_Please be seen here or by surgery in 10 days for suture removal._

These instructions have been explained to me and I fully understand.  I also certify that my address and or phone number / emergency contact information provided is accurate.

Patient Signature        Phone #        PA / MD Signature        RN/T Signature        Date: _5/10/10_        Time: _5:51 AM_

White copy: Chart        Yellow copy: Patient        MHC:052-5/06

**Exhibit Q**

1

```
 1   FAMILY COURT OF THE STATE OF NEW YORK
     CITY OF NEW YORK:   COUNTY OF NEW YORK
 2   ------------------------------------x
     In the Matter of a Family Offense
 3   Proceeding                         :

 4   KELLY CATHLEEN PRICE,              :

 5                  Petitioner,         :      DOCKET NO.
                                               O-10874/10
 6          -against-                   :

 7   RAHEEM POWELL,                     :

 8                  Respondent.         :
     ------------------------------------x
 9   Held:           60 Lafayette Street
                     New York, N.Y. 10013
10                   March 24, 2011 - Part 5,

11
     Before:         HONORABLE LORI S. SATTLER, JUDGE
12

13   Appearances:
                     EDWARD GREENBERG , ESQ.
14                   Attorney for the Petitioner

15
                     WILLIAM O'HEARN, ESQ.
16                   Attorney for the Respondent

17

18
     Also Present:
19
                     Kelly Price
20                   Raheem Powell

21

22
                               Kitty S. Irizarry
23                             Official Court Reporter

24

25
```

Proceedings

1            COURT OFFICER:  Six and fourteen in the matte:

2     Price and Powell.

3            Counsel, your appearance.

4            MR. GREENBERG:  For the petitioner, Your Honor

5     Edward C. Greenberg, 570 Lexington Avenue, New York, New

6     York.

7            Good morning.

8            COURT OFFICER:  Raise your right hand.

9            (Whereupon, the following parties were sworn i

10    by the court officer.)

11           MS. PRICE:  Kelly Catherine Price.

12           MR. POWELL:  Raheem Powell.

13           THE COURT:  Good morning, Your Honor.

14           You are entitled to have an attorney in this

15    proceeding.  If you don't have an attorney, I can assign c

16    to represent you.  You can also decide you would like to g

17    forward on our own without an attorney, or if you would

18    like, you can hire or consult with an attorney that you

19    would pick.

20           Do you want an attorney in this proceeding?

21           MR. POWELL:  Yes.

22           THE COURT:  What's your source of income at the

23    present time?  Are you working?

24           MR. POWELL:  Yes.

25           THE COURT:  How much are you earning?

                        Proceedings

1              MR. POWELL:  Like $250 a week.

2              THE COURT:  Are you a member of a union?

3              MR. POWELL:  (No response)

4              (Whereupon, the following party was sworn in b

5       the court officer.)

6              DETECTIVE SIMMONS:  Detective Linda Simmons,

7       shield number 2653 of the 28 Detective Squad.

8              THE COURT:  Sorry to drag you in, Detective

9       Simmons, but I have a couple of questions, since I was

10      informed that you are here to arrest the petitioner.

11             DETECTIVE SIMMONS:  We are here to pick her up

12      for another detective that will be arresting her.

13             THE COURT:  Anything related to my case here?

14             DETECTIVE SIMMONS:  It's between the two of th

15      It's between the two of them and how she calls him and

16      threatens to have him arrested if he doesn't come see her.

17             (Whereupon, Mr. O'Hearn entered the courtroom.

18             THE COURT:  Mr. O'Hearn is going to be

19      representing the respondent.

20             Do you want to note your appearance.

21             MR. O'HEARN:  William O'Hearn, 225 Broadway,

22      appearing for the respondent.

23             THE COURT:  Okay.  So he had a family offense

24      case at some point in time, but your Order of Protection w

25      vacated when you didn't show up on March 9th.

Proceedings

1        MR. POWELL:  I was on the wrong floor.

2        THE COURT:  Did you file again?

3        MR. POWELL:  No.

4        THE COURT:  So are you picking her up for

5   violating the order?

6        DETECTIVE SIMMONS:  She is going to be arreste

7   for aggravated harassment.

8        THE COURT:  Okay, got you.

9        MR. GREENBERG:  Your Honor, with respect to

10   Mr. Powell's claim that he was in the wrong room, I know

11   Your Honor is very busy and doesn't remember this case, bu

12   this case --

13        THE COURT:  No.  I actually remember it.

14        MR. GREENBERG:  Good.  Then Your Honor will

15   remember that we delayed to call this case for quite some

16   time because Mr. Powell was not here, and Your Honor calle

17   the case at 11:02.

18        THE COURT:  Your client wasn't here either on

19   that date, as I recall.

20        MR. GREENBERG:  That's correct, and I expressec

21   concern about the safety of my client.  So while the court

22   officer called the case at about 9:32, Your Honor didn't

23   hear it until about 11:00.  This was a 9:30 case, so I don

24   know how Mr. Powell couldn't have found his case within an

25   hour and a half.

4

Proceedings

1              THE COURT:  His case was dismissed.  He paid

2       consequence of not being here.

3              I think the bigger issue is your client is ab[

4       to get arrested.  And I am hearing that right now, and

5       perhaps that makes me concerned about whether I actually

6       need to continue an Order of Protection in this case,

7       because he is not getting arrested, she is getting arrest

8              Detectives investigated the stories?

9              DETECTIVE SIMMONS:  Yes.

10             THE COURT:  And don't find her story to be

11      credible?

12             DETECTIVE SIMMONS:  No.

13             MR. GREENBERG:  We have a couple of competing

14      issues.  Issue number one, and perhaps not the most

15      important, but I think it should be before Your Honor befc

16      the case is discussed before you, no request was made of n

17      office to surrender Ms. Price, notwithstanding the fact th

18      I had lengthy conversations with detectives at the 28

19      Precinct, including Detective Flowers, who is, presumably,

20      going to be the detective arresting Ms. Price today.

21             I had a conversation with Mr. Flowers for over

22      five minutes, and at no time did he ask me to bring

23      Ms. Price in, nor had any request been made to me or to

24      Ms. Price' other attorney to bring her in.  She would have

25      been brought in and this exercise, perhaps, would have bee

## Proceedings

 1    avoided or at least postponed.  That's issue one, Your

 2    Honor.

 3          Number two, there was an Order of Protection

 4    sought against Mr. Powell, whose acts of violence against

 5    Ms. Price are well documented by hospital reports and so

 6    forth.  The detectives have come in here, and I understand

 7    their responsibilities, as they see them, but they come in

 8    here without any adjudication at all based on, solely, the

 9    word of Mr. Powell, whom Your Honor has already awarded

10    Orders of Protection against, presumably, because Your Hor

11    was satisfied.

12          THE COURT:  Excuse me.

13          An ex-parte Order of Protection -- Everyone co:

14    in here and does an ex-parte the first time, and I -- This

15    is the first time I have the parties in front of me.

16          MR. GREENBERG:  That's true.

17          Not all ex-partes.  Ms. Price had been here

18    before.

19          MR. O'HEARN:  The most recent one was ex-parte

20    because he didn't show up, but that's not the initial one.

21    There was evidence that satisfied Your Honor to issue an

22    Order of Protection, apparently, where Mr. Powell was here

23    on prior occasions.

24          MR. GREENBERG:  My recollection, Your Honor, i

25    when I was here three or four weeks ago, Your Honor stated

## Proceedings

1    blackmail from the text messages from Mr. Powell to mysel

2    letting me know exactly what would happen to me if I ever

3    did such things like leave him, report the physical ongoi

4    physical abuse.

5             THE COURT:  Were the nude photos you are alleg

6    on there?

7             MS. PRICE:  No.  He never sent them to me.

8             THE COURT:  How, again, did you know there wer

9    photos of you?

10             MS. PRICE:  People in my neighborhood and

11    children in my neighborhood taunt me and taunt me with th

12    phones when I walk by.

13             THE COURT:  Did you see what was on the

14    children's phones?

15             MS. PRICE:  No, I did not.

16             I am happy to present respectable adults in my

17    neighborhood, especially the owners of the livery cabs

18    around the corner from me, who showed them to me and said

19    cannot believe this is happening to you and are willing to

20    testify.

21             THE COURT:  I am going to let them do whatever

22    they have to do, arrest your client.

23             I will give you another date to come back.

24             I will put in a usual terms Order of Protection

25    and refrain from communication.  If he is going to renew h

Proceedings

1    request, Mr. O'Hearn, he needs to do that.  This is agains

2    him.

3              She actually, quite frankly, based on the

4    allegations, I am willing to bet that the Criminal Court

5    will also put in an Order of Protection in place.  But you

6    client can decide if he wants to file here, and I will giv

7    you a date to come back to court.

8              MR. GREENBERG:  May I make a request with resp

9    to a return date, if it suits the Court?

10             THE COURT:  Sure.

11             MR. GREENBERG:  I can have any date in the las

12   two weeks of April, but the first two weeks I can't and I

13   can't in May.  So any date anytime that the Court wants f

14   April 18th to the end of the month is fine with me.

15             MR. O'HEARN:  I am out the last week of April.

16             THE COURT:  I am not here on the 18th or the

17   19th.

18             MR. GREENBERG:  Any date that week.

19             THE COURT:  How about the 21st?

20             MR. O'HEARN:  I am out that weekend.

21             THE COURT:  You are out the 18th.

22             How about May 2nd?  That certainly will give t

23   Criminal Court matter time for us to know what's going on

24   there.

25             I could bring you in earlier.  I could bring y

Proceedings

1    in on April 13th or 14th, but, otherwise, we are going to

2    May 2.

3            MR. O'HEARN:  I can appear on May 2nd.

4            MR. GREENBERG:  I will do May 2nd if I have to

5    At what time, Your Honor?

6            THE COURT:  Let me pick an available time.

7            11:00 a.m.

8            MR. GREENBERG:  That's fine.  All right.

9            THE COURT:  I will see you all then.

10           Thank you.

11   *********************************************************

12                  Court Reporter's Certification

13       I hereby certify that the foregoing transcript is a true

14   and accurate record of the stenographic proceedings in the abo

15   matter.

16

17                          Kitty S. Irizarry
                           Official Court Reporter

18

19

20

21

22

23

24

25

**Exhibit R**

Exhibit 5 page 16

# CRIMINAL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK

Page 1 of 1

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br>-against-<br><br>1. Kelly Price (F 40)          ECAB #<br>                                    1222673<br><br>                                    Defendant. | FAMILY OFFENSE<br>DEFENDANT/VICTIM<br>RELATIONSHIP:<br>INTIMATE/ACCESS<br><br>MISDEMEANOR<br>ADA MARQUEZ<br>212-335-9522 |

Detective Samuel Fontanez, shield 00311 of the 028 Detective Squad, states as follows:

On April 30, 2011, at about 00:01 hours inside of 315 West 116th Street in the County and State of New York, the Defendant committed the offenses of:

1.   PL215.50(3)     Criminal Contempt in the Second Degree
                           (1 count)

the defendant engaged in intentional disobedience to the lawful mandate of a court in other than a labor dispute.

The offenses were committed under the following circumstances:

Deponent states that deponent is informed by Raheem Powell, of an address known to the District Attorney's Office, that defendant called informant on the telephone and stated in substance: ARE YOU RECORDING ME? I WANT TO TALK TO YOU SO WE CAN WORK THINGS OUT. Deponent is further informed that informant has known defendant for more than two years and informant recognized defendant's voice.

Deponent states (i) that the above actions by defendant are in violation of an order of protection issued on  March 24, 2011 by Judge Amaker , docket number 2011NY021627 , and which remains in effect until  May 10, 2011 , (ii) that the order of protection directs the defendant to refrain from communication or any other contact by mail, telephone, e-mail, voicemail or other electronic means with Raheem Powell , and (iii) that defendant is aware of the order of protection in that  defendant was present in court when the court order was issued and the order of protection is signed by the defendant.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

| | |
|---|---|
| _Det OB #311_ | _5/6/11_ |
| Deponent | Date and Time |

ACT 5 Version 4.3.5 Created on 05/06/11 5:10 PM

Exhibit 5 page 2

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: PART D

THE PEOPLE OF THE STATE OF NEW YORK

-against-

KELLY PRICE,

Defendant.

SUPPORTING DEPOSITION
C.P.L. § 100.20

Docket No. 2011NY032918

I, Raheem Powell, of an address known to the District Attorney's Office, County of New York County, State of New York, being duly sworn, depose and say:

that I have read the Accusatory Instrument filed in the above-entitled action and attached hereto and that the facts therein stated to be on information furnished by me are true upon my personal knowledge.

*False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.*

_____          _____
Signature (Deponent)                              Date

She called me around 11:45 pm
and she said lets meet up

**Exhibit S**

## Property Receipt

Inmate _Price Kelly_
    Last      First

A № 768932   2011
              year

Institution _RMSC_

Date _05/07/11_

Exhibit 6 pg. 1

☐ NYSID # _07910819M_

☐ Book and Case # _31711C0278-8_

☐ Sentence # _____

CONTROL/CUFFLOCK# _____

### WHERE WAS PROPERTY TAKEN:
☐ Admission    ☐ Housing Area - Specify: _____    ☐ Other - Specify: _____
Was this property taken on a search: ☐ Yes / ☐ No

| No. | I. Personal Items — Articles | No. | II. Clothing — Articles | Color | No. | III. Jewelry — Article | Description Y | W | CS |
|---|---|---|---|---|---|---|---|---|---|
| | Radio | | Coat/Jacket | | | Tooth Cap | | | |
| | Personal papers | | Pants | | | Neck Chain | | | |
| | Pocketbook | | Belts | | | Earring | | | |
| | Gloves | | Shoes/Sneaker | | | Charm | | | |
| | Glasses | | Shirt/Blouse | | | Bracelet | | | |
| | Wig | | Skirt | | | Watch | | | |
| | Wallet | 2 | Boots | Black | | Ring | | | |
| | Keys | | Hat | | | | | | |

| | IV. Miscellaneous |
|---|---|
| No. | Article |

Identification: ☐ Yes  ☐ No    On Person  Same Name? Y N

**Please Note:**
Description Color:
Y-Yellow Metal
W-White Metal
CS-Color of Stone

| | On Person | Y | N |
|---|---|---|---|
| U.S. Passport | | | |
| Green Card | | | |
| Driver's License | | | |
| Other Government-issued photo ID | | | |
| Birth Certificate | | | |
| Social Security Card | | | |
| Other: | | | |

**INSTRUCTIONS**
1. If you receive more than one (1) item on a line, (e.g., coat/jacket) circle appropriate item then enter the number.

☐ NO PROPERTY

The above item(s) has been received from you because
☐ It is not on the list of items which are permitted in this facility.
☐ The quantity is in excess of that allowed in this facility.
☐ It may create a health, safety or security hazard, and therefore, you are not permitted to have it in your possession.
☐ You have submitted the item to us voluntarily for safekeeping.
☐ Other _____

_Inmate did not Receives BOOTS. CO / Inv # 14336_

_Pedrelto_
Signature of person taking property

_14944_
Shield ID #

_Robetto_
Print Name

Signature of Inmate

_05-07-11_
Date

_0349_
Time

SEE APPEAL AND DISPOSAL PROVISIONS ON OTHER SIDE.

Distribution:
White - Inmate Copy    Yellow - Duplicate (TO BE SECURED WITH PROPERTY)
Green - Inmate Legal Folder    Blue - Discharge Planning Cent (BOSTON CITY SENTENCING)

Exhibit T

*Exhibit 11 Page #1*

## DEBRIEFING AGREEMENT

With respect to the meeting of Kenya Wells, an Assistant District Attorney in the Office of the District Attorney for New York County ("Office") with Kelly Price ("Client") to be held on the date of this memorandum, the following understandings exist:

(1) Should any prosecutions be brought against Client by this Office, this Office will not offer as evidence in its case-in-chief any statement made by Client at the meeting, except in a prosecution for false statements or perjury.

(2) Notwithstanding paragraph one, (a) this Office may use information derived directly or indirectly from Client's statements at the meeting for the purpose of obtaining leads to other evidence, and if any such evidence is developed, it may be used in any prosecution of Client; and (b) should any prosecution of Client be undertaken, this Office may use statements made by Client at the meeting and all evidence obtained directly or indirectly therefrom for the purpose of cross-examination should Client testify, or to rebut any evidence offered by or on behalf of Client in connection with the prosecution.

(3) This agreement is limited to the statements made by Client at the meeting held on this date, and does not apply to any oral, written or recorded statements made by Client at any other time. No understandings, promises, agreements, or conditions have been entered into with respect to the meeting other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties.

DATED:   New York, New York
         June 21, 2011

                                    CYRUS R. VANCE, JR.
                                    District Attorney
                                    New York County

                                    By _____
                                    Kenya Wells
                                    Assistant District Attorney

_____
Client

_____
Attorney for Client

Exhibit U

BAIL RECEIPT & NOTICE TO PERSON POSTING BAIL

Exhibit #8 page 1

| Date Bail $ Received (Today's Date) | Time Bail $ Received |
|---|---|
| 05. 08. 10 | 21:35 |

| Indictment # | Docket # 2170 3298 | Defendant's Name (Last, First and M.I.)  People v. PRICE, KELLY |
|---|---|---|

| NYSID # 796189M | Book & Case # 3471 00788 | Offense(s) 215.50 (3) |
|---|---|---|

| Name of Judge/Justice Who Set Bail LBBOVITS | County NEW YORK | Court CRIMINAL | Part AR3A |
|---|---|---|---|

| Last Court Date Bail Was Set 05-06-11 | Bail Amount (Numerical) $ 2000.00 | Bail Amount (Written) TWO THOUSAND | DOLLAR(S) |
|---|---|---|---|

Check One:   Cash ✓   (if check(s) or money order(s), enter number(s) and name(s) of issuing organization(s))

Check or Money Order

Describe any outstanding warrants or detainers, including surety examination, prohibiting defendant's immediate discharge. If none, write "NONE".     NONE

Having posted the bail amount listed above, and having read the information on the back of Copy 1 concerning bail refunds, and having been notified of any outstanding warrants or detainers prohibiting the immediate discharge of the defendant, I undertake that the defendant will appear in this action whenever required & will at all times render himself/herself amenable to the orders and processes of the court, and I acknowledge that the bail will be forfeited if the defendant does not comply with any requirement or order of process to appear in this action, and that his/her next scheduled court appearance is at 9:30 A.M. on the date and place written below:

| Date of Next Court Appearance 05-11-11 | County NEW YORK | Court CRIMINAL | Part D. |
|---|---|---|---|

| OBTAIN SIGNATURE OF PERSON POSTING BAIL ON COPIES 2, 3, 4, & 5 | Name of Person Posting Bail (Printed) HAGUE, DAN | Occupation of Person Posting Bail FUND MANAGER |
|---|---|---|

Residential Address of Person Posting Bail (including ZIP Code)
60, BROADWAY, PH1A, BROOKLYN, NY 11211

| Signature of Employee Receiving Bail $ | Title C-O | Shield or ID # 38181 | Facility Recv'g Bail $ RICC | Facility Housing Inmate RMSC, |
|---|---|---|---|---|

## Distribution & Routing Instructions

No.1 Give to person posting bail. Bail funds are deposited not later than the next business day after their receipt. Checks for refund of bail, minus the Department of Finance three percent 3% fee will be mailed according to the notice on the back of this form from the DIRECTOR OF FINANCE OF THE CITY OF NEW YORK, Room 2200, Municipal Building, 1 Centre Street, New York, NY 10007. The three percent 3% fee will not be subtracted if the case is terminated at the trial level with a dismissal or acquittal.

COPY 1                                                34 R (4/91)

**Exhibit V**



left outer hand.jpg



POLICE INJURIES.pdf



left outer wrist an...



-right outer wrist.jpg



rear right leg.jpg



front of legs.jpg



Case 1:15-cv-05871 LAP   Document 16-3   Filed ... 16   Page ... 71

right back hand.jpg



inner left upper ar...



rightblackeyera.jpg



inner right upper ...



left inner lower ar...



Exhibit W

| People v Price (Kelly) |
| :---: |
| 2016 NY Slip Op 50231(U) |
| Decided on February 25, 2016 |
| Appellate Term, First Department |
| Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. |
| This opinion is uncorrected and will not be published in the printed Official Reports. |

Decided on February 25, 2016
SUPREME COURT, APPELLATE TERM, FIRST DEPARTMENT
PRESENT: Schoenfeld, J.P., Shulman, Hunter, Jr., JJ.
571134/12

The People of the State of New York, Respondent, -

against

Kelly Price, Defendant-Appellant.

Defendant appeals from a judgment of the Criminal Court of the City of New York, New York County (Robert M. Mandelbaum, J.), rendered October 18, 2012, convicting him, after a nonjury trial, of two counts of disorderly conduct, and imposing sentence.

Per Curiam.

Judgment of conviction (Robert M. Mandelbaum, J.), rendered October 18, 2012, reversed, on the law and the facts, and the accusatory instrument is dismissed.

The verdict convicting defendant of two counts of disorderly conduct (see Penal Law §§ 240.20[2], [3]), was not based on legally sufficient evidence and was, in any event, against the weight of the evidence. The trial evidence showed that defendant called police after she was asked to leave a midtown Manhattan bar on a Saturday evening; the responding officers observed defendant to be visibly upset and they tried to calm her down; upon interviewing people inside the bar, the officers informed defendant that there was no action that they could take on her behalf; defendant was angry, but walked away from the scene; and that as defendant was approximately 20 feet away from the officers, she turned her head and shouted an epithet at them. On these facts, defendant's intent to cause public inconvenience, annoyance, or alarm, or recklessness in creating such a risk, was not established beyond a reasonable doubt (see Penal Law § 240.20 People v Baker, 20 NY3d 354 [2013]). Defendant's conduct did not indicate an intent to breach the peace, or even constitute an act from which a breach of the peace was likely to occur (see People v Johnson, 22 NY3d 1162 [2014]; People v Baker, supra; People v Pritchard, 27 NY2d 246 [1970]; People v Smith, 19 NY2d 212 [1967]).

THIS CONSTITUTES THE DECISION AND ORDER OF THE COURT.

I concur I concur I concur

Decision Date: February 25, 2016

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE TERM: FIRST DEPARTMENT
------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,          :

                Respondent,          :

           -against-          :

KELLY PRICE,          :

              Defendant-Appellant.          :

------------------------------------------------------------------x

<u>STATEMENT PURSUANT TO RULE 5531</u>

1.   The docket number in the court below was 2011NY016509.

2.   The full names of the original parties were People of the State of New York against Kelly Price. There has been no change of parties on appeal.

3.   This action was commenced in Criminal Court, New York County.

4.   This action was commenced by the filing of an accusatory instrument.

5.   This appeal is from a judgment convicting appellant, after a bench trial, of two counts of disorderly conduct (P.L. §240.20(2); P.L. §240.20(3)).

6.   This is an appeal from a judgment of conviction rendered October 18, 2012 (Mandelbaum, J., at trial and sentencing).

7.   Appellant has been granted permission to appeal as a poor person on the original record. The appendix method is not being used.

1

## PRELIMINARY STATEMENT

This is an appeal from a judgment of the Criminal Court, New York County, dated October 18, 2012, convicting appellant, after a bench trial, of two counts of disorderly conduct (P.L. §240.20(2); P.L. §240.20(3)), and sentencing her to a conditional discharge and three days community service (Mandelbaum, J., at trial and sentencing).[1]

Timely notice of appeal was filed and, on January 7, 2013, this Court granted appellant leave to appeal as a poor person on the original record and typewritten briefs, and assigned Seymour James, Jr., successor to Steven Banks, as appellate counsel.

Appellant did not have any codefendants below. She is not incarcerated pursuant to the judgment above.

## QUESTION PRESENTED

Whether the convictions should be reversed and the accusatory instrument dismissed where the evidence was insufficient to establish that appellant had the requisite *mens rea* to commit disorderly conduct. U.S. Const., Amend. XIV; N.Y. Const. art. I, §6; P.L. §240.20.

---

[1] References are to the trial transcript (Part 1), dated October 17, 2012; Those preceded by "T" are to the combined trial minutes (Part 2) and sentencing minutes, dated October 18, 2012.

The original complaint, which charged appellant with one count of disorderly conduct P.L. §240.20(3)), was replaced by a Prosecutor's Information charging her with both P.L. §240.20(2) and P.L. §240.20(3) (2-3).

## STATEMENT OF FACTS

*Trial*

On September 24, 2011, at about 10 p.m., Police Officer *Matthew Winters*, a seven-year veteran of NYPD assigned to Midtown South, and his partner, Police Officer Michael Relf, responded to a radio run of an assault in progress at Stitch Bar, 247 W. 37th St., New York County (27-30, 61, 64). [2] There, Winters was approached by appellant, who had called to report the assault and was standing in front of the bar waiting for the police to arrive. Winters recalled that appellant was upset and had "visible bruises" on her arms (30, 62-64). [3]

After briefly speaking to appellant, Winters went inside the bar to hear "the other side of the story" while appellant remained outside (30, 63-64). When Winters returned a few minutes later, he told appellant that the police would not be charging anyone and refused to take her complaint (30-31, 51-54, 64).

While Winters was conversing with appellant, he was standing by the curb next to several other officers, and leaning on a phone booth with his back to the street. Appellant, who appeared visibly exhausted, stood directly in front of Winters (31-34). After Winters told appellant that the police would not assist her, appellant became more upset. The tone of her voice became higher and her hand gesturing movements became more animated (33). Winters testified that he tried to calm appellant down -- he told her to "calm down"

---

[2] September 24, 2011 was a Saturday.

[3] Counsel told the court that, at the time of trial, CCRB was investigating the police response to appellant's 911 complaint and the circumstances of her arrest in the instant case (12-14).

and "speak lower." Appellant lowered her voice but, as she grew more excited, the tone of her voice became elevated (33-34, 54-55).

Appellant communicated to Winters, who spoke to appellant for about five minutes, that she was upset about the way the police were handling her complaint. In response, Winters told her to contact the Better Business Bureau if "she had a problem with the establishment" (34-35, 65-67, 70-71). After Winters made the remark, appellant started walking away from the bar towards Eighth Avenue. When she had walked about 20-25 feet, appellant glanced over her shoulder and yelled to Winters, "go f--- yourself" in a tone that Winters ranked as 9 on a 1-10 scale with 10 being the highest. Because appellant's remark was "loud enough for others to hear," Winters immediately grabbed appellant and placed her under arrest (34-35, 55-58, 65-68, 70-71). Winters did not recall appellant making any other derogatory statements prior to her arrest (36-37).[4]

Throughout the course of their conversation, Winters recalled, appellant's tone "fluctuated up and down" with her emotions. After he told her that police would not be charging anyone, appellant became more upset and her tone became higher (66-69).

From the time Winters first responded to the time of appellant's arrest, Winters estimated that there were about twenty people in the area. "There were a few [people] in front of the bar, a few to my left, a few to my right, and a few across the street" (35). He

---

[4] The People introduced a videotape showing the police responding to the scene, and Winters speaking to appellant, entering the bar, exiting the bar, and again speaking to appellant, who could be seen waving her arms (51-54, 65; People's exhibit number 2).

4

testified that "[p]eople were walking through us as we were speaking with the defendant" and that some people stopped on the sidewalk (37).[5]

When Police Officer *Michael Relf*, Winters' partner, first observed appellant, she was animated and "on the verge of crying" (T. 16-19, 26-27). As appellant described the incident, Relf recalled, the tone of appellant's voice fluctuated considerably – she spoke calmly one minute, and was yelling the next (T. 16-19, 26-27). After Relf and his partner spoke to the bar manager and two patrons, they decided not to arrest anyone for assault (T. 20-21, 28).

Although appellant was initially calm when Winters told her that the police would not be making an arrest, she became upset after Winters refused to take her statement. Appellant, who felt as if she had been wronged, Relf testified, then purportedly became "animated and aggressive" and she told Winters that NYPD was "worthless" and "she is the victim" (T. 20, 28-30).[6] After appellant yelled "go f--- yourself" as she was walking away from the scene in a tone Relf described as a 9,[7] Winters arrested appellant for using "obscene language easily within hearing of the general public" (T. 22-25, 30-31).

Relf described the area as mostly commercial. Although there were about ten people in the general area and appellant's comments caused some pedestrians to glance

---

[5] The court stated that it would only consider the "go f--- yourself" statement because the other statements contained in the complaint were apparently made after appellant was arrested and would be precluded (38).

[6] When asked to describe the tone of appellant's voice at the time she made the comments, Relf testified her tone was a 7 or 8 on a scale of 1 to 10 with 10 being the highest (T. 28).

[7] On a scale of 1 to 10 with 10 being the highest tone (T. 30-31).

over, appellant did not try to engage any of them and none of them got involved (T. 20-21, 24-31).

When Midtown South Police Officer *Dianne Melidones* responded to Stitch Bar, Winters was on the sidewalk in front of the bar talking to appellant, who appeared "agitated" and was waving her hands around, and Melidones remained with appellant when Winters went inside the bar (72-75; T. 3-5). When Winters returned and informed appellant that the police would not help her, appellant's tone became elevated. After Winters told appellant to contact the Better Business Bureau about her complaint, appellant started walking away from the scene. As she was walking away, appellant was purportedly "screaming and carrying on" and, after she told the police "go f--- yourself," Winters proceeded to arrest her (77-79; T. 2, 9-12).

During the encounter, Melidones testified, a few pedestrians glanced over as they passed by but continued walking and did not have any audible reaction, and a "crowd of five people gathered across the street" (75-79; T. 9, 13-15). Appellant made no attempt to engage any of the bystanders or pedestrians (T. 9-11).

*The Defense Motion to Dismiss*

After the People rested, counsel moved for a trial order of dismissal. The defense maintained that the People failed to make out a *prima facie* case since the evidence was insufficient to support the inference that appellant acted intentionally or recklessly to create a public safety risk. Citing, *inter alia, People v. Munafo*, 50 N.Y.2d 326 (1980), counsel noted that the dispute was a private matter solely between appellant and the

police -- specifically officer Winters -- regarding her assault complaint. Although a few pedestrians glanced in appellant's direction as they walked by, they did not get involved and there was no indication that appellant sought to incite or involve the public or that the public was inconvenienced, annoyed, or alarmed. Thus, counsel continued, the circumstances did not support the inference that appellant intentionally or recklessly created a risk that the private dispute between her and the police would extend its boundaries and become a public issue (T. 33-37, 40-48).

In response, the prosecutor contended that yelling "go f--- yourself" in a loud tone -- even just once – is sufficient to establish "unreasonable noise" under subsection (2) of P.L. §240.20 (T. 49-50). Citing *People v. Weaver*, 16 N.Y.3d 123 (2011), the prosecutor further argued that appellant's use of "profanities one time" was sufficient to satisfy P.L. §240.20(3), and that the noise and obscene language recklessly "created a risk to the public" (T. 49-53).

The court denied the defense motion (T. 57).

*The Closing Arguments*

Counsel maintained that the People failed to prove beyond a reasonable doubt that appellant had the requisite *mens rea* or *actus rea* to commit disorderly conduct. Appellant sought out the police after she was assaulted and when they refused to take her complaint, she became justifiably upset with Winters. At no point, however, did appellant attempt to involve or incite others and, although a few curious pedestrians turned to look, they

continued walking, and there was no evidence it caused them to become inconvenienced, annoyed, or alarmed or created a risk to public safety (T. 58-61, 66-68).

Counsel further noted that appellant made the derogatory remark to Winters because she was nervous and upset with Winters, and not to intentionally incite others and, moreover, the disorderly conduct statute was not intended to criminalize the conduct here – a single derogatory remark made during a private dispute with a police officer. Counsel also pointed out that the encounter occurred in midtown Manhattan, where the public is constantly barraged with sirens and other loud noises, which is relevant in assessing whether the noise was "unreasonable" (T. 59-68).

In response, the People contended that appellant intended to cause public inconvenience, annoyance, or alarm because she was "already agitated and worked up and then became even more agitated when they told her they would not arrest the person but when they told her she should go to the Better Business Bureau she got even more upset because she wasn't having her own way and she continued yelling and cursing and then walked away from the place. At the moment she said 'go f--- yourself' [in a loud tone] we know that her intention was to cause public inconvenience, annoyance, or alarm [because] she did not state to the police officers 'go fuck yourself' when she was standing right in front of them within 2 to 3 feet" (T. 71-75). According to the prosecutor, because appellant was aware that members of the public were in the area, by making unreasonable noise and yelling obscenities and gesturing, she recklessly created a risk to others (T. 77-82).