24. I have been unable to attain work in my field of photojournalism because the MDAO destroyed my credibility. The most valuable possession that an editor/journalist has in this worl is HER CREDIBILITY. Nothing I can do myself will help restore me to the status I enjoyed in the wake of the MDAO's reckless, criminal, unconstitutional, and malicious behavior towards me: an innocent crime victim.

25. I miscarried a child I was pregnant with by Mr. Powell in the Spring of 2011 and had to suffer through incarceration at Rikers Island on Mother's day.

26. I have a debilitating psychiatric condition (C-PTSD) as a result of the pain and suffering foisted on me not only by Mr. Powell and his family and friends but also by a judicial system hell-bent on ruining me.

27. I came to the MDAO and NYPD in 2010 about my situation as I was suffering severe physical, mental, and economic abuse and instead of assisting me they chose to throw me to the wolves and put me in Riker's Island for alleged crimes of harassment I supposedly purported against my batterer. When I went to the NYPD for help in freeing myself from my batterer not one person in the precinct took the time to meet with me and review the many pieces of evidence that I had proving that I had not fabricated my own injuries; the stance the detectives in the 28 squad and the Manhattan District Attorney's office took in order to protect my batterer who was involved in several prosecutions they had already set in-motion against other parties not associated with me.

28. My batterer (Raheem Andre Powell) enjoyed a privileged status with the MDAO and NYPD as a result of several incidents: he had assisted in helping the police previously and warned me that I would be unable to find sympathetic ears regarding his violence. More recently Powell had been a complainant in an attempted murder case wherein his marijuana distribution hideout was robbed in December of 2010 by an armed member of a central-Harlem gang. During that robbery Powell was shot at by the perpetrator as he chased him up nearby Frederick Douglas Boulevard in front of the 28th precinct.   That young robber/shooter was key in unraveling knowledge about the "Goodfellas" and "137th st" gang in Central Harlem which were 'brought to justice' under fanfare and several public press conferences by the district attorney's office.  Powell also had knowledge of other gang-related (Crips/Bloods) activities that involved the murder of his cousin, Andre, in broad daylight on the corner of 115th and Lenox in the Fall of 2010 among other pieces of information he on passed to the police.  As ADA Strohbehn at the time was a junior member of an anti-gang task force in Harlem (See Exhibit # 18 Strohbehn Linked in Resume) **I have a very hard time understanding why Strohbehn was allowed to be the only ADA to evaluate the veracity of my complaints when it was known that my Batterer was an active participant in one of her investigations and clearly she would need to defend his credibility to assist in her \*case-building (\*self-promoting career-building too.) Strohbehn after 'cleaning up' Harlem as a Junior member of the anti-gang squad has been PROMOTED to now be the SENIOR LEADER on a similar squad centered in MIDTOWN! (see Exhibit #18 Strohbehn linked-in resume).**

29. My complaints as a battered intimate-partner against Powell fell on deaf ears at the 28th precinct nearby to my former home on w. 120th st in Manhattan.  I was caught up in a miasma of legal posturing and wrangling as the DAs office made a case against me for

8

hundreds of counts of alleged aggravated harassment I supposedly committed against Powell (Exhibit #s 4 & 5) Without examining one hospital emergency room record, speaking to one neighbor, examining the receipts I had for various broken windows, kicked-down doors, or examining the photos of my injuries I was labeled a fabricator and liar.  Branded a pariah I was thrown into jail, miscarried the child fathered by Powell I was carrying, and began suffering serious symptoms of Complex Post Traumatic Distress Disorder.  Everything I had worked for in my life burned around me as my credibility was lost.  My friends and neighbors looked at me with disdain and disbelief as swirling rumors fueled by the actions of the police and DAs office gave people incredulous pause whenever they confronted me.  On many occasions I was physically attacked in the neighborhood by people I knew loosely in the street.

## II. Rough timeline of events involving violence against me by Powell

30. August 2009—First Beating I suffered at the hands of Powell People I told about first incident and/or who saw bruises/marks on me after incident (I went to a party that night with friends and was in shock still as the beating had taken place in the early morning): Friends who attended Party: James Price-Newsweek Magazine: 718. 872.8544  or office: 212 445 4628 Paul Moakley (party thrower):  Deputy Director of Photography, Time Magazine: 646 379 0806 Brona Hatchette: Women's Health Magazine: 646 667 7609

31. Fall 2009:  I receive a visit from best college friend from Mount Holyoke, Amy Carter, from Seattle while she is in town on Business. She comments on how I live in fear of my boyfriend: she is upset that even though she is taking me out to dinner I still have to prepare meal for Raheem and that he calls me several times throughout dinner to check up on me and question me jealously about my whereabouts. After her visit she sends me a letter fearful of my circumstances, begging me to take a hard look at why I am in relationship and encouraging me to leave Raheem.
    Amy Carter
    The Bill & Melinda Gates Foundation
    Senior Program Official, Private Gifts
    Seattle, WA
    206 709 3282
    206 612 6496
    206 691 1655

32. Beatings Continue through fall of 2009 and winter of 09/2010.
    People who heard domestic disputes:
    Tammy Grinder upstairs neighbor (646 228 1469)

9

Jared Love (upstairs neighbor in #3—Landlord Adam Gargani has his contacts 347 237 0100)

People who called the Police when they feared for me b/c of Raheem:
(neighbor) NYC Public School Teacher.  646 320 6145
Tammy Grinder (definitely called police on night of 11/12–646 228 1469)

33. People who saw bruises/marks on me:
Neighborhood drivers from Harlem Transport—cab base around the corner:
Kalu 646 721 8592
Modou 347 751 4211
Dee and Marilyn; 347 203 2623

34. Neighbors:
Brianne: ask landlord for number ex-girlfriend of Jordon Love (Adam Gargani is landlord: 347 237 0100)
Tony: Photographer who lives at 231 w 120th apt #3: he took pictures when Raheem would beat me:  (212 729 7434)
Faisal: ask landlord for number—he and his wife have moved back to Iran I believe but they witnessed Raheem punching me and preventing me from entering my home (Adam Gargani is landlord: 347 237 0100)
Feliciano My building super; witnesses Raheem push me and hit me in front of my home in the spring of 2010: (646 201 1096)
Marcel: the son of Maria Robinson.  Lives at 232 w 120th #1 (cq)
Dee & Marilyn Benetatos: Owners and Residents of 231 w 120th st:  witnesses bruises on me on numerous occasions. 347 203 2623
Maria Robinson: Lives across street:  witnesses Raheem Beating me on 12/20/2010 in front of my home. Her son, Marcel, also saw bruises on me on numerous occasions Maria died of Cancer in 2012)Todd Stevens: 212 350 8507 (my real estate broker from Douglas Elliman—encountered me covered with bruises in sept of 2010 @ 28th precinct as I tried to make a police report about beating.)

35. February 2010:  suffer massive beatings:  sent to Emergency rooms twice back to back @ St. Luke's and Metropolitan to treat ripped cornea/black eyes Have Emergency Reports Archived.

36. March 2010:  suffer fabric burns all over upper body from Raheem ripping my clothes off as I tried to flee and dislocated shoulder.  Photos of injuries

37. April 2010: huge fight over Easter week.  bruised badly-entire back and arms covered in bruises: swollen jaw. sprained ankle.

38. Beatings continue whenever we fight throughout Spring of 2010

39. May/June 2010:  call and visit 28th precinct multiple times to discuss how to get help. Speak with young officer at desk: Officer Williams. (pretty, petite, Afro-American) she witnesses bruises all over me and encourages me to make report.  She warns me that he will be locked up if I sign report.  I beg her if there is a way to just give him a warning or to help me just extricate myself from relationship.  She says the only way Police can help is if he is arrested.  I leave station house without signing report.

10

40. June 2010; Raheem attacks me with belt that is covered in metal bottle-caps. leaves permanent bruises on me. Several people exclaim that my body looks as if it had been run over by a truck. Dirk Caldwell VP of Sales at Black Enterprise witnessed belt marks; 347.865.5892

41. June 2010
    kidnapped a raped at gunpoint by guy on long island named Ricky. I have address and phone number still. Raheem indifferent—beats me up and blames me. I call svu and discuss attack with female officer who tells me that I cannot make an anonymous report to police. Raheem encourages me not to make report and he gets in shouting match on phone with kidnapper. I have a longer brief about this incident that I have provided to the OIGNYPD. I also tried to inform ADA Higgins nee Richendorfer about these events in 2013 but she refused to take my brief. I have reported this incident to the OIG.

42. July 3 2010: Raheem attacks me as I leave my house to see friend Dirk J. Caldwell, SVP of Sales, Black Enterprise who wants to take me to Carmine's for dinner that evening. He chokes me through my front gate and rips off my necklace and prohibits me from leaving aedicule outside my front door. I have to call Police to get him to leave and permit me to leave my home. Officers respond to 911 call. They encourage me to make report—I decline as they say he will be arrested. officers Loor and Chan respond.

43. July-September 2010: multiple blow-ups; police called to home on many occasions in response to my calls and other complaints by neighbors.

44. July-September 2010: multiple trips to station house to discuss situation with Domestic Violence officers McNair and Diaz. I fill out several reports and don't sign. Many photos taken at precinct of my injuries. I discuss abuse with Officer Williams at the 28th precinct on multiple occasions. She is a beautiful, young, afro-American officer who sat at the desk Sergeants' desk. She is very sympathetic but adamant that there is no way police can intervene unless I sign a complaint against him for felony assault.

45. September 2010: multiple calls to Police. Front Windows smashed and replaced several times. Door kicked in, locks broken, locksmiths called. Locksmiths and glass companies have records of damages and repairs.

46. October 11, 2010: Raheem tackles me and beats me in street at intersection of 118th and st. Nicholas Ave (NW corner.) He beats me with his fists and cell phone and Police are called. Police encourage me to make a combined report of stolen license plates, car, and Domestic Abuse all n one. I'm not given copy of report. Police take extensive photos of face, back and torso with bruises all over. Officers instruct parking garage to not allow Raheem to take my car out of garage. Raheem bribes parking lot owner and takes car even though Police helped me remove one license plate and park suv in front of car. Witnesses: Levertt (number above) and a girl named Jenn I know from the Dog Park (can get her number) (Please see photos dated Exhibit #1 10/11/10)

47. October 14, 2010: (Double check date of desk appearance ticket issued me—day could be one day later or earlier) Blackmailed and life threatened: dogs' lives threatened by Raheem. Says he will "ruin" me by telling ex colleagues and family private info about me if he gets arrested for Domestic violence, if I leave him, or if I fail to pay his bills.

11

Forced to go to precinct and ask for help. I explain to officer McNair and Detective Simmons that I'm being blackmailed and Raheem is blackmailing me and if he gets arrested everyone will know etc. Detective Simmons states the only way to dismiss complaint filed without my permission is that she needs overtime that week and by arresting me for making a false statement she will receive it. She says since I've never been arrested that this will not be an issue and I won't go to jail. She helps me write simple statement saying I caused bruises to my face bc we were in a fight and I was mad etc. I'm arrested and given a desk appearance ticket for falsifying a police report. I agree to plan as attack had happened in PUBLIC on a STREET CORNER in BROAD DAYLIGHT and I knew if ever investigated that it would be proved that I was not lying. When I appear in court to answer on the DAT a month later the DA declines to prosecute when I make court appearance and issues an ACD which I do not sign or agree to.

48. Night of November 11/12 2010: Raheem breaks into my house and is waiting for me when I come home. I had been at Amsterdam Ale House for dinner. Police saw me (officer Loor) come home as they beeped at my taxi to move aside when I was paying fare and waved at them when I disembarked. When I entered my home Raheem attacked me, stole my money and choked me until I passed out on my living room floor. When I regained consciousness I tried to run for door and screamed for help. At that point Raheem tried to detain me and I was thrown/pushed through a 30 gallon fish-tank. When Raheem realized what he did he panicked and stepped in the glass to pull me out of tank as I was sitting in glass and foul water. He stepped on glass in his flip-flops and needed to be treated months later in December or early January at st. Luke's for an infection he suffered from a shard of glass lodged in his foot from that evening that had become infected. Neighbors all called police and they were pounding on my door; there must have been 30 officers in my house that night. After much arguing with police (Raheem had disappeared out the back door) I was taken to Metropolitan Hospital and treated. The FDNY ambulance workers (Valentin was one of them) remember the incident and how strange the police were acting. The doctor who treated me can also comment on this (dr. Albert Della Fave—ER Resident.) MANY neighbors heard me screaming for my life and called police that night. survey 911 calls

49. Medical Professionals who Treated me:
    FDNY Valentin: see copy of FDNY ambulance report (EXHIBIT #2)
    Dr. Albert Della Fave: Metropolitan Hospital ER Resident: 212 423 6262 to attain a copy of DELLA FAVES INTERNAL DISPOSITION describing events with police and my treatment beyond the scope of what is in my medical records. (see EXHIBIT # 2 Hospital emergency Report)

50. November 17, 2010: Beaten by Nancy Powell, Raheem's mother when I go to her house to ask her for help in extracting myself from relationship/getting my car and other belongings back. Face completely covered in blood and deep scratches from her fake nails digging into my flesh. I have permanent facial scarring as a result. (See Exhibit # 1 Photo of deep scratches on face dated 11/17/2010) Nancy Powell was given an ACD which she violated by being re-arrested for marijuana possession six months later but the Das never prosecuted her. (2010NY092185).

12

51. November 22, 2010: after lying in bed frightened and starving for five days while my house is trashed (rocks thrown through front window, flowerpots broken, doormat in front of front door stolen, trash cans tipped, doorbell constantly rung to the point I had to disable it) I go to the police in fear of my life. Police see the damage on my face still five days later and allow me to make report against Nancy Powell however they refuse to allow me to make a report about the November 11/12 incident where Raheem threw me through a fish tank and instead the precinct instructs me to go to family court to attain a restraining order against him which I do (Exhibit # 26) I take it to police to serve and they tell me to come back. I return a few days later with Family Court restraining order to serve again and the precinct refuses to act on it. This continues for weeks.

52. December 22nd, 2010: beaten, robbed, dragged into street by Raheem after he breaks into my house and steals my money and phones. Multiple witnesses call 911 for help. Precinct desk sergeant Agron tells me when I go to make report that he will arrest me for trespassing if I don't leave the precinct. Refuses to act even though I have an active restraining order against Raheem. He refuses to look at it let alone serve it. I call 911 from inside precinct to report his conduct and the operator tells me they can't do anything to help me.

53. More fights through December 2010 and January 2011. ***I attempt to lock Raheem out over Christmas and Raheem incessantly pounds on door and windows calling me all night for two days when I wouldn't let him in********I had a friend staying with me, Dirk Caldwell from Black Enterprise. He witnessed this barrage of harassment and vowed to only return to my house 'with a gun to protect himself.' Dirk Caldwell VP of Sales at Black Enterprise witnessed Raheem trying to break down my door and his incessant pounding on my windows 347.865.5892

54. January 27th 2011: fight with Raheem. I go to precinct to make police report of incident and sergeant Agron again tells me that the only thing he can do for me is to "move me to Nevada" (implying that I am a some kind of filthy degenerate prostitute unworthy of the NYPD's assistance.) (See texts from Powell EXHIBIT #12)

55. January 28th 2011: I make appeal to detective Simmons to help me. She is disgusted at Agron for his treatment of me and insists I make reports about 12/20 and 1/27 incidents to DV officers when they are in the next day.  Simmons agrees to help me if I tell her everything I know about Raheem's drug-dealing and his connections etc. I ask about signing a complaint for injuries dating from 11/11/2011 and Simmons tells me its too late that the precinct will look bad.

56. January 29th 2011: Interviewed by DTs about Raheem's drug sales enterprise. They never ask me to show them pictures, ER reports or anything related to my abuse whatsoever etc. Detectives tell me the only way they will help keep Raheem away from me and to get my car back from Raheem is if I press charges against Raheem.

57. January 30th 2011: DV officer McNair takes report of 12/20 incident and encourage me to make report about 1/27 incident. I am leery b/c no one saw him harm me on 1/27 but people did see me harmed on 12/20. Precinct tells me that Raheem has been making reports against me and that if I don't make report about 1/27 incident "decisions may be

13

made that are not in my favor." I ask again to make a report about incident on 11/10 and am told that; ' too much time has passed' by officer McNair and that "the Precinct will look bad" if they take a report for an assault that happened over two months ago even though I was accompanied to ER by the SHIFT SARGEANT and over half a dozen blue uniforms and at least two detectives.

58. January 31st 2011: file report regarding 1/27 incident.

59. February 1st, 2011 receive call from 28th pct DV officer McNair telling me Raheem has been arrested and served with restraining order. he then asks me where I am and presses me. He insists he must know my whereabouts. I refuse to tell him.

60. February 2nd 2011: receive call from DA Strohbehn: she tells me I have "less than an hour" to get downtown to her office. When I arrive she and det. Simmons and another dt from the 28 (George?) peppers me with questions, call me a liar. Strohbehn informs me she is declining to prosecute Raheem, refuses to look at any evidence I have that supports that I have not been making-up abuse, accuses me of running a dominatrix dungeon out of my brownstone apt, informs me that if I make another report against RAHEEM that she will 'lock me up and throw away the key". She also informs precinct that she will personally handle all of my inquiries and if I have "a bullet-hole in my head that they are to call her first before responding to any call from me." She also encourages Raheem to press counter-claims of harassment against me and instructs me that even though I haven't been served that I am to show up in family court the next morning to respond to Raheem's charges. She tells me I will be charged with contempt of court if I do not show up. She tells me her only concern is that "an innocent black man has been sitting in jail for 24 hours…"(See Exhibit #25 Powell's family court complaint vs. me). My landlord, Adam Gargani attempts to call her to introduce his perspective based on repeated reports of abuse enacted on me at the hands of Powell and Strohbehn hangs up on him (see Letter from Landlord Gargani Exhibit #3).

61. February 3rd: Powell tries to accost me on way out of family court. Judge denies his petition for a reciprocal restraining-order ADA Maria Strohbehn refuses to help me file report about Raheem's conduct on way out of court building. I make report with Det. Mortimer at 5th precinct of violation of restraining order. He is told to stand down regarding investigation and arrest of Powell.

62. February 2011: I discover I am pregnant

63. Early February 2011: Neighbors tell me that nude photos of me have been texted around to all the neighborhood boys. I call precinct and Strohbehn and no one will take report. I call Mortimer and he tells me he can't do anything. Lt. LArocca from the 28th pct encourages me to make a report to the court and to the Department of Investigations as he informs me that ADA Strohbehn has instructed the pct. to not take any reports from me. (PLEASE CONTACT LT LAROCCA he has retired and rumored to be living in Florida.)

64. February-Marcy 2011 Numerous calls from Raheem from Pay phones remember many and can pinpoint March 16th 10:30am repeated calls from him. please check my phone records 212 470 5624 was my number then.)

65. February/March 2011: I make various calls to DV advocates/Mayor's office complaining about Strohbehn, how she never investigated my allegations and refused to prosecute my

14

batterer. I am informed by ADA Larry Newman that Strohbehn is removed from my case/investigating my allegations.

66. February 20th 2011: I call Raheem to tell him about pregnancy. I was extremely uncomfortable and in pain. We speak for hours/days on end about situation. Raheem enraged that I will not return to him and that I am considering terminating my pregnancy. He's also enraged that I beg him to seek counseling for his abuse and battery. I beg him to admit his wrongdoing for the sake of our unborn child and to take the batter's course. He is Beyond angry that I am now living in expensive loft in SOHO, that I have a new boyfriend, and that I am considering an abortion.

67. February 23 (cq)2011: receive call from officer Diaz at DV office of 28th precinct asking me to "come in to tell them how things are going." I smell something fishy and bug out. Officer McNair admits to me that Raheem made claims of harassment against me. He's surprised to find out that Raheem and I had been discussing my pregnancy. Tells me I will be arrested.

68. February/March 2011: I miscarry my child. It is a long, drawn-out miscarriage painful and protracted. I don't even realize what is happening for the first week or so of the miscarriage.

69. March 24th 2011: arrested in Manhattan family court by FOUR NYPD DETECTIVES from the 28...Det. Simmons is called in front of Judge Sattler and lies on the stand (see attached transcript from Family Court Exhibit #13). After she is allowed to cuff me in front of Judge Sattler because she alleges she has investigated my claims of battery and they are not credible she takes me to the 28th pct for booking and while there responds to a question I ask her (after she calls me a liar and accuses me of making up abuse) by saying: "Kelly: I don't tell you how to lay {sic} flat on your back and spread your legs when you do your job and I certainly don't expect you to tell me how to do mine..." while I am in the holding cell at the 28 DT squad room.

70. Later that evening as I am being arraigned the ADA standing in the court part, Ms. Zeinreich, eagerly tells Judge she is filing and expedited count sheet and requesting for a restraining order against me and filing a family registry this is before any member of the Das office investigated any of my allegations. NO one asked me to sign HPPA forms, to review photographs or for numbers of neighbors that could confirm my allegations.

71. May 2011: arrested by Dt. Fontanez for contempt of court. Not given time to make bail; taken straight to Rikers island where I am beaten. Raheem's cousin works on Rikers island so I was treated with special disdain. Dt. Fontanez promises if I come with him quietly that he will investigate my claims that Raheem beat me. Contract sinus infection that causes hearing loss on Rikers. Rikers staff loses my belongings and refuses to give me house keys when I am discharged. Corrections officers Montague and others I made note of. They can vouch to the abuse I suffered while in custody of the NYCD. (Exhibit #6)

72. May/June 2011: Jumped by women's shelter dwellers at 233 W. 120th st. who do drugs with Raheem's cousins across the street three times. Police called: they refuse to help.

73. May/June/July 2011:  constantly taunted by neighbors about beatings and called a whore.
Told my life is in danger by Raheem's drug-pusher TY who was still slinging Raheem's
drugs out of 239 w 120th st. #2.

74. AUGUST 2011:  multiple attacks and constant taunting & harassment by neighbors with
allegiances to Raheem.  Police take reports.

# III. Events that led to the filing of Federal Department of Justice/CCRB/IAB/DOI/OIG complaints & details of those incidences.

75. Complained July 15th, 2011 complaint # 11-31923  and #11-43253 that Dt. Simmons
failed to investigate my allegations of abuse at the hands of Powell, and that the 28th
precinct never investigated my complaints.  No action was ever taken nor any report
provided back to Manhattan North liaison (as per officer Van Vorren and SGT Purcel on
Manhattan North Patrol Bureau desk.)

76. NEITHER ADA Maria Strohbehn nor Detective Simmons investigated my assertions that
I had been abused by Powell.  They never inquired about the abuse and checked with my
neighbors, interviewed me about the abuse, reviewed the photographs (Exhibit #1) ,
hospital emergency room reports (Exhibit #2), receipts for broken windows and kicked-
down doors or to spoke with my neighbors who had heard and seen the constant
battery.  They never investigated my claims of abuse at the hands of Powell before the
squad at the 28th precinct charged me with hundreds of crimes against Powell.  They
failed to interview my landlord (Exhibit #3) and neighbors (and even lied about this);
never looked at or compared photos of my severe injuries (#1) or hospital emergency
room reports (#2); never requested that my sign HPPA forms (Exhibit #24) releasing
medical records,  and refused to collect/ accept other evidence such as 911 calls, receipts
for repair work for broken windows or doors that had been kicked down that proves that
regular battery had taken place against my by Powell.  They accused me of fabrication
without knowing or seeking to examine the facts and then initiated an elongated, over-
zealous, and incorrectly charged case against me.

77. ADA Strohbehn and Detective Simmons never investigated the facts of my abuse despite
the fact that on the night of November 10-11th, 2010 over thirty members of the 28th
precinct converged on my home.  The police accompanied my ambulance to Metropolitan
hospital after I had been choked until passing out and thrown through a fish tank by
Powell (see Exhibit #2 hospital records and Exhibit #1 photographs of permanent
scarring from being thrown through fish tank).  They never asked me to sign a HPPA
form or for permission to speak to various doctors that had treated me for the many
emergency room visits she made in 2010.  They never interviewed neighbors who heard
constant battery and called the police beseeching them to help me before they accused me
of crimes and incarcerated me setting off a chain of events that would place me and my
life into a Devil's cauldron of misery.

78. Simmons and I had had a previous encounter on October 14, 2010 when I begged the
28th precinct not to file a report of abuse that I wasn't ready to submit.  Officers Diaz and

16

McNair had told me that I could have a night to sleep on a report I was contemplating making before they would initiate action on. I was not ready at that time to initiate a prosecution against my batterer, Raheem Andre Powell, as he had threatened me with blackmail and reminded me that he had Police connections and would 'ruin me' if I reported his battery to the police. Upon arriving at the 28th Precinct on the morning on or about October 14th, 2010 and telling the DV officers McNair and Diaz that I was choosing to not initiate prosecution against Powell for beating me on 10/11/2010 I asked them to tear up the 61 report. The previous evening I had been told by the police that they would allow me time to think about if I wanted to follow through with the filing of the complaint against Powell. I was reticent to go forward with my claim against Powell for several reasons including that Powell was blackmailing (Exhibit #12) me by telling me that he would release intimately personal photos and information about me to my family and colleagues if I ever went to the police about the battery he unhanded on me. (please refer to exhibit #12, cell phone transcripts of messages sent to me from Powell proving the blackmail). The DV officers had already elevated the report even though they had promised not to and it had been assigned to Detective Simmons.

79. Simmons agreed to tear up my report against Powell only if I wrote out statement saying I had made a false report and inflicted injuries on
myself. Simmons recommended this course of action as it was the easiest way to make the situation go away. Simmons stated that she needed overtime hours that day and as it was nearing the end of her shift and by booking me that day for filing a false police report she would get some overtime hours. Simmons told me that as I had never been arrested that I would only receive a Desk Appearance Ticket and that no one would go to jail. She also warned me to keep my head down and that I should move out of the neighborhood because from this point on "you're on your own." The report that I had made was for injuries inflicted on me in public on the corner of 118th st. and St. Nicholas Avenue. The events were witnessed by people known to me and I knew that if my story was ever followed up on that the facts would come out so I agreed to Simmons' plan. Simmons informed me that this was the only way she would not arrest Powell based on my complaint filed without my permission by the DV officers. Detective Simmons coached me on how to retract my statements: asking me to rewrite a synopsis of events several times each time asking me to write the time at the top of the page much earlier than the last so that Detective Simmons "could receive overtime by catching the case with enough time to start to work it" on 10/14/2010. A record of Simmons' overtime request and payment is on file for this day (Please double check date— Simmons' OT was same day as my DAT).

80. On March 24th, 2011 Detective Simmons was called in front of Judge Sattler in Family Court and asked if she had investigated my claims of abuse and if they were credible. Simmons replied "no" (Exhibit #13 ) even though she had not questioned me about my emergency room visits, reviewed photos of injuries taken by my neighbors, or interviewed my building super, landlord or neighbors about the ongoing abuse. After Simmons answered that she did not believe my allegations Judge Sattler allowed four officers from the precinct to cuff me in the Family Court House on Lafayette St in her courtroom and transport me back to the 28th precinct for booking and further processing and arraignment. DETECTIVE SIMMONS HAD NEVER INVESTIGATED MY ALLEGATIONS OF ABUSE & SHE PERJURED HERSELF IN OPEN COURT.

81. When I was in the cell in the squad room AFTER being arrested in Sattler's court I inquired as to why Simmons hadn't investigated my claims. My home was 1.5 blocks

17

from the Precinct on 122nd but no one in my brownstone was interviewed about the constant abuse. Detective Simmons replied to my query: "Miss Price, when you lay on your back and spread your legs while doing your job I'm not standing over you telling you what to do and I sure as hell don't expect you to tell me how to do mine..."

82. Complaint # # 11-31923 was marked "unsubstantiated" by lt. Rentas and 11-43253 was closed by a 28 squad investigator and closed by lt. laburda: 678 1608. No one ever contacted me to interview me regarding these complaints.

83. 9/1/2011 Filed complaint vs. Officers Bright, Ebright and Raman as well as Sergeant Agron for incident on 8/31. IAB complaint # 11-39869 PO EBRIGHT PO RAMAN and PO Ehlers]. This complaint was marked the 28 precinct as unsubstantiated by someone named Lopez. Basically these cops instead of taking my report of death threats by Raheem's friends outside my home chided me, harassed me, and laughed in my face. When they arrived on scene and Ebright said to me; "Miss Price I hope someday I am called to your home and you are lying dead on the sidewalk with a knife in you..."

84. October 2011; filed IAB complaint # 11-49386 against 28 pct DV officers Rosendary and Simmons WHO THREW AWAY MY 61 when I complained that Powell was violating his restraining order. (exhibits 14 & 15) complaint c1-1-667494377. This complaint was referred back to the precinct for investigation by the manager of the officers, the SGT also marked my complaint as UNSUBSTANTIATED.

85. On October 25, 2011 I attempted to file a DIR report with the 28th precinct about a violation of a restraining order Powell had committed on 10/21/11 against an order of protection issued by Judge Sattler (Docket #0-00763-11, File # 1685, order #2011-1195 issued on 9/29/11 expiring on 3/29/12.) I was refused the opportunity to make a report of the violation on the date of occurrence. I went back on subsequent days in an attempt to file the report and Captain Williams, the CO of the 28th precinct, instructed his DV officers to take the report. The DV officer who took the report eventually (id # 939468) ripped up the report and refused to process it (Exhibit #14 copy of report ripped up by DV officers). When following up the next week on the status of the DIR I was told it was missing and that I was not invited back into the precinct to refile it. I was accompanied on 12/01/11 by representatives from the St. Luke's Roosevelt Hospital Crime Victims Center back to the precinct to refile a new DIR (Exhibit #15.) The DIR was accepted by the SGT (id # 933944). I at that time received an apology from the SGT about the missing DIR and I provided a copy of the missing DIR to the SGT. The new DIR was assigned to Detective Ransom of the 28th squad who did not follow-up on any investigation regarding the complaint. In fact sgt Ransom engaged in a game of telephone cat and mouse with me and Powell was never arrested, investigated or questioned about his offense against the court order. A DIR was lost about a violation of a restraining order and the superior marks the complaint about the loss and inaction to protect my safety 'unsubstantiated?''

86. In November of 2011 I filed complaint # 11-55009 against detective Simmons about her perjuring herself under oath in front of Family Court Judge and failing to investigate my abuse claims (see court transcript Exhibit #13). This was logged by Detective Rogers on

18

11/29/2011.  It was marked unsubstantiated by Lt. Franqui.  No one called me or followed up with me.

# IV Details of attacks on my person that the 28th precinct and other precincts in town refused to follow up on because they were told by the MDAO that I was no longer entitled to Police Services

87. I was informed multiple times after being assaulted or threatened that the Manhattan DAs office had instructed the precinct involved not to take my complaint or to not follow-through on any investigation of my allegations. This happened on numerous occasions notably: 6/3/2013, 5/17/13, 10/17/12, 07/27/12: (incident #2012-020-2969), 7/14/12, 4/17/12, 1/20/12, 12/1/11, 8/13/11, 8/4/11, 8/2/11. Attacks on my person and death threats/harassment continued  through 2013 when I moved out of the 28th precinct's domain.  Please refer to incident report slips, jaywalking tickets, hospital records etc.

88. 8/2/11:  When assaulted (punched in the face and chest when I went outside to check my mailbox) in front of my home by neighbors associated with the cousin of my ex intimate partner and batterer, Raheem Andre Powell.  I called 911. p.o. Cooley shield # 14327 responded and told me I was not allowed to receive police services, that the pct. had been informed by the DAs office that I was 'crazy' and that even if he took an incident report nothing would come of it.  I called 911 around 1230 pm.  Cooley and his partner arrived at 1250 pm.  I followed up the next day to get incident ID# and was ignored and never received a call back from a detective investigating the assault or from the mousy grey-haired mean-spirited clerk in the 29 pct who assigns the ID #.  Eventually in 2012 Lt. LaRocca looked up the incident and provided and ID# to me.

89. 8/11/11:  Told by associates of my ex intimate partner and batterer, Raheem Andre Powell, who were exiting 239 w 120th next to my brownstone where Raheem operated his drug distribution in apt #2 upstairs on the second floor in the back of the building (overlooking my backyard and bedroom window) that 'I would be taken care of' and that I should fear for my life.  Called 911 to report death threats around 330pm.  P.O. Bonaparte (did not provide shield #) responded with partner around 400pm and took incident report.  No one followed up with me.  I followed up and received a complaint number from lt. larocca who looked it up for me;  complaint # 2011-28-003732.  No one ever followed up with me about these threats or arrested the perps.  They continued to threaten and intimidate me each time I left my home and encountered them for the next two years saying;  'no one cares about you at the precinct;  no one gives a shit if anything happens to you Kelly…'

90. 8/16/11:  Assaulted by associate of RAP on my way home from store.  Punched in the face.  called 911.  Ambulance arrived and treated me, police took report and never followed up.  See photos of busted face taken by FDNY ambulance workers (Exhibit #1 photos dated 8/16/11)

91. 8/31 9/1: harassed by associates of RAP. PO EBRIGHT PO RAMAN and PO Ehlers respond and tell me I should move out of neighborhood, they harass me about associating with 'these people in this neighborhood' and refuse to take my complaint. Ebright tells me he hopes he responds to one of my complaints one day and 'finds me lying on the sidewalk in front of my brownstone with a knife in my back.'

92. 9/24/11 In the wake of the ten-year anniversary of the tragedy of 9/11 the city erupted with violent clashes between Occupy Wall Street protestors and the NYPD. The whole of the city was on edge. I had called police after being man-handled by an over-zealous man in a bar and been humiliated by the officers who arrived. After the officers refused to take report I walked away and said "Ya'll should go fuck yourselves you don't help anyone." I did not scream this at the top of my lungs: I said it as I turned to walk away overwhelmed with despair and tears rolling down my face and was apprehended forcefully from behind causing bruises to my entire body.(Exhibit # 10 Injuries sustained from Police beating Officer Winters of Midtown South)

93. My injuries were sustained as I was tackled from behind by the police that evening, hog-tied and dragged to a police cruiser (please refer to photographs provided in exhibit #10) and ambulance workers were called to the 20th precinct to examine me. I had called 911 and then ended up black and blue. My lawyer spent months trying to subpoena all relevant video and audio material. When the tape finally appeared it had been tampered with omitting the exchange outside the midtown bar where I beseeched officers to taker my 61 report and they summarily dismissed me. Eventually when the full un-edited tapes arrived in court months the officers all lied and said that I had screamed at the top of my lungs "Fuck you" even though the video does not show this nor did the officers report this in their CCRB interviews or make any notation of it in their logbooks (Exhibit#19 CCRB audiotapes and Exhibit #20 officer logbooks). In fact when questioned directly about the actual words that came out of my mouth by the CCRB the officers actually can't remember what I said/when I said anything specifically.

94. On September 24, 2011 I was propositioned by a man at a bar and I rebuffed his advances. The gentleman as it turns out was the owner of the bar and was upset at the way I turned him down. He put his hands on me and I told him he had no right to touch me. The spat escalated and he had his bouncer grab me and throw me out of the bar injuring me as I was tossed through the door. My chest was sore and beginning to bruise and I know NO ONE is allowed to put their hands on me so I called the police to report the incident (see video inside bar).

95. When the police arrived the lead officers ignored me and marched into the bar to talk to their buddies (apparently the bar is only a block away from the 14th pct. and they frequent the place).

96. Without listening to my side of the story the officer in charge, Matthew Winters, told me "to keep it moving" that he wasn't doing anything to record the menacing, assault, and harassment I had just encountered. I told the officers they are not allowed to refuse to take my 61 report and that I would be making CCRB and IAB reports about their misconduct and callous regard for my safety. I was upset and I turned to walk away I was

20

crying and I said to the officers: "Ya'll don't help anyone ya'll should go fuck yourselves." (see video outside bar)

97. I proceeded two steps away from the group of four cops and from behind me and without warning Officer Winters tackled me to the ground by kneeing the back of my right knee and forcing me to collapse. He also grabbed my upper arms so hard literally each of his fingers made a bruise in my flesh. You can make out his handprints in the flesh of my upper arms (see attached photos and the bruise in the back of my right leg among others see exhibits # 10.)

98. I woke up hours later in a jail cell literally covered in bruises with officer Winters standing over me. He told me that I was arrested for disorderly conduct and that he had gone through my purse and found a few small dime bags of weed that I had as well as several condoms. He said that he was throwing the weed out as a favor to me and expected me "to do him a favor in return." He suggested that I don't report my injuries incurred during arrest and that "things would go in my favor." He also asked why I had so many condoms. I told him I was headed to a swinger's party that evening and he informed me he could have me also arrested on suspicion of prostitution and intent to distribute marijuana but that he was "being a nice guy." I listened to him with doubt and astonishment as I rubbed at my swollen wrists, hands and several dozen bruises all over my body. I was furious. Since when does a woman in NYC who calls the police for help B/C SHE has been harmed wind up incarcerated and beaten by the cops responding to her call for help?

99. ADA Kenya Wells caught the case. At that time another drawn-out case maliciously filed against me by Mr. Wells was pending over me. Mr. Wells kept insisting that I had made false reports to the police about my ex-boyfriend, Raheem Powell who had been beating me and subjecting me to economic, emotional, and physical abuse. I was charged after I went to the police for help to get him away from me because of my ex's relationship with the precinct as a confidential informant. He was a key witness in a murder, an attempted murder and several gang-related cases that were in-motion already so the police and Mr. Wells threw me to the wolves instead of assisting me at the darkest, bleakest, most helpless moment in my life. That case against me was eventually dropped after I stood in court for two years with the scars on my body burning under my dress as I repeatedly was called a fabricator in the I-DV court part. Mr. Wells had already made poorly-investigated conclusions about my other case (again similar scenario with him— no investigation just jumping to conclusions based on his own gut). Eventually that case was dismissed and sealed after I rejected every offer Mr. Wells through at me to try to cover up his errors. **Mr. Wells had a special vendetta against me because he was forced to drop the (329 incorrectly charged and malicious) charges he had filed. When it came time for trial for my disorderly conduct case Mr. Wells was prepared to do whatever it took to win: his reputation and his personal vendetta against me, a domestic violence survivor, a 911 survivor, and a 4th generation New Yorker was at stake.**

100.     **SETTING THE SCENE:** September 24, 2011 was an emotional time for me. It was shortly after the ten-year anniversary of the 911 attacks that I had survived by running for my life away from the towers and everything I had built for myself had subsequently unraveled around me because of the ineptitude and hubris of this young, untrained, sloppy District Attorney who had thrown me in Rikers island on Mothers' day after I miscarried my child and turned my life upside down. I had spent all weekend with a friend of mine, Lewyn Pogue, a member of SPECIAL FORCES NAVY SEAL TEAM 6, who was in town to swim in the "Little Red Light house Race" to raise money for the families of his friends who had died in an horrible attack on their helicopter in Afghanistan earlier that summer. It was the deadliest attack to date in that war and our emotions were high. I had been crying all day for the most part. I had nothing left inside of me. I wanted to sit down and have a drink quietly somewhere before moving on to a party that night. **Coincidentally the cops were twitchy. The entire city was on red-alert because the Occupy Wall Street marchers had violently clashed for the first time that morning with police and many members of the 14th pct. had been involved in crowd control. The cops were agitated and twitchy.** The bruises literally covering my body were a by-product of their sour mood. Lewyn can testify to the fact that I had nary a bruise on me when he left me half an hour before I strolled into the Stitch bar on W 37th st where I was assaulted. I had also had dinner at a place in Midtown I go to often and the bartender can also aver that I had nary a bruise on me while she served me my Cobb salad and coffee. I'm happy to provide you this information should you need it.

101.     **Mr. Wells didn't even investigate the case:** My Lawyer, Benjamin Dell from Legal Aide, spoke with Mr. Wells after the arrest and before my first court appearance. Mr. Wells didn't know that I had called 911. He said to my lawyer that in fact the incident had happened because the police had come upon me screaming and simply arrested me. When my lawyer, Benjamin Dell, suggested to Mr. Wells that there are 911 calls of my calmly requesting for police assistance Mr. Wells seemed panicked. He was also informed that there were video cameras all over the bar that would corroborate my story and it was suggested that he drop the case because the police had beaten me badly and I was a woman who had called them for help. Mr. Wells refused and scrambled to try to reconcile the way he wanted to paint the events of the evening to get a conviction. He knew he couldn't prove that a crowd had gathered or that I had blocked traffic on the sidewalk if the video was shown at trial. He then embarked on a campaign to keep the video tapes of the events from surfacing. Please pull the Part A transcripts for the case and pay careful attention to how many times Mr. Wells argues with the judges (on more than one occasion) about the lack of necessity of attaining the video tapes. In one instance the Judge in the court part remarked that she is surprised that Mr. Wells didn't already have the tapes in his possession and that he doesn't feel they are relevant! Isn't it the DAs DUTY to investigate? Isn't failing to do so an egregious error that allows for the breakdown of prosecutorial immunity? Is this not being taught to young ADAs in the Manhattan District Attorney's office? We (Mr. Dell and I) had asked Stitch bar for the tapes and they had refused. Instead we subpoenaed them from the CCRB as I had made a CCRB complaint as soon as I was released from jail. Graham Daw at the CCRB can attest to the fact that the bar sent over edited versions of the video tapes first that omitted all interaction I had with the police outside the bar. Why would the bar do this? Someone needs to ask the owners of Stitch bar if they were instructed by the police or by Mr. Wells to do so when they have to answer under sworn testimony. Eventually the correct tapes were sent to the CCRB and Graham Daw on passed them to the court. This caused MUCH consternation, huffing, puffing and pouting at each new court date when they didn't appear as Mr. Wells wanted to press on for trial. Surprise: the tapes were

105.    In November of 2011 My Legal Aide Attorney, Benjamin Wells, attempted to
turn in a motion to the court asking the judge to dismiss the case against me as other
cases had recently been dismissed of similar circumstances when constituents in NYC
had said anything similar to "fuck yourselves" to NYPD.  The ADA standing in the court
part literally said: "Your honor I need you to know that Miss Price is considered a
DANGEROUS person as she currently has over 300 counts of DOMESTIC VIOLENCE
pending against her upstairs in Judge Dawson's I-DV court part."  There was an audible
gasp from the judge and gallery and the Judge dismissed Mr. Dell's motion based on this
assertion. The ADA intentionally made it sound as if I had been abusing someone
physically instead of the other way around.  To what ends to these lies serve?  How dare
the District Attorney's office enter intentional falsehoods and misleading lies onto the
court record.  These liabolous statements caused me creat injury and when I get a hold of
the transcript I will be adding this ADAs name to the list of persons guilty of crimes
against me in a revised complaint to NY Supreme Court.

106.    The conviction revolved around Mr. Wells' LIE about the tone of my voice.  He
coached the cops to say that I screamed at the top of my lungs at a level TEN (being the
loudest a human voice can possibly make according to Wells).  Never had the cops made
this statement before to any interviewer of the CCRB or in their log books.  The reason
Mr. Wells had to coach the cops to LIE is this is the only way he could win the case.
This is why he didn't want the video tapes introduced into evidence.  He did not want to
have to suborn perjury but was forced to do so to win the case and tried everything in his
power to avoid this.  There simply is no other explanation for his reticence in presenting
the tapes to court.

107.    I was convicted of TWO counts of disorderly conduct as one was for allegedly
screaming and one was for making an obscene gesture but never in court did anyone
mention that I made an obscene gesture in their logs, in their CCRB interviews or at
Trial.  This count should most certainly be dropped because it was never proven.  Instead
it was merely just bivouacked onto the other charge without any lip-service whatsoever.

108.    Mr. Wells started his statements at trial by alleging to the judge that I am a
"fabricator" and that I had hundreds of criminal charges filed against me because of this
false fact.  My lawyer objected stating that these cases were dismissed and sealed and
Wells argued that he could bring up the cases because they supported his theory that I
was a fabricator and that my credibility is allegedly weak.  He was so hell-bent on
making me appear to be a lying fabricator that he asked his colleague, ADA Bernard, to
decline to prosecute another man who had hit me outside of a bar on July 28, 2012
shortly before my trial date. That man went on to assault, stalk, masturbate on, and
trespass against several other women in town BECAUSE HE WAS not punished for his
acts against me.  Please look up this criminal: Rami Baly. ADA Richendorfer is
FINALLY prosecuting him OVER a full year later for his crimes against me because I
made complaints to the DOI, the IAB, the State Attorney General, Senator Gillabrand,
Councilwoman Quinn, Councilwoman Dickenson, the Mayor's office, the Borough
President, the Public Advocate, and the New York State Bar Association about how my
right to equal protection under the law had been stripped from me. **Mr. Wells couldn't
have me appear as an innocent defendant in the same courthouse at the same time**

24

mysteriously LOST in the courthouse for months after they arrived. Please note the court transcripts where My lawyer asks for a delay in trial until the tapes can be found by the Part A clerk and please note Mr. Wells insistence that the trial go forward without the tapes. The judges kept asking Mr. Wells why he had not pulled the tapes to begin with and Mr. Wells simply kept averting the questions. The plain truth is that he HAD to have already pulled the tapes and they did not corroborate the Police's version of the story that would allow him to take me to trial and justify his pursuit of the case against me so he tried to keep them out of our hands and the hands of the court. He stated MANY times on record that he had never seen the tapes.   I would be very interested if your conviction integrity officers can compare records of when he got a hold of the tapes at the DAs office and then compare that information with Mr. Wells' statements in court. He claims the first time he saw the video was in late Sept/early Oct of 2012. I sincerely doubt his honesty concerning his statements to this effect.   I would bet dollars to donuts that Wells had the video tapes in hand in late 2011 or early 2012.

102.     **In each of the three interviews the CCRB conducts with three of the four officers who responded to my 911 call there is a different story told than the manufactured, glossed, coached and clean version that Mr. Wells helped the officers recapitulate on the stand at trial.** Please listen to each of the interviews. Not one of the officers states that I raised my voice and screamed at a level 10 out of 10 being the loudest a human voice can possibly make during their CCRB interviews. In fact the officers don't even recall what I said as I walked away from them. But MAGIC! –when Mr. Wells called them to the stand they ALL say that I screamed "FUCK YOU" at the top of my lungs to the cops. How strange:  magically over a year later all three cops' stories changed and were consistent!   There must be a magic memory pill in the water at the 1 Hogan Place  witness lounge! A few weeks after the incident when the officers were questioned by CCRB inspectors there was not a narrative consensus about what I said or how I said it but  over a year later at trial all of a sudden each officer magically remembers that I screamed at the top of my lungs "fuck you?" I find this incredulous. In addition to the lack of consensus about events stated in recorded CCRB interviews  in NONE of the officer's log books is any sort of notation that I screamed aloud or that even recounts what I said.  One would logically think that this information had it really occurred would have been recorded in the log books OR remembered in the CCRB interviews.

103.     The fourth Police officer, a young, Caucasian, female officer was never interviewed or called to testify. We need to get her version of the story. Her name was Officer _____.   She was Maladano's partner that evening and when I saw her in the pct the next afternoon as I was being led to a waiting van to be transported to the tombs for arraignment and booking she looked disgusted to see the amount of bruises all over my body caused by the brutal arrest by Officer Winters. Her CCRB interview, logbooks and statements about the incident are SUSPICIALLY ABSENT FROM THE OFFICIAL RECORD.

104.     The video tapes show that a crowd NEVER gathered to witness "the spectacle I [sic] was making." Please review. The cops all say different-sized clusters of people were standing just out of camera sight in their CCRB interviews in different places. NONE of their statements to the CCRB is consistent with what they claimed at trial. Please make note of time-stamps: xyz on the video tape and abc on the ccrb interviews.

23

he was trying to paint me as a **crazy fabricator** in front of the judge to win a disorderly conduct conviction. So Mr. Baly was set free instead to punch NYPD officers (he was arrested a month later for assaulting an officer, arrested in November of 2012 for lewd acts on an Amtrak train, arrested in March of 2013 for trespassing and stalking, again in May, again in June and again in July of 2013. Conveniently Mr. Wells aided and abetted Mr. Baly in his crime spree against other women in the City of New York by tricking his fellow colleague into declining to prosecute Mr. Baly so that he could paint me as ugly as possible on a fresh courtroom canvas. Look: this is anathema. Re-read the above paragraph. Mr. Wells wanted to win against me so badly that he had a colleague sit on a case against a man who clearly needed to be under psychiatric care and have his dopamine levels regulated and monitored all in the name of winning against me. Is this really a person you want in your office? This guy is the JAYSON BLAIR of the District Attorney's office and should be arrested himself for malicious prosecution, obstruction of justice, tampering with evidence and suborning perjury. Because of Wells' grudge against me many other women in town were armed by Baly. See below paragraphs detailing events that transpired on the evening of 7/27-/7/28 2012

109.      10/21/11:  Raheem breeches restraining order in front of my home. A report is finally made on 12/1/11 for Raheem's breech of restraining order  see description of my attempt to file a report for Raheem's breech of restraining order detailed above in the section outlining events that led to me filing and IAB complaint against the DV officers Rosendary and Simmons above in section II. (Exhibits # 14 & #15).

110.      1/20/12:  Attacked by woman named INA who lived across the street in the white building Raheem's uncle and cousins dwelled in on 120th near my brownstone. This woman has known my batterer since he was a child, is a known street walker, crack/cocaine addict and has had her youngest daughter, Sarde, removed from her by children's services. She encountered me as I as walking to the store and began yelling at me abut how she loved watching people attack and harass me whenever I left my home. I replied that she was a crack whore who couldn't even take care of her own children, that often I had to care for 'Dee-Dee' (short for Sarde) often when she was too cracked out to help her own daughter with her homework or when she fell off her bike and needed bandaging and love. I had even taken her kid to Chucky Cheese with other neighborhood girls once when I surprised all the little girls on the block with an outing to the restaurant in September of 2010. Ina became enraged and smacked me in the face with a closed fist resulting in my front right tooth becoming dislodged and landing on the sidewalk. As blood spurted from my face and I searched the sidewalk for my missing tooth Ina picked up a long wooden leg from an old table that still had large protruding nails at the top of it where it had once been attached to the table top. She began to run at me with this weapon and the only person on the sidewalk who interfered was the neighborhood UPS guy, Danny, who jumped off his truck and tackled INA so she would not club me from behind with the weapon.  At that moment a police cruiser passed by and I waved it down. IT was a Manhattan north lt. and his assistant who took my details and said they would on pass my complaint to the 28 but that I should also call 911 which I did. The complaint was assigned to Dt. Fontanez who followed up once with me asking who my assailant was. I gave her first name and address to Fontanez and he mentioned he couldn't make an arrest based on that. I deplored him to make an arrest and he drove me around one night when I saw her walking in the neighborhood but never followed up

25

again with me about locating this crazed attacker. I called Fontanez multiple times reminding him that the statute of limitations on assault is two years and he told me that he couldn't do anything because his hands were tied.

111.    4/17/12 attacked in front of home again.

112.    7/14/12, attacked in front of 200 St. Nicholas Ave., around the corner from my home on way home from store. Hair grabbed and slammed over and over onto pavement by associates of RAP. Knee damaged bruises all over. called 911 around 200 am in the morning and P.O. Johns and partner responded, told me they wouldn't do anything to help. I insisted it is my constitutional right to make a 61 report and that it is illegal for the police to refuse to take my report. They gave me an incident slip marked 'harassment' around 230 a.m. No one ever called or came by my brownstone to investigate or follow up. I attempted to get an ID number for my complaint and was rebuffed again by the mean mousy grey-haired lady who assigns these numbers in the 28th pct.

113.    7/25-7/25 2012 (Late night/early morning on the 25th) 7/27-7/28 2012 (Late night/early morning on the 28th) Incident at Soldier McGee's Bar. See Exhibit #1 photos dated 7/28/12 In this case the man who attacked me (incident #2012-020-2969), was let go by the 20th precinct and he continued to stalk, flash, and trespass and terrorize other women in town. The same man who attacked me on 7/28/12 went on to continue to terrorize women in NYC.)

| Case # | Defendant | Summons # | Appearance Date | Court | Judge | Part |
|---|---|---|---|---|---|---|
| 2013NY031505 | Baly, Rami | | 08/07/2013 | New York Criminal Court | | A |
| 2013NY049135 | Baly, Rami | | 08/07/2013 | New York Criminal Court | | A |
| 2013CN000347 | Baly, Rami H | | 08/02/2013 | New York Criminal Court | | A |

\'

139. Mr. Baly went on to assault, stalk, masturbate on, and trespass against several other women in town after he was not punished for his acts against me. Instead, Mr. Baly was set free by the 20th precinct's Detective Galan to purport other crimes on the public: he was arrested in November of 2012 for lewd acts on an Amtrak train, arrested in March of 2013 for trespassing and stalking, again in May, again in June and again in July of 2013. The system itself aided and abetted Mr. Baly in his crime spree against other women in the City of New York. Mr. Wells needed to win against me: a colleague of his sat on a case against a man who should have been arrested and penalized for his behavior as well

as under psychiatric care.

140. OVER A YEAR LATER charges were subsequently brought against the man, Rami Baly, (New York Criminal Court case #s 2013NY031505, 2013NY049135, and 2013CN000347) the same man who attacked me on 7/28/12. All other crimes Mr. Baly was charged with occurred after Baly attacked me and was allowed to walk free out the back door of the 20th precinct without arrest in August of 2012. Baly proceeded on a crime spree against women that ran from the fall of 2012 to the summer of 2013. On numerous occasions the detectives and the other ranking members of the 20th precinct (Lt. Carbone) informed Price and her advocate, Kerri Toner, from Saint Luke's Roosevelt Hospital's Crime Victims Center/Connect NYC that the reason that Mr. Baly had not been arrested was that he could not be located. Mr. Baly had paid with a credit card that evening at Soldier McGee's bar and the DAs office refused to request a subpoena from the court to attain his billing information so that he could be apprehended.

141. **When Mr. Baly returned to the bar on or about August 25th of 2012 approximately a month after assaulting me staff members alerted the 20th precinct and he was apprehended. When he was approached by officers in the bar he acted disorderly, allegedly fought with officers and resisted arrest. He was arrested (case # 2012NY067321) and released and given "time-served" but not charged with the assault against me. The detective assigned to the case, Galan, pretended Baly could not be located even though this was not the case. Galan had been told by the MDAO that they would NOT press charges against him and to NOT arrest him. He had been arrested already and not charged with the crime against me but was charged with acting disorderly and resisting arrest when NYPD approached him to question him!** I pushed the case and my advocate, Kerri Toner, from the St. Luke's Roosevelt Crime Victims Center /Connect NYC inquired as to why no photo lineup had been done after the assault and nor any follow-up was made to trace Mr. Baly after he was let go as per procedure outlined in the NYPD Patrol handbook (citation needed).

142. Ms. Toner was told that the case was being pursued and Baly could not be located and she made notes to this effect in her log (see Exhibit #40 ). It was not until after Mr. Baly had committed other predatory crimes against other women that Baly was arrested for his assault against me which was over a year after his crime! Baly was arrested on 4/24/13 NINE MONTHS AFTER he assaulted me when he appeared in criminal court to answer charges of criminal trespass (PL 140.01(a)), public lewdness PL 245.00, and public exposure of a person (PL 245.01). He had been arrested for these NEW CRIMES against ANOTHER WOMAN by the 1st Precinct's Officer Jessica Valle on 4/21/13 for crimes he committed against Kristyn Abbale. Following the arrest and the issuance of a desk appearance ticket to Baly for his crimes against me that had happened a year earlier neither I nor Ms. Toner from Connect NYC/Mt. Sinai & St. Luke's Roosevelt CVTC was not informed of his arrest. The first we ever heard of Mr. Baly was when I received a voice mail message from ADA Laura Higgins (nee Richendorfer) on June 23, 2013 informing me she was investigating the assault. A prosecution of Baly for his crime against me was initiated on paper, never investigated by Das office (See Exhibit # 41 Statement from Soldier McGee's Bartender stating he was NEVER contacted by ADA HIGGENS) but later dropped. The DAs office told the judge presiding over the case that

27

they couldn't locate ME to testify and the case 30-30'd. The bartender who witnessed events the night of the attack and when the man returned to the bar weeks later was never interviewed by police. Ms. Higgins informed me that my allegations were too difficult to prove. HOW WERE MY ALLEGATIONS SO DIFFICULT??

143. 10/17/12  While walking home from the subway on 125th street and passing 200 st. Nicholas Ave I was attacked by someone named Willy who sells Heroin on the stoop of that building and is an associate of RAP. He jumped me as I was passing his stoop and threw me onto the ground causing substantial damage to my right knee (see photos Exhibit #1 photos dated 10/17/12 ). I went to the emergency room and have reports and follow-ups from my orthopedic surgeon stating that I need knee surgery as a result of attack (Exhibit #23 ER Report and Orthopedic evaluation). P.O. Longo responded (shield # 31565) and said they were instructed by desk sergeant not to take my report. I insisted and they said they would turn in a notation to the desk sergeant about the incident. I called the desk sergeant and complained No one ever called me to follow up on this assault. complaint # 2012-28-005194. The first police who responded to my call said; 'aren't you the crazy one we are not supposed to take reports from?" P.O. Longo and Walker eventually followed up after I called 911 and complained about the first officers on scene. P.O. Walker sympathetically stated to me that the District Attorney's office had instructed the precinct not to respond to any of my calls. This was Witnessed by my neighbor, Elizabeth Walker, who is a graduate of Harvard University, Colombia Law School and a MEMBER OF THE NEW YORK BAR ASSOCIATION. WALKER PRESSED WILLIAM'S AND LONGO TO TAKE MY COMPLAINT, reminded them that it is illegal to deny a person police services. Williams commented that the precinct had been instructed by the District Attorney's office to not respond to any calls I made AND THEY took my information and told me nothing would be done eventually. (See Exhibit #30 Letter from Elizabeth Walker.)

144. On the night of 6/2/2013-6/3/2013  While en route home from the Amsterdam Ale house on 76th and Amsterdam where I had dinner with a friend of mine I instructed the cab driver to follow a certain route and he refused. I asked him to stop his cab so I could get out and instead he locked the doors and sped up. He carried on like this for a number of blocks while I screamed at him to stop the cab and let me out. I called 911 from the back of the cab and when we stopped at a red light nearby police from the 28th pct were called over. Officer Officer was one of these officers and he announced to his partner that I was not to be given police services or assisted in any way and that he refused to take a report from me. I called 911 and reported this incident. Surprise; it was never followed up on.

145. 6/2013;  while in route to the subway past precinct from my home Detectives from the 28 squad opened their windows overlooking my path up St. Nicholas to the 125th st. subway station and 'MOO' at me as if I were a cow. I called the precinct and complained to the CO and his assistant immediately.

146. July 2013;  while walking my dog near my home I'm given a jaywalking ticket on the

corner of 120th and St. Nicholas (I have eyewitnesses that will testify that I did not jaywalk) even though I wasn't jaywalking. 28th pct cops were rude and condescending. I fought the ticket in court and won (docket # 2013SN053520).

147. 2014: ADA Carolyn Maloney is assigned to represent three ADAs I named on my NY Supreme Court Lawsuit vs. City of NY. Maloney commits various acts of perjury within her own sworn court papers in an attempt to mislead the court.

148. June 2014 ADA Maloney in DIRECT CONFLICT OF INTEREST WITH HER ETHICAL OBLIGATIONS AND VOWS takes on the role of acting as FOIL officer in response to my FOIA request for all information in my MDAO files. As Maloney is the attorney representing individuals named in lawsuit how possibly could she fulfill her legal obligation to provide me with materials I am legally and lawfully entitled to that would implicate her colleagues in my lawsuit? Who allowed this mewling ingénue to take on the responsibility of being the same FOIL officer to respond to my request? I will on pass communications regarding this request separately. I'm still barking mad that anyone in the MDAO, especially her supervisors Patricia Bailey and Susan Roque would allow this misdeed and clear violation of ethics and legal standards to take place. I'm filing a Federal Lawsuit about this matter to be meted out in a court that does not care that she is the daughter of the very congresswoman who wrote the FOIA legislation her own child willfully spits in the face of.

149. The Manhattan District Attorney, Mr. Cyrus Vance, Jr., quoted Berger v S, 295 U.S. 78, 88 (1935) in his Recommendation for Dismissal of charges against DSK:

> "Along with the substantial power conferred upon prosecutors come unique responsibilities. Rather than serving only as a zealous advocate on behalf of a client, prosecutors have a broader set of obligations to the community, the victim, and the defendant: the [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is a complain as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that *guilt shall not escape or innocence suffer*." HOW MUCH LONGER MUST I SUFFER MR SCHLANGER?

# V. Moving FORWARD: THE MDAO, MISS PRICE, AND ADVOCACY FOR THE PROFESSION OF PHOTOJOURNALISM IN NYC.

139. I have some ideas about how the MDAO can rehabilitate its reputation and restore its good name in regard to the mess it has caused itself over my case. Many people in town know about my case, the abusive treatment the MDAO unhanded to me and the

29

egregious violations to my Constitutional Rights that took place in its attempt to cover-up its wrong-doing. It is in this office's best-interest to correct its own violations, to institutionalize proper training and to enforce diligent adherence standards of conduct, fairness, ethics and professional behavior for the people it has in its employ. I would like to start a dialogue with you about how exactly the MDAO can help restore me to the status I enjoyed before these malicious prosecutions, unlawful arrests and illegal actions against me.

140. As a public official Mr. Vance must recognize that his office must hold itself to the same high-standards of professional conduct that it insists from its constituents. How can this same office accuse various corporate entities of corporate wrongdoing, mishandling and various actionable breaches of professional standards when he does not hold his own employees accountable or attempt to make reparations for their misanthropy?

141. Before these egregious breaches of my Constitutional Rights I was well on my way to creating a governing body to give safe-harbor to professional photojournalists. I want to continue my work. I believe professional photographers are in danger now more than ever before and are under attack not only from Digital Media that practices that belittles and devalues their work but also from professional entities that seek to destabilize the industry for their own monetary gain. I would like to propose that the MDAO use some of the resources it has allocated to protect other industries in town (think Stub-hub and the office created to protect digital entertainment ticket sales) to oversee and protect the industry and business of photography/photojournalism. The creation of such an office would:

   a. Act as an assertion that the MDAO recognizes the integral work of photographers in building our society and in recording history.
   b. -Acknowledge that NYC is the place where the commerce of photojournalism takes place more so than any other city in the world.
   c. -Assert that there is sufficient need to establish protections and encouragements for professional photojournalists/photographers because of its SPECIAL JURISDICTIONAL PRESEDENCE/POSITIONING over the international industry that is anchored here in Manhattan

142. The authority that such an office could exercise to its protectees around the globe by asserting its control here over factions or entities with business addresses in NYC whom operate oversees potentially could work in many ways.

143. The office would act as a body to advocate for basic professional working rights and wages and benefits for registered members. For instance it could begin to standardize fair day rate and space rate and danger pay agreements as well as regulations for royalty splits and copyright enforcements. Current business practices by Goliath Agencies such as Getty have endangered the business and asserted egregious working standards on photographers (i.e a 70/30 royalty split in favor of the Agency that photographers HAVE to agree to or else not have their work distributed globally by the largest global player in the industry.)

30

144. It could also work to protect members from threats against their persons as a result of their journalistic endeavors. Meaning: if a registered member of the office worked say in a place like Pakistan and was undergoing harassment by authorities while doing his/her job a member of the office would visit the Pak Mission to the UN here in NY and have a chat with someone like Shalit Jalal, the Information Minister, with a formal complaint letter and a course of action plan outlined if actions weren't taken to exert checks and controls over such threats.

145. The office would work on specialized legislative projects such as advocating for 9/11 photographers. Many I know are currently outraged that nothing is being done to stop the illegal distribution of our photographic output by near-do-wells who have illegally collected them into memory books for sale by legions of street-vendors on the fringes of Ground Zero. What will happen when the transit hub is opened? Will the same flotilla of illegal memory-book hawkers flood the area below Calatrava's beloved firebird and continue their illegal commerce? Who is coordinating with the City Council to pass legislation prohibiting illegal sales on hallowed ground? Who is working with the NYPD to trace the publisher of such books and hold them accountable? Who is monitoring where the millions of dollars a month being made by such illegal practices is flowing to? When I last sat near the Millenium Hilton /Centry 21 department store where the lions share of the books are sold these days I counted over 25 book sales men all with armloads of books selling for 10.00 to 20.00 USD each (Exhibit #42 photos of Yemenis salesmen illegally selling 9/11 "memory" books by Ground Zero.) Just a quick estimate:

average of 100 books/day each @ 15.00 USD = 1000.00 USD EACH per day = 1500 USD/day

20 vendors x 1500 = $30,000.00/day

7 days per week = $210,000.00/week

52 weeks/year = $ 10,920,000.00/year in ILLEGAL 9/11 photo book sales at Ground Zero ALONE.

I have MANY other ideas and would like to begin a dialogue on how we can bring this very painful episode to a conclusion and work together to do some good. I very much look forward to hearing from you Mr. Schlanger. Please take my statements seriously. I'm happy to have this document notarized if you feel more comfortable knowing my statements are sworn.


Yours,

*Miss Kelly Price

*signed as per the 2000 Federal Digital Signature Act

**Exhibit FF**

Exhibit # 9 Pg 1

## CRIMINAL COURT OF THE CITY OF NEW YORK

### COUNTY OF NEW YORK

### ADJOURNMENT SLIP

DEFENDANT NAME: PRICE, KELLY C.

DOCKET NUMBER: 2013SN053520

YOU ARE TO APPEAR IN COURT ON __08/27/2013__ , IN PART

SAP , __346 BROADWAY__ __09:00__ A.M./P.M.

IF YOU FAIL TO APPEAR, A WARRANT MAY BE ISSUED FOR YOUR ARREST.

BRING THIS NOTICE WITH YOU.

## TRIBUNAL CRIMNAL DE LA CIUDAD DE NEW YORK

### CONDADO DE NEW YORK

### AVISO DE APLAZAMIENTO

NOBRE DE EL ACUSADO: PRICE, KELLY C.

NUMERO DE INSCRIPCION: 2013SN053520

USTED DEBE COMPARECER AL TRIBUNAL EL __08/27/2013__ , EN LA

SALA __SAP__ , EN __346 BROADWAY__ .

A LA(S) __09:00__ A.M./P.M.

SI USTED NO COMPARECE, UNA ORDEN DE DETENCION PODRIA SER
EMITIDO PARA USTÉD.

TRAIGA ESTA NOTIFICION CUANDO VENGA AL TRIBUNAL.

**Exhibit GG**

Case 1:15-cv-05871-KPF   Document 21-7   Filed 09/02/16   Page 28 of 55
Case 1:15-cv-05871-AR   Document 16-6   Filed 05/09/16   Page 6 of 49
Mayor's Office to Combat Domestic Violence - Get Help - NYC Family Justice Centers    Page 1 of 2



NYC Resources | 311 | Office of the Mayor

**Mayor's Office to Combat Domestic Violence**

Printer Friendly    Email a Friend    Translate This Page    Text Size: A A A

SEARCH [GO]

Call 311 for the DV Hotline
Call 911 in emergencies

Home
About OCDV
Get Help
Domestic Violence Hotline
NYC Family Justice Centers
Domestic Violence Response Team (DVRT)
NYC Services Snapshot
A.V.O.N. Mentoring Program
Resource Directory
Staying Safe

Prevention + Education
Statistics
Newsroom
Donate/Volunteer
Frequently Asked Questions
Contact OCDV

**Available Languages**

| Español | Français |
| --- | --- |
| 简体中文 | اردو |
| Русский | 한국어 |
| عربي | বাংলা |
| বাংলা | 日本人 |
| Polski | Shqip |
| Kreyòl Ayisyen | English |

Resource Directory →



## NYC Family Justice Centers

The New York City Family Justice Centers are a program of the Mayor's Office to Combat Domestic Violence.

### Services Provided
The New York City Family Justice Centers provide criminal justice, civil legal, and social services all in one location for victims of domestic violence, elder abuse, and sex trafficking.

Victims can meet with a prosecutor, speak with a trained counselor, and apply for housing and financial assistance in just one place. Children age 3 and up can play in a children's room while their parents receive services.

Services are free and available to all victims. Victims can get help at the Centers no matter what their immigration status or the language they speak. Staff can speak more than 30 languages and interpretation services are also available in many more languages.

### Locations
Each Center is open Monday through Friday, from 9am- 5pm. Clients may walk-in during these hours – you do not need to make an appointment.

**NYC Family Justice Center Bronx**
Address:
198 East 161st Street, Bronx
Phone:
(718) 508-1222

Subway: Take the 4 or B D to 161st Street Yankee Stadium station. Exit near the intersection of E. 161st Street and River Avenue. Walk east on 161st Street towards the Grand Concourse. The Center is located at the corner of E. 161st Street and Sheridan Avenue.

Bus: The BX1, BX2, BX6, and BX13 all stop near the Center.

**NYC Family Justice Center Brooklyn**
Address:
350 Jay Street, downtown Brooklyn
Phone:
(718) 250-5111 and select 6

Subway: Take the A C, F or R train to Jay Street or the 2 3 or 4 5 train to Borough Hall.

Bus: The B25, B26, B38, B51, B54, B57, B61, B65, B67, and B75 buses all stop near the Center.

**NYC Family Justice Center Manhattan**
Address:
80 Centre St.
Phone:
(212) 602-2800

Subway: Take the 4 5 6 to Brooklyn Bridge-City Hall, the J Z to Chambers Street, the N R Q to Canal Street, the 1 2 3 to Chambers Street or the A C to Chambers Street.

Bus: The M5, M9, M22 and M103 buses all stop near the Center.

**NYC Family Justice Center Queens**

Mayor's Office to Combat Domestic Violence - Get Help - NYC Family Justice Centers

**Address:**
126-02 82nd Avenue, Kew Gardens
**Phone:**
(718) 575-4500

**Subway:** Take the 🚇 or Ⓔ train to Kew Gardens/Union Turnpike  Use the "Court House/North Side" exit and walk east on Queens Boulevard past Queens Borough Hall. Turn left on 82nd Avenue.

**Bus:**  The Q10, Q37, Q46, and Q60 all stop near the Center

**Learn More**
View our video about the New York City Family Justice Center, Brooklyn: 56k, 300k

Download one-page flyers about the New York City Family Justice Centers in these languages.
Albanian, Arabic, Bengali, Chinese (traditional), English, French, Haitian Creole, Hindi, Korean, Japanese, Polish, Russian, Spanish, Urdu (in PDF)
Download the New York City Family Justice Center Initiative Brochure (in PDF)
Visit our Frequently Asked Questions

**Partners**
Get information about the on-site community organizations and government partners.

The New York City Family Justice Center Initiative is a private/public partnership of the Mayor's Fund to Advance New York City, a 501(c)(3) not-for-profit organization established to promote partnerships between the City and the private sector.

Copyright 2015 The City of New York

Contact Us  |  Privacy Policy  |  Terms of Use

**Exhibit HH**

**JULY 26, 2012**

## STATEMENT BY COALITION AGAINST TRAFFICKING IN WOMEN

**We are a coalition of advocates for victims of sex trafficking who feel compelled to speak in support of the complainant and her family in this case and to express our concern about the dismissal of charges against the defendants. In many respects, this case, in which a young girl from Crown Heights reported victimization by a group of older men, one of whom has been convicted of felony-level sex trafficking and another faces charges of murder in unrelated cases, is typical of sex trafficking.**

A victim of prior childhood sexual abuse, like an estimated 70 percent of prostituted girls and young women, the victim in this case reported that a group of adult men in her neighborhood sexually assaulted her and seasoned her into prostitution when she was in her early teens. Experts report that the average age of entry into prostitution is 13 years old and that prior sexual victimization renders many of these girls especially vulnerable to their exploiters' tactics of power and control. Traffickers are often trusted friends, family members, or neighbors.

**There is voluminous evidence corroborating this young woman's claim of sex trafficking and rape.** Police records and neighborhood witnesses support her and her family's account that they made complaints to the local police about her victimization by a group of neighborhood men during the early stages of her trafficking but the police did nothing to protect her. While police response to sex trafficking is changing under the leadership of Commissioner Kelly, it has been longstanding police practice, in New York City and throughout the country, to ignore the perpetrators and to blame and arrest the victims. The mental health issues faced by this victim, for which her family assisted her in obtaining in-patient treatment, are also typical. Most victims of prolonged sex trafficking suffer from acute post traumatic stress disorder, as this victim does.

**One of the most representative yet misunderstood features of this case is the victim's psychological bonds with her abusers.** Like most girls and young women under pimp control, she viewed her traffickers, variously, as tormentors, protectors, romantic partners, and surrogate father figures. Like most girls and young women under pimp control, and like many victims of domestic violence, a closely related form of gender abuse, the victim in this case expressed feelings of love for her tormentors, at times wished to protect them from punishment, blamed herself for her victimization, and repeatedly returned to them. This psychological condition,

sometimes called "Stockholm Syndrome" and designated "traumatic bonding" by mental health professionals, is widespread among victims of severe and prolonged sexual and physical violence. It is typically engendered by beatings, rape, captivity, and threats to the victim and the victim's family members, punctuated by expressions of caring and love. The young woman in this case reported precisely this kind of treatment at the hands of her traffickers.

**It is unfortunate that statements made by the victim that should be viewed as evidence of traumatic bonding have been wrongly interpreted by key legal players in this case as evidence of consent and have become the basis for the Brooklyn District Attorney's Office's decision to dismiss the charges against the defendants.** We regret that expert witness testimony was not employed by the Brooklyn District Attorney to educate the jury and the general public about the meaning and significance of these statements. We are concerned that the dismissal of these charges, coupled with silence about the role of traumatic bonding in this case and others, will have a chilling effect on other victims' willingness to report sex trafficking and may foster the erroneous view that women and girls' reports of sex trafficking are not to be trusted. We are outraged that some of the media coverage has denigrated the young woman in this case, who had the courage to come forward and report years of horrific abuse. We are deeply saddened that the victim and her family have been denied justice.

**This case has nothing to do with the victim's or her alleged perpetrators' race, religion, or ethnicity. Sex traffickers come from every racial, ethnic, and religious background, as do their victims.** In New York City, most sex trafficking victims are girls and young women from minority groups who grew up in conditions of poverty. Their poverty and minority status render them vulnerable and are exploited in the sexual stereotypes projected onto them by traffickers, who evoke them in marketing their victims to johns. This case is no different. One of ten children from a working-class family in a poor neighborhood, this victim's ethnicity and distinctive racial features were similarly exploited by the pimps who sold her and the johns who purchased her body.

One atypical factor in this case is this victim's strong family support. While her family members were unable to protect her from years of exploitation and abuse, they valiantly attempted to do so and today wholeheartedly stand behind their daughter and sister. Attached is a statement from the victim's father, who is determined to prevent other girls and young women from experiencing the suffering that his daughter has endured.

Press statement by the victim's father
July 26, 2012

June 28th of last year, the indictment of four individuals who had brutalized and prostituted my daughter since the age of 13 was announced with great fanfare by the Brooklyn District Attorney. For me, her father, her mother, and the other members of our family, this represented the end of a long nightmare. We had hoped that this case would shed light upon the legal and psychological issues that accompany this devastating crime. Today, the District Attorney has chosen to discontinue this legal battle. It is a decision that was made against our wishes and against our will.

We have maintained our silence at the request of the District Attorney, even as the defense in this case maintained a feverish battle in the court of public opinion. We were told repeatedly by the DA to maintain our silence, not to divulge facts that could be useful to the defense. We were told that our chance to reply would come in court. This is a promise that was not kept.

With our promise of silence now null and void, we now wish to set the record straight with facts that were omitted from press accounts of this case.

First, I became aware of the possibility of prosecution in my daughter's case in May of last year, almost six weeks before the indictments of Jamali and Jawara Brockett, Damien Crooks and Darrell Dula. During that time, my daughter courageously shared the details of her mental health history, as well as the extent of her "traumatic bonding" with her traffickers, in which

she felt fondness and affection that increased in direct proportion to the extent that she was brutalized. All of these facts she was eager to explain in a court of law. Repeatedly, she and I asked people in the DA's office if these facts-- facts which could easily be twisted and manipulated by defense attorneys- would stand in the way of their prosecuting the case. Repeatedly, we were assured that the case could go forward, that my daughter was no more to be blamed for returning to abuse than an abused wife or girl friend.

The press, hand fed a selective menu of leaks by the defense, presented my daughter in the most damaging light possible. Even when she attempted to learn self defense, a logical, therapeutic step for someone who had been gang raped at age 13, it was splashed in the headlines in a sensationalistic and negative way. What the press never focused on or even acknowledged was that every single piece of information they brought to light came from voluminous evidence turned over by my daughter. Presented in its context, and explained by experts in sex trafficking and domestic violence, the evidence should have been more than sufficient to convict my daughters' traffickers. It also would have enlightened the public on how to protect their children, as well as to expose how traffickers target their victims, "turn them out," put them on the street, and profit from their sale.

One of the most damning pieces of evidence cited against my daughter was a supposed recantation which she had signed. A copy of the so called recantation shows that it was defaced, and that the words "not true" were crossed out. [This needs a little more explanation.]What is not mentioned is that the signature

was extracted from my daughter when she was at a hospital, receiving medication intravenously. In this weakened state, she was told by the man who goes by the official title of detective that she could be arrested for prostitution if she did not recant. What is also not mentioned is that this individual, who was on duty wearing an NYPD badge, cursed at her as he left the room with her coerced recantation. Sadly enough, this incident was only one of many in which my daughter was rebuffed by police when she reached out to law enforcement authorities to obtain protection from the abuse to which she was being subjected.

Several of these attempts to obtain protection from the police came when she was well under age and therefore legally unable to consent to sex. Back when my daughter was only 14, at a meeting arranged by Crown Heights Shmira, my son and I met with Lieutenant Cantwell and other police officers at our local precinct and voiced our concerns that my daughter was being forced into sex by the Brockett brothers. Despite the our reports of serious criminal activity—the repeated rape of a minor-- there was absolutely no follow up by Lieutenant Cantwell or any of the other officers to the best of our knowledge. In nine years of dealing with the NYPD, I can truly say that a stolen car merits more attention than a stolen childhood in many parts of New York City. The attitude of the NYPD that we experienced towards under aged trafficking victims was one of sneering indifference, a response that served only to cover the backs of perpetrators who turn out and prostitute under aged girls.

As a result our government's failure to protect her, my daughter spent years in in-patient treatment. She now feels overwhelming sadness about the time she spent away from family, and about

the fact that a locked ward was the only place that she could be free of sexual enslavement.

It should be self evident that a young woman who has been subjected to years of physical and sexual abused would be in need of serious psychiatric intervention. Tragically, what the defense has shown, and what the District Attorney has affirmed, is that a "history of mental illness" is a scarlet letter that in all too many cases deprives its wearers of any legal recourse against those who victimize them. In addition, the "traumatic bonding" increasingly understood by the legal system, in cases of abused spouses is used against them as proof that they sought out, enjoyed, and deserved their victimization. One legal expert told me that understanding of sex trafficking is today where the understanding of spousal abuse was 30 years ago.

It saddens me and my family that we had to leave our beloved community, one in which people of different racial, ethnic, and religious groups lived side by side and learned to respect our differences and cherish our commonalities, especially our desire to nurture our children. We leave it with a deep sense of empathy for other families that have lost children to "the street life." Even today, in this hour of defeat, we remain committed more than ever to bringing about the day when law enforcement will treat forcing a child into prostitution with the same horror felt by the average citizen. I personally feel conscripted to fighting this tragic form of human suffering as a life's mission.

We had hoped that Brooklyn would be the place in which a stand would be made against sex trafficking. This was unfortunately not the case. Despite my daughter's total

cooperation, the Brooklyn District Attorney has surrendered against our will and without our consent. We have no doubt that a day will come when a victim of sex trafficking will fight and win in a battle in court and win. We have no doubt that precinct by precinct, city by city and state by state, police and the courts will reflect and act upon the natural indignation citizens feel about this heinous crime.

In 1857, the infamous Dred Scott decision affirmed the legality of slavery. In 1865, Juneteenth became a celebration of the freedom Dred Scott never lived to see. Despite today's surrender in Brooklyn, the fight against sex trafficking goes on. I am saddened as a father and as a human being that this decision to drop charges was made. As a Brooklynite, I am ashamed as well.

Women are half of the human race. When women are oppressed by gender violence and inequality, men are diminished as well. Until my dying day, the sex trafficking of women and girls, men and boys, in prison and in freedom [not sure what you mean by "men and boys, in prison and in freedom"] will remain my cause. The dignity given us by G-d is not ours to diminish or to deny others. This struggle will go on. I thank the many people who behind the scenes have assisted our family in coping with this crisis and who have helped my daughter reclaim her freedom and dignity. G-d bless you all and G-d save our country.

# Speakers at Press Conference

**Kim Sykes, Director of Special Projects, Coalition Against Trafficking in Women**

**Taina Bien-Aime, J.D., former Executive Director, Equality Now, New York State Anti-Trafficking Coalition**

**Dr. B.J. Cling, Ph.D, J.D., Clinical and Forensic Psychologist**

**Danielle Latimer, LMSW, Commercial Sexual Exploitation Program Coordinator and Clinician, Mount Sinai School of Medicine**

**Norma Ramos, J.D., Executive Director, Coalition Against Trafficking in Women**

**Jane Manning, J.D., former prosecutor and Legislative Director, New York City NOW**

**Shana Frydman, MSW, Director of Clinical Programs, Metropolitan Council on Jewish Poverty**

**Kira Laffe, Outreach and Training Coordinator, New York City Alliance Against Sexual Assault**

**Exhibit II**

Price began the careers of many journalists such as David Rochkind: his work on the drug wars in South America spans a decade of reportage produced together. The Guardian just did a review of his book co-produced with the Pulitzer Center: http://www.guardian.co.uk/artanddesign/photography-blog/2013/jan/25/mexico-drug-war-photographer-david-rochkind?intcmp=ILCMUSTXT9384

Scout Tufankjian was asked to be one of President Obama's Photographers after her comprehensive coverage of his 2008 campaign. Price was Scout's editor who stewarded her work with the campaign: Scout even mentions Price as the reason for her success when interviewed on the Charlie Rose show: http://www.charlierose.com/view/interview/10026 and thanks her in the forward and back cover of her best-selling book "Yes we Can":  http://www.scouttufankjian.com/#/yes-we-can---the-book.

Kate Brooks was one of the many photographers Price worked with and wrangled into difficult areas of the world to cover wars throughout the Mideast as well as children's' and women's' issues http://lightbox.time.com/2011/09/19/in-the-light-of-darkness-a-photographers-journey-after- 911/#12

Photographers such as Max Becherer, Christoph Bangert, Johan Spanner and Mitchell Prothero needed help getting into Iraq to work. Price not only got them safely in and out of the country dozens of times but initiated them on how to operate while there and subsequently most became full-time staffers at the NYT House in Baghdad: http://maxbecherer.com/#/the-dark-days-iraq/01182013_Becherer_IraqDark001

Price helped to position exclusive access inside the home of Benizir Bhutto in Pakistan while she was placed under house arrest by the Pakistani government upon her return after years in exile a week before her assignation:  http://www.time.com/time/photogallery/0,29307,1683694_1485358,00.html

Price worked with Stephanie Sinclair on several stories including a never-before-seen intimate portrayal of the family of polygamist Warren Jeffs for the NYT Magazine (Winner of National Magazine Award for Best Cover Story, 2009) http://www.childbrides.org/raid_NYTimes_children_of_God.html

Price is a 9/11 survivor whose work was published around the world:  now that she has lost credibility she has difficulty distributing her photos taken on 9/11 for which she made yearly income:

http://digitaljournalist.org/issue0609/watching-the-world-change.html

http://www.amazon.co.uk/102-Minuten-erz%C3%A4hlte-Geschichte-%C3%9Cberleben/dp3492250521ref=sr_1_11s=books&ie=UTF8&qid=1363704757&sr=1-11

http://www.nytimes.com/2001/09/23/arts/the-aftermath-peering-into-the-abyss-of-the-future.html

http://www.time.com/time/magazine/article/0,9171,1053663,00.html

http://www.thetimes.co.uk/tto/news/uk/jubilee/article3353131.ece

Price positioned photojournalist Robert Stolarik in NOLA days before hurricane Katrina and more than supported his efforts to document the events during and after the storm: Stolarik won many awards that year and Robert's coverage secured him a staff position at the NYT: http://www.nypress.org/KATRINA/index.html

**Exhibit JJ**



**CCM** COMMUNITY
COUNSELING
& MEDIATION

115 West 31st Street . 5th Floor . New York, NY 10001
PH 212 564 6006 . FAX 212 564 3440 . WWW.CCMNYC.ORG

January 25, 2016

To Whom It May Concern,

Ms. Kelly Price is a client here at the Manhattan clinic of Community Counseling and Mediation. She is seen for weekly psychotherapy and has been diagnosed with: F43.10 Posttraumatic Stress Disorder. She began treatment on December 29, 2015 and her most recent appointment was Friday, January 15th.

Please inform if there is any additional information you may need.

Sincerely,

Alyssa Rodriguez, MHC Intern

Lauren L. Rigney, MS, LMHC, NCC
Clinic Director

BOARD OF DIRECTORS

LaWanda A. Jackson, Esq.
Chairperson

Russel Shuler
Treasurer

Jean Goossen
Secretary

Cassandra Underdue

Joyce Tyson
Past Chairperson

ADVISORY BOARD

Margaret Crawford

Jenny Morgenthau

Emory X. Brooks
President and CEO

THERAPEUTIC SERVICES FOR CHILDREN AND THEIR FAMILIES

**EXHIBIT 20**

*Exhibit 4 Page 1*

# CRIMINAL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK

Page 1 of 4

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br>-against-<br><br>1. Kelly Price (F 40)    ECAB #<br>1208401<br><br>Defendant. | FAMILY OFFENSE<br>DEFENDANT/VICTIM<br>RELATIONSHIP:<br>INTIMATE/ACCESS<br><br>MISDEMEANOR<br>ADA WELLS<br>212-335-4032 |

Raheem Powell, of an address known to the District Attorney's Office, states as follows:

At the times and places described below in the County and State of New York, the defendant committed the offenses of:

1. PL240.30(2)     Aggravated Harassment in the Second Degree
                   (109 counts)
2. PL240.30(1)(a)  Aggravated Harassment in the Second Degree
                   (109 counts)
3. PL240.30(1)(b)  Aggravated Harassment in the Second Degree
                   (109 counts)
4. PL240.26(3)     Harassment in the Second Degree
                   (1 count)

the defendant, with intent to harass, annoy, threaten and alarm another person, made a telephone call with no purpose of legitimate communication; the defendant, with intent to harass, annoy, threaten and alarm another person, communicated with a person, anonymously and otherwise, by telephone, by telegraph, and by mail, and by transmitting and delivering any other form of written communication, in a manner likely to cause annoyance and alarm; the defendant, with intent to harass, annoy, threaten and alarm another person, caused a communication to be initiated by mechanical and electronic means and otherwise with a person, anonymously and otherwise, by telephone, by telegraph, and by mail, and by transmitting and delivering any other form of written communication, in a manner likely to cause annoyance and alarm; and the defendant, with intent to harass, annoy and alarm another, engaged in a course of conduct which alarmed and seriously annoyed another person and which served no legitimate purpose.

The offenses were committed under the following circumstances:

*Exhibit 4 page 2*

## CRIMINAL COURT OF THE CITY OF NEW YORK
### COUNTY OF NEW YORK

Page 2 of 4

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br>-against-<br><br>1. Kelly Price (F 40)  ECAB #<br>1208401<br><br>Defendant. | FAMILY OFFENSE<br>DEFENDANT/VICTIM<br>RELATIONSHIP:<br>INTIMATE/ACCESS<br><br>MISDEMEANOR<br>ADA WELLS<br>212-335-4032 |

Deponent states that on January 27, 2011, from about 23:36 hours until about 23:54 hours, at 315 West 116 Street, deponent received three (3) text messages from defendant, and deponent recognized the phone number of said text messages to be the defendant's phone number.

Deponent further states that on January 28, 2011, at about 00:49 hours, at 315 West 116 Street, deponent received a text message from defendant which stated in substance: I JUST TOOK ALL THE VICADIN AND IBUPROFIN PILLS WANDA GAVE ME AT ONCE. I HOPE I NEVER WAKE UP FROM THIS NIGHTMARE, and deponent recognized the phone number which the text message came from to be the defendant's phone number.

Deponent further states that on January 28, 2011, at about 2:39 hours, at 315 West 116 Street, deponent received a text message from defendant which stated in substance: I AM GOING TO ENACT A REVENGE ON YOU LIKE HELL HAS YET TO EVER SEE. YOU WILL TREMBLE AT MY FURY YOU WORTHLESS MAN-CUNT, and deponent recognized the phone number which the text message came from to be the defendant's phone number.

Deponent further states that on January 28, 2011 at about 10:44, at 315 West 116 Street, deponent received a text message from defendant which stated in substance: SADIE JUST SEALED YOUR FATE. WHAT YOU DONT KNOW IS MY NEW MAN IS VERY POWERFUL RAHEEM. GOT COPS ON A STRING. YOU WILL BE VERY SORRY FOR THIS, and deponent recognized the phone number which the text message came from to be the defendant's phone number.

# CRIMINAL COURT OF THE CITY OF NEW YORK ~~Exhibit4 page 3~~
## COUNTY OF NEW YORK

Page 3 of 4

THE PEOPLE OF THE STATE OF NEW YORK
:against-

1. Kelly Price (F 40)          ECAB #
                               1208401

                    Defendant.

FAMILY OFFENSE
DEFENDANT/VICTIM
RELATIONSHIP:
INTIMATE/ACCESS

MISDEMEANOR
ADA WELLS
212-335-4032

Deponent further states that on January 28, 2011, from about 00:14 hours until about 11:55 hours, at 315 West 116 Street, deponent received five (5) additional text messages from defendant, and deponent recognized the phone number of said text messages to be the defendant's phone number.

Deponent states that on February 20, 2011, from about 8:57 hours until about 16:05 hours, at 315 West 116 Street, deponent received twenty-two (22) phone calls from the defendant, and some of said calls were within one minute apart from one another, and deponent answered some of said phone calls and deponent heard and recognized defendant's voice, and when deponent answered said phone calls deponent stated in substance to defendant, STOP CALLING MY PHONE and one of the times when deponent answered the phone deponent heard defendant state in substance: I HAVE YOUR LIFE IN MY HANDS AND I WILL GET YOU ARRESTED.

Deponent further states that on February 20, 2011, from about 17:22 hours until about 17:44 hours, at 2271 Frederick Douglas Boulevard, deponent received seven (7) phone calls from the defendant, and all of said phone calls were made within the time span of twenty-two (22) minutes.

Deponent further states that on February 20, 2011, from about 19:10 hours until about 21:56 hours, at 315 West 116 Street, deponent received seven (7) phone calls from the defendant, and some of said calls were within one minute apart from one another, and deponent answered some of said phone calls and deponent heard and recognized defendant's voice when deponent answered said phone calls, and when deponent answered said phone calls deponent stated in substance to defendant, STOP CALLING MY PHONE.

*Exhibit 4 page 4*

# CRIMINAL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK

Page 4 of 4

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br>-against-<br><br>1. Kelly Price (F 40)                    ECAB #<br>                                                          1208401<br><br>                                        Defendant. | FAMILY OFFENSE<br>DEFENDANT/VICTIM<br>RELATIONSHIP:<br>INTIMATE/ACCESS<br><br>MISDEMEANOR<br>ADA WELLS<br>212-335-4032 |

Deponent further states that on from about 7:30 hours until about 21:30 hours on February 21, 2011, at 315 West 116 Street, deponent received forty-one (41) phone calls from the defendant, and some of said calls were within one minute apart from one another, and deponent answered some of said phone calls and deponent heard and recognized defendant's voice when deponent answered said phone calls, and when deponent answered said phone calls deponent stated in substance to defendant, STOP CALLING MY PHONE.

Deponent further states that on from about 8:32 hours until about 15:02 hours on February 22, 2011, at 315 West 116 Street, deponent received twenty-one (21) phone calls from the defendant, and some of said calls were within one minute apart from one another, and deponent answered some of said phone calls and deponent heard and recognized defendant's voice when deponent answered said phone calls, and when deponent answered said phone calls deponent stated in substance to defendant, STOP CALLING MY PHONE.

Deponent is further states that defendant's above-described actions caused informant to become alarmed and annoyed and feel harassed and afraid for deponent's well-being.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

_____                    3/25/11   5:21 PM
Deponent                                              Date and Time

ACT 5 Version 4.3.5 Created on 03/25/11 5:18 PM

**EXHIBIT 12**

Exhibit 7   Page 1

SUPREME COURT OF THE STATE OF NEW YORK        NO FEE
NEW YORK COUNTY
100 CENTRE STREET
NEW YORK, NY 10013

CERTIFICATE OF DISPOSITION DISMISSAL

DATE: 08/08/2012                    CERTIFICATE OF DISPOSITION NUMBER: 29363

PEOPLE OF THE STATE OF NEW YORK         CASE NUMBER:              20075-2011
                 VS.                    LOWER COURT NUMBER(S):    2011NY021627
                                        DATE OF ARREST:           03/24/2011
                                        ARREST #:                 M11625738
PRICE,KELLY                             DATE OF BIRTH:            11/27/1970

_____DEFENDANT_____

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 07/24/2012 THE ABOVE ACTION WAS
DISMISSED AND ALL PENDING CRIMINAL CHARGES RELATED TO
THIS ACTION WERE ALSO DISMISSED BY THE HONORABLE  DAWSON,T    THEN
A JUDGE OF THIS COURT.

THE DEFENDANT WAS DISCHARGED FROM THE JURISDICTION OF THE COURT.

THE ABOVE MENTIONED DISMISSAL IS A TERMINATION OF THE CRIMINAL
ACTION IN FAVOR OF THE ACCUSED AND PURSUANT TO SECTION 160.60 OF
THE CRIMINAL PROCEDURE LAW "THE ARREST AND PROSECUTION SHALL BE
DEEMED A NULLITY AND THE ACCUSED SHALL BE RESTORED, IN
CONTEMPLATION OF LAW, TO THE STATUS OCCUPIED BEFORE THE ARREST
AND PROSECUTION".

PURSUANT TO SECTION 160.50(1C) OF THE CRIMINAL PROCEDURE LAW, ALL
OFFICIAL RECORDS AND PAPERS RELATING TO THIS CASE ARE SEALED.


IN WITNESS WHEREOF,I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 08/08/2012.

                                        _____
                                                COURT CLERK

**EXHIBIT 13**

*Exhibit 7 Page 2*

NO FEE

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY
100 CENTRE STREET
NEW YORK, NY 10013

CERTIFICATE OF DISPOSITION DISMISSAL

CERTIFICATE OF DISPOSITION NUMBER: 29364

DATE: 08/08/2012

PEOPLE OF THE STATE OF NEW YORK
VS.

| | |
|---|---|
| CASE NUMBER: | 20111-2011 |
| LOWER COURT NUMBER(S): | 2011NY032918 |
| DATE OF ARREST: | 05/06/2011 |
| ARREST #: | M11639652 |
| DATE OF BIRTH: | 11/27/1970 |

PRICE,KELLY C

DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 07/24/2012 THE ABOVE ACTION WAS
DISMISSED AND ALL PENDING CRIMINAL CHARGES RELATED TO
THIS ACTION WERE ALSO DISMISSED BY THE HONORABLE  DAWSON,T    THEN
A JUDGE OF THIS COURT.

THE DEFENDANT WAS DISCHARGED FROM THE JURISDICTION OF THE COURT.

THE ABOVE MENTIONED DISMISSAL IS A TERMINATION OF THE CRIMINAL
ACTION IN FAVOR OF THE ACCUSED AND PURSUANT TO SECTION 160.60 OF
THE CRIMINAL PROCEDURE LAW "THE ARREST AND PROSECUTION SHALL BE
DEEMED A NULLITY AND THE ACCUSED SHALL BE RESTORED, IN
CONTEMPLATION OF LAW, TO THE STATUS OCCUPIED BEFORE THE ARREST
AND PROSECUTION".

PURSUANT TO SECTION 160.50(1C) OF THE CRIMINAL PROCEDURE LAW, ALL
OFFICIAL RECORDS AND PAPERS RELATING TO THIS CASE ARE SEALED.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 08/08/2012.

COURT CLERK

**EXHIBIT 14**



EXHIBIT 15