**Color of State Law in her official capacity as an employee of the Manhattan District Attorney's Office a division of an official Agency of the City of New York, or in her own capacity:**

Plaintiff Price repeats and realleges each and every allegation contained in the above paragraphs. Plaintiff claims that she was injured and continues to be injured as a result of being placed on the NYPD "Do not Serve" Compstat List. Under the Due Process Clause of the Fourteenth Amendment, state officials may not deprive an individual of life, liberty, or property without due process of law. The Due Process Clause generally does not require the state and its officials to protect individuals from harms caused by persons who are not acting on behalf of the government that the government did not cause. However, the Due Process Clause does prohibit state officials from engaging in conduct that renders an individual more vulnerable to such harms. In this case, Plaintiff Price claims that Strohbehn rendered her more vulnerable to harm by placing her on a "do not serve" list, informing the NYPD of such status, and not ensuring that this messaging was kept confidential and did was not shared with Plaintiff's abuser or other neighborhood rogues seeking to do harm to Price in retaliation for her difficulties with their close associate: Mr. Powell Price's former pimp and abuser. To establish this claim, Plaintiff Price must prove all of the 15 following four things by a preponderance of the evidence: First: The harm to Plaintiff Price of being constantly under siege in her neighborhood when her abuser and his associates discovered her status was a foreseeable and fairly direct result of Strohbehn's conduct. Second: Strohbehn acted with conscious disregard of a great risk of serious harm and deliberate indifference. Third: There was some type of relationship between Strohbehn and Plaintiff Price that distinguished Plaintiff Price from the public at large. Fourth: Strohbehn's action made Plaintiff Price more vulnerable to attacks as persons knew they would not face penal repercussions for

harms they unhanded to Price.  The first of these four elements requires Plaintiff Price to show that the harm to Plaintiff Price, constant violent attacks in her Harlem neighborhood was a foreseeable and fairly direct result of Strohbehn's conduct. This element includes two related concepts: foreseeability and directness. Foreseeability concerns whether Strohbehn should have foreseen the DIRECT and constant battery of assaults Plaintiff Price would encounter if her enemies were informed of the DO NOT SERVE status assigned her unlawfully and unconstitutionally by Strohbehn. Directness of Strohbehn's involvement in Price's constant battery and assault from neighbors concerns whether it is possible to draw a direct enough connection between Strohbehn's conduct can be said to be a fairly direct cause of constant battery Plaintiff Price suffered on many occasions.  Strohbehn acted with deliberate indifference.  Strohbehn knew that there was a strong likelihood of harm to Plaintiff Price,  and that Strohbehn disregarded that risk by failing to take reasonable measures to address it even though she knew the harm was obvious,

137.   Strohbehn acted with conscious disregard of a great risk of serious harm. Strohbehn knew there was a great risk of serious harm, and that Strohbehn consciously  disregarded that risk. There was a special relationship between Strohbehn and Plaintiff Price that distinguished Plaintiff Price from the public at  large. Strohbehn's conduct created a risk to the general public by allowing people who battered, assaulted and abused Plaintiff Price free-reign to continue their assault to others.  The six other women harmed by Rami Baly, the man who attacked Plaintiff Price on July 28, 2012 outside of Soldier McGee's Bar were put at risk and indeed suffered sexual assault and other forms of stalking and harassment by Stohbehn's act of placing Plaintiff Price on a Do NOT Serve List and denying her police services when she knew that Plaintiff Price

was not a fabricator.  Strohbehn's conduct created a foreseeable risk to Plaintiff Price and

another a definable group of people including Plaintiff Price: other women in NYC who would

be attacked by predators given leniency because of Strohbehn's personal vendetta against

Plaintiff Price.

138.    **Count # 14: Defendant Police Officer Matthew Winters: Section 1983 – Excessive Force (Including Some Types of Deadly Force)  During a Stop, Arrest, or other "Seizure" Under the Fourth Amendment: Under Color of State Law in his official capacity as an employee of the NYPD a division of an official Agency of the City of New York, or in his own capacity:**

Plaintiff Price repeats and realleges each and every allegation contained in the

above paragraphs.   claims that she was injured constitutionally by being excessively

assaulted during an arrest by PO Winters.  The Fourth Amendment to the United States

Constitution protects persons from being  subjected to excessive force while being

arrested. In other words, a law  enforcement official may only use the amount of force

necessary under the circumstances to make the arrest.  Every person has the constitutional

right not to be subjected to excessive force while being arrested even if the arrest is

otherwise  proper.  In this case, Plaintiff Price claims that Winters used excessive force

when he arrested Plaintiff Price. In order to establish that Winters used excessive

force,  Plaintiff Price must prove both of the following by a preponderance of the

evidence: First: Winters intentionally committed certain acts.   Second: Those acts

violated Plaintiff Price's Fourth Amendment right not to be subjected to excessive force.

In determining whether Winters' acts constituted excessive force, you must ask whether

the amount of force Winters used was the amount which a reasonable officer would  have

used in making the arrest  under similar circumstances. The court should  consider all the

relevant facts and circumstances (leading up to the time of the arrest that defendant

reasonably believed to be true at the time of the arrest that are amplified in pleadings and

in the Appellate Panel's summary of events attached as Exhibit outlined when charges

against Plaintiff were overturned by appeal on or about February of 2016..   The court

could consider those facts and circumstances in order to assess whether there was a need

for the application of  force, and the relationship between that need for force, if any, and

the amount of force applied.  Price was accused of disorderly conduct, or making noise

and expressing a profanity at police:  neither are severe crimes at issue.  Plaintiff Price

did NOT pose an immediate threat to the safety of Winters or others.  Plaintiff Price was

clearly not armed as she was wearing an eensey party dress.  There were NO

other☐persons subject to the police action who were violent or dangerous.  Plaintiff Price

never actively resisted  arrest or attempted to evade arrest by flight. Certainly Plaintiff's

injuries which have been plead and exhibits of severe injuries attached were the direct

result☐ of Officer Winter's OVER USE of physical force that was applied to such an

extent as to lead to unnecessary injury.  The reasonableness of Winter's acts must be

judged from the perspective of a  reasonable officer on the scene. The law permits the

officer to use only that degree of force  necessary to make the arrest.  The force Winters

used was unreasonable:  you can make out his HANDPRINTS ON HER UPPER ARMS

IN THE FORM OF BRUISES:  following it does not matter whether Winters  had good

motivations as clearly an Excessive Use of Force was used in Plaintiff's wrongful arrest.


**139.    Count #s 15 and 16 & 17: Officers Relf and Officer Maldonado: Liability in
Connection with the Actions of Another – Failure to Intervene Police Officers Maldonado,
Jane Doe and Officer Relf under color of State Law in his official capacity as an employee
of the New York City Police Department a division of an official Agency of the City of New
York,  or in his own capacity:**

Plaintiff Price repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.  Plaintiff contends that NYPD Officers Relf, D  and Maldonado and Officer Jane Doe violated Plaintiff's specific right to not be arrested with excessive Force by NYPD Officer Matthew Winters: and that NYPD Officers Relf , Maldonado and Doe should be liable for that violation because Relf failed to intervene to stop the violation on September 24, 2011.  Relf , Maldonado and Doe are liable for that violation if plaintiff has proven all of the following four things by a preponderance of the evidence: First: P.O. Matthew Winters violated Plaintiff Price's right not to be excessively abused with excessive force while being detained or arrested.  Second: Relf , Maldonado and Doe had a duty to intervene. Police officers  have a duty to intervene to prevent the use of excessive force by a fellow officer. Third: Officers Relf , Maldonado and Doe Had a reasonable opportunity to intervene. Fourth: Relf failed to intervene.

140.    **Count # 18 Section 1983 – Liability in Connection with the Actions of Another – Municipalities – Choice by Policymaking Official, District Attorney Cyrus Vance Under color of State Law in his official  capacity as an employee of the Manhattan District Attorney's Office: a division of an official Agency of the City of New York,  or in his own capacity:**   Plaintiff Price repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.  Plaintiff contends that The Manhattan District Attorney's Office ("MDAO)") of the City of New York is a policymaking entity whose actions  represent a decision by the government itself (insert Walker case citation). The same is true of an official or body to whom the MDAO has given final policymaking authority: such as Operation Crew Cut Squads.  The actions of that official or body represent a decision by the government

itself. Thus, when the MDAO or Vance make a deliberate choice to follow a course of

action, that choice represents an official policy. Through such a policy, the MDAO or the

DA Vance may cause a violation of a federal right by: ☐ directing that the violation

occur,☐ authorizing the violation, or☐ agreeing to a subordinate's decision to engage in

the violation. The MDAO or Vance may also cause a violation through inadequate

training and/or inadequate supervision, failure to adopt a needed policy, but only if the

City of New York is deliberately indifferent to the fact that a violation of Due Process

Rights to not be Maliciously Prosecuted and to not be unlawfully Searched and Seized is

a highly predictable consequence of the [inadequate training, inadequate supervision,

and the failure to adopt a needed policy by Vance, the MDAO and the City of New

York. I instruct you that Cyrus Vance Jr. and the MDAO are policymakers whose

deliberate choices represent official policy.

**141.   Count #s 19-23: Section 1983 – Unlawful Seizure: NYPD Officers: Detective Linda Simmons, and Officer Matthew Winters: under color of State Law in his/her official capacity/ies as employees of the New York City Police Department: a division of an official Agency of the City of New York, or in his/her own capacity:**
        Plaintiff Price repeats and realleges each and every allegation contained in the

above paragraphs with the same force and effect as if fully set forth herein. Plaintiff

contends that NYPD Officers Winters and Simmons violated Plaintiff's specific right to

not be arrested **under** The Fourth Amendment to the United States Constitution which

protects persons from being subjected to unreasonable seizures by the police. A law

enforcement official may only seize a person if there is appropriate justification to do 8

so. In this case, Plaintiff Price claims and has amply pled that defendants Winters and

Simmons subjected Plaintiff Price to an unreasonable arrest in violation of the Fourth

Amendment. A preponderance of the evidence pled amplifies these claims. First:

Defendants Winters and Simmons intentionally had no cause and acted with malice and or other motivation when arresting Price on four occasions.  Those acts subjected Plaintiff Price to (a) "seizures" and the "seizure" was unreasonable.

142.    **Count # 24: Section 1983 – Unlawful Seizure Under the Fourth Amendment– Terry Stop and Frisk:  John Doe and Jane Doe Police Officers of the Midtown North Precinct under color of State Law in his/her official capacities as employees of the NYPD: or in his/her own capacity/ies.**
Plaintiff Price repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.  Plaintiff contends that NYPD Officers John and Jane Doe of the Midtown North Precinct violated Plaintiff's specific right to not be arrested on or about JULY 3, 2015 when Plaintiff was seized and transported to /Bellevue Hospital "Arrest" on or about July 3, 2015  as is amplified in the above pleadings.   A "seizure" occurs when a police officer restrains a person in some way, either by means  of physical force or by a show of authority that the person obeys.  In  view of all the circumstances of pleadings expressed about Price's July 2015 seizure by the Midtown North Precinct and its unknown police officers, a reasonable person would have believed that Plaintiff Price  was not free to end the encounter as Police had placed handcuffs on Price and put her under armed guard in the back of an ambulance as they transported her against her will to Bellevue Hospital for Psychiatric evaluation. If a reasonable person, under the circumstances, would have believed that she was not free to end the encounter, then at that point the encounter has turned  into a "stop" that counts as a "seizure" for purposes of the Fourth Amendment. If the court finds that Plaintiff Price has proved by a preponderance of the evidence that such a stop  occurred, then the court must decide whether the stop was justified by

"reasonable suspicion." The Fourth Amendment requires that any seizure must be reasonable. In order to "stop" a person, the officer must have a "reasonable suspicion" that the person has committed, is committing, or is about to commit a crime. These are not the facts pled: Price was attempting to make a police report about an assault made against her person. These specific facts, taken together with the rational inferences from those facts DO NOT reasonably warrant the stop.

143.   **COUNT # 25:  DUE PROCESS CLAIM AGAINST THE CITY** Plaintiff

Price repeats and realleges each of the allegations contained in paragraphs 1 through 124 with the same force and effect as if fully set forth herein. By its policies, practices, acts, and omissions, the City has caused the plaintiff whose abuser was a Confidential Informants and/or witness/complainant on major cases to be subjected to further abuse by the criminal justice system when she came forward for help, in violation of her due process rights under the Fourteenth Amendment to the United States Constitution.

144.   **COUNT #s 26 and 27:  (Malicious Prosecution Under Federal Law: Defendants ADA Maria Strohbehn, Ada Kenya Wells, City of New York Under the color of State Law in their official capacities as employees of the Manhattan District Attorney's Office:** Plaintiff repeats and realleges each and every allegation contained in this Complaint. By virtue of the foregoing, the Individual Defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.  The criminal proceedings terminated in Plaintiff's favor. There was no probable cause for the commencement or the continuation of the criminal proceedings. The Defendants acted with actual malice. Defendant City of New York is liable under the principle of respondent superior.

145.    **COUNT # 28 (42 U.S.C. §1983; Denial Of Due Process Under the Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments; (Defendants: Simmons, Strohbehn, Vance, Wells,)**

Plaintiff repeats and realleges each and every allegation contained of this complaint as if fully set forth herein. Among other offenses, Defendants  Simmons knowingly and willfully manufactured, or caused the manufacturing of, a false written statement, which they prepared and improperly compelled or induced Plaintiff to sign under "oath," accusing Plaintiff of fabricating her own injuries or they told her that her abuser would be arrested and he would tell everyone that she was working as a prostitute under duress. They knew that the statement would, and caused the statement to, be relied upon by the MDAO and the court as a basis to arrest Plaintiff, to formally initiate her prosecution, to hold her for trial, and to compel Powell to submit affidavits, and to give testimony consistent with her statement. Wells thereafter knowingly swore to a false Criminal Court complaint initiating the criminal prosecution of Plaintiff, and causing Plaintiff to be held in Rikers Island and in the tombs at 100 Centre Street. Malicious Prosecution: Defendants filed hundreds of counts of aggravated harassment against Plaintiff against the allotments stipulated by the statute for aggravated harassment. Additionally, prior to trial, Simmons manufactured false "threat" evidence by filing a false police complaint alleging that Plaintiff was responsible for numerous threats against Raheem Powell: in fact Plaintiff's assertions that she would turn Powell into the NYPD for his physical attacks on her were themselves seen through some perverted law-enforcement spectrum as threats by Plaintiff to Powell by the NYPD and the MDAO:  they were used in the actual false filing as such which caused injuries to Plaintiff, as set forth above. By virtue of the foregoing, Simmons and Strohbehn and Wells, with actual malice, initiated and continued, or caused the initiation and

continuation of, criminal proceedings against Plaintiff for which they knew, or should have known, there was no probable cause, and for which

a.      In fact there was no probable cause, and thereby caused Plaintiff to be deprived of her liberty. Such proceedings ultimately were terminated in Plaintiff's favor. Additionally, Simmons and Strohbehn knew, but withheld from the MDAO, either permanently or for a substantial period of time, and therefore from the court and the defense, exculpatory or impeachment evidence that tended to negate Plaintiff's guilt and which they knew or should have known the law required them to timely disclose (such as Plaintiff's Batterers PREVIOUS FELONY CONVICTION FOR DOMESTIC VIOLENCE by the MDAO). This evidence included, but was not limited to, Hospital Emergency Room reports, statements from Plaintiff's neighbors and ER doctors; Photographs of Plaintiff's injuries incurred at the hands of Powell; the fact that Powell was a drug dealer who had acted in concert with the NYPD on more than one previous occasion; and their unreasonable failure to investigate the information provided to them by Plaintiff and Plaintiff's attorney and advocates from various Domestic violence advocacy groups. The aforesaid conduct, which Defendants committed in concert with and in aid of each other, and/or in concert or conspiracy with others named and unnamed, operated to deprive Plaintiff of her rights under the Constitution and the Laws of the United States:

i.      Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

1. (b) Not to be deprived of her liberty absent probable cause to believe she has committed a crime, in violation of her rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

2. (c) To timely disclosure of all material evidence favorable to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States,_ 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

146.    The foregoing violations of Plaintiffs federal constitutional rights by the Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's criminal prosecution, her loss of liberty and detention, her wrongful conviction for disorderly conduct, her subsequent imprisonment, her restriction of movement and freedoms as specified in the order of protection the court ordered against her in the name of her batterer, Raheem Powell, her to be placed on a NYPD 'no services' list and her other injuries and damages. The foregoing violations of Plaintiffs rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Defendant's' employment and authority. Defendants committed the foregoing violations of Plaintiffs rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights. 413. By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

147.    **COUNT # 29:  (42 U.S.C. §1983; Denial Of Due Process Under the Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution, Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; Defendants: Moore, Wells, Strohbehn, Simmons, Vance acting under color of State law in their official capacities:**

Plaintiff repeats and realleges each and every allegation contained in contained in this complaint as if fully set forth herein Knowing that any colorable cause to continue the prosecution had evaporated, Wells, in the capacity of an investigator or "witness," acted in concert and conspired with Strohbehn, Wells, Moore, and others, named and unnamed, to use any means, no matter how unlawful or coercive, to intimidate them into falsely accusing Plaintiff of the charged crimes. These illegal and unconstitutional means included, but were not limited to,

i.      Abusing judicial process by misusing the court's subpoena power to compel witnesses to appear at Court and the Das office;

ii.     Abusing judicial process by deceiving the court into issuing "orders of protection" restricting Plaintiff's liberties and freedom by: Personally attesting to "facts" which they knew were untrue in order to deceive the court into issue orders authorizing them to take custody of such plaintiff;

2.      These lawless actions foreseeably caused the aforementioned witnesses to manufacture false evidence which Strohbehn and Simmons then used to continue Plaintiffs malicious prosecution, without probable cause, and for Wells to bring about her false conviction at trial. The foregoing violations of Plaintiffs federal constitutional rights by the Defendants, together with their co-conspirators and accomplices, known and unknown,

directly, substantially, proximately, and foreseeably caused the continuation of Plaintiffs

malicious prosecution without probable cause, her wrongful imprisonment, and her other

injuries and damages.  The foregoing violations of Plaintiffs rights amounted to

Constitutional torts and were affected by actions taken under color of State law, and

within the scope of the Defendant's' employment and authority. Defendants committed

the foregoing violations of Plaintiffs rights knowingly, intentionally, willfully, recklessly,

negligently, and/or with deliberate indifference to Plaintiff's constitutional rights or to the

effect of such misconduct upon Plaintiffs constitutional rights. By reason of the

foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for

compensatory and for punitive damages.

3. **CLAIM # 29:  (Monell/42 U.S.C. § 1983: Claim Against Defendant City of New York For The Actions Of The NYPD)**
> Plaintiff repeats and re-alleges each and every allegation contained in contained

in  this complaint as if fully set forth herein.  The foregoing violations of Plaintiffs

federal constitutional rights and injuries were further directly, foreseeably, proximately,

and substantially caused by conduct, chargeable to Defendant City, amounting to

deliberate indifference to the constitutional rights of persons, including Plaintiff, who are

investigated, arrested, or prosecuted for alleged criminal activities. Prior to Plaintiff's

arrest, policymaking officials at the NYPD, with deliberate indifference to the

constitutional rights of individuals suspected or accused of criminal activity, to the risk of

arresting, prosecuting and convicting innocent people, and to the right of all criminal

suspects and defendants to due process and a fair trial, implemented plainly inadequate

policies, procedures, regulations, practices, customs, training, supervision, and discipline

concerning:

i.      The use of excessive promises of rewards with witnesses, including drug dealers and and/or individuals fearing persecution and imprisonment for their own criminal behavior;

ii.      The determination of probable cause to make an arrest; and

iii.      The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information ("Brady material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under Brady.

2.      With respect to "a" and "c" in the preceding paragraph, prior to Plaintiff's arrest and the initiation of her prosecution the NYPD or the MDAO provided no training at all in regards to how a DV or trafficking complainant should be evaluated or the efficacy of their complaints as victims should they be suspected of fabricating their injuries. What further review other than the cursory nods by individuals who had not investigated the facts is needed to brandish such a title on a crime victim/complainant? What review exists to ensure an investigation is in fact undertaken? What checks and balances are in place to ensure innocent victims are not falsely branded "fabricators" enabling their abusers to use the criminal justice system against them to control their lives and alter the freedoms and liberties most citizens enjoy? To imprison them and cause them public shame, emotional distress, loss of income and loss of private and professional standing?

The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

a.     to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b.     that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c.     that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

d.     The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances: Plaintiff has obtained amicus briefs and affidavit testimony from present and former Domestic Violence advocacy groups, establishing, prior to and during the time period of Plaintiff's arrest and prosecution, the NYPD and MDAO provided no training concerning appropriate interrogation of Domestic Violence complainants suspected of being fabricators. formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with

disciplinary or other remedial action; and the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions. Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of Brady material. The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policy maker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

151.    During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public. The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiffs rights under the Constitution and laws of the United States. By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiffs constitutional rights and her constitutional injuries.

**152.    ClAIM #30: (Monell/42 U.S.C. § 1983 Claim Against Defendants: Vance, Moore,  City Of New York For Actions Of The MDAO)**

Plaintiff repeats and realleges each and every allegation contained in contained in this complaint as if fully set forth herein. At the time of Plaintiff's original prosecution, and continuing, District Attorney Cyrus Vance Jr, as the manager and chief administrator of the MDAO, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his employees of the constitutional rights of individuals who made complaints as victims of domestic violence whose batterers held information critical to other investigations and criminally prosecuted in New York County, including, but not limited to, abuse of process, manufacturing of false evidence and testimony through improper coercion of witnesses, Brady violations, reliance on false or misleading evidence and argument at trial ("the policy"), and covering up the same.  The policy permits, encourages, or acquiesces in the commission of, constitutional violations of the rights of suspects and defendants by prosecutors, detective-investigators, and NYPD detectives working with the D.A. 's Office, particularly in high profile or serious cases where arrest and conviction is most desired by the Office. The policy led directly to the violations of Plaintiffs constitutional rights, and the subsequent cover-up of police and prosecutors' wrongdoing, which greatly prolonged Plaintiffs wrongful imprisonment, seizure and other damages. Vance had no employee handbook, manual, or other document setting forth any process for evaluating "fabricators". Defendant CITY is liable for having substantially caused the foregoing violations of Plaintiffs constitutional rights and his resultant injuries.

**153.    CLAIM # 31: (Negligent Hiring, Training and Supervision Under State Law; Defendant City of New York, Vance, Moore acting under the color of state law in their official and individual capacities)**

Plaintiff repeats and realleges each and every allegation contained in this

Complaint. By virtue of the foregoing, defendant City of New York is liable to plaintiff

because of its intentional, deliberately indifferent, careless, reckless, and/or negligent

failure to adequately hire, train, supervise, and discipline its agents, servants and/or

employees employed by the MDAO and or the NYPD with regard to their

aforementioned duties.

154.    **CLAIM # 33: 42 U.S.C. §1983; Denial Of Due Process Under the Fifth, Sixth and Fourteenth Amendments; Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; Defendants Obe, Pierre-Louis, Strohbehn, Vance, Wells, Winters:** the NYPD and the MDAO, as a matter of policy, stripped Miss Plaintiff of her First Amendment Rights to petition the Government for redress of grievances:

155.    **CLAIM # 34: 42 U.S.C. §1983; Unreasonable Search & Seizure Under the Fourth Amendment's; \*Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments\*; Defendants: Simmons, Strohbeh, Wells, Winters and Vance** Under Color of State Law:

Plaintiff's knowingly kept Plaintiff Price under unreasonable seizure for an

elongated period of time during her false arrest and drawn-out prosecution lasting

approximately SIX years (during which the seizure continued) denying her of her Fourth

Amendment right against unreasonable searches and seizures as some charges are still

Pending as this complaint is filed.

156.    **CLAIM # 35: 42 U.S.C. §1983; Excessive and Unusual Punishment  Under the Eighth Amendment; \*Abuse of Process, and Deprivation of Liberty Under the First, Fourth, Eighth, Fifth and sixteenth Amendments\*; Defendants Simmons, Moore, Wells, Strohbehn, Vance Under the color of state law in their official capacities:**

Defendants eschewed Plaintiff her Eighth Amendment rights by denying her

police services asserting excessive and unusual punishment and commencing court

proceedings not once but twice against Plaintiff Price in order to achieve another goal:  to

keep her batterer and abuser, Raheem Andre Powell cooperating with their operation

"Crew Cut" investigation(s).

157.   **Count # 36: Section 1983 – Unlawful Seizure: NYPD Officer: Detective Linda Simmons: under color of State Law in his/her official capacity/ies as employees of the New York City Police Department: a division of an official Agency of the City of New York,  or in his/her own capacity for Actions undertaken on our about 10/13/2010:**

The Fourth Amendment to the United States Constitution protects persons from being subjected to unreasonable seizures by the police. A law enforcement official may only seize a  person (for example, by stopping or arresting the person) if there is appropriate justification to do so. In this case, Plaintiff Price claims that Detective Simmons subjected  Plaintiff Price to an unreasonable arrest, in violation of the Fourth Amendment. To establish this claim,  Plaintiff Price must  prove each of the following three things by a preponderance of the evidence: First: Simmons intentionally arrested  Plaintiff Price even though she knew her to be not guilty of fabricating a police report.  Second: Those acts subjected  Plaintiff Price to a "seizure." Third: The "seizure" was unreasonable.

158.   **CLAIM # 37: 42 U.S.C. §1983; Denial Of Due Process and Equal Protection Under the Fifth, Sixth and Fourteenth Amendments; Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; Defendants Jane Doe II  and John Doe:**

Under the Due Process Clause of the Fourteenth Amendment, state officials may not deprive an individual of life, liberty, or property without due process of law. The Due Process Clause generally does not require the state and its officials to protect individuals from harms caused by persons who are not acting on behalf of the government. However, the Due Process Clause does prohibit state officials from engaging in conduct that renders an individual more vulnerable to such harms. In this case, Plaintiff Price claims that Defendant Agron rendered her more vulnerable to harm by refusing to take a report for events that transpired on the evening of November 11, 2010 where Powell threw

Plaintiff through a fish tank and instead the precinct instructs Plaintiff to go to family

court to attain a restraining order against him which she does (Exhibit # E).  To establish

this claim, Plaintiff Price must prove all of the 15 following four things by a

preponderance of the evidence: First: The harm to Plaintiff Price's refusal of police

service was a foreseeable and fairly direct result of the defendant officers' conduct.

Second: These officers acted with deliberate indifference.  Third: There was some type of

relationship between these officers and Plaintiff Price that distinguished Plaintiff Price

from the public at large. Fourth: These officers action made Plaintiff Price more

vulnerable to further abuse by her batterer.

159.    **COUNT #38:  42 U.S.C. §1983; Denial Of Due Process and Equal Protection Under
the Fifth, Sixth and Fourteenth Amendments; Abuse of Process, and Deprivation of
Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; Defendant Agron:**
                    Under the Due Process Clause of the Fourteenth Amendment, state officials may

not deprive an individual of life, liberty, or property without due process of law. The Due

Process Clause generally does not require the state and its officials to protect individuals

from harms caused by persons who are not acting on behalf of the government. However,

the Due Process Clause does prohibit state officials from engaging in conduct that

renders an individual more vulnerable to such harms. In this case, Plaintiff Price claims

that two unknown officers, Jane Doe and John Doe,  rendered her more vulnerable to

harm by telling Plaintiff when she goes to make report that he will arrest Plaintiff  for

trespassing if she doesn't leave the precinct, after she was beaten, robbed, and dragged

into the street Powell on December 22nd, 2010, and multiple witnesses called 911 for

help.  To establish this claim, Plaintiff Price must prove all of the 15 following four

things by a preponderance of the evidence: First: The harm to Plaintiff Price's refusal of

police service was a foreseeable and fairly direct result of the defendant officers' conduct.

Second: Sergeant Agron acted with deliberate indifference.  Third: There was some type

of relationship between Sergeant Agron and Plaintiff Price that distinguished Plaintiff

Price from the public at large. Fourth: Sergeant Agron's action made Plaintiff Price more

vulnerable to further abuse by her batterer.

**160.   COUNT #39: 42 U.S.C. §1983; Denial Of Due Process and Equal Protection Under the Fifth, Sixth and Fourteenth Amendments; Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; Defendant Agron:**
Under the Due Process Clause of the Fourteenth Amendment, state officials may

not deprive an individual of life, liberty, or property without due process of law. The Due

Process Clause generally does not require the state and its officials to protect individuals

from harms caused by persons who are not acting on behalf of the government. However,

the Due Process Clause does prohibit state officials from engaging in conduct that

renders an individual more vulnerable to such harms. In this case, Plaintiff Price claims

that Defendant Agron  rendered her more vulnerable to harm by telling Plaintiff that the

only thing he can do for Plaintiff is to "move Plaintiff to Nevada" (See texts from Powell

EXHIBIT # N) after Plaintiff goes to the precinct to make a police report of Powell's

further abuse on January 27, 2011.  To establish this claim, Plaintiff Price must prove all

of the 15 following four things by a preponderance of the evidence: First: The harm to

Plaintiff Price's refusal of police service was a foreseeable and fairly direct result of the

defendant officers' conduct. Second: Sergeant Agron acted with deliberate

indifference.  Third: There was some type of relationship between Sergeant Agron and

Plaintiff Price that distinguished Plaintiff Price from the public at large. Fourth: Sergeant

Agron's action made Plaintiff Price more vulnerable to further abuse by her batterer.

**161.   COUNT #41: 42 U.S.C. §1983; Denial Of Due Process and Equal Protection Under the Fifth, Sixth and Fourteenth Amendments; Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; Defendant Simmons:**

Under the Due Process Clause of the Fourteenth Amendment, state officials may not deprive an individual of life, liberty, or property without due process of law. The Due Process Clause generally does not require the state and its officials to protect individuals from harms caused by persons who are not acting on behalf of the government. However, the Due Process Clause does prohibit state officials from engaging in conduct that renders an individual more vulnerable to such harms. In this case, Plaintiff Price claims that Defendant Simmons rendered her more vulnerable to harm by telling Plaintiff that "it's too late that the precinct will look bad" when she asked about signing a complaint for injuries dating from November 11, 2011.  To establish this claim, Plaintiff Price must prove all of the 15 following four things by a preponderance of the evidence: First: The harm to Plaintiff Price's refusal of police service was a foreseeable and fairly direct result of the defendant officers' conduct. Second: Detective Simmons acted with deliberate indifference.  Third: There was some type of relationship between Detective Simmons and Plaintiff Price that distinguished Plaintiff Price from the public at large. Fourth: Detective Simmons's action made Plaintiff Price more vulnerable to further abuse by her batterer.

162.    **Count #42: Defendant Detective Linda Simmons: Section 1983 Violations for State-created Danger under the Due Process Clause of the Fourteenth Amendment:  Under Color of State Law in her official capacity as an employee of the Manhattan District Attorney's Office a division of an official Agency of the City of New York,  or in her own capacity:**

Plaintiff Price repeats and realleges each and every allegation contained in the above paragraphs.

163.    This lawsuit seeks to hold the defendant CITY OF NEW YORK liable for the above and below

stated misconduct under the federal civil rights statute, 42 U.S.C. § 1983, and Monell v. Dept. Of Social

Services, 436 U.S. 658 (1978) and under state law. The unlawful actions of police detectives and

prosecutors documented in this lawsuit resulted from affirmative or de facto municipal policies, practices

and customs to violate the constitutional rights of survivors involved in making Domestic Violence and/or

human  trafficking complaints, or from deliberate indifference by policy-making officials, acting on

behalf of the City of New York, to such violations. As Plaintiff will demonstrate, both the NYPD and the

MDAO, as a matter of policy, instructed and coerced witnesses to give false or unreliable testimony

through their misuse of their powers of arrest and interrogation, unlawfully concealed exculpatory or

impeachment evidence known as "Brady" material, and lied to or misled courts, defense attorneys, and

criminal defendants in order to cover up their unlawful behavior.   Further they retaliated by placing

Plaintiff on a "DO NOT SERVE" list making it impossible for her to attain police services of protections

in the wake of  the MDAO and NYPD losing the protracted criminal proceedings against her.

164.    Plaintiff, Kelly Price, is an intelligent and able individual who had built a career in

photojournalism and would have continued to earn a substantial salary as an International News

Assignment and Features Editor, but for the defendants' misconduct in causing her wrongful prosecution,

and imprisonment. She seeks $30 million in actual damages, and $10 million in punitive damages, for the

egregious misconduct that deprived her of the joys of bearing the child she miscarried, of family life, of

her journalism career, psychological damages, emotional pain and suffering, defamation and of living as a

free person and to be blacklisted by the NYPD in a city where Plaintiff is a fourth-generation member of

her family to live.

### XIV. DAMAGES

1.  WHEREFORE, Plaintiff seeks compensatory damages in the amount of $30,000,000 (THIRTY

    MILLION USD) together with attorney fees and court costs for defamation, loss of work,

    emotional pain and suffering. Plaintiff also seeks POLICY CHANGE for the way that Domestic

    Violence Survivors are treated within the criminal justice system when they come forward for

help in extracting themselves from life-threatening intimate partner situations. A methodology and better training needs to be implemented for identifying true victims that is not subject to the whimsy of one lone prosecutor's bias(es). When a victim is thought to be a 'fabricator' a review of his/her case need to be examined by Domestic Violence advocates, therapists, social workers, and psychiatrists before they are denied protections, police services, social welfare services, a normal quality of life free from harm, and their ability to petition the government for redress of grievances. Recently, the Manhattan District Attorney Cyrus Vance has stated that his office reviews 5,000 case of Domestic Violence a year. How many of these cases are labeled 'fabrications' by prosecutors with other motives or who are too burdened by their caseloads and lack the acumen or incentive to make the right call? Plaintiff seeks transparency and public dialogue in order to ensure other victims don't slip through the cracks allowing their batterers to be emboldened to harm others and the victim to slip into emotional, psychological, social, physical and economic dire straits.

a.    Plaintiff Price is a talented, ardent, skilled ambitious (Exhibit # JJ recent letter of recommendation from Dorchen Leidholdt, Director of Battered Women's' Services at Sanctuary for Families, NY) used to operate at very high-level as one of the most respected young photojournalism editors running war correspondents in and out of conflict zones (Exhibit # 12). She is a graduate of Mount Holyoke College and attended the University of Colorado where she worked on her Master's degree: she won many academic awards and scholarships and endeavored to have a bright future ahead of her. Plaintiff ran the world's top photojournalists in and out of war zones and covered top stories on all fronts for over the past decade. (Exhibit # 12  list of some of Price's journalistic accomplishments.) She had achieved a high level of respect and admiration based on trust and love and solid, steady, cool-headed work. Now her life is literally in tatters. Credibility is key to the journalistic community and the pallor of criminality still follows her as a result of the malicious arrests and prosecutions. The emotional pain and suffering from these events has debilitating effects on Plaintiff who has literally lost everything she worked for: her personal identity, her career, her familial and social support networks, her unborn child,

her apartment, her belongings, had her car repossessed, lost a pet because she did not have funds for vet bills, been ostracized from everything and everyone that meant anything to her. She was at one time trusted and loved until her world fell apart because of these prosecutions by the people she turned to for help at her darkest, most helpless hour. Plaintiff more than anything wants her name back and wishes to continue to do the good work she was producing. She struggled to build a beautiful life for herself. Now she is trying to put the pieces of her life together but her troubles seem to compound as time slips by.

2. Plaintiff has been diagnosed with Borderline Personality Disorder and  Complex Post-Traumatic-Stress-Disorder by Psychiatrists and therapists at the St. Luke's Roosevelt Hospital Crime Victims Center and CCM where she has been in intensive Domestic Violence therapies and programs since 2011 and by the Psychiatric staff at Bellevue Hospital's 9/11 Survivors' Health Care Program. She suffers severe depression, bouts of racing thoughts, nausea, temperature swings, disassociation, mood-swings, sleeplessness, despair, weight fluctuations, digestive disorders and headaches.  She is currently in therapy at Sanctuary for Families, New York for the same disorders.

3. DAMAGES DEMAND WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

.      For POLICY CHANGE for the way victims of trafficking and battery abused by Confidential Informants and/or witnesses/complaints on major cases are handled by the Police and District Attorneys when they come forward for help and to report the abuse.

a.      For compensatory damages of not less than $30 million;

b.      For punitive damages against the individual Defendants of$10 million;

c.      For reasonable attorneys' fees, together with costs and disbursements,

d.      pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

e.      For pre-judgment interest as allowed by law; and For such other and further relief as   this Court may deem just and proper.

4.  The Manhattan District Attorney, Mr. Cyrus Vance, Jr., quoted Berger v S, 295 U.S. 78, 88

(1935) in his Recommendation for Dismissal of charges against DSK:  "Along with the

substantial power conferred upon prosecutors come unique responsibilities. Rather than serving

only as a zealous advocate on behalf of a client, prosecutors have a broader set of obligations to

the community, the victim, and the defendant:

> "The [prosecutor] is the representative not of an ordinary party to a controversy, but of a
>
> sovereignty whose obligation to govern impartially is a complaint as its obligation to govern
>
> at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case,
>
> but that justice shall be done. As such, he is in a peculiar and very definite sense the servant
>
> of the law, the twofold aim of which is that guilt shall not escape or innocence suffer."

128.   How much longer must Ms. Price suffer?

Kelly Price                                    Sworn to before me on this 3rd day of January, 2017

Munir Pujara
Notary Public of the State of New York
No. 02PU6139776
Commission in New York County
Commission Expires 10/02/2018

1     computer without authorization".   In other words, if

2     you're allowed to be at the computer, it's okay, even

3     if you violate that terms of use.   What's wrong with

4     that?

5               MR. RIVELLESE:   Well, if - - - if you're

6     committing crimes with the computer, that should be

7     enough to - - -

8               JUDGE SMITH:   Well, you - - - well, you can

9     be prosecuted for the crimes you're committing, but

10    are you committing the crime of unauthorized use of a

11    computer, if, in fact, you are authorized to use the

12    computer?

13              MR. RIVELLESE:   Well, if - - - if you know

14    that you're not authorized to use the computer

15    because you're using the computer to commit conduct

16    that you're not supposed to be using on it - - -

17              JUDGE SMITH:   Like going on Facebook, for

18    example.

19              MR. RIVELLESE:   If you knew for a fact you

20    weren't supposed to use a computer to do it, and you

21    went and did it, you'd be violating that - - - that

22    term.

23              JUDGE SMITH:   I'll say a misdemeanor.

24              MR. RIVELLESE:   But - - - but - - -

25              CHIEF JUDGE LIPPMAN:   Counsel, but isn't

1    the fact that we're going through these - - - these

2    scenarios, doesn't it almost get to the point of

3    being a comedy and looking at what you're alleging

4    are crimes and when it is and when it isn't?  Doesn't

5    it get to the point where it's almost, you know,

6    ludicrous?  I mean, we're looking at this, and we're

7    here looking at criminal violations in the context of

8    the factual - - - the facts as we know it in this

9    case.

10            MR. RIVELLESE:  Well, you can - - -

11            CHIEF JUDGE LIPPMAN:  Almost ethereally

12    absurd, I guess, is what I'm saying.

13            MR. RIVELLESE:  What happened here is he

14    really got charged with everything that he could be

15    alleged to have done, whereas there was a very

16    central gravamen of crime, which was the

17    impersonating Schiffman, the stealing of Schiffman's

18    identity, and pretending to be - - -

19            CHIEF JUDGE LIPPMAN:  What's the crimes

20    that are most defensible to you, from your point of

21    view?  What's your strongest case against - - -

22            MR. RIVELLESE:  Schiffman.  Everything

23    against Schiffman, because he pretended to be him - -

24

25            CHIEF JUDGE LIPPMAN:  Everything that he

1    had to do with Schiffman, because he was using his

2    name?

3         MR. RIVELLESE:  Yes, he pretended to be

4    him.  He convinced people he was him.  He got

5    responses to his e-mails, believing that they were

6    responding to Schiffman, not just from the students,

7    but also from the Provost, informing defendant that

8    he was going to be referred to the proceedings to

9    determine whether he was a plagiarist.  So he got

10   responses indicating everyone thought he was

11   Schiffman.

12        He then continued to respond, for example,

13   to the students he - - - he responded back.  So he

14   was clearly orchestrating an identity theft, having

15   people believe he was Schiffman, in order to get

16   Schiffman, either fired, uninvited to the Jewish

17   Museum, otherwise damage his career, and help his own

18   father.  And that's - - - that's clearly every

19   element of the statute.

20        JUDGE GRAFFEO:  That you feel is the

21   strongest proof on a crime in this case?

22        MR. RIVELLESE:  Absolutely, and - - - and

23   those are the most solid and central, and then the

24   other ones are the ones that are tangential, and also

25   - - -

35

1      JUDGE SMITH:  And the ones - - -

2      JUDGE GRAFFEO:  And for those crimes that

3  you - - - the Schiffman crimes that you've just

4  mentioned, what is it that crosses the line then from

5  the civil to the criminal?  What makes it criminal

6  activity?  Just to focus in on those crimes.

7      MR. RIVELLESE:  The strongest thing is that

8  he's trying to convince other people that he is

9  someone other than who he is.  He's stealing the

10  identity of Schiffman, pretending to be him, and

11  getting them to rely on that, by saying - - -

12      CHIEF JUDGE LIPPMAN:  Counsel, what would

13  you advise someone who came to you?  Would you advise

14  them to go get themselves a lawyer to sue, or would

15  you advise them to go to the prosecutor?  In this

16  particular set of facts?

17      MR. RIVELLESE:  Well - - -

18      CHIEF JUDGE LIPPMAN:  Put - - - take off

19  your hat for a second, and - - -

20      MR. RIVELLESE:  Well, given what happened

21  to Schiffman, the prosecutor - - - that's clearly the

22  central and the most - - -

23      CHIEF JUDGE LIPPMAN:  You would clearly say

24  go to a prosecutor; it's a criminal offense.

25      MR. RIVELLESE:  Yes.

1              CHIEF JUDGE LIPPMAN:  These are criminal

2      offenses.

3              MR. RIVELLESE:  Yes.  And no, it's not an

4      A-I felony; it's not state prison, but it's

5      definitely wrong.  If you pretend to be someone else,

6      get people to believe you, and have them take actions

7      or expect them to take actions based on your

8      deception, not based on your personally saying what

9      you think, but pretending to be someone else,

10     confessing to something that they did or did not do,

11     because you can't pretend to be a criminal defendant

12     and confess to a crime either.

13              You have to be honest about who you are.

14     That's the real gravamen of the offense.  It's not

15     that he's alleging that someone's a plagiarist.  That

16     doesn't matter; he could be right about that.  But

17     he's saying that Schiffman is confessing to

18     plagiarism and pretending that he is Schiffman

19     confessing.  Judge Rivera mentioned that before, I

20     think.

21              If you're pretending to be someone and

22     confess to something that person did, that's the

23     dishonesty there.  It's not that the person may or

24     may not have done the thing, it's that they didn't

25     really confess to it; you did.

1          CHIEF JUDGE LIPPMAN:  Okay, thanks,

2    counsel.

3          MR. RIVELLESE:  Thank you.

4          CHIEF JUDGE LIPPMAN:  Counsel, rebuttal?

5          MR. KUBY:  Yes, thank you.  First of all,

6    it is state prison.  The - - - he's convicted of one

7    felony, the identity theft in the second degree.  The

8    prosecution asked for one and a third to four years.

9    Judge - - - Justice - - - former Justice Berkman, in

10   her infinite kindness, only gave him six months.  So

11   we are talking state prison here.

12          JUDGE SMITH:  Is - - - is six months so

13   very harsh for this - - - wasn't this a vicious thing

14   to do to try to ruin a man like this?

15          MR. KUBY:  If - - - if you start with the

16   assumption that this is a good man - - -

17          JUDGE SMITH:  Suppose - - - suppose a

18   mediocre man like everyone else, is it - - -

19          MR. KUBY:  Or - - - or - - - or maybe a bad

20   man, telling the truth about a bad man in a specific

21   way, is that a bad thing to do?  I don't know.  I'm

22   sort of okay with it.  You're not.  That's fine.

23   That's fine.  But we're talking about the use of the

24   criminal sanction - - -

25          JUDGE SMITH:  I mean, if - - - if - - -

Case 1:15-cv-05871-KPF   Document 41-1   Filed 01/03/17   Page 34 of 61

Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 7 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 39 of 81

38

1        yeah, I mean - - - I suppose, yeah.

2                MR. KUBY:  Yeah.

3                JUDGE SMITH:  You aren't really saying it's

4        okay to do it to bad people, and not good people, are

5        you?

6                MR. KUBY:  No, I - - - I - - - I'm saying

7        that - - - that if you sat here and - - - and you

8        believed that in fact, Schiffman was a rank

9        plagiarist and had ripped off the work of many other

10       scholars, it would have did - - - different

11       atmospherics and moreover, it never would have been

12       brought in the first place, because - - -

13               JUDGE PIGOTT:  Well, so, if you - - - if

14       you - - - if you say I'm A-Rod, and I admit that I

15       did drugs and I - - - you know, and I'm really sorry

16       about it, and I wish I could give the money back to

17       the Yankees, you don't see a problem with that?

18               MR. KUBY:  Well, I - - - I don't actually

19       see a criminal problem with that for the same reason

20       there's not a criminal problem here.  Exactly the

21       same situation.  Schiffman makes this confession.

22       What happens isn't the university fires Schiffman;

23       he's confessed to plagiarism.  The record reveals

24       they said to him, hey, this looks weird; is this you?

25       He says, no, it's not me.

Case 1:15-cv-05871-KPF   Document 41-1   Filed 01/03/17   Page 35 of 61
Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 8 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 40 of 81

39

1          JUDGE SMITH:  But suppose he's not going to

2     sue - - - he - - - he - - - he did do it, I guess, to

3     a tenured professor.  Suppose he - - - suppose he

4     gets mad at some poor adjunct who has to make a

5     living and does the same thing, shouldn't the adjunct

6     be protected by the criminal law?

7          MR. KUBY:  The - - - the adjunct is - - -

8     is protected by the way things actually work on

9     Planet Earth.  Nobody gets fired in - - - in the real

10    world based on a Gmail account, where they confess to

11    something that you haven't asked.

12          CHIEF JUDGE LIPPMAN:  But is it, counsel -

13    - -

14          JUDGE RIVERA:  But is that - - - is that

15    what had to happen, that he would have had to have

16    been fired that - - - you have to actually have that

17    as the result?

18          MR. KUBY:  No, no, you don't actually have

19    to have that, and - - - and even - - -

20          JUDGE RIVERA:  What if his reputation is

21    tarnished in the institution?  Nobody actually

22    believes him even if he - - -

23          MR. KUBY:  But if want to go - - -

24          JUDGE RIVERA:  - - - he's found not guilty.

25          MR. KUBY:  If we want to go back and

1    resurrect criminal libel in the Internet era, then we

2    can do that.  But - - - but at least, since 1965, the

3    law has been these types of reputational harms - - -

4            CHIEF JUDGE LIPPMAN:  Counsel - - -

5            MR. KUBY:  - - - are beyond the scope of

6    criminal law.

7            CHIEF JUDGE LIPPMAN:  Counsel, is your

8    basic argument that in the practical common-sense

9    world, these are not crimes in the year 2014?  And -

10   - - and if that is your argument, why is it that you

11   think that they've chosen to prosecute?  That they

12   chose to prosecute the defendant?

13           MR. KUBY:  Yes, it is my argument, Judge

14   Lippman.  And as we say in our brief, this type of

15   Internet impersonation, causing people to think it's

16   the real person, is absolutely ubiquitous in American

17   public life.

18           CHIEF JUDGE LIPPMAN:  But why - - - but why

19   did they choose to prosecute this?

20           MR. KUBY:  I can give you a dehors the

21   record answer.

22           CHIEF JUDGE LIPPMAN:  Go ahead.

23           MR. KUBY:  Because according, at least, to

24   Larry Schiffman when he gave an interview, what

25   happened was, he was upset about this, and - - - and

Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 10 of 54

Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 42 of 81

41

1        things weren't happening enough, so he contacted one

2        of his pals in the FBI, because he had done forensic

3        work for the FBI in the past.

4                 The FBI hooked him up with the prosecutor,

5        and - - - and unfortunately, both Robert Morgenthau,

6        the former New York County District Attorney with his

7        long relationship to the Skirball Center, and

8        Lawrence Schiffman with his long relationship to the

9        Skirball Center, had a lot of sort of overlapping

10       types of relationships.

11                And the assumption was that this guy, who

12       really has no power, no authority, would just take

13       the plea that was offered, which is, hey, a single

14       misdemeanor and three years probation.

15                CHIEF JUDGE LIPPMAN:  Okay, counsel, thank

16       you both.

17                MR. KUBY:  All right.

18                CHIEF JUDGE LIPPMAN:  Appreciate it.

19                (Court is adjourned)

20

21

22

23

24

25

42

1

2                      C E R T I F I C A T I O N

3

4            I, Karen Schiffmiller, certify that the

5       foregoing transcript of proceedings in the Court of

6       Appeals of People v. Raphael Golb, No. 72, was

7       prepared using the required transcription equipment

8       and is a true and accurate record of the proceedings.

9

10

11

12       Signature:  _____

13

14       Agency Name: eScribers

15

16       Address of Agency:   700 West 192nd Street

17                            Suite # 607

18                            New York, NY 10040

19

20       Date:   April 2, 2014

21

22

23

24

25

Case 1:15-cv-05871-KPF   Document 41-1   Filed 01/03/17   Page 40 of 61
Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 13 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 45 of 81

Procedure No: 208-36                          Date Effective: 01-01-0-

# FAMILY OFFENSES/DOMESTIC VIOLENCE

## PURPOSE

To process family offenses and other offenses that occur between family/household members as per the Family/Household - Expanded Definition.

## DEFINITIONS

COMPLAINANT/VICTIM - For purposes of this procedure ONLY, is limited to a person described in subdivisions "a" through "g" below:

FAMILY/HOUSEHOLD (AS DEFINED IN FAMILY COURT ACT) - includes persons who:

    a. Are legally married to one another.

    b. Were formerly legally married to one another.

    c. Are related by marriage (affinity).

    d. Are related by blood (consanguinity).

    e. Have a child in common regardless of whether such persons have been married or have lived together at any time.

[I.O. 17 s 09] *f. Are not related by consanguinity (blood) or affinity (marriage) and who are, or have been, in an intimate relationship regardless of whether such persons have lived together at any time.*

*NOTE  A common sense standard regarding the totality of the circumstances involving the relationship should be used to determin if an "intimate relationship" exists. Factors a member of the service may consider in determining whether a relationship is an "intimate relationship" include but are not limited to: the nature or type of relationship (the relationship between the involved parties does not have to be sexual in nature to be considered "intimate"); the frequency of interaction between persons; and the duration of the relationship. Neither a casual acquaintance nor ordinary fraternizatio between two individuals solely in a business, educational, or social context shall be deemed to constitute an "intimate relationship." If unable to determine if the relationship in question is an "intimate relationship," the member of the service concerned will request the response of the patrol supervisor.*

*Additional factors that may assist in determining the intimacy of a relationship include, but are not limited to, amount of time spent together in either a work or leisure related capacity, shared expense and/or finances, extent of interaction with family members, etc.*

*All members of the service are reminded that their primary responsibility is to ensure the immediate and future safety of all parties involved in domestic violence incidents."*

*FAMILY/HOUSEHOLD (NYPD EXPANDED DEFINITION) - includes subdivisions "a" through "f" above, AND persons who:*

    *g.  Are currently living together in a family-type relationship.*

    *h.  Formerly lived together in a family-type relationship.*

*A family/household thus includes: "common-law" marriages, same sex couples registered NYC domestic partners, different generations of the same family.*

48

Section:  Arrests

1

Procedure No:   208-36

*siblings and in-laws, persons involved in "intimate relationship", and persons who live or have lived together in a family-type relationship.*

OFFENSE - Conduct for which a sentence to a term of imprisonment or to a fine is provided (felony, misdemeanor, or violation).

FAMILY OFFENSE - Any act which may constitute:

Harassment 1st or 2nd degree

Assault 1st degree

Assault 2nd degree or Attempt

Disorderly Conduct (including acts amounting to Disorderly Conduct NOT committed in a public place)

Aggravated Harassment 2nd degree

Assault 3rd degree or Attempt

Reckless Endangerment

Menacing 2nd or 3rd degree - that is committed by one member of the same family/household, AS DEFINED IN THE FAMILY COURT ACT (subdivisions "a" through "e" above), against another.

[REV 01-01] Stalking (1st, 2nd, 3rd, and 4th degrees)

> NOTE  The law also adds the crimes of Stalking in the first through fourth degrees to the list of criminal convictions which will subject an offender to automatic suspension or revocation of a pistol license by the Criminal or Family Court.

ORDER OF PROTECTION - An order issued by the New York City Criminal Court, New York State Family Court, or the New York State Supreme Court, requiring compliance with specific conditions of behavior, hours of visitation and any other condition deemed appropriate by the court of issuance.

An Order of Protection may also be issued by the Supreme Court as part of a separation decree, divorce judgment, annulment, or as part of a court order in a pending separation, divorce, or annulment action.

PROBABLE CAUSE - A combination of facts, viewed through the eyes of a police officer, which would lead a person of reasonable caution to believe that an offense is being or has been committed.

The "probable cause" standard applied in family offense/domestic violence offenses IS NO DIFFERENT from the standard applied in other offenses and may be met by evidence other than the statement of the complainant/victim.

CONCURRENT JURISDICTION - Concurrent jurisdiction exists when different courts have jurisdiction over the same subject matter within the same territory. Both Criminal Court and Family Court have concurrent jurisdiction when:

a. A family offense (as defined above) has been committed, AND

   [I.O. 17 s 09]  b. A family/household relationship as defined in the Family Court Act "a" through "f" above (and NOT including the NYPD expanded definition) exists between the offender and the victim; AND

c. The offender is sixteen (16) years of age or older.

> NOTE  All three of the above elements must exist for both Family Court and Criminal Court to have jurisdiction at the same time.  If either of the first two (2) elements are not met, the complainant MUST go to Criminal Court.  If the first two (2) elements are met, but the offender is less than sixteen (16) years of age, the complainant must go to Family Court.

WHEN CONCURRENT JURISDICTION EXISTS:

Advise complainants/victim that:

© FPA July, 2009

490

Procedure No:   208-36

   a. There is concurrent jurisdiction with respect to family offenses in both Family Court and the Criminal Courts.

   b. A Family Court proceeding is a civil proceeding and is for the purpose of attempting to stop the violence, end the family disruption and obtain protection. Referrals for counseling or counseling services are available through probation for this purpose;

   c. A proceeding in the Criminal Courts is for the purpose of prosecution of the offender and can result in a criminal conviction of the offender;

   d. A proceeding or action subject to the provisions of Family Court Act, Section 812, is initiated at the time of filing of an accusatory instrument or Family Court petition, not at the time of arrest, or request for arrest, if any;

   e. An arrest may precede the commencement of a Family Court or a Criminal Court proceeding, but an arrest is not a requirement for commencing either proceeding; however, that the arrest of an alleged offender shall be made under the circumstances described in subdivision four (4) of Section 140.10 of the Criminal Procedure Law.

**PROCEDURE**

When members of the service respond to, or are notified of, any incident involving members of the same Family/Household (NYPD EXPANDED DEFINITION):

**UNIFORMED MEMBER OF THE SERVICE**

1. Obtain medical assistance if requested or the need is apparent.

2. Ascertain all facts.

   a. Interview persons involved SEPARATELY.

   b. Interview and take the names of any witnesses present at time of occurrence.

   c. Collect evidence and record statements of persons present (e.g., admission by offender during dispute).

[I.O. 17 s 08] d. Take photographs using the domestic violence digital camera in all cases where a victim has visible injuries and/or damaged property as a result of domestic violence. Photographs will be uploaded into the Domestic Violence Digital Photo Database as per P.G. 208-39, "Family Offenses/Domestic Violence (Digital Photography of Visible Injuries/Damaged Property)." Other domestic violence evidence (i.e., weapons, clothing, etc.) must be vouchered in accordance with P.G. 218-01, "Invoicing Property - General Procedure".

3. Determine whether:

   a. Probable cause exists that any offense has been committed.

   b. An Order of Protection has been obtained by complainant/victim.

   c. The offense constitutes a FAMILY OFFENSE.

   d. There are children present in the home who may be victims of neglect, abuse, or maltreatment.

     (1) If a member REASONABLY SUSPECTS a child less than eighteen (18) is abused, neglected or maltreated and continued presence in the household presents an imminent risk to the child's physical or mental health; request the patrol supervisor to respond, prepare REPORT OF SUSPECTED CHILD ABUSE OR MALTREATMENT (PD377-154), and notify the State Central Registry as outlined in P.G. 215-03, *"Emergency Removals Or Investigation And Reporting Of Abused, Neglected Or Maltreated Children."*

49

**Section:**   Arrests

Procedure No: 208-36

NOTE: *Willful failure to make such notification is a Class "A" Misdemeanor. Further, civil liability may result for the damages caused by such failure.*

WHEN OFFENDER HAS DEPARTED SCENE PRIOR TO ARRIVAL OF POLICE:

4. Conduct search of immediate vicinity for offender when:
   a. Probable cause exists that a crime has been committed OR an Order of Protection has been violated, AND
   b. Officer has reason to believe that such search might yield positive results.

5. Advise complainant/victim to call police when offender returns, if search produces negative results and follow reporting procedures as set forth below.

WHEN COMPLAINANT/VICTIM INDICATES THAT AN ORDER OF PROTECTION HAS BEEN OBTAINED:

[I.O. 38 s 03] 6. Request complainant/victim to produce Order of Protection.
   a. If Order of Protection cannot be produced, use the Central Records Division inmate database application to do a search for all Orders of Protection issued by a New York City based court. If the computer system is down, or for Orders of Protection issued outside New York City, telephone Central Records Division, Identification Section at (646) 610-5195 to verify that an Order of Protection was issued, court of issuance, specific conduct prohibited and the expiration date.
   b. If the Identification Section reports that there are no Orders of Protection on file pertaining to the complainant/victim, telephone the precinct of occurrence and request a member of the service authorized to operate the FINEST System to conduct an Order of Protection database inquiry.
   c. In the event the precinct of occurrence is unable to conduct the inquiry, request the Communications dispatcher to conduct the inquiry.

IF OFFENDER IS PRESENT OR THE SEARCH FOR THE OFFENDER WAS SUCCESSFUL AND THERE IS PROBABLE CAUSE THAT ANY FELONY HAS BEEN COMMITTED OR AN ORDER OF PROTECTION HAS BEEN VIOLATED:

7. Arrest offender even if complainant/victim requests that offender not be arrested.
   a. When an Order of Protection is violated and the act that violates the order is an offense, offender must be charged with that offense in addition to the appropriate charge for the violation of the Order of Protection.
   b. In all cases, whether the Order of Protection was issued by Family Court, Supreme Court, or Criminal Court, and whether the violation of the Order of Protection also constitutes an offense or not (e.g., offender in proximity to complainant's residence or place of employment is not an offense in and of itself but does violate an Order of Protection), the violation of the Order of Protection shall be charged as the Penal Law crime of Criminal Contempt, or Aggravated Criminal Contempt, as appropriate, and the offender brought to Criminal Court.

NOTE: *Under the federal 1994 Violence against Women Act, Orders of Protection issued by courts of other jurisdictions (other states, U.S. territories, tribal jurisdictions), in cases of domestic violence covered by this procedure, may be enforced in New York State. If the particular*

© FPA July, 2009

Case 1:15-cv-05871-KPF   Document 41-1   Filed 01/03/17   Page 44 of 61
Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 17 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 49 of 81

Procedure No:   208-36

out-of-state Order of Protection is available, and otherwise appears to be valid on its face (i.e., not expired, signed by a judge or justice of a court), and there is probable cause to believe that the Order of Protection has been violated, and that the offender had notice of the order and an opportunity to be heard, uniformed members of the service will arrest the offender and charge him or her with either Criminal Contempt in the second degree (Penal Law Section 215.50 (3), Criminal Contempt in the first degree (Penal Law section 215.51 (b), (c), or (d)), or Aggravated Criminal Contempt (Penal Law section 215.52), as appropriate.

In order to charge any of the criminal contempt charges above, for a violation of either an in-state or out-of-state Order of Protection, there must be a showing that the offender had "notice" of the issuance of the Order of Protection, either because he or she was present in court when the order was issued or because he or she was duly served with the order.

In order to establish probable cause that the offender had notice, uniformed members of the service should ask the offender if he or she knew of the order and if necessary ask the complainant/victim to verify that the offender had knowledge of the order. Additionally, if such is deemed necessary, uniformed members of the service may call the court that issued the order during normal business hours to seek further information.

In the case of out-of-state Orders of Protection, there is an additional requirement that the offender has had or will shortly have an opportunity to be heard. This essentially means that the offender was notified of a date to appear in the particular court in order to respond to the issuance of the order. In order to take enforcement action, probable cause as to any of the following must exist:

a.  The offender appeared in court in response to issuance of the Order of Protection,

b.  The offender was served with notice to appear, in response to the issuance of the Order of Protection and failed to appear, or

c.  The offender was served with an Order of Protection with a notice to appear before the court within thirty (30) days of the issuance of the Order of Protection.

The inquiries set forth in the preceding paragraph may be used to establish the existence of this element of probable cause.

In cases in which the Order of Protection is not produced by the complainant/victim, in addition to the procedure set forth in step six (6), above, uniformed members of the service shall inquire whether a record of the order exists on the statewide registry of Orders of Protection or the protection order file maintained by the National Crime Information Center (NCIC). However, the presence of the order on any file shall not be required for enforcement of the order, provided that the uniformed member of the service has probable cause to believe that the order is in existence through credible information supplied by the complainant/victim or other reliable source.

Section:   Arrests

49:

Procedure No:   208-36

*When an offender is arrested for violating any Order of Protection, his or her arrest will, in ALL cases, be processed in New York City Criminal Court, regardless of the court that issued the order.  The offender will be charged with the appropriate criminal contempt charge. The offender will also be charged with any pertinent criminal offense for which probable cause exists.  When an arrest is made for violation of a Family Court Order of Protection, the complainant/victim will be advised that he or she has a right to proceed independently in Family Court by filing a petition.  However, uniformed members of the service are required to bring the offender before the local criminal court.*

<u>WHEN THERE IS PROBABLE CAUSE THAT ANY MISDEMEANOR HAS BEEN COMMITTED, IN OR OUT OF THE OFFICER'S PRESENCE, OR A VIOLATION HAS BEEN COMMITTED IN THE OFFICER'S PRESENCE:</u>

8. Arrest offender.

   a. Under the Criminal Procedure Law, a uniformed member of the service must arrest the offender, unless the victim specifically states, on his or her own initiative, that he or she does not want the offender arrested.  The officer **shall not** ask the victim if he or she wants to have the offender arrested.  The uniformed member of the service retains the discretion to make an arrest in a misdemeanor case, despite the victim's decision not to seek an arrest.

> *NOTE   The primary considerations when the complainant/victim does not want an arrest are the prevention of further violence and the safety of ALL household members. Factors to be taken into consideration include, BUT ARE NOT LIMITED TO:*
>
> *a.   The past history of the offender and victim (prior arrests, incidents, injuries sustained etc.).  If possible, conduct an inquiry through the Precinct Domestic Incident Database.*
>
> *b.   The officer's observations of the scene and victim.*
>
> *c.   Statements of witnesses.*
>
> *d.   Statements made by the offender (especially threats of suicide, homicide or other future violence).*
>
> *e.   Threatened use of weapons, or the presence of or access to weapons by the offender.*
>
> *f.   Mental and physical state of the offender (drug or alcohol intoxication, etc.).*
>
> *g.   Presence of other household members who may be at risk, including the elderly.*
>
> *If an officer has any doubts about the continued safety of any household member, AN ARREST SHOULD BE EFFECTED.*

9. Make an **ACTIVITY LOG (PD112-145)** entry if complainant/victim does not want an arrest for a misdemeanor or any violation committed in the officer's presence by family/household member.

   a.   Request complainant/victim to sign log entry.

   b. Enter "Refused Signature" if complainant/victim will NOT sign entry.

<u>IN CROSS COMPLAINT SITUATIONS, WHERE THERE IS PROBABLE CAUSE TO BELIEVE THAT MORE THAN ONE FAMILY OR HOUSEHOLD</u>

© PPA July, 2009

494

Procedure No:    208-36

MEMBER HAS COMMITTED A *FAMILY OFFENSE* MISDEMEANOR, IN OR OUT OF THE OFFICER'S PRESENCE IN A SINGLE DOMESTIC INCIDENT:

10. Attempt to identify the primary physical aggressor after considering the following criteria:

   a. The comparative extent of any injuries inflicted by and between the parties;
   b. Whether any of the parties are threatening or have threatened future harm against another party, family, or household member,
   c. Whether any of the parties has a prior history of domestic violence that the uniformed member of the service can reasonably ascertain,
   d. Whether any such person acted defensively to protect himself or herself from injury.

   *NOTE   Where one party has committed a family offense misdemeanor against a family/household member in response to or in retribution for a crime committed against him or her in the past, the responding police officers shall* not *determine who was the "Primary Physical Aggressor" and proceed as required by step eight (8), above.*

11. Confer with the patrol supervisor.

12. Arrest the offender identified as the primary physical aggressor.

   a. If complainant/victim requests that offender not be arrested, the officer may still effect the arrest.

   *NOTE   Where there is reasonable cause to believe that both parties to a particular domestic violence disputes have committed family offense misdemeanors and the responding uniformed members of the service are unable to determine who, if anyone, was the primary physical aggressor, it would be lawful to arrest both parties. Further, even where the responding uniformed members of the service are able to determine who was the primary physical aggressor, both parties may, if appropriate, be arrested. This primary consideration when deciding whether to arrest other persons, in addition to the primary aggressor, is the prevention of further violence and the safety to ALL household members. Evaluate each complaint separately. Do not base a decision to arrest or not to arrest on the willingness of a person to testify or otherwise participate in a judicial proceeding. If a complainant/offender/victim requests that the offender not be arrested, the officer may still effect an arrest. The primary considerations when the complainant/offender/victim does not want an arrest to be made are the prevention of future violence and the safety of ALL household members. (See NOTE following step eight [8]).*

13. Make an ACTIVITY LOG entry of:

   a. Factors that resulted in determination or inability to determine that a particular offender was the primary physical aggressor.
   b. Fact that the complainant/victim does not want an arrest to be made.
      (1) Request complainant/victim to sign LOG entry.
      (2) Enter "Refused Signature" if complainant/victim will not sign entry.

   WHEN THERE IS PROBABLE CAUSE THAT ANY VIOLATION HAS BEEN COMMITTED NOT IN THE OFFICER'S PRESENCE:

14. Refer complainant/victim as follows:

Section:    Arrests

495

**Procedure No: 208-36**

a. Family/Household members, as defined in Family Court Act, AND family
   offense violation, to:
   (1) Family Court
   (2) Summons Part - Criminal Court (if concurrent jurisdiction exists,
       complainant may go to either court or both.)

   **[I.O. 17 s 09]** *b. Family/Household - Expanded Definition subdivisions "g"
   and "h" above and/or non-family offense violations - to Summons Part -
   Criminal Court.*

   > **NOTE** *An officer cannot effect an arrest for VIOLATIONS NOT
   > COMMITTED IN HIS/HER PRESENCE, UNLESS such violation is
   > specifically prohibited in a current Order of Protection issued to the
   > complainant/victim. The proper charge is Criminal Contempt in the
   > Second Degree, Penal Law Section 215.50(3), or Criminal Contempt in
   > the First Degree, Penal Law Section 215.51(b)(v)) or (c) (see para-
   > graph 7(b), above).*

## WHEN CONCURRENT JURISDICTION EXISTS:

15. Advise complainant/victim of the courts available to them and the purpose of
    each court as outlined in the "Definitions - Concurrent Jurisdiction" section.

## IN ALL CASES:

16. Advise complainant/victim of availability of shelter and other services by
    providing 1-800-621-HOPE hotline number.

17. Prepare New York State Standardized Domestic Incident Report (DCJS 3221) in
    ALL instances in which response to OR becoming apprised of an incident (e.g.,
    altercation, disturbance, conflict, or dispute) involves members of the same
    Family/Household-Expanded Definition, or is an allegation of child abuse.

    a. If prepared in response to a radio run include SPRINT job number on form.
    b. List in the "Narrative of the Incident" section all factors that resulted in
       determination or inability to determine that a particular offender was the
       primary physical aggressor and any property removed, (e.g. arrest evidence,
       safekeeping, etc.)
    c. Ensure that the name and phone number of the precinct Domestic Violence
       Prevention Officer is printed on the rear of the last copy of the N.Y.S.
       Domestic Incident Report. Advise complainant/ victim to contact the
       Domestic Violence Prevention Officer to obtain further information (e.g.
       referrals, voucher number, etc.)

    **[I.O. 7 s 04]** d. Insert Tax Number of reporting member of the service in
       caption entitled "Officer I.D. No."
    e. Give New York State Standardized Domestic Incident Report (pink copy)
       and Domestic Violence Notice (gold copy) to complainant/victim, if present.
    f. Inform all parties that they may be contacted by the Precinct Domestic
       Violence Prevention Officer concerning this incident.

    > **[I.O. 7 s 04] NOTE** *In cross complaint situations, a New York State
    > Standardized Domestic Incident Report shall be prepared for each
    > complainant/offender. Every attempt should be made to have the
    > complainant complete the "Victims Statement of Allegations" caption,*

© FPA July, 2009

Case 1:15-cv-05871-KPF   Document 41-1   Filed 01/03/17   Page 48 of 61
Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 21 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 53 of 81

Procedure No: 208-36

*regardless of what language he/she speaks or writes. DO NOT enter in "Victims Statement" caption "Refused" or "Same as above" if victim is unable to speak or write in English, unless the victim refuses. Always allow the victim to write in his/her primary speaking language if unable to write in English.*

18. Use radio code dispositions to finalize assignment:

   a. 10-90F(1) DIR Prepared/No Offense Alleged;
      Only to be used in those instances where the uniformed member of the service responded to a dispute which did not rise to the level of an offense; OR

   b. 10-90F(2) DIR Prepared/Unfounded

   c. 10-92F Arrest Effected/DIR Prepared

   d. 10-93F COMPLAINT REPORT/DIR Prepared
      These dispositions MUST be used to finalize any incident involving a Family/Household-Expanded Definition. Communications Section will NOT accept any other disposition code. If the assignment was initially categorized as other than signal 10-52, notify Dispatcher and use above codes to finalize the assignment.

## REPORTING PROCEDURE:

### MEMBER OF THE SERVICE

19. Prepare COMPLAINT REPORT (PD313-152) for each complainant/ victim in addition to the N.Y.S. Domestic Incident Report when complainant/victim alleges an OFFENSE has been committed between members of the same Family/Household-Expanded Definition, including the violation of an Order of Protection. Include in the "Details":

   a. Whether an Order of Protection is in effect.

   b. Issuing court, and

   c. If offender not present, the possible location(s) of offender.

   d. In cross-complaint situations, where an attempt to determine which offender was the "primary physical aggressor" is required, include a statement that the offender was the "primary physical aggressor." The COMPLAINT REPORT pertaining to the offender determined not to be the "primary physical aggressor" shall be CLOSED to "Patrol" and the "Details" section shall include a statement that the offender was determined not to be the "primary physical aggressor."

> *NOTE  In cross-complaint situations requiring the preparation of two (2) or more COMPLAINT REPORTS and where the responding uniformed members of the service are unable to determine which offender was the primary physical aggressor, the factors that resulted in the inability to make that determination must be included in the "Details" section of each COMPLAINT REPORT.*

20. Enter in caption entitled "Unit Referred to":

   a. Precinct Detective Squad - when COMPLAINT REPORT is prepared for:

      (1) Felony(s)

      (2) Violation(s) of an Order of Protection

      (3) Misdemeanor(s)

> *NOTE  The COMPLAINT REPORT MUST be classified as "open" in the above three circumstances, if an arrest is not made by patrol.*

Section:   Arrests                                                    497

Procedure No: 208-36

> However, in misdemeanor cases, close **COMPLAINT REPORT** only if complainant/victim does not want offender arrested and officer does not believe an arrest is warranted after considering criteria above.

b. Court(s) victim was referred to in closed complaints.

21. When concurrent jurisdiction applies, make entry in ACTIVITY LOG indicating that complainant/victim was advised of:

a. Difference between proceedings in each court

b. Importance in selection of the appropriate court to process charge(s) and option to change from one court to the other, or proceed in both.

## DESK OFFICER

22. DO NOT issue a DESK APPEARANCE TICKET (PD260-121) or stationhouse bail when any offense is committed and an arrest is affected involving members of the same Family/Household-Expanded Definition.

23. Verify accuracy and completeness of all required forms.

24. Have prisoner removed to borough Court Section facility to complete arrest process.

## DOMESTIC VIOLENCE PREVENTION OFFICER

25. Perform duties and process all Domestic Incident Reports as per *P.G. 202-29, "Domestic Violence Prevention Officer."*

## ADDITIONAL DATA

*A police officer will, when requested by a petitioner, assist in the service of an Order of Protection, summons, or petition. (Orders of Protection issued by the Family Court and delivered directly to the police will be served according to P.G. 212-57, "Service Of Family Court/Supreme Court Orders Of Protection By Uniformed Members Of The Service."*

*To avoid unnecessary court appearances by uniformed members of the service who are requested by a petitioner to serve a respondent with an Order of Protection, summons, or petition, uniformed members of the service will prepare STATEMENT OF PERSONAL SERVICE (PD260-152). The uniformed member concerned will sign the STATEMENT OF PERSONAL SERVICE after completing all captions on the form. It is no longer sworn to before a supervisory officer. The original copy (white) will be given to the petitioner and the duplicate copy (blue) will be filed in the precinct of service.*

*Domestic Incident Reports, are potential Rosario material, and must be maintained at the precinct of occurrence. If an arrest is effected, the arresting officer must ensure that the Assistant District Attorney is provided with a copy of the Domestic Incident Report prepared in regards to the incident. When requested, the Domestic Violence Prevention Officer will make all Domestic Incident Reports prepared regarding the person arrested available to a Assistant District Attorney.*

*In violation cases referred to the Criminal Court - Summons Part, the complainant/victim must have the offender's address available for service of the summons. Misdemeanor cases should NOT be referred to the Criminal Court - Summons Part. The preferred course of action is to advise the complainant/victim to contact the police on the next contact with the offender and request an arrest, presenting the Domestic Incident Report as proof of the previous complaint.*

© FPA July, 2009

Procedure No:   208-36

*Uniformed members of the service responding to a report of a domestic incident*
*question persons present about the existence of firearms in the household. Seize*
*ANY firearms (including rifles and shotguns), and licenses/permits, if:*

   *(1) License holder is arrested, regardless of the charge; or*
   *(2) An Order of Protection exists against the licensee; or*
   *(3) When the incident involves physical force or the threat of physical force*

*When a police officer reasonably believes that the presence of firearms at a locat*
*create imminent risk of physical injury or serious physical injury, the following*
*actions should be taken to remove the weapon from the location:*

   *(1) Seize illegally possessed firearm(s) and make an arrest.*
   *(2) Seize legally possessed firearm(s) when such weapons create imminent*
       *risk of physical injury or serious physical injury.*
   *(3) Voucher legally possessed firearms which are voluntarily surrendered*
       *by participants in domestic incidents.*

*In all incidents involving pistol or permit holders, notify the License Division*
*Incident Section at (212) 374-5538, and comply with A.G. 321-07, "Incidents*
*Involving Holders of Pistol Licenses or Pre-Exemption License Permits."*
*License/permit holders must immediately notify the License Division, Incident*
*Section, of any police incident in which they are involved.*

## RELATED PROCEDURES

*Desk Appearance Ticket - General Procedure (P.G. 208-27)*
*Invoicing Property General Procedure (P.G. 218-01)*
*Unlawful Evictions (P.G. 214-12)*
*Family Offenses and Domestic Violence Involving Uniformed or Civilian Membe.*
*Of The Service (P.G. 208-37)*
*Emergency Removals Or Investigation And Reporting Of Abused, Neglected Or*
*Maltreated Children (P.G. 215-03)*
*Incidents Involving Holders Of Pistol Licenses Or Pre-Exemption License Permits (A.G. : 07)*

## FORMS AND REPORTS

*ACTIVITY LOG (PD112-145)*
*COMPLAINT REPORT (PD313-152)*
*DESK APPEARANCE TICKET (PD260-121)*
*STATEMENT OF PERSONAL SERVICE (PD260-152)*
*New York State Standardized Domestic Incident Report (DCJS 3221)*

Section:    Arrests

Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 24 of 54

Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 56 of 81

Procedure No: 208-37                              Date Effective: 01-01-00

# FAMILY OFFENSES AND DOMESTIC VIOLENCE INVOLVING UNIFORMED OR CIVILIAN MEMBERS OF THE SERVICE

## PURPOSE

To process domestic incidents involving uniformed or civilian members of the service.

## PROCEDURE

When directed to respond on a radio run or assignment that is later deemed to be a family offense or domestic incident (as per the Department's expanded definition of Family/Household) involving uniformed or civilian members of the service:

> *NOTE  Effective January 1, 1996, the Criminal Procedure Law mandates that an arrest be made when an officer establishes probable cause that any family offense misdemeanor has been committed, unless the victim, on his/her own volition, requests that an arrest not be made. The law prohibits a uniformed member of the service from inquiring whether the victim seeks an arrest of such person. In addition, uniformed members of the service are reminded that P.G. 208-36, "Family Offenses/Domestic Violence," sets out a mandatory arrest policy if a uniformed member of the service establishes probable cause that any felony has been committed or an order of protection has been violated.*

## RESPONDING MEMBER OF THE SERVICE

1. Obtain medical assistance if requested or the need is apparent.
2. Ascertain the facts.
3. Ensure that the patrol supervisor is responding.

> *NOTE  Communications Section will automatically direct the patrol supervisor to respond to the scene of all family-related incidents involving members of the service.*
>
> *A member of the service performing stationhouse duties who is apprised of a domestic incident involving a member of the service will notify the desk officer.  The desk officer will ensure that the procedures outlined in this order are followed.*

## PATROL SUPERVISOR

4. Comply with the provisions of P.G. 208-36, "Family Offenses/Domestic Violence."
   a. Direct the preparation of a New York State Domestic Incident Report (DCJS 3221) in all cases.
      (1) Give the last copy (pink) and the "Information to Victims of Domestic Violence" sheet (gold) to the complainant/victim.

500

© TPA July, 2003

Procedure No: 208-37

IN ALL CASES INCLUDING WHEN NO OFFENSE HAS BEEN ALLEGED:

**PATROL SUPERVISOR**

5. Comply with P.G. 208-36, "Family Offenses/ Domestic Violence."

6. Apprise the parties of the availability of counseling (See *Additional Data Statement*).

*NOTE* *When there is doubt as to who is the offender and who is the victim, or if there is a cross-complaint situation, the commanding officer/duty captain will be notified and will determine the course of action.*

WHEN THE MEMBER OF THE SERVICE IS A VICTIM:

7. Notify precinct commanding officer/duty captain who will ensure that appropriate action is taken and apprise parties of the availability of counseling IF THE MEMBER OF THE SERVICE IS ALLEGED TO HAVE COMMITTED AN OFFENSE, IN ADDITION TO STEPS 5 AND 6, COMPLY WITH THE FOLLOWING STEPS:

8. Direct that a COMPLAINT REPORT WORKSHEET (PD313-152A) be prepared.

*NOTE* *If a member of the service is arrested, comply with P.G. 206-11, "Member Of The Service Arrested - Uniformed Or Civilian."*

9. Notify desk officer, precinct of occurrence.

**DESK OFFICER**

10. Notify and confer with precinct commander/duty captain.

11. Notify Internal Affairs Bureau Command Center and obtain Log Number.

[I.O. 27 s 03] *a. Enter the IAB Log # in the "Details" section of the NYS Domestic Incident Report.*

b. Enter IAB Log # in the "Details" section of the COMPLAINT REPORT (IAB will determine the appropriate investigating command.)

c. Enter the words "IAB Log #" and the corresponding Log # in the precinct Domestic Incident Report Log under the caption Precinct Serial #." Also, have entered the corresponding SPRINT number in the caption "SPRINT NO." (For the purposes of this procedure, Transit Bureau personnel will use the "CAD. NO." in place of the "SPRINT NO." for assignments that originate through Transit Bureau communications).

[I.O. 27 s 03] *d. Direct that the NYS Domestic Incident Report be entered into the Domestic Violence Database (including the IAB Log#).*

[I.O. 27 s 03] 12. *Prepare report on Typed Letterhead in all cases even if offender was not present. Provide details of incident and include domestic violence referrals/counseling offered to the victim. Forward with copy of COMPLAINT REPORT and NYS Domestic Incident Report in a sealed envelope, as follows:*

*a. Chief of Internal Affairs (original and canary copy of DIR).*

b. Commanding officer, member of the service involved. (If more than one member of the service is involved, send a copy of report to commanding officer of each.)

c. Commanding officer, precinct of occurrence.

(1) Maintain in confidential file.

c. Commanding officer, borough investigations unit concerned.

d. Commanding officer, borough investigations unit covering member's command, if different from "d."

**Section:   Arrests**

Procedure No:   208-37

f. Commanding officers of:

   (1) Medical Division

   (2) Employee Management Division (immediately, by fax at (212) 374-2768)

   (3) Personnel Orders Section, if firearms are removed.

> [P.O. 27 s 03] NOTE  In situations where the complainant/victim is present at the stationhouse, the desk officer will ensure that only persons who are investigating the incident have access to the complainant/victim. No other copies or files relating to the investigation will be maintained in the precinct of occurrence other than in the commanding officer's confidential file.

Victims of domestic violence may be referred to the following in an effort to provide appropriate victim services:

NYC Victims Services             (800) 621-HOPE (4673)
NYS Coalition Against Domestic Violence   (800) 942-6906

**COMMANDING OFFICER/DUTY CAPTAIN**

13. Commence an immediate investigation and take appropriate action as indicated by P.G. 208-36, "Family Offenses/Domestic Violence."

   a. Make a background inquiry through the Internal Affairs Bureau Command Center during the initial stages of an official investigation involving a member of the service and PRIOR to suspending, modifying or placing the member concerned on restricted duty pending evaluation of duty status. This conferral is to obtain background information that may assist in the investigation. All decisions regarding the investigation, as well as any resulting determination regarding the member's duty status, remain the responsibility of the commanding officer/duty captain concerned.

   b. If the offender is not present and further investigation is required, confer with the Internal Affairs Bureau and request assistance if needed.

> NOTE  Whenever notification of an incident involving a member of the service (uniformed or civilian) residing outside the City of New York is received, the appropriate duty captain will be responsible for conducting an investigation. All decisions concerning the initial investigation of the allegation remain the responsibility of the duty captain. Follow-up notifications concerning actions taken or anticipated will be made to update the Internal Affairs Bureau Command Center.

**COMMANDING OFFICER/M.O.S. INVOLVED**

14. Review and maintain a confidential file of all reports regarding members of the service involved in domestic incidents.

   a. Confer with Internal Affairs Bureau or investigations unit concerned, regarding status of ongoing investigations.

**I.A.B. MEMBER CONCERNED**

15. Determine immediately, if circumstances necessitate an investigation be conducted by Internal Affairs Bureau.

   a. In all other cases, refer the investigation to the investigations unit covering the borough of occurrence.

Case 1:15-cv-05871-KPF   Document 41-1   Filed 01/03/17   Page 54 of 61
Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 27 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 59 of 81

Procedure No:   205-37

## INVESTIGATIONS UNIT, COMMANDING OFFICER

16. Designate a supervisory member of the unit to be a "Domestic Violence Investigator."

17. Ensure that the investigations unit is equipped with a Domestic Incident Report database.

[I.O. 27 s 03] 18. Ensure that the NYS Domestic Incident Report has been entered into the Domestic Violence Database System. Conduct the Domestic Violence Database System Review process and finalize the DIR in the database.

19. Check the database for a record of prior domestic incidents.

> NOTE  *In addition, confer with the integrity control officer of the subject's and victim's resident precincts to ascertain if other NYS Domestic Incident Reports have been prepared, (e.g., no allegation was alleged, etc.). Also, check with the investigations unit covering the command of the subject member of the service.*

20. Confer with Internal Affairs Bureau to ascertain whether there exists any record of prior domestic violence incidents involving the subject member of the serv

[I.O. 27 s 03] 21. Confer with the Domestic Violence Officer of the victims reside precinct/local police agency to ascertain if there are domestic violence service available and make appropriate referrals to the victim. Document referrals ma in case folder.

## ADDITIONAL DATA

*An off-duty uniformed member of the service present at an unusual police occurrence (including family disputes and other incidents of domestic violence) i which the officer is either a participant or a witness is required to remain at the scene when feasible and consistent with personal safety and request the response the patrol supervisor. In situations where remaining at the scene is not feasible, uniformed members are to notify the desk officer, precinct of occurrence. When i incident occurs outside the City of New York, the uniformed member of the servic to notify the Operations Unit.*

*In all circumstances, no matter where issued, when a member of the service (uniformed or civilian) becomes aware that he or she is the respondent/defendant an Order of Protection, the member concerned MUST IMMEDIATELY notify his commanding officer/supervisory head. The commanding officer/supervisory hea will interview the member concerned and conduct an investigation to determine whether the member of the service is fit for duty. The commanding officer/supervisory head must then notify the Internal Affairs Bureau Command Center at (212) 741-8401 and obtain an Internal Affairs Bureau log number. If t will immediately notify the Internal Affairs Bureau Command Center at (212) 74. member's command is not open when such situation occurs, the number concern 8401 and obtain an Internal Affairs Bureau log number. The member will subsequently notify his/her commanding officer/supervisory head [providing the Internal Affairs Bureau log number obtained] at the first available opportunity. After obtaining the log number the commanding officer/supervisory head will prepare a report to the Chief of Internal Affairs, containing a decision as to duty status. Additional copies of the report will be forwarded to the commanding offi of the member's resident precinct, the Director of the Employee Management Division and the Investigation Unit concerned. Any decision regarding a uniform*

**Section:  Arrests**

Case 1:15-cv-05871-KPF   Document 41-1   Filed 01/03/17   Page 55 of 61
Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 28 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 60 of 81

PROCEDURE NO: 208-37

member of the service's duty status should be made on a case by case basis. The Order of Protection should only be one factor considered in this determination. In cases where the member of the service is a petitioner or complainant on an Order of Protection, the member may choose to notify their commanding officer for safety reasons. If necessary, those affected should comply with the provisions of P.G. 212-31, "Threats To Members Of The Service."

Counseling and other services are available for both members of the service and their families. Uniformed and civilian members or their families may contact any of the units listed below to obtain necessary services and referrals for counseling, shelter and other assistance:

| | |
|---|---|
| Family Counseling Unit | (718) 760-7665 |
| Employee Relations Section | (212) 374-5434 |
| Early Intervention Unit | (212) 374-6730 |
| Counseling Service Unit | (212) 489-0586 |
| Chaplains' Unit | (212) 374-6472 |
| Psychological Services Section | (718) 760-7665 |
| Sick Desk | (718) 760-7600 |
| Sick Desk Supervisor | (718) 760-7606 |
| NYPD HELPLINE | (718) 271-7777 |
| Operations Unit | (212) 374-5580 |

After hours, or in an emergency, contact the HELPLINE, Sick Desk or Operations Unit.

In addition, the following non-Departmental programs and Domestic Violence Prevention Hotlines can provide referrals:

| | |
|---|---|
| New York City (Victims Services) | 800-621-HOPE |
| NYS Coalition Against Domestic Violence | 800-942-6906 |
| National Coalition Against Domestic Violence | 202-638-6388 |
| PBA Membership Assistance Program | 888-267-7267 |
| Police Self Support Group | (718) 745-3345 |

## RELATED PROCEDURES

Family Offenses/Domestic Violence (P.G. 208-36)
Threats To Members Of The Service (P.G. 212-31)
Member Of The Service Arrested -Uniformed Or Civilian (P.G. 206-11)
[REV 08-03] Employment Discrimination (P.G. 205-36)

## FORMS AND REPORTS

COMPLAINT REPORT WORKSHEET (PD313-152A)
New York State Domestic Incident Report (DCJS 3221)

© FPA July, 2007

504

Case 1:15-cv-05871-KPF   Document 41-1   Filed 01/03/17   Page 56 of 61
Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 29 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 61 of 81

Procedure No: 208-38                    Date Effective:   01-01-

# NEW YORK STATE ORDER OF PROTECTION REGISTRY

## PURPOSE

To establish guidelines to be followed whenever a complainant claims to be the petitioner (possessor) of an active order of protection but is either unable to produce a copy of the order or produces one that is illegible, for the responding officer's review.

## PROCEDURE

When a member of the service is informed by a complainant that he/she possesses an active order of protection, which has been violated, but is unable to produce a copy of that order.

## UNIFORMED MEMBER OF THE SERVICE

1. Ascertain from the complainant all available information concerning the order (e.g., court of issuance, date of issuance, the names, addresses and dates of birth of all parties concerned, etc.).

   *NOTE  The above list of information to be obtained, if possible, from the complainant serves to aid the member accessing the system in verifying that the correct order has been located.  Failure to obtain certain information from this list will not prevent the locating of a database file; an order can be located merely by entering the petitioner's (complainant's) name and date of birth.  However, every attempt should be made to ascertain as much information as possible concerning the order and the parties to whom it pertains.*

   [I.O. 38 s 03] 2. *Telephone Central Records Division, Identification Section a (646) 610-5195 to verify that an Order of Protection was issued, court of issuance, specific conduct prohibited and the expiration date.*

3. If the Identification Section reports that there are no Orders of Protection on file pertaining to the complainant/victim, telephone the precinct of occurrence and request a member of the service authorized to operate the FINEST System to conduct an Order of Protection database inquiry.

   a. In the event the precinct of occurrence is unable to conduct the inquiry, request the Communications Division dispatcher to conduct the inquiry.

   [I.O. 38 s 03] *NOTE  The following information is obtainable through the database:*

   a. *Data relating to the person requesting the order of protection (name, address, date of birth, etc).*
   b. *Data relating to the person against whom the order runs (name, address, date of birth, etc).*
   c. *The terms and conditions of the order.*
   d. *Date and court of issuance, and date of expiration.*
   e. *Whether the respondent has been served with a copy of the order.*
   f. *Additional comments regarding the parties involved and unique terms of the order.*

Section:   Arrests

Procedure No: 208-38

*It should be noted that the state database will not contain orders of protection that have been issued prior to October 1, 1995.*

*The Central Records Division intranet database application will be utilized to access information for all Orders of Protection issued by New York City based courts, as outlined in Patrol Guide procedure 208-36, "Family Offenses/Domestic Violence."*

WHEN THE COMPLAINANT INDICATES THAT THE ORDER WAS ISSUED PRIOR TO OCTOBER 1, 1995, OR A STATE DATABASE INQUIRY REVEALS THAT THERE IS NO ORDER ON FILE RELATING TO THE PARTIES CONCERNED

## UNIFORMED MEMBER OF THE SERVICE

4. Telephone Central Records Division, Identification Section, at (212) 374-5195 to verify the existence of the order.

WHEN A STATE DATABASE INQUIRY REVEALS THAT THERE IS AN ACTIVE ORDER OF PROTECTION IN EFFECT

5. Verify that the order relates to the parties involved, naming the complainant as petitioner and the offender as the respondent.

6. Verify that the respondent has been previously served with a copy of the order.

*NOTE  In order to effect an arrest for violation of an order of protection, the member must have probable cause to believe the order was effectively served upon the respondent PRIOR to its violation. While a notation in the database file will provide the member with sufficient probable cause to believe the order was effectively served, the absence of such information in the database file will not automatically prevent the member from making the arrest. If the member, through alternative means, can verify that the order was properly served (e.g., an affidavit of service, an admission by the respondent that he/she was properly served, etc) then the arrest can be effected.*

7. Determine whether there exists probable cause to believe that the terms of the order have been violated by the respondent. If probable cause does exist, comply with the applicable provisions of P.G. 208-36, "Family Offenses/Domestic Violence."

*ADDITIONAL DATA*

*The fact that the order has not been properly served or that the specific terms of the order have not been violated will not prevent the member from effecting an arrest if the underlying conduct constitutes a crime.*

*RELATED PROCEDURE*

Family Offenses/Domestic Violence (P.G. 208-36)

© PPA January, 2004

INTERIM ORDER 17 ISSUED 05-21-08 SUSPENDING/REPLACES PATROL GUIDE 208-39

# FAMILY OFFENSES/DOMESTIC VIOLENCE
## (DIGITAL PHOTOGRAPHY OF VISIBLE INJURIES/DAMAGED PROPERTY)

**PURPOSE**

To capture, catalog, store and maintain digital photographic evidence of visible injuries and/or damaged property as a result of domestic violence.

**SCOPE**

All precinct and police service area commands citywide are now able to digitally capture domestic violence photos and transmit them as a permanent record into the Domestic Violence Digital Photo Database. These images may then be instantly viewed by prosecutors at each borough's District Attorney's Office and the New York City Law Department (Corporation Counsel) who will have access to the Domestic Violence Digital Photo Database. Prosecutors may then present digital images of domestic violence to judges at the time of arraignment, thereby strengthening the District Attorney's case. In addition, uniformed members acting in investigatory and support roles (Detective Bureau personnel, domestic violence prevention officers, etc.) will be able to view these photos prior to making further contact with the victim and/or offender.

**PROCEDURE**

Upon responding to the scene of a reported domestic violence incident:

**UNIFORMED MEMBER OF THE SERVICE**

1. Comply with P.G. 208-36, "Family Offenses/Domestic Violence."
2. Determine if photographs must be taken.
3. Ascertain if the victim is willing to be photographed.
   a. Advise the victim that photographable evidence is crucial to future prosecutorial efforts and/or civil process such as divorce and child custody proceedings.
   b. If victim is not willing to be photographed, note refusal in ACTIVITY LOG (PD112-145), and if possible, have victim sign entry.
4. Notify the patrol supervisor and request that the domestic violence digital camera be brought to location.

> **NOTE** Only the domestic violence digital camera should be used to capture domestic violence evidence. No other cameras are compatible with the domestic violence capture station located in the area of the precinct desk. PERSONAL PHOTOGRAPHIC EQUIPMENT (CAMERAS, CELL PHONES, HANDHELD COMPUTERS, ETC.) SHOULD NEVER BE USED TO CAPTURE DOMESTIC VIOLENCE EVIDENCE. The Domestic Violence Digital Photo Database will be the sole repository for photographs of all domestic violence evidence.

**PATROL SUPERVISOR**

5. Respond to requested location with domestic violence digital camera and direct photographs be taken of complainant/victim (if willing) and scene, if appropriate.

**Section: Arrests**

51

Case 1:15-cv-05871-KPF   Document 41-1   Filed 01/03/17   Page 59 of 61
Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 32 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 64 of 81

INTERIM ORDER 17 ISSUED 05-20-08 SUSPENDS/REPLACES PATROL GUIDE 208-39

> **NOTE** Domestic violence prevention officers are also equipped with a digital camera. When working in the field, domestic violence prevention officers should respond to the scene where a domestic violence digital camera has been requested.

## UNIFORMED MEMBER OF THE SERVICE

6. Take digital photographs as necessary, including but not limited to:

   a. Visible injuries

   > **NOTE** Injuries may not be initially prominent, therefore it is crucial for domestic violence prevention officers and investigators to take follow-up photographs for bruises that appear at a later time. When a victim makes a complaint of substantial pain (Assault 3rd Degree), and there are no visible injuries, do not take photos.

   b. Damaged property
   c. Weapons
   d. Overall scene to illustrate items in disarray, indicating domestic violence or distress in home.
   e. Other types of evidence (i.e., pictures of caller-id box for aggravated harassment or flowers/notes for stalking, blood on the clothes/hands or ripped clothing of the victim/perpetrator, etc.)
   f. Both pages (Data Sheet and Statement of Allegations written and signed by victim) of the completed **New York State Domestic Incident Report (DCJS 3221-6/05)**
   g. Photo of the victim from the waist up, providing context for the series of photos.

   > **NOTE** The digital camera is to be set at the highest resolution setting to maximize the quality of the photo with minimal file size. Each photo takes approximately one megabyte of data storage. Therefore, memory cards containing 256 megabytes of memory will be able to hold approximately 256 photos; those with 512 megabytes will hold around 512 photos, etc. The storage capacity of the camera enables members of the service to take as many photos as needed to depict any evidence and/or violence in the home. There is no longer a limit to the number of photos or "sets" of photos that can be taken in domestic violence cases. Do not set the digital camera memory to "internal memory." The camera must be set to capture photos on a memory card. Photos saved on the internal memory mode cannot be uploaded into the Domestic Violence Digital Photo Database.

7. Ensure that the phrase "DIGITAL PHOTOS" is documented on the "Evidence Collection" portion of the COMPLAINT REPORT WORKSHEET (PD313-152A) and the "Incident #" obtained from the first caption on the initial screen in the Domestic Violence Digital Photo Database is documented in "Invoice #" caption.

   a. This "Incident #" is used by personnel at the District Attorney's Office to retrieve digital photos during pre-arraignment.

© FPA July, 2008

508

INTERIM ORDER 17 ISSUED 05-20-08 SUSPENDS/REPLACES PATROL GUIDE 208-39

*NOTE* *Polaroid film will no longer be used to capture domestic violen* *evidence. Therefore, PROPERTY CLERK'S INVOICES (PD521-14* *will no longer be used to voucher domestic violence digital photo* *Domestic violence digital photos will be uploaded into the Domes* *Violence Digital Photo Database and NOT vouchered. Members a* *reminded that the photographing of evidence does not substitute* *the collection and invoicing of physical evidence (i.e., weapon* *clothing, etc.). Members will adhere to Patrol Guide 218-01, "Invoici* *Property – General Procedure" when invoicing physical evidence.*

8. Ensure that the "Photo Section" of the New York State Domestic Incident Report is completed after the victim completes the "Statement of Allegations/Supporting Deposition" section located on page two (2) of the **Domestic Incident Report.**

**ARREST PROCESSING OFFICER/ ARRESTING OFFICER/ ASSIGNED OFFICER**

9. Upload all digital photos taken from the digital camera into the Domestic Violence Digital Photo Database by docking the camera and following the prompts from the system.

*NOTE* *Domestic violence digital photos must be uploaded into t* *Domestic Violence Digital Photo Database by the arresting/assign* *officer at the earliest opportunity.   Digital photos are needed by t* *District Attorney's Office in arrest cases and by detective investigatic* *on open cases.*

10. Adhere to the following in all cases:
   a. Ensure that the Domestic Violence Digital Photo Database is logged on as DYCAM. No password is necessary.
   b. Place the camera on the docking station and press the space bar (camera can be on or off).
   c. Close the "Internal Memory" and "Picture Card" windows that appear.
   d. Click on the "Domestic Violence Camera" icon.
   e. If the pending box appears, close it and click on the "Capture" icon.
   f. Check off the appropriate relationship(s) to associate the specific domestic relationship.
   g. Answer all mandatory fields designated by an asterisk.
   h. Click on "add" to add photos.
   i. Click on photo thumbnails pertaining to the file, then click "OK" and await transfer of photos.
   j. Complete the captions located beneath the photos.
   k. Click on "Save" and the photos are now saved to the database.

*NOTE* *Instructions for the use of the domestic violence digital came* *and the uploading and hosting of domestic violence photos into th* *Domestic Violence Photo Database are maintained at the desk, th* *Command Reference Library, and are available on the Departme* *Intranet Site.*

508

**Section:   Arrests**

INTERIM ORDER 11 ISSUED 05-20-09 SUSPENDS/REPLACES PATROL GUIDE 2007-39

## UNIFORMED MEMBER OF THE SERVICE

11. Make an ACTIVITY LOG entry indicating date, time, number of digital photos taken, name and tax number of the officer taking the photos, name and tax number of officer uploading the images, and the name of the Assistant District Attorney confirming receipt if arrest is effected.

12. Ensure the COMPLAINT REPORT (PD313-152) number is obtained and entered into the system as soon as practicable.

13. Print one (1) copy of the image(s) using the thumbnail feature and attach it to the NYS Domestic Incident Report.

## DOMESTIC VIOLENCE PREVENTION OFFICER

14. Review all completed NYS Domestic Incident Reports, finalized COMPLAINT REPORT printouts, and the Domestic Violence Digital Photo Database daily to make certain that the digital photos for domestic violence were taken as necessary.

15. Perform follow-up with victims and take digital photos as necessary.

16. Host digital photos after the COMPLAINT REPORT has been finalized in the On Line Complaint System (OLCS).

> NOTE Once hosted, information contained in the OLCS will automatically transfer to occupy captions in the Domestic Violence Digital Photo Database.

## ADDITIONAL DATA

The uploading of domestic violence digital photos into the Domestic Violence Digital Photo Database does not require a unique password. The universal password "DVCAM" should be used to gain access to the system. Once uploaded, personnel at the District Attorney's Office can instantly view domestic violence digital photos. Therefore, arresting/assigned officers MUST upload any domestic violence photos from the camera into the database during arrest processing (arrest evidence) or prior to the end of their tour (non-arrest/investigatory evidence), whichever applies.

The domestic violence camera and capture station must be maintained in the vicinity of the command desk. Commanding officers will ensure that digital cameras are accessible at all times. Desk officers will allow access to cameras to uniformed members of the service to upload/host digital photos into the Domestic Violence Digital Photo Database. When not in use, domestic violence digital cameras must be left on the docking station to maintain a charge. The docking station also serves as a conduit to upload domestic violence photos. The digital cameras assigned to the command are to be included in the commands computer self-inspection worksheet and inventory.

## MAINTENANCE OF THE DOMESTIC VIOLENCE DIGITAL PHOTO CAMERA

### DESK OFFICER

17. At the beginning of each tour:
   a. Inspect all domestic violence digital cameras assigned to patrol.
   b. Ensure docking station, cables and memory cards (check inside cameras) are operational.
   c. Make a Command Log entry of results.

© FFA July, 2008

508-B