Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 1 of 55
Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 35 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 67 of 81

INTERIM ORDER 17 ISSUED 05-20-08 SUSPENDS/REPLACES PATROL GUIDE 208-39

*NOTE If during inspection, cameras/related equipment are found to be inoperable, the desk officer will immediately notify the Domestic Violence Unit at 646-610-5970. The Domestic Violence Unit is operational Monday through Friday, between 0600 and 1800 hours. However, message must be left during non-office hours. Domestic Violence Unit personnel will return the call as soon as possible. In the event that the computer where the digital camera capture station resides becomes disabled/inoperable, the desk officer will immediately call the MISD Help Desk at (646)-610-6473 and the Domestic Violence Unit. An entry of these notifications will be made in the Telephone Record.*

*If during inspection, the loss or theft of any domestic violence camera equipment is discovered, be guided by P. G. 219-20, "Loss or Theft of Department Property."*

**PATROL SUPERVISOR**

18. Make a Command Log entry when signing out or returning a domestic violence digital camera.

**DOMESTIC VIOLENCE PREVENTION OFFICER**

19. Inspect all domestic violence digital cameras each day to ensure operability and that all photos are uploaded into the Domestic Violence Digital Photo Database.

   a. If upon inspection, any domestic violence cameras/related equipment are missing, lost or inoperable, notify the desk officer.

**DOMESTIC VIOLENCE SERGEANT**

20. Ensure that digital photos are being taken with domestic violence digital cameras by first responding officers, as appropriate.

21. Take corrective action when necessary.

**TRAINING SERGEANT**

22. Ensure that all uniformed members of the service assigned to the command are properly trained in the taking and uploading of domestic violence digital photos.

*RELATED PROCEDURES*

Family Offenses/Domestic Violence (P. G. 208-36)
Invoicing Property – General Procedure (P.G. 218-01)
Family Offenses and Domestic Violence Involving Uniformed Members of the Service (P. G. 208-37)

*FORMS AND REPORTS*

ACTIVITY LOG (PD112-145)
COMPLAINT REPORT WORKSHEET (PD313-152A)
COMPLAINT REPORT (PD313-152)
PROPERTY CLERK'S INVOICE (PD521-141)
New York State Domestic Incident Report (DCJS 3221-6/05)

501

**Section:   Arrests**

This Page Intentionally Left Blank

© FFA July, 2008

Procedure No:   208-70                                      Date Effective: 03-26-

# PROCESSING OF NEW YORK STATE
# DOMESTIC INCIDENT REPORTS IN THE
# DOMESTIC VIOLENCE DATABASE

## PURPOSE

To improve the tracking, monitoring, and analysis of domestic violence cases.

## PROCEDURE

Whenever entering information from a command's past/current **New York State Domestic Incident Report (DCJS-3221)** into the new Domestic Violence Database System:

## UNIFORMED MEMBER OF THE SERVICE

1. Submit hard copy of Domestic Incident Report and any related paperwork [COMPLAINT REPORT (PD313-152), AIDED REPORT WORKSHEET (PD304-152b), ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159) etc.] to desk officer.

> *NOTE* The current *New York State Domestic Incident Report (DCJS-3221) does not have captions for certain pertinent information that is collected in the Domestic Violence Database System. Therefore, the following information is to be elicited from the person(s, involved and recorded in the NARRATIVE OF THE INCIDENT:*
>  a. *Alcohol involved*
>  b. *Narcotic involved*
>  c. *Verbal dispute only*
>  d. *Court and Docket number of Order of Protection*
>  e. *Voucher number of photos (if taken)*
>  f. *Social security number and alias of persons involved (record next to name if space allows, otherwise include name and information in narrative)*
>  g. *Reporting officer's tax number in box titled "OFFICER I.D. NO.*

## DESK OFFICER

2. Review hard copy of **Domestic Incident Report** and any related paperwork fo accuracy and completeness and sign.
3. Direct command clerk to enter information from the **Domestic Incident Repo** into the Domestic Violence Database System.

## COMMAND CLERK

4. Enter information from the Domestic Incident Report into the Domestic Violence Database System and print out computer copy.
5. Attach hard copy and computer copy and present them to the desk officer for review.

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 4 of 55

Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 38 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 70 of 81

Procedure No: 208-70

**NOTE** With the implementation of new, linked computer systems, the command clerk must enter all associated reports and obtain numbers from the other appropriate computer systems (OLCS, Aided, etc.) PRIOR TO entering the data into the Domestic Violence Database System. The command clerk will record all appropriate numbers on the hard copy of the **Domestic Incident Report**. It is imperative that these numbers are obtained prior to the entry of the Domestic Incident report since these numbers link to the other systems and links information contained therein and CAN NOT be entered or retrieved later. In the event that a **Domestic Incident Report** is entered into the database without these numbers, it MUST BE VOIDED and re-entered with this information.

The command clerk will prepare a Domestic Incident Report for walk-in complainants reporting domestic incidents whenever the command's domestic violence officer is not available to do so.

**DESK OFFICER**

6. Review computer copy and compare to the hard copy for accuracy and completeness.
7. Forward both copies to the command's domestic violence officer/designated reviewer.

**DOMESTIC VIOLENCE OFFICER/ DESIGNATED REVIEWER**

8. Obtain previously assigned victim and/or offender numbers or generate new numbers, as appropriate, from database.
9. Query the Domestic Violence Database System for the following offender information:
   a. Warrant history
   b. Investigation card status
   c. Gun license/permit status
   d. Criminal recidivist history
   e. Targeted narcotics violator status
   f. Domestic violence history

**NOTE** Results of the New York State Police Information Network (NYSPIN) inquiries concerning orders of protection, probation status and arrest history (Booking Arraignment Disposition System [BADS]), and complaint history (On Line Complaint System [OLCS]), will be entered onto the appropriate captions of the Domestic Incident Report review screen.

10. Ensure that all computer inquiries regarding the offender are completed during the tour in which they are commenced.
   a. Attach printouts of all inquiries listed in step 9 to the **Domestic Incident Report.**
11. Forward both copies of the **Domestic Incident Report** back to the desk officer or domestic violence supervisor for endorsement.

Procedure No: 208-70

## DESK OFFICER/DOMESTIC VIOLENCE SUPERVISOR

12. Review the Domestic Incident Report computer summary screen. Ensure that all Domestic Incident Reports and the necessary offender queries are completed.

13. Utilize the supervisory sign off function to finalize each Domestic Incident Report thereby entering it into the Domestic Violence Database System.

   a. Print finalized copy of Domestic Incident Report.

> NOTE Any Domestic Incident Report prepared by a command other than PRECINCT OF OCCURRENCE, must be entered, reviewed and finalized by the COMMAND OF REPORT. The hard copy of the Domestic Incident Report will then be faxed to the precinct of occurrence. The original will be maintained in a file folder marked, "Out of Command DIRs ". (This folder is not required if prepared by a PSA, and the incident occurs within the precincts that they cover).

14. Void any duplicate Domestic Incident Reports and those entered incorrectly or in error.

## DOMESTIC VIOLENCE PREVENTION OFFICER

15. Prepare daily a Domestic Incident Index utilizing the computer's "Domestic Violence Query-Status Report" for all the Domestic Incident Reports entered the previous day.

   a. Maintain a copy of the Index in the Domestic Violence office and at the desk.

16. Utilize the computer's add/view "follow-up comments function" to enter new information (e.g. results of home visits, phone contacts, additional information, etc.) related to the Domestic Incident Report.

17. Utilize the computer's "High Propensity Offender" function to add and remove offenders to the commands High Propensity List.

## PRECINCT DETECTIVE SQUAD MEMBER

18. Enter case closing status of any resolved domestic violence case into the Domestic Violence Database System.

## ARREST PROCESSING OFFICER

19. Complete a "Global Name Check" of the offender and victim in all domestic violence arrest cases.

   a. Print out the result screen and the previously prepared Domestic Incident Report(s).

20. Forward the name check results and Domestic Incident Report(s) with the arrest package to the District Attorney's Office.

Procedure No:   208-70

## COMMAND INTEGRITY CONTROL OFFICER

21.  Provide members of the service access to the Domestic Violence Database System utilizing the administrator options of the computer as appropriate.
22.  Maintain a list of authorized users assigned to the command.
23.  Print, review, and maintain on a monthly basis, a list of all voided Domestic Incident Reports entered into the Database.
     a.  Take corrective action where appropriate.

## ADDITIONAL DATA

*Domestic Incident Reports that are prepared by officers assigned to commands other than precinct of occurrence (i.e. Housing Bureau personnel, etc.) who have access to the Domestic Violence Database System, will be responsible for the data entry, review and finalization of the Domestic Incident Report. The follow-up investigation will be the responsibility of the precinct of occurrence or housing PSA, as appropriate.*

*Due to the sensitive nature of the Database information, access is limited to authorized users and is controlled using CRSN passwords. The command's integrity control officer provides access to the system; however, revoked passwords must be re-activated by the integrity control officer assigned to the Management Information Systems Division.*

*Commands will access the Domestic Violence Database System from local area network (LAN) workstations that have Internet Explorer Browser installed. Once the system issues a sequential number and the Domestic Incident Report is reviewed by the domestic violence officer, only a supervisor from the precinct of occurrence is permitted to make modifications.*

*Additionally, once a desk officer/domestic violence supervisor has finalized a Domestic Incident Report for entry into the Domestic Violence Database System, no modifications will be allowed.  (This does not include domestic violence officer notes or detective case closing).*

## RELATED PROCEDURES

*Domestic Violence Prevention Officer (P.G. 202-29)*
*Family Offenses/Domestic Violence (P.G. 208-36)*
*Family Offenses and Domestic Violence Involving Uniformed or Civilian Members Of The Service (P.G. 208-37)*
*Family Offense/Domestic Violence (Photographing Visible Injuries/Damaged Property) (P.G. 208-39)*

## FORMS AND REPORTS

AIDED REPORT WORKSHEET (PD304-152b)
COMPLAINT REPORT (PD313-152)
ONLINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159)
*New York State Domestic Incident Report (DCJS-3221)*

Procedure No:   212-56

## INTELLIGENCE DIVISION MEMBER

12. Transmit details of incident to:
   a. United States Mission to United Nations
   b. New York City Commission for the United Nations and Consular Corps
   c. United States Department of State
   d. Federal Bureau of Investigation.

## PATROL SUPERVISOR

13. Investigate incident and interview witnesses.
14. Determine if incident is of a serious or non-serious nature.
15. Take immediate action as required by circumstances of incident.
16. Report actions taken to precinct desk officer.

> NOTE  *The desk officer will notify the precinct commander/duty captain, who will perform the duties of the patrol supervisor if the incident is of serious nature. Incidents of a non-serious nature will be investigated by the patrol supervisor.*

17. Review actions already taken, conduct additional investigation as necessary.
18. Telephone results of preliminary investigation to:
   a. Operations Unit
   b. Patrol borough office concerned
   c. Intelligence Division - indicate whether incident serious or non-serious.
19. Prepare four (4) copies of report concerning results of investigation on Typed Letterhead, when incident is of a serious nature, and forward to:
   a.   Chief of Patrol - one (1) copy <u>DIRECT</u>
   b.   Intelligence Division - two (2) copies <u>DIRECT</u>
   c.   File last copy in precinct desk binder.
20. Notify precinct commander/duty captain of actions taken, when incident is of a non-serious nature.

## PRECINCT COMMANDER/DUTY CAPTAIN

21. Review actions taken by the patrol supervisor in non-serious incidents.

## INTELLIGENCE DIVISION MEMBER

22. Forward one (1) copy of report, if appropriate, to:
   a. United States Mission to the United Nations
   b. New York City Commission for the United Nations and Consular Corps
   c. United States Department of State
   d. Federal Bureau of Investigation.

## DESK OFFICER

23. Review and process required reports/forms.

## ADDITIONAL DATA

Subsequent reports including final dispositions will be prepared and forwarded in the same manner as initial reports.

*A parking summons placed upon a vehicle bearing "Diplomat" and "Consul" license plates for a safety hazard violation is NOT considered a diplomatic incident.*

## RELATED PROCEDURES

Parking Summons - General Procedure (P.G. 209-07)
Unusual Occurrence Reports (P.G. 212-09)

## FORMS AND REPORTS

*ACTIVITY LOG (PD112-145)*
*TYPED LETTERHEAD*

Section:   Command Operations

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 8 of 55

Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 42 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 74 of 81

Procedure No:  212-57                                    Date Effective:  01-01-00

# SERVICE OF FAMILY COURT/SUPREME COURT ORDERS OF PROTECTION BY UNIFORMED MEMBERS OF THE SERVICE

## PURPOSE
To effect the service of all orders of protection, and any associated papers, issued by Family Court or Supreme Court to the respondent, and to ensure proper entry of police service into the order of protection database.

## PROCEDURE
When an order of protection issued by a Family Court or Supreme Court is to be served:

## UNIFORMED MEMBER OF THE SERVICE ASSIGNED TO FAMILY/SUPREME COURT

1. Obtain, on a daily basis, all orders of protection and any related papers from the Family Court or Supreme Court clerk.
2. Review order of protection and associated papers to ensure that respondent's address is provided, or petitioner's address if order is to be served at petitioner's residence.
   a. Any set of papers lacking an address will be returned to the Family Court or Supreme Court clerk.
3. Separate orders of protection by patrol borough based on the respondent's address.
4. Prepare two (2) copies of a letter of transmittal  on Typed Letterhead for each patrol borough, as necessary, including:
   a. Respondent's name
   b. Docket number
   c. Caption for final disposition.

> **NOTE**  In addition to orders obtained from Family Court, members of the service assigned to Family Court will also be delivered orders from Supreme Court. These Supreme Court orders will be processed in the same manner as those from the Family Court.  Orders from both Family Court and Supreme Court may be listed on the same letter of transmittal but should be separated by a single blank line.  No more than ten (10) orders of protection will be listed on each letter of transmittal.

5. Attach letter of transmittal to orders of protection, that have been separated by patrol borough, to be picked up by local patrol borough personnel.
   a. File photocopy of letter of transmittal.

## PATROL BOROUGH COORDINATOR WHEREIN FAMILY COURT LOCATED

6. Obtain all orders of protection and accompanying letters of transmittal on a daily basis.

> **NOTE**  Messengers from Patrol Boroughs Manhattan North and Brooklyn South will pick up their borough's orders of protection from the uniformed member of the service assigned to the local Family Court.

© PPA July, 2003

870

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 9 of 55

Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 43 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 75 of 81

Procedure No: 212-57

7. Forward via Department mail orders of protection to be served in other patrol boroughs.
8. Verify all orders of protection listed on letter of transmittal have been received.
9. Number each order of protection received by precinct and serial number beginning with the number one (1) at the start of each year. (Example, the first order of protection in the 60th Precinct would be listed as 60-1).
10. Prepare two (2) copies of a letter of transmittal on Typed Letterhead captioned as in step 4 for each precinct where an order of protection is to be served.
11. Attach STATEMENT OF PERSONAL SERVICE (PD260-152) and WARRANT OFFICER'S REPORT OF INVESTIGATION (PD374-1510) to each order of protection.
12. Forward letter of transmittal and orders of protection to appropriate precinct(s).
   a. File photocopy of letter(s) of transmittal.

> NOTE   A separate file of letters of transmittal will be maintained for each precinct within the patrol borough.

DESK OFFICER

13. Verify all orders of protection listed on letter of transmittal have been received.
14. Make an entry in a log maintained at the desk and captioned across a double page as follows:

LEFT PAGE

| Pct. Serial # | Petitioner's Name | Respondent's Name | Docket # | 1st Tour UMOS Assigned/Desk Officer | Date & Time of Attempt(s) |
|---|---|---|---|---|---|

RIGHT PAGE

| 2nd Tour UMOS Assigned/Desk Officer | Date & Time of Attempt(s) | (Through) →→→→→ | 6th Tour UMOS Assigned/Desk Officer | Date & Time of Attempt(s) | Final Disposition | Time/Date Entered In Database |
|---|---|---|---|---|---|---|

15. Assign a uniformed member of the service to serve the order of protection.
   a. Indicate name under caption "1st TOUR UMOS."

UNIFORMED MEMBER OF THE SERVICE

16. Attempt to serve the order of protection.

> NOTE   The order of protection may be served at any time seven (7) days a week, twenty-four (24) hours a day.

Section:   Command Operations

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 10 of 55

Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 44 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 76 of 81

Procedure No:   212-57

## IF ORDER OF PROTECTION IS SERVED

### UNIFORMED MEMBER OF THE SERVICE

17. Prepare STATEMENT OF PERSONAL SERVICE and then photocopy.
   a. Examine and account for all documents served by insuring that appropriate box is checked.
18. Deliver form to desk officer
   a. Forward photocopy to domestic violence prevention officer.

   > NOTE When preparing STATEMENT OF PERSONAL SERVICE forms for orders issued by Supreme Court, strike out the heading reading "Family Court" and write in "Supreme Court".

## IF UNABLE TO SERVE ORDER OF PROTECTION

### UNIFORMED MEMBER OF THE SERVICE

19. Document each attempt on WARRANT OFFICER'S REPORT OF INVESTIGATION.
20. Make an ACTIVITY LOG (PD112-145) entry of each attempt to serve the order of protection.
21. Return the order of protection and related forms at end of tour to the desk officer.

### DESK OFFICER

22. Repeat step 15.
   a. Indicate name under caption "2nd TOUR UMOS," etc.

   > NOTE Service of the order of protection must be attempted at least once on each tour for six (6) consecutive tours. After the sixth tour the order of protection will be considered to be "Undeliverable." Service of order of protection will be initiated on the same tour that the order of protection will be initiated on the same tour that the order is received.

### DESK OFFICER

23. Enter into the log one (1) of four (4) final dispositions:
   a. Order of protection served.
   b. Undeliverable-respondent not known at address.
   c. Undeliverable-respondent's new address located outside of command.
   d. Undeliverable-attempts completed on six (6) consecutive tours.
      (1) Ensure that dates and times of attempted service are indicated in the log.
24. Prepare STATEMENT OF PERSONAL SERVICE and write "NOT SERVED" on the top right hand corner of the form, if the order of protection was not served.
   a. Strike out the heading "Family Court" and write in "Supreme Court", if the order was issued by a Supreme Court.
25. Place "Undeliverable" orders of protection in log for precinct domestic violence prevention officer to forward.

© FPA July, 2003

872

Procedure No:   212-57

## DOMESTIC VIOLENCE PREVENTION OFFICER

26. Coordinate all tasks relating to the service and recording of orders of
protection including filing, forwarding, etc.

27. Enter applicable information into the State Order of Protection Registry, via
the FINEST system, upon receipt of each photocopy of a **STATEMENT
OF PERSONAL SERVICE.**

28. Enter the date and time entry into the registry was made under the
appropriate caption in log.

   a. Place initials inside same caption.

> **NOTE** *The Domestic Violence Unit will be responsible for ensuring
> that all Domestic Violence Prevention Officers are trained in the use o
> the NYSPIN/FINEST system in regard to the entry of service
> information.*

29. Check log containing orders of protection on a daily basis.

   a. Ensure that for every disposition indicating service was made a
   corresponding entry was made into the order of protection registry.

30. Forward to the patrol borough coordinator any orders of protection and related
forms, if investigation reveals that respondent resides outside of precinct.

31. Maintain a file of letters of transmittal.

32. Enter a final disposition on letters of transmittal as indicated in step 23.

> **NOTE** *Every order of protection received must be assigned one (1) ot
> the four (4) final dispositions.*

33. Forward to the patrol borough coordinator:

   a. Original (white copy) of the completed **STATEMENT OF PERSONAL
   SERVICE** for all orders of protection.

   b. Original of completed **WARRANT OFFICER'S REPORT OF
   INVESTIGATION** for orders of protection that are "Undeliverable."

34. Attach to file copy of appropriate letter of transmittal:

   a. Second (blue copy) of **STATEMENT OF PERSONAL SERVICE** and

   b. Photocopy of **WARRANT OFFICER'S REPORT OF
   INVESTIGATION**, if applicable.

## PATROL BOROUGH COORDINATOR

35. Attach to the file copy of appropriate letter of transmittal, a photocopy of the
**STATEMENT OF PERSONAL SERVICE** and the **WARRANT
OFFICER'S REPORT OF INVESTIGATION**, if applicable.

   a. Ensure that a final disposition is indicated on letter of transmittal.

36. Forward original (white copy) of **STATEMENT OF PERSONAL
SERVICE** and/or **WARRANT OFFICER'S REPORT OF
INVESTIGATION** to the uniformed member of the service assigned at the
Family Court that issued the order of protection.

> **NOTE** *If the originating Family Court is located outside the patrol
> borough, the STATEMENT OF PERSONAL SERVICE and/or
> WARRANT OFFICER'S REPORT OF INVESTIGATION will be
> returned via the patrol borough coordinator in which the Family Court i
> located.*

**Section:   Command Operations**

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 12 of 55

Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 46 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 78 of 81

Procedure No:   212-57

**UNIFORMED MEMBER OF THE SERVICE ASSIGNED FAMILY COURT**

37. Indicate on original letter of transmittal a final disposition:
    a. Order of protection served
    b. Undeliverable-respondent not known at address
    c. Undeliverable-attempts completed on six (6) consecutive tours.
38. Forward STATEMENT OF PERSONAL SERVICE to Family Court or
    Supreme Court clerk.
39. File WARRANT OFFICER'S REPORT OF INVESTIGATION.

*ADDITIONAL DATA*

*Each attempt made to serve the order of protection shall be documented on a WARRANT OFFICER'S REPORT OF INVESTIGATION and an ACTIVITY LOG entry shall be made. The respondent's name shall be entered under the caption "Defendant Surname" and the docket number shall be entered under the caption "Docket/Indict #." Service must be attempted at least once each tour for six (6) consecutive tours, after which the order of protection may be considered undeliverable.*

*The assigned uniformed member of the service will inquire of neighbors, superintendent, etc., as to respondent's whereabouts. If respondent has moved, attempt to obtain the new address. If the new address is within the precinct, service of the order of protection will be attempted at the new location for an additional six (6) consecutive tours. A new log entry will be required.*

*If the new address is outside the precinct concerned, indicate this on the WARRANT OFFICER'S REPORT OF INVESTIGATION. The order of protection will be returned to the patrol borough coordinator for forwarding to the proper patrol borough. Although most of the Family Court or Supreme Court orders of protection will be delivered through the patrol borough coordinator, the petitioner may elect to personally seek police assistance in serving the order of protection. In that instance, the desk officer will impact the "Order of Protection" log to determine if the order of protection has already been served. If it has not been served, a uniformed member of the service will provide assistance in serving the order and give the original (white copy) of the completed STATEMENT OF PERSONAL SERVICE to the petitioner. The petitioner will be instructed to deliver the form to the Family Court or Supreme Court clerk that issued the order of protection. The blue copy of the STATEMENT OF PERSONAL SERVICE will be delivered to the desk officer who will indicate in the log that the order of protection was served, and then forward the copy to the domestic violence prevention officer who will process it in accordance with the foregoing procedure.*

© FPA July, 2003

Procedure No:   212-57

When an exclusionary Order of Protection has been served, uniformed members of the service may not assist respondents who wish to remove clothing/property (commonly known as "clothes jobs"), where an exclusionary Order of Protection exists which prohibits contact between the petitioner and respondent and/or excludes the respondent from being present at said location. Instead, the respondent should be advised to return to court to have the Order of Protection amended, so that he/she may remove clothing/personal property from the location, or, so that the items may be delivered to the respondent or a third party.

RELATED PROCEDURES

Arrests - Removal To Department Facility For Processing (P.G. 208-02)
Family Offenses/Domestic Violence (P.G. 208-36)
Arrests – Removal To Department Facility For Processing (P.G. 208-02)
Family Offenses/Domestic Violence (P.G. 208-36)

FORMS AND REPORTS

ACTIVITY LOG (PD112-1450)
STATEMENT OF PERSONAL SERVICE (PD260-152)
WARRANT OFFICER'S REPORT OF INVESTIGATION (PD374-1510)

Section:   Command Operations

Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 48 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 80 of 81

Procedure No:  212-58              **FIRE**              Date Effective:  01-01-00

## PURPOSE
To protect life and property and assist the Fire Department.

## PROCEDURE
Upon arriving at the scene of a fire:

## UNIFORMED MEMBER OF THE SERVICE
1. Send an alarm or make sure one has been sent.
2. Park RMP car to prevent interference with fire fighting operation.
3. Direct responsible person to remain in front of location to direct fire apparatus if fire is not in view.
4. Warn and assist occupants in evacuation of building.
5. Take other action required by situation.

## UPON ARRIVAL OF FIRE APPARATUS:

## UNIFORMED MEMBER OF THE SERVICE
6. Establish police lines beyond the fire apparatus and hydrants in use.
   a. Establish police lines behind the building beyond fire operations, if necessary.

## PATROL SUPERVISOR
7. Supervise members of the service.
   a. Notify desk officer if fire is suspicious and request detectives concerned.
8. Immediately assign uniformed members of the service to direct and control responding emergency vehicles to allow free access to affected area.
   a.   Ensure that fire hydrants remain accessible for use.

## UNIFORMED MEMBER OF THE SERVICE
9. Permit only the following persons or vehicles to enter fire lines:
   a. The Mayor
   b. Members of governmental agencies in performance of duty
   c. Employees of public service corporations in the performance of emergency duties
   d. Persons holding unexpired:
      (1) Working Press cards
      (2) Fire Line cards signed by the Fire Commissioner
   e. The Mayor's car
   f. Police and Fire Department vehicles
   g. Ambulances
   h. Public service corporation vehicles for duty in connection with the fire
   i. City agency vehicles for duty in connection with the fire
   j. U.S. Mail vehicles
   k. Prison vans transporting prisoners.

© FPA July, 2003

876

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 15 of 55
Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 49 of 54
Case 1:15-cv-05871-LAP   Document 16-1   Filed 05/09/16   Page 81 of 81

Procedure No:  214-21                    Date Effective: 09-22-00

# PROJECT SAFE – ESCORTS FOR SAFE HORIZON
## CLIENTS AND LOCKSMITHS

### PURPOSE
To prevent assaults and other criminal acts against Safe Horizon clients and authorized locksmiths (Project SAFE).

### SCOPE
PROJECT SAFE is a program administered by Safe Horizon that provides lock replacements and counseling to victims of domestic violence and other crimes. This Department will assist in this endeavor by providing a police escort.

### PROCEDURE
When a request is received from Safe Horizon to escort a client and authorized locksmith:

### DESK OFFICER
1. Record notification from Safe Horizon in Telephone Record.

> NOTE *Safe Horizon will telephone in advance to notify desk officer of the pending arrival of the locksmith and client.*

2. Identify the client and locksmith, when they arrive at the precinct.

> NOTE *Safe Horizon policy is to ensure that domestic violence victims still cohabiting with the batterer must have an exclusionary Order of Protection in order to have their locks changed.  Desk officers will ensure that this policy is enforced.*

3. Assign the precinct crime prevention officer or the precinct domestic violence officer to escort the client and locksmith, if time permits.
4. Assign a uniformed member of the service to provide the escort, if the crime prevention officer or the domestic violence officer is not available.

### UNIFORMED MEMBER OF THE SERVICE
5. Escort identified client and locksmith to location and notify radio dispatcher.
6. Have client ride in Department vehicle to the location, if necessary.
7. Remain at location until locksmith has completed the work.
8. Escort locksmith from premises.
9. Notify radio dispatcher that escort is completed.
10. Report completion of assignment to desk officer.

Procedure No:   214-20

**OPERATIONS UNIT**

7. Notify the Commanding Officer, Building Maintenance Section of the request assistance.

**COMMANDING OFFICER BUILDING MAINTENANCE SECTION**

8. Confer with the precinct commander/duty captain.

9. Determine if Building Maintenance Section personnel should respond to the scene.

10. Advise supervisor on scene to request desk officer, precinct of occurrence/police service area, to assign precinct/police service area uniformed member of the service, if not already present, to safeguard scene.

> *NOTE   If the damaged premises are within a New York City Housing Authority development, repairs will be performed by New York City Housing Authority maintenance staff. The local management office concerned, or Housing Authority Emergency Service Office will be notified by the PSA supervisor concerned, if available.*

**DESK OFFICER**

11. Assign uniformed member(s) of the service to location until Building Maintenance Section or New York City Housing Authority personnel, if appropriate, complete assignment.

> *NOTE   A uniformed member of the service from the precinct of occurrence or police service area concerned will be assigned to secu the location as soon as possible after the forced entry was made. Th uniformed member of the service will remain at the location until Building Maintenance Section (who may be civilian members of the service) or Housing Authority personnel make the repairs and secure the location.*

**COMMANDING OFFICER BUILDING MAINTENANCE SECTION**

12. Notify Operations Unit and desk officer, precinct of occurrence, when repairs/replacements are completed.

13. Report on a quarterly basis, through channels, to the Deputy Commissioner - Management and Budget, the cost to make repairs in connection with this procedu

*RELATED PROCEDURES*
Accidents In Which The City Is Involved (P.G. 217-04)

*FORMS AND REPORTS*
*ACCIDENT REPORT-CITY INVOLVED (PD301-155)*

Section:   Quality of Life Matters

Case 1:15-cv-05871-KPF    Document 41-2    Filed 01/03/17    Page 18 of 55
Case 1:15-cv-05871-KPF    Document 21-2    Filed 09/02/16    Page 52 of 54
Case 1:15-cv-05871-LAP    Document 16-2    Filed 05/09/16    Page 3 of 61



NCVLI
NATIONAL CRIME VICTIM LAW INSTITUTE

State
Constitutional and Statutory Victims' Rights
New York

310 SW 4th Ave., Suite 540, Portland, OR 97204

# NEW YORK VICTIMS' RIGHTS LAWS[1]

## Constitution

*New York does not have a victims' rights amendment to its constitution.*

## McKinney's Executive Law; Article 23, Fair Treatment Standards for Crime Victims

### § 640 – Fair Treatment Standards for Crime Victims

1. The commissioner of the division of criminal justice services, in consultation with the director of the office of victim services and other appropriate officials, shall promulgate standards for the treatment of the innocent victims of crime by the agencies which comprise the criminal justice system of the state.

2. For the purposes of this article the term "criminal justice" shall include juvenile justice and the objectives and criteria set forth in sections six hundred forty-one and six hundred forty-two of this article shall apply to presentment agencies as defined in subdivision twelve of section 301.2 of the family court act.

### § 641 – Objectives of Fair Treatment Standards

The object of such fair treatment standards shall be to:

1. Ensure that crime victims routinely receive emergency social and medical services as soon as possible and are given information pursuant to section six hundred twenty-five-a of this chapter on the following:

    (a) availability of crime victim compensation;

    (b) availability of appropriate public or private programs that provide counseling, treatment or support for crime victims, including but not limited to the following: rape crisis centers, victim/witness assistance programs, elderly victim services, victim assistance hotlines and domestic violence shelters;

    (c) the role of the victims in the criminal justice process, including what they can expect from the system as well as what the system expects from them; and

    (d) stages in the criminal justice process of significance to a crime victim, and the manner in which information about such stages can be obtained.

---

[1] Not intended to be exhaustive.

2.  Ensure routine notification of a victim or witness as to steps that law enforcement officers or district attorneys can take to protect victims and witnesses from intimidation.

3.  Ensure notification of victims, witnesses, relatives of those victims and witnesses who are minors, and relatives of homicide victims, if such persons provide the appropriate official with a current address and telephone number, either by phone or by mail, if possible, of judicial proceedings relating to their case, including:

    (a) the arrest of an accused;

    (b) the initial appearance of an accused before a judicial officer;

    (c) the release of an accused pending judicial proceedings; and

    (d) proceedings in the prosecution of the accused including entry of a plea of guilty, trial, sentencing, but prior to sentencing specific information shall be provided regarding the right to seek restitution and reparation, and where a term of imprisonment is imposed, specific information shall be provided regarding maximum and minimum terms of such imprisonment.

### § 642 – Criteria for Fair Treatment Standards

Such fair treatment standards shall provide that:

1.  The victim of a violent felony offense, a felony involving physical injury to the victim, a felony involving property loss or damage in excess of two hundred fifty dollars, a felony involving attempted or threatened physical injury or property loss or damage in excess of two hundred fifty dollars or a felony involving larceny against the person shall, unless he or she refuses or is unable to cooperate or his or her whereabouts are unknown, be consulted by the district attorney in order to obtain the views of the victim regarding disposition of the criminal case by dismissal, plea of guilty or trial. In such a case in which the victim is a minor child, or in the case of a homicide, the district attorney shall, unless the family refuses or is unable to cooperate or his, her or their whereabouts are unknown, consult for such purpose with the family of the victim. In addition, the district attorney shall, unless he or she (or, in the case in which the victim is a minor child or a victim of homicide, his or her family) refuses or is unable to cooperate or his, her or their whereabouts are unknown, consult and obtain the views of the victim or family of the victim, as appropriate, concerning the release of the defendant in the victim's case pending judicial proceedings upon an indictment, and concerning the availability of sentencing alternatives such as community supervision and restitution from the defendant. The failure of the district attorney to so obtain the views of the victim or family of the victim shall not be cause for delaying the proceedings against the defendant nor shall it affect the validity of a conviction, judgment or order.

2.  The victims and other prosecution witnesses shall, where possible, be provided, when awaiting court appearances, a secure waiting area that is separate from all other witnesses.

2-a. (a) All police departments, as that term is defined in subdivision a of section eight

Case 1:15-cv-05871-KPF   Document 21-2   Filed 09/02/16   Page 54 of 54

hundred thirty-seven-c of this chapter, district attorneys' offices and presentment agencies, as that term is defined in subdivision twelve of section 301.2 of the family court act, shall provide a private setting for interviewing victims of a crime defined in article one hundred thirty or section 255.25, 255.26, or 255.27 of the penal law. For purposes of this subdivision, "private setting" shall mean an enclosed room from which the occupants are not visible or otherwise identifiable, and whose conversations cannot be heard, from outside such room. Only (i) those persons directly and immediately related to the interviewing of a particular victim, (ii) the victim, (iii) a social worker, rape crisis counselor, psychologist or other professional providing emotional support to the victim, unless the victim objects to the presence of such person and requests the exclusion of such person from the interview, and (iv) where appropriate, the parent or parents of the victim, if requested by the victim, shall be present during the interview of the victim.

(b) All police departments, as that term is defined in subdivision a of section eight hundred thirty-seven-c of this chapter, shall provide victims of a crime defined in article one hundred thirty of the penal law with the name, address, and telephone of the nearest rape crisis center in writing.



3. Law enforcement agencies and district attorneys shall promptly return property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial.

4. The victim or witness who so requests shall be assisted by law enforcement agencies and district attorneys in informing employers that the need for victim and witness cooperation in the prosecution of the case may necessitate absence of that victim or witness from work. In addition, a victim or witness who, as a direct result of a crime or of cooperation with law enforcement agencies or the district attorney in the investigation or prosecution of a crime is unable to meet obligations to a creditor, creditors or others should be assisted by such agencies or the district attorney in providing to such creditor, creditors or others accurate information about the circumstances of the crime, including the nature of any loss or injury suffered by the victim, or about the victim's or witness' cooperation, where appropriate.



5. Victim assistance education and training, with special consideration to be given to victims of domestic violence, sex offense victims, elderly victims, child victims, and the families of homicide victims, shall be given to persons taking courses at state law enforcement training facilities and by district attorneys so that victims may be promptly, properly and completely assisted.

### § 642a – Fair Treatment of Child Victims as Witnesses

To the extent permitted by law, criminal justice agencies, crime victim-related agencies, social services agencies and the courts shall comply with the following guidelines in their treatment of child victims:

1. To minimize the number of times a child victim is called upon to recite the events of the case and to foster a feeling of trust and confidence in the child victim, whenever practicable and where one exists, a multi-disciplinary team as established pursuant to

subdivision six of section four hundred twenty-three of the social services law and/or a child advocacy center shall be used for the investigation and prosecution of child abuse cases involving abuse of a child, as described in paragraph (i), (ii) or (iii) of subdivision (e) of section one thousand twelve of the family court act, sexual abuse of a child or the death of a child.

2. Whenever practicable, the same prosecutor should handle all aspects of a case involving an alleged child victim.

3. To minimize the time during which a child victim must endure the stress of his involvement in the proceedings, the court should take appropriate action to ensure a speedy trial in all proceedings involving an alleged child victim. In ruling on any motion or request for a delay or continuance of a proceeding involving an alleged child victim, the court should consider and give weight to any potential adverse impact the delay or continuance may have on the well-being of the child.

4. The judge presiding should be sensitive to the psychological and emotional stress a child witness may undergo when testifying.

5. In accordance with the provisions of article sixty-five of the criminal procedure law, when appropriate, a child witness as defined in subdivision one of section 65.00 of such law should be permitted to testify via live, two-way closed-circuit television.

6. In accordance with the provisions of section 190.32 of the criminal procedure law, a person supportive of the "child witness" or "special witness" as defined in such section should be permitted to be present and accessible to a child witness at all times during his testimony, although the person supportive of the child witness should not be permitted to influence the child's testimony.

7. A child witness should be permitted in the discretion of the court to use anatomically correct dolls and drawings during his testimony.

## § 643 – Fair Treatment Standards for Crime Victims; Agencies Generally

1. As used in this section, "crime victim-related agency" means any agency of state government which provides services to or deals directly with crime victims, including (a) the office of children and family services, the office for the aging, the division of veterans affairs, and correctional alternatives the division of parole, office of victim services the department of motor vehicles, the office of vocational rehabilitation, the workers' compensation board, the department of health, the division of criminal justice services, the office of mental health, every transportation authority and the division of state police, and (b) any other agency so designated by the governor within ninety days of the effective date of this section.

2. Each crime victim-related agency shall review its practices, procedures, services, regulations and laws to determine the adequacy and appropriateness of its services with respect to crime victims, including victims with special needs, particularly the elderly, disabled or victims of child abuse, domestic violence or sex-related offenses. Such review

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 22 of 55
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 2 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 7 of 61

shall include reasonable opportunity for public comment and consultation with crime victims or their representatives, and may include public hearings.

3. After the review, and not later than one hundred eighty days after the effective date of this section, each crime victim-related agency shall submit a report to the governor and the legislature, setting forth the findings of the review including a description of the services provided by the agency and recommendations for changes in its practices, procedures, services, regulations and laws to improve its services to crime victims and to establish and implement fair treatment standards for crime victims.

4. Subject to the direction of the governor, and to the extent practicable, each crime victim-related agency shall expeditiously implement the recommendations of its report.

## § 644 – Implementation

The commissioner of the division of criminal justice services and the director of the office of victim services shall assist criminal justice agencies in implementing the guidelines promulgated by the commissioner.

## § 645 – Fair Treatment Standards for Crime Victims in the Courts

The chief administrator of the courts, in consultation with the commissioner of the division of criminal justice services, the director of the office of victim services and other appropriate officials, shall promulgate standards for the treatment of the innocent victims of crime by the unified court system. These standards shall conform to and be consistent with the regulations promulgated pursuant to section six hundred forty of this article.



## § 646 – Police Reports

1. A victim of crime shall be entitled, regardless of physical injury, without charge to a copy of a police report of the crime.

2. An individual whose identity was assumed or whose personal identifying information, as defined in section 190.77 of the penal law, was used in violation of section 190.78, 190.79 or 190.80 of the penal law, or any person who has suffered a financial loss as a direct result of the acts of a defendant in violation of section 190.78, 190.79, 190.80, 190.82 or 190.83 of the penal law, who has learned or reasonably suspects that his or her personal identifying information has been unlawfully used by another, may make a complaint to the local law enforcement agency of the county in which any part of the offense took place regardless of whether the defendant was actually present in such county, or in the county in which the person who suffered financial loss resided at the time of the commission of the offense, or in the county where the person whose personal identification information was used in the commission of the offense resided at the time of the commission of the offense as provided in paragraph (l) of subdivision four of section 20.40 of the criminal procedure law. Said local law enforcement agency shall take a police report of the matter and provide the complainant with a copy of such report free of charge.

### § 646 – Objectives

The object of these fair treatment standards shall be to:

1. Ensure that crime victims are given information on the following:

    (a) the role of the victims in the criminal justice process, including what they can expect from the system as well as what the system expects from them;

    (b) stages in the criminal justice process of significance to a crime victim, and the manner in which information about such stages can be obtained; and

    (c) how the court can address the needs of the victims at sentencing.

2. Ensure routine notification of a victim or witness as to steps that the court can take to protect victims and witnesses from intimidation, including the issuance of orders of protection and temporary orders of protection.

3. Ensure notification of victims, witnesses, relatives of those victims and witnesses who are minors, and relatives of homicide victims, if such persons provide the appropriate court official with a current address and telephone number, either by phone or by mail, if possible, of judicial proceedings relating to their case, including:

    (a) the initial appearance of an accused before a judicial officer;

    (b) the release of an accused pending judicial proceedings;

    (c) proceedings in the prosecution of the accused, including entry of a plea of guilty, trial, sentencing, and where a term of imprisonment is imposed, specific information shall be provided regarding maximum and minimum terms of such imprisonment; and

    (d) the reversal or modification of the judgment by an appellate court.

### § 646-a – Information Relative to the Fair Treatment Standards; Pamphlet

1. The district attorney shall provide the victim, at the earliest time possible, with an informational pamphlet detailing the rights of crime victims which shall be prepared by the division of criminal justice services in consultation with the director of the office of victim services and distributed to each district attorney's office.

2. The pamphlet shall summarize provisions of this article. It shall also include specific information with appropriate statutory references on the following:

    (a) the rights of crime victims to compensation and services;

    (b) the rights of crime victims to routine notification of judicial proceedings relating to their case as provided in section six hundred forty-one of this article, in section 330.20, and section 440.50 of the criminal procedure law and section one hundred forty-nine-a of the correction law;

(c) the rights of crime victims to be protected from intimidation and to have the court, where appropriate, issue protective orders as provided in sections 530.12 and 530.13 of the criminal procedure law and sections 215.15, 215.16 and 215.17 of the penal law;

(d) the rights of crime victims to submit, where appropriate, a victim impact statement for the pre-sentencing report and the parole hearing as provided in section 390.30 of the criminal procedure law and section two hundred fifty-nine-i of this chapter;

(e) the rights of crime victims, where a defendant is being sentenced for a felony, to request the right to make a statement at the time of sentencing as provided in section 380.50 of the criminal procedure law; and

(f) the rights of crime victims to request restitution and have the district attorney present such request to the court and assist the crime victim in the filing and collection of a restitution order in cooperation with the designated agency of the court as provided in section 420.10 of the criminal procedure law and section 60.27 of the penal law.

(g) the rights of crime victims to be aware of the defendant's incarceration status by providing the division of parole's contact information, including the division's toll-free telephone number, as provided for in subdivision two of section two hundred fifty-nine-i of this chapter. Such notice shall advise the crime victim to use the division's toll-free telephone number to update contact information.

3. This pamphlet shall provide space for the insertion of the following information:

(a) the address and phone number of the office of victim services;

(b) the address and phone numbers of local victim service programs, where appropriate;

(c) the name, phone number and office location of the person in the district attorney's office to whom inquiries concerning the victims case may be directed; and

(d) any other information the division deems appropriate.

4. (a) The commissioner of the division of criminal justice services in consultation with the director of the office of victim services shall develop and prepare a standardized form for the use of district attorney offices for the purpose of reporting compliance with this section. The form is to be distributed to each district attorney. Every district attorney's office in the state shall complete the reporting form annually and send it to the director of the office of victim services by the first day of January each year subsequent to the effective date of this subdivision.

(b) A copy of the report shall be retained by the district attorney and upon request, a victim of a crime or relative of a victim shall be entitled to receive from the district attorney a copy of their district attorney's annual report without charge. Any other person requesting a copy of the report shall pay a fee not to exceed the actual cost of reproduction.

## § 647 – Criteria

Fair treatment standards for crime victims in the courts shall provide that:

1. The court shall consider the views of the victim of a violent felony offense, a felony involving physical injury to the victim, a felony involving property loss or damage in excess of two hundred fifty dollars, a felony involving attempted or threatened physical injury or property loss or damage in excess of two hundred fifty dollars or a felony involving larceny against the person, or of the family of a homicide victim or minor child, regarding discretionary decisions relating to the criminal case, including, but not limited to, plea agreements and sentence. In addition, the court shall consider the views of the victim or family of the victim, as appropriate, concerning the release of the defendant in the victim's case pending judicial proceedings upon an indictment, and concerning the availability of sentencing alternatives such as community supervision and restitution from the defendant. The failure of the court to consider the views of the victim or family of the victim shall not be cause for delaying the proceedings against the defendant nor shall it affect the validity of a conviction, judgment or order.

2. The victims and other prosecution witnesses shall, where possible, be provided, when awaiting court appearances, a secure waiting area that is separate from all other witnesses.

3. The court shall assist in and expedite the return of property held for evidentiary purposes unless there is a compelling reason for retaining it relating to proof at trial.

4. Victim assistance education shall be given to judicial and nonjudicial personnel of the unified court system so that victims may be promptly, properly and completely assisted.

## § 648 – Review; Report and Implementation

1. The chief administrator of the unified court system shall review court practices, procedures, services, regulations and laws to determine the adequacy and appropriateness of its services with respect to crime victims, including victims with special needs, particularly the elderly, disabled or victims of child abuse, domestic violence or sex-related offenses. Such review shall include reasonable opportunity for public comment and consultation with crime victims or their representatives, and may include public hearings.

2. After the review, and not later than two hundred seventy days after the effective date of this section, the chief administrator of the unified court system shall submit a report to the governor and the legislature, setting forth the findings of the review, including a description of the services provided by the components of the unified court system and recommendations for changes in its procedures, services, regulations and laws to improve its services to crime victims and to establish and implement fair treatment standards for crime victims.

3. Subject to the direction of the chief administrator, the components of the unified court system shall expeditiously implement the recommendations of its report.

## § 649 – Miscellaneous

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 6 of 50

Nothing in this article shall be construed as creating a cause of action for damages or injunctive relief against the state or any of its political subdivisions or officers or any agency thereof.



**McKinney's Social Services Law § 483-aa**

**§ 483-aa. Definitions**

The following definitions shall apply to this article:

    (a) "Human trafficking victim" means a person who is a victim of sex trafficking as defined in section 230.34 of the penal law or a victim of labor trafficking as defined in section 135.35 of the penal law.



    (b) "Pre-certified victim of human trafficking" is a person who has a pending application for federal certification as a victim of a severe form of trafficking in persons as defined in section 7105 of title 22 of the United States Code (Trafficking Victims Protection) but has not yet obtained such certification, or a person who has reported a crime to law enforcement and it reasonably appears to law enforcement that the person is such a victim.

**§ 483-bb. Services for victims of human trafficking**

    (a) The office of temporary and disability assistance may coordinate with and assist law enforcement agencies and district attorney's offices to access appropriate services for human trafficking victims.

    (b) In providing such assistance, the office of temporary and disability assistance may enter into contracts with non-government organizations for providing services to pre-certified victims of human trafficking as defined in subdivision (b) of section four hundred eighty-three-aa of this article, insofar as funds are available for that purpose. Such services may include, but are not limited to, case management, emergency temporary housing, health care, mental health counseling, drug addiction screening and treatment, language interpretation and translation services, English language instruction, job training and placement assistance, post-employment services for job retention, and services to assist the individual and any of his or her family members to establish a permanent residence in New York state or the United States. Nothing in this section shall preclude the office of temporary and disability assistance, or any local social services district, from providing human trafficking victims who are United States citizens or human trafficking victims who meet the criteria pursuant to section one hundred twenty-two of this chapter with any benefits or services for which they otherwise may be eligible.



**§ 483-cc. Confirmation as a victim of human trafficking**

    (a) As soon as practicable after a first encounter with a person who reasonably appears to a law enforcement agency or a district attorney's office to be a human trafficking victim, that agency or office shall notify the office of temporary and disability assistance and

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 27 of 55
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 7 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 12 of 61

the division of criminal justice services that such person may be eligible for services under this article.

(b) Upon receipt of such a notification, the division of criminal justice services, in consultation with the office of temporary and disability assistance and the referring agency or office, shall make a preliminary assessment of whether such victim or possible victim appears to meet the criteria for certification as a victim of a severe form of trafficking in persons as defined in section 7105 of title 22 of the United States Code (Trafficking Victims Protection) or appears to be otherwise eligible for any federal, state or local benefits and services. If it is determined that the victim appears to meet such criteria, the office of temporary and disability assistance shall report the finding to the victim, and to the referring law enforcement agency or district attorney's office, and may assist that agency or office in having such victim receive services from a case management provider who may be under contract with the office of temporary and disability assistance, or from any other available source. If the victim or possible victim is under the age of eighteen, the office of temporary and disability assistance also shall notify the local department of social services in the county where the child was found.

## Statutes
**McKinney's Executive Law Ch. EIGHTEEN, Art. 23, Refs & Annos**

CROSS REFERENCES

Action against offender's estate; victim as creditor, see Civil Rights Law § 79-d.

Action by victim of criminal offense, time limits, see CPLR 213-b.

Compensation for crime victims, see Executive Law § 620 et seq.

Deaf victim, appointment of interpreter, see Judiciary Law § 390.

Dispositions of offenders, restitution and reparation, see Penal Law § 60.27.

Dispute resolution, notice and opportunity for victim to be heard prior to referral, see CPL 215.10; CPL 215.20.

Employer unlawfully penalizing victim witness, misdemeanor, see Penal Law § 215.14.

Forfeiture of proceeds of crime, see CPLR 1310 et seq.

Intimidation of victim, felony, see Penal Law § 215.15 et seq.

Judicial administration, chief administrator, see Judiciary Law § 212.

Mentally incapacitated defendant, notice to potential victim of release, see CPL 730.60.

Notice to crime victim of case disposition, see CPL 440.50.

Orders of protection for crime victims while action pending, see CPL 530.12; CPL 530.13.

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 28 of 55
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 8 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 13 of 61

Parole board, consideration of crime victim's statement, see Executive Law § 259-i.

Proceeds of crime, recovery by victim, see Executive Law § 632-a.

Released inmates; notification to victims and family members, see Correction Law § 149-a.

Restitution and reparation to crime victim, see Penal Law § 60.27.

OPERATION CREW CUT RESULTS

Page 1 of 2

This page is located on the NYC.gov Web site at
http://www.nyc.gov/html/nypd/html/pr/pr_2013_11_25_operation_crew_cuts_homicide_among_youth_in_half.shtml

FOR IMMEDIATE RELEASE
Monday, November 25, 2013

HOMICIDES AMONG VICTIMS AGE 13 TO 21 HAVE DECLINED 50% CITYWIDE

NYPD Credits Reduction to Operation Crew Cut; 21% Decrease In Homicides
and Shootings Overall

Strategic Enforcement Team in Brownsville, Brooklyn Identifies 20 Subjects
Being Indicted Today

Police Commissioner Raymond W. Kelly announced Monday that one year after the
implementation of the NYPD's "Operation Crew Cut," crime statistics show that homicides
among young people ages 13 to 21 – those who are most at risk of retaliatory street
violence such as that which Operation Crew Cut is designed to suppress – have fallen
50.6%, from 87 to 43 through November 24. Commissioner Kelly was joined at One
Police Plaza by Chief of Department Philip Banks III, Chief of Patrol James P. Hall;
Assistant Chief Gerald Nelson, the commander of Patrol Borough Brooklyn North; Deputy
Inspector Joseph Gulotta, the commanding officer of the 73rd Precinct in Brownsville;
Lance Ogiste, Counsel to the Kings County District Attorney; and Chief of the Kings
County District Attorney Gangs Bureau, Edward J. Carroll.

"Strategic enforcement and proactive policing combined with strong prosecutorial
partnerships, including attention to the new battleground of social media, have resulted
in lives being saved in New York City, mostly young minority men." Police Commissioner
Raymond W. Kelly said. "Additionally, shootings and homicides citywide, regardless of
victim age, are down 21% on top of 2012's record lows."

Commissioner Kelly said that since the establishment of Operation Crew Cut last October,
police and prosecutors have conducted 25 investigations throughout the five boroughs
resulting in more than 400 crew members indicted for crimes including murder,
robberies, assault, and weapons possession. Twenty subjects responsible for violence in
Brownsville's 73rd Precinct have been identified in indictments being unsealed in
Brooklyn today. The charges include the August 2012 shooting homicide of a 14-year-old
"ATC - Addicted to Cash" crew member, Ronald Wallace.

In 2011, about one-third of shootings in New York City were committed by young people
motivated by geographic turf or other street crew rivalry. In response, the Department
increased the number of detectives in its Gang Division and shifted investigative
attention to loosely organized crews, as well as partnered NYPD attorneys with Gang
Division investigators and their counterparts in the five District Attorneys' offices. A
Juvenile Justice Division was established within the Community Affairs Bureau and its
members have, along with helping to enhance investigations with insight gleaned from
open-source social media, held 'youth summits' to educate parents and guardians, school
personnel and other adults on signs of crew involvement or violent criminal behavior, and
ways to mitigate that.

At the precinct level, Strategic Enforcement Teams (SETs) were developed and deployed
to perform proactive, anti-crime patrol and in cases of established rivalries, to identify
and apprehend perpetrators and prevent further escalation between groups. Members of
the NYPD's Transit and Housing Bureaus were trained and dedicated to work closely with
investigators on cases. A disproportionate number of shootings occur in public housing
--- approximately one in five or 20% of violent crimes citywide, with only 5% of New
York City residents living in public housing.

Year to date, the Department also has recovered 2,657 guns, including from young men
originally stopped for infractions such as turnstile jumping . Five guns were recovered
from the subjects identified in Monday's case, including a loaded 22-caliber revolver from
a 14-year-old female crew member carrying it in her pocketbook this August.

# # #

VIDEO: «Commissioner Kelly Announces Operation Crew Cut, Oct. 2012»



## The New York Times

N.Y. / REGION

# A New Crackdown Yields 14 Indictments Against a Youthful Harlem Gang

By JOHN ELIGON   FEB. 16, 2011

All but one of the reputed gang members were born in the 1990s. The lone female among them was a student at Deerfield Academy, an elite Massachusetts prep school.

They were said to have hired young girls to carry their guns because the girls were less likely to be stopped and frisked by the police. And some of them allegedly continued to run their Central Harlem drug operation from behind bars, referring to their product with terms like "chicken" when they spoke to their associates over the phone.

That was how prosecutors on Wednesday described a gang called the 137th Street Crew, which they said ran a cocaine ring and used guns to protect their turf from rival gangs.

Manhattan prosecutors won indictments of 14 people they identified as members of the gang. Five of them were charged with first-degree conspiracy, which carries a maximum sentence of life in prison.

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 12 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 17 of 61    Page 2 of 3

14 Reputed Cocaine Sellers on a Harlem Block Indicted - The New York Times

Other charges included attempted assault and weapons possession. And prosecutors accused one of the alleged gang members, Jonathan Hernandez, of attempted murder involving a shooting last July.

The arrests were the first major roundup in an ambitious effort by Cyrus R. Vance Jr., the Manhattan district attorney, to try to take down, over the course of the next year, roughly 20 gangs that his office has identified.

Mr. Vance said that his office, working with the Police Department, had used new analytic tools that have allowed prosecutors to better identify gangs and connect different criminal acts to particular gangs.

"This is a measured, proactive, step-by-step approach to taking on violent hot spots throughout Manhattan," Mr. Vance said.

All but two of the defendants are in custody, and they were arraigned on Wednesday in State Supreme Court in Manhattan. Mr. Vance appeared before the judge for several of the arraignments, a rare step for a prosecutor with many assistant district attorneys.

The court entered not guilty pleas on the defendants' behalf.

This gang fits what prosecutors have called the new face of gangs in the city: young people, many still in their teens, organized by blocks, well armed and willing to protect their territory.

The 137th Street Crew operated "in the center of a cultural zone of Harlem," Mr. Vance said. Their turf was 137th Street between Adam Clayton Powell Jr. Boulevard and Lenox Avenue, the same block that the Abyssinian Baptist Church, Mother A.M.E. Zion Church and the Harlem Children's Zone Promise Academy are on.

Jaquan Layne, who prosecutors said was one of the leaders of the operation, continued to coordinate drug activity after he was jailed on Rikers Island in a different case.

"Just sit in front of the stoop in the morning," Mr. Layne, 20, told a co-defendant, according to an excerpt of their recorded telephone conversation cited in

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 13 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 18 of 61      Page 3 of 3

14 Reputed Cocaine Sellers on a Harlem Block Indicted - The New York Times

the indictment. "You catch all the morning flow, 'cause they'll all come see you, boom, boom, boom, 'cause that's the morning."

### Correction: February 23, 2011

An article on Thursday about indictments of reputed gang members in Harlem misstated the name of a church that is on the block where the gang allegedly operated. It is Mother A.M.E. Zion Church, not Mother A.M.E. Zion Baptist Church.

A version of this article appears in print on February 17, 2011, on page A29 of the New York edition with the headline: A New Crackdown Yields 14 Indictments Against a Youthful Harlem Gang.

© 2015 The New York Times Company



# How the NYPD is using social media to put Harlem teens behind bars

*The untold story of Jelani Henry, who says Facebook likes landed him in Rikers*

By Ben Popper on December 10, 2014 01:15 pm

**The Henry brothers**, Asheem and Jelani, were born exactly one year apart to the day, in the warm Junes of 1991 and '92. "I always felt there was something special about that," says their mother Alethia. "A little bit of magic." The two grew up together in their mother's small apartment on the corner of 129th Street and Malcolm X Boulevard in New York's Harlem neighborhood.

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 15 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 20 of 61

How the NYPD is using social media to put Harlem teens behind bars | The Verge                    Page 2 of 17

As young children, the brothers were good friends with kids from all over—but as they matured into adolescent young men, a set of once-invisible rivalries began to surface. The True Money Gang from the Johnson Houses was at war with the Air It Out crew from the Taft Houses. Crews from Grant and Manhattanville projects exchanged gunfire in the streets. As he grew up, Jelani looked forward to leaving the neighborhood for school, "So I didn't have to look behind my back every two seconds to see if someone about to bash me in the head," he says.

When Asheem was 13 and Jelani was 12, the Henry boys began running with a crew based on 129th Street between Fifth Avenue and Lenox. The Goodfellas was a clique that offered the boys camaraderie, cache, and protection from other crews. "If you in another crew's area, without your boys, those niggas will jump you," explains Asheem.

## THE MOUNTAINS OF DIGITAL MEDIA POSTED ONLINE ARE A TANGLED WEB OF CONNECTIONS

In November of 2011, the crew life caught up with them. Asheem was arrested on conspiracy charges as part of gang raid that targeted the Goodfellas. Five months later, Jelani was arrested and charged with a double attempted murder charge following a shooting in the neighborhood. Social media evidence was at the center of the older brother's case, and the the family says online activity figured into the arrest of the younger brother as well.

The story of the Henry brothers highlights a new reality for teenagers growing up at the intersection of social media, street gangs, and mounting law enforcement surveillance. For those coming of age in gang-saturated areas, the mountains of digital media posted online are a tangled web of connections that can be used to lock up violent perpetrators—but can also ensnare the innocent along with them.



Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 36 of 55
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 16 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 21 of 61



**Alethia Henry raised** her boys as a single mother, maintaining a steady job as a case manager for an organization supporting people with developmental disabilities. She made sure her two sons had a good education and wore the latest clothes. Her home was a welcoming place, and Asheem and Jelani's friends would gather at the Henry house to play video games and get a full meal. "My mom, she always opened the door to other kids," says Asheem. "She kind of made our place a safe space to hang."

As kids, the brothers felt comfortable walking the streets of their neighborhood—Asheem played pick-up basketball games at courts all around Harlem. But as the brothers turned 12 and 13, they became increasingly aware of a violent map of territories and rivalries. Jelani says that sometimes he was afraid to go to the grocery store. Certain friends the boys had known for years suddenly became enemies because of where they were from.

How the NYPD is using social media to put Harlem teens behind bars | The Verge

# THE BROTHERS BECAME INCREASINGLY AWARE OF A VIOLENT MAP OF TERRITORIES AND RIVALRIES

New York City's murder rate has been falling for two decades, recently hitting lows not seen since the 1960s. But that trend isn't true in Harlem, where gun violence began climbing during the boys' teenage years. At the heart of this violence was a back and forth cycle of vengeance between youth crews that exploded in number during the Henry boys teenage years.

Harlem, like many poor urban areas, had experienced its shares of notorious gangs like the Bloods and Crips. But the crews that the Henry boys grew up with were mostly small and local in nature, with no connection to a larger, national organization. Like an increasing number of such groups across the country, these crews consisted of a loose group of a dozen or so teens from the neighborhood. Sometimes they controlled nothing more than a single corner. "You could live on the east side of a project, and have problems with them dudes on the west side, one block away," says Asheem.

"You roll up to a spot with your boys, you wanna feel safe, you wanna impress the girls," he explains. Goodfellas was never meant to be a criminal organization — more of a neighborhood clique. But over time, the crew found itself in violent rivalries with other crews in the area. "The first time someone robbed me for my jacket, I let it happen," Asheem says. "The second time, I fought back and got my ass whooped. The third time, I got a weapon to defend myself."

Case 1:15-cv-05871-KPF  Document 41-2  Filed 01/03/17  Page 38 of 55
Case 1:15-cv-05871-KPF  Document 21-3  Filed 09/02/16  Page 18 of 50
Case 1:15-cv-05871-LAP  Document 16-2  Filed 05/09/16  Page 23 of 61

How the NYPD is using social media to put Harlem teens behind bars | The Verge



Source: Harlem Community Justice Center
(http://www.courtinnovation.org/sites/default/files/documents/Juvenile_Gangs_Needs_Assessment.pdf)

More so than his younger brother, Asheem fell deeply into the
Goodfellas crew and its conflicts. Jelani, meanwhile, managed to stay
removed from these local struggles. As a young teen, he began
attending Leake & Watts, a special needs school based in Yonkers,
outside the city. But as Asheem's younger brother, Jelani remained a
background member of the crew by default.

"I knew them all my life, and we always had each other's back.
Somebody mess with you, they mess with all, that was my perspective.
Just friends hanging out, chasing after girls," says Jelani. "I didn't think

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 39 of 55
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 19 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 24 of 61

of it as a gang. I thought of it as family." He was aware of the violence that the boys involved in, but says he never participated, save a few scuffles in the street. For the most part, Jelani says, "what they was doing, I wasn't doing."



*The Goodfellas. Jelani can be seen at top right*

**Like many teens,** the Henry boys were avid users of social media, posting content about themselves and their crew. They appeared in Goodfellas rap videos on YouTube, and had accounts on MySpace and Facebook where they appeared in Goodfellas jackets or in images tagged with "Goodfellas" and "GF." It was clear to both of them that the reputation they projected online was not just fun, but as critical to their safety as not walking alone at night.

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 40 of 55
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 20 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 25 of 61

How the NYPD is using social media to put Harlem teens behind bars | The Verge          Page 7 of 17

"The streets be watching, you know that saying?" says Asheem, a close friend of Jeff Lane, an assistant professor at Rutgers University in the School of Communication and Information who came to know the Henry boys well. Lane spent several years living in Harlem, working on violence prevention and writing about street life. Even good kids who prefer to spend time with family and in the classroom often find it necessary to act "hard," says Lane. In tough neighborhoods, displays of violence and bravado are not a choice, but a survival tactic. "Teenagers these days need to worry not just about how they act in real life, but also how they are perceived on the digital street."

For those not deeply involved in crews but who, like Jelani, were connected by family and proximity, the same kind of scrutiny applied. "People are looking to see how you respond," Jelani explains. There might be a fistfight, for example, and a video would be posted online to Facebook or YouTube. "If you don't 'like' that post," he says, "people are gonna ask you why."

**As crime in** New York City has fallen, law enforcement has focused on the pockets of violence that remain. Over the last five years, the New York City police department and Manhattan prosecutors office have ramped up their efforts to understand, oversee, and infiltrate the digital lives of teenagers from crime-prone neighborhoods like Harlem. They track the activity of kids through services like Twitter, Facebook, YouTube, and Instagram, going so far as to create fake accounts and spark online friendships to sidestep privacy settings. A recent indictment discusses activity of crew members as young as 10, and arrested several 15-year-olds following a four and half year investigation.

"We are coming to find you and monitor every step you take," Joanne Jaffe, the department's Housing Bureau chief, told *The New York Times* in 2013. "And we are going to learn about every bad friend you have."

*A music video by The Goodfellas*

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 41 of 55

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 21 of 50
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 26 of 61   Page 8 of 17

How the NYPD is using social media to put Harlem teens behind bars | The Verge

**THE VERGE**

In Harlem, the social media busts emerged around 2011 with a crack down of 14 crew members. Asheem's case followed shortly thereafter, with 19 defendants. In April of 2013, another Harlem raid took down 63 crew members. Many of these operations have been organized under the rubric of Operation Crew Cut, a police strategy combining a focus on crews and social media in an effort to curb gun violence.

The most recent Crew Cut raid took place this past June, just after dawn. Helicopters circled low over the Grant and Manhattanville housing projects in West Harlem. Hundreds of officers swarmed into the buildings as members of the press, tipped off beforehand, watched from the wings. In all, 103 defendants, many between the ages of 15 and 20, were indicted. (The word "Facebook" appears more than three hundred times in these indictments.) It was the largest gang raid in the history of New York City, part of an escalating pattern of mass arrests that used social media evidence and conspiracy statutes to arrest larger and larger numbers of defendants.

The district attorney leading the case accused rival crews who lived in the housing projects of two homicides and 19 non-lethal shootings, pointing to a wealth of evidence gathered from reviews of over 1 million social media pages where feuds played out. "IM GOOD BRO THEY SHOT ND MISS WE SHOOT TO KILL" read one Facebook message. "NOW IMAA REALII KILL SOMEONE" read another.

## "THE MIX OF SOCIAL MEDIA AND CONSPIRACY STATUTES CREATES A DRAGNET THAT CAN BRING ALMOST ANYBODY IN"

Though the New York City Police has declined to comment for this piece, in the past the department has touted Operation Crew Cut as a success. "Strategic enforcement and proactive policing combined with strong prosecutorial partnerships, including attention to the new battleground of social media, have resulted in lives being saved in New York City, mostly young minority men," former police commissioner Raymond Kelly said in a 2013 press release. The NYPD says statistics

How the NYPD is using social media to put Harlem teens behind bars | The Verge

**THE VERGE**

show that during the first year of Operation Crew Cut, homicides among young people ages 13 to 21 fell 50.6 percent in the areas targeted by the operation.

But critics say that while violence may have fallen, the number of arrests during each raid has not. "The mix of social media and conspiracy statutes creates a dragnet that can bring almost anybody in," says Andrew Laufer, a New York City attorney who has worked on numerous cases involving teenagers wrongly arrested by police. "It's a complete violation of the Fourth Amendment and the worst kind of big brother law enforcement." To build the case for the Harlem raid, police had begun social media surveillance of children well before they had built up a serious criminal record.

Affiliation with a crew, even a tangential one, can be a deciding factor in getting locked up. "I find it disturbing and scary," says Christian Bolden, a professor of criminology at Loyola University. "In many states, if police see you together with someone three times — and this can be in real life or in a picture they find online — that is enough to prove conspiracy. That puts the onus on young people to be smart and careful about who they are with and what they post. And if we know one thing about teenagers, it's that they are rabidly social and often quite reckless." It was this exact mix of neighborhood affiliations and social media that entangled the fates of the Henry brothers.

In 2008, **Asheem** was arrested for weapons possession. He had never fired the gun in question—the indictment showed that it didn't even work—but he admits to obtaining the weapon illegally. When I visited him at Elmira Correctional Facility, a maximum security four hours northwest of New York City where he was serving his sentence, he wore a dark green prison uniform and clean white sneakers. His hair was still in the stylish waves he was known for in Harlem. "I was running around with a gun because—not because I was a gangbanger," he says. "You get caught out your neighborhood, you get jumped."

**THE VERGE** "YOU NEED TO COME HOME," HIS MOTHER
TOLD HIM. "THE POLICE ARE LOOKING FOR
YOU."

Asheem pleaded guilty to the charge and got five years probation. Determined to fly straight, he kept a clean record after that, graduating high school and heading off to college at William Paterson University in New Jersey. As a freshman, Asheem had finally put some distance between himself and his troubled neighborhood. But in the week of his first midterm exams, his mother called him. "You need to come home," she told him. "The police are looking for you."

The 129th street indictment was one of the earliest in a string of cases that the Manhattan DA has brought against 16 crews in the last four years. These operations have leveraged the potent combination of social media evidence and conspiracy statutes. Asheem was charged with conspiracy in the third degree. The evidence was the gun charge to which he had already pled guilty, and photos, which he says dated back to the time when he was 14 and 15, showing him and other boys under the banner of Goodfellas.

*The Goodfellas. Jelani can be seen top right*

One image showed Asheem and friends at an older girl's Sweet Sixteen party — their arms draped over one another's shoulders. Alethia says the picture was used as evidence to show participation in a criminal conspiracy. His mother had been at the party as a chaperone. "I didn't see gangsters," she says, "I just saw some kids."

But even though these photos were posted online when Asheem was still a minor, they were fair game for the prosecutor when bringing charges against him as an adult. Along with his previous confession to the gun charge, it was enough to prove he belonged to a violent crew. "So I asked them, 'Yo, is that no form of double jeopardy?' And they said, 'No, because you pled guilty to the weapon, it opens up [the conspiracy charge],'" recalls Asheem. "And because you got pictures

**THE VERGE**

with these other guys, they're saying you guys all knew what was going
on.

# "I DIDN'T SEE GANGSTERS," HIS MOTHER SAYS. "I JUST SAW SOME KIDS."

"We were just young dumb kids running around, and we just happened
to run under the one name," he tells me. "There wasn't no hierarchy,
there wasn't order." But the nature of some conspiracy statutes,
especially when defendants are identified as gang members, doesn't
require that teens be aware of a specific plan or crime in order to be
found guilty.

According to Chris Lawson, a prosecutor in San Diego, three
ingredients must be present to bring a conspiracy charge against gang
members in his state: knowledge of a gang's criminality, active
participation in the gang, and intent to further the gang's overall goals.
Prosecutors can glean evidence for all of this off social media. "If you
go out and represent yourself as a members of the Crip killers, and if
shortly after you make threats online, a Crip is killed—even though we
don't know who pulled the trigger—we can hold you legally responsible
for conspiracy to commit those murders."

Alethia says that in Asheem's case, the judge told him he was looking
at a possible sentence of 15 to 30 years. It was a frightening length of
time that convinced Asheem to take a plea deal that could range from
16 months to 4 years instead. While he was incarcerated, the police
matched his DNA to another gun recovered near the scene of a gang
altercation. Though this gun was operable and loaded, it had not been
used in a murder or violent conflict. But Asheem, knowing his record
would look bad before a judge, decided to take another plea, adding
six more years onto his current sentence. He is now scheduled for
release in 2017.

*Photo taken by local event company at a Sweet Sixteen party. Asheem is farthest left*

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 45 of 55
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 25 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 30 of 61

How the NYPD is using social media to put Harlem teens behind bars | The Verge          Page 12 of 17

**THE VERGE**

Had it not been for the social media evidence, it's likely Asheem would not have been pulled into the conspiracy indictment. California has introduced a new law that would allow teenagers to wipe clean their online presence when they turn 18, erasing youthful indiscretions. And in Europe, major governments have forced Google to remove links that users feel keep them unfairly associated with their past. But for now, in most US states, social media creates a time capsule that can come back to haunt you. Asheem was a minor during the period when the pictures were taken. But when the conspiracy indictment came down, he was old enough to be charged as an adult.

## IN MOST US STATES, SOCIAL MEDIA CREATES A TIME CAPSULE THAT CAN COME BACK TO HAUNT YOU

Individuals who work closely with at-risk youth in Harlem and strive to keep them out of the prison system admit that the surveillance of social media and operations like Crew Cut are a necessary response to gun violence among youth. "Nobody wants to see 14- and 15-year-old kids getting locked up," says Chris Watler, Project Director at the Harlem Community Justice Center. "But if a kid is picking up a gun, or shooting other kids, we need to stop them from doing that. If you have a kids posing online with a gun, what is the obligation of law enforcement? There is a legitimate public safety concern."

To his family and friends, Asheem's case is tragic. They saw a a high school graduate and aspiring college freshman, a young man who had pled guilty to his crime and then tried to leave that life behind. But belonging to the Goodfellas was also a crime—and Asheem was admittedly guilty of it. He would become among the earliest of more than 300 crew members who have been convicted over the past four years by the Manhattan DA on conspiracy charges.

But what happened next came as a shock: the police came for Jelani as well.

*A line up of suspects in Jelani's case. Jelani is at bottom right.*

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 46 of 55
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 26 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 31 of 61     Page 13 of 17

How the NYPD is using social media to put Harlem teens behind bars | The Verge

**THE VERGE**

Five months after Asheem's indictment, in April of 2012, the police arrested him at his girlfriend's home in the Bronx. At first he thought it was for something minor: he had jumped a subway turnstile earlier that year and failed to show up in court for his summons. But he quickly learned that he was under arrest for two counts of attempted murder and other charges.

A few weeks prior, a girl had been spit on by members of a local Harlem crew. The next day, someone shot the spitter and his friend in retaliation. The gunfire broke out in front of Kings Deli on 129th Street and Frederick Douglass Boulevard, two blocks west of the Henry household. Jelani, the police said, matched an eyewitness description of an individual fleeing the scene: a tall, light-skinned black male.

In the interrogation room, two detectives grilled Jelani about Goodfellas gang rivalries in the area. "All my friends are in jail," he told them. "I don't hang out with nobody."

## "ALL MY FRIENDS ARE IN JAIL," JELANI TOLD THE POLICE. "I DON'T HANG OUT WITH NOBODY."

Jelani had never been convicted of a crime, but at the arraignment, the District Attorney's office described him as a known member of a violent gang. As evidence, Jelani and Alethia say, she pointed to posts about Goodfellas that he had "liked" on Facebook. The judge denied Jelani bail, instead sending him to Rikers Island, one of the nation's most notorious jails. The district attorney offered him 20 years if he pled guilty, but Jelani refused. He was certain that a trial would prove his innocence. Days went by, then weeks, months, a year. The trial never came.

During the time he was imprisoned, the DA refused to share almost all the evidence with Jelani or his lawyer. He had no access to the testimony or physical evidence against him and therefore no way to argue that his indictment and detention should be overturned. What little his lawyer did know showed the case to be a shaky one. Two men

How the NYPD is using social media to put Harlem teens behind bars | The Verge

**THE VERGE**

were seen running from the scene of the shooting. One eyewitness said a dark-skinned man held the gun. Another said it was the light-skinned man. An eye witness picked Jelani out of a lineup, but another failed to do so.

"Because of them pictures, the DA said I was affiliated, that I know what's going on in the hood," Jelani remembers. On Facebook, Jelani had appeared in pictures with the crewmembers, and he had liked images linked to Goodfellas on Facebook. Again and again, Jelani says, the district attorney pressed him to take a plea bargain, pointing to the evidence on social media. But he refused. "Those are people I would call my friends, but what they was doing, I wasn't doing. To her, I'm part of them. I'm a monster."

## IN A BIT OF KAFKA-ESQUE ARITHMETIC, 19 MONTHS BECAME 83 DAYS

Every so often Henry would be shuttled to the courthouse in Manhattan, and every time, the district attorney delayed the start of the trial. In New York, a defendant is entitled to a trial, and a felony suspect is supposed to be freed on bail after six months without one.

But the district attorney convinced a judge that most of the time Jelani spent in jail shouldn't count towards that release. She argued that days spent gathering more evidence, delays in testimony by a police officer who was on vacation, or instances where she was unprepared to make her case did not figure into the six-month period. The judge agreed. In a bit of Kafka-esque arithmetic, 19 months became 83 days. Instead of finishing trade school, Jelani celebrated his 20th and 21st birthdays in a cell.

Because of the serious charges and the assertion that the crime was gang-related, Jelani was kept in the George R. Vierno Center, among the most violent housing facilities at Rikers Island. There he was forced into close proximity with inmates from rival areas of Harlem, leading to several fights. The violence changed him. "My experience on Rikers

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 28 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 33 of 61

How the NYPD is using social media to put Harlem teens behind bars | The Verge    Page 15 of 17

**THE VERGE**

Island, that's when I had to show, like not just be myself," he says. "I had to act beast."

Jelani fought with other inmates and was was punished with solitary confinement. "I did nine months straight in the box," he remembers. That meant 23 hours a day in a 6 x 8 foot cinder block room, his meals pushed through a slot in the door. "For a while, I kind of lost my mind in there."

Henry said he struggled at times to avoid taking the guilty plea. "I'm like, God's not listening to my prayers." Thinking of his brother's plea helped him to stay strong. "I knew sooner or later, [God's] gonna be like, aight, you suffered enough."

Meanwhile, the district attorney kept dragging her feet. "She definitely thought we would crack if she kept him up in Rikers long enough," says Alethia. But Jelani and his mother refused to cut a deal. "They took one of my boys, but you can't have them both," she says.

Alethia finally convinced her lawyer to file a speedy trial motion and in November of 2013 Jelani was given bail. Four months later, with no move by the DA to proceed, his case was finally dismissed, almost two years to the day it began. The DA has refused to share the document that outlines the reason for dismissing Jelani's case with him or his lawyer. To date, there has been no explanation and no apology for Jelani's detention.

## "THEY TOOK ONE OF MY BOYS, BUT YOU CAN'T HAVE THEM BOTH."

**After leaving Rikers,** Henry moved in with his grandmother in West Harlem. He has tried to steer clear of old neighborhood conflicts. "My head is all over the place these days," he says, walking along Harlem River Drive.

Gone is the skinny kid who appears in Goodfellas group photos on MySpace. He is a young man now, with a mustache goatee and a layer of muscle he put on in prison. "I want to be a DJ, a bartender, maybe

How the NYPD is using social media to put Harlem teens behind bars | The Verge

**THE VERGE**

write a book. I just feel like I'm making up for the lost time, and there is nothing more I could do." He hopes to return to school, this time for a degree in automotive repair.

As for social media, and socializing in general, he says he mostly avoids it. "I prefer to just be in the house, not do nothing, be bored out my mind, instead of being outside and being a part of something, which I'm not really." He is hypervigilant about what he posts and what pictures he appears in, but says he doesn't think the big takedowns of crews have changed the behavior of the average Harlem teenager. "People post things just to get likes to be popular," he says.

Because Jelani's case was dismissed, the Manhattan District Attorney legally cannot discuss it in any way. But the office stands by the work it has done on social media and the cases it prosecuted based on Operation Crew Cut raids.

"When we first start, a crew might have hundreds of people in it. We then start to narrow, and we focus, like a laser, the worst of the worst," says Chief Assistant District Attorney Karen Friedman Agnifilo. "We are very careful to make sure that we have evidence that we can prove at trial, that these weren't just kids who like to hang out with the gang [but] members who are really a part of the violence."

Jelani's case wasn't caught up in one of the big conspiracy indictments — his was one ripple farther out from those takedowns. While she wouldn't discuss Jelani directly, Agnifilo spoke in broad terms about the risk-and-reward dynamic of this new style of policing. "With big gang raids, there is collateral damage that spills over and affects the families," she says. "The criminal justice system is not the answer. This is a social and economic issue. But when there is violence, we are prosecutors, and there are only so many options."

Unfortunately, Henry's troubles from the arrest aren't over. He is now facing assault charges stemming from a fight in prison. "He was innocent when he went in there, and now he might come out with a charge for defending himself," says Alethia. His family plans to sue the

How the NYPD is using social media to put Harlem teens behind bars | The Verge

city over his arrest and to have the charges stemming from his time in Rikers.

**THE VERGE**

Alethia is committed to getting his story out there because she believes the policies of police and prosecutors have to change. "Jelani was brought in over nothing. Because he was Asheem's brother. Because he was friends with people from the hood on Facebook." Well before the arrest of either boy, she had gone to the local police, begging them to intervene in the deadly neighborhood conflicts. "We asked for help, and we got an indictment instead," she says sitting in her kitchen, tears wetting her eyes. "People don't understand why it's so dangerous to put yourself out there on social media. You know what my son is guilty of? Being born on 129th Street."

*Photography by Bryan Derballa*

*Map by Ryan Mark and Josh Laincz*

*Additional reporting by Chaim Gartenberg*

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 32 of 50

Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 37 of 61

GF2 8/2002

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of a Family Offense Proceeding

| | | File #: | 132891 |
| | | Docket #: | O-10874-10 |

Kelly Cathleen Price,

Petitioner,                                **SUMMONS**

- against -

Raheem Powell,

Respondent.

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK:

> To:   Raheem Powell
>       315 West 116th Street #3B
>       New York, NY 10026

A petition under Article 8 of the Family Court Act having been filed with this Court, and annexed hereto

YOU ARE HEREBY SUMMONED to appear before this court on

| | |
| --- | --- |
| Date/Time: | January 24, 2011 at 9:15 AM |
| Purpose: | Return of Process |
| Part: | 5 |
| Floor/Room: | Floor 8 South/Room PT 5 |
| Presiding: | Hon. Lori S. Sattler |
| Location: | 60 Lafayette Street |
| | New York, NY 10013 |

to answer the petition and to be dealt with in accordance with the Family Court Act.

On your failure to appear as herein directed, a warrant may be issued for your arrest.

Dated: November 22, 2010                    Evelyn Hasanoeddin, Clerk of Court

NOTICE: Family Court §154(c) provides that petitions brought pursuant to Article 4, 5, 6, 8 and 10 of the Family Court Act, in which an order of protection is sought or in which a violation of an order of protection is alleged, may be served outside the State of New York upon a Respondent who is not a resident or domiciliary of the State of New York. If no other grounds for obtaining personal jurisdiction over the Respondent exist aside from the application of this provision, the exercise of personal jurisdiction over the respondent is limited to the issue of the request for, or alleged violation of, the order of protection. Where the Respondent has been served with this summons and petition does not appear, the Family Court may proceed to a hearing with respect to issuance or enforcement of the order of protection.

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 53 of 55
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 33 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 38 of 61

F.C.A.§§ 812, 818, 821                                                8-2 09/2009

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of a Family Offense Proceeding          File #:     132891
                                                      Docket #:   O-10874-10
Kelly Cathleen Price,

                              Petitioner,             **FAMILY OFFENSE**
    - against -                                       **PETITION**

Raheem Powell,

                              Respondent.

TO THE FAMILY COURT:

The undersigned Petitioner respectfully states that:

I, Kelly Cathleen Price reside at[1] 237 West 120th Street #1, New York, NY 10027.

The Respondent, Raheem Powell resides at 315 West 116th Street #3B, New York, NY 10026.

The Respondent and I are related in the following way: I had a intimate relationship (former dating) with the Respondent.

The Respondent committed the following family offenses against me and/or my children which constitute attempted assault, assault in the second or third degree, aggravated harassment in the second degree, harassment in the first or second degree, disorderly conduct, menacing in the second or third degree, reckless endangerment, and criminal mischief.

The most recent incident was on November 11, 2010 at home of the Petitioner. Petitioner states that the Respondent choked her until she passed out and pushed her through a fish tank (causing severe cuts and blood loss). Petitioner states that she has to go to the hospital for stitches in her rear due to the above incident. Petitioner states she was and beaten by the Respondent's mother on 11/17/2010 (she was arrested 11/22/10). Petitioner states that the Respondent has made death threats against her and his family has caused her bodily harm.

I have not filed a criminal court complaint concerning these incidents, but Petitioner states that she has filed numerous complaints against the Respondent.

I have no minor children and there are no other minor children living in my home.

The Respondent owns or has access to guns as follows: Petitioner states that the Respondent owns and/or has access to guns and knives.

---

[1]If your health or safety or that of your child or children would be put at risk by disclosure of your address or other identifying information, you may apply to the Court for an address confidentiality order by submitting General

Case 1:15-cv-05871-KPF   Document 41-2   Filed 01/03/17   Page 54 of 55
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 34 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 39 of 61



Page: 2 of 2
Docket No: O-10874-10
8-2

The Respondent has the following criminal convictions: **Petitioner states that the Respondent has been arrested in the past for selling narcotics.**

I have not made any previous application to any court or judge for the relief requested in this petition.

WHEREFORE, Petitioner respectfully requests this Court to:

- adjudge the Respondent to have committed the family offenses alleged;
- enter an order of protection, specifying conditions of behavior to be observed by the Respondent in accordance with Section 842 of the Family Court Act:
  - **Petitioner is requesting an Order of Protection to keep the Respondent away from her, her home, her pets, and to stop the Respondent from harming, harassing, menacing, calling, any 3rd party and electronic contact, and threatening the Petitioner in any way;**
- order such other and further relief as the Court deems just and proper.

**Dated:** November 22, 2010

Kelly Cathleen Price, Petitioner

VERIFICATION

STATE OF NEW YORK)
                              :ss:
COUNTY OF NEW YORK)

Kelly Cathleen Price being duly sworn, says that he/she is the Petitioner in the above-named proceeding and that the foregoing petition is true to his/her own knowledge, except as to matters stated to be alleged on information and belief and as to those matters he/she believes them to be true.

Kelly Cathleen Price, Petitioner

Sworn to before me on
November 22, 2010

Chief Clerk or Designee
Notary Public