DECEMBER 18, 2015

My name is Mark Christopher LaRocca. I worked as a Lieutenant in the New York City Police Department from 1997 to 2013 assigned to the 028 Precinct in Manhattan. Circa 2010 and 2011, I had several conversations with Ms. Kelly Price in which she claimed to be a crime victim, specifically a victim of domestic violence.

During my interviews of Ms. Price, I found her allegations of abuse, to be credible and with merit. I felt there was sufficient evidence to prepare Complaint Reports to document these allegations which would then be further investigated by the Precinct Domestic Violence Officer and/or the Precinct Detective Squad.

After speaking with the Detectives regarding Ms. Price's allegations, I was informed that prior to a report being further investigated, a phone call to someone in the Manhattan District Attorney's Office who was familiar with Ms. Price's history of reporting crimes needed to be consulted.

Ms. Price informed me that she felt this hindered her ability to receive fair treatment regarding the investigation of her complaints. I informed her that as a victim, she should speak with the supervisor of the person at the Manhattan District Attorney's Office handling her complaint if she felt her complaints were being stonewalled and not acted upon in a fair manner.

MARK C. LaRocca

Mark C. LaRocca

July 30, 2015

Miss Kelly Grace Price
534 w 187th st #7
New York, NY 10033
Graciegracie212@gmail.com
646 676 1940

Lt. Larocca
c/o Lieutenant's Benevolent Association
Woolworth Building
233 Broadway
ste. 1801
New York, NY 10279
VIA FAX 212.964.4240

Dear Lt. LaRocca

I hope you remember me from 2011-2012 when you worked at the 28th pct. If you recall I came to the NYPD with complaints of violent physical, mental and economic abuse as well as complaints of being trafficked by my intimate partner at the time: Raheem Andre Powell.

As Mr. Powell was assisting the MDAO and their "Crew Cut" team in clearing out "gangs" from upper Manhattan my complaints were never investigated and I instead was falsely arrested on hundreds of counts of alleged harassment against Mr. Powell and thrown in Rikers Island where I miscarried my baby. After over two years I managed to out-maneuver the mewling ingénues at the MDAO and win a FULL DISMISSAL of all bogus charges against me. I am STILL however on a "DO NOT SERVE" list kept by the NYPD and the MDAO and am still being denied police assistance.

I have partnered with Sanctuary for Families, the largest advocacy group for DV and trafficking victims in the country and am bringing a Federal class-action lawsuit against the NYC, the NYPD, and the MDAO for blatantly denying me my due process rights, infringing my freedom of speech, denial of equal protection, abuse of process, malicious prosecution and for illegally seizing and searching me (my phone is STILL being monitored by the NYPD).

FIVE Other women in NYC have been subsequently raped, sexually assaulted, stalked and masturbated on by at least one man who assaulted me on 7/28/2012 because the NYPD and MDAO refused to investigate my complaint of assault against him because ADA Strohbehn placed me on a "do not serve" list and instructed the precinct to not help me. In fact, all other crimes this creep committed against other women of Gotham happened AFTER he was apprehended and released and told basically: "its your word against hers" by the 20th pct who arrested him on resisting arrest, disorderly conduct and felony assault of a police officer charges a month after his assault on me (the DA instructed him to be only charged on the DO offense and he was given a desk appearance ticket, NOT arrested for his assault against me a month prior, and released out the back door of the 20th pct). So this person, Rami Baly, went on to continue his crime spree against women because he had been given the green light to do so by the city because of their animus towards me. Maybe you can verify what I say is true by looking up SOME of his charges for crimes against other innocent women:

| Case # | Defendant | Summons # | Appearance Date | Court | Judge | Part |
|--------|-----------|-----------|-----------------|-------|-------|------|
| 2013NY031505 | Baly, Rami | | 08/07/2013 | New York Criminal Court | | A |

Case 1:15-cv-05871-KPF   Document 41-3   Filed 01/03/17   Page 3 of 60

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 38 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 43 of 61

| | | | | A |
|---|---|---|---|---|
| 2013N Y0491 35 | Bal y, Ra mi | 08/07 /2013 | New York Criminal Court | |
| 2013C N0003 47 | Baly, Rami H | 08/02 /2013 | New York Criminal Court | |

I had attained a restraining order from the Family Court in Judge Lori Sattler's part as per your instructions in Oct/Nov of 2010 and thus the City of New York had a SPECIAL RELATIONSHIP with me and had promised me protections and police services. Lt. Larocca: if you had not instructed me to do this my case would be MUCH weaker right now because of precedents set in the cases of Riddick and MacLean that state that the NYPD does not HAVE to give assistance UNLESS there is a pre-existing promise to protect or special relationship between the victim and the city. I am ETERNALLY GRATEFUL TO YOU FOR THIS STEWARDSHIP AND ADVICE.

I need your assistance in proving that ADA Maria Strohbehn instructed you at the precinct to not investigate my claims of battery and trafficking and to not give me any assistance unless pre-approved by the MDAO. Please can you contact me to discuss this and other affidavits I need from you. I know what happened to me sat hard in your heart. I know you know the law, which mandates investigations and procedure to be followed when a complainant asserts certain types of crimes have been committed against them. Both McKinney's Crime Victim's Statutes and the NYPD handbook call for procedures and investigative mandates to be followed in situations such as I presented that were blatantly ignored.

I also know that the reason that my batterer was given special treatment and that I was thrown under the bus is that ADA Strohbehn and her "Crew Cut" team needed his assistance in making major cases against gangs in Harlem. My batterer was shot in front of the 28th precinct by an armed assailant who had been attempting to rob his weed spot on w 120th st. in December of 2010. That shooter turned out to be a young teen member of a mid-Harlem Gang centered around 137th st. He was apprehended and charged with attempted murder. Strohbehn and her team needed my batterer to cooperate with their investigation into his gang ties. Following, as I had been actively trying to make complaints against him for his violent abuse the only alternative Strohbehn had if she wanted to keep her case alive and turn the shooter into an informant by offering him a lower plea in exchange for intel about his gang was to paint me as a fabricator in order to deny me police services and protections in order to protect my batterer and keep him cooperating.

This scheme is not only highly illegal but if left unchecked is a TEMPLATE for future prosecutors and police to utilize in similar situations. I know you don't wish for part of your legacy with the NYPD to be that of creating a cookie-cutter template for re-victimizing women already horribly victimized and abused. I know the person you are and all the things you did to try to help me and I need your help Lt. Larocca. Please reach out to me ASAP. I need someone from the precinct to aver that Strohbehn instructed the 28th precinct/NYPD not to respond to my complaints or take me seriously and to label me as "crazy" alternatively. This action was blatantly against my Constitutional Rights to equal protection under the law, not to be illegally searched and seized, not to be unusually punished, et al.

I know this much and so do you. My case is VERY strong but I need this piece from you Lt. Please reach out to discuss what you can do to help. I've come a VERY long way in rebuilding my life since I last saw you in late 2012/early 2013 (I HAVE TAKEN THE LSAT AND AM APPLYIN TO LAW SCHOOL THIS FALL SO I CAN SPEND MY LIFE HELPING OTHER VICTIMS WHOSE LIVES HAVE BEEN FELLED

BY SECONDARY VICTIMIZATION) but my life is still very very different from the way it was before my batterer. I need you to help me bridge the gap between who I was and who I am now. Please Lt; I'm begging you not to ignore me. Prosecutors should not be allowed to over-rule the judgment of experienced Police in the name of case-building (and career-building too!).

Lastly, remember please that I am a survivor of 9/11 and that I deserve to live a life in NYC free from continuous retribution from law enforcement and denial of services. I deserve to be protected and to feel safe here. I am a FOURTH GENERATION daughter of the city of New York and no little mewling ingénue imported for service by the MDAO from Maryland who has NOT a CLUE about the intricacies of city living and the special mysteries of Harlem has the right to take this away from me. Strohbehn already has taken everything from me: my reputation, my career, my unborn child, my sense of place and pride in the world, my friends and family. Please don't let her have the last word Lt. Larocca: pretty please I know you can help me.

Humbly,
Kelly

http://www.nytimes.com/2014/12/07/magazine/cyrus-vance-jrs-moneyball-approach-to-crime.html?_r=0

Magazine

# Cyrus Vance Jr.'s 'Moneyball' Approach to Crime

By CHIP BROWNDEC. 3, 2014

Photo



Cyrus Vance Jr. Credit Lee Friedlander for The New York Times

Advertisement

Advertisement

Continue reading the main story

Continue reading the main story Share This Page

- Email
- Share
- Tweet
- Pin
- Save
- more

Continue reading the main story

A glance at New York City crime statistics might lead you to conclude that Cyrus Vance Jr., the district attorney of New York County, no longer works in what William Travers Jerome, who held the job more than a century ago, once called "the mouth of hell." Nowhere have declining crime trends been more striking than in Manhattan, where last year burglaries, shootings and murders were the lowest since the city began keeping formal records in the early 1960s; so far this year, statistically speaking, the epidemic of civility rages on. It's still a shock — where did Gotham go, the dangerous dark of nighttime Central Park, the East Village addicts brandishing box cutters, the cardsharps and sallow denizens of Times Square, which now seems overrun by Elmo impersonators and wide-eyed naïfs in fanny packs?

## Stories from Our Advertisers

- 
- 
- 
- 

Continue reading the main story

## Related Coverage

- 



### New York Initiative to Help Other Cities Clear Rape-Kit BacklogsNOV. 12, 2014

- 

### Cyrus R. Vance Jr. Found Own Way to Manhattan District Attorney's OfficeDEC. 27, 2009

- 



Case 1:15-cv-05871-KPF   Document 41-3   Filed 01/03/17   Page 8 of 60
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 43 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 48 of 61

# Vance Is Winner in Primary Vote to Replace MorgenthauSEPT. 15, 2009

Vance is the fourth elected district attorney in 75 years to head what has been hailed as the model ministry of criminal justice since the arrival in 1935 of Thomas E. Dewey, who made a name for himself as the Gangbuster and established the office's tradition of nonpartisan professionalism. He was succeeded by Frank S. Hogan, Mr. Integrity, who served for 32 years and stepped aside in December 1973, just three months before his death. After a special election, Robert M. Morgenthau, a former federal prosecutor from the Southern District of New York, began his 35-year reign. At the time, Morgenthau recalled recently, crime was "endangering the economic and social viability of the city." He added dozens of detectives to the staff, boosted salaries and hired accountants to tackle white-collar crime. One of his major innovations was to "vertically integrate" prosecutions so that one assistant D.A. handled a case from arraignment to trial. There were 648 murders in Manhattan in the first year of Morgenthau's tenure; in 2009, when he retired, there were 59.

## Continue reading the main story

'The question I had when I came in was, Do we sit on our hands waiting for crime to tick up, or can we do something to drive crime lower?'
Campaigning on the themes of enhancing safety and fairness, and lifted by Morgenthau's endorsement, Vance won a three-way primary race for the D.A.'s office in 2009 and then carried the general election. In November 2013, he was re-elected with only token opposition. With violent crime at historic lows since its peak in the early 1990s, you might think being D.A. today is an afternoon nap compared with when Dewey was tilting at municipal corruption and trying gangsters like Lucky Luciano; or when Hogan was courting controversy with prosecutions of Lenny Bruce and antiwar demonstrators at Columbia University; or when Morgenthau was running the show with civil society hanging by a thread.
And to be sure, at the start of his second term in January, Vance was still intent on answering the questions he confronted when he first sought the job of overseeing 535 lawyers in the mouth of hell (which even with the recent renovations is still suffused with the purgatorial gloom of Manhattan's massive Criminal Courts Building, where most of the offices of the D.A. are housed and where a power failure caused by a hurricane can produce a Dickensian tableau of prosecutors handwriting charging documents by candlelight). In an era of low crime, what was the job of the D.A.? Who was to say the city couldn't be any safer, or what anti-crime ideas and utopian dreams were too far-fetched to pursue?
Advertisement

## Continue reading the main story

In 2010, at the start of his first term, Vance drew up a list of 20 things to do; four years later he had checked them all off, except for learning Spanish. He helped create a new court that offered alternatives to prison for mentally ill defendants whose crimes might have stemmed from treatable conditions. He set up a "conviction integrity program," which reviewed innocence claims in more than 160 cases and vacated four convictions. He pushed to raise the age of criminal responsibility to 18 — New York and North Carolina are the only states that treat 16-year-olds as adults. He lobbied for the New York's All Crimes DNA law, which doubled the kinds of crimes for which DNA evidence could be collected. He focused on crimes where the numbers in New York were going the wrong way: computer fraud, identity theft, abuse of the elderly and domestic violence. He reorganized office units and bureaus and shaved nine hours off the time between arrest and arraignment, freeing up cops who used to have to wait so long to give statements that they would sometimes bring lawn chairs to the intake area in order to have a place to sit. Drunken-driving dismissals, according to the D.A.'s office, are down 81 percent; cases tossed because prosecutors violated speedy-trial rules were down 91 percent. Felony conviction rates, which were lower in Manhattan in 2009 than in the other four boroughs, now trailed only the conviction rate in Queens.
But Vance's most significant initiative, one that has been emulated in jurisdictions from Brooklyn to San Francisco, has been to transform, through the use of data, the way district attorneys fight crime. "The question I had when I came in was, Do we sit on our hands waiting for crime to tick up, or can we do something to drive crime lower?" Vance told me one afternoon in his eighth-floor office at the Criminal Courts Building in Lower Manhattan. "I wanted to develop what I call intelligence-driven prosecution."

Preparing to run in 2009, Vance studied "community-based prosecution" programs in Washington and consulted with experts in Milwaukee and San Francisco. The concept of expanding prosecution strategies to address neighborhood concerns emerged in the early 1990s as prosecutors and police departments grappled with an epidemic of violence, drug abuse and "quality of life" issues. Inspired by "broken windows" policing strategies advocated by William J. Bratton, who at the time was head of the city's transit cops and is now the New York City police commissioner, D.A.s began to prosecute offenses once considered small potatoes. The iconic example in New York was the campaign against the "squeegee men" cleaning car windshields when drivers were trapped in traffic.

The community focus was effective as far as it went, but there had been a revolution in the use of data over the last 20 years in areas as disparate as retailing, baseball and, in the prime example of the N.Y.P.D.'s CompStat program, policing; Vance thought prosecutors should get in on it. He sat down with a whiteboard, a cup of coffee and one of his first hires, an imaginative, dark-haired lawyer named Chauncey Parker, 54, who started his career under Morgenthau, spent a decade as a United States attorney and now, as Vance's executive assistant D.A. for crime-prevention strategies, had the job of dreaming up ideas, no matter how outlandish, that might reduce crime. It was glaringly evident to both men that assistant D.A.s fielding the 105,000-plus cases a year in Manhattan seldom had enough information to make nuanced decisions about bail, charges, pleas or sentences. They were narrowly focused on the facts of cases in front of them, not on the people committing the crimes. They couldn't quickly sort minor delinquents from irredeemably bad apples. They didn't know what havoc defendants might be wreaking in other boroughs.

Advertisement

## Continue reading the main story

By May 2010, Parker and Vance had roughed out the structure of the so-called Crime Strategies Unit (C.S.U.). They divided Manhattan's 22 police precincts into five areas and assigned a senior assistant D.A. and an analyst to map the crime in each area. C.S.U. staff members met with patrol officers, detectives and Police Department field intelligence officers. They asked police commanders to submit a list of each precinct's 25 worst offenders — so-called crime drivers, whose "incapacitation by the criminal-justice system would have a positive impact on the community's safety." Seeded with these initial cases, the C.S.U. built a searchable database that now includes more than 9,000 chronic offenders, virtually all of whom have criminal records. A large percentage are recidivists who have been repeatedly convicted of grand larceny, one of the top index crimes in Manhattan, but the list also includes active gang members, people whom the D.A. considers "uncooperative witnesses," and a fluctuating number of violent "priority targets," which currently stands at 81.

But assembling data was meaningless without a timely way of distributing it. In-house software programmers made key refinements to what is now considered the nerve center of the office, the Arrest Alert System. When someone in the Arrest Alert System is picked up, even on a minor charge or a parole violation, or is arrested in another borough, any interested prosecutor is automatically pinged with a detailed email. People outside the D.A.'s office like parole officers or police intelligence officers are often notified, too. The database can be programmed to send arrest alerts for a particular defendant, a particular gang, a particular neighborhood or housing project, and can be sorted to highlight patterns of crime from bike theft to homicide.

"These are people we want to know about if they are arrested," says Kerry Chicon, who started as the Crime Strategies Unit prosecutor in Area 3 and was promoted to C.S.U. chief in January. "We are constantly adding, deleting, editing and updating the intelligence in the Arrest Alert System. If someone gets out of a gang, or goes to prison for a long time, or moves out of the city or the state, or ages out of being a focus for us, or dies, we edit the system accordingly — we do that all the time."

Chicon, a 43-year-old mother of four, usually starts her morning reviewing the night's haul of 30 to 35 arrest alert emails as she drops her kids off at school. "C.S.U. prosecutors don't have to try cases — our job is to help assistant district attorneys understand whom they are prosecuting," she says. "Every morning, I talk to my five A.D.A.s, who are experts in their areas. We decide whom we should try to pull out for a debriefing. We don't debrief people arrested for felonies because we don't want to compromise a case. We pull people arrested on low-level misdemeanor charges, maybe two or three a week. We read them their Miranda rights. About 80 percent of them will talk. If you speak to a 16-year-old, they might tell you, 'This kid is running things, this kid is a hanger-on.' That's how we find out information like whether a gang has changed their name. We took down the Flow Boyz gang at the Robert F. Wagner housing project in 2012. But a lot of those gang members have aged out, and now there's a new group of 14- and 15-year-olds who want their own set name. Through debriefings, we learned they call themselves Only the Wagner."

Case 1:15-cv-05871-KPF   Document 41-3   Filed 01/03/17   Page 10 of 60

Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 45 of 50
Case 1:15-cv-05871-LAP   Document 16-2   Filed 05/09/16   Page 50 of 61

Advertisement

Continue reading the main story

The Arrest Alert System was the first of four programs created or tweaked by the C.S.U. using a combination of in-house technology and commercial software. The DANY (the District Attorney of New York) InPho program analyzes recorded inmate phone calls from Rikers Island. SCIM (the Surveillance Camera Interactive Map) shows the locations of and contact information for some 6,000 public and private surveillance cameras in Manhattan, making it possible for prosecutors to know whom to call at the 109th Street and Madison Avenue Dunkin' Donuts if they want to see what was recorded on the camera behind the cash register.

C.S.U. "violence timelines" reveal patterns around certain housing developments and neighborhoods, including shooting incidents that didn't generate a police report but that prosecutors were able to substantiate through debriefings or reports on social media. Probably the most comprehensive database is the Crime Prevention System, which targets violent crimes and gathers on one spreadsheet the sort of information that used to be scattered on legal pads or parked in some retired detective's head — details about a defendant, including nicknames, which can be linked to additional information: friends, tattoos, telltale scars, Facebook entries, geo-coded street addresses, debriefing tips, excerpts from jailhouse phone calls.

Photo



Cyrus Vance Jr. (a future Manhattan district attorney) and Sr. (a future secretary of state). Credit Photograph from the Vance Family

"It's the 'Moneyball' approach to crime," Parker told me. "The tool is data; the benefit, public safety and justice — whom are we going to put in jail? If you have 10 guys dealing drugs, which one do you focus on? The assistant district attorneys know the rap sheets, they have the police statements like before, but now they know if you lift the left sleeve you'll find a gang tattoo and if you look you'll see a scar where the defendant was once shot in the ankle. Some of the defendants are often surprised we know so much about them."

In speeches praising intelligence-driven prosecution, Vance often cites the case of a 270-pound scam artist named Naim Jabbar, who for more than a decade made a living in the Times Square area bumping into pedestrians and then demanding money, saying they had broken his glasses. Convicted 19 times on the misdemeanor charge of "fraudulent accosting," Jabbar never served more than five months in jail until he was flagged by the C.S.U. His next arrest, in July 2010, triggered an alert. Instead of being offered a plea bargain, he was indicted and subsequently convicted on a felony robbery charge, and sentenced to three and a half years to seven years in prison. With time served before his conviction, he was soon paroled and then arrested again, in July 2014, for another broken-eyeglasses incident and charged with robbery and grand larceny.

More broadly, working with the Police Department and following a plan based on information developed by the C.S.U., the Violent Criminal Enterprises Unit, which Vance created in his first term, began taking down the most violent of Manhattan's roughly 30 gangs; since 2011, 17 gangs have been dismantled, including three broken up last June at the Manhattanville and Grant housing projects, resulting in the largest number of gang indictments in a single operation. "There's a reason murders in Manhattan went from 70 in 2010 to 29 so far this year," Karen Friedman Agnifilo, former chief of the Trial Division, told me late last year. (In January, Vance promoted Friedman Agnifilo to the No. 2 job, chief assistant district attorney.) "We figured out who are the people driving crime in Manhattan, and for four years we focused on taking them out."

Advertisement

## Continue reading the main story

**One evening shortly** before Vance won his second term, I locked the only bicycle I haven't had stolen in New York to a No Parking sign in front of a restaurant in the East Village and lugged the front wheel inside, where Vance was nursing a club soda at the bar. "You're afraid of being robbed while having dinner with the district attorney?" he said. "That's an insult to me!"

Vance, now 60, is said to be funny in private, but as the white hat of moral order in Manhattan, he makes no apologies for his public persona, which is earnest, thoughtful, buttoned up and not unduly colorful. Not really colorful at all, in fact. He has a halting speaking style and the subdued manner of a man constrained by temperament, training and the peculiar fetters of his public duty.

"I would be more interesting to the newspapers if I showed up at crime scenes in a yellow coat barking orders into a two-way wrist watch," Vance told me. "But that's not me."

Vance was born in New York, the youngest of five siblings. His mother, Grace Sloane, who was called Gay, grew up dressing for black-tie dinners on the Philadelphia Main Line in the socially prominent family that founded the W. & J. Sloane furniture business. His father, Cyrus Roberts Vance, was born in West Virginia, where the idyll of his childhood ended at 5 when his father died of pneumonia. Vance's parents were both public-minded. His mother served as president of the New York Urban League. His father, after Yale, Yale Law School and a stint in the Navy, shuttled from a partnership at the prestigious law firm Simpson Thacher & Bartlett to various posts under three United States presidents and emerged as an icon of the Eastern establishment — a lawyer-counselor-diplomat who, after three years as secretary of state, resigned without fanfare in 1980 when President Jimmy Carter, against Vance's advice, authorized the ill-fated attempt to rescue the American hostages in Tehran.

Cy Vance Jr. grew up among the elite of Washington after the family moved to the capital from the Upper East Side in 1960. His father took him fishing at Camp David. He spent the night at the White House and met President Lyndon B. Johnson when he was 12. He followed his father to Yale, where he studied American history. Determined not to become a lawyer, he peddled oil-marketing services in West Africa. He wasn't very good at it, and after five years he reconciled himself to his father's profession, enrolling at the Georgetown University Law Center. He graduated in 1982, shortly before his 28th birthday. Robert M. Morgenthau liked to say he had one rule — "never do a politician a favor"— but he hired his share of celebrity lawyers' sons, and Vance landed a coveted assistant D.A. position. He was assigned to Trial Bureau 80, where the halls were piled with cardboard boxes and the blue carpet underfoot was so memorably gross that Vance was given a framed swatch of it as a keepsake when it was finally replaced.

"That time was the wild west," recalled Jeffrey Schlanger, Vance's chief of staff, who got to be friends with him when they worked together in the Rackets Bureau. "The crack epidemic was going. Arraignments had a feeling of controlled chaos. I remember one mentally ill defendant pulling feces out of his pants. Every day was a scramble. We were learning things they didn't teach in law school."

Advertisement

## Continue reading the main story

Trials were what appealed to Vance — the strategies, the characters, the drama of verdicts, the satisfaction of knowing his work mattered. He handled cases from murder to art theft to animal cruelty and made friends with people you don't normally see at Yale reunions. He loved getting up in the middle of the night to inspect crime scenes with detectives from the robbery squad. "We focused on pattern robberies," he recalled, "like the guys who specialized in shotgun stickups of Häagen-Dazs stores."

After six years, Vance was ready to get out from under the shadow of his father's fame. Against the advice of his dad, who said he was "waving the white flag" on his career, he found a job as an associate at Culp Dwyer Guterson & Grader in Seattle, where he moved with his wife, Peggy McDonnell, whom he'd

married in 1984. He proved adept at white-collar criminal defense work, eventually made partner and then seven years later left to start his own firm. "He was *the* criminal lawyer in Seattle," recalled Robert Sulkin, a founding member of McNaul Ebel Nawrot Helgren & Vance. "When you got into trouble, you called Cy Vance."

Vance handled most of the firm's criminal work, taking cases that political opponents would later try to use against him, like his defense of Joseph Meling, an insurance salesman convicted of killing two people in an attempt to cover his tracks after trying to poison his wife with cyanide-laced Sudafed. Years at the defense table underlined for Vance some of the prosecutor's powers. "The philosophy I have about law enforcement — enhancing public safety while enhancing fairness — didn't come from my father, and it didn't come from reading or professors in law school," Vance said. "It came from years of practical experience as a prosecutor and a defense attorney."

On trips back East, Vance would call on Morgenthau. In January 2002, his father died after a long decline. Two years later, with their children, Simon and Clare, on the brink of high school, and Vance's mother and his sister Amy debilitated by illness, Peggy thought it was time to come home. With the help of Morgenthau and Eliot Spitzer, then the New York State attorney general, whom Vance met in the Rackets Bureau, Vance landed a job in New York as a partner at a boutique white-collar firm, Morvillo Abramowitz. He had been back in the city a year or so when he confided to his wife that he was thinking of running for Manhattan district attorney if Morgenthau retired. His political résumé at the time consisted of passing out fliers for Lyndon Johnson and a couple of days of advance work for Gary Hart's unsuccessful presidential bid in 1984.

## Continue reading the main story

'We figured out who are the people driving crime in Manhattan, and for four years we focused on taking them out.'

**So numerous were** the stumbles in Vance's first term that for a while it looked as if he might not have the luxury of a second. At one point the Data D.A. had a far more formidable reputation on the Facebook pages of East Harlem gangs than he did in the New York press. The New York Post labeled him, "Soft Cy," "Manhattan's hapless district attorney" who learned to fight crime in the "espresso bars of Seattle."

Advertisement

## Continue reading the main story

"Cy's first 18 months in office were so bruising that having no opposition for re-election was something I never expected even a year ago," says Linda Fairstein, a former Manhattan sex-crimes prosecutor and Vance adviser. The nadir of his rookie woes came in August 2011, when the sex-crimes prosecution of the French politician Dominique Strauss-Kahn collapsed. It's hard to imagine Vance will ever again find himself in a maelstrom like the drama of Strauss-Kahn and the Sofitel housekeeper Nafissatou Diallo: 19 New York Post cover stories; writhing news-media scrums outside the Criminal Courts Building; armchair prosecutors dissecting how the green D.A. and his mismanaged minions were in over their heads. Kenneth Thompson, who at the time was the attorney for Diallo and now is the district attorney in Brooklyn, tore into Vance in front of TV cameras: "If the Manhattan district attorney, who is elected to protect our mothers, our daughters, our sisters, our wives and our loved ones, is not going to stand up for them when they're raped or sexually assaulted, who will?" (Many months later, when Thompson was preparing to run for public office himself, Vance says Thompson privately apologized. Thompson says that he did call to say he shouldn't have said Vance was afraid to try the case, but that that didn't constitute an apology.) I asked Vance what he would do differently if he could replay those tumultuous weeks. "I probably would handle it exactly the same way," he said after a long pause.

Nothing different?

"I would like to have had the time the federal government has between arraignment and indictment. By law we have six days. Federal prosecutors have 30. That forced everybody to make rapid decisions. But I think at every stage we made the best decisions we could."

Even Vance's wife, Peggy, who had joined us for dinner, wondered if he wouldn't change his approach. "I would probably move more slowly if I had to do it again," he conceded. "But what went right in DSK — although others might not see it this way — is that when we assessed the information we had that undermined the case, we didn't hide it. I look at the DSK case as a paragon, because we absolutely believed this poor woman should be believed over this powerful man, and when additional facts came out, we were willing to show them to the defense."

Vance critics have generally been focused on less sensational issues, questions of policy and priorities for which they find the D.A.'s leadership wanting. Did the Manhattan D.A., they ask, really need to set up a two-year study with the Vera Institute of Justice to realize the criminal-justice system was plagued by racial bias? And in light of its entrenched inequities, aren't databases and targeted intelligence-based prosecution especially problematic?

Continue reading the main story

## Recent Comments

### psqm

December 6, 2014

kudos cy vance. it's not the change in the economic make up of manhattan that has brought crime down, the rich don't move into rough...

### EMJ

December 6, 2014

the only reason Vance's office had to indict DSK in six days was that it would not consent to release him on bail (which happened later). ...

### EuroAm

December 5, 2014

Perfection: An admirable yet unobtainable goal...

- See All Comments

"When prosecutors begin to compile databases and start doing so-called 'smart prosecutions,' you have to ask who is getting in the databases, what are the criteria and where are the outside checks?" says Steven Zeidman, director of the criminal-defense clinic at the CUNY School of Law. "More than a thousand people are arrested in N.Y.C. each day, and the overwhelming and disproportionate number of them are people of color arrested for 'broken windows' type offenses like riding a bike on the sidewalk or jaywalking. I was in court with a kid arrested for jaywalking; the arresting officer was from the gang unit, and he stopped the kid because he was wearing a red shirt that, according to the police, happened to be a gang color. He wasn't in a gang, but he's probably now in a database."

Advertisement

Continue reading the main story

Vance has also been criticized for shrinking from leadership on the issue of marijuana arrests in the city. In recent years, tens of thousands of New Yorkers — a vast majority of them blacks and Hispanics — have been arrested for small amounts of marijuana after being searched under the Police Department's now-scaled-back stop-and-frisk policy. Marijuana offenses were the top arrest category for the entire program in 2012, according to a study by the New York chapter of the American Civil Liberties Union. Vance has long supported reforming the penal code to treat small amounts of pot "in public view" as a violation resulting in a fine rather than a misdemeanor, which might lead to a jail sentence and a criminal record. But his office has declined to prosecute just under 7 percent of the 54,000 misdemeanor pot arrests in Manhattan since 2009, and it was Vance's old antagonist, the Brooklyn district attorney Kenneth Thompson, who declared his office would no longer prosecute such cases.

Vance's efforts to make prosecutors smarter — "to play offense instead of defense," as he has said — depend on what he calls "extreme collaboration" with the Police Department, cooperation that has increased notably since the arrival in January of William Bratton as police commissioner. Prosecutors say they now have access to precinct-level commanders they almost never had before. The complicated anti-gang cases mounted in Manhattan — like the one at the Manhattanville and Grant housing projects last June, which resulted in 103 arrests — were built by teams from the D.A.'s office working hand in glove with the investigators from the police and the city's Department of Correction. But critics argue that in doing so, prosecutors risk becoming extensions of the police force.

"Prosecutors are supposed to be the gatekeepers to the criminal-justice system," Zeidman told me. "They should maintain a healthy distance from the police so they can evaluate the constitutionality and appropriateness of what the police are doing. If they had been fulfilling that function all along, we might

never have had scandals like the rampant Fourth Amendment violations uncovered in the federal stop-and-frisk litigation."

Continue reading the main story

'When prosecutors begin to compile databases and start doing so-called ''smart prosecutions,'' you have to ask who is getting in the databases, what are the criteria and where are the outside checks?'

It's hard to know how much one person or policy can affect the crime rate, and consequently how much credit or blame should be assigned when things go well or don't. Evaluations of anti-crime measures often conflate cause and correlation. The sun comes up, the roosters preen. Raymond Kelly, the former New York City police commissioner, once said that taking credit for a decline in crime is like taking credit for an eclipse, but he, too, was quick to attribute auspicious trends to his department's strategies and tactics. The N.Y.P.D.'s seminal crime-mapping methodology CompStat surely made cops more effective and helped reduce crime, and yet crime began its epic decline in 1990, four years before CompStat was implemented. For years Kelly and former Mayor Michael Bloomberg insisted the city's stop-and-frisk program was the key — but then, as opponents asked, why did crime continue to go down even when stop-and-frisk was curtailed by public pressure in 2012?

Advertisement

Continue reading the main story

Apart from effective police work, studies have attributed the decline in violent crime to a confounding hash of variables: demographic trends, fashions in drug abuse, a surge in public-housing programs, the proliferation of surveillance cameras, decreases in lead toxicity, increased incarceration rates (and paradoxically in recent years, increased prison discharge rates), even the availability of abortion. Morgenthau credits the pivotal role of the district attorney, noting Manhattan had 39 percent of the city's homicides when he took office and only 12 percent in the year before he finished — evidence to him of the difference a D.A. makes given that the city's boroughs all have the same police force. In his final report, he tartly observed that the 90 percent decline in murders in Manhattan during his tenure was "not due simply to the dawn of gentler times."

But of course gentler times were something to hope for and to cultivate if possible. Vance pressed the point to his staff: Their pole star wasn't convictions but safety, a goal as readily attained by preventing crime as by prosecuting it. With asset-forfeiture money seized from drug dealers, Vance has opened 10 Manhattan gyms that would otherwise be closed on weekends and started sports programs for 11-to-18-year-olds called Saturday Night Lights. The community-affairs unit hired professional sports trainers to run drills and academic advocates to work as tutors and mentors and to keep track of how the players are faring in school. "We ask ourselves, Are we doing everything possible to reduce crime?" Chauncey Parker says. "If an overwhelming number of Rikers Island inmates don't have high-school diplomas, maybe we should be finding ways to help people stay in school and graduate. It seems obvious, but it's not until someone starts doing it."

Parker challenged C.S.U. prosecutors to come up with their equivalent of the Apollo moon project. Their answer was reforming public housing in the city, including the Polo Grounds, St. Nicholas and Wagner developments, and they are drawing up plans with the expectation that they can drive down crime.

A number of other cities and states are studying how the Manhattan D.A. has developed and deployed data. At a February 2013 conference in Miami, Kerry Chicon and David O'Keefe, then the C.S.U. chief, received numerous requests for meetings after their presentation on the Arrest Alert System. Philadelphia now has a rudimentary intelligence system modeled on Manhattan's C.S.U. So does the Delaware Department of Justice. "The Manhattan C.S.U. prosecutors spent a day with us, going over intelligence-driven models and how they analyzed cases," says Kathleen M. Jennings, the state prosecutor and head of the criminal division. "We developed an arrest-alert system that identified 50 high-risk offenders. In May we created our crime-strategies unit. Wilmington has one of the highest violent-crime rates in the country, but 1 to 2 percent of the people are doing 70 percent of the crimes. We've taken dozens of high-risk offenders off the street."

Advertisement

Continue reading the main story

Advertisement

Continue reading the main story

When he took office in 2011, District Attorney George Gascon of San Francisco was shocked by the paucity of data-informing prosecutions. "It wasn't even a bell that was being rung," says his chief of staff,

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 1 of 66

Cristine Soto DeBerry. "We spent a day in Manhattan learning the ropes of how they used data, and Kerry Chicon came and spoke to our board of supervisors. It's very clear to our D.A. that we are overincarcerating, and we need to do something different. Jail is not an economically sustainable model. We need to know for whom jail is appropriate and whom it isn't. That's where data becomes very useful."

In some ways it may be easier to be the district attorney of Manhattan in an era when New Yorkers aren't so inclined to do terrible things to one another. And yet the Manhattan D.A.'s office still handles more cases than the entire United States Department of Justice. Vance's predecessors didn't have to cope with the terabytes of digital evidence now central to many prosecutions, or with malign enterprises particular to our time, like cybercrime (200 to 300 complaints a month in Manhattan alone) and lone-wolf terrorism. Vance was especially frustrated that his office had been unable to stem the upsurge in domestic violence. While the index felonies were going down, misdemeanor arrests in Manhattan were going up. And arrests for grand larceny, many of which involved iPads and iPhones, were running counter to the positive crime trends.

"I don't want to be known as the D.A. whose main mission was reducing property crime, but it is important we excel even in these kind of cases," Vance said. "The bar Bob Morgenthau set when he left was very high. It's my job to raise it."

It was almost midnight, and he was sitting in a pub in Chelsea reflecting on his first four years on the job. The supporters who helped him secure another term had gone home. "So," asked his wife, Peggy, "what three things have you learned about yourself?" Vance gazed at her evenly, well aware of the perils of domestic cross-examination. "You just have to be honest," she said.

"I'm thinking," he said, looking, for a moment, as if he would rather be coping with the recent outbreak of mold at their country house.

"Cyrus has always been a question to himself," Peggy said to me. "The things that should make him happy didn't make him happy. He's never had the ability to separate himself from his work."

Jimmy Zaccari, a detective on Vance's protection detail, was waiting outside in a black Suburban to drive the couple home. It was a quiet night, except for the cry of far-off sirens. Changed as it might be, Manhattan was still the place where Jose Pimentel plotted to terrorize New Yorkers by detonating pipe bombs, and Corey Dunton stands accused of firing a gun at skaters in Bryant Park, and Cesar Lucas raped a woman on the West Side. It was still the place where, among thousands of nonviolent but still disgraceful affronts to the civility of city life, Dr. Lawrence Levitan stole insurance money from a hospital and Naim Jabbar wrung cash from people for eyeglasses they didn't break. It was still the place where even a Times Square Elmo impersonator had been jailed for harassment and extortion. Gentler times in Manhattan? Maybe someday — but not tonight. Sirens in the night meant cases in the morning.

## Correction: December 7, 2014

An article on Page 22 this weekend about Cyrus Vance Jr., the district attorney of New York County, describes incompletely a shooting incident at the Bryant Park ice rink in November 2013 and misspells the given name of a man charged with shooting skaters. He is Corey Dunton, not Cory, and he has pleaded not guilty and is awaiting trial; it has not been established that he "fired a gun at skaters." In addition, the article misstates the length of time that Robert M. Morgenthau served as district attorney of New York County. It was 35 years, not 34.

Adam Gargani

To Whom It May Concern:

This reviews a phone conversation I had with the New York City's District Attorney's Office.

On February 2 of 2011 I received a voicemail message from Maria Strohbhen stating she was from the District Attorney's Office and was calling as part of a matter she was handling with one of my tenants, and requested a return call, which I did.

The matter involved Kelly Price who was my tenant at that time at 237 West 120th Street, #1 New York, NY 10027 from July of 2007 to August of 2013.

Miss Strohbhen had several questions to ask me concerning events that had taken place at the building. Specifically these involved incidents where the police had been called and other events that involved altercations between Ms. Price and a man.

Miss Strohbhen asked me about my knowledge of these events. In both the structure of the questions and the inflection with which these were asked, it was apparent that the purpose was to question whether these events happened, and as it was directly communicated to question whether Ms. Price had been telling the truth, which she posed was not the case.

I informed Miss Strohbhen that I was aware of issues taking place by reports from my other tenants as well as conversations with Ms. Price. I told Miss Strohbhen that although I did not have any direct knowledge of what took place since I did not live at the building, and was not present when they occurred, I also had no reason to question the veracity of either the reports from my other tenants or Ms. Price.

I would characterize the reaction of Miss Strohbhen to my responses as frustrated or annoyed.

She indicated that she was dealing with Ms. Price and was looking to assemble information that refuted claims that Ms. Price had made. She suggested that Ms. Price had been making false statements. I told Miss Strohbhen that I although I

could not comment on any specific event on the basis of other than what I had been told, that in my dealings with Ms. Price as a tenant in general I had no reason to presume that her claims, or the reports of my other tenants, were less than the truth.

The names of other tenants or neighbors were not requested

Miss Strohbhen gave me the impression she was less than satisfied with the outcome of her call and ended it abruptly.

Sincerely,

Adam Gargani

Landlord and Owner of 237 West 120th Street, NY NY 10027

EVergreen 9- Corporation
267 Carleton Avenue
Suite 202
Central Islip, NY 11722

347 237 0100

8 October 2013

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 6 of 66

Elizabeth Walker
235 West 120th Street Apt 2
New York, NY 10027
(917) 575-9600

April 22, 2014

To Whom It May Concern:

I was one of Kelly Price's neighbors when she lived at 237 West 120th Street. I have lived at 235 West 120th Street for five years. I am an attorney and have been a member of the New York State Bar for over seven years.

During the course of our relationship as neighbors and eventually as friends, Kelly shared with me the trouble she had obtaining police assistance from members of the 28th Precinct on multiple occasions when she had been attacked by people in our neighborhood, including her ex intimate partner, Raheem Powell. I did not witness the events or attacks Kelly described to me, but throughout 2011 and 2012 she would cry and talk to me whenever she was assaulted. Kelly believed the women who assaulted her were associated with either her ex, his alleged drug dealing associates or his childhood cronies. Kelly was particularly dismayed that the police refused to take her reports, follow up on assaults against her person, or regard her as a member of society needing protection in general. She told me that officers in the precinct told her that the district attorney's office had instructed them not to assist her. Candidly, I did not entirely believe that the police would refuse Kelly, and I suspected that she was omitting some dispositive reason why the police were reluctant to intervene on her behalf against her various alleged attackers.

On the evening of October 18, 2012, Kelly called me crying and asking for my help. I observed her distraught and injured after she said she had been assaulted in broad daylight on the corner of our block, at 120th Street and St. Nicholas Avenue, at approximately 5:30 p.m. while she was en route to her home from the 125th Street subway. I observed that she was disheveled, her stockings were torn and her knees and hands were bruised and bloodied. Kelly was nearly hysterical, and I had to calm her down and give her medical assistance. Kelly related that a purported heroin dealer named Willy who was known to many residents in the neighborhood (he purportedly operated his business from a visible stoop on Saint Nicholas Avenue) had "jumped" her and hit her in the face, spit at her and pushed her onto the sidewalk, all the while screaming insults at her. I do not recall what Kelly said she said to him before or after the attack, but I do recall that she said she did not provoke him or retaliate against him physically. I took pictures of Kelly and her wounds, and encouraged her to call 911 for assistance in reporting the crime. Kelly stated that she already had called the 28th Precinct and that a patrol car had been sent to the scene of the assault. Kelly said that when the officers arrived they refused to take her report and called her crazy. Kelly also stated that she had then walked to the precinct, three blocks away, for help and had been rebuffed by the desk sergeant, who Kelly said ridiculed and mocked her.

Case 1:15-cv-05871-KPF   Document 41-3   Filed 01/03/17   Page 22 of 60
Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 7 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 1 of 71

Page 2 of 2

Notwithstanding her story that she had sought police intervention earlier that day, I insisted that she call 911 again and report the chain of events. She complied.

Eventually another patrol car arrived in front of our building. Two police officers, whom Kelly has since reminded me were named P.O. Longo (shield # 31565) and P.O. Walker, related to us that they were instructed by the station's desk sergeant not to take Kelly's reports. P.O. Walker stated that the District Attorney's office had instructed the precinct not to respond to any of Kelly's calls. I recall being genuinely shocked and outraged to hear this instruction, and further surprised that a young woman, like P.O. Walker, would be tasked by her superiors with being complicit in a practices that left a domestic violence victim without recourse for protection. At this juncture, I introduced myself as an officer of the court and member of the NY State Bar, and reminded the officers of their legal and ethical responsibilities to provide complainants with police services. I recall that the officers responded more favorably to me than they did to Kelly, but I could not discern whether this was the case because I notified them that I am an attorney, or because I'm just someone other than Kelly Price. P.O. Walker stated that she would take basic information about the incident, but she believed that once the precinct began to process the event, it most likely would be "circular-filed" in the trash bin. P.O. Longo gave Kelly an incident ID slip and told her to follow up with the precinct in a few days, then both officers left. I was then, and remain, dumbfounded by what I witnessed transpire that evening.

As a single young woman living and working in NYC, it unsettled me that the police could be so cavalier about Kelly Price's safety. Kelly has since told me that the complaint number she was given months later when she inquired as to why no one had ever followed up with her about the incident was 2012-28-005194. Kelly also informs me that the detective squad at the 28th Precinct closed her incident report without contacting her either to identify the perpetrator of the attack or review the emergency room reports or follow-on orthopedic assessments describing Price's injuries resulting from the attack.

Please feel free to contact me concerning these events.

Sincerely,

Elizabeth Walker

Marilyn Benetatos
231 West 120th Street
N.Y. N.Y. 10027
(212) 663-5372 (home)
(347) 203-2623 (cell)

3 – 24 - 2014

To whom it may concern:

I was a neighbor of Kelly Price when she lived at 237 West 120th Street. I am a manager in Con Edison where I have worked for over 26 years. I have approximately 70 employees in my chain of command. I lived on the street for over 12 years, walk my dog every day and know and get along with my neighbors.

In the spring and summer of 2011 and later in 2012, there were some problems on the street related to young teenagers from other blocks hanging out on 120th street vandalizing cars, the school yard, fighting in the streets and being somewhat threatening to others. As a result, a group of us from the block attended monthly meetings at the police station to make our issues known there and to get further on-going support from the police and the community officer. The police were very helpful, offered a lot of support and worked with us and the principal at the local school and facilitated the problem going away.

After the formal meeting, the head of the station, Captain Rodney Harrison, invited attendees to speak with him personally about issues of concern. I went up to him after one of these meetings and asked him why more was not being done to help Kelly Price, who everyone knew was being battered. I was concerned because the young teenagers seemed to be learning the wrong thing from the situation. At that time, Captain Harrison told me that he had never seen anything like it, but he/the police were told to not respond to Kelly Price without the direct instruction of the District Attorney's office. He said it was strange but indicated that, to some extent, his hands were tied.

I found his response really surprising, so it stood out in my mind. I don't remember when or in what circumstances I came to be telling Kelly Price the details of my interaction with Captain Harrison.

Please feel free to contact me, should I be able to assist you further.

Sincerely,

Marilyn Benetatos

*Marilyn Benetatos*

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 9 of 66

Marilyn Benetatos
231 West 120th Street
N.Y. N.Y. 10027
(212) 663-5372 (home)
(347) 203-2623 (cell)

To whom it may concern:

I was a neighbor of Kelly Price when she lived at 237 West 120th Street.  I am a manager in Con Edison where I have worked for over 26 years.  I have approximately 70 employees in my chain of command.  I lived on the street for over 12 years, walk my dog every day and know and get along with my neighbors.

In the spring and summer of 2011 and later in 2012, there were some problems on the street related to young teenagers from other blocks hanging out on 120th street vandalizing cars, the school yard, fighting in the streets and being somewhat threatening to others.  As a result, a group of us from the block attended monthly meetings at the police station to make our issues known there and to get further on-going support from the police and the community officer.  The police were very helpful, offered a lot of support and worked with us and the principal at the local school and facilitated the problem going away.

After the formal meeting, the head of the station, Captain Rodney Harrison, invited attendees to speak with him personally about issues of concern.  I went up to him after one of these meetings and asked him why more was not being done to help Kelly Price, who everyone knew was being battered.  I was concerned because the young teenagers seemed to be learning the wrong thing from the situation.  At that time, Captain Harrison told me that he had never seen anything like it, but he/the police were told to not respond to Kelly Price without the direct instruction of the District Attorney's office.  He said it was strange but indicated that, to some extent, his hands were tied.

I found his response really surprising, so it stood out in my mind.  I don't remember when or in what circumstances I came to be telling Kelly Price the

details of my interaction with Captain Harrison.

Please feel free to contact me, should I be able to assist you further.

Sincerely,

Case 1:15-cv-05871-KPF   Document 41-3   Filed 01/03/17   Page 28 of 60
Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 12 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 6 of 71

The New York Times |

N.Y. / REGION

# In Conspiracy Trial, a Query: What, Exactly, Is a Gang?

By JOHN ELIGON   OCT. 11, 2011

From a telephone on Rikers Island, an inmate barked out his orders to a man in Harlem, prefacing them with an explanation.

"Yo, there's money out there right now," the inmate, Jaquan Layne, said. "Go outside."

The man on the other end of the line, Jeffrey Brown, turned to the others inside the Harlem apartment and echoed Mr. Layne's orders: "He said there's money out there right now. Go to the block."

There were other directives: Mr. Brown should collect some money from a woman named Gloria, and if she asked any questions, she should be told that Mr. Brown was "taking care of this now" because Mr. Layne was locked up. Another man in the apartment, Habiyb Mohammed, was asked to monitor the others because they were "new at what they're doing right now, so, like, keep them on point."

This recorded phone call and dozens of others between Mr. Layne and his friends form the central issue in a trial in Manhattan that might at first seem simple: What is a gang?

To Manhattan prosecutors, a gang is a structured criminal organization, and Mr. Layne's worked together as a drug-selling enterprise that defended its turf, a block of 137th Street, with violence.

Harlem Drug Conspiracy Case Is Heading to Jury - The New York Times

But to the lawyers for Mr. Layne and four co-defendants, the group, while perhaps selling drugs, was anything but a structured trafficking enterprise.

The trial began three weeks ago and is expected to go to the jury on Wednesday.

The defendants, portrayed by prosecutors as gang leaders, are Mr. Layne, 21; his brother Jahlyl, 18; Mr. Brown, 20, who is a cousin; Mr. Mohammed, 31; and Jonathan Hernandez, 19. Jahlyl Layne is charged with second-degree conspiracy. The other four are charged with first-degree conspiracy, which carries a maximum sentence of life in prison.

The prosecutors, who must prove that the defendants agreed to commit a crime and took steps to do so, are using the recorded telephone conversations to illustrate what they say is the behind-the-scenes planning and structuring of a drug organization.

Conspiracy charges are generally difficult to prove, legal experts said, but they offer prosecutors a great reward: they can bring down multiple defendants at once and wipe out entire pockets of crime.

Karen Friedman Agnifilo, chief of the trial division in the Manhattan district attorney's office, speaking generally about gangs and not about the case currently on trial, said, "They might not be as structured or organized, but they're not less violent." She added, "We're focusing on violence."

She said Cyrus R. Vance Jr., the Manhattan district attorney, emphasized a holistic approach in which the office not only prosecuted violent groups, but also promoted community-building activities to help keep young people away from crime.

Law enforcement authorities said that modern-day gangs in New York City shared several characteristics: members tend to be young, under 20; they are territorial, attaching themselves to a specific block or housing project; they are well armed and instantly violent. Some gangs simply exist to fight other gangs, while others are centered on crimes like gun trafficking.

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 14 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 8 of 71
Harlem Drug Conspiracy Case Is Heading to Jury - The New York Times                    Page 3 of 4

In the 137th Street case, prosecutors said, Jaquan Layne was the ringleader of a gang tied together by a drug operation. But where prosecutors hear strategy and planning in telephone conversations, Mr. Layne's lawyer, Franklin Rothman, hears a young man who likes to boast.

"They have nothing on Jaquan Layne other than his big, stupid mouth that got him in trouble," Mr. Rothman said in his opening statement. "He's not part of a conspiracy. He's not part of this gang. He's a guy from the block."

In one call, Jahlyl Layne seemed intent on collecting on a debt, even though he was in jail.

"You know them fiends still owe me that money, too," he told the man on the other end of the phone. "Go get that money, B."

"I'm gonna go knock on that door for you," the man responded. "I got you."

Prosecutors said some of the calls also described the group's violence and the passing of weapons. Pierce Gross, who is not on trial but was one of the people charged with the 137th Street group, told someone in a recorded call that "Jon snapped," meaning he had fired a gun.

Mr. Gross was speaking of an episode, prosecutors said, in which Mr. Hernandez fired several shots at someone, leading to an attempted-murder charge being prosecuted in the trial.

Some of the phone calls displayed internal strife, prosecutors said. In one call, Jahlyl Layne told Louis Williams, who prosecutors said was in the gang, that someone was "gonna kill" him and others in the group who were still on the streets because, he said, using a term for money, they "ain't setting no chicken out" to those who were in jail. They were "due a spanking," Mr. Layne said.

Mr. Williams called Mr. Layne's bluff, saying they were not "gonna kill nobody."

In another call, Jaquan Layne appeared to complain that Mr. Brown and another man were still selling drugs but not putting any of the money in his commissary account at Rikers. They "ain't sending me no paper," Mr. Layne told

Afrika Owes, a former private-school student who was also charged in the case but pleaded guilty to lesser charges.

"Who they selling it for?" Ms. Owes asked.

"They self," Mr. Layne responded.

Mr. Rothman, his lawyer, has said that that answer indicated an every-man-for-himself attitude, rather than some structured drug organization with people working together.

Yet in another call, Mr. Layne appeared to be instructing Ms. Owes on how to take care of herself. After she explained that she was carrying guns, Mr. Layne told her that if things got crazy, she should use them — "let it go, let it go."

"I got you," Ms. Owes responded.

"Make sure," Mr. Layne said, "head shots only."

A version of this article appears in print on October 12, 2011, on page A21 of the New York edition with the headline: In Conspiracy Trial, a Query: What, Exactly, Is a Gang?.

© 2016 The New York Times Company



# Maria Strohbehn

Assistant District Attorney, Manhattan District Attorney's Office

New York, New York | Law Practice

| | |
|---|---|
| Current | Manhattan District Attorney's Office |
| Previous | U.S. Department of Justice, U.S. Attorney's Office, District of Maryland, State Attorney's Office, Anne Arundel County, National District Attorney's Association/ American Prosecutors Research Institute |
| Education | The George Washington University Law School |

**119**
connections

**Send Maria InMail** ▶

🔗 www.linkedin.com/pub/maria-strohbehn/54/1b9/284

## Background

📖 Summary

As a member of the Trial Division, I am responsible for investigating, indicting, and trying felonies. In Manhattan, we vertically prosecute: I take on cases from arrest and handle them through collateral appeal. As lead prosecutor, I have tried nine cases before juries in New York County and conducted dozens of hearings. I have presented at least fifty cases before the grand jury, including cold-hit DNA cases.

Currently, I am supervising two junior attorneys in a project targeted to reduce crime in Mid-town Manhattan. In the past, I served as a junior member of a project targeting a specific gang responsible for violence in Harlem. Those projects highlight the investigative skills necessary for a big-city prosecutor.

Ads You may be interested in

**Corporate Headshots**
$25.00 off to LinkedIn Members!
Over 240 Recommendations on
LinkedIn!

**Find Your Dream Job Fest**
Get free tips on how to find your
travel, tourism & hospitality
dream job.

**Jump Start Q2 Sales**
Support your hybrid
entrepreneurs, overcome the 3
Fatal Flaws in Selling

## People Also Viewed

**Amy Cohen**
Assistant District Attorney

**Daniel Boylan**
Assistant District Attorney, Crime
Strategies Unit at New York County
District Attorney's Office

**David R. Smith**
Trial Attorney at Adam Leitman Bailey,
P.C.



**palmira garcia**

**Erin Tierney**
Assistant District Attorney at New York

Maria Strohbehn

Assistant District Attorney, Manhattan District Attorney's Office

Location

New York, New York (Greater New York City Area)

Industry

Law Practice

Maria Strohbehn's Overview

Current

- Assistant District Attorney at Manhattan District Attorney's Office

Past

- Law Clerk at U.S. Department of Justice, U.S. Attorney's Office, District of Maryland
- Intern at State Attorney's Office, Anne Arundel County
- Law Clerk at National District Attorney's Association/ American Prosecutor's Research Institute

see all...

Education

- The George Washington University Law School
- University of Maryland Baltimore County

Connections

77 connections

Maria Strohbehn's Experience

Assistant District Attorney

**Manhattan District Attorney's Office**

Law Practice industry

September 2008 – Present (2 years 11 months)

· Research and write various pre-trial and post-conviction motions, including motions in opposition of dismissal, motions in opposition of vacating judgment, and motions for protective order

· Write search warrants including residences, computers, cellular telephones, and other mobile technology

· Present cases to the grand jury in Manhattan, from complex identity theft cases to domestic violence assaults

· Investigate and prosecute long-term employee fraud

· Serve as First Chair on bench and jury trials

· Organize trial strategies by reviewing evidence and developing themes

· Collaborate with family lawyers in domestic violence-related custody and divorce issues in the Integrated Domestic Violence Part of the New York County Supreme Court

· Volunteer, such as a presentation to adolescents in upper-Manhattan on various aspects of the criminal law and law enforcement issues in New York, including dating violence

· Attend continuing legal education seminars including a lecture on various forms of financial evidence, and its collection

· Write complaints to commence prosecution on the basis of a thorough review of evidence in shifts, including shifts into the early morning

· Balance a caseload of about three-hundred active cases with an aggressive court schedule· **Chosen to begin working on a bureau based project targeting gang-related violent crime in the 28th precinct in 2011**

12/20/10

9:32 PM
1/2  Chalupa u fucking with this dude: but you on my back about girls.  trying to get me locked up for no reason. When I  get locked up I'm showing and telling
2/2  everything.  And calling warren once I get locked up.

9:46 PM: I will turn your life upside down one I'm in Jail.

10:02 pm: Yea if you say so Hoe:  Everybody is going to know

10:25 pm:  so they will love all the great things I got to show them

10:31 pm: its your word against mine let's play I got pi and everything else.  Daddy and mommy and big bro will love my info.  And I saw your speed dial u got two guys on speed dial ur sad broke and a hoe.  ur a loser

10:33 pm:  warren rob warren rob warren rob they going to love me


12/21/10

6:37 am: lets have make up sex my dick is rock hard

(12/21 time unidentified sometime between 6:37 and 10:17 am)
[TEXT BENEATH NAKED PHOTO OF ME]
U see that window that's your house.  Just leave me alone please I don't want to be with someone that wants to get me locked up.  Plus Hoeing

(12/21 time unidentified sometime between 6:37 and 10:17 am)
[TEXT BENEATH NAKED PHOTOs OF ME]
Two taps I can see every word even your number and I got more.  Just leave me alone and stop lying to the cops.  I'm not going to fuck you intill I get lock up for no reason

10:17 am
I have Keys

10:19 am: U think I'm playing.  Play with the cops and u will never hoe or work again

10:21 a.m: Your is too

10:25 a.m. thanks more for the cops when you get me locked up

10:28 Not when they see what I got and the people who will come downtown to help me

10:32 that paper will

12/22:

9:02 a.m.: Did you pay my car note

9:20 am: I was making a lot of money when I had my car. How u think I saved your ass so many times. When u had no money. I would love it if u can pay my car note like you said u would but if not we can go 310 310 = 620 or I can pay It by myself just the the info. please I need that car on the streets. I don't have to get nj plate it koool. I will wait intill the weeks are up. ate the gym I'm taking a cab to my lot and going to the dmv to take back my plates

*RESPONSE 9:30 am: You ignore every holiday you spend hem with someone else including my birthday I can't wait till your car is gone*

9:28 am: when they take my car I'm telling every thing that on niya

9:30 am: once that go u know what's going to happen

*9:30 am RESPONSE: I am not talking to you until I get my phones and i'm warning you stay away from the DMV u have no right to conduct my business*

10:07 am: So get my car took of u want. Just know what's happens after. no order can stop me from talking.

*RESPONSE: 10:10 am I hate you for ruining me but I will survive you been doing me filthy for too long*

10:16 am: Hell no tell me how? other way around. Ruining you how? Ur selfish an i u fuck me with the cops or my car u will not survive because I'm going to really ruining u like u keep trying to do to me. But I'm going to OVER DOSE ON YOU. So give me the info or let's go half or pay the note. but that car is not going no where.

10:22 am: I will never fuck you. But u fuck me so many times. So I'm not letting u get away no more. You know right from wrong so u fuck me I'm going hard. Please I love you so don't make me do this

Case 1:15-cv-05871-KPF   Document 41-3   Filed 01/03/17   Page 40 of 60

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 24 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 18 of 71





Exhibit 2
Page 1



**SKIN**
___ intact
___ warm, dry

**BACK**
___ no CVA
___ tenderness
___ no vertebral tenderness

**EXTREMITIES**
___ atraumatic
___ pelvis stable
___ no non-tender
___ no distal edema
___ full ROM
___ normal color / temp

___ see diagram
___ ecchymosis / laceration
___ crepitus / ecchymosis
___ swelling

___ see diagram
___ vertebral point-tenderness
___ CVA tenderness
___ muscle spasm / limited ROM

___ see diagram
___ bony point-tenderness
___ painful / unable to bear weight
___ pulse deficit

Joint Exam:
___ limited ROM / ligamentous laxity
___ joint effusion

**First Name** Cornelius     **Last Name** Asse
167 Y107     White

**EKG & XRAYS**
EKG ___ NML ___ Injury, by me ___ Reviewed by me   Rate ___
___ NSR ___ nml intervals ___ nml axis ___ nml QRS ___ nml ST/T

XRAYS ___ Injury, by me ___ Reviewed by me ___ Discussed w/ radiologist
C-spine   T-spine   LS-spine   pelvis
___ nml / NAD ___ no fracture ___ nml alignment ___ soft tissues nml

CXR
___ nml / NAD ___ no pneumothorax ___ nml heart size ___ nml mediastinum

CT Scan                                    ___ Discussed w/ radiologist
head   C-spine   chest   abdomen / pelvis
___ nml / NAD

Ultrasound / FAST Exam
___ nml / NAD

Other ___

**PROGRESS**
Time ___     unchanged   improved   re-examined

___
___
___
___
___

___ Referred / Discussed with PCP Dr. ___     Time ___
will see patient his office / ED / hospital
___ re-interviewed / examined by ED attending
___ re-discussed with ED attending ___

___ Counseled patient / family regarding   Additional history from
lab / rad. results diagnosis need for follow-up   family caretaker paramedics
Rx given
___ CRIT CARE TIME (excluding separately billable procedures) ___ min

**CLINICAL IMPRESSION**
Abrasion ___
Concussion with LOC   w/o LOC ___
Contusion ___
Dislocation ___
Fracture ___
Sprain / Strain   cervical   thoracic   lumbosacral ___

**PROCEDURES**
Wound Description / Repair:                      Time ___
length 1.5 x 3 cm   location   Lower lip
linear   stellate   (irregular) (flap)   layer subcut / muscle
(clean,) contaminated moderately / heavily
distal NVT: (neurol'ic intact) (no tendon injury)
anesthesia: (1%) topical   Lido (sub-cut.) bupivacaine   epi / bicarb
digital block
prep: Shur-Clens   Betadine w/c ___
w/ sterile wash saline
wound explored   ___ devitalized tissue / anatomic
to bone / in bloodless field   ___ wound margins revised
(no) foreign body biomated   ___ multiple flaps aligned
foreign material removed
repair: Wound closed with   wound adhesive / Dermabond / steri-strips
SKIN-   #   17   ___ 0   nylon / prolene / staples /
silk / solution
SUBCUT-   #   ___ 0   vicryl / chromic
OTHER-   #   ___ 0   ___

**LABS**
| CBC | Chemistries | UA | ETOH |
|---|---|---|---|
| normal except | normal except | normal except | TOX ___ |
| WBC ___ | Na ___ | | |
| Hgb ___ | K ___ | | |
| Hct ___ | CO3 ___ | HCG | PT/PTT ___ |
| Platelets ___ | Gluc ___ | serum / urine | INR ___ |
| | BUN ___ | POS   NEG | |
| | Creat ___ | | |

DISPOSITION-   ✓ home   ☐ transferred ___
Time ___   ☐ admitted   ☐ PCA   decubitus / IUB (days) ___
CONDITION-   ☐ unchanged   ☐ improved   ☐ stable ___

___ Anker   Gem Fine   MD / DO / PA

___   MD / DO / ___

☐ Template Complete   ☐ See Addendum (Dictated / Template # ___ )

Multiple Trauma - 11

Page 2 of 2

T=Tenderness   PT=Point Tenderness   S=Swelling   E=Ecchymosis   B=Burn
C=Contusion   L=Laceration   A=Abrasion   M=Muscle spasm   PW=Puncture Wound
(CF = Foreign body   wound   ___)

Exhibit 2
page 1

**SKIN**
___ intact
___ warm dry

**BACK**
___ no CVA
___ tenderness
___ no vertebral
___ tenderness

**EXTREMITIES**
___ atraumatic
___ pelvis stable
___ sys non-tender
___ sys pedal edema
___ nml ROM
___ nml color / temp

___ r/o diagram
___ ecchymosis / hematoma
___ crepitus / emphysema
___ decubitus
___ see diagram
___ vertebral point-tenderness
___ CVA tenderness
___ muscle spasm / limited ROM

**Joint Exam**
___ limited ROM / ligaments boggy
___ joint effusion



P=Tenderness  PsP=Point Tenderness  S=Swelling  E=Ecchymosis  B=Burn
C=Crepitus  Le=Laceration  A=Abrasion  N=Needle spine  PW=Puncture Wound
Ab=abscess around ___ wound

**First Name** Gonzalez   **Last Name** Ares
___ 167 4107   MRN ___ Utica

**EKG & XRAYS**
EKG ___ NML ___ Interp. by me ___ Reviewed by me   Rate ___
___ NSA ___ nml intervals ___ nml axis ___ nml QRS ___ nml ST/T

XRAYS ___ Interp. by me ___ Reviewed by me ___ Cleared of radiologist
C-spine   T-spine   LS-spine   pelvis
nml / NAD ___ no fracture ___ nml alignment ___ soft tissues nml

CXR
nml / NAD ___ no pneumothorax ___ nml heart size ___ nml mediastinum
___ Cleared w/ radiologist

CT Scan
head   C-spine   chest   abdomen / pelvis
nml / NAD ___

Ultrasound / FAST Exam
nml / NAD ___

Other ___

**PROGRESS**
Time ___   unchanged   improved   re-examined

**PROCEDURES**
**Wound Description / Repair:**   Time ___
length 1.5 x 5 cm   location lower lip
___ linear   stellate   (regular)   (flap)   intact subcut / muscle
(clean)   contaminated   moderately / heavily
distal NVI: ___ neurovasc intact ___ no tendon injury
anesthesia: ___ topical ___ (lidocaine) / bupivacaine epi / bicarb /
digital block
prep: Shur-Clens ___ Betadine ___
irrigated with saline ___ (debrided) mod. / extensive
wound explored ___ wound margins revised
to base / in abrasion field ___ multiple flaps aligned
(no foreign body identified)
foreign material removed
repair: Wound closed with ___ wound adhesive / Dermabond / steri-strips
SKIN: # ___ ___ 5-0 nylon / prolene / staples /
vicryl / ethilon
SUBCUT: # ___ ___ 0 vicryl / chromic
OTHER: # ___ ___ 0 ___

Referred / Discussed with PCP Dr. ___   Time ___
will see patient in: office / ED / hospital
Pt interviewed / examined by ED attending
Pt discussed with ED attending ___
Counseled patient / family regarding   Additional history from:
lab / rad results diagnosis need for followup   family caretaker paramedics
Rx given ___   min
CRIT CARE TIME ___ (performed separately billable procedures)

**CLINICAL IMPRESSION**
Abrasion ___
Concussion with LOC   w/o LOC ___
Contusion ___
Laceration ___
Fracture ___
Sprain / Strain   cervical   thoracic   lumbosacral

DISPOSITION:   ☒ home   ☐ transferred ___
Time ___   ☐ admitted   FDA devdition / IUB (days) ___
CONDITION:   ☐ unchanged   ☐ improved   ☐ stable ___
___ MD / DO / PA
___ MD / DO / PA

☐ Template Complete   ☐ See Addendum (Dictated / Template # ___ )

**LABS**
CHEM: ___   Coagulation: ___   UA: ___   LION: ___
normal   except   normal   except   normal   except   TOX: ___
WBC ___   Na ___
Hgb ___   K ___   HCG ___   PT/TT ___
Hct ___   CO2 ___   serum / urine   INR ___
Platelets ___   Glu ___   POS   NEG
BUN ___
Creat ___

Multiple Trauma - 18

Page 2 of 2

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/10   Page 28 of 66

Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 22 of 71

*Exhibit 2 page 2*

Fri, 22 Apr 11  1450                                        Page  3 of 8

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|----------|--------------|----------------|--------------|-----|-----|
| DIS-Hd6 | Price,Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche,Carlos M, MD

---

ED Adult RN Initial Note -- cont'd
Braden Scale : Score: 22 Scale: no risk Sensory Perception: responds to
              verbal commands,has no sensory deficits Moisture: skin
              is usually dry Activity: walks frequently during
              waking hours Mobility: makes position changes without
              assistance Nutrition: eats over half most meals or on
              tube feeding or TPN regimen which probably meets most
              of nutritional needs Friction/Shear: moves in bed and
              in chair independently.

Skin Lesions?: yes
Lesion Detail: Lesions: laceration, hematoma Location: right posterior
              thigh, facial
              Lesions: laceration Location: right thigh, left buttocks,
              face
Photo       : not applicable

---

Problem List:
Diagnosis   :
Working Diag:

Resulted by   : Lopez,Michelle, RN  (ESOF)
Ordering MD   :  (ESOF)

Exhibit 2
page 8

CAD #

74776827

**Narrative History:** Key words - (Onset, Provokes, Quality, Radiates, Severity, Position, Changes En Route, Medications)

PMH: ☐ Asthma ☐ Angina ☐ Chronic Renal Failure ☐ Cancer ☐ COPD ☐ Cardiac ☐ CVA / Stroke ☐ Diabetes ☐ Dialysis ☐ Frail / Debilitated ☐ HIV / AIDS ☐ Hypertension ☐ Incontinent ☐ IV Drug Use ☐ Psychiatric Hx ☐ Seizure Disorder ☐ Substance Abuse ☐ Tracheostomy ☐ Tuberculosis

Special Conditions: ☐ Bed Confined ☐ Non Ambulatory ☐ Required Stretcher ☐ Valid DNR

Obvious Death: ☐ Decomposition ☐ Dependent Lividity ☐ Rigor Mortis ☐ Mortal Injury

Allergies: ☒ No known allergies

Medications: ☐ Unknown Denied

Pt Ambulatory, Alert. Appears to have small abrasions on her face
PERL ⊖LOC some abrasions to her face [illegible]
[illegible] ABD [illegible] SNT ND, side of upper leg (R)
proximal to buttocks on lateral side locations
(small multiple) PMS x 4 [illegible] Pt was assaulted earlier by
unknown person. She was [illegible] and wrestled with this person & [illegible]
crashed into a [illegible]

167 46 07
[illegible]
PRICE, CATHLEEN
F [illegible] 11/11/10
[illegible] WEST [illegible] STR
NEW YORK NY 1002[illegible]

**Cardiac Arrest Information**

Witnessed by: ☐ PD ☐ CFR / EMS ☐ Other
ROSC: ☐ PD ☐ CFR / EMS ☐ Other

**Prior to this Units Patient Contact**

CPR was started by: ☐ Bystander ☐ Family ☐ PD ☐ CFR ☐ EMS ☐ Medical
Minutes Since Arrest / CPR Started / CPR Stopped
AED was used by: ☐ PD ☐ CFR ☐ EMS ☐ Other
Minutes Since 1st AED Shock

Have the patient's symptoms appeared or gotten worse in the last 72 hours? ☒ Yes ☐ No

Confirmation False ☐

Chief Complaint: [illegible] in face
Presumptive Diagnosis: [illegible] s/p Assault

**OLMC**

Time of Contact | OLMC Physician | Reason For Contact: ☐ RMA ☐ Consult ☐ Orders ☐ Transport Decision ☐ Oncecne Triage | OLMC Terminate Time | CQ Chart Number

Given | C.S. Administered By - Signature | Witness Signature / Title | Amount Wasted | # Vials Used | OLMC Physician | UAN | SO

**Payer Info**

Insurance Company Name
Policy Number | Group Number
Insurance Related Information: ☐ Auto Insurance ☒ Self Pay ☐ Private Insurance | Medicare # | Medicaid # | Work related? ☐

(1) PATIENT INFORMATION DISCLOSURE AND ASSIGNMENT OF CLAIM: I acknowledge that I have been given the Notice of Privacy Practices and Patient Information Release/Assignment of Claim, set forth on the Patient Copy of this Prehospital Care Report and have read or been informed of their contents, including the purposes for which my protected health care information will be shared, and my responsibility for any charges for services not covered by my insurance or found to be medically unnecessary. I hereby authorize, for myself or my dependent(s), the release of medical and other information for the purposes specified, including treatment and billing. I further authorize and assign payment of Medicare and any other authorized benefits to the NYC Fire Department. ☐ Patient Unable to Sign (Reason Documented) ☐ Patient Refused to Sign

(1) [signature] Informed Consent Patient / Auth. Rep. Signature

(2) OUT OF AREA TRANSPORT / DIVERSION: I request to be transported to a hospital that is more than 10 minutes from the closest appropriate hospital, or that is on diversion status. I have been advised and I understand that I may experience delays in my care that may impact my health or result in death. ☐ Patient Unable to Sign ☐ Patient Refused to Sign Hospital Requested

(2) Out of Area Transport Patient Signature

(3) RELEASE/REFUSAL OF MEDICAL ASSISTANCE (RMA): I have been advised and I understand that I require medical assistance, and will be transported to a hospital of my choice, and that my refusal to accept such medical assistance may impact my health or result in death, but I nonetheless refuse to accept the medical assistance. I agree to assume all risks, consequences and costs of my decision not to accept such care, and I release the provider of ambulance service, and its employees, agents and independent contractors, from any liability arising from my decision.

☐ Pre-hospital care refused ☐ Transportation to hospital refused ☐ Patient Unable to Sign ☐ Patient Refused to Sign

(3) RMA Patient Signature | RMA Witness Name / Signature

**Safety**

Lights / Siren: ☐ To Scene (83) ☐ To Destination (82)

Conditions Causing Delay: Traffic, Weather, Crowd, Scene Hazard, Bad Address, Difficult Location, Extrication, Elevator, Building Access, Door Locked, Distance To Pt, Awaiting Help, Equip. Malf. — To Scene / To Patient / To Hospital

Seat Belt Use: ☐ Lap Belt ☐ Shoulder Belt; Car Seat: ☐ Front Facing ☐ Side Facing ☐ Rear Facing

Airbags Deployed: ☐ Steering Wheel ☐ Passenger Dash ☐ Driver Door ☐ Passenger Door ☐ Other

Patient Safety Equip.: ☐ Eye Protection ☐ Helmet ☐ Personal Flotation ☐ Protective Clothing ☐ Protective Gear

**Disposition**

Removed to Vehicle By: ☐ Chair ☐ Walked ☐ Carried ☐ Scoop Stretcher ☐ Flat ☐ Stretcher ☒ Walked to Ambulance

Transport From: ☒ Residence (Home) ☐ Scene of Accident or Acute Event ☐ Residential, Custodial Facility ☐ Skilled Nursing Facility (SNF) ☐ Inter-facility; Transport From Code:

Transport Position: ☐ Supine ☒ Sitting ☐ Shock ☐ Semi / Full Fowlers ☐ Left Lateral Recumbent ☐ Restrained

Pt Transported in Vehicle: # of Patients Transported 1; Transport Miles 2; Hospital Destination 12

Hospital Selection: ☐ Nearest Facility ☒ Patient / Family Choice ☐ Specialty Referral ☐ Hospital Diversion; Diverted From Code

Pt Not Transported in This Vehicle: ☐ Assisted in Transport With Unit # ☐ RMA ☐ Pronounced, NOT Transported ☐ Oncecne Triage ☐ Transferred Care To Unit # ☐ Other

Hospital Receiving Agent Signature | FDNY Code | Qty | Supply Code | Qty | Supply Code | Technician Signature [signature]

Case 1:15-cv-05871-KPF   Document 41-3   Filed 01/03/17   Page 46 of 60

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 30 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/08/16   Page 24 of 71

Exhibit 2 page 3

Fri, 22 Apr 11  1450                                    Page  4 of 8

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|----------|--------------|----------------|--------------|-----|-----|
| DIS-Hd6 | Price,Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche,Carlos M, MD

--------------------------------------------------------------------------------

MDInitNote DellaFavaA
Event Time: Thu, 11 Nov 10  0336                     Status: complete

Thu, 11 Nov 10  0606   Documented by Carlos M Meletiche, MD

T                : 97.9 F (36.6 C)
P                : 84 bpm
BP               : 127/77
R                : 18
Pain             : yes
Pt Walked Out?   : no
Time Pt Seen     : 11Nov2010 0326
Visit Provider   : Albert David Della Fava, MD
Attending        : Carlos M Meletiche, MD
Communication    : Direct Communication in Patients's Primary Requested
                   Language
Chief Complaints : Assault Sustain 3 laceration to Rt posterolat thigh and
                   facial hematoma
TB/Pneumonia     : Fever: no Cough: no Night Sweats: no Weight Loss: no
                   Shortness of Breath: no
Assessment       : vs wnl, mild distress however patient calmed during exam,
                   no respiratory distress or SOB, abrasion/bruise to right
                   infraorbit, no orbital tenderness EOMI, erythema to
                   lateral neck and throat, 5 cm laceration to left buttock,
                   3 1.5 cm lacerations to right hip, no boney deformates or
                   joint complaints
Plan             : clinical work up as ordered
Diagnosis        : Assault by other specified means
E&M Level        : non critical visit
Non-Critical Vst : 99283 expanded problem focused hx, exam and mod complex MDM
Attend'g Addendum: Gen Supv
DAWN?            : no
Comment          : See paper chart
--------------------------------------------------------------------------------

Diagnosis      : E968.8    Assault by other specified means
Principal Pr: E968.8    Assault by other specified means

Exhibit 2 page 4

Fri, 22 Apr 11  1450                                    Page  5 of 8

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|---|---|---|---|---|---|
| DIS-Hd6 | Price,Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche,Carlos M, MD

---

PHM/PSHx/Fam:
Diagnosis    :
Working Diag:

Resulted by     : Meletiche,Carlos M, MD (ESOF)
Ordering MD     : (ESOF)

ED RN Disposition Assessment                         Status: complete
Event Time: Thu, 11 Nov 10  0554

Thu, 11 Nov 10  0558   Documented by Nakita Mccoy, RN

Discharge Disposition: treated & released
Home Care Discharge  : no
Diagnosis            : Assault by other specified means
Vital Signs          : SBP:: 121  mmHg DBP:: 64  mmHg P: 76  bpm R: 17 T:
                       97.8 F (36.6 C) Temp Route: oral O2
                       Saturation: 99  % Comments: ROOM AIR

Barriers to Learning : none
DC Plan              : MEDICATION AS PRESCRIBED. FOLLOW UP IN CLINIC AS
                       DIRECTED. RETURN TO ER FOR ANY NEW OR WORSENING
                       CONCERNS. NAD NOTED.
Valuables/Clothing   : patient kept at own risk
Comment              : PT OUT WITH STEADY GAIT. RESP EVEN/UNLABORED. NO
                       DISTRESS NOTED. PT VERBALIZED UNDERSTANDING OF INSTR
                       PROVIDED BY DELLFAVA, MD
Medication Order(s)  : Adacel (Tdap 11-64y)(Tetanus Toxoid, Reduced
                       Diphtheria Toxoid & Acellular Pertussis Vaccine
                       Adsorbed)
Medication Effect(s) : no adverse effects for all new medications

---

Diagnosis    :
Working Diag: E968.8    Assault by other specified means

Fri, 22 Apr 11  1450

Page  6 of 8

Chart Review Print

Metropolitan Hospital Center

| Location | Patient Name | Patient Number | Visit Number | Age | Sex |
|---|---|---|---|---|---|
| DIS-Hd6 | Price,Cathleen | 1674607 | 1674607-4 | 40Y | F |

Attending Physician
Meletiche,Carlos M, MD

---

ED Chest Pai:
Diagnosis   :

Resulted by       : Mccoy,Nakita, RN  (ESOF)
Ordering MD       :   (ESOF)

Metropolitan Hospital Center
Department of Emergency Medicine
1901 First Avenue
New York, NY 10029
212-423-6466

*Exhibit 2 page 7*

STR _Camuuu Rue_
Patient Name

_burlington plate_

Discharge Instructions for: _____Abscess_____
(condition)

The emergency examination and treatment you received today is not intended to provide you with a complete medical workup. You should follow-up with a physician for further evaluation and treatment. If you have any questions or concerns regarding your emergency department treatment, please return to the Emergency Department. Notify your own physician for any new or remaining problems. If you are concerned about those problems, please return to this or any other Emergency Department. Otherwise, follow these instructions below.

The results of x-rays, ultrasounds, blood tests and EKGs are preliminary at this time. They will be reviewed by a specialist, usually within 24 hours. Should it be necessary, you will be contacted. Notify your primary care physician if you had such tests done during your emergency visit.

Please make sure that you have notified the physicians and nurses of all of your past medical and surgical history as well as any medications (including over-the-counter and herbal preparations) that you are currently taking.

Return to the Emergency Department, or any other emergency Department, for any current or new problem that you think may be a serious threat to your health. These problems vary depending on your underlying condition, but include such problems as high fever, severe pain, shortness of breath, persistent vomiting, excessive diarrhea, heavy bleeding, black stools, seizure/convulsion or change in behavior. Ask your nurse or doctor to inform you of any problems that may be more specific to your visit today.

Continue taking any previously prescribed medications, in addition to any new ones from today, unless otherwise informed. Please make sure that you have informed us today of all of your medications and allergies to medications/ foods, including any recently changed by any other doctor.

Medications: _Tylenol #3  2 tabs by mouth every 4 hours with pain_
_Keflex  500mg by mouth every 6 hours for 7 days_

Please pick up or ask for any printed educational materials that we may have specific to your probable condition.

Make an appointment to:
☐ follow up with your primary care provider within _____ days. If you don't have a primary care provider, you can call our clinic appointment center at 212-423-7000 for an appointment to the _____ clinic. Inform them that you need to be seen within this number of days.
☑ Follow up in _Surgery_ clinic within _10_ days (212-423-7000.)
☑ Follow up in _ER_ clinic within _10_ days or 212-423-7099.

Additional Instructions: _Please Review re Em. For Redness, increasing discharge or Pain._
_Please BB Seen Well or by Surgery in 10 days for suture removal_

These instructions have been explained to me and I fully understand. I also certify that my address and or phone number / emergency contact information provided is accurate.

_____   _____   _CS 192._   _Molla_   _Molla_   _5:31pm_
Patient Signature   Phone #   PA / MD Signature   NP/T Signature   Date   Time

White copy: Chart          Yellow copy:  Patient                    MHC;952-5006

1

```
 1   FAMILY COURT OF THE STATE OF NEW YORK
     CITY OF NEW YORK:  COUNTY OF NEW YORK
 2   ------------------------------------x
     In the Matter of a Family Offense
 3   Proceeding                           :

 4   KELLY CATHLEEN PRICE,                :

 5                    Petitioner,         :   DOCKET NO.
                                              O-10874/10
 6         -against-                      :

 7   RAHEEM POWELL,                       :

 8                    Respondent.         :
     ------------------------------------x
 9   Held:          60 Lafayette Street
                    New York, N.Y. 10013
10                  March 24, 2011 - Part 5

11   Before:        HONORABLE LORI S. SATTLER, JUDGE
12

13   Appearances:
                    EDWARD GREENBERG, ESQ.
14                  Attorney for the Petitioner

15                  WILLIAM O'HEARN, ESQ.
16                  Attorney for the Respondent

17

18
     Also Present:
19
                    Kelly Price
20                  Raheem Powell

21

22                          Kitty S. Irizarry
                            Official Court Reporter
23

24

25
```

Proceedings

| | |
|---|---|
| 1 | COURT OFFICER:  Six and fourteen in the matter |
| 2 | Price and Powell. |
| 3 | Counsel, your appearance, |
| 4 | MR. GREENBERG:  For the petitioner, Your Honor |
| 5 | Edward C. Greenberg, 570 Lexington Avenue, New York, New |
| 6 | York. |
| 7 | Good morning. |
| 8 | COURT OFFICER:  Raise your right hand. |
| 9 | (Whereupon, the following parties were sworn i |
| 10 | by the court officer.) |
| 11 | MS. PRICE:  Kelly Catherine Price. |
| 12 | MR. POWELL:  Raheem Powell. |
| 13 | THE COURT:  Good morning, Your Honor. |
| 14 | You are entitled to have an attorney in this |
| 15 | proceeding.  If you don't have an attorney, I can assign |
| 16 | to represent you.  You can also decide you would like to g |
| 17 | forward on our own without an attorney, or if you would |
| 18 | like, you can hire or consult with an attorney that you |
| 19 | would pick. |
| 20 | Do you want an attorney in this proceeding? |
| 21 | MR. POWELL:  Yes. |
| 22 | THE COURT:  What's your source of income at the |
| 23 | present time?  Are you working? |
| 24 | MR. POWELL:  Yes. |
| 25 | THE COURT:  How much are you earning? |

Proceedings

1          MR. POWELL:  Like $250 a week.

2          THE COURT:  Are you a member of a union?

3          MR. POWELL:  (No response)

4          (Whereupon, the following party was sworn in b

5    the court officer.)

6          DETECTIVE SIMMONS:  Detective Linda Simmons,

7    shield number 2653 of the 28 Detective Squad.

8          THE COURT:  Sorry to drag you in, Detective

9    Simmons, but I have a couple of questions, since I was

10   informed that you are here to arrest the petitioner.

11         DETECTIVE SIMMONS:  We are here to pick her up

12   for another detective that will be arresting her.

13         THE COURT:  Anything related to my case here?

14         DETECTIVE SIMMONS:  It's between the two of th

15   It's between the two of them and how she calls him and

16   threatens to have him arrested if he doesn't come see her.

17         (Whereupon, Mr. O'Hearn entered the courtroom.

18         THE COURT:  Mr. O'Hearn is going to be

19   representing the respondent.

20         Do you want to note your appearance.

21         MR. O'HEARN:  William O'Hearn, 225 Broadway,

22   appearing for the respondent.

23         THE COURT:  Okay.  So he had a family offense

24   case at some point in time, but your Order of Protection w

25   vacated when you didn't show up on March 9th.

3 3

Proceedings

1          MR. POWELL:  I was on the wrong floor.

2          THE COURT:  Did you file again?

3          MR. POWELL:  No.

4          THE COURT:  So are you picking her up for

5    violating the order?

6          DETECTIVE SIMMONS:  She is going to be arreste

7    for aggravated harassment.

8          THE COURT:  Okay, got you.

9          MR. GREENBERG:  Your Honor, with respect to

10   Mr. Powell's claim that he was in the wrong room, I know

11   Your Honor is very busy and doesn't remember this case, bu

12   this case --

13         THE COURT:  No. I actually remember it.

14         MR. GREENBERG:  Good.  Then Your Honor will

15   remember that we delayed to call this case for quite some

16   time because Mr. Powell was not here, and Your Honor calle

17   the case at 11:02.

18         THE COURT:  Your client wasn't here either on

19   that date, as I recall.

20         MR. GREENBERG:  That's correct, and I expressec

21   concern about the safety of my client.  So while the court

22   officer called the case at about 9:32, Your Honor didn't

23   hear it until about 11:00.  This was a 9:30 case, so I don

24   know how Mr. Powell couldn't have found his case within an

25   hour and a half.

Case 1:15-cv-05871-KPF   Document 41-3   Filed 01/03/17   Page 55 of 60
Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 39 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 33 of 71

Proceedings

1          THE COURT:  His case was dismissed.  He paid

2     consequence of not being here.

3          I think the bigger issue is your client is ab

4     to get arrested.  And I am hearing that right now, and

5     perhaps that makes me concerned about whether I actually

6     need to continue an Order of Protection in this case,

7     because he is not getting arrested, she is getting arrest

8          Detectives investigated the stories?

9          DETECTIVE SIMMONS:  Yes.

10         THE COURT:  And don't find her story to be

11    credible?

12         DETECTIVE SIMMONS:  No.

13         MR. GREENBERG:  We have a couple of competing

14    issues.  Issue number one, and perhaps not the most

15    important, but I think it should be before Your Honor befc

16    the case is discussed before you, no request was made of m

17    office to surrender Ms. Price, notwithstanding the fact th

18    I had lengthy conversations with detectives at the 28

19    Precinct, including Detective Flowers, who is, presumably,

20    going to be the detective arresting Ms. Price today.

21         I had a conversation with Mr. Flowers for over

22    five minutes, and at no time did he ask me to bring

23    Ms. Price in, nor had any request been made to me or to

24    Ms. Price' other attorney to bring her in.  She would have

25    been brought in and this exercise, perhaps, would have bee

Proceedings

1    avoided or at least postponed.  That's issue one, Your

2    Honor.

3              Number two, there was an Order of Protection

4    sought against Mr. Powell, whose acts of violence against

5    Ms. Price are well documented by hospital reports and so

6    forth.  The detectives have come in here, and I understand

7    their responsibilities, as they see them, but they come in

8    here without any adjudication at all based on, solely, the

9    word of Mr. Powell, whom Your Honor has already awarded

10   Orders of Protection against, presumably, because Your Hon

11   was satisfied.

12             THE COURT:  Excuse me.

13             An ex-parte Order of Protection -- Everyone co

14   in here and does an ex-parte the first time, and I -- This

15   is the first time I have the parties in front of me.

16             MR. GREENBERG:  That's true.

17             Not all ex-partes.  Ms. Price had been here

18   before.

19             MR. O'HEARN:  The most recent one was ex-parte

20   because he didn't show up, but that's not the initial one.

21   There was evidence that satisfied Your Honor to issue an

22   Order of Protection, apparently, where Mr. Powell was here

23   on prior occasions.

24             MR. GREENBERG:  My recollection, Your Honor, i

25   when I was here three or four weeks ago, Your Honor stated

Proceedings

1    blackmail from the text messages from Mr. Powell to mysel

2    letting me know exactly what would happen to me if I ever

3    did such things like leave him, report the physical ongoi

4    physical abuse.

5                THE COURT:  Were the nude photos you are alleg

6    on there?

7                MS. PRICE:  No.  He never sent them to me.

8                THE COURT:  How, again, did you know there wer

9    photos of you?

10               MS. PRICE:  People in my neighborhood and

11   children in my neighborhood taunt me and taunt me with th

12   phones when I walk by.

13               THE COURT:  Did you see what was on the

14   children's phones?

15               MS. PRICE:  No, I did not.

16               I am happy to present respectable adults in my

17   neighborhood, especially the owners of the livery cabs

18   around the corner from me, who showed them to me and said

19   cannot believe this is happening to you and are willing to

20   testify.

21               THE COURT:  I am going to let them do whatever

22   they have to do, arrest your client.

23               I will give you another date to come back.

24               I will put in a usual terms Order of Protectio

25   and refrain from communication.  If he is going to renew h

Case 1:15-cv-05871-KPF   Document 41-3   Filed 01/03/17   Page 58 of 60
Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 42 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 36 of 71

Proceedings

1   request, Mr. O'Hearn, he needs to do that.  This is again:
2   him.
3                   She actually, quite frankly, based on the
4   allegations, I am willing to bet that the Criminal Court
5   will also put in an Order of Protection in place.  But you
6   client can decide if he wants to file here, and I will gi·
7   you a date to come back to court.
8                   MR. GREENBERG:  May I make a request with resp
9   to a return date, if it suits the Court?
10                  THE COURT:  Sure.
11                  MR. GREENBERG:  I can have any date in the las
12  two weeks of April, but the first two weeks I can't and I
13  can't in May.  So any date anytime that the Court wants f
14  April 18th to the end of the month is fine with me.
15                  MR. O'HEARN:  I am out the last week of April.
16                  THE COURT:  I am not here on the 18th or the
17  19th.
18                  MR. GREENBERG:  Any date that week.
19                  THE COURT:  How about the 21st?
20                  MR. O'HEARN:  I am out that weekend.
21                  THE COURT:  You are out the 18th.
22                  How about May 2nd?  That certainly will give t
23  Criminal Court matter time for us to know what's going on
24  there.
25                  I could bring you in earlier.  I could bring y

Proceedings

1    in on April 13th or 14th, but, otherwise, we are going to

2    May 2.

3                    MR. O'HEARN:  I can appear on May 2nd.

4                    MR. GREENBERG:  I will do May 2nd if I have to

5    At what time, Your Honor?

6                    THE COURT:  Let me pick an available time.

7    11:00 a.m.

8                    MR. GREENBERG:  That's fine.  All right.

9                    THE COURT:  I will see you all then.

10                   Thank you.

11   ********************************************************

12                    Court Reporter's Certification

13          I hereby certify that the foregoing transcript is a true

14   and accurate record of the stenographic proceedings in the abo

15   matter.

16

17                        Kitty S. Irizarry
                          Official Court Reporter

18

19

20

21

22

23

24

25