Exhibit 5 Page 1

## CRIMINAL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK

Page 1 of 1

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br>-against-<br><br>1. **Kelly Price** (F 40)<br><br>ECAB #<br>1222673<br><br>Defendant. | FAMILY OFFENSE<br>DEFENDANT/VICTIM<br>RELATIONSHIP:<br>INTIMATE/ACCESS<br><br>MISDEMEANOR<br>ADA MARQUEZ<br>212-335-9522 |

Detective Samuel Fontanez, shield 00311 of the 028 Detective Squad, states as follows:

On April 30, 2011, at about 00:01 hours inside of 315 West 116th Street in the County and State of New York, the Defendant committed the offenses of:

1.    PL215.50(3)    Criminal Contempt in the Second Degree
                           (1 count)

the defendant engaged in intentional disobedience to the lawful mandate of a court in other than a labor dispute.

The offenses were committed under the following circumstances:

Deponent states that deponent is informed by Raheem Powell, of an address known to the District Attorney's Office, that defendant called informant on the telephone and stated in substance: ARE YOU RECORDING ME? I WANT TO TALK TO YOU SO WE CAN WORK THINGS OUT. Deponent is further informed that informant has known defendant for more than two years and informant recognized defendant's voice.

Deponent states (i) that the above actions by defendant are in violation of an order of protection issued on March 24, 2011 by Judge Amaker, docket number 2011NY021627, and which remains in effect until May 10, 2011, (ii) that the order of protection directs the defendant to refrain from communication or any other contact by mail, telephone, e-mail, voicemail or other electronic means with Raheem Powell, and (iii) that defendant is aware of the order of protection in that defendant was present in court when the court order was issued and the order of protection is signed by the defendant.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

_____ #311
Deponent

5/6/11
_____
Date and Time

ACT 5 Version 4.3.5 Created on 05/06/11 5:10 PM

Exhibit 5 page 2

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: PART D

THE PEOPLE OF THE STATE OF NEW YORK

-against-

KELLY PRICE,

                                        Defendant.

SUPPORTING DEPOSITION
C.P.L. § 100.20

Docket No. 2011NY032918

I, Raheem Powell, of an address known to the District Attorney's Office, County of New York County , State of New York, being duly sworn, depose and say:

that I have read the Accusatory Instrument filed in the above-entitled action and attached hereto and that the facts therein stated to be on information furnished by me are true upon my personal knowledge.

*False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.*

_____          _____
Signature (Deponent)                          Date

She called me around 11:45 pm
~~aft she said~~ lets meet up

**Property Receipt**

Inmate _Price Kelly_
          Last        First

Institution _RMSC_

Date _05/07/11_

A № 768932   2011 year

Exhibit 6 pg 41

☐ NYSID # _079668_9M_
☐ Book and Case # _3171100788_
☐ Sentence # _____

CONTROL/CUFFLOCK # _____

**WHERE WAS PROPERTY TAKEN:**
☐ Admission   ☐ Housing Area - Specify: _____   ☐ Other - Specify: _____
Was this property taken on a search: ☐ Yes / ☐ No

| I. Personal Items | | II. Clothing | | | III. Jewelry | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No. | Articles | No. | Articles | Color | No. | Article | Description | | |
| | | | | | | | Y | W | CS |
| | Radio | | Coat/Jacket | | | Tooth Cap | | | |
| | Personal papers | | Pants | | | Neck Chain | | | |
| | Pocketbook | | Belts | | | Earring | | | |
| | Gloves | | Shoes/Sneaker | | | Charm | | | |
| | Glasses | | Shirt/Blouse | | | Bracelet | | | |
| | Wig | | Skirt | | | Watch | | | |
| | Wallet | 2 | Boots | Black | | Ring | | | |
| | Keys | | Hat | | | | | | |

**Identification:** ☐ Yes  ☐ No

| | On Person | Same Name? | | |
|---|---|---|---|---|
| | | Y | N | |
| U.S. Passport | | | | |
| Green Card | | | | |
| Driver's License | | | | |
| Other Government-issued photo ID | | | | |
| Birth Certificate | | | | |
| Social Security Card | | | | |
| Other: | | | | |

**Please Note:**
Description Color:
Y - Yellow Metal
W - White Metal
CS - Color of Stone

**INSTRUCTIONS**
1. If you receive more than one (1) item on a line, (e.g. coat/jacket) circle appropriate item then enter the number.

| IV. Miscellaneous | |
|---|---|
| No. | Article |
| | |
| | |
| | |
| | |
| ☐ NO PROPERTY | |

Inmate did not receives BOOTS. City/M00.14330

The above item(s) has been received from you because:
☐ It is not on the list of items which are permitted in this facility.
☐ The quantity is in excess of that allowed in this facility.
☐ It may create a health, safety or security hazard, and therefore, you are not permitted to have it in your possession.
☐ You have submitted the item to us voluntarily for safekeeping.
☐ Other _____

_Pedrelte_                    _14944_              _Robelte_
Signature of person taking property    Shield ID #         Print Name

_[signature]_               _05/07/11_            _6349_
Signature of Inmate           Date                Time

SEE APPEAL AND DISPOSAL PROVISIONS ON OTHER SIDE.

Distribution:
White - Inmate Copy        Yellow - Duplicate (TO BE SECURED WITH PROPERTY)
Green - Inmate Legal Folder   Blue - Discharge Planning Cent   (ON CITY SENTENCING)

Exhibit 11 page #1

## DEBRIEFING AGREEMENT

With respect to the meeting of Kenya Wells, an Assistant District Attorney in the Office of the District Attorney for New York County ("Office") with Kelly Price ("Client") to be held on the date of this memorandum, the following understandings exist:

(1) Should any prosecutions be brought against Client by this Office, this Office will not offer as evidence in its case-in-chief any statement made by Client at the meeting, except in a prosecution for false statements or perjury.

(2) Notwithstanding paragraph one, (a) this Office may use information derived directly or indirectly from Client's statements at the meeting for the purpose of obtaining leads to other evidence, and if any such evidence is developed, it may be used in any prosecution of Client, and (b) should any prosecution of Client be undertaken, this Office may use statements made by Client at the meeting and all evidence obtained directly or indirectly therefrom for the purpose of cross-examination should Client testify, or to rebut any evidence offered by or on behalf of Client in connection with the prosecution.

(3) This agreement is limited to the statements made by Client at the meeting held on this date, and does not apply to any oral, written or recorded statements made by Client at any other time. No understandings, promises, agreements, or conditions have been entered into with respect to the meeting other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties.

DATED:   New York, New York
         June 21, 2011

                                        CYRUS R. VANCE., JR.
                                        District Attorney
                                        New York County

                                        By _____
                                        Kenya Wells
                                        Assistant District Attorney

_____
Client

_____
Attorney for Client

BAIL RECEIPT & NOTICE TO PERSON POSTING BAIL

Exhibit #8 Pag 1

| | | | | |
|---|---|---|---|---|
| | | Date Bail $ Received (Today's Date) | | Time Bail $ Received |
| | | 05. 08. 11 | | 21:35 |

| Indictment # | | Docket # 2 1 Y 0 3 2 9 8 | Defendant's Name (Last, First and M.I.) People v. PRICE, KELLY |
|---|---|---|---|

| NYSID # 7 9 6 1 8 1 9 M | Book & Case # 3 4 7 1 0 0 7 8 8 | Offense(s) 215.50 (3) |
|---|---|---|

| Name of Judge/Justice Who Set Bail LBBOVITS | County NEW YORK | Court CRIMINAL | Part AR 3A |
|---|---|---|---|

| Last Court Date Bail Was Set 05.06.11 | Bail Amount (Numerical) $ 2,000.00 | Bail Amount (Written) TWO THOUSAND | DOLLAR(S) |
|---|---|---|---|

Check One: Cash ✓ (if check(s) or money order(s), enter number(s) and name(s) of issuing organization(s))

Check or Money Order _____

Describe any outstanding warrants or detainers, including surety examination, prohibiting defendant's immediate discharge.
If none, write "NONE". NONE

Having posted the bail amount listed above, and having read the information on the back of Copy 1 concerning bail refunds, and having been notified of any outstanding warrants or detainers prohibiting the immediate discharge of the defendant, I undertake that the defendant will appear in this action whenever required & will at all times render himself/herself amenable to the orders and processes of the court, and I acknowledge that the bail will be forfeited if the defendant does not comply with any requirement or order of process to appear in this action, and that his/her next scheduled court appearance is at 9:30 A.M. on the date and place written below:

| Date of Next Court Appearance 05 · 11 · 11 | County NEW YORK | Court CRIMINAL | Part D. |
|---|---|---|---|

OBTAIN SIGNATURE OF PERSON POSTING BAIL ON COPIES 2, 3, 4, & 5

| Name of Person Posting Bail (Printed) HAGUE, DAN | Occupation of Person Posting Bail FUND MANAGER |
|---|---|

Residential Address of Person Posting Bail (including ZIP Code)
60, BROADWAY, PH1A, BROOKLYN, NY 11211

| Signature of Employee Receiving Bail $ M Whye | Title C dot | Shield or ID # 38181 | Facility Recv'g Bail $ RICC | Facility Housing Inmate RMSC, |
|---|---|---|---|---|

## Distribution & Routing Instructions

No.1 Give to person posting bail. Bail funds are deposited not later than the next business day after their receipt. Checks for refund of bail, minus the Department of Finance three percent 3% fee will be mailed according to the notice on the back of this form from the DIRECTOR OF FINANCE OF THE CITY OF NEW YORK, Room 2200, Municipal Building, 1 Centre Street, New York, NY 10007. The three percent 3% fee will not be subtracted if the case is terminated at the trial level with a dismissal or acquittal.

COPY 1

34 R (4/91)


left outer hand.jpg



POLICE INJURIES.pdf


left outer wrist an...


-right outer wrist.jpg


rear right leg.jpg


front of legs.jpg

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 55 of 66
Case 1:15-cv-...-LAP   ...cument 16-3   Filed 05/09/16   Page 49 of 71





right back hand.jpg

inner left upper ar...



rightblackeyera.jpg



inner right upper ...



left inner lower ar...

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 58 of 60

| |
|---|
| People v Price (Kelly) |
| 2016 NY Slip Op 50231(U) |
| Decided on February 25, 2016 |
| Appellate Term, First Department |
| Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. |
| This opinion is uncorrected and will not be published in the printed Official Reports. |

Decided on February 25, 2016
SUPREME COURT, APPELLATE TERM, FIRST DEPARTMENT
PRESENT: Schoenfeld, J.P., Shulman, Hunter, Jr., JJ.
571134/12

The People of the State of New York, Respondent, -

against

Kelly Price, Defendant-Appellant.

Defendant appeals from a judgment of the Criminal Court of the City of New York, New York County (Robert M. Mandelbaum, J.), rendered October 18, 2012, convicting him, after a nonjury trial, of two counts of disorderly conduct, and imposing sentence.

Per Curiam.

Judgment of conviction (Robert M. Mandelbaum, J.), rendered October 18, 2012, reversed, on the law and the facts, and the accusatory instrument is dismissed.

The verdict convicting defendant of two counts of disorderly conduct (see Penal Law §§ 240.20[2], [3]), was not based on legally sufficient evidence and was, in any event, against the weight of the evidence. The trial evidence showed that defendant called police after she was asked to leave a midtown Manhattan bar on a Saturday evening; the responding officers observed defendant to be visibly upset and they tried to calm her down; upon interviewing people inside the bar, the officers informed defendant that there was no action that they could take on her behalf; defendant was angry, but walked away from the scene; and that as defendant was approximately 20 feet away from the officers, she turned her head and shouted an epithet at them. On these facts, defendant's intent to cause public inconvenience, annoyance, or alarm, or recklessness in creating such a risk, was not established beyond a reasonable doubt (see Penal Law § 240.20 People v Baker, 20 NY3d 354 [2013]). Defendant's conduct did not indicate an intent to breach the peace, or even constitute an act from which a breach of the peace was likely to occur (see People v Johnson, 22 NY3d 1162 [2014]; People v Baker, supra; People v Pritchard, 27 NY2d 246 [1970]; People v Smith, 19 NY2d 212 [1967]).

THIS CONSTITUTES THE DECISION AND ORDER OF THE COURT.

I concur I concur I concur

Decision Date: February 25, 2016

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 16 of 54
Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 59 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 53 of 71

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE TERM: FIRST DEPARTMENT
--------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,                    :

                        Respondent,                     :

                    -against-                           :

KELLY PRICE,                                            :

                        Defendant-Appellant.            :

--------------------------------------------------------x

## STATEMENT PURSUANT TO RULE 5531

1.    The docket number in the court below was 2011NY016509.

2.    The full names of the original parties were People of the State of New York
      against Kelly Price. There has been no change of parties on appeal.

3.    This action was commenced in Criminal Court, New York County.

4.    This action was commenced by the filing of an accusatory instrument.

5.    This appeal is from a judgment convicting appellant, after a bench trial, of two
      counts of disorderly conduct (P.L. §240.20(2); P.L. §240.20(3)).

6.    This is an appeal from a judgment of conviction rendered October 18, 2012
      (Mandelbaum, J., at trial and sentencing).

7.    Appellant has been granted permission to appeal as a poor person on the original
      record. The appendix method is not being used.

1

## PRELIMINARY STATEMENT

This is an appeal from a judgment of the Criminal Court, New York County, dated October 18, 2012, convicting appellant, after a bench trial, of two counts of disorderly conduct (P.L. §240.20(2); P.L. §240.20(3)), and sentencing her to a conditional discharge and three days community service (Mandelbaum, J., at trial and sentencing).[1]

Timely notice of appeal was filed and, on January 7, 2013, this Court granted appellant leave to appeal as a poor person on the original record and typewritten briefs, and assigned Seymour James, Jr., successor to Steven Banks, as appellate counsel.

Appellant did not have any codefendants below. She is not incarcerated pursuant to the judgment above.

## QUESTION PRESENTED

Whether the convictions should be reversed and the accusatory instrument dismissed where the evidence was insufficient to establish that appellant had the requisite *mens rea* to commit disorderly conduct. U.S. Const., Amend. XIV; N.Y. Const. art. I, §6; P.L. §240.20.

---

[1] References are to the trial transcript (Part 1), dated October 17, 2012; Those preceded by "T" are to the combined trial minutes (Part 2) and sentencing minutes, dated October 18, 2012.

The original complaint, which charged appellant with one count of disorderly conduct P.L. §240.20(3)), was replaced by a Prosecutor's Information charging her with both P.L. §240.20(2) and P.L. §240.20(3) (2-3).

2

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 18 of 54
Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 01 of 00
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 55 of 71

## STATEMENT OF FACTS

*Trial*

On September 24, 2011, at about 10 p.m., Police Officer *Matthew Winters*, a seven-year veteran of NYPD assigned to Midtown South, and his partner, Police Officer Michael Relf, responded to a radio run of an assault in progress at Stitch Bar, 247 W. 37th St., New York County (27-30, 61, 64). [2] There, Winters was approached by appellant, who had called to report the assault and was standing in front of the bar waiting for the police to arrive. Winters recalled that appellant was upset and had "visible bruises" on her arms (30, 62-64). [3]

After briefly speaking to appellant, Winters went inside the bar to hear "the other side of the story" while appellant remained outside (30, 63-64). When Winters returned a few minutes later, he told appellant that the police would not be charging anyone and refused to take her complaint (30-31, 51-54, 64).

While Winters was conversing with appellant, he was standing by the curb next to several other officers, and leaning on a phone booth with his back to the street. Appellant, who appeared visibly exhausted, stood directly in front of Winters (31-34). After Winters told appellant that the police would not assist her, appellant became more upset. The tone of her voice became higher and her hand gesturing movements became more animated (33). Winters testified that he tried to calm appellant down -- he told her to "calm down"

---

[2] September 24, 2011 was a Saturday.

[3] Counsel told the court that, at the time of trial, CCRB was investigating the police response to appellant's 911 complaint and the circumstances of her arrest in the instant case (12-14).

Case 1:15-cv-05871-KPF   Document 21-4   Filed 03/02/16   Page 62 of 66

and "speak lower." Appellant lowered her voice but, as she grew more excited, the tone of her voice became elevated (33-34, 54-55).

Appellant communicated to Winters, who spoke to appellant for about five minutes, that she was upset about the way the police were handling her complaint. In response, Winters told her to contact the Better Business Bureau if "she had a problem with the establishment" (34-35, 65-67, 70-71). After Winters made the remark, appellant started walking away from the bar towards Eighth Avenue. When she had walked about 20-25 feet, appellant glanced over her shoulder and yelled to Winters, "go f--- yourself" in a tone that Winters ranked as 9 on a 1-10 scale with 10 being the highest. Because appellant's remark was "loud enough for others to hear," Winters immediately grabbed appellant and placed her under arrest (34-35, 55-58, 65-68, 70-71). Winters did not recall appellant making any other derogatory statements prior to her arrest (36-37).[4]

Throughout the course of their conversation, Winters recalled, appellant's tone "fluctuated up and down" with her emotions. After he told her that police would not be charging anyone, appellant became more upset and her tone became higher (66-69).

From the time Winters first responded to the time of appellant's arrest, Winters estimated that there were about twenty people in the area. "There were a few [people] in front of the bar, a few to my left, a few to my right, and a few across the street" (35). He

---

[4] The People introduced a videotape showing the police responding to the scene, and Winters speaking to appellant, entering the bar, exiting the bar, and again speaking to appellant, who could be seen waving her arms (51-54, 65; People's exhibit number 2).

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 20 of 54

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 63 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 57 of 71

testified that "[p]eople were walking through us as we were speaking with the defendant"

and that some people stopped on the sidewalk (37).[5]

When Police Officer *Michael Relf*, Winters' partner, first observed appellant, she

was animated and "on the verge of crying" (T. 16-19, 26-27). As appellant described the

incident, Relf recalled, the tone of appellant's voice fluctuated considerably – she spoke

calmly one minute, and was yelling the next (T. 16-19, 26-27). After Relf and his partner

spoke to the bar manager and two patrons, they decided not to arrest anyone for assault

(T. 20-21, 28).

Although appellant was initially calm when Winters told her that the police would

not be making an arrest, she became upset after Winters refused to take her statement.

Appellant, who felt as if she had been wronged, Relf testified, then purportedly became

"animated and aggressive" and she told Winters that NYPD was "worthless" and "she is

the victim" (T. 20, 28-30).[6] After appellant yelled "go f--- yourself" as she was walking

away from the scene in a tone Relf described as a 9,[7] Winters arrested appellant for using

"obscene language easily within hearing of the general public" (T. 22-25, 30-31).

Relf described the area as mostly commercial. Although there were about ten

people in the general area and appellant's comments caused some pedestrians to glance

---

[5] The court stated that it would only consider the "go f--- yourself" statement because the other statements contained in the complaint were apparently made after appellant was arrested and would be precluded (38).

[6] When asked to describe the tone of appellant's voice at the time she made the comments, Relf testified her tone was a 7 or 8 on a scale of 1 to 10 with 10 being the highest (T. 28).

[7] On a scale of 1 to 10 with 10 being the highest tone (T. 30-31).

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 21 of 54

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 64 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 58 of 71

over, appellant did not try to engage any of them and none of them got involved (T. 20-21, 24-31).

When Midtown South Police Officer *Dianne Melidones* responded to Stitch Bar, Winters was on the sidewalk in front of the bar talking to appellant, who appeared "agitated" and was waving her hands around, and Melidones remained with appellant when Winters went inside the bar (72-75; T. 3-5). When Winters returned and informed appellant that the police would not help her, appellant's tone became elevated. After Winters told appellant to contact the Better Business Bureau about her complaint, appellant started walking away from the scene. As she was walking away, appellant was purportedly "screaming and carrying on" and, after she told the police "go f--- yourself," Winters proceeded to arrest her (77-79; T. 2, 9-12).

During the encounter, Melidones testified, a few pedestrians glanced over as they passed by but continued walking and did not have any audible reaction, and a "crowd of five people gathered across the street" (75-79; T. 9, 13-15). Appellant made no attempt to engage any of the bystanders or pedestrians (T. 9-11).

*The Defense Motion to Dismiss*

After the People rested, counsel moved for a trial order of dismissal. The defense maintained that the People failed to make out a *prima facie* case since the evidence was insufficient to support the inference that appellant acted intentionally or recklessly to create a public safety risk. Citing, *inter alia, People v. Munafo*, 50 N.Y.2d 326 (1980), counsel noted that the dispute was a private matter solely between appellant and the

6

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 22 of 54
Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 65 of 66
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 59 of 71

police -- specifically officer Winters -- regarding her assault complaint. Although a few pedestrians glanced in appellant's direction as they walked by, they did not get involved and there was no indication that appellant sought to incite or involve the public or that the public was inconvenienced, annoyed, or alarmed. Thus, counsel continued, the circumstances did not support the inference that appellant intentionally or recklessly created a risk that the private dispute between her and the police would extend its boundaries and become a public issue (T. 33-37, 40-48).

In response, the prosecutor contended that yelling "go f--- yourself" in a loud tone -- even just once – is sufficient to establish "unreasonable noise" under subsection (2) of P.L. §240.20 (T. 49-50). Citing *People v. Weaver*, 16 N.Y.3d 123 (2011), the prosecutor further argued that appellant's use of "profanities one time" was sufficient to satisfy P.L. §240.20(3), and that the noise and obscene language recklessly "created a risk to the public" (T. 49-53).

The court denied the defense motion (T. 57).


*The Closing Arguments*

Counsel maintained that the People failed to prove beyond a reasonable doubt that appellant had the requisite *mens rea* or *actus rea* to commit disorderly conduct. Appellant sought out the police after she was assaulted and when they refused to take her complaint, she became justifiably upset with Winters. At no point, however, did appellant attempt to involve or incite others and, although a few curious pedestrians turned to look, they

Case 1:15-cv-05871-KPF   Document 21-4   Filed 09/02/16   Page 66 of 66

continued walking, and there was no evidence it caused them to become inconvenienced, annoyed, or alarmed or created a risk to public safety (T. 58-61, 66-68).

Counsel further noted that appellant made the derogatory remark to Winters because she was nervous and upset with Winters, and not to intentionally incite others and, moreover, the disorderly conduct statute was not intended to criminalize the conduct here – a single derogatory remark made during a private dispute with a police officer. Counsel also pointed out that the encounter occurred in midtown Manhattan, where the public is constantly barraged with sirens and other loud noises, which is relevant in assessing whether the noise was "unreasonable" (T. 59-68).

In response, the People contended that appellant intended to cause public inconvenience, annoyance, or alarm because she was "already agitated and worked up and then became even more agitated when they told her they would not arrest the person but when they told her she should go to the Better Business Bureau she got even more upset because she wasn't having her own way and she continued yelling and cursing and then walked away from the place. At the moment she said 'go f--- yourself' [in a loud tone] we know that her intention was to cause public inconvenience, annoyance, or alarm [because] she did not state to the police officers 'go fuck yourself' when she was standing right in front of them within 2 to 3 feet" (T. 71-75). According to the prosecutor, because appellant was aware that members of the public were in the area, by making unreasonable noise and yelling obscenities and gesturing, she recklessly created a risk to others (T. 77-82).

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 24 of 54
Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 1 of 41
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 61 of 71

*Sentencing*

Appellant was convicted of both P.L. §240.20(2) and P.L. §240.20(3) (T. 82). Before sentencing, appellant apologized for her actions and explained to the court that she was a victim of domestic violence and suffered from post dramatic stress syndrome, and that the guilty verdict was punishment enough (T. 83-85). The court sentenced appellant to a conditional discharge and three days community service, and imposed a $120 mandatory surcharge (T. 85-86).

## ARGUMENT

### POINT

THE CONVICTIONS SHOULD BE REVERSED AND ACCUSATORY INSTRUMENT DISMISSED WHERE THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT APPELLANT HAD THE REQUISITE *MENS REA* TO COMMIT DISORDERLY CONDUCT. U.S. CONST., AMEND. XIV; N.Y. CONST. ART. I, §6; P.L. §240.20.

Shortly before 10:00 p.m. on the Saturday night in question, appellant called 911 to report that she was being assaulted in Stitch Bar in midtown Manhattan. When officer Winters and his partner responded to the scene, they were approached by appellant, who was standing in front of the bar waiting for the police to arrive. Appellant, Winters recalled, was distraught and had visible bruising on her arms. As appellant described the incident to Winters, the tone of appellant's voice fluctuated with her emotional state; When she was calm, appellant spoke in a low tone and when she was agitated or upset, appellant's tone became elevated. After briefly speaking to a couple of people about the

Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 2 of 41

allegations outside of appellant's presence, Winters informed appellant that the police would not take any further action and refused to take her assault complaint. When Winters suggested that appellant contact the Better Business Bureau about her complaint, appellant became upset and started to walk away. After she had walked about 25 feet, appellant glanced over her shoulder and, as she continued walking, yelled to Winters, "go f--- yourself." Winters immediately arrested appellant for disorderly conduct. As discussed below, because evidence that appellant had the requisite *mens rea* to commit disorderly conduct was lacking, the convictions must be reversed and the accusatory instrument dismissed.

It is a fundamental principle that a criminal conviction cannot stand absent sufficient proof beyond a reasonable doubt on every element of the offense. *See Jackson v. Virginia*, 443 U.S. 307, 316 (1979). A conviction is legally insufficient where, viewing the record in the light most favorable to the prosecution, there is no "valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt." *People v. Maldonado*, 24 N.Y.3d 48 (2014)(quoting *People v. Danielson*, 9 N.Y.3d 342, 349 (2007)); *see People v. Khan*, 18 N.Y.3d 535, 541 (2012); *People v. Williams*, 84 N.Y.2d 925, 926 (1994); *People v. Contes*, 60 N.Y.2d 620, 621 (1983).[8]

---

[8] Counsel preserved the legal insufficiency argument by moving for a trial order of dismissal based on the lack of evidence of "public harm," a requisite element of P.L. §240.20. *See People v. Hawkins*, 11 N.Y.3d 484 (2008); *People v. Gray*, 86 N.Y.2d 10 (1995).

Moreover, even if all the elements are supported by some credible evidence, the Court still must examine the evidence further and "determine whether an acquittal would not have been unreasonable." *People v. Bailey*, 94 A.D.3d 904, 905 (2d Dept. 2012). If, based on the credible evidence, a different finding would not have been unreasonable, then the appellate court must "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony." *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987)(citation omitted); *see People v. Danielson*, 9 N.Y.3d 342; *People v. McFadden*, 106 A.D.3d 1020 (2d Dept. 2013)(noting there is no preservation requirement for appellate weight-of-the-evidence review).

In reviewing a weight of the evidence claim, an appellate court exercises its power to "affirmatively review the record; independently assess all of the proof; substitute its own credibility determinations for those made by the jury[,] determine whether the verdict was factually correct; and acquit a defendant if the court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt." *People v. Delamota*, 18 N.Y.3d 107, 117 (2011); *see Danielson*, 9 N.Y.3d at 348; *Bleakley*, 60 N.Y.2d 490.

*Appellant lacked the mens rea to commit disorderly conduct*

Appellant was convicted of two counts of disorderly conduct, P.L. §240.20(2) and P.L. §240.20(3). Under Penal Law §240.20(2), "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e makes unreasonable noise." Under Penal Law §240.20(3),

11

Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 4 of 41

"[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [i]n a public place, he uses abusive or obscene language, or makes an obscene gesture."[9]

That the "defendant's disruptive statements and behavior [are] of a public rather than an individual dimension . . . stems from the *mens rea* component, which requires proof of an intent to threaten public safety, peace or order (or the reckless creation of such a risk)." *People v. Baker*, 20 N.Y.3d 354, 360 (2013). The Court of Appeals in *People v. Baker* noted that, because of its "important narrowing function," without which the disorderly conduct statute would be vulnerable to constitutional attack, the "public harm" element "cannot be overstated." *People v. Baker*, 20 N.Y.3d 354, 360. Thus, "a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem" *Id.* at 359-360; *see People v. Bakolas*, 59 N.Y.2d 51, 54 (1983)(public harm element vital to the constitutionality of P.L. §240.20 because it "narrows the definition [of prohibited conduct], so that no inadvertent . . . act may be punished").

---

[9] "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct." P.L. §15.05(1).

"A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto." P.L. §15.05(3).

Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 5 of 11

To determine whether the record supports an inference that the defendant had the requisite *mens rea*, courts conduct "a contextual analysis that turns on consideration of many factors, including 'the time and place of the episode under scrutiny; the nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances." *Baker*, at 360 (quoting *People v. Weaver*, 16 N.Y.3d 123, 128 (2011)). Although the risk of public disorder does not have to be realized, "the circumstances must be such that defendant's intent to create such a threat (or reckless disregard thereof) can be readily inferred." *People v. Baker, supra* (citing *People v Todaro*, 26 N.Y.2d 325, 329 (1970)).

In *Baker*, the Court of Appeals revisited several of its seminal decisions analyzing the "public harm" element of the disorderly conduct statute, and the decision provides a helpful contextual framework for assessing whether a particular situation "extend[s] beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem." *People v. Baker*, 20 N.Y.3d at 359-360 (citing *People v Weaver*, 16 N.Y.3d at 128 (internal quotation marks and citation omitted)).

The defendant in *Baker* approached a police car that was parked on a residential block in Rochester and asked the officer inside why he had checked the license plate of a car that was parked in his girlfriend's driveway across the street. The officer replied that "he could run a plate if he wanted to," and the defendant, who started backing away from the officer towards the middle of the street, swore at the officer in a loud tone. When the officer asked "what did you say," the defendant repeated the profanity and accused the

Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 6 of 41

officer of harassing him. The officer then arrested the defendant for disorderly conduct. *Baker*, at 357.

Although the defendant swore at the officer in a loud tone and his conduct attracted the attention of about ten bystanders, who had gathered on the sidewalk to watch the interaction, the Court, reversing the defendant's plea conviction, held there was "no record basis for the finding of probable cause" to arrest the defendant for P.L. §240.20(3) because the proof was "insufficient to support the public harm element." *Id.* at 362-363.

Conducting a multi-factored contextual analysis, the *Baker* Court noted that the defendant's "public outburst" -- which consisted of making two loud derogatory statements claiming harassment -- was "extremely brief." *Id.* And, because the incident "occurred around dinner time on a heavily-populated city street bustling with car traffic and pedestrian activity," the Court observed, "there was no significant likelihood that defendant's brief statements loud [as] they were would disrupt peace and order in the vicinity." *People v. Baker,* at 363.

The Court further noted that, although a group of bystanders had gathered around the defendant and his girlfriend, there was "no evidence that the bystanders expressed any inclination, verbally or otherwise, to involve themselves in the dispute between defendant and [the officer]" and "no basis to infer that these spectators were motivated by anything other than curiosity." *Baker,* at 363. In addition, the Court pointed out that the derogatory statements were "not accompanied by menacing conduct" and, in fact, the "defendant was stepping away from the vehicle when he made them." Nor was there any basis to infer

Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 7 of 41

that the officer felt threatened by the statements, and the presence of another officer at the scene who was "fully able to provide assistance diluted the risk that others in the vicinity would join forces with [the] defendant and gang up on [the officer]." *Id.*

"Another factor worthy of consideration," the *Baker* Court continued, was that the abusive statements were directed at a police officer.

> [B]oth at its inception and conclusion, the verbal exchange was between a single civilian and a police officer. The fact that defendant's abusive statements were directed exclusively at a police officer a party trained to diffuse situations involving angry or emotionally distraught persons further undermines any inference that there was a threat of public harm, particularly since the police officer was in a position of safety and could have closed his windows and ignored defendant. . . . [I]solated statements using coarse language to criticize the actions of a police officer, unaccompanied by provocative acts or other aggravating circumstances, will rarely afford a sufficient basis to infer the presence of the "public harm" *mens rea* necessary to support a disorderly conduct charge.

*People v. Baker*, 20 N.Y.3d at 363 (emphasis added).

As discussed below, the underlying facts in the instant case are strikingly similar to those in *Baker*. While in *Baker*, the facts did not provide a record basis to support a finding of probable cause, in the instant case there was an insufficient factual basis to support the conviction. The encounter here was merely a "purely personal clash" and "momentary . . . flare-up [and did not] attain the degree of gravity warranting criminal prosecution under the statute." *Baker*, at 361 (citing *People v. Pritchard*, 27 N.Y.2d 246, 249 (1970)).

Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 8 of 41
Case 1:15-cv-05871-LAP   Document 16-3   Filed 05/09/16   Page 68 of 71

*Nature and character of the conduct*

As in *Baker*, appellant's outburst was extremely brief. Dissatisfied with the way officer Winters responded to her complaint, appellant expressed her dissatisfaction by making a loud derogatory remark to officer Winters as she was walking away from the scene. Winters reacted by immediately arresting appellant for disorderly conduct.

The disorderly conduct statute was not intended to proscribe each and every minor annoyance. Again, the scope of the statute "is limited to that type of conduct which involves a genuine intent or tendency to provoke a breach of the peace." *People v. Pritchard*, 27 N.Y.2d at 248 (quotations omitted). Thus, standing alone, appellant's statement was insufficient to satisfy the "public harm" element of P.L. §240.20. *See People v. Baker, supra*, at 362-363; *People v. Pritchard, supra*, at 249 (reversing disorderly conduct conviction based on defendant's fight in dance club, which resulted in crowd gathering); *People v. Perry*, 265 N.Y. 362, 365 (1934)(notwithstanding the fight occurred in public venue and a crowd had gathered to watch, evidence legally insufficient to establish disorderly conduct); *see also People v. Carter*, 13 A.D.2d 652 (1st Dept. 1961)(defendant may not be convicted of disorderly conduct where there is a reasonable doubt whether the conduct was intentional or whether it resulted from a momentary and unanticipated lack of physical control).

*Time and Place*

As in *Baker*, the incident here occurred "on a heavily-populated city street bustling with car traffic and pedestrian activity." Specifically, the encounter occurred shortly

Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 9 of 41

before 10:00 p.m. on a Saturday night in noisy midtown Manhattan, a few blocks from Madison Square Garden, where sport fans regularly congregate outside and yell and curse and complain about their team's latest loss. Thus, as in *Baker*, given the makeup of the area, "there was no significant likelihood that defendant's brief statements loud [as] they were would disrupt peace and order in the vicinity." *Baker*, 20 N.Y.3d at 363.

*Private exchange*

The *Baker* Court reiterated that "isolated statements using coarse language to criticize the actions of a police officer, unaccompanied by provocative acts or other aggravating circumstances, will rarely afford a sufficient basis to infer the presence of the 'public harm' *mens rea* necessary to support a disorderly conduct charge." *Id.* [10]

As in *Baker*, appellant's remark was directed exclusively at a police officer, "a party trained to diffuse situations involving angry or emotionally distraught persons." *Baker*, 20 N.Y.3d at 363. [11]

---

[10] *See also People v. Fassinger*, 42 Misc. 3d 407 (Crim. Ct. N.Y. Co. 2013)(dismissing accusatory instrument charging P.L. §240.20(2) and P.L. §240.20(3) based on defendant, who was walking in middle of street, yelling to officer, including saying "arrest me," and making several obscene gestures including giving two middle fingers and grabbing her crotch in that the conduct "create[d] the risk for public alarm as cars were stopped behind patrol in view of the defendant's behavior." Court noted that officer "could have just as easily ignored Defendant's crude gestures" and "isolated statements using course language to criticize the actions of a police officer, unaccompanied by provocative acts or other aggravating circumstances, will rarely afford a sufficient basis to infer the presence of the public harm *mens rea* necessary to support a disorderly conduct charge.").

[11] In *City of Houston v. Hill*, 482 U.S. 451 (1987), the defendant was arrested after "shout[ing] abuses," which violated a city ordinance that prohibited "intentionally interrupt[ing] a city policeman . . . by verbal challenge during an investigation," and accosting police officers who were in the process of issuing a ticket to his friend. *Id.* at 454 & n.2. The law had been interpreted as encompassing those who "verbal[y] abuse" and "curs[e]" at a police officer while in the line of duty. *Id.* at 457.

*Absence of other aggravating circumstances*

Nor do the other circumstances of the encounter support the inference that appellant intentionally or recklessly caused public harm or created the risk thereof. As in *Baker*, appellant uttered the statement as she was walking away from the scene, from a distance of 25 feet. The fact that appellant had started to physically distance herself from the encounter is inconsistent with the finding that she possessed the requisite *mens rea* or that her statement created a public safety risk or was otherwise threatening to the police.[12]

---

Vacating Hill's conviction, the Supreme Court found that the ordinance was unconstitutionally overbroad because "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Hill*, 482 U.S. at 461-463. Even speech that is "provocative and challenging" is "protected against censorship or punishment," the Court explained, "unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* at 461. Unless a defendant's verbal challenge to law enforcement officers rises to the level of "fighting words that 'by their very utterance inflict injury or tend to incite an immediate breach of the peace,'" his activity is constitutionally protected. *Hill*, 482 U.S. at 461-462 (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 133 (1974)(invalidating ordinance that made it a crime "for any person wantonly to curse or revile or to use obscene or opprobrious language toward . . . police"). As the *Hill* Court noted, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462-463.

Similarly, in *Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir. 2001), the Court sustained the jury finding that police lacked probable cause to arrest Provost under P.L. §240.20(3)(using abusive or obscene language in a public place), despite evidence that Provost, who became angry after a lengthy wait at a police station, repeatedly "scream[ed], sw[ore], [and] holler[ed]" at officers in the presence of others. *Id.* at 151-152. The Court ruled that Provost's "language could not be the basis for a valid arrest because . . . it was constitutionally protected," 262 F.3d at 159, and "[o]nly fighting words directed at police officers can be criminalized" because "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen." *Id.* at 159-160 (quotations and citations omitted).

[12] The prosecutor's argument on summation that appellant's intent to create a public disturbance could be inferred from the fact that she made the statement to the police from afar instead of face-to-face is ridiculous and should be rejected. There were four officers at the scene, none of whom seemed the least bit sensitive to appellant's complaint, and appellant, who was evidently

Nor was there any evidence that Winters felt threatened by appellant at an earlier

point, before she started to walk away. During Winters five-minute conversation with

appellant, the officer was leaning against a phone booth in a relaxed pose and three

fellow officers were within arm's reach. [13]

Regardless of whether the remark was directed at Winters specifically or all four

officers, here, as in *Baker* and as in *People v. Munafo*, 50 N.Y.2d 326 (1980), [14] which

also involved a private dispute between the defendant and police, there was no indication

that appellant sought to expand the boundaries of the encounter by inciting or involving

---

alone, had reason to question their professionalism and judgment. That appellant uttered the statement from a distance supports the inference that, although she wanted to voice her dissatisfaction with how Winters handled her complaint, she felt less vulnerable expressing herself from afar.

[13] Although appellant had earlier used animated hand gestures while communicating to officer Winters, there is no evidence that the gestures were intended to be menacing or threatening. Studies of gesture at the University of Chicago concluded that speech and gesture are two aspects of a single linguistic system and the evidence suggests that the greater the cognitive effort required for speech, the more we gesture. Essentially, hand-waving, some of which is reflexive, seems to decrease our "cognitive load" or the amount of mental effort needed to retrieve information. http://online.wsj.com/news/articles/SB10686987621722900. Although Relf claimed that appellant was acting "aggressively," Relf was apparently referring to appellant's hand gesturing and there is no evidence to suggest that Relf (or any of the other officers) actually felt threatened. In any event, regardless of how the police perceived the earlier hand gesturing, at the time of appellant's arrest, she was walking away from the scene and clearly posed no threat.

[14] Defense counsel relied on *Munafo* in support of the defense motion to dismiss based on insufficient evidence of public harm. In *Munafo*, the defendant fired a shot in the air at a State Power Authority construction crew that was attempting to erect a transmission line on a right-of-way that went through his farm. About ten people witnessed the incident but they had not been drawn there by defendant's conduct and did not get involved. The evidence in *Munafo* did not support the disorderly conduct conviction not only because the incident occurred on the defendant's private property in a remote area, but also because there was no indication that the defendant sought to incite or involve the witnesses, who were already in the area, and the "only fair inference was that the differences between the authority and the defendant were confined to these two disputants rather than spread to the public." *People v. Munafo*, 50 N.Y.2d at 332.

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 35 of 54
Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 12 of 41
Case 1:15-cv-05871-LAP   Document 16-4   Filed 05/09/16   Page 1 of 40

members of the public. *See Munafo*, at 331-332; *see also People v. Castro*, 29 Misc. 3d 1217(A) (Sup. Ct. Bronx Co. 2010)(no probable cause supporting disorderly conduct arrest; defendant's conduct - yelling and cursing at officers writing traffic ticket and puffing out his chest - was directed at police and defendant made no attempt to involve spectators); *cf. People v. Gonzalez*, 112 A.D.3d 440 (1st Dept. 2013)(finding probable cause for disorderly conduct arrest where defendant loudly and angrily cursed police officers, violently waved his arms, screamed complaints about the police to people in the vicinity, and forced subway riders out of his way, conduct which "escalated defendant's initially individual interaction with the police officer so as to create a 'potential or immediate public problem'")(quoting *People v. Weaver*, 16 N.Y.3d at 128)); *In re Jonathan McL.*, 303 A.D.2d 169 (1st Dept. 2003)(probable cause for disorderly conduct arrest where defendant flailed his arms and yelled obscenities in presence of gathering crowd and police, who had been summoned by livery cab driver to help resolve dispute with appellant).[15]

*Conduct of bystanders*

Nor did the other evidence support the finding that appellant's private grievance with the police was at risk of becoming public issue. *See Munafo*, 50 N.Y.2d at 331. In assessing whether a defendant's conduct constitutes "a potential or immediate public

---

[15] The *Baker* Court noted that the presence of another officer in the area effectively "diluted the risk that others in the vicinity would join forces with [the] defendant and gang up on [the first officer]." *Baker*, at 363. Unlike in *Baker*, here there were three other officers at the scene, not just one.

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 36 of 54
Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 13 of 41
Case 1:15-cv-05871-LAP   Document 16-4   Filed 05/09/16   Page 2 of 40

problem," relevant factors include: "the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances." *People v. Pritchard*, 27 N.Y.2d at 248–249.

While there were a few pedestrians and bystanders in the vicinity, and one officer testified that a crowd of five gathered across the street, [16] as in *Baker*, there is "no evidence that the bystanders expressed any inclination, verbally or otherwise, to involve themselves in the dispute between defendant and [the officer]." *People v. Baker*, 20 N.Y.3d at 363; *see People v. Munafo*, 50 N.Y.2d at 331-332 (no public harm to support disorderly conduct conviction where, *inter alia*, confrontation "confined to [the] two disputants"). Thus, as in *Baker*, there is "no basis to infer that these spectators were motivated by anything other than curiosity or a desire for entertainment." *Baker*, at 361 (citing *Pritchard*, at 248-249).

*No evidence that the public was annoyed, alarmed, or inconvenienced*

Moreover, although the police were obviously upset over appellant's remark, there is no evidence that members of the public were actually annoyed, alarmed or inconvenienced by appellant's actions, as required under P.L. §240.20. *See People v. Jones*, 9 N.Y.3d 259, 262 (2007)(dismissing information charging P.L. §240.20(5)(obstructing vehicular or pedestrian traffic) for failure to allege sufficient facts "supporting or tending to support" *mens rea* element; Although as a result of defendant's

---

[16] According to the police, the number of bystanders and onlookers who gathered to watch the encounter ranged from five to twenty.

conduct, numerous pedestrians had to walk around defendant, "[s]omething more than a mere inconvenience of pedestrians is required to support the charge"); *People v. Munafo*, 50 N.Y.2d at 332 (no evidence defendant's conduct caused "any obstruction of passage, vehicular or pedestrian, of the public at large"); *People v. Richardson*, 30 Misc. 3d 1204(A) (Crim. Ct. N.Y. Co. 2010)(P.L. §240.20(3))(information alleging defendant yelled obscenities at a New York City location, causing a crowd to gather, insufficient to support disorderly conduct, absent allegation that anyone was annoyed or inconvenienced by defendant's actions); *see also U.S. v. Olavarria*, 2011 WL 1529190 (S.D.N.Y.)(where entire incident lasted no more than five minutes, obstruction of pedestrian traffic unlikely); *People v. Snyder*, 36 Misc. 3d 137(A) (9th &10th Jud. Dists. 2012)(evidence legally insufficient to establish P.L. §240.20(2); intent to create public disturbance not supported by facts where, *inter alia*, defendant shouted in protest of what he reasonably believed to be his wrongful treatment by police outside his home and prosecution did not present evidence regarding effect on public); *cf. People v. Malone*, 28 Misc. 3d 1227(A) (Crim. Ct. New York Co. 2010)(disorderly conduct charge sufficiently pled where defendant's conduct caused people to leave and avoid Times Square area).[17]

*This case is readily distinguishable from People v. Weaver and People v. Tichenor*

At trial, the prosecutor, relying on *People v. Weaver*, argued that appellant's *mens rea* to commit disorderly conduct was inferable from the circumstances. Given the

---

[17] The requisite intent to breach peace cannot be found solely upon the prohibited act itself. *See People v. Pearl*, 321 N.Y.S.2d 986, 987 (1st Dept. App. Term 1971)(obstructing sidewalk).

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 38 of 54
Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 15 of 41
Case 1:15-cv-05871-LAP   Document 16-4   Filed 05/09/16   Page 4 of 40

striking factual dissimilarities between this case and *Weaver*, however, the prosecutor's reliance on *Weaver* was wholly misplaced.[18]

In *Baker*, the Court cited *Weaver* as an example of a case in which the requisite *mens rea* was "readily inferred" from the circumstances, which included:

1. Context: The incident in *Weaver* occurred A) at a public location – a parking lot by an open gas station; B) in a sleepy little upstate town; C) in the middle of the night.

2. Defendant's conduct: A) Weaver was waving his arms and yelling obscenities at his bride (who was sitting on the curb crying) in a "loud, aggressive, and threatening tone" and, B) when the police tried to intervene on his wife's behalf, the defendant threatened the officer not to put her hands on him; and C) only after failing to comply with repeated warnings to stop his disruptive behavior, was defendant was arrested for disorderly conduct.

Given Weaver's aggressive response to the officer's effort to intervene on his bride's behalf, the *Baker* Court noted, the "protracted, increasingly aggressive nature of defendant's vocalizations," the officer's repeated warnings to calm down and go elsewhere, which Weaver ignored, and the place and time of the encounter, readily supported the inference that Weaver's intent was to create a risk of public harm.

Notably, unlike *Weaver*, the encounter here occurred shortly before 10 p.m. on a Saturday night in midtown Manhattan, an area where the public is bombarded with loud noises around the clock – including clanging banging sanitation trucks, horns, shrill

---

[18] The court, in denying the motion to dismiss and convicting appellant on both counts, presumably credited the prosecutor's argument.

police and ambulance sirens, street traffic – chronic noises that are louder and far more noxious and offensive than one brief vocal outburst.

Moreover, unlike in *Weaver*, appellant's conduct was not "increasingly aggressive," and the dispute was a private matter between appellant and officer Winters and did not involve an innocent third party. Notably, unlike in *Weaver*, where the defendant was arrested only after he ignored repeated police warnings and whose disruptive conduct showed no sign of abating, here the police did not issue a single warning, let alone multiple warnings prior to the arrest.[19] Moreover, unlike the defendant in *Weaver*, appellant was arrested after she started to walk away, when the encounter was winding down. *See People v. Richardson*, 30 Misc. 3d 1204(a) (in determining whether defendant had culpable mental state to create public disturbance court should consider, *inter alia*, whether defendant persisted in the conduct after the police issued warnings).

Finally, unlike the protracted encounter in *Weaver*, here the conduct consisted of a single derogatory statement. Even if the conduct preceding the remark could somehow be characterized as disruptive – which it was not – the entire encounter was over in five minutes or less.

The facts in this case also bear little resemblance to those in *People v. Tichenor*, 89 N.Y.2d 76, where the defendant's intent was also readily inferable from the circumstances. *Baker*, 20 N.Y.3d at 361.

---

[19] When Winters asked appellant to lower her voice, appellant complied. Her tone again became elevated in reaction to Winters' comment that appellant should contact the BBB about the assault.

24

In *Tichenor*, the defendant, who was standing by the entranceway of a bar in Saratoga Springs late at night, spit and yelled obscenities at an officer as the officer walked by and then shoved the officer, who was alone on foot patrol. When the officer tried to arrest the defendant for disorderly conduct, a crowd of patrons gathered and yelled for the officer to leave the defendant alone. The defendant retreated inside the bar and, when the officer followed him inside, a scuffle erupted between the defendant, the officer, and a number of bar patrons. *Id.*

The defendant instigated the confrontation, the *Baker* Court noted, and the circumstances of the encounter -- a single officer, a crowd of reactive bar patrons who voiced their support for the defendant, and the defendant's retreat inside the bar -- created "a risk of public harm." That the harm actually materialized was "a predictable result given the context of [defendant's] obstreperous statements and conduct." *Baker*, at 361.

The only commonality between the instant case and *Tichenor* is that both cases occurred at night in or near a bar. Indeed, unlike the officer in *Tichenor*, who was alone on foot patrol, here there were three officers standing within arm's reach of Winters. And, unlike the officer in *Tichenor*, who felt threatened and called for back-up assistance, here there was no evidence that the police considered appellant's conduct a threat to the police or to the public. Finally, unlike the defendant in *Tichenor*, appellant approached the police for a lawful purpose, not to instigate a confrontation.

*Appellant's statement did not constitute "unreasonable noise"*

Appellant also lacked the requisite *actus rea* to commit P.L. §240.20(2). In *People v. Bakolas*, 59 N.Y.2d 51, the defendant, who was stopped for a traffic violation, became abusive and threatening to the police. Refusing to return to his vehicle when ordered to do so, the defendant stood in the roadway thus forcing vehicles to swerve to avoid striking him. *Id.* at 52-53. Defining "unreasonable noise" as a noise of a "type or volume that a reasonable person, under the circumstances, would not tolerate," the *Bakolas* Court concluded that "the objective standard of public disturbance, the requirement of unreasonableness, and the narrowing effect of the fact that all of the other acts proscribed by the section are publicly offensive, permit, if they do not require, [a constitutionally permissive] construction." *People v. Bakolas*, 59 N.Y.2d at 53-54; *People v. Carver*, 971 N.Y.S.2d 669 (Sup. Ct. 2013)(discussing P.L. §240.20(2)); relevant inquiry includes nature of noise and attendant circumstances, such as character of surrounding area and number of people attracted).

Although appellant's remark was loud, given the makeup of the area and the lack of sound measurement evidence in the case, the evidence did not establish that the tone of appellant's voice was objectively unreasonable, particularly since there was no testimony that any of the bystanders complained to the police or acted in a way that suggested they found the noise intolerable.

*Conclusion*

In sum, appellant's appellant's brief emotional outcry over Winter's handling of her assault complaint and the officer's insensitive comment does not constitute disorderly conduct. Appellant may have uttered the statement on a public street, but the remark was directed exclusively at the police, specifically officer Winters, the episode occurred on a commercial block in noisy midtown Manhattan, appellant never attempted to draw a crowd or to incite anyone else to become involved with her private grievance against the police, and there was no evidence suggesting there was a risk that the situation could escalate. In fact, appellant made the statement after she physically withdrew from the situation and was walking away, thus signaling that her intent, notwithstanding her brief outcry, was to put the entire upsetting exchange with Winters behind her. In short, this was not a situation "that carried beyond the individual disputants to a point where [it] had become a potential or immediate public problem." *Munafo*, 50 N.Y.2d at 331.

Thus, for the reasons stated above, even viewing the evidence in the light most favorable to the prosecution, there was a failure of proof as to an essential element of the crime. The circumstances simply do not support the inference that appellant intended to create a public disturbance or recklessly disregarded the risk thereof. At the very least, the verdict was against the weight of the evidence. Therefore, the conviction should be reversed and the accusatory instrument dismissed.

Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 20 of 41

Case 1:15-cv-05871-LAP   Document 16-4   Filed 05/09/16   Page 9 of 40

## CONCLUSION

FOR THE REASONS STATED ABOVE, THE
CONVICTION SHOULD BE REVERSED AND THE
ACCUSATORY INSTRUMENT DISMISSED.

Respectfully submitted,

SEYMOUR JAMES, Jr.
Attorney for Defendant-
Appellant

JANE LEVITT
Of Counsel
June 2015

**Exhibit X**

**NEW YORK STATE**
**DOMESTIC INCIDENT REPORT**

Agency:                                                              Serial # (NYC)          Incident #

**DATES**

| Month | Day | Year | Time (24 hr) | Address of Occurrence | APT # | Precinct (PO) CTV | Auto # (NYC) Complaint # |

O Officer-Initiated   O Radio Run   O Walk-In

**VICTIM/PARTY (P1)**

Name (Last, First, M.I.) (include aliases)

DOB   Month   Day   Year   Age   O M   O F

If non-English, language:   O Spanish   O Chinese   O Other

Injured?  O No   O Yes          Removed to Hospital?  O No   O Yes   If yes, what hospital?
O White   O Black   O Asian   O Native American   O Other
O Hispanic   O Non-Hispanic   O Unknown

Describe:

Name (Last, First, M.I.) (include aliases)          Phone

**SUSPECT/PARTY (P2)**

DOB   Month   Day   Year   Age   O M   O Female

Street & City          APT #   Zip

If non-English, language:   O Spanish   O Chinese   O Other

Injured?  O No   O Yes          Removed to Hospital?  O No   O Yes   If yes, what hospital?
O White   O Black   O Asian   O Native American   O Other
O Hispanic   O Non-Hispanic   O Unknown

Describe:

| | Prior DV History? | O Yes   O No |
| Prior DV police report? | O Yes   O No |
| Victim fearful? | O Yes   O No |
| Access to weapons? | O Yes   O No |
| Suspect Drug/Alc Abuse? | O Yes   O No |
| Suspect Hx suicide threat? | O Yes   O No |
| Suspect Probation/Parole? | O Yes   O No |

**LIVING SITUATION**

**SUSPECT (P2) present?**
O Yes   O No

Do parties currently live together?  O Yes   O No
IF NO, have they lived together in the past?  O Yes   O No
Do the parties have a child-in-common?  O Yes   O No

**RELATIONSHIP: (SUSPECT/P2 to VICTIM/P1)**
O Married   O Formerly Married
O Intimate Partner/Dating   O Former Intimate/Dating
O Child of victim/party 1   O Parent of victim/party 1
O Relative   O Other

**ASSOCIATED PERSONS**

**SUSPECT/SUSPECT ACTIONS**

(Check all that apply)
O Biting
O Destroyed Property (estimate $)
O Forced Entry
O Forcible Restraint
O Hair Pulling
O Homicide
O Impaired Alcohol/Drugs
O Injury to Child
O Injury to Other Persons
O Injury to Pet/Animal
O Interference with Phone
O Intimidation/Coercion
O Kicking
O Punching
O Pushing
O Sexual Assault
O Shooting
O Slapping
O Slamming Body
O Stabbing
O Strangulation/Choking
O Suicide or Attempt
O Threw Items
O Unwanted Contact
O Verbal Abuse
O Violated Visitation/Custody Conditions
O OTHER Suspect Actions:
O Threat (specify):
O Injure/Kill Persons
O Injure/Kill Self
O Injure/Kill Pet/Animal
O Take Child
O Destroy/Take Property
O Other:
O Threat with weapon
O Weapon used: (specify)
O Blunt Object
O Gun
O Motor Vehicle
O Sharp Instrument
O Other:

**ARREST & OFFENSES**

Arrest Made?  O Yes   O No   Arrest #
Reasons arrest not made on-scene:  O No Offense Committed   O No Probable Cause   O Suspect Off-Scene
O Warrant/Criminal Summons to be requested   O Violation level, not in police presence (no citizen's arrest)   O Other:

| Offenses | Law (e.g. PL) | Section (Sub) | Charges Filed |
|---|---|---|---|
| 1. | | | O |
| 2. | | | O |
| 3. | | | O |

Offenses involved: check all that apply   O Felony
O Misdemeanor   O Violation   O Other (Specify)

| Registry Checked? | O Yes   O No | OP Court Name: |
| Order of Protection? | O Yes   O No | O Family   O Criminal   O Supreme |
| Stay Away Order? | O Yes   O No | O Out of State   O Tribal |
| Order Violated? | O Yes   O No | Expiration Date   Month   Day   Year |
| Any PRIOR orders? | O Yes   O No | |

**STOP!** ★ ★ ★ ★ ★ ★ ★ COMPLETE STATEMENT ON PAGE 2 NEXT ★ ★ ★ ★ ★ ★ ★

Photos Taken?  O Yes   O No   IF YES, photos taken of:  O Victim Injuries   O Suspect Injuries
O Scene   O Damaged Property   O Other:
Other evidence collected?  O Yes   O No
IF YES, describe:

**INVESTIGATION**

Results of investigation and basis of action taken: (list excited utterance, spontaneous admission or spontaneous statement made)  O Yes   O No   (Compare 710.30 or other form when applicable)

**OTHER AGENCIES** involved with the parties or incident (e.g. advocates, hospital, probation)

Is there reasonable cause to suspect a child may be the victim of abuse, neglect, maltreatment, or endangerment?  O Yes   O No   IF YES, officer must contact the NYS CHILD ABUSE HOTLINE REGISTRY # 1-800-635-1522

CONTACTS INITIATED BY POLICE:  O Adult Protective Services   O Child Protective Services (or ACS)   O Domestic Violence Services   O Firearms Licensing
O Mental Health   O Parole   O Probation   O Rape Crisis   O Other Agency:

O Guns in House   O Guns Seized   O Has Permit   O Permit Seized   Issuing County:
Permit #(s):
Name on Permit(s):

Date:   Who was notified?   Notified by (initial):

| Officer's Signature (& Rank) | (PRINT and SIGN)   ID. | Month | Day | Year |
| | | 1. Has DIR given to the victim at the scene?  O Yes   O No |
| | | 2. Was Victim Rights Notice given to victim?  O Yes   O No |
| Supervisor's Signature (& Rank) | (PRINT and SIGN) | IF NO, give reason: |

VICTIM/COMPLAINANT COPY          NYS DOMESTIC VIOLENCE HOTLINE (voice) 1-800-942-6906          DCJS Copyright © 2008 NYS

| | Sprint # (NYC) | Incident # | Precinct envel/CTV | Squad # (NYC) | Complaint # |

## Page 2 of the NYS Domestic Incident Report:
### STATEMENT OF ALLEGATIONS / SUPPORTING DEPOSITION

Suspect Name (Last, First, M.I.)

I, _____ (victim/deponent name), state that on _____ (date) at _____

Yo, _____ (nombre de victima/deponente), declaro que en tal fecha _____ en _____

(location of incident), in the County/City/Town/Village of _____ of the state of New York, the following did occur:
(donde el incidente ocurrio), el condado/ciudad/aldea/pueblo de _____ del estado de Nueva York, lo siguiente ocurrio:

_I was approached on October 20, 2011 as I left my_
_brownstone apt in the basement of 233 W 129th #1_
_by my ex boyfriend, Kahram Farell who attempted to_
_communicate with me as he approached my_
_building and he said Marquanda. I flagged into_
_a waiting livery cab. The driver of the cab witnessed_
_Kahram walk by and there was video taken from_
_a surveillance camera at 233 W 129th. He made no_
_attempt to avoid contact with me or cross the street_
_when he saw me coming up the stairs out of my_
_brownstone apt onto the sidewalk. He then took a_
_running pose. I was closed in front of the car_
_as we tried to pull away._

(Use additional pages as needed)

False Statements made herein are punishable as a Class A Misdemeanor, pursuant to section 210.45 of the Penal Law.
Declaraciones falsas hechas aqui son castigables como una clase de delito menor, de acuerdo con la seccion 210.45 de la
ley penal.

Victim/Deponent Signature                     Date
Firma de victima/deponente                    Fecha

**Note:**
Whether or not this form is signed, this DIR form will be filed with law-enforcement.

Interpreter _____                    Date

**Nota:**
Si esta forma esta firmada, o no, esta DIR forma sera registrada con la policia.

Witness or Officer _____             Date

| Services | | |
|---|---|---|
| ServiceDate | Service Notes | Type of Service |
| 9/7/2011 | SD met with CL at CVTC. | CVTC |
| 9/7/2011 | SD did a lot of CC with CL during our meeting. | Crisis Counseling |
| 9/7/2011 | SD s/w CL about the likelihood that the charges against her will be dropped. | Info-Legal |
| 9/7/2011 | SD s/w CL about the history of DV b/w them and described the common tactics used by abusers to get what they want. | Info-Other |
| 9/7/2011 | SD advised CL that the court calendar governs when certain things happen, so if the ADA is planning on dropping the charges, he/she can do so at that court date. | Info-Legal |
| 9/7/2011 | SD suggested that CL look into the CCRB as a possible mechanism for holding the 28th precinct cops accountable for what they've done to her. | Info-Legal |
| 9/7/2011 | SD advised CL that the only real oversight with NYPD comes from IAB (which she's already involved with) and the CCRB. | Info-Legal |
| 9/7/2011 | SD advised CL that in cross-complaint cases, credibility is key and the pending criminal case against her puts her at a disadvantage as far as that's concerned. | Info-Legal |
| 9/7/2011 | SD informed CL that the first focus should be getting the charges dropped and once that's resolved, then see if it's possible to re-open the assault case against RESP. | Info-Legal |
| 9/7/2011 | SD gave CL my card with the LAP HL # on it in case she needs to contact me. | Info-Legal |
| 9/14/2011 | SD s/w CL who called in for me at CVTC. | Follow Up |
| 9/14/2011 | SD, with Lisa H. @ CVTC, attempted to contact Lisa Callahan @ the Mn DA's office. No answer. Left vm with my direct line and extension to call me back. | CJA-DA |
| 9/14/2011 | SD advised CL that b/c of the bureaucratic nature of the system, correcting mistakes like this take an extensive amount of time. | Info-Legal |
| 9/14/2011 | CL expressed fear at being incarcerated "for the rest of her life," and SD reminded her that these are all MISD charges and carry a maximum of 1 year. | Info-Legal |
| 9/14/2011 | SD advised CL that we tried to call Lisa Callahan at the DA's office, but there was no answer so we left a message asking her to call me back at the office on my extension. | Info-Legal |
| 9/14/2011 | SD advised CL that we have a working relationship with the DA's office and will try to utilize that to help her. | Info-Legal |
| 10/14/2011 | SD called Lisa @ CVTC to s/w her on CL's behalf about Belinda escorting CL to her appt with a City Council member to discuss her treatment by NYPD and the DA's office. No answer. Left vm. | PA-Legal |
| 10/28/2011 | SD s/w CL who called for me on the HL. | Follow Up |
| 10/28/2011 | SD offered CL emotional support given her treatment by the police and the DA's office | Crisis Counseling |

1

Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 27 of 41

| Services | | |
|---|---|---|
| ServiceDate | Service Notes | Type of Service |
| 10/28/2011 | SD advised CL that I can call the precinct to speak with the DVPO who took her rep't on RESP's latest attack (a PO Simmons) and find out what happened w/ the DIR. | Info-Legal |
| 10/28/2011 | SD advised CL that both Lisa @ CVTC and I have been trying to get through to the DA's office about getting the charges dropped but we're not getting anywhere on that front. | Info-Legal |
| 10/28/2011 | SD advised CL to send me her copy of the DIR and then I can call the 28th precinct to speak with DVPO Simmons about how it was "lost" according to Lt. LaRocca. Gave CL our fax #. | Info-Legal |
| 11/1/2011 | SD called the 28th precinct to speak w/ DVPO Simmons about this DIR. She was very resistant and wasn't able to provide any info except that the report got "lost in the system". Her stance was that CL must return to the precinct to file another one. | CJA-Police |
| 11/8/2011 | SD s/w CL about Belinda accompanying her to the precinct to make a report as well as to her meeting with Christine Quinn's office to report her treatment by the police. | Info-Legal |
| 11/8/2011 | SD offered CL emotional support and validated her feelings about the 28th precinct's handling of her case. | Crisis Counseling |
| 11/8/2011 | SD gave CL a run-down of the very unproductive phone call I had with the DVPO last week, and advised her that the issue is definitely not her fault. | Info-Legal |
| 11/8/2011 | CL called on the HL and SD s/w her about what happened when I called the 28th precinct last week. | Follow Up |
| 11/8/2011 | SD emailed KT & Anindita about having Belinda accompany CL to the 28th precinct to re-file the DIR that they "lost" in their system. | PA-Legal |
| 11/9/2011 | SD s/w CL briefly at CVTC about Belinda accompanying her to the 28th precinct. CL was just getting out of group at CVTC. | Follow Up |
| 11/9/2011 | SD s/w CL briefly at CVTC about Belinda accompanying her to the 28th precinct. CL was just getting out of group at CVTC. | Info-Legal |
| 11/9/2011 | SD provided CL w/ emotional support about her treatment by the 28th and confirmed that I was also stonewalled by the DVPO there. | Crisis Counseling |
| 11/9/2011 | SD advised CL that I would meet with Belinda on Friday to go over CL's case with her, so she should be able to accompany her next week. | Info-Legal |
| 11/15/2011 | SD called CL to set up a time for Belinda to accompany her to the precinct in order to make a report. No answer. Her voice mail box was full so I couldn't leave a message. | Follow Up |
| 11/15/2011 | SD called Lisa @ CVTC to s/w her about CL. No answer. Left vm asking for a call back. | PA-Legal |
| 11/15/2011 | SD s/w Lisa @ CVTC who returned my phone call. Discussed the accompaniment to the 28th precinct as well as CL possibly testifying at City Council. | PA-Legal |
| 11/16/2011 | SD met with CL at CVTC and briefly discussed Belinda escorting her | Info-Other |

2

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 51 of 54

Case 1:15-cv-05871-KPF   Document 21-5   Filed 09/02/16   Page 28 of 41
Case 1:15-cv-05871-LAP   Document 16-4   Filed 05/09/16   Page 17 of 40

| Services | | Type of Service |
|---|---|---|
| ServiceDate | Service Notes | |
| | to the 28th precinct to file her DIR as well as possibly testifying at City Council early next yr. | |
| 11/16/2011 | SD met with CL at CVTC and briefly discussed Belinda escorting her to the 28th precinct to file her DIR as well as possibly testifying at City Council early next yr. | Follow Up |
| 11/16/2011 | SD met with CL at CVTC and briefly discussed Belinda escorting her to the 28th precinct to file her DIR as well as possibly testifying at City Council early next yr. | Info-Legal |
| 11/22/2011 | SD called CVTC to s/w Lisa to let her know that Kelly and Belinda will be meeting at CVTC on Thursday (12/1) to head up to the 28th precinct. | PA-Legal |
| 11/22/2011 | BD s/w CL and arranged a date/time to meet @ CVTC and then to go up to the 28th precinct. | Info-Legal |
| 11/22/2011 | SD s/w CL who called in on the HL. Let her know that I hadn't been able to get a hold of her and had her s/w Belinda to schedule a time to go to the precinct. | Follow Up |
| 11/22/2011 | SD s/w CL who called in on the HL. Let her know that I hadn't been able to get a hold of her and had her s/w Belinda to schedule a time to go to the precinct. | Info-Legal |
| 11/30/2011 | SD advised CL that now that her OP was downgraded, it's critical that she obtain the DIR to prove the OP violation to the IDV judge. | Info-Legal |
| 11/30/2011 | SD called CL to s/w her about meeting tomorrow w/ BD to head to the 28th precinct. | Follow Up |
| 11/30/2011 | SD provided CL emotional support b/c of what occurred in IDV w/ her OP (hers was downgraded to a limited OP and he still has a stay away against her). | Crisis Counseling |
| 11/30/2011 | SD s/w CL about what happened in IDV court yesterday w/ her OP. | Info-Legal |
| 11/30/2011 | SD s/w CL about the possibility of a City Council hearing and let her know that it's still in the initial stages. I haven't heard anything more about it. | Info-Other |
| 11/30/2011 | SD confirmed the time/date for CL to meet with BD and head to the precinct. | Info-Legal |
| 12/1/2011 | SD called Lisa @ CVTC to give her an update on what took place today at the 28. No answer. Left vm. Also informed her about my conversation w/ KT and the potential to speak directly to Audrey but we need to be confident that there's nothing that can be used against CL. | PA-Legal |
| 12/1/2011 | BD met with CL at CVTC to accompany her to the 28th precinct. BD assisted CL with filing a DIR for the OP violation and emailed SD to inform her of what took place. CL was very happy with the effect of the accompaniment and articulated her desire for BD to accompany her in other respects. | CJA-DA |
| 12/1/2011 | SD s/w Lisa who called me back. Discussed CL's case and | PA- |

3

| | Services | Type of Service |
|---|---|---|
| ServiceDate | ServiceNotes | |
| | possibility of a meeting to try and hash out the probability of going to DA's office with a solid case for dropping the charges. Will speak to KT about this. | Counseling |
| 12/1/2011 | SD s/w Lisa who called me back. Discussed CL's case and possibility of a meeting to try and hash out the probability of going to DA's office with a solid case for dropping the charges. Will speak to KT about this. | PA-Legal |
| 12/1/2011 | BD met with CL at CVTC to accompany her to the 28th precinct. BD assisted CL with filing a DIR for the OP violation and emailed SD to inform her of what took place. CL was very happy with the effect of the accompaniment and articulated her desire for BD to accompany her in other respects. | CJA-Police |
| 12/1/2011 | BD met with CL at CVTC to accompany her to the 28th precinct. BD assisted CL with filing a DIR for the OP violation and emailed SD to inform her of what took place. CL was very happy with the effect of the accompaniment and articulated her desire for BD to accompany her in other respects. | Info-Legal |
| 12/1/2011 | BD met with CL at CVTC to accompany her to the 28th precinct. BD assisted CL with filing a DIR for the OP violation and emailed SD to inform her of what took place. CL was very happy with the effect of the accompaniment and articulated her desire for BD to accompany her in other respects. | Follow Up |
| 12/1/2011 | BD met with CL at CVTC to accompany her to the 28th precinct. BD assisted CL with filing a DIR for the OP violation and emailed SD to inform her of what took place. CL was very happy with the effect of the accompaniment and articulated her desire for BD to accompany her in other respects. | Crisis Counseling |
| 12/2/2011 | SD emailed Lisa to arrange a time for us to meet w/ KT to discuss CL's case and develop a strategy for advocating with the DA's office. | PA-Legal |
| 12/5/2011 | SD s/w CL who called in very upset b/c she ran into RESP at the bodega and had to turn around and walk out while they (him and his friend) laughed at her. | Follow Up |
| 12/5/2011 | SD s/w CL to try and de-escalate her a bit, and then reminded her that the best thing she can do for now is protect herself from the OP even though it's infuriating. | Crisis Counseling |
| 12/5/2011 | SD s/w CL to try and de-escalate her a bit, and then reminded her that the best thing she can do for now is protect herself from the OP even though it's infuriating. | Safety Planning |
| 12/5/2011 | SD advised CL that KT and I need to review her papers from court so that we can see what exactly happened there before we can do any kind of advocacy on her behalf. CL will fax them today. | Info-Legal |
| 12/6/2011 | SD called CL unblocked to f/u on her vm from yesterday about her fax. It was not in the fax machine. No answer. Left vm. | Follow Up |
| 12/6/2011 | SD s/w CL who called in returning my vm. Confirmed for her that I | Info-Legal |

4

Case 1:15-cv-05871-KPF   Document 41-4   Filed 01/03/17   Page 53 of 54
Case 1:15-cv-05871-KPF   Document 21-3   Filed 09/02/16   Page 30 of 41
Case 1:15-cv-05871-LAP   Document 16-4   Filed 05/09/16   Page 19 of 40

| | Services | |
|---|---|---|
| ServiceDate | Service Notes | Type of Service |
| | did not receive the fax (checked again), so she is going to drop it by the office today. I gave her the address. | |
| 12/6/2011 | SD called CL unblocked to f/u on her vm from yesterday about her fax. It was not in the fax machine. No answer. Left vm. | Info-Legal |
| 12/6/2011 | SD s/w CL who called in returning my vm. Confirmed for her that I did not receive the fax (checked again), so she is going to drop it by the office today. I gave her the address. | Follow Up |
| 12/7/2011 | SD and Lisa s/w CL about how her actions, w/o the context of the history of DV against her, could have been seen as a batterer's actions. | Info-Legal |
| 12/7/2011 | SD met with CL at CVTC. | CVTC |
| 12/7/2011 | SD and Lisa s/w CL about the common tactics batterers use to intimidate their victims, and how some of her actions and statements could be misrepresented to look like those tactics. | Info-Legal |
| 12/7/2011 | SD s/w CL about the 28th precinct and their handling of the case. | Info-Legal |
| 12/7/2011 | SD provided CL w/ emotional support given the handling of her case to date. | Crisis Counseling |
| 12/7/2011 | SD s/w Lisa about CL's case and tried to set up a time for her to meet with KT and I to go over the court doc's in CL's possession and work out a coherent story to possibly present to the DA's office on CL's behalf. | PA-Legal |
| 12/7/2011 | SD s/w CL about the DA's office's handling of her case. | Info-Legal |
| 12/8/2011 | SD s/w Lisa and KT about setting up a meeting sometime next week. | PA-Legal |
| 12/13/2011 | SD tried calling Lisa @ CVTC again to set up a time to meet w/ KT re. CL's legal case. Trying for tomorrow afternoon near the end of the day. | PA-Legal |
| 12/13/2011 | SD s/w Lisa who called me back, and we set up the time of 3pm tomorrow to meet w/ KT to review CL's legal case. | PA-Legal |
| 12/20/2011 | SD called Lisa returning her message about setting up a time to meet w/ KT re. CL's legal case. No answer. Left vm. | PA-Other |
| 12/20/2011 | SD called Lisa returning her message about setting up a time to meet w/ KT re. CL's legal case. No answer. Left vm. | PA-Legal |
| 12/20/2011 | SD s/w Lisa @ CVTC and (tentatively) set up a meeting for next week on Wed @ 11 am. | PA-Legal |
| 12/28/2011 | SD met w/ Lisa & KT re. CL's case; Family Court OP, Crim Court charges, and proving she's a survivor of DV. | PA-Legal |
| 12/28/2011 | KT met w/ Lisa & SD re. CL's case: Family Court OP, Crim Court charges, and proving she's a surivor of DV. | PA-Counseling |
| 12/28/2011 | KT met w/ Lisa & SD re. CL's case: Family Court OP, Crim Court charges, and proving she's a surivor of DV. | PA-Legal |
| 12/28/2011 | SD met w/ Lisa & KT re. CL's case; Family Court OP, Crim Court | PA-Family |

5

| | Services | |
|---|---|---|
| ServiceDate | Service Notes | Type of Service |
| | charges, and proving she's a survivor of DV. | Court |
| 12/28/2011 | SD met w/ Lisa & KT re. CL's case; Family Court OP, Crim Court charges, and proving she's a survivor of DV. | PA-Counseling |
| 12/28/2011 | KT met w/ Lisa & SD re. CL's case: Family Court OP, Crim Court charges, and proving she's a surivor of DV. | PA-Family Court |
| 1/5/2012 | KT met with Lisa, SD, and CL to discuss the FC case, the CC charges against her, short and long-term priorities and goals, and forming an effective strategy to address them. | PA-Family Court |
| 1/5/2012 | KT met with Lisa, SD, and CL to discuss the FC case, the CC charges against her, short and long-term priorities and goals, and forming an effective strategy to address them. | PA-Legal |
| 1/5/2012 | SD met w/ Lisa, KT, and CL to discuss the FC case, the CC charges against her, short and long-term priorities and goals, and forming an effective strategy to address them. | Safety Planning |
| 1/5/2012 | KT met with Lisa, SD, and CL to discuss the FC case, the CC charges against her, short and long-term priorities and goals, and forming an effective strategy to address them. | Safety Planning |
| 1/5/2012 | KT met with Lisa, SD, and CL to discuss the FC case, the CC charges against her, short and long-term priorities and goals, and forming an effective strategy to address them. | Crisis Counseling |
| 1/5/2012 | SD met w/ Lisa, KT, and CL to discuss the FC case, the CC charges against her, short and long-term priorities and goals, and forming an effective strategy to address them. | Crisis Counseling |
| 1/5/2012 | SD met w/ Lisa, KT, and CL to discuss the FC case, the CC charges against her, short and long-term priorities and goals, and forming an effective strategy to address them. | PA-Legal |
| 1/5/2012 | SD met w/ Lisa, KT, and CL to discuss the FC case, the CC charges against her, short and long-term priorities and goals, and forming an effective strategy to address them. | PA-Family Court |
| 1/5/2012 | SD met w/ Lisa, KT, and CL to discuss the FC case, the CC charges against her, short and long-term priorities and goals, and forming an effective strategy to address them. | PA-Counseling |
| 1/5/2012 | KT met with Lisa, SD, and CL to discuss the FC case, the CC charges against her, short and long-term priorities and goals, and forming an effective strategy to address them. | PA-Counseling |
| 1/11/2012 | SD explained what our strategy will be in advocating with the DA's office and reminded her that while we believe her story, we have to know exactly what took place (whether it was incriminating or not) so that we can lay out the entire context of DV and its impact on her actions. | Info-Legal |
| 1/11/2012 | SD s/w CL about the different sub-sections of the aggravated harassment charge that she's facing and what they mean. | Info-Legal |
| 1/11/2012 | SD met w/ CL at CVTC to discuss the charges in-depth and to get a | Follow Up |