H3KNPRIC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   KELLY PRICE,

4                    Plaintiff,

5            v.                          15 Civ. 5871 (KPF)

6   THE CITY OF NEW YORK, et al.,

7                    Defendants.         Conference

8   ------------------------------x
                                         New York, N.Y.
9                                        March 15, 2017
                                         10:10 a.m.
10
    Before:
11
                    HON. KATHERINE POLK FAILLA,
12
                                         District Judge
13

14                        APPEARANCES

15  KELLY PRICE
         Pro Se Plaintiff
16
    NEW YORK CITY LAW DEPARTMENT
17       Attorneys for Defendants
    BY:  ELISSA B. JACOBS
18       DEBRA MARCH

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H3KNPRIC

1              (Case called)

2              THE DEPUTY CLERK:  State your name, please.

3              MS. PRICE:  Kelly Price.

4              THE COURT:  Ms. Price, good morning to you.  I am

5     going to ask you a favor please.  If I direct questions to you,

6     I am going to ask you to stand and bring the microphone closer

7     to you.  There is a computer monitor that's blocking my view of

8     you, and I do want to be able to see you.  But for now this is

9     great.

10             Thank you.

11             At the back table?

12             MS. JACOBS:  Elissa Jacobs from Corporation Counsel

13    for the city, Inspector Obe and Selevena Brooks.  I have with

14    me Debra March.  Ms. March has been handling this case.  She is

15    an attorney, but she has not yet been admitted to the Southern

16    District.  She was in fact supposed to be admitted yesterday.

17             THE COURT:  Yes.

18             MS. JACOBS:  With your permission, I would like her to

19    be able to participate as well.

20             THE COURT:  Absolutely.

21             I will admit you pro hac vice since you would have

22    been admitted were it not for a blizzard.

23             Ms. March, should I be directing my questions to you

24    in the first instance?

25             MS. MARCH:  Yes, your Honor.

3

H3KNPRIC

1           THE COURT:  Let me do that, then.

2           Ms. Jacobs, you are welcome to sit down.  Thank you

3    very much.

4           Ms. March, I would like to understand a little bit

5    more about the manner in which these Twitter accounts are

6    operated.  I will confess to not being on Twitter because,

7    well, I believe judges shouldn't be, but as a result I also

8    don't know the technology.

9           They are maintained at -- one is at the 28th precinct?

10          MS. MARCH:  Yes, your Honor.  And the other one is the

11   Mayor's Office to Combat Domestic Violence.

12          THE COURT:  That is maintained by someone in the

13   mayor's office.

14          MS. MARCH:  Yes, your Honor.

15          I can explain before we get into the matter what

16   Twitter means and what it means to block someone on Twitter.

17          THE COURT:  Yes.

18          MS. MARCH:  What it is essentially, Twitter is a

19   private entity, and it allows individual users to create

20   accounts, a Twitter account through that website, and it allows

21   users to interact with other people on Twitter.

22          And one of the features somebody could do is block

23   someone.  Even if somebody blocks someone, for instance,

24   Ms. Price alleges she was blocked by the agency Twitter, she

25   would still be able to tweet, which is essentially a post

H3KNPRIC

1    limited to 140 characters, she would still be able to put --

2            THE COURT:  I'm sorry.  I want to hear that.  Even if

3    blocked she could still --

4            MS. MARCH:  Tweet her own posts.

5            THE COURT:  Just not as a reply to something on that

6    account?

7            MS. MARCH:  Yes.

8            That would be the only -- one of the only small

9    limitations.  She would still be able to tag the agency

10   accounts by putting an "@" with the agency's name and

11   essentially tweeting at them and tagging them in that post.

12           THE COURT:  Could she retweet into her account?

13           MS. MARCH:  What the individual agencies posted?

14           THE COURT:  Right.  If she's blocked, she can't

15   retweet their tweets into her account?

16           MS. MARCH:  No, your Honor, not under her account if

17   she was logged in.

18           She could, however, put a hashtag with something

19   regarding the agency, and this would allow other users on

20   Twitter to look up and see what somebody was posting, for

21   instance, about the 28th precinct or the Mayor's Office to

22   Combat Domestic Violence.

23           The only thing that Ms. Price would not be able to do,

24   the minor limitation is she wouldn't be able to look at the

25   agency's Twitter accounts as she was logged in as herself, and

H3KNPRIC

1   she would also not be able to reply to anything that they

2   posted themselves under their own tweeter accounts.

3           THE COURT:  Just for clarification, I exist as a

4   person without a Twitter account, but if I wanted to, I can go

5   look up the two NYPD accounts that have been mentioned most

6   recently in this complaint, and I could look at what's being

7   posted there even, though I would not be able to reply to

8   anything or add my voice to anything there, correct?

9           MS. MARCH:  Yes, your Honor.

10          Both agencies have public Twitter accounts, which

11  means essentially what your Honor stated, any user could go on

12  the Internet and could look at these posts.

13          Ms. Price could simply log out of her own Twitter

14  account, and she could simply look it up on the Internet and

15  see all of the posts that the agency Twitter accounts have

16  made.

17          The other only minor limitation is she couldn't

18  directly message them, which essentially means she couldn't

19  send them a private message between her and the Twitter

20  account.

21          However, Ms. Price could still see their public posts

22  if she wasn't logged into her account.  She could write

23  anything she wanted about them.  She could tag them, hashttag

24  them as I stated previously.

25          THE COURT:  OK.

H3KNPRIC

1              I am imagining, but I don't know, that the reason that

2      she was blocked from these two accounts is because there is not

3      a way for the city or the particular person who's maintaining

4      these two accounts to delete tweets that that person may find

5      inappropriate.

6              I mean, because in other areas you would just delete

7      the matter, but here you can't, correct?  Twitter does not

8      permit you to delete these messages?

9              MS. MARCH:  That's correct, your Honor.

10             Under Twitter, the agencies would not be able to

11     delete any of Ms. Price's comments on Twitter, which are

12     essentially her posts or anything she replied to them on

13     Twitter.  That is essentially -- on a similar social media site

14     such as Facebook --

15             THE COURT:  Right.

16             MS. MARCH:  -- I believe the user would be able to

17     delete a comment.  But that's not active at all on Twitter.

18             THE COURT:  Of course, Ms. Price could, if she wanted

19     to, delete comments that she had issued, but the recipient

20     would not have that power to so.

21             MS. MARCH:  Yes, your Honor.

22             I believe that any user could delete the comments that

23     they personally wrote.

24             THE COURT:  I will get back to you in just a moment,

25     but I realize as I am talking to you think I want to have some

7

H3KNPRIC

```
1    more -- I want to walk a few steps back.  So let me talk to

2    Ms. Price for a bit.  Thank you very much.

3           Ms. Price, first of all, good morning and welcome.

4    This is in our initial pretrial conference in this case.  The

5    purpose of this conference is for me to talk to the parties

6    about the issues involved in the case, to talk about perhaps

7    some housekeeping matters, if there are any, and then, because

8    your adversaries have filed a letter with me, and you've

9    responded to it, regarding a motion they wish to pursue,

10   talking to you about that.  So I wanted to make sure you

11   understood what the purpose of the conference was.

12          Let me talk to you about your case, because your case

13   doesn't merely involve this Twitter account.  It involves as

14   well allegations that you've made that a former intimate

15   partner of yours is being effectively protected by the NYPD, is

16   that correct?

17          MS. PRICE:  Yes, your Honor.

18          THE COURT:  OK.  Are there tissues?  Off the record.

19          (Discussion off the record)

20          THE COURT:  Tell me, please, what you would like me to

21   know about your case that I haven't already read in the various

22   complaints.

23          MS. PRICE:  Your Honor, I thank you for taking the

24   time to read everything in this case.

25          THE COURT:  Of course.
```

8

H3KNPRIC

1           MS. PRICE:  There's a lot of things I would like to

2    say, your Honor, but I think the most important thing that I

3    haven't put in any of my complaints or any of the moving papers

4    is that my case represents constitutional harms that are being

5    unhanded to the public willy nilly without any due process or

6    oversight regarding this McCarthy-istic list of people that are

7    denied police services because they are put on the NYPD

8    CompStat arrest alert list.

9           They're denied services and protections, they're

10   marked as fabricators, they are given a low police algorithm

11   rating.  And, as you know, NYPD patrol officers now all have

12   Palm Pilots or iPhones.  As soon as they swipe your ID or they

13   punch in your identification number, a rating pops up, and how

14   the police are to treat you is then conveyed to the individual

15   police officer.

16          Because of the trouble I have had with the police and

17   the district attorney and my abuser and this conspiracy to

18   create a danger, I have been marked as such, and continuing to

19   be abused at every encounter with the police that I have where

20   I need services or the police are called.

21          Your Honor, I appeared in this court in front of

22   Honorable Judge Abrams on February 13 in another federal matter

23   that I have filed.  I don't know if you are aware of it.

24          THE COURT:  I am not.

25          MS. PRICE:  I have a litigation against Reuters

9

H3KNPRIC

1  Thomson, the newswire.  I have been litigating since 2004

2  because I am a 9/11 survivor.  As I ran from the towers I took

3  photos of the towers collapsing over me.

4       I made a deal with Reuters in 2001 for syndication of

5  those photos.  They're very famous.  Reuters didn't adequately

6  remunerate me for my share in the royalties.

7       To speed it up, I have litigation, Honorable Abrams

8  awarded me pro bono counsel, and I appeared for a conference

9  about the 12(b)(6) that the Reuters attorneys filed.

10      I brought my service dog with me.  I wish I had her

11  with me today, but it's too gross out for her.  By the way,

12  Judge Abrams interrupted the conference, put her hand over the

13  microphone and said to the Reuters lawyer, Why haven't you

14  settled with Ms. Price?

15      I was so happy to have a break.  I left -- to speed

16  up, on my way back to the subway I stopped -- this was the day

17  before my affidavits were due to Ms. March and Ms. Jacobs.  I

18  stopped at Mudville to use the bathroom and to talk to a

19  bartender, Carly, I know, and tell her I finally had a break.

20  Many bartenders around the courthouses know of what's happened

21  to me.

22      The bar manager said to me I wasn't disabled and asked

23  me to prove my disability, and I told him that was against the

24  Americans with Disabilities Act.  The police were called and

25  didn't know how to handle the situation.

H3KNPRIC

1          The bar manager was convinced I had to show him proof

2     of my disability, which is not in what the ADA says.   The

3     police, not knowing what to do, when they swiped my ID and saw

4     all this mess of not credible or whatever it says tried to

5     arrest me for trespassing, ripped my service dog away

6      from me, took her doggy Rikers.

7          I woke up in the next morning the Beth Israel Hospital

8     psych ward with -- you can still see them around my ankles --

9     shackle bruises, my ankles bleeding from being shackled.

10         This part of it I have tried to convey to your Honor,

11    that I keep at every point, at absolutely every interaction

12    with the NYPD I keep being maligned.   The police believe that

13    they can abuse me.

14         And this part, I want you to know that the Brennan

15    Center for Justice almost wrote me in amici brief, but they

16    asked me to ask your Honor's permission if you would accept an

17    amici brief from them before they write it.

18         They too are very troubled about this new practice by

19    the NYPD and district attorneys of marking people on some sort

20    of McCarthyistic CompStat list.   They've submitted a FOIA

21    asking for information from the NYPD about how people get

22    placed on this list, what are the qualifications, how do you

23    get off this list, what happens to you.

24         I'm sorry that NYLAG printers weren't working this

25    morning, so they only printed out one copy of the FOIA.   I know

H3KNPRIC

1    I am not allowed to turn it in.

2            THE COURT:  No.  With respect to the Brennan Center,

3    we are getting a little bit ahead of ourselves, because there

4    hasn't been a motion filed yet.  But they can write to me and

5    ask for permission to file an amicus brief in this case.

6            I guess what's confusing to me is the third amended

7    complaint, the operative complaint in this case, I understood

8    to be more focused on the fact that you believe that your

9    partner was allowed, your former partner was allowed to treat

10   you in an abusive fashion without being called out by the

11   police and instead that you were arrested.

12           Is that correct?

13           MS. PRICE:  That is correct, your Honor.

14           THE COURT:  But the CompStat material is that in the

15   operative complaint, the third amended right now?

16           MS. PRICE:  I do mention that I have been placed on a

17   list, and I quote extensively the district attorney in a

18   December of 2014 New York Times magazine article called Cy

19   Vance's Moneyball, and I have attached it to all of the

20   complaints.  All of them have been accepted and rejected.

21           THE COURT:  Yes.

22           MS. PRICE:  I discussed extensively how I have been

23   placed on this list.  It's a byproduct of this conspiracy to

24   create state-created danger so that people don't know the true

25   nature of what happened, of how Cy Vance got the proffer to

H3KNPRIC

1    bring down the 137th Street gang.

2        I'm getting ahead of myself because I thought I would

3    be discussing that after we discussed the Twitter part.

4        THE COURT:  OK.

5        MS. PRICE:  I wanted to mention all that, and I didn't

6    mean to be so histrionic.  That was the hardest part that I had

7    I had to talk about, but I really believe that Lieutenant

8    LaRocca wrote me that affidavit because he believed in me.

9        He said to me, I'm not going to help you because it

10   won't help me.  You don't understand, Ms. Price.  It's very

11   deigning us to go against this machine.

12       I said, Lieutenant LaRocca, you you'll never have to

13   tom become to New York.  The federal court has a new law that

14   says that if you are going to give any sort of testimony or

15   deposition you can just drive to Tampa, to the nearest

16   courthouse.

17       That is the only way I got him to write me that

18   affidavit that said that the district attorney issued a

19   no-services order, and thus inserted itself into the

20   investigative role, which, as you know, is the barrier for when

21   district attorneys are allowed absolute immunity.  If they stay

22   in that lane or they cross that lane, they are not longer

23   entitled to all absolute immunity defenses and some qualified

24   immunity defenses.

25       THE COURT:  I am going to ask you to slow down for

H3KNPRIC

1   court reporter and for judge.

2           You said something very thoughtful, which is that we

3   are getting ahead of ourselves.  I do want to hear before

4   about, and I think I have a better understanding of it now, but

5   one of the issues with this piece of your case going forward is

6   that there have been some difficulties in identifying the

7   individuals who have encountered you.  I believe that one of

8   the things the city wanted from you was a release pursuant to

9   160-50 are you aware of their request?

10          MS. PRICE:  I believe I turned in the releases the day

11  after they were due because I had been in the emergency room, I

12  needed to bail my dog out of Rikers.

13          I explained the situation, and the very next day I

14  appeared at Ms. Jacobs' and Ms. March's office and filled out

15  the forms.

16          THE COURT:  Great.

17          So then I will talk to them later about who they have

18  been able to identify, if anyone, at this time.

19          All right.  Give me the shortened version of the

20  non-Twitter portion of your complaint.

21          MS. PRICE:  I was hoping I could talk about Twitter

22  first because --

23          THE COURT:  That is fine.

24          Talk about Twitter first.

25          MS. PRICE:  I believe that it informs the rest of it,

H3KNPRIC

1    your Honor.

2             THE COURT:  OK.

3             MS. PRICE:  First of all, I just want to say that I am

4    a highly offended even though I like Ms. March and I

5    congratulate here on her near acceptance to the bar, I'm

6    totally offended by her saying that I just encounter minor

7    limitation by being blocked on twitter.

8             THE COURT:  Well, it is not for you to be offended or

9    not offended.  You can disagree.  Don't take personal offense.

10            MS. PRICE:  I beg your pardon, but they are not minor

11   limitations.

12            First, free speech is sacrosanct.  Even if you do

13   consider Twitter to be a limited public forum, and the case

14   that the City Law Department cites, of course, is in Virginia,

15   in the Fourth Circuit, so it's not applicable, where they claim

16   that social media was labeled as a limited private forum, which

17   is the most strict of the three different types of speech.

18            Even if you consider Twitter to be a limited public

19   forum, the case that the City Law Department cites, <u>Davison v.</u>

20   <u>Loudoun County Board of Supervisors</u>, to say that that

21   particular instance of social media use was considered by the

22   Court to be a limited public forum, the plaintiff in that case,

23   Mr. Davison conceded to his social media use of Facebook and

24   the Loudoun County Board of Supervisors to be a limited public

25   forum.  So it's not even as if that was argued properly and the

H3KNPRIC

1    case isn't applicable.

2              But I actually like the _Davison_ case the City Law

3    Department cites to reaffirm its stance that they are able to

4    block me on Twitter because they consider Twitter to be a

5    limited public forum.

6              I like that case.  Because what the City Law

7    Department omitted to add in describing events that unfolded in

8    that particular case is that, even though Twitter, Facebook was

9    considered to be a limited public forum, the appellate court in

10   Virginia said that the board of supervisors could not delete

11   the individual comments by Mr. Davison.

12             THE COURT:  Let me stop you for a moment, please.  The

13   decision I was looking at was from the Eastern District of

14   Virginia.  Has it gone up to the Fourth Circuit or are you

15   looking at --

16             MS. PRICE:  Maybe I'm confused about it going to an

17   appellate panel just being at the Fourth Circuit.  I beg your

18   pardon.  I'm still very green at this stuff, so I get confused

19   very easily.

20             I did bring in copies of that particular decision with

21   me today for everybody.  It sounds like you already have it,

22   your Honor.

23             THE COURT:  I do.  Thank you.

24             MS. PRICE:  Do you?

25             MS. MARCH:  Yes.

H3KNPRIC

1          MS. PRICE:  Thank you.

2          THE COURT:  Thank you for bringing them.

3          That is not a big deal.  I do know, as you do, that

4     there was at least a suggestion in the opinion that there was a

5     First Amendment violation by the blocking.

6          MS. PRICE:  Absolutely, because it wasn't -- I'm sorry

7     to step on your words, your Honor, but I'm really excited that

8     I understand very completely what's at stake here.

9          Even under the rules of a limited public forum you

10    cannot delete a user or a comment if their viewpoint is not

11    neutral.  In this case my viewpoint was clearly not neutral.

12         I also want to add that since we turned in our briefs,

13    your Honor, there was a very important case that was discussed

14    in the Supreme Court the day before we turned in our briefs on

15    February 27, Lester Packingham v. North Carolina.

16         Mr. Packingham had been blocked from all social media

17    on Twitter by the state of North Carolina because he was on the

18    sex offender registry, and he made a comment on Facebook about

19    having a parking ticket dismissed and praise the Lord and was

20    charged with a felony for using social media.

21         He challenged whether or not North Carolina could

22    block him entirely from using all social media.  I brought the

23    case, in case you haven't read it.

24         THE COURT:  That's fine.

25         Ms. Lopez, could you please accept that from

H3KNPRIC

1    Ms. Price.

2              THE DEPUTY CLERK:  Yes, your Honor.

3              THE COURT:  Thank you, Ms. Price.

4              MS. PRICE:  In this particular case almost every

5    single justice that had something to say about the Packingham

6    case reinforced that all social media should be protected free

7    speech.

8              Even though these cases are very different, I think

9    that the Packingham case sheds light into how the federal

10   court -- I'm sorry, you are the federal court -- but the

11   Supreme Court is going to rule should a case like this make its

12   way.

13             Specifically, Justice Kagan argues that all social

14   media are protected free speech, and Justice Kagan says, How

15   many people under 30 do you think don't use these sites to get

16   all their information" --

17             THE COURT:  Hold on.

18             Slow down.  Thank you.

19             MS. PRICE:  Thank you, your Honor.

20             THE COURT:  Go ahead.  You may continue.

21             MS. PRICE:  -- "use these site to get all their

22   information?  Under 35.  I mean, they are increasingly -- this

23   is the way people get everything that -- all information.  This

24   is --" and he continues -- "this is the way people structure

25   their civic community life."

H3KNPRIC

1        THE COURT:  This is Justice Kagan saying that?

2        MS. PRICE:  Yes, ma'am.

3        THE COURT:  She's a she by the way.

4        MS. PRICE:  I'm sorry, thank you.

5        Yes, your Honor.

6        Justice Ginsburg chimes in.  She says, "The point is

7  that being -- that people being cut off from a very large part

8  of the marketplace of ideas and the First Amendment includes

9  not only the right to speak, but the right to receive

10  information."

11        And this is a nuance, or one of these, as Ms. March

12  put it, minor limitations to me being blocked on Twitter.

13        I am blocked from the entire communication of ideas by

14  these certain officials, by the 28th Precinct and by the

15  Mayor's Office to Combat Domestic Violence.

16        It is more than just a minor limitation to have to log

17  out of Twitter, to have to perhaps create a secondary Twitter

18  account to log in and view, or even I know I can view the

19  tweets without logging in.  But that creates an undue burden.

20  And that undue burden on my free speech the Supreme Court over

21  and over and over has come down --

22        THE COURT:  The burden can't be that you have to log

23  out and look.  The burden is not on the fact that you may have

24  to log out of your account in order to look at the tweets.

25        The burden I would think would be your inability to

H3KNPRIC

1    participate in any discussions that are taking place in the

2    Twitter feed.

3              MS. PRICE:  I believe, yes, your Honor.

4              THE COURT:  OK.

5              MS. PRICE:  I believe what you said is much more

6    important, but I do believe it is a burden, not as large, but

7    to have to log out does create a burden on me that I shouldn't

8    have to.

9              So, like I said, I would really like the Packingham

10   case.  I underlined some really good quotes, there's a number

11   of them, where specifically even Justice Kennedy, the most

12   conservative justice I believe still says this is ridiculous.

13   This is free speech.  This is protected speech.  Social media

14   should be considered as a public square.

15             It's that emphasis that I really want to hammer

16   through to the Court, that of the three types of government

17   speech, the traditional public forum, the government-created

18   designated public forum, and the limited public forum, social

19   media, all social media, all tweets, all Facebook posts, all

20   Instagram posts should be treated as a public forum.

21             The argument that the City Law Department proffers

22   that social media should be treated as government limited

23   public forums is ridiculous.

24             Social media is not like a monument that conveys

25   information one way.  Social media is like a march.  Social

H3KNPRIC

1    media is like a protest, and I find these comments particularly

2    ridiculous.

3               Also, since I turned in my brief on February 28, there

4    was an article in the Wall Street Journal about New York City's

5    new social media director, Sree Sreenivasan, and I brought

6    copies of this article, too, for everyone.

7               Mr. Sreenivasan specifically says about the way that

8    the 360-some government-operated Twitter accounts in New York

9    City, he says, There are three things that I can think of that

10   these social media accounts do for this city:  Responsible

11   communication, accurate, up-to-date plain language information

12   about what your agency is doing, using it as a customer service

13   tool as a way for an agency to better do its job, and then

14   engagement.

15              He says, Our community affairs unit live tweets

16   certain events, cultural affairs, the department solicits new

17   ideas.  I think this is one of the great things that has

18   changed in the last 15 to 25 years.  We used to go from people

19   hearing from the government in a kind of linear fashion where

20   the government would release information, but now the public is

21   able to engage and learn much more on a regular basis from city

22   agencies.

23              I brought copies of this article for everyone, because

24   it did just come out.

25              THE COURT:  Mr. Lopez.

H3KNPRIC

1            THE DEPUTY CLERK:  Yes, your Honor.

2            MS. PRICE:  Thank you.

3            Of course, I have also brought copies of the New York

4    City social media customer use policy for everyone that I

5    included as an attachment in my reply.

6            THE COURT:  All right.

7            Mr. Lopez, once more.

8            MS. PRICE:  I'm sorry, Mr. Lopez.

9            THE DEPUTY CLERK:  That's OK.

10            MS. PRICE:  And of course --

11            THE COURT:  Thank you.

12            Wait.  Ms. Price, just so my deputy doesn't have to

13    keep going back and forth, are we good with handouts right now?

14            MS. PRICE:  Yes, your Honor.

15            THE COURT:  Thank you.

16            Please continue.

17            MS. PRICE:  So the social media policy is very clear

18    and acknowledges to some extent First Amendment rights.  It

19    specifically says that only individual tweets or posts can be

20    denied, and I believe that just because the government doesn't

21    have a way to delete my individual tweets that doesn't give

22    them the right to violate my First Amendment rights, and

23    there's some case law that reaffirms that.  I won't go into it.

24            But I really want to hammer home this point about the

25    viewpoint-neutral basis that -- the nonviewpoint-neutral basis

H3KNPRIC

1    that the government is allowed to edit under a limited public

2    forum.  Even under a limited public forum, their editing must

3    be in a nonviewpoint-neutral basis.

4            My posts on Twitter were critical of the 28th Precinct

5    and the Mayor's Office to Combat Domestic Violence.  Exclusion

6    on this basis amounts to violations of my First Amendment

7    rights, and blocking me from posting is far more drastic than

8    other cases, such as the one that the defendants have cited,

9    because they only deleted in that case Mr. Davison's individual

10   posts, but entirely blocking me on Twitter completely impinges

11   my First Amendment rights.

12           Then I want to add that there are three tests whether

13   or not, to distill if speech is actually government speech.

14           THE COURT:  Yes.

15           MS. PRICE:  And in this particular case, Pleasant

16   Grove --

17           THE COURT:  Are these the tests about whether the

18   government has long used the forum to communicate its message?

19           MS. PRICE:  Yes, ma'am.

20           THE COURT:  Whether the forum is often closely

21   identified in the public with government, and whether the

22   government maintains direct control of the messages?

23           MS. PRICE:  I really appreciate you doing that for me.

24   You did it much better than I could.

25           THE COURT:  Not at all.

1           MS. PRICE:  But in all three of these tests, the

2      Pleasant Grove tests, all three tests favor my argument, your

3      Honor, because the government has not -- I don't need to go

4      over them.  I think you can deduce yourself.

5           The government has not long used this, and they do

6      open themselves up to communication.  And this argument that

7      once an individual user cites a handle of a government agent or

8      agency that this -- thank you for punctuating my point.  That

9      those tweets are automatically converted to government speech

10     is I believe a very thin argument and a very large stretch,

11     your Honor.

12          I don't believe that my tweets or anyone's tweets

13     would automatically be converted to government property or

14     government speech just because a handle is mentioned.  I think

15     that this particular argument is ludicrous.

16          Now, the last point I think I want to make -- I think

17     I'll probably forget a couple.  There's two little points I

18     wanted to make and that is -- OK, three.

19          I was blocked in October of 2014 by the Mayor's Office

20     to Combat Domestic Violence, by the 28th Precinct and by the

21     commissioner of domestic violence, Rose Pierre-Louis.

22          Now, because of these issues with me asking to rewrite

23     my complaint, which I will go into later, my actions against

24     Commissioner Rose Pierre-Louis for blocking me her personal

25     account which she called RPLNYC, in which she, in her profile,

H3KNPRIC

1    labeled herself as the Commissioner for the Mayor's Office to

2    Combat Domestic Violence and from that account she tweeted

3    government official information, I wasn't able in the complaint

4    to fully articulate those actions.

5             As you read from my papers, I turned in that

6    particular complaint in early September because I didn't know

7    if I would get the extension from Honorable Judge Preska, so I

8    just turned it in -- literally it was 11:50, and I was sitting

9    at Sanctuary for Families and I realized I had to get down here

10   and file it, just because I didn't want my complaint to be

11   dismissed if I didn't get the extension until September 15.

12            So that's why that action against Commissioner Rose

13   Pierre-Louis was stricken from the complaint, because I didn't

14   get a chance to actually elucidate that action against her.

15            But, again, she blocked me in October of 2014, so the

16   statute of limitations doesn't expire until October of this

17   year.  I could open up another complaint individually against

18   her, but I would really like to add it to this, because I

19   believe that these actions need to be regarded together and

20   coterminously with all of these communications between city

21   officials being told they can ignore me and block me.

22            I believe the Court should consider these things, and

23   since the statute of limitation hasn't tolled on adding

24   Commissioner Rose Pierre-Louis, I would really like to add her

25   blocking me from her personal account as well to my complaint.

H3KNPRIC

1          THE COURT:  Let me stop you for a moment.

2          The issue with your fourth amended complaint, which I

3     did reject, was because you were adding back in things that

4     Judge Preska had specifically told you not to add back in.  So

5     we did look to see what was new and what was old, and my

6     concern was your inability to follow Judge Preska's directives.

7          MS. PRICE:  Your Honor, when I turned in the fourth

8     amended complaint I -- you know, I have a lot of trouble doing

9     this work, and I am proud of the work that I have been able to

10    turn in, not horribly proud of it.

11         But only in the last month have I received help from

12    the NYLAG clinic.  I think you can tell from my response to the

13    city's question that the level of my work has considerably

14    stepped up.  I'm able to edit.  I'm able to articulate.

15         So now I have the help.  I didn't have any help to

16    assist me through the wilderness of articulating these

17    constitutional wrongdoings.  Nobody has helped me, not even my

18    own mentor.

19         I have explained to the Court that the people that I

20    am accusing of these constitutional wrongdoings are very

21    powerful.  They have a lot of money right now.

22         Specifically, the district attorney of Manhattan,

23    Cyrus Vance, Jr., has an $850 million war chest that he

24    received from BNP Paribas when he caught that bank running

25    sanction money from Iran and Sudanese to New York banks, and he

1  is giving that money away now to everyone that would possibly

2  want to help me, so nobody will actually step up to the plate

3  and help me.

4          So, for instance, Sanctuary for Families just received

5  $12 million two weeks ago from the district attorney's office

6  to build a child welfare center in Washington Heights and my

7  own mentoring advocate, Dorchen Leidholdt, has said to me,

8  Grace -- I go by grace -- helping you and advocating for you

9  and helping you with your complaint and explaining the law will

10 be tantamount to malpractice for me.

11         So I hope you understand I have made a lot of

12 mistakes, and I will go into the time line with the requesting

13 to put the state-created danger torts on my complaint later

14 when we talk about my motion.  But specifically for this

15 Twitter-related argument, I want to say that the actions

16 against Rose Pierre-Louis weren't articulated in that third

17 complaint, because I really didn't think it was going to be

18 taken as the operative complaint.  I thought I would have time,

19 and I was also thinking the Court would award me pro bono

20 counsel there's a lot of stake and there's certainly a lot of

21 issues that are far above my head.

22         THE COURT:  Let me stop you for a moment, please.

23         MS. PRICE:  Can I just to make one more point and then

24 I will shut up about all this.

25         THE COURT:  OK.

H3KNPRIC

1          MS. PRICE:  The city served the Law Department,

2     Ms. Brooks, and Inspector Obe for purposes of the Valentin

3     order, but the marshals didn't even serve Inspector Obe or

4     Ms. Brooks when they filed their opposition to my request,

5     which was February 28, but the process receipt and return shows

6     that they hadn't even been served yet.

7          THE COURT:  Is it that they have not been served --

8          MS. PRICE:  They haven't been served.

9          THE COURT:  -- or they had not recorded that receipt?

10         Of course, the receipt comes later, after the service.

11         MS. PRICE:  So, the copies here say that as of

12    February 1 that neither of them had even been served yet, and I

13    believe that the city's request was put in on January 26, 27,

14    or 28.  So I am not even -- I don't know.

15         THE COURT:  OK.

16         MS. PRICE:  But I am asking the Court, I am not even

17    sure that they were party to the, officially party to the

18    proceedings yet when they wrote the request to the Court for

19    the pre-12(b)(6) dismissal conference.

20         I mean, the matter will come up again, but I just want

21    to make that point.  I am not sure because they were only

22    served for purposes of the Valentin order.

23         I really appreciate you listening to me.  I'm kind of

24    tired of the sound of my voice.  There's a number of things I

25    really wanted to go into, but I feel that I have taken enough

H3KNPRIC

1    of the Court's time on this particular issue.

2              I hope that you do not entertain the City Law

3    Department's request for this conference.  I believe that the

4    social media director's comments, the New York City social

5    media policy and the recent case law all support that in fact

6    the City Law Department is protecting people that shouldn't be

7    protected from constitutional harms against me.

8              THE COURT:  OK.  You mentioned NYLAG earlier.

9              Are you working with the NYLAG personnel in this

10   courthouse or somewhere else?

11             MS. PRICE:  Your Honor, downstairs.  I literally take

12   communion every time I walk into this courthouse thanking those

13   people for helping me.  A particular angel is a second year law

14   student at Columbia named Jeremy.

15             THE COURT:  He's been helping you?

16             MS. PRICE:  He is my angel.

17             THE COURT:  Good to know.  I am happy to hear that

18   because I'm happy to hear about the work that they are doing.

19   Let me talk to the folks at the back table, and then I will

20   talk to you again.

21             Ms. March, you are up.  Why don't we focus on the

22   first issue, which is whether this is in fact government

23   speech.  I have to tell you, having looked at the cases, the

24   Pleasant Grove City case and looking at that three-part test, I

25   am wondering whether government speech is your strongest

H3KNPRIC

1    argument.

2          I think it's difficult to argue, and I think there's a

3    tension in your arguments to me that social media can qualify

4    under the first of these standards, which is the government has

5    long used the forum to communicate its message, and then

6    simultaneously to say to me that there is a violation there

7    should be qualified immunity because social media has not had a

8    lengthy presence in government.

9          So can you talk to the first part of that, please.

10         MS. MARCH:  Yes, your Honor.

11         We contend that the government's Twitter accounts are

12   government speech.  The First Amendment applies on regulation

13   of private speech, the government's regulation of private

14   speech, not the government's regulation of its own speech.

15         While your Honor has brought forth the factors that

16   are both in the <u>Pleasant Grove</u> case as well as <u>Walker v. Texas</u>,

17   those are simply factors.  The Supreme Court has never given us

18   a bright-line test to tell us when exactly government speech

19   should apply.

20         I will address the government speech portion first,

21   because qualified immunity, our argument to that is that this

22   is very -- we are dealing with a very limited case law before

23   us.  There are not too many cases.

24         As Ms. Price mentioned, one of the cases was the

25   Eastern District of Virginia that we are looking at.  So we are

straining for case law that really applies here to this topic
because it is such a novel, new emerging claim.

THE COURT:  We will talk about qualified immunity a
little bit later.  Let's first figure out whether there may or
may not be a violation on the issue of government speech.

I think you understand Ms. Price's argument that there
is a difference for constitutional purposes between putting
forward the city's tweets or whoever is administering the
account for whatever purpose, and accepting, or not, the
responses of private citizens like herself.

So how does her response become government speech that
you can address in the manner that you have, by blocking her
participation in it?

MS. MARCH:  Your Honor, first of all, I would like to
point out that, as the government agencies have these Twitter
accounts, their own posts really support the position that this
is government speech, and the government is free to say what
they want to say through their Twitter account.

The agencies can post their own posts, and there's
even this feature on Twitter called retweeting, which is
essentially if another user posts something that, say, the
agency wants to put it on its own post, they can simply retweet
it, and it posts out to the public.  That is essentially the
government taking ownership of that tweet, of that post, and
that's the government saying what it wants to say.

H3KNPRIC

1          Here, while we do have those factors that <u>Walker</u> kind

2     of guides us with in that case, we have the history, the

3     tradition, while social media is new, the government speaking

4     to others through technology, such as radio, television.  That

5     certainly is not new.

6          However, the real crux of <u>Texas v. Walker</u> was more the

7     government kind of having that final authority over it, and

8     those other two factors, the final authority and who took

9     ownership.

10          The government by tweeting out posts, that's them

11     taking ownership of it, and that's them having final authority

12     of what message they want to convey, to communicate with the

13     public on Twitter.  That's essentially what they're doing.  The

14     small limitation on Ms. Price, if any, is that she can't

15     directly reply under the government's post.

16          THE COURT:  Right.  OK.

17          You'll get her ire by saying this is a minor

18     limitation.  I am not going to opine it on one way or the

19     other.  But if the city wanted to or if each individual --

20     let's say if the 28th Precinct wanted to, could it have a

21     Twitter account to which no one could reply, that would just be

22     postings, and there would be no ability to reply to it at all,

23     entirely informational purposes and nothing else?

24          MS. MARCH:  Your Honor, I don't believe that Twitter

25     allows you to create a Twitter account like that.  I personally

H3KNPRIC

1    tried to test out Twitter to learn more about it to completely

2    understand it, but I don't believe that Twitter gives you that

3    feature, since Twitter is a private entity in itself.  It's not

4    the government controlling what features they can have.

5              THE COURT:  No, and I'm not suggesting that.

6              What I was thinking, what if the city were concerned

7    about people posting negative or inappropriate or messages they

8    were not expecting, maybe irrelevant messages on the Twitter

9    feeds.  A way of stopping that would be to have a feed that one

10   can simply read but not respond to.

11             I can understand why you might not want to do that.

12   That might also not promote the engagement issue of the new

13   social media director.  Nonetheless, I just was wondering if

14   that was a possibility.  At the moment we just don't know.

15             I suppose there's a related antecedent question,

16   though, that we should be talking about, which is what you are

17   asking is a motion to dismiss, correct?

18             MS. MARCH:  Yes, your Honor.

19             THE COURT:  How are we going to get all of this

20   information about Twitter into the motion to dismiss?  Do you

21   think that I can take judicial notice of all this?  I am not

22   sure I can.  That's why I am asking.

23             MS. MARCH:  Yes, your Honor.

24             If you can take judicial notice of how Twitter

25   works --

H3KNPRIC

1           THE COURT:  Well, I don't know.  But your contemplated

2      motion is going to have to explain what is not contained in the

3      complaint, which is the mechanisms by which the account works

4      and how one can respond to it and how one can be blocked from

5      responding, correct?

6           MS. MARCH:  Yes, your Honor, as background information

7      to just even understand the claim that we are talking about.

8           THE COURT:  Of course.  I don't want to talk past you.

9           My point is simply whether under 12(b)(6) that is

10     material that I may properly consider.  I have offered to you

11     the possibility, and I just don't know, that it's stuff I can

12     take judicial notice of, but perhaps there's something else.

13          Ms. Jacobs.

14          MS. JACOBS:  Your Honor, I believe you would be able

15     to take judicial notice of it.  Twitter is a public website.

16     Their policies are public in terms of how blocking works.

17          This as all public information that is easily

18     available, and I believe you would be able to take judicial

19     notice of that information.

20          THE COURT:  All right.  We'll see.

21          Thank you very much.

22          So, let me let you continue.  Your view is this is

23     government speech, and that's OK, and they have a modicum of

24     control as a result.

25          I guess the question is, some of Ms. Price's tweets

H3KNPRIC

1    that have been cited to me would seem to be less relevant or

2    only tangentially relevant to the particular feed, but some of

3    them do seem relevant.  They just happen to be critical.

4           So I am not sure that by blocking her -- well, number

5    one, by blocking her you are preventing her from filing

6    relevant, important, inoffensive tweets in addition to the ones

7    that you and your clients are taking issue with.

8           So, is this not sort of an overreaction to or it seems

9    that it is an overreaction in the sense that you are preventing

10   her from saying anything without even knowing whether it might

11   be offensive or irrelevant or somehow inappropriate?

12          MS. MARCH:  No, your Honor, because she's only

13   prevented from replying directly to the Twitter feed of the

14   agencies.

15          Ms. Price is allowed, as I stated before, to tweet

16   whatever she wants and to tag the Twitter account and say

17   whatever comments she wants about them.

18          THE COURT:  Let me be more precise.  There are other

19   people in the city of New York who are permitted to comment on

20   the Twitter feeds that are in question here, is that correct?

21          MS. MARCH:  Yes, your Honor.  That is as a reply.

22          THE COURT:  Yes, as a reply.

23          And those individuals presumably are permitted to

24   comment because they are acting in accordance with the relevant

25   social media policy, is that correct?

H3KNPRIC

1          MS. MARCH:  Yes, your Honor.

2          THE COURT:  OK.  Because of Ms. Price's prior tweets,

3   she is not permitted to comment on the particular feeds again,

4   correct?

5          MS. MARCH:  Well, she's not permitted.  She was

6   blocked from both agencies.

7          THE COURT:  Exactly.  My point is, she's being blocked

8   without even knowing what she's going to say.

9          It may be that she could comment in a way that was

10  completely in accordance with the social media policies.  It

11  may be something other than the tweets that you have called to

12  my attention or that have been called to my attention as being

13  potentially irrelevant or inflammatory or for some other reason

14  inappropriate.

15         All I am saying is you are cutting her off at the

16  start.  You are not even giving her a chance to violate the

17  social media policy.  I just want to make sure I understand the

18  basis on which the city can do that.

19         MS. MARCH:  Well, Ms. Price was able to engage with

20  both agencies initially.

21         THE COURT:  Yes, until she wasn't.  Yes.

22         I guess, I think what I'm understanding is that the

23  reason she was blocked is because she posted replies on the

24  feed that were considered inappropriate.

25         Correct?

H3KNPRIC

1          MS. MARCH:  Well, not in accordance with the policy of

2     harassing comments.

3          THE COURT:  That were not in accordance with the

4     policy.  OK.  Fine.

5          But now you're preventing her from replying on these

6     feeds, and it's not even clear that what she's going to say is

7     going to be outside of the scope of the social media policy.

8     That's my concern.

9          MS. MARCH:  But, your Honor, that's the only minor

10    limitation Ms. Price has.  She can still write -- while she

11    can't directly reply, she can log out and see what the actual

12    Twitter posts are.  She can still communicate to the precinct

13    by calling them.  She can check their Facebook page.  She could

14    show up at the precinct.  There's a number of ways to get in

15    contact with them.

16         THE COURT:  Let me hear your thoughts as to whether a

17    social media policy or a social media account results in the

18    creation of a limited public forum or a completely public forum

19    or something else entirely?

20         MS. MARCH:  Your Honor, the public forum analysis is

21    not a natural fit for this case as the nature of Twitter and

22    how an agency can create their own account and have their own

23    voice to the community, what they want to convey to users.

24         The Supreme Court has even warned about this kind of

25    having a mechanical application of this.  Even in one of our

H3KNPRIC

1    cases mentioned, Sutliffe v. Epping School District, the public

2    forum doctrine was used commonly when it was talking about

3    public parks and streets historically.

4         However, now we are dealing with something that's

5    completely different from where it first began.  Here our case

6    really doesn't fit within that terminology of what a public

7    forum is.

8         Addressing Mrs. Price, one of her points that she

9    brought up is that this would be a traditional public forum.

10   But the crux of that is that you need government property, and

11   Twitter is not government property.  Twitter is a private

12   entity.

13        Even the Eleventh Circuit mentioned in a case Mech v.

14   School Board of Palm Beach County in 2015 in dicta they made an

15   interesting note that, for example, if the school board posted

16   on Facebook or Twitter that they would have a message about

17   school closings for increment weather, that the court would

18   have little difficulty classifying that message as government

19   speech even though social media is a relatively new phenomenon.

20        So that just shows how novel this issue is and how

21   it's still evolving, and different courts are taking different

22   views on it.

23        We don't believe, even if you find this was a limited

24   public forum, we don't believe this was.  This was a minor

25   restriction, and you are allowed to have a minor restriction

H3KNPRIC

1    under the limited public forum.

2              This really goes to show how, even if you don't

3    believe it fits under government speech or the forum analysis,

4    it shows that qualified immunity should apply, because it's not

5    clear whether blocking someone, a government Twitter account

6    blocking a user is a violation of the First Amendment or not.

7              Inspector Obe and Selevena Brooks did not have any

8    clearly established law to guide them on this issue.  As

9    Ms. Price even brought up, the Supreme Court case Packingham v.

10   North Carolina that arguments were heard on, that also goes to

11   show that this is such a new issue being heard even by the

12   Supreme Court this term.

13             However, that case is very different from our case.

14   That dealt with a ban for social media of previous sex

15   offenders.  They couldn't even access social media accounts,

16   which they're dealing with whether that law is too broad and

17   not narrowly tailored to their goal of preventing them from

18   communicating with minor children.

19             THE COURT:  I am going to get ahead of myself for a

20   moment here.  Let's say -- and obviously I haven't done enough

21   research to decide this at all, we are just at the stage of

22   discussing whether a motion is going to be filed, but if I were

23   to file that this were a First Amendment violation, but that

24   qualified immunity were to apply, would you unblock Ms. Price

25   from the accounts?

H3KNPRIC

1          MS. MARCH:  Your Honor, I am not sure what the

2     protocol --

3          THE COURT:  OK.

4          MS. MARCH:  -- would be going forward.

5          THE COURT:  I will let you think about that.  I am not

6     there yet either, so that is fine.  While I have you standing,

7     let me talk to you about a couple of other issues.

8          One of the things that was of concern to me, and may

9     still be, I haven't decided it yet, was the fact that I was

10     concerned that Ms. Price could not follow the directives issued

11     by this court, be it myself or Judge Preska.  I was unaware

12     that Judge Abrams matter.  But if she has the assistance of New

13     York Legal Assistance Group and the clinic downstairs, it might

14     be wise to permit her to refile a complaint that actually

15     abides by those directives.

16          Why I am talking about this is there's another half to

17     this case, or maybe another two-thirds.  I am understanding

18     that Ms. Price has a more expansive view of the case than I

19     did, and that involves the incidents with respect to her former

20     intimate partner.

21          What is the status from your perspective of the

22     information that you have obtained from Ms. Price in order to

23     figure out who these people are?

24          Do you have what you need?

25          MS. MARCH:  Your Honor, the releases that we received

H3KNPRIC

1   from Ms. Price, those were to help us identify the John and

2   Jane Does who Ms. Price alleges took her to Bellevue

3   Hospital --

4             THE COURT:  Yes.

5             MS. MARCH:  -- in July 2015 I believe.

6             Those were the only claims remaining against the John

7   and Jane Does.  Those previous claims were dismissed.

8             We also asked Ms. Price for descriptions and also if

9   she could provide us with one today of what these individual

10  officers looked like who took her.  We're still trying to

11  identify the information as we only received the releases in

12  late February.

13            However, those other claims regarding Mrs. Price's

14  abuser and the statements that she stated prior, those have

15  been dismissed in numerous orders by both Judge Preska and your

16  Honor.

17            THE COURT:  Yes.

18            MS. MARCH:  And a lot of those had to do with ADAs in

19  this case who were dismissed various times for absolute

20  immunity and also time barred claims.

21            However, I just would like to also clarify that

22  Ms. Price brought up about service with Inspector Obe.

23            THE COURT:  Please, yes.

24            MS. MARCH:  And Brooks.

25            The marshals sent waivers for Inspector Obe and

H3KNPRIC

1    Selevena Brooks, and the city waived service on them on their

2    behalf.

3              THE COURT:  OK.

4              MS. MARCH:  That is already on the docket.

5              THE COURT:  Do you know when that was?

6              MS. MARCH:  We have it available.  The waivers were

7    returned executed on January 11, 2017.

8              THE COURT:  OK.  It was my supposition that the timing

9    of your request for a premotion conference was occasioned by

10   the fact that your clients, Ms. Brooks and Mr. Obe, had

11   received the summons and complaint and there was a deadline for

12   them to respond, and this was the chosen method of response.

13             Am I correct?

14             MS. MARCH:  Yes, your Honor.

15             You issued the Valentin order.  The city complied with

16   it by identifying Inspector Obe as the operator of the 28th

17   Precinct on the respective date and Selevena Brooks as the

18   operator of the Mayor's Office to Combat Domestic Violence on

19   the respective date.

20             Then I believe the marshals sent them a waiver of

21   service, and they were returned executed.  But then shortly

22   after January 26 I believe we filed our request for a premotion

23   conference.

24             THE COURT:  OK.  I understand that.

25             Ms. Price is saying to me that she has proof -- I am

H3KNPRIC

1    not sure that I agree with it, but proof that in fact at least

2    the district attorney was acting in a manner that might be

3    beyond the scope of absolute immunity.

4            Did you understand that portion of the conversation I

5    was having with Ms. Price?

6            MS. MARCH:  I believe, to the extent that I did

7    understand it, but please correct me if I'm not stating it

8    right when I respond, I believe those claims have been

9    dismissed numerous times with the ADAs relating to the same

10   events, and Ms. Price has been bringing up the same events

11   repeatedly.

12           There have been about six different complaints that

13   have been attempted to be filed in this case.  There's been

14   numerous orders by Judge Preska and your Honor, and all those

15   claims have been reviewed and they have been dismissed for

16   reasons, and when Ms. Price was supposed to amend her complaint

17   to comply with those orders, all those claims still appeared in

18   her complaint.

19           THE COURT:  Yes.  I am aware.

20           I'm sorry.  Let me be more precise.  My question is,

21   is there a basis -- and I am not saying there is, I'm asking --

22   is there a basis to allow her to replead if she puts forward

23   newly found evidence that would suggest, for instance, that one

24   of the assistant district attorneys or the district attorney

25   himself was acting in a manner that might be outside the

H3KNPRIC

1    parameters of absolute immunity.

2              I understand that you disagree that such evidence

3    exists, but I am just asking the question as to whether you

4    believe there is any basis to permit her to replead.  Of

5    course, your answer is no, but tell me more than that.

6              MS. MARCH:  Your Honor --

7              MS. JACOBS:  Your Honor, if I may?

8              THE COURT:  You may, Ms. Jacobs.  Thank you.

9              You will excuse me if the question was little

10   convoluted.

11             MS. JACOBS:  No, I understood your question.

12             The Office of Corporation Counsel, we do not represent

13   the Manhattan District Attorney's Office.

14             THE COURT:  Right.

15             MS. JACOBS:  In these cases they provide their own

16   counsel.  They have not been served.  They are not parties to

17   this action.  They are not here to respond to that.

18             THE COURT:  I completely forgot that they are not

19   represented by your office.  Thank you.

20             MS. JACOBS:  Correct.

21             I think we would have a hard time speaking to whether

22   or not there is a claim against them.  Again absolute immunity

23   for DAs is not our area of expertise.

24             THE COURT:  Of course.  All right.

25             Ms. March, is there anything else you would like me to

H3KNPRIC

1   know?

2          MS. MARCH:  Your Honor, regarding the motion for

3   reconsideration.

4          THE COURT:  Well, that is fully briefed.

5          MS. MARCH:  Yes.

6          THE COURT:  I have that, and I intend to decide that

7   in the coming weeks.  In light of the fact that Ms. Price

8   mentioned additional or new evidence that she's accumulating in

9   more recent time periods, I did want your thoughts on it.

10         I have part of your thoughts on it.  I think I have

11  the rest of your thoughts on it as well.  I don't believe I

12  need argument on that motion.  But I guess there is as well a

13  Monell claim that I thought you wanted to speak to.

14         MS. MARCH:  Yes, your Honor.

15         THE COURT:  Am I discussing that with you, or am I

16  discussing that with Ms. Jacobs?

17         MS. MARCH:  You ask discuss it with me.

18         For the Monell claim our request to make a motion is

19  for a partial motion in relation to the government-run Twitter

20  accounts and also the claims against the city.

21         First of all, we are asking that there is no

22  constitutional violation for a government official blocking

23  someone on Twitter, so as a result there could be no Monell

24  liability claim for that against the city because there would

25  be no underlying constitutional violation in that case.

H3KNPRIC

1          THE COURT:  OK.

2          MS. MARCH:  Then, secondly, the only other claim

3     standing presently is the claim against the Jane and John Doe

4     who took Ms. Price, she alleges, to Bellevue.

5          With regard to that claim, Ms. Price has not tied in

6     that claim against any city policy.  That's why we are moving

7     to dismiss that claim as well.

8          THE COURT:  OK.  I think I understand that better.

9          Let me ask another housekeeping question that I just

10    don't know.  I know with claims against the city -- is it

11    Section 50 or 50H?  50I?  Do you mow what I'm speaking of.

12         MS. PRICE:  50I.

13         THE COURT:  The requirement of presentation a claim to

14    the city before it can be brought.

15         Have these claims been exhausted in that matter?

16         MS. JACOBS:  I believe you are talking about the

17    notice of claim requirement?

18         THE COURT:  That is exactly what I'm saying.  You will

19    excuse me for not having not said that, but yes.

20         MS. JACOBS:  That's only for state law claims, not

21    for, for example, a 1983 claim.  And there are no state law

22    claims in this case.

23         THE COURT:  That is what I was asking.

24         Thank you very much.  I appreciate the clarification.

25         Ms. March, thank you.

46

H3KNPRIC

1          Ms. Price, I will briefly hear you in reply.

2          MS. PRICE:  Thank you, your Honor.

3          I just want to remind everyone that reserving the

4     right to moderate a forum, even if you do decide that Twitter

5     and social media is a limited public forum and you buy

6     Ms. March's argument, even if you decide that, reserving the

7     right to moderate the forum is not sufficient to eliminate my

8     First Amendment rights.

9          The case that they cite specifically reaffirms,

10    buttresses my claim.  I think that's really important.  Their

11    viewpoint discrimination that they exercised in blocking me

12    from these accounts is an egregious form of content

13    discrimination.

14         The government must abstain from regulating speech

15    when the specific motivating ideology or the opinion or

16    perspective of the speaker is the rationale for the

17    restriction, and that's a very famous case, <u>Rosenberger v.</u>

18    <u>Rector and Visitors of the University of Virginia</u>.

19         That's something that I really want to emphasize on

20    the Court, that these are not just minor limitations.  This

21    goes to the core of my free speech.

22         I also just want to point out regarding the Twitter

23    blocking that no one in the City Law Department has actually

24    looked at my tweets and shown the burden of what part of my

25    tweets was harassing, what part of my tweets was threatening.

H3KNPRIC

1          They enjoyed -- maybe that's the wrong verb -- but

2     they enjoy the burden of proving that my tweets existed in any

3     of these categories.  If it is a limited public forum that it

4     was not of the right content, and if those are the cases, then

5     according to the social media policy, they absolutely had to

6     prove that these tweets existed in any of these categories.

7          And, if anything, the City Law Department has gone out

8     of its way to avoid speaking about the subject matter, about

9     the facts and the elements of this case.  And the facts and the

10    elements of this case, your Honor, are horrifying.  And what

11    has happened to me hasn't just happened to me, but many other

12    women in my situation this has happened to.  I'm here to speak

13    for them as well.

14          I have the feeling that this is a last chance I am

15    going to have at the microphone, so --

16          THE COURT:  For now, yes.

17          MS. PRICE:  For now.

18          I wanted to go over the chronology of this nexus of

19    things that happened in my case since July when Honorable Judge

20    Preska gave me her rewrite order on July 26.

21          The City Law Department stood up here and said that

22    all my claims have been dismissed over and over, but this has

23    been a work in progress, and the Court has taken pains to

24    explain to me where different parts of my arguments are weak,

25    where new evidence has come forward, such as the affidavit

H3KNPRIC

1    from Lieutenant LaRocca are, which I can't tell you how hard it

2    was to track him down in Florida.  When I won my appeal for the

3    disorderly conduct -- what's the word? -- conviction, all of

4    these things are the reason new evidence has come up, and these

5    are the reasons I have asked for new rewrites.

6            Honorable Judge Preska in her July 26 order to me

7    asked me to look at state-created danger.  She asked me to look

8    the Dwares case, and only at that time was I introduced to the

9    concept of state-created danger.

10           All of the state-created danger torts that I am

11   struggling with articulating I've asked the Court to allow me

12   to add back on my complaint, I already had permission to add

13   those to my complaint.

14           Honorable Judge Preska gave me permission to look at

15   state-created danger and to rewrite my complaint on July 26,

16   2016.  I received that order on or about August 2.  Because I

17   don't have access to ECF -- I did have a little account for a

18   while, but I maxed out the $40 limit, and you know I don't have

19   any money.

20           I don't have access to ECF.  Sometimes I can look now

21   at the NYLAG office.  Sometimes I can go on the pro se office

22   and look, but I live in Washington Heights, and sometimes don't

23   even have the subway fare to come down.  It's impossible.

24           I got the order a week late.  So then right before

25   August 26, when it was due, I wrote Honorable Judge Preska, and

49

H3KNPRIC

1    I informed her that I needed the full 30 days to do the work

2    and I would be turning in her rewrite order on or about

3    September 2, 30 days from the date that I received it.

4    Honorable Judge Preska construed that as a request for more

5    time, and she gave me another week to do the work.

6         Two days before that was due, I was poking around in

7    the county clerk's office at 100 Centre Street in the criminal

8    clerk's office to get a certificate for dismissal for an arrest

9    that I had in October of 2010 by Detective Simmons, because I

10   didn't have the certificate of dismissal for that, and I know

11   that I need that.  One of the prongs for bringing any Section

12   1983 complaint is that the proceedings were disposed of in

13   favor of the deponent.

14        So I needed that proof that that arrest from October

15   of 2010 had been dismissed and sealed.  When I arrived at the

16   courthouse a couple of days before September 2, on or about,

17   the clerk informed me that that arrest had never been

18   adjudicated.  It still was open from 2010 six years later.

19        I was really alarmed that was still open, and someone

20   told me -- I'm going to get in trouble for saying this, but

21   someone who used to be a federal prosecutor who's a friend of

22   mind told that the district attorney does that when they want

23   to keep a tap on someone's phone.

24        so I found out that in fact the district attorney has

25   been tapping me and knows every text, everyone I've called,

H3KNPRIC

1      every one of my friends for the last six years.

2                  THE COURT:  Wait, wait, wait, and wait.

3                  I am also a former federal prosecutor.  I am not aware

4      of a policy by the district attorney to keep an arrest open to

5      permit the interception of calls.

6                  But even if that were a policy, which I am not saying

7      it is, how do you get from the point of knowing that it's a

8      possibility to knowing that it's actually happening?

9                  MS. PRICE:  I beg your pardon.  Before I said it, I

10     said I was going to be in trouble for saying that.  It was an

11     aside.

12                 But I'm very angry about it, and it's probably not so

13     relevant to the time line I am trying to point out.  Maybe I

14     will just retract that comment.

15                 THE COURT:  Yes.  Because from my own experience,

16     obtaining the power to intercept someone's telephone lines or

17     electronic communications is quite an endeavor.  It's not done

18     easily.  So I would be surprised if it could be done in some

19     sort of reflexive pattern as you have you have just suggested.

20                 Let's move on from that topic.

21                 MS. PRICE:  I beg your pardon.  I should know better,

22     when I get that itch, don't say it.  I should know better.

23                 I'll abide by that, your Honor.  Thank you.

24                 But I do -- what did I want to say? -- so I am talking

25     about the time line.

H3KNPRIC

1          THE COURT:  Yes.

2          MS. PRICE:  Since this charge was still unadjudicated,

3    the day before the rewrite was due, in early September I wrote

4    the Court again, asked for an extension of another two weeks

5    because the clerk's office told me it would take two weeks to

6    have that charge adjudicated and to get the certificate of

7    dismissal.

8          So then on or about September 1st  or 2nd I wrote

9    Honorable Judge Preska.  I informed her that I still had this

10   charge that needed to be adjudicated, and I asked her for an

11   additional two weeks to turn in a complaint that included this

12   particular charge, and I wasn't quite sure how -- you know,

13   what I was going to do with it, but I knew I was going to do

14   something with it.

15         Before I got her response -- because remember I am --

16   I get snail mail up in Canada, in Washington Heights where

17   live.  It was due.  The complaint was due.

18         So I turned in my third amended complaint with a note

19   saying I don't know if you are going to approve my extension

20   until mid-September.  I have to turn this in or risk dismissal.

21   It's not complete.  Please feel free to not pay attention to

22   this.

23         So then, of course, you know what happened.  I turned

24   in the complaint on September -- in mid-September.  It wasn't

25   perfect but it was better I felt like.  It had more articulated

H3KNPRIC

1    state-created danger actions, not perfect.

2            I had really edited the chronology of my complaint.  I

3    had taken 25 pages out of it, even though the complaint was a

4    little longer.  That was due to the extra actions that I had

5    begun.

6            That's the hard work of the Section 1983 civil rights

7    lawyer, is to be able to take the events and understand how to

8    argue those elements, and that's the acumen I think you can

9    tell I'm getting better at it.  I'm not great at it, but I'm

10   getting better, and I really need help.

11           One of the reasons the different actions had been

12   dismissed in the past is because I didn't know that I had to

13   put everyone's name everywhere.

14           For instance, I was issued a jaywalking ticket in July

15   of 2013, I believe, because the 28th Precinct was retaliating

16   against me.  Every time they would see me in public, they would

17   just stop and harass me.

18           And in my complaint I named this as an instance where

19   I had, you know, an encounter with the police because I was on

20   this list of people to be incapacitated by the criminal justice

21   system on the CompStat list.

22           Remember, those are Cy Vance's words from the

23   moneyball article.  People on the Comstat arrest alert list are

24   to be incapacitated by criminal justice system.

25           So I added this jaywalking ticket, which I had

H3KNPRIC

1    dismissed and sealed.  The police didn't even show up in court

2    to defend themselves for giving it to me.  I was just walking

3    my service dog.  I wasn't jaywalking.

4           But because I hadn't named a Jane or John doe police

5    officer, that particular complaint was dismissed, just because

6    I didn't adequately connect the dots.

7           And many of my complaints against individuals were

8    dismissed because I didn't establish those kind of parameters

9    in the complaint, and I really have a hard time even

10   articulating what I didn't do as I stand here embarrassed

11   speaking to you about it, your Honor.

12          But I had been granted permission to add the

13   state-created danger torts to my complaint.  I had turned in

14   those particular torts in the mid-September complaint, but I

15   had mislabeled that complaint as fourth amended complaint.  I

16   didn't know what to label it.

17          So then, when I turned in, Honorable Judge Preska

18   thought I had just turned it in without permission.  She didn't

19   realize that it was the one she had given me permission to turn

20   in.

21          But even the complaint, the third complaint that's now

22   the operative document, doesn't include the arrested that were

23   dismissed in September of 2016 because it was turned in on or

24   about September 2, and those arrests weren't even adjudicated

25   until on or about September 12.

H3KNPRIC

1      So I would really like the chance to be able to amend

2  my complaint.  I want to highlight that the state-created

3  danger torts are still tolling.

4      I didn't find out -- I had, you know, definitely

5  suspected and different people had told me that the DA's office

6  had told the NYPD that I was not to receive police services

7  without their intercessing between myself and the police in

8  those cases, but I didn't have proof, and I didn't know it for

9  certain.

10      Even district attorney Audrey Moore, who is the chief

11  of Special Victims Unit, had met with one of my advocates from

12  St. Luke's Roosevelt crime victims center and vehemently denied

13  that such an edict had been given from the district attorney's

14  office to the police.

15      So I had no reason to even believe that the

16  state-created danger and denial of services was in existence

17  until I received that affidavit from Lieutenant LaRocca, which

18  was on or about December 20, of 2015.

19      So those statute of limitations for the state-created

20  danger torts, that I am beseeching the Court to allow me to

21  work with NYLAG to appoint me a pro bono lawyer.  This is why

22  they call me Grace.  I'm not very graceful.

23      The statute of limitations for those section 1983

24  state-created danger and maybe conspiracy torts, if I can

25  figure that out, don't expire until November, December of 2018.

H3KNPRIC

1          So I certainly -- even if you don't allow me to

2     rewrite my complaint now with the help of Jeremy and Robin from

3     the NYLAG office, I can still come back and refile that, but I

4     believe all of these crimes and all of the context the

5     landscape of the various denial of services and constitutional

6     harms to me need to be considered coterminously and together.

7          I really beg the court to allow me to articulate these

8     things with the help that I now have.  As I mentioned before, I

9     think you can see the level of my work.  I even abided your

10    Honor's court part rules to make my response three pages.  I

11    never would have -- I'm sorry.  I know I monkeyed with the

12    margins a little bit.  I won't do it again.

13          THE COURT:  I noticed.

14          MS. PRICE:  I'm sorry.

15          THE COURT:  All right.

16          MS. PRICE:  But those are the things I really wanted

17    to highlight, that the statute of limitations are still tolling

18    on this stuff.

19          I know the Court has been patient, but the Court gave

20    me permission to refile and the permissions for accepting on a

21    motion for reconsideration are either a manifest injustice or

22    an error.

23          I believe this was just simply an error on the -- I

24    hate to say that because I know that dings pejoratively on the

25    judge's record if there was an error.  But I do believe there

H3KNPRIC

1   is a little error, a misunderstanding in the order of

2   operations that my complaints were turned in.

3         I would really ask the Court to consider that, all of

4   these things together, with the statute of limitations still

5   tolling, give me a chance to, to really stand this thing up

6   properly, your Honor.

7         I am, you know, visibly weakened, but I can do this,

8   and I really appreciate the Court having faith in me even this

9   far to take this case to this point, your Honor.

10        THE COURT:  Thank you very much.

11        OK.  Let me do this.

12        Ms. March, I suspect that I will be unable to persuade

13   you from not to file the motion that you contemplate, is that

14   correct?

15        MS. MARCH:  Yes, your Honor.

16        THE COURT:  All right.  Well, then you're welcome to

17   sit down.  Thank you.

18        Ms. Price, what I say to litigants in this context is

19   that I don't have the ability to prevent someone from filing a

20   motion to dismiss.  I have the control over deciding it.  I

21   don't want to schedule it, though, until I have resolved your

22   motion for reconsideration.

23        So what I will do is I am going to say on the record

24   that I am staying the time within which the two defendants who

25   are here, Ms. Brooks and Inspector Obe need to respond until we

H3KNPRIC

1   resolve this motion.

2           In my mind filing the premotion letter tolls the

3   deadline.  But in case there's any doubt, I am tolling the

4   deadline for your response.

5           I will issue, when I can, in the near term a

6   resolution of the reconsideration motion just so that everybody

7   knows what the operative document is or will be.  From there we

8   will set a schedule.

9           When we get to that point, let me just give you a

10  couple of thoughts.  Ms. March, I am going to ask you please to

11  obtain in the ordinary course a transcript of today's

12  conference and, when you get it, please mail a copy to

13  Ms. Price, unless you three have agreed to share things through

14  e-mail or some other medium, at least get a copy to her.  That

15  is the important thing.

16          When you do file your motion, please make sure that

17  all materials that you cite, all cases that you cite in the

18  motion, you have copies of those for Ms. Price as well, because

19  she may not have the access to WestLaw or Lexis that you have.

20          Ms. Price, when I set the motion, I will give a

21  specified amount of time for the folks at the back table to

22  make the motion, I will give you a slightly longer period of

23  time to respond, and then there will be a period of time for

24  their reply.

25          If I need oral argument, I will call you in.  You had

H3KNPRIC

1    mentioned earlier that the Brennan Center might want to be

2    heard on this.

3            Why don't you let them know, Ms. Price, when I issue a

4    scheduling order, because today this is a motion that has no

5    dates, and that's just sort of a motion that's being

6    contemplated without any part of it actually being real.

7            If they want to be heard on the issue or want to

8    participate, they can write me when there's a schedule in

9    place, and I will hear from them at that point.

10           That is all I have to say today.

11           Ms. Price, anything else to tell me?

12           The answer can be no.  That's fine.  I just want to

13   make sure.

14           MS. PRICE:  I have asked the Court on one prior

15   occasion to award me pro bono counsel.

16           THE COURT:  Yes.

17           MS. PRICE:  I would ask the Court for permission to

18   turn in another request at this time.  You don't have to give

19   me your answer now, but I do know that in my Reuters case, I

20   really stood up my complaint.

21           I knew the law.  It wasn't as hard for me to deal with

22   it.  It wasn't a minefield every time -- as much a minefield

23   every time I opened up the files.

24           I thought I had that case nailed, but Honorable Judge

25   Abrams gave me a pro bono lawyer, and he showed me and taught

H3KNPRIC

 1    me things about that case and about the case law.

 2             I would have been creamed in that case.  I understand

 3    the value and the importance, and I know that the Court is on a

 4    budget for pro bono counsel.

 5             THE COURT:  We don't have any.  That's the issue.

 6    They are pro bono, and it's only the volunteers that we have.

 7    So we can call around and ask, but we can't direct anyone to do

 8    it.

 9             Are you not getting sufficient assistance from the

10    clinic?

11             I would think that they have been very helpful.

12             MS. PRICE:  They are just up and running, but they

13    really just have certain people at certain slots of time.

14             I really need someone 24/7 to help me with this case.

15    There is no small amount of enormous work and detail and all

16    kinds of rules.  I really don't even know how I've gotten this

17    far, your Honor.

18             So I would ask, even if the Court isn't able to award

19    me pro bono counsel, since Judge Abrams has ordered Reuters to

20    settle with me, I will get a settlement in, I don't know, six

21    months, eight months.

22             THE COURT:  She's asked.  She hasn't ordered.  She

23    can't actually make them settle.

24             MS. PRICE:  I'm sorry.  I am an ingenue at this stuff,

25    and I don't mean to say certain things.  They just pop out of

H3KNPRIC

```
 1    my mouth.  I don't enjoy the taste of my foot in there, but I
 2    do it a lot.
 3              What I was trying to say, this is going to maybe sound
 4    crazy --
 5              THE COURT:  I understand what you're saying.  You are
 6    in the future there may be money.
 7              MS. PRICE:  It is a crazy argument, but I will have
 8    money to pay someone.  Certain lawyers have told me this is
 9    this is so much work.  I want to help you, Ms. Price.  There's
10    no way I can do it.  I need to feed my kids.
11              There will be money if there's any way we can delay
12    until I --
13              THE COURT:  Let me speak to Ms. Turnofsky, if you
14    don't mind my speaking to Ms. Turnofsky.
15              MS. PRICE:  I will be delighted.
16              THE COURT:  Thank you.
17              Ms. March, Ms. Jacobs, anything you like to add?
18              MS. MARCH:  No, your Honor.
19              I would just like to clarify, the stay is also for the
20    city as well as Inspector Obe and --
21              THE COURT:  Of course.  Thank you.
22              That's right.  The Monell claim we have been
23    discussing earlier.  Yes, it extends on that as well.
24              Ms. Jacobs, anything else?
25              MS. JACOBS:  No, your Honor.
```

H3KNPRIC

1              THE COURT:  All right.

2              This has been a productive, if long, conference.

3              Thank you very much.

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25