The Mayor's Office of Communications decides whether something is an emergency. They may call for all outbound social posts to be paused, or mandate certain messaging to inform all NYC account followers of critical information.

One specific type of emergency that social media managers might encounter is a cyber attack, such as someone hacking into an agency Twitter account to post rude comments. In case of a suspected cyber attack, ███████████████████████████████
███████████████████████

## Accounts for Individuals Rather than Agencies

Within city government, social media accounts are typically created to represent agencies. Occasionally, an agency might want to create an official social media account for an individual, like the head of the department or a press officer.

An account made for a City worker in an official capacity operates differently than that worker's own personal account.

Individuals authorized to post on social media platforms as part of their City work must comply with all City and agency guidelines while doing so. This includes linking to the User Social Media Policy, and retention policies. They may post on City time using City resources, which includes employees. These accounts become public property and do not transfer to the employee's personal use should they leave the City. In other words, if an account was created for a Commissioner to use in her official capacity, she does not get to keep the account after her service is over. The account should be clearly labeled with the official's title, for example Commissioner O'Neill, @NYPDONeill.

A personal account may be turned into an official account, but that account is considered donated to the City and stays with the City should the employee leave. Personnel who wish to use social media in a personal capacity must indicate they are only representing themselves, and cannot do so on City time or use City resources, including personnel. For information on personal use of social media sites during work hours, please check with your agency's Acceptable Use Policy.

| Official City Accounts for City Workers | City Worker's Personal Account |
|---|---|
| May be used for promoting agency work. | May be used for promoting agency work. |
| May be taken as official agency commentary. | May not be taken as official agency commentary. |
| Must comply with all City rules and regulations for social media accounts. | Does not have to comply with all City rules and regulations for social media accounts other than agency guidelines specific to personal usage. |
| May not engage in overtly political endorsements or campaign activity. | May engage in campaign or political activity subject to COIB and other restrictions. |
| Must archive all posts for FOIL requests. | Is not covered by FOIL under most circumstances if no official business is conducted or discussed. |
| Must stay with the City and is considered City property. | Does not have to stay with the City, and is considered personal property. |
| May not delete comments unless they violate the City's terms of service and user policy. | May delete comments as per the owner's discretion. |
| Can be worked on by City employees apart from the person the account represents. | Cannot be worked on by City employees apart from the owner. |
| Cannot be transferred for personal use. | May be transferred for official use, but cannot then be transferred back. |

## Responding to Requests

If you take any big company and look at their Tweets & Replies, you will see that they actively respond to user complaints and questions.



**Exhibit D**

April 22, 2014
Elizabeth Walker

235 West 120th Street
Apt 2
New York, NY 10027
(917) 575 9600 (cell)



To Whom It May Concern:

I was one of Kelly Price's neighbors when she lived at 237 w            eet. I have lived at 235 west 120th Street for five years. I am an attorney    nave been a member of the New York State Bar for over seven years.

During the course of our relationship as neighbors Kelly shared with me the trouble she was having obtaining police assistance from members of the 28th Precinct on multiple occasions when she had been attacked by people in our neighborhood, including her ex intimate partner, Raheem Powell. I did not witness the events or attacks Price described to me, but she would cry on my shoulder whenever was assaulted, often by women whom Kelly believed were associated with her ex, his alleged drug dealing associates, or childhood cronies. Kelly was particularly dismayed that the police refused to take her reports, follow up on assaults against her person, or regard her as a member of society needing protection in general. She told me that officers in the precinct told her that the district attorney's office had instructed them not to assist her. Candidly, I did not entirely believe that the police would refuse Kelly, and I suspected that it was likely she was omitting some dispositive reason why the police were reluctant to intervene on her behalf against her various alleged attackers.

On the evening of October 17, 2012, Kelly called me crying and asking for my help. I observed her distraught and injured after being assaulted in broad daylight on the corner of our block, at 120th Street and St. Nicholas Avenue, while she was en route to her home from the 125th Street subway at approximately 5:30 p.m. I observed that she was disheveled, her stockings were torn, and her knees and hands were bruised and bloodied. Kelly was nearly hysterical and I had to calm her down and give her medical assistance. Kelly related that a purported heroin dealer named Willy who was known to many residents in the neighborhood (he operated his business from a visible stoop on Saint Nicholas Avenue) had "jumped" her and hit her in the face, spit at her and pushed her onto the sidewalk while screaming insults at her. I do not recall what Kelly had said to him before or after the attack, but I do recall that she did not provoke or retaliate against him physically. I took pictures of Kelly and her wounds, and encouraged her to call 911 for assistance in reporting the crime. Kelly stated that she already had called the 28th Precinct and that a patrol car had been sent to the scene of the assault. Kelly said that when the officers arrived they refused to take her report and called her crazy. Kelly also stated that she had then walked to the precinct a block or so away for help and been rebuffed by the desk sergeant who Kelly said ridiculed and mocked her. Notwithstanding her story that she had sought police intervention earlier that day, I insisted that she call 911 again and report the chain of events. She complied.

Eventually another patrol car with Officers from the 28th precinct arrived in front of the brownstone we lived in. Two police officers, whom Kelly has since reminded me were named PO Longo (shield # 31565) and PO Walker, related to us that they were instructed by the station's Desk Sergeant not to take Kelly's reports. PO Walker stated that the District Attorney's office had instructed the precinct not to respond to any of Kelly's calls. I recall being genuinely shocked and outraged to hear this instruction, and further surprised that a young woman, like PO Walker, would be tasked by her superiors with being complicit in such a scheme that leaves domestic violence victims without recourse for protection. At this juncture, I introduced myself as an officer of the court and member of the NY State Bar, and pressed the officers by reminding them of their legal and ethical responsibilities to provide complainants with police services. I recall that the officers responded more favorably to me than they did to Kelly, but I could not discern whether this was the case because I notified them that I am an attorney, or because I'm just someone other than Kelly Price. PO Walker stated that she would take basic information about the incident, but she believed that once the precinct began to process the event that it most likely would be circular-filed in the trash bin. PO Longo gave Kelly an incident ID slip and told her to follow up with the precinct in a few days, then both officers left. I was then, and remain dumbfounded by what I witnessed transpire that evening.

As a single young woman living and working in NYC, it unsettled me that the police could be so cavalier about the safety of Kelly Price. Kelly has since told me that the complaint number she was given months later when she inquired as to why no one had ever followed up with her about the incident was 2012-28-005194. Kelly also informs me that the detective squad at the 28th Precinct closed her incident report without contacting her to identify the perpetrator of the attack or review the emergency room reports or follow-on orthopedic assessments describing Price's injuries resulting from the attack.

Please feel free to contact me with any questions.

Sincerely,

Elizabeth Walker

Marilyn Benetatos
231 West 120th Street
N.Y. N.Y. 10027
(212) 663-5372 (home)
(347) 203-2623 (cell)

To whom it may concern:

I was a neighbor of Kelly Price when she lived at 237 West 120th Street. I am a manager in Con Edison where I have worked for over 26 years. I have approximately 70 employees in my chain of command. I lived on the street for over 12 years, walk my dog every day and know and get along with my neighbors.

In the spring and summer of 2011 and later in 2012, there were some problems on the street related to young teenagers from other blocks hanging out on 120th street vandalizing cars, the school yard, fighting in the streets and being somewhat threatening to others. As a result, a group of us from the block attended monthly meetings at the police station to make our issues known there and to get further on-going support from the police and the community officer. The police were very helpful, offered a lot of support and worked with us and the principal at the local school and facilitated the problem going away.

After the formal meeting, the head of the station, Captain Rodney Harrison, invited attendees to speak with him personally about issues of concern. I went up to him after one of these meetings and asked him why more was not being done to help Kelly Price, who everyone knew was being battered. I was concerned because the young teenagers seemed to be learning the wrong thing from the situation. At that time, Captain Harrison told me that he had never seen anything like it, but he/the police were told to not respond to Kelly Price without the direct instruction of the District Attorney's office. He said it was strange but indicated that, to some extent, his hands were tied.

I found his response really surprising, so it stood out in my mind. I don't remember when or in what circumstances I came to be telling Kelly Price the

details of my interaction with Captain Harrison.

Please feel free to contact me, should I be able to assist you further.

Sincerely,

**Exhibit E**

DECEMBER 18, 2015

My name is Mark Christopher LaRocca. I worked as a Lieutenant in the New York City Police Department from 1997 to 2013 assigned to the 028 Precinct in Manhattan. Circa 2010 and 2011, I had several conversations with Ms. Kelly Price in which she claimed to be a crime victim, specifically a victim of domestic violence.

During my interviews of Ms. Price, I found her allegations of abuse, to be credible and with merit. I felt there was sufficient evidence to prepare Complaint Reports to document these allegations which would then be further investigated by the Precinct Domestic Violence Officer and/or the Precinct Detective Squad.

After speaking with the Detectives regarding Ms. Price's allegations, I was informed that prior to a report being further investigated, a phone call to someone in the Manhattan District Attorney's Office who was familiar with Ms. Price's history of reporting crimes needed to be consulted.

Ms. Price informed me that she felt this hindered her ability to receive fair treatment regarding the investigation of her complaints. I informed her that as a victim, she should speak with the supervisor of the person at the Manhattan District Attorney's Office handling her complaints if she felt her complaints were being stonewalled and not acted upon in a fair manner.

MARK C. LaROCCA
Mark C. LaRocca