UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

KELLY PRICE,

Civil Action No. 15-cv-5871 (KPF)

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/4/17

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS CITY OF NEW YORK, SELVENA BROOKS, INSPECTOR OBE, ROSE PIERRE-LOUIS, DETECTIVE SIMMONS, SGT. SHEVITZ, AND SGT. DEJESUS' MOTION TO DISMISS

# PRELIMINARY STATEMENT[1]

Plaintiff Kelly Price ("Price") respectfully submits this memorandum of law, together with the Declartion of Kelly Price ("Price Decl."), with exhibits, in opposition to Defendants The City of New York, Selvena Brooks, Inspector Obe, Rose Pierre-Louis, Detective Simmons, Sgt. Shevitz, and Sgt. Dejesus' motion to dismiss Plaintiff Price's Amended Complaint, Civil Docket Entry No. 69 (the "Am. Complaint").

Price is seeking, in part, to recover for 1st Amendment, free speech violations which befell her as a direct result of Defendants Rose Pierre-Louis ("Pierre-Louis"), as the operator of the Twitter account @RPLNYC, Inspector Obe ("Obe"), as the operator of @NYPD28Pct, and Selvena Brooks ("Brooks"), as the operator of @NYCagainstabuse, (collectively, the "Operators") blocked Ms. Price's Twitter account, @GracieeGorgeous, from their respective pages in an act to silence her complaints about the methods and speed with which domestic abuse allegations are handled in New York City.  Despite Defendants' contention to the contrary, each blocking of Ms. Price's account was performed under color of law, but was not an action that could be plausibly considered protected government speech.  Moreover, none of the Operators are entitled to qualified immunity for their actions where they violated clearly established law by explicitly engaging in viewpoint discrimination in a public forum when they each blocked Ms. Price's Twitter account.  Additionally, the City of New York is liable for the actions Operators where a specific policy was put in place by the City which required official Twitter account operators to seek training and recommended legal guidance where an operator believed he or she may delete other users' comments under an unlisted narrow exception to the general City policy that users' comments are not to be deleted.

---

[1] This document was prepared with the assistance of the New York Legal Assistance Group Legal Clinic for Pro Se Litigants in the SDNY.

Plaintiff is further seeking, in part, to recover for an instance of malicious prosecution wherein Defendant Detective Simmons ("Simmons") maliciously issued a Desk Appearance Ticket against Ms. Price for her decision to retract her prior complaint for fear of retaliation by her assailant. Plaintiff also seeks, in part, to recover for a distinct instance wherein City of New York Officers caused a state created danger to be formed by intentionally not investigating her claim of assault. The City of New York is similarly liable for these actions wherein the City has failed to properly train and instruct the officers in question.

For the reasons discussed below, Defendants' motion to dismiss the complaint should be denied in full.

## LEGAL STANDARD

"In considering a motion to dismiss, that challenges the legal sufficiency of a complaint, the Court is limited to 'the factual allegations in [the]… complaint, … documents attached to the complaint as an exhibit or incorporated in it by reference, … matters of which judicial notice may be taken, [and] documents either in plaintiff['s] possession or of which the plaintiff[] had knowledge and relied on in bringing suit." *Morillo v. 1199 SEIU Benefit and Pension Funds*, 783 F.Supp.2d 487, 489 (SDNY 2011), quoting, *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (alterations in original). "In a *pro se* action such as this, however, [] Court[s] [are] required to construe the plaintiff's complaint 'to raise the strongest arguments that [it] suggest[s].'" *Morillo*, 783 F.Supp.2d at 490, fn.3, citing, *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (quoting, *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001)).

## ARGUMENT

## I.   MS. PIERRE-LOUIS ACTED UNDER COLOR OF LAW IN BLOCKING PLAINTIFF ON TWITTER, THUS MAKING MS. PIERRE-LOUIS SUBJECT TO CONSTITUTIONAL CLAIMS FOR HER ACTIONS

"[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Gleason v. Scoppetta*, 566 Fed.Appx. 65, 68 (2d Cir. 2014), quoting, *West v. Atkins*, 487 U.S. 42, 50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).   Yet, "not all acts performed by public employees under color of state law: 'acts of officers in the ambit of their personal pursuits are plainly excluded.'" *Gleason*, 566 Fed.Appx at 65, quoting, *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).   Unfortunately, however, "there is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994).   In attempting to draw this distinction, courts, rather than consider the officer's status or the property used, "look to the nature of the officer's act." *Id.*   Yet, the actions themselves are often not dispositive. *See, e.g., Gleason*, 566 Fed.Appx. at 69 ("Whether [Defendant's] actions were rogue or unlawful is not dispositive of whether they acted under color of state law … Nor is it necessary that [the Defendant has] taken action pursuant to their official [] duties to have acted under color of state law").

In the instant matter, Defendant Pierre-Louis, the operator of the Twitter handle @RPLNYC, intentionally labeled her Twitter handle with the suffix "NYC." *Am. Complaint*, ¶ 126.   Furthermore, When Ms. Price was silenced by Defendant Pierre-Louis' unlawful blocking of her Twitter account, Defendant Pierre-Louis' Twitter was actively being used to disseminate official information.   Indeed, a quick look at the Twitter timeline for @RPLNYC during the month of October 2014—the month in which Ms. Price was blocked from @RPLNYC—shows

Defendant Pierre-Louis utilizing her allegedly "private" Twitter account to promote "Domestic Violence Awareness Month" by posting links to official nyc.gov pages and raising awareness for the New York City "UpStanders" program, promoting events hosted by both @NYCagainstabuse and @NYPD28Pct. *See Price Decl.*, ¶ 2, and accompanying exhibit. New York City's own media training materials and instructions for its employees, agents, and agencies with social media accounts are explicit that, once an individual, such as Defendant Pierre-Louis, disseminates official information from an allegedly 'personal' Twitter account, that account is then considered "Donated" to the City of New York and becomes official property. AFFIDAVIT.

Defendant's argument that @RPLNYC is and remains a 'personal' Twitter account amounts only to a bald assertion that any privately made account is and forever remains a personal account. Defendant fails to acknowledge that, what was once 'personal' property may nevertheless become public through the actions of its owner. Once Defendant Pierre-Louis began to use her account to disseminate public information affiliated with her position as the NYC Commissioner of the Mayor's Office to Combat Domestic violence, she necessarily gained followers, such as Ms. Price, who were not interested in the individual, but only in the office she represented. These followers looked to her to spread official information, including: promotion of the "UpStander" program, promotion of various panels discussing domestic violence issues, and links to official information, such as the calendar of events for NYC's participation in National Domestic Violence Awareness Month. Once Defendant Pierre-Louis elected to use her personal account to advance her position as NYC Commissioner of the Mayor's Office to Combat Domestic Violence, the followers she gained were followers of a *public* account that disseminated public information to a population of citizens. Indeed, by opening up her once

'personal' twitter account to public debate through the use of her official position, Defendant
Pierre Louis created a public forum wherein private citizens could address their concerns about
domestic violence to an official figure in the domestic violence prevention framework. Thus, by
silencing Ms. Price, Defendant Pierre-Louis stripped Ms. Price of the opportunity for her voice
to be heard in this newly created public forum.

## II.    THE SUBJECT TWITTER ACCOUNTS DO NOT QUALIFY AS GOVERNMENT SPEECH WITH RESPECT TO THE COMMENTS MADE BY NON-GOVERNMENTAL USERS ON THE ACCOUNTS' ASSOCIATED PAGES

When the government does speak, "it is not barred by the Free Speech Clause from
determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans,
Inc.*, 135 S.Ct. 2239, 2241, 192 L.Ed.2d 274 (2015), citing, *Pleasant Grove City v. Summum*, 555
U.S. 460, 467-468, 129 S.Ct. 1125, 172 L.Ed.2d 853. Broadly speaking, no one would think to
argue that the government has the right to say as it pleases. On Twitter, for instance, these public
accounts may be used to post about whatever they wish. Surely, speaking in that manner equates
to government speech. Yet, this is not the entire conversation taking place on the public twitter
feed. Individuals reply; some agree and praise, others disagree and criticize. It would be absurd
to think that these replies by individual users could be considered government speech. Certainly,
it is not the government speaking, but concerned individuals responding to what the government
has already spoken. It is important to remember that the issue at hand is not whether the
government's posts on the three respective Twitter accounts constitutes government speech.
Rather, the issue here is whether the action of blocking an individual from viewing, reading, and
posting replies on such government run pages—an ability every other user on Twitter has—is a

permissible action of government speech/expression.  In this sense, Defendants are attempting to claim that the government may, in its right to express itself, silence those that criticize it.

The Defendants attempt to draw analogy to the permission of hyperlinks on government-run sites is flawed.  Unlike Twitter, where a user may comment on any post, the hyperlinks that Defendants elect to refer to are not permitted to be placed on a site via a dialogue box.  Defendants specifically refer to government-run websites where the government was in a position to place hyperlinks throughout its site.  In doing so, the government is the one posting the hyperlinks.  This allows the government to pick and choose which links appear on its sites (i.e., which ones they adopt) and which they decline.  Adopting a hyperlink in this fashion is akin to a 'share' on Facebook or a 're-tweet' on Twitter, where the user sees the message and elects to adopt it as his/her own.  If this were the issue in the instant matter, it may be that such 're-tweets' would be government speech as it would be clear that the government adopted the speech as its own. *Cf. Matal v. Tam*, 137 S.Ct. 1744, 1758, 198 L.Ed.2d 366 (2017) ("If private speech could be passed off by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints.  For this reason, we must exercise great caution before extending our government-speech precedents").

Rather than hyperlinks, the better analogy here is to a town hall or city council meeting.  Imagine, if you will, a town hall meeting.  The government speaker makes a comment and opens the conversation to the crowd.  One man from the crowd speaks, criticizing an issue the government speaker had addressed.  The government speaker has several options:  he or she can reply positively in agreement, she can disagree, or she can even adopt the criticism as his own.  However, there is no indication in case law or otherwise that the government would, in this

instance, be permitted to forcefully remove the man from this meeting and all future meetings held by that government speaker.

## III.   THE OPERATORS OF THE SUBJECT TWITTER ACCOUNTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY FOR THEIR ACTIONS IN BLOCKING MS. PRICE'S TWITTER ACCOUNT

### A.  The creation and use of the Subject Twitter Accounts created a public forum

In *Perry Education Association v. Perry Local Educators Association* the Supreme Court divided public spaces into "three types of for a:  a traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).  A public forum is created "[i]n places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).  "In addition to the traditional public fora, a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Packingham v. North Carolina*, 137 S.Ct. 1730, 1737, 198 L.Ed.2d 273 (2017).  Certainly, the government is not "required to create" any designated forum, nor must it "indefinitely retain the open character of [it]" yet, "as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry*, 460 U.S. at 46, 103 S.Ct. 948.

The government only creates a public forum "by intentionally opening a nontraditional forum for public discourse." *Cornelius* 473 U.S. at 802, 105 S.Ct. 3439.  Courts consider factors such as "the policy and practice of the government['s]" use of the property, "the nature of the property," and "[the property's] compatibility with expressive activity." *Id.*  Presumptively,

those public spaces that have "as a principal purpose ... the free exchange of ideas," *Int'l Soc'y for Krishna Consciousness Inc. v. Lee (ISKCON)*, 505 U.S. 672, 679, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), or that are "designed for and dedicated to expressive activities," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), may be deemed public forums. Indeed, the forum the government has selected must not be "disrupted by [the] expressive activity," *Cornelius*, 473 U.S. at 804, 105 S.Ct. 3439; the government's use must be "compatible with the intended purpose of the property." *Perry*, 460 U.S. at 49, 103 S.Ct. 948.

Courts have begun to recognize the critical role that social media plays as "the modern public square... [allowing users to] engage in a wide array of protected First Amendment activity *Packingham*, 137 S.Ct. at 1735-36. "Twitter, [in particular] acts as the modern, electronic equivalent of a public square." *Twitter, Inc. v. Sessions*, 2017 WL 2876183, at *8 (N.D. Cal. July 6, 2017). "[O]n Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner." *Packingham*, 137 S.Ct. at 1735. Indeed, "Governors in all 50 states and almost every Member of Congress have set up accounts for this purpose. *Id.* Indeed, the principal purpose of Twitter is to promote the free exchange of ideas. *See ISKCON*, 505 U.S. at 679, 112 S.Ct. 2701.

In the instant matter, three public, government-run Twitter accounts have blocked Ms. Price: (1) @RPLNYC, operated by Defendant Pierre-Louis who was, for all relevant times, the Commissioner of the Mayor's Office to Combat Domestic Violence; (2) @NYPD28Pct, the official twitter of the NYPD 28th Precinct, operated by Defendant Inspector Obe; and (3) @NYCagainstabuse, the official twitter of the Mayor's Office to Combat Domestic Violence,

operated by Defendant Brooks (collectively, the "Subject Accounts"). *Am. Complaint*, ¶ 103, 117, 133.

The Subject Accounts created, at the very least, limited public forums. While the government did not create Twitter itself, it elected to make several official accounts, either directly or by turning personal accounts into official accounts as described above in the case of Defendant Pierre-Louis. In doing so, the government acted akin to renting a suitable assembly hall to hold public meetings. The Subject Accounts were, at all relevant times, utilized for the public dissemination of information and similarly generated public discourse in the comment sections that accompany the various posts by the subject government officials. There is no indication that any of the Subject Accounts were protected or otherwise initially limited in who may view and engage in the public discourse. In fact, the only Twitter accounts that are prohibited from doing so are those that the government has blocked, such as Ms. Price, the plaintiff herein. That is not to say that Plaintiff contends that the government *must* create Twitter accounts that are open to the public. Yet, having done so, Defendants cannot block Plaintiff merely because she criticizes Defendants' practices and policies.

The result of Defendants' actions should be no different simply because the forum the government selected is entwined with new technological and social developments. Certainly "the policies underlying the [public forum] doctrine cannot be given effect unless we recognize that open, public spaces... that are suitable for discourse may be public forums... Without this recognition our forum doctrine retains no relevance in times of fast-changing technology and increasing insularity... [O]ur failure to recognize the possibility that new types of government property may be appropriate forums for speech will lead to a serious curtailment of our

expressive activity." *ISKCON*, 550 US at 597-98, 112 S.Ct. 2701 (Kennedy, J., concurring in judgments).

> **B. The Operators of the Subject Accounts engaged in viewpoint discrimination when they blocked Ms. Price's Twitter account and are thus not entitled to qualified immunity.**

In both the traditional public forum and the public forum by designation, "[r]easonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry*, 460 U.S. at 45-46, 103 S.Ct. 948. While "[c]learly established law holds that in a limited public forum the 'government is free to impose a blanket exclusion on certain types of speech, [] once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre.'" *Anello v. Anderson*, 518 Fed. Appx. 24, 25 (2d Cir. 2013), quoting *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991). Pertinently, viewpoint discrimination—that which occurs when an individual is discriminated against based on the "speaker's specific motivating ideology, opinion, or perspective"—is never permitted in any public forum. Specifically, the government may not "exercise viewpoint discrimination, even when the … forum is one of its own creation." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 820, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (The government may not "exercise viewpoint discrimination, even when the … forum is one of its own creation"). *See also Matal*, 137 S.Ct. at 1763, 198 L.Ed.2d 366 ("When a government creates a [limited public forum], in either a literal or 'metaphysical sense' … some content- and speaker-based restrictions may be allowed … However, even in such cases, what we have termed 'viewpoint discrimination' is forbidden"); *Davison v. Loudoun County Bd. Of Supervisors*, 2017 WL 3158389, at *10 (ED Va, July 25, 2017) ("Viewpoint discrimination is prohibited in all forums") *Byrne v. Rutledge*, 623 F.3d 46,

- 11 -

54 n.8 (2d Cir. 2010).  Moreover, the Supreme Court once noted that "speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Garrison v. Louisiana*, 379 U.S. 64, 74-75, quoting, *NY Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

In the instant matter, Ms. Price's Twitter account was blocked from the three Subject Accounts based solely on comments she made detailing her own story of domestic violence and issues that were raised when she attempted to stand up to her abuser.  Ms. Price was specifically addressing policy concerns that were raised in her own experiences with domestic violence in public forums created by government officials.  She was blocked solely because of her viewpoint without warning or reason.   Once blocked, Ms. Price could no longer post her viewpoint on these public forums, she could no longer read others' viewpoints posted on the public forums, and she could no longer acquire the information disseminated via the public forum through the same means as those with different viewpoints or who failed to voice their own viewpoints could.  While this information may have still existed through other means, or the discourse could have included Ms. Price elsewhere, these facts are not sufficient to cure the First Amendment violation that Ms. Price suffered from the blocking. *See, e.g., Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings College of Law v. Martinez*, 561 U.S. 661, 690 (2010) ("If restrictions on access to a … public forum are viewpoint discriminatory, the ability of a group to exist outside the forum would not cure the constitutional shortcoming").

Defendants' claim that their actions were permissible under the doctrine of qualified immunity, such that they could not know of the supposed right to not be blocked on Twitter, misses the point entirely.  The Plaintiff's right which was violated is the right to not be discriminated based upon her viewpoint.  Plaintiff does not intent to assert a general constitutional right which would make any 'blocking' action on Twitter unconstitutional.

Qualified immunity is available only where "the contours of the right are sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011), quoting, *Zieper v. Metzinger*, 474 F.3d 60, 68 (2d Cir. 2007).  In the instant matter, Defendants appear to believe that they were entitled to—or at the very least assert that it is unclear whether they may—engage in viewpoint discrimination under the government speech doctrine.  While it is true that "the government may discriminate on the basis of viewpoint when it is speaking *only for itself* ... [where the fora] involve, at minimum, some private speech ... it [is] not [] reasonable for defendants to conclude [the government speech] doctrine permit[s] viewpoint discrimination." *Children First Found., Inc. v. Martinez*, 169 Fed.Appx. 637, 639 (2d Cir. 2006) (emphasis added).  Thus, here, it is unreasonable for the Defendants to assert that they were not aware of Ms. Price's right to not be discriminated based solely on her viewpoint.  Defendants, as city officials, cannot be entitled to qualified immunity simply because the technology or the interface changes with time.  *See Terebesi v. Torreso*, 764 F.3d 217, 237 n.20 (2d Cir. 2014) ("It has become commonplace for defendants in excessive force cases to support their claims to qualified immunity by pointing to the absence of prior case law concerning the precise weapon, method, or technology employed by the police. [Citation]. As the Supreme Court has made clear, however, it is not necessary to find a 'case directly on point' in order to show that the law governing a plaintiff's claim is

clearly established.  [Citing, *Ashcroft v. al-Kidd*, 563 U.S. 731, 739, 131 S.Ct. 2074, 179 L.Ed.2d

1149 (2011)]  Some measure of abstraction and common sense is required … in light of rapid

innovation in hardware and tactics").  *Cf. Lauro v. Charles*, 219 F.3d 202, 215 (2d Cir. 2000)

("[O]ne of the policies behind the qualified immunity doctrine[ is] to relieve individual officials

of the burden of anticipating every new development *in constitutional law*") (emphasis added).

## IV.     MS. PRICE HAS SUFFICIENTLY PLEAD DEPRIVATION FOR A MALICIOUS PROSECUTION CLAIM

The elements of malicious prosecution are well settled in New York.  In [her] claim for

malicious prosecution, plaintiff had to establish 1) that the defendant either commenced or

continued a criminal proceeding against [her]; 2) that the proceeding terminated in his favor; 3)

that there was no probable cause for the proceeding; and 4) that the criminal proceeding was

instituted with actual malice."  *Gray v. Millea*, 892 F.Supp. 432, 435-36 (NDNY 1995).

Furthermore, under New York law a request that the plaintiff be prosecuted is the minimum

action necessary to sustain a claim under malicious prosecution.  *Id.*, citing, *Raysor v. Port*

*Authority*, 768 F.2d 34, 39 (2d Cir. 1985), *cert. den'd*, 475 U.S. 1027, 106 S.Ct. 1227, 89

L.Ed.2d 337 (1986).  "[L]iability for the tort of malicious prosecution is [] intended to protect an

individual from the unwarranted defamation of character, inconvenience and anxiety suffered

when he is compelled to appear in a court to answer anticipated criminal charges." *Rosario v.*

*Amalgamated Ladies' Garment Cutters' Union, Local 10, I.L.G.W.U.*, 605 F.2d 1228, 1249 (2d

Cir. 1979).

While it may often be the case, as Defendants note, that a claim for malicious prosection

"may arise only after an arraignment or indictment or some other evaluation by a neutral body

that the charges [were] warranted," this is only the case where the plaintiff in such cases had not

been issued a desk appearance ticket ("DAT") or similar "command to appear in court." *Stampf*

*v. Long Is. R. Co.*, 761 F.3d 192, 199 (2d Cir. 2014) quoting, *Snead v. Aegis Sec., Inc.*, 105

A.D.2d 1059, 482 N.Y.S.2d 159, 160-61 (4ᵗʰ Dep't 1984). Defendants are not the first to make

this mistake, in fact the court in *Stampf* acknowledged "several courts of first instance" which

incorrectly applied *Stile* to rule that a DAT fails to initiate a criminal proceeding for the purposes

of the tort of malicious prosecution:

> "Nonetheless, in view of the fact that the Second Department has never held that a DAT
> does not initiate a criminal proceeding for the purposes of a malicious prosecution claim,
> and that the Third and Fourth Departments in *Snead* and *Allen* held, in accordance with
> *Rosario*, that it does, we adhere to the position we took in *Rosario* that, under New York
> law, the issuance of a DAT sufficiently initiates a criminal prosecution to sustain a claim
> of malicious prosecution." *Stampf*, 761 F.3d at 199.

*See also Rosario*, 605 F.2d at 1249-50 (interpreting New York law and finding "that the issuance

of an Appearance Ticket commences a prosecution for purposes of determining whether an

action for malicious prosecution lies").

In the instant matter, Ms. Price was issued a DAT on or about October 14, 2010 by

Defendant Simmons for her decision to rescind her complaint against her abuser for fear of

repercussions that might befall her. *Am. Complaint*, ¶30-36 She was detained in a holding cell

both prior to signing her retraction and for one hour thereafter. *Id.*, ¶ 39-44. After she was

released, Ms. Price was issued a DAT, requiring her to appear in court the following month. *Id.*,

¶ 45, 49. Defendant Simmons issued the DAT without probable cause, without belief that the

proceeding would succeed, and with malice to punish Ms. Price for retracting her statement in

fear. *Id.*, ¶ 46-48. Moreover, the matter was dismissed almost six years later by certificate of

dismissal from the Manhattan District Attorney's Office on or about September 9, 2016 without

ever having been adjudicated. *Id.*, ¶ 61Therefore, Plaintiff Price has plead the minimum

requirements for malicious prosecution as the issuance of the DAT is sufficient to show

deprivation for the purposes of pleading the tort of malicious prosecution.

## V.   DEFENDANTS CAUSED A STATE CREATED DANGER TO FORM BY INTENTIONALLY NEGLECTING TO INVESTIGATE MS. PRICE CLAIM OF ASSAULT

Truthfully, the Constitution does not typically require State actors "to protect the life,

liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago*

*County Dept. of Social Services*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

However, two exceptions exist to this general rule, permitting "a substantive due process claim

[to] aris[e] out of a private harm ... (1) the victim of private conduct was in a 'special

relationship,' with the State or (2) the state or its agents 'in some way assisted in creating or

increasing the danger to the victim.'" *Campbell v. Brentwood Union Free School Dist.*, 904

F.Supp.2d 275, 280 (EDNY 2012), quoting, *Matican v. City of New York*, 524 F.3d 151, 155 (2d

Cir. 2008).  Where either exception exists, the plaintiff must also show that the defendants acted

in a way that "so egregious, so outrageous, that it may fairly be said to shock the contemporary

conscience." *Matican*, 524 F.3d at 155, quoting, *County of Sacramento v. Lewis*, 523 U.S. 833,

848, 118 S.Ct. 1708, 140 L.Ed.2d 1043 n.8 (1998).  The second circuit, unlike the minority of its

sister circuits, "treat special relationships and state created dangers as separate and distinct

theories of liability ... Our distinction between these categories of cases suggests that 'special

relationship' liability arises from the relationship between the state and a particular victim,

whereas 'state created danger' liability arises from the relationship between the state and the

private assailant." *Pena v. DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005).

- 16 -

On January 24, 2017, Ms. Price was assaulted by an unknown assailant. *Am. Complaint*,

¶ 170.  Despite several attempts to make a report with and provide video evidence of the incident

to the 34th Precinct, Ms. Price has not received any follow-up regarding the incident. *Id.*, ¶ 181.

By failing to properly investigate the issue, Defendants "assisted in … increasing the danger to

[Ms. Price]" by permitting the assailant to roam free and potentially assault or otherwise accost

her at a subsequent time.


**VI.    MS. PRICE HAS SUFFICIENTLY PLEAD THAT THE CITY IS LIABLE
WHERE RELEVANT POLICIES, CUSTOMS, TRAINING, AND INTERNAL
LEGAL GUIDANCE PERMITTED THE INSTANT CONSTITUTIONAL
VIOLATIONS TO OCCUR**

A prerequisite to municipal liability under *Monell [v. Dept. of Social Services of City of*

*New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)] is an underlying

constitutional violation by a state actor.  '*Monell* does not provide a separate cause of action for

failure by the government to train its employees; it extends liability to a municipal organization

where that organization's failure to train, or the policies or customs that it has sanctioned, led to

an independent constitutional violation." *De Michele v. City of New York*, 2012 WL 4354763, at

*19 (SDNY Sept. 24, 2012), quoting, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir.

2006).  "Plaintiffs seeking to impose § 1983 liability on local governments must prove that their

injury was caused by 'action pursuant to official municipal policy,' which includes the decisions

of a government's lawmakers, the acts of its policymaking officials, and practices so persistent

and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 51,

131 S.Ct. 1350, 179 L.Ed.2d 417 (2011), quoting, *Monell*, 436 U.S. at 691, 98 S.Ct. 2018.  A

claim of "failure to train must amount to 'deliberate indifference to the rights of persons with

whom the [untrained employees] come into contact." *Connick*, 563 U.S. at 51, 131 S.Ct. 1350,

quoting, *Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

"Deliberate indifference in this context requires proof that the city policymakers disregarded the

'known or obvious consequence' that a particular omission in their training program would cause

city employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 51, 131 S.Ct.

1350, quoting, *Board of Comm'rs of Bryan Cty v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382,

137 L.Ed.2d 626 (1997).

      The existence of a policy or practice which may subject the City of New York to *Monell*

liability may be shown by "evidence of a formal policy officially adopted by the municipality,"

but it is by no means limited to such a showing. *De Michele*, 2012 WL 4354763, at *20, citing,

*Monell*, 436 U.S. at 690, 98 S.Ct. 2018.  Indeed, "[t]he policy or custom used to anchor liability

need not be contained in any explicitly adopted rule or regulation … So long as the

[unconstitutional] practices of city officials are persistent and widespread they could be so

permanent and well settled as to constitute custom or usage with the force of law, and thereby

generate municipal liability." *Morpurgo v. Inc. Vil. of Sag Harbor*, 697 F.Supp.2d 309, 325

(EDNY 2010), *aff'd*, 417 Fed.Appx. 96 (2d Cir. 2011), quoting, *Sorlucco v. New York Police

Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992).

      Regarding the City of New York's liability for the Defendants' viewpoint discriminative

action of blocking Ms. Price's Twitter account, the City of New York has provided officials with

official documents detailing how government officials are to handle public social media

accounts.  In fact, by the end of 2014, all of New York City's precinct commands "were trained

in the use of Twitter." *See Berkman Klein Report, annexed to Price Dec.*, ¶ 4.  These training

sessions "consisted of lectures on best practices, legal concerns, and hands-on experience with

Twitter in the computer lab.  [They] were open to all commanding officers and any members of

their staff who they believed could support the use of Twitter as part of precinct operations… [I]t was understood that the successful use of Twitter would require daily engagement and might benefit from the support of several staff members." *Id.* Moreover, the Official New York City Social Media Policy (the "Social Media Policy") not only requires that "[e]ach person or group involved in an agency's official social media effort must have a clear understanding of the City's social media policy," but even suggests that "[t]raining should be provided for employees authorized to engage in social media on behalf of the City." *Price Dec.*, ¶ 3 and accompanying exhibit. Notably, the Social Media Policy specifically addresses "Moderating Customer Input" as a legal concern, noting that "[s]ocial media platforms often provide users the ability to voice their opinions and reactions to posted information … An agency should not use social media if it is uncomfortable with the idea of users posting negative or unsavory comments about itself, its leaders, or its programs." *Price Dec.*, ¶ 3. More specifically, the Social Media Policy calls on agencies to "not delete or modify comments that are posted," and suggests legal guidance to determine whether any of the "narrow exceptions" to that rule apply. Certainly, it appears that the Operators of the Subject Accounts must have perceived Ms. Price's comments to fall within one of these "narrow exceptions" as her comments on each of the three Subject Accounts were deleted as a result of the three independent blocking actions. Notably, the Social Media Policy fails to articulate these "narrow exceptions. Presumably, then, either the Operators received training or sought legal guidance on these "narrow exceptions." This training and/or guidance must have improperly, and in violation of Ms. Price's constitutional rights, suggested that the blocking action was permissible. Moreover, the three Operators—Defendants Brooks, Obe, and Pierre-Louis—each independently blocked Ms. Price's account, evidencing a significantly more

widespread issue that an individual rogue Twitter user violating the unlisted "narrow exceptions" or otherwise ignoring his/her training and/or legal guidance.

Turning to the City's liability for the malicious prosecution claim, the City's inability to effectively train its officers on the issues and nuances of domestic violence necessarily resulted in this incident.  Had the defendant-officers been properly trained on how to handle an incidence of domestic violence, like that which Ms. Price originally claimed of when filing her complaint with the 28th Precinct on or about October 13, 2010, Defendant Simmons would not penalized Ms. Price when she came to him to retract her complaint out of fear of her assailant / domestic-abuser's threatened response. *Am. Complaint*, ¶ 34-39.  It was this hostility that led to Ms. Price being forced to spend time in a holding cell and the issuance of a DAT and, thus, the incidence of malicious prosecution. *Id.*, ¶ 39-45.  Detective Simmons was fully informed of the situation between Ms. Price and her abuser and his insistence on prosecuting Ms. Price for her retraction evidences nothing if not insufficient training and improper policy manifesting a "deliberate indifference to the rights of persons" suffering from domestic violence for which the City of New York is liable for under *Monell*.  *Canton*, 489 U.S. at 388, 109 S.Ct. 1197; *Am. Complaint*, ¶ 34-35.

Lastly, the City is liable under *Monell* for instating an improper policy and failing to train officers regarding said policy, resulting in the state created danger to Ms. Price.   Upon information and belief, Ms. Price's claim regarding the January 27, 2017 incident was not fully investigated because she had been placed on a "do not serve list" or been labeled a "fabricator" in the City's records. *Am. Complaint*, ¶ 177, 182, and associated exhibit.  Moreover, Ms. Price has not been kept abreast of any supposed developments that could have occurred despite several attempts to follow-up on her report.  The institution of the policy by which Ms. Price was placed

on this list has necessarily caused Ms. Price to be placed in a state created danger as Ms. Price's non-fabricated claim has yet to be properly investigated. *Id.*, ¶ 170-82. Alternatively, the training which the officers received regarding how to assist individuals placed on such a list resulted in the improper investigation of her claim which necessarily caused Ms. Price to be placed in a state created danger. *Id.*

As discussed above, the blocking of Ms. Price's Twitter account by the defendant-operators of the Subject Accounts was an instance of viewpoint discrimination in violation of her First Amendment rights. Moreover, the issuance of a DAT is, contrary to Defendants' contention, sufficient deprivation for a claim of malicious prosecution. Lastly, by intentionally ignoring Price's complaint of assault and failing to properly investigate the matter, Defendants subjected themselves to liability for a state created danger. Thus, the pleaded constitutional violations sufficiently meet the first criterion of *Monell* liability. Therefore, Price's claims against the City ought not to be dismissed.

## CONCLUSION

For all of the above reasons, Plaintiff asks this Court to deny Defendant's motion to dismiss in its entirety, and for any such other and further relief as this Court deems just and proper under the circumstances.

Date:   New York, New York
        November 30, 2017

Kelly Price
*Plaintiff Pro Se*

- 21 -