USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 25, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KELLY PRICE,

                    Plaintiff,

          -v. -

THE CITY OF NEW YORK; ROSE PIERRE-
LOUIS, in her individual and official capacity;
SELVENA BROOKS, in her individual and
official capacity; INSPECTOR OLUFUNMILO
F. OBE, in her individual and official
capacity; DETECTIVE LINDA SIMMONS, in
her individual and official capacity; OFFICER
JOHN STAINES, in his individual and official
capacity; OFFICER ISELAINE GUICHARDO
HERMENE GILDO CRUZ, in her individual
and official capacity; LT. NICHOLAS
CORRADO, in his individual and official
capacity; LIEUTENANT RAYMOND
DEJESUS, in his individual and official
capacity; OFFICER EMMET, in his individual
and official capacity; SERGEANT SHEVITZ,
in his individual and official capacity; MTA
OFFICER JOHN DOE, in his individual and
official capacity; MTA OFFICER JANE DOE,
in her individual and official capacity,

                    Defendants.

---

15 Civ. 5871 (KPF)

OPINION AND ORDER

---

KATHERINE POLK FAILLA, District Judge:

     Plaintiff Kelly Price brings this *pro se* action under 42 U.S.C. § 1983,

alleging violations of her constitutional rights.  This case has a long history,

with which the Court presumes familiarity.  But it suffices to say that Plaintiff

has filed a Fourth Amended Complaint (the "FAC" (Dkt. #69)), and it is the

operative pleading.  She sues the City of New York, ten of its employees

(primarily officials of the New York City Police Department, or "NYPD"), and two

unidentified employees of the Metropolitan Transportation Authority Police Department. The City of New York and its employees (collectively referred to as the "City Defendants") have moved under Rule 12(b) (6) of the Federal Rules of Civil Procedure to dismiss nearly all of the claims against them. For the reasons set forth below, the Court grants in part and denies in part the City Defendants' motion to dismiss.

## BACKGROUND[1]

The following allegations are taken from the FAC and are assumed to be true for the purposes of this Opinion. *See Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). From approximately September 2008 to December 2013, Plaintiff "was in a 'relationship' with [nonparty] Raheem Andre Powell," who abused her "physically, mentally, and economically." (FAC ¶¶ 19-20). For several years during their "relationship," Powell "forced [Plaintiff] to engage in sexual acts with third parties and to provide him monies accrued from performing such services, against [Plaintiff's] will." (*Id.* at ¶ 21).

In 2010, Plaintiff obtained from the New York City Family Court an order of protection against Powell. She requested that officers of the NYPD's 28th Precinct serve the order on Powell, but they refused to do so. (FAC ¶¶ 22-23). Plaintiff further alleges that the Manhattan District Attorney's Office directed officers of the 28th Precinct "to not give police services or take reports from [Plaintiff]" without the District Attorney's prior approval. Officers of the 28th

---

[1]    For ease of reference, the Court refers to the City Defendants' supporting memorandum of law as "Def. Br." (Dkt. #108); Plaintiff's memorandum in opposition as "Pl. Opp." (Dkt. #110); and the City Defendants' reply memorandum as "Def. Reply" (Dkt. #111).

Precinct consequently placed Plaintiff on a "Do Not Serve / Arrest Alert List" and labeled her as a "fabricator." (*Id.* at ¶¶ 24-25).[2]

In October 2010, after Powell assaulted Plaintiff on a public street, Plaintiff sought assistance at the 28th Precinct police station. Plaintiff provided details about the incident to nonparty Officer Diaz, who "organized for photos to be taken of [her] injuries." (FAC ¶¶ 26-28). But after Plaintiff left the police station, she decided that due to fear of retaliation from Powell, she would request that the report not be filed. (*Id.* at ¶¶ 29-30).

When Plaintiff returned to the 28th Precinct stationhouse the next day, she learned that the report had already been filed and that NYPD Detective Linda Simmons had been assigned to the investigation. (FAC ¶¶ 31-33). Plaintiff spoke with Simmons, explained that she feared retaliation from Powell (and provided her with her reasons why she was afraid), and requested to withdraw the complaint against him. Simmons explained that if Plaintiff wished to withdraw the report, Plaintiff would have to provide a false statement that she "had caused her own injuries," a statement that would lead to Plaintiff receiving "a desk appearance ticket for making a false police report." (*Id.* at ¶¶ 34-37). Plaintiff agreed to retract the report and was placed in a holding cell while Simmons conducted a criminal background check. After Simmons confirmed that Plaintiff had no active warrants, she let Plaintiff out of the cell

---

[2] In previous pleadings, Plaintiff alleged that Powell was a major case informant for the NYPD and Manhattan District Attorney's Office, and that both entities sought to protect Powell by refusing to investigate or pursue Plaintiff's allegations against him. (*See, e.g.*, Dkt. #21 at ¶¶ 5-6, 16, 24, 26).

so that Plaintiff could write a statement providing that "she had caused the injuries to her face herself." (*Id.* at ¶¶ 38-41). When Plaintiff finished writing the statement, Simmons handcuffed her and put her in a cell. Plaintiff was detained for approximately one hour and was released with a desk appearance ticket that required her to appear in court the following month. (*Id.* at ¶¶ 43-45). At the court appearance, Plaintiff "was told the charge would be adjudicated in six months if she did not get re-arrested." (*Id.* at ¶ 49).

After Plaintiff withdrew her October 2010 complaint, she repeatedly sought to file "formal police reports" concerning Powell's abuse. In February 2011, Manhattan Assistant District Attorney ("ADA") Maria Strohbehn summoned Plaintiff to her office to inform Plaintiff both that she was declining to charge Powell and that she had put Plaintiff "on a do-[not]-serve services list." (*Id.* at ¶¶ 50-51).

In August 2016, Plaintiff visited the New York City Criminal Court in Manhattan and requested a certificate of disposition related to the 2010 desk appearance ticket. The court clerk informed Plaintiff that the "desk appearance ticket had never been adjudicated and still remained open after almost six years." (FAC ¶ 59). Plaintiff alleges that, finally, on September 9, 2016, "the proceedings commenced by Simmons terminated in [Plaintiff's] favor with a certificate of dismissal issued by the [Manhattan District Attorney's Office]." (*Id.* at ¶ 61).[3]

---

[3]  Plaintiff does not explain the basis of the criminal court's dismissal of the charge or charges against her.

Plaintiff then pivots to allege facts concerning another allegedly unlawful arrest and detention. She asserts that a stranger assaulted her on July 2, 2015, and that when she went to the NYPD's Midtown North police station to file a complaint, Lieutenant Nicholas Corrado refused "to take [her] report about the assault." (FAC ¶¶ 62-65). Unsatisfied, Plaintiff requested to speak with a commanding officer, and Corrado responded by ordering her to leave the station. Plaintiff refused to leave and insisted that the NYPD take her report. (*Id.* at ¶¶ 66-68). Corrado, assisted by Officer Iselaine Guichardo Hermene Gildo Cruz, "physically pulled [Plaintiff] out of her seat," put handcuffs on her, and detained her inside the station until an ambulance arrived to take her to Bellevue Hospital Center for involuntary observation. (*Id.* at ¶¶ 69-73). Cruz stayed with Plaintiff during the ambulance ride to Bellevue, and inside of the hospital, she was joined by Officer John Staines in continuing to detain Plaintiff for about an hour. (*Id.* at ¶¶ 74-77). At the direction of hospital staff, Cruz and Staines removed Plaintiff's handcuffs; they subsequently left the building. (*Id.* at ¶¶ 78-79). After about two hours of observation by hospital staff, Plaintiff was released from Bellevue. Plaintiff asserts that Corrado, Cruz, and Staines had no reason to believe that she was a risk of harm to herself or others, or that she required immediate mental health treatment. (*Id.* at ¶¶ 80-83).

Plaintiff continued to advocate for herself and to complain to City officials about the NYPD's refusal to protect her from Powell or to investigate her allegations of abuse. One way in which she did so was by lodging publicly

viewable complaints directed at several of the City's official Twitter accounts. For instance, she interacted with the official Twitter feed for the NYPD's 28th Precinct, which feed has a Twitter handle, or username, of @NYPD28Pct. That account was administered by NYPD Inspector Olufunmilo F. Obe. (FAC ¶¶ 91-95). The 28th Precinct's Twitter page includes a hyperlink to the City's official Social Media Policy and "does not otherwise limit the purpose or topic of the @NYPD28Pct Account," beyond the restrictions set forth in that policy. (*Id.* at ¶¶ 96-97).[4]

In October 2014, Plaintiff began following the @NYPD28Pct account, and she would occasionally post public responses to the account. (FAC ¶¶ 101-02). For instance, on October 14, 2014, Plaintiff posted two responses to the @NYPD28Pct account. The first response read:

> @NYPD28Pct @sffny ATTN Insp OBE: link 4 #DomesticViolence prevention leads to a JEWELRY MALL. Your selection is nice ow.ly/CdI1G.

(*Id.* at ¶ 102). On the same day, Plaintiff posted the following reply to another tweet by the @NYPD28Pct account:

> @NYPD28Pct @sffny nice selection INSP OBE! Any extra time to respond to the letter I sent 2 your precinct about #DV?

---

[4]     Plaintiff notes that according to a report from Harvard University's Berkman Klein Center for Internet & Society, the City encouraged NYPD commanders to create official Twitter accounts "to increase interaction with the communities in which police officers work every day" and "to share information about community events, encourage community members to attend public meetings, and document NYPD's service work in communities." (FAC ¶ 99 & Ex. B at 18).

(*Id.*). Shortly thereafter, "Obe blocked [Plaintiff] from the @NYPD28Pct Account without notifying [Plaintiff] or providing reasons for blocking her." (*Id.* at ¶ 103).

As a result of being "blocked" by Obe, Plaintiff could not — and still cannot — use her own Twitter account to view tweets from @NYPD28Pct, respond to any tweet published by @NYPD28Pct, or view any other person's responses to tweets by @NYPD28Pct. (FAC ¶¶ 104-05). Plaintiff alleges that Obe blocked her from the @NYPD28Pct account in retaliation "for her criticism of the domestic violence assistance rate within the 28th Precinct" and to prevent her "from publically criticizing the 28th Precinct." (*Id.* at ¶¶ 106-07).

Plaintiff had a similar experience with the Twitter account for the New York City Mayor's Office to Combat Domestic Violence, @NYCagainstabuse, and its administrator, Selvena Brooks. Near the end of 2014, Plaintiff used her Twitter account to post the following responses to tweets from @NYCagainstabuse:

> @NYCAGAINSTABUSE @NYPD28Pct victims be wary of the 2-8: their "Help" put me on #Rikers & my abuser walked chn.ge/11fKJZd #JAILSACTION
>
> ***
>
> @NYCagainstabuse Many more women could have benefitted from services at a FJC [Family Justice Center] but were barred because they were falsely labeled "fabricators."
>
> ***
>
> @NYCagainstabuse where do we go when wrongly dubbed as "fabricators" by #MYNYPD & @manhattanda & denied entrance to Family Justice Centers?

(FAC ¶ 114). On the same day as Plaintiff's final tweet to @NYCagainstabuse, Brooks blocked Plaintiff's Twitter account from accessing the official account of the Mayor's Office to Combat Domestic Violence, leading to the same limitations as those concerning the @NYPD28Pct account. (*Id.* at ¶¶ 115-19). Plaintiff surmises that Brooks blocked her in retaliation for her criticism of the City's domestic violence assistance rates and to prevent further public criticism of the Mayor's Office to Combat Domestic Violence. (*Id.* at ¶¶ 120-23). Plaintiff also asserts that Rose Pierre-Louis, who at the time was the Commissioner of the Mayor's Office to Combat Domestic Violence, ordered Brooks to block Plaintiff from @NYCagainstabuse. (*Id.* at ¶¶ 121, 124).

Plaintiff also had interactions with a Twitter account named @RPLNYC, which was moderated by Pierre-Louis. Plaintiff contends that Pierre-Louis identified herself on the account as the Commissioner of the Mayor's Office to Combat Domestic Violence and used the account to "disseminate official information during that time that she was Commissioner." (FAC ¶¶ 126-28). She adds that Pierre-Louis "gained followers and credibility by naming her official title on her @RPLNYC [T]witter account and disseminating official information and offering her editorial opinion of that information in her capacity as Commissioner for the NYC Mayor's Office to Combat Domestic Violence." (*Id.* at ¶ 129).

Plaintiff alleges that in October 2014, Pierre-Louis blocked her from viewing and posting replies to the @RPLNYC Twitter account. (FAC ¶ 131). While Plaintiff does not specifically allege the facts and circumstances that

preceded her being blocked from the @RPLNYC account, she contends that Pierre-Louis blocked her in retaliation for "her criticism of the domestic violence community's response to her secondary victimization by the criminal justice system" and "to mitigate fears that other victims may harbor when [ ] turning to authorities for help if they learned of [Plaintiff's] fate when she attempted to do so." (*Id.* at ¶¶ 136-37).

In addition to accusing Obe, Brooks, and Pierre-Louis of blocking her from viewing Twitter accounts that they administer, Plaintiff also asserts that the City itself is responsible. She alleges that even though the City's official, written social media policies "are explicit that people are not to be blocked on Social Media based on viewpoint, the City has a practice and custom of blocking unfavorable comments on social media[,]" as allegedly demonstrated by the allegations set forth above. She also contends that the City ratified the conduct of Obe, Brooks, and Pierre-Louis — essentially adopting their conduct — by their refusal to order Obe, Brooks, and Pierre-Louis to "unblock" her, despite Plaintiff's personally submitting requests to several City officials. (FAC ¶¶ 141-49).

Plaintiff further alleges that on November 17, 2016, during the pendency of this civil action, several unidentified persons harassed her inside of Penn Station. While this incident was occurring, MTA Officers John and Jane Doe approached the area, and after Plaintiff's harassers dispersed, Officer John Doe "attacked [Plaintiff] from behind without provocation," causing bruising on Plaintiff's arms and legs and knocking out one of her teeth. (FAC ¶¶ 150-52).

The officers handcuffed Plaintiff and stated that they intended to take her, involuntarily, "to Bellevue Hospital's psych ward." (*Id.* at ¶¶ 153-54). After a brief detention inside of an MTA police station, the officers instead took Plaintiff to St. Vincent's Hospital. There, Officer John Doe told a nurse to sedate Plaintiff, which the nurse did — again, without Plaintiff's consent. (*Id.* at ¶¶ 153-61). About eight hours later, Plaintiff "woke up" and was released from the hospital. (*Id.* at ¶ 164). As Plaintiff was leaving, a nurse "handed [Plaintiff] two tickets from MTA Officers John Doe and Jane Doe, one for public intoxication and one for disorderly conduct." (*Id.* at ¶ 168). In March 2017, the criminal court dismissed both charges because the allegations were facially insufficient. (*Id.* at ¶ 169).

Plaintiff adds that on January 24, 2017, also during the pendency of this civil action, members of the NYPD again denied her services. Plaintiff states that after she was assaulted by an unknown individual, she reported the incident to officers of the NYPD's 34th Precinct and Transit Bureau 3, including Officer Emmett, who told her to call the Transit Bureau on the following day to get an incident report number. (FAC ¶¶ 170-73). Over the following days, Plaintiff called the Transit Bureau several times but was given the same response each time: "no report had been made yet but [ ] call back the next day." (*Id.* at ¶¶ 174-75). Plaintiff eventually spoke with Lieutenant Raymond DeJesus, who promised a full investigation into the assault. After a week passed with no apparent action by the NYPD, Plaintiff spoke with Sergeant Shevitz, who also promised a full investigation into the incident. (*Id.* at ¶¶ 176-

80).  As of the filing of the FAC, however, the NYPD and its officers had taken no action to investigate the assault.  (*Id.* at ¶ 181).  Plaintiff attributes the NYPD's inaction to the City's practice or custom of "deny[ing] service to individuals such as [Plaintiff] who are on a [']do not serve['] list or have been labeled a fabricator in the City's records."  (*Id.* at ¶ 182).

## DISCUSSION

Plaintiff's claims for relief, all under § 1983, can be organized into the following categories:

1. Malicious prosecution claims under the Fourth Amendment against Simmons, in her individual and official capacities, and the City of New York;

2. First Amendment claims against Obe, Brooks, and Pierre-Louis, in their individual and official capacities, and the City of New York;

3. False arrest claims under the Fourth Amendment, against Corrado, Cruz, and Staines, in their individual and official capacities, and the City of New York;

4. False arrest, excessive force, and malicious prosecution claims under the Fourth Amendment, against MTA Officer John Doe and MTA Officer Jane Doe, in their individual and official capacities, and the City of New York; and

5. Substantive due process claims under the Fourteenth Amendment, against all of the individual defendants, related to the assault and denial of services on January 24, 2017.

(FAC ¶¶ 186-90).  Plaintiff seeks a declaratory judgment that Defendants have violated her constitutional rights, a permanent injunction restraining Defendants from placing or keeping her on a do-not-serve list or deeming her a fabricator, and compensatory and punitive damages.

The City Defendants have moved, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss all claims against them, except for the false arrest claims against Corrado, Cruz, and Staines.  The MTA and its officers are not parties to this motion.

## A.     Applicable Law

### 1.     Rule 12(b)(6) of the Federal Rules of Civil Procedure

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  While this plausibility requirement "is not akin to a probability requirement . . . , it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  It is not enough for a plaintiff to allege "naked assertions or conclusory statements"; rather, a plaintiff must come forward with "factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Biro* v. *Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (internal quotation marks omitted). The Court is obliged, however, to construe *pro se* pleadings liberally, *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*,"[5] *Triestman* v. *Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted, emphasis in original); *see generally McLeod* v. *Jewish Guild for the Blind*, 864 F.3d 154, 157 (2d Cir. 2017).

The motion should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Matson* v. *Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (citation omitted, alterations in original). In applying these standards, the Second Circuit has specifically cautioned against hastily dismissing complaints alleging civil rights violations. *See McGarry* v. *Pallito*, 687 F.3d 505, 510 (2d Cir. 2012); *see also Tarshis* v. *Riese Org.*, 211 F.3d 30, 35 (2d Cir. 2000) (collecting cases).

---

[5]     The Court notes that Plaintiff's memorandum of law in opposition to this motion "was prepared with the assistance of the New York Legal Assistance Group Legal Clinic for Pro Se Litigants in the SDNY." (*See* Pl. Opp. 2 n.1). Accordingly, the Court will not afford Plaintiff's memorandum of law the special solicitude normally afforded to *pro se* submissions. *See Spira* v. *J.P. Morgan Chase & Co.*, 466 F. App'x 20, 22 n.1 (2d Cir. 2012) (summary order); *Ibrahim* v. *United States*, 868 F. Supp. 2d 27, 29 (E.D.N.Y. 2012); *see generally In re Fengling Liu*, 664 F.3d 367, 369-71 (2d Cir. 2011) (holding that an attorney's undisclosed ghostwriting may violate the attorney's duty of candor). But because there is no clear indication that the FAC was prepared by an attorney, the Court will continue to afford Plaintiff special solicitude in interpreting the pleading's allegations. *See Tracy* v. *Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).

## 2.    Civil Rights Claims Under 42 U.S.C. § 1983

The Ku Klux Klan Act of 1871, amended and codified in relevant part as 42 U.S.C. § 1983, created a private right of action against any person acting under color of law who subjects another to the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Accordingly, to sustain an action under § 1983, the conduct at issue "must have been committed by a person acting under color of state law" and "must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell* v. *Callan*, 13 F.3d 545, 547 (2d Cir. 1994); *see also West* v. *Atkins*, 487 U.S. 42, 48-49 (1988).

When a plaintiff sues a municipality under § 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. The plaintiff must show that the municipality itself caused the violation of the plaintiff's rights. *See Connick* v. *Thompson,* 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell* v. *Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 692 (1978)); *accord Cash* v. *Cty. of Erie,* 654 F.3d 324, 333 (2d Cir. 2011). In other words, to state a § 1983 claim against a municipality, the plaintiff must allege facts showing (i) the existence of a municipal policy, custom, or practice, and (ii) that the policy, custom, or practice caused the violation of the plaintiff's

constitutional rights. *See Bd. of Cty. Comm'rs of Bryan Cty.* v. *Brown,* 520 U.S. 397, 403 (1997); *Jones* v. *Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012).

There are several ways that a plaintiff can state a claim of municipality liability under § 1983. A plaintiff can, for instance, plead (i) a formal policy officially promulgated by the municipality caused the constitutional violation, *see Monell*, 436 U.S. at 690; (ii) the official responsible for establishing the policy, with respect to the subject matter in question to the specific action, caused the constitutional violation, *see Pembauer* v. *City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (plurality opinion); (iii) the existence of an unlawful practice by subordinate officials, which was so widespread and well settled as to constitute a "custom or usage" of the municipality, caused the constitutional violation, *see City of St. Louis* v. *Praprotnik*, 485 U.S. 112, 127-30 (1985) (plurality opinion); *Sorlucco* v. *N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992); or (iv) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *see City of Canton* v. *Harris*, 489 U.S. 378, 388 (1989); *Cash,* 654 F.3d at 334.

### 3. Qualified Immunity

The doctrine of qualified immunity shields public officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982)); *see generally Kisela* v. *Hughes,* 138 S. Ct. 1148,

1152 (2018); *Almighty Supreme Born Allah* v. *Milling*, 876 F.3d 48, 58-59 (2d Cir. 2017).

For a constitutional right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987); *see also Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741 (2011). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle* v. *Howards*, 566 U.S. 658, 664 (2012) (internal citation and quotation marks omitted).

If the law is "clearly established, the immunity defense ordinarily should fail, since [ ] reasonably competent public official[s] should know the law governing [their] conduct." *Vincent* v. *Yelich*, 718 F.3d 157, 166 (2d Cir. 2013) (quoting *Harlow*, 457 U.S. at 818-19). But "[e]ven where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon* v. *Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Creighton*, 483 U.S. at 641). "The objective reasonableness test is met — and the defendant is entitled to immunity — if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (citing *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)).

**B.    Analysis**

**1.    Malicious Prosecution Claims Against Simmons and the City of New York**

The Court first considers Plaintiff's § 1983 malicious prosecution claims against Simmons and the City of New York.  The tort of malicious prosecution "remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal process."  *Wallace* v. *Kato*, 549 U.S. 384, 389-90 (2007).  The elements of a malicious prosecution claim under § 1983 are derived from applicable state law.  *See Swartz* v. *Insogna*, 704 F.3d 105, 112 (2d Cir. 2013) (citing *Conway* v. *Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984)).

Under New York law, to state a claim for malicious prosecution, a plaintiff must allege facts showing: (i) the defendant initiated or continued a prosecution against the plaintiff, (ii) the defendant lacked probable cause to commence the proceeding or believe the proceeding could succeed, (iii) the defendant acted with malice, and (iv) the prosecution was terminated in the plaintiff's favor.  *See Fulton* v. *Robinson*, 289 F.3d 188, 195 (2d Cir. 2002).  A claim for malicious prosecution under § 1983 requires the additional element of (v) "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights."  *Rohman* v. *N.Y.C. Trans. Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).  This element can be satisfied where, for instance, a plaintiff was remanded pending trial, *see Singer* v. *Fulton Cty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995), or where a plaintiff was compelled to return to court before dismissal of the criminal charge, *see Swartz*, 704 F.3d at 112.

In their motion, the City Defendants do not dispute that Plaintiff's allegations have satisfied the first four elements of the claim.  Instead, they argue that "Plaintiff's single court appearance does not amount to a deprivation of her liberty interest."  (Def. Br. 16 (relying exclusively on *Burg* v. *Gosselin*, 591 F.3d 95 (2d Cir. 2010)).[6]  The Court disagrees.

The Second Circuit has "consistently held," most recently in *Swartz* v. *Insogna*, "that a post-arraignment defendant who is 'obligated to appear in court in connection with [criminal] charges whenever [her] attendance [i]s required' suffers a Fourth Amendment deprivation of liberty."  704 F.3d at 112 (quoting *Murphy* v. *Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (finding that post-arraignment requirements that plaintiff appear for court appearances and not leave the state were sufficient to implicate the Fourth Amendment)).  Thus, "the requirement that a plaintiff appear in court, post-arraignment, in connection with criminal proceedings, does constitute [a deprivation of liberty]." *MacPherson* v. *Town of Southampton*, No. 07 Civ. 3497 (DRH) (AKT), 2013 WL 6058202, at *5 (E.D.N.Y. Nov. 14, 2013).  Courts have found a liberty deprivation, for example, where arrestees were arraigned and were subsequently required to make one other court appearance.  *See Willis* v. *City of New York*, No. 12 Civ. 5259 (RA), 2015 WL 556884, at *8 n.9 (S.D.N.Y. Feb. 9, 2015) (finding liberty depravation in context of § 1983 malicious prosecution claim); *see also Gogol* v. *City of New York*, No. 15 Civ. 5703 (ER),

---

[6]     The City Defendants' reliance on *Burg* is puzzling, as "there was no claim for malicious prosecution in *Burg*," *Swartz* v. *Insogna*, 704 F.3d 105, 112 (2d Cir. 2013) — an important fact that they fail to mention.

2017 WL 3449352, at *11 (S.D.N.Y. Aug. 10, 2017) (finding liberty interest in context of § 1983 fair trial claim).

In this case, Plaintiff alleges that after she received the desk appearance ticket, she was released from custody, appeared in court about a month after the ticket was issued, and about six years later — when she learned that the prosecution remained pending long after she believed it to have been dismissed — she again appeared in court, where the charge was dismissed. (FAC ¶¶ 59-61).[7]  During the entire pendency of the prosecution, she remained subject to New York Criminal Procedure Law § 510.40, which states that "[u]pon ordering that a principal be released on [her] own recognizance, the court must direct [her] to appear in the criminal action or proceeding involved whenever [her] attendance may be required and to render [herself] at all times amenable to the orders and processes of the court."  N.Y. Crim. Proc. Law § 510.40.

In *Rohman*, the Second Circuit recognized that under § 510.40, an arrestee released on her own recognizance "must ordinarily remain in the state."  215 F.3d at 216; *see also Perez* v. *Duran*, 962 F. Supp. 2d 533, 542 (S.D.N.Y. 2013) ("[T]he plaintiff's release on his own recognizance necessarily required the plaintiff to comply with travel restrictions.").  The restrictions on Plaintiff's travel, which operated as a *de facto* confinement within the state and remained in place as long as Plaintiff was released on her own recognizance,

---

[7]      The City Defendants repeatedly, and erroneously, state that Plaintiff only appeared in court once.  (*See* Def. Br. 16-17; Def. Reply 6-7).  The FAC makes clear that Plaintiff appeared in court twice.

are therefore sufficient to implicate the Fourth Amendment and constitute a seizure.  *See Rohman*, 215 F.3d at 216; *Murphy*, 118 F.3d at 947; *Gogol*, 2017 WL 3449352, at *11.  Accordingly, the Court denies the motion to dismiss the individual-capacity claims against Simmons.[8]

The Court must also deny the City Defendants' correlative motion to dismiss the official-capacity claims against Simmons and the *Monell* claim against the City.[9]  It appears that the City Defendants' sole argument for dismissal of these claims is that Plaintiff did not allege a constitutional violation by Simmons — that is, a sufficient post-arraignment restraint.  (Def. Br. 19 ("[A] desk appearance ticket with a single court appearance for that ticket is not a sufficient deprivation of liberty.")).  As explained above, Plaintiff has, in fact, stated a § 1983 claim against Simmons for malicious prosecution. On this basis alone, denial of the City Defendants' motion is warranted.

In any event, Plaintiff has set forth sufficient facts suggesting that the City was a moving force behind Simmons's conduct.  Plaintiff alleges that at the

---

[8]    Simmons did not argue that she was entitled to qualified immunity, and that argument is therefore waived.  Even if she did, the argument would fail.  Reasonably competent officers understand that it is unlawful to initiate a prosecution against a domestic violence victim for allegedly filing a false report when there was no reason to believe the report was false and was only being retracted because the victim feared retaliation from her abuser.  Stated another way, it is objectively unreasonable to arrest and initiate a prosecution of a person that the officer knows to be innocent of any crime.  *See Scotto* v. *Almenas*, 143 F.3d 105, 113 (2d Cir. 1998); *Ricciuti* v. *N.Y.C. Trans. Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).

[9]    The Court considers these claims together, because an official-capacity claim against a governmental official is the functional equivalent of a claim against the governmental entity itself.  *See Kentucky* v. *Graham*, 473 U.S. 159, 165 (1985); *Monell* v. *Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 n.55 (1978)); *Tanvir* v. *Tanzin*, 889 F.3d 72, 81-82 & n.7 (2d Cir. 2018) (discussing the distinctions between individual and official-capacity claims).

direction of the Manhattan District Attorney's Office, the NYPD placed her on a "Do Not Serve / Arrest Alert List" and labeled her as a "fabricator." (FAC ¶¶ 24-25). Based on this allegation of "deliberate conduct" by the City, *see Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 404 — which the Court accepts as true for the purposes of this motion — it appears that the City had a policy of disbelieving Plaintiff's allegations of abuse and considering her to be a "fabricator."

Against this background, Plaintiff alleges that Simmons framed her for fabricating a police report, despite Simmons's having no reason to believe that Plaintiff was lying when she initially reported to Officer Diaz that Powell had beaten her. (FAC ¶¶ 26-45). In the context of the facts alleged by Plaintiff, Simmons's conduct is inexplicable, unless one accepts Plaintiff's assertion that the NYPD had a policy of labeling her a fabricator, as this would supply a plausible explanation for Simmons's conduct. Stated another way, acting pursuant to a municipal policy of labeling Plaintiff a fabricator, Simmons initiated a prosecution against Plaintiff for filing a false report. *See Monell*, 436 U.S. at 694 ("[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury, [ ] the government as an entity is responsible under § 1983."). Because, at this stage in the litigation, the allegations plausibly suggest that the City's policy of labeling Plaintiff a fabricator was the moving force behind Simmons's otherwise unconstitutional conduct, the Court denies the City Defendants' motion to dismiss the *Monell*

claim against the City and the official-capacity claim against Simmons for malicious prosecution.[10]

## 2. First Amendment Claims Against Brooks, Obe, Pierre-Louis, and the City of New York

The Court next considers Plaintiff's First Amendment claims, beginning with the individual-capacity claims asserted against Brooks and Obe, the operators of the City's @NYCagainstabuse and @NYPD28Pct Twitter accounts (the "official accounts" or "official Twitter accounts"), respectively.

In this case, the City Defendants do not dispute that Brooks and Obe acted under color of law when moderating the official Twitter accounts and ultimately blocking Plaintiff from viewing or otherwise interacting with them. To the contrary, as set forth below in more detail, the City Defendants explicitly argue that Brooks and Obe were engaged in "government speech." (Def. Br. 9-12). The Court therefore concludes that Brooks and Obe were "state actors" for the purposes of establishing liability under § 1983.

---

[10] The Court pauses to note a potential ambiguity in Plaintiff's allegations. At Plaintiff's initial criminal court appearance, "[s]he was told the charge would be adjudicated in six months if she did not get re-arrested." (FAC ¶ 49). This allegation suggests that Plaintiff was offered, and accepted, an adjournment in contemplation of dismissal, or "ACD." *See* N.Y. Crim. Pro. L. § 170.55(2); *Stone* v. *Port Auth. of N.Y. & N.J.*, No. 11 Civ. 3932 (SMG), 2014 WL 3110002, at *9 (E.D.N.Y. July 8, 2014) ("An ACD is a conditional dismissal that becomes final from six months to one year after it is accepted, provided the court does not decide, on the prosecutor's motion, to restore the case to its calendar in the interest of justice." (citation omitted)). An ACD precludes any claim for malicious prosecution because, under New York law, it is not a "favorable termination" of the criminal proceedings. *See Fulton*, 289 F.3d at 196; *Hollender* v. *Trump Vill. Co-op, Inc.*, 58 N.Y.2d 420, 425-26 (1983). But Plaintiff alleges that her criminal charge remained pending for almost six *years* after her initial appearance in criminal court. This suggests that the final disposition was *not* an ACD. The City Defendants did not address this issue in their motion, and the Court need not resolve it at this point. The parties may nevertheless wish to explore this issue in discovery.

The issue in this case is whether Brooks and Obe violated Plaintiff's First Amendment rights by blocking her on Twitter — thereby preventing her from viewing two of the City's official Twitter feeds and from interacting with them under her own account — in response to Plaintiff's tweets that were critical of the City's handling of domestic violence cases, including her own case. After careful consideration, the Court concludes that Plaintiff has adequately pleaded facts showing that Brooks and Obe violated her First Amendment rights.

Before delving too deeply into its First Amendment analysis, the Court pauses to acknowledge the comprehensive analysis undertaken by Judge Buchwald in *Knight First Amendment Institute at Columbia University* v. *Trump*, — F. Supp. 3d —, No. 17 Civ. 5205 (NRB), 2018 WL 2327290 (S.D.N.Y. May 23, 2018). The *Trump* decision arose in the context of cross-motions for summary judgment; it thus necessarily implicated a different factual record and different legal standards than the instant case. Nonetheless, the analysis offers a useful primer.

Judge Buchwald first considered whether the individual plaintiffs in that case, who had been blocked from the President's Twitter account because of the political views each had expressed, had engaged in political speech, and concluded quickly that they had. 2018 WL 2327290, at *13. She then considered whether forum analysis applied to the President's Twitter account, prefacing the analysis as follows:

> We can therefore reject, at the outset, any contention
> that the @realDonaldTrump account as a whole is the

23

would-be forum to be analyzed. Plaintiffs do not seek access to the account as a whole — they do not desire the ability to send tweets as the President, the ability to receive notifications that the President would receive, or the ability to decide who the President follows on Twitter. Because the access they seek is far narrower, we consider whether forum doctrine can be appropriately applied to several aspects of the @realDonaldTrump account rather than the account as a whole: the content of the tweets sent, the timeline comprised of those tweets, the comment threads initiated by each of those tweets, and the "interactive space" associated with each tweet in which other users may directly interact with the content of the tweets by, for example, replying to, retweeting, or liking the tweet.

*Id.* at *14.

The district court found that the account was "owned or controlled by the Government," and that the act of blocking an individual user from such an account constituted state action. 2018 WL 2327290, at *15. However, it also found that government control did not extend to the comment component of each tweet, which therefore excluded that component from forum analysis. *Id.* at *16. Additionally, Judge Buchwald found the content and timeline components of the President's Twitter account to be "government speech" as opposed to private speech, and excluded those components as well from forum analysis. *Id.* at *17-18. For the remaining element, the "interactive space" for replies and retweets, the court found it to be a designated public forum, and found the blocking of users from that space to be impermissible viewpoint discrimination under the First Amendment. *Id.* at *20-22.

The instant case arises in the very different context of a motion under Rule 12(b)(6), where the Court is obligated to credit all well-pleaded allegations

of the operative complaint. Plaintiff here alleges that the blocking of her account by @NYPD28Pct, for example, has rendered her unable to use her own Twitter account to view tweets from @NYPD28Pct, to respond to any tweet published by @NYPD28Pct, or to view any other person's responses to tweets by @NYPD28Pct. (FAC ¶¶ 104-05). These disabilities may be broader than those addressed by Judge Buchwald. Moreover, the parties to this case have not framed their arguments in a manner that tracks the analysis in *Trump*. Given these differences, this Court's analysis will chiefly respond to the parties' arguments.

The First Amendment guarantees the right of freedom of speech to individuals and groups; it speaks in strong terms: "Congress shall make no law . . . abridging the freedom of speech." Justice Cardozo called the freedom of speech and thought "the indispensable condition ... of nearly every other form of freedom." *Palko* v. *State of Conn.*, 302 U.S. 319, 327 (1937), *overruled on other grounds by Benton* v. *Maryland*, 395 U.S. 784 (1969).

The existence of a right of access to public spaces "and the standard by which limitations upon such a right must be evaluated differ depending on the character of the [space] at issue." *Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983); *Make the Road by Walking, Inc.* v. *Turner*, 378 F.3d 133, 142 (2d Cir. 2004). In *Perry Education Association* v. *Perry Local Educators' Association*, the Supreme Court recognized a doctrinal structure for identifying public spaces in which the government is limited, to varying degrees, in its ability to restrict activity covered by the First Amendment. 460

U.S. at 45-47.  It divided such spaces into three types of forums: the traditional

public forum, the public forum created by government designation, and the

nonpublic forum.  *See id.*; *see also Cornelius* v. *NAACP Legal Def. & Educ.*

*Fund, Inc.*, 473 U.S. 788, 802 (1985).  In evaluating whether a particular space

should be classified as a traditional public forum, a designated or limited

public forum, or a nonpublic forum, the Supreme Court has directed lower

courts to consider the space's compatibility with expressive activity and

whether the government's general "policy and practice" shows that the forum is

intended to be used for speech by the public.  *Paulsen* v. *Cty. of Nassau*, 925

F.2d 65, 69 (2d Cir. 1991); *see also Cornelius*, 460 U.S. at 45.[11]

In *Hotel Employees & Restaurant Employees Union, Local 100 of New*

*York, N.Y. & Vicinity, AFL-CIO* v. *City of New York Department of Parks and*

*Recreation*, 311 F.3d 534 (2d Cir. 2002), the Second Circuit identified four

factors that courts should use when evaluating the nature of a particular

---

[11]    "Governmental intent is said to be the touchstone of forum analysis."  *Huminski* v.
*Corsones*, 386 F.3d 116, 152 (2d Cir. 2004) (quoting *Gen. Media Commc'ns, Inc.* v.
*Cohen*, 131 F.3d 273, 279 (2d Cir. 1997)).  In evaluating whether the government
intended to create a public forum, courts may look to its "policies or regulations"
regarding use of the space.  *Hotel Emps. & Rest. Emps. Union, Local 100 of N.Y., N.Y. &*
*Vicinity, AFL-CIO* v. *City of N.Y. Dep't of Parks and Recreation*, 311 F.3d 534, 547 (2d
Cir. 2002).

However, "[i]ntent is not merely a matter of stated purpose."  *Paulsen* v. *Cty. of Nassau*,
925 F.2d 65, 69 (2d Cir. 1991).  Courts must look beyond official policy statements and
evaluate the government's *actual practice* towards the space at issue.  *Make the Road by*
*Walking, Inc.* v. *Turner*, 378 F.3d 133, 143 (2d Cir. 2004) (citing *Cornelius* v. *NAACP*
*Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)); *Paulsen*, 925 F.2d at 69
(Government intent can be inferred from "policy and past practice, *as well as* the nature
of the property and its compatibility with expressive activity." (emphasis added)).  To
that end, "[o]bjective indicia of intent to create a public forum, combined with a history
of consistent practice, can overcome a bare statement of contrary purpose."  *Paulsen*,
925 F.2d at 70 (citation omitted).

property or space: (i) "whether the [property] falls within those categories of property historically deemed to be traditional public fora," (ii) "whether it is the *type* of property that should be so classified given its physical characteristics," (iii) "the objective way it is used," and (iv) the government's "intent in constructing and opening it to the public." *Zalaski* v. *City of Bridgeport Police Dep't*, 613 F.3d 336, 343 (2d Cir. 2010) (quoting *Hotel Emps.*, 311 F.3d at 536-37). The Second Circuit has repeatedly recognized that the "primary factor" in forum analysis is the manner in which the public space is used. *See id.*; *Hotel Emps.*, 311 F.3d at 547.

The first category is the traditional public forum, including public streets, parks, and sidewalks, *see Perry Educ. Ass'n*, 460 U.S. at 45, which "by long tradition or by government fiat have been devoted to assembly and debate," *Paulsen*, 925 F.2d at 68 (quoting *Perry Educ. Ass'n*, 460 U.S. at 45). *See also Int'l Soc'y for Krishna Consciousness, Inc.* v. *Lee*, 505 U.S. 672, 678 (1992) (observing that traditional public forums are spaces that have "traditionally been available for public expression").

In a traditional public forum, content-based restrictions on speech must survive "strict scrutiny" — that is, the restriction must be narrowly tailored to serve a compelling government interest. *Pleasant Grove City* v. *Summum*, 555 U.S. 460, 469 (2009); *Hotel Emps.*, 311 F.3d at 545. In such a forum, the government may impose content-neutral time, place, and manner restrictions; however, these must be "narrowly tailored to serve a significant government

interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45.

The second category is the designated public forum, which although not a traditional public forum,[12] exists because "the government has taken affirmative steps to open up [the space] for general public discourse." *Johnson* v. *Perry*, 859 F.3d 156, 172 (2d Cir. 2017) (quoting *Peck* v. *Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 626 (2d Cir. 2005)). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. Examples include university meeting facilities and municipal theatres. *See United Methodist Parish* v. *Bd. of Educ. of City Sch. Dist. of City of Newburgh*, 907 F. Supp. 707, 713 (S.D.N.Y. 1995).

"Speech in a designated public forum is entitled to the same constitutional protection as that extended to expression in a traditional public forum, so long as the state continues to designate the forum for such use." *Peck*, 426 F.3d at 626. That is, in designated public forums, content-based restrictions on speech must survive strict scrutiny. *See Pleasant Grove City*, 555 U.S. at 469-70; *Int'l Action Ctr.* v. *City of New York*, 587 F.3d 521, 526-27 (2d Cir. 2009); *Hotel Emps.*, 311 F.3d at 545.

---

[12]    A space is presumptively a public forum if it is "generally open to the public," *Widmar* v. *Vincent*, 454 U.S. 263, 268 (1981), "designed for and dedicated to expressive activities," *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U.S. 546, 555 (1975), or "has as a principal purpose … the free exchange of ideas," *Int'l Soc'y for Krishna Consciousness, Inc.* v. *Lee*, 505 U.S. 672, 679 (1992) (citation omitted).

A limited public forum is a subset of the designated public forum. It arises "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Hotel Emps.*, 311 F.3d at 545 (quoting *N.Y. Magazine* v. *Metro. Transp. Auth.*, 136 F.3d 123, 128 n.2 (2d Cir. 1998)). Once a government "has opened a limited forum . . . , [it] must respect the lawful boundaries it has itself set." *Rosenberger* v. *Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also* Ross Rinehart, *"Friending" and "Following" the Government: How the Public Forum and Government Speech Doctrines Discourage the Government's Social Media Presence*, 22 S. Cal. Interdisc. L.J. 781, 788-89 (Spring 2013) ("When a state opens a limited public forum but excludes a speaker who falls within the class of speakers to whom the forum is made available or whose speech concerns a subject matter for which the forum is dedicated, the state's exclusion is subject to strict scrutiny." (citing *Ark. Educ. Television Comm'n* v. *Forbes*, 523 U.S. 666, 672 (1998)). Restrictions on speech that is *not* within the type of expression allowed in a limited public forum must only be reasonable and viewpoint-neutral. *See, e.g., Fighting Finest* v. *Bratton*, 95 F.3d 224, 227 (2d Cir. 1996) (corrected opinion).

The third category is that of nonpublic forums, which consist of spaces that "the government has not opened for expressive activity by members of the public." *Hotel Emps.*, 311 F.3d at 546; *see also Perry Educ. Ass'n*, 460 U.S. at 45-46. The state has more control over speech in nonpublic forums than in public forums because "its actions [in nonpublic forums] are most analogous to

that of a private owner." *Paulsen*, 925 F.2d at 69. In nonpublic forums, the government may restrict speech so long as the restrictions are "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46; *Hotel Emps.*, 311 F.3d at 546 ("The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality.").

Regardless of where it occurs, however, the government's own speech "is exempt from First Amendment scrutiny." *Johanns* v. *Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). Instead, when the government engages in its own speech, it is permitted to "speak for itself" and to "select the views that it wants to express." *Pleasant Grove City*, 555 U.S. at 467-68 (upholding a local government's exclusion of a proposed privately funded monument from a public park, and holding that the government's display of a permanent monument in a public park is not a form of expression limited by the Free Speech Clause); *see also Matal* v. *Tam*, 137 S. Ct. 1744, 1757 (2017) ("The First Amendment prohibits Congress and other government entities and actors from 'abridging the freedom of speech'; the First Amendment does not say that Congress and other government entities must abridge their own ability to speak freely."); *Latino Officers Ass'n, N.Y., Inc.* v. *City of New York*, 196 F.3d 458, 468 (2d Cir. 1999) ("[I]t is well settled that the government may regulate its own expression in ways that would be unconstitutional were a private party the speaker."); *United Veterans Mem'l & Patriotic Ass'n of the City of New Rochelle* v. *City of New Rochelle*, 72 F. Supp. 3d 468, 474 (S.D.N.Y. 2014)

("[B]ecause the Free Speech Clause does not restrict government speech, forum analysis does not apply at all when the government is speaking for itself." (citing *Pleasant Grove City*, 555 U.S. at 480-81)), *aff'd*, 615 F. App'x 693 (2d Cir. 2015) (summary order)).  When determining whether speech should be attributed to the government, rather than to a private party, courts must consider: (i) whether the government has long used the forum to communicate its message, (ii) whether the particular speech at issue is "closely identified in the public mind with the government," and (iii) whether the government maintains direct "control over the messages conveyed" in the forum.  *Walker* v. *Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2248-49 (2015); *see also Matal*, 137 S. Ct. at 1757-60 (discussing the government speech doctrine and concluding that trademarks are private speech, not government speech); *United Veterans Mem'l*, 72 F. Supp. 3d at 474 (noting that in *Pleasant Grove City*, the Supreme Court "did not announce a test for identifying government speech, but it placed considerable emphasis on whether, based on all the circumstances, a reasonable observer would have concluded that the government was the speaker").

In this case, the City Defendants contend that the entirety of the official Twitter feeds — including publicly viewable reply tweets from Plaintiff and other members of the public — constitute government speech, such that they can control their content by blocking replies from others.  (Def. Br. 9-12).  In support, they argue that *Walker* — a case in which the Supreme Court upheld Texas's scheme for specialty license plate designs, even though it rejected a

design that presented certain messages that the state did not wish to publicly support or adopt — favors its position. The Court is not persuaded. *See Matal*, 137 S. Ct. at 1758 (characterizing the government speech doctrine as "essential" but "susceptible to dangerous misuse"). And here it will focus, as Judge Buchwald did, on "the 'interactive space' associated with each tweet in which other users may directly interact with the content of the tweets by, for example, replying to, retweeting, or liking the tweet." *Trump*, 2018 WL 2327290, at *14.

None of the factors set forth in *Pleasant Grove City* or *Walker* favors the City Defendants' argument for government speech. Most importantly, reasonable observers of the official Twitter accounts would understand that Plaintiff's reply tweets — those that sharply criticized the City's handling of domestic abuse victims and warning other victims of the possible consequences of relying on City agencies for assistance — were not the City's own speech, but were Plaintiff's alone. These messages emanated from Plaintiff's own Twitter account and clearly identified Plaintiff (or at least her Twitter account) as the speaker. The City Defendants cannot credibly suggest that the public would confuse Plaintiff's posts criticizing the City as being the City's own speech.

The other factors likewise counsel against a finding of government speech. The City has not long used Twitter specifically, or social media generally, to convey its messages, as social media websites are relatively recent phenomena. Messages that emanate from Plaintiff's Twitter account cannot be said to be "closely identified in the public mind" with the City. The City does

not — and in fact, cannot — exercise direct control over messages from Plaintiff's own Twitter account. *Cf. Walker*, 135 S. Ct. at 2248-49.[13] The Court therefore concludes that the conduct of Brooks and Obe in blocking Plaintiff from the official Twitter accounts cannot be classified as government speech. It is instead governed by the Free Speech Clause of the First Amendment.[14]

The Court therefore turns to the difficult task of forum analysis. In *Davison* v. *Loudoun County Board of Supervisors*, No. 16 Civ. 0932 (JCC), 2016 WL 4801617 (E.D. Va. Sept. 14, 2016) — a nonbinding district court case with similar facts to those at issue here — the *pro se* plaintiff accessed the official Facebook page of the Loudoun County Government and posted a message on the page that was critical of the government's handling of an open-records request. The webpage's manager, an employee of the Loudoun County government, deleted the comment in apparent violation of the county's own

---

[13]    As Plaintiff alleges in the FAC, "[t]here is no ability of an account owner to delete another user's tweet to his account without blocking the other user." (FAC ¶ 89). *See also Monroe* v. *Hopkins*, (2017) EWHC 433 (QB), at Appendix ¶ 24 ("If @Person really [does not] like tweets by @Stranger, they can 'Block' @Stranger, and neither @Person nor @Stranger will be able to receive each other's tweets into their respective Timelines or view each other's tweets on each other's Profiles. However, no tweets are deleted by blocking, and all tweets of a Blocked person are still available for everyone else to see as before, including in any search results."), *available at* https://www.judiciary.gov.uk/judgments/judgment-monroe-v-hopkins. Because the City lacks the ability to delete any account's tweets other than its own, it cannot credibly claim direct control over the messages posted in reply to its tweets.

[14]    The Court is aware of *Morgan* v. *Bevin*, No. 17 Civ. 60 (GFVT), 2018 WL 1557300 (E.D. Ky. Mar. 30, 2018), a district court opinion that denied a preliminary injunction to two plaintiffs who were blocked from viewing or commenting on the Twitter and Facebook pages for the Governor of Kentucky. That court held that the governor's social media pages — including critical comments posted by the governor's constituents about matters of public concern, i.e., the governor's right-to-work policies and his then-overdue property taxes — were government speech not subject to the Free Speech Clause. *Id.* at 3, 6. For the reasons set forth above, this Court declines to follow *Morgan*.

Social Media Comments Policy.  Plaintiff posted another comment that protested the alleged violation of his free speech rights, and that message was also deleted, as well as two subsequent postings — making all of Plaintiff's postings invisible to the public.  *See id.* at *1-2.

The plaintiff sued under 42 U.S.C. § 1983, for violation of his First Amendment rights.  In support of its motion to dismiss, the government conceded that "in adopting a Social Media Comments Policy, the County designated its Facebook page a limited public forum," but nevertheless argued that "because the County reserved the right to moderate comments, the removal of [p]laintiff's comments [did] not implicate the First Amendment."  *Id.* at *6-7 (citations omitted).  The district court rejected the defendants' argument, stating that "[o]nce [the government] had opened a limited forum … the State must respect the lawful boundaries it has itself set," and thus, "[h]aving adopted the Social Media Comments Policy, the County government is bound to abide by its terms."  *Id.* at *7 (citing *Rosenberger*, 515 U.S. at 829).  The district court denied the government's motion to dismiss the complaint, and later denied a government official's motion to dismiss the First Amendment claim related to blocking Plaintiff's critical comment from the official's Facebook page.  *See Davison* v. *Loudoun Cnty. Bd. of Supervisors*, 227 F. Supp. 3d 605, 610-12 (E.D. Va. 2017).

While *Davison* confronted similar issues to those present here, it is of limited assistance to this Court: there, the defendants conceded that the county's official Facebook account constituted a limited public forum, but here,

the City Defendants make no such concession.  In any event, if forced to resolve, this Court would be inclined to find that the City's official Twitter accounts do not constitute a traditional public forum.  The Supreme Court "has rejected the view that traditional public forum status extends beyond its historic confines," *Ark. Educ. Television Comm'n*, 523 U.S. at 678 (citing *Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 680-81), which consist of public streets, parks and sidewalks, *see Perry Educ. Ass'n*, 460 U.S. at 45.  *See also United States* v. *Am. Library Ass'n*, 539 U.S. 194, 205-06 (2003) ("The doctrines surrounding traditional public forums may not be extended to situations where such history is lacking.").

The Court would also likely be inclined to reject the notion that the City's official Twitter pages are nonpublic forums, because by creating the Twitter accounts and interacting with the public, it has opened those forums "for expressive activity by members of the public."  *Hotel Emps.*, 311 F.3d at 546; *see also Perry Educ. Ass'n*, 460 U.S. at 45-46.  In fact, the City's official Twitter pages share many characteristics of public forums, even if not *traditional* public forums: Twitter is "generally open to the public," *Widmar* v. *Vincent*, 454 U.S. 263, 268 (1981); appears to be "designed for and dedicated to expressive activities," *Southeastern Promotions*, 420 U.S. at 555; and appears to have "as a principal purpose … the free exchange of ideas," *Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 679 (citation omitted).

The Court, however, need not resolve the issue now.  The FAC sets forth facts suggesting that Plaintiff posted tweets in the interactive sections of two

35

Twitter accounts, under her own account name and attributed to her alone, that criticized City agencies and officials for failing to adequately serve domestic violence victims and that warned other victims of the consequences of seeking help from City agencies.  Very shortly after posting the critical tweets, Obe and Brooks blocked Plaintiff from the official accounts.  (*See* FAC ¶¶ 102-14).  These allegations strongly suggest that Obe and Brooks blocked Plaintiff from the official Twitter accounts because of her critical comments and to prevent her from publicly criticizing City officials in those forums.  That is, it appears that Obe and Brooks expelled Plaintiff from the official Twitter accounts on the basis of her viewpoint.  *See Rosenberger*, 515 U.S. at 829 (stating that "viewpoint discrimination" is "an egregious form of content discrimination" in which the government "targets not subject matter, but particular views taken by speakers on a subject").

Regardless of whether it occurs in a public, designated, or nonpublic forum, viewpoint discrimination that results in the intentional, targeted expulsion of individuals from these forums violates the Free Speech Clause of the First Amendment.  *See Rosenberger*, 515 U.S. at 820 (holding that the government is prohibited from "exercis[ing] viewpoint discrimination, even when the ... forum is one of its own creation"); *Make the Road by Walking*, 378 F.3d at 143 (requiring viewpoint neutrality even in nonpublic forum).  Because viewpoint discrimination, such as that alleged by Plaintiff in this action, is unlawful in *any* forum subject to the Free Speech Clause, the Court finds that

Plaintiff has adequately alleged that Obe and Brooks violated her rights under the First Amendment.

This is not the end of the analysis, however, as Obe and Brooks contend that they are entitled to qualified immunity.[15] They argue qualified immunity is appropriate because "there is *no* controlling authority in this jurisdiction on whether a government[-]operated Twitter account can block a private user's account." (Def. Br. 14). They add that even those courts outside of this Circuit that have addressed analogous issues have "failed to create a clear standard that would allow these individuals to know that their actions in blocking [Plaintiff] violated the First Amendment." (*Id.* at 13).

Plaintiff counters by framing the constitutional issue much more broadly. She states:

> Defendants' claim that their actions were permissible under the doctrine of qualified immunity, such that they could not know of the supposed right to not be

---

[15] The Court is within its discretion to resolve the constitutional issue before addressing the defense of qualified immunity. Reaching the constitutional issue before considering qualified immunity "is often beneficial" because it "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Pearson* v. *Callahan*, 555 U.S. 223, 236 (2009); *see also Plumhoff* v. *Rickard*, 134 S. Ct. 2012, 2020 (2014) (resolving the Fourth Amendment question before reaching the issue of qualified immunity). This is entirely consistent with the courts' long-standing obligation to "say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803); *see also* Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences*, 113 Mich. L. Rev. 1219, 1249 (May 2015) ("[I]f a court reviewing a constitutional claim to which qualified immunity applies [does] not address the merits of the claim, the same right may be violated time and again, with courts declining each time to provide a remedy or state the law for future cases."); Michael T. Kirkpatrick and Joshua Matz, *Avoiding Permanent Limbo: Qualified Immunity and the Elaboration of Constitutional Rights from* Saucier *to* Camreta *(and Beyond)*, 80 Fordham L. Rev. 643, 678 (Nov. 2011) (encouraging courts to reach the merits in civil rights actions where the constitutional injuries at issue "are particularly ill-suited to development through alternative dynamics").

> blocked on Twitter, misses the point entirely. The
> Plaintiff's right which was violated is the right to not be
> discriminated [against] based on her viewpoint ....
> Defendants, as city officials, cannot be entitled to
> qualified immunity simply because the technology of
> the interface changes with time.

(Pl. Opp. 13). The FAC and Plaintiff's memorandum of law in opposition, taken

together, can also be construed as suggesting that Obe and Brooks had fair

warning, from at least two different sources, that their conduct was unlawful:

(i) appellate authority holding that, generally speaking, viewpoint

discrimination is unlawful in forums subject to the Free Speech Clause, and

(ii) the City's own Social Media Policy — that is, its own internal regulation —

which prohibits the City's social media moderators from blocking a person on

Twitter because of a disfavored viewpoint. (*See, e.g.*, FAC ¶ 138).

Although Plaintiff did not cite the case, her argument echoes the

reasoning of *Hope* v. *Pelzer*, 536 U.S. 730 (2002) — a case where the Supreme

Court denied qualified immunity to prison guards who twice handcuffed a

prisoner to a hitching post, with one of the occasions lasting seven hours, and

with the prisoner outside in the Alabama summer sun without a shirt, water,

or bathroom breaks. The Supreme Court held that state prison regulations

and a report of the U.S. Department of Justice that criticized the "hitching

post" practice — in addition to federal appellate authority addressing similar,

but by no means identical situations — were sufficient to clearly establish the

law and put the guards on notice that their conduct was unlawful. *Id.* at 741-

42. The Court explained that "officials can still be on notice that their conduct

violates established law even in novel factual circumstances." *Id.* at 741; *see*

*also United States* v. *Lanier*, 520 U.S. 259, 271 (1997) ("There has never been … a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." (alteration in original) (citation omitted)).  In so doing, the Supreme Court rejected the Eleventh Circuit's requirement that, for qualified immunity purposes, the previous cases holding the conduct to be unlawful must be "materially similar" to the case at bar, *Hope*, 536 U.S. at 739, and cautioned against "the danger of a rigid overreliance on factual similarity," *id.* at 742.  Instead, the Supreme Court held that the "salient question" is whether the state of the law at the time of the subject incident gave public officials "fair warning" that the conduct was unlawful.  *Id.* at 741.

The Supreme Court has never overruled *Hope*, but its retreat from that decision is palpable.[16]  Two years after *Hope* was decided, the Supreme Court characterized that case as standing for the narrow proposition that the absence of federal appellate authority supporting a claim is not fatal in cases where the

---

[16]     Academic literature reflects this assessment.  *See, e.g.*, Karen Blum et al., *Qualified Immunity Developments: Not Much Hope Left for Plaintiffs*, 29 Touro L. Rev. 633, 654 (2013) ("The Court's language in *Hope* is clearly more 'plaintiff-friendly,' but since that decision, the 'fair warning' formula has been virtually ignored by the Supreme Court." (citation omitted)); Daniel K. Siegel, *Clearly Established Enough: The Fourth Circuit's New Approach to Qualified Immunity in* Bellotte *v.* Edwards, 90 N.C. L. Rev. 1241, 1252 (May 2012) (discussing the modern trend among the circuits to require a case on point for law to be clearly established); *see also* Tahir Duckett, *Unreasonably Immune: Rethinking Qualified Immunity in Fourth Amendment Excessive Force Cases*, 53 Am. Crim. L. Rev. 409, 429 (Spring 2016) ("[*Hope*] applies only to actions that 'obviously run afoul of the law,' and it has rarely been applied.  Only once has a Supreme Court Justice applied [*Hope*] to conclude that an officer was put on notice in novel factual circumstances, and it was in a dissent.  And only once has the Supreme Court applied [*Hope*] to a case where the officer was not found to have qualified immunity." (footnote call numbers omitted)).

constitutional violation is "obvious." *See Brosseau* v. *Haugen*, 543 U.S. 194, 199 (2004) (per curiam). And despite the wave of Supreme Court cases addressing (and granting) qualified immunity in recent years, no Supreme Court majority has cited *Hope* in the qualified immunity context for approximately four years, *see Tolan* v. *Cotton*, 134 S. Ct. 1861, 1866 (2014), and none has cited its "novel circumstances" holding in almost nine years, *see Safford Unified Sch. Dist. No. 1* v. *Redding*, 557 U.S. 364, 377-78 (2009).

In this action, Plaintiff argues that Brooks and Obe are not entitled to qualified immunity because, generally speaking, government officials should know that viewpoint discrimination is unlawful in any forum. (Pl. Opp. 13). But the Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152 (citations and quotation marks omitted); *see also White* v. *Pauly*, 137 S. Ct. 548, 552 (2017); *Plumhoff*, 134 S. Ct. at 2023. The Second Circuit has followed suit. *See, e.g.*, *McGowan* v. *United States*, 825 F.3d 118, 122-25 (2d Cir. 2016) (holding that appellate cases "establishing the right of a prisoner to be free from retaliation for filing a lawsuit or grievance" did not clearly establish the unlawfulness of retaliating against a prisoner for authoring an article, under his own byline, that was critical of prison policies).

Here, neither the parties nor the Court has "identified any binding authority in existence at the relevant time that . . . 'directly address[ed]' the reasonableness of the challenged conduct," *see McGowan*, 825 F.3d at 124 (quoting *Garcia* v. *Does*, 779 F.3d 84, 92 (2d Cir. 2014)), particularly in the

40

context of First Amendment claims concerning the government's use of social media.  Nor have decisions from other circuits "clearly foreshadow[ed] a particular ruling on the issue."  *Scott* v. *Fischer,* 616 F.3d 100, 105 (2d Cir. 2010); *see also al-Kidd,* 563 U.S. at 742 (requiring, in the absence of controlling authority, "a robust 'consensus of cases of persuasive authority'" (quoting *Wilson* v. *Layne*, 526 U.S. 603, 617 (1999))).[17]  After careful consideration, the Court concludes that it must grant qualified immunity to Brooks and Obe on the individual-capacity claims against them.

Turning to the individual-capacity claim against Pierre-Louis, the parties vigorously dispute whether Pierre-Louis acted under color of law when she blocked Plaintiff from the @RPLNYC Twitter account.  But the Court need not resolve this dispute.  Even if Pierre-Louis did act under color of law, she would be entitled to qualified immunity because at the time of the challenged conduct, there was neither binding authority nor "a robust 'consensus of cases of persuasive authority'" holding that her conduct was unlawful.  *See al-Kidd,* 563 U.S. at 742 (quoting *Wilson,* 526 U.S. at 617).  The Court therefore grants

---

[17]  In *Hope*, the Supreme Court appeared to hold that the law could be clearly established by state regulations and guidance from the U.S. Department of Justice concerning the challenged conduct.  536 U.S. at 741-42.  In this case, Plaintiff alleges that "[t]he City Social Media Policy provides that a comment may be deleted if it violates the comment policy" and that the policy dictates that "people are not to be blocked on Social Media based on viewpoint."  (FAC ¶¶ 94, 138).  If *Hope* were the last word on qualified immunity, which it is not, the Court might be inclined to conclude that the City's Social Media Policy provided fair warning to Brooks and Obe that their conduct — blocking Plaintiff from the official Twitter accounts because of her viewpoint — was unlawful, and therefore deny them qualified immunity.  But the Court does not conclude as such because *Hope*'s holding has been cabined to "obvious" cases, *see Brosseau* v. *Haugen*, 543 U.S. 194, 199 (2004) (per curiam), and because the influence of *Hope* is at a low ebb, *see, e.g.*, *McGowan* v. *United States*, 825 F.3d 118, 122-25 (2d Cir. 2016).

qualified immunity to Pierre-Louis on the individual-capacity claims against her.

The Court next considers whether the City of New York, through its policies, practices, or widespread customs, caused the violation of Plaintiff's rights under the First Amendment. *See Askins* v. *Doe*, 727 F.3d 248, 254-55 (2d Cir. 2013) (holding that qualified immunity is a defense available only to individuals sued in their individual capacities; municipalities have no immunity from damages for liability flowing from their constitutional violations).[18] Plaintiff does not appear to allege that the City had an official policy of blocking commenters on social media because of their viewpoint. Rather, she alleges that the City's official policy was that its social media moderators — such as Brooks and Obe — may *not* block commenters based upon their expressed viewpoint. (FAC ¶ 138). Stated another way, she has not alleged that an official City policy caused the violation of her First Amendment rights; she contends that Brooks's and Obe's *departure* from official policy caused the harm.

Instead, Plaintiff appears to invoke three other theories of municipal liability under § 1983: (i) the existence of an unlawful practice by subordinate officials, which was so widespread and well settled as to constitute a custom or usage of the municipality, caused the constitutional violation; (ii) the failure to train amounted to deliberate indifference to the rights of those with whom the

---

[18]    At the same time, the Court addresses the official-capacity claims against Brooks, Obe, and Pierre-Louis.

municipality's employees interact, thereby causing the constitutional injury; and (iii) that the official responsible for establishing the policy, with respect to the subject matter in question to the specific action, caused the constitutional violation.  (FAC ¶¶ 139-49).

Concerning the first theory, "*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds* v. *Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).  Plaintiff does not allege that any person besides herself was blocked by the City's social media moderators.  She instead alleges that an informal but widespread custom must have existed because she was blocked on three occasions by three separate City employees.  (FAC ¶ 139).

But Plaintiff's allegations of three similar constitutional violations do not allow the Court plausibly to infer the existence of a widespread custom or practice that can be attributed to the City.  *See Jones*, 691 F.3d at 85 (holding that three incidents "fell far short of showing a policy, custom, or usage of officers"); *Giaccio* v. *City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (summary order) (stating that four similar constitutional violations "falls far short of establishing a practice that is 'so persistent or widespread' as to justify the imposition of municipal liability"); *White* v. *City of New York*, No. 15 Civ. 6696 (GHW), 2016 WL 4750180, at *12 (S.D.N.Y. Sept. 12, 2016) (holding that six incidents over five years were insufficient to plausibly allege the existence of

a municipal policy); *Davis* v. *City of New York*, 228 F. Supp. 2d 327, 346 (S.D.N.Y. 2002) ("*[T]wo* incidents of unconstitutional conduct by low-level employees in a city agency with over 35,000 employees can never provide a reasonable basis for finding a *widespread* or *well-settled* custom."). The Court therefore concludes that Plaintiff fails to allege plausibly that a widespread municipal custom exists.

Plaintiff also asserts a *Monell* claim against the City based upon its alleged failure to train its employees about the interplay between social media use and the First Amendment. The Supreme Court has explained that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. "Where municipal liability is based on … inaction, rigorous standards of culpability and causation must be applied to ensure against vicarious liability." *Matusick* v. *Erie Cty. Water Auth.*, 757 F.3d 31, 73 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 405).

In order for municipal liability to attach on a failure-to-train theory, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S. at 61 (citing *City of Canton*, 489 U.S. at 388). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (internal quotation marks and citation omitted). To allege deliberate indifference in the context of a failure-to-train

claim, a plaintiff must plead facts giving rise to a plausible inference that (i) the municipality knows "to a moral certainty" that its employees will confront a given situation, (ii) either the situation presents the employees with a difficult choice of the sort that training will make less difficult, or there is a history of employees mishandling the situation, and (iii) the wrong choice by the employee will frequently cause a constitutional deprivation. *Walker* v. *City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).

Plaintiff alleges that "[t]he City's failure to train employees on the proper use of social media carries a high risk that deleting comments or blocking users will cause violations of those users' First Amendment rights." (FAC ¶ 140). This allegation, without more, does not "nudge[ ] [Plaintiff's] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, and fails to meet the "rigorous standard of culpability and causation" required to plead municipal liability based upon alleged municipal inaction, *Matusick*, 757 F.3d at 73; *see also Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (quoting *Twombly*, 550 U.S. at 555, 557)). Plaintiff's bare allegation therefore does not state a claim of deliberate indifference by the City.

Even when the Court liberally construes the operative pleading, there is no suggestion that before Brooks, Obe, and Pierre-Louis blocked Plaintiff from the Twitter accounts at issue, the City knew of "[a] pattern of similar

constitutional violations by untrained employees." *Connick*, 563 U.S. at 62. A municipality cannot act with deliberate indifference if it had no reason to believe its employees would engage in the unconstitutional conduct at issue. *See DeCarlo* v. *Fry*, 141 F.3d 56, 61 (2d Cir. 1998); *Walker*, 974 F.2d at 297-98. It may well be that this lawsuit, and this Opinion, place the City on notice of the need to train its employees that viewpoint discrimination is unlawful in forums governed by the Free Speech Clause, including the City's official Twitter accounts. Indeed, the Court hopes that it does. But that does not mean that the City's alleged failure to train — when it had no reason to believe "to a moral certainty" that its failure would result in constitutional violations, *see Walker*, 974 F.2d at 297 — caused the violation of Plaintiff's First Amendment rights.

Finally, although the FAC is not entirely clear, it can be read to suggest that the City should be liable because its employees failed to correct the problem — that is, unblock Plaintiff on Twitter — after Plaintiff made them aware of what had happened. Plaintiff specifically alleges that she lodged complaints with 311, Pierre-Louis, and NYPD Commissioner James O'Neill. (*See* FAC ¶¶ 141-49). By making these allegations, Plaintiff may be attempting to argue that the City of New York itself undertook the alleged conduct pursuant to a policymaker's adoption or ratification of his subordinates' conduct. *See Pembauer*, 475 U.S. at 481 ("[M]unicipal liability may be imposed for a single decision by municipal policymakers ... where the decisionmaker possesses final authority to establish municipal policy with respect to the action."); *Amnesty Am.* v. *Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir.

2006) (recognizing that a superior's awareness of subordinate's unconstitutional conduct imposes municipal liability under *Monell* based on ratification or deliberate indifference).

It is true that Commissioner O'Neill is a "policymaker" for *Monell* purposes, such that his decisions can bind the City of New York. *See* N.Y. City Charter § 434; *Domenech* v. *City of New York*, 919 F. Supp. 702, 710 & n.1 (S.D.N.Y. 1996). But Plaintiff's bare allegation that she "complained orally to NYPD Commissioner James O'Neill about being blocked on Twitter" is insufficient to show that O'Neill knew that his subordinates blocked Plaintiff *for unconstitutional reasons. See Praprotnik,* 485 U.S. at 127 ("If the authorized policymakers approve a subordinate's decision *and the basis for it,* their ratification would be chargeable to the municipality because their decision is final." (emphasis added)); *Davis* v. *City of New York*, 228 F. Supp. 2d 327, 341-42 (S.D.N.Y. 2002) (holding that city could not be liable on grounds that former Commissioner knew subordinates refused to reinstate the plaintiff without proof that he knew such refusal was because the plaintiff had exercised his First Amendment rights). Because Plaintiff fails to allege that O'Neill knew that Obe and Brooks blocked Plaintiff *because of her viewpoint,* and because the allegations do not suggest that O'Neill agreed with his employees' decision to engage in viewpoint discrimination, Plaintiff fails to allege plausibly that the City ratified or adopted the conduct of Brooks and Obe.

For these reasons, the Court grants the City Defendants' motion to dismiss the *Monell* claim against the City of New York, and the official-capacity

claims against Obe, Brooks, and Pierre-Louis, related to the their blocking of Plaintiff from the subject Twitter accounts.  *See* Fed. R. Civ. P. 12(b)(6).

### 3.  Due Process Claims Against the City Defendants

Plaintiff also asserts substantive due process claims, under the Due Process Clause of the Fourteenth Amendment, against the City Defendants. These claims relate to Plaintiff's assault by an unidentified person on January 24, 2017.  (*See* FAC ¶¶ 170-82).  The FAC appears to limit this claim to the alleged failure of Emmett, Dejesus, and Shevitz to investigate and file a formal report concerning Plaintiff's assault on January 24, 2017.  (*See id.* at ¶ 190 ("The denial of services to Ms.  Price on January 24, 2017, and thereafter as set forth above violated Ms. Price's rights under the Fourteenth Amendment.")).  The Court understands this allegation as suggesting that Plaintiff has a freestanding constitutional right to have police investigate her assault and file a formal report or complaint, and that Defendants violated that right.

But to the extent that Plaintiff asserts a freestanding constitutional right to have her assault complaint investigated, she fails to state a claim for relief. Generally speaking, crime victims do not have a stand-alone constitutional right to have officers investigate their complaints.  *See Troy* v. *City of New York*, No. 13 Civ. 5082 (AJN), 2014 WL 4804479, at *6 (S.D.N.Y. Sept. 25, 2014) (holding that there is "no constitutional right to an investigation by government officials"), *aff'd*, 614 F. App'x 32 (2d Cir. 2015) (summary order); *Lewis* v. *Gallivan*, 315 F. Supp. 2d 313, 316 (W.D.N.Y. 2004) ("[T]he law is well settled

that no private citizen has a constitutional right to bring a criminal complaint against another individual."); *cf. Harrington* v. *Cty. of Suffolk*, 607 F.3d 31, 35 (2d Cir. 2010) (in the *procedural* due process context, holding that parents had no constitutional due process property interest in adequate police investigation of motor vehicle collision that killed their son). The Court must therefore dismiss Plaintiff's claims concerning a stand-alone constitutional right to have her assault complaint investigated by the police.

In light of the Plaintiff's *pro se* status, the Court alternatively construes Plaintiff's allegations as suggesting that the City Defendants — through their alleged history of inaction toward Plaintiff's allegations of assaults over the years — caused the assault of January 24, 2017, in violation of Plaintiff's substantive due process rights.

"[T]he Due Process Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Lombardi* v. *Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) (internal quotation marks omitted). For that reason, "[o]nly an affirmative act can amount to a violation of substantive due process." *Id.* Governmental action resulting in bodily harm is not a substantive due process violation unless the state "action was so 'egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena* v. *DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) (quoting *Cty. of Sacramento* v. *Lewis*, 523 U.S. 833, 847 n.8 (1998)). It is therefore insufficient to simply allege that a state actor failed to protect an individual, even from a known danger of bodily harm, or failed to warn that individual of such danger.

*See Collins* v. *City of Harker Heights*, 503 U.S. 115, 125-29 (1992). "This includes dangers arising from private parties." *Estate of M.D. by DeCosmo* v. *New York*, 241 F. Supp. 3d 413, 425 (S.D.N.Y. 2017) (holding that a father failed to state a substantive due process claim against government officials who were aware of complaints of child abuse by the child's mother's paramour and who did not prevent the paramour from further harming the child).

As the Supreme Court has explained, the purpose of the Due Process Clause of the Fourteenth Amendment is "to protect the people from the State, not to ensure that the State protected them from each other." *DeShaney* v. *Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors," *id.* at 195, and the language of the Due Process Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means," *id.*

It is true that in exceptional circumstances, "a governmental entity may have a constitutional obligation to provide protection, either because of a special relationship with an individual, or because the governmental entity itself has created or increased the danger to the individual." *Ying Jing Gan* v. *City of New York*, 996 F.2d 522, 533 (2d Cir. 1993) (citing *DeShaney*, 489 U.S. at 198). The Court below examines these two exceptions to the general *DeShaney* rule.

*First*, Plaintiff may contend that as a frequent crime victim, she had a "special relationship" with the NYPD that entitled her to protection from assault by private parties. This allegation is insufficient to trigger the "special relationship" exception. In *DeShaney*, the Supreme Court stated that a special relationship, for substantive due process purposes, springs "from the limitation which [the government] has imposed on [the plaintiff's] freedom to act on [her] own behalf." 489 U.S. at 200. For this reason, "involuntary custody" is "the linchpin of any special relationship exception." *Matican* v. *City of New York*, 524 F.3d 151, 156 (2d Cir. 2008) (collecting cases); *see also Cruz* v. *N.Y.C. Hous. Auth.*, No. 03 Civ. 8031 (RJH), 2004 WL 1970143, at *8 (S.D.N.Y. Sept. 3, 2004) ("[T]he Second Circuit has . . . only recognized 'custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child' as imposing an affirmative duty to protect on state actors." (quoting *Ying Jing Gan*, 996 F.2d at 533)).

In this case, the alleged harm is Plaintiff's assault by an unknown person on January 24, 2017. Plaintiff was not in the government's physical custody at any time relevant to that assault. Therefore, the City Defendants' conduct — allegedly refusing to investigate Plaintiff's reports of crimes over the past several years — does not rise to the level of a "limitation on [Plaintiff's] freedom to act on [her] own behalf." *DeShaney*, 489 U.S. at 200. The Court therefore finds that Plaintiff's allegations are insufficient to invoke the special relationship exception.

*Second*, Plaintiff may contend that the City Defendants' alleged refusal to process her assault complaints over the past several years, or otherwise investigate the crimes against her, "has created or increased the danger to [her]." *Ying Jing Gan*, 996 F.2d at 533 (citing *DeShaney*, 489 U.S. at 198). This is commonly referred to as the "state-created danger" exception. *See Dwares* v. *City of New York*, 985 F.2d 94, 98-99 (2d Cir. 1993), *overruled on other grounds by Leatherman* v. *Tarrant Cty. Narc. Intelligence & Coordination Unit*, 507 U.S. 163 (1993); *Estate of M.D. by DeCosmo*, 241 F. Supp. 3d at 426-28 (surveying Second Circuit cases concerning the contours of the exception). This exception arises when governmental officials provide "a prearranged official sanction of privately inflicted injury," *Dwares*, 985 F.2d at 99, or where a "state actor aids and abets a private party in subjecting a [person] to unwanted physical harm," *Hemphill* v. *Schott*, 141 F.3d 412, 418 (2d Cir. 1998); *see also Okin* v. *Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 429 (2d Cir. 2009) ("The affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence."); *Pena*, 432 F.3d at 111 ("[W]hen … state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under [§] 1983 for injury caused by the misconduct under *Dwares*."). But "an allegation simply that police officers had failed to act upon reports of past violence would not implicate the victim's

rights under the Due Process Clause[.]" *Dwares*, 985 F.2d at 99; *see also Pena*, 432 F.3d at 109 ("A failure to interfere when misconduct takes place, and no more, is not sufficient to amount to state created danger.").

In this action, "any theory of state-created danger is fatally undermined by the absence of any allegation that [the City Defendants] affirmatively communicated, even implicitly [to Plaintiff's unidentified assailant] that abuse against [Plaintiff] was permissible." *Estate of M.D. by DeCosmo*, 241 F. Supp. 3d at 427. Plaintiff does not allege, for instance, that any of the City Defendants communicated to the unidentified assailant, "explicitly or implicitly, official sanction of private violence," *Okin*, 577 F.3d at 429, or affirmatively aided and abetted the assault of Plaintiff, *see Hemphill*, 141 F.3d at 418. While the City Defendants "may have been aware of the dangers that [Plaintiff] faced in the free world, [they] played no part in their creation, nor did [they] do anything to render [Plaintiff] any more vulnerable to them." *DeShaney*, 489 U.S. at 201. Plaintiff's allegations — although profoundly troubling to the Court — do not rise to the level of a violation of Plaintiff's substantive due process rights. The Court therefore must grant the City Defendants' motion to dismiss the substantive due process claims against them.

### 4. *Monell* Claims Against the City for Acts of MTA Officers

Plaintiff also appears to assert a § 1983 claim against the City of New York related to her arrest by MTA Police Officers John and Jane Doe. (FAC ¶ 189). The Court must grant the City's motion to dismiss this claim.

The MTA and the City of New York are separate and distinct municipal entities for § 1983 purposes. *See Lloyd* v. *City of New York*, No. 12 Civ. 4303 (BMC), 2012 WL 3878116, at *1 n.1 (E.D.N.Y. Sept. 6, 2012) (collecting cases); *Altro* v. *Conrail*, 130 A.D.2d 612 (2d Dep't 1987) ("The MTA is a public benefit corporation created to continue and improve railroad commuter transportation throughout a commuter transportation district including Westchester County and the City of New York." (citations omitted)). In this action, Plaintiff does not sue the MTA. Rather, she attempts to hold the City of New York liable for the conduct of the MTA's police officers. But she does not allege any facts suggesting that the City of New York was a moving force behind her arrest by MTA officers. She does not, for instance, allege that the MTA police officers were ever trained or employed by the City of New York or that the City had any control whatsoever over these officers. *See Breitkopf* v. *Gentile*, 41 F. Supp. 3d 220, 259-61 (E.D.N.Y. 2014); *cf. N.Y. Magazine*, 136 F.3d at 126-27 (holding that a plaintiff lacked standing to sue the City of New York for harms allegedly caused by the MTA). Plaintiff therefore fails to state a *Monell* claim against the City of New York related to her arrest by MTA officers.

## CONCLUSION

For the reasons stated above, the Court: (i) DENIES the motion to dismiss the § 1983 malicious prosecution claim against the City of New York and Simmons; (ii) GRANTS the motion to dismiss the § 1983 First Amendment claims against Brooks, Obe, and Pierre-Louis in their individual capacities on the basis of qualified immunity, and the claims against the City of New York —

along with Brooks, Obe, and Pierre-Louis in their official capacities — for failure to state a claim; (iii) GRANTS the City Defendants' motion to dismiss the substantive due process claims against them, for failure to state a claim; and (iv) GRANTS the City's motion to dismiss the *Monell* claim related to the false arrest and malicious prosecution by MTA officers.

The following § 1983 claims remain: (i) malicious prosecution, against Simmons in her individual and official capacities, and the City of New York; (ii) false arrest, against Corrado, Cruz, and Staines in their individual capacities; (iii) false arrest, excessive force, and malicious prosecution, against MTA Officer John Doe and MTA Officer Jane Doe in their individual capacities.

The parties are ordered to meet and confer and propose a discovery schedule to the Court, using the Court's case management plan, on or before July 20, 2018.

The Clerk of Court is directed to terminate the motion at docket entry 107.

SO ORDERED.

Dated:  June 25, 2018
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*Sent by First Class Mail to:*
Kelly Price
534 W. 187th Street, Apt. #7
New York, NY 10033