IBEQPRIc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   KELLY PRICE

4                  Plaintiff

5          v.                              15 Civ. 5871 (KPF)
                                           Conference
6   CITY OF NEW YORK,  et al

7                  Defendants

8   ------------------------------x
                                           New York, N.Y.
9                                          November 14, 2018
                                           11:35 a.m.
10
    Before:
11
                    HON. KATHERINE POLK FAILLA
12
                                           District Judge
13
                          APPEARANCES
14
    KELLY PRICE, Pro Se
15
    NEW YORK CITY LAW DEPARTMENT
16       Attorney for Defendants
    DEBRA M. MARCH
17

18

19

20

21

22

23

24

25

IBEQPRIc

1          (Case called)

2          DEPUTY CLERK:  Will plaintiff and counsel state your

3    name for the record, beginning with plaintiff.

4          MS. PRICE:  Kelly Price.

5          THE COURT:  Yes.  Ms. Price, you're half an hour late

6    for this conference.  You know that, right?

7          MS. PRICE:  Yes, your Honor.

8          THE COURT:  And you know you can't be a half hour late

9    for this conference.

10          MS. PRICE:  I apologize, your Honor.

11          THE COURT:  All right.  I'm happy that you are here.

12    I do want to talk to you, but I do need you to be on time.  I

13    also want to make sure, if it is possible, if you could stand

14    when you're speaking so I can see you better because I just

15    have a computer monitor in my line of sight, but that will just

16    be for going forward.  Thank you very much at the back table.

17          MS. MARCH:  Good morning, your Honor.

18          Debra March from Corporation Counsel for the City

19    defendants.

20          THE COURT:  Thank you.  Just excuse me one moment

21    while I get set up.

22          (Pause)

23          THE COURT:  Ms. March, we're here at your request.  Is

24    that not correct?

25          MS. MARCH:  Yes, your Honor, that's correct.

IBEQPRIc

```
 1              THE COURT:  All right.  Now, let me make sure I
 2     understand.  Here is what I understand to be going on.  There
 3     was motion practice.  There was a decision.  There was a case
 4     management plan that the parties submitted.  It is ongoing, and
 5     we're here today because there have been some issues with or
 6     alleged issues with the production of discovery.
 7              Ms. March, am I correct -- and I'll turn to Ms. Price
 8     because you are the reason we're having this conference.
 9              MS. MARCH:  Yes, your Honor.
10              THE COURT:  Your letter to me was dated the 15th of
11     October.  Since that letter was issued, has there been any
12     progress in the production of discovery or in any other facet
13     of this case?
14              MS. MARCH:  No, your Honor, I have not received
15     anything since.
16              THE COURT:  Ms. March, tell me please what you think
17     your clients are entitled to in discovery.  I would like to
18     understand all of the open issues at this time.  Thank you.
19              MS. MARCH:  Yes, your Honor.  While we served
20     interrogatories and document requests on Ms. Price back on
21     August 13 by mail, I believe we are entitled to responses to
22     those interrogatories and document requests in order to
23     determine what the responses are, if there are any
24     deficiencies, and do that prior to taking Ms. Price's
25     deposition.
```

IBEQPRIc

```
1          THE COURT:  OK.  I am aware as I'm speaking to the
2   parties that I have a conference currently scheduled for the
3   6th of December for post fact discovery.  I'm sensing, without
4   making any final determinations in this second, that that
5   conference may have to move, but I just want you all to be
6   aware that I'm aware of it.
7          Ms. March, have you received from Ms. Price or anyone
8   acting on her behalf any requests for discovery of any type:
9   Interrogatories, requests for documents, things of that nature?
10          MS. MARCH:  Yes, your Honor.  I have received them
11   from Ms. Price, and we responded to them in early October.
12          THE COURT:  Tell me, please when, you received the
13   plaintiff's discovery request.
14          MS. MARCH:  Received plaintiff's discovery request on
15   August 30.
16          THE COURT:  Am I understanding that they were all --
17   that there were requests for different types of things at the
18   same time?  Let me ask the question better.
19          Was there a second set of discovery requests or just
20   the one set in late August?
21          MS. MARCH:  No, your Honor, just the one set from
22   plaintiff in late August along with her initial disclosures.
23          THE COURT:  When did your clients make their initial
24   disclosures?
25          MS. MARCH:  We made our initial disclosures on
```

5

IBEQPRIc

1  August 13, the same date that we put our discovery requests in

2  the mail.

3       THE COURT:  And you produced your responses to

4  plaintiff's discovery requests in October?

5       MS. MARCH:  Yes, your Honor, on October 5.

6       THE COURT:  Have you received any letters or other

7  communications from Ms. Price suggesting that there's any

8  deficiency in your productions?

9       MS. MARCH:  No, your Honor.

10       THE COURT:  Just while I have you standing, is there

11  anything else you would like me to know at this time before I

12  turn to Ms. Price?

13       MS. MARCH:  No, your Honor.

14       THE COURT:  Thank you.

15       Ms. Price, let us begin at the beginning.

16       You made initial disclosures in or about August of

17  2018.  Is that correct?

18       MS. PRICE:  I believe I made them August 30, your

19  Honor.

20       THE COURT:  I know in the past you've had assistance

21  in the NYLAG legal clinic this building.  Are you receiving

22  assistance from them or someone else at this time?

23       MS. PRICE:  Your Honor, a modicum of assistance, yes,

24  your Honor.

25       THE COURT:  I know the individual with whom you're

IBEQPRIc

1    working graduated, and, therefore, his internship position came

2    to an end.  Are they helping you with the discovery process?

3              MS. PRICE:  Yes, your Honor.

4              THE COURT:  I'm understanding that you produced

5    discovery requests –– you made requests of the defendants in or

6    about August.  Did you receive their responses in or about

7    October?

8              MS. PRICE:  No, your Honor, I did not.  I received

9    nothing from the City Law Department.

10             THE COURT:  Nothing?

11             MS. PRICE:  Nothing.  In fact ––

12             THE COURT:  Stay there, please.  Your production of

13   October 5, how long was it?

14             MS. MARCH:  What do you mean, how many ––

15             THE COURT:  How many pages?  Are we talking thousands?

16   Hundreds?

17             MS. MARCH:  No.  No.  No, your Honor.  The responses

18   were 27 pages plus there were some documents and a notice of

19   deposition and a cover page.

20             THE COURT:  Ms. Price, you're saying you didn't

21   receive any of this on or about the 5th of October?

22             MS. PRICE:  No, your Honor.  In fact, I find it very

23   unusual that the City Law Department would say that it sent me

24   my –– a response to my interrogatories because they always

25   email me a copy, and I have received absolutely no email from

7

IBEQPRIc

1     them with any of this material.  Nothing has come in the mail.

2     And the last communication that I had with Ms. March was on

3     October 9, as I was struggling to burn a disk on the evening

4     that the information was due to Ms. March.  I had some problems

5     of varying degrees as I was scrambling at the last minute to

6     burn everything together and thought that I had a couple days

7     leeway to try and come up with everything.

8           Basically, I had a hard drive where I had all of my

9     files, the photographs, all the court documents burned on to as

10    a secondary backup, and that hard drive no longer worked as I

11    was trying to burn my disk for Ms. March.  And before I could

12    even get ahold of someone that would help me recover all of

13    that information, I was slight -- literally three days later,

14    Ms. March filed her demands with the Court before I even had a

15    chance to negotiate with her to tell her what kind of problems

16    I was having and give her an estimation of how long it would

17    take me to recover those particular documents.  And I find

18    that, in fact, the entire discovery calendar was entered into

19    on bad faith by the City Law Department.

20          THE COURT:  Wait.  Bad faith?

21          MS. PRICE:  Your Honor, if you would just allow me to

22    proceed.

23          THE COURT:  I will, but those are very serious

24    allegations to make.

25          MS. PRICE:  I understand, your Honor.

8

IBEQPRIc

1      When I was negotiating with Ms. March in July to come

2  up with a discovery calendar, I made it very clear to her that

3  this work was extremely traumatic, extremely triggering, and

4  that I needed ample time to sift through it because going

5  through all the files and all the paperwork resurfaces all of

6  the trauma and all of the injustices that I have had to endure

7  over the better part of the last decade.  I was very clear to

8  her that I needed sufficient time to work through those

9  chemical highs and lows that are triggered in my brain when the

10  trauma surfaces.  I'm OK.  OK.  I have my hanky.

11      THE COURT:  And you have your dog as well.

12      MS. PRICE:  Frank, yes, he's new.  Thank you.

13      So we agreed that the discovery requests would be due

14  August 30, and then the responses would be due some 30 days

15  after, but the City Law Department worded the request,

16  Ms. March composed it so that there was a compaction of the

17  calendar if the City Law Department delivered its request to me

18  irrelevant.

19      So, in effect, they -- I believe that they

20  intentionally with knowledge that I needed ample time to work

21  through all of these triggers and traumas that resurfaced when

22  dealing with these documents, they literally shoved the request

23  at me in their initial disclosures on August 13, weeks early of

24  the due date.  And I didn't realize when I signed that

25  discovery calendar that they would have the flexibility to be

IBEQPRIc

1    able to shove the request at me, the response to me early and

2    then I would be obligated to respond to them early because the

3    schedule was by August 30 the requests are due, and then in

4    another 30 days the responses are due.

5         But the way that the discovery calendar was worded,

6    there was nothing prohibiting them from serving their documents

7    to me early and forcing an expedited calendar.  And I found

8    that extremely -- especially since I felt like I had built a

9    beautiful rapport with Ms. March and I really had hopes for

10   this new generation in the City Law Department.  I found that

11   extremely re-traumatizing to feel that I hadn't caught that,

12   and, of course, your Honor, you are aware I have been working

13   very hard on this lawsuit and sounding the alarms for all kinds

14   of problems that have surfaced for women seeking justice and

15   safety in the City years before other people sounded these

16   alarms.

17        I have been working meticulously, and I feel almost at

18   every occasion I have risen to the challenge that the Court has

19   given me to learn the case law for First Amendment, to learn

20   the rules of federal process, but I cannot deal with an

21   opposition that intentionally tries to sabotage me knowing that

22   I have specific disabilities.

23        I have been diagnosed with PTSD, as you know, and that

24   diagnosis comes from the World Trade Center Health Program, not

25   some fly-by-night quack.  As I work through these issues, I

IBEQPRIc

```
1    feel the City Law Department is working against me.  I didn't

2    even bat an eye when Ms. March mentioned she needed more time

3    to respond to my request as well and we agreed for October 9.

4            But then when I was having problems, and, again,

5    dealing with those photos on that evening combined with not

6    being able to access all my documents because I've written

7    dozens of briefs to different government and city officials

8    that were requested.  And all of that stuff was on the hard

9    drive.  So those two things compounded really sent me into a

10   tizzy.

11           I finally found someone to help me access my hard

12   drive, and then it was Monday.  It was literally three business

13   days after my request was due, and the City Law Department

14   slapped that motion on the Court making it sound like I wasn't

15   complying and they were trying to work with me.  And, again, I

16   feel like that particular presentation to the Court was trying

17   to malign my ability to adhere to the calendar which was set up

18   to make me fail to begin with.

19           So these are the issues that I have been dealing with.

20   I have also enormous issues trying to understand what I'm

21   obligated to provide to the City Law Department and what I'm

22   not.  I have had conversations with the new persons assigned to

23   my case in NYLAG, and I like him very much, but I will say that

24   having to build a new relationship with someone in the NYLAG

25   office every six or eight months and having to bring them up to
```

IBEQPRIc

1    date on all the very intricate and nuanced and Byzantine

2    aspects of this case is in itself triggering.

3             So working with a new person at NYLAG has been

4    slow-going because they don't understand the history of the

5    case.  They haven't had time to sit down and read the hundreds

6    of documents entered into the court file or the thousands of

7    pieces of evidence or the numerous attempts I have made to

8    assert the wrongs unhanded to me by different New York City

9    city officials.

10            So I have -- today I have my responses for the City

11   Law Department.  There are a few of them that I am still

12   uncertain if I'm obligated to provide.  For instance, the City

13   law department is asking for all of my communications with my

14   lawyer and all of my text messages on my phone.

15            THE COURT:  With the lawyer?

16            MS. PRICE:  I don't understand why they would ask for

17   that, but it's asked for, and I don't really know how to say

18   no.

19            THE COURT:  Well, certainly you wouldn't have to

20   produce privileged materials.  Could you read to me the request

21   that calls for communications with your attorney?

22            MS. PRICE:  So they're asking for all statements,

23   signed or unsigned, all injuries claimed by plaintiff, let's

24   see, treatment.  I beg your pardon, I should have flagged it.

25            (Pause)

IBEQPRIc

1          MS. PRICE:  I beg your pardon, your Honor.  Thank you

2     for that allowance.

3          THE COURT:  Of course.

4          MS. PRICE:  It's their item number 18 in their -- I

5     believe it's their interrogatories:

6          "Identify all experts that plaintiff expects to call

7     at the time of trial or correspondence between counsel for

8     plaintiff and any such experts, any notes taken by any such

9     experts, and provide all disclosures required provided to

10    Federal Rule 26(a)(2).

11         THE COURT:  Let's calm down for a moment, please.

12         They're asking for your attorney's communications with

13    a third party; not for your discussions with your attorneys.

14    Your discussions with your -- if you think about the

15    attorney-client privilege as belonging to the attorney and

16    client, if you talk to third parties, those communications are

17    not privileged.

18         MS. PRICE:  Since I don't have a lawyer, it doesn't

19    apply to me.  So any emails that I've sent to people asking

20    them to provide testimony, I'm confused if I have to provide

21    that.  I don't feel like I should have to --

22         THE COURT:  Well, that -- what you just read to me, I

23    thought I heard expert witnesses.  So if you have, for example,

24    a psychiatrist who would be testifying on your behalf or

25    someone else as an expert witness that you've designated as an

IBEQPRIc

1    expert witness, then I do think those communications might have
2    to be produced.
3             I don't believe she is asking you to produce any
4    communications you've had with folks at NYLAG who have been
5    helping you, because those communication to my mind are
6    privileged.
7             MS. PRICE:  And what about -- I understand that it had
8    to do with expert testimony, but since I'm acting as my own
9    lawyer --
10            THE COURT:  Yes.
11            MS. PRICE:  -- of course I've been emailing people
12   asking them to be expert witnesses for me.  People from, you
13   know, the national agency to end domestic violence, experts in
14   the field.  So do I have to provide all that since I'm acting
15   as my own lawyer?  I'm really confused by this, and I don't see
16   why I should have to.
17            THE COURT:  I need to see the discovery request.  And
18   I can't provide you legal advice.
19            It sounds like the communications you had with people
20   about potentially serving as an expert witness might be
21   discoverable.  You may object to them on relevance grounds or
22   something else, and then we'd have the discussion here about
23   whether they would have to be produced.  But at the moment I
24   don't think that those communications call for you to turn over
25   privileged communications.  I want to back up further though.

IBEQPRIc

1    I want to move back with you a couple of steps, all right?

2              MS. PRICE:  Yes.

3              THE COURT:  Earlier in your conversation, I thought

4    you said you had, at least at one point, a good relationship

5    with the corporation counsel.  Am I correct?

6              MS. PRICE:  I felt that way.  I actually was feeling

7    warm and fuzzy about Ms. March.

8              THE COURT:  Then I believe you should continue to feel

9    warm and fuzzy, and let me explain to you why.  Because what

10   shy was doing in these most recent communications have

11   nothing -- to my way of looking at it, has nothing to do with

12   trying to set you up to fail and has nothing to do with trying

13   to get you in trouble.

14              She is concerned, as her office is always concerned,

15   about running afoul of my deadlines.  So she is walking a bit

16   of a tight rope here, if she doesn't mind my speaking for her.

17   She wants to have a good relationship with you.  She wants to

18   extend you the courtesies that you need to get these things

19   done, but she also knows that at some point she is going to

20   have to come before me, and if she knows anything about me, she

21   knows that I don't like extending discovery deadlines.

22              So the reason for the letter on the compressed

23   timeframe that she sent it was, as she noted, she was saying

24   basically, "Look Failla, I know you're going to be really angry

25   if we come before you in November and nothing is done.  I am

15

IBEQPRIc

1   early on letting you know about this issue so that you can

2   bring people in.

3          So it has nothing to do with any disrespect or lack of

4   regard for you.  She is, as many folks are, concerned about the

5   deadlines that I am setting.  And that's why we're here today.

6   So I don't -- she is not setting you up to fail.  She was

7   trying to give you these materials early so that you could have

8   more time to look at them.  I understand, yes, that accelerated

9   the clock, but I suspect that if you had called her and said,

10  "Hey, I still want until the 30th of" -- whatever the date it

11  was in October, she would have given you that time.  Here we

12  are in mid November, and you still haven't produced them,

13  correct?

14         MS. PRICE:  I have them today, your Honor.

15         THE COURT:  You have them today, which is great.  But

16  I am asking you -- I'm not ordering you -- I am asking you to

17  reconsider your feelings that they are trying to harm you

18  because I really do believe based on the communications that I

19  am seeing that they are just appropriately worried about how a

20  judge will react upon being told that there are problems with

21  discovery.  That's what this is.  It's me.  It's not you.  Do

22  you understand that?

23         MS. PRICE:  Yes, your Honor.  Thank you.

24         THE COURT:  OK.  So, again, I would never tell you how

25  to feel, but I have been doing this job longer than you have

IBEQPRIc

1    been doing your work on this case, and there are many people

2    who are reluctant to come before me and say, "We have a problem

3    with discovery."  So that's all she was doing.  She was trying

4    to -- what's the expression -- she was trying to nip it in the

5    bud, trying to get it resolved early.

6            We will talk today about setting this discovery

7    schedule in a way that everyone can succeed.  You're saying

8    that you were able to fix your hard drive.

9            MS. PRICE:  Yes, your Honor.  In fact, I had a second

10   hard drive in storage that I couldn't access because I hadn't

11   paid my storage fee because it was in auction, but I did save

12   it.  So now I again have two copies of everything.

13           THE COURT:  Great.

14           MS. PRICE:  In fact, I am probably providing more

15   information than I should in my discovery requests, but there

16   are elements that I still feel like I don't need to provide.

17   For instance, my entire medical file.  I don't know why I need

18   to provide my entire medical file from Bellevue from the

19   beginning of time and it can't just be limited -- you know,

20   there are different little things like that that maybe I can

21   work out with Ms. March.

22           THE COURT:  I'm asking you, and I'm asking Ms. March,

23   to try and work together, if you will, to begin this

24   relationship anew with an understanding that you are each

25   trying to do the right thing, which is to move this discovery

IBEQPRIc

1   forward, appropriately and fairly.  And if there are problems,

2   that's why I'm here.  We can work them out.  You guys can send

3   me letters, and I can decide.

4           Let me hear about -- you've already talked about one

5   thing, which is your communications with expert witnesses.  So

6   stay right where you are.

7           And, Ms. March, let me talk to you.  What is it you

8   are looking for?  You are looking for efforts to solicit expert

9   testimony?

10          MS. MARCH:  Just to identify any experts that she

11  intends to call at trial.

12          THE COURT:  Well, what about the ones that she spoke

13  to and it didn't work out, does she have to talk to you about

14  them?  I'm thinking no.  Do you really need that information?

15          MS. MARCH:  I'm thinking no as well, your Honor, just

16  the one intended for trial.

17          THE COURT:  Ms. Price, we've got one issue resolved.

18  If you've decided on an expert witness and you're going to call

19  this expert witness at any trial in this case or this person

20  will provide any expert testimony in connection with any

21  further practice in this case, that person you have to identify

22  and any communications with that person you'd have to produce.

23          But for the folks that you are either -- that for one

24  reason or another you are deciding not to go forward with, we

25  don't need to have those communications.  OK.  That's one

IBEQPRIc

1    thing.

2        Tell me your next thing.  Medical records.  What is

3    the request?

4        MS. PRICE:  So they're asking for the entire file.

5    They are asking for my entire Medicaid file.  They're asking

6    for my entire file -- let me read it to you specifically.

7        They want:  All medical providers, including, but not

8    limited to, doctors, hospitals, psychiatrists, psychologists,

9    social workers and other counseling services who have rendered

10   treatment.  That's one.

11       THE COURT:  There is no date restriction on that?

12       MS. PRICE:  No, sir.  I beg your pardon, your Honor.

13   No, ma'am.

14       THE COURT:  Ms. March, there is no date restriction on

15   that?

16       MS. MARCH:  Yes, your Honor.  I believe plaintiff is

17   referring to interrogatory number 7, which is to identify the

18   medical providers within the past ten years who have rendered

19   treatment to her.

20       THE COURT:  Ten years of treatment?

21       MS. MARCH:  Yes, your Honor.

22       THE COURT:  Do you know who they are?

23       MS. PRICE:  Ten years takes me back to 2008, when I

24   was still a happy photo editor running the world's best photo

25   journalists in and out of war zones.  This whole miasma of my

IBEQPRIc

1  life started, the abuse started in 2009.  The hard-core abuse

2  started in 2010:  The pimping, the choking, all that stuff.

3  And then in 2010, 2011 I was seeking treatment, and I -- at the

4  end of 2011, I finally started receiving treatment at the St.

5  Nick's Roosevelt Crime Victims Treatment Center.  So I would be

6  happy to provide records from the end of 2011 forward, but this

7  carte blanche look-back into my life into 2008 --

8       THE COURT:  Well, I believe the issue is you are

9  making claims in the case that what happened to you in 2009 and

10  2010 caused you harm and distress and problems, and you believe

11  that in part -- I thought one of your claims was that the city

12  did not react appropriately.

13       MS. PRICE:  Yes, your Honor.

14       THE COURT:  So I believe that they are entitled to

15  those materials to probe the claim that you've made that these

16  incidents in 2008 and -- 2009 and 2010 caused you these

17  problems.  But let me talk with Ms. March.

18       Ms. March, is there any shorter -- can I narrow

19  further the discovery period?

20       MS. MARCH:  Well, your Honor, let me just clarify.

21  The interrogatory was asking her to just list for the past ten

22  years.  The actual document request was for authorizations for

23  five years prior.

24       THE COURT:  OK.  So, Ms. Price, can you identify the

25  names of people in the past ten years?

IBEQPRIc

```
 1              MS. PRICE:  I can, your Honor, yes, and I have.

 2              THE COURT:  And give them authorizations for five

 3   years?

 4              MS. PRICE:  I can.  That is another part of it.  The

 5   authorizations that were provided to me are corrupt, so I will

 6   need new authorizations.

 7              THE COURT:  Ms. March, you will give her new

 8   authorizations, new HIPAA authorizations, please?

 9              When you say "corrupt," is it that they could not be

10   opened on your computer?

11              MS. PRICE:  No.  They're just alphabet soup.  They

12   look like this, in part.  They're just scrambled.

13              THE COURT:  Textually, they are a mess.  Can you send

14   them as PDFs?

15              MS. MARCH:  I did send them as PDFs.  I'm happy to

16   resend them.

17              THE COURT:  OK.  That's medical reports.  What else

18   have we got?

19              MS. PRICE:  The other thing they asked for are all of

20   my cell phone providers.

21              THE COURT:  Yes.

22              MS. PRICE:  I'm wondering, do I need to allow them a

23   look into my entire life for the last ten years.  You know,

24   there was a part of my life when I was being pimped, and there

25   are still some people whose names I would like to protect from
```

IBEQPRIc

```
1    that part of my life.  I certainly would not want the City Law
2    Department to see all of my personal text message exchanges
3    with everyone in my personal life.  I don't understand that,
4    why I have to identify my cell phone providers.
5         THE COURT:  Ms. March, let me understand what the
6    issue is.  How far back are you going with cell phone
7    providers?
8         MS. MARCH:  I believe, if I'm correct, that Ms. Price
9    is referring to the interrogatories number 22, 23.  Those just
10   refer to -- first is 22:  Any internet-based social networking
11   sites that Ms. Price used to talk about this lawsuit or
12   anything in connection with that.
13        And then the other interrogatories in regards to any
14   text messages sent about this lawsuit to identify.
15        THE COURT:  Are you asking her -- remember, I don't
16   have these discovery requests.  Are you asking her to produce
17   to you any social media entries regarding this lawsuit that she
18   may have sent or received and any text messages regarding this
19   lawsuit that she may have sent or received?
20        MS. MARCH:  Yes, your Honor.  First, we're asking her
21   to identify them and also we have a document request that any
22   responses identified in response to our interrogatories, for
23   her to produce those documents.
24        THE COURT:  Right, but we're all here together, and I
25   want to make sure she understands it.  So I'm going to ask it
```

IBEQPRIc

1   again.

2              MS. MARCH:  Sure.

3              THE COURT:  Ultimately, what you're asking for is not

4   every text she ever sent.

5              MS. MARCH:  That's correct.

6              THE COURT:  But every text relating to the subject

7   matter of this lawsuit, either the abuse or her interactions

8   with the City.  So if she texts her friend and says, "I can't

9   believe they blocked me from the Twitter account," you want

10  that?

11             MS. MARCH:  Yes, your Honor.

12             THE COURT:  But if she talks about the great dinner

13  she had last night at Lilia, you don't want that.

14             MS. MARCH:  That's correct.

15             THE COURT:  Ms. Price, do you understand that?

16             MS. PRICE:  I do, your Honor, but I have no idea how I

17  would go about going through my texts since this began and

18  identifying those particular texts.  I have had numerous burner

19  phones that weren't even listed in my account.  I have had

20  numerous phones that weren't even android phones.  They were

21  just the analogue Obama phones.  I have had so many

22  conversations with so many people about what D-bag Cy Vance is

23  and how he ruined my life.  I can't even begin -- I have no

24  problem with the social media posts.  I've done that.  And it

25  took me forever to do that.  But the text messages, how do I

IBEQPRIc

1 possibly --

2        THE COURT:  Well, it's the text messages that are in

3 your possession, custody or control.  I am assuming -- and

4 please tell me this is correct -- that you did not upon filing

5 this lawsuit go destroying documents or destroying texts,

6 right?  You wouldn't do that.

7        MS. PRICE:  My life is an open book, your Honor.

8        THE COURT:  OK.  So if -- I believe the way to do it

9 is that one would typically take screen-shots of texts.  Now,

10 you only have the phone that you have, and maybe you don't have

11 other phones previously.

12        MS. PRICE:  I have a couple of other ones.  I save

13 them.  I do have about six cell phones.

14        THE COURT:  Well, if there are texts on them related,

15 then you would have to produce them, and you can work with

16 Ms. March about how best to produce them.  And maybe they have

17 technological capabilities to aid you in downloading them.  I

18 don't know.

19        But for the phones you don't have any more, I can't

20 really worry about those.  For the things you do have, if there

21 are texts on them that are related to this lawsuit, then yes,

22 you do need to produce them.

23        And why don't we -- perhaps we should talk about how

24 much time that's going to take, because I think we're going to

25 need to extend discovery just so you can look at your text

1    messages, but at least you and I have an understanding of

2    what's being requested and what I'm asking you to produce.

3           Tell me, please, another category of materials about

4    which you have concerns.

5           MS. PRICE:  So there are -- I find just about every

6    request to be ubiquitously broad that's not redundant.

7           THE COURT:  Let's go with overbroad.

8           MS. PRICE:  Overbroad.

9           THE COURT:  What they're trying to do because I used

10   to do this for a living, is you want to be sure nothing falls

11   between the cracks.  So to be repetitive and redundant is part

12   of being a lawyer.  That's what happens.  So never be a lawyer

13   and this won't happen to you.

14          But are there other things, other categories?

15          MS. PRICE:  So, number one, identify all persons who

16   witnessed, were present at, or have knowledge of the incidents

17   for which plaintiff is suing, including the October 2010

18   incident, July 25.  If you are unable to identify any of the

19   individuals within the meaning of Local Rule 26.3, describe the

20   individual's physical appearance.

21          So, your Honor I literally have spent the better part

22   of the last decade complaining to everybody that would listen

23   about what happened to me:  Strangers on bar stools.  I've

24   written emails to every public official in the State of New

25   York and some federal officials.  I've met with every advocacy

IBEQPRIc

1    organization.  I've worked as an intern for some of these

2    advocacy organizations.  And while I sat in their offices was

3    working on this lawsuit at the Urban Justice Center at the

4    National Organization For Women.  There are thousands of people

5    that have knowledge of what happened to me.

6              I did my very best to create a list of the people

7    whose ears I filled the most about the secondary victimization,

8    but I just don't know where I would begin.

9              THE COURT:  Ms. March, is that sufficient?  Can you

10   look at her response?  I'm assuming initially you were really

11   looking for the folks with firsthand knowledge?

12             MS. MARCH:  Yes, your Honor.

13             THE COURT:  OK.  But she's given you more than that.

14   She has given you the folks who he or she has filled the most.

15             It is my expectation that will be sufficient.  You

16   will let me know if it is not?

17             MS. MARCH:  I will, your Honor.

18             THE COURT:  OK.  Ms. Price, we're OK.

19             MS. PRICE:  And then identify all statements, number

20   two, signed or unsigned, recorded electronically or otherwise

21   prepared by plaintiff or any other person that relate to the

22   claims or subject matter of this litigation.

23             THE COURT:  I do need you to speak a little slower for

24   the court reporter.

25             MS. PRICE:  I beg your pardon.

IBEQPRIc

| | |
|---|---|
| 1 | THE COURT:  Let's try that again. |
| 2 | MS. PRICE:  Number two, identify any and all |
| 3 | statements, signed or unsigned, recorded electronically, or |
| 4 | otherwise prepared by plaintiff or any other person that relate |
| 5 | to the claims and/or subject matter of this litigation. |
| 6 | So, your Honor -- |
| 7 | THE COURT:  Same thing. |
| 8 | MS. PRICE:  And, I mean, there were all kinds of |
| 9 | people helping me when my case was in state court.  All those |
| 10 | lawyers, all the lawyers I approached to try and help me, the |
| 11 | advocates, all the briefs. |
| 12 | THE COURT:  So have you done your best to give what |
| 13 | you have? |
| 14 | MS. PRICE:  I absolutely have, but I speak at "The |
| 15 | Moth," I speak at rallies, all the city counsel testimony.  I |
| 16 | tried to gather it all, but -- |
| 17 | THE COURT:  That's fine.  Again, Ms. March will look |
| 18 | at it.  It will almost certainly suffice for what she needs, |
| 19 | and she understands.  We understand that this has been -- I'm |
| 20 | not using the term loosely -- a crusade for you, and you've |
| 21 | spoken to a lot of people, and it is impossible for you to get |
| 22 | every -- to retract or to obtain a copy of every statement |
| 23 | you've made.  That's fine.  But see, the conversation we're |
| 24 | having right now, I want to believe you can have with |
| 25 | Ms. March.  Yes? |

IBEQPRIc

1          MS. PRICE:  I felt like yes.

2          THE COURT:  So I still do.  So what about this:  If I

3    gave you until the end of the year to work out the document

4    production issues and then gave you the month of January to do

5    depositions, will that work?

6          MS. PRICE:  Umm, depositions is another problem for

7    me, your Honor.

8          THE COURT:  OK.

9          MS. PRICE:  I have no idea how to do a deposition.

10         THE COURT:  OK.

11         MS. PRICE:  You know, I feel like I've done an

12   adequate job rising to every challenge that this crusade has

13   posed for me.  I have no idea how to do a deposition.

14         THE COURT:  All right.  A couple of points to that.

15   Number one, one way of doing it is with written questions

16   instead of you actually asking someone something in person.

17         Number two is to see if the NYLAG folks will find you

18   someone to help you.  And if your concern is with the

19   turnover -- that is your concern?  The turnover?  You had

20   somebody help you and then you've had somebody else help you,

21   and each semester somebody else is helping you.

22         My suspicion is someone from NYLAG would love to help

23   with you depositions because that type of experience is

24   something that people really enjoy having, so I think they will

25   be present to help you.

IBEQPRIc

1        But why don't you let me know if they're not.  And,

2   alternatively, do I have your authorization to speak with

3   Ms. Tarnofsky, the head of NYLAG?

4        MS. PRICE:  Always, your Honor.  Thank you.  They were

5   amazingly helpful.  They literally polled every civil rights

6   law firm and attorney that works with the Southern District

7   asking if they would do the depositions for me and take on that

8   part of it.

9        THE COURT:  And?

10        MS. PRICE:  They found that everyone they asked was

11   excited at first, and then when they ran conflicts, they

12   disappeared.  So, again, the specter, I can only assume the

13   powerful people who I'm trying to unearth -- like the Brennan

14   Center has totally backed away from writing me an amici brief

15   because they got wind -- someone got wind in the Manhattan

16   District Attorney's Office that I had mentioned to you the last

17   time I stood before you in early 2017, that the Brennan Center

18   wanted to write me an amici brief, and they have literally been

19   told "you're not doing that" because we get funding from the

20   Manhattan District Attorney's Office.

21        So there's been -- I've been fighting against this

22   behemoth -- nobody will do the depositions for me, and they

23   found one woman who has an independent law firm who agreed to

24   depose five people.

25        THE COURT:  OK.

IBEQPRIc

1          MS. PRICE:  I say, OK, that's a great start.

2          THE COURT:  It is great.

3          MS. PRICE:  I was so happy for that, but then she

4     started working on someone else's case and was no longer

5     available to me.

6          THE COURT:  I'll speak to Ms. Tarnofsky.  You need

7     assistance with depositions.

8          MS. PRICE:  Your Honor, if you don't mind, I would

9     really like to turn in another request for pro bono counsel.  I

10    turned one in to Honorable Judge Preska at beginning of these

11    proceedings because, as you may recall, I had a pending

12    litigation against Reuters News Service for violating my

13    copyright of the photos I took running from the Towers on 9/11?

14         THE COURT:  Yes.

15         MS. PRICE:  That proceeding has commenced.  All I am

16    allowed to say is that both parties were satisfied.

17         THE COURT:  You settled it?

18         MS. PRICE:  I'm not allowed to say that.

19         THE COURT:  But when you said "commenced," that means

20    begin.  You really meant end.

21         MS. PRICE:  I'm sorry.  You know, when I get nervous,

22    I murder my own language, but I will say that that was in front

23    of Judge Parker.  She was our mitigation magistrate, and I do

24    very much love her.

25         THE COURT:  I will tell her that.

IBEQPRIc

1          MS. PRICE:  I think she knows that.  Please tell her
2     that again.
3          But that particular experience just reminded me again
4     of how badly I need pro bono counsel.  I'm not allowed to talk
5     about what happened in mitigation.
6          THE COURT:  I don't want to know.
7          MS. PRICE:  But they really -- and I just feel so --
8     at every step, I have let elements and actions of my case slip
9     away through unforced errors, and I think you've seen the
10    record.  The City Law Department has been really great at
11    taking advantage of those unforced errors.  And I'm so
12    frightened that I am going to keep making mistakes, so I would
13    love to turn in another request for pro bono counsel.  There
14    are all kinds of reasons --
15         THE COURT:  Let's slow down for a second.
16         Ms. March, do you have a problem if I look for
17    pro bono counsel?
18         MS. MARCH:  No, your Honor.
19         THE COURT:  Understanding that that may delay for a
20    period of time discovery in this case?
21         MS. MARCH:  Yes, your Honor.
22         THE COURT:  Let's do that.
23         MS. PRICE:  Thank you, your Honor.  I have been told
24    by a couple of attorneys that at this point the real barrier is
25    expenses because depositions run on average of a thousand

IBEQPRIc

1    dollars each, I was told.  I wish that my case that was

2    resolved with Reuters had reaped me, but I -- so I have my

3    request.  I'd like to turn it in.

4              THE COURT:  OK.

5              MS. PRICE:  There's all kinds of reasons.  I don't

6    know if you want to hear my voice go over them.

7              THE COURT:  I think I know what they are.  Let's do

8    this:  I am not going to ask you today to turn over your

9    discovery requests to Ms. March.  And I am not going to ask

10   Ms. March to turn over her discovery requests to you, unless

11   she wishes to, because she said she did so already in October.

12             Let me figure out -- and it may take me some time --

13   whether there is an attorney.  I won't make any promises

14   because I don't want to walk away from them later.  I will

15   speak with Ms. Tarnofsky and with Ms. Malloy of the pro se

16   office here and see if there are is someone who can take the

17   case to prevent the every semester transitions that you're now

18   having.

19             If I can find somebody, then we will reset the

20   schedule to allow this new counsel to come up to speed.  If I

21   can't, we will come back here, and we will talk about what we

22   do instead.  All right?

23             MS. PRICE:  Thank you, your Honor.  One last thing.

24             THE COURT:  Of course.

25             MS. PRICE:  My persecution by the NYPD has continued,

IBEQPRIc

```
 1    and it has made my state of being literally on the edge of

 2    reason.

 3              THE COURT:  What is going on?

 4              MS. PRICE:  Last month -- there is a -- I live uptown

 5    behind a yeshiva synagogue in an old SRO, thank God, because I

 6    was homeless for months in 2013.  And I love it up in Fort

 7    George.  It's peaceful.  There is an HIV shelter two doors down

 8    for women, which I love, because those women are my people, and

 9    I take care of them.  There is a super in that building who --

10    I'm a person with a mental health diagnosis, but this person is

11    nuts.  And right around the time that the discovery requests

12    were due -- this isn't an excuse, but this is just sort of an

13    example of the turmoil in my life -- this guy, who is the super

14    of a homeless women's shelter with a very vulnerable population

15    of women with HIV.  They are all old prostitutes.  They just

16    have sadder stories than I do.  And this person is also a drug

17    dealer, and he moves the weight and the neighborhood hustlers

18    come and pick up their packages every morning from his basement

19    apartment, and they go hustle.

20              He's a very dangerous person.  I had a rapport with

21    him because he's an Iraqi war vet, and he was in prison for

22    awhile.  But then he got into a fight with the guy who lives in

23    the studio next to me.  Tried to stab him.  There was blood all

24    over my hallway.  I was literally watching this through my

25    doorway as my neighbor was screaming for someone to come save
```

IBEQPRIc

1    his life.  And I went to the police to try and report this

2    incident because my life was threatened by this person, on and

3    on.  The police still refuse to take my complaints.

4         The man even stole -- I had stroller for Frank,

5    because he was just a little tiny puppy.  He's five months now,

6    but he was just short of four months last month when all this

7    was happening, and he was still in a stroller.  And the police

8    literally refused to take my complaint.

9         Likewise, my landlord, who is a very smart orthodox

10   gentleman and has trying to get me out of this SRO forever

11   because I've organized all the other poor people to stand up

12   and take a reasonable buyout.  We live right behind a yeshiva

13   synagogue, so they are trying to build a community center and

14   force us out.  We didn't have heat or hot water for two and a

15   half years.  But that's been another one of my crusades, to

16   help -- anyway, long story short, I had to call Jeffrey

17   Schlanger, who is now the general counsel for NYPD.  His name

18   might be familiar to you because he used to be the chief of

19   staff for the Manhattan District Attorney.  He is the

20   wunderkind behind the implementation of Palantir.

21        So I called Jeff Schlanger crying, you know, please,

22   the 34th precinct won't even take my complaints.  And

23   literally, Mr. Schlanger, because he gave me his business card

24   and told me -- because he recognizes the situation that he

25   himself I think has created for me that if I ever need help,

1    that he will help me.

2           So just last week I saw a team of undercovers check

3    into the shelter, which I'm very happy I have that connection

4    for, but I just want to emphasize to the Court that these

5    things keep happening.  It happened in August of 27, a very

6    similar thing where the landlord illegally locked us out.  We

7    called for an illegal lockout, and the police came.  They

8    swiped my ID because I'm the person who made the 911 call about

9    the illegal lockout.  Instead of arresting the super or issuing

10   a summons as per NYPD Handbook Procedure 112.10, they arrested

11   me and made me go to the psyche ward because I have this

12   history in my record.

13          So these things I just want to mention to you.  You

14   were very kind in early 2017 when I explained that these things

15   were recurring, and you asked me to explain them to you, and

16   then you allowed me to write those into my complaint, which I'm

17   very grateful for.  But I can't keep rewriting the complaint

18   every time these things happen.

19          THE COURT:  Of course.

20          MS. PRICE:  But I want to let you know that this is

21   really contributing to my state of being.

22          I have a new puppy, and instead of being able to take

23   him out and train him, because I'm potty training, the dog goes

24   to the bathroom in the shower because I'm afraid to go outside

25   when I know that person is outside.  And this is the life that

35
IBEQPRIc

1    I lead.  And I try to be happy and leave the neighborhood and

2    go do other things, but these -- the situation that has been

3    created, I wonder if you would entertain a motion for summary

4    judgment to get the NYPD to take me off this list at this early

5    stage.  I don't know else what else to do.

6             THE COURT:  You wouldn't want the summary judgment

7    until we have discovery though.  It's too early now.

8             MS. PRICE:  I beg your pardon.

9             THE COURT:  No, that's OK.

10            MS. PRICE:  I just wanted to let you know these things

11   are ongoing.  Like I said, the landlord even forged a bunch of

12   documents to DHCR, Departments of Housing and Community

13   Renewal, trying to navigate the housing court, which hates my

14   landlord, because he knows the police won't do anything to help

15   me.  So this man committed six acts of forgery literally.  And

16   the NYPD hasn't done anything against him.

17            This all goes back to what happened when Cy Vance and

18   his posse marked me as this P&G in their database, and so the

19   long-range effects of this I'm still paying for.

20            If I hadn't caught my landlord in these forgeries, he

21   would have been successful in getting DHCR to lower my rent

22   just a modicum.  I won't waste your time explaining all of

23   this, but I am in a very precarious situation because of this

24   continuing discriminatory McCarthy-esque practice that has been

25   employed by the NYPD.

36

IBEQPRIc

1        THE COURT:  I think I'm going to communicate that

2    information as well to any attorney that comes on to the scene.

3    But I did ask you to let me know, and I appreciate you letting

4    me know.

5        Ms. March, you're going to get a transcript of this

6    and arrange to send it to Ms. Price.

7        Await word from me.  I don't know how long it will

8    take, but await word from me, and I will bring the parties in

9    or call you on the phone when need be.

10        Ms. Price, are you phone-able?

11        MS. PRICE:  There are four or five days every month

12    when my phone is off between -- my bill is due on the 3rd, and

13    I get four days extension, but then I don't get my public

14    assistance until the 10th or 11th.  So between the 6th and the

15    11th every month my phone is off.

16        THE COURT:  Then I will make sure that we have the --

17    if we set something up, it will not be between the 6th and

18    11th.

19        MS. PRICE:  Your Honor, I want to apologize for being

20    late this morning.  I lost my subway card, and literally --

21        THE COURT:  OK.

22        MS. PRICE:  I usually hop the subway.  I admit, I do

23    break the law.  But there was a cop there this morning.  So I

24    went home and borrowed $3 from my neighbor.  That literally is

25    my excuse, that this is literally my life at this point.

IBEQPRIc

1          There was one other thing I wanted to indulge myself.

2    I just wanted to ask if I turn in my motion for pro bono

3    counsel today is that OK?  You said to wait.  Do I wait to turn

4    that in?

5          THE COURT:  I'm considering you to have made it

6    orally.  I won't need a written motion.

7          MS. PRICE:  I won't waste your time with it then, your

8    Honor.  Thank you for letting me know.

9          THE COURT:  It is -- I am granting it but that doesn't

10   guarantee you an attorney.  So we go through -- that's why I

11   want to make the phone calls to Ms. Tarnofsky and Ms. Malloy,

12   but I accept and can see what has happened in the last two

13   years, and I think it is appropriate that pro bono counsel be

14   appointed.

15         MS. PRICE:  Thank you, your Honor.  That might just be

16   the best news since your ruling about the Twitter account,

17   which, by the way, thank you so much for that.  It took me two

18   months to read that decision.  This is how my life is.  I'm so

19   scared that I can't -- and I wish I had read it earlier because

20   I had been arguing with the new person at NYLAG about those

21   specific Twitter claims.  And I really had it Tweeted directly

22   to the police commissioner and to the mayor and complained

23   about being blocked, but they said my complaint was too long

24   and I shouldn't include that evidence.

25         So there are all kinds of things here where I feel

IBEQPRIc

```
 1    like if I had a lawyer, maybe that -- even though that was a
 2    big win for me, and thank you, I feel like that action maybe
 3    would have survived had I been able to include that extra
 4    evidence.  So I really sabotaged myself by not being able to
 5    even read your orders because I have no time to write a motion
 6    for reconsideration because the two weeks had expired after
 7    your order.  These are the kind of things that I just scream at
 8    night about.
 9               THE COURT:  Right.  And I can't tell you what to do
10    because that is not my job, but I have no reason to believe
11    that Ms. March has any personal animus towards you, nor do I.
12    So, if you get things from us, I'm not trying to set you up to
13    fail.  I don't believe she is either.  So read what we send
14    you.
15               MS. PRICE:  I understand, your Honor.  It just takes
16    me -- because previous orders have sent me into such a tizzy --
17               THE COURT:  Yes.
18               MS. PRICE:  -- that I have to wait until -- it's a
19    weird chemistry.  I feel like I can, but it's not good all the
20    time.  My good intellectual energy doesn't exist in this space
21    all the time.  And other spaces, closing the Rose M. Singer
22    Center, ending the rape crisis on Rikers, no problem.  I can
23    turn it on, but this particular set of facts I really
24    appreciate your help, and I feel like I need to shut up.
25               THE COURT:  I'm not going to tell you that, but I
```

IBEQPRIc

```
1   think I have heard what I needed to hear today, and I hope
2   you've said what you needed to say.
3             Ms. March, I don't think there is anything else you
4   would like to add.  Am I correct?
5             MS. MARCH:  I just would like to add that there has
6   been no intentional attempt to sabotage or any bad faith.
7             THE COURT:  I understand.  And that has not been my
8   experience with the law department.
9             MS. MARCH:  Yes.
10            THE COURT:  They are afraid of me, and that's fine.
11  So that's where I think this is all coming from.  They don't
12  want to violate my deadlines, which is totally right, but I
13  have the ability to reset them in special cases, and I will
14  here.
15            I thank you both for coming in today.  I am going to
16  have the next conference set up.  I thank you very much.
17            (Adjourned)
18
19
20
21
22
23
24
25
```