UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KELLY PRICE,

                    Plaintiff,

          -against


| | | |
|---|---|---|
| THE CITY OF NEW YORK, ROSE | : | 15-CV-5871 |
| PIERRE- LOUIS, in her individual and | : | |
| official capacity, SELVENA BROOKS, in | : | |
| her individual and official capacity, | : | |
| INSPECTOR OLUFUNMILO F. OBE, in | : | **FIFTH AMENDED** |
| | : | **COMPLAINT** |
| her individual and official capacity, | : | |
| DETECTIVE LINDA SIMMONS, in her | : | |
| individual and official capacity, OFFICER | : | Jury Trial Demanded |
| JOHN STAINES, in his individual and | : | |
| official capacity, OFFICER ISELAINE | : | |
| GUICHARDO HERMENE GILDO CRUZ, | : | |
| in her individual and official capacity, LT. | : | |
| NICHOLAS CORRADO, in his individual | : | |
| and official capacity; LIEUTENANT | : | |
| RAYMOND DEJESUS, in his individual | : | |
| and official capacity; OFFICER EMMET, in | : | |
| his individual and official capacity; | : | |
| SERGEANT SHEVTIZ, in his individual | : | |
| and official capacity; MTA OFFICER | : | |
| STEPHEN MEARS, in his individual and | : | |
| official capacity; MTA OFFICER ALISON | : | |
| SCHMITT, in her individual and official | : | |
| capacity | : | |
| Defendants | x | |

---------------------------------------------------------------

1

## TYPE OF CASE

1.   Plaintiff brings claims under 42 U.S.C. s. 1983 for violation of her constitutional rights by Defendants.

## PARTIES

### Plaintiff

2.   The Plaintiff, Ms. Kelly Price, is a resident of New York, and a citizen of the United States of America.

### Defendants

#### *City of New York*

3.   Defendant City of New York ("the City") was and is a municipal corporation duly organized and existing under the laws of the State of New York.

4.   The City maintains the New York Police Department ("NYPD"). The NYPD provides police services for the City.

5.   The City maintains the Mayor's Office to Combat Domestic Violence. The office provides advocate services and programs for survivors of Domestic Violence.

#### *City of New York Employees*

6.   Selvena Brooks ("Ms. Brooks") was at all relevant times an employee of the City. On the date of the incident, in or around December 2014, she worked for the Mayor's Office to Combat Domestic Violence. Ms. Brooks is sued in her individual and official capacity.

7.   Rose Pierre-Louis ("Ms. Pierre-Louis") was at all relevant times an employee of the City. On the dates of the incidents, in or around October 2014, she worked as the Commissioner of the Mayor's Office to Combat Domestic Violence. Ms. Pierre-Louis is sued in her individual and official capacity.

#### *NYPD Officers*

8.   NYPD Inspector Olufunmilo F. Obe ("Inspector Obe") was at all relevant times an employee of the NYPD. On the dates of the incident, in or around October 2014, she was assigned to the 28th Precinct in New York County ("28th Precinct"). Inspector Obe is sued in her individual and official capacity.

9.   NYPD Detective Linda Simmons ("Det. Simmons") was at all relevant times an employee of the NYPD. On the date of the incident, October 14, 2010, she was

assigned to the 28th Precinct. Det. Simmons is sued in her individual and official capacity.

10.     NYPD Officer John Staines ("Officer Staines") was at all relevant times an employee of the NYPD. On the date of the incident, July 2, 2015, he was assigned to the Midtown North Precinct in New York County ("MTN Precinct"). Officer Staines is sued in his individual and official capacity.

11.     NYPD Officer Iselaine Guichardo Hermene Gildo Cruz ("Officer Cruz") was at all relevant times an employee of the NYPD. On the date of the incident, July 2, 2015, she was assigned to the MTN Precinct. Officer Cruz is sued in her individual and official capacity.

12.     NYPD Lieutenant Nicholas Corrado ("Lt. Corrado") was at all relevant times an employee of the NYPD. On the dates of the incident, July 2, 2015, he was assigned to the MTN Precinct. Lt. Corrado is sued in his individual and official capacity.

*MTA Officers*

13.     MTA Police Officer Stephen Mears was at all relevant times an employee of the MTA. On the date of the incident in November 2016, he was working at Penn Station. MTA Officer Stephen Mears is sued in his individual capacity.

14.     MTA Police Officer Alison Schmitt was at all relevant times an employee of the MTA. On the date of the incident in November 2016, she was working at Penn Station. MTA Officer Alison Schmitt is sued in her individual capacity.

**Color of Law**

15.     At all times relevant herein, Ms. Brooks, Ms. Pierre-Louis, Inspector Obe, Det. Simmons, Officer Staines, Officer Cruz, Lt. Corrado, MTA Officer Stephen Mears and MTA Officer Alison Schmitt (together, the "individual defendants") were acting under color of state law.

**FACTS**

**Ms. Price's Career**

16.     From 1998 to 2008, Ms. Price worked in the area of media and technology for various employers, including Corbis Images, JP Morgan and various International Photo-Journalism agencies including being a founding member of Polaris Images in September of 2002.

17.     At the time that Ms. Price left Polaris Images in 2008, she was earning on average $175,000 a year.

3

18.  In 2008, Ms. Price co-founded an international photojournalism agency specializing in representing war correspondents.

**Ms. Price's Relationship With Raheem Powell**

19.  From about September 2008 to December 2013, Ms. Price was in a "relationship" with Raheem Andre Powell ("Mr. Powell").

20.  During the course of their relationship, Mr. Powell abused Ms. Price physically, mentally, and economically.

21.  At various times from about March 2010 to December 2013, Mr. Powell forced Ms. Price to engage in sexual acts with third parties and to provide to him monies accrued from performing such services, against Ms. Price's will.

22.  In about November 2010, the Family Court issued an Order of Protection in favor of Ms. Price against Mr. Powell.

23.  In or about November 2010, Ms. Price took the Family-Court-issued Order of Protection to the 28th precinct in Harlem near her home to serve on Mr. Powell and she was refused by various members of the 28th precinct. when she requested it be served on Mr. Powell.

24.  On information and belief, at some point prior to October 28, 2011, the 28th precinct of the NYPD was directed by the Manhattan District Attorney's office to not give police services or take reports from Ms. Price without the approval of the MDAO. As a result, Ms. Price was placed on a "Do Not Serve/Arrest Alert List".

25.  On information and belief, at some point prior to July 28, 2013, Ms. Price was labeled a fabricator by the NYPD, and there as someone whose reports to the police were not to be given credence.

**Det. Simmons Maliciously Prosecutes Ms. Price**

26.  On or about October 11, 2010, Mr. Powell attacked Ms. Price on the street. Mr. Powell beat Ms. Price about the face, neck, and back with his hands and his mobile phone.

27.  On or about October 13, 2010, Ms. Price went to the 28th Precinct to ask for help to prevent her abuse by Mr. Powell.

28.  At the 28th Precinct, Ms. Price spoke to Officer Diaz. Ms. Price told Officer Diaz about the assault that occurred on or about October 11, 2010, and gave Officer Diaz the names and contact details of two witnesses to the attack. Officer Diaz organized for photos to be taken of Ms. Price's injuries, including bruising to her face, back, and lower torso. She also told Officer Diaz that Mr. Powell was forcing her to engage in sexual acts for money against her will as a result of Mr. Powell's violence.

29.     After speaking with Officer Diaz, Ms. Price was not sure that she wanted to make a formal report. Officer Diaz told Ms. Price that he would not file a report until the next day, so that Ms. Price could "sleep on it".

30.     After Ms. Price left the 28th Precinct, she decided that she did not want to make a report. Ms. Price did not want to make a report because she was frightened of retaliation by Mr. Powell and was worried about her professional career being ruined because of threats of blackmail Mr. Powell had sent to her via text message warning her he would reveal sensitive personal information about her to her family and professional circle if she reported him to the NYPD.

31.     On or about October 14, 2010, the day after she had spoken with Officer Diaz, Ms. Price returned to the 28th Precinct.

32.     At the 28th Precinct, Ms. Price told Officer McNair that she did not want to make a report. Officer McNair told Ms. Price that the report had already been filed, and suggested that Ms. Price speak with the detective been assigned to her case.

33.     Det. Simmons had been assigned to Ms. Price's case.

34.     On the same day, Ms. Price spoke with Det. Simmons. Ms. Price told Det. Simmons that she did not want to make the report, and she did not want Mr. Powell to be arrested.

35.     Ms. Price told Det. Simmons that she was in an abusive relationship, and that she was being forced to perform sexual acts for money under the threat of violence and retaliation. Ms. Price told Det. Simmons that Mr. Powell kept all of the money from these activities and that he was violent towards her in order to enforce her compliance and that he had made threats of blackmail towards her if she went to the NYPD to report her abuse.

36.     Det. Simmons told Ms. Price that the only way to prevent Mr. Powell's arrest was to retract the report, and that Ms. Price would need to file a statement stating that she had caused her own injuries.

37.     Det. Simmons told Ms. Price that, provided Ms. Price had no prior arrests, she would only be given a desk appearance ticket for making a false police report and would not go to jail.

38.     Ms. Price agreed to retract her report, and she told Det. Simmons that she had never been arrested.

39.     Det. Simmons put Ms. Price in a holding cell in the squad room while Det. Simmons searched the system to confirm Ms. Price had no prior arrests.

40.     After Det. Simmons did a criminal background check, she released Ms. Price from the holding cell so that Ms. Price could write the retraction.

41.    At Det. Simmons' direction, Ms. Price prepared a statement stating that she had caused the injuries to her face herself.

42.    When Ms. Price finished the statement the first time, Det. Simmons asked her to rewrite it with a later time on it in order for Det. Simmons to get overtime.

43.    After Ms. Price finished a second statement, Det. Simmons placed Ms. Price under arrest and put handcuffs on her.

44.    Det. Simmons then detained Ms. Price in a holding cell again. This detention lasted for approximately an hour.

45.    After Ms. Price had been detained for approximately an hour, Det. Simmons released Ms. Price and gave her a desk appearance ticket.

46.    Det. Simmons lacked any cause for commencing the proceeding against Ms. Price.

47.    Det. Simmons lacked any cause to believe that the proceeding against Ms. Price would succeed.

48.    Det. Simmons acted with malice in commencing a proceeding against Ms. Price, without any cause and without any belief that the proceeding would succeed.

49.    In about November 2010, Ms. Price attended a court date as required by the desk appearance ticket. She was told the charge would be adjudicated in six months if she did not get re-arrested.

50.    On or about January 28, 2011 Ms. Price attempts to make formal police reports about all of the abuse unhanded to her by Powell.

51.    On or about February 1, 2011 Ms. Price is called to the Manhattan District Attorney's office by ADA Maria Strohbehn who informed Ms. Price that she was declining to charge Mr. Powell, and had put Ms. Price on a do-no-serve services list, and had informed NYPD that any involvement by the police with Ms. Price required ADA Strohbehn's prior approval.

52.    On or about February 2011 ADA Maria Strohbehn has a conversation with Ms. Price's landlord, Adam Gargani looking for information about Ms. Price's alleged fabrications. Mr. Gargani stated that he wasn't aware of any fabrications, and offered evidence that supported Ms. Price's claims. Ms. Strohbehn hangs up the phone on Mr. Gargani. (See a written statement from Adam Gargani, attached as **Exhibit A**).

53.    On or about February 2011, Ms. Price is arrested by Detective Linda Simmons inside the Family Courthouse in Manhattan as she appeared to have her restraining order renewed by Hon. Judge Sattler and charged with 324 counts of

NYS CPL 240.30(11) for allegedly harassing her abuser, Raheem Powell, electronically via text and telephone calls.

54.     On or about May 8, 2011 Ms. Price is arrested for Felony Contempt of Court and placed on Rikers Island.

55.     The desk appearance ticket was always mentioned along with certain other charges improperly brought against Ms. Price arising out of unlawful arrests in February through May 2012. Note of the desk appearance ticket appeared in her case file at each court appearance she made in connection therewith.

56.     On several occasions the Manhattan District Attorney's office made offers to Ms. Price's Legal Representatives on or about February of 2012 offering to dismiss the desk appearance ticket and the other counts if Ms. Price would plead guilty to two counts of disorderly conduct. Miss Price refused the offers.

57.     On or about July 25, 2012 Ms. Price arrived in the I-DV Part of NY Supreme Court at 100 Centre St and was told by Hon. Judge Tandra Dawson's clerk that all charges had been dismissed and sealed against her and that she was free to go. Miss Price inquired as to why she was not to make an appearance and have the charges formally dismissed in court in front of the judge and to receive proof but Miss Price was rebuffed and told to leave the courtroom.

58.     On or about July 27, 2012 Miss Price received certificates of dismissal for charges stemming from her February through May 2012 arrests from the Clerk's office at 100 Centre St. on the 7th floor. She was told that the COD for the desk appearance ticket could be obtained downstairs on the first floor but that office was closed when Ms. Price visited it that same day.

59.     On our about August 24, 2016 Ms. Price visited that clerk's window on the first floor of 100 Centre St. and inquired about a certificate of dismissal for the desk appearance ticket. Ms. Price was informed the desk appearance ticket had never been adjudicated and still remained open after almost six years.

60.     Ms. Price inquired with the MDAO as to why the charge had never been adjudicated and was met with silence. She was told she could pick up her COD in approximately two weeks.

61.     On September 9, 2016, the proceedings commenced by Det. Simmons terminated in Ms. Price's favor with a certificate of dismissal issued by the MDAO.

**Lt. Corrado, Officer Cruz and Officer Staines Falsely Arrest Ms. Price**

62.     On July 2, 2015, Ms. Price was assaulted by a stranger at the Ivy, a bar and restaurant located at Eighth Avenue and West 56th Street, New York.

63.     On the same day, Ms. Price went to the MTN (NYPD Midtown North) Precinct to file a complaint about her assault.

7

64.     At the MTN Precinct, Ms. Price spoke to a red-headed man behind the desk. On information provided by the Defendants pursuant to a Valentin order, that man was Lt. Corrado.

65.     Lt. Corrado refused to take Ms. Price's report about the assault.

66.     Ms. Price requested to speak to the Commanding Officer of the MTN Precinct, and then sat on a chair in the waiting area.

67.     Lt. Corrado told Ms. Price to leave or she would be arrested.

68.     Ms. Price refused to leave and said that the precinct had to take her "61" (the code for an assault).

69.     A young female police officer was ordered to be present in the waiting area. On information provided by the Defendants pursuant to a Valentin order, that female officer was Officer Cruz.

70.     Lt. Corrado indicated to Officer Cruz that she should go over to Ms. Price.

71.     Ms. Price asked Lt. Corrado on what basis she would be arrested, and Lt. Corrado answered "we're not arresting you, we're taking you to Bellevue".

72.     Officer Cruz physically pulled Ms. Price out of her seat and put handcuffs on Ms. Price.

73.     Officer Cruz detained Ms. Price in the waiting room until an ambulance arrived to take Ms. Price to Bellevue.

74.     When the ambulance arrived, Officer Cruz put Ms. Price in the ambulance. Officer Cruz also rode in the ambulance.

75.     Officer Cruz continued to detain Ms. Price for the duration of the journey to Bellevue.

76.     At Bellevue Hospital, a male officer was present. On information provided by the Defendants, that male officer was Officer Staines.

77.     At Bellevue Hospital, Officer Staines and Officer Cruz continued to detain Ms. Price for about 1 hour.

78.     Officer Staines went through Ms. Price's bag and her personal effects, including her medication and contact cards. While going through Ms. Price's bag, Officer Staines made a circular motion next to his ear using his finger, to indicate that Ms. Price was crazy.

79.     At the direction of Bellevue Hospital Staff, Officers Staines and Cruz removed the handcuffs from Ms. Price and left the hospital.

80.     Bellevue Hospital kept Ms. Price for two hours for observation, reviewed her medical records, which were already at the hospital, and then released her.

81.     Lt. Corrado, Officer Cruz and Officer Staines, had no basis to believe that Ms. Price was likely to cause harm to herself or others.

82.     Lt. Corrado, Officer Cruz and Officer Staines detained and hospitalized Ms. Price against her will.

83.     There was no immediate need for mental health treatment for Ms. Price while she was at Bellevue.

**City And Its Employees Block Ms. Price From Public Twitter Accounts**

*Twitter*

84.     Twitter is a social media website. People or organizations who have an account with Twitter ("users") can share short public posts ("tweets").

85.     Each user has a private news timeline that shows, among other things, tweets collated from other Twitter accounts that the user follows.

86.     Each Twitter user has a public profile page. A profile page includes, amongst other things:

        a.      a profile photo and a background photo, chosen by the user;

        b.      a short description, written by the user;

        c.      a list of statistics, automatically generated by Twitter, showing (among other things) the number of accounts that the user follows and the number of accounts that follow the user;

        d.      a "feed", automatically generated by Twitter, showing in reverse chronological order all posts ("tweets") by that user, with links below each tweet showing the number of replies to that tweet, the number of times that tweet has been shared ("retweeted") by other users, and the number of other users who liked that tweet.

87.     Without logging in to Twitter, it is possible to view a profile page for an account but it is not possible to reply to that account's tweets, or view anyone else's other replies to that account's tweets.

88.     When a user is blocked by another Twitter account, that user:

        a.      is unable to reply to the blocked account's tweets;

9

b.      is unable to view any replies (by other users) to the blocked account's tweets;

c.      is unable to share (retweet) any tweet by the blocked account; and

d.      will not see the blocked account's tweets in the user's news timeline.

89.    There is no ability of an account owner to delete another user's tweet to his account without blocking the other user.

90.    Ms. Price maintains an account on the website Twitter. The account is called "K Grace Price" and has the handle "@GracieeGorgeous".

### *The City's Use Of Twitter*

91.    The City maintains a number of accounts on Twitter.

92.    The City maintains a Social Media Customer Use Policy, published on the internet at http://wwwv.nyc.gov/html/misc/html/social_medikpolicy.html ("City Social Media Policy"). This Social Media Customer Use Policy has been updated at least twice since 2014.

93.    The City Social Media Policy states that: "Communicating with the City through social media ... enables customers to contact the City in a direct and meaningful way".

94.    The City Social Media Policy provides that a comment may be deleted if it violates the comment policy.

### *Inspector Obe Blocks Ms. Price From The Twitter Account Of The 28th Precinct*

95.    At all relevant times, Inspector Obe maintained a Twitter account for the 28th Precinct. The account is called "NYPD 28th Precinct" and has the Twitter handle "@NYPD28Pct" ("NYPD28Pct Account").

96.    The profile page for NYPD28Pct Account states that it is "The official Twitter of the 28th Precinct" and provides a link to the City Social Media Policy.

97.    The profile page does not otherwise limit the purpose or topic of the NYPD28Pct Account.

98.    NYPD28Pct was a public forum.

99.    In fact, a report from the Berkman Klein Center for Internet & Society at Harvard University states, "the first priority and initial impetus for using Twitter was to increase interaction with the communities in which police officers work every day. (See page 18 of the quoted report, attached as **Exhibit B).**

100.   In the alternative, NYPD28Pct was a limited public forum.

101.   In about October 2014, Ms. Price followed the NYPD28Pct Account.

102.   From time to time, Ms. Price publically replied to tweets from the NYPD28Pct Account. For instance:

    a.   On October 14, 2014, Ms. Price posted a reply to NYPD28Pct stating:

        @NYPD28Pct @sffny ATTN Insp OBE: link 4 #DomesticViolence prevention leads to a JEWELRY MALL. Your selection is nice ow.ly/CdI1G

    b.   On October 14, 2014, Ms. Price posted a reply to NYPD28Pct stating:

        @NYPD28Pct @sffny nice selection INSP OBE! Any extra time to respond to the letter I sent 2 your precinct about #DV?

103.   On or about October 14, 2014, Inspector Obe blocked Ms. Price from the NYPD28Pct Account without notifying Ms. Price or providing reasons for blocking her.

104.   At the date of this complaint, Ms. Price remains blocked from the NYPD28Pct Account.

105.   As a consequence of Inspector Obe blocking Ms. Price, Ms. Price:

    a.   was and is unable to reply to any tweets by the NYPD28Pct Account;

    b.   was and is unable to view any replies (by other users) to tweets by the NYPD28Pct Account;

    c.   was and is unable to post any information for all followers of the @NYPD28 pct to have broadcast into their Twitter Feeds by beginning her tweet(s) with the @NYPD28pct handle.

    d.   was and is unable to share (retweet) any tweet by the NYPD28Pct Account; and

    e.   was and is unable to see the tweets by the NYPD28Pct Account in her news timeline.

106.   Inspector Obe blocked Ms. Price to retaliate against Ms. Price for her criticism of the domestic violence assistance rate within the 28th Precinct.

107.   Further, or in the alternative, Inspector Obe blocked Ms. Price to prevent her from publically criticizing the 28th Precinct.

108.    Further, or in the alternative, Inspector Obe blocked Ms. Price to prevent users who followed NYPD28Pct from being able to view Ms. Price's comments.

109.    Further, or in the alternative, Inspector Obe blocked Ms. Price to retaliate against Ms. Price for her criticism of Inspector Obe's linking to an "Earrings Plaza" online shopping cart containing jewelry items selected to-be-purchased instead of a November 2014 schedule of events for NYC Domestic Violence Awareness Month in a posting she made from the @NYPD28pct Twitter account.

### Ms. Brooks Blocks Ms. Price From The Twitter Account Of the New York City Office To Combat Domestic Violence

110.    At all relevant times, Ms. Brooks maintained a Twitter account for the New York City's Mayor's Office to Combat Domestic Violence. The account is called "Office to Combat DV" and has the Twitter Handle "@NYCagainstabuse" ("NYCagainstabuse Account").

111.    In about October 2014, Ms. Price followed the NYCagainstabuse Account.

112.    NYCagainstabuse was a public forum.

113.    In the alternative, NYCagainstabuse was a limited public forum.

114.    From time to time, Ms. Price publically replied to tweets from the NYCagainstabuse Account. For instance:

   a.    On October 10, 2014, Ms. Price posted a reply to the NYCagainstabuse Account stating:

        @NYCAGAINSTABUSE @NYPD28Pct victims be wary of the 2-8: their "Help" put me #Rikers & my abuser walked chn.ge/11fKJZd #JAILSACTION

   b.    On November 3, 2014, Ms. Price posted a reply to the NYCagainstabuse Account stating:

        @NYCagainstabuse Many more women could have benefitted from services at a FJC but were barred because they were falsely labeled "fabricators."

   c.    On December 1, 2014, Ms. Price posted a reply to the NYCagainstabuse Account stating:

        @NYCagainstabuse where do we go when wrongly dubbed as "fabricators" by #MYNYPD & @manhattanda & denied entrance to Family Justice Centers?

12

115. On December 1, 2014, Ms. Brooks sent a direct message to Ms. Price from the NYCagainstabuse Account, asking Ms. Price for her phone number.

116. On the same day, Ms. Price replied to Ms. Brooks with information about Ms. Price's contact details.

117. On or about December 1, 2014, Ms. Brooks blocked Ms. Price from NYCagainstabuse without notifying her or providing her with any reasons for blocking her.

118. At the date of this complaint, Ms. Price remains blocked from the NYCagainstabuse Account.

119. As a consequence of Selvena Brooks blocking Ms. Price, Ms. Price:

    a.    was and is unable to reply to any tweets by the NYCagainstabuse Account;

    b.    was and is unable to view any replies (by other users) to tweets by the NYCagainstabuse Account;

    c.    was and is unable to post any information for all followers of the @NYCagainstabuse account to have broadcast into their Twitter Feeds by beginning her tweet(s) with the @NYCagainstabuse handle.

    d.    was and is unable to share (retweet) any tweet by the NYCagainstabuse Account; and

    e.    was and is unable to see the tweets by the NYCagainstabuse Account in her news timeline.

120. Ms. Brooks blocked Ms. Price to retaliate against Ms. Price for her criticism of the domestic violence assistance rate by the City.

121. Further, or in the alternative, Ms. Brooks blocked Ms. Price as per the instruction of her supervisor, Rose Pierre-Louis, Commissioner of the Mayor's Office to Combat Domestic Violence at the time.

122. Further, or in the alternative, Ms. Brooks blocked Ms. Price to prevent her from publically criticizing the City for its response on domestic violence and/or to cover-up Ms. Price's unconstitutional handling as a victim of domestic violence by the City and its agents and agencies

123. Further, or in the alternative, Selvena Brooks blocked Ms. Price to prevent users who followed NYCagainstabuse from being able to view Ms. Price's comments.

124. On information and belief, Ms. Pierre-Louis was the supervisor of Ms. Brooks.

*Pierre-Louis Blocks Ms. Price From Public Twitter Account*

125. At all relevant times, Ms. Pierre-Louis was the commissioner of the Mayor's Office to Combat Domestic Violence.

126. Ms. Pierre-Louis maintains a Twitter account called "Rose Pierre-Louis" with the handle @RPLNYC.

127. Ms. Pierre-Louis used the account to disseminate official information during the time that she was Commissioner and had responsibility for combating domestic violence.

128. Ms. Pierre-Louis identified herself as the NYC Commissioner of the Mayor's Office to Combat Domestic Violence at the top of her page.

129. Ms. Pierre-Louis gained followers and credibility by naming her official title on her @RPLNYC twitter account and disseminating official information and offering her editorial opinion of that information in her capacity as Commissioner for the NYC Mayor's Office to Combat Domestic Violence.

130. NYC's own media training materials and instructions for its employees, agents, and agencies with social media accounts are explicit that once you disseminate official information from a private Twitter account and/or name your official city title on a social media account that that account is then considered "Donated" to the City of New York and no longer the property of the private citizen who works/has worked for the Government. (See attached excerpts from NYC Digital Strategy Social Media Tips, Guidelines & Best Practices as **Exhibit C**).

131. As a result this account was a public forum.

132. In the alternative, this account was a limited public forum.

133. In or about October 2014, Ms. Pierre-Louis blocked Ms. Price from viewing and posting replies to the @RPLNYC Twitter account.

134. Ms. Pierre-Louis did not notify Ms. Price or provide any reasons why she had been blocked.

135. As of the date of this complaint Ms. Price remains blocked from the @RPLNYC account.

136. Ms. Pierre-Louis blocked Ms. Price to retaliate against Ms. Price for her criticism of the domestic violence community's response to her secondary victimization by the criminal justice system.

137. Further, or in the alternative Ms. Pierre-Louis blocked Ms. Price to mitigate fears that other victims may harbor when facing turning to authorities for help if they learned of Ms. Price's fate when she attempted to do so.

14

*City's Practice and Custom of Blocking Unfavorable Comments on Social Media*

138.    While NYC's own media training materials and instructions for its employees, agents, and agencies with social media accounts are explicit that people are not to be blocked on Social Media based on viewpoint (.), the City has a practice and custom of blocking unfavorable comments on social media.

139.    The fact that municipal employees blocked Ms. Price on more than one occasion because she was critical of the City demonstrates that these employees likely acted in accordance with an unwritten practice or custom of blocking users who criticizeued the police and the City.

140.    The City's failure to train employees on the proper use of social media carries a high risk that deleting comments or blocking users will cause violations of those users' First Amendment rights. Further, and in the alternative, the City's role in formulating and overseeing the City's Social Media Policy places them in the position of ratifying the conduct of the municipal employees.

### City Fails To Remedy After Ms. Price Complains

141.    On or about October 14, 2014, Ms. Price lodged a complaint with the City, via the 311 hotline, about the 28th Precinct blocking Ms. Price from the NYPD28Pct Account.

142.    In or about December 2014 or January 2015, Ms. Price used a secondary twitter account she had to complain about being blocked from the @RPLNYC Twitter account.

143.    In or around December 2014, Ms. Price emailed the Mayor's office to combat domestic violence to complain about being blocked from @NYCagainstabuse.

144.    In or about February of 2015 Ms. Price made a 311 complaint about the Mayor's office to combat domestic violence blocking her on Twitter.

145.    In or about February of 2015 Ms. Price met Rose Pierre-Louis at a Women's History Event at the Bryant Park Hotel sponsored by the Federation of Protestant Welfare Agencies and asked her to stop blocking Ms. Price.

146.    In or around February of 2016 Ms. Price complained orally to the new Commissioner of Domestic Violence who has replaced Rose Pierre Louis about being blocked on Twitter.

147.    In or around May of 2017 Ms. Price discussed being potentially unblocked by the 28th pct with the new Commanding Officer who has replaced Inspector Obe.

148.    In or around May of 2017 Ms Price complained orally to NYPD Commissioner James O'Neill about being blocked on Twitter.

149.   None of the Defendants or other City employees responded to Ms. Price's complaints, or took any steps to remedy the wrongful blocking of her from the Twitter Accounts.

### *November 2016 Incident Involving MTA Police*

150.   On November 17, 2016, Ms. Price was being harassed by several individuals on the platform of the uptown 1 train at Penn Station.

151.   Two MTA officers, one male (MTA Officer Stephen Mears) and one female (MTA Officer Alison Schmitt), came up to the group and caused the group to disperse.

152.   As Ms. Price was walking away, MTA Officer Stephen Mears attacked her from behind without provocation. His attack caused bruising on her arms and legs and knocked out one of her front teeth, which was an implant.

153.   Ms. Price asked why she was being arrested and MTA Officer Stephen Mears said she was not being arrested but was going to be brought to Bellevue Hospital's psych ward.

154.   MTA Officer Stephen Mears handcuffed Ms. Price.

155.   Ms. Price informed MTA Officer Stephen Mears that as a 9/11 survivor that Bellevue has her psychiatric records because of the Zadroga Health Care Program for survivors and that she would be discharged in a matter of minutes after arriving at that facility.

156.   MTA Officer Alison Schmitt called paramedics, who conveyed her in a wheelchair to the MTA police station within Penn Station.

157.   Ms. Price was detained for approximately 30 minutes in the Penn Station MTA police station.

158.   When Ms. Price tried to speak, she had difficulty because of her missing tooth and MTA Officer Alison Schmitt mocked her for lisping.

159.   MTA Officer Alison Schmitt informed Ms. Price that they had decided to take her not to Bellevue but to St. Vincent's Hospital.

160.   MTA Officers Stephen Mears and Alison Schmitt reviewed the contents of Ms. Price's bag and called an ambulance.

161.   MTA Officer Stephen Mears dragged Ms. Price into the St. Vincent's Hospital emergency room from the ambulance parked in the back, injuring Ms. Price's knee and causing substantial bruising. He indicated to an emergency room nurse that Ms. Price should be sedated.

162.  Ms. Price protested that she did not wish to be sedated merely separated from MTA Officer Stephen Mears but the nurse sedated her despite her protests.

163.  As Ms. Price fought the sedative she observed MTA Officer Stephen Mears going through all the contents of her purse including confidential medical/psychological diagnosis letters marked "CONFIDENTIAL" and read the letters out loud to the audience of nurses and orderlies in the atrium open-air style emergency room at St. Vincent's. Officer Stephen Mears also mocked Ms. Price calling her a liar for claiming to be a 9/11 survivor until he found a letter in her notebook from the Zadroga 9/11 Health Care Program. Officer Stephen Mears went through all of Ms. Price's personal business cards and made notes of certain NYC officials she had the contacts for.

164.  Ms. Price woke up approximately 8 hours later and was released after she glued her tooth back in.

165.  MTA Officers Stephen Mears and Alison Schmitt had no basis to believe that Ms. Price was likely to cause harm to herself or others.

166.  MTA Officers Stephen Mears and Alison Schmitt detained and hospitalized Ms. Price against her will.

167.  There was no immediate need for mental health treatment for Ms. Price while she was at St. Vincent's.

168.  Upon leaving St. Vincent's Hospital, a nurse handed Ms. Price two tickets from MTA Officers Stephen Mears and Alison Schmitt, one for public intoxication and one for disorderly conduct.

169.  In March 2017, these two tickets were terminated in Ms. Price's favor by a Midtown Manhattan Court Judge in that they were dismissed as facially insufficient and ordered sealed by the judge.

*City And Its Employees Again Decline Service to Ms. Price -- January 24, 2017 Incident*

170.  On January 24, 2017, Ms. Price was assaulted on the downtown 1 train by an unknown individual.

171.  Immediately after the assault, a subway reported the incident and officers from the 34th Precinct and TB3 responded to the assault. Ms. Price attempted to make a report to officers from the 34th Precinct and TB3 who responded to the assault.

172.  To the best of Ms. Price's knowledge, Officer Emmet, Badge No: 5191, who responded to the assault, took Ms. Price's ID, and stepped away from Ms. Price.

173.  Upon returning Ms. Price's ID, the Officer Emmet said that she should call the TB the next day for an incident report number.

174.    The next day Ms. Price called TB3, and the unknown person who answered her call informed her that no report had been made yet but to call back the next day.

175.    Ms. Price called on January 26th and received the same response from the person who answered the phone.

176.    On January 27th, Ms. Price called TB3 again regarding the assault, and the person who picked up the phone put Ms. Price through to Lt. Raymond DeJesus of TB3.

177.    Ms. Price complained to Lt. DeJesus about the failure to process her report. Ms Price said she knew whe was on a do not serve list and had been blacklisted by the NYC police department.

178.    Lt. DeJesus at that point asked Ms. Price to send the video tape of the assault. DeJesus requested the video be sent to him to the email address: raymond.dejesus@nypd.org ,which Ms. Price did on January 27, 2017.

179.    A few days after speaking with Lt. DeJesus on January 27th, Ms. Price called TB3 again regarding her assault and was again put through by the person who answered the phone to Lt. DeJesus. During Ms. Price's phone call with Lt. DeJesus, and the Lieutenant promised a full investigation regarding the assault.

180.    About a week after her phone call with Lt. DeJesus, Ms. Price called TB3 again to check on the status of the investigation of her assault, and was put through by the person who answers the phone to Sergeant Shevitz. Sgt. Shevitz also promised a full investigation regarding the assault. Specifically, Sgt. Shevitz promised that a detective would be assigned to the case.

181.    To this date nothing has been done to follow-up on this incident.

182.    On information and belief, this denial of service to Ms. Price was pursuant to a policy, practice or custom of the City to deny service to individuals such as Ms. Price who are on a do not serve list or have been labeled a fabricator in the City's records. The source of that information and belief include:

  a.    Statements to Ms. Price by numerous police officers, including PO Walker (October 18, 2012), from the NYPD 28th Pct; Lt. LaRocca from the NYPD 28th Pct (on or about October 28, 2011); and PO Officer at the NYPD 28th PCT (in or about June 2013) that the precinct had been directed by the Manhattan District Attorney's office to not give police services or take reports from Ms. Price without the approval of the MDAO and that Ms. Price has been placed on a "Do Not Serve/Arrest Alert List".

  b.    Statements by various members of the NYPD heard by Ms. Price's neighbors on 120th St and her landlord that Ms. Price had been placed on a "do not serve" list by the NYPD (See a written statements from Ms. Price's neighbors, attached as **Exhibit D).**

     c.      A statement on or about July 28, 2013 by one of Ms. Price's acquaintances, who had been working on an NYPD technology project, that Ms. Price had been erroneously identified as "patient zero" for an NYPD algorithm that would allegedly identify "fabricators."

     d.      A December 18, 2015 affidavit from Lt. LaRocca (formerly of the 28th precinct of the NYPD) stating that in essence that Manhattan District Attorney's Office had issued a "NO Services" order regarding Ms. Price to the NYPD (see a written statement from Lt. LaRocca attached as **Exhibit E**)

## INJURIES

183.    As a result of the City and the NYPD Defendants' malicious prosecutions, false arrests and denials of service, Ms. Price has suffered the following injuries: she has been diagnosed with Borderline Personality Disorder and with Complex-Post Traumatic Stress Disorder, requiring her to seek expensive and bi-weekly treatment; emotional pain and suffering; anguish and anxiety about being labeled a pariah by the NYPD and denied protections in a city where her family has lived for four generations and in which Ms. Price survived the terrorist attacks of 9/11; inability of Ms. Price to continue working in her profession of journalism or to hold any job professionally.

184.    As a result of the MTA Officer Defendants' false arrest and malicious prosecution, Ms. Price suffered:

     a.      bruises to her arms, torso, and legs; significant loss of use of her right knee, and loss of an implanted front tooth; hearing loss in her right ear;

     b.      Borderline Personality Disorder and with Complex-Post Traumatic Stress Disorder, requiring her to seek expensive and bi-weekly treatment; emotional pain and suffering; anguish and anxiety about being labeled a pariah by the NYPD and denied protections in a city where her family has lived for four generations and in which Ms. Price survived the terrorist attacks of 9/11; inability of Ms. Price to continue working in her profession of journalism or to hold any job professionally; and

     c.      miscarriage of a child fathered by Mr. Powell;

185.    As a result of the acts of Defendants NYC, Inspector Obe, Ms. Pierre-Louis and Ms. Brooks, Ms. Price was stifled in her efforts to express her views about the City's policies, practices and customs with respect to treatment of domestic violence victims.

## CLAIMS

### Violation of 42 USC s. 1983 -- First Amendment — against Defendant NYC and against Defendants Obe, Pierre-Louis and Brooks (in their individual and official capacities)

186.     Blocking Ms. Price from various City-sponsored Twitter accounts as set forth above violated Ms. Price's rights under the First Amendment.

### Violation of 42 USC s. 1983 -- Fourth Amendment — against Defendant NYC and against Defendant Det. Simmons (in her individual and official capacities)

187.     The malicious prosecution of Ms. Price following her 2010 report to Detective Simmons as set forth above violated Ms. Price's rights under the Fourth Amendment.

### Violation of 42 USC s. 1983 -- Fourth Amendment — against Defendant NYC and against Defendants Corrado, Cruz and Staines (in their individual and official capacities)

188.     The false arrest of Ms. Price in July 2015 as set forth above violated Ms. Price's rights under the Fourth Amendment.

### Violation of 42 USC s. 1983 -- Fourth Amendment — against Defendant NYC and against MTA Defendants Stephen Mears and Alison Schmitt (in their individual capacities)

189.     The false arrest and malicious prosecution of Ms. Price in November 2016 as set forth above violated Ms. Prices' rights under the Fourth Amendment.

### Violation of 42 USC s. 1983 -- Fourteenth Amendment — against Defendant NYC and  Defendants Rose Pierre-Louis; Selvena Brooks; Inspector Olufunmilo F. Obe; Detective  Linda Simmons; Officers John Staines; Officer Iselaine Guichardo Hermene Gildo Cruz;  Lt. Nicholas Corrado; Lieutenant Raymond DeJesus; Officer Emmet; Sergeant Shevitz, MTA Officer Stephen Mears, MTA Officer Alison Schmitt (in their individual and official capacities)

190.     The denial of services to Ms. Price on January 24, 2017 and thereafter as set forth above violated Ms. Price's rights under the Fourteenth Amendment.

## RELIEF

The Plaintiff, Ms. Price, respectfully requests the following relief:

A.     A declaratory judgment from the Court that Defendants' conduct violated the First, Fourth and Fourteenth Amendments of the United States Constitution and federal civil rights statutes 42 U.S.C. §§ 1983;

B.      A permanent injunction restraining the Defendants from placing the Plaintiff on a do-not-serve list and/or a list that identifies her as a "fabricator" to be not taken seriously, or as someone with a LOW credibility algorithm rating by the NYPD or authorities;

C.      Award to the Plaintiff of compensatory damages in the amount of $30 million against all Defendants, jointly and severally, including compensation for the Plaintiff's emotional distress;

D.      Award to the Plaintiff of punitive damages in the amount of $10 million against all Defendants on the basis of their conscious wrongdoing;

E.      All other relief this Court finds appropriate and just.


November 15, 2019

CRAVATH, SWAINE & MOORE LLP


by

/s/ Kelsie Docherty
_____

Kelsie Docherty



Worldwide Plaza

825 Eighth Avenue

New York, NY 10019

(212) 474-1000

*kdocherty@cravath.com*



*Attorney for Plaintiff Kelly Price*

21