KB5TPRIC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   KELLY PRICE,

4                   Plaintiff,

5            v.                              15 CV 5871 (KPF)

6   CITY OF NEW YORK, et al.,

7                   Defendants.

8   ------------------------------x
                                    New York, N.Y.
9                                   November 5, 2020
                                    2:00 p.m.
10
    Before:
11
                    HON. KATHERINE P. FAILLA,
12
                                        District Judge
13

14                  APPEARANCES (Telephonic)

15  KELLY PRICE, PRO SE

16  NEW YORK CITY LAW DEPARTMENT
         Attorneys for Defendants
17  BY:  LAURA IHEANACHOR
         QIANA SMITH-WILLIAMS
18
    METROPOLITAN TRANSPORTATION AUTHORITY
19       Attorneys for Defendants
    BY:  JASON BARNES
20

21

22

23

24

25

KB5TPRIC

1          (Via telephone, case called)

2          MS. PRICE:  This is Kelly Price, plaintiff.

3          THE COURT:  Thank you, Ms. Price, this Judge Failla.

4          Representing the MTA this afternoon?

5          MR. BARNES:  This is Jason Barnes representing the MTA

6     defendants.

7          THE COURT:  Thank you, Mr. Barnes.

8          And representing the other defendants in the case?

9          MS. IHEANACHOR:  Yes, your Honor, this is Laura

10    Iheanachor for the police department.

11         MS. SMITH-WILLIAMS:  And Qiana Smith-Williams for the

12    City of New York.  Good afternoon, your Honor.

13         THE COURT:  Good afternoon, thank you.  Could you tell

14    me, please, of the two of you, is there one of you to whom I

15    should be directing my questions?

16         MS. IHEANACHOR:  Yes, your Honor, Laura Iheanachor.

17         THE COURT:  And may I ask again the pronunciation of

18    your last name?

19         MS. IHEANACHOR:  Iheanachor.

20         THE COURT:  Thank you much for your assistance today.

21    And Ms. Iheanachor, could I ask you, please, at the end of this

22    proceeding to arrange to obtain a transcript of this

23    conference, and when you receive it, to please transmit a copy

24    of it to plaintiff.

25         MS. IHEANACHOR:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.

KB5TPRIC

1            THE COURT:  Thank you for doing that.

2            This is a conference that I think long ago had been

3    designed to discuss the possibility of a settlement in this

4    case, but more recent communications from the parties have

5    indicated that, at least from the perspective of the City

6    defendants, there is no longer an appetite for settlement

7    discussions, although I would be happy to be proven wrong in

8    that regard.  So I wanted to understand the parties' views

9    going forward.

10            Ms. Price, to the best of your understanding, has

11    discovery concluded in the case?

12            MS. PRICE:  No, your Honor, not even.

13            THE COURT:  Not even.  I see.  And where do you

14    believe we are with respect to discovery?

15            MS. PRICE:  Your Honor, for a long time there has been

16    a constant, urgent plea I have issued to the Court in all of my

17    moving papers and oral arguments.  I have asked you to

18    recognize, at the very least, that the Manhattan District

19    Attorney's Office is sort of lax when it comes to producing

20    honest responses to this Court's orders.  And this issue has

21    only expanded in discovery when it comes to the Manhattan DA

22    and the delaying of exculpatory evidence production, destroying

23    evidence, and forging evidence in response to the subpoena for

24    discovery materials that we served.

25            Now there have been some judges recently in the

KB5TPRIC

1    Southern District that are starting to call out federal

2    prosecutors in a string of recent high-profile orders.  While

3    the Manhattan DA and the federal prosecutors office are

4    entirely two different entities, I don't see any clear path to

5    holding the people who work at One Hogan Place to a lower

6    standard than the attorneys at St. Andrew's Place when it comes

7    to how they conduct business in front of you and in front of

8    this Court.

9         I ask you to consider the paltry evidence I have been

10   able to squeeze out of the District Attorney's Office obtained

11   this year in discovery in response to the subpoena sent,

12   endorsed by your Court, which is in no way sates the demands of

13   the discovery subpoena.  And the way it was returned to me

14   against the landscape of comments about prosecutorial duty to

15   unhand exculpatory evidence and to be truthful in all dealings

16   with the Court by judges such as Honorable Judge Hellerstein in

17   the case against *Victor Mones Coro*, and most presciently and

18   recently Honorable Judge Nathan's landmark order and decision

19   in *US v. Najad*, 18 CR 224, Document 379, dated September 16 of

20   this year, in which she begins citing *Brady* and *US v.*

21   *Universitas* while she addresses the federal prosecutors.

22        Honorable Judge Nathan said:  Prosecutors have

23   constitutional and statutory duties to disclose many types of

24   evidence to defendants.  The principle of disclosure is central

25   to our criminal justice system.  A prosecutor that withholds

KB5TPRIC

1    evidence on demand of an accused which, if made available,

2    would tend to exculpate him or reduce the penalty –– reduce the

3    penalty –– helps shape a trial that bears heavily on the

4    defendant.  My emphasis.  That casts the prosecutor in the role

5    of an architect of a proceeding that does not comport with the

6    standards of justice.  *Brady v. Maryland*.  And federal

7    prosecutors, like all parties that appear before the Court,

8    have ethical duties of candor.  *United States v. Universitas*.

9    And prosecutors have a special duty not to mislead, and the

10   government should, of course, never make affirmative statements

11   contrary to what it knows to be the truth.

12          As with the prosecutors in *US v. Najad*, and in this

13   case, the Manhattan DA's office and the City Law Department

14   have repeatedly violated their disclosure discovery obligations

15   and, at best, toed the line with respect to their duty of

16   candor.

17          THE COURT:  Ms. Price, I'm going to ask you to pause

18   for a moment.  I'm not sure if you're aware of this, but

19   because we're doing this by phone, it more difficult for me and

20   for the court reporter to follow you.  I'm just going to ask

21   you to speak a little slower.  I certainly want to hear what

22   you have to say, but I also want to make sure all of it is

23   taken down.  So thank you, and I will let you continue right

24   now.  Thank you.

25          MS. PRICE:  I'm so sorry, your Honor.  I've actually

KB5TPRIC

1    written everything down and I'm happy to send you my script.  I

2    just didn't want to burden the Court during this with having to

3    follow along verbatim, but I will try and be very slow.

4            The Manhattan District Attorney's Office topped the

5    actions of the lawyers in the case that Honorable Judge Nathan

6    presided over in *Najad*.  The District Attorney's Office's

7    intentional misrepresentations to this Court have done me and

8    your Honor great harm.  These actions have hamstrung valid

9    actions and delayed proceedings while the City Law Department

10   sat back and allowed them to file mistruth after mistruth.

11           Over the course of years in these proceedings, at

12   least once in late winter of 2017, the Court, your Honor, has

13   reached out to the DA's Office to answer under affidavit my

14   actions, and that office has responded to the Court with, in my

15   opinion, less than candid responses that were taken at their

16   word at that point in time.

17           At the end of my comments today, I would like to also

18   present evidence to you that proves that those 2017 responses

19   were known mistruths presented by the Manhattan District

20   Attorney's Office.  But the DA's misconduct specifically in

21   discovery doesn't merely involve withholding exculpatory

22   evidence and making misleading statements.

23           THE COURT:  Ms. Price, again I'm going to ask you to

24   pause.  I want to make sure I'm understanding what you're

25   saying.

KB5TPRIC

          Now the *Najad* case, Judge Nathan's, with which I'm

very familiar, having read her very thoughtful opinion on the

issue, was a case involving *Brady* disclosures in a criminal

matter.  Is what you're saying to me today that in related

prosecutions involving you that you did not receive exculpatory

material to which you were entitled, or are you trying to

analogize the *Brady* standard to what you should be receiving in

this case?

          MS. PRICE:  Your Honor, because, as I'm going to go on

and explain to you, I have only just received back personal

property that the DA's Office has withheld from me for nine

years, and that has delayed my ability to restore myself and to

prevail, because the material that was returned to me is so

exculpatory and the way it was returned to me is so shady.

          If you will allow me, I will run through it and I will

try and go slowly but quickly.

          THE COURT:  Go ahead.

          MS. PRICE:  So as far as the first point I want to

make here is the DA withheld this exculpatory evidence.  I gave

the District Attorney's Office -- and by the way, I spent a

tremendous amount of time presenting this evidence to the City

Law Department over the summer, and I really felt like I had

some rapport, I thought we were going somewhere.  But

regardless, this information has been passed on to the City Law

Department.

KB5TPRIC

1          So point one, the DA's Office has repeatedly denied me

2     the return of two telephones I turned over to them, to that

3     office during a June 21 -- if you look at the exhibits I sent

4     over, I turned over the June 21, 2001 Queen for a Day

5     appointment document with the District Attorney's Office that I

6     had with my defense counsel, and I marked that Exhibit A in the

7     sashay of exhibits that I sent over to run through today.

8          THE COURT:  I'm looking at it now.  Again, I ask you

9     to pause.

10          Mr. Barnes, have you received a copy of these

11     exhibits?

12          MR. BARNES:  I was copied on the email that the

13     plaintiff sent earlier in the conference, yes.

14          THE COURT:  Thank you.  I am able to look at them

15     while I'm participating in this phone conference.  Are you,

16     sir?

17          MR. BARNES:  Yes, I am.

18          THE COURT:  Thank you.  And Ms. Iheanachor, the same

19     question.

20          MS. IHEANACHOR:  Yes, your Honor, I have them up right

21     now.

22          THE COURT:  Thank you very much.  I will let you

23     continue, Ms. Price.  I am looking at Exhibit A of what you

24     sent over.  Thank you.

25          MS. PRICE:  Thank you, your Honor, for indulging me.

KB5TPRIC

1          The details of that meeting on June 21, 2001 and the

2     handing over the phones have been described in prior docket

3     entries to your Honor and to previous judges, Honorable Judge

4     Preska, who presided ad nauseam, and I believe the Court is

5     familiar with this narrative.

6          The phones were finally returned to my former

7     attorneys at Cravath in late March of this year by ADA Lauren

8     Angelo, who has been assigned to respond to my discovery

9     requests.  And that's a whole different story why all the

10    sudden Angelo is assigned and Susan Roque isn't, but I want to

11    skip over that.

12         After months of fighting, we got the phones back.  And

13    remember, I have submitted receipts, but I own those phones, to

14    the Court, and I can attach them again, I just didn't attach

15    them here.  I had purchased both phones in 2010 and I have the

16    receipt for both of them.  One of them, my abuser, Raheem

17    Powell, was using.  He was supposed to pay me back for the

18    phone and he never did and he continued to use it.

19         And in late --

20         THE COURT:  I'm going to ask you to pause again,

21    please.  It is Raheem Powell, R-A-H-E-E-M  P-O-W-E-L-L?

22         MS. PRICE:  Yes, your Honor.

23         THE COURT:  I'm saying that for the convenience of the

24    court reporter.  I will let you continue, thank you.

25         MS. PRICE:  Thank you, your Honor.  When Mr. Powell

KB5TPRIC

1    accidentally dropped the phone in my apartment in late January

2    of 2001, I examined the phone and I found evidence of coercion

3    and blackmail on the phone that Mr. Powell was preparing to use

4    and maybe had already employed against me.

5            After I had all charges dismissed and sealed in July

6    of 2012, I began asking for the return of those phones that I

7    had turned over on June 21st of 2011 to the District Attorney's

8    Office.  The DA's Office continuously refused to return my

9    property and even appointed a FOIL officer to refuse a FOIL

10   that I submitted and I know the Court is familiar with.

11           THE COURT:  I am.

12           MS. PRICE:  And I have actually attached in my

13   exhibits a little bit further down, Exhibits E, I believe --

14   sorry, Exhibit F, a response by Susan Roque when I had the FOIL

15   determination.  All the FOIL documents have been turned in to

16   the Court in the past.  Regardless, I kept relentlessly asking

17   for the phones back because I knew they had proof of my

18   narrative that was incontrovertible on them.

19           And when we finally got the phones back, the District

20   Attorney's Office, ADA Lauren Angelo, said -- and I have

21   attached this as an exhibit as well, the exhibit is C, if you

22   go to page 2, I underlined the part I would like to bring to

23   the Court's attention where Ms. Angelo, in February or March of

24   2020, referring to phones handed over on June 21, 2011, says to

25   my attorneys:  An item unintentionally not addressed in my

KB5TPRIC

1    letters are the cellphones related to the case.  The phones

2    were never forensically tested, but are still in the case

3    files.  You may send a messenger to pick them up at your

4    convenience.

5           So your Honor, the narrative here from the DA's Office

6    is that the phones just sat in the file and no one ever looked

7    at them.  But if you look at Exhibit B, you can tell that

8    Cravath had the phones forensically tested.  They sent them to

9    a high tech international firm called Alix Partners, A-L-I-X.

10   And Alix Partners made mirror images of the drives of the

11   phones, and on those drives we discovered that on June 28,

12   2011, a week after the phones had been turned over to the

13   District Attorney's Office, hundreds of files had been deleted.

14          Now destroying evidence is one thing, but withholding

15   that evidence from me for nine years is a whole different

16   thing.

17          THE COURT:  Ms. Price, just for my clarification, I am

18   looking at Exhibit B, and it lists approximately maybe 20 or 25

19   files where the words "deleted" are quite clear.  Is this the

20   totality of deleted files or is this just an example of files

21   that were deleted?

22          MS. PRICE:  Your Honor, it's just one screen shot.

23   It's just an example.  There are more.

24          THE COURT:  Thank you.  And you said it's your belief

25   that there were hundreds of files deleted on or about the 28th

KB5TPRIC

1    of June, 2011?

2              MS. PRICE:  Yes, your Honor.

3              THE COURT:  Thank you.  I will let you continue.

4              MS. PRICE:  So I'm having a hard time, of course,

5    believing the efficacy of what is coming out of discovery from

6    the District Attorney's Office, especially considering, if you

7    scroll down to Exhibits D and E.  And I tried to be very

8    selective with these exhibits for the Court.  I would like them

9    not to be entered into the public evidence.  If they're

10   entered, please, if you could sequester them somehow because

11   they're very personal in nature, and wading through this

12   material is very troubling to me.

13             But on the phones that the District's Attorney's

14   Office held for nine years from me are all kinds of videos that

15   Mr. Powell had made.  For instance, Exhibit B is a video made

16   on December 20, 2010 where Mr. Powell's voice is heard as he

17   pans his phone over an open laptop, displaying photos of me

18   nearly nude and my headless body posted on an escort dating

19   site.  Mr. Powell's voice says:  This is Ra.  This is Kelly

20   F'ing Price.  She's hoeing.  She's a hooker.

21             I'm sorry, I'm not ready to continue.

22             THE COURT:  You don't need to continue.  I promise you

23   I'm following you along.  You don't need to do this.  But let

24   me please understand, did you extract Exhibit D from one of the

25   cellphones just returned to you or from somewhere else?  Where

KB5TPRIC

1    is this coming from?

2         MS. PRICE:  This is from the same phone, one of the

3    two phones that were just handed back from the District

4    Attorney's Office after nine years that Cravath sent to Alix

5    Partners.

6         THE COURT:  So separate and apart from the hundreds of

7    files that this forensic review indicated had been deleted,

8    what remained were things like Exhibit D and the text messages

9    on Exhibit E, is that correct?

10        MS. PRICE:  That is correct, your Honor.  That's just

11   a very small sampling of the kind of things that the District

12   Attorney's Office -- beyond the implausibility of that being

13   true, with me asking for the phones and demanding phones and

14   FOILing the phones and putting in my state court actions and my

15   federal court actions that they're being improperly withheld,

16   and Judge Preska -- beyond all that, the District Attorney

17   famously has a $10 million phone tech lab that they brag about

18   in the press, and I'm sure that everyone is familiar with the

19   amount of technology behind the Manhattan District Attorney.

20        Unfortunately, phones are so old that Alix Partners

21   could not tell if they in fact had been copied by anyone else,

22   but the deletions I think speak for themselves that in fact

23   somebody had gone through the phones and deleted whatever was

24   there.  But on the other hand, I think that this tapped out on

25   the District Attorney's narrative that I was a faker and fraud

KB5TPRIC

1    of abuse, and they maintain that in all their moving papers

2    against me in state court and federal court that there is some

3    sort of -- anyway, I will move on.

4            Destroying evidence I believe is in violation of 18 US

5    Code 1512, but, of course, I'm not a federal prosecutor and I

6    don't have the right to bring criminal prosecution against a

7    district attorney's office, although I do believe that there

8    was a concerted effort to keep this evidence from me.  Too many

9    people I had asked for it and too many people have denied it to

10   me.

11           THE COURT:  Let's please talk about that, Ms. Price,

12   the concerted effort to keep the evidence from you.  First, it

13   was in 2012 or thereabouts where you sought its return after

14   you understood that they were not bringing charges against you,

15   and it was denied at that time and then it was denied in

16   response to FOIL requests, and then, from your perspective,

17   it's been denied until February of this year.

18           MS. PRICE:  I believe the phones -- I will have to

19   check, but I believe the phones were finally returned in March

20   or April of this year because the DA's office made me sign an

21   affidavit saying I was the owner of both phones before they

22   would return them.  And that took some time for Cravath to do,

23   but yes, that's correct.

24           THE COURT:  Again, because I want to make sure I

25   understand the facts in this case, other than -- there's a 2012

KB5TPRIC

1    request.  When was the FOIL request?

2         MS. PRICE:  2014.  I'm happy to turn in that original

3    request again.  I have turned it in evidence in previous

4    complaints, but there's a voluminous docket there.

5         THE COURT:  I don't know that I need that, I'm just

6    noting to myself.  2012, 2014, between then and this

7    litigation, were there other formal or informal requests that

8    you made of persons affiliated with the District Attorney's

9    Office for the return of the phones?

10        MS. PRICE:  I will go over that in point 5, and I talk

11   about all the people that I made contact with, the prosecuting

12   District Attorney Kenya Wells, the head of the trial bureau

13   that Kenya Wells worked over, Minton Sabor, who is the director

14   of Trial Bureau 70.  I had numerous email and telephone

15   conversations with Patricia Bailey, who is the supervisor of

16   Susan Roque or a compatriot at some managerial level in the

17   special litigations unit, and I have emails to Ms. Bailey.

18        And then, as I turned in my exhibits, I have

19   Ms. Roque's response to my FOIL appeal where she didn't say

20   that I won, even though I did win, she just demanded ADA

21   Maloney, who, by the way, was also the attorney appointed to

22   defend the DA's Office in state court, who was coterminously

23   falsely denying my FOIL for materials, all this material that

24   would have certainly hastened my chances of winning my state

25   court appeal.  In 2014, you see that Susan Roque was reviewing

KB5TPRIC

1    the FOIL where I specifically demanded the return of the phones

2    and all information downloaded from the phones.  And then again

3    in 2016 I added it as an action in my federal complaint when I

4    had named Susan Roque as a defendant individually in this

5    proceeding, and I had specifically said that Susan Roque and

6    Patricia Bailey withheld my phones from me.

7              So there's a long, documented record of me requesting

8    this material back, and I had given it in good faith during

9    this Queen for a Day, and my defense attorney, Mr. Cartagena,

10   recalls this very well.  And I believe Kenya Wells -- I believe

11   his exact words to me when I asked him for the material back

12   was that all proceedings had to be dismissed against me.  And I

13   had said to him well, they have been.  But in retrospect, your

14   Honor, I think that maybe the DA's Office thought that because

15   the desk appearance ticket was still lingering -- you know

16   what, I shouldn't hypothesize.

17             THE COURT:  Let's not.  I agree with you.

18             So at the beginning of this section of our discussion

19   you talked to me about evidence being withheld, evidence being

20   destroyed, evidence being forged.

21             MS. PRICE:  Yes, your Honor.

22             THE COURT:  So we have been talking about the phones.

23   Is there something else you want to discuss?

24             MS. PRICE:  So I have attached in my exhibits marked G

25   and H two separate desk appearance ticket dismissals.  You

KB5TPRIC

1   remember, your Honor, there was the issue of this lingering

2   desk appearance ticket I had been issued in 2010 by Detective

3   Simmons.

4               THE COURT:  Yes.

5               MS. PRICE:  It still had not been dismissed in 2016.

6   And Judge Preska still had my case at the time, but I asked the

7   District Attorney's Office to give me a certificate of

8   dismissal because I didn't realize that it was still open.  I

9   had gone to the clerk's office and I turned in separate tickets

10  of dismissal for the other misdemeanor charges, the 324 and the

11  other charge for the contempt of court.  And I had asked for

12  certificates of dismissal from the clerk's office, but I didn't

13  know I had to go to the District Attorney's Office to ask for a

14  separate dismissal from them for some technical reason.  I had

15  no idea that DAT still remained open until 2016.

16              So in discovery, one of the first things that

17  Ms. Roque -- before Ms. Angelo was doing discovery -- turned

18  over was this desk appearance dismissal, and it's marked

19  Exhibit H.  And it's a completely wholly separate desk

20  appearance dismissal than the one I received from the District

21  Attorney's Office on September 12.

22              And your Honor, I would note that this -- I marked it

23  Exhibit G, I previously turned in -- I know I turned in

24  attached to the complaint that Preska struck in September of

25  2016 because of a filing jumble, and I also turned it in

KB5TPRIC

1    subsequently.  This is the desk appearance ticket dismissal

2    form that I was given.  But when the District Attorney's Office

3    provided discovery materials to Cravath, they turned in a

4    wholly different document.  And this was very concerning --

5          THE COURT:  Ms. Price, let's pause for a moment.  You

6    received both pages of Exhibit G?

7          MS. PRICE:  Yes, your Honor, on September 12, 2016

8    from the District Attorney's Office.

9          THE COURT:  Okay.  And they disclosed a completely

10   different document that you had never seen before in the course

11   of discovery in this case, and this is Exhibit H, which I note

12   to be dated September 7 of 2016.  Correct?

13         MS. PRICE:  Correct.

14         THE COURT:  Okay, thank you.  Please continue.

15         MS. PRICE:  At the time when I received that desk

16   appearance ticket, Mr. Alcantara, who is the author of

17   Exhibit G, told me that nothing had been done.  And he called

18   down to the DAT unit, they told him it hadn't been prepared,

19   and so they dictated to him what to say.  And I watched

20   Mr. Alcantara type it and hand it to me.

21         Now the distinction here between the two documents is

22   nuanced but magnanimous for this case, your Honor.  If you

23   notice in the exhibit marked H, the reason for the DAT not

24   being dismissed allegedly is a delay in processing.  And the DA

25   goes out of the way to say, in fact, we weren't able to get to

KB5TPRIC

1    this and there was a delay.

2            This is significant because there is case law in the

3    Southern District that says if DATs are accidently left open

4    that there's no culpability.  And unfortunately, I don't have

5    that citation handy, I apologize.  But we were very confused by

6    this document, and Cravath asked many times if the District

7    Attorney's Office would give us the metadata on this document

8    so we could examine it and see if it was in fact created on the

9    day that they claim.

10           I believe the Court is familiar with IPTC data on

11   documents.  Every document has IPTC data associated with it

12   where you can review the date and time where the document was

13   created.  But after at least six separate requests over the

14   period of no less than nine months, the District Attorney's

15   Office has been unable to produce this original document for us

16   so that we can examine its e-contents.  They have given all

17   kind of explanations about their processes.  We asked for the

18   print logs on their printers.  We asked for the temp files.  We

19   asked for everything.  And in fact, we haven't gotten anything

20   satisfactory.  And I want your Honor to note that this is the

21   kind of, in my opinion, outrageous re-architecture of a case

22   file that I have seen.

23           If you note, Cravath hired handwriting experts because

24   I persisted in trying to establish that this document was a

25   forgery.  And the handwriting experts need more samples, your

KB5TPRIC

1    Honor, because there's not enough actual lettering on the page

2    to make final decisions to determine if the two people who

3    allegedly signed off on Exhibit H are the same two people.  But

4    just eyeballing those two signatures, your Honor, there's a

5    striking similarity, the upward slash, they are like almost

6    exactly parallel.  There are sort of so many uncanny features

7    of this document that it goes without saying that I made no

8    bones about the importance, in my opinion, of this document to

9    the City Law Department and encouraged them to try and get an

10   honest answer out of the District Attorney's Office regarding

11   this.  And I was told by the City Law Department that in fact

12   they would get back to me on that issue and I never heard

13   anything back on that issue.

14          I have a couple more points, your Honor.  I do feel

15   very strongly that the DA's Office did conspire to keep the

16   phones' exculpatory evidence from me.  There are some

17   interesting entries in the privilege log sent over of meetings

18   held with DA employees after all charges were dismissed and

19   sealed against me in July of 2012, strategy meetings that are

20   allegedly marked privileged and, when pressed, the answer came

21   back the DA's Office knew it was going to get sued so it was

22   strategizing, and all contents and emails -- which I find to be

23   more than interesting responses.  I don't believe that the DA

24   can assert privilege in the federal court, I believe their

25   privilege only extends -- there's all kinds of things that have

KB5TPRIC

1   come up in discovery, and I could go over them ad nauseam, but

2   I want to let you know that this is why I was pushing so hard

3   to sit down in front of you.

4          I do feel that the statements submitted to you, your

5   Honor, in the winter of 2017 by the District Attorney are

6   patently false.  I know that you will recall that I submitted a

7   motion paper to you after you had responded to the District

8   Attorney's affidavit claiming that there was no special

9   relationship between the District Attorney's Office and my

10   abuser, Mr. Powell, but I would like to draw your attention to

11   Exhibit I.

12          THE COURT:  I am there, now, yes.

13          MS. PRICE:  This is a property clerk's motor vehicle

14   boat invoice issued by the New York City Police Department to

15   Mr. Powell when he was arrested -- I just want to look very

16   carefully at this document -- in August of 2010 on a felony

17   drug sale to Detective David Bailey of the Manhattan South

18   Narcotics Unit.

19          I didn't have this piece of evidence before your

20   Honor, I just found it within the last year in my storage

21   locker, but as you can plainly tell, Mr. Powell was arrested,

22   there's an arrest number there, but there's absolutely no court

23   record of this, your Honor.  Mr. Powell was not prosecuted.

24   This is a drug sale to an undercover narcotic officer.  He did

25   not get community service, he was not prosecuted.  And I submit

KB5TPRIC

this to you, your Honor, as further proof that there is no

small amount of enormous relationship between the District

Attorney's Office and my abuser.

        I won't review the documents and arguments I made to

you in 2017 about the reasons that I feel that affidavit

submitted to you to be false, but I do remember urging your

Honor to look at the carefully crafted wording of that

document.  And, of course, reading Judge Nathan's recent

comments to the assistant U.S. attorneys and her demands asking

for emails about how those documents were edited, I can't ask

you what to do, your Honor, but I'm presenting evidence to you

and I hope in some way that you will think about -- issue some

kind of sanction or order to the District Attorney's Office to

get to the bottom of these carefully crafted documents and

statements that they keep making under sworn affidavit to the

Court.

        I can't tell you how frustrating it's been to watch

all these things happen in real-time, to go to the City Law

Department on bended knee.  You will see I submitted my emails

where I explain all these materials to the City Law Department.

At the bottom of the exhibits I marked them Exhibit K.  I don't

want to go over them now, but --

        THE COURT:  Before you get to Exhibit K, could you

tell me, please, about Exhibit J?  Is this a BOP inmate or

something like that?  I'm trying to understand that.

KB5TPRIC

1              MS. PRICE:  I entered this as another piece of the

2     puzzle that I'm trying to make sense of.  Mr. Powell was

3     arrested and incarcerated in Brooklyn in the summer of 2019,

4     but again, I have gone -- I have no proof of this, because you

5     can't get proof of no proof when you go to a county clerk and

6     ask for proof of proceedings, but the Brooklyn Criminal Court

7     has no evidence of this prosecution of Mr. Powell or evidence

8     of any court proceedings against him ever.

9              THE COURT:  Can I ask you to pause, please, for a

10    moment.

11             The MDC Brooklyn, is it -- the one that I know is a

12    federal facility, so might it not be the case that Mr. Powell

13    was prosecuted federally, and that looking in state courts for

14    his prosecution might not prove as useful as looking in federal

15    courts?  There may be an MDC in Brooklyn that is also state

16    related, but the one that I deal with on a regular basis is a

17    federal facility.

18             MS. PRICE:  I beg your pardon, your Honor.  I think

19    you're absolutely right, and maybe J is not my strongest piece

20    of evidence.  I beg your pardon.

21             THE COURT:  Are you offering to me Exhibit J as

22    further proof that Mr. Powell had criminal matters for which

23    you can find no documentation?

24             MS. PRICE:  Yes, your Honor, but you are correct, I

25    did not look in the federal files, and I could be absolutely

KB5TPRIC

1  incredibly wrong about this.  Yes, your Honor.  Although I hope

2  you look at the other things that I submit to you.

3        THE COURT:  Yes, of course.

4        MS. PRICE:  I am embarrassed to step on your words,

5  your Honor.

6        THE COURT:  Not at all.

7        MS. PRICE:  I said I don't know everything about the

8  courts.

9        THE COURT:  I understand.  Let's please go on.

10        About Exhibit K, you just want me to review Exhibit K,

11  do I understand that correctly?

12        MS. PRICE:  I want the Court to see that I made my

13  best efforts to discuss with the City Law Department the

14  implications of what I believe to be criminal and further

15  unconstitutional acts by the District Attorney and the

16  implications, perhaps asking the Court to add the District

17  Attorney back for denying me my material, my First Amendment

18  right to redress my government for grievances.  I have been

19  denied satisfaction because I haven't had satisfactory proof,

20  and that's denying me my First Amendment right, my 14th

21  Amendment Right.  I discussed the implications of this proof,

22  especially the DA statements that the phones hadn't been

23  processed when right there there are traces that the DA -- I

24  discussed all these things.

25        I also laid out punitive, actual punitive and

KB5TPRIC

1    equitable relief, and I believe my equitable relief is really

2    fair.  And I really tried to engage with the City Law

3    Department.  I added the response from the City Law Department

4    that was really, for me, heartbreaking, because I really liked

5    Ms. Iheanachor --

6          Did I get it right, Ms. Iheanachor?

7          MS. IHEANACHOR:  Iheanachor.

8          THE COURT:  We're both -- Ms. Price, you and I will

9    have both have trouble with that, and Ms. Iheanachor will

10   forgive us for this.

11         So you're asking me to basically look at things that

12   have previously happened in this case in light of evidence that

13   you received more recently.

14         MS. PRICE:  I just don't understand, your Honor, why

15   the City Law Department is letting the District Attorney's

16   Office represent itself in this case and is letting it -- I

17   don't understand.  *Walker v. City of New York* determines the

18   District Attorney is a policy-making official, the City is just

19   as responsible for his actions, his failure to supervise, all

20   of the above.  It's heartbreaking.

21         So I would really like to have a fair conversation.

22   And I tried, on August 27 to have a fair conversation, and

23   Ms. Iheanachor kept saying to me our current offer of

24   settlement is $2,500.  And I said:  What about my equitable

25   relief?  It's heartbreaking that we couldn't have a

KB5TPRIC

conversation about why the City Law Department doesn't see all
of this material as exculpatory as I do, because I do feel that
I'm in a place where I could ask the Court -- even though I
don't believe I have the full picture.

     The DA's Office still hasn't given me any of my
complaints against Raheem.  They claim that since those
proceedings were determined in his favor that I'm not entitled
to any of the files about my complaints against him without a
Court order.  But I do believe we gave a Court order.  Maybe we
need another Court order.  The District Attorney's Office
taunted me and said I could ask Mr. Powell for his permission
to release those files to me, which I thought was very
insulting.  So there's a lot more here that I feel I would like
to say.  I do appreciate that you allowed me so much time at
the beginning.  I've said a mouthful.

     There's one other thing I would like to add that I
have discovered since I have last been in touch with the Court
and your Honor, and that's that -- I never realized this, but I
lived across from Linda Fairstein years ago on East 70th
Street, and she was always yelling and complaining.  And it
turns out Linda Fairstein, when she left the DA's Office, was
the person that came to intelligence who sent all the data to
form the Palantir algorithm about who was a true fabricator of
sexual violence and who wasn't.

     So I keep pressing the DA's Office for all this

KB5TPRIC

1   information about who said I was a fabricator, and I'm not

2   getting any of this, but there's a wealth of material out there

3   that I'm really going to have to fight for if this case moves

4   forward.  And I made an appeal to the City Law Department to

5   have pity on me, it's now been ten years, and I really asked

6   her to just settle with me.  And your Honor, I just feel like

7   you might be a better interceptor in getting the magnanimity of

8   this material through to the City Law Department.

9           Thank you, I'm tired of the sound of my voice.

10          THE COURT:  Thank you.  Ms. Price, may I ask you

11   something related to what you have been saying, and that is we

12   have two sets of folks of counsel on the line, one representing

13   the City defendants and one representing the MTA.  I thought I

14   understood from materials submitted to me preliminary to this

15   conference that while the City defendants were not interested

16   in settlement, the MTA was.  I don't know what your views are

17   on that point, and I don't know if you have had discussions

18   separate with the MTA defendants about the possibility of

19   settlement.  I don't know, again, what your thoughts are.

20          MS. PRICE:  Your Honor, thank you.  I have spoken with

21   Mr. Barnes, and quite frankly, I find him to be an entirely

22   likeable professional person who is ready to talk about the

23   reality of this case.

24          I might allow Mr. Barnes to summarize our discussions

25   and update us on where they are, because he had some things he

KB5TPRIC

was going to back to me on.  Maybe he's ready to share.  But if

I have any problems with his representations, I will let you

know, but if you don't mind, maybe he could answer where we

are.

THE COURT:  Sure.  I'm not trying to push one thing or

the other, I want to understand the views of the parties.

Mr. Barnes, do you want to be heard on this issue?

MR. BARNES:  Sure, your Honor.  So I have not been

included on the majority of the discussions that have been

taking place this year.  I wasn't actually aware they were

taking place.  I thought that discovery had simply been stayed

since March and that everything was on hold.  But I found out

about a month ago that discussions were taking place and had a

phone call on, I believe it was October 7, with Ms. Price.  And

I have authority to settle on behalf of the MTA defendants for

what the MTA defendants believes to be a reasonable amount.

THE COURT:  Please don't tell me what that is, sir.

MR. BARNES:  I know, I'm not going to.

THE COURT:  Okay.

MR. BARNES:  But I was going to add that Ms. Price

suggested that we hold off on actually having any dedicated

settlement negotiations until she has more information about

the MTA Police Department's access to any shared database for

law enforcement purposes that the MTA PD and the New York City

Police Department share, because she is concerned about her

KB5TPRIC

1    ability to still get discovery that she believes she may need

2    from the MTA to support her broader case against the City.  I

3    assured her that she could possibly still subpoena the MTA for

4    this information, but nonetheless, we decided to hold things

5    off until the present.

6          THE COURT:  Okay, I understand.  Mr. Barnes, is there

7    a possibility that part of your settlement with Ms. Price, were

8    there to be one, would be provision of information in the

9    possession, custody and control of the MTA?

10         MR. BARNES:  We would be happy to supply the

11   information that we have.  We served demands for document

12   disclosure and interrogatories and other such things in January

13   and received a response from Ms. Price through her Cravath

14   attorneys in February along with demands from us, but because

15   the way that we understood it -- and the parties discussed this

16   at this time and agreed that discovery was stayed -- the stay

17   of discovery prevented us from ultimately responding to those

18   demands.

19         THE COURT:  I appreciate that.  Thank you.

20         Mr. Barnes, is there anything else -- it sounds like

21   you're open to the possibility of settlement, you're open to

22   the possibility of completing certain extant or open discovery

23   requests, and that you have been engaged in discussions with

24   some level of productivity with Ms. Price.  Am I overstating

25   the issue, sir?

KB5TPRIC

1    MR. BARNES:  I think that's fair to say.  I will add

2    one thing to the discussion of the discovery that Ms. Price

3    would like from the MTA.  I was asked to look into the

4    existence of some shared database.  Ms. Price thought that it

5    was something run by Palantir.

6         What I have discovered is that there is a database

7    called E-Justice New York which the MTA Police Department has

8    access to and which I believe the New York City Police

9    Department also uses, and that is administered by the New York

10   State Department of Criminal Justice Services.  And I am trying

11   to get Ms. Price's actual record from that, but I have run into

12   a problem where the State Division of Criminal Justice Services

13   views disclosure even to counsel for the MTA as a violation of

14   the agreement that the MTA has to use that database.  So I will

15   need to address that going forward.

16        THE COURT:  Mr. Barnes, if that is something that a

17   Court order might be useful in clearing up, you will please let

18   me know?

19        MR. BARNES:  Absolutely, your Honor.

20        THE COURT:  Thank you very much.  Mr. Barnes, is there

21   anything else you would like me to know?

22        MR. BARNES:  No, your Honor.

23        THE COURT:  Thank you.  Ms. Iheanachor -- and again I

24   apologize in advance, am I at least getting closer to the

25   pronunciation of your name?

KB5TPRIC

1          MS. IHEANACHOR:  Yes, your Honor.

2          THE COURT:  Thank you.  I have just heard a lot in the

3     last 45 minutes or so of discussion.  I don't know how you

4     would like to address it, but I imagine that you do want to say

5     something in response, so let me please hear from you.

6          MS. IHEANACHOR:  Yes, your Honor.  So I guess first as

7     to settlement, our position is not that we do not want to

8     settle this case with Ms. Price, we are certainly open to

9     discussing settlement with her, but as she described, we did

10    make her an offer of settlement that we felt was reasonable

11    under the circumstances, and in our communications we did

12    discuss the fact that the injunctive relief and equitable

13    relief that she had mentioned is not something that the City

14    Law Department can offer in terms of a settlement.  So while we

15    definitely understand her position, it is just something that

16    we simply can't do.

17          But turning to discovery in this case, given that the

18    claims as it is against the City defendants pertaining to a

19    false arrest and malicious prosecution claim having to do with

20    Detective Simmons from plaintiff's arrest in October of 2010

21    and then subsequently another false arrest claim pertaining to

22    her removal to Bellevue Hospital on July 2nd of 2015, we do

23    believe that, with the exception of this additional discovery

24    that Ms. Price mentioned earlier this year, that we completed

25    discovery for that as it relates to the claims against the City

KB5TPRIC

1    defendants.

2         THE COURT:  I don't quite understand what happened

3    with these two phones and how they're only being released in

4    March of this calendar year.  Have you looked into this

5    incident?  Are you going to tell me that I should not be as

6    concerned as I currently am?  Because it sounds as though

7    Ms. Price did make multiple requests for the return of the

8    phones and only now got them back.  That is troubling thing

9    number one, but perhaps you can explain it.

10        Troubling thing number two is the forensic examination

11   does appear to show deleted files, and I'm not really sure the

12   rhyme or reason of the files that were deleted, which,

13   according to at least the exhibits I have been shown -- and

14   I'll be clear, I cannot speak to their authenticity or when

15   they were created, but there does appear to be a series of

16   modifications and deletions one week after Ms. Price turned in

17   the phones at what I would consider a proffer session.  So how

18   did that happen?  If you know.

19        MS. IHEANACHOR:  So directed to the District

20   Attorney's Office, I -- my understanding is that we, at the

21   City Law Department have little control over what the Manhattan

22   District Attorney's Office does in terms of the procedures with

23   which they withhold certain property.  And generally the

24   Manhattan District Attorney's Office represents itself, as I

25   believe Ms. Roque and Ms. Angelo had made appearances at the

KB5TPRIC

1    time when they were still defendants in this case from the

2    Manhattan District Attorney's Office.  So as far as the claims

3    against the City, and I am not aware that anything having to do

4    with these phones has any direct affect on the specific claims

5    of false arrest and malicious prosecution from 2010 or from her

6    false arrest claim having to do with her removal to the

7    hospital in 2015.  So that's essentially my understanding of

8    the nature of the phones.

9         But also to the point that when your Honor had issued

10   an order asking us to the point that we could engage in

11   additional settlement negotiations, and I think that Ms. Price

12   had mentioned the conditional discovery back in March when your

13   Honor adjourned the initial settlement conference, I did

14   request that information from Ms. Price and I did not receive

15   it.  So what I'm seeing now that she shared with us today is

16   the first time that I have seen any of this other documentation

17   pertaining to what her previous attorney had done as far as the

18   forensic examination of the phone.

19        THE COURT:  I don't want to misstate what you just

20   said, but I think what you're saying to me is you're not in a

21   position to speak to a lot of the evidence that I have been

22   reviewing with Ms. Price this afternoon, but separately, for

23   the claims that remain in the case, and indeed, Ms. Price is

24   asking me to put some more claims back in the case, the claims

25   that remain, this evidence is not relevant to those claims?

KB5TPRIC

1          MS. IHEANACHOR:  Yes, your Honor.

2          THE COURT:  I'm neither agreeing or disagreeing but I

3     do understand what you're saying.

4          MS. PRICE:  Your Honor, I want to say that the desk

5     appearance ticket, 2010, Detective Simmons has everything to do

6     with the evidence that I turned over.  You will see my emails

7     are attached.  I did email it to Ms. Iheanachor where you will

8     see I sent it in evidence.

9          THE COURT:  I believe what they're saying -- and

10    again, I'm not here to speak as translator for either side, but

11    I believe that what defense counsel is saying for the City

12    defendants is there has been motion practice in the case and

13    certain claims were dismissed from the case.  And you may now

14    be arguing to me, Ms. Price, that in light of the evidence that

15    you have received and have presented in this particular

16    conference, that perhaps the Court should think about whether

17    it made the right decision with dismissing those claims.  But

18    with respect to the claims that remain, it is the position of

19    Ms. Iheanachor that the evidence, even the evidence that you're

20    showing to me now, doesn't actually pertain to or is relevant

21    to claims that remain in the case.  And I think you disagree

22    with that, but I think that's the position that they're taking.

23         So I want to continue with Ms. Iheanachor, then I will

24    come back to you, Ms. Price.

25         So thank you, Ms. Iheanachor, is there something else

KB5TPRIC

1    that you would like me to know?

2            MS. IHEANACHOR:  That's it, your Honor.  That's the

3    extent of it.

4            THE COURT:  So just going back to -- I think I always

5    bristle a little bit when I am told that things can't be done,

6    and that is my own failing, but when you say the injunctive and

7    the equitable relief that she seeks cannot be accomplished in

8    settlement, what do you understand to be the injunctive and

9    equitable relief that Ms. Price is seeking?  Then I will

10   understand from that better why you believe that cannot be

11   achieved in the context of settlement discussions.

12           MS. IHEANACHOR:  Yes, your Honor.  As it relates to

13   one of the emails that Ms. Price sent in late August, I believe

14   she is requesting for District Attorney Vance to write a letter

15   apologizing for his sins against her, that's a quote, and also

16   for the City of New York to admit that other survivors --

17           THE COURT:  Sorry, you're cutting out.  I hope that

18   you returned.

19           MS. IHEANACHOR:  I'm so sorry.  Can you hear me now?

20           THE COURT:  I can now, thank you.  The first thing was

21   the apology letter, the second thing was, and that's when I

22   stopped hearing you.

23           MS. IHEANACHOR:  Sorry, yes.  The other thing was

24   ostensibly a public statement from the City of New York

25   apologizing for labeling certain survivors of sexual violence

KB5TPRIC

1    as fabricators and to be taken off of a do-not-serve list that

2    is allegedly maintained by Palantir and other technology

3    corporations.

4             THE COURT:  Again, Ms. Iheanachor you're cutting out.

5    And we were doing so well.  I believe the issue was being taken

6    off of a do-not-serve list, and could you continue from there,

7    please?

8             MS. IHEANACHOR:  Yes, your Honor.  And her request to

9    be taken off of a do-not-serve list that is maintained by

10   Palantir wherein she's alleging that the New York City Police

11   Department has noted her as a fabricator.  And so that goes to

12   the equitable relief for which we are not in a position to

13   direct the District Attorney's Office or the City of New York

14   to make any --

15            THE COURT:  Ms. Iheanachor, you cut out again.  You're

16   not in a position to direct the City of New York to -- please

17   finish.

18            MS. IHEANACHOR:  I'm sorry.  To issue a public apology

19   or any type of statement pertaining to the things with which

20   Ms. Price is discussing or may be aware of that she is entitled

21   to as equitable relief.

22            THE COURT:  Let me please ask you this, let's imagine

23   that at the end of this we concluded that Ms. Price was not a

24   fabricator, is there in fact, if you know, some database

25   accessible by or in use by some city agency that lists her as

KB5TPRIC

1    one?

2                MS. IHEANACHOR:  There is not, your Honor.

3                THE COURT:  There is not.  I should have asked a

4    better question.  Let me ask that now.  Was there ever a

5    database or a list of folks who are deemed fabricators?

6                MS. IHEANACHOR:  No, your Honor.

7                THE COURT:  No.  The do-not-serve list of which

8    Ms. Price speaks, is that not a thing?

9                MS. IHEANACHOR:  There is no --

10               THE COURT:  You got to find a better location, I'm not

11   hearing you again.

12               MS. IHEANACHOR:  Can you hear me now?

13               THE COURT:  I can.

14               MS. IHEANACHOR:  Sorry, I'm right next to the window

15   now.

16               Yes, there is no such thing as a do-not-serve list.

17               THE COURT:  Okay.

18               MS. PRICE:  Your Honor --

19               THE COURT:  Ms. Price, no, I will get to you in a

20   moment, Ms. Price.  I want to hear Ms. Iheanachor first.

21               Ms. Iheanachor, why is it that Ms. Price believes that

22   she has been designated a person unworthy of belief by the NYPD

23   or other city agencies?

24               MS. IHEANACHOR:  My understanding --

25               THE COURT:  Did she make this up?

KB5TPRIC

1          MS. IHEANACHOR:  My understanding is that I believe

2     Ms. Price has submitted a letter or communication that she had

3     with a former officer of the NYPD who allegedly mentioned

4     something to the effect of a list that the NYPD had of certain

5     people who either tend to make a lot of complaints and

6     complaints are unfounded.  And as far as official NYPD

7     paperwork or anything to that effect, from my --

8          THE COURT:  No, wait, stop.  I lost you again.

9          MS. IHEANACHOR:  From the City's perspective and from

10    our own searching, there is no such list to that effect.  So I

11    can't speak to what this particular individual that Ms. Price

12    has allegedly spoken with said about NYPD policies, but our own

13    review of NYPD policies has not revealed the existence of any

14    such list or database.

15          THE COURT:  Does the NYPD have access to Palantir?

16          MS. IHEANACHOR:  Not to my knowledge, your Honor.

17          THE COURT:  Not to your knowledge, really?  Are there

18    any city agencies of which you are aware that have access to

19    the Palantir system?

20          MS. IHEANACHOR:  Not that I'm aware of, your Honor,

21    no.

22          THE COURT:  Okay.  There's reference to a system

23    called Cobalt, is that a system that at least you're familiar

24    with?

25          MS. IHEANACHOR:  I'm not familiar with the Cobalt

KB5TPRIC

1    system.

2           THE COURT:  And Domain Alert Awareness?

3           MS. IHEANACHOR:  I'm not familiar with that system.

4           THE COURT:  These are things that I believe were

5    discussed with you in Ms. Price's email from July of this year,

6    actually.  And so are you saying that there is no -- well, is

7    there any database to which the NYPD has access in which

8    Ms. Price is contained at all?

9           MS. IHEANACHOR:  No.

10          THE COURT:  No?  She had two desk appearance tickets,

11   is she not --

12          MS. SMITH-WILLIAMS:  Your Honor --

13          THE COURT:  Yes.

14          MS. SMITH-WILLIAMS:  I'm sorry, this is Qiana

15   Smith-Williams.  If I may, your Honor?

16          THE COURT:  I would be happy to hear from you, yes,

17   especially if your phone doesn't cut out.  Go ahead.

18          MS. SMITH-WILLIAMS:  I hope it does not.  I will try

19   my best.

20          Ms. Price has made a number of complaints over the

21   years, so any time that an individual makes a complaint, it, of

22   course, goes into the NYPD system.  So of course her complaints

23   would be reflected in the NYPD databases, so she does appear

24   there.  The NYPD, as Ms. Iheanachor was previously stating

25   doesn't use Palantir, or that's our understanding, so we would

KB5TPRIC

1    have access to -- as far as NYPD, in any way, we would not have

2    access to anything in Palantir, so to speak.

3            So while she does likely appear in the database as it

4    applies to complaints, you can put in her name and any

5    complaint that she has made would appear in the complaint

6    system.

7            THE COURT:  I want to focus on the complaint system.

8    So in this complaint system, these complaints are collected,

9    and I appreciate that, but is there any workup that has been

10   done of these complaints?  For example, is there any discussion

11   in these databases about the resolution of the complaints or

12   about whether these complaints were found to be substantiated,

13   to use a term that I know is a little bit fraught in this

14   context, but I'm trying to figure out whether the database is

15   just a collection of documents untethered to any review or

16   analysis of them or something else.

17           MS. SMITH-WILLIAMS:  The only thing that the complaint

18   would be attached to is whether or not there was an arrest made

19   in connection with the complaint that was made.  That's the

20   only sort of connection that would be made between the

21   complaint system itself and let's say the arrest, the arrest

22   paperwork.  But other than that, no, there's no indication --

23   no one looks at the complaint, so to speak, to see whether or

24   not she has had unfounded complaints and made some notation,

25   there's nothing like that that goes on, no, your Honor.

KB5TPRIC

1          THE COURT:  Okay.  You'll excuse me for asking this

2     question, but you know this how?

3          MS. SMITH-WILLIAMS:  Based on ten years of working

4     with the police department and a familiarity sometimes more

5     than I like with the databases as these things come up in any

6     number of cases.

7          THE COURT:  Okay.  Let me please use this analogy:  I

8     can, in the ECF system, type in the name of a person or the

9     name of an entity or the name of an attorney -- not to suggest

10    that attorneys are not people -- and I can get results.  If I

11    type in the name of a particular litigant and I see that there

12    are dozens and dozens of complaints, all of which were

13    dismissed shortly after filing, no one has said anything to me

14    but I might draw something about the viability of the

15    complaints filed by this individual.  Are you saying there's no

16    similar way to draw any conclusions about the veracity or not

17    of a complainant simply by dint of their inclusion in the

18    database?

19         MS. SMITH-WILLIAMS:  I think it's a difficult question

20    to answer.  If I'm an individual and I went in and I typed up

21    Ms. Price's name and I looked and there were 20 complaints,

22    could I look at those complaints and make some subjective

23    analysis as to whether or not I believed there was any merit to

24    the complaints she's making?  Sure, I could do that

25    individually.  But as the police department, there's no one

KB5TPRIC

1   going in looking for Ms. Price and her number of complaints to

2   assess whether or not she's generally a fabricator.

3           THE COURT:  Ms. Williams, there's a reference in

4   Ms. Price's emails over the summer to algorithm ratings for

5   credibility.  To the best of your knowledge, does the NYPD use

6   any form of algorithm to assess the credibility of any

7   complainant or witness?

8           MS. SMITH-WILLIAMS:  I don't know if we posed that

9   exact question, so your Honor, I can't really speak to that,

10   but we have had discussions about whether or not there's any --

11   there has been any sort of notation to Ms. Price being a

12   fabricator, and the answer has been no.

13           THE COURT:  Can you ask that question to the folks who

14   can provide an accurate answer to that question?

15           MS. SMITH-WILLIAMS:  Sure.

16           THE COURT:  Can you let me know what that answer is?

17           MS. SMITH-WILLIAMS:  Absolutely.

18           THE COURT:  You were telling me as well that

19   Ms. Price's name, is it that it may appear in arrest databases,

20   and would that be as potentially a complainant and as

21   potentially the subject of an arrest?

22           MS. SMITH-WILLIAMS:  Both.

23           THE COURT:  Okay.  And are there other databases in

24   use by the NYPD where her name might appear?

25           MS. SMITH-WILLIAMS:  If there were any domestic

KB5TPRIC

1    violence incidents and she filed domestic violence incident

2    reports, it might appear there.

3           THE COURT:  Let's pause there with the domestic

4    violence incident reports.  Is there any workup of those

5    reports that would speak to the credibility of the complainant?

6           MS. SMITH-WILLIAMS:  I guess I'm not quite sure what

7    your Honor is asking.

8           THE COURT:  I haven't seen what this database looks

9    like, so just like you know and I know the CCRB databases and

10   the ways in which certain CCRB complaints are resolved, and

11   there's founded, unfounded, substantiated, unsubstantiated,

12   things of that nature, you're aware of that.  What I'm asking

13   is:  Is there a similar method for analyzing domestic violence

14   complaints?

15          MS. SMITH-WILLIAMS:  No, your Honor, it's a collection

16   of data, so it is essentially just a collection of the reports.

17          THE COURT:  Okay.  Now are there other databases used

18   by the NYPD in which Ms. Price's name might appear?

19          MS. SMITH-WILLIAMS:  That's pretty much it.

20          THE COURT:  Pretty much.  I would like a little more

21   definitive, please.  There's nothing else that you can recall?

22          MS. SMITH-WILLIAMS:  If, potentially, she ever made a

23   911 call, if she was listed as her phone number being attached

24   as providing a witness or subject it could be in the E-911

25   system, but that's pretty much the universe of where you would

KB5TPRIC

1    see information.

2            THE COURT:  What about 311 calls?  Do you also log

3    those in a similar manner?

4            MS. SMITH-WILLIAMS:  311 calls are logged.  It's a

5    separate system, it's not a NYPD system.  There is a 311

6    system.

7            THE COURT:  Separate from the 311 system, are there

8    other city administrative or non-NYPD systems where her name

9    might appear?

10           MS. SMITH-WILLIAMS:  That is not anything that I think

11   I would ever really be able to answer.  As your Honor knows,

12   there are like thousands of city agencies, so it would be

13   difficult to answer whether or not her name appears in any city

14   database.

15           THE COURT:  All right.  Thank you, Ms. Williams, I

16   appreciate you picking up the baton for your colleague.  Is

17   there anything else that you would like me to know?  I've had a

18   substantial conversation with Ms. Price and I'm about to return

19   to her for her thoughts, so before I do, is there any issue

20   that you would like to speak on that you have not?

21           MS. SMITH-WILLIAMS:  I just would briefly like to

22   touch on the issue with the Manhattan DA.  It's a bit sort

23   of -- I don't want to say unfair, but --

24           THE COURT:  I'm neither agreeing or disagreeing with

25   you, but I appreciate the adjective that you have chosen.

KB5TPRIC

```
 1              MS. SMITH-WILLIAMS:  We had sort of no advance
 2     indication that a lot of Ms. Price's concerns about discovery
 3     or the lack of discovery or purported misconduct as it relates
 4     to discovery would be regarding the DA's Office, so they
 5     haven't really been given an opportunity to appear and address
 6     her concerns.  And as your Honor is aware, the DA's Office
 7     typically represents themselves.  They're not an agency that
 8     the New York City Police Department represents or frankly has
 9     any control over.  So I know that your Honor was mentioning
10     that perhaps Ms. Price would be asking for certain claims to be
11     reinserted into this matter, and I think if your Honor was
12     considering that beforehand that we should definitely give them
13     the opportunity to speak as to these various issues.
14              THE COURT:  I'm not disagreeing with that at all.  I
15     think I'm understanding from you today that, without agreeing
16     or disagreeing with what Ms. Price has said, you're not in a
17     position to speak to the issues.
18              MS. SMITH-WILLIAMS:  We are not.
19              THE COURT:  I understand.
20              Ms. Price, I will hear from you again, thank you.
21              MS. PRICE:  Thank you, your Honor.  And thank you,
22     Ms. Williams.  It's nice to meet you, by the way.
23              Three quick points, the City Law Department absolutely
24     is responsible for the District Attorney's actions.  I heard
25     Ms. Williams say that NYPD doesn't represent the District
```

KB5TPRIC

1   Attorney, but the last time I checked, Ms. Williams, you work

2   for the New York City Law Department, not the NYPD.  And I

3   don't understand why the City Law Department doesn't represent

4   the District Attorney's Office like it does every other agency

5   in power.  I don't understand how the City Law Department hides

6   behind this construct where the DA represents itself and gets

7   to manufacture it's own.  I don't understand that.

8          THE COURT:  Ms. Price, before you get to your second

9   point, I will push back a little bit on that.  In all cases

10  that I have had where the DA's Office is a party to the

11  litigation, as distinguished from someone prosecuting the

12  matter, they have represented themselves.  It has not been the

13  law department representing them, it has been someone at the

14  DA's Office.

15         And so I appreciate what you're saying and I

16  appreciate your belief that the Law Department could represent

17  them.  I'm not yet willing to go with you to the point of

18  saying that the fact that the Law Department does not represent

19  the DA's Office is somehow indicative or somehow deliberately

20  designed to permit the manufacture, the hiding or the

21  alteration of evidence.  I appreciate that you don't understand

22  why they do it, and that may be something that I'll get more

23  information on, but I'm not yet willing to accept the

24  proposition that the fact that they don't represent them is

25  somehow designed to allow fraudulent conduct to be perpetrated.

KB5TPRIC

1          Let's go to your second point, please.

2          MS. PRICE:  I apologize, I'm still pro se and I will

3    mind myself.  I departed.  I would add that it definitely

4    increases the burden on me.

5          THE COURT:  Yes, of course.

6          MS. PRICE:  And the second thing I want to say is that

7    I have had -- and I told you in previous conferences in front

8    of you, your Honor, that in one instance NYPD Officer Bonham

9    from the 34th Precinct opened up his Android phone and said it

10   says right here, Ms. Price, the NYPD Detective Bureau says that

11   you are not to receive police services, that you are a

12   fabricator.  And if I have to depose Officer Bonham, I will.

13         In addition, it has come out -- and I haven't shared

14   this with you -- that the District Attorney's Office had the

15   28th Precinct announcing roll calls for months on end and hold

16   up my photo and saying I was not to received police services if

17   the officers encountered me on the street or responded to a

18   radio run.  And Lieutenant LaRoca will testify to that as well

19   as any number of former officers of the 28th Precinct that I

20   have been in touch with and have verified that in fact this

21   happened.  I cannot get now Chief of Detective Rodney Harrison

22   to verify that.  He has repeatedly told me that if he is

23   subpoenaed, he will tell the truth, but there's a plethora of

24   evidence out there that is dispositive to the statements made

25   today.

KB5TPRIC

1      Anyway, those were the three points that I wanted to

2  make.

3      THE COURT:  Okay.  Thank you.  I, on this level, have

4  failed you all in this regard.  Let me explain why I'm

5  confessing failure.  I thought I understood how today's

6  conference would go, but I was not expecting to receive the

7  exhibits from Ms. Price which have occupied a lot of this

8  conference and are really just making me think.

9      So what I would like to do is I'm going to beg your

10  indulgence.  I want to spend some time reviewing my own prior

11  rulings in this matter and these exhibits and thinking about

12  how best to proceed and who I would want at a next conference

13  in this case.

14      So please know that I will not forget about this case

15  or let it fall through the cracks, but I want you to give me

16  the time to look at these issues with greater care.  While I'm

17  doing that, Mr. Barnes, I will not to stop you, if you want to

18  have continued discussions with Ms. Price; indeed, to my

19  friends from the Law Department, I won't stop you either, but I

20  want to think about the discovery in this case and how best it

21  should proceed.  So I ask you for that indulgence.

22      That is all that I have on the table for today's

23  conference.

24      Ms. Price, is there anything else you would like to

25  address to my attention?

KB5TPRIC

1      MS. PRICE:  I very carefully, your Honor, scripted

2  what I wanted to say today point by point.  If it will be

3  helpful to all parties, I'm happy to distribute that, but if it

4  would increase the burden, I could keep it to myself.

5      THE COURT:  You're not here to see it, but I took

6  very, very detailed notes, and I know we had a court reporter

7  taking it down, so I believe we are fine.  But know if I need

8  to hear from you about what you said or recapitulate what you

9  said, I ask you, please, to keep those notes.

10      MS. PRICE:  Thank you, your Honor.

11      THE COURT:  Thank you very much.

12      Mr. Barnes, is there anything else that you would like

13  to bring to my attention?

14      MR. BARNES:  Just to be clear, your Honor, I would

15  like to ask:  Is the stay in discovery still in place for the

16  time being then?

17      THE COURT:  It is, sir, pending further order of the

18  Court.  Thank you for the confirmation.

19      MR. BARNES:  You're welcome, your Honor.  Could I ask

20  for an oral exemption to that for anything that I need from the

21  Division of Criminal Justice Services regarding any record they

22  may or may not have of Ms. Price?

23      THE COURT:  Given that those requests are made in

24  furtherance of settlement discussions that I think would be

25  productive, yes, you do that have that exemption, sir.

KB5TPRIC

1          MR. BARNES:  Thank you, your Honor.

2          THE COURT:  Ms. Williams, I'm directing it to you

3    because I could hear you better, Ms. Williams, is there

4    anything else that you or your colleague wishes to bring to my

5    attention?

6          MS. SMITH-WILLIAMS:  No, your Honor.

7          THE COURT:  Thank you all very much.  Please, I wish

8    you continued safety and good health during this pandemic.

9    Stay safe and we will talk again.

10         Thank you, we are adjourned.

11         MS. SMITH-WILLIAMS:  Thank you, your Honor.

12         MS. PRICE:  Thank you, your Honor.

13         (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25