UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KELLY PRICE,

Plaintiff,

-against

THE CITY OF NEW YORK, ROSE
PIERRE- LOUIS, in her individual and
official capacity, SELVENA BROOKS, in
her individual and official capacity,
INSPECTOR OLUFUNMILO F. OBE, in
her individual and official capacity,
DETECTIVE LINDA SIMMONS, in her
individual and official capacity, OFFICER
JOHN STAINES, in his individual and
official capacity, OFFICER ISELAINE
GUICHARDO HERMENE GILDO CRUZ,
in her individual and official capacity, LT.
NICHOLAS CORRADO, in his individual
and official capacity; LIEUTENANT
RAYMOND DEJESUS, in his individual
and official capacity; OFFICER EMMET, in
his individual and official capacity;
SERGEANT SHEVTIZ, in his individual
and official capacity; MTA OFFICER
STEPHEN MEARS, in his individual and
official capacity; MTA OFFICER ALISON
SCHMITT, in her individual and official
capacity
Defendants

15-CV-5871

FOLLOW-UP TO LETTERS
SUMMARIZING DISCOVERY ISSUES

Hon. Katherine Polk Failla
United States District Judge
c/o Pro Se Office
United States District Court
Southern District of New York
500 Pearl Street, Room 230
New York, NY 10007

**Re:    Lack of Response from MDAO's office to your Honor's 11/30/20 order &
Response to City Law Department's 1/11/21 statements:**

1

Dear Hon. Judge Polk-Failla:

If you will allow me I would like to make two short points to the court:

I.      **I.  Manhattan District Attorney's Office has been unresponsive to your November 30, 2020 order; believes it hasn't been ordered to respond to my allegations of discovery fraud and; wrongly believes it has satisfied all of its discovery obligations.**

II.     **The City Law Department's 1/11/21 statement that I have not asserted a Monell violation is false.**

<------------------------------------    ---------------------------------------    ------------------------------→

I.      **To date, the Manhattan District Attorney's Office ("MDAO" or "DANY") has been unresponsive to Your Honor's November 30, 2020 order; believes it hasn't been ordered to respond to my allegations of discovery fraud and; wrongly believes it has satisfied all of its discovery obligations.**

I am an humble pro se litigant but my reading of your November 30, 2020 order is that Your Honor gave the Manhattan District Attorney's Office the chance, in fact ordered it, to respond to a variety of allegations of discovery fraud, and other forms of forgery, dishonesty and criminal conspiracy I alleged Cyrus Vance Jr.'s office has committed when responding to this court in matters pertaining to these proceedings and in responding to the discovery subpoena issued to that office by this court.

To date, some fifteen days after Your Honor ordered responses to my allegations as outlined in my 12/30/20 and 1/4/21 letters the MDAO's office still has not responded.

I wrote to the MDAO last week asking if they planned to submit further discovery to me as per your 11/30/20 instruction and/or to respond to your order and I was informed by Susan Roque of the MDAO's Special Litigation Division that:

> "DANY has no materials responsive to the court's comment in the order of November 30, 2020. (15-cv-05871 - DE#179, page 6).   For your reference, I have attached the letter sent to your former attorneys on October 30, 2019 indicating that DANY has complied with disclosure."[1]

A. **My 12/30/20 and 1/03/21 letters to the court allege other discovery issues aside from due process allegations** that Ms. Roque is referring (and that you discuss on page six of your 11/30/20 order) --such as discovery forgery and other discovery withholding -- that the MDAO's office have left unchallenged.   My allegations do encompass a flotilla of fraud and discovery holes other than the due process "state created danger" allegations arising from destruction of evidence/withholding of evidence that I have asked your honor to allow me re-activate on my complaint against members of the DA's office and members of the NYPD that Ms. Roque refers to in 1/20/21 email to me.  All of these allegations (and evidence I offered in support to prove them) have been left unchallenged by MDAO.

B. **MDAO DA's claim that it has satisfied all discovery obligations as of October 2019 is ludicrous**:  they didn't even unhand the phones we have been

---

[1] See Exhibits A & B Letter and attachment from Susan Roque to Kelly Price dated 1/20/21.

[2] See Exhibit C  **"The Intelligence-Driven Prosecution Model: A Case Study in the New York County District Attorney's Office:"** *by The Center for Court Innovation:* Jennifer A. Tallon, Dana Kralstein, Erin Farley,

discussing until Feb 2020.  There remain a slew of other discovery issues

outstanding that they have not responded to or addressed by the MDAO's office.

The statement that --in October 2019, some FIVE MONTHS before they even

unhanded my phones, that their discovery obligations to me under Your Honor's

court subpoena were fulfilled -- is ridiculous.  In support of my assertions that

the MDAO has not turned over voluminous database information about me in

response to the court's discovery subpoena (and that I included in the discovery

deficiencies outlined in my 12/30/20 and 1/4/21 letters to the court) I have

uncovered a comprehensive survey of all databases kept by the MDAO's office.

**The MDAO databases are outlined in a 2017 Center for Court Innovation**

**Report (commissioned by the MDAO's office,) topically about the DANY's**

**"Intelligence Driven Prosecution Model".[2]**  The Center for Court Innovation

report describes MDAO workflows with the NYPD and also details how the

MDAO's Office and the NYPD, initiate investigations, store, and share information

about defendants and "priority targets" of law enforcement:

> "Additional Tools for Gathering, Organizing, and Disseminating Intelligence:  CSU staff originally
> stored their intelligence in Excel files, but the volume of accumulated intelligence over time
> prompted the unit to adopt alternative data gathering and organizing methods. This section
> briefly describes the technological resources (other than arrest alerts) that organize and "push
> out" CSU-gathered intelligence."[3]

---

[2] See Exhibit C  **"The Intelligence-Driven Prosecution Model: A Case Study in the New York County
District Attorney's Office:"** *by The Center for Court Innovation:* Jennifer A. Tallon, Dana Kralstein, Erin Farley,
*and* Michael Rempel*: linked January 24, 2021:*
https://www.courtinnovation.org/publications/intelligence-driven-prosecution-model-case-study-new-york-county-district-attorneys
[3] Id. p 23

According to the Court Innovation report the eleven various databases the MDAO's office stores data and communicates data to and from NYPD about defendants and potential defendants in, are:[4]

1. Palantir: "Is a technology suite for data analysis allowing CSU staff to connect data and information across all pertinent databases. For example, Palantir will soon work in tandem with CSU developed SCIM database described above to help prosecutors search for surveillance cameras within a specific radius. Palantir also enables prosecutors to make connections between data derived from phone calls and Facebook, a process highlighting potential links between individuals and events."[5]

2. SCIM: "Surveillance Camera Interactive Map (SCIM)is a database allowing users to identify the location of cameras in the vicinity of a crime scene to determine how many cameras are in the area and which ones may have captured the incident on video. The database links to an interactive mapping program allowing users to highlight an area of interest with their cursors (i.e., a four-block radius). Once the area is highlighted, the program visually identifies all the locations of known cameras within that area. When the user clicks on a camera icon, a description pops up detailing where the camera is located, who to contact to acquire the footage, and how long the location preserves the video."[6]

3. Photosheets: "Photosheets present pictures of individuals associated with a gang, who drive crime at hotspot locations, or who routinely engage in a particular type of crime."[7]

4. DANYInPho: " DANY InPho is a Microsoft Excel Macro program reducing the demands of reviewing an overwhelming number of subpoenaed jail phone calls associated with an investigation.3DANY InPho extracts digital information from the phone calls' files, including NYSID, name, book and case number, date and time of the call, number dialed, and call duration. Intelligence analysts review this information, import the data into an Excel file, and provide the intelligence to ADAs who can analyze and listen to the most pertinent calls. This program also allows the person listening and summarizing the phone calls to easily flag important summaries for the prosecutor's review."[8]

5. DANY311: "DANY311is an electronic form established in the fall of 2013, where ADAs can submit a wide range of questions to CSU, primarily related to priority or violent offenders. For example, prosecutors may contact CSU staff to identify the whereabouts of a person of interest, review gang activity, access geographic information, etc. The program tracks questions and responses so CSU can examine the types of inquiries submitted to CSU Area ADAs and the response time required to answer these inquiries. If a question arises during a conversation between an ADA and a CSU Area ADA, whether in person, over the phone, or through email, a CSU Area ADA can enter this question into DANY311. This process allows CSU Area ADA to create a record of all requests or questions and route each inquiry to the appropriate staff member. For example, if a question arises during a conversation

---

[4] Id. pps. 23-29
[5] Id. p 28
[6] Id. pps 27-28.
[7] Id. p. 27
[8] Id. p. 27

between an ADA and the Area 5 ADA that is best answered by the Area 3 ADA, the Area 5 ADA will enter the question into DANY311 and send it to the Area 3 ADA."[9]

6. <u>SharePoint:</u> "DANY utilizes Microsoft's SharePoint system as an internal web application to access numerous resources. After an upgrade to SharePoint 2013 in May 2015, the DA's Office rebranded SharePoint as DANYNET. Because data collection concluded prior to the upgrade, our focus is limited to the resources available during the study period."[10]

7. <u>Bureau-Based Project Team Reports:</u> "Bureau-Based Projects (BBP)Hot Spot Reports are documents describing all current and past BBPs and lists each BBP-assigned prosecutor's trial bureau. The document also includes relevant CSU contact information to ensure that anyone viewing the document—whether CSU staff or an ADA assigned to a current or past BBP—can immediately know whom to contact. Since BBPs integrate non-CSU prosecutors into investigative projects, distributing this information also serves as a recruitment tool for individuals interested in volunteering for specific teams."[11]

8. <u>Arrest Alert Database:</u> "Arrest Alert System:  The Arrest Alert System includes information on each priority offender of interest. Updated numerous times since 2010, the system enables DANY to record intelligence that is not available on a defendant's rap sheet (e.g., criminal associations, gang involvement, or other activities), and ensures that intelligence on priority offenders is effectively stored for future use. A priority offender is most often (though not exclusively) a repeat offender associated with serious and violent crimes. Any ADA can enter an offender into the system or sign up to receive alerts on new investigations involving offenders of interest. In addition, CSU Area ADAs automatically receive alerts on new cases and "push out" that information to line ADAs working on bail recommendations, charging, plea offers, or sentencing. The AAS is not the only technological solution falling under the IDPM umbrella, but is arguably the most pivotal and influential. AAS was the primary subject of the SMART prosecution federal grant award that made the current evaluation possible."[12]

9. <u>"wiki" Pages:</u>  "are a CSU-written and interlinked set of web pages designed to store and organize unstructured intelligence on defendants. Prosecutors may request access to these pages from CSU, which controls the levels of access and permissions for each user. Each "page" represents a person of interest; these individuals could be priority offenders or criminal associates. Information on a Wiki page may include the defendant's association with gangs, feuds, victims, and eyewitnesses to the defendant's criminal activity. Wikis allow users to not only search individuals, but locations, crimes, contact information, and more. Through a comprehensive search engine on a variety of topics, prosecutors can highlight patterns, connections, and relationships that may have otherwise remained hidden under a vast amount of data."

10. <u>Crime Prevention System:</u> "Crime Prevention System (CPS) is a CSU-maintained repository of criminal intelligence. CSU organizes CPS around persons, gangs, BBPs, and incidents, which allows prosecutors to discover relationships in the data. Individual of interest may have a file even if they have not been arrested. For example, CSU staff may add a file to CPS documenting a violent incident, including the date, start date, end date, precinct, address, relative location, geocoding fields for mapping, and incident description, even if the incident did not result in an arrest. CSU can also describe incidents as homicides, shootings, shots fired, stabbings, sexual assaults, drug-related incidents, gang-related incidents or

---

[9] Id. p. 24
[10] Id. p. 24
[11] Id. p. 24
[12] Id. p IV "Executive Summary"

domestic violence incidents. CSU staff can identify victims, suspects, witnesses, or defendants, and document the type of weapon used in the crime."[13]

11. <u>ECAB:</u> Early Case Assessment Bureau Reports:



The MDAO's office has not provided information entered into any of the above-mentioned databases about me in its anemic discovery submissions, nor has it asserted any of this information is privileged. What information in these databases has been entered about me? Who entered the data? And; has it been deleted/updated?

## C.  CREATION OF MDAO'S BUREAU BASED PROJECT TEAMS: IMPLICATIONS FOR DISCOVERY:  Many of the documents that the MDAO has claimed are "privileged" appear to

---

[13] Id. p. 28

have been written by members of the "BBP" teams[14] who in these roles functionally stepped out of their traditional court-advocate aspect and into that of police investigator; effectively stripping them of immunity protections and also of their rights to assert privilege over their work-product.

Figure 1.1. The Crime Strategies Unit



*Source:* Reprinted from: New York County District Attorney. *Intelligence-driven Prosecution: The Arrest Alert System.* New York, NY: New York County District Attorney.

Chapter 1. The Intelligence-Driven Prosecution Model                              Page 8

All reports, data-entries, assessments, excel documents, emails, communications, work-product etc. arising from a member of the MDAO's office functioning as a member of the BBP teams are not privileged as they were created by a person acting outside of the "advocacy" role defined in the "functional test" set forth in Buckley, Imbler et al.

_____

[14] See Exhibit E: Excerpt from Id. p 8.

Identifying "crime drivers" and creating "arrest alerts" and writing reports based on data, information and analysis not gleaned from the advocate role of the district attorney is not an advocacy function and steps out of the preoperational role for trial. When a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent and so are assertions of privilege over work-product. Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings. A district attorney is absolutely immune from civil liability for initiating a prosecution and presenting the case at trial. Id. at 430-31, 96 S.Ct. at 995; Buckley, U.S. at, 113 S.Ct. at 2613.  Such official is also immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, Buckley, U.S. at, 113 S.Ct. at 2615, or determining which offenses are to be charged. See Ying Jing Gan v. City of New York, 996 F.2d 522, 530 (2d Cir.1993). **Prosecutorial immunity from § 1983 liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's]** *function as an advocate.*" **Dory v. Ryan, 25 F.3d 81, 83 (2d Cir.1994).** But, for those acts that historically received no immunity at common law, absolute immunity may not be invoked. Buckley, U.S. at  n. 5, 113 S.Ct. at 2616 n. 5 (noting that malicious prosecution was traditionally immune while the manufacture of evidence was not.  Similarly in my case, the withholding and destruction of evidence is not covered by immunity protections, nor is their work-product). ***"When a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent. Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings."*** Buckley, U.S. at ,

113 S.Ct. at 2614; Barbera v. Smith, 836 F.2d 96, 100 (2d Cir.1987) (distinguishing between the investigator's role in acquiring evidence and the advocate's in organizing and evaluating that evidence), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989).

"Before any formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his [her/their] acts." See Barbera, 836 F.2d at 100. "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." Buckley, U.S. at, 113 S.Ct. at 2616. _Further, prosecutors are not entitled to absolute immunity for the act of giving legal advice to the police in the investigative phase of a criminal case, Burns, 500 U.S. at 493, 111 S.Ct. at 1943._  **But this is precisely what the members of the Bureau-Based Project teams did:**

"In July 2010, CSU Area ADAs presented the Briefing Book to District Attorney Cyrus R. Vance, Jr. Following this CSU-based research, DA Vance created thirty-three Bureau-Based Project Teams to investigate and prosecute specific crime areas (i.e. crime types, gangs, hotpots, or "projects") across the city.  Bureau-Based Project teams (BBPs) consist of approximately three to six dedicated prosecutors from the trial division. These ADAs become experts on a select crime concern or hot-spot, identify offenders believed to be the crime drivers in a particular geographic location (the location does not have to encompass an entire "area"), and devise a plan to target, prosecute, and eventually incapacitate these individuals through incarceration or supervision (i.e., parole or probation). DANY primarily formed BBPs to address violent crime, but developed additional teams to address other issues, including scammers, prostitution, and larceny-related crimes."[15]

The members of the MDAO's offices 'embedded' in Bureau-Based-Project teams also INITIATED criminal investigations (for instance, by creating "arrest alerts" in MDAO databases: "Priority offender identified & arrest alert created by CSU Area ADA:"[16])

---

[15] Id. pps. 16-17
[16] Id. pps. 25-26.





"When DANY created CSU in 2010 it simultaneously overhauled the AAS. With CSU chief and two Area ADAs collaborating with the DA's Information Technology Office, the system was fully automated. Staff members reconsidered and selected the types of information included in an arrest alert, how the information is organized, and how intelligence is visually displayed to users. Staff members may create an arrest alert using the defendant's unique New York State ID (NYSID) number, which is assigned at a defendant's first finger-printable arrest. ADAs may request arrest alerts about persons already in the system or can create arrest alerts about new persons of interest. Area ADAs from CSU staff play a particularly important role in creating new arrest alerts because of their in-depth knowledge of crime drivers in each precinct."[17]

There are many alarming unconstitutional offshoots to this new, un-tested workflow

practice created by the MDAO's office of "embedding ADAs into NYPD precincts to act in a

supervisory role over police investigations, the creation of "arrest alerts," arrests, and

_____

[17] Id. pp 19.

identifying "crime-drivers."   Most malicious for my circumstances is the MDAO's ability to intercede when its informants/agents/priority witnesses are arrested and to manipulate the traditional workflow between the NYPD and MDAO's offices.  Under previous workflows my abuser would have been arrested, detained, transported to the tombs from the precinct to await arraignment, arraigned and either released or further detained.  His case would have been handled by an ADA in the Special Victims Unit.  But, because the ADA's in the BBP were alerted to my abuser's arrest, their actions included but were not limited to: interceding on his behalf; ensuring he was not placed in the tombs prior to arraignment; declining to prosecute him; assisting him in scripting a counter-claim against me in family court for a reciprocal restraining order, and; then ordering NYPD to arrest me when I appeared in Family Court to have my restraining order extended! (n.b. DA's only receive immunity/can only assert privilege for actions they take as ADVOCATE in their own, Criminal Court:  they have no protections for actions they take to direct outcomes in FAMILY COURT.)

Conversely whenever I have/have had interactions with the NYPD of any sort the BBP teams are alerted and/or NYPD sees information entered into these databases by BBP members, and maximize penalty/inconvenience to is assessed to me and nary any NYPD services are rendered to assist me.[18]

---

[18] Please see timeline provided in Letter to NYPD Inspector Kim, or CONNECT NYC database notes, both submitted in my 1/04/21 letter to the Court for a timeline of NYPD interactions and outcomes to those encounters.

Finally, the Court Innovation Report also comments that members of the BBP squads are responsible for coordinating and communicating alerts and information to other law-enforcement agencies INCLUDING the MTA Police, et al:

"Based on expected workload, certain areas were also expected to coordinate with non-precinct-based police bureaus, including the Metropolitan Transport Authority, the Port Authority of New York and New Jersey, and Police Service Areas (e.g., the NYPD Housing Bureau)."[19]

**D.   THE PLAYERS: the members of the MDAO's BBP squad assigned to the 28th precinct at the time of my unlawful arrests, malicious prosecutions, wrongful incarceration and denial of services that I know of are mostly persons whose names the court is familiar with:**

1.  Maria Strohbehn:  Ms. Strohbehn's own 2012 resume[20] claims she was:

**"Chosen to begin working on a bureau based project targeting gang-related violent crime in the 28th precinct in 2011."**

Strohbehn was also the ADA who initially prosecuted me, and was removed from the case after representatives from Senator Gillabrand's and former City Councilwoman Christine Quinn's offices interceded and advocated for me.  ADA Strohbehn was rewarded for her work on the 28th precinct BBP squad c 2010-2013 and PROMOTED to Midtown BBP CSU Chief in  c. 2014.[21] Strohbehn's updated LinkedIn resume from 2015 states:

---

[19] See Exhibit C  **"The Intelligence-Driven Prosecution Model: A Case Study in the New York County District Attorney's Office:"** *by The Center for Court Innovation:* Jennifer A. Tallon, Dana Kralstein, Erin Farley, *and* Michael Rempel: *linked January 24, 2021:*
https://www.courtinnovation.org/publications/intelligence-driven-prosecution-model-case-study-new-york-county-district-attorneys
[20] See Exhibit D: Maria Strohbehn LinkedIn Resume 2012
[21] See Exhibit F: Maria Strohbehn LinkedIn Resume 2015.

"In the past, I served as a junior member of a project targeting a specific gang responsible for violence in Harlem.  These projects highlight the investigative skills necessary for a big-city prosecutor."[22]

As there weren't other ADA's involved in my case this is very strong evidence that either Ms. Strohbehn and/or another member of the BBP squad that ran of the 28th precinct c 2010-1023 is/are the author(s) of several of the "documents" marked as privileged by Ms. Angelo specifically as Item #s: 8, 9, 11, 14, 15, 16, 17, 20. 21, 22 and 23 in her October, 2018 privilege logs.[23]

2.   Christopher Ryan: I discussed Mr. Ryan's extraordinary role in participating in and promoting the activities of the BBP squad in which he participated in my January 26, 2017 Motion for Reconsideration to the court and in my April 21, 2017 Letter to the Court.  After his successes in Harlem leading the BBP squad he was flown across the country to lecture about his successes including at a 2016 "Prosecutors Against Gun Violence" Summit in Los Angeles.[24] Subsequently Mr. Ryan was promoted to Chief of the Violent Crimes Unit.  During that time he submitted a misleading affidavit to the court on or about March of 2017.  Sometime soon after that Mr. Ryan left the MDAO's office for K2Intelligence where he now leads the secretive analytics company AS ITS MANAGING DIRECTOR.[25]

"Prior to joining K2 Integrity, Chris served as Chief of the Violent Criminal Enterprises Unit of the Manhattan District Attorney's Office. This elite unit was responsible for the dismantling of sophisticated criminal enterprises, including interstate gun traffickers; arson/insurance fraud rings; major narcotics organizations; hate, extremist, and terror groups; and criminal street gangs. As chief, Chris developed the methodology of using long-term, multi-defendant prosecutions under New York State's conspiracy statutes against violent neighborhood-based street gangs. This innovative program, which was adopted and implemented citywide by the New York City Police Department, has been credited with helping to reduce New York's homicide rate to historic lows."[26]

---

[22] Id.
[23] See Exhibit K:  10/30/19 Letter and Privilege log from ADA Lauren Angelo: "exhibit a."
[24] See Exhibit L: Christopher Ryan PGAV 2016 LA Summit Presentation ref BBP Activity
[25] See Exhibit G:  PR Newswire Announcement ref Christopher Ryan Joining K2 Intelligence.
[26] See Exhibit H:  Christopher Ryan Bio on K2Integrity (nee K2Intelligence) website.

3.  <u>BBP Unit Chief  and other members:</u>  I am not sure of the other members of this team but the Court Innovation Report names Tanya Apparicio as the Unit Chief for the 28th Precincts BBP Squad, and states that each BBP had between 4-5 members.[27] I would like to request All of the work-product of these BBP team-members (known and unknown) that has been marked as "privileged" by Ms. Angelo, in addition to the other discovery deficiencies (not limited to files I have already asked for regarding my complaints against Mr. Raheem Andre Powell) that have been withheld by the MDAO's office.

**II.  City Law Department's Assertion that I have not asserted a Monell complaint is false.** The same Court Innovation report[28] details that:

A.  **Precincts made lists of ~25 "crime drivers" by precinct:  the City of New York allowed a policy and practice of allowing Assistant District Attorneys to make lists of alleged "crime drivers" and to "incapacitate [those] people with criminal justice system" who were on this 'crime-driver' list.** This City policy and procedure allowing the MDAO's investigatory practice of creating list of "25 crime drivers per precinct" and allowing non-investigative ADA's to place "alerts" about us in the law enforcement databases --prejudice all police encounters we have consequently-- is another Monell Violation.

---

[27] [27] See Exhibit C  **"The Intelligence-Driven Prosecution Model: A Case Study in the New York County District Attorney's Office:"** *by The Center for Court Innovation:* <u>Jennifer A. Tallon</u>, <u>Dana Kralstein</u>, <u>Erin Farley</u>, and <u>Michael Rempel</u>:  p. 8: linked January 24, 2021:
<u>https://www.courtinnovation.org/publications/intelligence-driven-prosecution-model-case-study-new-york-county-district-attorneys.</u>
[28] Id.



The Court Innovation Report details this practice when it describes the:

"Identification of Specific Crime Drivers:  At the beginning of the project, CSU area assistant district attorneys (ADAs) collaborated with local police commanders and Field Intelligence Officers (FIOs) to identify at least 25 priority offenders in each precinct. ADAs then entered offender names into the Arrest Alert System (AAS) (see below), and can continuously expand the list of priority offenders and/or record relevant intelligence."[29]

—this is the DO NOT SERVE list I was Placed on! I was identified as a "crime-driver," entered onto the list and an Arrest Alert was set for me in the Arrest Alert System and other MDAO databases.[30]   Every time I called 911 or had a NYPD/law enforcement interaction these dispositive data points were entered about me into the AAS and the responding officers culled this data from the AAS

---

[29] See Exhibit C:  **"A Case Study in the New York County District Attorney's Office:"** *by The Center for Court Innovation:* [Jennifer A. Tallon](#), [Dana Kralstein](#), [Erin Farley](#), *and* [Michael Rempel](#): *linked January 24, 2021:* [https://www.courtinnovation.org/publications/intelligence-driven-prosecution-model-case-study-new-york-county-district-attorneys](#) page IV.

[30] See Exhibits I & Exhibit J:  Screenshot of database of "crime-drivers/priority targets per precinct" from "Creating an Arrest Alert System in your Jurisdiction;" Manhattan District Attorney's Office, April, 2017; linked 1/25/2021: [http://apa-justice.squarespace.com/](#) then: [https://static1.squarespace.com/static/557ef1aae4b05d6e392d2f2b/t/58a5c3d846c3c4b348c46de4/1487258585462/Arrest+Alert+Curriculum+-+PowerPoint+-+Jan.+2017+FINAL.pdf](#) (full power point entered as EXHIBIT J).

and other MDAO databases!  There were MANY other people placed on this McCarthyistic list—not just me—who most likely aren't even aware of being placed on this status.  This practice is ongoing and still continuing without oversight.  The City of New York has been allowing this practice to continue since at least 2010 with little to no training or oversight.  This MDAO practice of allowing DA Court Advocates to act as POLICE INVESTIGATORS by "collecting and sharing intelligence on priority offenders within designated neighborhoods,"[31] and initiating Arrest Alerts, IS A MONELL VIOLATION.

**B.  District Attorney New York County Office ("DANY") "Bureau Based Project" ("BBP") teams inserted themselves into precinct/ NYPD investigatory workflow/roles, effectively mitigating their absolute and most qualified immunities afforded to them, and erasing all privilege protections of their work-product IS A MONELL VIOATION THAT REMAINS UNCHECKED BY THE CITY OF NEW YORK.**  The creation of "borough based project teams" and the practice of allowing these "BBP" DAs to insert themselves into the investigatory role of police (out-stepping their own role of court advocate), is a pretty big Monell violation (*see above discussion of difference between "Court Advocate" and "Police Investigator" above in points I.C- I.D.)

E.   There is a third Monell Violation that I need more time to prove your honor and I was hoping Discovery submissions would mete out:  the City of New York

---

[31] See Exhibit C:  "**The Intelligence-Driven Prosecution Model: A Case Study in the New York County District Attorney's Office:**" *by The Center for Court Innovation:* Jennifer A. Tallon, Dana Kralstein, Erin Farley, *and* Michael Rempel: *linked January 24, 2021:* https://www.courtinnovation.org/publications/intelligence-driven-prosecution-model-case-study-new-york-county-district-attorneys page IV.

allowed the practice of using  an algorithm to determine who was telling the truth about sexual violence/trafficking/domestic violence and who wasn't **_based on my data_**.  In July of 2013 a member of a NYPD technology projects team contacted me as a whistle-blower and told me that my data had been used to "model" what a "fabricator" of sexual violence and/or of pimping/human sex trafficking looks like in NYPD/MDAO technological systems.  He related to me that there were many meetings /communications between the MDAO's office, the NYPD and Palantir/K2Intelligence about whether or not I was a "fabricator" or not.  He also related that when Rami Baly assaulted me on or about July 26, 2012, (and he was not arrested because I was the complainant, and Mr. Baly went on to sexually assault FIVE other women in Manhattan) that questions began to be raised about the efficacy of the entire algorithm and data-culling processes throughout NYPD/MDAO technology architecture.

I have this person's alias, a disconnected phone number, a photograph and an email that is no longer valid.  Your honor I need more time and any assistance from the court to gather more information about this practice.  I would like very much for the court to issue me subpoenas to Palantir and K2Intelligence for this purpose and would like to propose the court accept a further brief from me on this topic if Your Honor needs more background information and evidence to support my request.  Regardless of whether I am able to track this person down I have received nothing of this in discovery from either the NYPD or the MDAO's office.

Thank you, Your Honor, for allowing me to shed light on the kinds of discovery still being

with-held from me to your attention.  I would like to request that the MDAO's office be held

in contempt of court, and that the discovery requests I have made that have gone

unchallenged by the MDAO and the City Law Department be provided to me in the most

expedient manner possible.


Kelly Price
Pro se
534 w 187th st #7
New York, NY
10033
646 932 2625
gorgeous212@gmail.com


/s/ [Kelly Price].                              January, 25 2021