# The Intelligence-Driven Prosecution Model

## A Case Study in the New York County District Attorney's Office

**By Jennifer A. Tallon, Dana Kralstein, Erin J. Farley, and Michael Rempel**



520 Eighth Avenue, 18th Floor
New York, New York 10018
646.386.3100 fax 212.397.0985
www.courtinnovation.org

The Intelligence-Driven Prosecution Model:
A Case Study in the New York County District Attorney's Office

By Jennifer A. Tallon, Dana Kralstein, Erin J. Farley, and Michael Rempel

© September 2016

Center for Court Innovation
520 Eighth Avenue, 18th Floor
New York, New York 10018
646.386.3100 fax 212.397.0985
www.courtinnovation.org

# Acknowledgements

The authors are deeply grateful for the cooperation and support of the District Attorney's Office of New York (DANY) in making this evaluation possible. Many thanks to Kerry Chicon for her feedback on all aspects of the research design as well as her efforts in facilitating the research on behalf of DANY. Thanks also to the 17 project staff and stakeholders from DANY and the New York Police Department as well as several community representatives for their participation in in-depth interviews regarding the goals, operations, and effects of the Intelligence-Driven Prosecution Model.

At the Center for Court Innovation, we are grateful to Julius Lang and Natalie Reyes for their assistance in coordinating the work between the evaluation and a series of coinciding technical assistance activities that were intended to frame and highlight key elements of the DANY model. We also thank Steve Jansen of the Association of Prosecuting Attorneys for similar coordination. Finally, we thank Greg Berman for his comments on an earlier version of the report.

This research was funded by a grant from the Bureau of Justice Assistance of the U.S. Department of Justice to the District Attorney's Office of New York, which in turn subcontracted with the Center for Court Innovation. Any opinions and interpretations are those of the authors or, where attributed, to staff, stakeholders, and research participants. Moreover, where not otherwise attributed, the opinions, findings, and conclusions or recommendations expressed in this publication are those of the authors and do not necessarily reflect the positions or policies of the U.S. Department of Justice or the District Attorney's Office of New York.

# Table of Contents

**Acknowledgments**                                                                i

**Executive Summary**                                                              iii

Chapter 1.
The Intelligence-Driven Prosecution Model:
A New Adaptation of Community Prosecution Principles          1

Chapter 2.
Research Design and Methodology                                          9

Chapter 3.
Planning and Implementation of the Model                             12

Chapter 4.
Communication Survey Findings                                             33

Chapter 5.
Impact on Prosecution Outcomes                                           50

Chapter 6.
Conclusions                                                                        58

References                                                                          60

Appendices

Appendix A.
Survey Instrument                                                               62

Appendix B.
Survey Responses of the Support Staff Subsample                    68

Appendix C.
Propensity Score Matching                                                    75

Appendix D.
Outcomes for Felony Defendants Only and Misdemeanor Defendants Only          81

# Executive Summary

Designed and implemented by the New York County District Attorney's Office (DANY), the Intelligence-Driven Prosecution Model (IDPM) is a novel prosecutorial strategy rooted in the rigorous collection of background information about the people, places, and problems driving crime in specific neighborhoods. Through enhanced information gathering—including close coordination with local law enforcement and robust community outreach—the IDPM intends to facilitate improved prosecutorial decision-making. Though technology-centered intelligence collection concerning the specific people and places driving crime adds a unique dimension to data analysis, the model is better understood as a logical extension of earlier community prosecution initiatives dating back to the late 1980s and 1990s.

With funding from the U.S. Bureau of Justice Assistance, this study aims to document how the IDPM operates, and explore the model's implementation and effects in New York County, known more widely as the borough of Manhattan. Study methods included intensive document review, interviews with key District Attorney's Office staff and community stakeholders, a quantitative survey of assistant district attorneys regarding their knowledge and use of intelligence gathered in connection with the model, and an impact analysis concerning the effects of the model on bail recommendations, charging, case disposition, and sentencing outcomes.

## Implementation of the Intelligence-Driven Prosecution Model

The District Attorney's Office of New York County (DANY) established the Intelligence-Driven Prosecution Model, along with the Crime Strategies Unit (CSU), in May 2010. CSU organized its work at the neighborhood level and divided Manhattan into five smaller geographic areas, each containing an average of four police precincts. Major components of the model are below.

- **Crime Strategies Unit (CSU) Staffing:** CSU has a unit chief plus five, three-person teams, including a coordinator from the Community Partnership Unit (CPU). Unit teams are dedicated to one of the five designated areas of Manhattan and each team includes an assistant district attorney, an intelligence analyst, and a community affairs coordinator.

Every area team is responsible for developing relationships with local law enforcement and community stakeholders, and gaining expertise in the people, places, and problems that drive crime in each precinct.

- **Community Outreach:** CSU staff, in conjunction with CPU, devote significant time to attend meetings with local community groups (e.g., precinct councils, community boards, tenant associations, etc.) to gather information about community players and their public safety concerns. Community stakeholders who participated in research interviews said they appreciated both the quantity and quality of work from CSU staff.

- **Precinct-Based Crime Assessments:** Several months after CSU's launch, area teams completed a Briefing Book with four- to six-page summary assessments of each Manhattan police precinct. Assessments included a precinct map, data on population demographics and major crime problems (based on CompStat reports and other evidence), details on homicides and/or shootings in 2009 and 2010, a narrative description of at least two local crime problems, a list of "hot spots," and a list of local gangs or "crews" known to be involved in significant criminal enterprises. Area teams continually update these assessments based on new information.

- **Identification of Specific Crime Drivers:** At the beginning of the project, CSU area assistant district attorneys (ADAs) collaborated with local police commanders and Field Intelligence Officers (FIOs) to identify at least 25 priority offenders in each precinct. ADAs then entered offender names into the Arrest Alert System (AAS) (see below), and can continuously expand the list of priority offenders and/or record relevant intelligence.

- **Bureau-Based Project Teams:** Based on Briefing Book information, DANY established 33 Bureau-Based Project teams (BBPs). Each team of three to six prosecutors focused on a particular citywide crime concern to better identify the offenders who drive that type of crime in specific neighborhoods; these BBPs then devised appropriate prosecution strategies stemming from their research. DANY may add or disband BBPs based on evolving priorities.

- **Arrest Alert System:** The Arrest Alert System includes information on each priority offender of interest. Updated numerous times since 2010, the system enables DANY to record intelligence that is not available on a defendant's rap sheet (e.g., criminal associations, gang involvement, or other activities), and ensures that intelligence on priority offenders is effectively stored for future use. A priority offender is most often (though not exclusively) a repeat offender associated with serious and violent crimes. Any ADA can enter an offender into the system or sign up to receive alerts on new investigations involving offenders of interest. In addition, CSU Area ADAs automatically receive alerts on new cases and "push out" that information to line ADAs working on bail recommendations, charging, plea offers, or sentencing.

- **Additional Technology Resources:** DANY established a wide range of technology-based tools enabling ADAs throughout the office to monitor arrests, request additional information from CSU, and/or share intelligence about priority offenders. While some of these technology-based tools predate CSU, others were developed since its establishment. Examples of such tools include: "DANY311", an application allowing ADAs to submit questions to CSU electronically, the "Glossary of Street Slang," a system gathering intelligence from sources such as defendant phone calls within city jail, the "Homicides and Shootings spreadsheets," continuously updated files containing key facts about homicides and shootings dating back to 2008, the "Crime Prevention System," a CSU-maintained database highlighting relationships between persons, gangs, BBPs, and crime incidents, and "Wiki Pages," a database detailing intelligence on individual priority offenders.

# Survey Findings on the Communication of Intelligence to Assistant District Attorneys

In May 2015, 285 DANY staff members, including 233 ADAs, participated in an online survey to determine the use and effectiveness of CSU-gathered intelligence. The response rate was 70%. Key findings are below.

- **Frequency:** During the six months prior to the survey, 61% of responding ADAs reported that CSU communicated with them to share intelligence related to at least one case, and 70% reported that they initiated contact with CSU at least once to request intelligence. Notably, 47% of respondents indicated that both events had occurred. Of those who had communicated with CSU in the previous six months, more than 80% reported contact on about one to five cases.

- **Timing:** Communication with CSU most often took place in felony cases between criminal court arraignment and presentation to the grand jury (36% of ADAs stated that CSU staff most likely contacted them during this time). The second most common time was pre-arraignment when prosecutors craft the original criminal complaint (28%).

- **Topics:** The most common topics discussed were defendant/witness gang affiliations (51%) and whether a defendant was a potential suspect in an unsolved crime (31%).

- **Types of Cases Involved:** Communication was particularly common in connection to violent felony cases (74%), drug felonies (31%), and non-drug, nonviolent felonies (27%). Some ADAs reported communication on multiple types of cases in the six months prior to the study.

- **Impact of CSU Information on Decision-making:** Among those ADAs reporting communication with CSU, 11% reported that CSU information frequently or very frequently influenced their investigations, 38% reported that the information moderately or strongly affected their bail request decisions, and 38% reported that communication with CSU moderately or strongly affected their plea offers or sentencing recommendations. With regard to arrest alerts, 41% of ADAs reported that, in the six months prior to the study, information stemming from such alerts did not lead to an investigative step that would not otherwise have been taken, and 44% reported that the alerts did lead to new investigative steps in one to five cases.

## Impact of the Arrest Alert System on Prosecution Outcomes

The Center for Court Innovation (CCI) conducted a quasi-experimental impact evaluation to examine the effectiveness of the Arrest Alert System. Specifically, CCI compared a sample of Arrest Alert cases arraigned from CSU's start date in May 2010 through 2013 to two groups: 1) a contemporaneous sample also arraigned from May 2010 through 2013 with cases not involved in an arrest alert, and 2) a pre-implementation sample arraigned from January 2009 through April 2010. Propensity score matching was used to ensure sample comparability. Findings are below.

- **Seriousness of the Priority Offender Target Population:** Consistent with the intended model, defendants in Arrest Alert cases are substantially more violent than the general defendant population. Before statistical matching, 93% of Arrest Alert defendants had a prior arrest (compared to less than half in the two comparison samples), 25% had a prior violent felony arrest (compared to 5% in the comparison samples), and 15% had a prior violent felony conviction (compared to 2% in the comparison samples). Arrest Alert defendants were more likely to be arraigned on a felony than comparison defendants (24% v. 14%).

In the bullets that follow, reported comparisons are for statistically refined and matched samples that no longer differ in baseline characteristics.

- **Impact on Bail Decisions:** Arrest Alert cases were modestly but significantly more likely to have bail set, and averaged significantly higher bail amounts than comparison cases.

- **Impact on Case Disposition:** Arrest Alert cases were overwhelmingly likely to be convicted (at least 96% in all samples), reflecting the serious criminal activity of targeted Arrest Alert System defendants. Arrest Alert cases were modestly but significantly more

likely to be convicted of a felony than a misdemeanor or lesser offense (a difference of 3 and 4 percentage points between Arrest Alert cases and cases in the two respective comparison samples).

- **Impact on Sentencing:** Arrest Alert cases arraigned on a felony were more likely to receive a prison sentence (reaching statistical significance in one of the two comparison samples). In addition, among those sentenced to jail or prison, Arrest Alert defendants received jail or prison sentences averaging more than 100 days longer than sentences for defendants in either of the two comparison groups.

This evaluation demonstrates that the Intelligence-Driven Prosecution Model represents a multi-pronged, technologically sophisticated, and replicable model for collecting and sharing intelligence on priority offenders within designated neighborhoods. Although not all ADAs receive or utilize intelligence obtained through the model, survey responses indicate that DANY has integrated at least some aspects of the model into everyday decision-making. Analysis demonstrates that, early in implementation, the Intelligence-Driven Prosecution Model achieved modest, quantifiable changes in prosecution outcomes related to bail decisions, charging at disposition, and length of custodial sentences.

**Chapter 1**

# The Intelligence-Driven Prosecution Model: A New Adaptation of Community Prosecution Principles

Intelligence-driven prosecution represents a novel prosecutorial strategy rooted in the rigorous collection of background information about the people, places, and problems driving crime in specific neighborhoods. Through improved information gathering on the role of criminal suspects within local criminal enterprises, the prosecutor's office intends to facilitate more informed prosecutorial decision-making.  These enhanced intelligence gathering initiatives, combined with extensive community outreach designed to better understand the people and places driving crime in local communities, create an intelligence-driven prosecution model that marries both intelligence gathering and community outreach. The Intelligence-Driven Prosecution Model (IDPM) is a logical extension of earlier community prosecution efforts in the late 1980s and 1990s.

With funding from the U.S. Bureau of Justice Assistance, the current study aims to examine the District Attorney's Office of New York's (DANY) implementation of the Intelligence-Driven Prosecution Model. DANY prosecutes state and local offenses in Manhattan (also known as New York County), one of the five boroughs of New York City.

DANY established the IDPM, along with the Crime Strategies Unit (CSU), in May 2010. CSU divided Manhattan into five geographic areas and assigned three-person teams (consisting of an assistant district attorney, an intelligence analyst, and a community coordinator from the Community Partnership Unit) to coordinate a series of related initiatives to improve information sharing, both within DANY and between DANY and external stakeholders.

This chapter provides background on DANY's extended community prosecution principles and details prior research efforts from nationwide community prosecution initiatives. This chapter also briefly introduces DANY's IDPM. Chapter 2 presents the research methodology and subsequent chapters report study findings.

# Community Prosecution

The origins of community prosecution can be traced to the rise of community policing in the 1980s (Stone and Turner 1999). Building on ideas such as Wilson and Kelling's "Broken Windows" theory (1982), community policing commonly focused on quality-of-life crimes and minor signs of disorder, offenses thought to create an environment where serious crime could flourish. By working closely with community groups and other agencies, community policing initiatives sought to establish consensual crime fighting priorities, create innovative responses to crime, and focus aggressive attention on the physical conditions of disorder (Wilson and Kelling 1982; Wolf 2006).

## Core Elements of Community Prosecution

Thompson and Wolf defined the core elements of community prosecution as "problem-solving, community involvement, and partnerships" (2004: 4); to which the National District Attorneys Association (NDAA) added a fourth principle- "evaluating outcomes of activities" (2009: 4).

At the same time, Goldkamp (Goldkamp et al, 2003) identified a longer list of seven operating principles based on analysis of actual community prosecution initiatives underway in 36 prosecutors' offices in the early 2000s. The seven principles were (1) target problems, (2) identify the geographic target area, (3) define the role of the community, (4) create appropriate responses to community problems, (5) make organizational changes within the prosecutor's office, (6) decide which case processing adaptations to use (e.g., vertical prosecution or geographic prosecution), and (7) establish interagency collaborations and partnerships.

Work by Coles at Harvard University (Coles et al, 2000; Coles and Kelling 1998) placed the greatest emphasis on the fifth principle: organizational changes within the prosecutor's office. In their view, while other principles described motivating aspirations or concrete community outreach activities, these outcomes could only be achieved by revising the structure of the prosecutor's office so it could take on new tasks and use new strategies.

Coles framed community prosecution as an "organizational strategy" involving a substantial decentralization of staff and authority in the prosecutor's office. Related organizational changes include increased hiring of non-lawyers with prosecution functions, enhanced

communication with other law enforcement agencies, and increased outreach to community stakeholders: all changes resulting in greater effectiveness. While other authors identified community outreach and partnerships as goals in themselves, Coles placed community prosecution squarely within the traditional bailiwick and provided a new and more efficient strategy to prosecute cases.

## Early Community Prosecution Models

Many credit the Multnomah County (Oregon) District Attorney with launching the first community prosecution initiative in 1990, a targeted effort to reduce quality-of-life crime in a budding commercial district (Boland 2007, Wolf and Worrall 2004). Precipitated by a growing drug trade and related rises in drug and property crimes in three Portland neighborhoods, and concerns that such criminal activity could hamper planned commercial development, the Multnomah County District Attorney's Office established a Neighborhood District Attorney Unit. Collaborating with law enforcement, business groups, and legislators from the three target neighborhoods in Portland, prosecutors from this new unit sought to more aggressively and effectively enforce drug laws. Specific practices included the enforcement of a drug-free zone to facilitate trespass arrests for anyone who, following a drug arrest, was found in the targeted neighborhoods, and the selective deportation of undocumented persons after any drug conviction (Boland 1998a, 2007). Over time, the initiative also increased prosecution of other quality-of-life crimes, notably chronic public drinking (Boland 2007).

Beginning at almost the same time as the Multnomah County initiative, then-Kings County (Brooklyn) District Attorney, Charles Hynes, began a community prosecution strategy in 1991. Rather than assign a small number of neighborhood prosecutors to work intensively in carefully selected neighborhoods, Hynes divided a sizable percentage of the more than 400 ADAs into five geographic zones spanning the entire county (Wolf and Worrall 2004). Ideally these zones would then help prosecutors more efficiently prosecute cases and develop better relationships with police officers in each area. The Brooklyn model also established an office-wide Community Relations Bureau and utilized vertical prosecution (the same prosecutor follows a case from intake to disposition) as standard office practice (Goldkamp et al. 2003). The Kings County District Attorney's Office later established an alternative to incarceration program called Drug Treatment Alternatives- to-Prison (DTAP) for second-time felony offenders, and assigned dedicated prosecutors to the Red Hook Community Justice Center, a court-based project requiring low-level defendants to perform community service or attend treatment-based social services (Lee et al. 2013). The Brooklyn District

Attorney assigned these alternative sentencing initiatives to the community prosecution umbrella (Wolf and Worrall 2004).

As documented in Goldkamp et al. (2003), community prosecution initiatives spread throughout the remainder of the 1990s, particularly in major urban centers, including Denver, Los Angeles, Philadelphia, Seattle, and Washington, D.C. However, each model typically focused on different types of crimes, communities, and problems. For instance, whereas the original Multnomah model combatted lower level quality-of-life crimes, the Washington, D.C. initiative emerged in response to a sharp rise in drug-related violent crime in the early 1990s (Boland 2001). The countywide initiative in Middlesex County, Massachusetts focused on violent crime by juvenile gangs (Goldkamp et al. 2003). The Placer County, California initiative involved a multi-agency collaboration around elder abuse (Goldkamp et al. 2003). The Indianapolis model included special initiatives related to prostitution and "nuisance properties" (sites of extensive drug dealing, prostitution, or noise), but did not limit itself to those offenses (Wolf and Worrall 2004).

A survey released in 2001 found that 49% of prosecutors nationwide reported engaging in some form of community prosecution, but actual practices varied widely (Nugent and Rainville 2001). A 2004 survey found that 38% of prosecutors reported practicing community prosecution. The 2004 survey also reported that 55% of prosecutors had implemented at least some community-based initiatives, suggesting fairly deep penetration of basic community prosecution principles (Nugent 2004).

## Early Community Prosecution Efforts in Manhattan

The Manhattan District Attorney's Office established a Community Affairs Unit as early as 1985, five years before the Multnomah County initiative (Boland 1998a). A non-attorney staff member in this unit conducted outreach in Washington Heights, a neighborhood in northern Manhattan, which was confronting significant problems with illegal drug use and crime rates at that time. The initiative relied on community residents to provide information that would improve the quality of prosecutions against drug dealers. The Manhattan District Attorney's Office maintained its Community Affairs Unit, but did not incorporate greater institutional changes until 2010.

# The Intelligence-Driven Prosecution Model

In May of 2010, the New York County (Manhattan) District Attorney, Cyrus R. Vance, Jr., established the Crime Strategies Unit (CSU) and charged the unit with implementing a new Intelligence-Driven Prosecution Model (IDPM). The IDPM aimed to promote more informed decision-making throughout the District Attorney's Office by improving the collection and circulation of information on the persons, places, and problems driving crime within discrete neighborhoods.

Unlike other community prosecution models, DANY's IDPM does not focus on one particular type of crime.  Instead, the model functions as a countywide strategy that, by dividing the county into distinct areas, can adopt to multiple problems found at the neighborhood level.

Importantly, DANY's new model still fundamentally represents a *place-based* approach. The model divides Manhattan into five geographic areas with boundaries falling along police precinct lines. There are, on average, four precincts per area. Under the oversight of a newly designated unit chief, DANY assigns three-person teams to each area, consisting of one assistant district attorney, a CSU intelligence analyst, and a CPU area coordinator assigned to various forms of intelligence gathering. The dedicated staff members, in theory, gain expertise on the people, places, and problems responsible for crime within these designated areas, and have the time and resources to forge productive relationships with local police officers and commanders. DANY's model introduces a new set of strategies for community prosecution initiatives: a neighborhood-level focus, community engagement, local information gathering, and individualized solutions to specific neighborhood-based problems.

## Rationale for a New Community Prosecution Strategy

DANY created IDPM to solve the inherent difficulties of informed decision-making in a large prosecutorial office. Specifically, DANY employs more than 500 ADAs and handles more than 100,000 cases each year, making it one of the largest prosecutor's offices in the country. Due to time constraints and limited resources, it can be challenging for DANY's prosecutors—or prosecutors in any large office—to gather the necessary intelligence for effective prosecutions.

Prior to 2010, DANY's prosecutors generally only had access to rap sheet information when making bail requests, plea offers, or sentencing recommendations. This information did not, however, include data on if a defendant was the leader of a violent gang or was otherwise a key driver of local criminal enterprises. While some prosecutors obtained valuable information about defendants' criminal behavior and pro-criminal associations through investigations, without an office-wide technology to store intelligence, this information was easily lost. For instance, if a different prosecutor opened a new criminal case involving the same defendant, the new prosecutor may lack access to the previously collected intelligence. Prosecutors must then either repeat the same investigatory steps or simply prosecute the case based on information in the rap sheet- information lacking special intelligence that could inform or modify the prosecution strategy.

The IDPM emerged as a means to gather and disseminate information within the prosecutor's office, enhance prosecutorial decision-making, and, ultimately promote public safety in communities throughout Manhattan.

Although the IDPM focuses heavily on improved information flow *within* the prosecutor's office, the model also focuses on enhanced information sharing and interagency coordination with *external* stakeholders, including law enforcement and representatives of local community-based agencies. Planners believed the newly created geographic areas would foster these external connections.

## Core Elements of the DANY Model

Figure 1.1 shows the structure of the Crime Strategies Unit (CSU) and its geographic organization circa 2010, which CCI reproduced from official DANY documents. The five areas portrayed in the figure, if fit together, create the map of Manhattan.

Each area includes an average of four police precincts. DANY assigned an area ADA, an intelligence analyst, and a community coordinator from the Community Partnership Unit to each area (their roles are described in Chapter 3).

DANY's model contains all three core ingredients of "problem-solving, community involvement, and partnerships" identified by Thompson and Wolf (2004), and utilizes innovative strategies across all seven key dimensions identified by Goldkamp et al. (2009). DANY's model implements these elements, much as Coles anticipated, as an "organizational strategy" to harness a place-based structure that fosters informed decision- making

throughout the prosecutor's office.  IDPM's rigorous focus on intelligence gathering, combined with its extensive use of technology (see below), makes DANY's model relatively unique in the prosecutorial field today.

## The Arrest Alert System

Among the many technological tools described in Chapter 3, the most central is the Arrest Alert System (AAS), a process referred to as an automated "early warning system." The AAS stores information, drawn from multiple sources, on individuals identified as priority offenders of interest. The AAS immediately notifies CSU when a priority offender is arrested and provides additional intelligence on the defendant's criminal associations and activities. This system ensures that intelligence collected on priority offenders is effectively stored for future use. While individuals on the AAS are most often repeat offenders with serious and violent criminal history, priority offenders may also be quality-of-life recidivists. Depending on the nature of local crime, the priority offenders list can have different characteristics within each of the five geographic areas. In short, the AAS is a technological system that translates data on persons, places, and problems into usable and transferable information.

The AAS is not the only technological solution falling under the IDPM umbrella, but is arguably the most pivotal and influential. AAS was the primary subject of the SMART prosecution federal grant award that made the current evaluation possible. For this reason, the current report emphasizes prosecutor's use of AAS and its impact on prosecutorial decision-making.

## Figure 1.1. The Crime Strategies Unit



*Source:* Reprinted from: New York County District Attorney. *Intelligence-driven Prosecution: The Arrest Alert System.* New York, NY: New York County District Attorney.

## Chapter 2
# Research Design and Methodology

This report includes a process evaluation that documents key components of the IDPM, as well as several research strategies designed to assess the practical implementation and effects of the model on information sharing and prosecutorial decision-making. Data collection occurred between the summer of 2014 and the spring of 2015. As a result, this report focuses on the implementation of IDPM from 2010 through mid-2015.

## Qualitative Data Collection

The Center for Court Innovation (CCI) conducted interviews to understand how staff and stakeholders, both within and outside of the District Attorney's Office, utilize the IDPM. All interviews with CSU staff took place in the summer of 2014. These sessions included a joint interview with both the current and former CSU chiefs, as well as one in-depth interview and numerous follow-ups with the current CSU chief to clarify the nature of the model. In addition, CCI conducted interviews with the five Area ADAs responsible for coordinating the work within each geographic area and with four intelligence analysts, representing four of the five geographic areas.

Other interviews, which took place over the remainder of 2014 and early 2015, involved two assistant district attorneys who do not work within CSU, but represent a source of information regarding how line prosecutors use the AAS, one captain from the New York City Police Department, and two community stakeholders (community representatives who do not work for any public agency). In addition, CSU chief provided narrative descriptions of fourteen specific cases that utilized an arrest alert in prosecutorial decision-making. CCI reviewed these descriptions and independently synthesized some of the original fourteen cases to include in this report. The subset of cases provides a range of instances and scenarios in which the model provided relevant information that influenced prosecutorial decisions.

In addition, the Center for Court Innovation obtained and reviewed numerous documents that describe the IDPM and its specific components, the AAS, and other related technologies designed to enhance information sharing (see Chapter 3). Finally, as part of the same Bureau

of Justice Assistance award funding the current evaluation report, the Center for Court Innovation created five fact sheets that describe various elements of the model. These products (available at www.courtinnovation.org) were reviewed, incorporated when necessary into the current evaluation report, or cited briefly within the current report in lieu of replicating descriptions already available elsewhere.

# Communication Survey

Upon review of the qualitative data described above, the Center for Court Innovation worked with the District Attorney's Office to develop a thirty-four-item, closed-ended survey. The purpose of the survey was to better understand how assistant district attorneys and other DANY staff used the AAS and related CSU resources, particularly within the past six months. The survey included questions to determine the nature of initial contact with CSU, the frequency of contact, and the stages in case processing where contact most likely occurred. CCI similarly wanted to evaluate whether information sharing effected actual decision-making, specifically investigative choices, bail requests, and sentencing recommendations (see Appendix A for a copy of the survey instrument).

The Center for Court Innovation administered the survey via SurveyMonkey in May 2015-the survey took participants approximately 10 minutes to complete. David O'Keefe, Deputy Chief of the Trial Division, contacted the six trial bureaus, Special Litigation, Violent Criminal Enterprises, and Special Victims units via listservs at the start of the month. The initial email instructed participants about the purpose of the project and included a link to the survey website. Frequent reminder emails were sent out before the data collection period closed at the end of the month.

There are currently 406 individuals working within DANY's trial division. During the data collection period, 285 people participated in the survey for a response rate of 70.2%.

# Analysis of the Impact of the Arrest Alert System on Decision-making

The Center for Court Innovation obtained quantitative data from the DANY database to compare select aspects of case processing between cases with an arrest alert and similar cases without an arrest alert. In consultation with CSU, the impact analysis focused on cases from two of the five geographic areas: Area 3, which encompasses the 19th, 23rd, and 25th police precincts spanning the Upper East Side and East Harlem neighborhoods, and Area 2, which encompasses the 20th, 24th, 28th, and 32nd police precincts covering Central Park, the Upper West Side, and Central Harlem.

The AAS sample looked at cases arraigned from May 2010 through the end of 2013.  To maximize the validity of any findings or conclusions, CCI identified two quasi-experimental comparison groups. The first was a "pre" comparison group consisting of cases arraigned from January 2009 through April 2010, before DANY modified the AAS to reflect the current structure. This "pre" comparison group draws on cases that under no circumstance received arrest alerts since the AAS had not yet been implemented. This group also carries the threat of historic bias because prosecutorial practices may have changed for reasons other than the AAS. The second comparison group, a "contemporaneous" group, consisted of cases arraigned in the same May 2010 through 2013 timeframe as the arrest alert sample, but analyzed cases where an arrest alert was not triggered because the defendant had not yet been identified as a person of interest in the system.

To maximize the validity of both comparison groups, CCI statistically matched potential comparison cases to AAS cases with comparable background characteristics, utilizing standard propensity score matching techniques (Rosenbaum and Rubin 1983; Rubin 1973). After selecting statistically matched comparison cases, CCI deleted all other potential comparison cases prior to final analysis to ensure all analytic findings were based on final matched samples. Because the propensity score matching process did not eliminate all significant differences in the baseline characteristics of AAS and comparison cases, impact analyses controlled for select characteristics to statistically adjust for any remaining baseline differences between the samples (see Chapter 5). Further details of the impact methodology are provided in Appendix C.

## Chapter 3
# Planning and Implementation of the Model

This chapter describes key elements of the IDPM, including the roles and responsibilities of CSU staff, technological information gathering techniques, and other resources used to gather, organize, and "push out" intelligence to relevant parties.

# Initial Planning Elements

In January 2010, Cyrus R. Vance, Jr. assumed office as the newly elected District Attorney of New York (Manhattan). Among his first priorities was the full implementation of the IDPM. Building off extensive planning work during the tenure of the previous District Attorney, Robert M. Morgenthau, DANY formally established the IDPM and CSU five months into Cyrus Vance Jr.'s term, (May 2010). Planning work and background data collection on crime trends specific to each of CSU's five geographic areas—and the police precinct falling within each area—continued after the IDPM's implementation to ensure CSU staff remained updated on relevant sources of criminal activity. All area-based CSU teams included an intelligence analyst who could conduct ongoing crime analysis work.

## Division of Manhattan into Five Areas

To implement the IDPM, DANY had to first establish CSU's geographic boundaries. The District Attorney and his executive staff divided Manhattan into five areas, as shown in Figure 1.1. DANY drew these areas along precinct lines and patrol boundaries (Patrol Borough of Manhattan South and Patrol Borough of Manhattan North) to ensure close coordination with the New York Police Department (NYPD). DANY also defined geographic boundaries based on types and volumes of crime; this approach grouped precincts with similar crime concerns in the same area and created a balanced workload for respective Area ADAs. For example, Area 3, which spans the upper east side of Manhattan (19th precinct) and East Harlem (23rd and 25th precincts), includes only three police precincts, instead of four, because of overall crime volume and severity; this area likewise keeps the East Harlem community intact instead of mixing it with other northern Manhattan precincts.

Overall, the five areas average four precincts each, although only Area 1 includes exactly four precincts (Area 3 includes three precincts, Areas 4 and 5 include five precincts, and Area 2 includes four numbered precincts plus Central Park). Based on expected workload, certain areas were also expected to coordinate with non-precinct-based police bureaus, including the Metropolitan Transport Authority, the Port Authority of New York and New Jersey, and Police Service Areas (e.g., the NYPD Housing Bureau).

## Appointing Senior ADAs to Crime Strategies Unit Areas

DANY appointed ADA David O'Keefe to serve as CSU's chief in May 2010, while the unit as a whole reported to Chauncey Parker, an Executive Assistant District Attorney and Special Policy Advisor who oversees crime prevention strategies. Reporting to the unit chief, DANY appointed five senior ADAs to lead the work in each of the five respective geographic areas.

## Crime Assessments by Precinct

Area ADAs became experts on the crime issues within their districts by researching crime trends in their respective areas and reaching out to the precinct commanders and field intelligence officers (FIOs) to discuss the top crime concerns of the NYPD for each precinct. CSU Area ADAs also requested each precinct commander identify 25 priority offenders. These priority offenders included individuals identified as crime drivers in each of the precincts, primarily drivers of violent crime and, to a lesser extent, quality-of-life issues. By prosecuting and incarcerating these individuals, DANY believed it could improve community safety and quality of life. Area ADAs also reached out to community stakeholders during the course of their intelligence gathering to better understand the communities within each area. DANY conducted a crime assessment of all 22 police precincts in Manhattan (Central Park was included as a precinct for the purpose of this tally) and incorporated these assessments into a "Briefing Book." The Briefing Book included a four-to-six-page evaluation of each Manhattan precinct, densely packed with:

- A map of the given precinct with boundaries clearly demarcated and separately noted,
- A narrative overview of the demographics and major crime problems in the precinct,
- Contact information for the Commanding Officer and other senior New York Police Department (NYPD) staff assigned to the precinct,
- Crime data on the seven index crimes in 2009 and up to June 27, 2010 (a month after CSU was established),

- Crime data specifically on homicides and shootings in 2009 and 2010 year-to-date, along with specifics on one or two recent homicides or shootings in some precincts,
- A narrative description of, on average, two types of crimes that briefly explained the nature of each problem, what neighborhood factors drive it, and in what kinds of locales or specific locations the problem had manifested,
- Community concerns, as reported by residents and/or community representatives,
- Specific "hot spots," if known, (e.g., housing complexes, intersections, or other types of places where problem crimes were known to occur), and
- Information, if known, about local gangs or "crews" that were implicated in significant criminal activity within the precinct.

Through the Briefing Book, CSU informed the District Attorney and his executive on the program's initial progress. Furthermore, the Briefing Book helped facilitate relationship building within each area and provided insight for future prosecution initiatives.

# Crime Strategies Unit Staff: Roles and Responsibilities

## Crime Strategies Unit Area ADAs

As described above, CSU Area ADAs became experts on the nature of crime within their respective areas and the five geographic divisions helped ensure that law enforcement in each area had a single point of contact within the DA's Office. Because the areas focused on different types of crime and geographically-based issues, law enforcement and CSU must collaborate to effectively identify offenders and facilitate the exchange of information. For example, Area 4 is home to several major transportation hubs (Penn Station, the Port Authority Bus Terminal, and Grand Central Station). The CSU Area ADA must coordinate with each agency responsible for policing these hubs to successfully prosecute non-violent offenses such as burglaries, pickpockets, and quality-of- life offenses. Area 2 & 3 see more incidents of violent crime than the other areas, which requires close collaboration with the NYPD. As described by a CSU ADA, while it took time for the NYPD to understand the new data-driven approach, both agencies worked through the "culture shift" with open communication and collaboration.  Ultimately, the number of successfully prosecuted cases strengthened the partnership.

Finally, DANY assigned each of the five geographic areas a community coordinator from the Community Partnership Unit of the District Attorney's Office.[1] Community coordinators played a key role in educating CSU Area ADAs on critical information gathering work, such as which community stakeholders to contact and what community meetings to attend.

In the early months of CSU, Area ADAs spent substantial portions of their days, and even some weekends, at various community meetings (e.g., precinct council meetings, community board meetings, tenant association meetings, and other meetings involving community-based organizations, local public safety, or quality-of-life issues). Once CSU Area ADAs became familiar with the community and its stakeholders, they decreased the number of meetings personally attended; however, the monthly Precinct Council Meeting was, and continues to be, a priority for all CPU Area Coordinators.

Similar to the collaboration between law enforcement and CSU ADAs, CSU and local community partnerships collaborate to enhance public safety. As described by one CSU ADA, the community has been receptive to working with CSU.

> *I find that for the most part they are excited and happy to hear that law enforcement wants to listen to them and get to know what their concerns are.  They have called 311, they have called 911, they have met with the police precinct commanding officer, and so they are happy to explain what they need in the community.*

The relationship with law enforcement is characterized by collaborative intelligence sharing. As one community stakeholder stated, "it was definitely not a one-way street. It was everybody working together." Several community leaders noted how their communities experienced significant improvements since working with CSU. With regard to whether there were noticeable changes in crime, one community leader stated, "I don't want to say it's night and day, but it's pretty close." Community stakeholders have cautioned that collaboration must continue to ensure success. As one stakeholder said, "I feel like we have to continue. If not, in 2017 it might get to the same level where we will have to do this whole thing all over again with a lot of pressure." Other community members identified areas where intelligence sharing could be strengthened. One community leader noted that, although they share intelligence with CSU, it is sometimes unclear what ultimately happens to specific individuals and whether they remain in the community.

---

[1] This unit was formerly known as the Community Affairs Unit, and its existence dates back to the 1980s.

*Sometimes we provide information on a crime and I don't know if it's because of the law, but we don't get an update.  I don't know if the individual is still loose out there.  So we are giving out all this information for the better quality of life and we are sort of in the dark.*

Additionally, the community has expressed the need for youth engagement and intervention to curb future gang violence. "Two to three years from now, we are going to get more gang members. We really have to work with that community," said one community leader. Community programs sponsored through the District Attorney's Office, such as Saturday Night Lights, represent opportunities for CSU to engage stakeholders while also providing youth in hotspot neighborhoods opportunities to avoid violence. Although the District Attorney's Office has been active in community outreach, a CSU ADA thought DANY should also address the sources creating these gangs; the mass arrests of gang members can be "painful for the community and you are also leaving a vortex. You don't want someone else to be like, 'now I can start up a gang because there's no one to oppose me.'" To address this issue, one CSU ADA collaborated with administrators at a school in the middle of a hotspot to enroll the district in DANY's Adopt-a-School program. Through this initiative, DANY implemented youth- specific programming (e.g., gang awareness, cyberbullying) in conjunction with outreach activities aimed at parental engagement.

## Bureau-Based Project Teams

In July 2010, CSU Area ADAs presented the Briefing Book to District Attorney Cyrus R. Vance, Jr. Following this CSU-based research, DA Vance created thirty-three Bureau-Based Project Teams to investigate and prosecute specific crime areas (i.e. crime types, gangs, hotpots, or "projects") across the city.

Bureau-Based Project teams (BBPs) consist of approximately three to six dedicated prosecutors from the trial division. These ADAs become experts on a select crime concern or hot spot, identify offenders believed to be the crime drivers in a particular geographic location (the location does not have to encompass an entire "area"), and devise a plan to target, prosecute, and eventually incapacitate these individuals through incarceration or supervision (i.e., parole or probation). DANY primarily formed BBPs to address violent crime, but developed additional teams to address other issues, including scammers, prostitution, and larceny-related crimes. BBPs also require prosecutors to work closely with NYPD specialized units (i.e. gangs, narcotics, and/ or grand larceny units).  BBPs are not

permanent fixtures. DANY may dismantle a team once successful prosecutions substantially decrease the targeted criminal behavior-if the crime issue re-emerges at a later date, DANY creates a new BBP team. In the fall of 2014, DANY had 13 operational BBPs.

The nature of BBPs varies in different regions. One CSU ADA noted that DANY disbanded a BBP focused on grand larceny investigations to instead monitor recidivists using the AAS. In areas characterized by greater gang activity, BBPs must evolve to reflect current intelligence on gangs and crews. Another CSU ADA described a situation in which two gangs had been feuding for years within the confines of three police precincts. When a third gang formed within the same area, a significant number of individuals "double jacked," or affiliated with more than one gang. As a result, this area felt a "bit more malleable, which muddies the water a lot and makes it more complicated to try to figure out where the gang violence is isolated." The BBPs associated with each individual gang then merged to centralize intelligence. This merger created a team of veteran ADAs already familiar with the gang activity in the region. BBPs must both evolve as a function of intelligence, and ensure the continuity of intelligence through the careful selection of team members with background knowledge in specific areas.

## Intelligence Analysts

When DANY established CSU, it assigned four intelligence analysts to the unit. Early on, intelligence analysts worked together as a resource for all CSU ADAs. However, over time, DANY assigned specific intelligence analysts to particular areas. In the five designated areas of Manhattan, DANY assigned three intelligence analysts to a specific region, with a fourth intelligence analyst split between the remaining two areas. DANY has since added an Analyst Supervisor, who also manages the DANY311 system, and a Strategic Intelligence Analyst, who is responsible for technology within CSU and serves as the technology trainer and liaison to the Tech Analysts embedded in the trial bureaus. Qualifications for intelligence analysts primarily include: an undergraduate degree, an interest in law enforcement, and a potential or demonstrated facility with crime data. Responsibilities include: analyzing crime data, constructing crime reports, and providing intelligence in the form of statistics and mapping to the area ADAs, Community Coordinators, Bureau-Based Teams, and select other ADAs throughout the DANY office.

One analyst described the job as a combination of intelligence gathering and investigative analysis. Analysts can provide feedback to CSU on how to improve information sharing and analysis. Analysts have worked closely with CSU Area ADAs to develop innovations, such

as DANY InPho, a program organizing intelligence gathered from recorded jail telephone calls.  Analysts likewise improved the SharePoint website to include camera mapping. As one analyst noted, "all of the data collection that we are doing only becomes valuable if we can understand how they intersect."

## Internship Program

Part of the New York City Department of Correction's policy is to record all phone calls made by defendants. These calls are a vital resource for local District Attorney's Offices, who use the intelligence to successfully prosecute criminal defendants. However, a single offender can amass a large volume of phone calls, which can overwork ADAs. As a result, CSU created an internship program through a pre-established relationship with the National Guard, where area ROTC students listen to phone calls and document potentially useful information as it relates to a projects, priority offenders, or requests from an ADA[2].  In the early phase of CSU, these interns had top secret security clearances, were monitored by a National Guard member, and worked off site.

In the fall of 2011, CSU restructured the internship program to resemble a college course. The program expanded to include students attending local universities and colleges (i.e., Fordham University, NYU, and John Jay College of Criminal Justice). One ADA described the internship experience at CSU as "almost like a college course. We are going to have a curriculum. You come in, you're going to get training, you're going to get a briefing on the cases that you're going to be working on, and then we are going to assign you to help us out with these phone calls." In addition to processing phone calls, interns may also work on Facebook reviews, translate documents, sit in on interviews, and organize photographic intelligence. As of the fall of 2014, approximately 15 interns per semester worked onsite in the DANY offices two to three days a week. Interns receive college credit for successfully completing a certain number of hours of work within a semester. A National Guard member still oversees the interns and continues to manage the workload.

---

[2] ADAs with a large volume of phone calls to review in respect to a case or investigation can request assistance from CSU to have interns review phone calls

# Enhancing Information Sharing: The Arrest Alert System

The Arrest Alert System (AAS) of the District Attorney's Office of New York has existed in some form for approximately 30 years. Essentially, the AAS is a means of notifying assistant district attorneys throughout the office when a person of interest or "priority offender"— typically an individual who is known to play a central role in creating or overseeing local criminal activities or enterprises—has a new arrest. Through this notification system, which also provides relevant information about the priority offender to whoever is prosecuting the new case, ADAs can make more informed prosecutorial decisions about charging, bail requests, appropriate case disposition, and sentencing.

## A Brief History of the Purpose and Operation of the Arrest Alert System

When first created 30 years ago, the AAS was a simple database managed by the DANY technical support staff. During the early years of the AAS, the system only partially automated information. If a computer/management information system staff member wanted to notify an interested ADA about a priority offender's arrest, they had to deliver a paper notification to the ADA's mailbox. Such notifications were rarely delivered or received prior to arraignment, and this delay prevented ADAs from using the system's information to inform their bail applications or initial charging decisions. In cases that proceeded promptly to disposition (particularly misdemeanors that are often disposed at arraignments), this paper notification system essentially meant that notifications would rarely, if ever, impact disposition and sentencing recommendations.

When DANY created CSU in 2010 it simultaneously overhauled the AAS. With CSU chief and two Area ADAs collaborating with the DA's Information Technology Office, the system was fully automated. Staff members reconsidered and selected the types of information included in an arrest alert, how the information is organized, and how intelligence is visually displayed to users. Staff members may create an arrest alert using the defendant's unique New York State ID (NYSID) number, which is assigned at a defendant's first finger-printable arrest. ADAs may request arrest alerts about persons already in the system or can create arrest alerts about new persons of interest. Area ADAs from CSU staff play a particularly important role in creating new arrest alerts because of their in-depth knowledge of crime drivers in each precinct. CSU provided necessary staffing to ensure the system

remain updated, that new persons of interest are added promptly, and that non- CSU ADAs consistently receive alerts on persons of interest.

In the fall of 2013, another AAS update expanded the capabilities of the system and allowed staff to create alerts based on a defendant's name (first, last), geographic location (or hotspot), offense type, or date of birth. The new structure of the system also allowed individuals to organize arrest alert data into subfolders. For example, instead of creating an alert based on a single defendant, a CSU Area ADA could create an alert based on New York City Housing Authority developments, gang involvement, and crime type.

While any ADA in the office can create an alert, CSU staff are the main users and consumers. CSU ADAs typically receive approximately 10 to 20 arrest alerts a day. Analysts working within CSU may be in charge of creating and modifying alerts, and the number of arrest alerts handled by an analyst will vary across CSU areas. For example, while one analyst described working with alerts about "twenty times a day," an analyst in a different CSU area noted that he processed alerts in bulk. This analyst did not work with arrest alerts on a daily basis, but rather made around 30 to 50 information adjustments when necessary. Only CSU staff can create arrest alerts based on geographic location and date of birth. However, as emphasized above, the revamped AAS function to use CSU staff's expertise and capacity to disseminate relevant arrest alerts to DANY ADAs who need this information to better prosecute individuals and cases.

## The Mechanics of Utilizing Arrest Alerts to Prosecute Cases

**Communication of Arrest Alerts from CSU to Prosecuting Assistant District Attorneys:** Although much depends upon the situation, (e.g. priority level of the offender, nature of the alert) Figure 3.1 provides a graphic representation of potential actions and outcomes that may occur when a priority offender is newly arrested. A CSU area ADA receives an arrest alert and CSU area ADA communicates relevant information about the offender to the ADA prosecuting the case.

Within two to three hours after a priority offender is arrested and fingerprinted, CSU staff receive an automatic email notification through the AAS. This email notification includes: the defendant's name, date of birth, NYSID number, resident precinct, arrest date, time, and location, the name of the arresting officer, the arresting officer's precinct, the top charge, the date, time and place of the incident, and a brief narrative.

CSU Area ADAs then take a variety of actions, depending on the information they received. For example, CSU Area ADA can reach out to the ADA writing up the case in the Early Case Assessment Bureau (ECAB) to inform the prosecutor of pertinent information related to the defendant's criminal activity unavailable on the rap sheet (such as whether the defendant is a member of a violent gang). Such communication to the ADA in ECAB may alter the bail amount requested, influence the ADA's decision to recommend setting bail in the first place in lieu of recommending the defendant be released on his own recognizance, may enhance charges against a defendant, or change the disposition and/or sentencing recommendations.

CSU Area ADA may also offer the attorney in ECAB a prepared bail application with all of the relevant intelligence entered. In addition, if a defendant is re-arrested while out on bail (or while released without bail), the ADA can utilize the information provided in the arrest alert to petition the judge to revoke bail and ensure speedy trial time is not sacrificed.

In the majority of cases, CSU Area ADAs work to "push out" intelligence during the pre-arrangement phase so that ADAs obtain relevant information in time to influence a release or bail recommendation. However, a CSU Area ADA may also wait until the post-arraignment phase to contact the prosecuting attorney. For example, in situations where the defendant commits a serious crime (i.e., robbery at gunpoint), CSU ADA can ensure the prosecuting attorney pursue the case aggressively by filing a greater charge and requesting a higher bail or a denial of bail. CSU Area ADA does not necessarily need to intervene in the pre-arrangement phase. Instead, in such cases, CSU Area ADA will reach out to the prosecuting attorney during the post-arraignment phase to provide useful intelligence during the investigation. ADAs and investigators can use that intelligence at any time from post-arraignment to the final disposition of the case. As one CSU ADA described it:

> Our focus is to know everything we can know and then to push that out to the ADAs.  So every single day, I will call up an ADA and say, 'the case you have, let me tell you a few things.' I will send information in an email to say 'we found his Facebook address and he's bragging about this,' or 'he's claiming he's going to do this,' or 'I just found out that he was the victim of a gun crime in the Bronx a year ago.  Did you know that?"  So, I mean that is a constant here, getting the information where it needs to go, and where it needs to go is to another prosecutor.

**Communication of Arrest Alerts Triggered by the Prosecuting Assistant District Attorneys:** While CSU Area ADAs have greater access to the AAS and are its primary users, members of Bureau-Based Project teams and individual ADAs can also create

and utilize arrest alerts. For example, ADAs involved in BBPs may be interested in monitoring specific offenders. After receiving an arrest alert, the ADA in a BBP could debrief the defendant as part of a continuing investigation or request the case from another ADA in ECAB. Figure 3.2 provides a graphic representation of the possible actions and outcomes when an ADA from a Bureau-Based Project team or another ADA who signed up for alerts on a priority offender receives a new arrest alert.

Regardless of who initially created an arrest alert, if an ADA subscribes to an alert on a priority offender, within two to three hours of the offender's arrest and fingerprinting, the ADA receives an automatic email notification. This email notification is in the same format as CSU Area ADA alerts (described above). Whether the ADAs are independently prosecuting a single case or are members of a Bureau-Based Project team, they can take a variety of actions depending on the information in the alert. If a priority offender already has an open case, the ADA/BBP can reach out to the prosecuting attorney or presiding judge to request they revoke bail. The ADA/BBP can also reach out to the ADA in ECAB and either provide the necessary intelligence to enhance bail, charges, or sentencing recommendations or ask to take on the case themselves.

**Other Intelligence Gathering Uses of the Arrest Alert System:** The Arrest Alert System helps gather intelligence, specifically on priority offenders. For example, a CSU Area ADA may be interested in debriefing an individual who was arrested and linked to an active gang. Even if some of the information the defendant provides is not immediately useful for prosecuting a priority offender, ADAs can still enter this intelligence into files on SharePoint or Wiki Pages and re-access the information at a later time. Maintaining up-to-date intelligence is a vital step in tracing and identifying evolving criminal patterns and associations. In 2015, DANY halted pre-arraignment debriefings after determining they required a revised system to ensure intelligence is found quickly and completely. CSU developed protocols, policies, and training for a debriefing/proffer program to be implemented across the Manhattan District Attorney's Office in the near future.

In addition to monitoring specific individuals, CSU Area ADAs may use the alerts associated with particular crimes or locations to develop a better sense of crime in their area. One CSU Area ADA described how weapons arrest alerts helped prosecutors gather intelligence on up-and-coming gang members. The ADA explained that, although the gang unit of the NYPD worked closely with CSU, gang activity in this area was a relatively new phenomenon and the strategic use of intelligence helped law enforcement better understand the relationship between gangs and priority offenders from other areas.

*The arrest alerts are one of the key things that helped indicate to me that there was some violence going on that I otherwise would not have been alerted to and then made me dig deeper to figure out what was going on. And sometimes, too, it's uptown guys who one of my colleagues has arrest alerts on [who] come down to the Lower East Side and commit violence and the alerts let [my colleagues] know that they need to loop me in.*

ADAs and BBPs may create arrest alerts for both witnesses and victims; the system does not exclusively focus on defendants/perpetrators. Such alerts may be useful if victims and witnesses "go missing." An arrest alert can let ADAs know they need to either speak with the victim or witness or confirm the witness's current living situation.

Limitations in Identifying Gang-Involved Individuals
CSU can create a more comprehensive assessment of gang-related crime in each area with the strategic use of arrest alerts combined with intelligence gathered via social media. Although CSU works closely with the NYPD gang unit, there were challenges in identifying new gangs in each region through arrest alerts alone.

## Summary: The Impact of the Arrest Alert System

The enhanced communication and intelligence flow between CSU and prosecuting ADAs means that bail requests, charging decisions, and disposition and sentencing recommendations more accurately reflect a priority offender's true criminal involvement. In other words, ADAs obtain stronger evidence to support their sentencing recommendations through comprehensive intelligence gathering and organization. The intermediate goal of this intelligence-driven prosecution model is to incapacitate high priority offenders with higher bail or more severe incarceration sentences, which results in increased prosecutorial effectiveness and enhanced public safety.

# Additional Tools for Gathering, Organizing, and Disseminating Intelligence

CSU staff originally stored their intelligence in Excel files, but the volume of accumulated intelligence over time prompted the unit to adopt alternative data gathering and organizing methods. This section briefly describes the technological resources (other than arrest alerts) that organize and "push out" CSU-gathered intelligence.

## SharePoint Resources

DANY utilizes Microsoft's SharePoint system as an internal web application to access numerous resources. After an upgrade to SharePoint 2013 in May 2015, the DA's Office rebranded SharePoint as DANYNET. Because data collection concluded prior to the upgrade, our focus is limited to the resources available during the study period.

- **DANY311** is an electronic form established in the fall of 2013, where ADAs can submit a wide range of questions to CSU, primarily related to priority or violent offenders. For example, prosecutors may contact CSU staff to identify the whereabouts of a person of interest, review gang activity, access geographic information, etc. The program tracks questions and responses so CSU can examine the types of inquiries submitted to CSU Area ADAs and the response time required to answer these inquiries. If a question arises during a conversation between an ADA and a CSU Area ADA, whether in person, over the phone, or through email, a CSU Area ADA can enter this question into DANY311. This process allows CSU Area ADA to create a record of all requests or questions and route each inquiry to the appropriate staff member. For example, if a question arises during a conversation between an ADA and the Area 5 ADA that is best answered by the Area 3 ADA, the Area 5 ADA will enter the question into DANY311 and send it to the Area 3 ADA.

- **Bureau-Based Projects (BBP) Hot Spot Reports** are documents describing all current and past BBPs and lists each BBP-assigned prosecutor's trial bureau. The document also includes relevant CSU contact information to ensure that anyone viewing the document—whether CSU staff or an ADA assigned to a current or past BBP—can immediately know who to contact. Since BBPs integrate non-CSU prosecutors into investigative projects, distributing this information also serves as a recruitment tool for individuals interested in volunteering for specific teams.

- **Glossary of Street Slang** is a document providing definitions for commonly used street slang recorded in jail phone calls or on social media forums. During investigations, prosecutors may request tapes of jail phone conversations, which may number in the hundreds. While prosecutors can derive valuable intelligence from these phone calls, defendants often use terms to refer to criminal activity that are not part of common vernacular. For example, the street slang for a gun is a hammer. If prosecutors listen to jail phone conversations and hear an unfamiliar term, they can refer to the glossary to help clarify what the defendant is discussing.

**Figure 3.1. Potential Case Flow for Priority Offenders Identified by the Crime Strategies Unit**



**Figure 3.2. Potential Case Flow for Arrest Alerts Created by DAs and BBPs**



- **DANY InPho** is a Microsoft Excel Macro program reducing the demands of reviewing an overwhelming number of subpoenaed jail phone calls associated with an investigation.[3] DANY InPho extracts digital information from the phone calls' files, including NYSID, name, book and case number, date and time of the call, number dialed, and call duration. Intelligence analysts review this information, import the data into an Excel file, and provide the intelligence to ADAs who can analyze and listen to the most pertinent calls. This program also allows the person listening and summarizing the phone calls to easily flag important summaries for the prosecutor's review.

- **Gang Information** is a document providing a list and description of all known gangs in Manhattan. This list includes the location of the gang, who the gang is feuding with, and a link to a photo sheet with pictures of confirmed gang members.

- **Homicides and Shootings** are Excel files, updated on a daily basis, providing a breakdown of all shootings and homicides by precinct since CSU's creation in 2010; some files do, however, extend back to 2008.

- **Precinct Information** provides a map of Manhattan delineating all 22 precinct boundaries at the street level. This map also notes the different patrol sectors within each precinct.

- **NYCHA (& other locations)** provides a map of Manhattan identifying the New York City Housing Authority buildings and other hotspots in Manhattan. These maps are color-coded and clearly show each building and its address.

- **Photosheets** present pictures of individuals associated with a gang, who drive crime at hotspot locations, or who routinely engage in a particular type of crime. Prosecutors and investigators use Photosheets during debriefings with defendants and/or civilians.

- **Surveillance Camera Interactive Map (SCIM)** is a database allowing users to identify the location of cameras in the vicinity of a crime scene to determine how many cameras are in the area and which ones may have captured the incident on video. The database links to an interactive mapping program allowing users to

---

[3] A precursor to DANY InPho, the Inmate Call Summary form, was available on SharePoint until early 2014.  Prosecutors could open this form and enter information on who the defendant was speaking to, what they were discussing, and when the conversation occurred. The prosecutor could then save this information and be able to search through all of the phone call forms at a later time.

highlight an area of interest with their cursors (i.e., a four-block radius). Once the area is highlighted, the program visually identifies all the locations of known cameras within that area. When the user clicks on a camera icon, a description pops up detailing where the camera is located, who to contact to acquire the footage, and how long the location preserves the video.

- **Crime Prevention System (CPS)** is a CSU-maintained repository of criminal intelligence. CSU organizes CPS around persons, gangs, BBPs, and incidents, which allows prosecutors to discover relationships in the data. Individual of interest may have a file even if they have not been arrested. For example, CSU staff may add a file to CPS documenting a violent incident, including the date, start date, end date, precinct, address, relative location, geocoding fields for mapping, and incident description, even if the incident did not result in an arrest. CSU can also describe incidents as homicides, shootings, shots fired, stabbings, sexual assaults, drug-related incidents, gang-related incidents or domestic violence incidents. CSU staff can identify victims, suspects, witnesses, or defendants, and document the type of weapon used in the crime.

- **Wikis** are a CSU-written and interlinked set of web pages designed to store and organize unstructured intelligence on defendants. Prosecutors may request access to these pages from CSU, which controls the levels of access and permissions for each user. Each "page" represents a person of interest; these individuals could be priority offenders or criminal associates. Information on a Wiki page may include the defendant's association with gangs, feuds, victims, and eyewitnesses to the defendant's criminal activity. Wikis allow users to not only search individuals, but locations, crimes, contact information, and more. Through a comprehensive search engine on a variety of topics, prosecutors can highlight patterns, connections, and relationships that may have otherwise remained hidden under a vast amount of data.

- **Palantir** is a technology suite for data analysis allowing CSU staff to connect data and information across all pertinent databases. For example, Palantir will soon work in tandem with CSU developed SCIM database described above to help prosecutors search for surveillance cameras within a specific radius. Palantir also enables prosecutors to make connections between data derived from phone calls and Facebook, a process highlighting potential links between individuals and events.

# Logic Model

Figure 3.3 is a graphic representation of the logic model for the Intelligence-Driven Prosecution Model, capturing and distilling most of the elements discussed above.

**Figure 3.3. Intelligence-Driven Prosecution Logic Model**

| Resources/Inputs | Foundation Steps | Activities | Outputs | Customers | Immediate Outcomes |
|---|---|---|---|---|---|
| Establish CSU-appoint Chief and Area ADAs<br><br>ADAs<br><br>Intelligence Analysts<br><br>Intelligence Officer, Patrol Officers (NYPD)<br><br>Community Coordinators (from Community Partnerships Unit)<br><br>Community Stakeholders<br><br>Interns<br><br>Administrative Assistants<br><br>DANY IT | Establish & maintain relationships between CSU, NYPD, community partnerships and the community<br><br>Identify 25 priority (FIO source) offenders in each area<br><br>Collect intelligence on priority offenders and criminal associates<br><br>Identify major crime problems (i.e., gang violence)<br><br>Identify how intelligence data needs to be organized and managed | Educate ADAs through lectures and trainings<br><br>Create web & tracking resources (SharePoint, etc.)<br><br>Recruit 3-6 senior ADA's for each BBP and train them<br><br>Intelligence gathering by interns (Facebook posts & jail phone calls) | DANY311<br><br>Resources on SharePoint<br><br>Bureau-Based Project Teams<br><br>Arrest Alerts<br><br>Wiki Pages<br><br>DANYInPho<br><br>Palantir<br><br>Crime Prevention System | BBP Teams<br><br>Prosecutors<br><br>Law Enforcement<br><br>Community | Accurate understanding of the nature of crime issues facing communities, from violent crimes to quality-of-life issues. Identify individuals who are drivers of crime. |

**Intermediate Outcomes**

Enhanced charging decisions (indictments), bail applications, and sentencing recommendations

**Long Term Outcomes**

Increase public safety

# CSU Resources in Practice

## Use of the Arrest Alert System by CSU Assistant District Attorneys

A CSU ADA provided an example illustrating how efficient intelligence gathering can influence cases across the five boroughs. The ADA, following initial meetings with law enforcement and community contacts, identified two brothers as priority offenders associated with grand larcenies, robberies, and narcotics. Soon after Hurricane Sandy, CSU received an arrest alert indicating that the brothers had been arrested for trespassing in a business on Staten Island. The case was weak, however, because prosecutors could not prove why the brothers were in the store (possibly seeking shelter from the hurricane) or on Staten Island in the first place. At the time of the trespassing arrest, one of the brothers had an open case in special narcotics and CSU knew that his Facebook page was listed under his street narcotics name, information otherwise unavailable to an attorney unfamiliar with the offender. Prior to the hurricane, the offender posted on his Facebook page that, "I am going to Staten Island to get rich tonight." Within a matter of days, CSU coordinated with Staten Island DAs, who used the Facebook post to support a burglary case against the offender.

Although the AAS functions as an invaluable tool in helping combat gang violence in certain CSU areas, the system can also address broader quality-of-life issues. Each crime area contains a group of priority recidivists tied to the specific needs of the region. For example, some areas have to contend with "squeegee" men and women who wash the windshields of cars stopped at intersections and then solicit money. One individual was so notorious for such activity; he had made the front page of several local newspapers. Upon arrest, this individual regularly told police, "I'm going to get time served. I'm going to get out." One day, after being arrested, arraigned, and released in the morning, this individual was arrested less than eight hours later on a new charge. Upon receiving the arrest alert, a CSU ADA shared this knowledge with the judge during the evening arraignment, saying, "Your Honor, I want to explain to you who this person is because it is a huge safety hazard when he blocks traffic on major thoroughfares and acts in a very aggressive manner. Think about when you swerve your car to avoid hitting the man in front of you and what happens as a result. He is cavalier and blasé about it and says, 'I'm just going to keep doing it, because I always get time served.'" As a result of this intervention, the judge did not offer the individual time served at arraignment. The defendant was unable to make bail and spent 22 days in jail before conviction, where he was ultimately sentenced to time served. According to the ADA

who relayed this story, in the eight months before the defendant's detainment pretrial, CSU received an arrest alert for this individual on a weekly basis. After he spent time in jail, CSU did not receive an alert on the defendant for eight months.

In another example, CSU used the AAS to influence the case of a known recidivist identified by the NYPD as "one of the city's worst scammers." The individual would walk up to people, drop a pair of glasses, and say, "Hey, you broke my glasses. You need to pay me so I can replace them." After the NYPD arrested him for jostling, CSU received an arrest alert and reached out to the ADA drafting the case in ECAB. CSU staff notified the ADA that the individual was a known recidivist and prosecutors could possibly draft the case as a robbery since the individual was very physically imposing. When the ADA interviewed the victim, he could not confirm that a physical assault occurred, but the victim asserted that the "threat" of violence had been present. Despite "basically coming in and out of our system on a daily basis," the CSU-provided information allowed the ADA to investigate further and enhance the charges. The defendant went to trial, where he ultimately lost and was sentenced to three-and-a-half years in prison.

## Case Examples Provided by CSU

What follows is a brief summary of several cases provided by CSU's chief to illustrate the AAS' role in prosecutorial decision-making.[4]

- **Transit Recidivist:** This case concerns a defendant who tampered with MetroCard machines in the subway (Criminal Tampering in the First Degree). CSU received a transit recidivist arrest alert and notified ECAB. Because CSU identified this defendant as a problem for nearly five years, prosecutors charged the case as a felony; without CSU's intervention, prosecutors would have normally reduced the charge to a misdemeanor. The more aggressive charging may have contributed to a $15,000 bail request (the judge ultimately set bail at $5,000) and the defendant's eventual plea to a misdemeanor with a lengthy six-month jail sentence.

- **Enhanced Bail Application:** This case concerns an individual who was arrested for attacking a man and stealing his iPod. Prosecutors charged the defendant, who

---

[4] It was unfeasible for researchers to view DANY maintained case files. Instead, CSU chief provided more than a dozen examples of how the Arrest Alert System influenced decision making, from which researchers selected six (in the last instance condensing two examples into one) for a brief bullet form summary. Researchers intentionally selected these six examples because they represent a range of the Arrest Alert System's functions. The summary of each case essentially edits and shortens a longer paragraph that CSU chief provided. In this regard, the research team deeply appreciates the unit chief's assistance.

committed the crime with two other perpetrators, with Robbery in the Second Degree, a Class C Felony. After CSU staff notified the ADA writing up the case in ECAB of the defendant's gang affiliation and involvement in another open case, the ADA doubled the bail request from $5,000 to $10,000.

- **Grand Jury Charging:** CSU received an arrest alert indicating that a defendant belonged to an identified gang in an area with recent shootings, had previously been shot and was uncooperative, and was a possible witness to a homicide. The ADA drafting the case enhanced the charge (brandishing a metal lock in a large group) to Criminal Possession of a Weapon in the Third Degree, a felony, based on his previous criminal conviction. Prosecutors subsequently added charges of Bail Jumping in the Second Degree and Resisting Arrest when the defendant warranted and then resisted arrest on the warrant. The defendant was ultimately sentenced to two to four years of incarceration. Without the arrest alert, prosecutors would have likely charged the defendant at the misdemeanor level, which carries the maximum of a one-year jail sentence.

- **Enhanced Intelligence Gathering Opportunities:** When CSU received an alert that a violent gang member had been arrested for a robbery, the unit reached out to the ADA drafting the case in ECAB and provided intelligence on the individual's gang affiliation and photographs of other suspected members of the gang. The ADA in ECAB took a statement from the defendant. Although the defendant did not admit to the robbery, he confirmed the identities of several of the individuals CSU identified as members of the same gang. The defendant also clarified the familial relationships between himself and other prominent gang members. Although this information did not enhance the robbery case, it helped CSU staff gather intelligence on a violent gang and its members.

- **Informing Parole Decisions:** CSU received an arrest alert that an identified gang member, who was on parole, had been arrested for a misdemeanor shoplifting offense. CSU staff successfully requested that the State Division of Parole set conditions barring the defendant from the gang area and from associating with members of his gang. While the new arrest was outside the gang area, it triggered an arrest alert, which prompted CSU to examine the co-defendant's background. CSU informed Parole that the co-defendant was on a list of individuals who the original defendant was barred from associating; Parole subsequently filed a parole violation.

- **Informing Judges on Violations of their Orders:** In two separate cases, judges assigned youthful defendants (ages 17 and 15) curfews after robbery arrests. In both cases, subsequent after-hours arrests triggered alerts, leading the respective judges to remand the defendants into custody.

# Chapter 4
# Communication Survey Findings

Based on the results of the survey administered to assistant district attorneys and other DANY staff, this chapter describes how often and in what ways DANY utilizes the Arrest Alert System and other technological resources overseen by the Crime Strategies Unit.

## Characteristics of Survey Respondents

Table 4.1 provides a description of the survey respondents. The majority (82%) were ADAs. Eighteen percent were support staff (Trial Preparation Assistant/Analyst/Tech Analyst). Given the small size of the support staff subsample, this chapter primarily examines ADAs' use of CSU resources and how this information guides their decision-making. Appendix B contains tables that detail the responses of the support staff subsample.

**Table 4.1. Characteristics of Survey Respondents (n = 285)**

|  | Percent |
|---|---|
| *Current Position in DANY* | |
| Assistant District Attorney (ADA) | 82% |
| Trial Preparation Assistant (TPA) | 14% |
| Analyst/Tech Analyst (A/TA) | 4% |
| *Assigned to ECAB during the past six months* | |
| Yes | 58% |
| No | 26% |
| Not Applicable/not an ADA | 16% |
| *Years of experience as ADA* | |
| Less than 1 year | 7% |
| 2 years | 10% |
| 3 years | 10% |
| 4 years | 10% |
| 5 years | 8% |
| 6 years | 7% |
| 7 years | 6% |
| 8 years | 4% |
| 9 years | 5% |
| 10 years or more | 32% |

## Experience in ECAB

During the six months prior to the survey, 58% of ADAs reported that they were assigned to ECAB. To determine whether contact with CSU varied as a function of assignment, we isolate these ADAs in some of the analyses reported below to examine their level of communication with CSU more closely.

## Years of Experience

ADAs and support staff had varying degrees of experience. While 32% of ADAs reported ten or more years of experience in their current position, 37% reported four years or less. In contrast, the majority of support staff respondents had only served in their respective roles for less than a year. Five support staff individuals reported having served four years or more in their position.

# Frequency of Communication with CSU

The tables provided below detail the frequency with which CSU staff initiated contact with an ADA (Table 4.2) or an ADA initiated contact with CSU (Table 4.3). In the six months prior to the survey, 61% of ADAs reported that CSU had initiated contact to provide information about a priority offender or ongoing case; but 84% reported that CSU had initiated contact in only 1-5 cases in the given six-month period. An important consideration for interpreting this finding is that the survey item is measuring the number of cases rather than the frequency of communication between CSU and ADAs. It is not uncommon for CSU staff to contact ADAs several times during the course of a single case.

### Table 4.2. Communication Initiated by CSU (n = 233)

|  | Percent |
|---|---|
| *CSU initiated contact during the past six months* | |
|    Yes | 61% |
|    No | 39% |
| *Number of cases/investigations in which CSU initiated contact* | |
|    1 - 5 cases | 84% |
|    6 - 10 cases | 11% |
|    11 - 15 cases | 4% |
|    16 - 20 cases | 1% |
|    21 or more cases | 1% |

*Note:* Percentages may not add up to 100% due to rounding.

**Table 4.3. Communication with CSU Initiated by ADAs (n = 233)**

|  | Percent |
|---|---|
| *ADA initiated contact with CSU during the past six months* |  |
| Yes | 70% |
| No | 30% |
| *Number of cases/investigations in which staff initiated contact with CSU* |  |
| 1 - 5 cases | 80% |
| 6 - 10 cases | 11% |
| 11 - 15 cases | 5% |
| 16 - 20 cases | 3% |
| 21 or more cases | 2% |

The results in Table 4.3 indicate that 70% of ADAs contacted CSU either directly or via a DANY 311 request without CSU staff making initial contact. Once again, the majority of contact was reported in the 1-5 cases category (80%).

## CSU Communication with Support Staff

It appears CSU does not communicate as frequently with support staff as with ADAs. Forty-nine out of 52 responding support staff members reported that CSU did not contact them in the prior six months. Support staff were more likely to initiate contact with CSU, and the majority did so either directly or indirectly through a DANY 311 request (30 of 52 support staff contacted CSU in this manner in the prior six months). The number of cases in which support staff initiated communication paralleled the findings from the ADA sample: where contact did occur, it was most likely to happen in the 1-5 cases category. These findings are consistent with expectations because ADAs, who are assigned to specific cases, should have the most interaction with CSU. Instances of support staff engaging CSU illustrates that this population is using CSU resources to assist ADAs during the course of their cases.

## Methods of Communication

Table 4.4 contains information about the most frequently used methods of communicating with CSU. Whether CSU staff contacted an ADA to share information or an ADA contacted CSU, the majority of communication occurred by email or phone. Over a third of ADAs reported never having used DANY 311, while another third reported occasional use.

**Table 4.4.  Methods of Communication**

| Frequency of Use | Phone | Email | Other | DANY 311 |
|---|---|---|---|---|
| *CSU Methods of Communicating with ADAs (n = 233)* | | | | |
| Never used | 17% | 1% | 77% | - |
| Rarely used | 22% | 11% | 2% | - |
| Occasionally used | 39% | 43% | 14% | - |
| Frequently used | 18% | 31% | 5% | - |
| Very frequently used | 4% | 14% | 2% | - |
| *Frequently/Very frequently used* | 22% | 45% | 7% | - |
| *ADAs' Methods of Communicating with CSU (n = 163)* | | | | |
| Never used | 12% | 9% | 82% | 36% |
| Rarely used | 18% | 13% | 2% | 19% |
| Occasionally used | 43% | 43% | 9% | 32% |
| Frequently used | 19% | 25% | 4% | 9% |
| Very frequently used | 8% | 9% | 2% | 4% |
| *Frequently/Very frequently used* | 27% | 34% | 7% | 13% |

# Communication Typology

Survey findings make clear that the exchange of information sometimes occurs in the manner described in official Intelligence-Driven Prosecution Model documents and CSU staff interviews: CSU "pushes out" information to ADAs. However, findings also make clear that communication patterns are often reversed - ADAs reach out to CSU for information. Some ADAs reported that the information flow originated from *both* CSU staff and the ADA.

We were interested in exploring potential differences in survey responses between ADAs who only reported that CSU contacted them versus ADAs who at least sometimes initiated contact with CSU of their own accord. First, we examined the reported prevalence of each category of communication flow over the prior six months: CSU to ADA, ADA to CSU, both, or neither. Table 4.6 illustrates the four different types of exchanges that occurred between ADAs and CSU.

- **Prime Communication:** Almost half of responding ADAs (47%) reported that CSU staff initiated contact in the past six months and they reached out to CSU at least once.

- **Proactive Communication:** Twenty-three percent of responding ADAs reported that CSU staff had not contacted them in the past six months, but the ADAs initiated contact in order to obtain information.

- **Standard Communication:** Reflecting the model of CSU "pushing out" information to ADAs to inform their decision-making, only 14% of ADAs reported that CSU staff initiated contact with them in the past six months to provide intelligence or other information, and they had not initiated contact with CSU. No support staff members displayed this pattern of communication.

- **Suboptimal Communication:** We also identified instances in which communication did not occur at all. For these respondents, CSU did not open lines of communication and the ADA did not contact CSU. Although formally "suboptimal," the lack of any communication between CSU staff and an ADA who responded to the survey could simply reflect the specific job responsibilities or types of cases that some ADAs prosecute. They may require less CSU-collected information.

**Table 4.6. Communication Typology (n = 233)**

| Groups Defined by Direction of Communication | Percent |
|---|---|
| Prime communication (CSU and ADA regularly communicate) | 47% |
| Proactive ADA communication (only ADA initiates communication) | 23% |
| Standard CSU communication (only CSU initiates communication) | 14% |
| Suboptimal communication (neither party initiates communication) | 16% |

## Communication Typology and Experience

We next examined whether an ADA's years of experience influenced levels of involvement with CSU. We used a chi square analysis to explore this possibility and observed differences between the prime and proactive communication groups—the two groups that, together, included 70% of all responding ADAs. Interestingly, ADAs with the least (1-3 years) and the most (10 or more years) experience were more frequently in the proactive communication category with one-way initiation of communication during the prior six months.

## Future Opportunities to Increase Communication

We looked at ways to reduce suboptimal communication and increase the frequency of ADAs using CSU-collected intelligence. One potential solution would be for CSU staff to increase its outreach and training of line ADAs throughout DANY. CSU regularly engages DANY staff at various points in their careers. The Unit targets each new class of attorneys when they start their work in criminal court and interacts with them again a year later during a formal lecture about CSU resources when attorneys receive felony training. One CSU ADA suggested that DANY augment these efforts by qualifying CSU lectures on intelligence-driven prosecution as continuing legal education credits.

Although process research makes clear that CSU regularly engaged with the trial bureaus through training and other initiatives, CSU staff also reported that experience often determined how much attorneys engaged with CSU. As one CSU ADA pointed out:

> If you are a senior person in the office, you probably understand CSU because we've been in existence long enough. . . . but if you're a low level attorney in this office or mid-level, we maybe haven't spoken to you as many times. . .  We take that as an opportunity to explain to them how we can help, what we can do and we have a lot of information on our SharePoint site, which is available to them . . . We'll say 'you can always reach out to me' and 'I can always answer this question, but there's a lot of information we have pushed out that's just sitting there on your desktop waiting for you to access it.'

Although targeted outreach may encourage ADAs to reach out to CSU, an unexpected finding from the survey shows that a great many ADAs were not contacted by CSU staff in the prior six months. Thirty-nine percent of ADA respondents fell into the proactive and suboptimal categories, neither of which were contacted by CSU. As noted above, some ADAs may simply not handle the types of cases that are the subject of arrest alerts or other kinds of CSU information resources. Other ADAs responding to the survey may have been confused as to what constitutes formal contact. For instance, although DANY311 should serve as a metric for capturing how many ADAs interact with CSU, communication may occur in a much more informal manner than what the survey was designed to capture. As one CSU ADA said:

> If I reach out to someone to give then information, it's not a DANY311.  But if in the course of reaching out to them, they ask me for something then that's a 311. He's like, 'I can never figure out what's a 311 and what is not or he'll say 'you forgot to open a 311

*on that' . . .  If you work with us constantly then I think maybe you start to get a hang of what's a 311 and what's not.*

# Topics Covered in Communication with CSU

When communication does take place, Figure 4.1 displays the different types of information CSU staff provide that are not on a defendant's official RAP sheet. Information on gang affiliations—involving both defendants and witnesses—were the most frequently reported piece of new information, followed by knowledge that the defendant was a suspect in an unsolved crime. As the data in Figure 4.1 indicates, CSU provides ADAs a variety of different types of information.

# Impact of CSU Information on Decision-making

Table 4.7 provides survey data on how often information obtained from CSU influenced ADAs' investigations, bail requests, and sentencing recommendations. Of those ADAs reporting at least some communication with CSU staff in the prior six months, 13% believed the information they received "frequently" or "very frequently" impacted their cases or investigations. 38% percent reported that CSU information moderately or strongly affected their bail requests, and 38% reported that the information moderately or strongly affected plea offers or sentencing recommendations.



Figure 4.1.   Information Provided by CSU/DANY 311 (n = 233)

| | Percent |
|---|---|
| Other | 5% |
| Crime data | 12% |
| Geographic context | 12% |
| Defendant victimization information | 12% |
| N/A not provided information in past six months | 16% |
| Defendant/witness nickname or other personal... | 21% |
| Priority recidivist for DANY or NYPD | 25% |
| Social media information | 26% |
| Defendant as a suspect in unsolved crimes | 31% |
| Defendant/witness gang affiliation | 51% |

As previously discussed, our communication typology allowed us to identify three groups that varied in terms of how they acquired information from CSU (the fourth group– suboptimal–did not report communication in either direction). As Table 4.8 shows, these three groups vary in how often they applied CSU information to investigations, bail requests, and plea offers/sentencing recommendations. The ADAs in the prime and standard communication categories frequently reported that CSU information had a large impact on their decision-making. In contrast, the proactive users who contacted CSU for information but had not themselves been contacted by CSU staff, were less likely to respond that information from CSU moderately or strongly affected their decision-making. ADAs can reach out to CSU and request intelligence on any aspect of their case, but the unit will only actively push out information to ADAs on individuals identified as known drivers of crime. CSU contacted ADAs in the prime and standard groups because these ADAs prosecute more cases related to individuals already in CSU system. ADAs in the proactive group reach out to CSU for intelligence on defendants or witnesses who are not known crime drivers. Though CSU will provide any intelligence they may have on these individuals, it is unlikely this information will impact decision-making.

**Table 4.7. The Impact of CSU Information on ADAs Decision-making**

|  | Percent |
|---|---|
| **Results on those ADAs reporting communication with CSU in the prior 6 months (excluding "suboptimal" users without any reported communication).** | |
| ***How frequently did CSU information impact cases/investigations at any point?*** | |
| Never | 15% |
| Rarely | 30% |
| Occasionally | 42% |
| Frequently | 10% |
| Very frequently | 3% |
| *Frequently/Very frequently* | 13% |
| ***How much did CSU/DANY 311 information impact your bail requests?*** | |
| Did not affect | 36% |
| Slightly affected | 26% |
| Moderately affected | 24% |
| Strongly affected | 14% |
| *Moderately/Strongly affected* | 38% |
| ***How much did CSU/DANY 311 information impact your plea offers or sentencing recommendations?*** | |
| Did not affect | 33% |
| Slightly affected | 29% |
| Moderately affected | 26% |
| Strongly affected | 12% |
| *Moderately/Strongly affected* | 38% |

**Table 4.8. Communicative Typologies and the Application of CSU Information**

|  | Prime Users (n = 110) | Proactive Users (n = 53) | Standard Users (n = 32) |
|---|---|---|---|
| *How frequently did CSU information impact cases/investigations at any point?* + | | | |
| Never | 7% | 26% | 22% |
| Rarely | 28% | 28% | 26% |
| Occasionally | 49% | 35% | 44% |
| Frequently/Very frequently | 16% | 12% | 9% |
| *How much did CSU/DANY 311 information impact your bail requests?* *** | | | |
| Did not affect | 27% | 60% | 28% |
| Slightly affected | 26% | 24% | 24% |
| Moderately/Strongly affected | 47% | 16% | 48% |
| *How much did CSU/DANY 311 information impact your plea offers or sentencing recommendations?* * | | | |
| Did not affect | 24% | 48% | 44% |
| Slightly affected | 34% | 26% | 15% |
| Moderately/Strongly affected | 41% | 26% | 41% |

Note:  Table contains column percentages from chi square contingency table to allow for comparison across categories on each item.

+$p < .10$, * $p < .05$, ** $p < .01$, ***$p < .001$.

# Stage of Case Processing When Communication Takes Place

The results in Table 4.9 indicate the stage of case processing when ADA respondents most often received unsolicited information from CSU. The table provides results for all responding ADAs and also breaks down responses for those ADAs who reported having been assigned to ECAB in the past six months (ADAs with recent ECAB experience would presumably have opportunities that other ADAs might not have to receive CSU information prior to arraignment). Thirty-six percent of all respondents and 41% of those recently assigned to ECAB reported that CSU was most likely to communicate information in felony cases after criminal court arraignment but before the grand jury presentation. The second most common point where CSU initiated communication was in ECAB. These findings are consistent with the intended model, which focuses on more serious cases (i.e., felonies) and communicating information in the earlier stages of case processing.

**Table 4.9. Communication Initiated by CSU During Case Processing**

| Stage in Case Processing | All ADAs (n = 233) | ECAB ADAs (n = 164) |
|---|---|---|
| Pre-arrest/investigation phase | 20% | 13% |
| ECAB | 28% | 31% |
| Misdemeanor - post-criminal court arraignment | 12% | 14% |
| Felonies - post-criminal court arraignment, pre-Grand Jury presentation | 36% | 41% |
| Felonies - post-Grand Jury presentation, pre-Supreme Court arraignment | 3% | 1% |
| Felonies - post-Supreme Court arraignment (through trial or plea) | 1% | - |

Table 4.10 contains information on when ADAs most likely initiated contact with CSU to obtain information. The data again indicates that CSU information is sought most often in felony cases, after criminal court arraignment but before Grand Jury presentations. Interestingly, those assigned to ECAB were least likely to initiate contact with CSU. This is not surprising, given our earlier finding (see Table 4.9) that CSU staff frequently initiated contact with ADAs in ECAB, obviating the need for communication to begin with the ADAs themselves. It is also likely that ADAs are under significant time pressure in ECAB to file complaints, making it more problematic for them to initiate contact at this stage.

**Table 4.10. Communication Initiated by ADA During Case Processing**

| Stage in Case Processing | All ADAs (n = 163) | ECAB ADAs (n = 118) |
|---|---|---|
| Pre-arrest/investigation phase | 20% | 12% |
| ECAB | 9% | 9% |
| Misdemeanor - post-criminal court arraignment | 10% | 12% |
| Felonies - post-criminal court arraignment, pre-Grand Jury presentation | 38% | 44% |
| Felonies - post-Grand Jury presentation, pre-Supreme Court arraignment | 10% | 13% |
| Felonies - post-Supreme Court arraignment (through trial or plea) | 13% | 10% |

From a program model perspective, the findings highlight that CSU delivers information when their intelligence can be most effective. As noted by one CSU ADA, DANY is the only office in New York City that engages in the vertical prosecution of felonies, so when an ECAB ADA draws up a felony, he will remain with the case through all stages of processing until the case is closed. As a result, CSU may target ADAs handling felony cases to provide information that will facilitate case processing as early in the process as possible. Even if CSU contacts these ADAs later on, the vertical prosecution of felonies ensures that the same ADA will receive this information. Indeed, as felony cases are rarely resolved at arraignment, some ADAs said there were advantages to receiving communication at a slightly later point than ECAB. As one CSU ADA said:

*Because ECAB is a busy place you know, you may not want to stop the ADA in their tracks to say, 'Hey hold the phone. Let me tell you about stuff I could tell you tomorrow.' So I reach out the next day to say, 'You know that case? I know he's in. You're going to have to go to the Grand Jury in six days. Let me tell you what is going on in that neighborhood, what is going on in that particular location and what I know about this defendant, what I know about the gang he is involved in and what other things you may not know from his rap sheet,' but that might be more helpful as the investigation continues.*

# Case Types and Topics Involved in Communication with CSU

Figure 4.2 illustrates that ADAs most frequently initiated contact with CSU when they were prosecuting violent felonies (74%), drug felonies (31%) or non-drug, non- violent felonies (27%) (respondents could check more than one case type). Support staff displayed similar case patterns. These findings confirm that the IDPM model, which provides additional intelligence (especially about individuals who pose a significant threat to public safety within a local community), is running effectively.



Figure 4.2. Types of Cases in which ADAs Contacted CSU (n = 163)

Table 4.11 lists the primary reasons why ADAs engage CSU. The reasons cited most often were to obtain general background intelligence on a particular person (cited by 81% of responding ADAs who contacted CSU for information at least once); to obtain intelligence on a particular gang or geographic area (44%); and to check for video locations (38%).

**Table 4.11.  Primary Reasons ADAs Contacted CSU (n = 163)**

| Reason | Percent |
|---|---|
| Obtain general background intelligence on a particular person | 81% |
| Obtain general intelligence on a particular gang or geographic area | 44% |
| Check for video camera locations | 38% |
| Learn whether a particular person is active on social media | 22% |
| Get help reaching out to a member of the police department | 17% |
| Search for additional contact information for a witness | 13% |
| Set up an arrest alert | 10% |
| Expedite a subpoena process | 3% |
| Other | 5% |

Note: Percentages do not total 100% because respondents could check all that applied.

# Utilization of the Arrest Alert System

Because the Arrest Alert System is a central component of the IDPM, a number of survey questions specifically asked how ADAs use this system. As shown in Table 4.12, 41% of ADAs reported that the system did not prompt them to pursue new investigative steps, whereas 44% responded that the system prompted new strategies one to five times. Only 17% of respondents reported that the system led to new investigative steps six or more times.

**Table 4.12. Impact of the Arrest Alert System on ADAs' Investigations (n = 233)**

| | Percent |
|---|---|
| ***Number of times the system prompted you to take an investigative step you would not have otherwise taken in the last 6 months*** | |
| 0 times | 41% |
| 1 - 5 times | 44% |
| 6 - 10 times | 9% |
| 11 - 15 times | 2% |
| 16 - 20 times | 2% |
| 21 or more times | 3% |

Table 4.13 indicates the number of arrest alerts ADAs signed up for and their recent use of the system. The data shows, for example, that 59% of ADAs reported receiving an arrest alert notification in the past six months. CSU ADAs are the primary users of the Arrest Alert System. According to a CSU ADA, only a few other ADAs heavily used the system. In interviews with two non-CSU ADAs, both noted that they learned about CSU through an initial email blast and attended a formal training; these ADAs, however, used the Arrest Alert System in a different capacity. One ADA became a frequent user after DANY implemented the 2013 version of the system. During the course of a large investigation, this ADA recounted personal involvement in "hundreds" of arrest alerts, but after completing the investigation, this ADA's ongoing involvement with alerts became "sporadic." The ADA said the alerts did not really change the course of the investigation because the prosecuting ADAs had a close relationship with law enforcement and could discover the information independently. At the same time, the ADA thought the system could "gives you an edge" and some of the alerts guided who prosecutors interviewed or how much information was leveraged with certain defendants. In contrast, the other ADA described infrequent usage (more than once a month, but not weekly).

## ADAs' Usage of the Arrest Alert System to Monitor Witnesses/Victims

One of the non-CSU ADAs interviewed described using the Arrest Alert System to understand the relationships between individuals facing current charges and other potential defendants, witnesses, or victims. This ADA described the bulk of relevant work as non-arrest investigatory collaboration with other attorneys in the District Attorney's Office. Fifty-three percent of ADAs reported creating arrest alerts to locate missing witnesses/victims for court appearances (see Table 4.14).

**Table 4.13. ADAs' Use of the Arrest Alert System (n = 233)**

|  | Percent |
|---|---|
| *Number of current Arrest Alerts[1]* |  |
|   0 arrest alerts | 24% |
|   1 - 5 arrest alerts | 38% |
|   6 - 20 arrest alerts | 18% |
|   21 or more arrest alerts | 20% |
| *Number of current Arrest Alerts created in the last 6 months* |  |
|   0 arrest alerts | 33% |
|   1 - 5 arrest alerts | 40% |
|   6 - 20 arrest alerts | 15% |
|   21 or more arrest alerts | 12% |
| *Have you received an arrest alert notification in the past 6 months?* |  |
|   Yes | 59% |
|   No | 24% |
|   N/A I don't have any arrest alerts | 17% |
| *Has another ADA reached out to you regarding an arrest alert that you created in the past six months?* |  |
|   Yes | 14% |
|   No | 69% |
|   N/A I have not created an arrest alert in the past 6 months | 18% |

[1]Current arrest alerts excluding automatically generated open case arrest alerts.

Note:  Responses were collapsed to create the 6 - 20 and 21 or more groups to facilitate a sub-analysis of communicative interplay.  The results were not significant at $p < .05$

# Communication Typology and the Arrest Alert System

The results in Table 4.15 suggest that there was significant variation in how the three communication groups described above (excluding the suboptimal group that did not report any communication with CSU) utilized the Arrest Alert System. Specifically, prime communicators (reported both that they contacted CSU for information and that CSU contacted them in the previous six months) appeared to use the Arrest Alert System most often, whereas proactive communicators (reported contacting CSU for information but not the reverse) reported using the system the least. These findings are largely consistent with analogous findings reported earlier. Although the Arrest Alert System represents only one component of the resources available within CSU, the prime communicators, who engaged with CSU information most often, similarly reported the greatest use of the Arrest Alert System.

**Table 4.14. ADAs' Use of the Arrest Alert System to Locate Witnesses and Victims (n = 233)**

|  | Percent |
|---|---|
| *Reasons for creating an Arrest Alert for witnesses or victims* | |
| Giglio reasons | 10% |
| Locate a missing witness and/or produce witness/victim for a court appearance | 53% |
| Other | 37% |
| *Number of current Arrest Alerts added For witnesses or victims* | |
| 0 arrest alerts | 56% |
| 1 - 5 arrest alerts | 36% |
| 6 - 10 arrest alerts | 5% |
| 11 - 20 arrest alerts | 2% |
| 21 - 30 arrest alerts | 1% |
| 31 - 40 arrest alerts | - |
| 41 or more arrest alerts | 2% |
| *Have you received an arrest alert notification for a victim or witness?* | |
| Yes | 29% |
| No | 40% |
| N/A I don't have any arrest alerts for victims or witnesses | 31% |

Note:  A sub-analysis was conducted using collapsed categories in order to examine how communicative interplay is related to arrest alerts for witnesses/victims.  The results were not significant at p < .05.

# CSU SharePoint

Along with updating the technology associated with the Arrest Alert System, DANY created another important technological innovation with CSU SharePoint website, which houses a wide range of resources targeting specific needs and, via the DANY311 system, enables ADAs to pose questions to CSU staff (see Chapter 3). Twenty-seven percent of ADAs who contacted CSU for any purpose in the past six months reported using the website, 54% reported that they were aware of the SharePoint website but had not used it in the past six months, and 26% were unaware of the website.

Figure 4.3 lists the specific resources that ADAs who used the SharePoint website accessed. The three resources used most often were the NYCHA map (47%), information on gangs/crews (44%), and information related to BBPs (42%).

**Table 4.15. Influence of Communicative Interplay On ADAs' Use of Arrest Alert System**

| | Prime Users (n = 110) | Proactive Users (n = 53) | Standard Users (n = 32) |
|---|---|---|---|
| ***Number of current Arrest Alerts**** | | | |
| 0 arrest alerts | 13% | 35% | 15% |
| 1 - 5 arrest alerts | 34% | 37% | 63% |
| 6 - 20 arrest alerts | 27% | 11% | 7% |
| 21 or more arrest alerts | 26% | 17% | 15% |
| ***Number of current Arrest Alerts added in the last six months**** | | | |
| 0 arrest alerts | 23% | 46% | 19% |
| 1 - 5 arrest alerts | 39% | 37% | 59% |
| 6 - 20 arrest alerts | 21% | 11% | 7% |
| 21 or more arrest alerts | 17% | 7% | 15% |

Note:  Table contains column percentages from a Chi square contingency table to allow comparisons across categories for each item.  +p < .10, * p < .05, ** p < .01, ***p < .001.



Figure 4.3. ADAs' Usage of SharePoint Resources (n = 43)

# Chapter 5
# Impact on Prosecution Outcomes

This chapter reports the impact of the Arrest Alert System on bail amounts, case processing, dispositions, charge severity at disposition, and sentences, based on a quasi-experimental analysis. In brief, arrest alerts are triggered when a priority offender is arrested, quickly notifying interested parties of the crime information and facts of the arrest. Priority offenders are generally, although not exclusively, individuals with a history of involvement in serious or violent criminal activities (see Chapter 3). With increased information about criminal associations available through notes in the Arrest Alert System and other CSU databases, ADAs can justify more aggressive prosecution strategies, including higher bail requests (though judges ultimately determine bail), fewer plea offers with a reduced charge severity, and more and longer jail sentences.

The results reported in this chapter indicate that the Arrest Alert System successfully identified high-stakes priority offenders: defendants involved in more serious and violent criminal activity. The analysis also demonstrates that arrest alert cases were significantly more likely to have bail set, averaged a significantly higher bail amount, were significantly more likely to involve a felony (as opposed to a misdemeanor or lesser offense), and produced longer times in custody if a judge imposed a jail or prison sentence. Most of the effect sizes were modest in magnitude, but the presence of consistently expected and significant effects suggests that, to a certain extent, IDPM's impacts are already felt in cases processed under the model to date.

As described in Chapter 2, we based results on a comparison of cases arraigned from May 2010 through the end of 2013. There were two comparison samples: (1) a contemporaneous comparison composed of cases arraigned during the target period for which arrest alerts were not triggered, and (2) a pre-implementation comparison of cases arraigned from January 2009 through April 2010, prior to the formal launch of the IDPM and CSU. All cases in the analysis, both arrest alert and comparison cases, were arrested in Areas 2 or 3 of Manhattan (see Figure 1.1). CSU staff thought this research design would be the most appropriate way to assess the model.

# Characteristics of Arrest Alert Cases

Table 5.1 compares the background characteristics of arrest alert cases with the background characteristics of cases in the two comparison groups *prior to the implementation of statistical matching strategies*. This particular comparison reveals how arrest alert targeted cases differ from a general sample of criminal cases originating in the same areas of Manhattan. Since CSU staff members indicated that the Arrest Alert System is intended (not exclusively but for the most part) to target serious and violent offenders, we hypothesized that prior to statistical adjustments, the arrest alert sample would have a more extensive and serious criminal history than the comparison cases.

The findings in Table 5.1 provide strong confirmation for this hypothesis across all examined measures. The arrest alert sample defendants had far lengthier and more serious criminal histories than defendants in the comparison samples, and faced more serious criminal charges in their current cases. These findings confirm that CSU reached its intended serious offender population using the arrest alert process. For example, 93% of arrest alert defendants had a prior arrest, whereas under half of the defendants in each of the comparison groups had a prior arrest. One-quarter (25%) of arrest alert defendants had a prior violent felony offense (VFO) arrest and 15% had a prior VFO conviction. In the two comparison samples, only 5% had a prior VFO arrest and 2% had a prior VFO conviction. Twenty-four percent of the defendants in the arrest alert sample had felony arraignment charges in the instant case, compared to 14% of defendants in each of the two comparison samples. Additional comparisons consistently revealed that priority offenders in the Arrest Alert System had more serious prior criminal behavior or alleged current criminal behavior than defendants in the comparison groups.

Having confirmed that arrest alert cases differed from potential comparison cases in the manner hypothesized, we then refined the two comparison samples to preserve only those comparison cases with background characteristics closely matching the arrest alert cases. As described in Chapter 2, and further detailed in Appendix D, we implemented propensity score matching techniques to properly conduct this analysis (Rosenbaum and Rubin 1983; Rubin 1973). By the end of the propensity score matching process, 2,318 arrest alert cases were matched on a one-to-one basis with exactly 2,318 cases from each of the two comparison groups.

## Table 5.1. Background Characteristics of Arrest Alert v. Comparisons

| Sample | Arrest Alert | Pre-Comparison | Contemporaneous Comparison |
|---|---|---|---|
| | N = 2,444 | N = 35,366 | N = 80,076 |
| **Demographic Background** | | | |
| Race/Ethnicity | | | |
|   Black, Non-Hispanic | 63% | 49%*** | 46%*** |
|   Black, Hispanic | 11% | 9%*** | 9%** |
|   White, Non-Hispanic | 3% | 13%*** | 14%*** |
|   White, Hispanic | 22% | 24%** | 24%*** |
|   Asian/Pacific Islander | 0% | 4%*** | 4%*** |
|   Other | 0% | 0%* | 0%* |
| Gender | | *** | *** |
|   Male | 96% | 84% | 84% |
|   Female | 4% | 16% | 16% |
| Age at arrest | 29.12 | 34.74*** | 34.63*** |
| | | | |
| **Criminal History** | | | |
| Any prior arrests (in Manhattan) | 93% | 48%*** | 45%*** |
| No. of prior arrests (in Manhattan) | 7.03 | 2.47*** | 1.98*** |
| Prior violation arrests | 26% | 12%*** | 11%*** |
| No. of prior violation arrests | 0.86 | 0.31*** | 0.24*** |
| Prior misdemeanor arrests | 81% | 43%*** | 39%*** |
| No. of prior misdemeanor arrests | 4.95 | 1.86*** | 1.45*** |
| Prior felony arrests | 63% | 19%*** | 18%*** |
| No. of prior felony arrests | 1.2 | 0.3*** | 0.28*** |
| Prior violent felony arrests | 25% | 5%*** | 5%*** |
| No. of prior violent felony arrests | 0.3 | 0.05*** | 0.05*** |
| Prior weapons arrests | 15% | 3%** | 3%*** |
| No. of prior weapons arrests | 0.17 | 0.04*** | 0.03*** |
| Prior gun arrests | 3% | 0%*** | 0%*** |
| No. of prior gun arrests | 0.03 | 0%*** | 0%*** |
| Prior drug arrests | 41% | 18%*** | 15%*** |
| No. of prior drug arrests | 1.2 | 0.47*** | 0.36*** |
| Prior marijuana arrests | 34% | 10%*** | 10%*** |
| No. of prior marijuana arrests | 0.84 | 0.17*** | 0.16*** |
| | | | |
| Prior convictions | 93% | 48%*** | 45%*** |
| No. of prior convictions | 7.03 | 2.47*** | 1.98*** |
| Prior violation convictions | 63% | 27%*** | 26%*** |
| # prior violation convictions | 1.83 | 0.6*** | 0.54*** |

| Sample | Arrest Alerts | Pre-Comparison | Contemporaneous Comparison |
|---|---|---|---|
| | N = 2,444 | N = 35,366 | N = 80,076 |
| **Criminal History** *(continued)* | | | |
| Prior misdemeanor convictions | 64% | 33%*** | 28%*** |
| No. of prior misdemeanor convictions | 4.33 | 1.67*** | 1.22*** |
| Prior felony convictions | 47% | 12%*** | 11%*** |
| No. of prior felony convictions | 0.67 | 0.14*** | 0.15*** |
| Prior violent felony convictions | 15% | 2%*** | 2%*** |
| No. of prior violent felony convictions | 0.16 | 0.02*** | 0.02*** |
| Prior weapons convictions | 11% | 3%*** | 2%*** |
| No. of prior weapons convictions | 0.12 | 0.03*** | 0.02*** |
| Prior gun convictions | 2% | 0%*** | 0%*** |
| No. of prior gun convictions | 0.02 | 0*** | 0*** |
| Prior drug convictions | 37% | 17%*** | 13%*** |
| No. of prior drug convictions | 1.13 | 0.46*** | 0.34*** |
| Prior marijuana convictions | 32% | 9%*** | 9%*** |
| No. of prior marijuana convictions | 0.78 | 0.16*** | 0.15*** |
| | | | |
| **Arraignment Year** | | | |
| Year of Arraignment | | | |
|   2009 | 0% | 71%*** | 0%*** |
|   2010 | 10% | 26% | 17% |
|   2011 | 24% | 0% | 24% |
|   2012 | 29% | 0% | 25% |
|   2013 | 34% | 0% | 27% |
|   2014 | 1% | 0% | 1% |
|   2015 | 0% | 0% | 0% |
| | | | |
| **Current Charge Severity** | | *** | *** |
|   Felony | 24% | 14%*** | 14%*** |
|     A Felony | 0% | 0% | 0%+ |
|     B Felony | 10% | 3%*** | 3%*** |
|     C Felony | 4% | 2%*** | 2%*** |
|     D Felony | 6% | 5% | 6% |
|     E Felony | 4% | 3%+ | 3% |
|   Misdemeanor | 54% | 54% | 51%+ |
|     A Misdemeanor | 40% | 38%* | 36%** |
|     B Misdemeanor | 10% | 7%*** | 6%*** |
|     Misdemeanor Unspecified | 4% | 9%*** | 9%*** |
|   Infraction / Violation / Traffic | 19% | 29%*** | 29%*** |

| Sample | Arrest Alerts | Pre-Comparison | Contemporaneous Comparison |
|---|---|---|---|
| | N = 2,444 | N = 35,366 | N = 80,076 |
| **Current Charge Type** | | | |
| Violent | 10% | 4% *** | 4% *** |
| Weapons (incl. guns) | 4% | 3% | 3% |
| Guns | 1% | 0% *** | 0% *** |
| Drugs (excl. marijuana) | 13% | 9% *** | 8% *** |
| Marijuana | 12% | 8% *** | 7% *** |
| Assault | 7% | 5% *** | 7% |
| Contempt/Harassment | 10% | 16% *** | 15% *** |
| Property Theft | 31% | 29% * | 26% *** |
| Grand Larceny/ID Theft | 9% | 12% *** | 12% *** |
| Robbery | 4% | 2% *** | 1% *** |
| Burglary | 18% | 15% *** | 13% *** |
| Sex | 1% | 1% * | 1% *** |
| Trafficking (VTL) | 3% | 12% *** | 13% *** |

+ p < .10  * p < .05  ** p < .01  *** p < .001

# Impact on Prosecution Outcomes

We compared final samples on four primary types of outcome: (1) bail amounts, (2) case processing (number of court appearances and days to disposition), (3) case dispositions (including the charges at disposition in cases of a conviction), and (4) sentencing. The main results are in Table 5.2. (Appendix D provides separate tables comparing outcomes for cases with top arraignment charge at initial arrest for felonies and cases with top arraignment charges at initial arrest for misdemeanors.) Based on process findings reported in the previous chapters, the authors hypothesized that arrest alert cases would average higher bail amounts and more severe disposition and sentencing outcomes.[5]

---

[5] Please note that the data in Table 5.2, as well as in Appendix D, provide separate comparisons of arrest alert cases and each comparison sample. As explained previously in Appendix C, due to varying background characteristics, the statistical adjustments varied slightly between the two comparison groups, resulting in slightly different percentages for the arrest alert sample.

**Table 5.2. Comparison of Outcomes: Arrest Alert v. Comparison Cases**

| Sample | Arrest Alert | Contemporaneous Comparison | Arrest Alert | Pre-Comparison |
|---|---|---|---|---|
| **Sample Size** | **N = 2,318** | **N = 2,318** | **N = 2,318** | **N = 2,318** |
| **Bail** (*if continued at arraignment*) | | | | |
| Any bail set | 60% | 56%* | 58% | 53%* |
| Amount of bail set | $5,461.66 | $4,031.92*** | $4,816.80 | $3,877.81* |
| **Case Processing** | | | | |
| No. of court appearances | 3.95 | 3.44*** | 3.91 | 3.45** |
| Days, arraignment to disposition | 101.67 | 92.12* | 100.95 | 94.09 |
| **Disposition Type** | | | | |
| Plea/Convicted | 96% | 96% | 97% | 98%** |
| ACD | 1% | 1% | 1% | 0%* |
| Dismissed/Acquitted | 2% | 2% | 1% | 1%+ |
| Other Disposition | 1% | 1%+ | 1% | 1%* |
| **Disposition Charge Severity** (*if pled/convicted*) | | | | |
| Felony | 19% | 15%*** | 19% | 16%* |
| A Felony | 0% | 0% | 0% | 0% |
| B Felony | 6% | 4%** | 5% | 4%+ |
| C, D or E Felony | 13% | 11%* | 14% | 12%+ |
| Misdemeanor | 45% | 48%+ | 45% | 51%*** |
| A Misdemeanor | 34% | 36%* | 34% | 37%* |
| B Misdemeanor | 8% | 8% | 8% | 9% |
| Misdemeanor Unspecified | 3% | 4% | 3% | 5%* |
| Infraction/Violation | 36% | 38% | 36% | 34%+ |
| *Violent Felony Offense conviction* | *8%* | *6%** | *8%* | *7%** |
| **Sentence Type** (*if pled/convicted*) | | | | |
| Prison | 13% | 9%*** | 12% | 11% |
| Jail | 25% | 26% | 26% | 27% |
| Probation | 2% | 3% | 3% | 3% |
| Time Served | 29% | 30% | 28% | 27% |
| Conditional Discharge | 23% | 25% | 23% | 23% |
| Fine Only | 8% | 7% | 8% | 9% |
| Other | 1% | 1% | 1% | 1% |
| *Community Service in sentence* | *17%* | *19%* | *17%* | *17%* |
| *Treatment Program in sentence* | *2%* | *2%* | *2%* | *2%* |
| **Jail/Prison Sentence Length[1]** | | | | |
| Days in prison or jail (full sample) | 244.88 | 165.61*** | 230.05 | 188.27* |
| Days in jail or prison (*if sentenced to jail or prison*) | 654.07 | 483.22*** | 617.18 | 505.54* |

*Note:* All outcomes are computed after controlling for several criminal history variables. This table reflects adjusted means after setting the number of prior arrests, any prior misdemeanor arrest, and number of prior drug convictions at their mean.

[1] Data on days in prison were obtained for maximum sentences.

Among cases continued at arraignment, more than half of all samples had bail set, reflecting the high-risk nature of the defendant populations. Arrest alert defendants were modestly, but significantly, more likely to have bail set than comparison group defendants (a 4 or 5 percentage-point difference). In cases where the judge set bail, the bail amount was significantly higher in arrest alert cases.

Arrest alert cases averaged modestly but significantly more court appearances than cases in either comparison sample; and averaged significantly more days to disposition than both comparison groups, though only reached statistical significance when compared to the contemporaneous group. Though we had not hypothesized a case processing effect, it is possible arrest alert cases were prosecuted more aggressively because defendants were identified as priority offenders, which resulted in a modest but significant increase in court appearances and processing time. This conclusion is, of course, merely speculative on our part.

Case defendants in all samples were overwhelmingly likely to plead guilty or be convicted on their instant case (at least 96% for all samples), presumably reflecting the severity of the charges and criminal histories involved in nearly all of the sampled cases. Results point to a modest but significantly greater likelihood of a felony-level conviction charge, instead of a misdemeanor or violation level conviction, in arrest alert cases (19% vs. 15% or 16% in the comparison groups). In misdemeanor arraignments (see Appendix D), arrest alert cases were significantly more likely to be disposed at the original misdemeanor level than be disposed at a lesser violation level.

The only significant difference in sentencing outcomes was an increase in the frequency of prison sentences in arrest alert cases compared to cases in the contemporaneous comparison sample. This one significant effect, demonstrating more severe sentencing outcomes for arrest alert cases, was expected. Such an effect did not appear between the arrest alert cases and the cases in the pre-implementation comparison sample. In felony cases (see Appendix D), arrest alert defendants' prison sentences were 9% longer than sentences for defendants in the contemporaneous comparison group and 5% longer than sentences for defendants in the pre-implementation comparison group (the latter comparison did not reach statistical significance).

Finally, when all sampled cases were evaluated, arrest alert cases averaged significantly more days sentenced to incarceration than cases in either the contemporaneous comparison sample (245 v. 166 days) or cases in the pre-implementation comparison sample (320 v. 188

days). Among the subsamples of cases that were actually sentenced to jail or prison, the average sentence length for those cases was also significantly greater among arrest alert cases than those in the contemporaneous comparison sample (654 v. 483 days) and the pre comparison sample (617 v. 506 days). These findings confirm expectations.

# Chapter 6
# Conclusion

The District Attorney's Office of New York (DANY) implemented a highly sophisticated strategy known as the Intelligence-Driven Prosecution Model (IDPM). Though elements of the model had been in place previously, the IDPM emerged as a fully institutionalized part of DANY's fabric when District Attorney Cyrus Vance Jr. established the Crime Strategies Unit (CSU) in 2010.

The model encompasses a large number of components, strategies, and tools, but several particularly significant innovations include:

- The model extends community prosecution principles through a neighborhood focus, while simultaneously expanding the initiative city-wide. In short, by dividing Manhattan into five geographic areas, DANY created an initiative that is both countywide and neighborhood-specific.
- The IDPM zeroes in on specific problem individuals who are key drivers of crime at the police precinct level. The initiative is rigorous and gathers intelligence that is specific to individual persons and places.
- The model collaborates with law enforcement and community partners. The IDPM collects intelligence in tandem with the New York Police Department (and local police precincts), while also working with community representatives.
- The IDPM utilizes advanced technology, including but not limited to the Arrest Alert System that houses important information about crime problems, criminal behavior, and the associates of crime drivers in each neighborhood. The IDPM uses technology to facilitate communication throughout the office and enhances the effective communication of the intelligence.
- Alongside the IDPM, DANY established the Crime Strategies Unit (CSU) to oversee and coordinate all aspects of the model and its implementation.

During the past six months, 61% of responding assistant district attorneys (ADAs) reported that CSU contacted them to provide information, and 70% reported that they reached out to CSU for intelligence related to their case. Analysis identified four groups of ADAs who differed in their contact with CSU: one-way communication (originating either from CSU or from the ADA but not both), two-way communication, and no communication. These four groups used CSU information to guide their decision-making in distinct ways. ADAs who experienced two-way communication (47%) or who were contacted by CSU (14%) weighed

the intelligence more heavily in their decision-making compared to ADAs who first initiated contact with CSU (23%).

To interpret these findings, one must fully understand the role CSU plays as a centralized intelligence unit. If new intelligence relates to a known crime driver, CSU staff will actively push out that information to ADAs assigned to the crime driver's case. This process means CSU staff interact with the ADAs prosecuting cases associated with priority individuals at a higher rate than ADAs working on non-priority offender cases- this information is also more likely to influence an ADAs decision-making. All ADAs may reach out to CSU if they require further information on any aspect of their case; while CSU will provide any known information, this intelligence may be more generalized and, therefore, less likely to influence an ADAs prosecutorial decision-making. As a whole, although a communication survey did not reveal universal engagement with information originating from CSU and its many technological resources, or reveal that ADAs acted on CSU information in all cases, the results clearly show that a meaningful level of engagement takes place.

An impact analysis detected modest but statistically significant effects of the AAS on certain prosecutorial decisions, such as whether bail is set, bail amounts, charge severity at disposition, and sentence type and length. A particularly notable effect was that arrest alert defendants sentenced to jail or prison served an average of 100 days longer than defendants in either matched comparison sample. While these results demonstrate the impact arrest alerts can have on case outcomes, this study did not measure the IDPM's long-term effects on both individual defendants and communities; these results, therefore, remain unknown.[6] The immediate potential of the model is clear, however: the IDPM produces and distributes more comprehensive intelligence to prosecutors.  Moreover, other prosecutorial offices seeking a 21st century solution to pressing crime problem should consider replicating the IDPM's robust formalization, quality implementation, and unique approach to criminal justice.

---

[6] Prior research (Listwan et al. 2013; Loeffler 2013; Lowenkamp et al. 2013; and Rempel et al. 2016) does not generally indicate that additional periods of incarceration impacts longer-term crime reduction efforts, including recidivism. However, previous research has not exclusively focused on primary crime drivers, and given the unique elements of the IDPM model, it cannot be ruled out that such effects or other longer-term changes may take place.

# References

Boland, B. 1998a. "The Manhattan Experiment" in *Crime and Place: Plenary Papers of the 1997 Conference on Criminal Justice Research and Evaluation*. Washington, D.C.: U.S. Department of Justice, National Institute of Justice.

Boland, B. 1998b. "Community Prosecution: Portland's Experience" in *Community Justice*, ed. David Karp. Lanham, Maryland: Rowman & Littlefield.

Boland, B. 2001. *Community Prosecution in Washington, D.C.: The U.S. Attorney's Fifth District Pilot Project.* Washington, D.C.: U.S. Department of Justice, National Institute of Justice.

Boland, B. 2007. *The Response of Multnomah County to Neighborhood Crime: 1990-2005*. Alexandria, VA: American Prosecutors Research Institute.

Coles, C. M. 2000. *Community Prosecution, Problem Solving, and Public Accountability: The Evolving Strategy of the American Prosecutor*. Working Paper #00-02-04. Program in Criminal Justice Policy and Management of the Malcolm Wiener Center for Social Policy, John F. Kennedy School of Government, Harvard University.

Coles, C. M., and Kelling, G. L., with Moore, M. H. 1998. *Prosecution in the Community: A Study of Emergent Strategies*. Cambridge, MA: John F. Kennedy School of Government, Harvard University.

Goldkamp, J. S., Irons-Guynn, C., and Weiland, D. 2003. *Community Prosecution Strategies*. Washington, D.C.: Bureau of Justice Assistance.

Listwan, S. J., Sullivan, C., Agnew, R., Cullen, F. T., and Colvin, M. (2013). "The Pains of Imprisonment Revisited: The Impact of Strain on Inmate Recidivism." *Justice Quarterly* 30: 1: 144-167.

Lee, C.G., Cheesman, F., Rottman, D., Swaner, R., Lambson, S. H., Rempel M., and Curtis, R. 2013. *A Community Court Grows in Brooklyn: A Comprehensive Evaluation of the Red Hook Community Justice Center*. Williamsburg VA: National Center for State Courts.

Loeffler, C. E. (2013). "Does Imprisonment Alter the Life Course? Evidence on Crime and Employment from a Natural Experiment." *Criminology* 51: 1: 137-167.

Lowenkamp, C., VanNostrand, M., and Holsinger, A. (2013a). *The Hidden Costs of Pretrial Detention.* Houston, Texas: The Laura and John Arnold Foundation.

National District Attorneys Association (NDAA). 2009. *Key Principles of Community Prosecution*. Washington, D.C.: Bureau of Justice Assistance. Retrieved from: http://www.ndaa.org/apri/programs/community_pros/final_key_principles_updated_jan_2009.pdf

Nugent, E. 2004. *The Changing Nature of Prosecution: Community Prosecution vs. Traditional Prosecution Approaches*. Alexandria, VA: American Prosecutors Research Institute.

Nugent, E., and Rainville, G. A. 2001. "The State of Community Prosecution: Results from a National Survey." *The Prosecutor* (March/April): 36-33.

Rempel, M., Kerodal, A., Spadafore, J., and Mai, C. (2016). *Jail in New York City: Evidence-Based Opportunities for Reform*. New York, NY: Center for Court Innovation.

Rosenbaum, P. R. and Rubin, D. B. 1983. "The Central Role of the Propensity Score in Observational Studies for Causal Effects." *Biometrika 70:* 1: 41-55.

Rubin, D.B. 1973. "The Use of Matched Sampling and Regression Adjustment to Remove Bias in Observational Studies." *Biometrics* 29: 1: 184-203.

Stone, C., and Turner, N. 1999. *Politics, Public Service, and Professionalism: Conflicting Themes in the Invention and Evaluation of Community Prosecution*. New York, NY: Vera Institute of Justice.

Thompson, A. C., and Wolf, R. V. 2004. *The Prosecutor as Problem-Solver: An Overview of Community Prosecution: A Workshop for Prosecutors: Teacher's Guide*. New York, NY: Center for Court Innovation.

Wilson, J. Q., and Kelling, G. L. 1982. "Broken Windows." *Atlantic Monthly* (March): 29-37.

Wolf, R. V. 2006. "Community Justice around the Globe: An International Overview." *Crime and Justice International* 22: 93: 4-22.

Wolf, R. V., and Worrall, J. L. 2004. *Lessons from the Field: Ten Community Prosecution Leadership Profiles*. Alexandria, VA: American Prosecutors Research Institute.

## Appendix A
# Survey Instrument

### District Attorney of New York County
### Intelligence Driven Prosecution Survey 2015

With funding from the Bureau of Justice Assistance, the New York County District Attorney's Office is working with the Association of Prosecuting Attorneys and the Center for Court Innovation to conduct an evaluation of the Office's Intelligence-Driven Prosecution Model. This evaluation focuses on the Office's Arrest Alert System and aims to develop a program and tools to support this model's replication in other jurisdictions.

The purpose of this survey is to collect information regarding how ADAs and others use the Arrest Alert System and its related resources, and how this information sharing affects decision-making. Your responses will provide valuable feedback as to how the current system is utilized and can help improve the Office's ability to provide appropriate resources to ADAs in the prosecution of their cases.

All information is anonymous.  Responses will be collected, tabulated, and analyzed by the Center for Court Innovation and included in a summary report.  Individual responses will not be disclosed. If you have any questions about this survey, please contact the Center for Court Innovation.

## <u>Respondent Information</u>

1. What is your current position in the Manhattan District Attorney's Office?
   Assistant District Attorney, Trial Preparation Assistant, Analyst/Tech Analyst

2. How long have you worked in this position?  _____years (drop down)
   <1,2,3,4,5,6,7,8,9,10+

3. In the past 6 months, have you been assigned to ECAB (excluding supervisor shifts)?
   Yes, No, NA (I am not an ADA)

## Section I: Contact with CSU

In answering Questions 4 through 16, only consider the past 6 months.

4. Has CSU contacted you without you contacting them first?
   Yes, No [If no, skip to Question 8]

5. Approximately how many cases or investigations has CSU contacted you regarding?
   1-5, 6-10, 11-15, 16-20, 21 or more

6. How frequently did CSU use the following methods to contact you?

   1-never , 2-rarely, 3-occasionally, 4-frequently, 5-very frequently

   _____ Phone
   _____ Email
   _____ Other (please describe) _____

7. When was CSU most likely to contact you?

   _____ Pre-arrest/investigation phase
   _____ ECAB
   _____ Misdemeanors – post criminal court arraignment
   _____ Felonies – post-criminal court arraignment, pre-Grand Jury presentation
   _____ Felonies – post-Grand Jury, pre-Supreme Court arraignment
   _____ Felonies – post-Supreme Court arraignment (through trial or plea)

8. Have you contacted CSU, either directly or via a DANY 311 request, without CSU first making the initial contact?
   Yes, No (If no skip to question 17)

9. On approximately how many cases or investigations have you contacted CSU (including via a DANY 311 request)?
   1-5, 6-10, 11-15, 16-20, 21 or more

10. Please indicate your primary reason(s) for contacting CSU.
    _____ To check for video camera locations
    _____ To obtain general background or intel on a particular person
    _____To obtain general intel on a particular gang or geographic area
    _____ To get help reaching out to a member of the police department
    _____To search for additional contact information for a witness
    _____To learn whether a particular person is active on social media

_____To set up an arrest alert
_____To expedite a subpoena process
_____Other (write in)

11. On a scale of 1 to 5, how frequently did you use the following methods to contact CSU?

       1- never, 2- rarely, 3-occasionally, 4-frequently, 5-very frequently

____ Phone
____ DANY 311
____ Email
____ Other (please describe) _____

12. At what point(s) during a case or investigation were you <u>most likely</u> to initiate contact with CSU (including DANY 311 requests)?

____ Pre-arrest/investigation phase
____ ECAB
____ Misdemeanors – post criminal court arraignment
____ Felonies – post-criminal court arraignment, pre-Grand Jury presentation
____ Felonies – post-Grand Jury, pre-Supreme Court arraignment
____ Felonies – post-Supreme Court arraignment (through trial or plea)

13. On what types of cases or investigations did you reach out to CSU or DANY 311? Select all that apply.

___Violent felonies
___Non-drug, non-violent felonies
___Drug felonies
___Domestic violence felonies
___Non-domestic violence, non-drug misdemeanors
___Domestic violence misdemeanors
___Drug misdemeanors

14. How frequently did you use the following resources or links provided on the CSU SharePoint website?

     1-never, 2-rarely, 3-occasionally, 4-frequently, 5-very frequently

a. ____ DANY 311
b. ____ Glossary of Street Slang
c. ____ DANY InPho (Inmate call summary form)
d. ____ Homicides/Shootings by precinct
e. ____ Precinct information

    f.    _____ NYCHA map
    g.    _____ Photosheets
    h.    _____ SCIM
    i.    _____ Gangs/crews
    j.    _____ Bureau-based projects
    k.    _____ Violent crime statistics
    l.    _____ I was unaware of the CSU SharePoint website's existence
    m.    _____ I am aware of the CSU SharePoint website, but I have not used it in the past 6 months.

15. At what stage of a case or investigation were you <u>most likely</u> to seek out the information provided on the CSU SharePoint website?  Please rank from 1 to 6. (Skip to Question 16 if you have not used the CSU SharePoint website in the past 6 months.)

    _____ Pre-arrest/investigation phase
    _____ ECAB
    _____ Misdemeanors – post-criminal court arraignment
    _____ Felonies – post-criminal court arraignment, pre-Grand Jury presentation
    _____ Felonies – post-Grand Jury, pre-Supreme Court arraignment
    _____ Felonies – post-Supreme Court arraignment (through trial or plea)

16. What type(s) of information did you receive from CSU or DANY 311 that <u>was not</u> on the defendant's RAP sheet? Select all that apply.
    ___Defendant/witness gang affiliation
    ___Defendant as a suspect in unsolved crimes
    ___Defendant victimization information
    ___Defendant or witness nickname or other personal information
    ___Social media information
    ___Crime data
    ___Geographic context
    ___Priority recidivist for DANY or NYPD
    ___Other (please describe): _____

In answering Questions 17 through 20, only consider cases or investigations where you received information from CSU or DANY 311 within the past 6 months:

17. How frequently did information provided by CSU impact your case or investigation at any point?
        1-never, 2-rarely, 3-occasionally, 4-frequently, 5-very frequently

18. How frequently did the information provided by CSU or DANY 311 impact your decisions or recommendations to the court during the following stages of your case or investigation?
        1-never, 2-rarely, 3-occasionally, 4-frequently, 5-very frequently

_____ Investigation
_____ Charging
_____ Bail Recommendation (including specific bail amount)
_____ Plea Offer or Sentencing Recommendation

19. On average, how much did the information you received from CSU or DANY 311 affect the amount of bail you requested?

1-did not affect, 2-slightly affected, 3-moderately affected, 4-strongly affected

20. On average, how much did the information you received from CSU or DANY 311 affect your plea offers or sentencing recommendations?

1-did not affect, 2-slightly affected, 3-moderately affected, 4-strongly affected

## Section II: Your Use of the Arrest Alert System

In answering Questions 21 through 33, only consider the past 6 months.

21. Approximately how many arrest alerts do you have (excluding automatically generated open case arrest alerts)?
0, 1-5, 6-10, 11-20, 21-30, 31-40, 41 or more

22. How many of those arrest alerts have been added (by you or someone else) in the past 6 months (excluding automatically generated open case arrest alerts)?
0, 1-5, 6-10, 11-20, 21-30, 31-40, 41 or more

23. How many of those added arrest alerts are for witnesses or victims?
0, 1-5, 6-10, 11-20, 21-30, 31-40, 41 or more

24. How many of those added arrest alerts do not include witnesses or victims?
0, 1-5, 6-10, 11-20, 21-30, 31-40, 41 or more

25. Have you received an arrest alert notification in the past 6 months?
Yes__ No___ NA (I don't have any arrest alerts)___

26. Have you received an arrest alert notification for a witness or a victim in the past 6 months?
Yes__ No___ NA (I don't have any arrest alerts for victims or witnesses)___

27. Please rank your primary reasons for creating an arrest alert for a witness or a victim.
    ____ Giglio reasons (i.e., to ensure that you are informed if a witness or a victim with a prior criminal history is re-arrested.)
    ____ To attempt to locate a missing witness or victim and/or to produce a witness or a victim for a court appearance.
    ____ Other (write in)_____

28. Has another ADA reached out to you regarding an arrest alert that you created?
    Yes __ No ___ NA (I have not created an arrest alert)___

29. When you are drafting a felony case in ECAB, do you routinely check to see whether an arrest alert for that defendant exists?
    Yes___ No___ NA (I do not draft felony cases)___ NA (I have not been in ECAB in the past 6 months)___

30. When you are drafting a misdemeanor in ECAB, do you routinely check to see whether an arrest alert for that defendant exists?
    Yes___ No___ NA (I have not been in ECAB in the past 6 months)___

31. While in ECAB, approximately how many times has someone reached out to you regarding an existing arrest alert before or while you are drafting the case associated with that alert?
    NA (I have not been in ECAB in the last 6 months)
    0,1-5, 6-10, 11-20, 21-30, 31-40, 41 or more

32. How many times have you found the information contained in an arrest alert useful while you were drafting a case in ECAB?
    NA (I have not been in ECAB in the last 6 months)
    0, 1-5, 6-10, 11-15, 16-20, 21 or more

33. Approximately how many times has the Arrest Alert System caused you to take an investigative step that you would not have otherwise taken (i.e., reach out to a police officer, reach out to another ADA, reach out to a defense attorney, attempt to take a statement or debrief the defendant)?
    0, 1-5, 6-10, 11-15, 16-20, 21 or more

## Section III: Suggestions

34. Do you have any suggestions about how the office's Intelligence-Driven Prosecution Model, CSU, or the Arrest Alert System can be of additional value?

## Thank you for your cooperation!

## Appendix B
# Survey Responses of the Support Staff Subsample

**Table B.1. Years of Experience as Support Staff (n = 52)**

|  | Frequency |
|---|---|
| Less than 1 year | 31 |
| 2 years | 12 |
| 3 years | 4 |
| 4 years | 1 |
| 5 years | - |
| 6 years | - |
| 7 years | - |
| 8 years | 1 |
| 9 years | - |
| 10 years or more | 3 |

**Table B.2. Communication with Support Staff Initiated by CSU (n = 52)**

|  | Frequency |
|---|---|
| *Has CSU initiated contact with you during the past 6 months?* |  |
| Yes | 3 |
| No | 49 |
| *Number of cases/investigations in which CSU initiated contact* |  |
| 1 - 5 cases | 2 |
| 6 - 10 cases | - |
| 11 - 15 cases | - |
| 16 - 20 cases | - |
| 21 or more cases | 1 |

Note:  In terms of case processing, the three respondents all indicated that CSU was most likely to contact them during the pre-arrest/investigation phase.  Email was the most frequent method used by CSU to establish contact.

**Table B.3. Communication with CSU Initiated by Support Staff (n = 52)**

|  | Frequency |
|---|---|
| *Have you initiated contact with CSU during the past 6 months?* |  |
| Yes | 30 |
| No | 22 |
| *Number of cases/investigations in which you initiated contact with CSU* |  |
| 1 - 5 cases | 18 |
| 6 - 10 cases | 2 |
| 11 - 15 cases | 3 |
| 16 - 20 cases | 1 |
| 21 or more cases | 2 |

**Table B.4. Communicative Exchange Between CSU and Support Staff (n = 52)**

|  | Frequency |
|---|---|
| Prime communication (CSU and TPA/A/TA regularly communicate) | 3 |
| Proactive ADA communication (only TPA/A/TA initiates communication) | 27 |
| Standard CSU communication (only CSU initiates communication) | - |
| Suboptimal communication (neither party initiates communication) | 22 |

**Table B.5.  Primary Reasons Support Staff Contacted CSU (n = 30)**

| Reason | Frequency |
|---|---|
| Check for video camera locations | 16 |
| Obtain general background intelligence on a particular person | 13 |
| Obtain general intelligence on a particular gang or geographic area | 11 |
| Learn whether a particular person is active on social media | 9 |
| Search for additional contact information for a witness | 7 |
| Set up an arrest alert | 6 |
| Other | 4 |
| Get help reaching out to a member of the police department | 2 |
| Expedite a subpoena process | 1 |

Note: Frequencies sum to more than n = 30 because respondents could check all that applied.

**Table B.6. Support Staff Methods of Communicating with CSU (n = 30)**

| Frequency of Use | Phone | DANY 311 | Email |
|---|---|---|---|
| Never used | 8 | 7 | 4 |
| Rarely used | 10 | 3 | 3 |
| Occasionally used | 5 | 12 | 9 |
| Frequently/very frequently used | 2 | 3 | 10 |

Note: Frequencies sum to more than n = 30 because respondents could check all that applied.

**Table B.7. When Were Support Staff Most Likely to Initiate Contact with CSU? (n = 30)**

| Stage in Case Processing | Frequency |
|---|---|
| Pre-arrest/investigation phase | 12 |
| ECAB | - |
| Misdemeanor - post-criminal court arraignment | 2 |
| Felonies – post-criminal court arraignment, pre-Grand Jury presentation | 5 |
| Felonies - post-Grand Jury, pre-Supreme Court arraignment | 1 |
| Felonies - post-Supreme Court arraignment (through trial or plea) | 6 |

**Table B.8. Types of Cases in which Support Staff Reached Out to CSU or DANY 311 (n = 30)**

| Case Type | Frequency |
|---|---|
| Violent felonies | 19 |
| Non-drug, non-violent felonies | 6 |
| Drug felonies | 13 |
| Domestic violence felonies | 6 |
| Non-domestic violence, non-drug misdemeanors | 3 |
| Domestic violence misdemeanors | 3 |
| Drug misdemeanors | 3 |

Note: Frequencies sum to more than n = 30 because respondents could check all that applied.

**Table B.9. CSU SharePoint Usage By Support Staff Who Initiated Contact With CSU**

|  | Proactive Users (n = 27) | Prime Users (n = 3) |
|---|---|---|
| *Have you used any of the resources or links provided on the CSU SharePoint website in the last six months?* |  |  |
| Staff member used CSU SharePoint website | 11 | 3 |
| Staff member was unaware of CSU SharePoint website | 5 | - |
| Staff member was aware of CSU SharePoint website, but has not used it during timeframe | 7 | - |

**Table B.10. Nature of Support Staff Usage of CSU SharePoint Resources (n = 14)**

| CSU SharePoint Resources | Never Used | Rarely Used | Occasionally Used | Frequently Used | Very Frequently Used |
|---|---|---|---|---|---|
| DANY 311 | 5 | 2 | 5 | 1 | 1 |
| Glossary of Street Slang | 5 | 7 | 2 | - | - |
| DANY InPho | 4 | 3 | 2 | 3 | 2 |
| Homicides/Shootings by precinct | 4 | 3 | 6 | - | 1 |
| Precinct information | 6 | 3 | 2 | 3 | - |
| NYCHA map | 4 | 3 | 4 | 3 | - |
| Photosheets | 8 | 2 | 2 | 2 | - |
| SCIM | 9 | 1 | 1 | 3 | - |
| Gangs/crews | 7 | 2 | 3 | 2 | - |
| Bureau-based projects | 12 | - | 1 | 1 | - |
| Violent crime statistics | 12 | - | 1 | 1 | - |

Support Staff used SharePoint most often during case processing. The most frequent response was ECAB (n = 6) followed by misdemeanors-post-criminal court arraignment (n = 4 for Second Ranking), Felonies - post-criminal court arraignment, pre-Grand Jury presentation, and Felonies - post-Grand Jury, pre-Supreme Court arraignment (n = 4 for Third Ranking).

### Table B.11. Information Provided by CSU or DANY 311 to Support Staff That Was Not on the RAP Sheet (n = 52)

| Information | Frequency |
|---|---|
| N/A – did not receive information in the past 6 months | 17 |
| Defendant/witness gang affiliation | 13 |
| Social media information | 11 |
| Defendant/witness nickname or other personal information | 8 |
| Defendant as a suspect in unsolved crimes | 5 |
| Crime data | 4 |
| Other | 4 |
| Geographic context | 3 |
| Defendant victimization information | 2 |
| Priority recidivist for DANY or NYPD | - |

Note: Frequencies sum to more than n = 52 because respondents could check all that applied.

### Table B.12. Impact of CSU Information on Case Processing

| | Frequency |
|---|---|
| *How frequently did CSU information impact your case/investigation at any point?* | |
| Never | 1 |
| Rarely | 4 |
| Occasionally | 14 |
| Frequently/very frequently | 4 |
| N/A – did not receive information in the past 6 months | 13 |
| *How much did CSU/DANY 311 information impact your bail requests?[1]* | |
| Did not affect | 10 |
| Slightly affected | 4 |
| Moderately/strongly affected | 1 |
| *How much did CSU/DANY 311 information impact your plea offers or sentencing recommendations?* | |
| Did not affect | 11 |
| Slightly affected | 8 |
| Moderately/strongly affected | 4 |

[1]The following two items exclude Support Staff who reported no contact with CSU during the past 6 months, reducing the sample to n = 23

**Table B.13. How Much Impact Did CSU/DANY 311 Information Exert on Support Staff Decision-making? (n = 23)**

| ADA Decision or Recommendation | Never Impacted | Rarely Impacted | Occasionally Impacted | Frequently/Very Frequently Impacted |
|---|---|---|---|---|
| Investigation | 6 | 3 | 11 | 2 |
| Charging | 11 | 3 | 8 | - |
| Bail Recommendation | 12 | 3 | 7 | - |
| Plea Offer or Sentencing Recommendation | 11 | 2 | 8 | - |

**Table B.14. Support Staff Use of the Arrest Alert System (n = 52)**

| | Frequency |
|---|---|
| *Number of Current Arrest Alerts[1]* | |
| 0 arrest alerts | 18 |
| 1 - 5 arrest alerts | 6 |
| 6 - 20 arrest alerts | 7 |
| 21 or more arrest alerts | 5 |
| *Number of current Arrest Alerts added in the last six months* | |
| 0 arrest alerts | 17 |
| 1 - 5 arrest alerts | 10 |
| 6 - 20 arrest alerts | 4 |
| 21 or more arrest alerts | 5 |
| *Have you received an arrest alert notification?* | |
| Yes | 13 |
| No | 6 |
| N/A I don't have any arrest alerts | 17 |
| *Has another ADA reached out to you regarding an arrest alert that you created?* | |
| Yes | 6 |
| No | 12 |
| N/A I have not created an arrest alert in the past 6 months | 18 |

[1]Current arrest alerts, excluding automatically generated open case arrest alerts

Note:  Responses were collapsed to create the 6-20 and 21 or more groups.

**Table B.15. Support Staff Use of the Arrest Alert System to Locate Witnesses and Victims (n = 52)**

|  | Frequency |
|---|---|
| *Reasons for creating an Arrest Alert for witnesses or victims* |  |
| Giglio reasons | 7 |
| Locate a missing witness and/or produce witness/victim for a court appearance | 11 |
| Other | 18 |
| *Number of current Arrest Alerts added for witnesses or victims* |  |
| 0 arrest alerts | 24 |
| 1 - 5 arrest alerts | 9 |
| 6 - 10 arrest alerts | 1 |
| 11 - 20 arrest alerts | 1 |
| 21 - 30 arrest alerts | - |
| 31 - 40 arrest alerts | - |
| 41 or more arrest alerts | 1 |
| *Have you received an arrest alert notification for a victim or witness in the last six months?* |  |
| Yes | 3 |
| No | 10 |
| N/A - I don't have any arrest alerts for victims or witnesses | 23 |

**Table B.16. Impact of the Arrest Alert System on Support Staff Investigations (n = 52)**

|  | Frequency |
|---|---|
| *Number of times the AAS prompted you to take an investigative step you would not have otherwise taken in the last six months.* |  |
| 0 times | 24 |
| 1 - 5 times | 9 |
| 6 - 10 times | 2 |
| 11 - 15 times | - |
| 16 - 20 times | - |
| 21 or more times | 1 |

## Appendix C
# Propensity Score Matching

To properly consider the impact of the Arrest Alert System, an appropriate comparison group needed to be constructed. There were two comparison samples considered and, ultimately, included in the evaluation. The use of two separate comparison samples constitutes a sensitivity analysis, enabling the determination of whether impact findings vary based on the particular type of quasi-experimental design utilized. Such variations in the substantive findings were not, in fact, detected in the final impact analysis (see Chapter 5), which strengthens confidence in the validity of the findings.

For the first comparison sample, a sample of Manhattan arrests was collected with an arraignment date from 2009 through April 2010, before the initiation of the Crime Strategies Unit. For the second comparison sample, a sample of Manhattan arrests was collected with an arraignment date from May 2010 through 2013—i.e., contemporaneously with the arrest alert sample but where the case was not the subject of an arrest alert.

Propensity score matching techniques were utilized to select the most comparable arrests within each comparison group in order to provide appropriate comparisons to arrest alert cases.

The first step in the propensity score matching process was to compare the arrest alert sample to each comparison sample at baseline. As shown in Table 5.1 (and discussed in Chapter 5), there were many significant differences between the arrest alert and the two respective comparison samples. Most notably, the arrest alert defendants had significantly more serious criminal histories and criminal charges on the instant case.

The nature and implications of all subsequent steps for the final sample size in both samples is summarized in Table C.1.

Specifically, the second step in the process was to remove cases missing key background characteristics from all three samples. This process resulted in the final arrest alert sample of 2,318 defendants (see Table C.1).

The third step (whose results are also shown in Table C.1) was to randomly remove from each comparison sample a subsample of cases with less serious criminal histories (i.e., no prior arrests) and instant case charges (i.e., violation level) in order to produce a pool of potential comparison cases that did not deviate from the arrest alert sample in quite as large an extent as was originally reflected in Table 5.1. Specifically, 80% of comparison defendants with no prior arrests were removed, as well as, 20 percent of comparison defendants with a violation or infraction level arraignment charge.

The fourth step was to develop two separate propensity models (i.e., logistic regressions predicting sample membership), one in which the dependent variable was the arrest alert sample as opposed to the pre comparison sample and the other in which the dependent variable was the arrest alert sample as opposed to the contemporaneous comparison sample. These models generated propensity scores for each case.

At this point, in the fifth step, propensity score matching was attempted to assess the comparability of the samples. The matching process utilized a one-to-one matching algorithm to select the 2,318 potential comparison defendants in each potential comparison sample who were most similar to the arrest alert group (of those comparison cases not previously matched).

In the sixth step of the process, baseline differences were then compared between the final matched samples (arrest alert v. final pre sample and arrest alert v. final contemporaneous sample). The results, shown in Table C.3, indicate that baseline differences were vastly attenuated; yet, there were still significant differences between the samples, most notably in criminal history, as shown in Table C.3. Test analyses confirmed that these final modest, yet statistically significant, differences could be eliminated by controlling for three variables in all impact analyses involving the final samples: the number of prior arrests, any prior misdemeanor arrest, and the number of prior drug convictions.

Accordingly, in the seventh and final step of the process, as part of the analytic plan, all impact analyses (whose findings are reported in Tables 5.2, 5.3, and 5.4) result in the production of *statistically adjusted outcome percentages or outcome means*—generated only after setting all samples at the mean for the three aforementioned control variables.

## Table C.1. Refinement of the Two Comparison Groups

| Samples | Sample Sizes |
|---|---|
| **1. INITIAL ARREST ALERT AND COMPARISON GROUPS** | |
| Arrest Alert | 2,444 |
| Comparison, Pre Sample | 35,366 |
| Comparison, Contemporaneous Sample | 80,076 |
| | |
| **2. INITIAL REFINEMENT OF ARREST ALERT SAMPLE** | |
| Original Sample | 2,444 |
| Remove offenders missing key background characteristics (sex, race, age, prior arrests, arraignment) | -126 |
| ***Arrest Alerts, Final Sample*** | ***2,318*** |
| | |
| **3. CONSTRUCTION OF THE PRE COMPARISON GROUP** | |
| Original Sample | 35,366 |
| Remove offenders missing key background characteristics (sex, race, age, prior arrests, arraignment) | -1,814 |
| Remove random 80% defendants with no prior arrests | -13,566 |
| Remove random 20% defendants with infraction/violation arraignment charge | -1,033 |
| ***Pre Arrests, Potential Comparison Cases*** | ***18,953*** |
| ***Nearest Neighbor Propensity Score Matching: 1:1 Selection*** | ***2,318*** |
| | |
| **4. CONTRUCTION OF CONTEMPORANEOUS COMPARISON** | |
| Original Sample | 80,076 |
| Remove offenders missing key background characteristics (sex, race, age, prior arrests, arraignment) | -4,400 |
| Remove random 80% defendants with no prior arrests | -33,756 |
| Remove random 20% defendants with infraction/violation arraignment charge | -2,294 |
| ***Contemporaneous Arrests, Potential Comparison Cases*** | ***39,626*** |
| ***Nearest Neighbor Propensity Score Matching 1:1 Selection*** | ***2,318*** |
| | |
| **FINAL SAMPLES** | |
| Arrest Alert | 2,318 |
| Comparison, Pre Sample | 2,318 |
| Comparison, Contemporaneous Sample | 2,318 |

**Table C.2. Predicting Arrest Alert for Two Potential Comparison Groups**

| Logistic Regression Model (Dependent Variable = Arrest Alert Sample v. Given Comparison Sample) | Pre Comparison | Contemporaneous Comparison |
|---|---|---|
| Total Sample included in the analysis | 21,316 | 41,759 |
| Arrest Alerts | 2,318 | 2,318 |
| Comparison Group Candidates | 18,998 | 39,441 |
| Chi-Square for logistic regression model | 1996.919*** | 2469.209*** |
| Nagelkerke R-Square | 0.180 | 0.165 |
| | | |
| **Logistic Regression Odds Ratios** | | |
| Black | 2.182 | 3.019 |
| Black-Hispanic | 1.863 | 2.239 |
| White | 0.699 | 0.828 |
| White-Hispanic | 1.612 | 2.151 |
| Asian | 0.457 | 0.669 |
| Female | 0.303*** | 0.281*** |
| Age | 0.943*** | 0.940*** |
| Any Prior Felony Arrests | 3.392*** | 3.709*** |
| Arraignment Year | | 1.283*** |
| Arraigned on Felony | 1.099 | 1.212* |
| Arraigned on Misdemeanor | 0.884* | 1.094 |
| Arraigned on Violent Felony Offense Charge | 1.444*** | 1.718*** |
| *Constant* | *0.278* | *0.36** |

+ p<.10   *p<.05   **p<.01   ***p<.001

**Table C.3. Background Characteristics, Post-Propensity Score Matching**

| Sample | Arrest Alerts | Pre-Comparison | Contemporaneous Comparison |
|---|---|---|---|
| **Sample Size** | **N = 2,318** | **N = 2,318** | **N = 2,318** |
| | | | |
| **Demographics** | | | |
| Race/Ethnicity | | | |
|   Black, Non-Hispanic | 64% | 64% | 64% |
|   Black, Hispanic | 11% | 11% | 11% |
|   White, Non-Hispanic | 3% | 3% | 2% |
|   White, Hispanic | 22% | 22% | 22% |
|   Asian/Pacific Islander | 0% | 0% | 0% |
|   Other | 0% | 0% | 0% |
| Gender | | | |
|   Male | 96% | 97% | 97% |
|   Female | 4% | 3% | 3% |
| Age at arrest | 29.17 | 29.24* | 29.16 |
| | | | |
| **Criminal History** | | | |
| Any prior arrests (in Manhattan) | 93% | 89% | 88%*** |
| # prior arrests (in Manhattan) | 7.08 | 4.74*** | 4.19*** |
| Any prior violation arrests | 27% | 20%* | 18%*** |
| # prior violation arrests | 0.88 | 0.47** | 0.41*** |
| Any prior misdemeanor arrests | 81% | 71%*** | 70%*** |
| # prior misdemeanor arrests | 4.97 | 3.27*** | 2.81*** |
| Any prior felony arrests | 63% | 63%*** | 62% |
| # prior felony arrests | 1.21 | 0.98+ | 0.95*** |
| Any prior violent felony arrests | 25% | 20% | 22%* |
| # prior violent felony arrests | 0.3 | 0.23* | 0.24*** |
| Any prior weapon arrests | 15% | 10%** | 10%*** |
| # prior weapon arrests | 0.17 | 0.11** | 0.11*** |
| Any prior gun arrests | 3% | 1%** | 2%** |
| # prior gun arrests | 0.03 | 0.01** | 0.02** |
| Any prior drug arrests | 42% | 39% | 34%*** |
| # prior drug arrests | 1.2 | 0.93 | 0.79*** |
| Any prior marijuana arrests | 35% | 29%*** | 21%*** |
| # prior marijuana arrests | 0.84 | 0.38*** | 0.38*** |
| | | | |
| Any prior convictions | 93% | 89% | 88%*** |
| # prior convictions | 7.08 | 4.74*** | 4.19*** |
| Any prior violation convictions | 63% | 50%*** | 50%*** |

| Sample | Arrest Alerts | Pre-Comparison | Contemporaneous Comparison |
|---|---|---|---|
| **Sample Size** | **N = 2,318** | **N = 2,318** | **N = 2,318** |
| # prior violation convictions | 1.86 | 1.1*** | 1.07*** |
| Any prior misdemeanor convs. | 64% | 57%+ | 54%*** |
| # prior misdemeanor convictions | 4.35 | 3** | 2.43*** |
| Any prior felony convictions | 48% | 41% | 41%*** |
| # prior felony convictions | 0.67 | 0.53** | 0.54*** |
| Any prior VFO convictions | 15% | 12%+ | 12%** |
| # prior VFO convictions | 0.16 | 0.12 | 0.13** |
| Any prior weapon convictions | 11% | 7%* | 7%*** |
| # prior weapon convictions | 0.12 | 0.08* | 0.07*** |
| Any prior gun convictions | 2% | 1%** | 1%** |
| # prior gun convictions | 0.02 | 0.01** | 0.01** |
| Any prior drug convictions | 38% | 36% | 30%*** |
| # prior drug convictions | 1.12 | 0.89 | 0.74*** |
| Any prior marijuana convictions | 32% | 20%*** | 19%*** |
| # prior marijuana convictions | 0.77 | 0.35*** | 0.34*** |
| | | | |
| **Arraignment Year** | | | |
| 2009 | 0% | | 0% |
| 2010 | 10% | | 10% |
| 2011 | 24% | | 24% |
| 2012 | 30% | | 30% |
| 2013 | 35% | | 36% |
| 2014 | 1% | | 1% |
| 2015 | 0% | | 0% |
| | | | |
| **Charge Severity** | | | |
| Felony | 25% | 24% | 25% |
| B Felony | 10% | 8%* | 7%*** |
| C Felony | 5% | 6% | 6% |
| D Felony | 6% | 7%* | 8%* |
| E Felony | 4% | 3% | 4% |
| Misdemeanor | 56% | 57% | 56% |
| A Misdemeanor | 41% | 40% | 43% |
| B Misdemeanor | 10% | 10% | 8%** |
| Misdemeanor Unspecified | 4% | 6%** | 5% |
| Infraction / Violation / Traffic | 19% | 19% | 20% |

+ p < .10  * p < .05  ** p < .01  *** p < .001

**Appendix C. Propensity Score Matching**

**Appendix D**

# Outcomes for Felony Defendants Only and Misdemeanor Defendants Only

---

**Table D.1. Comparison of Outcomes: Defendants Arraigned on a Felony**

| Sample | Arrest Alert | Contemporaneous Comparison | Arrest Alert | Pre Comparison |
|---|---|---|---|---|
| **Sample Size** | **N = 570** | **N = 571** | **N = 570** | **N = 565** |
| **Bail** (*if continued at arraignment*) | | | | |
| Any bail set | 89% | 85%* | 88% | 86% |
| Amount of bail set | $12,731.38 | $9,450.13*** | $11,530.68 | $9,025.15** |
| | | | | |
| **Case Processing** | | | | |
| # Court Appearances | 8.48 | 7.33** | 8.25 | 7.61 |
| Days, Arraignment to disposition | 215.29 | 195.40+ | 205.45 | 194.58 |
| | | | | |
| **Disposition Type** | | | | |
| Disposition | | | | |
| Plea / Convicted | 94% | 94% | 94% | 96% |
| ACD | 0% | 0% | 0% | 0% |
| Dismissed/Acquitted | 1% | 3% | 1% | 1% |
| Other Disposition | 5% | 3% | 4% | 3% |
| | | | | |
| **Disposition Charge Severity** | | | | |
| (*if pled /convicted*) | | | | |
| Felony | 70% | 61%** | 76% | 67%** |
| A Felony | 0% | 0% | 0% | 1% |
| B Felony | 21% | 15%** | 22% | 17%* |
| C, D or E Felony | 48% | 46% | 53% | 49% |
| Misdemeanor | 21% | 26%* | 21% | 30%** |
| A Misdemeanor | 20% | 25%* | 20% | 29%** |
| B Misdemeanor | 1% | 0% | 1% | 1% |
| Misdemeanor Unspecified | 0% | 1% | 0% | 0% |
| Infraction / Violation / Traffic | 3% | 6%** | 3% | 3% |
| *Violent Felony Offense conviction* | *32%* | *28%+* | *34%* | *28%+* |
| | | | | |
| **Only for Those Pled/Convicted** | (n = 515) | (n = 512) | (n = 517) | (n = 539) |
| Prison | 51% | 41%** | 50% | 45% |
| Jail | 29% | 30% | 27% | 30% |
| Probation | 9% | 711% | 12% | 12% |
| Time Served | 4% | 4% | 4% | 4% |
| Conditional Discharge | 7% | 13%** | 7% | 9% |
| Fine Only | 0% | 1% | 0% | 0% |
| Other | 0% | 0% | 0% | 0% |
| *Any Community Service in sentence* | *2%* | *5%** | *2%* | *4%* |
| *Any Treatment Program in sentence* | *1%* | *1%* | *0%* | *0%* |
| | | | | |
| **Jail / Prison Sentence Length**[1] | | | | |
| Days in prison or jail (Full Sample) | 935.23 | 692.30*** | 893.72 | 766.75+ |
| Days in jail or prison (*if sentenced to jail or prison*) | 1225.81 | 1022.44* | 1209.09 | 1028.77 |

*Note:* All outcomes are computed after controlling for several criminal history variables. This table reflects adjusted means after setting the number of prior arrests, any prior misdemeanor arrest, and the number of prior drug convictions at their mean.

[1] Data on days in prison were obtained for the maximum sentence.

**Table D.2. Comparison of Outcomes: Defendants Arraigned on a Misdemeanor**

| Sample | Arrest Alert | Contemporaneous Comparison | Arrest Alert | Pre Comparison |
|---|---|---|---|---|
| Sample Size | N = 1,293 | N = 1,293 | N = 1,299 | N = 1,311 |
| **Bail** (*if continued at arraignment*) | | | | |
| Any bail set | 43% | 39%+ | 41% | 34%** |
| Amount of bail set | $567.91 | $473.84+ | $510.92 | $410.09 |
| **Case Processing** | | | | |
| # Court Appearances | 2.86 | 2.64* | 2.93 | 2.47*** |
| Days, Arraignment to disposition | 81.86 | 78.50 | 85.48 | 80.35 |
| **Disposition Type** | | | | |
| Plea / Convicted | 96% | 96% | 97% | 99%** |
| ACD | 1% | 1% | 1% | 0%* |
| Dismissed/Acquitted | 3% | 2% | 2% | 1%* |
| Other Disposition | 0% | 0% | 0% | 0%+ |
| **Disposition Charge Severity** (*if pled /convicted*) | | | | |
| Felony | 1% | 0%+ | 1% | 1% |
| A Felony | 0% | 0% | 0% | 0% |
| B Felony | 0% | 0% | 0% | 0% |
| C, D or E Felony | 1% | 0% | 1% | 1% |
| Misdemeanor | 72% | 66%** | 72% | 76%* |
| A Misdemeanor | 52% | 48%* | 52% | 54% |
| B Misdemeanor | 14% | 12% | 14% | 15% |
| Misdemeanor Unspecified | 6% | 6% | 6% | 8%* |
| Infraction / Violation | 24% | 30%** | 28% | 24%* |
| *Violent Felony Offense conviction* | *0%* | *0%* | *0%* | *0%* |
| **Sentence Type** (*if pled / convicted*) | | | | |
| Prison | 0% | 0% | 0% | 1% |
| Jail | 31% | 32% | 33% | 33% |
| Probation | 0% | 0% | 0% | 0% |
| Time Served | 32% | 33% | 32% | 32% |
| Conditional Discharge | 27% | 26% | 26% | 25% |
| Fine Only | 7% | 5% | 7% | 8% |
| Other | 0% | 0% | 0% | 0% |
| *Any Community Service in sentence* | *19%* | *20%* | *19%* | *20%* |
| *Any Treatment Program in sentence* | *3%* | *3%* | *3%* | *2%* |
| **Jail / Prison Sentence Length** | | | | |
| Days in jail (Full Sample) | 18.83 | 12.45* | 19.38 | 15.71 |
| Days in jail (*if sentenced to jail*) | 58.90 | 37.77* | 58.14 | 47.47 |

*Note:* All outcomes are computed after controlling for several criminal history variables. This table reflects adjusted means after setting the number of prior arrests, any prior misdemeanor arrest, and the number of prior drug convictions at their mean.